# EXHIBIT L

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

```
IN RE: 3M COMBAT ARMS EARPLUG     )   Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,    )
                                  )   Pensacola, Florida
                                  )   January 8, 2021
                                  )   8:33 a.m.
                                  )
                                  )
_____)
```

**EVIDENTIARY HEARING ON CHOICE OF LAW**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
and
THE HONORABLE GARY R. JONES
UNITED STATES MAGISTRATE JUDGE
(Pages 1-410)

## **A P P E A R A N C E S**

**JUDGE DAVID R. HERNDON** (ret.)
*dave@herndonresolution.com*

**FOR THE PLAINTIFFS:**     Aylstock, Witkin, Kreis & Overholtz, PLLC
By:   **BRYAN F. AYLSTOCK**
          *baylstock@awkolaw.com*

                **NEIL D. OVERHOLTZ**
                 *noverholtz@awkolaw.com*

                **JENNIFER HOEKSTRA**
                  *jhoekstra@awkolaw.com*
                17 E Main Street, Suite 200
                Pensacola, Florida  32502

Clark Love & Hutson, GP              Laminack, Pirtle & Martines LLP
By:   **SHELLEY HUTSON**             By:   **THOMAS W. PIRTLE**
    *shutson@triallawfirm.com*            *tomp@lmp-triallaw.com*
440 Louisiana Street, Ste 1600       5020 Montrose Blvd, 9th Floor
Houston, Texas  77002                Houston, Texas  77006

Ciresi Conlin LLP                    Levin Papantonio
By:   **MICHAEL A. SACCHET**         by:   **BRIAN H. BARR**
    *mas@ciresiconlin.com*                *bbarr@levinlaw.com*
225 South 6th Street, Ste 4600       316 S Baylen Street, Suite 600
Minneapolis, Minnesota  55402        Pensacola, Florida  32502


**FOR THE DEFENDANTS:**     Kirkland & Ellis, LLP
By:   **ROBERT C. BROCK**
          *mike.brock@kirkland.com*
                1301 Pennsylvania Avenue NW
                Washington, D.C.  20004

Kirkland & Ellis, LLP                Moore, Hill & Westmoreland, PA
By:   **MARK J. NOMELLINI**          By:   **LARRY HILL**
    *mnomellini@kirkland.com*             *lhill@mhw-law.com*

    **NICHOLAS F. WASDIN**              **CHARLES F. BEALL, JR.**
    *nick.wasdin@kirkland.com*            *cbeall@mhw-law.com*
300 N Lasalle                        350 W Cedar Street, Suite 100
Chicago, Illinois  60654             Pensacola, Florida  32502

```
 1                    P R O C E E D I N G S
 2            JUDGE RODGERS:  Good morning, welcome.
 3            We're here this morning for an evidentiary
 4   hearing in the 3M litigation on the choice of law
 5   issue.
 6            What I expect to hear today is largely
 7   related to place of injury and Aearo activities in
 8   relation to the earplug.
 9            I have a number of lawyers here in the
10   courtroom.  I know there are a number appearing by
11   Zoom as well.
12            For 3M, Mr. Brock, Mr. Nomellini, Mr. Wasdin,
13   and I see Mr. Beall just came in, and I believe there
14   are others on Zoom.
15            For Plaintiffs, I have Mr. Aylstock and Ms.
16   Hutson at counsel table along with IT, Mr. Marbut.
17            And then you are IT, sir?  What is your last
18   name?
19            MR. GUILLORY:  Guillory.
20            JUDGE RODGERS:  Guillory, all right.
21            And on Zoom I have -- I can see Judge Herndon
22   and Judge Jones.  Good morning to you both.
23            JUDGE HERNDON:  Good morning.  Thank you.
24            JUDGE JONES:  Good morning.
25            JUDGE RODGERS:  Also, I'd like to introduce
```

1    tinnitus, subjective.  Do you see that?
2    **A.**   Yes.
3    **Q.**   And does the designation "subjective" indicate
4    that this was something that was reported to you by
5    Mr. Hacker during the appointment?
6    **A.**   Yes.
7              **JUDGE RODGERS:**  Is that it, Mr. Brock?
8              **MR. BROCK:**  Yes, Your Honor.
9              **JUDGE RODGERS:**  All right.  Let's move on,
10   please.
11             Just for your reference, Mr. Hacker's depo
12   was scheduled to last 40 minutes, and we have now been
13   at -- we're at 70 minutes.
14             **MR. AYLSTOCK:**  We're behind, Your Honor.
15             Ms. Hutson is going to call Mr. Baker.
16             **JUDGE RODGERS:**  Okay.  I presume both sides
17   conferred about the schedule that I was given and how
18   long it would take for each witness?
19             **MR. AYLSTOCK:**  We did, Your Honor.
20             **JUDGE RODGERS:**  All right.  This is Mr.
21   Baker?
22             **MR. BROCK:**  Your Honor, one note on timing is
23   that I think we've got -- and we have discussed this
24   and I just want to let you know.  Our examination of
25   Mr. Myers, the corporate witness, we have two hours

1   set aside for that.  We think our examination will be
2   30 minutes or less, so we'll be able to make up some
3   time there.
4           **JUDGE RODGERS:**  Very good, very good.
5           **MS. HUTSON:**  Would you like for the witness
6   to be sworn in, Your Honor?
7           **JUDGE RODGERS:**  Yes.  Do we have -- oh, there
8   he is.  Yes.
9           Mr. Baker, could you state your full name.
10          **THE WITNESS:**  Yes, ma'am.  Lloyd Baker.
11          **JUDGE RODGERS:**  Mr. Baker, would you please
12  rise and raise your right hand to be sworn.
13      **LLOYD BAKER, PLAINTIFF WITNESS, DULY SWORN**
14          **JUDGE RODGERS:**  Mr. Baker, if you would be
15  seated.  Please let us know if you encounter any
16  technical problems on your end that maybe we're not
17  aware of.  I want to make sure that you hear
18  everything and hopefully see everything.
19          Please spell your last name for the record.
20          **THE WITNESS:**  Baker.
21          **JUDGE RODGERS:**  All right, thank you.
22          Ms. Hutson, go ahead.
23                  **DIRECT EXAMINATION**
24  **BY MS. HUTSON:**
25  Q.  Good morning, Mr. Baker.  How are you?  Can you

1   please rise and raise your right hand to be sworn.
2           **BRIAN MYERS, DEFENSE WITNESS, DULY SWORN**
3           **MADAM CLERK SIMMS:**  Be seated.  Please state
4   your full name and spell your last name for the
5   record.
6           **THE WITNESS:**  My name is Brian Carl Myers,
7   M-y-e-r-s.
8           **JUDGE RODGERS:**  Mr. Myers, if at any time
9   during your testimony today you experience some
10  difficulty with the Zoom, the transmission, just let
11  us know that, either audio or video, okay?
12          **THE WITNESS:**  Okay.
13          **JUDGE RODGERS:**  Mr. Wasdin, go ahead.
14                      **DIRECT EXAMINATION**
15  **BY MR. WASDIN:**
16  **Q.**  Good afternoon, Mr. Myers.  Please introduce
17  yourself to the Court.
18  **A.**  My name is Brian Myers.  I'm the business unit
19  director with 3M located in Saint Paul, Minnesota.
20  **Q.**  What's your home address?
21          **JUDGE RODGERS:**  No, Mr. Wasdin -- I'm sorry,
22  Mr. Myers, we don't need that.  You'll just have to
23  redact it.
24          **MR. WASDIN:**  Okay.
25          **JUDGE RODGERS:**  Thank you, though.

1  **BY MR. WASDIN:**
2  **Q.** Mr. Myers, where did you work before 3M?
3  **A.** I worked for a company called Aearo Company, which
4  was ultimately purchased by 3M in 2008.
5  **Q.** Where is Aearo Company located?
6  **A.** Aearo Company was -- there is a lot of moving
7  around that's -- I'm sorry --
8         **JUDGE RODGERS:** It's probably me. Go ahead.
9  I apologize. Go ahead.
10        **THE WITNESS:** Aearo Company was located in
11 Indianapolis, Indiana.
12 **BY MR. WASDIN:**
13 **Q.** Can you give us a brief overview of your career at
14 Aearo?
15 **A.** Certainly. So I took a job with what at that time
16 was a predecessor to Aearo Company, which was a
17 division of Cabot Corporation, in 1989, November of
18 1989. That was in Indianapolis. There were
19 subsequent name changes and a merger that allowed that
20 entity to become Cabot Safety Corporation. And then
21 ultimately, I want to say around 2000, it became Aearo
22 Company. And then in 2008, as I previously said, that
23 entity was purchased by 3M.
24 **Q.** What job titles did you hold over the course of
25 that time period?

1   **A.**   I started in manufacturing.  But in the early
2   1990s, I assumed a position where I had responsibility
3   for marketing and business functions of the hearing
4   protection group.  And then, through the rest of my
5   tenure there, I was either called a portfolio manager
6   or a marketing manager for that line of products all
7   the way up until 2008 when 3M purchased the entity.
8   And then I continued on after that time in a similar
9   role as a portfolio manager or marketing manager for
10  hearing protection.
11  **Q.**   Did you have any involvement with respect to the
12  Combat Arms Version 2 earplug?
13  **A.**   Yes, I did.
14  **Q.**   What was your role with respect to that product?
15  **A.**   So I was -- I was in an initial meeting, that I
16  recall, around 1997 that took place in Indianapolis.
17  I believe it was arranged by Elliott Berger.  And I
18  know there was at least one person there from a
19  technical research group in Europe that had this idea
20  of this filter that they thought would perform very
21  well in cases of loud impulse noise like weapons fire.
22      And they were looking for an interest from us to
23  help them commercialize this idea.  They needed it to
24  be put into an earplug, and they came to us -- or
25  Elliott at least facilitated an introduction with us

1    period of time when I was not involved in the hearing
2    protection business, but it was my understanding that
3    at some point they did begin to supply the products.
4    **Q.**   Well, you told this Court that at all times, I
5    believe, the product would come back from Mexico and
6    then be distributed out of Indianapolis.
7         Since you weren't there at that time, how do you
8    know that to be true?
9    **A.**   Well, I was referring to the time in which I was
10   involved with the business.
11   **Q.**   Okay.  So, after the time you were out of the
12   business, you're not making any representations to
13   this Court, are you, sir?
14   **A.**   There are some representations I think I can make.
15   I said, for example, that I was not involved with the
16   hearing protection business after January of 2011.
17   **Q.**   Okay.  And so, with regard to the distributorship
18   after that or the sales or the marketing, you don't
19   have any personal knowledge to provide the Court any
20   information on that, do you, sir?
21   **A.**   I might have some ability to provide information
22   on that.  For example, I was asked about an email that
23   was sent in 2015 when I became a part of the -- or had
24   responsibility for the business again.
25   **Q.**   That was at the summer of 2015 on, right?

1  **A.**  Yeah, something like that.
2  **Q.**  Let's go to the next exhibit, because I just want
3  to show the Court one of these sales sheets with New
4  Dynamics insignia on it.  And the address for New
5  Dynamics is Middleton, New York.
6      Do you know that to be true, sir?
7  **A.**  I don't know that to be true, but I wouldn't argue
8  with that.
9  **Q.**  Okay.  And if I represented to you that there came
10 a point in time where -- oh, here we are.  3M will
11 sell components of the Combat Arms.  New Dynamics will
12 source packaging materials and carrying case and
13 assemble into the retail pack.  All future retail
14 packs will be distributed through New Dynamics.
15     You see that, sir?
16 **A.**  I see it on the -- *(inaudible)* --
17 **Q.**  Let's move on to the time when 3M acquired Aearo,
18 because you talked a little bit about that.
19     Now we have the acquisition and merger agreement
20 dated November 14, 2007.  Does that comport with your
21 recollection, sir?
22 **A.**  Seems like I recall that's when it was announced,
23 and then early in 2008 the transaction actually
24 happened.  That was my understanding.
25 **Q.**  Now, the next exhibit is an exhibit to your

1   deposition.  When that acquisition happened, the
2   headquarters of Aearo moved to Saint Paul, correct?
3   The former headquarters were in Indianapolis, and then
4   it moved to Saint Paul, true?
5   **A.**   The headquarters for 3M and certainly for the
6   division in which Aearo joined was in Saint Paul.  But
7   the headquarters of Aearo, I guess, was liquidated; it
8   ceased to exist.
9   **Q.**   Right.  And so the headquarters became Saint Paul,
10  where you went, right.
11  **A.**   Ultimately I went to Saint Paul.
12  **Q.**   Yeah.  Let's look at that next exhibit because
13  I've got your CV; it was Exhibit 3 to your deposition.
14  It looks like April of '08 is when you moved to Saint
15  Paul, true?
16  **A.**   No.
17  **Q.**   So that's wrong?
18  **A.**   Yeah.  So, I mean, I don't recall when this --
19  when I put this document together.  But at the point
20  that I put the document together, the intention was to
21  indicate that I was current -- that I was located in
22  Saint Paul at that time.
23       But if you look on down, you'll see that, from
24  January '11 to November '12, I was located in Saint
25  Paul in this master black belt role.  But from

1    November '08 to December '10 I was in Indianapolis.
2    And even prior to November '08 I was in Indianapolis
3    but at that point working for Aearo.
4    **Q.**   Now, you were leading the integration of the Aearo
5    protection products, the legacy products into 3M's
6    hearing protection business, and that resulted in
7    sales growth, but that was integrating it into the
8    headquarters in Saint Paul, true?
9    **A.**   It wasn't integrating it into the headquarters of
10   Saint Paul.  It was taking the product portfolios that
11   existed for both product lines prior to the
12   acquisition and working to determine how we would
13   market those across the world in terms of a single
14   cohesive product line.  That's what that refers to.
15   **Q.**   All right.  I think the Court might have been
16   under the impression that basically with the 3M
17   takeover all the decision-makers stayed in
18   Indianapolis with regard to the Combat Arms.
19       You didn't mean to suggest that, did you, sir?
20   **A.**   Well, I stayed in Indianapolis.  I can tell you
21   that my boss was in Indianapolis.  Ultimately we
22   joined a division which was headquartered in Saint
23   Paul.
24   **Q.**   All right.  Let's look at another document, the
25   next one, Ted Madison.  Ted Madison was located in