# EXHIBIT 3

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| In re: | : | |
| | : | |
| Aearo Technologies LLC, *et al.*,[1] | : | Chapter 11 |
| | : | |
| Debtors. | : | Case No. 22-02890-JJG-11 |
| | : | |
| ——————————————— | : | |
| | : | |
| 3M OCCUPATIONAL SAFETY LLC, AEARO HOLDING LLC, AEARO INTERMEDIATE LLC, AEARO LLC, AND AEARO TECHNOLOGIES LLC, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | Adv. Pro. No. 22-50059 |
| | : | |
| THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT and JOHN AND JANE DOES 1-1000, | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |
| ——————————————— | : | |

## DEBTORS' MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF (I) CONFIRMING THAT THE AUTOMATIC STAY APPLIES TO CERTAIN ACTIONS AGAINST A NON-DEBTOR; (II) PRELIMINARILY ENJOINING CERTAIN ACTIONS AGAINST A NON-DEBTOR; AND (III) GRANTING A TEMPORARY RESTRAINING ORDER PENDING AN ORDER ON THE PRELIMINARY INJUNCTION

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' First Day Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief*, filed contemporaneously herewith. The location of the Debtors' service address for the purposes of these chapter 11 cases is: 7911 Zionsville Road, Indianapolis, Indiana 46268.

Pursuant to Rules 7001(7), 7001(9), and 7065 of the Federal Rules of Bankruptcy Procedure, Aearo Technologies LLC and certain other of the Debtors[2] in the above-captioned Chapter 11 Cases[3] seek (i) confirmation that the commencement or continued prosecution of Combat Arms Claims against 3M while these Chapter 11 Cases remain pending violates the automatic stay imposed by section 362(a) of the Bankruptcy Code, (ii) a preliminary injunction pursuant to sections 105 and 362 of the Bankruptcy Code prohibiting the Stay Defendants from continuing to prosecute the Combat Arms Claims against 3M while the Chapter 11 Cases remain pending, and (iii) a temporary restraining order prohibiting the prosecution of certain Combat Arms Claims against 3M pending an order on the Debtors' request for a preliminary injunction, or for the maximum period permitted by Fed. R. Bankr. P. 7065, whichever occurs sooner.

In support of this Motion, the Debtors incorporate the following documents filed contemporaneously herewith: (a) the *Debtors' Complaint for Declaratory and Injunctive Relief (I) Confirming that the Automatic Stay Applies to Certain Actions Against a Non-Debtor; (II) Preliminarily Enjoining Certain Actions Against a Non-Debtor; and (III) Granting a Temporary Restraining Order Pending an Order on the Preliminary Injunction*; (b) the *Debtors' Brief in Support of Motion for Declaratory and Injunctive Relief (I) Confirming that the Automatic Stay Applies to Certain Actions Against a Non-Debtor; (II) Preliminarily Enjoining Certain Actions Against a Non-Debtor; and (III) Granting a Temporary Restraining Order Pending an Order on the Preliminary Injunction*; (c) the *Declaration of Jeffrey Stein in Support of Debtors' Complaint for Declaratory and Injunctive Relief and Related Motions*; (d) the *Declaration of David Horowitz*

---

[2] Not all of the Debtors have been named as defendants in the Pending Actions, as defined herein.

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in *Debtors' Complaint for Declaratory and Injunctive Relief (I) Confirming that the Automatic Stay Applies to Certain Actions Against a Non-Debtor; (II) Preliminarily Enjoining Certain Actions Against a Non-Debtor; and (III) Granting a Temporary Restraining Order Pending an Order on the Preliminary Injunction*.

*in Support of Debtors' Complaint for Declaratory and Injunctive Relief and Related Motions*; (e) the *Declaration of John R. Castellano in Support of First Day Pleadings*; (f) the *Informational Brief of Aearo Technologies LLC*.

Indianapolis, Indiana
Dated:  July 26, 2022

*/s/ Jeffrey A. Hokanson*

Jeffrey A. Hokanson (Ind. Atty. No. 14579-49)
John C. Cannizzaro (Ohio Atty. No. 85161)
Connor Skelly (Ind. Atty. No. 35365-06) (*pro hac vice* pending)
**ICE MILLER LLP**
One American Square, Suite 2900
Indianapolis, IN 46282-0200
Telephone:    (317) 236-2100
Facsimile:    (317) 236-2219
Email:    jeff.hokanson@icemiller.com
    john.cannizzaro@icemiller.com
    connor.skelly@icemiller.com

Edward O. Sassower, P.C. (*pro hac vice* pending)
Emily Geier (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    edward.sassower@kirkland.com
    emily.geier@kirkland.com

Mark McKane, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California  94104
Telephone:    (415) 439-1473
Facsimile:
Email:    mark.mckane@kirkland.com

Chad J. Husnick, P.C. (*pro hac vice* pending)
David M. Bernick (*pro hac vice* pending
Brenton A. Rogers, P.C. (*pro hac vice* pending)
Renee D. Smith (*pro hac vice* pending)
Spencer Winters (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    chad.husnick@kirkland.com
    david.bernick@kirkland.com
    brogers@kirkland.com
    renee.smith@kirkland.com
    spencer.winters@kirkland.com

David I. Horowitz, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 South Flower Street, 37th Floor,
Los Angeles, California 900714
Telephone:    (213) 680-8374
Facsimile:    (213) 808-8074
Email:    david.horowitz@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

4

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

|  |  |
|---|---|
| In re: | : |
|  | : |
| Aearo Technologies LLC, *et al.*,[1] | :     Chapter 11 |
|  | : |
|           Debtors. | :     Case No. 22-02890-JJG-11 |
|  | : |
|  | : |
| 3M OCCUPATIONAL SAFETY LLC, | : |
| AEARO HOLDING LLC, AEARO | : |
| INTERMEDIATE LLC, AEARO LLC, | : |
| AND AEARO TECHNOLOGIES LLC, | : |
|  | : |
|         Plaintiff, | : |
| v. | :     Adv. Pro. No. 22-50059 |
|  | : |
| THOSE PARTIES LISTED ON | : |
| APPENDIX A TO THE COMPLAINT | : |
| and JOHN AND JANE DOES 1-1000, | : |
|  | : |
|         Defendants. | : |
|  | : |

## DEBTORS' BRIEF IN SUPPORT OF MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF (I) CONFIRMING THAT THE AUTOMATIC STAY APPLIES TO CERTAIN ACTIONS AGAINST A NON-DEBTOR; (II) PRELIMINARILY ENJOINING CERTAIN ACTIONS AGAINST A NON-DEBTOR; AND (III) GRANTING A TEMPORARY RESTRAINING ORDER PENDING AN <u>ORDER ON THE PRELIMINARY INJUNCTION</u>

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' First Day Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief*, filed contemporaneously herewith. The location of the Debtors' service address for the purposes of these Chapter 11 Cases is: 7911 Zionsville Road, Indianapolis, Indiana 46268.

Aearo initiated these chapter 11 proceedings in the wake of the failure of the Combat Arms MDL to advance the equitable and efficient resolution of tort claims related to the Combat Arms Earplug. To achieve that goal, it is essential to pause the underlying litigation.

Accordingly, pursuant to Rules 7001(7) and (9) of the Federal Rules of Bankruptcy Procedure, Aearo Technologies LLC ("**Aearo**") and certain other of the debtors ("**Debtors**")[2] in the above-captioned Chapter 11 Cases (the "**Chapter 11 Cases**") seek confirmation that section 362(a) of the Bankruptcy Code prohibits the commencement or continuation of certain Combat Arms Earplug-related lawsuits (the "**Pending Actions**") against 3M Company ("**3M**") and its non-debtor affiliates[3] while the Chapter 11 Cases remain pending. In addition, the Debtors request a preliminary injunction under section 105(a) of the Bankruptcy Code enjoining the defendants in this adversary proceeding, who are plaintiffs in the Pending Actions (the "**Stay Defendants**"), from prosecuting the Pending Actions against 3M during the pendency of these Chapter 11 Cases. Finally, the Debtors also seek a temporary restraining order, entered on shortened notice, to effectuate the requested relief pending an order on the Debtors' request for a preliminary injunction, or for the maximum period permitted by Rule 7065 of the Federal Rules of Bankruptcy Procedure, whichever occurs sooner. Unlike the requested declaratory relief and preliminary injunction, however, the temporary restraining order is only sought as to those Pending Actions that have active discovery, pre-trial, trial, appellate, or other deadlines (the "**Active Litigation**"),

---

[2]  Not all of the Debtors have been named defendants in the Pending Actions, as defined herein. Those that have been named as defendants include: 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, and Aearo Technologies LLC. For ease of reference, this Motion refers to these as the Debtors.

[3]  The relief requested herein would stay or enjoin all Combat Arms-related actions or, under the requested temporary restraining order, all Active Litigation, against 3M and any of its non-debtor affiliates that is alleged to be liable for Combat Arms-related liabilities. Accordingly, the term 3M refers to 3M collectively with its non-debtor affiliates, as context requires.

2

which includes the lawsuits of approximately 3,000 Combat Arms plaintiffs (the "**Active Litigants**").[4]

Given the identity of interests between the Debtors and 3M, the Court would be within its discretion to confirm that the automatic stay under section 362 immediately applies to 3M with respect to all Pending Actions. Likewise, the standards for a preliminary injunction and temporary restraining order are easily met here because of, among other things, the Debtors' indemnification obligations owed to 3M and risk to the property of the bankruptcy estate.

As set more fully in the *Informational Brief* of *Aearo Technologies LLC* (the "**Informational Brief**"), the Combat Arms MDL docket, and sheer volume of case inventory, has become unmanageable. If the more than 230,000 claims that constitute the Pending Actions, and in particular the Active Litigation, are permitted to continue, it will undermine a primary objective of these bankruptcy cases: to efficiently and equitably resolve Combat Arms-related claims against the Debtors through a plan of reorganization that establishes a trust to ensure compensation to claimants entitled to payment. As long as the Pending Actions proceed, the value of the Debtors' estates will be placed at risk due to the overwhelming costs of litigation, the Debtors' indemnification of 3M and its non-debtor affiliates for any judgments, and the potential depletion of estate assets, including the proceeds of the Debtors' shared insurance policies with 3M. The Debtors and 3M have scheduled *over 100 depositions* in the next two weeks alone, and are facing numerous important briefing and expert disclosure deadlines. Granting the Debtors' the requested relief is thus critical.

---

[4]     The Debtors reserve the right to seek further relief, including an injunction under section 105 of the Bankruptcy Code, to extend the automatic stay or enjoin certain claims against non-debtors related to the Debtors' respirator liabilities. *See, e.g.,* First Day Decl. ¶ 10.

In support of this Motion, the Debtors incorporate (a) the *Declaration of Jeffrey Stein in Support of Debtors' Complaint for Declaratory and Injunctive Relief and Related Motions* (the "**Stein Declaration**"), filed contemporaneously herewith, (b) the *Declaration of David Horowitz in Support of Debtors' Complaint for Declaratory and Injunctive Relief and Related Motions* (the "**Horowitz Declaration**"), filed contemporaneously herewith, (c) the *Declaration of John R. Castellano in Support of First Day Pleadings* (the "**First Day Declaration**"), filed in the main docket for the Debtors' Chapter 11 Cases, and (d) the Informational Brief, filed in the main docket for the Debtors' Chapter 11 Cases.

## SUMMARY OF ARGUMENT

### I. APPLICATION OF THE AUTOMATIC STAY TO 3M

"Addressing mass torts through a legislative scheme enacted by Congress within the bankruptcy system . . . provides a judicially accepted means of aggregating and resolving mass tort claims." *In re LTL Mgmt., LLC*, 637 B.R. 396, 411 (Bankr. D.N.J. 2022). Within that legislative scheme, 11 U.S.C. § 362(a) provides "one of the fundamental protections afforded to debtors by the bankruptcy laws" by automatically staying value-destructive litigation. *In re Grede Foundries, Inc.*, 651 F.3d 786, 790 (7th Cir. 2011) (quotation marks omitted).

The commencement or continuation of the Pending Actions against 3M is properly stayed under section 362 of the Bankruptcy Code. Due to the identity of interest between the Debtors and 3M, the prosecution of claims related to the Combat Arms Earplug ("**Combat Arms Claims**") against 3M is effectively an "action or proceeding against the debtor" to recover a prepetition claim. 11 U.S.C. § 362(a)(1); *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 1002-03 (4th Cir. 1986) (holding that the automatic stay applies to a non-debtor where there is a sufficient "identity between the debtor and the third-party defendant that the debtor may be said to be the real party

defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor").

*First*, because the Debtors are real-party, jointly and severally liable co-defendants with 3M in the Pending Actions, the continued litigation of the Pending Actions against 3M would effectively bind the Debtors. The plaintiffs in the Pending Actions assert the same claims against both 3M and the Debtors, using the same evidence to prove liability. In these circumstances, if the automatic stay is not applied to 3M in the Pending Actions, the Debtors will lose the benefits of the stay, and will likely have no choice but to discard the stay and defend themselves to avoid being bound by adverse judgments.

*Second*, continuing the Pending Actions against 3M would deplete the proceeds of the Debtors' shared insurance policies. The Debtors and 3M share insurance policies that provide coverage for defense costs and liabilities related to the Pending Actions. If the Pending Actions against 3M are not stayed, that litigation risks depleting the Debtors' available coverage under shared policies with 3M, which are property of the Debtors' estates and expressly protected by the Code's automatic stay.

*Third*, the continued litigation of the Pending Actions against 3M implicates the Debtors' indemnification of 3M and its non-debtor affiliates for Combat Arms losses. The Debtors have agreed to indemnify 3M and its non-debtor affiliates for the Pending Actions. Accordingly, the Debtors' estates are placed directly at risk by the immense and accelerating cost of litigating the Pending Actions, as well as any resulting adverse judgments against 3M or its non-debtor affiliates.

Applying the automatic stay to 3M—which plaintiffs in the Pending Actions seek to hold jointly and severally liable with the Debtors—is necessary to save the Debtors from the avalanche

of litigation that threatens to undermine their successful reorganization and impede the orderly and equitable resolution of the Combat Arms Claims.

## II.     REQUEST FOR PRELIMINARY INJUNCTION

Courts consistently exercise their injunctive powers under section 105(a) of the Bankruptcy Code to enjoin claimants from continuing or commencing actions against non-debtor parents and affiliates in mass-tort bankruptcies. *See, e.g.*, *In re LTL Mgmt., LLC*, 638 B.R. 291 (Bankr. D.N.J. 2022); *In re Aldrich Pump LLC*, No. 20-30608, 2021 WL 3729335, at \*38 (Bankr. W.D.N.C. Aug. 23, 2021); *In re Purdue Pharms. L.P.*, 619 B.R. 38 (S.D.N.Y. 2020); *In re Bestwall LLC*, 606 B.R. 243 (Bankr. W.D.N.C. 2019); *In re USA Gymnastics*, No. 18-09108-RLM-11, Adv. No. 19-50075 [Dkt. 71] (Bankr. S.D. Ind. Apr. 22, 2019); *In re TK Holdings*, No. 17-11375, Adv. No. 17-50880 [Dkt. 63] (Bankr. D. Del. Aug. 22, 2017).

Moreover, this is a "'textbook case' for a section 105(a) injunction" because "[b]ankruptcy courts have often enjoined litigation against a non-debtor . . . who intends to contribute financially to the debtor's reorganization." *In re Caesars Entertainment Operating Co., Inc.*, 561 B.R. 441, 451 (Bankr. N.D. Ill. 2016). 3M's financial contribution to the Debtors' reorganization as part of the Funding Agreement (as defined below) is critical to the Debtors' ability to reorganize. Consequently, an injunction of the Pending Actions against 3M is necessary to prevent irreparable harm to the Debtors' estates.

The Debtors' request meets the standard for a preliminary injunction. ***First***, the Pending Actions threaten to impair or defeat this Court's jurisdiction. The Pending Actions, unless stayed, will deplete the Debtors' assets, frustrating a reorganization and preventing the equitable resolution of Combat Arms Claims. As noted, despite the fact that the Stay Defendants' claims focus on the Debtors' alleged conduct prior to their acquisition by 3M in 2008, the Stay Defendants have nonetheless treated 3M and the Debtors as essentially one entity, prosecuting claims under a theory

of joint and several liability, and routinely referred to the Debtors as "3M." Consequently, for all practical purposes, a judgment against 3M is a judgment against the Debtors. Additionally, litigation costs and judgments paid by 3M will deplete a key source of the Debtors' funding, because 3M has committed to fund the Debtors through the Funding Agreement. Moreover, the Debtors and 3M are co-insureds under at least 46 insurance policies. Those policies are property of the Debtors' estates that, in the absence of an injunction, could be drawn down or exhausted by defense costs and judgments against 3M. Finally, the Debtors have agreed to indemnify 3M and its non-debtor affiliates for any losses related to Combat Arms pursuant to the terms of the Funding Agreement, so any judgment against 3M will deplete the Debtors' estates.

Conversely, an injunction placing Pending Actions against 3M on hold will allow for the orderly and equitable resolution of Combat Arms Claims against the Debtors through application of the tools available to chapter 11 debtors, including the bankruptcy claims estimation and reconciliation process. Put another way, enjoining the Pending Actions against 3M is "likely to enhance the prospects for a successful resolution of the disputes attending [the Debtors'] bankruptcy." *In re Caesars Ent. Operating Co., Inc.*, 808 F.3d 1186, 1188-89 (7th Cir. 2015).

**Second**, the Debtors have a reasonable likelihood of a successful reorganization. The Debtors filed these cases in good faith to pursue the equitable resolution of Combat Arms Claims, which is only reasonably possible through a streamlined, uniform process—provided by the Bankruptcy Code. In turn, resolution—which benefits all stakeholders—is only possible with the funding provided by 3M through the Funding Agreement between the Debtors and 3M, which provides sufficient resources to fund both the costs of these Chapter 11 Cases and the establishment of a trust to resolve Combat Arms-related liabilities. *See In re Purdue Pharma L.P.*, 619 B.R. 38, 45-46 (S.D.N.Y. 2020) (noting that the bankruptcy court granted a preliminary injunction in part

because "the broad injunction was necessary to preserve 'any reasonable prospect of success' for a future reorganization plan," which was premised on a settlement with claimants and establishment of a trust).

*Third*, the requested injunctive relief is in the public interest. Courts have long recognized the public interest in a successful reorganization. This is especially true in the mass tort context, where "completing the reorganization process . . . [will] resolv[e] thousands of claims in a uniform and equitable manner." *In re W.R. Grace & Co.*, 386 B.R. 17, 36 (Bankr. D. Del. 2008) (extending injunction to non-debtor affiliate railroad that transported debtor's products). The Pending Actions include the largest multi-district litigation in history, including more than 230,000 claimants. Ultimately, each of the 94 federal court districts will face an average of approximately 2,500 cases remanded for trial—which would impose an unprecedented burden on judicial resources. Horowitz Decl., Ex. 56 (mediation order) at 2. Absent injunctive relief, the opportunity to resolve the more than 230,000 pending claims in a fair, equitable, and efficient manner may be irretrievably lost, to the detriment of all involved.

## III.    REQUEST FOR TEMPORARY RESTRAINING ORDER

Finally, to avoid the immediate and irreversible harm that would occur without the requested injunction, the Debtors also seek a temporary restraining order, entered on shortened notice, to effectuate the requested relief pending an order on the Debtors' request for a preliminary injunction, or for the maximum period permitted by Fed. R. Bankr. P. 7065, whichever occurs sooner. As further explained below, without immediate and narrowly tailored injunctive relief, the Debtors will be compelled to spend significant resources defending against the Active Litigation and meeting the many imminent discovery, briefing, and pre-trial deadlines, hampering the Debtors' reorganization from the outset and rapidly diminishing the Debtors' estates.

## JURISDICTION AND VENUE

The United States Bankruptcy Court for the Southern District of Indiana (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference from the United States District Court for the Southern District of Indiana, dated July 11, 1984. This is a core proceeding pursuant to 28 U.S.C. § 157 and the Court has "related to" jurisdiction under 28 U.S.C. § 1334(b). The Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper in this District pursuant to 28 U.S.C. § 1409.

## FACTUAL BACKGROUND

On July 26, 2022 (the "**Petition Date**"), the Debtors commenced these Chapter 11 Cases by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors are continuing in possession of their property and are managing their business, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## IV. THE RELEVANT PARTIES

The Debtors manufacture and sell custom noise, vibration, thermal, and shock protection solutions, primarily serving the aerospace, commercial vehicle, heavy equipment, and electronics industries. First Day Decl. ¶ 7. Aearo is a limited liability company incorporated under the laws of Delaware. Collectively, the Debtors have approximately 330 employees and $108 million in direct sales in 2021. *Id.* The Debtors are headquartered in Indianapolis, where they have been based for over 40 years and where they have their main operating plant. *Id.*

Founded in 1902 as the Minnesota Mining and Manufacturing Company in Two Harbors, Minnesota, 3M is an iconic American multinational technology and manufacturing company. *Id.* ¶ 20. 3M develops products across a wide range of markets including pharmaceuticals and

chemicals, digital imaging and sound technology, and office supply and consumer goods. *Id.* 3M's business remains strong, with over $8.8 billion in sales reported through the first financial quarter of 2022, roughly matching their sales from the same period in 2021. *Id.* ¶ 21.

3M acquired the Debtors in April 2008 through a stock purchase for approximately $1.2 billion. First Day Decl. ¶ 22. The acquisition was initiated with the goal of creating synergies with 3M's existing occupational health and safety business by adding the Debtors' hearing, eyewear, and fall protection product lines. *Id.*

At the time of the acquisition, the Debtors were already manufacturing and distributing the Combat Arms Earplugs that would ultimately lead to the Combat Arms Claims necessitating the Chapter 11 Cases. First Day Decl. ¶ 22. Of the approximately $31 million in lifetime sales of the Combat Arms, a substantial percentage (approximately 80%) occurred prior to 3M's acquisition of the Debtors. *Id.* In the first two years following the acquisition, the Debtors' business remained independent from 3M. *Id.* ¶ 23. Not until 2010 was the component of the Debtors' business responsible for the significant majority of its earplug sales transferred upstream to 3M. *Id.*

The Debtors and 3M are co-defendants in a consolidated multi-district litigation proceeding in the United States District Court for the Northern District of Florida (the "**MDL Court**") that includes more than 230,000 claims concerning a hearing protection device called the Combat Arms Earplug, Version 2 (the "**MDL**"). *See* Horowitz ¶ 4. The Debtors and 3M are also co-defendants in approximately 2,000 lawsuits pending in Minnesota state court. *Id.* ¶ 6. Indeed, as of June 15,

10

2022, the Combat Arms MDL accounted for over 30% of the total number of cases pending in federal courts.[5] The MDL and Minnesota lawsuits collectively constitute the Pending Actions.

The Stay Defendants are the plaintiffs in the Pending Actions. A list of the Stay Defendants is contained in <u>Appendix A</u> to the Adversary Complaint. Each of the Stay Defendants John and Jane Does 1-1,000 is a prospective plaintiff who may, at any time while the Chapter 11 Cases are pending, seek to commence an action to pursue a Combat Arms Claim against the Debtors or 3M. A subset of the Stay Defendants—those approximately 3,000 Combat Arms plaintiffs that have active discovery, pre-trial, trial, or appellate deadlines—are referred to herein as Active Litigants. A list of the Active Litigants is contained in <u>Appendix B</u> to the Adversary Complaint.

## V.    THE PENDING ACTIONS

As detailed further in the Informational Brief, the Pending Actions allege that the Debtors and 3M manufactured and distributed a hearing protection device—the Combat Arms Earplug, Version 2 ("**<u>CAEv2</u>**") and a civilian version of the CAEv2 sold commercially to non-military consumers (the "**<u>Arc Plug</u>**," and together with the CAEv2, the "**<u>Combat Arms Earplug</u>**")—that did not provide appropriate noise protection due to design flaws, causing hearing loss and tinnitus in some users. Aearo designed the Combat Arms Earplug and made key early decisions that plaintiffs now challenge, and a substantial percentage (approximately 80%) of the lifetime sales of the Combat Arms Earplug occurred prior to 3M's acquisition of the Debtors in 2008. First Day

---

[5]     June 15, 2022 MDL Statistics Report - Distribution of Pending MDL Dockets by Actions Pending, J.P.M.L. *avail. at* https:jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_Actions_Pending-Jun-15-2022.pdf.  As of September 30, 2021, 629,588 cases were pending in federal courts.  Table C, U.S. District Courts—Civil Cases Commenced, Terminated, and Pending During the 12-Month Periods Ending September 30, 2021, Judicial Business of the United States Courts, Annual Reports of the Director, Administrative Office of the United States Courts, *available at* https://www.uscourts.gov/sites/default/files/data_tables/jb_c_0930.2021.pdf.  As of that same date, 391,953 actions were pending in and subject to MDL proceedings.  United States Judicial Panel on Multidistrict Litigation, Statistical Analysis of Multidistrict Litigation Fiscal Year 2021, *available at* https://www.uscourts.gov/sites/default/files/data_tables/jb_s20_0930.2021.pdf.

Decl. ¶ 22. The claims against 3M, therefore, are derived from the Debtors' alleged misconduct. The Debtors stand behind the safety and efficacy of the Combat Arms Earplug. Based on decades of government, military, and other independent testing, the Debtors maintain that the product works as intended, and did not cause any injuries.

In the early 1990s, a military research institute established by French and German governments—Institute de St. Louis ("**ISL**")—invented a level-dependent "filter" to be used in earplugs in which low-level sounds can pass through the filter, but sharp "impulse" noises, like gunfire, are diminished. Informational Br. at 14. In early 1997, ISL requested assistance from Aearo Company in Indianapolis to develop a non-linear earplug based on ISL's filter and Aearo's existing UltraFit earplug, which was a premolded, triple-flanged earplug. *Id.* Around the same time, a representative from the United States Army Research Laboratory concluded that the non-linear filter was a good option to protect against "impulse noises" such as mortar blasts and gunfire. *Id.* But military also needed standard linear ear protection, similar to a traditional foam earplug. *Id.* Thus, two ISL scientists devised a two-ended device, with one end using the non-linear filter and the other end functioning as a traditional earplug. *Id.*

In 1997, the manager of the Army's Hearing Conservation Program and chair of the Defense Department's Hearing Conservation Working Group, Dr. Doug Ohlin, indicated that he preferred the two-ended earplug design, which would be easier to dispense in the field to soldiers than two separate earplugs. Informational Br. at 14. Heeding Dr. Ohlin's direction, Aearo and ISL developed and manufactured a two-ended earplug designed on the UltraFit. *Id.* at 15. Dr. Ohlin found that these initial samples were too long, in part because they would not fit in a standard-issue earplug carrier, so he cut down the samples himself to shorten them. *Id.* Aearo then sent Dr. Ohlin samples of the shortened version of the dual-ended earplug in late April 1999. *Id.* Dr. Ohlin

12

ultimately found the shortened dual-ended earplugs acceptable, and made a Combat Arms earplug purchase request to the Department of Defense's Joint Readiness Clinical Advisory Board. *Id.*

World-class military laboratories, including the Army Research Laboratory and United States Air Force Research Laboratory, tested the Combat Arms, some several times, using multiple test methods. Informational Br. at 16. Each of these tests confirmed that the product performed as intended. *Id.* at 17. Nonetheless, through a well-orchestrated and well-funded lawyer ad campaign that cut across traditional and social media channels as well as more targeted outlets, plaintiffs' lawyers bombarded servicemembers and veterans with messages that the Combat Arms was to blame for any hearing-related conditions in soldiers who served between 2003 and 2015. *Id.* at 25-26.

In April 2019, the Judicial Panel on Multidistrict Litigation formed MDL No. 2885 to "promote the just and efficient conduct of the litigation."[6] By then, the number of potential tag-along or related actions in federal courts had grown to nearly 700 cases. Informational Br. at 7. The MDL centralized claims before one judge charged with overseeing consolidated pretrial proceedings, weeding out meritless claims, and ultimately positioning the case for settlement. *Id.* However, in the Combat Arms MDL, plaintiffs' lawyers helped ensure that some of the most basic tools of MDL practice, including filing fee requirements and medical records releases and production, were shelved or suspended early on. *Id.* While the MDL Court recognized the need to vet the merits of the inventory of cases in order to filter out claims that could not be supported, plaintiffs' lawyers, in response, claimed burdens in accessing their clients' military records (records that are needed to support their claims). *Id.* at 6-7.

---

[6]     *In re: 3M Combat Arms Earplug Prods. Liab. Litig.*, 366 F. Supp. 3d 1368, 1369 (J.P.M.L. 2019).

As a result, for nearly two years, more than 99 percent of plaintiffs in the MDL were relieved of any obligation to produce documents substantiating their claims. Informational Br. at 8. The Combat Arms MDL is now flooded with a massive volume of claims that still have yet to vetted—today, more than 110,000 active plaintiffs still have not been required to pay a filing fee, and their claims are languishing on an "administrative" docket. Informational Br. at 20; Horowitz Decl. ¶ 17.

As discussed above, and extensively in the Debtors' *Informational Brief,* the MDL bellwether trial process similarly failed to advance any meaningful resolution of the tort claims related to the Combat Arms. Of the 27 plaintiffs designated as bellwethers, eight plaintiffs were dismissed before trial, and six trials resulted in defense verdicts. Horowitz Decl. ¶¶ 10-11. And those bellwether trials that resulted in plaintiffs' verdicts provided minimal information about value or resolution given widely disparate outcomes. First Day Decl. ¶ 9. Juries awarded plaintiffs with individual verdicts ranging from $1.7 million to as much as $77.5 million. Id. ¶ 39. Appeals are pending on several issues, including whether the Debtors can assert the "government contractor" defense, which may be a total defense to liability. *Id.* ¶ 9.

Throughout the bellwether process, the MDL plaintiffs routinely treated the Debtors and 3M as essentially a single entity, and—despite the fact that the alleged misconduct overwhelmingly occurred prior to 3M's acquisition of the Debtors in 2008—the MDL plaintiffs allege that the Debtors and 3M are jointly and severally liable. *See* Horowitz Decl., Ex. 2 (MDL Master Long Form Compl.) at ¶ 206 ("Defendants are jointly and severally liable to Plaintiffs for their individual and collective tortious acts."). And throughout their Master Complaint, Plaintiffs do not delineate between defendants when alleging the commission of specific acts, including with respect to pre-acquisition conduct. *See, e.g.*, *id.* at ¶ 209 (regarding internal testing).

14

During opening statements in the first bellwether trial (*EHK*), plaintiffs' counsel stated, "This case is about 3M." Counsel further elaborated that even though the jurors will see documents with names of different companies, "for purposes of this case, they're all one and the same. So if you see one of these [other company names] just know Aearo is 3M…" Horowitz Decl., Ex. 34 (3/30/2021 *EHK* Trial Tr. at 59:3-13). When introducing the CAEv2 to the jury in *EHK*, the jury heard that "3M" began selling this "new, unusual earplug" in 1999, even though 3M did not have any involvement in the sale of the CAEv2 until a full two years after it acquired Aearo in April 2008. *Id.* at 44:12-15; *see also* First Day Decl. ¶¶ 22-23.

MDL plaintiffs continued to blend the Debtors and 3M together during deposition videos played for the jury. When plaintiffs played these videos to the jury, the introductions and edited testimony created the impression that 3M and Aearo were one and the same. *See, e.g.*, Horowitz Decl., Ex. 35 (04/02/2021 *EHK* Trial Tr. at 13:20-15:9). Furthermore, in the *Blum* trial, plaintiffs' counsel introduced one witness via video designation as the "acoustic technician and the fitter in the 3M/Aearo lab from 1998 to 2015." Horowitz Decl., Ex. 36 (10/19/2021 *Blum* Trial Tr. at 76:12-15).

The verdict forms in bellwether trials also lumped the Debtors and 3M together. For example, in *EHK*, all three verdict forms allocated 100% of fault to "Defendants" without any breakdown between the Debtors and 3M. Horowitz Decl., Exs. 25 (*Estes* Verdict Form), 27 (*Hacker* Verdict Form), and 28 (*Keefer* Verdict Form).

The MDL Court also treated the Debtors and 3M as a single entity over the course of the bellwether process. For example, in introductory remarks to the jury during the first bellwether trial (*EHK*), the MDL Court informed the jurors that the CAEv2 "was designed and sold by the defendants, 3M and Aearo to the United States military," despite the fact that the CAEv2 was

15

designed by the Debtors in collaboration with the military years before the Debtors' acquisition by 3M. Horowitz Decl., Ex. 34 (3/30/2021 *EHK* Trial Tr. at 15:6-10).

With the bellwether trials concluded, the remaining MDL claims are contained on two dockets: an "administrative docket," which houses claims before they are moved to the "active docket." Horowitz Decl. ¶ 17. As of July 22, 2022, approximately 110,000 cases remain on the administrative docket, with more than 120,000 of the claims pending in the MDL on the active docket. *Id*. The MDL Court has also selected "waves" of cases on the active docket— approximately 500 at a time—to engage in active discovery (the "**Waves**"). Horowitz Decl. ¶¶ 19-22. Three such waves have been created so far, and after accounting for voluntary dismissals, approximately 1,200 cases are currently in active discovery. *Id.* ¶¶ 23-25.

In Wave 1, which as of July 22, 2022, includes 374 active cases after accounting for dismissals and moves to subsequent "waves," the parties are preparing *Daubert*, choice of law, and summary judgment motions, with responses due on August 9. *Id.* ¶¶ 23, 28. In Wave 2, which as of July 22, 2022, includes 372 active cases after accounting for dismissals and moves to subsequent "waves," expert discovery is ongoing. Defendants' expert disclosures/reports are due August 15. *Id.* ¶¶ 24, 28. Rebuttal expert disclosures by plaintiffs are due August 25. *Id.* ¶ 28. Depositions of plaintiffs' experts will mostly begin after the rebuttal deadline of August 25, but some may be held sooner. *Id.* Expert depositions must be completed by September 26. *Daubert* and dispositive motions are due October 6, with responses due October 25. *Id.*

In Wave 3, which as of July 22, 2022, includes 466 active cases, fact discovery is in progress, including records production and written discovery responses. Horowitz Decl. ¶¶ 25, 28. Responses to written discovery are due by August 8 at the latest. *Id.* ¶ 28. The deadlines for plaintiff and non-plaintiff fact depositions are September 6 and September 30, respectively. *Id.* Defense

medical exams must be completed by September 27. *Id.* Plaintiffs' expert disclosures/reports are due October 11, and defendants' expert disclosures/reports are due November 10. *Id.* Rebuttal expert disclosures/reports are due November 21. *Id.* Expert depositions must be completed by January 10, 2023. *Id. Daubert* and dispositive motions are due January 20, and responses are due February 8. *Id.* Currently, there are approximately 449 Wave 3 fact depositions scheduled. *Id.* ¶ 29.

Among Waves 1-3, as of July 22, 2022, approximately 50 depositions are scheduled to occur the week of July 25, and approximately 62 depositions are scheduled for the week of August 1. Horowitz Decl. ¶ 29. In the coming months, the Wave cases will be remanded *en masse* to courts across the country. The MDL Court stated in June: "As of June 10, 2022, there were 233,883 plaintiffs in the MDL, down from 282,902 at its height in September 2021. That averages [to] 2,500 cases being remanded for trial to each of the 94 districts nationwide." Horowitz Decl., Ex. 56 (mediation order) at 2. The MDL Court observed that "likely no district will be spared the burden" of this litigation, and "the amount of judicial resources required to handle this number of cases is staggering." *Id.* In fact, the MDL Court has already scheduled the first trial of a Wave case to begin on October 24, 2022. *Id.* ¶ 26.

In addition to the MDL, the Pending Actions include approximately 2,000 Minnesota state court lawsuits. Horowitz Decl. ¶ 6. As in the MDL, Stay Defendants in the Minnesota state actions also treat 3M and the Debtors as essentially a single entity and attempt to hold them jointly and severally liable for Combat Arms Claims. *See, e.g.* Horowitz Decl., Ex. 3 (Exemplar Minnesota Compl.) ¶ 1 ("This is a failure to warn product liability action related to an earplug manufactured and sold by Defendants…as a result of Defendants' failure to warn, [Plaintiff] now suffers from hearing loss and tinnitus. Defendants knew the earplugs needed to be inserted in a particular

manner in order to have any effectiveness. But the Defendants failed to warn potential purchasers of the danger of failing to do so.").

The first of the Minnesota bellwether trials is scheduled to begin on August 29, 2022. Horowitz Decl. ¶ 31. Four additional trial dates have been selected for 2023 and 2024; July 10, 2023; September 11, 2023; October 23, 2023; and February 5, 2024. *Id.* ¶ 32. Thirty additional bellwether Minnesota cases are in various phases of discovery in preparation for trials scheduled within the next two years. *Id.* ¶ 33.

## VI.    THE DEBTORS' DECISION TO FILE FOR CHAPTER 11 REORGANIZATION

As of the Petition Date, more than 230,000 Combat Arms hearing-injury claims are pending in the MDL and Minnesota state court. Horowitz Decl. ¶¶ 4, 6. Despite the disadvantageous rulings from the MDL Court, the Debtors and 3M had success in many of the MDL's bellwether proceedings because there is no legitimate scientific or other proof that the Combat Arms is responsible for any plaintiffs' hearing loss or tinnitus. *See, e.g.*, Informational Br. The Debtors and 3M, however, have also been subject to large and wildly divergent compensatory and punitive damages awards ranging from $1.7 million to upwards of $77 million for a single plaintiff. First Day Decl. ¶ 39. Moreover, the remand of thousands of cases for trial in district courts around the country is destined to result in yet more divergent, inequitable, and non-uniform verdicts even for similarly situated Combat Arms plaintiffs. Only the Chapter 11 Cases allow for a systematic, streamlined, and efficient means of providing a uniform and equitable recovery for claimants that prove their entitlement to payment.

Additionally, the Debtors and 3M have expended significant resources in defense of the Pending Actions. Defense of the Pending Actions has cost $347 million in fees and costs to date. First Day Decl. ¶ 40. This year alone, 3M spent approximately $47.77 million in attorneys' fees and costs in the first quarter of 2022, and approximately $74.5 million in the second quarter, which

amounts to approximately $4.7 million spent per week. *Id.* For the remainder of 2022, 3M projects that it will spend approximately $99.8 million on attorneys' fees and costs ($56.8 million and $43 million in the third and fourth quarters, respectively).[7] *Id.* As the approximately 1,200 MDL Wave cases continue to proceed through fact and expert discovery and, ultimately, remand to trial, litigation expenses will inevitably increase.

Given the burden, uncertainty, and anticipated duration of the Pending Actions, the status quo is untenable. The only available option to appropriately assess, resolve, and administer the Pending Actions in an efficient and equitable manner is the Chapter 11 Cases. With these considerations in mind, the Debtors commenced the Chapter 11 Cases.

## VII. THE FUNDING AGREEMENT

In the months prior to commencing these Chapter 11 Cases, the Debtors took proactive steps to determine if they could address their Combat Arms and other liabilities through chapter 11. Stein Decl. ¶ 10. One requisite step was determining if the Debtors could obtain the financing necessary to ensure that it could fund successful Chapter 11 Cases, including the professional fees expected to be incurred and the ultimate funding of a claims trust, while also remaining independent from 3M before and during a Chapter 11 Case. *Id.*

Against this backdrop, the Debtors, at the direction of the Disinterested Directors, and 3M determined to enter into a funding agreement pursuant to which 3M would fund the Debtors' Chapter 11 Cases. Stein Decl. ¶ 11. The Debtors sought to secure funds from 3M to satisfy administrative and professional fees, as well as additional proceeds to fund a claims trust, all in exchange for the Debtors' commitment to indemnify 3M for all liabilities related to the Combat

---

[7] These projections assume that the MDL Court does not constitute a Wave 4 and that the only additional trial in 2022 will be the August 2022 trial scheduled in the Minnesota state actions. This does not include the October 24, 2022 Wave trial scheduled by the MDL Court as of July 22, 2022. *See* Horowitz Decl. ¶ 26.

19

Arms Claims. *Id.* ¶ 12. And, in light of the shared services historically provided by 3M for the benefit of the Debtors, the Debtors also proposed to 3M that 3M commit to continue such services in the ordinary course going forward. *Id.* ¶ 14.

On July 25, 2022, the Debtors and 3M executed the Funding and Indemnification Agreement (the "**Funding Agreement**").[8] Stein Decl. ¶ 11. As part of the Funding Agreement, 3M agreed, upon the Debtors' exhaustion of cash, to fund the Debtors' operating and administrative costs and expenditures for the duration of these Chapter 11 Cases and, upon confirmation of a plan of reorganization, to contribute to a trust to ensure Combat Arms claimants entitled to compensation receive payment. In exchange, the Debtors agreed to indemnify 3M and its non-debtor affiliates for liabilities related to the Combat Arms.[9]

The Funding Agreement will fund the Debtors' operations and capital needs, along with the Chapter 11 Cases (including a claims trust to address the Combat Arms liabilities)—on an uncapped basis—with no obligation of the Debtors to pay interest or other costs to 3M. Stein Decl. ¶ 14. The Debtors also will never have to repay any amounts advanced by 3M. *Id.* Aside from 3M, no third-party would ever provide a comparable facility on the same advantageous terms to the Debtors. *Id.* ¶ 12. The Funding Agreement is an enormous contribution by 3M that is integral to the Debtors' successful restructuring and the efficient, equitable resolution of all Combat Arms Claims. *Id.*

---

[8]  The description of the Funding Agreement set forth herein is qualified by reference to the terms of the Funding Agreement, which controls in all respects.

[9]  In the context of the Funding Agreement, "Earplug Liabilities" means "any Liability of any Company Party, whether existing now or arising in the future, based in whole or in part on any conduct or circumstance arising out of, relating to or in connection with dual-ended earplugs, including Dual-Ended Combat Arms – Version 2 earplugs, ARC Plug earplugs, and AO Safety Indoor Outdoor Range Earplugs, sold or manufactured by any Company Party, under any trade name, including any Liability pursuant to any Proceedings relating to any of the foregoing." Funding Agreement § 1.

In financial year 2021, 3M's net sales exceeded $35 billion, up from approximately $32 billion in financial year 2020. First Day Decl. ¶ 12. The Funding Agreement therefore ensures the resources necessary for these Chapter 11 Cases to be fully funded, including administrative expenses, general unsecured claims, and any ultimate plan trust. *Id.*

## VIII.   THE DEBTORS' INSURANCE COVERAGE

The Debtors and 3M share insurance and reinsurance policies that provide coverage for claims and defense costs related to the Combat Arms Claims. First Day Decl. ¶ 34. The Debtors are insured and reinsured under many primary, umbrella, and excess liability insurance policies, including commercial general liability policies that cover defense and indemnity costs related to the Pending Actions. *Id.* These include several policies pre-dating the Debtors' acquisition by 3M (the "**Aearo Legacy Program**") that collectively provide approximately $500 million in coverage, not including any supplemental defense coverage. *Id.* More importantly, the Debtors have had continuous insurance coverage since the April 1, 2008 acquisition under 3M's product liability and other insurance programs, including dozens of primary, umbrella and excess policies (the "**3M Program**"). *Id.*

Critically, with respect to the 3M Program, commercial general liability policies covering the 2018-2019 policy period—which include 46 separate policies comprising 18 layers of coverage—are shared between the Debtors and 3M. First Day Decl. ¶ 35. The policies explicitly provide retroactive coverage for Aearo, back to the April 1, 2008 acquisition, and Aearo is listed as a named insured alongside 3M. *Id.* The combined aggregate limit of 3M's 2018-2019 commercial general liability policies is more than $1.05 billion—more than double the coverage available under the Aearo Legacy Program. *Id.*

3M—on behalf of itself and the Debtors—provided notice of the Combat Arms Claims to the following insurers: (1) the Debtors' primary and excess insurers for policy periods covering

1997 to 2008, and (2) 3M's tower policy insurers and reinsurers for a policy period covering 2018 to 2019. First Day Decl. ¶ 36. In those notice letters, 3M and the Debtors requested coverage, including for litigation costs, for their defense of personal injury allegations and other covered claims relating to the Combat Arms Claims. *Id.* Although none of the insurers has yet acknowledged its coverage obligations, 3M and the Debtors maintain that they are entitled to coverage for the Combat Arms Claims under these policies. *Id.*

## ARGUMENT

### I.   SECTION 362(A)'S AUTOMATIC STAY PROHIBITS THE CONTINUED PROSECUTION OF THE PENDING ACTIONS AGAINST 3M.

Section 362(a)(1) of the Bankruptcy Code bars "the commencement or continuation…of a judicial…action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1). Section 362(a)(3) similarly prevents "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The automatic stay "functions as one of the fundamental protections afforded to debtors by the bankruptcy laws, as it preserves…the debtor's…estate and provides a systematic equitable liquidation procedure for all creditors, secured as well as unsecured, thereby preventing a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts." *In re Grede Foundries, Inc.*, 651 F.3d at 786 (internal quotations and citations omitted). Moreover, the scope of the automatic stay is "extremely broad." *In re Wallingford's Fruit House*, 30 B.R. 654, 659 (Bankr. D. Me. 1983); *see also In re Stringer*, 847 F.2d 549, 552 (9th Cir. 1988) ("Congress clearly intended the automatic stay to be quite broad."). Conversely, "[e]xemptions to the stay…should

be read narrowly to secure the broad grant of relief to the debtor." *In re Grede Foundries, Inc.*, 651 F.3d at 790 (internal quotations and citations omitted).

The Seventh Circuit has confirmed that the automatic stay applies to a non-debtor where there is a sufficient "identity of interest" between the debtor and non-debtor such "that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *In re Fernstrom Storage and Van Co.*, 938 F.2d at 736 (internal quotations omitted); *see also Fox Valley Constr. Workers Fringe Benefit Funds v. Pride of Fox Masonry*, 140 F.3d 661, 666 (7th Cir. 1998) ("The stay, however, protects only the debtor, unless the debtor and some third party have such a similarity of interests that failure to protect the third party will mean that the assets of the debtor itself will fall into jeopardy."). Furthermore, the automatic stay applies to a third party where "pending litigation . . . would cause the debtor, the bankruptcy estate, or the reorganization plan irreparable harm." *In re Fernstrom Storage and Van Co.*, 938 F.2d at 736 (internal quotations omitted).

Here, the Court can confirm that the automatic stay under section 362 immediately applies to 3M with respect to all Pending Actions: (1) the Stay Defendants have asserted claims of joint and several liability against 3M and the Debtors, treating them as essentially a single entity, such that a judgment against 3M is effectively a judgment against the Debtors; (2) 3M and the Debtors are co-insureds under shared insurance policies, the proceeds of which may be depleted if the Pending Actions are not stayed as to 3M; and (3) the Debtors are obligated to indemnify 3M and its non-debtor affiliates for any losses related to Combat Arms. Based on the evidentiary record, the Court can confirm that the automatic stay immediately applies to 3M.

A. **The automatic stay applies to 3M because the continued litigation of the Pending Actions against 3M will effectively bind the Debtors.**

The Seventh Circuit has held that, when a judgment against a third-party defendant would "in effect be a judgment or finding against the debtor," there is a sufficient identity of interest for the stay to apply to the third-party defendant. *Id*. Indeed, numerous bankruptcy courts have confirmed that the automatic stay applies to non-debtors where litigation against an affiliated non-debtor would effectively bind the debtor. *See, e.g.*, *In re LTL Mgmt, LLC*, 638 B.R. at 307 ("[T]he Court concludes that continued litigation against the [non-debtors] would liquidate pending tort claims, as well as indemnification claims, against Debtor outside of chapter 11 and potentially deplete available insurance coverage—frustrating the purpose of the automatic stay."); *In re Aldrich Pump LLC*, 2021 WL 3729335, at *31 ("Litigating the [tort] claims against the [non-Debtor] would effectively liquidate claims against the Debtors."); *In re DBMP LLC*, 2021 WL 3552350, at *27 (Bankr. W.D.N.C. Aug. 11, 2021) (same).

Relatedly, courts have found an identity of interest exists where litigation against an affiliated non-debtor could potentially bind the debtor through principles of collateral estoppel and/or *res judicata*. *See In re LTL Mgmt, LLC*, 638 B.R. at 316 ("[I]t suffices to acknowledge that there *exists a risk* that the doctrine of res judicata could adversely impact Debtor in future litigation."); *In re Aldrich Pump LLC*, 2021 WL 3729335, at *31 ("There is even an outside risk that such litigation could bind the Debtors through *res judicata* and collateral estoppel[.]").[10]

---

[10]  *See also In re DBMP LLC*, 2021 WL 3552350, at *27 (Bankr. W.D.N.C. Aug. 11, 2021) (same); *In re Mallinckrodt Plc*, Adv. D.I. No. 20-12522 [Dkt. 186] 11/23/20 Hr'g Tr. at 45 (Bankr. D. Del. 2020) ("It would be impossible to proceed against the nondebtor defendants only without creating significant risk of collateral estoppel and record taint, to the point where the debtors would need to participate in those actions to protect their interest."); *In re Bestwall LLC*, 606 B.R. 243, 256 (Bankr. W.D.N.C. 2019), aff'd, 3:20-CV-105-RJC, 2022 WL 68763 (W.D.N.C. Jan. 6, 2022) ("If Bestwall Asbestos Claims against the Protected Parties are permitted to proceed, the Debtor faces the additional risk that findings and judgments against the Protected Parties would bind the Debtor, and effectively establish Bestwall Asbestos Claims against it, including under the doctrines of res judicata and collateral estoppel."); *In re Union Tr. Philadelphia, LLC*, 460 B.R. 644, 656 (E.D. Pa. 2011) (applying stay to third parties in part because "if the state proceedings are allowed to continue, it could be barred

The Debtors are real-party, jointly and severally liable co-defendants with 3M in the Pending Actions. Despite the fact that the overwhelming majority of alleged misconduct (and over 80% of the lifetime sales of Combat Arms Earplugs) occurred prior to 3M's acquisition of the Debtors, the Stay Defendants nonetheless assert the same claims against both 3M and the Debtors, using the same evidence to prove liability. First Day Decl. ¶ 22. In fact, the Stay Defendants treat 3M and the Debtors as a single entity in the prosecution of their claims. *See supra* at V (summarizing Stay Defendants' treatment of the Debtors and 3M as a single entity during course of Pending Actions). For example, the Stay Defendants routinely refer to Aearo as "3M," and instruct juries not to pay any attention to their corporate distinction. *See, e.g.*, Horowitz Decl., Ex. 37 (Vaughn Trial Tr. 4/18/2022 at 144:17-23) ("Now, I've mentioned 3M and Aearo. These are all of the companies that are involved. ***They're all the same company for the intents and purposes of this lawsuit***. Whether the company goes by EAR, Peltor, AOSafety, Aearo, Cabot, or 3M, they are all the same company for this lawsuit. One was acquired by the other; one was a division of the other. But anytime you see any of those names, it's the same people.") (emphasis added). The MDL Court has similarly treated 3M and the Debtors as a single entity. *See, e.g.*, Horowitz Decl., Ex. 38 (*Wayman* Dkt. 198) at 5-6 (rejecting plaintiff's argument that there were technically six defendants in order to circumvent Colorado's cap on non-economic damages); *see supra* pp. 12-13.

---

from relitigating issues in those proceedings by operation of collateral estoppel.); *In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 615 (E.D. Pa. 2009) (holding that "if the suit against non-debtors proceeded without the involvement of [debtors], the [debtors] may be later barred from defending these claims by operation of collateral estoppel."); *In re W.R. Grace & Co.*, 115 Fed. Appx. 565, 569 (3d Cir. 2004) (affirming bankruptcy court's decision to apply stay to third party because of the potential harm due to collateral estoppel); *In re Am. Film Techs., Inc.*, 175 B.R. 847, 849 (Bankr. D. Del. 1994); *In re Sudbury, Inc.*, 140 B.R. 461, 464 (Bankr. N.D. Ohio 1992) (holding that collateral estoppel concerns were "a powerful and legitimate incentive for the Court to invoke section 105 of the Bankruptcy code to issue an order to make effective the section 362 stay. . . ."); *Robins*, 788 F.2d at 1008 ("It seems incontestable that, if the suits are permitted [against co-defendants] and discovery allowed, any effort at reorganization of the debtor will be frustrated, if not permanently thwarted).

Given their treatment as one, allowing the Pending Actions to continue against 3M would bind the Debtors. If 3M is found liable, the Debtors' indemnification obligations are triggered. Additionally, judgments against 3M in the Pending Actions would also risk binding the Debtors through collateral estoppel and/or *res judicata*, creating an evidentiary record that could prejudice the Debtors during the Chapter 11 Cases' claims estimation process. All scenarios would frustrate the Debtors' efforts to orderly and equitably resolve the universe of Combat Arms Claims and would put the Debtors' estates and reorganization in jeopardy. Accordingly, if the Pending Actions proceed against 3M, the Debtors will have no choice but to forgo the protections of the automatic stay and defend themselves, contrary to the goals of the Bankruptcy Code.

**B.     The automatic stay applies to 3M because the continued litigation of the Pending Actions against 3M could deplete the Debtors' available coverage under shared insurance and reinsurance policies.**

The Debtors and 3M share insurance policies that provide coverage for defense costs and liabilities related to the Pending Actions. First Day Decl. ¶ 34. If the Pending Actions against 3M are not stayed, that litigation risks depleting the Debtors' available coverage under shared policies with 3M, which is property of the Debtors' estates and expressly protected by the Code's automatic stay.

Insurance policies and coverage are considered property of a debtor's estate under section 541(a)(1) of the Bankruptcy Code. *In re Stinnett*, 465 F.3d 309, 312 (7th Cir. 2006) ("[I]nsurance contracts in which the debtor has an interest at the time the petition is filed constitute property of the estate for purpose of § 541(a)."); *see also Home Ins. Co. v. Cooper & Cooper Ltd.*, 889 F.2d 746, 748 (7th Cir. 1989) ("A policy of insurance is an asset of the estate[.]"). Consequently, actions that threaten the Debtors' insurance policies are subject to the automatic stay. *See Matter of Gatke Corp.*, 117 B.R. 406, 409 (Bankr. N.D. Ind. 1989) ("Several courts have held that the automatic stay applies to a debtor's insurance policies and the proceeds therefrom in situations where

26

numerous parties hold tort claims against the debtor."); *Robins Co*, 788 F.2d at 1001–02 (agreeing with "the weight of authority" that insurance contracts are property of the estate and that "[a]ccordingly actions 'related to' the bankruptcy proceedings against the insurer . . . are to be stayed under section 362(a)(3)").

Where a debtor and non-debtor are jointly covered by a shared insurance policy, courts have confirmed that the automatic stay applies to claims against the non-debtor; otherwise, the insurance assets could be drained by the non-debtor, depleting property of the Debtors' estates. *See id.* (holding that proceedings against non-debtors "who qualify as additional insureds under the [insurance] policy are to be stayed under section 362(a)(3)"); *see also Raudonis, as trustee for the Raudonis 2016 Revocable Trust v. RealtyShares, Inc.*, 507 F. Supp. 3d 378, 384 (D. Mass. 2020) ("Because courts generally recognize insurance policy as 'property' under 11 U.S.C. § 541(a)(1)—and thus find such policies subject to an automatic stay pursuant to 11 U.S.C. § 362(a)(3)—the defendants' shared insurance contract arguably sweeps [co-insureds] into the reach of the automatic stay."); *In re Metro Mortg. & Secs. Co.*, 325 B.R. 851, 856-57 (Bankr. E.D. Wash. 2005) (holding that shared insurance policies and their proceeds were property of the debtors' estates and were protected by automatic stay). Additionally, litigation against a jointly-covered non-debtor could "strengthen[] insurance defense arguments against coverage," which could "impair reorganization efforts and drain resources and time." *In re LTL Mgmt., LLC*, 640 B.R. 322, 336-37 at *7 (Bankr. D.N.J. 2022) (confirming application of the stay to non-debtor affiliate).

The Debtors have shared policies with 3M covering the Combat Arms Claims asserted in the Pending Actions. First Day Decl. ¶ 34. Specifically, at least 46 policies are shared between the Debtors and 3M and provide retroactive coverage for claims against the Debtors dating back to April 1, 2008. *Id.* ¶ 35. In total, the combined limit of these policies is more than $1.05 billion—

more than double the coverage available under the Debtors' separate policies. *Id.* If 3M must continue to defend itself in the Pending Actions, it will result in the depletion of property of the Debtors' estates via the proceeds of these shared policies in violation and frustration of the very purpose of the Bankruptcy Code's automatic stay.

      **C.**    **The automatic stay applies to 3M because the continued litigation of the Pending Actions against 3M implicates the Debtors' indemnification of 3M for Combat Arms losses.**

In the Funding Agreement, the Debtors agreed to indemnify all liabilities related to the Pending Actions in exchange for 3M's agreement to fund the Debtors in an amount sufficient to pay the costs of those liabilities and continued business operations. Stein Decl. ¶ 12. No third party would ever provide a comparable facility on the same advantageous terms to the Debtors as 3M. *Id.* Specifically, the "Indemnification" section of the Funding Agreement provides:

> <u>Earplug Liabilities</u>. The Aearo Entity Earplug Defendants shall and hereby agree to jointly and severally indemnify, defend and hold harmless the Payor and each of the Payor Affiliates (each of which is an express third-party beneficiary of the provisions of this Section 3) from and against, and pay and reimburse Payor (or the applicable Payor Affiliate) for any Losses incurred, sustained by or imposed on Payor or any Payor Affiliate arising out of, relating in any way to or in connection with any Earplug Liabilities, including any Losses for reimbursement or other obligations of Payor or any Payor Affiliate under or in respect of any appeal bonds or similar litigation-related surety Contracts that are or have been posted or entered into by Payor or any Payor Affiliate in connection with Proceedings in respect of any Earplug Liabilities, as applicable.

First Day Decl., Ex. B (Funding Agreement) § 3(a). These indemnity obligations are automatic and mandatory.

Because the Debtors are obligated to indemnify 3M and its non-debtor affiliates for any losses related to the Combat Arms—including as to any claims in the Pending Actions asserted against 3M or its non-debtor affiliates—there is an identity of interest between the parties that warrants an application of the stay to litigation of the Pending Actions against 3M and its non-debtor affiliates. In general, the automatic stay applies to a non-debtor co-defendant in suits where

the non-debtor "is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case." *Robins*, 788 F.2d at 999. "To refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute." *Id.* Accordingly, courts routinely hold that even the "mere possibility of indemnification obligations warrants extension of the automatic stay." *In re LTL Mgmt., LLC*, 638 B.R. 291, 312 (Bankr. D.N.J. 2022); *see also In re Aldrich Pump LLC*, 2021 WL 3729335, at *30-32 (staying asbestos-related actions against indemnified parties); *Edwards v. McElliotts Trucking, LLC*, 2017 WL 5559921, at *3 (S.D. W. Va. Nov. 17, 2017) (finding indemnification arrangement between debtor non-debtor defendants subjected action against non-debtor defendants to automatic stay); *Lee v. RCN Corp.*, 2004 WL 2108557, *1 (N.D. Ill. Sept. 20, 2004) (noting indemnification constitutes colorable claim for application of automatic stay) *In re W.R. Grace & Co.*, 2004 WL 954772, at *4 (Bankr. D. Del. Apr. 29, 2004) (applying automatic stay to litigation between two non-debtor parties where one was entitled to contractual indemnity from debtor); *see also Trimec, Inc. v. Zale Corp.*, 150 B.R. 685, 687 (N.D. Ill. 1993) (holding automatic stay applied to debtor's co-defendants because of debtor's indemnification obligations). Consequently, if the Pending Actions are not stayed as to 3M, the Debtors will be denied the breathing space and protections guaranteed to them by the automatic stay.

## II. THE COURT SHOULD ALSO EXERCISE ITS INHERENT AUTHORITY UNDER 11 U.S.C. § 105(A) TO ENJOIN THE PROSECUTION OF THE PENDING ACTIONS AGAINST 3M.

Section 105(a) of the Bankruptcy Code provides that "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). In addition to core jurisdiction, here, the Court has "related to" jurisdiction under 28 U.S.C. § 1334(b). *See Caesars Ent. Operating Co., Inc.*, 808 F.3d 1186, 1188–89 (7th Cir. 2015) ("Notice too that 28 U.S.C. § 1334(b), provides that 'the district courts

shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in *or related to* cases under title 11.'") (emphasis in quote); *see also Bush v. United States*, 939 F.3d 839, 846 (7th Cir. 2019) ("[T]he related-to jurisdiction must be assessed at the outset of the dispute, and it is satisfied when the resolution has a potential effect on other creditors.").

In addition, the Debtors request that this Court exercise its inherent equitable authority to enjoin the prosecution of the Pending Actions against 3M. Specifically, the Debtors request the issuance of a preliminary injunction that enjoins the Stay Defendants from continuing to prosecute the Pending Actions against 3M until the effective date of the Chapter 11 Cases in order to protect the Debtors' estates, allow for the equitable and orderly estimation and resolution of all Combat Arms Claims, and facilitate the Debtors' successful reorganization. *See Caesars Ent. Operating Co., Inc.*, 808 F.3d at 1188–89 (noting injunctive power under Section 105(a) is valid when the injunction is "likely to enhance the prospects for a successful resolution of the disputes attending [the debtor's] bankruptcy"); *see also In re Purdue Pharms. L.P.*, 619 B.R. 38, 45 (S.D.N.Y. 2020).

Because they facilitate the core goals of the chapter 11 process, courts have granted preliminary injunctions of this nature in similar mass tort bankruptcies. *See e.g.*, *In re LTL Mgmt., LLC*, 638 B.R. 291, 322 (Bankr. D.N.J. 2022); *In re Aldrich Pump LLC*, No. 20-30608, 2021 WL 3729335, at *38 (Bankr. W.D.N.C. Aug. 23, 2021); *In re Purdue Pharms. L.P.*, 619 B.R. 38, 46 (S.D.N.Y. 2020); *In re Bestwall LLC*, 606 B.R. 243, 258 (W.D.N.C. 2019); *In re USA Gymnastics*, No. 18-09108-RLM-11, Adv. No. 19-50075 [Dkt. 71], at 4 (Bankr. S.D. Ind. Apr. 22, 2019); *In re TK Holdings*, No. 17-11375, Adv. No. 17-50880 [Dkt. 63], at 4 (Bankr. D. Del. Aug. 22, 2017).

### A. This Court has authority under 11 U.S.C. § 105(a) to enjoin the Stay Defendants from prosecuting the Pending Actions against 3M.

Courts in this circuit have construed a bankruptcy court's powers under section 105(a) to be "extensive." *Caesars*, 808 F.3d at 1188. Indeed, these equitable powers must be vast for a

bankruptcy court to "preserve its own jurisdiction" and effectuate its statutory duties. *See Matter of L&S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir. 1993). Accordingly, the Seventh Circuit, and the Bankruptcy Code, permit bankruptcy courts to enjoin other proceedings in other courts "when it is satisfied that such proceedings would defeat or impair its jurisdiction over the case before it." *Id.*

Notably, this power to enjoin creditors of non-debtors from proceeding in other courts under section 105 extends beyond those parties whose cases may not be automatically stayed by virtue of 11 U.S.C. § 362(a). *In re The 1031 Tax Grp., LLC*, 397 B.R. 670, 684 (Bankr. S.D.N.Y 2008). This injunctive authority can also extend to non-debtors, especially when failure to enjoin the proceedings in other courts against non-debtors adversely affects the bankruptcy estate to the detriment of the debtor. *See Robins*, 788 F.2d at 1002-03 (citing *In re Otero Mills, Inc.*, 25 B.R. 1018, 1020 (D.N.M. 1982)); *see also In re Lazarus Burman Assocs.*, 161 B.R. 891, 897 (Bankr. E.D.N.Y. 1993) ("When an action by a creditor of a debtor against a non-debtor third party threatens a debtor's reorganization, the creditor's action may be enjoined pursuant to Section 105(a)."). And a bankruptcy court's authority under sections 105 and 362 of the Bankruptcy Code to enjoin actions against non-debtor third parties in other courts is augmented by virtue of 28 U.S.C. § 1334. *See Robins*, 788 F.2d at 1003 ("[T]he bankruptcy court . . . has the 'inherent power of courts under their general equity powers and in the efficient management of the dockets to grant relief' to grant a stay.") (quoting *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983)).

Courts have consistently exercised injunctive power under section 105(a), including in the mass-tort-bankruptcy context, to enjoin claimants from continuing or commencing actions against

non-debtors.[11] These courts recognize that allowing thousands of creditors to pursue claims against affiliated non-debtors in other courts threaten the debtor's estate and jeopardize a successful reorganization. *See, e.g.*, *In re Fed-Mogul Glob., Inc.*, 684 F.3d 355, 359 (3d Cir. 2012) ("Bankruptcy has proven an attractive alternative to the tort system for corporations [facing mass tort claims] because it permits a global resolution and discharge of current and future liability, while claimants' interests are protected by the bankruptcy court's power to use future earnings to compensate similarly situated tort claimants equitably."); *In re Bestwall LLC*, 606 B.R. at 258 (granting injunction); *Robins*, 788 F.2d at 1008; *In re Purdue Pharms. L.P.*, No. 19-23649, Adv. No. 19-08289 [Dkt. 82] (Bankr. S.D.N.Y. Oct. 11, 2019), *aff'd* 619 B.R. 38 (S.D.N.Y. 2020) (granting injunction); *In re USA Gymnastics*, No. 18-09108, Adv. No. 19-50075 [Dkt. 71], at 4 (Bankr. S.D. Ind. Apr. 22, 2019) (granting injunction); *In re TK Holdings, Inc.*, No. 17-11375, Adv. No. 17-50880 [Dkt. 63], at 3-4 (Bankr. D. Del. Aug. 22, 2017) (granting injunction).

Indeed, "these facts describe a 'textbook case' for a section 105(a) injunction." *Caesars*, 561 B.R. at 451. "Bankruptcy courts have often enjoined litigation against a non-debtor . . . who intends to contribute financially to the debtor's reorganization." *Id.* (citing cases). Here, 3M's

---

[11] *See, e.g.*, *In re Aldrich Pump LLC*, No. 20-30608, Adv. No. 20-03041, 2021 WL 3729335, at *38 (Bankr. W.D.N.C. Aug. 23, 2021) (granting preliminary injunction to stay litigation against non-debtor affiliates of debtor); *In re DBMP LLC*, No. 20-30080, Adv. No. 20-03004 , 2021 WL 3552350, at *43 (Bankr. W.D.N.C. Aug. 11, 2021) (granting preliminary injunction to stay litigation against non-debtor affiliates and distributors of debtor); *In re Kaiser Gypsum Co., Inc.*, No. 16-31602, Adv. No. 16-03313 [Dkt. 18], at 5 (Bankr. W.D.N.C. Nov. 4, 2016) (granting preliminary injunction to stay litigation against non-debtor affiliates and insurers); *In re Garlock Sealing Techs. LLC*, No. 10-31607, Adv. No. 10-03145 [Dkt. 14], at 6 (Bankr. W.D.N.C. June 21, 2010) (granting preliminary injunction to stay litigation against non-debtor affiliates); *In re Leslie Controls, Inc.*, No. 10-12199, Adv. No. 10-51394 [ Dkt. 12], at 5-6 (Bankr. D. Del. Aug. 9, 2010) (granting preliminary injunction to stay litigation against non-debtor affiliates); *In re Specialty Prods. Holding Corp.*, No. 10-11780, Adv. No. 10-51085 [Dkt. 13], at 5 (Bankr. D. Del. June 4, 2010) (granting TRO to stay litigation against non-debtor affiliates); *In re Quigley Co., Inc.*, No. 04-15739, Adv. 04-04262 [Dkt. 122], at 5-6 (Bankr. S.D.N.Y. Dec. 17, 2004) (granting preliminary injunction to stay litigation against non-debtor affiliate Pfizer); *In re Combustion Eng'g, Inc.*, No. 03-10495, Adv. No. 03-50839 [Dkt. 19] (Bankr. D. Del. Mar. 7, 2003); *In re W.R. Grace & Co.*, No. 01-01139, Adv. No. 01-00771 [Dkt. 32] (Bankr. D. Del. May 3, 2001); *In re Harbison-Walker Refractories Co.*, No. 02-2080, Adv. No. 02-02080 (Bankr. W.D. Pa. Feb. 14, 2002).

financial contribution to the Debtors' reorganization as part of the Funding Agreement is critical to the Debtors' emergence. Stein Decl. ¶ 12. Consequently, an injunction of the Pending Actions against 3M is absolutely necessary to prevent irreparable harm to the interest of the Debtors' estates. *See Robins,* 788 F.2d at 1002-03.

>
 **B.     The Debtors' request meets the standard for a preliminary injunction.**

The Seventh Circuit utilizes a modified three-prong standard to assess whether to issue a preliminary injunction under section 105. *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998); *L&S Indus., Inc.*, 989 F.2d at 932 ("However, in order to issue a preliminary injunction, a court sitting in bankruptcy need not meet all three [traditional] requirements [for a preliminary injunction]."). ***First***, the court analyzes whether allowing third-party litigation would "'defeat or impair' the bankruptcy court's 'jurisdiction over the case before it.'" *Caesars*, 561 B.R. at 450 (quoting *Fisher*, 155 F.3d at 882); *see also L & S Indus.*, 989 F.2d at 932 ("[A] bankruptcy court can enjoin proceedings in other courts when it is satisfied that such proceedings would defeat or impair its jurisdiction over the case before it."). ***Second***, the court assesses whether there is a likelihood of success on the merits, which means a likelihood of a successful reorganization. *Caesars*, 561 B.R at 450. ***Third***, the court determines whether the injunction would serve the public interest. *Id.* The Debtors' requested injunction satisfies all three prongs.

>
 **1.     The prosecution of Pending Actions against 3M threatens to impair or defeat this Court's jurisdiction.**

The Stay Defendants' continued prosecution of the Pending Actions against 3M will undermine this Court's orderly administration over the Debtors' bankruptcy proceedings and deprive the Debtors of their ability to employ the full array of tools afforded debtors in chapter 11, including a comprehensive and fair and equitable means to estimate and resolve all Combat Arms Claims under a confirmable plan of reorganization. *See Bestwall*, 606 B.R. at 257. Courts in

this Circuit have consistently enjoined third-party actions that would otherwise "interfere with, deplete or adversely affect property of a debtor's estate or which would frustrate the statutory scheme embodied in Chapter 11 or diminish a debtor's ability to formulate a plan of reorganization." *In re Gander Partners LLC*, 432 B.R. 781, 788 (Bankr. N.D. Ill. 2010); *see also Fisher*, 155 F.3d at 882 ("The jurisdiction of the bankruptcy court to stay actions in other courts extends beyond claims by and against the debtor, to include suits to which the debtor need not be a party but which may affect the amount of property in the bankrupt estate . . . or the allocation of property among creditors."); *Caesars,* 561 B.R. at 450 (finding a temporary injunction was "likely to enhance the prospects for a successful resolution of the disputes attending the . . . bankruptcy"); *In re Kmart Corp.*, 285 B.R. 679, 688 (Bankr. N.D. Ill. 2002) (noting the Seventh Circuit has extended the stay to non-debtors "where the continuation of the proceedings against the non-debtor could cause irreparable harm to the debtor by diverting resources needed for its reorganization"); *In re USA Gymnastics*, No. 18-09108, Adv. No. 19-50075 [Dkt. 71] (Bankr. S.D. Ind. Apr. 22, 2019) (enjoining litigation against non-debtors where debtor might be required to indemnify non-debtors or participate in litigation to protect its rights). For the reasons set forth below, this Court should similarly enjoin the prosecution of Pending Actions against 3M.

The goal of bellwether trials is to "produ[ce] reliable information about other cases centralized in that MDL proceeding."[12] But out of the 27 bellwether plaintiffs, eight were dismissed before trial and six resulted in trial victories in favor of Aearo. Horowitz Decl. ¶¶ 10-11. Those bellwether trials that resulted in plaintiffs' verdicts did not provide representative information or meaningfully inform settlement, as the MDL Court obstructed defenses and barred

---

[12] *Fed. Jud. Ctr., Bellwether Trials in MDL Proceedings: A Guide for Transferee Judges* at 3, 4, 18 (May 15, 2019); *see Guidelines & Best Practices for Large & Mass-Tort MDLs*, Bolch Jud. Instit., Duke Law School 18-19 (2d ed. Sept. 2018); *Manual for Complex Litig.* § 22.315 ("Test Cases") (4th ed. 2004).

key evidence in the 16 bellwether trials (some with multiple plaintiffs), which were tried in an unprecedentedly compressed time span—an average of one trial per month. *Id.* The frenetic bellwether cadence and enormous litigation spend, combined with the cascading effects of substantial evidentiary errors and false narratives, tainted the bellwether trials from the start. *Id.*

Now there are approximately 3,000 Active Litigants pursing claims against the Debtors—just in the first three Wave discovery pools. Horowitz Decl. ¶¶ 23-25. Each individual case requires attorneys from both sides to spend many hours reviewing records, taking and preparing for depositions, preparing expert reports, responding to and enforcing discovery obligations, and briefing *Daubert* and summary judgment motions—all before a case even gets to trial.[13] Given the incredible volume of cases, even simple administrative tasks, like selecting dates for expert depositions, has consumed significant time and resources for all parties, including the Debtors and their advisors.

In this restructuring, the Debtors seek to establish a global trust to equitably and efficiently compensate Stay Defendants who are entitled to payment. Courts have recognized that trusts established by debtors in chapter 11 proceedings are an appropriate means to accomplish that purpose. *See e.g.*, *Bestwall*, 606 B.R. at 257; *In re Federal-Mogul Glob., Inc.*, 684 F.3d 355, 362 (3d Cir. 2012) (noting "trusts' effectiveness in remedying some of the intractable pathologies" of mass tort litigation, including by reduc[ing] transaction costs and attorneys' fees over comparable rates in the tort system."); *In re Combustion Eng'g., Inc.*, 391 F.3d 190, 234 (3d Cir. 2004) ("This unique funding mechanism makes it possible for future [tort] claimants to obtain substantially similar recoveries as current claimants in a manner consistent with due process.").

---

[13] The MDL Court itself recognized the myriad complexities and nuances involved in adjudicating a single Combat Arms case, and that it is likely "no [federal] district will be spared the burden." Horowitz Decl., Ex. 56 (mediation order) at 1-2.

35

Here, the absence of an injunction will impair or defeat this Court's jurisdiction by: (1) depleting the Debtors' estate of valuable assets—proceeds of shared insurance policies— otherwise available to fund a plan of reorganization and global settlement; (2) frustrating the Debtors' indemnification obligations and overall restructuring effort; and (3) re-directing resources away from restructuring efforts. *See Robins*, 788 F.2d at 1003 (noting that enjoining third-party litigation may be appropriate where failure to do so "would adversely or detrimentally influence and pressure the debtor through the third party") (internal citations omitted); *see also Caesars*, 808 F.3d at 1188-89 (noting that injunctive power under Section 105(a) is valid when the injunction is "likely to enhance the prospects for a successful resolution of the disputes attending [the debtor's] bankruptcy").

          a.     *Without an injunction, the Debtors' assets are at risk due to the Debtors' shared insurance coverage with 3M.*

Each day the Pending Actions are allowed to continue, proceeds available under the Debtors' insurance policies are placed at increasing risk. As described above, the Bankruptcy Code and courts in the Seventh Circuit recognize that the Debtors' interest in insurance policies (and their proceeds) are property of their estates. *See* 11 U.S.C. § 541(a)(1), (6); *see also Home Ins. Co.*, 889 F.2d at 748; *In re Allied Prods. Corp.*, 288 B.R. 533, 535-36 (Bankr. N.D. Ill. 2003); *In re Forty-Eight Insulations, Inc.*, 54 B.R. 905, 908 (Bankr. N.D. Ill. 1985).

As noted above, the Debtors and 3M are co-insureds of shared policies that cover the defense costs and any resulting judgments from the Pending Actions. First Day Decl. ¶ 34. The legal expenses incurred over the past three years of Combat Arms litigation—upwards of $347 million, with approximately $122 million so far in 2022 alone—are staggering. First Day Decl. ¶ 40. This significant spend will continue as the Debtors and 3M defend against 1,200 active "Wave" cases, and increase even further when these cases are remanded for trials across the country. And

adverse judgments could, in turn, exhaust available insurance proceeds. In any event, 3M's ability to make a claim for coverage under the shared policies alone justifies an injunction of the Pending Actions against 3M under section 105. *See In re Quigley Co., Inc.*, 676 F.3d 45, 58 (2d Cir. 2012) (enjoining third-party litigation where non-debtor could submit an insurance claim out of an insurance policy held jointly by debtor and non-debtor); *Robins*, 788 F.2d at 1003 (noting that enjoining third-party litigation is appropriate where failure to do so "would adversely or detrimentally influence and pressure the debtor through the third party") (citation omitted); *In re IFC Credit Corp.*, 422 B.R. 659, 663 (Bankr. N.D. Ill. 2010) (enjoining third-party litigation where "number and scope of the lawsuits pending" may diminish amount of debtor's insurance policy proceeds).

> b.     *Without an injunction, the Debtors' indemnification obligations will jeopardize their restructuring and equitable resolution of Combat Arms Claims.*

As discussed above, under the Funding Agreement, the Debtors owe significant indemnification obligations to 3M and its non-debtor affiliates with respect to losses related to Combat Arms, including those associated with the Pending Actions. Stein Decl. ¶¶ 12-14. Even though the Pending Actions are automatically stayed as to the Debtors, the Debtors' indemnification obligations render them the real-party defendant in any ongoing Pending Actions against 3M. This alone is sufficient to warrant an injunction under section 105. *See In re USA Gymnastics*, No. 18-9108, Adv. No. 19-50075 [Dkt. 71], at 4 (Bankr. S.D. Ind. Apr. 22, 2019) (granting preliminary injunction of lawsuits against non-debtor co-defendants)*; In re LTL Mgmt, LLC,* 638 B.R. at 307 (same as to non-debtor affiliates); *Robins*, 788 F.2d at 999 (explaining indemnification between debtor and non-debtor is sufficient to warrant injunction); *In re Bestwall LLC*, 606 B.R. at 255 (same); *In re W.R. Grace & Co.*, No. 01-01139, 2004 WL 954772, at *4 (Bankr. D. Del. Apr. 29, 2004) (granting injunction under Section 105(a) due to indemnification

37

obligations); *In re Family Health Servs.*, 105 B.R. 937, 942-43 (Bankr. C.D. Cal. 1989) (same); *In re Lomas Fin. Corp.*, 117 B.R. 64, 68 (S.D.N.Y. 1990).

> c. *If an injunction is not granted, the Pending Actions will redirect resources away from a successful restructuring.*

Allowing the Pending Actions to proceed against 3M would impair the Court's jurisdiction by depleting 3M's assets, which are a critical source of funding for the Debtors' restructuring. Through the Funding Agreement, 3M has become the Debtors' sole outside source of funding for the Debtors' operations and capital needs, along with the Chapter 11 Cases (including a claims trust to address the Combat Arms liabilities). Stein Decl. ¶ 12. Every dollar expended by 3M in defense of the Pending Actions or in payment of resulting judgments depletes the funding source that the Debtors will rely upon to achieve a successful reorganization. *See In re MCSi, Inc.*, 371 B.R. 270, 271–72 (S.D. Ohio 2004) (collecting cases in which courts "stayed actions against non-debtor co-defendants 'where they have found that the bankrupt estate would be adversely affected because the creditor's action would prevent the non-debtor from contributing funds to the reorganization.'").

Additionally, the ongoing prosecution of the Pending Actions against 3M will force the Debtors' management and outside advisors to focus on defending thousands of lawsuits instead of working toward a global, systematic, and equitable resolution of Combat Arms Claims under the supervision of the Bankruptcy Court. Before the Wave cases are remanded for trial to courts across the country, each case has significant discovery deadlines on the horizon. Horowitz Decl. ¶ 28-29. For example, more than 100 depositions are set to proceed this week and next week alone; defense expert reports for Wave 2 plaintiffs are due August 12, 2022; depositions of experts for both sides are to be completed by September 26, 2022; *Daubert* and choice-of-law motions are due October 6, 2022 with corresponding responses due October 25, 2022. *Id.* Without an injunction, the Debtors

and their advisors must familiarize themselves with the individual facts and intricacies of each case in order to appropriately defend themselves and prevent an adverse judgment against 3M for which the Debtors will ultimately be financially liable. All of these resources would be better spent focusing on a successful restructuring. *MCSi, Inc.*, 371 B.R. at 271–72 (collecting cases in which courts stayed actions against non-debtors where actions "would consume time and energy of the non-debtor that would otherwise be devoted to a reorganization effort").

Moreover, allowing the Pending Actions to proceed against 3M puts Aearo at risk of evidentiary prejudice. As thousands of cases are worked up in Wave discovery and ultimately remanded to district courts around the country, all of the documents, exhibits, statements, and other evidence generated in each of those proceedings may be used to establish Combat Arms Claims against the Debtors, including deposition testimony from the Debtors' and 3M's experts. *See Bestwall*, 606 B.R. at 256 (finding injunction of litigation against non-debtor appropriate where it would "create the additional risk that statements, testimony, and other evidence generated in the proceedings against the [non-debtor] will be used to try to establish" claims against the debtor).

These risks put the Debtors in a precarious situation: either take an active role in the third-party proceedings to protect their evidentiary interests (to the detriment of their restructuring efforts); or concentrate on the restructuring process (to the detriment of protecting their evidentiary interests). Courts have recognized this Hobson's choice and granted injunctive relief to protect the debtor's future evidentiary interests to facilitate a smoother restructuring process. *See In re Johns-Manville Corp.*, 40 B.R. 219, 225 (S.D.N.Y. 1984); *see also W.R. Grace & Co.*, 386 B.R. at 34.

### 2. The Debtors have a reasonable likelihood of a successful restructuring if the requested injunctive relief is granted.

Second, a preliminary injunction is appropriate because the Debtors have a reasonable likelihood of a successful restructuring. In bankruptcy proceedings, "success on the merits is to be

evaluated in terms of the likelihood of a successful reorganization." *Bestwall*, 606 B.R. at 254 (quoting *Sudbury, Inc. v. Escott*, 140 B.R. 461, 466 (Bankr. N.D. Ohio 1992)).

A reasonable likelihood of successful restructuring exists where there is a realistic possibility that a reorganization plan will be confirmed. *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 860 (6th Cir. 1992). This is not a high standard. Rather, "[a] successful reorganization is likely unless there are clear reasons that force the conclusion that a debtor could not reorganize." *In re Lyondell Chem. Co.*, 402 B.R. 571, 590 (Bankr. S.D.N.Y. 2009); *see also Steven P. Nelson, D.C., P.A. v. G.E. Capital Corp.*, 140 B.R. 814, 816 (Bankr. M.D. Fla. 1992) ("This Chapter 11 case is still in an embryonic stage and it is clearly unreasonable to require the Debtor at this early stage of the case to make detailed projections of the terms or anticipated feasibility of its plan of reorganization."). More importantly, the standard is easily met here.

A primary objective of the Debtors' Chapter 11 Cases is to permanently and equitably resolve all Combat Arms Claims for the benefit of both the claimants and the Debtors. Stein Decl. ¶ 9. The Debtors intend to utilize the tools afforded by chapter 11 of the Bankruptcy Code to establish a claims trust and seek approval of a reorganization plan. First Day Decl. ¶ 11. And no third-party would ever provide a comparable facility on the same advantageous terms to the Debtors as 3M. Stein Decl. ¶ 12. There is no reason to suspect this reorganization will fail given 3M's enormous funding contribution on advantageous terms, particularly if the Debtors' request for injunctive relief is granted. *See Lyondell*, 402 B.R. at 590 (finding that there is no reason to suspect reorganization will fail early in the bankruptcy process, "unless, of course, the acts sought to be enjoined *cause* it to fail"); *In re Gathering Rest., Inc.*, 79 B.R. 992, 998 (Bankr. N.D. Ind. 1986) (the court "must indulge in a presumption, until evidence is presented to the contrary, that .

40

. . the debtor has a reasonable prospect of proposing a feasible plan within a reasonable period of time").

Once the Pending Actions are enjoined, the Debtors' planned restructuring will allow them to accomplish the goals of these Chapter 11 Cases. The process provided by the Bankruptcy Code will assist all stakeholders in avoiding the continuing significant cost and delay associated with protracted litigation in the tort system, and will allow all claimants entitled to compensation to receive a fair and equitable recovery.

With the Funding Agreement, the Debtors believe they have sufficient assets to fund a claims trust governed by procedures that will efficiently and fairly review claims and compensate Combat Arms claimants. Stein Decl. ¶ 18. This course of action will enable the Debtors efficiently and equitably to compensate tort claimants while allowing the Debtors and 3M to avoid an unnecessary expenditure of time and resources, thereby allowing them to continue operating their otherwise healthy businesses. *Id.* ¶ 19. Furthermore, the Debtors and 3M are prepared to commit the necessary resources to reach an agreement with the Stay Defendants' representatives on a fair and equitable plan of reorganization as soon as possible. The Debtors look forward to engaging in good-faith negotiations to reach a consensual resolution of these Chapter 11 Cases with the Stay Defendants' representatives as soon as they are appointed and willing to begin discussions.

### 3.    The requested injunction will serve the public interest.

Finally, enjoining the Pending Actions against 3M will serve the public interest. "In the bankruptcy context, the relevant public interest is the interest in successful reorganizations, since reorganizations preserve value for creditors and ultimately the public." *Caesars*, 561 B.R. at 453; *accord Gander Partners*, 432 B.R. at 789 ("Promoting a successful reorganization is one of the most important public interests") (quoting *In re Integrated Health Services, Inc.*, 281 B.R. 231, 239 (Bankr. D. Del. 2002)); *Gathering*, 79 B.R. at 999 ("In the context of a bankruptcy case…the

41

public interest means the promoting of a successful reorganization which should be one of the paramount concerns of a bankruptcy court…").

Enjoining the Pending Actions against 3M will serve the public interest by allowing the Debtors to focus on the most important task at hand: confirming a chapter 11 plan. The Combat Arms MDL is the largest MDL in history and threatens to over-burden the nation's federal trial courts in the coming months as over a thousand Wave cases are remanded for trial. As the MDL Court noted, "An enormous amount of time and resources will be required to accomplish this endeavor, not just from this Court but from the entire federal judiciary…no district will be spared the burden." Horowitz Decl., Ex. 56 (mediation order) at 2. Conversely, enjoining the Pending Actions against 3M followed by estimation and resolution of the constituent claims through the chapter 11 process will ease the burden on judicial resources while providing for just and equitable recovery for the Stay Defendants. *See In re Grede Foundries, Inc.*, 651 F.3d 786, 790 (finding that an injunction will prevent a "chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts."); *see also In Re W.R. Grace & Co.*, 386 B.R. 17, 36 (Bankr. D. Del. 2008) (extending injunction to non-debtor affiliate railroad that transported debtor's products because "completing the reorganization process…[will] resolv[e] thousands of claims in a uniform and equitable manner"). Moreover, the breathing space provided by an injunction will provide the Debtors with the time necessary to engage in negotiations that would further a global settlement of Combat Arms and other liabilities.

It also is in the public interest to promote justice in the court system through uniform and equitable treatment of all holders of Combat Arms Claims. *See Bestwall*, 606 B.R. at 257 (noting a trust established by debtor in Chapter 11 "provide[s] all claimants—including future claimants who have yet to institute litigation—with an efficient means through which to equitably resolve

their claims"). To the contrary, inconsistent judgments are not a desirable means of resolving a dispute with nationwide implications. *See In re Dow Corning Corp.*, 211 B.R. 545, 588 (Bankr. E. D. Mich. 1997) ("[I]t is anything but just when presenting the identical proofs, one plaintiff suffering nearly identical injuries or illness[] wins a multimillion dollar verdict against a defendant while another takes nothing."). Ultimately, allowing the Pending Actions to proceed in the tort system would undermine the public interests by allowing for different recoveries for similarly situated claimants, as has already occurred during the MDL's bellwether process. While the tort system may benefit a few fortunate Combat Arms litigants, it will inevitably work to the disadvantage of others. *See In re Klarchek*, 508 B.R. 386, 392 (Bankr. N.D. Ill. 2014) ("Aggregation prevents efforts by creditors to pick off or affect the disposition of assets in ways that may be privately beneficial but collectively harmful.") (quoting *Nat'l Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 708 (7th Cir. 1994)).

## III. THE COURT SHOULD GRANT A TEMPORARY RESTRAINING ORDER TO EFFECTUATE THE RELIEF SOUGHT BY THE DEBTORS PENDING AN ORDER ON THE DEBTORS' PRELIMINARY INJUNCTION REQUEST.

This Court should also immediately enter a temporary restraining order to preserve the effectiveness of the automatic stay until this Court has the opportunity to rule on the Debtors' request for a preliminary injunction. Specifically, the Debtors seek a temporary restraining order only as to the continued prosecution of Pending Actions with active discovery, pre-trial, trial, or appellate deadlines (defined above as the "Active Litigation"), which includes the lawsuits of approximately 3,000 Active Litigants. Horowitz Decl. ¶¶ 23-25.

Bankruptcy Rule 7065 gives this Court authority to issue a temporary restraining order pursuant to Rule 65(b) of the Federal Rules of Civil Procedure. Civil Rule 65(b) (by virtue of Bankruptcy Rule 7065) provides:

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b);[14] Fed. R. Bankr. P. 7065. A temporary restraining order is properly granted where it is necessary to prevent immediate and irreparable injury pending a hearing upon a motion for an injunction. *See In re Britestarr Homes, Inc.*, 368 B.R. 106, 108 (Bankr. D. Conn. 2007) (granting temporary restraining order until preliminary injunction could be ruled on "in order to maintain the status quo pending the continued hearing on the plaintiffs' motion); 13 Moore's Federal Practice § 65.36 (2019).

The facts here satisfy the requirements for a temporary restraining order. As described above, the prosecution of the Active Litigation against 3M risks significant, immediate and irreversible harm to the Debtors and their estates. Stein Decl. ¶¶ 16-17. Indeed, in the next two weeks alone the Debtors and 3M have scheduled **over 100 depositions**. Horowitz Decl. ¶ 29. On a daily basis, obligations arise and deadlines are imposed in those cases, including in connection with depositions, briefing, and discovery requests. *See* Horowitz Decl. ¶ 28. Without immediate injunctive relief, the Debtors will be compelled to pull key estate resources away from its reorganization efforts to focus on that ongoing litigation, hampering the Debtors' reorganization from the outset. Stein Decl. ¶ 17. A denial of the Debtors' request for a temporary restraining order pending a ruling on the Debtors' request for injunctive relief would cause the very harm that the Debtors seek to prevent by this Motion and the Complaint.

---

[14] Although Civil Rule 65(c) requires the posting of a bond as a prerequisite to a preliminary injunction, Bankruptcy Rule 7065 exempts an application made by a debtor, trustee or debtor in possession from the bond requirement. Fed. R. Bankr. P. 7065.

In similar circumstances, numerous bankruptcy courts in mass tort chapter 11 cases have issued temporary restraining orders enjoining litigation as to third parties to avoid any immediate and irreparable harm to the debtor or its estate. *See, e.g., In re Aldrich Pump LLC*, No. 20-30608, Adv.No. 20-3041 (Bankr. W.D.N.C. June 25, 2020); *In re DBMP LLC*, No. 20-30080, Adv. No. 20-3004 (Bankr. W.D.N.C. Jan. 29, 2020); *In re Bestwall LLC*, No. 17-31795, Adv. No. 17-03105 (Bankr. W.D.N.C. Nov. 8, 2017); *In re Kaiser Gypsum Co.*, No. 16-31602, Adv. No. 16-03313 (Bankr. W.D.N.C. Oct. 7, 2016); *In re Specialty Prods. Holding Corp.*, No. 10-11780, Adv. No. 10-51085 (Bankr. D. Del. June 4, 2010); *In re W.R. Grace & Co.*, 386 B.R. at 21; *In re N. Am. Refractories Co.*, No. 02-20198, Adv. No. 02-02004 (Bankr. W.D. P.A. Jan. 4, 2002); *In re G-I Holdings Inc.*, No. 01-30135, Adv. No. 01-03013 (Bankr. D.N.J. Jan. 19, 2001). Immediate injunctive relief is likewise required here to safeguard the Debtors' prospects for a successful reorganization.

Although temporary restraining orders generally are limited to 14 days, before that period expires and for good cause, this Court may extend its order for an additional 14 days. Fed. R. Civ. P. 65(b)(2). The Debtors request that this Court: (a) for good cause, enter a temporary restraining order extending for the maximum period allowed under Civil Rule 65 and Bankruptcy Rule 7065; and (b) set a hearing on this Motion on or before that date, or such other later date agreed-upon by the parties. This will allow more parties in interest to participate in the hearing on the requested relief. Granting such relief also will conserve time and resources for the Court and the Debtors' estates.

## CONCLUSION

To equitably and expeditiously resolve the claims related to the Combat Arms Earplug, and formulate a confirmable plan, it is essential that the Pending Actions be paused for the pendency of the Chapter 11 Cases.

Accordingly, the Debtors request that the Court enter an order confirming that the automatic stay applies to the Pending Actions against 3M. In addition, the Debtors request that the Court enter an order preliminarily enjoining the continued prosecution of the Pending Actions against 3M while these Chapter 11 Cases remain pending. Further, the Debtors respectfully request that the Court enter an order temporarily restraining the Active Litigants from continuing to prosecute the Active Litigation against 3M until the Court has had an opportunity to rule on the Debtors' request for a preliminary injunction, or for the maximum period permitted by Fed. R. Bankr. P. 7065, whichever occurs sooner.

Indianapolis, Indiana
Dated: July 26, 2022

*/s/ Jeffrey A. Hokanson*
Jeffrey A. Hokanson (Ind. Atty. No. 14579-49)
John C. Cannizzaro (Ohio Atty. No. 85161)
Connor Skelly (Ind. Atty. No. 35365-06) (*pro hac vice* pending)
**ICE MILLER LLP**
One American Square, Suite 2900
Indianapolis, IN 46282-0200
Telephone:    (317) 236-2100
Facsimile:    (317) 236-2219
Email:    jeff.hokanson@icemiller.com
    john.cannizzaro@icemiller.com
    connor.skelly@icemiller.com


Edward O. Sassower, P.C. (*pro hac vice* pending)
Emily Geier (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    edward.sassower@kirkland.com
    emily.geier@kirkland.com


Mark McKane, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1473
Facsimile:
Email:    mark.mckane@kirkland.com


Chad J. Husnick, P.C. (*pro hac vice* pending)
David M. Bernick (*pro hac vice* pending
Brenton A. Rogers, P.C. (*pro hac vice* pending)
Renee D. Smith (*pro hac vice* pending)
Spencer Winters (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    chad.husnick@kirkland.com
    david.bernick@kirkland.com
    brogers@kirkland.com
    renee.smith@kirkland.com
    spencer.winters@kirkland.com


David I. Horowitz, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 South Flower Street, 37th Floor,
Los Angeles, California 900714
Telephone:    (213) 680-8374
Facsimile:    (213) 808-8074
Email:    david.horowitz@kirkland.com


*Proposed Co-Counsel to the Debtors and Debtors in Possession*