# Exhibit 1

**AGREEMENT AND PLAN OF MERGER**

among

**AEARO HOLDING CORP.,**

**3M COMPANY**

and

**TITAN ACQUISITION SUBSIDIARY, INC.**

**November 14, 2007**

ffny03\choial\717967.2

Confidential - Subject to Protective Order

3M_MDL000294299

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement and Plan of Merger as of the date first written above.

**AEARO HOLDING CORP.**

By: _____

Name:

Title:

**3M COMPANY**

By: _____

Name: Jean J. Lobey

Title: Executive Vice President

**TITAN ACQUISITION SUBSIDIARY, INC.**

By: _____

Name: Julie L. Bushman

Title:   President

**PERMIRA ADVISERS L.L.C. (solely in its capacity as the Representative)**

By: _____

Name:

Title:

Confidential - Subject to Protective Order

## TABLE OF CONTENTS

**Page**

ARTICLE I GENERAL ................................................................................................. 1

    1.1    The Merger ............................................................................................... 1

    1.2    Effective Time of the Merger. ................................................................. 1

    1.3    Effects of the Merger. .............................................................................. 1

    1.4    Certificate of Incorporation; By-Laws; Officers and Directors of Surviving Company. ............................................................................... 2

    1.5    Taking of Necessary Actions; Further Assurances. ................................. 2

    1.6    The Closing. ............................................................................................. 2

ARTICLE II PAYMENT OF CLOSING CONSIDERATION; EFFECT OF MERGER ON CAPITAL STOCK OF THE COMPANY AND ACQUISITION SUB ................................................................................. 2

    2.1    Purchase Price; Delivery of Funds and Surrender of Certificates. ......... 3

    2.2    Effect on Capital Stock. .......................................................................... 4

    2.3    Stock Options. .......................................................................................... 5

    2.4    Closing Adjustment. ................................................................................ 5

    2.5    No Further Ownership Rights in Common Stock, Preferred Stock and Options. ............................................................................................ 7

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE COMPANY ................................................................................................. 7

    3.1    Organization, Etc. .................................................................................... 7

    3.2    Capitalization of the Company and the Company Subsidiaries; Minute Books. ......................................................................................... 8

    3.3    Authority Relative to this Agreement, Etc. ............................................. 9

    3.4    Consents and Approvals; No Violations. ................................................. 9

    3.5    Financial Statements. ............................................................................... 9

    3.6    Absence of Certain Changes. ................................................................. 10

    3.7    Compliance with Law; Permits ............................................................. 11

    3.8    Litigation ................................................................................................ 11

    3.9    No Undisclosed Liabilities ..................................................................... 11

    3.10    Taxes. ..................................................................................................... 12

    3.11    Brokers' and Finders' Fees. ................................................................... 13

    3.12    Intellectual Property .............................................................................. 13

ffny03\choial\717967.2

Confidential - Subject to Protective Order

3M_MDL000294301

**TABLE OF CONTENTS**
(continued)

**Page**

| | | |
|---|---|---|
| 3.13 | Employee Benefit Plans; Employees. | 15 |
| 3.14 | Environmental Matters. | 18 |
| 3.15 | Material Contracts. | 19 |
| 3.16 | Related-Party Transactions. | 21 |
| 3.17 | Real Property. | 21 |
| 3.18 | Personal Property. | 22 |
| 3.19 | Insurance. | 23 |
| 3.20 | Suppliers and Customers. | 23 |
| 3.21 | Product Liability. | 23 |
| 3.22 | No Additional Representations. | 24 |
| ARTICLE IV | REPRESENTATIONS AND WARRANTIES OF THE PARENT AND ACQUISITION SUB | 24 |
| 4.1 | Organization, Etc. | 24 |
| 4.2 | Authority Relative to this Agreement, Etc. | 24 |
| 4.3 | Consents and Approvals; No Violations. | 25 |
| 4.4 | Litigation. | 25 |
| 4.5 | Parent's Business Investigation. | 25 |
| 4.6 | Disclaimer Regarding Projections. | 26 |
| 4.7 | Availability of Funds. | 26 |
| 4.8 | Operations of Acquisition Sub. | 26 |
| 4.9 | Brokers' and Finders' Fees. | 26 |
| 4.10 | No Additional Representations. | 26 |
| ARTICLE V | COVENANTS | 26 |
| 5.1 | Conduct of Business. | 26 |
| 5.2 | Access to Information. | 29 |
| 5.3 | Confidentiality; Solicitation. | 29 |
| 5.4 | Efforts to Consummate. | 30 |
| 5.5 | Expenses; Transfer Taxes. | 32 |
| 5.6 | Post-Closing Cooperation. | 32 |
| 5.7 | Publicity. | 32 |

ii

ffny03\choial\717967.2

## TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 5.8 | Employee Matters. | 32 |
| 5.9 | Indemnification, Exculpation. | 34 |
| 5.10 | Maintenance of Cabot Agreement. | 34 |
| ARTICLE VI | CONDITIONS PRECEDENT | 35 |
| 6.1 | Conditions to Each Party's Obligations. | 35 |
| 6.2 | Conditions to Obligations of the Parent and Acquisition Sub. | 35 |
| 6.3 | Conditions to the Obligations of the Company. | 37 |
| 6.4 | Frustration of Closing Conditions. | 37 |
| ARTICLE VII | TERMINATION | 37 |
| 7.1 | Termination. | 37 |
| 7.2 | Effect of Termination. | 38 |
| ARTICLE VIII | GENERAL PROVISIONS | 38 |
| 8.1 | Assignment. | 38 |
| 8.2 | No Third-Party Beneficiaries. | 38 |
| 8.3 | Survival of Representations and Warranties. | 39 |
| 8.4 | Notices. | 39 |
| 8.5 | Interpretation; Exhibits and Schedules. | 40 |
| 8.6 | Counterparts; Facsimile Signatures. | 41 |
| 8.7 | Entire Agreement. | 41 |
| 8.8 | Amendments and Waivers. | 41 |
| 8.9 | Severability. | 41 |
| 8.10 | Specific Performance. | 41 |
| 8.11 | Limitation on Damages. | 42 |
| 8.12 | No Personal Liability for Shareholders, Directors or Officers. | 42 |
| 8.13 | Governing Law. | 42 |
| 8.14 | Consent to Jurisdiction; Waiver of Jury Trial. | 42 |

iii

ffny03\choial\717967.2

3M_MDL000294303

**TABLE OF CONTENTS**
(continued)

Page

SCHEDULES

| | |
|---|---|
| Schedule 1.2 | Permitted Encumbrances |
| Schedule 3.2(a) | Shares |
| Schedule 3.2(b) | Company Subsidiaries |
| Schedule 3.4 | Consents and Approvals |
| Schedule 3.5 | Unaudited Financial Statements |
| Schedule 3.6 | Exceptions to Absence of Material Change |
| Schedule 3.7 | Exceptions to Compliance with Law; Permits |
| Schedule 3.8 | Litigation |
| Schedule 3.9 | Certain Liabilities |
| Schedule 3.10 | Taxes |
| Schedule 3.11 | Brokers' and Finders' Fees |
| Schedule 3.12(a) | Exceptions to Intellectual Property Rights |
| Schedule 3.12(c) | Intellectual Property Rights Infringement |
| Schedule 3.12(d)(1) | Domestic Patents |
| Schedule 3.12(d)(2) | Domestic Patent Applications |
| Schedule 3.12(e)(1) | Foreign Patents |
| Schedule 3.12(e)(2) | Foreign Patent Applications |
| Schedule 3.12(f) | Domestic Trademarks |
| Schedule 3.12(g) | Foreign Trademarks |
| Schedule 3.12(h) | Domain Names |
| Schedule 3.13(a)(i) | Benefit Plans |
| Schedule 3.13(a)(ii) | Exceptions to Benefit Plan Disclosure |
| Schedule 3.13(a)(iii) | Exceptions to Benefit Plan Compliance |
| Schedule 3.13(a)(v) | Benefit Plans: Collective Bargaining Agreements |
| Schedule 3.13(b) | Exceptions to Qualified Plans |
| Schedule 3.13(c) | Exceptions to Title IV Plans |
| Schedule 3.13(d) | Multiemployer Plans |
| Schedule 3.13(e) | Health Benefit Plans |
| Schedule 3.13(f) | Employment Actions |
| Schedule 3.14 | Environmental Matters |
| Schedule 3.15(a) | Material Contracts |
| Schedule 3.16 | Related-Party Transactions |
| Schedule 3.17(a) | Parcels |
| Schedule 3.17(b) | Leased Real Property |
| Schedule 3.18 | Exceptions to Personal Property |
| Schedule 3.19(a) | Insurance |
| Schedule 3.19(b) | Insurance: Denied Claims |
| Schedule 3.20 | Customers and Suppliers |
| Schedule 3.21 | Product Liability |
| Schedule 5.1(b) | Exceptions to Conduct of Business |
| Schedule 5.1(b)(xiii) | Key Employees |

ffny03\choial\717967.2

3M_MDL000294304

## TABLE OF CONTENTS
(continued)

**Page**

Schedule 5.8(d)          Employee Severance Benefits

<u>Exhibits</u>
Exhibit A – Certificate of Merger
Exhibit B – Letter of Transmittal
Exhibit C – Form of Company Stockholder Consent

ffny03\choial\717967.2

Confidential - Subject to Protective Order

**AGREEMENT AND PLAN OF MERGER**, dated as of November 14, 2007, by and among 3M Company, a Delaware corporation("Parent"), Titan Acquisition Subsidiary, Inc., a Delaware corporation and a wholly-owned subsidiary of Parent ("Acquisition Sub"), and Aearo Holding Corp., a Delaware corporation (the "Company").

WHEREAS, the respective Boards of Directors of each of the Parent, Acquisition Sub and the Company, and Parent, as the sole shareholder of the Acquisition Sub, have each duly approved and adopted this Agreement and Plan of Merger (this "Agreement"), the Certificate of Merger in substantially the form of Exhibit A attached hereto (the "Certificate of Merger") and the proposed merger (the "Merger") of Acquisition Sub with and into the Company in accordance with, and subject to, the terms and conditions of this Agreement, the Certificate of Merger and the Delaware General Corporation Law (the "DGCL"); and

WHEREAS, simultaneously with the execution and delivery of this Agreement, the Principal Stockholders are executing and delivering written consents (each, a "Principal Stockholder Consent") in substantially the form of Exhibit C hereto pursuant to Section 228 of the DGCL pursuant to which such Principal Stockholders adopt this Agreement.

NOW, THEREFORE, in consideration of the benefits to be derived from this Agreement and the Certificate of Merger and the representations, warranties, covenants, agreements and conditions contained herein and in the Certificate of Merger, the parties hereto hereby agree as follows:

## ARTICLE I

## GENERAL

**1.1   The Merger.**

At the Effective Time (as defined below) and in accordance with, and subject to, the provisions of this Agreement, the Certificate of Merger and the DGCL, Acquisition Sub shall be merged with and into the Company and shall cease to exist, and the Company shall be the surviving corporation in the Merger (hereinafter sometimes referred to as the "Surviving Company").

**1.2   Effective Time of the Merger.**

The Merger shall become effective on the Closing Date upon the filing by the Company of the Certificate of Merger with the Secretary of State of the State of Delaware (or at such later time as shall be agreed upon by the Company and Acquisition Sub and set forth in the Certificate of Merger). The Certificate of Merger shall be executed and delivered in the manner provided under the DGCL. The time when the Merger shall become effective is referred to herein as the "Effective Time."

**1.3   Effects of the Merger.**

Except as specifically set forth herein or in the Certificate of Merger, at the Effective Time, the identity, existence, corporate organization, purposes, powers, objects, franchises,

1

ffny03\choial\717967.2

  3M_MDL000294306

privileges, rights, immunities, restrictions, debts, liabilities and duties (collectively, the "Corporate Rights") of the Company shall continue in effect and be unimpaired by the Merger, and the Corporate Rights of Acquisition Sub shall be merged with and into the Company, which shall, as the Surviving Company, be fully vested therewith

**1.4     Certificate of Incorporation; By-Laws; Officers and Directors of Surviving Company.**

From and after the Effective Time, (a) the certificate of incorporation of the Acquisition Sub shall be the certificate of incorporation of the Surviving Company until altered, amended or repealed as provided in the DGCL or by applicable Law, except that Article I thereof shall be amended and restated as follows:  "The name of the Corporation is Aearo Holding Corp."; (b) the by-laws of Acquisition Sub shall become the by-laws of the Surviving Company, unless and until altered, amended or repealed as provided in the DGCL, the Surviving Company's certificate of incorporation or such by-laws, or by applicable Law; (c) the officers of the Company immediately prior to the Effective Time shall become the officers of the Surviving Company, respectively, unless and until removed or until their respective terms of office shall have expired in accordance with the DGCL or the Surviving Company's certificate of incorporation or by-laws, as applicable and (d) the directors of Acquisition Sub immediately prior to the Effective Time shall be the directors of the Surviving Company unless and until removed or until their respective terms of office shall have expired in accordance with the DGCL or the Surviving Company's certificate of incorporation or by-laws, as applicable.

**1.5     Taking of Necessary Actions; Further Assurances.**

Prior to the Effective Time, and subject to the terms and conditions contained in this Agreement, the parties hereto shall take or cause to be taken all such actions as may be reasonably necessary or appropriate in order to effectuate, as expeditiously as reasonably practicable, the Merger.

**1.6     The Closing.**

The closing (the "Closing") of the transactions contemplated by this Agreement shall take place at the offices of Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004 on a date (the "Closing Date") to be mutually agreed upon by the parties, which date shall be the later of January 31, 2008 or the last Business Day in the month that all of the conditions precedent set forth in Article VI have been satisfied or waived (other than those conditions which by their terms are intended to be satisfied at the Closing).  On the Closing Date, each of the Company and the Acquisition Sub shall execute the Certificate of Merger, and the Company shall file the Certificate of Merger with the Secretary of State of the State of Delaware pursuant to Section 1.2 hereof.

**ARTICLE II**

**PAYMENT OF CLOSING CONSIDERATION; EFFECT OF MERGER ON CAPITAL STOCK OF THE COMPANY AND ACQUISITION SUB**

ffny03\choial\717967.2

Confidential - Subject to Protective Order                3M_MDL000294307

**2.1     Purchase Price; Delivery of Funds and Surrender of Certificates.**

(a)     The aggregate purchase price payable in respect of all Shares, Preferred Shares and Options outstanding immediately prior to the Effective Time pursuant to the Merger shall be a dollar amount (such amount, the "Closing Consideration") equal to (i) $1,200,000,000, plus (ii) the amount, if any, by which Cash exceeds $2,000,000, less (iii) the amount, if any, by which Cash is less than $2,000,000, less (iv) all Transaction Related Expenses to the extent not paid at or prior to the Closing, less (v) Debt, plus (vi) the Acquisition 1 Total Enterprise Value (if any), plus (vii) the Acquisition 2 Total Enterprise Value (if any).

(b)     The Estimated Closing Consideration shall be as set forth in the Estimated Closing Consideration Statement, and shall be subject to adjustment as set forth in Section 2.4.  The Parent shall pay such Estimated Closing Consideration in immediately available funds as directed by the Company in accordance with this Section 2.1(b) and Section 2.3.  At the Effective Time, upon surrender by each Shareholder and each Preferred Holder to the Company of the certificate(s) which, immediately prior to the Effective Time, represented Shares or Preferred Shares, as applicable, together with a duly executed letter of transmittal in substantially the form attached as Exhibit B hereto (a "Letter of Transmittal") containing such provisions as shall reasonably be agreed by the Company and Parent, including provisions designating the Representative as the Representative under this Agreement, and providing for indemnification and other customary terms, the Company shall pay or shall cause to be paid to (i) each such Shareholder with respect to any Shares, an amount in cash equal to the product of (x) (I) the Estimated Closing Consideration plus (II) the Aggregate Exercise Price less (III) the Total Preferred Amount, and (y) such Shareholder's Proportionate Percentage, such amount to be paid by wire transfer of immediately available funds to an account designated by such Shareholder not later than three (3) Business Days prior to the Closing Date and (ii) each such Preferred Holder with respect to any Preferred Shares, an amount in cash equal to the Preferred Amount multiplied by the number of Preferred Shares held by such Preferred Holder, such amount to be paid by wire transfer of immediately available funds to an account designated by such Preferred Holder not later than three (3) Business Days prior to the Closing Date.  Until surrendered as contemplated by this Section 2.1(b), each certificate representing Shares and Preferred Shares shall be deemed, at and after the Effective Time, to represent only the right to receive upon such surrender the consideration or the Preferred Amount, respectively, contemplated by this Article II and the DGCL.

(c)     If payment or delivery is to be made to a Person other than the Person in whose name a certificate representing Shares or Preferred Shares, as applicable, so surrendered is registered, it shall be a condition of payment that the certificate so surrendered shall be properly endorsed or otherwise in proper form for transfer, that the signatures on the certificate or any related stock power shall be properly guaranteed and that the Person requesting such payment either pay any transfer or other Taxes required by reason of the payment to a Person other than the registered holder of the certificate so surrendered or establish to the reasonable satisfaction of the Surviving Company that such Tax has been paid or is not applicable.

(d)     In the event that any certificate representing Shares or Preferred Shares shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by a registered holder of such lost, stolen or destroyed certificate in form and substance reasonably

3

ffny03\choial\717967.2

3M_MDL000294308

satisfactory to the Surviving Company, the Surviving Company will issue in exchange for such lost, stolen or destroyed certificate the Closing Consideration (as adjusted pursuant to Section 2.4) or Preferred Amount, as applicable, in respect thereof in the manner set forth in this Article II.

**2.2    Effect on Capital Stock.**

(a)    The manner and basis of converting, exchanging or canceling the shares of capital stock of each of the Company and Acquisition Sub into or for cash (or the contingent right to receive cash) or securities of the Surviving Company shall be as follows:

(i)    each share of common stock, \$.01 par value, of Acquisition Sub issued and outstanding immediately prior to the Effective Time shall be converted into one (1) share of common stock, \$.01 par value, of the Surviving Company;

(ii)    each Share and each Preferred Share issued and outstanding immediately prior to the Effective Time and owned directly or indirectly by the Company (whether as treasury stock or otherwise), Parent or Acquisition Sub, if any, shall, by virtue of the Merger and without any action on the part of the holder thereof, be canceled and no consideration shall be delivered in exchange therefor;

(iii)    each Share and each Preferred Share that is authorized but unissued immediately prior to the Effective Time shall be canceled;

(iv)    Shares issued and outstanding immediately prior to the Effective Time (other than Dissenting Shares and Shares to be cancelled in accordance with Section 2.2(a)(ii)) shall, by virtue of the Merger and without any action on the part of the Holders thereof, cease to be outstanding, and each Holder thereof shall thereafter be entitled to receive in respect of such Holder's Shares an amount in cash without any interest thereon equal to the product of (A) (x) the Closing Consideration plus (y) the Aggregate Exercise Price less (z) the Total Preferred Amount, and (B) such Holder's Proportionate Percentage; and

(v)    Preferred Shares issued and outstanding immediately prior to the Effective Time shall, by virtue of the Merger and without any action on the part of the Preferred Holders thereof, cease to be outstanding, and each Preferred Holder shall thereafter be entitled to receive in respect of such Preferred Holder's Preferred Shares an amount in cash without any interest thereon equal to the Preferred Amount multiplied by the number of Preferred Shares held by such Preferred Holder.

(b)    Notwithstanding anything in this Agreement to the contrary, each Shareholder who did not vote or execute a written consent in favor of the Merger and who complies with all of the relevant provisions of Section 262 of the DGCL (each, a "Dissenting Shareholder" and collectively, the "Dissenting Shareholders", and the Shares held by such Dissenting Shareholders, "Dissenting Shares") shall not have the right to receive payment pursuant to Section 2.2(a)(iv) above, but instead and in lieu thereof shall have the right to receive payment from the Surviving Company with respect to its Dissenting Shares in accordance with the DGCL, unless and until such Shareholder shall have effectively withdrawn

4

ffny03\choial\717967.2

Confidential - Subject to Protective Order                                    3M_MDL000294309

or lost its rights to appraisal under the DGCL. If any such Shareholder shall have effectively withdrawn or lost such right, such Shareholder shall have the right to receive from the Surviving Company payment pursuant to Section 2.2(a)(iv) above. No later than ten (10) days following the date on which the Effective Time occurs, the Parent and the Surviving Company shall provide all Dissenting Shareholders with notice of the Effective Time.

**2.3    Stock Options.**

(a)    In connection with the Merger and without any action on the part of the Holders thereof, each Option, whether or not then vested or exercisable, outstanding immediately prior to the Effective Time shall be cancelled as of the Effective Time, and each Holder thereof shall have the right to receive an amount in cash equal to (1) the product of (A) such Holder's Proportionate Percentage and (B) (w) the Closing Consideration, plus (x) the Aggregate Exercise Price, minus (y) the Total Preferred Amount, minus (2) the aggregate exercise price for all Shares issuable upon the exercise of Options held by such Holder outstanding immediately prior the Effective Time. The Company will treat the Merger as a "Realization Event" for purposes of the 2006 Stock Incentive Plan, and will exercise its option under Section 9.3 of such plan to cash out all outstanding equity awards issued under such plan resulting in the termination of such plan.

(b)    On or as soon as practicable following the Closing Date (but in any event within 5 Business Days following the Closing Date), the Parent and the Company shall cause the Company's payroll agent to pay to each Holder of Options an amount in cash equal to (1) the product of (A) such Holder's Proportionate Percentage and (B) (w) the Estimated Closing Consideration, plus (x) the Aggregate Exercise Price minus (y) the Total Preferred Amount, minus (2) the aggregate exercise price for all Shares issuable upon the exercise of Options held by such Holder outstanding immediately prior the Effective Time. Notwithstanding anything in this Agreement to the contrary, any payment to a Holder in respect of any Options or Restricted Shares shall be reduced by the applicable amount of withholding for income and employment Tax purposes (the "Withholding Amount"), which Withholding Amount shall be paid to the Company to be applied to such Taxes for the benefit of the Holders disposing of such Options or Restricted Shares. Prior to the Effective Time, the Company shall provide to Parent a schedule setting forth each Holder of Options and a good faith estimate of the amount such Holder will receive in respect of his or her Options pursuant to this clause (b).

**2.4    Closing Adjustment.**

(a)    On or before the date that is ten (10) days prior to the anticipated Closing Date, the Company shall prepare and deliver to Parent and Acquisition Sub (i) a statement, certified by the Company's Chief Financial Officer (the "Estimated Closing Consideration Statement"), setting forth the Company's good faith estimate of the Closing Consideration (such amount, the "Estimated Closing Consideration"), together with reasonable supporting detail, and (ii) a statement, certified by the Company's Chief Financial Officer (the "Total Preferred Amount Statement"), setting forth the aggregate Preferred Amount to be paid to all Preferred Holders in exchange for the Preferred Shares outstanding immediately prior to the Effective Time (the "Total Preferred Amount"), together with reasonable supporting detail.

5

Confidential - Subject to Protective Order                    3M_MDL000294310

(b)     After receipt of the Estimated Closing Consideration Statement and the Total Preferred Amount Statement and prior to the day falling three (3) days prior to the anticipated Closing Date, Parent and the Company shall negotiate in good faith to mutually agree upon the amounts set forth in the Estimated Closing Consideration Statement.  If Parent and the Company agree upon the amounts set forth in the Estimated Closing Consideration Statement and the Total Preferred Amount Statement, then the Closing Consideration set forth therein shall be final, conclusive, binding and non-appealable.

(c)     If Parent and the Company fail to agree upon the amounts set forth in the Estimated Closing Consideration Statement within three (3) days of the anticipated Closing Date, neither Parent nor the Company shall delay the Closing because of such failure to agree.  The Estimated Closing Consideration set forth in the Estimated Closing Consideration Statement delivered by the Company shall be deemed to apply for purposes of Section 2.1(b) and Section 2.3(b).  As promptly as practicable following the Closing and in no event later than fifteen (15) days following the Closing Date, Parent and the Representative shall attempt in good faith to resolve any differences that they had with respect to the amounts set forth in the Estimated Closing Consideration Statement.  If Parent and the Representative resolve their differences, then, upon their agreement in writing setting forth such resolution, the Estimated Closing Consideration Statement, as amended to the extent necessary to reflect the resolution of their differences, shall be final, conclusive, binding and non-appealable.

(d)     If Parent and the Representative are unable to agree upon the amounts set forth in the Estimated Closing Consideration Statement during the 15-day period following the Closing Date, then they shall refer their remaining differences to the dispute resolution department of a nationally recognized independent accounting firm as the Parent and the Representative may agree (such accounting firm, the "Independent Accounting Firm"), which shall determine, whether and to what extent, if any, the Estimated Closing Consideration Statement requires adjustment.  Parent and the Representative shall instruct the Independent Accounting Firm to deliver its written determination to Parent and the Representative no later than the 15th day following the date on which the remaining differences are referred to the Independent Accounting Firm.  The Independent Accounting Firm's written determination shall be final, conclusive, binding and non-appealable.  The fees and expenses of the Independent Accounting Firm shall be paid 50% by Parent and 50% by the Representative.  Parent and the Representative shall make available to the Independent Accounting Firm and to each other all relevant books and records and working papers relating to the Estimated Closing Consideration Statement (including, without limitation, access to personnel at the Surviving Company who prepared such Estimated Closing Consideration Statement) and all other items reasonably requested by the Independent Accounting Firm.

(e)     If the Closing Consideration (if and when determined in accordance with Section 2.4(c) or Section 2.4(d)) exceeds the Estimated Closing Consideration (the amount of such excess, the "Excess Amount"), then the Closing Consideration shall be adjusted upward by an amount equal to the Excess Amount and within five (5) Business Days following such determination, Parent shall pay or cause to be paid to each Holder of Shares and Options outstanding immediately prior to the Effective Date an amount equal to the product of (x) such Holder's Proportionate Percentage and (y) the Excess Amount (less the applicable Withholding Amount for any such payment made in respect of Options and Restricted Shares).

ffny03\choial\717967.2

Confidential - Subject to Protective Order                                    3M_MDL000294311

(f)     If the Estimated Closing Consideration exceeds the Closing Consideration (if and when determined in accordance with Section 2.4(c) or Section 2.4(d)) (the amount of such excess, the "Shortfall Amount"), then the Closing Consideration shall be adjusted downward by an amount equal to the Shortfall Amount and the Representative (on behalf of the Holders of Shares and Options) shall pay to Parent, within five (5) days following such determination, the Shortfall Amount.

**2.5     No Further Ownership Rights in Common Stock, Preferred Stock and Options.**

The Closing Consideration, when paid in accordance with the provisions of this Article II, shall be deemed to have been paid in full satisfaction of all rights pertaining to the Options, Shares and Preferred Shares outstanding immediately prior to the Effective Time.  At and after the Effective Time, the stock transfer books of the Surviving Company shall be closed with respect to the capital stock of the Company, and there shall be no further registration of transfers of the capital stock of the Company thereafter on the records of the Surviving Company.  If, after the Effective Time, certificates representing Shares or Preferred Shares, or option agreements representing Options, in each case, that were outstanding immediately prior to the Effective Time are presented to the Surviving Company for any reason, together with a duly executed Letter of Transmittal, they shall be canceled and exchanged as provided in this Article II.

**ARTICLE III**

**REPRESENTATIONS AND WARRANTIES
OF THE COMPANY**

The Company hereby represents and warrants to the Parent and Acquisition Sub as follows:

**3.1     Organization, Etc.**

The Company and each of the Company Subsidiaries is duly organized, validly existing and in good standing (in such jurisdictions where such status is recognized) under the laws of the jurisdiction of its organization, with all corporate power and authority and all licenses, permits and authorizations necessary to own, lease or operate the properties and assets owned, leased or operated by it and to carry on its business as currently conducted, except where the failure to be so duly organized, validly existing and in good standing (in such jurisdictions where such status is recognized) or to have such corporate power or authority, licenses, permits and authorizations would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect.  The Company and each of the Company Subsidiaries is qualified or licensed to do business in each jurisdiction in which ownership of its property or assets or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed is not reasonably likely to have, in the aggregate, a Material Adverse Effect.  True and complete copies of the certificate of incorporation and by-laws (or other comparable governing documents) of the Company and each of the Company Subsidiaries, as in effect as of the date hereof, have been heretofore made available to Parent.

7

ffny03\choial\717967.2

Confidential - Subject to Protective Order                                    3M_MDL000294312

**3.2      Capitalization of the Company and the Company Subsidiaries; Minute Books.**

(a)      Schedule 3.2(a) sets forth the authorized and the issued and outstanding capital stock of the Company, and the owners thereof, together with the issued and outstanding Options and Restricted Shares and the Holders thereof.  Except as set forth on Schedule 3.2(a), all issued and outstanding shares of capital stock of the Company are duly authorized, validly issued, fully paid, nonassessable and free of preemptive rights and held of record by the Persons indicated on Schedule 3.2(a).  Except as set forth on Schedule 3.2(a) or required by applicable Law, there are no outstanding (i) securities convertible into or exchangeable for the capital stock of the Company, (ii) options, warrants, calls or other rights to purchase or subscribe for capital stock of the Company or (iii) Contracts of any kind to which any of the Company and the Company Subsidiaries is subject or bound requiring the issuance after the date hereof of (x) any capital stock of the Company, (y) any convertible or exchangeable security of the type referred to in clause (i) or (z) any options, warrants, calls or rights of the type referred to in clause (ii).  Except as set forth on Schedule 3.2(a), there are no voting trusts, proxies or other agreements or understandings to which the Company or any Company Subsidiaries is bound or, to the Knowledge of the Company to which any Person is bound with respect to voting of any shares of capital stock or any other equity interest of the Company or any Company Subsidiary.  Neither the Company nor any Company Subsidiary is the subject of any bankruptcy, dissolution, liquidation, reorganization or similar proceeding.

(b)      Schedule 3.2(b) sets forth a complete list of the Company Subsidiaries and the authorized and the issued and outstanding capital stock or other ownership interests, as the case may be, of each of the Company Subsidiaries and the owners thereof.  Except as set forth on Schedule 3.2(b), all issued and outstanding shares of capital stock or other ownership interests of each of the Company Subsidiaries are duly authorized, validly issued, fully paid, nonassessable and free of preemptive rights and held of record and owned beneficially by the Persons indicated on Schedule 3.2(b), free and clear of any Encumbrances other than Permitted Encumbrances.  Except as set forth on Schedule 3.2(b), or required by applicable Law, there are no outstanding (i) securities convertible into or exchangeable for the capital stock or other ownership interests of any of the Company Subsidiaries, (ii) options, warrants, calls or other rights to purchase or subscribe for capital stock or other ownership interests of any of the Company Subsidiaries or (iii) Contracts of any kind by which any of the Company and the Company Subsidiaries is subject or bound requiring the issuance after the date hereof of (x) any capital stock or any other ownership interests of any of the Company Subsidiaries, (y) any convertible or exchangeable security of the type referred to in clause (i) or (z) any options, warrants, calls or rights of the type referred to in clause (ii).  Except for the Company's direct or indirect interest in the Company Subsidiaries as set forth on Schedule 3.2(b), neither the Company nor any Company Subsidiary owns, directly or indirectly, any interest or investment in the form of equity in, and neither the Company nor any Company Subsidiary is subject to any obligation or requirement to provide for or make any investment in, any Person.

(c)      The stock record books of the Company and each Company Subsidiary accurately reflect in all material respects all transactions in their respective capital stock (or other ownership interests).  Correct and complete copies of the minute books of the Company (for the period from Company's inception to date) have been made available to Parent prior to the date hereof.

8

Confidential - Subject to Protective Order          3M_MDL000294313

**3.3     Authority Relative to this Agreement, Etc.**

The Company has all requisite corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery by the Company of this Agreement and the consummation of the transactions contemplated hereby has been duly authorized by all requisite corporate action of the Company. This Agreement has been duly and validly executed and delivered by the Company and, assuming this Agreement has been duly authorized, executed and delivered by Parent and Acquisition Sub, this Agreement constitutes a valid and binding obligation of the Company, enforceable against it in accordance with its terms, in each case subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally.  The execution and delivery of the Principal Stockholder Consents constitutes the required approval of the Holders under the DGCL.

**3.4     Consents and Approvals; No Violations.**

Except as set forth on Schedule 3.4, neither the execution, delivery and performance of this Agreement by the Company nor the consummation by the Company of the transactions contemplated hereby will (a) violate any provision of the certificate of incorporation or by-laws (or other comparable governing documents) of the Company or any of the Company Subsidiaries, (b) require any consent, waiver, approval, license, authorization or permit of, or filing with or notification to, any Governmental Authority except for (i) compliance with all applicable antitrust Laws and (ii) such consents, waivers, approvals, licenses, authorizations, permits, filings or notifications which, if not made or obtained, would not reasonably be likely to have, individually or in the aggregate, a Material Adverse Effect, (c) result in a violation or breach of, or constitute (with or without the giving notice, the lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration of any liability or obligation to repay or right to receive payment) under any Contract, to which the Company or any of the Company Subsidiaries is a party or by which the Company or any of the Company Subsidiaries or any of their respective properties or assets may be bound, except such violations, breaches and defaults which are not reasonably likely to have, individually or in the aggregate, a Material Adverse Effect, or (d) violate any Law applicable to the Company or any of the Company Subsidiaries or by which any of their respective properties or assets are bound, except such violations which are not reasonably likely to have, individually or in the aggregate, a Material Adverse Effect.

**3.5     Financial Statements.**

The Company has made available to Parent true and complete copies of (i) the audited consolidated balance sheet of the Company and its Subsidiaries as of September 30, 2006 and the related consolidated statements of operations, stockholders' equity and cash flows for the year ended September 30, 2006 (collectively, the "Audited Statements").  Attached on Schedule 3.5 are the unaudited consolidated balance sheet of the Company and its Subsidiaries as of June 30, 2007 and the related unaudited consolidated statements of operations, stockholders' equity and cash flows for the nine month period ending on June 30, 2007 (the "Unaudited Financial Statements" and together with the Audited Statements, the "Company Financial Statements").  Except as otherwise indicated in the Company Financial Statements or as set forth on Schedule

9

Confidential - Subject to Protective Order                                                   3M_MDL000294314

3.5, the balance sheets and statements of income and cash flows included in the Company Financial Statements have been prepared in accordance with GAAP consistently applied during the periods involved and fairly present, in all material respects, the consolidated financial position and the results of operations and cash flows of the Company Group as of the dates and for the periods indicated therein (subject, in the case of unaudited statements, to normal year-end adjustments (none of which are expected to be material) and the absence of footnotes). The Company makes no representation with respect to any financial information of the Company or any of the Company Subsidiaries other than as contained in or pursuant to this Agreement.

**3.6     Absence of Certain Changes.**

From June 30, 2007 to the date hereof, except as set forth on Schedule 3.6 or as contemplated by this Agreement and the Related Documents, the Company and the Company Subsidiaries have conducted their respective businesses in the ordinary course of business, and there has not been:

(a)     any change, development, event, occurrence, condition or effect that, individually or in the aggregate, has had or is reasonably likely to have a Material Adverse Effect;

(b)     any declaration, setting aside or payment of any dividend or other distribution (whether in cash, stock or property) with respect to any of the Company's or any Company Subsidiary's capital stock or any redemption, repurchase or other acquisition of any capital stock of the Company or any Company Subsidiary or any securities convertible, exchangeable or exercisable for or into capital stock of the Company or any Company Subsidiary;

(c)     (i) any granting by the Company or any Company Subsidiary to any officer or employee of the Company of any material increase in compensation; (ii) any granting by the Company or any Company Subsidiary to any officer, employee, director or consultant of any increase in severance or termination pay; (iii) any entry by the Company or any Company Subsidiary into any employment agreement, or any severance or termination arrangement, with any officer, employee, director or consultant; or (iv) any adoption, entering into, amendment or termination of any Benefit Plans in each case, except in the ordinary course of business;

(d)     any material change in accounting methods, principles or practices by the Company or any Company Subsidiary, any material Tax elections made or any material Tax liability settled or compromised, or any material revaluation for financial statement purposes by the Company or any Company Subsidiary of any asset (including, without limitation, any material writing down of the value of any material property, investment or assets);

(e)     any material adverse change in the Company or the Company Subsidiaries' relationship with any of its material suppliers, customers, distributors, lessors, licensors, licensees or other third parties material to the business other than changes in pricing and ordinary course changes in scope or quantity of products ordered;

ffny03\choial\717967.2

Confidential - Subject to Protective Order                                                      3M_MDL000294315

(f)      any sale, lease, license or other disposition by the Company or a Company Subsidiary of any of its or their assets, individually with a fair market value of $500,000 or higher;

(g)      any amendment, restatement, supplement or waiver of any provision of the certificate of incorporation or by-laws (or other comparable governing documents) of the Company or any Company Subsidiary; or

(h)      any agreement by the Company or any Company Subsidiary to do any of the foregoing.

**3.7    Compliance with Law; Permits.**

Except as set forth on Schedule 3.7, (a) each of the Company and the Company Subsidiaries is in compliance with all Laws applicable to the Company and the Company Subsidiaries, respectively, except for such instances of non-compliance which are not reasonably likely to have, individually or in the aggregate, a Material Adverse Effect, (b) each of the Company and the Company Subsidiaries has all governmental permits, licenses and authorizations necessary for the conduct of its respective business as presently conducted ("Permits") and is in compliance with the terms of its respective Permits, except where the failure to have any such Permit in compliance is not reasonably likely to have, individually or in the aggregate, a Material Adverse Effect and (c) neither the Company nor any Company Subsidiary has received any written or, to the Knowledge of the Company, oral communication since January 1, 2007 from a Governmental Authority that alleges that the Company or a Company Subsidiary is not in compliance in any respect with any applicable Law, except if such non-compliance is not reasonably likely to have, individually or in the aggregate, a Material Adverse Effect.

**3.8    Litigation.**

Except as set forth on Schedule 3.8, as of the date hereof, there is no Action pending, or to the Knowledge of the Company, threatened against the Company or any Company Subsidiary that (a) involves a claim in excess of $250,000, (b) involves a claim for an unspecified amount which is reasonably likely to have a Material Adverse Effect or (c) seeks injunctive relief and is reasonably likely to materially impair the ability of the Company to perform its obligations under this Agreement.  Except as set forth on Schedule 3.8, to the Knowledge of the Company, there are no outstanding writs, judgments, injunctions, decrees, settlement agreements or similar orders by which the Company, the Company Subsidiaries or any of their respective assets or properties, are bound that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Except as set forth on Schedule 3.8, since June 30, 2007, there has not been any change, circumstance or event which has had or would be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect with respect to any liability relating to or arising from any of the Actions set forth on Schedule 3.8.

**3.9    No Undisclosed Liabilities.**

Except as set forth in the Company Financial Statements or as set forth on Schedule 3.9, neither the Company nor any of the Company Subsidiaries has any material indebtedness,

11

ffny03\choial\717967.2

3M_MDL000294316

obligations or liabilities of any kind (whether accrued, absolute, contingent or otherwise, and whether due or to become due) which are of a nature required by GAAP to be reflected in a balance sheet or the notes thereto and which are not accrued or reserved against in the June 30, 2007 balance sheet included in the Company Financial Statements, other than liabilities or obligations (i) otherwise specifically disclosed in this Agreement or in the Schedules hereto or (ii) incurred since June 30, 2007 in the ordinary course of business consistent with past practice.

**3.10   Taxes.**

Except as set forth on <u>Schedule 3.10</u>, for all taxable periods beginning on or after October 1, 2004, (a) all material Tax Returns required to be filed by or on behalf of the Company and each of the Company Subsidiaries have been duly and timely filed with the appropriate Tax Authority (after giving effect to any valid extensions of time in which to make such filings); (b) such Tax Returns were true, correct and complete in all material respects when filed; (c) all amounts shown on such Tax Returns as due, and all other material Taxes that have become due and payable by any member of the Company Group, have been fully and timely paid; (d) the Company and the Company Subsidiaries have complied in all material respects with all applicable Laws relating to the payment, collection or withholding of Taxes (such as sales Taxes or withholding of Taxes from the wages of employees or other amounts paid or owing to any independent contractor, creditor, stockholder or other third party); (e) neither the Company nor any Company Subsidiary has been a member of a combined, consolidated, affiliated or unitary group for Tax filing purposes, other than the group in which it currently is a member, for which it has any current or future liability for Taxes; (f) the Company and the Company Subsidiaries are not a party to any Tax sharing indemnity or similar agreement allocating tax liability that will not be terminated on the Closing Date without any future liability to the Company or a Company Subsidiary (including for past Taxes); (g) to the Knowledge of the Company, no material claim has been made in writing by any Tax Authority: (i) in a jurisdiction in which the Company or the Company Subsidiaries do not file Tax Returns that any such person is or may be subject to Taxation by that jurisdiction or (ii) concerning any Tax liability of the Company or the Company Subsidiaries; (h) neither the Company nor any of its Subsidiaries currently is the beneficiary of any extension of time within which to file any tax Return; (i) all material deficiencies asserted or assessments made, as a result of any examinations by any Tax Authority of Tax Returns of or covering the Company or any of its Subsidiaries, have been fully paid or are being contested in good faith and no other material audits or investigations by any Tax Authority relating to any Tax Returns of or covering the Company or any of its Subsidiaries are in progress; (j) the Company has made available to Parent all material ruling requests, private letter rulings, notices of proposed deficiencies, closing agreements and settlement agreements, and any similar, documents or communications sent or received by the Company Group relating to Taxes to the extent still pending or in effect; (k) neither the Company nor any of its Subsidiaries has been a United States real property holding corporation within the meaning of Code §897(c)(2) during the applicable period specified in Code §897(c)(1)(A)(ii); (l) to the Knowledge of the Company, each of the Company and its Subsidiaries have disclosed on their federal income tax Returns all positions taken therein that could give rise to a substantial understatement of federal income tax within the meaning of Code §6662; (m) the Company and the Company Subsidiaries have not incurred any material liability for Taxes from and after September 30, 2006 other than Taxes incurred in the ordinary course; (n) the Company and the Company Subsidiaries have not agreed to, and are not required to, make any adjustments or changes either on, before or after the

12

ffny03\choial\717967.2

Confidential - Subject to Protective Order                                    3M_MDL000294317

Closing Date, to their accounting methods pursuant to Section 481 of the Code (or similar provisions of state, local or foreign law), and neither the Internal Revenue Service nor any other Tax Authority has, to the Knowledge of the Company, proposed in writing any such adjustments or changes in the accounting methods of the Company and the Company Subsidiaries; (o) the unpaid Taxes of the Company and the Company Subsidiaries, (i) did not, as of the most recent fiscal quarter end, exceed the reserve for Tax liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the fact of the most recent financial statements of the Company and (ii) will not exceed that reserve as adjusted for operations and transactions through the Closing Date in accordance with the past customs and practice of the Company and the Company Subsidiaries in filing their Tax Returns; and (p) neither the Company nor any of the Company Subsidiaries is a party to any agreement, contract, arrangement or plan that has resulted or will result, separately or in the aggregate in any payment of any "excess parachute payment" within the meaning of Code section 280G (or any corresponding provision of state, local or foreign Tax law).   Other than as set forth in this Section 3.10, the Company makes no representation or warranty in this Agreement with respect to Tax matters.  Schedule 3.10(a) sets forth the Company's good faith estimate of the Company's net operating loss for the periods, and based on the assumptions, set forth in that Schedule.

**3.11    Brokers' and Finders' Fees.**

Except as set forth on Schedule 3.11, the Company has not employed, nor are they subject to, any valid claim of liability or obligation to, any broker, finder, consultant or other intermediary in connection with the transactions contemplated by this Agreement.  Parent shall be responsible for any payment, fee or commission that may be due to the parties (other than Permira Advisers L.L.C.) listed on Schedule 3.11 in connection with the transactions contemplated hereby.

**3.12    Intellectual Property.**

(a)    Except as otherwise indicated on Schedule 3.12(a), the Company or one of the Company Subsidiaries owns or has a valid right to use each patent, trademark, service mark, domain name, logo, trade name, proprietary trade dress, copyright, trade secret, proprietary composition, proprietary information and proprietary method (including registrations and applications for registrations of any of the foregoing) used by the Company Group in its business (the "Intellectual Property"), except where the failure to own or have such a valid right could not reasonably be expected to have a Material Adverse Effect.

(b)    Neither the Company nor any of the Company Subsidiaries is in material default under any material license concerning use of the Intellectual Property and to the Knowledge of the Company there are no threatened claims that the Company or any of the Company Subsidiaries is in material default under any material license concerning use of the Intellectual Property.

(c)    Except as otherwise indicated on Schedule 3.8 or Schedule 3.12(c): (i) to the Knowledge of the Company, the operation of its business as currently conducted, and the use by the Company or any of the Company Subsidiaries of its Intellectual Property, does not infringe the intellectual property rights of any such Person; and (ii) there is no Action or claim

13

ffny03\choial\717967.2

relating to the Intellectual Property affecting the business or operations of the Company or any of the Company Subsidiaries which are pending or, to the Knowledge of the Company, threatened against the Company or any of the Company Subsidiaries or any of its officers or directors which is reasonably likely to have a Material Adverse Effect.

(d)     The Company, one of the Company Subsidiaries or their respective predecessors is listed in the records of the United States Patent and Trademark Office as the sole owner of record of, and does currently own, the patents listed on Schedule 3.12(d)(1) (the "Domestic Patents") and each of the applications listed on Schedule 3.12(d)(2) (the "Domestic Patent Applications"), except as otherwise indicated on such schedules. To the Knowledge of the Company: (i) there are no claims of third parties to any ownership interest in any of the Domestic Patents or Domestic Patent Applications, and except for the security interest of the Company's lenders under existing credit facilities, there exists no lien with respect to any of the Domestic Patents or Domestic Patent Applications; and (ii) none of the Domestic Patents or Domestic Patent Applications have been abandoned or have been held invalid or unenforceable.

(e)     The Company, one of the Company Subsidiaries or their respective predecessors is listed in the records of the appropriate foreign offices as the sole owner of record of, and does currently own, the foreign patents listed on Schedule 3.12(e)(1) (the "Foreign Patents") and each of the applications listed on Schedule 3.12(e)(2) (the "Foreign Patent Applications"), except as otherwise indicated on such schedules. To the Knowledge of the Company: (i) there are no claims of third parties to any ownership interest in any of the Foreign Patents or Foreign Patent Applications, and except for the security interest of the Company's lenders under existing credit facilities, there exists no lien with respect to any of the Foreign Patents or Foreign Patent Applications; and (ii) none of the Foreign Patents or Foreign Patent Applications have been abandoned or have been held invalid or unenforceable.

(f)     The Company, one of the Company Subsidiaries or their respective predecessors is listed in the records of the United States Patent and Trademark Office as the holder of record of, the trademarks listed on Schedule 3.12(f) (the "Domestic Trademarks"), except as otherwise indicated on such schedules. To the Knowledge of the Company, there are no claims of third parties to any ownership interest in any of the Domestic Trademarks, and except for the security interest of the Company's lenders under existing credit facilities, there exists no lien with respect to any of the Domestic Trademarks, and none of the Domestic Trademarks have been abandoned or have been held invalid or unenforceable.

(g)     The Company, one of the Company Subsidiaries or their respective predecessors is listed in the records of the appropriate foreign offices as the sole owner of record of, and does currently own, the foreign trademarks listed on Schedule 3.12(g) (the "Foreign Trademarks"), except as otherwise indicated on such schedules. To the Knowledge of the Company, there are no claims of third parties to any ownership interest in any of the Foreign Trademarks, and except for the security interest of the Company's lenders under existing credit facilities, there exists no lien with respect to any of the Foreign Trademarks, and none of the Foreign Trademarks have been abandoned or have been held invalid or unenforceable.

(h)     The Company, one of the Company Subsidiaries or their respective predecessors is listed in the records of the appropriate authority as the sole owner of record of,

14

ffny03\choial\717967.2

3M_MDL000294319

and does currently own, the domain name URL addresses listed on Schedule 3.12(h) (the "Domain Names"). To the Knowledge of the Company, there are no claims of third parties to any ownership interest in any of the Domain Names, and except for the security interest of the Company's lenders under existing credit facilities, there exists no lien with respect to any of the Domain Names, and none of the Domain Names have been abandoned.

(i)    (1) Except as otherwise indicated on Schedule 3.8 or Schedule 3.12(c), to the Knowledge of the Company, neither the Company nor any of the Company Subsidiaries has received any communication from any Person alleging that the Domestic Patents, Foreign Patents, Domestic Trademarks, or Foreign Trademarks are not valid and enforceable as issued; and (2) there is no action, suit, claim or proceeding relating to the validity or enforceability of the Domestic Patents, Foreign Patents, Domestic Trademarks, or Foreign Trademarks as issued that, if determined in a manner adverse to the Company, would be reasonably expected to result in a Material Adverse Effect.

(j)    Except as would not reasonably be expected to have a Material Adverse Effect, the Intellectual Property consists of all of the intellectual property that is necessary to conduct the business of the Company and the Company Subsidiaries, and no other intellectual property is required to conduct such business. To the Knowledge of the Company, the consummation of the transactions contemplated under this Agreement will not impair the ownership of or valid rights of the Company and the Company Subsidiaries to use the Intellectual Property in any material respect. The Company and the Company Subsidiaries have taken reasonable measures to ensure the confidentiality and security of any trade secrets and other proprietary information included in the Intellectual Property.

**3.13    Employee Benefit Plans; Employees.**

(a)    General.

(i)    Schedule 3.13(a)(i) lists all material employee benefit plans and employment or severance agreements or other similar arrangements to which the Company or any Company Subsidiary is a party or by which any of them is bound or has any liability (collectively, the "Benefit Plans"), including, without limitation, (a) any profit-sharing, deferred compensation, bonus, stock option, phantom stock, stock purchase, pension, retainer, consulting, retirement, severance, change of control, supplemental unemployment benefits, welfare or incentive plan, agreement or arrangement, (b) any plan, agreement or arrangement providing for "fringe benefits" or perquisites to employees, officers, directors or agents, (c) any hospitalization, health, welfare, dental, disability, life insurance or other benefit plan, or (d) any other "employee benefit plan" within the meaning of Section 3(3) of ERISA.

(ii)    Except as set forth on Schedule 3.13(a)(ii), Seller has made available to Parent true and complete copies of all Benefit Plans and, with respect to each Benefit Plan, if applicable, (a) the summary plan description, (b) the Form 5500 filed in the two most recent plan years, (c) the most recent determination letter from the IRS and (d) the two most recent actuarial reports.

15

ffny03\choial\717967.2

3M_MDL000294320

(iii)     Except as set forth on Schedule 3.13(a)(iii), the Benefit Plans have been operated in all material respects in compliance with their terms and the applicable provisions of ERISA, the regulations and published authorities thereunder, and all other Laws applicable to the Benefit Plans.  There are no actions (other than routine claims for benefits) pending or, to the Knowledge of the Company, threatened against the Company, any Company Subsidiary or any Benefit Plan or its assets, or arising out of any of the Benefit Plans which could reasonably be expected to result in material liability to the Company or any Company Subsidiary.  No Benefit Plan is under audit or investigation by the Internal Revenue Service, the Department of Labor, the Pension Benefit Guaranty Corporation or other regulatory agency and, to the knowledge of the Company, no such audit or investigation is threatened.  No prohibited transaction (within the meaning of Section 4975 of the Code or 406 of ERISA) has occurred with respect to any of such Benefit Plan that could reasonably be expected to result in material liability to the Company or any Company Subsidiary.

(iv)     No payment or benefit which will be made by the Company or any Company Subsidiary in connection with the transactions contemplated by this Agreement will be characterized as an "excess parachute payment" within the meaning of Section 280G(b)(1) of the Code.  Except as set forth on Schedule 3.13(a)(iv) or as otherwise provided in this Agreement, the execution of, and performance of the transactions contemplated by, this Agreement either alone or together with any additional or subsequent events, will not constitute an event under any Benefit Plan that will result in any payment (whether of severance pay or otherwise), acceleration, forgiveness of indebtedness, vesting, distribution, increase in benefits or obligation to fund benefits with respect to any Company Group Employee.

(v)     Except as set forth on Schedule 3.13(a)(v), no Benefit Plan is subject to the terms of any collective bargaining agreement.

(b)     Qualified Plans.  Except as set forth on Schedule 3.13(b), each Benefit Plan that is intended to be qualified under Section 401(a) of the Code and any trust maintained pursuant thereto has received a determination letter to such effect and that any such trust is exempt from federal income taxation under Section 501(c) of the Code, and nothing has occurred with respect to the operations of the Benefit Plans which is reasonably likely to cause the loss of such qualification or exemption.

(c)     Title IV Plans.  Except as set forth on Schedule 3.13(c), with respect to each Benefit Plan or other employee benefit plan subject to Title IV of ERISA (other than a Multiemployer Plan as defined below) which is maintained or contributed to by the Company, any Company Subsidiary or any trade or business (whether or not incorporated) that is a member of a group of which the Company or a Company Subsidiary is a member and with which the Company or any Company Subsidiary is under common control within the meaning of Section 414(b), (c) or (m) of the Code (an "ERISA Affiliate") or with respect to which any of them has or may have any liability (each a "Title IV Plan"), within the last six years, (i) neither the Company nor any Company Subsidiary nor any ERISA Affiliate has withdrawn from such Title IV Plan as a "substantial employer" (as defined in Section 4001(a) (2) of ERISA), (ii) neither the Company nor any Company Subsidiary nor any ERISA Affiliate has

16

ffny03\choial\717967.2

      3M_MDL000294321

filed a notice of intent to terminate any such Title IV Plan or adopted any amendment to treat any such Title IV Plan as terminated, (iii) the Pension Benefit Guaranty Company ("PBGC") has not instituted proceedings to terminate any such Title IV Plan, (iv) no material reportable event (as described in Section 4043 of ERISA) (other than those events as to which the thirty day notice period is waived) has occurred with respect to any such Title IV Plan and (v) no amendment with respect to which security is required under Section 307 of ERISA or Section 401(a)(29) of the Code has been made or is reasonably expected to be made. No accumulated funding deficiency, whether or not waived, exists with respect to any such Title IV Plan. No event has occurred and no condition exists that would be reasonably expected to subject the Company or any of the Company Subsidiaries to any material liability imposed under Title IV of ERISA. To the Knowledge of the Company, neither the Company nor any Company Subsidiary has or would have any liability (contingent or otherwise) arising under Title IV that arises or would arise by reason of the Company's or Company Subsidiary's relationship to any ERISA Affiliate (other than the Company or any Company Subsidiary).

(d)     Multiemployer Plans. Except as set forth in Schedule 3.13(d), neither the Company, the Company Subsidiaries nor any ERISA Affiliate participates or has participated in the last six years in any multiemployer plan, as defined under Section 3(37) of ERISA (a "Multiemployer Plan").

(e)     Health Benefit Plans. Except as required under Section 4980B of the Code or as set forth on Schedule 3.13(e), no Benefit Plan provides for welfare benefits to any employee following termination of employment.

(f)     Except as set forth in Schedule 3.8 or Schedule 3.13(f), with respect to the Company Group Employees, (i) within the last twelve (12) months, there has not been pending nor, to the Knowledge of the Company, threatened, (A) strike, slowdown, stoppage, organizational effort, picketing, handbilling activity, representation or certification campaign, grievance, arbitration, administrative hearing, or claim of unfair labor practice, not including workers' compensation claims, or (B) Action for wrongful discharge, Action for employment discrimination, Action for sexual harassment or other Action involving an employment dispute of any nature against the Company or any of the Company Subsidiaries which is, in the case of (A) and (B) and in the aggregate, reasonably likely to result in a material liability to the Company or any Company Subsidiaries; (ii) neither the Company nor the Company Subsidiaries are a party to any collective bargaining agreement or other Contract with any labor union or any other similar organization, no labor union or similar organization currently represents the employees of the Company and the Company Subsidiaries, and to the Knowledge of the Company, no labor union or similar organization, or any Company Group Employees have taken any action with respect to organizing the employees of the Company or the Company Subsidiaries; (iii) the Company has not, in the last three years, effectuated a "plant closing" or "mass layoff" as those terms are defined in WARN, affecting in whole or in part any site of employment, facility, operating unit or Company Group Employee without complying with the notice requirements and other provisions of WARN which could cause any liability to the Company or any of the Company Subsidiaries with respect to the Company Group Employees nor in the prior three-month period has any current or former Company Group Employee located in the United Kingdom been made redundant, had their contract of employment terminated or otherwise left their employment nor has any Company Group been

17

ffny03\choial\717967.2

Confidential - Subject to Protective Order

party to a "relevant transfer" as defined by the Transfer of Undertakings (Protection of Employment) Regulations 1987 at any time in the 3 years prior to the date of this Agreement; (iv) neither the Company nor any Company Subsidiary is the subject of any pending or, to the Knowledge of the Company, threatened proceedings alleging that the Company or any of the Company Subsidiaries has engaged in any material unfair labor practice under any Law; (v) no Company Group Employee having total annual compensation of more than $200,000 has given notice to the Company or any Company Subsidiary of his or her intent to terminate employment with the Company or such Subsidiary; and (vi) to the Knowledge of the Company, no Company Group Employee is subject to any other secrecy or noncompetition agreement or any other agreement or restriction of any kind that would impede in any way the ability of such employee to carry out fully all of his or her activities.

(g)     Foreign Plans.    Without limiting the generality of the foregoing provisions of this Section 3.13, with respect to any Benefit Plan maintained outside of the United States (i) each such Benefit Plan has been maintained in all material respects in accordance with the applicable law of the relevant jurisdiction and (ii) each such Benefit Plan that is intended to satisfy any specific tax or other qualification requirements to the Knowledge of the Company satisfies such tax or other qualification requirements, except where the failure to satisfy such tax or other qualification requirement would not reasonably be expected to result in a Material Adverse Effect.

(h)     Other than as set forth in this Section 3.13, the Company makes no representation or warranty in this Agreement with respect to employee benefit or labor matters.

**3.14     Environmental Matters.**

(a)     Except as set forth on Schedule 3.14: (i) the Company and each of the Company Subsidiaries possess, and, since January 1, 2006, have possessed, all Permits, licenses and authorizations required by Environmental Laws for the conduct of its respective business (collectively, "Environmental Permits"), except where the failure to possess such Environmental Permits does not have and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; (ii) the Company and each of the Company Subsidiaries is and, since January 1, 2006, has been in compliance with all applicable Environmental Laws and Environmental Permits, except for noncompliance that does not have and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; (iii) there are no claims or proceedings pending or, to the Knowledge of the Company, threatened, against the Company any of the Company Subsidiaries or any of their respective predecessors alleging the violation of, noncompliance with or liability under any applicable Environmental Laws that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; (iv) no notice under any Environmental Law has been received from any Governmental Authority that is currently outstanding concerning the Release or possible Release of Hazardous Substances, or requiring an investigation for Hazardous Substances, at any location owned, operated or leased, now or in the past, by the Company or any Company Subsidiary, the subject matter of which notice would reasonably be expected to have a Material Adverse Effect; (v) there are no Hazardous Substances on, at, under, or migrating to or from, (A) any property currently owned, operated or leased by the Company or any of the Company Subsidiaries, or (B) to the Knowledge of the Company, any property

18

ffny03\choial\717967.2

Confidential - Subject to Protective Order

formerly owned, operated or leased by the Company, any of the Company Subsidiaries, or any of their respective predecessors, in each case, that could reasonably be expected to result in liability under Environmental Law, except as would not reasonably be expected to have, in the aggregate, a Material Adverse Effect; and (vi) neither the Company, any of the Company Subsidiaries, nor, to the Knowledge of the Company, any of their respective predecessors, have used any waste disposal site, or otherwise disposed of, transported, or arranged for the transportation of, any Hazardous Substances to any place or location (x) in violation of any Environmental Law, or (y) listed on the National Priorities List or any similar state or foreign list of contaminated sites, in each case, except as would not reasonably be expected to have a Material Adverse Effect.

(b)    the Company has delivered or made available to Parent true and complete copies and results of any material reports, studies, analyses, tests, or monitoring in the possession or control of the Company or any Company Subsidiary with respect to Hazardous Substances on, at, under, or migrating to or from any property currently or formerly owned, operated, or leased by the Company, any Company Subsidiary or any of their respective predecessors, or concerning compliance by any of the foregoing with Environmental Law.

(c)    Other than as set forth in this <u>Section 3.14 and Section 3.8</u>, the Company makes no representation or warranty in this Agreement with respect to environmental, health or safety matters.

**3.15   Material Contracts.**

(a)    Except as set forth on <u>Schedule 3.15(a)</u>, neither the Company nor any of the Company Subsidiaries is a party to any Contract:

(i)    pursuant to which the Company or any Company Subsidiary has incurred any indebtedness for borrowed money, committed to incur indebtedness for borrowed money, or guaranteed indebtedness of any other Person (other than the Company or any Company Subsidiary) in excess of $500,000, or that is a Hedging Contract or Contract relating to the issuance of performance bonds, surety bonds, letters of credit or other credit support;

(ii)    that by its terms provides for the sale, assignment, license or other disposition of any asset or right (including Intellectual Property) of the Company or any Company Subsidiary that is material to the Company and the Company Subsidiaries, taken as a whole,

(iii)    that by its terms grants an Encumbrance upon any material asset of the Company or any Company Subsidiary, except for Permitted Encumbrances;

(iv)    that by its terms contains any covenant or provision currently in effect prohibiting the Company or any of the Company Subsidiaries from engaging in any line of business or competing with any Person in any geographic area;

19

ffny03\choial\717967.2

3M_MDL000294324

(v)     that is a partnership or joint venture agreement in which the Company or any of the Company Subsidiaries participates as a general partner or joint venturer;

(vi)    that by its terms requires the payment by or on behalf of the Company or any of the Company Subsidiaries in excess of $500,000 per annum, or the delivery by the Company or any of the Company Subsidiaries of goods or services with a fair market value in excess of $500,000 per annum or provides for the Company or any of the Company Subsidiaries to receive any payments in excess of $500,000 per annum;

(vii)   pursuant to which the Company or any Company Subsidiary has agreed to indemnify any other Person in other than Contracts with suppliers, distributors, sales representatives and customers entered into in the ordinary  course of business  or indemnification provided in connection with any Real Property Lease or in connection with personal property leases entered into in the ordinary course of business;

(viii)  pursuant to which the Company or any Company Subsidiary has advanced or loaned any amount to any of its directors, officers or employees outside the ordinary course of the Company Group's business; or

(ix)    that by its terms requires the Company or any Company Subsidiary to employ any individual at an annual salary in excess of $150,000.

(b)     The Company has made available to Parent or its agents or representatives a correct and complete copy of each Material Contract. Each Material Contract is in full force and effect and constitutes the legal, valid and binding obligation of the member of the Company Group party thereto and, to the Knowledge of the Company, each other party thereto, enforceable against such party in accordance with its terms, in each case subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally. Neither the Company nor any of the Company Subsidiaries or, to the Knowledge of the Company, any other party to any Material Contract, is in breach of, or in default under, any Material Contract, except for such breaches or defaults which would not reasonably likely to have, individually or in the aggregate, a Material Adverse Effect. No party has given any written notice of termination or cancellation of any Material Contract or that it intends to assert a breach of, or seek to terminate or cancel, any Material Contract as a result of the transactions contemplated hereby, in each case, except where such termination, cancellation or assertion, individually or in the aggregate, would not reasonably likely to have a Material Adverse Effect.

(c)     The Cabot Asset Transfer Agreement is in full force and effect and the Company or one of the Company Subsidiaries has timely paid all amounts to Cabot Corporation and its Affiliates required in order to maintain and otherwise keep in effect the Respirator Liability Retention arrangements pursuant to Section 4.12 thereof. To the Knowledge of the Company, as of the date hereof Cabot Corporation has not since April 7, 2004 given notice that it intends to assert a material breach of, or seek to terminate or cancel the Respirator Liability Retention arrangements pursuant to Section 4.12 of the Cabot Asset Transfer Agreement.

20

ffny03\choial\717967.2

Confidential - Subject to Protective Order   3M_MDL000294325

**3.16    Related-Party Transactions.**

Except as set forth on Schedule 3.16 or contemplated by this Agreement, since January 1, 2007, no Affiliate of the Company or any Company Subsidiary (other than the Company and the Company Subsidiaries) (i) has been a party to any Contract, or has otherwise entered into any transaction, with the Company or a Company Subsidiary that calls for the payment by or on behalf of the Company or any of the Company Subsidiaries in excess of $50,000 per annum, or the delivery by the Company or any of the Company Subsidiaries of goods or services with a fair market value in excess of $50,000 per annum, or provides for the Company or any of the Company Subsidiaries to receive any payments in excess of, or any property with a fair market value in excess of, $50,000 per annum, (ii) to the Knowledge of the Company, owns any property or right, tangible or intangible, which is used by the Company or any of the Company Subsidiaries or (iii) to the Knowledge of the Company, owns, directly or indirectly, any interest in (other than holding that represent less than 5% of any class of securities of any publicly-traded company), or is an officer, director, employee or consultant of, any Person which is a competitor, lessor, lessee, customer or supplier of the Company or any of the Company Subsidiaries (each, a "Related Party Transaction").

**3.17    Real Property.**

(a)     Schedule 3.17(a) is a true, correct and complete list of all real property owned by the Company or a Company Subsidiary (and the address of such real property) as of the date of this Agreement.  With respect to each parcel of owned real property (a "Parcel") listed on Schedule 3.17(a), except as set forth on Schedule 3.17(a):

(i)     the entity owning such Parcel has good, marketable and insurable fee title to such Parcel, free and clear of all Encumbrances other than Permitted Encumbrances, which do not have and are not reasonably likely to, individually or in the aggregate, impair in any material respect the current use or occupancy of property subject thereto;

(ii)     all facilities have received all material approvals of Governmental Authorities (including Permits) required in connection with the ownership or operation thereof and have been operated and maintained in accordance with applicable Law in all material respects;

(iii)     there are no subleases, licenses, concessions or other written agreements granting to any party the right of use or occupancy of any portion of any material Parcel or rights to purchase any material Parcel or any portion thereof or interest therein;

(iv)     there are no parties (other than the Company or any of the Company Subsidiaries) in possession of any Parcel, other than tenants under any leases who are in possession of space to which they are entitled;

21

ffny03\choial\717967.2

Confidential - Subject to Protective Order        3M_MDL000294326

(v)     each material structure on any Parcel is in sufficient repair and operating condition for the conduct of the business of the Company and the Company Subsidiaries as currently conducted.

(vi)     to the Knowledge of the Company, there is no threatened or contemplated special assessment or condemnation against any such Parcel; and

(vii)     no material portion of any material Parcel is subject to any pending condemnation proceeding and, to the Knowledge of the Company, there is no threatened condemnation proceeding with respect thereto.

(b)     Schedule 3.17(b) sets forth all real property and interests in real property used by the Company or one of the Company Subsidiaries, pursuant to leases, subleases, licenses and/or any other types of occupancy agreements, that are material to the continued operation of the business of the Company and the Company Subsidiaries, taken as a whole and as currently operated (any such lease, license or other occupancy agreement, individually, a "Real Property Lease").

(c)     The Company or one of the Company Subsidiaries has a valid and enforceable leasehold interest under each of the Real Property Leases, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity), and, to the Knowledge of the Company, none of the Company and/or the Company Subsidiaries has received any written notice of any default or event, which, with notice or lapse of time, or both, would constitute a default by the Company or such Company Subsidiary under any of the Real Property Leases, except such defaults that do not have and are not reasonably likely to have, in the aggregate, a Material Adverse Effect. Neither the Company nor any Company Subsidiary has transferred any interest in any of the Real Property Leases. The Company has made available to Parent true and complete copies of the Real Property Leases as in effect as of the date hereof, together with all material amendments, modifications or supplements, if any, thereto.

**3.18    Personal Property.**

Except as set forth on Schedule 3.18, the Company and the Company Subsidiaries (a) own, lease or license from third parties all material tangible personal property required to conduct its and their respective businesses as presently conducted, (b) have good and valid title to all such tangible personal property owned by it or them, free and clear of all Encumbrances except for Permitted Encumbrances, and (c) upon consummation of the transactions contemplated by this Agreement, will be entitled to continue to use all such tangible personal property which is currently employed by it or them in the conduct of their respective businesses as presently conducted. All such material tangible personal property is in sufficient repair and operating condition for the conduct of the business of the Company and the Company Subsidiaries as currently conducted.

22

ffny03\choial\717967.2

Confidential - Subject to Protective Order                    3M_MDL000294327

**3.19   Insurance.**

(a)   Schedule 3.19(a) contains a true and complete list of all material policies of liability, theft, fidelity, business interruption, key man life, fire, product liability, worker's compensation and other material forms of insurance held by the Company or any Company Subsidiary in effect as of the date hereof (specifying the insurer, amount of coverage, type of insurance, policy number, the amount of any deductible or retention, any material pending claims thereunder and the date through which coverage will continue based upon currently paid premiums).  Such policies are in full force and effect.  Except as set forth on Schedule 3.19(a), neither the Company nor any Company Subsidiary has reached or exceeded its policy limits for any insurance policy in effect at any time during the past five (5) years.

(b)   With respect to each policy of insurance listed on Schedule 3.19(a): (i) all premiums due with respect thereto are currently paid and the Company and the Company Subsidiaries are in compliance in all material respects with the terms of such policies; (ii) neither the Company nor any Company Subsidiary has received any written notice that such policy has been or shall be canceled or terminated or will not be renewed on substantially the same terms as are now in effect or the premium on such policy shall be increased on the renewal thereof; (iii) no such policy will terminate or lapse by reason of the transactions contemplated by this Agreement, in each case, except where such non-payment, cancellation, termination or non-renewal would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect.  Except as set forth on Schedule 3.19(b), with respect to such policies, there have not been any claim(s) brought by the Company or a Company Subsidiary in which the applicable insurer has questioned, denied or disputed coverage.

**3.20   Suppliers and Customers.**

Schedule 3.20 sets forth a list of (i) the ten largest suppliers (by dollar amount) to the Company and the Company Subsidiaries, taken as a whole, during the twelve months ended June 30, 2007 ("Major Suppliers") and (ii) the ten customers with the highest dollar amount of purchases or services from the Company and the Company Subsidiaries, taken as a whole, during the twelve months ended June 30, 2007 "Major Customers").  Except as set forth on Schedule 3.20, no Major Supplier or Major Customer has during the last twelve months materially decreased or limited, or threatened to materially decrease or limit, its provision or receipt of services to or from the Company or any of the Company Subsidiaries.  No termination, cancellation or limitation of, or any material modification or change in, the business relationships (including product pricing and payment terms) of the Company or any of the Company Subsidiaries has occurred or, to the Company's Knowledge, is threatened with any Major Supplier or Major Customer.

**3.21   Product Liability.**

Except as set forth on Schedule 3.21 or except as does not have and would not reasonably be likely to have, individually or in the aggregate, a Material Adverse Effect, all products designed, manufactured, sold, distributed, leased, installed, delivered or held in inventory by the Company or any Company Subsidiary (including, without limitation, all documentation furnished in connection therewith) are either (i) free from any material defects and conform in all

23

ffny03\choial\717967.2

material respects with all customary and reasonable standards for products of such type or (ii) covered by an applicable effective warranty of the manufacturer of any such product or some additional Person in the chain of distribution of any such product, such that, in either event, neither the Company nor any Company Subsidiary has any liability for replacement or repair thereof or other damages in connection therewith, in each case, subject only to the reserve for product warranty claims set forth on the face of the Company Financial Statements.

**3.22   No Additional Representations.**

NEITHER THE COMPANY NOR ANY OF ITS AFFILIATES IS MAKING ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OF ANY NATURE WHATSOEVER WITH RESPECT TO THE COMPANY OR ANY COMPANY SUBSIDIARY, INCLUDING ANY OF THE ASSETS, RIGHTS OR PROPERTIES OF THE COMPANY OR ANY COMPANY SUBSIDIARY AND INCLUDING THE ENVIRONMENTAL CONDITION OF ANY PAST OR CURRENT PROPERTY OR FACILITY OF THE COMPANY OR ANY COMPANY SUBSIDIARY, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE III OF THIS AGREEMENT.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF
### THE PARENT AND ACQUISITION SUB

The Parent and Acquisition Sub, jointly and severally, hereby represent and warrant to the Company as follows:

**4.1   Organization, Etc.**

Each of Parent and Acquisition Sub is duly organized, validly existing and in good standing (in such jurisdictions where such status is recognized) under the laws of the jurisdiction of its organization, with all corporate power and authority and all licenses, permits and authorizations necessary to own, lease or operate the properties and assets owned, leased or operated by it and to carry on its business as currently conducted, except where the failure to be so duly organized, validly existing and in good standing (in such jurisdictions where such status is recognized) or to have such corporate power or authority, licenses, permits or authorizations would not be reasonably likely to have, in the aggregate, a Buyer Material Adverse Effect.

**4.2   Authority Relative to this Agreement, Etc.**

Each of Parent and Acquisition Sub has all requisite corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement by Parent and Acquisition Sub and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate action of Parent and Acquisition Sub. This Agreement has been duly and validly executed and delivered by each of Parent and Acquisition Sub and, assuming this Agreement has been duly authorized, executed and delivered by the Company, this Agreement constitutes a valid and binding obligation of each of Parent and Acquisition Sub, enforceable

24

ffny03\choial\717967.2

Confidential - Subject to Protective Order

against it in accordance with its terms, in each case, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally. The requisite stockholders of Acquisition Sub have adopted this Agreement and authorized and approved the Merger in accordance with the applicable provisions of Acquisition Sub's certificate of incorporation and the DGCL.

**4.3    Consents and Approvals; No Violations.**

Neither the execution, delivery and performance of this Agreement by Parent or Acquisition Sub nor the consummation by Parent or Acquisition Sub of the transactions contemplated hereby will (a) violate any provision of the certificate of incorporation or by-laws (or other comparable governing documents) of Parent or Acquisition Sub, (b) require any consent, waiver, approval, license, authorization or permit of, or filing with or notification to, any Governmental Authority, except for compliance with all applicable antitrust Laws and such consents, waivers, approvals, licenses, authorizations, permits, filings or notifications which, if not made or obtained, would not reasonably be likely to have, individually or in the aggregate, a Buyer Material Adverse Effect, (c) result in a violation or breach of, or constitute (with or without notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration or any liability or obligation to repay) under any of the terms, conditions or provisions of any Contract to which Parent or Acquisition Sub is a party or by which any of its properties or assets may be bound, except such violations, breaches and defaults which does not have and are not reasonably likely to have, individually or in the aggregate, a Buyer Material Adverse Effect or (d) violate any Law applicable to Parent or Acquisition Sub or by which any of its properties or assets are bound, except such violations which does not have and are not reasonably likely to have, individually or in the aggregate, a Buyer Material Adverse Effect.

**4.4    Litigation.**

There are no Actions pending, or to the Knowledge of the Parent, threatened, against the Parent, Acquisition Sub or any of their respective Subsidiaries, and there are no outstanding writs, judgments, injunctions, decrees, settlement agreements or similar orders by which the Parent, Acquisition Sub or any of their respective Subsidiaries or any of their respective assets or properties, are bound, in either case that could materially impair the ability of Parent or Acquisition Sub to perform its obligations under this Agreement.

**4.5    Parent's Business Investigation.**

The Parent has conducted such investigation of the Company Group's business as it has deemed necessary in order to make an informed decision concerning the transactions contemplated hereby.  Neither the Company nor any of its Affiliates shall have or be subject to any liability to the Parent or any other Person resulting from the distribution to the Parent, or the Parent's use of, any such information, including any information, documents or material made available to the Parent and its representatives in any "data rooms" (virtual or otherwise), management presentations or in any other form in expectation of the transactions contemplated hereby.

ffny03\choial\717967.2

Confidential - Subject to Protective Order                                                          3M_MDL000294330

**4.6    Disclaimer Regarding Projections.**

In connection with Parent's investigation of the Company and the Company Subsidiaries, Parent has received from the Company and its Affiliates and their respective representatives and agents certain projections and other forecasts, including, without limitation, projected financial statements, cash flow items, certain business plan information and other data related to the Company and the Company Subsidiaries.  Parent acknowledges that (a) there are uncertainties inherent in attempting to make such projections, forecasts and plans and, accordingly, is not relying on them, (b) Parent is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections, forecasts and plans so furnished to it and (c) Parent shall have no claim against anyone with respect to any of the foregoing.

**4.7    Availability of Funds.**

Parent currently has access to sufficient immediately available funds in cash or cash equivalents, and will at the Closing have sufficient immediately available funds, in cash, to pay the Closing Consideration.

**4.8    Operations of Acquisition Sub.**

Since the date of its incorporation, Acquisition Sub has not engaged in any activities other than in connection with or as contemplated by this Agreement.

**4.9    Brokers' and Finders' Fees.**

Except for Lehman Brothers and KPMG LLP, neither the Parent nor Acquisition Sub has employed, nor are they subject to, any valid claim of liability or obligation to, any broker, finder, consultant or other intermediary in connection with the transactions contemplated by this Agreement.  The Parent shall be solely responsible for any payment, fee or commission that may be due to Lehman Brothers in connection with the transactions contemplated hereby.

**4.10    No Additional Representations.**

NONE OF PARENT, ACQUISITION SUB OR ANY OF THEIR AFFILIATES IS MAKING ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OF ANY NATURE WHATSOEVER, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE IV OF THIS AGREEMENT.

**ARTICLE V**

**COVENANTS**

**5.1    Conduct of Business.**

(a)    Except (i) with the written consent of the Parent (which consent shall not be unreasonably withheld or delayed), (ii) as set forth on <u>Schedule 5.1(b)</u>, (iii) as otherwise contemplated or permitted by the terms of this Agreement or (iv) as required by Law or any

26

ffny03\choial\717967.2

    3M_MDL000294331

Contract, from the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, the Company shall conduct its business (including, without limitation, with respect to making capital expenditures), and shall cause the businesses of the Company Subsidiaries to be conducted, in the ordinary course in substantially the same manner as presently conducted.

(b)     From the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, except (i) with the written consent of the Parent (which consent shall not be unreasonably withheld or delayed), (ii) as set forth on Schedule 5.1(b), (iii) as otherwise contemplated or permitted by the terms of this Agreement or (iv) as required by Law or any Material Contract, the Company shall not, and shall not permit any Company Subsidiary to:

(i)     declare, set aside, make or pay any dividend or other distribution in respect of the capital stock of the Company or any of the Company Subsidiaries (excluding dividends or distributions by a member of the Company Group to another member of the Company Group) or repurchase, redeem or otherwise acquire any outstanding shares of the capital stock or other securities of, or other ownership interests in the Company or the Company Subsidiaries;

(ii)     transfer, issue, sell or dispose of any shares of capital stock or other equity interests of the Company or any of the Company Subsidiaries (other than pursuant to exercise of any Options or vesting of any Restricted Shares outstanding as of the date hereof) or grant options, warrants, calls or other rights to purchase or otherwise acquire shares of the capital stock or other equity interests of the Company or any of the Company Subsidiaries;

(iii)     effect any recapitalization, reclassification, stock split or like change in the capitalization of the Company or any of the Company Subsidiaries;

(iv)     (A) incur any indebtedness or guarantee any indebtedness of another Person, issue or sell any debt securities or warrants or other rights to acquire any debt securities of the Company or any Company Subsidiary (other than incurrence of indebtedness under the Company's revolving credit facility or equipment financing in the ordinary course of the Company Group's business that may be repaid on the Closing Date without premium or penalty), guarantee any debt securities of another Person or enter into any arrangement having the economic effect of any of the foregoing, (B) make any loans, advances or capital contributions (other than loans, advances or capital contributions made by one member of the Company Group to another member of the Company Group) to any other Person, or (C) forgive any loans or advances to any director, officer or employee;

(v)     amend the certificate of incorporation or by-laws (or other comparable governing documents) of the Company or any of the Company Subsidiaries;

ffny03\choial\717967.2

Confidential - Subject to Protective Order     3M_MDL000294332

(vi)    grant or take any other action that will result in the imposition of any Encumbrance granted on any property or assets (whether tangible or intangible) of any of the Company or the Company Subsidiaries (other than Permitted Encumbrances);

(vii)    (A) adopt, enter into, terminate or amend any Benefit Plan, other than, in the case of non-executive officer employees, in the ordinary course of the Company Group's business, (B) materially increase in any manner the severance, termination pay, compensation or fringe benefits of, or, except in the ordinary course of business, pay any material bonus to, any director, officer or employee(C) pay any material benefit to any director, officer or employee not provided for under any Benefit Plan (other than customary director fees and expenses), (D) grant any equity-based awards or (E) except as required pursuant to any Benefit Plan, fund or secure the payment of material compensation or benefits under any Benefit Plan other than in the ordinary course of the Company Group's business;

(viii)    institute any general layoff of employees or implement any early retirement plan or announce the planning of such a program;

(ix)    change the Company's or any Company Subsidiary's methods of accounting, except as required by changes in GAAP, make any material Tax elections or settle or compromise any material Tax liability;

(x)    purchase, sell, exchange, license or otherwise dispose or acquire (whether by merger or otherwise) any property or assets or enter into any lease of real property (other than, in each case, in the ordinary course of the Company Group's business) for which the aggregate consideration paid or payable (A) in any individual transaction is in excess of $500,000 or (B) in the aggregate is in excess of $1,000,000;

(xi)    pay, discharge, settle or satisfy any material claims, litigations, accounts payable, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge, settlement or satisfaction, in the ordinary course of the Company Group's business or in accordance with their terms, of liabilities reflected or reserved against in the Company Financial Statements (or the notes thereto) or incurred thereafter in the ordinary course of the Company Group's business other than settlements in an aggregate amount not to exceed $250,000; provided that the Company will not settle any asbestos related claims relating to the AO Group or Eastern Safety in respect of any respirator liability for an aggregate amount per claim of greater than $2,000 or not to exceed $50,000 in total;

(xii)    accelerate the collection of or fail to collect any Company Group accounts receivable, in each case other than in the ordinary course;

(xiii)    terminate the employment of any of the Persons listed on Schedule 5.1(b)(xiii).

(xiv)    enter into, renew, modify or revise any Contract or transaction with any Affiliate, officer, director or employee of the Company or any Company Subsidiary (other than the Company or a Company Subsidiary);

28

Confidential - Subject to Protective Order

3M_MDL000294333

(xv)   (A) modify, amend or terminate any Material Contract (including without limitation the Cabot Asset Transfer Agreement) or Real Property Lease or waive, release or assign any material rights or claims under any Material Contract or Real Property Lease, other than in the Ordinary Course of the Company Group's business, or (B) fail to timely pay amounts  pursuant to Section 4.12 of the Cabot Asset Transfer Agreement or take or fail to take any other action that would reasonably be expected to have the effect of terminating the Respirator Liability Retention arrangements contained therein;

(xvi)   fail to pay any premium when due with respect to any of the insurance policies set forth on Schedule 3.19(a), to the extent such failure may result in the suspension, material impairment or cancellation of any such insurance policies;

(xvii)   terminate any Hedging Contracts prior to the termination date set forth in such agreements; or

(xviii)  authorize any of, or commit or agree to take any of, the foregoing actions.

Notwithstanding the foregoing, the Company and its Subsidiaries may enter into (and consummate) agreements in respect of Acquisition 1 and Acquisition 2.

**5.2    Access to Information.**

From and after the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, the Company shall, and shall cause the Company Subsidiaries to, afford to the Parent and its accountants, counsel, Parent's financing sources and their representatives and other representatives reasonable access during normal business hours to all the properties, books, contracts, commitments, Tax returns and records of the Company and the Company Subsidiaries, and, during such period, shall furnish promptly to the Parent any information concerning the Company and the Company Subsidiaries as the Parent may reasonably request; provided, however, that (a) such access does not unreasonably disrupt the normal operations of the Company or any of the Company Subsidiaries, (b) neither the Company nor any of the Company Subsidiaries is under any obligation to disclose to the Parent or its representatives any information the disclosure of which is prohibited by Contract or applicable Law or would result in the waiver of any attorney-client, work product or other applicable privilege and (c) Parent shall not conduct any environmental sampling or analysis of the nature commonly referred to as a "Phase II Environmental Assessment".  All information provided pursuant to this Section 5.2 shall remain subject in all respects to the Confidentiality Agreement (as defined below).

**5.3    Confidentiality; Solicitation.**

(a)    The Parent acknowledges that the information being provided to it, any of its Affiliates and its accountants, counsel and other representatives in connection with the consummation of the transactions contemplated hereby is being provided subject to the terms of a confidentiality agreement dated as of July 9, 2007 between 3M Company and the Company (the "Confidentiality Agreement").  The Parent acknowledges that it is, and shall remain until

29

ffny03\choial\717967.2

the Closing, subject to the terms of the Confidentiality Agreement, which are incorporated herein by reference.

(b)     The Company agrees that following the date of this Agreement, neither the Company, nor any of the Company Subsidiaries, nor any of their respective Affiliates, officers, directors, representatives or agents will directly or indirectly, solicit, initiate, consider, facilitate, encourage or accept or furnish to any other person any information with respect to, any other proposals from any Person relating to any acquisition or purchase of all or any substantial portion of the capital stock of the Company or any Company Subsidiary or all or substantially all of the assets of the Company or any Company Subsidiary (other than the sale of inventory in the ordinary course of business consistent with past practice).  The Company shall immediately cease and cause to be terminated all existing discussions, conversations, negotiations and other communications with any Person conducted heretofore with respect to any of the foregoing.

**5.4     Efforts to Consummate.**

(a)     Subject to the terms and conditions of this Agreement, each party shall use its reasonable best efforts to cause the Closing to occur and to cause the conditions set forth in Article VI to be satisfied, including (i) defending against any lawsuits, actions or proceedings, judicial or administrative, challenging this Agreement or the consummation of the transactions contemplated hereby, (ii) seeking to have any preliminary injunction, temporary restraining order, stay or other legal restraint or prohibition entered or imposed by any court or other Governmental Authority that is not yet final and non-appealable vacated or reversed and (iii) cooperating with each other to obtain, prior to Closing, all consents and approvals required to consummate the transactions contemplated by this Agreement; provided, however, that neither the Company nor any of its Affiliates shall be required to make any monetary expenditure, commence or participate in any litigation or offer or grant any accommodation (financial or otherwise) to any third Person.  Without limiting the foregoing, each party shall use its reasonable best efforts (subject to the provision in the immediately preceding sentence) to cause the Closing to occur within 90 days after the date hereof.

(b)     In furtherance and not in limitation of the foregoing, each of the Company and Parent shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable antitrust laws and regulations to consummate and make effective the transactions contemplated by this Agreement, including, without limitation, to obtain the consent, authorization, order or approval of, or any exemption by, any Governmental Authority with regulatory jurisdiction over enforcement of any applicable antitrust laws ("Governmental Antitrust Authority") or in order to obtain the jurisdiction of the European Commission ("EC") instead of review by EU Member States by means of a reasoned submission pursuant to Article 4 (5) of Council Regulation No. 139/2004 of the European Community, as amended (the "EC Merger Regulation"), which actions shall include, without limitation, furnishing all information required by applicable Law in connection with approvals of or filings with any Governmental Antitrust Authority, including filing, or causing to be filed, as promptly as practicable, except that any required notification and report forms under the HSR Act will be filed with the FTC and the DOJ no later than five (5) Business Days following the execution and delivery of this Agreement.  In the case of any filings required or agreed to be made by the parties pursuant to the EC Merger Regulation, a pre-notification

30

ffny03\choial\717967.2

shall be made as soon as reasonably practicable and the parties shall use best efforts to ensure that the effective date of notification shall in any event be within three (3) Business Days after the EC confirms that the information contained within a pre-notified filing is completed; subject only to the additional requirement that if the EC acquires jurisdiction pursuant to Article 4 (5) of the EC Merger Regulation, unless the parties otherwise agree, a pre-notification to the EC shall be made within five (5) business days from the date on which the EC acquired jurisdiction.

(c)      Each of the Parent and the Company shall furnish to the other such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under the HSR Act, the EC Merger Regulation or any other foreign antitrust merger control laws.  The Company and the Parent shall keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, the FTC, the DOJ and other Governmental Antitrust Authorities and shall comply as promptly as practicable with any such inquiry or request.  Each of Parent and the Company shall inform the other party of  any substantive meeting or discussion or communication with any Governmental Antitrust Authority in respect of any filings, investigation or inquiry concerning this Agreement or the Merger and shall use reasonable best efforts to consult with the other party in advance and, to the extent permitted by such Governmental Antitrust Authority, give the other party the opportunity to attend and participate thereat.   The Parent shall pay for filing fees incurred by the Company to comply with Section 5.4(b), including any filing fees under the HSR Act, the EC Merger Regulation or any other foreign antitrust merger control laws.

(d)      In furtherance and not in limitation of the foregoing, Parent shall take any and all steps necessary to avoid or eliminate impediments under any antitrust, competition, or trade regulation law that may be asserted by the FTC, the DOJ, applicable non-U.S. Governmental Antitrust Authority or any other Governmental Entity with respect to the Merger and the transactions contemplated by this Agreement so as to enable the consummation thereof as promptly as practicable.

(e)      Notwithstanding anything in this Section 5.4 to the contrary, nothing in this Section 5.4 shall require, or be deemed to require, Parent to propose, negotiate, offer to commit or effect any sale, divestiture or disposition of assets or businesses of Parent, the Surviving Corporation, or their respective subsidiaries if such sale, divestiture or disposition of assets or businesses and all related restrictions and requirements would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(f)      As promptly as practicable after the date of this Agreement, the Company will provide to any holder of Shares that has not approved and adopted this Agreement notice of the approval of this Agreement by the stockholders of the Company required by Sections 228 and 262 of the DGCL.  The Company shall provide Parent and Acquisition Sub a reasonable opportunity to review and comment on such notice prior to the distribution to such holders.

ffny03\choial\717967.2

Confidential - Subject to Protective Order                                              3M_MDL000294336

**5.5    Expenses; Transfer Taxes.**

(a)    Whether or not the Closing takes place, and except as set forth in Section 5.4(c), all costs and expenses incurred in connection with this Agreement and the Related Documents and the transactions contemplated hereby and thereby shall be paid by the party incurring such expense, including all costs and expenses incurred pursuant to Section 5.4(a); it being understood and agreed that any such costs and expenses paid by the Company or any Company Subsidiary prior to the Effective Time which are not Transaction Related Expenses shall be added back to Cash for purposes of this Agreement.

(b)    All transfer, documentary, sales, use, registration, value-added and other similar Taxes (including all applicable real estate transfer Taxes and real property transfer gains Taxes and including any filing and recording fees) and related amounts (including any penalties, interest and additions to Tax) incurred in connection with this Agreement, the Related Documents, the Merger and the other transactions contemplated hereby and thereby ("Transfer Taxes") shall be paid by the Parent. Each party shall use reasonable efforts to avail itself of any available exemptions from any such Transfer Taxes and to cooperate with the other parties in providing any information and documentation that may be necessary to obtain such exemptions.

**5.6    Post-Closing Cooperation.**

After the Closing, upon reasonable written notice, the Surviving Company and the Parent shall furnish or cause to be furnished to the Representative and its Affiliates, employees, counsel, auditors and representatives access, during normal business hours, to such information and assistance relating to the Company and the Company Subsidiaries as is reasonably necessary for financial reporting, Tax and accounting matters relating to time periods ending on or before the Closing Date.

**5.7    Publicity.**

Prior to the Effective Time, no public release or announcement concerning the transactions contemplated hereby shall be issued by the Company, on the one hand, or the Parent or Acquisition Sub, on the other hand, without the prior written consent of the Parent or the Company, as the case may be (which consent shall not be unreasonably withheld or delayed), except as such release or announcement may be required by Law or the rules or regulations of any United States or foreign securities exchange, in which case the party required to make the release or announcement shall allow the other parties reasonable time to comment on such release or announcement in advance of such issuance.

**5.8    Employee Matters.**

(a)    Parent agrees that, effective as of the Closing Date and until the first anniversary thereof, Parent shall provide or shall cause to be provided to Company Group Employees (as hereinafter defined) on the Closing Date with employee benefits (except with respect to severance benefits other than those required by Section 5.8(d), change in control arrangements, and equity-based or equity related arrangements) that are no less favorable in the aggregate than those provided to Company Group Employees immediately prior to the date hereof. With respect to any employee benefits that are provided to Company Group Employees

32

ffny03\choial\717967.2

Confidential - Subject to Protective Order

3M_MDL000294337

under employee benefits plans of Parent or its subsidiaries ("Parent Plans"), service accrued by Company Group Employees during employment with the Company or any of the Company Subsidiaries or their predecessors prior to Closing Date shall be recognized for all purposes to the same extent as such service was taken into account under the corresponding plans of the Company and any Company Subsidiary, except to the extent necessary to prevent duplication of benefits or benefit accrual under any defined benefit retirement plan or retiree welfare benefit plan (including retiree medical benefit plans). With respect to any medical, dental or other welfare benefits that are provided at any time to Company Group Employees under Parent Plans, any applicable pre-existing condition exclusions (except to the extent not satisfied under the comparable Benefit Plan as of such time) shall be waived, and any expenses incurred before such time under the comparable Benefit Plan shall be taken into account under such Parent Plan for purposes of satisfying applicable deductible, coinsurance and maximum out-of-pocket provisions.

(b)     Parent agrees to cause the Company (and each of the Company Subsidiaries, as applicable) to assume and honor, all of the Company's (and each Company's Subsidiary's) existing employment, severance, retention, bonus, other incentive agreements and arrangements, and medical, dental and life insurance arrangements, as amended through the date hereof (each, an "Employee Arrangement"), for the benefit of any employees and former employees of the Company and each of the Company Subsidiaries, as applicable, and their respective survivors, beneficiaries and dependents, including those Employee Arrangements set forth in Schedule 3.13(a)(i). Parent agrees that with respect to the Company's Management Incentive Plan and Annual Incentive Plan (collectively, the "Incentive Plans"), it will or will cause the Company to administer the plans for the fiscal year ending September 30, 2007 (the "2007 Fiscal Year") in a manner consistent with the Company's recent past practices. Without limiting the generality of the preceding sentence, participants shall be entitled to bonuses (i) in respect of the EBITDA component of the Incentive Plans that are based on the actual results for the 2007 Fiscal Year without any reduction, whether or not discretion has been reserved to reduce the amount payable, and (ii) in respect of the individual goals component of the Incentive Plans, that in the aggregate are at least equal to the amount accrued by the Company in respect of the Incentive Plans for the 2007 Fiscal Year, in all cases subject to the other terms and conditions of such Incentive Plans.

(c)     For purposes of this Section 5.8, the term "Company Group Employees" shall mean all current and former employees of the Company and of each of the Company Subsidiaries immediately prior to the Closing Date, including those on vacation, sick leave, maternity leave, military service, lay-off, retirement, disability or other leave of absence, paid or unpaid, and their survivors, beneficiaries and dependents.

(d)     Parent shall, or shall cause the Company or the Company Subsidiaries to, effective as of the Closing Date, and for a two-year period thereafter, provide to those employees of the Company or any of the Company Subsidiaries set forth in Schedule 5.8(d) whose employment is terminated without cause by the Company or any Company Subsidiary, the severance benefits described in Schedule 5.8(d) taking into account past service with the Company or any Company Subsidiary.

33

ffny03\choial\717967.2

Confidential - Subject to Protective Order                                                          3M_MDL000294338

(e)     Parent shall not, within ninety (90) days after the Closing Date, effectuate a "plant closing" or "mass layoff" as those terms are defined in WARN, affecting in whole or in part any site of employment, facility, operating unit or Company Group Employee without complying with the notice requirements and other provisions of WARN.

**5.9     Indemnification, Exculpation.**

(a)     All rights to indemnification and exculpation (including the advancement of expenses) from liabilities (including reasonable attorneys' fees and expenses) for acts or omissions occurring at or prior to the Effective Time (including with respect to the transactions contemplated by this Agreement) existing as of the date hereof in favor of the current or former directors, officers and employees of the Company and the Company Subsidiaries, as provided in the certificate of incorporation and/or the by-laws and pursuant to applicable Law shall survive the Merger, without further action, and shall continue in full force and effect without amendment, modification or repeal in accordance with their terms for a period of not less than six (6) years after the Effective Time; provided that no Person entitled to indemnification under this provision may settle any such claim without the prior approval of the Surviving Company, such approval not to be unreasonably withheld or delayed.

(b)     For a period of at least six (6) years after the Effective Time, the Surviving Company shall cause to be maintained in effect standard policies of directors' and officers' liability insurance in an aggregate coverage amount not less than the coverage amounts maintained by the Company and the Company Subsidiaries as of the date hereof and including coverage with respect to claims arising from facts or events which occurred at or prior to the Effective Time to the extent available; provided that (i) in no event shall the Surviving Company or a Company Subsidiary be required to expend more than an amount per year equal to 150% of the current annual premiums paid by the Company or any of the Company Subsidiaries to maintain or procure insurance coverage pursuant hereto, as forth in Schedule 3.19, and (ii) such policies may in the sole discretion of the Surviving Corporation be one or more "tail" policies for all or a portion of the full six (6) years.

(c)     The provisions of this Section 5.9 are (i) intended to be for the benefit of, and will be enforceable by, each Person entitled to indemnification hereunder, and each such Person's heirs, legatees, representatives, successors and assigns, and shall be binding on all successors and assigns of the Parent, Acquisition Sub and the Surviving Company and may not be terminated or amended in any manner adverse to such indemnified Person without its prior written consent and (ii) in addition to, and not in substitution for, any other rights to indemnification or contribution that any such Person may have by Contract or otherwise.

**5.10     Maintenance of Cabot Agreement.**

(a)     The Surviving Company shall pay on behalf of Aearo Corporation, or Parent shall cause to be paid, the amounts required in order to maintain, and otherwise keep in effect, the Respirator Liability Retention arrangements pursuant to Section 4.12 of the Cabot Asset Transfer Agreement.

ffny03\choial\717967.2

Confidential - Subject to Protective Order                                   3M_MDL000294339

(b)     The provisions of this Section 5.10 are (i) intended to be for the benefit of, and will be enforceable by, each Shareholder, and each such Shareholder's heirs, legatees, representatives, successors and assigns, and shall be binding on all successors and assigns of the Parent, Acquisition Sub and the Surviving Company and may not be terminated or amended in any manner adverse to such Shareholder without its prior written consent and (ii) in addition to, and not in substitution for, any other rights that any such Shareholder may have by Contract or otherwise.

## ARTICLE VI

## CONDITIONS PRECEDENT

### 6.1     Conditions to Each Party's Obligations.

The respective obligations of each party to effect the Merger are subject to the satisfaction or written waiver (to the extent such conditions can be waived) on or prior to the Closing of the following conditions:

(a)     Antitrust Approvals.     All required waiting periods or approvals applicable to this Agreement and the transactions contemplated hereby (including, without limitation, under the HSR Act, the EC Merger Regulation and the applicable foreign antitrust rules or Laws) shall have expired, been received or terminated.

(b)     No Injunctions or Restraints.     No applicable Law or injunction enacted, entered, promulgated, enforced or issued by any Governmental Authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated hereby shall be in effect; provided, however, that each of the Company and the Parent shall have complied with the provisions of Section 5.4, to prevent the entry of any such injunction or other order and to appeal as promptly as possible any such injunction or other order that may be entered.

### 6.2     Conditions to Obligations of the Parent and Acquisition Sub.

The obligations of the Parent and Acquisition Sub to consummate the Merger and the related transactions contemplated hereby are subject to the satisfaction (or written waiver by the Parent) on or prior to the Closing of the following conditions:

(a)     Representations and Warranties.     The representations and warranties of the Company made in this Agreement shall be true and correct in all respects as of the date of this Agreement and as though made on and as of the Closing Date (without giving effect to any "material", "materiality" or "Material Adverse Effect" qualification on such representations and warranties and other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified) except where the failure of any such representations or warranties to be so true and correct, whether individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect. The Parent and Acquisition Sub shall have received a certificate signed by an authorized officer of the Company certifying as to fulfillment of the conditions set forth in this Section 6.2(a) with respect to the Company.

35

Confidential - Subject to Protective Order     3M_MDL000294340

(b)      Performance of Obligations.   The Company shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by the Company prior to or at the time of the Closing, and the Parent and Acquisition Sub shall have received a certificate signed by an authorized officer of the Company certifying as to fulfillment of the conditions set forth in this Section 6.2(b) with respect to the Company.

(c)      Secretary's Certificates.   The Parent and Acquisition Sub shall have received a certificate, dated as of the Closing Date, signed by the Secretary of the Company and certifying as to (i) its certificate of incorporation and by-laws and the incumbency of officers executing this Agreement and (ii) the resolutions of the board of directors of the Company authorizing the execution, delivery and performance by the Company of this Agreement.

(d)      Chief Financial Officer's Certificate.   The Parent and the Acquisition Sub shall have received a certificate, dated as of the Closing Date, signed by the Chief Financial Officer of the Company certifying either (i) that all Debt of the Company has been paid in full and all related Encumbrances on assets of the Company, including, without limitation, the capital stock of any of the Subsidiaries, have been released prior to the Closing, or (ii) specifying the payoff amounts of all Debt of the Company in either case accompanied by related payoff letters, UCC releases, releases of all mortgages or deeds of trust on any Parcel and releases of all Subsidiary guarantees of Debt of the Company.

(e)      Material Adverse Effect.   No event, development, circumstance or occurrence shall have occurred since the date hereof that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect.

(f)      Related Party Transactions.   Each agreement between the Company and/or any Company Subsidiary on the one hand, and Permira Advisers L.L.C. and/or its affiliated funds, on the other hand, shall have been terminated without further liability (it being understood that all amounts payable thereunder or in connection therewith shall be paid prior to the Effective Time), and all obligations and liabilities of the Company and the Company Subsidiaries and each of their respective Affiliates, officers, directors, and employees to the other parties thereto shall be canceled, and Parent shall have received reasonably satisfactory evidence of the foregoing.

(g)      FIRPTA Certificate.   Parent shall have received (i) a certification from the Company, dated no more than thirty (30) days prior to the Closing Date and signed by a responsible corporate officer of the Company, that the Company is not, and has not been at any time during the five years preceding the date of such certification, a "United States real property holding corporation," as that term is defined in Section 897(c)(2) of the Code, and (b) proof reasonably satisfactory to Parent that the Company has provided notice of such certification to the Internal Revenue Service in accordance with the provisions of Treasury Regulation §1.897-2(h)(2).

ffny03\choial\717967.2

Confidential - Subject to Protective Order

3M_MDL000294341

**6.3    Conditions to the Obligations of the Company.**

The obligations of the Company to consummate the Merger and the related transactions contemplated hereby are subject to the satisfaction (or written waiver by the Company) on or prior to the Closing Date of the following conditions:

(a)    <u>Representations and Warranties of Parent and Acquisition Sub</u>.    The representations and warranties of the Parent and Acquisition Sub made in this Agreement shall be true and correct in all respects as of the date of this Agreement as though made on and as of the Closing Date except where the failure of any such representations or warranties to be so true and correct, whether individually or in the aggregate, would not reasonably be expected to have a Buyer Material Adverse Effect on the Parent or Acquisition Sub, and the Company shall have received a certificate signed by an authorized officer of each of the Parent and Acquisition Sub to such effect.

(b)    <u>Performance of Obligations of Parent and Acquisition Sub</u>.    The Parent and Acquisition Sub shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by the Parent and Acquisition Sub prior to or at the time of the Closing, and the Company shall have received a certificate signed by an authorized officer of each of the Parent and Acquisition Sub to such effect.

**6.4    Frustration of Closing Conditions.**

Neither the Parent, Acquisition Sub nor the Company may rely on the failure of any condition set forth in this <u>Article VI</u> to be satisfied if such failure was caused by such party's failure to act in good faith or to use its reasonable best efforts to cause the Closing to occur, as required by <u>Section 5.4</u>.

**ARTICLE VII**

**TERMINATION**

**7.1    Termination.**

(a)    This Agreement may be terminated and the transactions contemplated by this Agreement abandoned at any time prior to the Closing:

(i)    by mutual written consent of the Company and the Parent; or

(ii)    by either the Company or the Parent, if the Closing does not occur on or prior to June 1, 2008 (the "<u>End Date</u>") (other than as a result of the terminating party's failure to comply fully with its obligations under this Agreement).

(b)    In the event of termination by the Company or the Parent pursuant to this <u>Section 7.1</u>, written notice thereof shall forthwith be given to the other and the transactions contemplated by this Agreement shall be abandoned, without further action by any party.  If the transactions contemplated by this Agreement are abandoned as provided herein:

37

ffny03\choial\717967.2

3M_MDL000294342

(i)      the Parent and Acquisition Sub shall return all documents and other material received from the Company or any Company Subsidiary relating to the transactions contemplated hereby and any copies thereof, whether so obtained before or after the execution hereof, to the Company; and

(ii)      all confidential information received by the Parent and Acquisition Sub with respect to the business of the Company and the Company Subsidiaries shall be treated in accordance with the Confidentiality Agreement, which shall remain in full force and effect notwithstanding the termination of this Agreement.

**7.2     Effect of Termination.**

If this Agreement is terminated and the transactions contemplated hereby are abandoned as described in Section 7.1, this Agreement shall become null and void and of no further force and effect, except for the provisions of Sections 5.3(a), 5.5 and 5.7, this Article VII and Article VIII. Nothing in this Section 7.2 shall be deemed to release any party from any liability for any breach by such party of the terms and provisions of this Agreement prior to such termination.

## ARTICLE VIII

## GENERAL PROVISIONS

**8.1     Assignment.**

This Agreement and the rights and obligations hereunder shall not be assignable or transferable by the Parent, Acquisition Sub or the Company (including by operation of law in connection with a merger or consolidation of the Parent or Acquisition Sub) without the prior written consent of the other parties hereto; provided, however, that Parent and Acquisition Sub may assign any or all of their rights hereunder to one or more Affiliates or designees (provided that Parent shall remain liable for all of its obligations hereunder. Upon any such permitted assignment or designation, the references in this Agreement to Parent and Acquisition Sub shall also apply to such assignees unless the context otherwise requires. Any attempted assignment in violation of this Section 8.1 shall be void.

**8.2     No Third-Party Beneficiaries.**

Except as provided in Article II, Section 5.9 and 5.10 of this Agreement, this Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any Person, other than the parties hereto and such assigns, any legal or equitable rights hereunder. Notwithstanding the foregoing, the Shareholders (acting solely through the Representative) are intended third party beneficiaries of this Agreement and from and after the Closing Date, such Shareholders (acting solely through the Representative) shall be entitled to enforce the provisions of this Agreement and shall be entitled to avail themselves of the benefits of any remedy for a breach of any of the provisions of this Agreement.

ffny03\choial\717967.2

Confidential - Subject to Protective Order                                                      3M_MDL000294343

**8.3    Survival of Representations and Warranties.**

The representations and warranties contained in this Agreement, any Related Document and in any document delivered in connection herewith or therewith other than the Letter of Transmittal shall terminate and be of no further force and effect from and after the Closing (other than with respect to claims arising from actual fraud) and no party shall have any liability with respect to such representations and warranties from and after the Closing.  The covenants and agreements contained in this Agreement which contemplate performance after the Closing shall survive until performed in accordance with their terms; provided that the covenants and agreements contained in this Agreement which contemplate performance prior to the Closing shall not survive the Closing.

**8.4    Notices.**

All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand or sent by facsimile or sent, postage prepaid, by registered, certified or nationally recognized overnight courier service and shall be deemed given when so delivered by hand or facsimile, or if mailed, three (3) days after mailing (one Business Day in the case of overnight courier service), as follows:

(i)    if to the Parent or Acquisition Sub or, after the Closing, the Surviving Company, to:

3M Company
3M Center
St. Paul, Minnesota  55144-1000

Attention: Executive Vice President, Safety, Security and Protection Services Business
Telephone: 651-733-1110
Facsimile:

with copy to:

3M Company
3M Center
St. Paul, Minnesota  55144-1000
Attention: General Counsel
Telephone:  651-733-1110
Facsimile:  651-736-7859

39

Confidential - Subject to Protective Order                    3M_MDL000294344

        (ii)    if, prior to the Closing, to the Company, to:

                Aearo Holding Corp.
                5457 West 79th Street
                Indianapolis, IN  46268
                Attention:  Michael McLain and Robert Hebert
                Facsimile:  (317) 692-6557
                Telephone:  (317) 692-6784

                with a copy to:

                Fried, Frank, Harris, Shriver & Jacobson LLP
                One New York Plaza
                New York, NY 10004
                Attention: Christopher Ewan, Esq.
                Facsimile: (212) 859-4000
                Telephone: (212) 859-8875

        (iii)    if, to the Representative, to:

                Permira Advisers L.L.C.
                320 Park Avenue
                33rd Floor
                New York, New York
                10022

                Telephone: (212) 386-7480
                Facsimile: (212) 386 7481
                Attention:  Tom Lister

**8.5    Interpretation; Exhibits and Schedules.**

       The headings contained in this Agreement, in any Exhibit or Schedule hereto and in the table of contents to this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  Any matter set forth on any Schedule shall be deemed set forth on all other Schedules if, in each case, it is reasonably apparent from the information disclosed that another schedule is also applicable.  Except when the context requires otherwise, any reference in this Agreement to any Article, Section, clause, Schedule or Exhibit shall be to the Articles, Sections and clauses of, and Schedules and Exhibits to, this Agreement.  The words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation."  Any reference to the masculine, feminine or neuter gender shall include such other genders and any reference to the singular or plural shall include the other, in each case unless the context otherwise requires.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

40

Confidential - Subject to Protective Order                    3M_MDL000294345

When a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference shall be to a Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated.

**8.6    Counterparts; Facsimile Signatures.**

This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other party.  Facsimile counterpart signatures to this Agreement shall be acceptable and binding.

**8.7    Entire Agreement.**

This Agreement, the Related Documents and the Confidentiality Agreement contain the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter. Neither party shall be liable or bound to any other party in any manner by any representations, warranties or covenants relating to such subject matter except as specifically set forth herein or in the Related Documents or the Confidentiality Agreement.

**8.8    Amendments and Waivers.**

This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto; provided, that any amendment made subsequent to the adoption and approval of this Agreement by the stockholders of the Company or Acquisition Sub as required by the DGCL which, under applicable Law, requires further approval of such stockholders, shall not be made without further approval by such stockholders

**8.9    Severability.**

It is the desire and intent of the parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular provision of this Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.  Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

**8.10    Specific Performance.**

The parties hereto agree that if any of the provisions in this Agreement were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be difficult to determine, and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity.

41

ffny03\choial\717967.2

3M_MDL000294346

**8.11    Limitation on Damages.**

Notwithstanding any provision of this Agreement, no party shall be liable for any consequential damages (including loss of revenue, income or profits, loss in value of assets or securities), punitive, speculative, treble, remote, special or indirect damages, or loss of business reputation or opportunity relating to the breach of this Agreement, except to the extent such breach is an intentional breach of a material covenant set forth in this Agreement.

**8.12    No Personal Liability for Shareholders, Directors or Officers.**

The Company, Acquisition Sub and the Parent understand, acknowledge and agree that the officers and directors of the Company and its Affiliates have performed, or may perform, certain acts required or permitted under this Agreement on behalf of the Company or such Affiliates, to facilitate the transactions contemplated by this Agreement.  Except in cases of intentional fraud, no officer or director of the Company or such Affiliate shall, under any circumstances, have any liability for such acts, and the Company, the Acquisition Sub and the Parent hereby absolve all such Persons from any personal liability to the Company or the Parent (and each of their respective Affiliates) for any matter relating to or arising out of this Agreement.

**8.13    Governing Law.**

This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles of such State.

**8.14    Consent to Jurisdiction; Waiver of Jury Trial.**

(a)    Each of the Parent, Acquisition Sub, and the Company irrevocably submits to the exclusive jurisdiction of (i) the Court of Chancery of the State of Delaware and (ii) the United States District Court for the District of Delaware, for the purposes of any suit, action or other proceeding arising out of this Agreement, any Related Document or any transaction contemplated hereby or thereby.  Each of the Parent, Acquisition Sub, and the Company further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth above shall be effective service of process for any action, suit or proceeding in Delaware with respect to any matters to which it has submitted to jurisdiction in this Section 8.14.  Each of the Parent, Acquisition Sub, and the Company irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement, any Related Document or the transactions contemplated hereby and thereby in (i) the Court of Chancery of the State of Delaware and (ii) the United States District Court for the District of Delaware, and hereby and thereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

(b)    EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY COURSE OF

42

Confidential - Subject to Protective Order

CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION
OF ANY PARTY HERETO.

\* \* \* \*

43

ffny03\choial\717967.2

Confidential - Subject to Protective Order

3M_MDL000294348

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement and Plan of Merger as of the date first written above.

**AEARO HOLDING CORP.**

By: _____

Name:  Michael A. McLain
Title:   President and Chief Executive Officer

**3M COMPANY**

By: _____

Name: Jean J. Lobey
Title:  Executive Vice President

**TITAN   ACQUISITION   SUBSIDIARY, INC.**

By: _____

Name: Julie L. Bushman
Title:  President

**PERMIRA ADVISERS L.L.C. (solely in its capacity as the Representative)**

By: _____

Name:  Thomas H. Lister
Title:  Managing Partner Director

3M_MDL000294349

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement and Plan of Merger as of the date first written above.

**AEARO HOLDING CORP.**

By: _____
      Name:
      Title:

**3M COMPANY**

By: _____
      Name: Jean J. Lobey
      Title: Executive Vice President

**TITAN ACQUISITION SUBSIDIARY, INC.**

By: _____
      Name: Julie L. Bushman
      Title: President

**PERMIRA ADVISERS L.L.C. (solely in its capacity as the Representative)**

By: _____
      Name:
      Title:

Confidential - Subject to Protective Order

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement and Plan of Merger as of the date first written above.

**AEARO HOLDING CORP.**

By: _____

     Name:  Michael A. McLain
     Title:   President and Chief Executive
            Officer

**3M COMPANY**

By: _____

     Name: Jean J. Lobey
     Title:  Executive Vice President

**TITAN ACQUISITION SUBSIDIARY, INC.**

By: _____

     Name: Julie L. Bushman
     Title:  President

**PERMIRA ADVISERS L.L.C. (solely in its capacity as the Representative)**

By: _Thomas H. Lister_

     Name:  Thomas H. Lister
     Title:  Managing Director

Confidential - Subject to Protective Order

ANNEX I

**DEFINITIONS**

Capitalized terms used but not defined in the Agreement and Plan of Merger have the respective meanings assigned to such terms below.

"2006 Stock Incentive Plan" means the Company's 2006 Stock Incentive Plan.

"2007 Fiscal Year" has the meaning set forth in Section 5.8(b).

"Acquisition 1 Total Enterprise Value" means, if Acquisition 1 is consummated prior to the Effective Time, the debt free, cash free price paid at the consummation thereof by the Company and its Subsidiaries, plus the out-of-pocket fees and expenses actually paid as of the Closing in connection therewith and specified on Schedule I-A. The Acquisition 1 Total Enterprise Value shall not exceed $35,000,000 in the aggregate.

"Acquisition 2 Total Enterprise Value" means, if Acquisition 2 is consummated prior to the Effective Time, the debt free, cash free price paid at the consummation thereof by the Company and its Subsidiaries, plus the out-of-pocket fees and expenses actually paid as of the Closing in connection therewith and specified on Schedule I-A. The Acquisition 2 Total Enterprise Value shall not exceed $25,000,000 in the aggregate.

"Acquisition 1" means the proposed acquisition of the entity specified in Schedule I-A substantially on the terms (or terms more favorable to the Company and its Subsidiaries) presented to Parent prior to the date hereof.

"Acquisition 2" means the proposed acquisition of the entity specified in Schedule I-A, substantially on the terms (or terms more favorable to the Company and its Subsidiaries) presented to Parent prior to the date hereof.

"Acquisition Sub" has the meaning set forth in the caption.

"Action" means any action, suit, investigation, litigation or proceeding before any Governmental Authority or arbitrator.

"Affiliate" of any Person means another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.

"Aggregate Exercise Price" means the aggregate amount that would be paid to the Company in respect of all Options outstanding immediately prior to the Effective Time if the Holders thereof exercised such Options immediately prior to the Effective Time.

"Agreement" has the meaning set forth in the preamble.

"Benefit Plans" has the meaning set forth in Section 3.13(a)(i).

A-1ffny03\choial\717967.2

"Business Day" means any day that is not a Saturday, Sunday or other day on which banking institutions in New York, New York are not required to be open.

"Buyer Material Adverse Effect" means a material adverse effect on the ability of Parent or Acquisition Sub to consummate the transactions contemplated by this Agreement or perform its obligations under this Agreement or the Related Documents.

"Cabot Asset Transfer Agreement" shall mean the Asset Transfer Agreement dated June 13, 1995 among Cabot Safety Corporation, Cabot Canada Ltd., Cabot Safety Limited, Cabot Corporation, Aearo Corporation and Cabot Safety Acquisition Corporation, as amended prior to the date hereof.

"Cash" means, with respect to the Company and the Company Subsidiaries, as of the close of business on the day immediately prior to the Closing Date, cash and cash equivalents determined in accordance with GAAP, consistently applied in accordance with the Company's past practices.

"Certificate of Merger" has the meaning set forth in the preamble.

"Closing" has the meaning set forth in Section 1.6.

"Closing Consideration" has the meaning set forth in Section 2.1(a).

"Closing Date" has the meaning set forth in Section 1.6.

"Code" means the Internal Revenue Code of 1986, as amended.

"Common Stock" means the common stock, par value $.01 per share, of the Company.

"Company" has the meaning set forth in the caption.

"Company Group" means, collectively, the Company and the Company Subsidiaries.

"Company Group Employees" has the meaning set forth in Section 5.8(c).

"Company Financial Statements" has the meaning set forth in Section 3.5.

"Company Subsidiaries" means the Subsidiaries of the Company.

"Confidentiality Agreement" has the meaning set forth in Section 5.3.

"Contract" means any loan or credit agreement, note, bond, mortgage, indenture, lease, sublease, purchase order or other agreement, commitment, or license.

"Corporate Rights" has the meaning set forth in Section 1.3.

A-2

ffny03\choial\717967.2

   3M_MDL000294353

"Debt" means, with respect to the Company and the Company Subsidiaries on a consolidated basis as of the close of business or the day immediately prior to the Closing Date, (i) all indebtedness for borrowed money or for the deferred purchase price of property or services (other than current trade liabilities incurred in the ordinary course of business and payable in accordance with customary practices), whether or not evidenced by a writing, (ii) any other indebtedness that is evidenced by a note, bond, debenture, draft or similar debt instrument, (iii) all obligations under financing or capital leases, (iv) all obligations in respect of bankers acceptances issued or created for the account of the Company or its Subsidiaries, (v) letters of credit to the extent drawn, and (vi) any guarantee or accrued interest, related to any of the foregoing (but in no event shall the definition of Debt include any amounts already deducted from the Closing Consideration as a Transaction Related Expense); it being understood and agreed that any prepayment premium, penalties or breakage costs in respect of the foregoing shall not be Debt for purposes of this Agreement.

"DGCL" has the meaning set forth in the preamble.

"Dissenting Shares" has the meaning set forth in Section 2.2(b).

"Dissenting Shareholders" has the meaning set forth in Section 2.2(b).

"DOJ" means the Antitrust Division of the United States Department of Justice.

"Domain Names" has the meaning set forth in Section 3.12(h).

"Domestic Patents" has the meaning set forth in Section 3.12(d).

"Domestic Patent Applications" has the meaning set forth in Section 3.12(d).

"Domestic Trademarks" has the meaning set forth in Section 3.12(f).

"EC Merger Regulation" has the meaning set forth in Section 5.4(b).

"Effective Time" has the meaning set forth in Section 1.2.

"Employee Arrangement" has the meaning set forth in Section 5.8(b).

"End Date" has the meaning set forth in Section 7.1(a)(ii).

"Encumbrances" means mortgages, liens, security interests, pledges, easements, rights of first refusal, options, restrictions or encumbrances of any kind.

"Environmental Law" means any Law relating to the protection of the environment or human health or safety in effect as of or prior to the date of this Agreement, and as amended prior to the Closing.

"Environmental Permits" has the meaning set forth in Section 3.14.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

A-3

ffny03\choial\717967.2

"ERISA Affiliate" has the meaning set forth in Section 3.13(c).

"Estimated Closing Consideration" has the meaning set forth in Section 2.4(a).

"Estimated Closing Consideration Statement" has the meaning set forth in Section 2.4(a).

"Excess Amount" has the meaning set forth in Section 2.4(e).

"Foreign Patent Applications" has the meaning set forth in Section 3.12(e).

"Foreign Patents" has the meaning set forth in Section 3.12(e).

"Foreign Trademarks" has the meaning set forth in Section 3.12(g).

"FTC" means the United States Federal Trade Commission.

"GAAP" means generally accepted accounting principles as in effect in the United Stated from time to time.

"Governmental Antitrust Authority" has the meaning set forth in Section 5.4(b).

"Governmental Authority" means any supranational, federal, state, provincial, local, county or municipal government, governmental, regulatory or administrative agency, department, court, commission, board, bureau or other authority or instrumentality, domestic or foreign.

"Hazardous Substance" means any substance, material or waste that is controlled, regulated or governed by any Environmental Law as hazardous, toxic, or words of similar import.

"Hedging Contracts" means any interest rate swap agreement, interest collar agreement, interest hedging agreement, foreign exchange contract, currency swap agreement or any agreement designed to protect against fluctuations in currency values.

"Holder" means any Person who holds Shares, Preferred Shares or Options.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Incentive Plans" has the meaning set forth in Section 5.8(b).

"Independent Accounting Firm" has the meaning set forth in Section 2.4(d).

"Intellectual Property" has the meaning set forth in Section 3.12(a).

"Knowledge of the Company" means the actual knowledge, of Michael A. McLain, Jeffrey S. Kulka, Rahul Kapur, and Robert Hebert, none of whom shall have any personal liability or obligations regarding such knowledge.

A-4

ffny03\choial\717967.2

Confidential - Subject to Protective Order

3M_MDL000294355

"Law" means any law, statute, ordinance, rule, regulation, order, writ, judgment, common law, injunction or decree of any Governmental Authority.

"Letter of Transmittal" has the meaning set forth in Section 2.1(b).

"Major Customers" has the meaning set forth in Section 3.20.

"Major Suppliers" has the meaning set forth in Section 3.20.

"Material Adverse Effect" means any event, change or effect in the business, condition (financial or otherwise), assets, liabilities or results of operations of the Company Group other than as a result of (i) a general deterioration in the economy or in the businesses in which the Company Group operate except to the extent the Company Group is affected in a disproportionate manner as compared to other similarly sized U.S. based companies engaged in the business of the manufacture of personal protection equipment, (ii) the outbreak or escalation of hostilities involving the United States, the declaration by the United States of a national emergency or war or the occurrence of any other calamity or crisis, including an act of terrorism, (iii) any change in accounting requirements or principles imposed upon the Company, the Company Subsidiaries or their respective businesses which are not specific to the Company or the Company Subsidiaries or any change in applicable Laws, rules or regulations or the interpretation thereof except to the extent the Company Group is affected in a disproportionate manner as compared to other similar companies, (iv) the public disclosure of this Agreement, the announcement or public disclosure thereof, the transactions contemplated hereby and the identity or involvement by the Parent and its Affiliates) or (v) any fluctuation in currency exchange rates which has a material adverse effect on the Company Group (after taking into account any insurance recoveries available in respect thereof), taken as a whole.

"Material Contracts" means, collectively, the Contracts listed, or required to be listed, on Schedule 3.15(a).

"Merger" has the meaning set forth in the preamble.

"Multiemployer Plan" has the meaning set forth in Section 3.13(d).

"Options" means options to purchase shares of Common Stock granted pursuant to the 2006 Stock Incentive Plan, whether or not vested or exercisable.

"Parcel" has the meaning set forth in Section 3.17(a).

"Parent" has the meaning set forth in the caption.

"Parent Plans" has the meaning set forth in Section 5.8(a).

"PBGC" has the meaning set forth in Section 3.13(c).

"Permits" has the meaning set forth in Section 3.7.

A-5

ffny03\choial\717967.2

Confidential - Subject to Protective Order

3M_MDL000294356

"Permitted Encumbrances" means (i) those Encumbrances set forth on Schedule 1.2 or in the Company Financial Statements, or liens securing debt for borrowed money; (ii) mechanics', carriers', workmen's, repairmen's or other like Encumbrances arising or incurred in the ordinary course of business, Encumbrances arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business and liens for Taxes that are not due and payable or that may thereafter be paid without penalty or that are being contested in good faith by appropriate proceedings; (iii) all Encumbrances created by, arising under, or existing as a result of, any Law; (iv) all rights reserved to or vested in any Governmental Authority to control or regulate any asset or property in any manner and all Laws applicable to assets or properties; (v) other imperfections of title or encumbrances, if any, that do not, individually or in the aggregate, materially impair the continued use and operation of the Company's assets in the conduct of its business as presently conducted; (vi) easements, covenants, rights-of-way and other similar restrictions of record; (vii) any conditions that may be shown by a current, accurate survey or physical inspection of any Parcel made prior to Closing; and (viii) (A) zoning, building and other similar restrictions, (B) Encumbrances that have been placed by any developer, landlord or other third party on property over which the Company has easement rights and (C) unrecorded easements, covenants, rights-of-way and other similar restrictions, none of which items set forth in this clause (viii), individually or in the aggregate, materially impair the continued use and operation of any Parcel in the conduct of the business of the Company as presently conducted.

"Person" means and includes any domestic or foreign individual, partnership, corporation, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization or Governmental Authority (or any department, agency or political subdivision thereof).

"Preferred Amount" means the Liquidation Preference Amount, as such term is defined in the Certificate of Designation, Preference and Rights of Series A Preferred Stock, dated as of March 23, 2006, attached to the Certificate of Amendment of the Certificate of Incorporation of Pacer Holding Company as filed with the Secretary of State of the State of Delaware on March 23, 2006, payable with respect to each Preferred Share in connection with the Merger.

"Preferred Holder" means any Person who holds Preferred Shares.

"Preferred Shares" means shares of Preferred Stock.

"Preferred Stock" means the preferred stock, par value $.01 per share, of the Company.

"Principal Stockholders" means, collectively, Permira Europe III L.P. 1, Permira Europe III L.P. 2, Permira Europe III GmbH & Co KG, Permira Investments Limited, Permira Europe III Co-Investment Scheme, Michael A. McLain, McLain Capital Partners, Jeffrey S. Kulka and Rahul Kapur.

"Proportionate Percentage" means (a) with respect to any Shareholder, a fraction (expressed as a percentage) the numerator of which is the number of issued and outstanding

A-6

ffny03\choial\717967.2

Confidential - Subject to Protective Order

3M_MDL000294357

Shares held by such Holder immediately prior to the Effective Time and the denominator of which is the number of issued and outstanding Shares held by all Holders immediately prior to the Effective Time (assuming the exercise of all Options outstanding immediately prior to the Effective Time) and (b) with respect to any Holder of Options, a fraction (expressed as a percentage) the numerator of which is the number of Shares issuable upon the exercise of Options held by such Holder immediately prior to the Effective Time and the denominator of which is the number of issued and outstanding Shares held by all Holders immediately prior to the Effective Time (assuming the exercise of all Options outstanding immediately prior to the Effective Time).

"Real Property Lease" has the meaning set forth in Section 3.17(b).

"Related Documents" means the Certificate of Merger and such other agreements contemplated by this Agreement, as amended, restated, supplemented or otherwise modified from time to time.

"Related Party Transaction" has the meaning set forth in Section 3.16.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Substance).

"Representative" shall mean Permira Advisers L.L.C.

"Restricted Shares" means those shares of Common Stock that are the subject of "Restricted Stock Awards" made pursuant to the 2006 Stock Incentive Plan and that vest immediately prior to, but subject to, the consummation of the Merger in accordance with the 2006 Stock Incentive Plan.

"Shareholder" means any Person who holds Shares of the Company immediately prior to the Effective Time.

"Shares" means shares of Common Stock and the Restricted Shares.

"Shortfall Amount" has the meaning set forth in Section 2.4(f).

"Subsidiary" of any Person means another Person, an amount of the voting securities, other voting ownership or voting partnership interests of which is sufficient to elect at least a majority of its board of directors or other governing body (or, if there are no such voting interests, 50% or more of the equity interests of which) is owned directly or indirectly by such first Person.

"Surviving Company" has the meaning set forth in Section 1.1.

"Tax" or "Taxes" means, with respect to any Person, all income taxes (including any tax on or based upon net income, gross income, or income as specially defined, or earnings, profits, or selected items of income, earnings or profits) and all gross receipts, sales, use, ad

ffny03\choial\717967.2

Confidential - Subject to Protective Order

3M_MDL000294358

valorem, transfer, franchise, license, withholding, payroll, employment or windfall profits taxes, alternative or add-in minimum taxes, customs duties or other taxes of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any Taxing Authority on such Person and including any liability for the taxes of any person (other than the Company or any of its Subsidiaries) under Treasury Regulation §1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise.

"<u>Tax Authority</u>" means any Governmental Authority or any quasi-governmental or private body having jurisdiction over the assessment, determination, collection or imposition of any Tax.

"<u>Tax Return</u>" means any return, report, certificate, form or similar statement or document (including any related or supporting information or schedule attached thereto and any information return, amended Tax return, claim for refund or declaration of estimated Tax and including any amendment thereof) required or permitted to be supplied to, or filed with, a Tax Authority in connection with the determination, assessment or collection of any Tax or the administration of any Laws, relating to any Tax.

"<u>Title IV Plan</u>" has the meaning set forth in <u>Section 3.13(c)</u>.

"<u>Total Preferred Amount</u>" has the meaning set forth in <u>Section 2.4(a)</u>.

"<u>Transaction Related Expenses</u>" means (i) all out-of-pocket fees and expenses payable to Permira Advisers L.L.C. and its Affiliates, (ii) any amounts payable to third party service providers in excess of $5,000,000 that are incurred by the Company or the Company Subsidiaries in connection with this Agreement and the transactions contemplated hereby, and (iii) any amounts payable by the Company to any of its officers, directors or employees, if any, in the nature of a closing or signing bonus or similar payment as a result of the signing of this Agreement or the completion of the transactions contemplated hereby; for the avoidance of doubt it is agreed that any prepayment penalties, premiums, termination fees, expenses or breakage costs under the existing credit facilities or Hedging Contracts of the Company or any Company Subsidiaries shall not be treated as Transaction Related Expenses for purposes of this Agreement.

"<u>Transfer Taxes</u>" has the meaning set forth in <u>Section 5.5(b)</u>.

"<u>Unaudited Financial Statements</u>" has the meaning set forth in <u>Section 3.5</u>.

"<u>WARN</u>" means the Workers Adjustment and Retraining Notification Act, 29 U.S.C.   Sec. 2101 <u>et seq.</u>, as amended, and any other similar state, local or government regulation or ordinance.

"<u>Withholding Amount</u>" has the meaning set forth in <u>Section 2.3</u>.

ffny03\choial\717967.2

Confidential - Subject to Protective Order

3M_MDL000294359