# EXHIBIT 1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AEARO TECHNOLOGIES LLC, *et al.*,[1] | ) | Case No. 22-02890-JJG-11 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: Docket No. 173** |

## DEBTORS' SUPPLEMENTAL BRIEF
## IN SUPPORT OF THEIR MOTION FOR ENTRY OF AN ORDER
## ENFORCING THE AUTOMATIC STAY AND GRANTING RELATED RELIEF

---

[1] The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief*, entered by the Court for each consolidated Debtor [Docket Nos. 37–42]. The location of the Debtors' service address for the purposes of these chapter 11 cases is 7911 Zionsville Road, Indianapolis, Indiana 46268.

# Table of Contents

INTRODUCTION................................................................................................1

AMENDED RELIEF REQUESTED .................................................................2

SUPPLEMENTAL BACKGROUND ...............................................................3

    A.    Keller Postman's Mounting Violations Of The Automatic Stay. ...........3

        1.    Keller Postman's First Attempt To Enjoin 3M In The MDL Court. ...........3

        2.    Keller Postman's Second Attempt To Enjoin 3M In The MDL Court ...............................................................................4

        3.    Keller Postman's New PI Motion Seeks To Enjoin 3M From Performing Critical Contracts For The Debtors..........5

        4.    Keller Postman Continues To File JPML Tag-Along Actions Seeking To Transfer These Proceedings To The MDL. ............7

    B.    Actions By Other MDL Plaintiff Law Firms Raise Stay Violation Concerns. ................................................................7

SUPPLEMENTAL BASIS FOR RELIEF ........................................................8

I.    THE AUTOMATIC STAY PROHIBITS ACTIONS AGAINST PROPERTY OF THE ESTATE............................................................8

II.    THE DEBTORS' CONTRACTS ARE PROPERTY OF THE ESTATE. ..................9

III.    THE AUTOMATIC STAY APPLIES TO REQUESTS FOR INJUNCTIVE RELIEF..............................................................11

IV.    INJUNCTIONS INTERFERING WITH A DEBTOR'S CONTRACT RIGHTS VIOLATE THE STAY. ................................................11

V.    KELLER POSTMAN'S AUTOMATIC STAY VIOLATIONS ARE WILLFUL...............................................................12

NOTICE............................................................................................................13

ORDER ENFORCING THE AUTOMATIC STAY AND GRANTING RELATED RELIEF......................................................................1

## **Introduction**

The Debtors file this supplement in support of their opening motion to enforce [Docket No. 173] (the "Motion")[1] to apprise this Court of and seek appropriate relief for escalating violations of the automatic stay by the Keller Postman law firm.  As the Motion explained, on July 26, 2022—just hours after Debtors filed their chapter 11 petitions—the Keller Postman law firm violated the automatic stay by filing a tag-along notice with the JPML seeking to transfer the entirety of these bankruptcy proceedings to the MDL Court.[2]  Since that time, Keller Postman has ratcheted up its stay violations through a preliminary injunction motion in the MDL Court and additional JPML transfer notices, all the while making no bones about its goal of "sending this proceeding to a different tribunal"—the MDL Court.[3]

On August 3, 2022, Keller Postman filed in the MDL Court an "emergency motion," purportedly "on behlaf [sic] of all plaintiffs" for a preliminary injunction against 3M seeking, among other things, to prevent 3M from "supporting an injunction against any Plaintiffs from litigating CAEv2 matters against 3M in this [MDL] Court or following a remand for trial."[4]  This broad attempt to foreclose any 3M "support" of the Debtors' preliminary injunction efforts violates the automatic stay by attempting to interfere with the Debtors' rights under two critical contracts:  (a) the Support Services Agreement—cutting off the Debtors' access to critical shared

---

[1]   The facts and circumstances leading up to the filing of these chapter 11 cases are set forth in the *Declaration of John R. Castellano in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 11] (the "First Day Declaration"), filed on July 26, 2022.  Capitalized terms used but not immediately defined herein have the meanings given to them elsewhere in this Brief, in the Motion, or in the First Day Declaration, as applicable.

[2]   *See* JPML Docket No. 1771, attached to this Brief as **Exhibit C**

[3]   First Day Hr'g Tr. (a.m.) at 99, attached to this Brief as **Exhibit K-1**.

[4]   *Plaintiff's Emergency Motion for Preliminary Injunction Against Defendant 3M Company*, *In re: 3M Combat Arms Earplug Products Liability Litigation*, No. 3:19-md-2885 (N.D. Fla. Aug. 3, 2022) [Docket No. 3358], attached to this Brief as **Exhibit B** (the "PI Motion").

services provided thereunder; and (b) the Funding Agreement—putting at risk the entirety of the Debtors' reorganization efforts, each in plain violation of the automatic stay. Critically, less than three hours after Keller Postman filed the PI Motion, the MDL Court set it for hearing on August 11, 2022—four days before this Court's August 15, 2022, hearing on the Debtors' preliminary injunction in the Adversary Proceeding. Meanwhile, Keller Postman has filed several more JPML Transfer Requests[5] aimed at transferring specific proceedings—including the Adversary Proceeding and the Debtors' Bankruptcy Cases—to the MDL Court.

Keller Postman's actions violate the automatic stay provisions of section 362(a) and jeopardize the Debtors' ability to fairly, efficiently, and effectively restructure. The Debtors file this supplemental Brief to expand their original Motion to include the new Keller Postman PI Motion and the additional Transfer Requests and to modify the Motion's proposed form of order (Docket No. 173-1), to include a finding that these additional actions violate the automatic stay.[6]

The Debtors file this supplemental brief (this "Brief") in support of the Debtors' opening Motion to enforce the automatic stay and respectfully state as follows:

**Amended Relief Requested**

1.      The Debtors seek entry of an order, substantially in the form attached to this Brief as **Exhibit A** (the "Order"), (a) finding that the PI Motion violates the automatic stay under section 362 of the Bankruptcy Code; (b) finding that the four Transfer Requests violate the automatic stay under section 362 of the Bankruptcy Code; (c) directing Keller Postman to

---

[5]      *See* "Notice[s] of Potential Tag-Along Action" filed by Keller Postman LLC on July 26, 2022, July 29, 2022, August 2, 2022, and August 2, 2022, before the United States Judicial Panel on Multidistrict Litigation in *In re 3M Combat Arms Earplug Products Liability Litigation*, MDL 2885 [JPML Docket Nos. 1771, 1774, 1778, 1779], attached to this Brief as **Exhibits C, D, E, and F** (collectively, the "Transfer Requests").

[6]      The amended proposed Order also reflects the consensual resolution of the stay violations related to 94 amended Complaints.

withdraw the Transfer Requests; and (d) granting such other relief as the Court deems appropriate.

## Supplemental Background

### A.      Keller Postman's Mounting Violations Of The Automatic Stay.

#### 1.      Keller Postman's First Attempt To Enjoin 3M In The MDL Court.

2.      On the Petition Date, the Debtors commenced the above captioned chapter 11 cases (the "Bankruptcy Cases") and initiated an adversary proceeding with this Court seeking to preliminarily enjoin all Combat Arms Litigation (22-ap-50059) (the "Adversary Proceeding"). The next day, July 26, 2022, at 9:28 a.m.[7]—just minutes before this Court began the first day hearing (the "First Day Hearing"), Keller Postman filed a motion for a TRO in the MDL Court seeking, among other things, to prevent 3M from taking any steps outside of the MDL to enjoin lawsuits against 3M.  MDL Dkt. 3332, attached to this Brief as **Exhibit G**.  Less than two hours later, at 11:50 a.m., the MDL Court, *sua sponte,* ordered 3M to respond to the Keller TRO motion by 2:00 p.m. that same day.  MDL Dkt. 3333, attached to this Brief as **Exhibit H**.

3.      3M complied with the four-hour turn-around time (which was elapsing at the same time as this Court was holding its First Day Hearing) and opposed the TRO on multiple grounds. 3M observed that Keller Postman's TRO motion was "a misplaced and misguided effort to ask [the MDL] Court to preemptively rule on the scope of the automatic stay" and "to get a pre-bite at the apple through a repackaged objection to the Debtors' pending [preliminary injunction] motion" in this Court.  MDL Docket No. 3335 at 1-2, attached to this Brief as **Exhibit I**.  During this Court's First Day Hearing, Keller Postman principal, Ashley Keller, made clear that he had no intention of withdrawing its MDL TRO motion, even though certain plaintiffs' law firms had committed to try to persuade him to do so.  First Day Hr'g Tr. (p.m.) at 101, attached to this Brief

---

[7]    All time references in this Brief refer to Prevailing Eastern Time.

as **Exhibit K-2**.

4.      On July 28, 2022, the MDL court denied the TRO motion, stating, "[g]iven that there is presently no automatic stay in place as to 3M Company and the bankruptcy court's decision on whether the automatic stay will apply to 3M Company will not be made until August 18 or later, as well as the fact that the parties have stipulated to continuing Wave 3 discovery deadlines within the MDL, the Court finds that Plaintiff has failed to show irreparable harm absent a seven-day TRO."  MDL Dkt. 3343, attached to this Brief as **Exhibit L.**

2.      **Keller Postman's Second Attempt To Enjoin 3M In The MDL Court.**

5.      On August 3, 2022—undeterred by the denial of its first TRO motion (and on the heels of the Debtors' August 1, 2022, Motion to enforce the automatic stay as to the first Transfer Request)—Keller Postman announced that it would again attempt to enjoin 3M with a "renewed" TRO motion in the MDL court.  At 2:02 pm, Keller Postman emailed counsel for the Debtors and 3M, stating "[w]e intend to renew our motion seeking the relief sought by the Motion for the Temporary Restraining Order against 3M Company filed last week.  MDL Dkt 3332."  Email from Ashley Barriere of Keller Postman, attached to this Brief as **Exhibit M**.

6.      At 4:03 p.m., Keller Postman filed its PI Motion in the MDL, which is now styled as an *Emergency Motion on Behlaf [sic] of All Plaintiffs for Preliminary Injunction Against Defendant 3M Company*, MDL Dkt. 3358.  Keller Postman did not move for reconsideration of the MDL Court's prior denial of its TRO motion, nor did it offer any new evidence or argument that could not previously have been made—despite its assertion in that same PI Motion that "[p]arties who disagree with Court orders but respect the rule of law have two options:  file a motion for reconsideration or file a notice of appeal."  PI Motion at 7.  Keller Postman did neither of these things before filing its "renewed" motion, and instead only reasoned that its first TRO motion was "hurried."  *Id.* at 4.

7.      Keller Postman asked for expedited briefing on its PI Motion, seeking a response date of August 10, and a hearing date of August 12—all of which would be before this Court has an opportunity to hear the Debtors' preliminary injunction motion on August 15, 2022.  *Id.* at 22–23.  At 6:38 p.m. on August 3, 2022 (the same day Keller Postman filed the PI Motion), the MDL Court entered a briefing schedule that was even more expedited than requested by Keller Postman (making opposition briefs due August 9, instead of August 11), provided for a Keller Postman reply brief (which was not requested and is not allowed as a matter of right under the local rules governing the MDL Court), and set a hearing date of August 11 (which was also sooner than requested by Keller Postman, and still before the August 15, 2022, preliminary injunction hearing scheduled before this Court).  MDL Dkt. 3359, attached to this Brief as **Exhibit N**.  The MDL Court's order setting the briefing and hearing dates did not refer to the previous denial of Keller Postman's TRO motion nor question why the renewed motion was procedurally proper.  *See id.*

3.      **Keller Postman's New PI Motion Seeks To Enjoin 3M From Performing Critical Contracts For The Debtors.**

8.      Among other things, the PI Motion asked the MDL Court to enjoin 3M from "supporting an injunction against any Plaintiffs from litigating CAEv2 matters against 3M in this [MDL] Court or following a remand for trial."  This request directly seeks to enjoin 3M from providing services and funding ***to the Debtors***—as required by several important contracts.

9.      *First*, 3M and Non-Debtor Affiliates provide critical shared services to the Debtors pursuant to the Support Services Agreement, an agreement governing shared services between the parties for over 14 years.

10.      *In-House Legal Services:*  The Debtors do not maintain a stand-alone legal department and rely on 3M and the Non-Debtor Affiliates to provide comprehensive legal services support, including in-house support for the Debtors' litigation responsibilities and management of

external counsel.  This support is crucial to the Debtors' administration of their chapter 11 cases. For example, the Debtors' corporate secretary, Leigh Gillett, is a 3M employee and member of the 3M legal department.  Enjoining the participation of 3M's legal department in the preliminary injunction hearing before this Court impedes on the Debtors' contractual right to services provided under the Support Services Agreement and would frustrate the Debtors' ability to administer their bankruptcy estates as debtors-in-possession.

11.     *Human Resources***:**  The Debtors rely on 3M and the Non-Debtor Affiliates for the provision of comprehensive human resources services, including payroll processing and administration, management of benefits programs, management of employee performance evaluation processes, personnel recruiting, and training and development.  The PI Motion, insofar as it seeks to enjoin 3M's "support" of the Debtors in pursuing a preliminary injunction enjoining Combat Arms-related claims against 3M, effectively handcuffs the Debtors' employees from participation in the hearing and related preparation for the Adversary Proceeding, potentially restricting the processing and payment of wages as provided under the Support Services Agreement and as already approved on an interim basis by this Court.  *See* [Docket No. 150] (the "Interim Wages Order").  The human resources services provided by 3M pursuant to the Support Services Agreement enable the Debtors to effectively utilize key personnel critical in the administration of these chapter 11 cases.

12.     *Second*, the Funding Agreement obligates 3M to provide funding to the Debtors for various uses, including the payment of "the costs, expenditures (including capital expenditures), or other amounts incurred or to be incurred by such Aearo Entity . . . to administer a Bankruptcy Case, including any related professional fees and expenses."  *See* Funding Agreement, § 1, definition of "Permitted Funding Use."  The PI Motion seeks to enjoin the Debtors' contractual

right to payment by prohibiting 3M from funding any costs and expenses associated with the preliminary injunction proceeding before this Court.

*      *      *

13.     On August 4, 2022, the Debtors sent Keller Postman a letter notifying it that the PI Motion violated the automatic stay, and specifically referenced the interference with the Debtors' contracts.  Aug. 4, 2022, C. Husnick Ltr., attached to this Brief as **Exhibit O**.  Keller Postman has neither responded to the letter, nor withdrawn or modified its PI Motion.

              4.     **Keller Postman Continues To File JPML Tag-Along Actions Seeking To Transfer These Proceedings To The MDL.**

14.     The PI Motion is the latest in a series of Keller Postman actions that violate the automatic stay.  After the Debtors commenced these chapter 11 cases, Keller Postman filed four Transfer Requests.  For the reasons discussed in the Debtors' opening Motion, each of the Transfer Requests violates the Bankruptcy Code's automatic stay, which enjoins "all parties" from taking certain actions against the Debtors or interfering with property of their estate.

      a.     July 26, 2022—JPML Docket No. 1771 (seeking to transfer the Bankruptcy Cases), attached to this Brief as **Exhibit C**;

      b.     July 29, 2022—JPML Docket No. 1774 (seeking to transfer the Adversary Proceeding), attached to this Brief as **Exhibit D**;

      c.     August 2, 2022—JPML Docket No. 1778 (seeking to transfer the Bankruptcy Cases and listing parties more specifically), attached to this Brief as **Exhibit E**; and

      d.     August 2, 2022—JPML Docket No. 1779 (seeking to transfer the Bankruptcy Cases and listing parties more specifically), attached to this Brief as **Exhibit F**.

**B.     Actions By Other MDL Plaintiff Law Firms Raise Stay Violation Concerns.**

15.     While not the subject of this Brief, on August 4, 2022, MDL Executive Committee member Adam Wolfson (of Quinn Emanuel) filed a separate motion asking the MDL Court to issue an advisory ruling regarding 3M's potential successor liability to the Aearo Debtors.  MDL

Dkt. 3361, attached to this Brief as **<u>Exhibit J.</u>**  The MDL Court granted Quinn Emanuel's request to expedite briefing on the motion and "join" in the August 11 hearing that the MDL Court already set on Keller Postman's PI Motion.  MDL Dkt. 3364.  The Debtors reserve all rights with respect to the Quinn Emanuel motion, including seeking additional relief in connection with the automatic stay.

<u>Supplemental Basis For Relief</u>

16.     Keller Postman's PI Motion and Transfer Requests are knowing and willful violations of the automatic stay.  *See* Motion at ¶¶ 5-21.

**I.     THE AUTOMATIC STAY PROHIBITS ACTIONS AGAINST PROPERTY OF THE ESTATE.**

17.     The commencement of a bankruptcy case results in the imposition of an automatic stay, which operates as an injunction against "all entities" from taking certain actions against a debtor.  11 U.S.C. § 362(a).  Specifically, section 362(a)(3) of the Bankruptcy Code prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  Any action taken in violation of the automatic stay is void and without effect, and such violation may necessitate proceedings in the bankruptcy court, with the attendant possibility of sanctions, costs, and other expenses.  *See Cent. States, Se. and Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369 (7th Cir. 1992); *Fidelity Mortg. Inv'rs v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir. 1976), *cert. denied*, 429 U.S. 1093 (1977).

18.     All of Keller Postman's actions took place after the automatic stay was in effect.  Each act was a violation of sections 362(a)(1) and (a)(3) of the Bankruptcy Code.  Keller Postman's PI Motion and the request contained therein—that the MDL Court prohibit 3M from ***supporting*** an injunction against any Combat Arms Litigation—is a clear violation.  As discussed above, and shown below, the Debtors' contractual interests in the Support Services Agreement and

8

the Funding Agreement are property of the Debtors' bankruptcy estates and thereby protected by the automatic stay. Moreover, 3M's support under those agreements is instrumental to the Debtors' ability to obtain the preliminary injunction necessary and appropriate to their formulation of a plan of reorganization and successful administration of their estates.

## II.     THE DEBTORS' CONTRACTS ARE PROPERTY OF THE ESTATE.

19.     It is black letter law that a debtor's contracts "are considered a form of property of the estate" and, as such, "the debtor's interests in such contracts and leases are protected against . . . interference that would have the effect of removing or hindering the debtor's rights in violation of section 362(a)(3)." 3 Collier on Bankruptcy ¶ 362.03[5][a]. This broad interpretation has been reinforced by the Supreme Court, *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.9 (1983), and repeatedly upheld by circuit courts across the country. *See Nat'l Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 707-08 (7th Cir. 1994) (holding that the debtor's "right to collect from the general partners [under a partnership agreement] is 'property of the estate'" protected by section 362(a)(3) of the Bankruptcy Code); *In re Mirant Corp.*, 440 F.3d 238, 251–52 (5th Cir. 2006) (finding that a debtor's interest in a contract is property of the estate protected by the automatic stay); *In re 48th Street Steakhouse, Inc.*, 835 F.2d 427, 430 (2d Cir. 1987) ("The courts are in agreement that [executory contracts and unexpired leases] constitute property of the bankrupt estate."); *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 1002 (4th Cir. 1986) ("Under the weight of authority, [a debtor's] contracts have been said to be embraced in this statutory definition of 'property.'"); *In re Computer Commc'ns, Inc.*, 824 F.2d 725, 729 (9th Cir. 1987) (explaining that "contracts are embraced in the statutory definition of 'property'"); *Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1256 (11th Cir. 2006) ("The property of the estate of [the debtor] includes any contractual rights that it owned when it filed for bankruptcy."); *cf. In re Majestic Star Casino, LLC*, 716 F.3d 736, 750–51 (3d Cir. 2013) ("It is also well established

that the mere opportunity to receive an economic benefit in the future is property with value under the Bankruptcy Code.").[8]

20.     The Debtors have contract rights arising from the Support Services Agreement and the Funding Agreement (together, the "Agreements").  These contract rights are property of the estate.  Keller Postman's attempt to enjoin 3M from performing under the Agreements for certain purposes (i.e., supporting the Debtors' efforts to enjoin Combat Arms Litigation against non-debtor affiliates) seeks to exercise control over the Agreements by preventing the Debtors from exercising their contractual rights thereunder.

21.     Specifically, Keller Postman's request seeks to prohibit the Debtors from obtaining through the Funding Agreement any funding from 3M for the costs and expenses associated with the preliminary injunction proceeding before this Court.  The Debtors' rights under the Funding Agreement to receive funding from 3M to support the administration of these chapter 11 cases are unquestionably "opportunit[ies] to receive an economic benefit in the future," which is "property with value under the Bankruptcy Code."  *Extraction*, 2020 WL 7074142, at *4.  Likewise, the Debtors will need to utilize the critical human resources services, shared employees, and in-house legal support services from 3M which the Debtors are entitled to under the Support Services

---

[8]     *See also see e.g.*, *In re Lee*, 524 B.R. 798, 804 (Bankr. S.D. Ind. 2014) (holding that a debtor's voting rights under an operating agreement were property of the estate and protected by the automatic stay); *In re Windstream Holdings, Inc.*, 627 B.R. 32, 42 (Bankr. S.D.N.Y. 2021) ("Section 362(a)(3) clearly encompasses and protects a debtor's executory contracts, which are property of the debtor's estate under 11 U.S.C. § 541."); *U.S. BankTrust Nat'l Assn. v. Am. Airlines, Inc. (In re AMR, Inc.)*, 485 B.R. 279, 294 (Bankr. S.D.N.Y. 2013) (explaining that contract rights are property of the estate protected by section 362(a)(3) from the exercise of control over them), *aff'd* 730 F.3d 88 (2nd Cir. 2013); *In re Enron Corp.*, 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003) ("Courts have consistently held that contract rights are property of the estate, and that therefore those rights are protected by the automatic stay."); *Adelphia Communs. Corp. v. The America Channel, LLC (In re Adelphia Communs. Corp.)*, 2006 Bankr. LEXIS 975, at *10 (Bankr. S.D.N.Y. Apr. 5, 2006) ("An interference with the estate's . . . contractual right . . . is a classic and egregious violation of section 362(a)(3)."); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS), 2020 WL 7074142, at *4 (Bankr. D. Del. Dec. 3, 2020) ("Courts have repeatedly held that 'the mere opportunity to receive an economic benefit in the future is property with value under the Bankruptcy Code.'").

10

Agreement as they prepare for and prosecute the preliminary injunction proceeding before this Court. Moreover, the Debtors reiterate that this Court has already approved on an interim basis the processing and payment of wages by 3M pursuant to the Interim Wages Order.

## III.  THE AUTOMATIC STAY APPLIES TO REQUESTS FOR INJUNCTIVE RELIEF.

22.  The fact that Keller Postman's PI Motion requests injunctive relief does not absolve it as a clear violation of the automatic stay. The consensus among courts interpreting the automatic stay's application to injunctive relief is that the "stay includes actions seeking injunctive or similar relief." 3 Collier on Bankruptcy P 362.03 (16th 2022). *See, e.g.*, *Advanced Computer Servs. of Michigan, Inc. v. MAI Sys. Corp.*, 161 B.R. 771, 774 (E.D. Va. 1993) ("There is no merit to the argument that a suit for injunctive and declaratory relief is an equitable suit and not a 'judicial action' as to which a stay is applicable."); *Nat'l Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 707-08 (7th Cir. 1994) (holding that the automatic stay applied to an injunction exercising control over the debtor's contractual right to payment).

## IV.  INJUNCTIONS INTERFERING WITH A DEBTOR'S CONTRACT RIGHTS VIOLATE THE STAY.

23.  Moreover, the fact that Keller Postman's PI Motion seeks to interfere with the Debtors' contract rights is a violation of section 362(a)(3) of the Bankruptcy Code. Several courts, including the Seventh Circuit Court of Appeals, have expressly held that an injunction that interferes with a debtor's contractual rights violates the automatic stay. *See, e.g.*, *Nat'l Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 707-08 (7th Cir. 1994) (holding that the automatic stay applied to an injunction exercising control over the debtor's contractual right to payment); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2006 WL 1529357, at *4 (Bankr. S.D.N.Y. June 5, 2006) (holding that third-party's attempt to enjoin debtor's asset sale violated the automatic stay and explaining that "[a]n interference with the estate's . . . contractual right to secure

11

[funds] . . . is a classic, and egregious, violation of section 362(a)(3)"); *In re MCEG Prods., Inc.*, 133 B.R. 232, 235 (Bankr. C.D. Cal. 1991) (holding that an attempt to enjoin a non-debtor's performance under contracts with the debtor violated automatic stay because it "affected [the debtor's] interest in the [contracts]," and explaining that section "362(a)(3) protects against such acts to exercise control over property of the estate without distinction as to the form such interference takes"); *In re Dublin Properties*, 20 B.R. 616, 620 (Bankr. E.D. Pa. 1982), *rev'd in part sub nom. Frankford Tr. Co. v. Allanoff*, 29 B.R. 407 (E.D. Pa. 1983) ("We find it inconceivable to imagine that anyone familiar with the Bankruptcy Code could, in good faith, believe that the automatic stay provisions of the Code do not prohibit a person from taking action in another court to eliminate a property interest held by the estate.").

## V. KELLER POSTMAN'S AUTOMATIC STAY VIOLATIONS ARE WILLFUL.

24.     Keller Postman has appeared before this bankruptcy Court and is well aware of the import of the automatic stay, and has received written notice (both through direct correspondence and the original enforcement Motion) that its actions violate the stay.  Despite this knowledge, Keller Postman's repeated acts—culminating (so far) in the PI Motion—to exercise control over property of the estate constitute willful violations of the automatic stay.

25.     As set forth in the proposed Order, the Debtors seek entry of an order finding that Keller Postman has violated the automatic stay through both its PI Motion and Transfer Requests. The Debtors respectfully defer to this Court as to what, if any, additional relief it deems appropriate in this circumstance.  *See In re Klarchek*, 508 B.R. 386, 393 n.4 (Bankr. N.D. Ill. 2014) (to protect this jurisdiction, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title" (citing 11 U.S.C. § 105(a) and *Zerand-Bernal Group, Inc. v. Cox,* 23 F.3d 159, 162 (7th Cir. 1994))).

## <u>Notice</u>

26.     The Debtors will provide notice of this Brief to the following parties or their respective counsel:  (a) the United States Trustee for Region 10, Attn: Ronald Moore; (b) the Top Counsel List;[9] (c) counsel for non-Debtor 3M; (d) the United States Attorney's Office for the Southern District of Indiana; (e) the Internal Revenue Service; (f) the office of the attorneys general for the states in which the Debtors operate or face Tort Claims;[10] (g) the United States Department of Veterans Affairs; (h) the United States Department of Defense; (i) the Securities and Exchange Commission; (j) counsel for Keller Postman; (k) counsel for Aylstock, Keller Postman, and the other lawyers listed on <u>Exhibit C</u> to the opening Motion; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "<u>Notice Parties</u>").  Notice of this Brief and any order entered hereon will be served in accordance with Local Rule B-9013-3(d).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank]*

---

[9]     As defined in the Debtors' creditor matrix motion [Docket No. 17] (the "<u>Creditor Matrix Motion</u>").

[10]    As defined in the Creditor Matrix Motion.

WHEREFORE, the Debtors respectfully submit this Brief in support of the Motion and request the Court enter an order sustaining the Motion, as supplemented by this Brief, and granting such other relief to which the Debtors may be entitled.

Indianapolis, Indiana
Dated:  August 9, 2022

/s/ Jeffrey A. Hokanson

| | |
|---|---|
| **ICE MILLER LLP** | **KIRKLAND & ELLIS LLP** |
| Jeffrey A. Hokanson (Ind. Atty. No. 14579-49) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Connor Skelly (Ind. Atty. No. 35365-06) (*pro hac vice* pending) | Edward O. Sassower, P.C. (admitted *pro hac vice*) |
| | Emily Geier (admitted *pro hac vice*) |
| One American Square, Suite 2900 | 601 Lexington Avenue |
| Indianapolis, IN 46282-0200 | New York, New York 10022 |
| Telephone:      (317) 236-2100 | Telephone:    (212) 446-4800 |
| Facsimile:    (317) 236-2219 | Facsimile:    (212) 446-4900 |
| Email:       Jeff.Hokanson@icemiller.com | Email:        edward.sassower@kirkland.com |
|                   Connor.Skelly@icemiller.com |                    emily.geier@kirkland.com |
| | |
| *Proposed Co-Counsel to the Debtors and Debtors in Possession* | - and - |
| | |
| | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| | Chad J. Husnick, P.C. (admitted *pro hac vice*) |
| | Spencer A. Winters (admitted *pro hac vice*) |
| | 300 North LaSalle Street |
| | Chicago, Illinois 60654 |
| | Telephone:    (312) 862-2000 |
| | Facsimile:    (312) 862-2200 |
| | Email:        chad.husnick@kirkland.com |
| |                    spencer.winters@kirkland.com |
| | |
| | *Proposed Co-Counsel to the Debtors and Debtors in Possession* |

**Exhibit A**

**Proposed Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AEARO TECHNOLOGIES LLC, *et al.*,[1] | ) | Case No. 22-02890-JJG-11 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re:  Docket No. ___** |

## ORDER ENFORCING THE AUTOMATIC STAY
## AND GRANTING RELATED RELIEF

---

[1] The above-captioned debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief*, entered by the Court for each consolidated Debtor [Docket Nos. 37–42].  The location of the Debtors' service address for the purposes of these chapter 11 cases is 7911 Zionsville Road, Indianapolis, Indiana 46268.

Upon the motion (the "<u>Motion</u>") and the supplemental brief (the "<u>Brief</u>")[2] of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), for entry of an order (this "<u>Order</u>"), enforcing the automatic stay and granting related relief, all as more fully set forth in the Motion and the Brief; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference from the United States District Court for the Southern District of Indiana, dated July 11, 1984; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding, the Motion, and the Brief in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion and the Brief is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and the Brief and opportunity for a hearing on the Motion and the Brief were appropriate under the circumstances and that no other notice need be provided; and this Court having reviewed the Motion and the Brief and having heard the statements in support of the relief requested therein at a hearing before this Court (the "<u>Hearing</u>"); and this Court having determined that the legal and factual bases set forth in the Motion, in the Brief, and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion, as supplemented by the Brief, is granted as set forth in this Order.

2. Keller Postman's Transfer Requests are a violation of the automatic stay.

3. Keller Postman shall withdraw the Transfer Requests within two (2) business days of

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Brief.

the entry of this Order.

4.   Keller Postman's PI Motion is a violation of the automatic stay.

5.   Each Complaint is a violation of the automatic stay.

6.   Each plaintiff that filed a Complaint and has not yet dismissed such Complaint shall dismiss the Complaint within two (2) business days of the entry of this Order.

7.   The Debtors shall serve this Order in accordance with all applicable rules and shall file a certificate of service evidencing compliance with this requirement.

8.   The terms and conditions of this Order are immediately effective and enforceable upon its entry.

9.   The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order.

**Exhibit B**

**PI Motion**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to: *All Cases* | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AGAINST DEFENDANT 3M COMPANY

Pursuant to the All Writs Act, 28 U.S.C. § 1651(a), and Local Rule 7.1(L), Plaintiff, Richard Valle, respectfully asks this Court to enjoin 3M Company and any party acting on 3M's behalf, from filing any motion, action, proceeding, brief, or other judicial filing that seeks to enjoin parties from pursuing CAEv2 related claims against 3M in this MDL or in district courts where MDL cases have been remanded, or from supporting and/or advocating in favor of any other party seeking to enjoin any parties from pursuing CAEv2 related claims against 3M in this MDL or in district courts where MDL cases have been remanded.[1] Given the imminent harm, Plaintiff respectfully asks for an expedited briefing schedule such that any opposition be due within 7 days and a hearing to follow within 2 days.

---

[1] This motion is solely directed at 3M Company, who is not a debtor in the bankruptcy, *In re Aearo Technologies LLC, et al.*, 22-02890 (Bankr. S.D. Ind.), and is not subject to the automatic stay. MDL Dkt. 3329

This motion is based on the accompanying memorandum of law, declaration, and exhibits in support of Plaintiff's motion for a preliminary injunction.

Dated:  August 3, 2022        */s/ Ashley C. Keller*

        Ashley C. Keller (Bar #1029118)
        ack@kellerpostman.com
        Nicole C. Berg (Pro Hac Vice)
        ncb@kellerpostman.com
        Ashley Barriere (Pro Hac Vice)
        ashley.barriere@kellerpostman.com
        Frank G. Dylewski (Pro Hac Vice forthcoming)
        frank.dylewski@kellerpostman.com
        **KELLER POSTMAN LLC**
        150 North Riverside Plaza, Suite 4100
        Chicago, Illinois  60606
        Telephone: (312) 741-5220
        Facsimile: (312) 971-3502

        ***Counsel for Plaintiff Richard Valle***

## <u>REQUEST FOR EMERGENCY TREATMENT</u>

Pursuant to Local Rule 7.1(L), and given the imminent harm as more fully described in the accompanying memorandum, Plaintiff requests a ruling more promptly than would occur in the ordinary course of business because.

### REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(K), Plaintiff requests oral argument on this Emergency Motion and estimate that one hour shall be required for such argument.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to: *All Cases* | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## MEMORANDUM IN SUPPORT OF RICHARD VALLE'S EMERGENCY MOTION ON BEHLAF OF ALL PLAINTIFFS FOR PRELIMINARY INJUNCTION AGAINST DEFENDANT 3M COMPANY

1

# **INTRODUCTION**

3M is attempting to halt this MDL in its tracks by invoking an argument that may seem familiar at first blush: once a debtor has filed for bankruptcy, all related litigation in other tribunals must come to a halt, so that the bankruptcy court can efficiently resolve all claims affecting the insolvent entity in a single proceeding. But 3M's litigation strategy is anything but ordinary and in fact seeks to misappropriate the bankruptcy process in a cynical attempt to give a *non-debtor* a second bite at issues that have already been litigated and resolved. That attempt is wasteful, not efficient, and does not further any legitimate interest of the debtors (the Aearo entities), let alone a legitimate interest of an independently liable non-debtor (3M). Fortunately, 3M's superficial appeals to bankruptcy conventional wisdom are not actually supported by bankruptcy law. And this Court has well-established authority to put a halt to 3M's tactical gamesmanship.

The Constitution vests "judicial power" in federal courts that wield jurisdiction over specified "cases" and "controversies." U.S. Const. Article III, § 2, Cl. 2. And Congress vested this Court with exclusive statutory jurisdiction to oversee pretrial proceedings over diverse "civil actions" related to the CAEv2 earplugs manufactured and sold by Defendants. 28 U.S.C. § 1407; MDL Dkt 1.

Since April 3, 2019, this Court has tirelessly wielded its jurisdiction to issue myriad rulings that effect hundreds of thousands of Plaintiffs, including movant

Richard Valle.   The Court has ruled—which is to say, exercised its jurisdiction—on 24 *Daubert* motions, 263 motions in *limine*, 42 motions for summary judgment, all deposition designations in preparation for 16 bellwether trials, and 6 post-trial motions.  It has itself presided over six bellwether trials, including two with final judgments that are on appeal to the *only* intermediate appellate court with jurisdiction to review the decisions of this tribunal, the United States Court of Appeals for the Eleventh Circuit.

Now, some three years into this MDL, this Court's jurisdiction is under collateral attack.   Unsatisfied with scores of this Court's careful rulings, and unwilling to press their claims of error to the Eleventh Circuit, Defendants seek refuge in an Article I tribunal, the United States Bankruptcy Court for the Southern District of Indiana (the "Bankruptcy Court").   Defendants Aearo Technologies LLC and certain of its affiliates (the "Aearo Debtors") have filed a petition for Chapter 11 bankruptcy.  *See* MDL Dkt.  3328.  None of the Defendants, including 3M— a *non-debtor*—even attempt to mask their brazen intentions in the Bankruptcy Court. They claim this Court has presided over an *unfair* MDL and issued *erroneous* decisions that overstate Plaintiffs' right to relief.  So they ask the Bankruptcy Court to institute a claims process to value Plaintiffs' claims "on a scientific basis based on a fair and complete evidentiary record."  Ex. A, Informational Brief of Aearo Technologies, LLC at 12, 43-50, 56-57 (hereafter "Ex. A, Infor. Br.").  Defendants

invite the Bankruptcy Court to reapply the "Federal Rules of Evidence, including Rules 702 and 703" and issue *Daubert* decisions that *directly conflict* with this Court's rulings. *Id.* at 56. And to "resolve summary judgment" motions in their favor based on defenses this Court has already *rejected* time and again. *Id.*

This Court need not sit idly by while its Article III and statutory jurisdiction are impugned. Our Republic's very first Congress enacted the All Writs Act in 1789. That provision of federal law empowers this Court to issue "all writs necessary or appropriate in aid of [its] jurisdiction." 28 U.S.C. § 1651. As ancient and modern precedent confirms, that broad power was tailor made for this situation, where a defendant—dissatisfied with judgments it disagrees with—seeks not to exercise its appellate rights but instead to relitigate matters anew in another tribunal. It is no slight to the competence of the Bankruptcy Court to conclude that 3M is not free to revisit and undermine this Court's adjudicatory authority.

Mr. Valle recognizes that this Court previously denied his hurried motion for an *ex parte* temporary restraining order on the ground that he failed to show irreparable harm. MDL Dkt 3343. This more complete motion shows that attacks on a Court's properly vested jurisdiction undermine the integrity of the judicial process. Under binding precedent, that is irreparable harm as a matter of law. And 3M's threat to imminently abrogate this Court's jurisdiction irreparably harms Mr. Valle even under traditional principles of equity. 3M supports a motion that will be

4

heard in the Bankruptcy Court on August 15 to stay Mr. Valle and every other Plaintiff from pursuing CAEv2 related cases against 3M in this or any other federal court. If that motion is granted, it will assure that this Court cannot protect its jurisdiction going forward. In our adversarial system, this Court cannot rule on disputed matters if parties are forbidden from filing briefs and making arguments.

Robbing this Court of its constitutional and statutory jurisdiction will work an especially cruel hardship on Mr. Valle and similarly situated Plaintiffs. Mr. Valle is a Wave 1 Plaintiff whose case is almost ready for trial. He has been deposed; undergone a Defense Medical Examination; retained an expert who submitted a Rule 26 report and sat for a deposition; filed dispositive and *Daubert* motions against the Defendants; and is now opposing Defendants' dispositive and *Daubert* motions. Halting his case against *non-debtor* 3M so that he can start the entire process anew in a different tribunal imposes costs for which the law lacks an adequate remedy. The gross inefficiency of 3M's attempted jurisdiction strip is especially problematic in the context of this bankruptcy proceeding, because Mr. Valle is *entitled by law* to an Article III court's adjudication of his claims.

Section 157(b)(5) of the Bankruptcy Code provides unequivocally that personal injury claims "shall be tried in the district court in which the bankruptcy court is pending, or in the district court in which the claim arose." 11 U.S.C. § 157(b)(5). And of course, once a CAEv2 personal injury case is in district court,

it is a near certainty that it will be tagged and transferred by the JPML *back to this Court* for all pretrial proceedings. *See* MDL Dkt. 1. An Article III Court always has the power under the All Writs Act to prevent another tribunal from second guessing its jurisdiction. But wielding that statutory authority should be all but automatic when 3M seeks years of wrangling, delay, and expense *relitigating* in Bankruptcy Court matters this Court has already decided, only for the Bankruptcy Court to then yield—as required by black-letter bankruptcy law—to an Article III tribunal, roundtripping Mr. Valle's matter right back to where it currently sits.

For these reasons, Mr. Valle now moves for a preliminary injunction preventing 3M from (i) relitigating matters in Bankruptcy Court that this Court has already adjudicated and (ii) supporting an injunction against any Plaintiffs from litigating CAEv2 matters against 3M in this Court or following a remand for trial. To be clear, Mr. Valle is not asking the Court to enjoin any debtors in bankruptcy, as such entities are shielded by operation of the automatic stay. But 3M is not a debtor in bankruptcy, has no ability to sidestep this Court's authority,[1] and should be enjoined from making a mockery of Congress's unambiguous decision to vest this MDL Court with jurisdiction to issue judgments that 3M prefers to defy.

---

[1] 3M may continue to argue that the automatic stay applies to it, but that specious argument has been rejected by both this Court and the Bankruptcy Court. *See* Ex. C, Tr. July 27, 2022 Bankr. Hrg. at 103:8-105:22 ("Well I guess you may teach me because I disagree with you, but I don't know if you're going to have an apt student here. The stay doesn't automatically apply to random people.").

## BACKGROUND

Parties who disagree with Court orders but respect the rule of law have two options: file a motion for reconsideration or file a notice of appeal.

For three-and-a-half years, this Court has successfully steered this MDL, through a global pandemic no less, to complete sixteen bellwether trials, prepare over a thousand cases for remand, and transfer tens of thousands of cases to the active docket. Despite this, on July 26, 2022, the Aearo Debtors filed a Chapter 11 bankruptcy case in an attempt to abolish the Court's rulings in this case. 3M ignores the history of this case and portrays this litigation as "the failure of the largest MDL in U.S. history." Ex. A Infor. Br. at 1. A constant refrain from 3M is the "colossal docket" where "standard MDL early vetting tools . . . were curtailed or abandoned," *id.* at 3, 29-33, and exempted "from basic filing requirements." *Id.* at 33. 3M also seeks to blame the Plaintiffs' attorneys for an "extensive marketing campaign" to reach the claimants in this MDL. *See id.* at 25-29.

All of this revisionist history—blaming this Court and Plaintiffs' attorneys— is a legally irrelevant mirage.[2] The overwhelming majority of the management and

---

[2] The Aearo Debtors seek to sabotage the MDL by falsely accusing the Court of improper conduct. *See e.g.* Ex. A, Infor. Br. at 43 ("The frenetic bellwether cadence, coupled with the cascading effects of substantial evidentiary errors and false narratives, tainted the trials from the start."); *id.* at 7 ("[S]ome of the most basic tools of MDL practice, including medical records releases and production, along with filing requirements, were eliminated or suspended early on, reducing any chance of success an MDL might otherwise offer."). Ex. C, Tr. July 26, 2022 Bankr. Hrg. at

progression issues of which Defendants complain are of their own making. In the first year of this MDL, 3M negotiated and signed a tolling agreement—the supposed death knell of the MDL—relieving the Plaintiffs of the requirement to file their cases on the active docket in exchange for detailed case information contained on the Census Form, certain documents within their possession, and the obligation to request official records from the government. *See, e.g.*, Ex. B, Tolling Agmt. Between Plaintiff's Counsel and Defendants (signed by Mark Nomellini, Kirkland & Ellis "[f]or Defendants," August 26, 2019). In other words, 3M not only agreed to suspend the "gatekeeping mechanism" it now claims is improperly lacking, it was a willing participant. Unsurprisingly, the Aearo Debtors and 3M have not relayed their freely chosen litigation decisions to the Bankruptcy Court.[3] Ex. A, Infor. Br at

---

110:1-7 ("And I'm also informed that there are communications between where apparently Judge Rodgers is listening into this and we're now, you know, getting messages about it is that she apparently has said that she might be prepared to do. And they're not coming through any formal line of communication and so I'm very concerned about that. I think everybody should be concerned about that."); *id.* at 42:20-43:2 ("We have one case before one MDL judge, and they're saying, oh, let's tag-along the bankruptcy so that judge has it too, *when the heart of our problem comes out of her court*. And it's regardless of whether she did what right or she did wrong. It's we're you know, it's in the fact is indifferent to it. The fact is we've got a docket that's broken and a case that's broken.") (emphasis added).

[3] This Court, however, has intimate familiarity with the history of this litigation and the actions of the parties. Defendants have therefore found no success with trying to cast blame on others in this Court. *See, e.g.*, MDL Dkt. 2953 at 1 (explaining that the creation of the administrative docket was "in small part for the benefit of Defendants [ ] who were clamoring for data about individual claimants at the time").

33.  Furthermore, as detailed in a prior plaintiffs' filing, the requirement to produce records was suspended and replaced with a tiered approach due to difficulties associated with obtaining records from the government.  *See* MDL Dkt. 3255. Defendants were aware of these difficulties and were, in fact, part of the negotiations between the parties, the Court, and the government.  *Id.*[4]

3M no longer likes the decisions it freely made.  And it can barely mask its utter disdain for this Court's rulings and prior juries' verdicts.  So it has embraced a new strategy: Ask the Bankruptcy Court to *disregard* the Court's Orders in search of a second bite at the apple and  different outcomes.  For instance, five pages of the Informational Brief filed on the *first day* of the Aearo Debtors' bankruptcy disputes the Court's rulings on the admissibility of the Air Force Letter, the Michaels testing, and the applicability of the Government Contractor Defense.  Ex. A, Infor. Br at 45-50.  The Court has issued multiple substantive rulings on the evidentiary issues,[5] and those rulings, as well as the Government Contractor Defense, are currently on appeal

---

[4] Although 3M complains about the lack of medical records, the difficulties with obtaining medical records from the government will not somehow resolve upon transfer to the Bankruptcy Court.  Moreover, as this Court knows, "[t]he Department of Defense has recently put a process in place for a contractor to obtain and produce DOEHRS data for individual plaintiffs, which will fulfill the informational needs with respect to non-Wave plaintiffs at this stage of the litigation."  MDL Dkt. 3344.
[5] *See, e.g.*, Air Force Letter: *Estes*, 7:20-cv-137, Dkt. 205 at 4; *Baker*, 7:20-cv-39, Dkt. 129-1; 209 at 4; Michaels testing: *Baker*, Dkt. 118; MDL Dkt. 2244; *see also Baker*, Dkt. 187.

at the Eleventh Circuit.  *See 3M Co., et al. v. Estes, et al.*, Nos. 21-13131, 21-13133, 21-13135; *3M Co., et al. v. Baker*, No. 21-12517.

3M does not hide its disrespect for this Court's rulings.  *See, e.g.*, Ex. A, Infor. Br. at 43 ("[T]he MDL court gutted defenses and barred key evidence in the 16 bellwether cases (some with multiple plaintiffs), which were tried in an unprecedentedly compressed time span—an average of one trial per month.").  It invites the Bankruptcy Court to "resolve the claims" "on a scientific basis *based on a fair and complete evidentiary record*."  Ex. A, Infor. Br at 57 (emphasis added).  The Debtors' counsel reiterated the point to the Bankruptcy Court: "We would propose, ultimately as part of an estimation process, that the estimation be based on scientifically calculated allocations and determinations of liability."  Ex. B, 7/26/22 Bankr. Tr. at 23:4-7.  The barely veiled subtext of 3M's assault on this Court's jurisdiction is that the MDL has defied basic science, conducted an unfair process, and predicated its judgments on an incomplete record.

The affront to this Article III Court's judicial power is as brazen as it is lawless.  *Even if* this Court had misapplied the law, a litigant is not free to undermine the integrity of the judicial process by running to a new tribunal and seeking a do over.  And of course, 3M's gross mischaracterization of this deftly managed MDL is nothing but tendentious advocacy over disputed issues that juries and this Court correctly resolved against the company.  For instance, the Informational Brief baldly

represents that "[m]ost plaintiffs have no proof that they ever used the Combat Arms," largely premised on a section of the DD 2215 Reference Audiogram titled "Personal Hearing Protection – Type Used." *Id.* at 37 ("These forms therefore provide a reliable record of a soldier's hearing protection over time."). The expert and fact testimony elicited over the past two years, however, makes clear that the DD 2215 is anything but reliable, and in no way accurately proves whether a servicemember used the CAEv2. *See, e.g.* Ex. C, 4/13/21 *Estes*, *Hacker*, *Keeer* Trial Tr. at 47:9-51:18) (Packer) (testifying as to the various ways the DD 2215 could have been filled out and stating "I think there would be probably rare occurrences where somebody might have actually placed Combat Arms in the comment box on that box"); Ex. E, 9/23/21 *Adkins* Trial Tr. at 278:5 (Ohama) (testifying that the "accuracy could be questioned" as to the form DD 2215s).

The Informational Brief then goes on to completely misrepresent the complicated, nuanced science that has been heavily litigated in this case to baldly proclaim "Most Plaintiffs have no Hearing Loss," based solely on the World Health Organization (WHO) hearing loss criteria. Ex. A, Infor. Br at 39-41. But WHO provides just one standard for hearing loss, a standard that does not account for shifts and is not followed by many other hearing-related organizations, including American Speech Language Hearing ("ASHA") and the American Academy of Audiology. Whether a particular plaintiff suffers from hearing loss is an issue that

has been the subject of expert debate, a debate resolved by juries, consistent with the Seventh Amendment. *See, e.g.* Ex. F, 11/3/21 Camarillorazo Trial Tr. at 710:14-711:711 (Spankovich) (testifying that slight hearing loss is sustained at 15 to 25 dB as defined by the ASHA and the American Academy of Otolaryngology Head and Neck Surgery). Notably, 3M's summary of applicable hearing loss measurements also flouts the Court's Order on Hidden Hearing Loss. *See* MDL Dkt. 1933. This Court, having ruled on so many *Daubert* motions, presided over six bellwether trials, and participated in two "Science Days,"[6] has a thorough understanding of both the complexity of the science in this case and the flippant manner in which the Informational Brief ignores it.

3M's motives are not in dispute. It wants to wipe out the scientific and evidentiary rulings that the Court and the parties have tirelessly litigated; it wants to sidestep this Court's summary judgment decisions on 3M's meritless defenses; and it wants to undo multiple jury verdicts and final judgments against it. It seeks to achieve these aims not through an appeal (which 3M will not win), but through what is tantamount to a complete do over in a different court that 3M simply hopes will see things differently from this tribunal. To state the obvious, if 3M had prevailed on its various arguments before this Court, or if it thought it had strong odds of

---

[6] Which resulted in, *e.g.*, an Order from the Court dictating, according to reliable scientific authority, which medications experts could present as "ototoxic" in their causation opinions. MDL Dkt. 1330.

identifying reversible error by this Court on appeal, it would not be smearing the work of this Court and attempting to relitigate the same issues in another forum. 3M's position is simply that, if the Court and juries do not rule in its favor, the process is illegitimate. This Court should not countenance such a flagrant disregard for its constitutional and statutory authority. To protect its jurisdiction, this Court should grant Mr. Valle's motion.

## LAW AND ANALYSIS

### I. Preliminary Injunction Standard

The standard for an injunction under the All Writs Act is less demanding than that of a traditional preliminary injunction under Rule 65. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1100 (11th Cir. 2004). "Whereas traditional injunctions are predicated upon some cause of action, an All Writs Act injunction is predicated upon some other matter upon which a district court has jurisdiction. Thus, while a party must 'state a claim' to obtain a 'traditional' injunction, there is no such requirement to obtain an All Writs Act injunction—it must simply point to some ongoing proceeding, or some past order or judgment, the integrity of which is being threatened by someone else's action or behavior. The requirements for a traditional injunction do not apply to injunctions under the All Writs Act because a court's traditional power to protect its jurisdiction, codified by the Act, is grounded in entirely separate concerns." *Id.* "Proceedings in other courts that involve the

same facts as already issued judgments and orders, or that could result in the issuance of an inconsistent judgment, threaten the jurisdiction of the district court enough to warrant an injunction." *Id.* at 1104. *See also In re NTE Connecticut, LLC,* 26 F.4th 980, 987 (D.C. Cir. 2022) (Federal courts have "inherent power under the All Writs Act" to preserve their "prospective jurisdiction."). And even if Mr. Valle needed to satisfy the traditional injunction standard, his motion should be granted.

## II. Mr. Valle is certain to succeed on the merits because 3M cannot deny that it seeks to undermine this Court's jurisdiction.

"The All Writs Act, 28 U.S.C. § 1651(a), confers 'extraordinary powers' upon federal courts." *In re Managed Care Litig.*, 236 F. Supp. 2d 1336, 1339 (S.D. Fla. 2002). The Act provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. "Th[e] [Supreme] Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. New York Tel. Co.*, 434 U.S. 159, 172, (1977). "This statute has served since its inclusion [ ] in the original Judiciary Act as a legislatively approved source of procedural instruments designed to achieve 'the rational ends of law.'" *Harris v. Nelson*, 394 U.S. 286, 299 (1969). As the Eleventh Circuit explained, "[t]he court's power to protect its jurisdiction

14

includes the power to enjoin a dissatisfied party bent on re-litigating claims that were (or could have been) previously litigated before the court from filing in both judicial and non-judicial forums, as long as the injunction does not completely foreclose a litigant from any access to the courts." *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1295 n.15 (11th Cir. 2002); *see New York Life Ins. Co. v. Deshotel*, 142 F.3d 873, 879 (5th Cir. 1998).

That power was created for precisely this situation. 3M cannot and does not dispute that it plans to argue in Bankruptcy Court that this Court's myriad orders, decisions, and final judgments should be reconsidered and overruled. Though dissatisfied litigants usually try 3M's gambit by attempting to relitigate adverse federal-court decisions in state court, the All Writs Act provides ample authority to enjoin the maneuver when tried in another federal tribunal. *See, e.g.*, *New York Life Ins. Co.*, 142 F.3d at 879. In *In re Managed Care Litigation*, for instance, the MDL court relied on the All Writs Act to enjoin an MDL defendant from proceeding with pursuing a settlement in another federal jurisdiction. 236 F. Supp 2d 1336, 1343 (S.D. Fla. 2002). In response to the defendant's argument that the court should assume that all federal judges will follow the law, the court explained "the JPML vested in this Court the authority to streamline pretrial proceedings in these actions, while concomitantly directing the appropriate resolution of all claims," and that "[i]n order to follow the JPML's mandate, an injunction preventing [defendant] from

proceeding with the settlement is necessary from the standpoint of the proper administration of justice." *Id.*; *see In re Am. Honda Motor Co., Inc.*, *Dealerships Relations Litig.*, 315 F.3d 417, 441 (4th Cir. 2003) (injunction pursuant to All Writs Act "was necessary to vindicate the district court's exclusive jurisdiction to resolve interpretive questions under the MDL Settlement Agreement"); *Liles v. Del Campo*, 350 F.3d 742, 746 (8th Cir. 2003) (holding that the All Writs Act provides that federal courts may issue injunctions related to proceedings in other federal courts).

The need to draw upon the All Writs Act is particularly acute for an MDL court, such as this one, where the litigation has significantly progressed. Congress established MDLs through 28 U.S.C. § 1407 to avoid wasted resources and conflicting judgments in high stakes, complex cases, so it is especially critical for MDL courts to exercise their authority and quash competing, duplicative litigation. *See, e.g.*, *In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 337 (2d Cir. 1985) ("[T]he jurisdiction of a multidistrict court is 'analogous to that of a court in an *in rem* action . . . where it is intolerable to have conflicting orders from different courts.'") (citing 17 C. Wright & A. Miller & E. Cooper, Fed. Practice & Procedure § 4225 at 105 n.8 (Supp. 1985)). As the *Vioxx* MDL court explained, a justification for an MDL court to enjoin another proceeding "is that complex litigation cases are sufficiently similar to *in rem* proceedings so as to permit injunctions on cases actually *in personam* in nature." *In re Vioxx Prod.*

*Liab. Litig.,* 869 F. Supp. 2d 719, 726 (E.D. La. 2012) (Fallon, J). The court went on to state "[t]he theory behind the *in rem* analogy is that when complex litigation has reached the point of sufficient advancement, and there has been substantial investment of time and resources, in essence, a res is created." *Id.*

This MDL has certainly "reached the point of sufficient advancement" with a "substantial investment of time and resources." *In re Vioxx Prod. Liab. Litig.,* 869 F. Supp. 2d at 726. It would make a mockery of these extensive proceedings for 3M, as an independent, non-debtor defendant that is not a debtor in a bankruptcy case, to seek conflicting rulings associated with the CAEv2 in Bankruptcy Court. But that attack on this Court's jurisdiction is certain absent injunctive relief.

The Bankruptcy Code does not create any exemption that shelters non-debtors from the All Writs Act or requires this Court to yield its authority to prevent attacks on its jurisdiction by non-debtors. If anything, this Court's need to protect its own jurisdiction is more pronounced in this context, because it implicates separation-of-powers concerns. When a litigant attempts an end-run around a federal court's jurisdiction by attempting to relitigate in another Article III tribunal of equal dignity, it undermines the integrity of the judicial process. But the Bankruptcy Court is an Article I tribunal; it cannot constitutionally wield the "judicial power of the United States." U.S. Const. Art. III, Sec. 1; *Stern v. Marshall,* 564 U.S. 462, 484 (2011). Permitting a litigant to abrogate this Court's jurisdiction in favor of a tribunal in a

17

different branch of government would undermine this Court's crucial "role in implementing the separation of powers," which the framers designed into our constitutional system to safeguard the peoples' cherished liberties. *Id.* at 483.

It is blackletter law that that this Court may issue an injunction to stop collateral attacks on its jurisdiction in parallel *federal court* proceedings. It follows *a fortiori* that 3M may not seek to sidestep this Court's jurisdiction in favor of an Article I tribunal. 3M can point to no authority that eliminates this Court's powers under the All Writs Act when the collateral attack comes from a non-debtor in a bankruptcy court.

### III. Plaintiff, along with all of the MDL plaintiffs, faces irreparable harm if the Court does not enjoin 3M.

Even if Mr. Valle needed to show traditional irreparable harm to obtain an All Writs Act injunction, he easily meets that standard. 3M seeks to undermine this Court's jurisdiction, second guessing existing rulings and *enjoining* Mr. Valle from participating in his own case in this Court. It is irreparable harm to require litigants to *relitigate* issues that have already been decided by a court of competent jurisdiction. It only exacerbates that harm to prevent the litigant from participating in his own Article III case or controversy. That is precisely why "in aid of jurisdiction" injunctions under the All Writs Act routinely issue in situations such as this. Stated conversely, if the need to relitigate issues were *not* irreparable harm,

then an All Writs Act injunction could effectively never be justified. *Klay*, 376 F.3d at 1100.

Mr. Valle's status as a personal injury tort victim only makes this case stronger than the typical one—in which a dissatisfied litigant flees to another tribunal. That is because the dissatisfied litigant here, 3M, is attempting to whisk Mr. Valle and every other Plaintiff away to a court *that lacks statutory authority* to adjudicate his case. Section 157(b)(5) requires the district court to "order that personal injury tort or wrongful death claims shall be tried in the district in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending." *See generally In re Roman Cath. Church for Archdiocese of New Orleans*, 2021 WL 3772062, at *2 (E.D. La. Aug. 25, 2021).[7] 3M would relegate Plaintiff to the Bankruptcy Court for years. But to what end? Plaintiff will not consent to a bankruptcy court adjudication of his claim*, cf. Marshall,* 564 U.S. at 478-79, and thus will be *entitled* by statute to an Article III adjudication. And is there any doubt what will transpire when his case at long last returns to federal court? It will, alongside countless other cases, be tagged and transferred by the JPML back to this

---

[7] Plaintiff recognizes that Section 157(b)(5) is procedural and not jurisdictional. *See Stern v. Marshall*, 564 U.S. 462, 478-79 (2011). For avoidance of doubt, Plaintiff confirms he will not consent to the Bankruptcy Court's jurisdiction for final adjudication of his claims.

Court for pre-trial adjudication. Attempts to undermine this Court's jurisdiction should never be countenanced. But that is doubly so when the effort offers only an expensive detour on the path to justice that inevitably runs back to this Court.

The looming hearing on August 15 illustrates the definiteness of Plaintiff's injury; it is not a hypothetical scenario. A preliminary injunction is thus necessary to prevent 3M from arguing in favor of staying proceedings against it in this Court. Without this equitable relief, Plaintiff will likely irrevocably lose the ability to invoke the Court's Orders and will be forced to start his case afresh, right when it is ready to be remanded for trial.

## IV. Balance of Hardships

Any threatened injury to Plaintiff clearly outweighs the harm to 3M, who would merely be required to continue with litigation in this forum. 3M can produce *no authority* that requiring a non-debtor to litigate in a forum, which 3M consented to, is a hardship by any measure. To be sure, 3M believes it could benefit from avoiding a forum where it has been losing and relitigating legal and factual issues already decided by this Court. But the inability to obtain a do-over is not cognizable irreparable harm. By contrast, Plaintiff will lose the ability to draw on the extensive scientific and evidentiary rulings developed in the MDL. As detailed *supra* Section III, Plaintiff will likely be forced to go to the Bankruptcy Court only to end up where he started, thus enduring significant delay with his case.

And to the extent 3M wants to argue the stay applies to it, this Court is best equipped to decide the parameters of the automatic stay. The Court has unparalleled knowledge of the parties, the issues, the science, and the law—more so than the parties themselves. 3M has no plausible justification as to why the Bankruptcy Court—and not this Court—should rule on the scope of the stay.

## V. The preliminary injunction would serve the public interest.

The preliminary injunction would also serve the public interest. Instituting the stay would prevent 3M from improperly gaming the system to erase the litigation and the Court's work over the past several years. On the other hand, allowing 3M, a non-debtor, to proceed with its charade of invoking the automatic stay would create devastating precedent for future torts actions.[8] The Court should not allow 3M to simply wipe away the litigated record in these cases to the detriment of innocent claimants, like Plaintiff, because 3M is displeased with the results. Allowing such action to stand will signal to future tortfeasors that they can simply escape the civil

---

[8] 3M has justified its contemptible bankruptcy ploy by dismissing the tort system and large MDLs. As the Aearo Debtors (and 3M's lawyers in this action, Kirkland & Ellis) explained, "Lawyers, scholars, and judges have long raised questions about the utility of large MDLs to resolve mass tort claims, as aggregations of untested claims have become a magnet for frivolous lawsuits that otherwise may never have filed and inevitably result in the compensation of claims with little or no merit. The Combat Arms MDL exemplifies these problems." Exhibit A, Infor. Br. at 11-12. 3M actually supported consolidation of claims arising out of the CAEv2. *See* JPML Dkt. 98. It is only now that 3M has lost 13 of 19 bellwether trials with significant jury verdicts that it claims the MDL should be stayed so that another forum, with *no* experience with the facts of this case, should resolve the outstanding 233,000 claims.

justice system by having a related entity file bankruptcy—and not even the specific defendant itself—and extend the stay to the defendant without imposition of any bankruptcy obligations. That is a dangerous precedent to set, and one this Court should not sanction.

## VI. No evidentiary hearing is required here, but an expedited hearing for oral argument is necessary.

Finally, while courts sometimes order expedited discovery and an evidentiary hearing prior to entry of a preliminary injunction, neither is necessary when there are no issues of material fact in controversy that the court must resolve prior to ruling on a motion for preliminary injunction. *McDonalds Corp. v. Robertson*, 147 F.3d 1301, 1302 (11th Cir. 1998) ("Because no issues of material fact were in controversy when the district court ruled on the motion for preliminary injunction, we find that the district court acted well within its discretion and did not err in declining to hold an evidentiary hearing."); *Poarch Band of Creek Indians v. Hidreth*, 656 Fed.Appx. 934, 942 (11th Cir. 2016) (affirming preliminary injunction: "Thus, no material facts necessary to the legal determination on which the district court based its decision were in dispute, and no evidentiary hearing was required.").

Here, there are no relevant issues of material fact in dispute: this motion is based on the evidentiary record consisting of the Court's prior labor and rulings in this MDL, and the actions Debtors (and 3M) are taking in a separate court to try to frustrate the instant proceedings. None of these relevant facts require further

supplementation through discovery, nor does the Court need to hear witness testimony in an evidentiary hearing to preserve the record on which Plaintiff's requested preliminary injunction would be based. Any request by 3M to delay resolution of this motion through expedited discovery and/or an evidentiary hearing should therefore be denied.

## CONCLUSION

For these reasons, and as detailed herein, Plaintiff respectfully asks this Court to enjoin 3M and any party acting on 3M's behalf, from filing any motion, action, proceeding, brief, or other judicial filing that seeks to enjoin parties from pursuing CAEv2-related claims against 3M in this MDL or in district courts where MDL cases have been remanded. Given the imminent harm, Plaintiff respectfully asks for an expedited briefing schedule such that any opposition be due within 7 days and a hearing to follow within 2 days.

Dated:  August 3, 2022              /s/ Ashley C. Keller

Ashley C. Keller (Bar #1029118)
ack@kellerpostman.com
Nicole C. Berg (Pro Hac Vice)
ncb@kellerpostman.com
Ashley Barriere (Pro Hac Vice)
ashley.barriere@kellerpostman.com
Frank G. Dylewski (Pro Hac Vice forthcoming)
frank.dylewski@kellerpostman.com
**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois  60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

***Counsel for Plaintiff Richard Valle***

## <u>CERTIFICATE OF COMPLIANCE</u>
## <u>WITH LOCAL RULES 7.1(F) AND 56.1(E)</u>

I hereby certify that this motion complies with the word limit of Local Rules

7.1(F) and 56.1(E) and contains 5,819 words.

*/s/ Ashley C. Keller*

Ashley C. Keller

**CERTIFICATE OF COMPLIANCE**
**WITH LOCAL RULES 7.1(B) AND 7.1(B), (C)**

Pursuant to Local Rule 7.1(B), counsel for Plaintiff and 3M company conferred on August 3, 2022, regarding the foregoing motion but were unable to resolve the issues with 3M Company.

*/s/ Ashley C. Keller*
Ashley C. Keller

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 3, 2022, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

*/s/ Ashley C. Keller*
Ashley C. Keller

# Exhibit A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AEARO TECHNOLOGIES LLC, *et al.*,[1] | ) | Case No. 22-02890-JJG-11 |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## INFORMATIONAL BRIEF OF AEARO TECHNOLOGIES LLC

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' First Day Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief, filed contemporaneously herewith*. The location of the Debtors' service address for the purposes of these chapter 11 cases is: 7911 Zionsville Road, Indianapolis, Indiana 46268.

## Table Of Contents

I.  INTRODUCTION.................................................................................................... 1

    A.  Overview ..................................................................................................... 2

    B.  Roadmap ..................................................................................................... 4

II.  THE COMBAT ARMS EARPLUG OFFERED A REVOLUTIONARY
    SOLUTION TO AN AGE OLD MILITARY PROBLEM. .............................. 13

    A.  Balancing Hearing Protection Against  Situational Awareness  Was A
        Longstanding Military Challenge. ........................................................ 13

    B.  Aearo, In Collaboration And Partnership With The Military And The
        Institute de Saint-Louis, Developed A Revolutionary Solution. ......................... 14

    C.  Extensive Testing By The Military And Other Independent Laboratories
        Confirmed That The Combat Arms Worked In The Lab. .................................... 16

        1.  *The Military Extensively Tested The Combat Arms And Confirmed
            That It Worked As Expected.*............................................................... 16

        2.  *Other Well-Respected Laboratories Tested The Combat Arms.*............... 18

    D.  Real-World Experience Confirmed That The Combat Arms Earplug
        Worked In The Field. ................................................................................. 18

III.  STRUCTURAL PROBLEMS DOOMED THE MDL FROM THE OUTSET. .......

    A.  Plaintiffs' Lawyers Constructed Litigation Around The  Flange Report.  .......... 20

    B.  The Combat Arms MDL (Like Many Other MDLs) Became A Magnet
        For Unvetted Claims. ................................................................................. 23

        1.  *Plaintiffs' Lawyers Engaged In An Expansive And Targeted Ad
            Campaign.*............................................................................................ 25

        2.  *The Unvetted Claims Continue To Bloat The MDL Docket.* .................... 28

        3.  *The MDL Court Suspended Basic Vetting Requirements.* ........................ 29

            a.  Basic Data And Medical Records Requirements Were
                Suspended. .................................................................................. 30

            b.  Until Very Recently, Most Cases Were Exempt From Basic
                Filing Requirements.................................................................... 33

    4.    *Even Modest Vetting Substantially Reduces The Number Of Claims.* ................................................................ 34

C.   Data Indicate That The Overwhelming Majority of Claims Are Unsupported. ............................................................... 35

    1.    *Most Plaintiffs Have No Proof That They Ever Used The Combat Arms.* ....................................................... 35

    2.    *Most Plaintiffs Have No Hearing Loss.* .................................... 39

    3.    *The Few Plaintiffs With Some Hearing Loss Have Clear Alternative Causes.* ......................................... 41

**IV.**   **THE COMBAT ARMS MDL IS BROKEN BEYOND REPAIR.** ...........................

A.   Tainted MDL Bellwether Trials Frustrated, Instead Of Furthered, Settlement. ................................................................ 43

    1.    *Plaintiffs' Lawyers Made Inflammatory And Prejudicial Statements And Arguments.* ................................. 43

    2.    *Plaintiffs' Lawyers Falsely Told Juries That The Air Force Found The Combat Arms Earplugs To Be Defective.* .......................................... 45

    3.    *The Empirical And Exculpatory Michael Lab Testing Was First Limited And Then Excluded.* ....................... 47

    4.    *Plaintiffs' Lawyers Told A Fictionalized And Incomplete Development And Design Story* ........................... 48

        a.    Key ISL Depositions Were Deferred Until After The Trials. ........ 48

        b.    The Military's Role Was Downplayed By An Order Barring Aearo's Government Contractor Defense. ..................... 49

B.   Appellate Review Cannot Cure The Systemic Problems In The MDL. .............. 50

**V.**   **CHAPTER 11 PROVIDES THE ONLY EFFICIENT, E UITABLE, AND E PEDITIOUS RESOLUTION OPTION HERE.** ................................... **5**

A.   3M's Participation And Funding Commitment Are Essential To A Successful Reorganization And To An Expeditious And Equitable Resolution. ................................................................ 53

B.   The Bankruptcy Code Provides Powerful Tools To Deal With Mass Tort Claims That Cannot Be Fairly Or Fully Resolved In Traditional Litigation. ....... 54

    1.    *Centralization of Claims* ............................................. 54

ii

2.      *Consensual Resolution Track* .................................................................. 55

3.      *Parallel Claims Estimation Procedures* .................................................. 55

4.      *Global Resolution* .................................................................................. 57

## I.     INTRODUCTION

Debtor Aearo Technologies LLC initiates this voluntary chapter 11 proceeding to equitably and expeditiously resolve all tort claims related to the Combat Arms Earplug, Version 2.  Aearo and its corporate parent, 3M Company, have the utmost respect for this nation's military and those who serve our country.  Following in the footsteps of prior successful mass tort chapter 11 proceedings, Aearo looks forward to developing a framework to assess, resolve, and provide fair compensation for claims brought by U.S. military servicemembers and veterans.  Critically, Aearo's commitment to fair compensation is supported by an uncapped funding agreement from 3M.  Restructuring thus offers precisely the efficient and just solution that has eluded the complex and erratic tort claims system that is prologue to this filing.

Aearo turns to chapter 11 in the wake of the failure of the largest MDL in U.S. history to successfully advance the resolution of tort claims related to the Combat Arms earplug.  The Combat Arms MDL has become a refuge for more than 230,000[2] unvetted hearing injury claims to languish without scrutiny, as a handful of bellwether trials delivered headline-grabbing verdicts based on a false narrative that frustrated, instead of furthered, settlement and compromise.  The Combat Arms MDL now accounts for **_more than 30 percent of the total number of all cases pending in federal courts_**.[3]  Without mechanisms to assess, stratify, and cull claims with scientific rigor, the MDL structure could neither solve this massive docket in any practical timeframe, nor quell the onslaught of unvetted lawsuits   which shows no signs of abating.  In contrast, because

---

[2]     All numbers in this brief relating to filings and claims are Aearo's estimates based on available information and may be subject to modest adjustments depending on dates and data sources.

[3]     June 15, 2022 MDL Statistics Report - Distribution of Pending MDL Dockets by Actions Pending, J.P.M.L., *avail. at*  https://jpml.uscourts.gov/sites/jpml/files/Pending MDL Dockets By Actions Pending-Jun-15-2022.pdf Nat'l Judicial Caseload Profile, uscourts.gov, https://www.uscourts.gov/sites/default/files/ fcms na distprofile0331.2022.pdf  Nat'l Judicial Caseload Profile, uscourts.gov, https://www.uscourts.gov/sites/ default/files/fcms na distprofile0331.2022.pdf.

bankruptcy tools are designed to do exactly that, the chapter 11 alternative will provide an equitable, timely, and certain ending to this behemoth litigation.

A.     **Overview**

More than 20 years ago, Aearo, in partnership and collaboration with the U.S. military and world-renowned researchers, developed the Combat Arms earplug.  This revolutionary  non-linear  earplug offered servicemembers hearing protection while preserving lifesaving  situational awareness.   For  more  than  a  decade,  the  Combat  Arms  received  accolades  from  military researchers, scientists in independent labs, and soldiers in the field.  In recent years, however, enterprising  plaintiffs'  lawyers  built  a  cottage  industry  to  identify  and  recruit  U.S.  military servicemembers and veterans to sue Aearo and 3M (which acquired Aearo in 2008) for any and all  manner  of  hearing-related  conditions,  which  their  lawyers  claimed    in  a  feat  of  suspended scientific and historical disbelief   lay singularly at the feet of the Combat Arms.

As the number of lawsuits skyrocketed, the federal multidistrict litigation was formed.  *In re Combat Arms Earplug Products Liability Litig.*, MDL No. 2885 (N.D. Fla.). Fueled by aggressive advertising and direct outreach by plaintiffs' lawyers, the claims have ballooned from several hundred to more than 280,000 at their peak, and Aearo and 3M still face over 230,000 hearing-injury claims brought primarily by U.S. military servicemembers and veterans.  Almost all of the pending cases (more than 99 percent) are centralized for pretrial proceedings in the Combat Arms MDL, which is now the largest MDL in United States history   surpassing all prior MDLs, and eclipsing its contemporary MDLs by orders of magnitude.  Reports of not-yet-filed claims in plaintiffs' lawyers' inventory, coupled with statute of limitations tolling for certain military members, suggest that this number could grow to well in excess of the current docket counts.

2

This colossal docket would stretch the limits of any MDL case management efforts. But the problems here were compounded, as standard MDL early vetting tools (like early medical records production and modest filing requirements) were curtailed or abandoned. This incentivized the filing of unvetted claims, and, together with an accelerated bellwether trial process based on an incomplete record and fictional narratives (all without appellate review), ultimately delivered a few blockbuster verdicts untethered to any comparable compensatory benchmarks. Saddled with untested claims and tainted trial records, any reasonable and timely settlement within the MDL is virtually impossible. According to one plaintiffs' attorney, the claims pose an astonishing exposure risk of over 1 trillion.[4] But this speculation is driven by the sheer number of cases the vast majority of which have never been vetted and are (based on available data) likely non-compensable and by outsized verdicts and flawed bellwether trial process. Continuing to squander resources in this litigation vortex is neither efficient nor equitable to the claimants themselves.

Where the MDL and tort system broke down, this Court can oversee an efficient global solution. Rather than warehouse hundreds of thousands of claims, each waiting for an uncertain chance to win a lottery verdict at trial, a scientific- and data-driven estimation proceeding grounded in the facts will set the stage to stratify and assess the viability and true value of the claims. And 3M's agreement to provide Aearo uncapped funding for Combat Arms personal injury liability will ensure full compensation is available, unconstrained by Aearo's ability to pay.

---

[4]   Law Disrupted Podcast, *How a Document Found by a QE Second Year Associate Led to the Largest Mass Tort Litigation in History* (May 11, 2022), available at https://www.law-disrupted.fm/how-a-document-found-by-a-quinn-emanuel-second-year-associate-led-to-the-largest-mass-tort-litigation-in-history/.

## B. Roadmap

Aearo submits this informational brief to describe the historical context of the Combat Arms, to chronicle the confluence of events that doomed any reasonable or equitable resolution in the tort system, and to explain how chapter 11 provides the best solution to resolve claims in an MDL that has spiraled out of control. The following provides a roadmap of the issues.

The Combat Arms earplug revolutionized military hearing protection. Substantial noise exposure and concomitant hearing loss historically have been, and are to this day, ubiquitous facets of military life. The federal government and scientific researchers have long grappled with how to balance protecting servicemembers' hearing against the risks of compromising their ability to hear commands and enemy combatants. Too often, soldiers faced a choice: save their hearing or save their lives. As reflected in the soldiers' adage "better deaf than dead," servicemembers often chose to forego using any hearing protection at all rather than risk vulnerability on the battlefield.

Aearo—working with the military and expert scientists at the French-German Institute de St. Louis (ISL)—developed an innovative earplug that provided an elegant solution to this problem. With the Combat Arms' "non-linear" technology, soldiers for the first time did not have to make a binary choice between protection and awareness; they instead were able to allow certain noises to "pass through," while filtering others. The Aearo-manufactured first generation dual-ended earplug could either provide constant noise reduction (green end) or pass-through filtered protection (yellow end), which reduced loud "impulse" noises like gun fire while allowing soldiers to hear low-level sounds like those that signaled approaching danger. Experts for plaintiffs heralded this new technology as "ingenious," "fantastic," and novel.



The Combat Arms ushered in a new era of noise protection, setting the stage for other non-linear earplugs. Even so, hearing professionals within and outside of the military recognize that no earplug will fit every single ear and no single earplug no matter how advanced can protect against all levels of noise or auditory traumas no matter how extreme or severe. The goal, as with virtually all safety products, was to **_reduce_** the risk. The Combat Arms unquestionably did so.

<u>The earplug worked in the lab and in the field.</u> Over the course of more than a decade, world-class military researchers, including the Air Force Research Lab and the Army Research Lab, as well as numerous federal and foreign government organizations and academic institutions, tested the Combat Arms. As sampled below, those independent tests confirmed that the Combat Arms was effective, provided very good attenuation, and offered noise reduction comparable to later-generation non-linear earplug models.[5]

---

[5] *Air Force Research Laboratory Report, Wideband Hearing, Intelligibility, and Sound Protection (WHISPr)* at 20 (Oct. 2008), D-GEN-1112 *see also generally* Army Research Laboratory Report, A Comparison of the Single-Sided (Gen II) and Double-Sided (Gen 1) Combat Arms Earplugs (CAE): Acoustic Properties, Human Performance, and User Acceptance (Dec. 2012), D-GEN-0525.



The Army celebrated  finally having a hearing protector that protects without impairing military effectiveness.   Military audiologists and soldiers across the globe echoed those sentiments, applauding the effective protection and communication improvement.  As one Army audiologist put it, the Combat Arms earplug let soldiers  hear the bad guy.

Plaintiffs' lawyers capitalized on early internal testing documents.   After years of successful use and independent testing, plaintiffs' lawyers seized upon an Aearo internal memo produced in an unrelated lawsuit    and testimony from witnesses unfamiliar with the document to assail the entire history and performance of the Combat Arms.  According to plaintiffs' lawyers, that memo showed that the Combat Arms did not reduce or attenuate noise as much as the labelled noise reduction rating ( NRR ) of 22 suggested.  This  Flange Memo  became the centerpiece of plaintiffs' lawsuits against both Aearo and 3M.

Through a well-orchestrated and well-funded lawyer ad campaign that cut across traditional and social media channels as well as more targeted outlets, plaintiffs' lawyers bombarded servicemembers and veterans with messages that the Combat Arms was to blame for any hearing-related conditions in soldiers who served between 2003 and 2015.  Plaintiffs' lawyers'

6

broad sweep corralled many claimants for whom a basic, pre-filing record review would show normal hearing under even generous authoritative clinical hearing loss standards.

    <u>The Combat Arms became the largest MDL in history.</u>  The lawyer-advertising onslaught was wildly successful.  In April 2019, the Judicial Panel on Multidistrict Litigation formed MDL No. 2885 to  promote the just and efficient conduct of the litigation. [6]  By then, the number of potential tag along or related actions in federal courts had grown to nearly 700 cases.  Today, the Combat Arms MDL sits as the largest MDL in history, with more than ***twice as many claims as the other 191 pending MDLs combined***.[7]

    The Judicial Panel on Multidistrict Litigation centralized claims before one judge charged with overseeing consolidated pretrial proceedings, weeding out invalid claims, and ultimately positioning the case for settlement.  But commentators have long questioned the capacity of the MDL mechanism to accomplish these tasks in the face of a massive docket of claims, which invites shortcuts and departures from applicable rules and standard practice.  Indeed, in the Combat Arms MDL, some of the most basic tools of MDL practice, including medical records releases and production, along with filing requirements, were eliminated or suspended early on, reducing any chance of success an MDL might otherwise offer.  Although the MDL judge recognized the need to  test  the merit of the inventory of cases  and  filter  out unsupportable claims, [8] plaintiffs' lawyers' purported burdens in accessing military records to support their claims  in the MDL court's own words  torpedo ed  the parties' efforts to accomplish an  early' census of supportable claims. [9]

---

[6]   *In re: 3M Combat Arms Earplug Prods. Liab. Litig.*, 366 F. Supp. 3d 1368, 1369 (J.P.M.L. 2019).

[7]   *See* MDL Statistics Report   Distribution of Pending MDL Dockets by Actions Pending (May 16, 2022), U.S. Judicial Panel on Multidistrict Litigation, https://bit.ly/3aoCkDu ( MDL Statistics Report ).

[8]   M. Casey Rodgers, *Vetting the Wether: One Shepherd's View*, 89 UMKC L.R. 873, at 874 (2021).

[9]   *Id.* at 876.

As a result, for nearly two years, more than 99 percent of plaintiffs in the MDL had no obligation to produce documents or information substantiating their claims. Predictably (and as the MDL court recognized), left unchecked, high volumes of unsupportable claims wreaked havoc on this MDL by, among other things, clogging the docket and frustrating efforts to assess the strengths and weaknesses of the MDL as a whole.[10] The Combat Arms MDL is now flooded with a massive volume of claims that plaintiffs' leadership conceded are yet-to-be vetted and are being investigated still by plaintiffs' lawyers.[11] The lawyers' refusal to self-discipline before filing on the front end and the MDL's inability to weed out non-meritorious claims after filing mean there is no end in sight.

The overwhelming majority of claimants have normal hearing. The limited claimant-specific information that is available has exposed serious and systemic problems with most claims. Based on several hundred claims selected for wave discovery, more than 85 percent of plaintiffs had ***normal hearing*** after they stopped using the Combat Arms a fact that a proper pre-suit investigation should have revealed and that only underscores the efficacy of the Combat Arms. And even those with some hearing impairment have other case-ending or significantly value-reducing infirmities, including (i) injury onset ***before*** Combat Arms use, making causation temporally impossible (ii) non-noise-related hearing loss (iii) clear alternative causes and (iv) contemporaneous records reflecting use of only ***non***-Combat Arms hearing protection. The questionable merits of many claims also was exposed, as about 50,000 cases were dismissed either voluntarily or otherwise had their claims dismissed for violations of basic discovery requirements

---

[10]   *Id.* at 873.

[11]   6/17/2019 CMC Hr'g Tr. at 18-19, MDL Dkt. 469  3/24/2020 Hr'g Tr. at 66:16-67:7, MDL Dkt. 1027.

or as duplicate claims — all before any merits-based inquiry.  But hundreds of thousands of claims still fester unexamined.

<u>The accelerated bellwether trial process further hindered settlement prospects.</u>  The MDL bellwether trial process similarly failed to advance any meaningful resolution.  Of the 27 cases set for bellwether trials, eight plaintiffs' claims were dismissed before trial, and six trials resulted in complete defense verdicts.  Those bellwether trials that resulted in plaintiffs' verdicts provided minimal information about value or resolution.

Before the trials began, the MDL court denied Aearo's and 3M's summary judgment motion that the government contractor defense barred plaintiffs' claims, **and** granted plaintiffs' motion for summary judgment against that same defense.  As a result, large swaths of evidence regarding the military's role in the design and development of the Combat Arms earplug were excluded from trial.  The trial program continued apace (and even expanded) while the key — and dispositive — government contractor defense remained unresolved on appeal.  Indeed, the trial pace was unprecedented: 16 trials (involving 19 plaintiffs) in just one year, with some double-tracked as other judges were called in to preside over several trials.  The judges to whom the MDL court farmed out some trials questioned the push to try cases while appeals that — could potentially require the parties to relitigate — those same cases were pending.[12]  Similarly, the postponement of the depositions of critical ISL scientists involved in the development of the Combat Arms until after the trials defeated the purpose of bellwethers, which is to have trials that are representative and informative.

The compressed trials quickly devolved into a fictional performance — infected with plaintiffs' lawyers' misleading, and at times outright false, representations.  Plaintiffs' lawyers'

---

[12]  11/8/2021 *Camarillorazo* Trial Tr. at 1558:16-20 (statement of Judge Mark E. Walker).

inflammatory trial rhetoric and deliberate barrage of lawyer ads touting verdict amounts had a snowball effect, resulting in verdicts that dwarfed by multiple orders of magnitude any comparable awards across the country for similar claims. Juries rewarded even plaintiffs with mild hearing loss or treatable conditions with tens of millions of dollars in damages. The problem was particularly acute in those cases tried in Pensacola, Florida, where the MDL was venued and where the *Estes*, *Keefer*, *Hacker*, *Adkins*, *Sloan*, *Wayman*, *Vilsmeyer*, and *Beal* bellwethers were tried.

The verdicts were already outsized and untethered to reality to begin with. But in the course of one year, the compensatory damages awarded by Pensacola juries for nearly identical injuries increased from 350,000 in April 2021 to 50,000,000 in January 2022 nearly **150 times greater**, and the total damages (both compensatory and punitive) awarded to an individual plaintiff increased from 2,450,000 to 77,500,000 during that same time period.[13]



---

[13] The chart below is a modified version of a chart appearing on a plaintiff law firm's blog. *See* Lawsuit Information Center Blog, May 2022 Update: Good golly Beal was awarded 77.5 million , https://www.lawsuit-information-center.com/13-million-3m-earplug-verdict.html.

This exponential increase comes on the heels of lawyer-ad saturation coupled with increasingly skewed trial narratives.

Less than two months ago, the MDL court emphasized the inflection point of this litigation. Over the past three years, Aearo and 3M have participated in the MDL, defended bellwether trials, and engaged with plaintiffs' lawyers in multiple rounds of mediation and other settlement discussions, all to no avail. With bellwether trials now complete, the MDL court is on the precipice of remanding thousands of cases back to their transferor courts for trial, and just a few days ago set a non-bellwether case for trial in Pensacola, all while Aearo's appeals remain pending.[14] The brunt of the coming storm will fall not only upon Aearo and 3M, but also on the courts and plaintiffs. Recognizing the enormous amount of time and resources that will be required to accomplish this endeavor, not just from the MDL court but from the entire federal judiciary, [15] the MDL court underscored a startling reality: each of the 94 federal districts will face an average of approximately 2,500 cases remanded for trial, and while some districts will receive many fewer cases and other districts many more, it is likely no district will be spared the burden. T he amount of judicial resources required to handle this number of cases is staggering. [16] Meanwhile, plaintiffs still will be forced to take their place in line for a trial that may not happen for years, even decades.

In short, the tort system is no longer a viable forum to resolve this litigation, which is instead now a cautionary tale of an MDL that is broken beyond repair. Lawyers, scholars, and judges have long raised questions about the utility of large MDLs to resolve mass tort claims, as aggregations of untested claims have become a magnet for frivolous lawsuits that otherwise may

---

[14] *George v. 3M et al.*, No. 7:20-cv-71963, Dkt. No. 22.

[15] MDL Dkt. 3188 at 2.

[16] *Id.*

never have been filed and inevitably result in the compensation of claims with little or no merit. The Combat Arms MDL exemplifies these problems, but the extraordinarily high volume of claims and breakdown of traditional case management procedures created a perfect storm that no reasonable settlement could solve.

<u>Restructuring through the chapter 11 process is the only path forward.</u>  Against this backdrop and after careful consideration, Aearo has shifted its approach after concluding that chapter 11 presents the only option for achieving a fair, equitable, and expeditious process to resolve these claims.  Bankruptcy provides unique jurisdictional and procedural vehicles for consolidating claims, negotiating and voting on global resolution, and ensuring that the scientific and legal merits of claims remain the principal metric for their value.  In contrast to the MDL, which (at best) could resolve only a limited number of valid claims, the chapter 11 solution provides a process to establish full and fair compensation for all such claims.

The proposed restructuring path rests on decades of fundamental principles derived from countless other mass tort cases.  This Court can ensure the litigation of the core issues through a combination of the automatic stay  which provides a reprieve from the litigation that precipitated this filing  and the Bankruptcy Code's comprehensive process for administering and equitably resolving claims using well-tested tools, including claim objection, litigation, and resolution procedures that focus on the key scientific and factual issues gauged by federal evidentiary rules.

Make no mistake, the chapter 11 cases are not about walking away from responsibilities, and it will not be used to deprive claimants of a fair recovery or deny them their day in court.  In this respect, 3M's uncapped financial commitment to Aearo's reorganization  conditioned on Aearo indemnifying 3M against any losses related to Combat Arms claims  is essential.  3M is a co-defendant in nearly every Combat Arms personal injury case, and its liability traces back to

Aearo's alleged conduct. Aearo therefore seeks to confirm the automatic stay applies to 3M and obtain a temporary restraining order and preliminary injunction in favor of 3M. Leaving 3M exposed in the MDL which stands on the precipice of remanding thousands of cases to dispersed federal courts throughout the country (not to mention pending state court claims) would directly and immediately undermine this proceeding, relegating this Court to a peripheral function with little control over the central issues in these chapter 11 cases and risking depletion of estate assets.

## II. THE COMBAT ARMS EARPLUG OFFERED A REVOLUTIONARY SOLUTION TO AN AGE OLD MILITARY PROBLEM.

### A. Balancing Hearing Protection Against Situational Awareness Was A Longstanding Military Challenge.

Exposure to massive amounts of loud noises, and concomitant hearing loss or tinnitus (ringing in the ears), was and still is a prevalent part of military service.[17] Historically, however, servicemembers hesitated to wear hearing protection in combat, believing doing so would impede situational awareness the ability to hear critical sounds such as commands or signs of danger at the risk of their safety or even their lives. The legacy solution was for soldiers to sacrifice their hearing by not wearing hearing protection in an attempt to better monitor the soundscape and communication systems.[18] Army regulations advised that soldiers should NOT wear hearing protections when they impair necessary hearing, as in dismounted infantry operations *i.e.*, combat.[19] The military viewed t he goal of effectively protecting the hearing of personnel employing small arms in tactical environments as a very difficult, ***if not impossible***, task.[20]

---

[17] K. Conroy V. Malik, *Hearing Loss in the Trenches: A Hidden Morbidity of World War I*, 132 J LARYNGOL OTOL. 952,955 (Nov. 2018).

[18] Air Force Research Laboratory Report, *Wideband Hearing, Intelligibility, and Sound Protection (WHISPr)*, at 11 (Oct. 2008), D-GEN-1112 ( WHISPr Report ).

[19] Hearing Conservation Program, *Department of the Army Pamphlet 40-501* (1998) at 6-2(d)2), D-GEN-2170.

[20] WHISPr Report, *supra*, at 11, D-GEN-1112 (emphasis added).

13

### B. Aearo, In Collaboration And Partnership With The Military And The Institute de Saint Louis, Developed A Revolutionary Solution.

In an effort to solve this problem, in the early 1990s, ISL—a military research institute established by French and German governments—invented a non-linear, level-dependent filter,[21] in which low-level sounds can pass through the filter, but sharp impulse noises, like gunfire, are diminished.[22]  In early 1997, ISL requested assistance from Aearo Company in Indianapolis to develop a non-linear earplug based on ISL's filter and Aearo's existing UltraFit earplug, a premolded, triple-flanged earplug.[23]  Around the same time, an Army Research Laboratory representative concluded that the non-linear filter was a good option to protect against "impulse" noises such as gunfire, "especially when one considers that the alternative presently being used is not to wear hearing protection."[24]  But he also noted that it provided "essentially no attenuation against high level steady-state noise."[25]  For that, the military needed standard linear ear protection.  Pascal Hamery, another ISL scientist, devised a two-ended device, with one end using the nonlinear filter and the other end functioning as a traditional earplug.

In December 1997, Dr. Doug Ohlin, the manager of the Army's Hearing Conservation Program and chair of the Defense Department's Hearing Conservation Working Group, indicated that he preferred the two-ended earplug design, which would be easier to dispense in the field than two separate earplugs.[26]  Heeding Dr. Ohlin's direction, Aearo and ISL developed and manufactured a two-ended earplug based on the UltraFit.  Dr. Ohlin found that initial samples

---

[21]   Aearo Design Drawing No. 4047-A at 4, P-GEN-2976.

[22]   Armand Dancer & Pascal Hamery, *Nonlinear Hearing Protection Devices* (1998) at 9, D-GEN-2432.

[23]   Ltr. from Armand Dancer to Doug Ohlin at 1-2 (Jan. 13, 1997), D-GEN-1020.

[24]   Dept. of Defense Hearing Conservation Working Group Mtg. Agenda at 10 (Apr. 9, 1998), D-GEN-1405.

[25]   *Id.*

[26]   Notes from Meeting at Aberdeen Proving Ground, Md. at 2 (Dec. 16, 1997), S-GEN-108.

were at least a quarter of an inch too long, in part because they would not fit in a standard-issue earplug carrier, so he took the liberty in cutting down the samples himself.[27] Aearo sent Dr. Ohlin samples of a shortened version of the dual-ended earplug in late April 1999.

Dr. Ohlin found the shortened earplugs acceptable, and made a Combat Arms earplug purchase request to the Department of Defense's Joint Readiness Clinical Advisory Board, explaining that the Hearing Conservation Working Group recommended that a non-linear earplug configured to the specifications of the enclosed production samples be adopted for military use.[28] Dr. Ohlin concluded that, i n the Combat Arms Earplug, we finally have a hearing protector that protects without impairing military effectiveness.[29]

Dr. Ohlin asked Aearo to ship the earplugs in bulk 50 pairs in a bag inside a cardboard box and directed Aearo ***not to include instructions*** in th e box because h e felt that personal training was the most effective way to train the soldiers.[30] The military later created its own written instructions for the Combat Arms and a wallet-sized instruction card, which was made available in large quantities to audiologists and hearing technicians throughout the Army.[31]

---

[27]   Email from Doug Ohlin to multiple recipients (Apr. 13, 1999), D-GEN-2377 at 2.

[28]   Memo. for Staff Director, Joint Readiness Clinical Advisory Board, S-GEN-0002 at 1.

[29]   *Id.* at 4.

[30]   12/3/2019 Marc Santoro Dep. at 326:15-327:10 (emphasis added). As one military audiologist explained, it would have been unusual for the military to rely on a manufacturer's instructions to educate a soldier on proper use. D-GEN-1136 17. Another military audiologist stated that she did not rely on Aearo or 3M to provide any written instructions to soldiers on the Combat Arms, and that w hen military audiologists were responsible for training technicians and hearing conservation officers on how to fit the Combat Arms Version 2, they weren't relying on any Aearo or 3M instructions. 6/15/21 *Baker* Trial Tr. at 317:14-21 (testimony of Lt. Col. Leanne Battler) *id.* at 336:11-15 (same).

[31]   D-GEN-1136 15 S-GEN-0071. Aearo also eventually sold relatively small numbers of individually packaged pairs of the Combat Arms, which included individual instructions, in retail stores on Army bases. 12/3/2019 Marc Santoro Dep. at 183:4 184:8. But even in that circumstance, Dr. Ohlin reviewed and approved the retail instructions, suggesting additional language that Aearo adopted. S-GEN-0001.

### C. Extensive Testing By The Military And Other Independent Laboratories Confirmed That The Combat Arms Worked In The Lab.

#### 1. The Military Extensively Tested The Combat Arms And Confirmed That It Worked As Expected.

A noise reduction rating, or NRR, is a single number that gives an indication of the overall noise attenuation (protection) offered by an earplug.[32] Generally speaking, the higher the NRR, which is calculated based on real ear attenuation threshold ( REAT ) testing, the greater the attenuation the device provides. Through its own testing, Aearo found the NRR for the Combat Arms was 22. But for non-linear hearing protection, it is also necessary to perform impulse testing, which assesses the performance of a non-linear device when exposed to loud impulse noises, and localization testing, which assesses how well the user is able to maintain situational awareness.

The military does not rely on a manufacturer's testing or NRRs, but instead does its own testing using state-of-the-art methods, and it considers its own testing to be the strongest evidence of a hearing protection device's efficacy.[33] Indeed, the Navy's guidelines require it to **disregard** a manufacturer's testing when assessing any hearing protection product.[34]

World-class military laboratories tested the Combat Arms, some several times, using multiple testing methods, including through REAT tests, impulse tests, and localization tests. Each of these tests confirmed that the product performed as intended. Significantly, both the Army

---

[32] *See* 40 C.F.R. § 211.207. The EPA requires manufacturers of hearing protection devices *except* those designed for use in combat to label their products with an NRR. *See id.* § 211.206-1.

[33] D-GEN-3094 at 49-50 (Feb. 26, 2016 Air Force Instruction 48-127 citing AFRL ANSI measured values utilizing ANSI S12.6 the current standard as the most preferred method for selecting attenuation values for hearing protection devices) D-GEN-788 (Mar. 2006 USACHPPM technical guide on Personal Hearing Protection Devices, stating all approved hearing production devices have been tested for attenuation characteristics in accordance with (IAW) the ANSI, S12.6-1997 the current standard , as well as for durability and toxic effects ).

[34] Navy Medical Dept. Hearing Conservation Program Procedures (Sept. 15, 2008), D-GEN-3095 at 18-19 ( Remember, when investigating any hearing protection product assure they have been evaluated by an approved laboratory. An approved lab is defined as one that meets general industry accreditation standards **and is not affiliated with a manufacturer or product**. (emphasis added)).

16

Research Laboratory ( ARL ) and the Air Force Research Laboratory ( AFRL ) conducted extensive testing on the Combat Arms.

**Army Research Laboratory Testing.**   The ARL concluded that the Combat Arms' REAT test results   compared very well with design specifications,   and that   p redicted values of impulse noise attenuation were good, to within 15   of the experimental values. [35]   The ARL also found that the Combat Arms   functioned as intended to protect against impulsive noise. [36]

**Air Force Research Laboratory Testing**.   The AFRL similarly found that the Combat Arms   provide d  very good attenuation   and   seems to work as advertised. [37]   The AFRL even tested the Combat Arms against other non-linear earplugs, the SureFire Sonic Defenders and the Moldex Battleplug.  The Combat Arms beat the competition.[38]  At the highest sound level tested, both ends of the Combat Arms had better attenuation than the Battleplug and SureFire Sonic Defenders.[39]

---

[35]   Army Research Laboratory Report, *Modeling of Acoustic Pressure Waves in Level-Dependent Earplugs* (Sept. 2008), D-GEN-246 at 4.

[36]   Army Research Laboratory Report, U.S. Marine Corps Level-Dependent Hearing Protector Assessment: Objective Measures of Hearing Protection Devices (Jan. 2014), D-GEN-3567 at 20.

[37]   WHISPr Report, *supra*, D-GEN-1112 at 30, 81.  One of the lead Air Force researchers and authors on the 2008 report was Richard McKinley, who is now a paid expert for plaintiffs suing Aearo and 3M.  His paid expert opinions are markedly different from those he offered as a government employee whose task was to fairly evaluate the Combat Arms.

[38]   Air Force Research Laboratory Report, Continuous and Impulsive Noise Attenuation Performance of Passive Level Dependent Earplugs (Oct. 22-26, 2012), D-GEN-3729.

[39]   *Id.* at 15.

2. *Other Well-Respected Laboratories Tested The Combat Arms.*

The U.S. Department of Energy,[40] NIOSH,[41] ISL,[42] and the Canadian government[43] among others — also tested the earplug and confirmed that it was effective and worked as intended. Even a laboratory hired by a ***competitor*** tested the Combat Arms and found that it worked as designed. Years before any personal injury claims, in March 2012, Moldex, a competitor earplug manufacturer, hired the nationally accredited Michael — Associates Lab to test the Combat Arms earplug to develop evidence to use against Aearo in a patent dispute. Despite having every incentive to find that the earplug was ineffective, the Michael Lab found the opposite: the Combat Arms worked ***even better*** than advertised. The Michael Lab found that the closed end of the Combat Arms earplug had an NRR of 23 — higher than the NRR of 22 that Aearo found in its own testing and put on the label.[44]

**D.    Real World Experience Confirmed That The Combat Arms Earplug Worked In The Field.**

Real-world experience confirmed what researchers found in the lab. Military field studies found that soldiers almost unanimously reported that the Combat Arms was more comfortable than

---

[40]   Idaho Nat'l Laboratory (a U.S. Dept. of Energy Nat'l Laboratory), *Hearing Protection Evaluation for the Combat Arms Earplug at Idaho National Laboratory* (Mar. 2007), D-GEN-347 at 20 ( non-linear attenuation of impulse noise levels, using the Combat Arms earplug, provides adequate protection  while allowing necessary verbal communications during  combat exercises ).

[41]   Email from William Murphy to multiple recipients (Oct. 23, 2001), D-GEN-1750 (confirming that the Combat Arms performed as designed in protecting against impulse noise) Nat'l Institute for Occupational Safety and Health ( NIOSH ), Hearing Loss Prevention Section, *Attenuation Measurements of Passive Linear and Nonlinear Hearing Protectors for Impulse Noise*, D-GEN-1121 (same).

[42]   *See* ISL, *Evaluation of Hearing Protection Devices and a Flight Helmet when Undergoing Noise Stimulations* (Dec. 18, 2012), D-GEN-1116 (tests showing that the Combat Arms protected against impulse noises and offered more protection than the SureFire Sonic Defender, and at least as much protection as the Battleplug).

[43]   Defence Research and Development Canada, *Sound Attenuation of the Indoor/Outdoor Range E-A-R Plug* (2004), D-GEN-106 at 4 (concluding that  the observed outcomes suggest that the manufacturer's specifications were a good predictor of outcome ).

[44]   Michael   Assocs., Inc., *Hearing Protective Device Test Report Number Q2558A* (Mar. 28, 2012), D-GEN-0250 D-GEN-0248 at 4.

their current earplug, allowed them to hear speech better, and attenuated loud noises just as well. And when compared to much more expensive electronic devices, soldiers ranked the Combat Arms near the top in every single category, including situational awareness and durability.[45]

Feedback from the battlefield was equally positive. In a survey of 950 soldiers returning from Iraq, 86 found the Combat Arms to be beneficial in combat operations and 70 felt the Combat Arms protect ed their ears as well as improve d communication ability in noise.[46] One soldier in Iraq wrote that the Combat Arms Earplugs work great in this environment . T hey probably made the difference between eardrum/hearing damage and not, they definitely allow you to mentally recover very quickly, so you are able to deal with your situation' vs. standing around like a stunned mullet for awhile.[47]

Trained military audiologists were impressed with the Combat Arms based on their own experiences and those of the soldiers with whom they worked. For example, Lieutenant Colonel Leanne Battler, an Army audiologist, testified that she used the Combat Arms e very year for seventeen years and had excellent hearing and no tinnitus.[48] Battler fit thousands of soldiers with the Combat Arms, and not one ever complained that the Combat Arms failed to protect their hearing.[49] Battler explained that the Combat Arms was cutting-edge technology for the first time, soldiers were wanting the hearing protection they had great things to say about it, and testified that she a bsolutely believe d that the earplug, the Combat Arms earplug, Version 2,

---

[45] P-GEN-00782 WHISPr Study, *supra*, D-GEN-1112.

[46] U.S. Army Research Laboratory, *Improved Combat Arms Earplug QRI Status* (June 26, 2006), P-GEN-01011 at 4.

[47] D-GEN-0125 *see also* P-GEN-00071 at 23.

[48] 9/10/20 Leanne Battler Dep. at 125-126.

[49] *Id*. at 172:23-173:3.

helped improve situational awareness, survivability and lethality. [50] Others shared Battler's view,[51] and their experience was not just anecdotal.

## III.  STRUCTURAL PROBLEMS DOOMED THE MDL FROM THE OUTSET.

Decades of testing and overwhelmingly positive results in the lab and in the field showed that the Combat Arms worked.  Nonetheless, plaintiffs' lawyers seized on an internal Aearo document to build claims against Aearo and 3M alleging product defects and inadequate warnings.  The initial spate of lawsuits later ballooned into a massive and unmanageable MDL.  Bolstered by millions of dollars in advertising spend by plaintiffs' lawyers, the MDL became the largest in history, surpassing at its apex more than 280,000 individual plaintiffs, and consisting of more than 230,000 plaintiffs today.

It soon became clear that the MDL was too large to manage.  The problem was exacerbated by the suspension of customary procedures to vet mass tort claims.  Approximately 110,000 active plaintiffs still have their claims languishing on an administrative docket.  And of the approximately 124,000 plaintiffs on the active docket, only 1,500 or so have been required to produce basic discovery, including medical records.  This leaves more than 230,000 claims that remain completely unvetted.  Critically, once modest safeguards were imposed, a substantial portion of claimants (thus far, about 50,000) dropped out of the MDL, voluntarily or involuntarily.

### A.  Plaintiffs' Lawyers Constructed Litigation Around The  Flange Report.

In the face of overwhelming scientific evidence that the Combat Arms worked, and that the military understood how the earplug performed, plaintiffs' lawyers built their case around an early testing report known as the  Flange Memo,  authored by Aearo researcher Ron Kieper.  The

---

[50]  *Id.* at 82-84.

[51]  For example, military audiologist Lieutenant Colonel John Merkley testified that he wore the Combat Arms while deployed to Iraq and that it worked for him.  2/26/21 John Merkley Dep. at 197:1-198:17.

memo described interrupting the first REAT test before it was completed, after testing the plug on only eight people.  Kieper halted the test to investigate unexpectedly variable results  largely due to aberrantly low attenuation on one (out of three) trials in each of two users, and aberrantly **high** attenuation from another user.  He hypothesized that for some users, the opposing flanges (*i.e.*, the flanges on the side of the plug not inserted into the ear) may have come in contact with the outer ear anatomy and prevented deep insertion or caused the earplug to loosen after insertion.[52]  Kieper concluded that some users could therefore achieve a better fit by folding back the flanges of the opposing end of the earplug.  Kieper then completed a full REAT test a few weeks later, in which records indicate one user out of ten did in fact fold back the opposing flanges.  The results of that full REAT test led to a calculated NRR of 22.

At trial, plaintiffs treated the Flange Memo as a  smoking gun  document, incorrectly arguing that it showed that the Combat Arms was too short, that the NRR of 22 was fraudulent, and that the military was unaware of problems with the earplug.

First, the claim that the plug   having been shortened at the military's request   was too short is belied by the mountain of testing conducted by the military itself and other independent laboratories.  By the time Kieper stopped the test, the Combat Arms had been tested on only eight people.  Since then, dozens of tests have shown that the Combat Arms works.  Not one of them indicated that the earplug was too short.

Second, the NRR of 22 was accurate.  There could be no better proof that the NRR of 22 was legitimate than the testing performed by the Michael lab, an expert hired by Aearo's

---

[52]  Aearo Co., *How Folding the Flanges Back Affects REAT Results of the UltraFit Earplug End of the Combat Arms Plug* (July 10, 2000), D-GEN-0115 (  Flange Memo  ).

competitor and adversary in litigation, which determined that the NRR of the Combat Arms was 23, even higher than Aearo's results.

Third, the military was well aware of the option for some users to fold back the earplug's opposing flanges to get a better fit.  Aearo's retail packaging for the Combat Arms   which was provided to the military   included the following fitting suggestion:   f itting is     improved if the sealing rings of the outward directed plug are rolled back upon themselves. [53]



Aearo also discussed the flange fold option directly with Dr. Ohlin, who passed that information on to military audiologists.  The current manager of the Army Hearing Program testified that, as early as 2001, Dr. Ohlin told a gathering that included  most of the Army 's audiologists  that,  if you needed to, you could fold back the flange on the earplug to get a good fit. [54] A fact sheet that was distributed throughout the Army provided additional instructions on proper insertion and fit, including the ability to fold back the flanges if necessary to  enhance proper insertion. [55]   The military's own written instructions for the Combat Arms included a

---

[53]   S-GEN-0083  *see also* Email chain involving Doug Ohlin and others (Dec. 9-13, 2005), D-GEN-1903.

[54]    2/26/2020 John Merkley Dep. at 98:2-3, 106:21-107:1.

[55]    U.S. Army Center for Health Promotion and Preventive Medicine (  USACHPPM  ), *Just the Facts: The Combat Arms Earplug*, S-GEN-0070 at 3  4/27/2021 *EHK* Trial Tr. at 305:11-23.

picture of the Combat Arms with the flanges folded back and the following statement:    f or very

large ear canals, fold opposing plug back.



## B.    The Combat Arms MDL (Like Many Other MDLs) Became A Magnet For Unvetted Claims.

MDLs now account for over 62    of the cases pending in the federal court dockets,[56] the

overwhelming number of which involve mass torts.[57]   The  MDL has ascended as the most

important federal procedural device to aggregate (and settle) mass torts.  [58] But there are increasing

---

[56]   As of September 30, 2021, 629,588 cases were pending in federal courts.  Table C, U.S. District Courts    Civil Cases Commenced, Terminated, and Pending During the 12-Month Periods Ending September 30, 2021, Judicial Business of the United States Courts, Annual Reports of the Director, Administrative Office of the United States Courts,  *available at*  https://www.uscourts.gov/sites/default/files/data  tables/jb  c  0930.2021.pdf.   As of that same date, 391,953 actions were pending in and subject to MDL proceedings.  United States Judicial Panel on Multidistrict Litigation, Statistical Analysis of Multidistrict Litigation Fiscal Year 2021, *available at* https://www.uscourts.gov/sites/default/files/data  tables/jb  s20  0930.2021.pdf.

[57]   *See, e.g.*, Bolch Judicial Institute, *Guidelines and Best Practices for Large and Mass-Tort MDLs* (Duke Law School, 2d ed. 2018) ( Not only is the overall number of actions in MDLs growing, these actions are becoming more concentrated in a small number of mass-tort MDLs, primarily products liability, and particularly pharmaceutical and health-care cases. Of the MDLs pending in August 2018, 90    of them were consolidated in only 24 MDLs    predominately product liability.  ).

[58]   M. Thomas, *Morphing Case Boundaries in Multidistrict Litigation Settlements*, 63 EMORY L.J. 1339, 1346-47 (2014).  The MDL device is lauded as  a  once-in-a-lifetime' opportunity for the resolution of mass disputes by bringing similarly situated litigants from around the country, and their lawyers, before one judge in one place at one time.   E. Fallon, et al., *Bellwether Trials In Multidistrict Litigation*, 82 TUL. L. REV. 2323, 2339 (2008) *see*

concerns over the MDL process in the mass torts space.  The combination of advertising-induced filing of masses of unvetted claims and a preordained expectation of settlement often create a high-volume cudgel that inflates settlement value, or   as is the case with the Combat Arms MDL   precludes any reasonable settlement.

The MDL Subcommittee of the Advisory Committee on the Civil Rules recognized that there   seems to be fairly widespread agreement among experienced counsel and judges that in many MDL centralizations   perhaps particularly those involving claims about personal injuries resulting from use of pharmaceutical products or medical devices   a significant number of claimants ultimately (often at the settlement stage) turn out to have unsupportable claims, either because the claimant did not use the product involved, or because the claimant had not suffered the adverse consequence in suit   .  [59]  The MDL court recognized these problems in a law review symposium on MDLs, penned while presiding over the Combat Arms MDL:

> A reported twenty to fifty percent of those cases involve plaintiffs with unsupportable claims.  In the products liability context, unsupportable claims are often a result of a plaintiff having not used the relevant product and/or having not suffered the injuries alleged, or, in some cases, the applicable statute of limitations having run.  MDLs have no built-in, uniform mechanism for efficiently filtering out these sorts of claims.  The procedural safeguards used effectively in one-off cases (e.g., federal pleading standards, discovery obligations, case-specific motions for summary judgment, and Rule 11 sanctions) are difficult to employ at scale in the MDL context, where the volume of individual cases in a single MDL can number in the hundreds, thousands, and even hundreds of thousands.     T he sheer volume of unsupportable claims in some MDLs can grossly distort the true merit and size of the litigation.[60]

---

*also* Manual for Complex Litigation § 20.132 (2004) (MDLs   bring before a single judge all of the federal cases, parties, and counsel comprising the litigation   and   therefore afford a unique opportunity for the negotiation of a global settlement )  H. Erichson    B.   ipursky, *Consent Versus Closure*, 96 CORNELL L. REV. 265, 270 (2011) (MDL   creates the perfect conditions for an aggregate settlement ).

[59]  Fed. Rules Adv. Cmm. *Nov. 1, 2018 Agenda Book* 140, 142, *available at* https://www.uscourts.gov/sites/default/files/ 2018-11 civil rules agenda book 0.pdf.

[60]  Judge M. Casey Rodgers, *Vetting the Wether: One Shepherd's View*, 89 UMKC L. REV. 873, 873-74 (2021).  As another experienced federal MDL judge observed,   the evolution of the MDL process toward providing an alternative dispute resolution forum for global settlements has produced incentives for the filing of cases that

Critically, these unintended MDL consequences may have the perverse effect of prevent ing plaintiffs with trial-worthy claims from timely getting their day in court. [61] The Combat Arms MDL exemplified and increased these concerns by multiple orders of magnitude.

### 1. Plaintiffs' Lawyers Engaged In An Expansive And Targeted Ad Campaign.

Plaintiffs' lawyers launched an extensive marketing campaign that led to the filings of hundreds of thousands of Combat Arms lawsuits. The content of those ads evolved over time to capture headline-grabbing verdicts, which, together with intense media coverage, further incentivized filings and saturated the airwaves and internet feeds reaching prospective bellwether-trial jury pools.

Records suggest that, between January 2019 and May 2022, plaintiffs' lawyers spent nearly 25 million on television advertising alone, airing more than 120,000 advertisements during nationally and locally broadcast television programming. Lawyers spent untold millions more to solicit claimants through radio spots, direct emails, and targeted social media outreach to servicemembers and veterans. And law firm websites and podcasts, infomercials, and YouTube and other online videos furthered the reach of the litigation advertising machine.

---

otherwise would not be filed if they had to stand on their own merit as a stand-alone action. *In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, MDL No. 4:08-md-02004 (CDL), 2016 WL 4705807, at 1 (M.D. Ga. 2016) (Land, C.J.).

[61] H. Rep. No. 115-25, at 2 (2017) (italics omitted).




The advertisements promised that servicemembers may be entitled to substantial or significant financial compensation,[62] and many were inaccurate or misleading. In some cases, they falsely suggested that 3M had already agreed to settle or had paid out millions of dollars for personal injury claims. In others, lawyers inaccurately suggested that 3M had admitted the Combat Arms were defective, and at times, they even pictured the wrong version of the earplugs.[63]




---

[62]    Kenneth S. Nugent, P.C., *3M Earplugs Attorney Georgia | 3M Combat Arms Earplugs Lawyer*, https://www.youtube.com/watch v WOeiN-ip1sM.

[63]    Miller       ois, Attorneys at Law, *3M Earplugs Lawsuits Settlement Value Predictions*, youtube.com/watch v Kki svLONn0.

In addition, CAMG (an ad agency that works only with law firms) produced a 30-minute infomercial that has played in markets and across the U.S. on various cable channels.  Show host Tony Noakes and Dr. Wendy Walsh used a talk-show style set to urge potential plaintiffs to call a provided phone number to sign up for legal representation. [64]  The infomercial presents Dr. Walsh as an authority on Combat Arms design and hearing injury.  But it does not disclose that Dr. Walsh is not a medical doctor (nor an expert in the military, earplugs, or hearing issues), but instead is   a self-help expert   in   the science of love, [65] or that Noakes is a paid actor.[66]



---

[64]    3M Earplugs Infomercial, *available at* https://vimeo.com/431941540.

[65]    *See drwendywalsh.com* (   Dr. Walsh is  a self-help expert who helps you help yourself. Through her unique lens of evolutionary psychology and attachment theory and backed by science, Dr. Wendy Walsh shines a light on love, marriage, parenting, and workplace dynamics. With a core believe  *sic*  that healthy human connection is critical in order for humans to flourish, Dr. Wendy shows us how interpersonal relationships hold the keys to our mental and physical health, thriving in the workplace, and even our ability to reproduce. Dr. Wendy reveals the gameboard of life, giving you the freedom to make the best choices for your personal circumstances.  ).

[66]     Tony Noakes is an actor and cinematographer, known for *The Dentist* (1996), *Breakaway* (1996), and *JAG* (1995).   https://www.imdb.com/name/nm0633450/.

As trials began, the placement and timing of the ads were tailor-made for jury pools. The ads were disproportionately run in or targeted to Pensacola, Florida, where the MDL is venued and where most of the bellwether trials took place.[67] They touted increasingly outsized jury verdicts:[68]






### 2. The Unvetted Claims Continue To Bloat The MDL Docket.

Case numbers predictably skyrocketed. In November 2019, the number of cases stood at about 2,700. The number of cases ultimately peaked at more than 280,000, making the Combat Arms MDL the largest in history.[69]

---

[67] Although it is only the 57th largest media market out of the 210 local television media markets in the United States, the Mobile, Alabama Pensacola, Florida media market received more Combat Arms advertising spend than all but 12 local markets.

[68] Miller ois, Attorneys at Law, *$110 Million Verdict in 3M Earplugs Bellwether Trial*, https://www.youtube.com/watch v 4h7-g58SJBs.

[69] 11/22/2019 Hr'g Tr. at 4, MDL Dkt. 840 *see also* Nov. 19, 2019 MDL Statistics Report - Distribution of Pending MDL Dockets by Actions Pending, U.S. Judicial Panel on Multidistrict Litigation, *available at* https://www.jpml.uscourts.gov/sites/jpml/files/Pending MDLs by Actions Pending-November-19-2019.pdf. Thousands of these claims are duplicates, where a single plaintiff is named in two or more separate complaints, reflecting the lack of any meaningful vetting.

Indeed, data provided by the Judicial Panel on Multidistrict Litigation shows that, as of

June 15, 2022, the MDL had more than *twice* as many claims as the other 191 pending MDLs

*combined*.[70]  The Combat Arms MDL has become so large that for the last two years, in his annual

report on the federal judiciary, the Chief Justice has singled out the  unusually large number of

filings  associated with the MDL and has reported two separate sets of data detailing the annual

number of civil filings in the U.S.   one set that includes this MDL, and one that does not.[71]

### 3. The MDL Court Suspended Basic Vetting Requirements.

As they recruited more and more potential claimants, plaintiffs' lawyers were able to file

and maintain an avalanche of unvetted claims at virtually no expense.  Plaintiffs' leadership

conceded in mid-2019 that many of the claims in the litigation were then  yet-to-be vetted, [72]

and  almost a year later  admitted that  the vast majority  of claims that had yet to be

transitioned to the active docket  are being investigated still  by counsel.[73]  To this day, counsel

for the vast majority of plaintiffs have yet to obtain and evaluate basic records regarding the

plausibility of the pending claims.

A year and a half after creating the administrative docket, the MDL court began to

dismantle it.  In August 20, 2021, the MDL court ordered 1,358 of the more than 250,000 then-

remaining cases on the administrative docket to transfer to the active MDL docket, only then

triggering basic filing requirements.[74]  Since then, the MDL court has periodically, typically once

---

[70]  *See* June 15, 2022 MDL Statistics Report - Distribution of Pending MDL Dockets by Actions Pending, U.S. Judicial Panel on Multidistrict Litigation, *available at* https:jpml.uscourts.gov/sites/jpml/files/ Pending MDL Dockets By Actions Pending-Jun-15-2022.pdf.

[71]  *See, e.g.*, Chief Justice Roberts, 2021 Year-End Report on the Federal Judiciary at 8.

[72]  6/17/2019 CMC Hr'g Tr. at 18-19, MDL Dkt. 469.

[73]  3/4/2020 Hr'g Tr. at 66:16-67:7, MDL Dkt. 1027.

[74]  MDL Dkt. 1876 at 1-2, 4.

every month or two, ordered groups of cases to transition to the active docket.[75]  To date, the Court

has ordered nearly 140,000 cases to transition to the active docket, but there are still approximately

110,000 active cases sitting on the administrative docket with no requirement to file a claim on the

active docket.

a.      Basic Data And Medical Records Requirements Were Suspended.

A standard case management tool in large MDLs is the requirement that each plaintiff

provide basic factual information and discovery regarding their claims.  Plaintiff fact sheets or

responses to initial census questions, for example,  provide information useful for case

management  that, among other things, can  help to uncover cases that should not have been

centralized in the first instance.[76]  Similarly,  requiring the collection of plaintiffs' medical

records (in personal injury cases)    is another straightforward way that a transferee judge can

encourage a robust exchange of key information at a relatively early stage.[77]  In fact, medical

records  can help defendants verify the answers provided in  fact sheets and census responses

 and can shed light on the potential causes of the plaintiffs' injuries.[78]

Recognizing the importance of medical records in early vetting of plaintiffs' claims, MDL

courts across the country have required basic access to records at the outset of the litigation, before

full-fledged discovery.  Virtually all of the top ten largest MDLs nationwide require the production

of medical records and/or the authorization of medical release forms in early stages of the case.[79]

---

[75]  *See* MDL Dkt. 1915 (Sept. 3, 2021) (Transition Order #2)  MDL Dkt. 2652 (Jan. 31, 2022) (Transition Order #3)
MDL Dkt. 2825 (May 22, 2022) (Transition Order #4)  MDL Dkt. 2989 (Apr. 14, 2022) (Transition Order #5)
MDL Dkt. 3069 (May 3, 2022) (Transition Order #6)  MDL Dkt. 3204 (June 15, 2022) (Transition Order #7).

[76]  Bolch Judicial Institute, *Guidelines and Best Practices for Large and Mass-Tort MDLs* (Duke Law School, 2d
ed. 2018) at 10 (  BEST PRACTICE 1C(v) )  *see also id.* (  Fact sheets are one of the most useful and efficient
initial mechanisms for obtaining individual discovery in large mass-tort MDLs. ).

[77]  *Id.* at 11.

[78]  *Id.*

[79]  *See* MDL Statistics Report, https://bit.ly/3aoCkDu (listing MDLs by number of claims).  The MDL court has
likewise required screening information in a different MDL over which it presided.  In *In re Abilify Products*

30

- *C-Qur Mesh* MDL: Each Plaintiff in a case filed or transferred into this MDL is required to provide, contemporaneous with the submission of a Plaintiff Profile Form, all medical records in their possession, custody, or control that relate to the mesh implant, care, and treatment, as well as authorizations for the release of medical, insurance, employment, Medicare/Medicaid, military, income, and other records.[80]

- *Juul Labs, Inc.* MDL: Every personal injury plaintiff must complete a plaintiff fact sheet that include s document requests and a variety of written authorizations for the release of medical and other records.[81]

- *Xarelto* MDL: Plaintiffs were required to produce documents and an executed medical records authorization within 60 days of the date each Plaintiffs' case is filed or transferred to the MDL Court.[82]

- *Cook Medical IVC* MDL: In addition to extensive profile and fact sheets, all plaintiffs are required to produce, within 30 days of joining the MDL, hard copies or electronic files of all medical records in their possession, including records that support product identification and the alleged injury, along with authorizations for medical, insurance, and employment and other records.[83]

- *Roundup* MDL: Plaintiffs were required to list extensive information on a fact sheet, including all healthcare providers where you have received treatment over the last 25 years for any type of cancer or for conditions, procedures, or medications identified elsewhere on the form (including issues like eczema, ulcers, smoking, diabetes, and obesity) along with executed medical, employment, tax, and other authorizations.[84]

- *Proton-Pump Inhibitor* MDL: All plaintiffs are required to complete a 25-page fact sheet and produce medical or other records substantiating use of the PPI product, as well as all pharmacy and insurance records related to purchase of the product, all medical records related to the product, and all documents relating to alleged injuries, including but not

---

*Liability Litigation*, MDL No. 2734, the same MDL court required plaintiffs to provide more detailed information and supporting documentation. Judge M. Casey Rodgers, *Vetting the Wether: One Shepherd's View*, 89 UMKC L. REV. 873, 875 (2021). The result was a high rate of voluntary dismissals of cases. *Id.* This experience underscores the importance of an early vetting process in some litigation. *Id.* at 876.

[80] Fourth Am. CMO No. 3G, *In re: Atrium Medical Corp. C-QUR Mesh Prods. Liab. Litig.*, No. 16-md-2753-LM (D.N.H. Aug. 3, 2017), Dkt. 1098-1.

[81] CMO No. 8 at 2, *In re Juul Labs Inc. Marketing, Sales Pracs., and Prods. Liab. Litig.*, No. 19-md-2913 (N.D. Cal. Oct. 2, 2019), Dkt. 406. That order was later expanded to require all personal injury plaintiffs both (i) to produce all medical records in counsel's possession and (ii) to request and produce medical records that were not already in their possession regarding any medical treatments for injuries allegedly caused by JUUL use. *In re Juul Labs Inc.*, Dkt. 2928 at 8.

[82] CMO No. 1, *In re: Xarel (Rivoroxaban) Prods. Liab. Litig.* (E.D. La. May 4, 2015), Dkt. 891 at 4.

[83] CMO No. 2, In re: Cook Medical, Inc. IVC Filters Mktg., Sales Practices, Prods. Liab. Litig., No. 1-14-ml-02570-RLY-TAB (S.D. Ind. Dec. 16, 2016) see also Fourth Am. CMO No. 4, Cook Medical, Inc., Dkt. 13046 at 2.

[84] *In re: Roundup Prods. Liab. Litig.*, No. 3:16-md-02741-VC (N.D. Cal. Oct. 4, 2016), Dkt. 1918.

limited to, medical bills, medical records, hospital records, rehabilitation center records, treatment center records, employment records, and to give record authorizations.[85]

- *Pinnacle Hip Implant* MDL: Required production of medical records and medical records authorizations for all plaintiffs.[86]

Consistent with standard practice, the Combat Arms MDL court initially ordered that e ach Plaintiff must complete and serve on Defendants, under penalty of perjury, answers to the Initial Census uestions along with certain personnel and medical records.[87] Plaintiffs' lawyers agreed to produce a number of documents alongside the initial census form, including a ny audiograms or other hearing tests performed on Plaintiff outside of the military, r ecords relating to any disability benefits Plaintiff applied for and/or received as a result of hearing loss, tinnitus or other hearing injury, and military records related to the plaintiff's service and audiological exams.[88]

But on November 22, 2019, the MDL court suspended all obligations on the vast majority of plaintiffs to provide information about their claims, citing the difficulty in obtaining records from the military. [89] For almost two years, most plaintiffs were not required to provide *any* records or essential information about their claims. Initial census form obligations remained suspended until July 2021.[90] Even when the court reinstated *some* initial census form obligations, it eliminated the requirement that the initial census questions be answered under penalty of perjury.[91]

---

[85] CMO No. 9, *In re: Proton-Pump Inhibitor Prods. Liab. Litig.*, No. 2:17-md-02789 (D.N.J. Aug. 4, 2017), Dkt. 119-1 at 29, 30.

[86] CMO No. 5, *In re: DePuy Orthopaedics Inc.,Pinnacle Hip Implant Prods. Liab. Litig.*, No. 3:11-md-2244-K (N.D. Tex. May 24, 2011), Dkt. 151.

[87] Pretrial Order No. 18, MDL Dkt. 775 at 2-6.

[88] Pretrial Order No. 18, MDL Dkt. 775-2.

[89] 11/22/2019 Hr'g Tr. at 4:18-19, MDL Dkt. 840 Case Management Order No. 6, MDL Dkt. 836.

[90] Pretrial Order No. 81 at 1, MDL Dkt. 1848.

[91] *Id*. at 2 *see also* Bolch Judicial Institute, *Guidelines and Best Practices for Large and Mass-Tort MDLs* (Duke Law School, 2d ed. 2018) at 10 (to serve their intended purpose, fact sheets should be deemed a form of discovery

As for basic medical records, while the MDL court expected that the initial production deadline would be  redefine d  due to government burden, recognizing that the records were  need ed  to move this litigation forward, [92] the ensuing order instead indefinitely  suspended the production of medical records  until further order. [93]  No  further order  was ever issued, however.[94]  As a result, the vast majority (more than 99 percent) of plaintiffs in the MDL remain under no obligation to produce **any** medical records, regardless of how easy they are to access.

There is accordingly an extremely small volume of records and little reliable data available to determine whether most plaintiffs ever suffered any hearing injury, let alone an injury that could be attributable to the Combat Arms.  On July 12, 2022, the Defense Health Agency agreed to produce certain audiograms for plaintiffs.  But producing audiograms will take time, while representing only a fraction of the hearing and medical records necessary to assess the merits of each claim.

      b.    <u>Until Very Recently, Most Cases Were Exempt From Basic Filing Requirements.</u>

Standard practice in all federal cases, including MDLs, requires plaintiffs to comply with basic requirements for filing a claim, including, for example, modest filing fees.[95]  These requirements act as a  gatekeeping  mechanism to ensure non-meritorious claims do not burden

---

governed by the relevant Federal Rules of Civil Procedure, requiring the same level of completeness and verification ).

[92]    11/22/2019 Hr'g Tr. at 4:25-5:5, MDL Dkt. 840.

[93]    Case Management Order No. 6, MDL Dkt. 836 at 1.

[94]    On June 15, 2022, Aearo moved for an order requiring plaintiffs' counsel to access and produce medical records available online through the MyHealth*e*Vet and TRICARE portals.  There has been no ruling on this motion as of the time of this filing.

[95]    Federal law is clear that the district court  ***shall require***  a filing fee of  350  whenever any party  institute s ***any*** civil action, suit or proceeding.  28 U.S.C. § 1914 (emphases added).  The Local Rules of the MDL court likewise require that  a party who files or removes a civil case must simultaneously either pay any fee required under 28 U.S.C. § 1914 or move for leave to proceed in forma pauperis under 28 U.S.C. § 1915.   N.D. Fla. Loc. R. 5.3  *see also* http://www.flnd.uscourts.gov/fee-schedule (requiring filing fee of  402 for a civil case).

33

the judicial system or defendants or, by their large number, make settlement more difficult. A critical purpose of this filing requirement, for instance, is to act as a threshold barrier, albeit a modest one, against the filing of frivolous or otherwise meritless lawsuits. *In re Diet Drugs*, 325 F. Supp. 2d 540, 541 (E.D. Pa. 2004).

But approximately 110,000 Combat Arms MDL claims remain exempted from these requirements. On December 6, 2019, the court created an administrative docket and declared that all cases placed on the inactive administrative docket will be subject to the jurisdiction of the Court.[96] While the court required plaintiffs on the administrative docket to submit short-form complaints,[97] it suspended other basic requirements for initiating a case in federal court: No filing fee is required while a case remains on the inactive administrative docket.[98] Thus, all that was required to file a case was a short-form complaint naming the plaintiff and identifying alleged injuries from a list of check-the-box options.

*4.    Even Modest Vetting Substantially Reduces The Number Of Claims.*

History confirms that a significant portion of claimants in the MDL are unable or unwilling to comply with even the minimal requirements that are standard MDL practice. Once obligations to comply with basic filing requirements, serve unverified census forms, and produce proof of military service were imposed, dismissals began rolling in.

First, thus far nearly 140,000 plaintiffs have been required to transition their claims off of the court's administrative docket. More than 18,000 of those plaintiffs have already chosen to dismiss their claims rather than comply, and thousands more missed the deadline to transition and are subject to dismissal. When put to the test of filing a claim on the active docket and producing

---

[96]    Pretrial Order No. 20 at 2, MDL Dkt. 864.

[97]    *See id.* 3 Admin. Dkt. 3 4.

[98]    Pretrial Order No. 20 4, MDL Dkt. 864 Admin. Dkt. 3 5.

basic information and records that can be obtained for free, plaintiffs' lawyers declined to prosecute thousands of cases.

Second, only 1,500 of the claims on the active docket have been ordered to produce discovery, including medical records, depositions, and disclosure of experts. Of those, hundreds have been unable or unwilling to do so, resulting in 249 dismissals early on. Again, when required to substantiate claims with basic information, plaintiffs' lawyers have abandoned a significant number of claims.

**C.     Data Indicate That The Overwhelming Majority of Claims Are Unsupported.**

In the absence of any vetting requirements, the vast majority of MDL plaintiffs have yet to produce any discovery. The MDL court did, however, order three  waves  of 500 plaintiffs each to begin producing discovery. Notably, more than a quarter of plaintiffs in  Wave 1  voluntarily dismissed their claims or were transferred to another wave. Of the 500 plaintiffs who were ordered to provide discovery in Wave 1, 126 were either unable or unwilling to do so. Wave 1 discovery is now complete and shows that the vast majority of claims are highly implausible, even under plaintiffs' lawyers' flawed theories of liability.

*1.     Most Plaintiffs Have No Proof That They Ever Used The Combat Arms.*

The Combat Arms was just one of the many earplugs the military offered to soldiers, including hand-formed  foamies  single flange, triple flange, and quad flange earplugs Etymotic's SureFire Sonic Defenders, Moldex's Battleplugs  and versions 3 and 4 of the Combat Arms (which are not at issue in the MDL).



When the Combat Arms earplugs were on the market, the military spent hundreds of millions of dollars on hearing protection devices. The Combat Arms accounted for just a fraction of the total hearing protection units purchased by the military. The military's Combat Arms purchases in 1999 amounted to a mere 10,000. In 2000 and 2001, respectively, the military purchased only 89,360 and 64,480 worth of Combat Arms. The military purchased Combat Arms in greater numbers in 2003 and 2004, but they were still a small portion of the total hearing protection devices purchased by the military.[99] Even as the military's Combat Arms purchases increased, there were many bases at which Combat Arms earplugs were not available, largely due to supply constraints. For instance, the Hearing Conservation Manager at Fort Benning, Georgia

---

[99] Plaintiffs in the bellwethers frequently mischaracterized documents discussing the Combat Arms' market share in the smaller non-linear earplug sub-segment to argue that the Combat Arms had a monopoly on hearing protection devices purchased by the military. Because the Combat Arms was the first non-linear earplug, within this small niche, which represented only a fraction of the total purchases of hearing protection devices purchased by the military, Aearo initially had a large share. But market dominance in this small sub-segment was short lived, and the Combat Arms' share of the military's level-dependent purchases was quickly diminished by the launch of the Combat Arms version 3 in 2007 and version 4 in 2009, as well as the launch of the Sonic Defender in 2009 and the Moldex Battleplug in 2011 all of which are level-dependent earplugs.

from 2004 to 2008 testified that the base "opted not" to issue the Combat Arms to soldiers "and chose to go with a standard earplug instead of the Combat Arms Earplug." [100]

Even when Combat Arms earplugs were available, military records demonstrate that the majority of plaintiffs used hearing protection other than the Combat Arms. As part of its Hearing Conservation Program, the military conducts frequent audiograms, usually once per year, to monitor soldiers' hearing. In connection with those tests, the military documents the hearing protection devices issued to, and used by, each soldier. Specifically, the form used to document a soldier's first military audiogram (known as a "reference audiogram") includes a section titled "Personal Hearing Protection — Type Issued." [101] The form used for later annual or pre- or post-deployment audiograms contains a section titled "Type of Personal Hearing Protection Used." [102] Within these sections, both forms list several standard options that can be selected, including "single flange," "triple flange," "hand formed earplug," "ear canal caps," and "noise muffs." [103] The audiogram forms also include the options "other" and "none." When "other" is selected, the forms contain a field in which the type of hearing protection used can be entered manually. Military audiogram records produced by Wave 1 plaintiffs identify a number of "other" devices,

---

[100] 12/14/2020 Kevin Hannah Dep. at 34:23-35:2 *see also* 10/6/2020 Melissa Leccese Dep. at 19:6-18, 20:20-25 (triple flange earplugs, not Combat Arms, were standard issue at Fort Campbell, Kentucky between 2006 and 2010) 2/6/2011 Bettina Rogers Dep. at 30:8-9 (Fort Knox, Kentucky "never had supply of" Combat Arms between 2011 and 2019) 11/24/2020 Andrew Toyama Dep. at 70:22-23 (audiology technician at Schofield Barracks, Hawaii from 2012 to 2014 "never had" the Combat Arms "available to distribute") 11/13/2020 Jimmy Conforme Dep. at 79:10-14 (Army medic and audiology technician at Fort Stewart, Georgia did not fit soldiers with the Combat Arms between 2005 and 2010).

[101] DD 2215 Reference Audiogram Form, *available at* https://www.esd.whs.mil/Portals/54/Documents/DD/forms/dd/dd2215.pdf.

[102] DD 2216 Hearing Conservation Data Audiogram Form, *available at* https://www.esd.whs.mil/Portals/54/Documents/DD/forms/dd/dd2216.pdf.

[103] DD 2215 Reference Audiogram Form, *available at* https://www.esd.whs.mil/Portals/54/Documents/DD/forms/dd/dd2215.pdf DD 2216 Hearing Conservation Data Audiogram Form, *available at* https://www.esd.whs.mil/Portals/54/Documents/DD/forms/dd/dd2216.pdf.

including the Combat Arms, the Surefire Sonic Defender, Peltors, communications earplugs (CEPs), Elvex    uattro earplugs, and custom musician earplugs.

Military audiology technicians testified that when reporting for their audiograms, soldiers themselves identified the hearing protection device they used or were issued, which the technicians input onto the relevant form.[104]  If a soldier did not know the name of his or her hearing protection device, staff could help:    W e always had some to show them      if they couldn't remember the name, they knew the color or     some other identifying factor. [105]  If a soldier used more than one type of earplug, he or she could choose multiple options on the form.[106]

These forms therefore provide a reliable record of a soldier's hearing protection over time. Military records produced so far demonstrate that few plaintiffs reported using the Combat Arms. Nearly three quarters of Wave 1 plaintiffs have ***no record*** of ***ever*** using the Combat Arms earplug, including more than 65 percent of plaintiffs who affirmatively reported using ***different*** hearing protection.[107]  These records fail to support[108] (and instead contradict) certain claims of Combat Arms use.

Other use claims are also implausible.  For example, some plaintiffs claim use of Combat Arms before their military bases ever issued these earplugs, or during periods of extremely low

---

[104]  *See, e.g.*, 11/24/2020 Andrew Toyama Dep. at 83:11-14 ( I believe it gave a list of types of hearing protection devices, and then the patient would need to state which one they were using. )  11/13/2020 Jimmy Conforme Dep. at 63:10-16 (   S o once they give me that form, all that, once I put them in the booth and start the test, I will input all that stuff in the software. All those questionnaires that they answer, I have to answer for them on the on the software. ).

[105]  2/6/2011 Bettina Rogers Dep. at 58:9-12  103:15-20  *see also* 2/11/2021 Roberto Gonzalez Dep. at 52:19-22 (  W e have different pictures that show what the hearing    different type of hearing protection. We have them circle which one they're using.... ).

[106]  11/13/2020 Jimmy Conforme Dep. at 70:4-19  133:23-134:3.

[107]  These numbers are conservative since, in later years when the Combat Arms versions 3 and 4 were available, noting   Combat Arms   on the form did not necessarily mean the servicemember used the Combat Arms version 2.

[108]  *See* 2/11/2021 Roberto Gonzalez Dep. at 115:6-7 ( If it doesn't say Combat Arms Earplug   on the audiogram form , that means that they were using something else    ). ).

sales, while others claim that they were issued Combat Arms while stationed at military bases that did not issue those earplugs.

### 2. Most Plaintiffs Have No Hearing Loss.

The limited discovery available in the MDL shows that the vast majority of plaintiffs, most of whom claim hearing loss as their primary injury, have normal hearing by accepted clinical standards. Such claims thus fail because they cannot prove injury.

The gold standard test of a person's hearing is the "pure tone audiogram." An audiogram measures the person's hearing "thresholds" (*i.e.*, the softest sound the person can hear most of the time) for tones of various frequencies (*i.e.*, pitches). Thresholds are measured in "decibels," abbreviated as "dB," which reflect sound intensity. The lower the threshold, the softer the sound the person can hear, and the better the hearing. Thresholds at various frequencies (usually 500 Hz, 1000 Hz, 2000 Hz, and 3000 Hz or 4000 Hz) are averaged into a "pure tone average," or "PTA."

Using these measurements, the World Health Organization ("WHO") developed criteria for determining whether, and to what degree, an individual has hearing loss. To standardize the way in which severity of hearing loss is reported, the WHO adopted a grading system based on audiometric measurements.[109] The WHO grades hearing loss according to PTA as follows:

- Less than 20 dB is "normal hearing."[110]
- 20 dB to less than 35 dB is "mild hearing loss."
- 35 dB to less than 50 dB is "moderate hearing loss."

---

[109] WHO, *World Report on Hearing* at 37 (2021).

[110] The WHO's method is conservative, measuring the "onset" of mild hearing loss at 20 dB, equivalent to a very soft whisper. *Id.* This approach contrasts with the American Medical Association and numerous other organizations, including the military and plaintiffs' own experts, all of whom have concluded that mild hearing loss begins at a PTA of 25 dB. *See, e.g.*, Dennis A. Colucci, *AMA Hearing Loss / Tinnitus Guidelines* (Feb. 2016) American Accademy of Otolaryngology Committee on Hearing and Equilibrium, and the American Council of Otolaryngology Committee on the Medical Aspects of Noise, *Guide for the Evaluation of Hearing Handicap*, JAMA Vol. 241, No. 19 (May 11, 1979), at 2058 NIOSH, *Inquiring Ears Want to Know: A Fact Sheet about Your Hearing Test* OSHA Standard No. 1904.10, *Recording Criteria for Cases Involving Occupational Hearing Loss* U.S. Navy and Marine Corps Public Health Center, *Technical Manual NMCPHC—TM 6260.51.99-2* (Sept. 2008), at 14 U.S. Air Force Instruction No. 48-127 (May 10, 2013) at 33.

- 50 dB to less than 65 dB is  moderately severe hearing loss.
- 65 dB to less than 80 dB is  severe hearing loss.
- 80 dB to less than 95 dB is  profound hearing loss.
- 95 dB or greater is  complete or total hearing loss/deafness. [111]

The Wave 1 plaintiffs' audiograms indicate that the vast majority of plaintiffs had normal hearing by these standards during their alleged periods of Combat Arms use.  The chart below shows the number of plaintiffs who fall into each WHO category, using data from the first audiogram immediately following each plaintiff's last claimed Combat Arms use (or, for those plaintiffs who have not produced audiograms post-dating the claimed use period, the latest-in-time audiogram)[112]:



As reflected in the chart, after they allegedly stopped wearing the Combat Arms earplug, ***more than 85 percent*** of Wave 1 plaintiffs had ***normal hearing*** under the WHO's methodology.  People with normal hearing under the WHO standard should experience  no problem hearing sounds  in  a quiet environment,  and  no or minimal problem hearing sounds  in  a noisy environment. [113]

---

[111] WHO, *World Report on Hearing* at 38 (2021).  The WHO's criteria also define  unilateral  hearing loss as hearing of less than 20 dB or better (*i.e.*, normal hearing) in one ear, and 35 dB or worse in the other ear.  *Id.* at 38.

[112] Where the next audiogram was not until many years after a plaintiff's alleged use of the Combat Arms ended, the data reflect the latest-in-time audiogram during claimed Combat Arms use.

[113] WHO, World Report on Hearing at 38 (2021).

The American Medical Association employs its own method for categorizing hearing impairment, generating a hearing handicap score, with a score of zero indicating no impairment at all.[114]  Applying the AMA method to the Wave 1 plaintiffs results in hearing handicap scores of zero for more than 88 percent of Wave 1 plaintiffs.

### 3. The Few Plaintiffs With Some Hearing Loss Have Clear Alternative Causes.

Less than 15 percent of the remaining Wave 1 plaintiffs had some hearing loss during their claimed Combat Arms use period based on the conservative WHO criteria.  Of that small group, over 70 percent have only mild hearing loss, meaning that they  do  not have problems hearing conversational speech  in  quiet  environments, and  may have difficulty  hearing speech in  noisy  environments.[115]  Only 10 percent have moderate hearing loss.  According to the WHO, these individuals  may have difficulty  with speech in  quiet  environments, and likely will have difficulty in  noisy  environments.[116]  And 19 percent of those with some hearing loss have unilateral hearing loss (*i.e.*, normal hearing in one ear but hearing levels of 35 dB or greater in the other).[117]

Of course, product use and injury alone are not enough to prove a personal injury case.  A personal injury plaintiff must also prove causation, *i.e.*, that their injury was caused because the product failed to work as intended.  As to the few Wave 1 plaintiffs with (mostly very mild) hearing loss, however, the evidence reflects that other factors likely caused their injuries.  Many of them have types of hearing loss that are not caused by noise exposure but instead by other medical issues.  Several have conductive hearing loss, which, unlike  sensorineural  hearing loss, is not

---

[114]  *See generally* W. Dixon Ward, *The American Medical Association/American Academy of Otolaryngology Formula for Determination of Hearing Handicap*, AUDIOLOGY 22:313-324 (1983).

[115]  WHO, *World Report on Hearing* at 37 (2021).

[116]  *Id.*

[117]  *Id.*

caused by noise exposure, but by the blockage of sound through the external ear or middle ear, preventing full sound from reaching the inner ear. These plaintiffs have, among other things, conditions like Eustachian tube dysfunction, scarring from ruptured eardrums, and otosclerosis (abnormal bone growth inside the ear). In addition, several of the Wave 1 plaintiffs have a family history of hearing loss or other medical issues that can cause hearing loss, such as Meniere's disease.

Other potential causes of hearing loss in the plaintiff population abound. As just one example, more than 50 percent of the Wave 1 plaintiffs with some hearing loss were exposed to significant noise while not wearing any hearing protection.

## IV.     THE COMBAT ARMS MDL IS BROKEN BEYOND REPAIR.

The Combat Arms cases exceed the limits (and exemplify the shortcomings) of the MDL process as a means for consolidating, managing, and resolving mass torts. As of June 15, 2022, the Combat Arms claims accounted for over 30 percent of the total number of cases pending in federal courts.[118] Resolving such a massive docket of claims in the absence of any structural mechanisms to assess, stratify, and cull claims is neither feasible nor fair. These cases cannot be reasonably settled based on the extant record, and the bellwether trial process has done nothing to help. The looming remand of hundreds and then thousands of wave cases to courts across the country will only add to a backlog of trial cases in federal court.

---

[118]  June 15, 2022 MDL Statistics Report - Distribution of Pending MDL Dockets by Actions Pending, J.P.M.L. *avail. at* https:jpml.uscourts.gov/sites/jpml/files/Pending MDL Dockets By Actions Pending-Jun-15-2022.pdf Nat'l Judicial Caseload Profile, uscourts.gov, https://www.uscourts.gov/sites/default/files/ fcms na distprofile0331.2022.pdf.

## A. Tainted MDL Bellwether Trials Frustrated, Instead Of Furthered, Settlement.

The goal of bellwether trials is to produce reliable information about other cases centralized in that MDL proceeding. [119] The rushed Combat Arms bellwethers fell well short of that goal and resulted in knowingly incomplete and unsettled trial records that provided little reliable information about the merits of the 230,000 claims in the MDL.

Of the 27 bellwether plaintiffs, eight were dismissed before trial and six resulted in trial victories in favor of Aearo meaning 14 out of 27 bellwether plaintiffs did not recover. [120] Those bellwether trials that resulted in plaintiffs' verdicts did not provide representative data or meaningfully inform settlement, as the MDL court gutted defenses and barred key evidence in the 16 bellwether cases (some with multiple plaintiffs), which were tried in an unprecedentedly compressed time span an average of one trial per month. The frenetic bellwether cadence, coupled with the cascading effects of substantial evidentiary errors and false narratives, tainted the trials from the start.

### 1. Plaintiffs' Lawyers Made Inflammatory And Prejudicial Statements And Arguments.

Plaintiffs' lawyers in the bellwether trials repeatedly packed their opening statements and closing arguments with irrelevant, overwrought, and highly prejudicial rhetoric designed to inflame the jury. Aearo's objections to these inflammatory statements were denied.

---

[119] Fed. Jud. Ctr., Bellwether Trials in MDL Proceedings: A Guide for Transferee Judges 3 (May 15, 2019) *id.* at 4, 18 Bolch Judicial Institute, Guidelines and Best Practices for Large and Mass-Tort MDLs (Duke Law School, 2d ed. 2018) at 18 Manual for Complex Litig. § 22.315 (4th ed. 2004)

[120] *See Burgus* (Case No. 7:20-cv-007) Dkt. 11 *Garcia* (Case No. 7:20-cv-072) Dkt. 16 *Hensley* (Case No. 7:20-cv-093) Dkt. 59 *King* (Case No. 7:20-cv-132) Dkt. 21 *Lopez* (Case No. 7:20-cv-060) Dkt. 24 *McNeal* (Case No. 7:20-cv-066) Dkt. 24 *Rowe* (Case No. 7:20-cv-026) Dkt. 30 *Taylor* (Case No. 7:20-cv-071) Dkt. 24 *Blum* (Case No. 7:20-cv-122) Dkt. 119 *McCombs* (Case No. 7:20-cv-094) Dkt. 157 *Montero* (Case No. 20-cv-067) Dkt. 132 *Palanki* (Case No. 3:19-cv-2324) Dkt. 135 *Stelling* (Case No. 20-cv-143) Dkt. 176 *Kelley* (Case No. 7:20-cv-153) Dkt. 173.

In the *McCombs* trial, for instance, plaintiff's lawyers insinuated that Aearo was grateful to Osama Bin Laden because it profited from the September 11 terrorist attacks: Seven days after 9/11, war profiteering. Thank you, Osama. [121] In the *Vilsmeyer* trial, counsel falsely argued that Aearo was preoccupied with selling the Combat Arms earplug immediately after the 9/11 attack: And they **sell, sell, sell. That's what 3M does a week after 9/11. Dollar signs in their eyes**. Soldier safety, no way. [122] In the *Adkins* trial, plaintiff's counsel referenced the 9/11 attacks to suggest that the Afghanistan war was a money train for Aearo . [123] These were not isolated statements. Plaintiffs' lawyers frequently demonized Aearo and its witnesses in a ploy to inflate verdicts, even in several trials that did not involve claims for punitive damages:

- Plaintiffs' lawyers argued that Aearo was okay with Elliott Berger monkeying with these tests because, f or over 30 years, he's been instrumental. The last 10 years, from 2000 to 2010, he's brought in a billion dollars to the company. You'll put up with a lot for a billion dollars. Apparently 3M will. [124]

- **There's going to be happiness in the camp because they were not held responsible** for what they did to Mr. Vilsmeyer in an amount of money that's appropriate to **balance the harm with their conduct**. And that's going to happen. Or there's another future where you listen to the objective evidence a nd you find for the plaintiff in a fair and reasonable amount that **will let 3M know that they can't do this. Enough is enough**. [125]

Plaintiffs' lawyers used other misleading and inflammatory analogies, including implicitly comparing wearing the Combat Arms earplug to a car going 60 miles an hour hitting a little girl who goes off chasing a ball. [126] This analogy was in keeping with the theme irrelevant

---

[121] 5/28/2021 *McCombs* Trial Tr. at 53:22-23.

[122] 3/14/2022 *Vilsmeyer* Trial Tr. at 237:6-21 (emphasis added).

[123] 9/20/2021 *Adkins* Trial Tr. at 63:22-25.

[124] 3/14/2022 *Vilsmeyer* Trial Tr. at 152:5-10.

[125] 3/14/2022 *Vilsmeyer* Trial Tr. at 218:9-219:1 (emphasis added).

[126] 1/24/2022 *Sloan-Wayman* Trial Tr. at 123-124.

and unsupported by any evidence   that children may have been harmed by the Combat Arms.[127]
Despite the fact that the plaintiff was not a minor, the MDL court denied a mistrial motion because
 Kids do wear this earplug    depending on how you define kids.  [128]

Finally, and perhaps most egregiously, plaintiff's counsel in one trial   over Aearo's
objection   read a text message from plaintiff's counsel's father that was neither in evidence nor
admissible:  I have a father who served 30 years in the Air Force, and he sent me a text. And it
says,   h ope you picked a good jury and made headway helping your client. Sad and upsetting
when a prominent American company gouges the military     and screws the GIs.  [129]  The court
overruled Aearo's motion to strike the irrelevant and inadmissible comment.[130]

> 2. *Plaintiffs' Lawyers Falsely Told Juries That The Air Force Found The Combat Arms Earplugs To Be Defective.*

In July 2019, years after the last Combat Arms sale, an Air Force colonel named Jay Vietas
wrote an internal letter stating that the Combat Arms should be removed from the Air Force's
inventory.  Colonel Vietas's letter also included a highly prejudicial statement on the ultimate issue
in this case: that the Combat Arms   were found to be defective.  [131]  Colonel Vietas confirmed in
sworn deposition testimony that he was not speaking on behalf of the military when he wrote the
letter:  He   wasn't in a position  to speak on behalf of any other branch of the military, and thus
his opinion did not   relate to the other services in any way, shape or form.  [132]

---

[127]   1/21/2022 *Sloan-Wayman* Trial Tr. at 164:9-16.

[128]   *Id.* at 242:1-6.

[129]   5/28/2021 *McCombs* Trial Tr. at 148:7-13.

[130]   *Id.* at 148:12-19.

[131]   P-GEN-02586.

[132]   9/27/2021 Jay Vietas Dep. at 39:1-8.

More importantly, Colonel Vietas confirmed that he was not aware of any studies, testing, or analyses to support the statement that Combat Arms earplugs were found to be defective. [133] Instead, the sole basis for the statement in his letter that the Combat Arms was found to be defective was a press release from a *qui tam* litigation settlement in which the government ***did not*** find the earplug to be defective and in which there had been no determination of liability on the part of Aearo.[134]

Over Aearo's objections, plaintiffs' lawyers introduced the Air Force letter into evidence and made it a cornerstone of their trial presentation. They read the letter during opening statements, and showed it to nearly every witness they called even though none of those witnesses had any personal knowledge of the letter or its context.[135] Plaintiffs' lawyers falsely told juries that the letter shows that the Air Force did their own investigation, and determined that they're defective. [136] Attempting to undermine the Air Force's ***actual*** testing of the Combat Arms earplugs, plaintiffs' lawyers used the letter to support bold and inflammatory statements about there being something Aearo cannot escape : They're trapped by the Air Force investigation. [137] According to plaintiff's counsel, the box that Aearo is in is that the Air Force already looked at all of this when they concluded this was a defective product. [138]

---

[133]   *Id.* at 29:6-15.

[134]   *Blum* Dkt. 88 at 2.

[135]   *See, e.g.*, 3/28/2022 *Kelley* Trial Tr. at 223:7-10  6/7/2021 *Baker* Trial Tr. at 61:24-62:14  6/8/2021 *Baker* Trial Tr. at 196:16-199:20, 208:10-209:8  6/9/2021 *Baker* Trial Tr. at 323:17-324:19  6/10/2021 *Baker* Trial Tr. at 271:19-272:2  6/11/2021 *Baker* Trial Tr. at 303:9-304:7  6/15/2021 *Baker* Trial Tr. at 95:7-97:23  6/17/2021 *Baker* Trial Tr. at 58:3-59:18.

[136]   3/28/2022 *Kelley* Trial Tr. at 223:7-10  4/18/2022 *Vaughn* Trial Tr. at 168:1-4.

[137]   6/18/21 *Baker* Trial Tr. at 137:6-10.

[138]   *Id.* at 139:3-5 (emphasis added).

But none of that was true. And plaintiffs' lawyers, who attended and had access to the Vietas deposition, knew it. There was no Air Force investigation other than the myriad tests demonstrating that the Combat Arms worked. The Air Force never concluded that the Combat Arms was a defective product. [139]

> ### 3. The Empirical And Exculpatory Michael Lab Testing Was First Limited And Then Excluded.

Plaintiffs' lawyers repeatedly argued that the Flange Memo showed that Aearo's NRR of 22 was rigged and fraudulent and insisted that the NRR could not be and had never been replicated:

- What we are going to see in that evidence I showed you the slide **they never got a 22 ever again**, and they hid it. [140]

- There was other testing that was performed on this plug. And when you look at that testing done by 3M, you see very quickly that other tests of the plug confirm that they never got another 22. And **they never got another 22 because that's the one that they had to cheat on to get**. [141]

The Michael Lab testing testing by an independent laboratory paid for by a competitor showing a **higher** NRR of 23 refutes these false statements. The MDL court agreed that the Michael testing was very probative evidence.[142] At plaintiffs' lawyers' insistence, however, the court first limited and then eliminated the Michael Lab report entirely from the bellwether trials.[143]

---

[139] *Id.*

[140] 9/20/2021 *Adkins* Trial Tr. at 79:7-9 (emphasis added).

[141] 10/18/2021 *Blum* Trial Tr. at 76:12-17.

[142] 5/3/2021 *McCombs/Baker* Pretrial Tr. at 20:12-20 *Baker* Dkt. 118 at 3 *see also* 10/21/2021 *Blum* Trial Tr. at 65:19-20 10/21/2021 *Blum* Trial Tr. at 137:9-12. MDL Dkt. 2244 at 2.

[143] *See* MDL Dkt. 1454 at 2 *Baker* Dkt. 118 at 3.

4.  *Plaintiffs' Lawyers Told A Fictionalized And Incomplete Development And Design Story*

The rushed pace of trial resulted in the exclusion of key defense evidence because discovery was incomplete, while critical   potentially dispositive   pre-trial rulings had not been reviewed by the appeals court.

a.  <u>Key ISL Depositions Were Deferred Until After The Trials.</u>

Long before the first bellwether trial, Aearo sought to depose the two key ISL scientists, Dancer and Hamery.[144]  After administrative delays, the French Ministry of Justice authorized the depositions to take place in October 2021.  Despite finding that Aearo's  pursuit of the Hamery and Dancer depositions was diligent,  the MDL court delayed the depositions, reasoning that they would  unfairly prejudice Plaintiffs by potentially requiring extensive modifications to their trial work product. [145]  The court thus  permit ted  the depositions to go forward  only  ***after the bellwether trials are complete***. [146]

Plaintiffs' lawyers took advantage of this evidentiary vacuum by advancing a counterfactual narrative about ISL's involvement and views on the Combat Arms.  They told the bellwether juries that ISL had no role in the design of the two-ended stem, and   after bolstering ISL's Dancer as the  world leader in earplugs and acoustics [147]   argued ISL was critical of the Combat Arms design.  None of that was true.  But because the ISL depositions were taken only ***after*** the bellwether process was complete, there was no way for Aearo to correct the fiction, leaving juries with a false impression about ISL's role in, and view of, the design of the Combat Arms.

---

[144]  *See* MDL Dkt. 1288  MDL Dkt. 2201 at 3.

[145]  *Id.* at 4.

[146]  *Id.* at 5.

[147]  MDL Dkt. 2201 at 3  3/15/22 *Wilkerson* Trial Tr. at 259:1-3.

b.    The Military's Role Was Downplayed By An Order Barring Aearo's Government Contractor Defense.

Early in the litigation, Aearo moved for summary judgment on all of plaintiffs' claims based on the  government contractor defense,  which bars certain lawsuits against manufacturers if the government made an  informed, discretionary decision  about a design or the warnings associated with it.[148]  The military asked Aearo to develop a dual-ended earplug, reviewed samples, requested design changes, and approved the final design.  Further, the military asked Aearo **not** to provide instructions for using the Combat Arms, because the military preferred to train its own soldiers.  Later, when the military decided to use written instructions, it drafted its own.  The military plainly made an  informed, discretionary decision  about the Combat Arms earplug's design and warnings, such that the government contractor defense applied and should have barred every claim in the MDL.

The MDL court not only denied Aearo's summary judgment motion, it also granted plaintiffs' counter-motion and precluded Aearo from even arguing that defense to a jury.  Based on this ruling, the MDL court then excluded evidence about the government's role in the product's design and development.  The MDL court insisted that Aearo  was the designer and the only designer of this plug.  [149]  The court directed that  it's not going to be suggested to the jury, they're not going to be told, it's not going to be argued to them, witnesses are not going to get into that the government was responsible for the design.  That is not going to happen.  You can take it up with the Eleventh Circuit, but it's not going to happen in this courtroom.  [150]  The court also

---

[148]   *Boyle v. United Techs. Corp.*, 487 U.S. 500, 506-07 (1988).

[149]   3/15/2021 *Wilkerson* Trial Tr. at 9:9-18.

[150]   3/17/2021 *EHK* Trial Tr. 141:20-25, 142:1  *see also* 3/15/21 *EHK* Trial Tr. at 75:15-18 (  There is not going to be a suggestion that the government made a mistake here. Your client was the designer and the only designer of this plug.  )  4/13/2021 *EHK* Trial Tr. at 156:17-18 (   The military  didn't develop the plug. I'm not going to let you argue that.  ).

admonished Aearo that the mere idea that the military collaborated in the development and design of the plug is too close to violating its summary judgment order. [151]

The MDL court also repeatedly remind ed the jury that the military did not design this plug and interrupted a core witness who began discussing the military research that led to the Combat Arms.[152] In the final jury instructions, the MDL court reiterated that the United States has no legal responsibility for the design of the Combat Arms Earplug Version 2 . [153] Plaintiffs' lawyers capitalized on these rulings at trial. In opening statements, they argued that the government did not design this product. [154] And their witnesses followed suit, with Aearo unable to cross-examine them with the truth.[155]

### B.  Appellate Review Cannot Cure The Systemic Problems In The MDL.

The absence of interlocutory relief from most MDL court judgments on threshold dispositive issues means there is rarely appellate review of core issues. As Congress reported, some MDL judges have issued questionable rulings on pivotal issues that are not subject to immediate appellate review, including the admissibility of expert evidence and the appropriateness

---

[151]  9/20/2021 *Adkins* Trial Tr. at 1613-15. The court also excluded records confirming the military's (and ISL's) involvement in the development of the Combat Arms, including ones documenting that the military in partnership with ISL introduced a new earplug from an American manufacturer specifically designed for the dismounted soldier or marine. D-GEN-1095.

[152]   4/15/2021 *EHK* Trial Tr. at 203:2-3 ( I remind you that the military did not design this plug. ) *see also* 4/20/2021 *EHK* Trial Tr. at 178:4-6 ( I would remind you that the military hard no responsibility for the design of this earplug. ).

[153]  4/29/2021 *EHK* Trial Tr. at 52:23-25  *see also, e.g.*, 11/3/2021 *Camarillo* Trial Tr. at 530:7-8 (  T he military is not responsible for the design of the earplugs. ).

[154]  3/30/2021 *EHK* Trial Tr. at 59:20  *see also* 9/20/2021 *Adkins* Trial Tr. at 49:3-4 ( I want you to understand something, though. The plug was Aearo's design. ).

[155]  *See, e.g.*, 11/4/2021 *Palanki* Trial Tr. at 819:15-16 ( Aearo design ed the Combat Arms 2. ). Focusing on the Flange Memo, plaintiffs' lawyers also argued that Aearo **broke the law** by failing to comply with EPA regulations requiring certain testing and labeling, which were promulgated pursuant to the Noise Control Act. But the Noise Control Act expressly exempts equipment designed for use in combat. Even though the **Combat** Arms was clearly designed for use in **combat**, the MDL court ruled that the exemption did not apply. Plaintiffs' lawyers were again allowed to argue a fiction: that Aearo was a serial law-breaker. *See, e.g.*, 6/7/2021 *Baker* Trial Tr. at 36:19-25  3/30/2021 *EHK* Trial Tr. at 45:24-46:17  6/18/2021 *Baker* Trial Tr. at 53:24-54:2  6/9/2021 *Baker* Trial Tr. at 26:5-17, 29:1-2.

of multi-plaintiff trials. [156]   Indeed, MDL courts have sometimes forced defendants to proceed with consecutive trials without the benefit of appellate review, even though the same judicial errors will likely be repeated. [157] And   if the information gathered  for settlement purposes  is a result of uncorrected legal errors, then any resulting settlement is tainted. [158]  Legal commentators have similarly observed that, because  interlocutory rulings generally are not subject to immediate appeal, the trial judge presiding over an MDL lacks any meaningful appellate supervision. [159]  This is a problem because   a  single  MDL  trial-court decision can implicate hundreds, or even thousands, of individual lawsuits.  As a result, MDL decisions can have an exaggerated influence both for the parties to MDL proceedings and for the evolution of the law. [160]

Here, the lack of appellate review was especially impactful.  Pre-trial rulings   including most notably the order striking the government contractor defense and applying EPA's testing and labeling regulations to the Combat Arms   had a monumental influence in shaping the MDL and the bellwether trials.  Aearo sought interlocutory review by the appeals court before the bellwether trials, but its request was denied.[161]

Thus, Aearo was forced to defend itself in *16* bellwether trials (involving 19 plaintiffs) before the appellate court could consider Aearo's appeal, which is still unresolved today.  The frantic trial pace required enlisting eight other federal district court judges from across the Eleventh Circuit, who tried ten cases over a span of just 27 weeks (with several trials taking place

---

[156]   H.R. Rep. No. 115-25, at 36 (2017) (Judicial Comm. Report).

[157]   *Id.*

[158]   *Id.*

[159]   A. Pollis, The Need for Non-Discretionary Interlocutory Appellate Review in Multidistrict Litigation, 79 FORDHAM L. REV. 1643, 1646 (2011).

[160]   *Id.* at 1648.

[161]   MDL Dkt. 1329.

simultaneously).  As one of those judges put it:    I t's odd to me, and I understand you're trying to move the cases, but you do all these bellwether trials where the initial bellwether trial carries with it 20 major potential appellate issues that could potentially require the parties to relitigate 30 cases. [162]

The bellwether trials themselves resulted in numerous additional rulings that are now on appeal.  As rushed as the bellwether process was, however, the post-trial motions have stagnated. Aearo has filed eleven of them in total, but only four have been decided fully (two in August 2021, one just last week, and one yesterday).  As a result, there are currently seven sets of post-trial motions pending, the oldest of which has been pending for seven months.  Until Aearo obtains a ruling on these motions, the appeals process cannot even begin.  Meanwhile, as of this filing, hundreds or thousands of discovery deadlines loom in the next several months, as does potential remand of many cases for trial to federal courts throughout the country.  None of the appeals would have been decided in time to stem the tide or provide controlling authority for key issues in these cases.  And in any event, appellate review of those trials would come in the context of incomplete discovery and trial records.

## V.    CHAPTER 11 PROVIDES THE ONLY EFFICIENT, E UITABLE, AND E PEDITIOUS RESOLUTION OPTION HERE.

The Combat Arms MDL is a recent and extreme example of the systemic shortcomings of traditional litigation, including MDLs, in certain mass tort contexts.  At this point, the Combat Arms tort claims morass simply cannot be sorted out in the MDL or in the traditional tort system. This  elephantine mass  of claims is akin to those that introduced the era of asbestos bankruptcy cases.[163]  Dating back to the *Johns-Manville* asbestos bankruptcy in the 1980s, tools uniquely

---

[162]    11/8/2021 *Camarillorazo* Trial Tr. at 1558:16-20.

[163]    *Norfolk & Western Ry. Co. v. Ayers*, 538 U.S. 135 (2003)  *Ortiz v. Fibreboard Corp*., 527 U.S. 815, 821 (1999).

available in chapter 11 have offered a structured system to manage multiple liabilities and have provided a forum for companies with massive liabilities to attempt to do so. [164] These procedures have evolved and improved over time, providing the tools required to rationally and efficiently resolve mass tort claims against debtors and related third parties.

As explained below, chapter 11 protection and procedures which extend to Combat Arms litigation against 3M as well will facilitate the measurement of liability and fair compensation by legal and scientific merits. Chapter 11 is the only expeditious path forward to full, fair, and final resolution and compensation of Combat Arms claims.

### A. 3M's Participation And Funding Commitment Are Essential To A Successful Reorgani ation And To An Expeditious And Equitable Resolution.

Aearo is a wholly-owned indirect subsidiary of 3M. As explained above, Aearo developed and designed (in collaboration with the U.S. military and ISL) the Combat Arms and began manufacturing and selling the earplugs in the early 2000s. In 2008, 3M acquired Aearo, and in 2010, Aearo's earplug sales business was transferred upstream to 3M. The companies continued producing and selling the Combat Arms until 2015.[165] Throughout the entire time the Combat Arms was sold, the earplug design remained exactly the same, as did the instructions and labelling provided to the military.

Although the first Combat Arms lawsuit was not filed until December 2018, that lawsuit and the more than 280,000 that followed was predicated on design and instruction decisions that occurred years before the 3M acquisition. Plaintiffs' design defect and failure-to-warn claims were built around the so-called Flange Memo, which was written in 2000. And of the

---

[164] Report of the National Bankruptcy Review Commission 315 (Oct. 20, 1997).

[165] *See* Decl. of John R. Castellano in Support of the Debtors' Ch. 11 Petitions and First Day Motions ( Castellano Decl. ) 8 (filed concurrently).

approximately 31 million in lifetime sales of the Combat Arms, the vast majority (approximately 80 percent) occurred before 3M's acquisition.[166] Not surprisingly, throughout the MDL proceedings and trials, Aearo and 3M were together referred to as "Defendants," including on jury verdict forms assessing liability and damages.

As explained in Aearo's contemporaneous first day filings, the automatic stay applies to 3M. Among other things, 3M shares insurance and an identity of interests with, and has indemnification rights against, Aearo for these claims.[167] Under both Sections 362(a) and 105(a), the Code authorizes a stay of litigation as to 3M, which is essential to an evenhanded, efficient, and expeditious resolution here. Aearo's reorganization efforts would be thwarted if litigation were allowed to proceed apace against 3M, Aearo's financial sponsor and indemnitee.

3M's financial contribution is essential to a successful reorganization, which will promptly, fully, and fairly compensate servicemembers and veterans (as well as the relatively small number of civilians). 3M has agreed to fund both these chapter 11 cases and a subsequent claims trust. This funding is indispensable to the creation and implementation of a claims trust that will efficiently review and fairly compensate tort claims, and otherwise satisfy the requirements necessary to qualify for section 105(a) relief.[168]

### B. The Bankruptcy Code Provides Powerful Tools To Deal With Mass Tort Claims That Cannot Be Fairly Or Fully Resolved In Traditional Litigation.

#### 1. Centralization of Claims

As a gating issue, chapter 11 provides mechanisms to centralize Combat Arms claims to allow an efficient, consistent, and evenhanded approach to assessment and resolution. The Court

---

[166] *See* Castellano Dec. ¶ 22.

[167] *See* Castellano Decl. ¶¶ 7, 12, 34-49.

[168] Castellano Decl. ¶¶ 12, 45-49.

has the power to extend the stay to enjoin litigation against certain Debtors under Section 105(a) of the Bankruptcy Code.  As is routinely done in mass-tort chapter 11 cases, as part of its first day pleadings, Aearo is moving for an order holding that the automatic stay should be applied to Combat Arms-related actions against Aearo's parent, 3M, which has committed to provide uncapped funding to resolve Aearo's Combat Arms liability claims and which will be primary benefactor of any settlement trust.  Centralization will encourage the coordinated adjudication and resolution of all Combat Arms tort claims in this Court, or if appropriate in the case of liquidation of personal injury claims, in the District Court for the Southern District of Indiana.

### 2.    Consensual Resolution Track

Despite extensive settlement efforts, and the assistance of several court-appointed mediators, it is clear that the parties have materially divergent views as to the scope of liability and metrics for compensation.  Aearo nonetheless remains steadfastly committed to reaching a consensual resolution, through negotiations with any committee formed to represent claimants.  A chapter 11 plan may  provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate. [169]  Indeed, compromises are favored because they  minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate. [170]  As soon as the committee is formed, Aearo will stand ready to negotiate.

### 3.    Parallel Claims Estimation Procedures

In parallel with consensual plan negotiations, Aearo will propose (and work with the Court and interested parties to develop and implement) a schedule and protocol to estimate the aggregate

---

[169]    11 U.S.C. § 1123(b)(3)(A), (b)(6).

[170]    *In re MF Global Inc.*, 466 B.R. 244, 247 (Bankr. S.D.N.Y. 2012).

amount of liability for plan purposes. The estimation procedures will categorize and value the claims in aggregate, by collecting and analyzing (through empirical data and reliable methodologies) crucial information regarding, among others, product identification, hearing function, and alternative causes.

As in prior successful mass tort bankruptcies, such an estimation **cannot** be premised on speculation about settlements or judgments that might have arisen out of tainted litigation records in the tort system. Instead, any estimation procedures should include rigorous procedures for stratifying and assessing evidence of and severity of hearing loss, use of other non-Combat-Arms hearing protection devices, circumstances and timing of noise exposure, alternative causes for any alleged hearing injuries such as combat trauma, and other relevant facts.

Moreover, where liability is disputed, it must be determined in accordance with non-bankruptcy law, including substantive law where applicable. The procedural mechanisms for resolving disputed claims, however, must remain grounded in the Federal Rules of Evidence, including Rules 702 and 703. This Court is thus empowered to resolve summary judgment and *Daubert* motions.[171] The proposed restructuring path here rests on well-tested principles derived from successful mass tort bankruptcies, which have encouraged the litigation of core, cross-cutting issues, that have the potential to resolve or inform all or substantial parts of the litigation.[172] Aearo will be seeking a full and conclusive valuation of its liabilities for the benefit of all valid claims.

---

[171] 11 U.S.C. § 502(b)(1) *In re Dow Corning*, 215 B.R. 346, 348-52 (Bankr. E.D. Mich. 1997).

[172] *Order Estimating Aggregate Liability* ECF No. 3296 , *In re Garlock Sealing Technologies, LLC,* Case No. 10-31607 (GH) (Bankr. W.D.N.C. January 10, 2014) *In re W.R. Grace Co.,* 355 B.R. 462, 482- 83 (Bankr. D. Del. 2006) (employing an estimation proceeding to dispute liability for groups of claimants whose exposure was scientifically insufficient to establish causation) *In re Dow Corning,* 215 B.R. 346, 352-55 (Bankr. E.D. Mich. 1997) (holding that the bankruptcy court is to assess claim validity and may estimate any allowed claims) *In re Babcock Wilcox Co.,* No. CIV.A. 00-0058, 2000 WL 422372, at 4-5 (Bankr. E.D. La. Apr. 17, 2000) (adjudicating motions for summary judgment on threshold liability issues).

However, during the estimation litigation and even through any estimation trial, Aearo will continue negotiations to reach a consensual resolution.

### 4. Global Resolution

Aearo's ultimate objective is to confirm a plan of reorganization that resolves all Combat Arms-related claims against Aearo and 3M. That plan would have two cornerstones.

The first would be a settlement trust for Combat Arms claims funded by Aearo, including from an uncapped commitment by 3M that will ensure sufficient resources to pay the true value of all claims filed against it. The trust would have fair procedures to pay claimants who meet specified criteria to establish values of their claims. Plaintiffs would no longer have to wait for years or decades to have their claims resolved, would have greater certainty with respect to the compensation they will receive, and would not have to undergo time consuming and costly discovery, trials, and other litigation. And the staggering burden that the MDL court recently predicted would befall other federal courts throughout the country upon remand will be averted. Meanwhile, Aearo and 3M will be able to resolve the claims against them on a scientific basis based on a fair and complete evidentiary record. The settlement trust will be backstopped by a funding commitment from 3M that will not be capped, ensuring that Aearo and its affiliates will have access to sufficient funding to pay the fair value of all legitimate claims.

The second cornerstone would be a permanent channeling injunction and a third-party release of 3M. This injunction would require that all Combat Arms-related claims be brought only against the settlement trust, and not the reorganized Aearo entities or their non-debtor affiliates. The injunction would apply to all potential Combat Arms plaintiffs.

Through these twin pillars, this reorganization would achieve both fairness and finality in the Combat Arms litigation.

Indianapolis, Indiana
Dated: July 26, 2022

*/s/ Jeffrey A. Hokanson*

Jeffrey A. Hokanson (Ind. Atty. No. 14579-49)
John C. Cannizzaro (Ohio Atty. No. 85161)
Connor Skelly (Ind. Atty. No. 35365-06) (*pro hac vice* pending)
**ICE MILLER LLP**
One American Square, Suite 2900
Indianapolis, IN 46282-0200
Telephone:     (317) 236-2100
Facsimile:      (317) 236-2219
Email:            jeff.hokanson@icemiller.com
                      john.cannizzaro@icemiller.com
                      connor.skelly@icemiller.com

Edward O. Sassower, P.C. (*pro hac vice* pending)
Emily Geier (*pro hac vice* pending)
**KIRKLAND     ELLIS LLP**
**KIRKLAND     ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:            edward.sassower@kirkland.com
                      emily.geier@kirkland.com

Mark McKane, P.C. (*pro hac vice* pending)
**KIRKLAND     ELLIS LLP**
**KIRKLAND     ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California  94104
Telephone:     (415) 439-1473
Facsimile:
Email:            mark.mckane@kirkland.com

Chad J. Husnick, P.C. (*pro hac vice* pending)
David M. Bernick (*pro hac vice* pending
Brenton A. Rogers, P.C. (*pro hac vice* pending)
Renee D. Smith (*pro hac vice* pending)
Spencer Winters (*pro hac vice* pending)
**KIRKLAND     ELLIS LLP**
**KIRKLAND     ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:            chad.husnick@kirkland.com
                      david.bernick@kirkland.com
                      brogers@kirkland.com
                      renee.smith@kirkland.com
                      spencer.winters@kirkland.com

David I. Horowitz, P.C. (*pro hac vice* pending)
**KIRKLAND     ELLIS LLP**
**KIRKLAND     ELLIS INTERNATIONAL LLP**
555 South Flower Street, 37th Floor,
Los Angeles, California 900714
Telephone:     (213) 680-8374
Facsimile:      (213) 808-8074
Email:            david.horowitz@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

# Exhibit

## TOLLING AGREEMENT

THIS AGREEMENT is by and between 3M Company, Aearo Technologies LLC, Aearo Holding, LLC, Aearo Intermediate, LLC, and Aearo, LLC ("Defendants"), and the individual(s) identified on **Exhibit A[1]** ("Claimant(s)"), and _____**Nicole Berg**_____ ("Plaintiffs' Counsel"), and _____**Keller Lenkner LLC**_____ ("Plaintiffs' Law Firm") (each a "Party" and collectively the "Parties").

WHEREAS, Claimant(s) assert claims against Defendants alleging personal injury(ies) caused by using the dual-ended Combat Arms Earplugs Version 2 ("Combat Arms Earplugs"), or that they are, or are in the process of becoming, the legal representative of a person, or of the estate of a person, who was allegedly injured as a result of using Combat Arms Earplugs;

WHEREAS, Plaintiffs' Counsel and Plaintiffs' Law Firm represent Claimant(s);

WHEREAS, numerous cases involving Combat Arms Earplugs have been consolidated in MDL 2885, *In re: 3M Combat Arms Earplug Products Liability Litigation*, currently pending in the Northern District of Florida (the "Court");

WHEREAS, the Parties agree that it would be appropriate at this time to defer litigation of certain Claims (defined below), subject to the conditions contained in this Tolling Agreement;

WHEREAS, the Parties recognize the benefits of deferring litigation at this time, including cost savings, early vetting of cases without unnecessary expense, early exchange of significant information on unfiled cases that normally could not occur but for such agreement, and other benefits recognized by the Parties;

THEREFORE, the Parties have agreed as follows:

---

[1] Each Plaintiffs' Counsel shall complete and serve Exhibit A within 10 days of execution of this Tolling Agreement by that individual Plaintiffs' Counsel.

## Definitions

1. The term "Effective Date" shall mean: (i) with respect to Claimants who enter into this Tolling Agreement on or before October 4, 2019, **June 20, 2019**; (ii) with respect to Claimants who enter into this Tolling Agreement after October 4, 2019, **the date this Tolling Agreement is executed**; or (iii) with respect to Future Claimants, **the Disclosure Date on which the Future Claimant is disclosed to Defendants** (as such terms are defined in Paragraph 32 below).

2. The term "Tolling Period" shall mean the time period beginning on the Effective Date and ending on the earlier of: (i) 90 days after any Party provides written notice that the Party is withdrawing from this Tolling Agreement; (ii) the date on which the Claimant files or otherwise commences a tolled Claim against Defendants; or (iii) December 20, 2021.[2] The Tolling Period can be extended upon written agreement by all of the Parties.

3. The term "Claim" shall refer to any claim(s) or cause(s) of action alleging personal injury and associated harms caused by using Combat Arms Earplugs. The term "Claim" as defined herein specifically includes any loss of consortium claims and punitive damages claims that may exist, if any.

4. The term "Limitations" shall mean any and all time limitations for filing or pursuing Claims, including statutes of limitation, statues of repose, prescription, laches, and any other time bars, including, but not limited to, those based in equity.

5. The term "Initial Census Questions" shall refer to the questions in the questionnaire attached hereto as **Exhibit B**.

6. The term "Census Question Deadline" shall mean December 2, 2019.

---

[2] Provided, however, that solely for cases in which Louisiana law applies, the term "Tolling Period" shall mean the time period beginning on the Effective Date and ending on the earlier of: (i) 90 days after any Party provides written notice that the Party is withdrawing from this Tolling Agreement; (ii) the date on which the Claimant files or otherwise commences a tolled Claim against Defendants; or (iii) June 20, 2020, with an automatic extension thereafter through June 20, 2021, and a second automatic extension thereafter thru December 20, 2021.

7.      The term "Initial Census Documents" shall refer to the documents responsive to the document requests attached hereto as **Exhibit C**.

8.      The term "First Document Deadline" shall mean October 7, 2019.

9.      The term "Final Document Deadline" shall mean December 23, 2019.

10.     The term "Unfiled Client(s)" shall refer to all individuals represented by Plaintiffs' Counsel or Plaintiffs' Law Firm as of June 20, 2019 who had or have unfiled claims or causes of action against Defendants related to Combat Arms Earplugs.

11.     The term "Future Unfiled Client(s)" shall refer to all individuals who enter into an attorney-client relationship with Plaintiffs' Counsel or Plaintiffs' Law Firm after June 20, 2019 who have unfiled claims or causes of action against Defendants related to Combat Arms Earplugs.

## Tolling

12.     The Defendants agree to the tolling of Limitations during the Tolling Period with respect to the Claim(s) held by Claimant(s), provided, however, that this Tolling Agreement shall not revive existing Claims, if any, that have expired under applicable Limitations prior to commencement of the Tolling Period. As an example, if any applicable Limitations were to have expired prior to the Effective Date of this Tolling Agreement, then the Defendants' right and ability to assert Limitations in defense of the Claims is fully preserved.

13.     In determining the effect of any tolling under this Tolling Agreement, only any applicable Tolling Period will be excluded when calculating Limitations; otherwise, Limitations will be treated as running continuously before and after any applicable Tolling Period, unless tolled by operation of law for reasons other than those set forth in this Tolling Agreement.

14.     Any dispute between the Parties arising out of, or as to the meaning or effect of, this Tolling Agreement shall be resolved exclusively by the *In re: 3M Combat Arms Earplug*

*Products Liability Litigation* MDL 2885 Court, which shall have personal jurisdiction over the Claimant.

## Initial Census Questions

15.     Each Claimant will complete and serve on Defendants through MDL Centrality answers to the Initial Census Questions by the Census Question Deadline. Each Claimant's answers to the Initial Census Questions will be made under penalty of perjury, will be binding on the Claimant in any litigation against Defendants, will be treated as interrogatories pursuant to Federal Rules of Civil Procedure 33, and will be subject to Federal Rules of Civil Procedure 26 and 37. The Census Question Deadline may be extended by: (i) the Court upon good cause shown; or (ii) agreement of the Parties. To the extent a Claimant or Plaintiffs' Law Firm requests an extension of the Census Question Deadline for extenuating circumstances, Defendants will not unreasonably withhold their consent. If a Claimant fails to complete and serve answers to the Initial Census Questions by the Census Question Deadline no tolling under this Tolling Agreement shall apply, and the Limitations shall be deemed to have run without suspension or interruption as if this Tolling Agreement did not exist.

16.     If a Claimant serves deficient answers to the Initial Census Questions, Defendants shall notify Plaintiffs' Counsel that Claimant's answers are deficient.[3] Claimant will then have a sixty (60) day time period to serve non-deficient answers to Defendants (the "Cure Period"). If Claimant's answers to the Initial Census Questions contain any material deficiencies at the expiration of the Cure Period, no tolling under this Tolling Agreement shall apply, and the Limitations shall be deemed to have run without suspension or interruption as if this Tolling Agreement did not exist.

---

[3]      Whether an answer is deficient shall be determined under the standards and law that apply to interrogatories under Federal Rule of Civil Procedure 33.

- 4 -

17. To the extent Defendants take the position that no tolling under this Tolling Agreement applies because of a material deficiency with Claimant's answers to the Initial Census Questions, the Parties will submit the issue to the Court to decide whether Claimant's answers to the Initial Census Questions were materially deficient.

### Initial Census Documents

18. Each Plaintiff's Counsel shall provide Defendants through MDL Centrality with the Initial Census Documents for each Claimant that are in his or her possession, custody or control by the First Document Deadline. If Claimant or Plaintiff's Counsel thereafter gains possession, custody or control of additional Initial Census Documents, Plaintiffs' Counsel will timely provide those documents to Defendants through MDL Centrality.

19. To the extent any Initial Census Documents are in the possession of a third party, including the military or other government agency, Claimant agrees to request those documents from the third party within the following time periods: (i) for *Touhy* requests, within twenty one (21) days of the execution of this Tolling Agreement; and (ii) for all other requests, within sixty (60) days of the execution of this Tolling Agreement.

20. Each Claimant will complete his or her production of the Initial Census Documents to Defendants through MDL Centrality by the Final Document Deadline. The Final Document Deadline may be extended by: (i) the Court upon good cause shown; or (ii) agreement of the Parties. To the extent the Claimant or Plaintiffs' Law Firm requests an extension of the Final Document Deadline for extenuating circumstances, Defendants will not unreasonably withhold their consent.

21. If a Claimant fails to materially complete production of the Initial Census Documents by the Final Document Deadline, including any applicable extension(s), no tolling

under this Tolling Agreement shall apply, and the Limitations shall be deemed to have run without suspension or interruption as if this Tolling Agreement did not exist.

22. To the extent Defendants take the position that no tolling under this Tolling Agreement applies because of a Claimant's failure to materially complete production of the Initial Census Documents by the Final Document Deadline, the Parties will submit the issue to the Court to decide whether Claimant's production of Initial Census Documents was materially deficient.

**Claims Filed Prior To Completion Of The Initial Census**

23. If any Claimant files any Claims prior to providing answers to the Initial Census Questions and production of Initial Census Documents, Claimant shall remain obligated to complete the Initial Census Questions and complete production of the Initial Census Documents within the time periods contained in this Tolling Agreement, or within forty-five (45) days of filing, whichever is later. Failure to do so absent good cause shown shall be grounds for dismissal with prejudice.

**Venue For Filing Claims**

24. If any Claimant who is not a citizen of either Minnesota or Delaware for purposes of federal diversity jurisdiction files a lawsuit concerning a Claim tolled under this Tolling Agreement, the Claimant shall file such lawsuit only in (i) the federal District where he or she is domiciled or was provided and/or used Combat Arms Earplugs, and will consent to the transfer of the lawsuit to MDL 2885, or (ii) directly in the Northern District of Florida. Claimant agrees that when filing a lawsuit in federal court, he or she will not name any non-diverse person as a defendant. If a Claimant resists transfer to MDL 2885 of a case filed in federal court, no tolling under this Tolling Agreement shall apply, and Limitations shall be deemed to have run without suspension or interruption as if this Tolling Agreement did not exist.

- 6 -

25.     If any Claimant who is a citizen of either Minnesota or Delaware for purposes of federal diversity jurisdiction files a lawsuit concerning a Claim tolled under this Tolling Agreement, the Claimant shall file such lawsuit only in (i) state court in Minnesota or Delaware; (ii) the federal District where he or she is domiciled or was provided and/or used Combat Arms Earplugs, and will consent to the transfer of the lawsuit to MDL 2885, or (iii) directly in the Northern District of Florida. To the extent the Claimant files a lawsuit concerning a Claim tolled under this Tolling Agreement in state court, he or she (i) will not oppose removal of the lawsuit to federal court, (ii) will consent to transfer of the lawsuit to MDL 2885, and (iii) will not seek to remand the lawsuit to state court prior to Defendants providing notice to the Court that no basis for federal subject matter jurisdiction exists with respect to the Claims. If a Claimant resists transfer to MDL 2885 of a case filed in or removed to federal court, or seeks to remand a case to state court prior to Defendants providing notice to the Court that no basis for federal subject matter jurisdiction exists with respect to the Claims, no tolling under this Tolling Agreement shall apply, and Limitations shall be deemed to have run without suspension or interruption as if this Tolling Agreement did not exist.

26.     If Plaintiffs' Counsel or Plaintiffs' Law Firm files any lawsuit concerning claims or causes of action regarding the Combat Arms Earplugs on behalf of a plaintiff who is not a citizen of either Minnesota or Delaware for purposes of federal diversity jurisdiction, Plaintiffs' Counsel or Plaintiffs' Law Firm shall file such lawsuit only in: (i) a federal district where venue is appropriate, and will consent to the transfer of the lawsuit to MDL 2885, or (ii) directly in the Northern District of Florida. Plaintiffs' Counsel and Plaintiffs' Law Firm agree that when filing such a lawsuit in federal court, he or she will not name any non-diverse person as a defendant.

27.     If Plaintiffs' Counsel or Plaintiffs' Law Firm files any lawsuit concerning claims or causes of action regarding the Combat Arms Earplugs on behalf of a plaintiff who is a citizen

of either Minnesota or Delaware for purposes of federal diversity jurisdiction, Plaintiffs' Counsel or Plaintiffs' Law Firm shall file such lawsuit only in: (i) state court in Minnesota or Delaware; (ii) a federal district where venue is appropriate, and will consent to the transfer of the lawsuit to MDL 2885, or (iii) directly in the Northern District of Florida. To the extent Plaintiffs' Counsel or Plaintiffs' Law Firm files a lawsuit concerning claims or causes of action regarding the Combat Arms Earplugs in state court, he or she (i) will not oppose removal of the lawsuit to federal court, (ii) will consent to transfer of the lawsuit to MDL 2885, and (iii) will not seek to remand the lawsuit to state court prior to Defendants providing notice to the Court that no basis for federal subject matter jurisdiction exists with respect to such claims or causes of action.

### Filing Schedule After Notice Of Withdrawal

28. In the event Defendants provide written notice of their withdrawal from this Tolling Agreement, in order to maintain any benefit of this Tolling Agreement, Plaintiffs' Counsel shall file Claims under the following schedule: one hundred (100) Complaints per day for the first thirty (30) days from Defendants' written notice of withdrawal, and the remainder of all filings within ninety (90) days from Defendants' written notice of withdrawal. If a Court objects to this filing schedule, the parties shall meet and confer and coordinate with the clerk's office to establish a schedule for filing the complaints.

### Master Pleadings

29. The Parties consent to the use of a "Master Complaint" and "Master Responsive Pleading" in MDL 2885.

30. If any Claimant files a lawsuit concerning a Claim tolled under this Tolling Agreement, and such lawsuit is consolidated in MDL 2885, Claimant will adopt any "Master Complaint" in MDL 2885 through use of a separate "Short Form Complaint."

- 8 -

## Participation In Tolling Agreement

31. Plaintiffs' Counsel and Plaintiffs' Law Firm warrant and represent that the Claimants identified on Exhibit A include all or substantially all of their Unfiled Clients.

32. Plaintiffs' Counsel and Plaintiffs' Law Firm agree to disclose Future Unfiled Clients to Defendants on each of the following dates: September 30, 2019; November 29, 2019; January 31, 2020; March 31, 2020; May 29, 2020; July 31, 2020; September 30, 2020; November 30, 2020; January 29, 2021; March 31, 2021; and May 31, 2021 (each, a "Disclosure Date"). Each Future Unfiled Client included in such disclosures shall be referred to herein as a "Future Claimant."

33. Plaintiffs' Counsel and Plaintiffs' Law Firm warrant and represent that each Future Claimant shall enter into and be bound by the terms of this Tolling Agreement as of the Disclosure Date on which they are disclosed to Defendants, provided, however, that (i) the "Census Question Deadline" for a Future Claimant will be ninety (90) days from the Disclosure Date on which they are disclosed to Defendants, (ii) the "First Document Deadline" for a Future Claimant will be forty-five (45) days from the Disclosure Date on which they are disclosed to Defendants, and (iii) the "Final Document Deadline" for a Future Claimant will be one hundred and twenty (120) days from the Disclosure Date on which they are disclosed to Defendants.

34. Plaintiffs' Counsel's and Plaintiffs' Law Firm's participation and submission of Claimants under this Tolling Agreement constitutes participation in and reliance on valuable work product in the litigation of court proceedings involving claims of 3M Combat Arms Earplug-related injuries (the "Common Benefit Work Product") and establishes an amicable, working relationship with the PEC for the mutual benefit of their clients, as well as an intention to be legally bound by a Participation Agreement to contribute and share in Common Benefit Work Product pursuant to the Common Benefit Order(s) entered by the Court in MDL 2885.

Case 2:12-md-02327 Document 6973-13 Filed 03/09/22 Page 127 of 591 of 160

## Other Provisions

35.    In the event Defendants identify a duplicate Claimant pursuant to the information provided under this Tolling Agreement, Defendants shall reasonably notify Plaintiffs' Counsel.

36.    This Tolling Agreement shall not be construed as an admission or indication that the Defendants agree that any Claimant has meritorious claims against the Defendants.

37.    This Tolling Agreement shall not be construed as an admission or indication that Claimants claims are subject to any Statute of Limitations arguments.

38.    This Tolling Agreement cannot be modified except by a writing signed by the Parties or their attorneys.

39.    The Parties hereto agree that the existence and terms of this Tolling Agreement shall be deemed confidential and shall not be disclosed to anyone except as otherwise provided or required by law. This paragraph shall not be construed to prevent Claimants from disclosing this Tolling Agreement to overcome a defense based upon Limitations, or to co-counsel and their clients.

40.    If any term, provision, condition or covenant of this Tolling Agreement or the application thereof to any party or circumstance is held to be illegal, invalid or unenforceable under any present or future law: (i) such provision will be fully severable; (ii) this Tolling Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; and (iii) the remaining provisions of this Tolling Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom.

41.    Claimants are represented by counsel of their choice. By executing this Tolling Agreement, Plaintiffs' Counsel represents that he or she has entered into a written retention

agreement with the Claimant(s). Plaintiffs' Counsel warrants and represents that he or she has the authority of the Claimant(s) to enter into this Tolling Agreement.

42. This Agreement may be signed in counterpart.

Plaintiffs' Counsel: Nicole Berg

Dated: October 4, 2019

For Defendants: Mark Nomellini

Dated: August 26, 2019

For Plaintiffs' Law Firm: Travis Lenkner

Dated: October 4, 2019

## EXHIBIT A

**Claimant Information**

| Claimant full name: | Claimant SSN: | Claimant DOB: |
|---|---|---|
| Claimant home address: | Claimant mailing address: | |

**EXHIBIT B**

**Initial Census Questions**

1. Information

   a. Claimant Name: _____

   b. Law Firm: _____

   c. Male ☐  Female ☐

   d. Date of birth: _____

   e. Current state of residence: _____

   f. Number of years in current state of residence: _____

2. Did the claimant serve in the military and/or armed forces?

   Yes ☐      No ☐

   If yes:

   a. Identify each branch the claimant served in, and the dates of service in each branch:

| Branch | Start Date | End Date |
|---|---|---|
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |

   b. Identify each of the claimant's duty stations between 2000 and present:

| Duty Station | Start Date | End Date |
|---|---|---|
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |

- 13 -

| Duty Station | Start Date | End Date |
|---|---|---|
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |

    c.    Identify each of the claimant's military occupational specialties between 2000 and present:

| Military Occupation Specialty | Start Date | End Date |
|---|---|---|
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |

| Military Occupation Specialty | Start Date | End Date |
|---|---|---|
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |
| | | ☐ Present |

3.   Is the claimant currently on active military duty?

        Yes ☐     No ☐

4.   Did the claimant use the Combat Arms Earplugs version 2 ("CAEv2") when he or she served in the military and/or armed forces?

        Yes ☐     No ☐

If yes,

    a.   State whether the claimant used CAEv2 in training, combat, or both:

        Training ☐   Combat ☐   Both ☐

b.     Identify the year(s), duty station(s), and military occupational specialties in which the claimant used the CAEv2 earplugs:

| Year(s) | Duty Station | Military Occupational Specialty |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

5.     Did the claimant use CAEv2 earplugs as a civilian any time?

Yes ☐        No ☐

6.     Identify the physical injuries claimant sustained as a result of using CAEv2 earplugs:

☐ Total Hearing Loss, Left Ear

☐ Total Hearing Loss, Right Ear

Percentage/grade of hearing loss, if known:

☐ Partial Hearing Loss, Left Ear

_____

☐ Partial Hearing Loss, Right Ear

Percentage/grade of hearing loss, if known:

☐ Tinnitus, Left Ear

_____

☐ Tinnitus, Right Ear

☐ Tinnitus - Extent Unknown

☐ Other—Specify: _____

- 16 -

7. Identify the approximate year on which the claimant first noticed:

   a. that the CAEv2 was not providing adequate protection from loud noises;

   b. the injury described in response to Question No. 6 above.

| Injury described in response to Question No. 6 | Approx. year first noticed injury |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

8. Has the hearing loss identified in response to Question No. 6 above been identified during an audiogram or other hearing test?

   If yes, what was the approximate date of the first audiograms or other hearing tests that identified the injuries described in response to Question No. 6 above?

| Injury identified | Approx. Date of the first hearing tests |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

- 17 -

9. Has the claimant received disability benefits as a result of hearing loss, tinnitus or other hearing injury?

Yes ☐      No ☐

If yes, identify the agency or entity that provided the claimant with disability benefits:

### Declaration

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that all the information provided in response to these Initial Census Questions is true and correct to the best of my knowledge, information and belief formed after a reasonable inquiry. I understand that I am under an obligation to supplement these responses.

Date: _____

Signature: _____

Name: _____

## EXHIBIT C

### Initial Census Document Requests

1. Form DD214 and the ORB, ERB and/or NORB relating to the claimant's service in the military.

2. DD2215 and DD2216s audiological exams relating to the claimant's service in the military.

3. Any audiograms or other hearing tests performed on claimant outside of the military.

4. Records relating to any disability benefits claimant applied for and/or received as a result of hearing loss, tinnitus or other hearing injury. Such records would include, where available:

   a. VBA Worksheet 1305 (Audio)

   b. VA Form 21-4138 – Statement in Support of Claim

   c. VA 21-8940 (Application for Increased Compensation Based on Unemployability)

   d. 21-4192 (Request for Employment Information in Connection with Claim for DB)

   e. VA Form 21-256 EZ – Application for disability benefits

   f. VA form 10-2364 and 10-2354a – VA audiological examinations (audiograms)

   g. Rating Decision

# Exhibit C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA

IN RE:                          .     Case No.  22-02890-JJG
                                .     (Jointly Administered)
AEARO TECHNOLOGIES LLC,  .
ET AL.,                          .     116 U.S.  Courthouse
                                .     46 E.  Ohio Street, Room 116
        Debtors.         .     Indianapolis, IN  46204
. . . . . . . . . . . .  .
AEARO TECHNOLOGIES LLC,  .
ET AL.,                          .
                                .
        Plaintiffs,      .
    V.                          .     Adversary No. 22-50059
                                .
THOSE PARTIES LISTED ON  .
APPENDIX A,                      .
                                .
        Defendants.      .
                                .     Wednesday, July 27, 2022
. . . . . . . . . . . .  .     9:30 a.m.

    TRANSCRIPT OF MISCELLANEOUS MOTIONS BY PLAINTIFFS/DEBTORS
         BEFORE THE HONORABLE JEFFREY J. GRAHAM
         UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:        Kirkland & Ellis LLP
                        BY:  CHAD HUSNICK, ESQ.
                             DAVID M. BERNICK, ESQ.
                             SPENCER WINTERS, ESQ.
                        300 North LaSalle Street
                        Chicago, IL  60654


Audio Operator:         Heather Heiser-Davis

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**

**(609) 586-2311    Fax No.  (609) 587-3599**

2

APPEARANCES CONTINUED:

```
For the Debtors:           Kirkland & Ellis LLP
                           BY:  EMILY GEIER, ESQ.
                           601 Lexington Avenue
                           New York, NY  10022

                           Kirkland & Ellis
                           BY:  JARED MAHER, ESQ.
                                MARK McKANE, ESQ.
                           555 California Street, 27th Floor
                           San Francisco, CA  94104

                           Kirkland & Ellis
                           BY:  DAVID HOROWITZ, ESQ.
                           333 South Flower Street, Suite 3700
                           Los Angeles, CA  90071

For Creditors:             Valenti Hanley & Robinson PLLC
                           BY:  MARK A. ROBINSON, ESQ.
                           One Riverfront Plaza
                           401 W. Main Street, Suite 1950
                           Louisville, KY  40202

For 3M Company:            Faegre Drinker Biddle & Reath LLP
                           BY:  JAY JAFFE, ESQ.
                           600 East 96th Street, Suite 600
                           Indianapolis, IN  46240

                           White & Case LLP
                           BY:  MATTHEW E. LINDER, ESQ.
                                MICHAEL ANDOLINA, ESQ.
                           111 S. Wacker Drive, Suite 5100
                           Chicago, IL  60606

For Aylstock, Witkin,      Klee, Tuchin, Bogdanoff & Stern, LLP
Kreis & Overholtz, PLLC:   BY:  SASHA M. GURVITZ, ESQ.
                           1801 Century Park East, 26th Floor
                           Los Angeles, CA  90067

For Seeger Weiss LLP:      Rubin & Levin, P.C.
                           BY:  DEBORAH CARUSO, ESQ.
                                MEREDITH R. THEISEN, ESQ.
                           135 N. Pennsylvania St., Suite 1400
                           Indianapolis, IN  46204
```

3

APPEARANCES CONTINUED:

For Seeger Weiss LLP:          Seeger Weiss LLP
                              BY:  CHRISTOPHER SEEGER, ESQ.
                                   DAVID BUCHANAN, ESQ.
                              55 Challenger Road
                              Ridgefield Park, NJ  07660

                              Otterbourg P.C.
                              BY:  MELANIE CYGANOWSKI, ESQ.
                                   ADAM SILVERSTEIN, ESQ.
                              230 Park Avenue
                              New York, NY  10169-0075

For the U.S. Trustee:         U.S. Department of Justice
                              BY:  HARRISON E. STRAUSS, ESQ.
                                   NANCY GARGULA, ESQ.
                                   RONALD J. MOORE, ESQ.
                                   DAMARIS ROISCH-SCHWARTZ, ESQ.
                                   LAURA A. DUVALL, ESQ.
                              46 E. Ohio St., Road 520
                              Indianapolis, IN  46204

For various claimants:        Jacobson Hile Kight
                              By:  ANDREW KIGHT, ESQ.
                              108 E. 9th Street
                              Indianapolis, IN 46202

                              Weitz & Luxenberg
                              By:  LISA BUSCH, ESQ.
                              700 Broadway
                              New York, NY 10003

For various Claimants:        BY:  MARK WENZEL, ESQ.

For Richard Valle:            Keller Postman
                              BY:  ASHLEY KELLER, ESQ.
                              150 N. Riverside Plaza
                              Chicago, IL  60606

Case: 23-01940d 023853-MOR-PWC2 Doc #: 1-4 Filed: 03/09/22 Page: 141 of 591 of
160

22

1 believe that number to be accurate.  That covers approximately

2 2059 pending cases where the Aearo debtors are defendants, are

3 named defendants in the litigation.  There are some additional

4 cases where the debtors have indirect indemnification

5 obligations of parties.

6          Importantly, the TRO that Your Honor is considering

7 today does not relate to the asbestos docket.  It's dealing

8 with the Combat Arms docket today.

9          Where are we?  We're trying to get a fair and

10 efficient resolution using the Chapter 11 tools.  We're trying

11 to address each of the issues that I pointed out as I moved

12 through the materials, the lack of vetting of the 230,000

13 claims that are actively on the docket, or that are sitting on

14 the docket, whether on the administrative docket or the active

15 docket, but they're on unvetted.  We would propose that a

16 Chapter 11 process will have verified disclosures established

17 through a well-known bar date process required under the

18 Bankruptcy Rules.  It will require plaintiffs and claimants to

19 verify the nature and extent of their injuries so that they can

20 be properly evaluated.

21          Through the MDL, we've been unable to resolve

22 anything more than a small fraction of the cases and it's all

23 been through a piecemeal process.  We would propose, Your

24 Honor, a consolidated resolution, one where we're dealing with

25 the plaintiffs *in toto*  instead of having one-off trials.

Case 23-12825-MBK Doc 673-1 Filed 08/09/22 Page 142 of 591

1    Your Honor, we want to ensure fair compensation to

2    all of the plaintiffs, as opposed to the inconsistent jury

3    awards that you saw a couple of slides ago.  It cannot be that

4    150 times greater jury verdict is appropriate.  We would

5    propose, ultimately as part of an estimation process, that the

6    estimation be based on scientifically calculated allocations

7    and determinations of liability.  Ultimately, this is a

8    settlement negotiation, Your Honor.  That's what we intend to

9    do is negotiate with the plaintiffs in an attempt to try and

10   get to settlement using the tools that the bankruptcy process

11   provides.

12   We believe that the Chapter 11 process will provide

13   finality.  Because it has to be negotiated through a global

14   settlement with at least 75 percent of the plaintiffs, at least

15   in the respirator stage, that will engender a great deal of

16   consensus and hopefully avoid what could be years or even a

17   decade or more of litigation.  And that's not to mention the

18   imposition on the federal district courts.  Judge Rogers, I

19   believe, noted that, as she starts to remand the over 230 cases

20   now that the Bellwethers are complete, that could result in an

21   imposition on the 94 federal districts to the tune of 2,500

22   cases per district, which we certainly believe needs to be

23   taken into account when we're addressing the public interest

24   component of the TRO standard.

25   Your Honor, the debtors have done their homework in

Case 3:19-md-02885-MCR-HTC Document 637-1 Filed 03/09/22 Page 143 of 591

1  terms of determining what we believe the estimated liability

2  is.  The preliminary analysis by Dr. Charles Mullin at Bates

3  White, who is an experienced estimator of claims in the

4  Chapter 11 cases, who has testified in many, many large cases,

5  including Takata, the Purdue bankruptcy case, W.R. Grace.

6        Your Honor, Mr. Mullin's preliminary analysis

7  assesses that the total value of claims involving functional

8  hearing loss in the Combat Arms MDL is less than $1 billion.

9  We will present that analysis and his final report at the

10  appropriate time to both the Court and, of course, to the

11  plaintiffs.

12        Your Honor, the last piece I want to summarize is the

13  funding agreement.  I will not spend much time here.  Suffice

14  to say, 3M is committed to funding the resolution of this case.

15  Their lawyers are here.  They will say the same thing.  In

16  support of that commitment, they funded up front $5 million of

17  upfront cash and agreed to fund $1.24 billion into a trust and

18  to fund the operations of the debtors through the Chapter 11

19  cases.  The debtors are cash users during these cases.

20        Critically, really critically, these funds are

21  uncapped.  It is not meant to serve as a cap but is simply what

22  the debtors are committed -- or what 3M is committing up front.

23  3M is committed to provide additional funding to the extent

24  necessary to bring resolution to the cases.  3M has also agreed

25  to provide shared services that have historically been provided

41

1  definition of irreparable harm, not only to the litigants but

2  to the courts.

3          This is a case -- I can't think of a case that's more

4  compelling in terms of the acceleration in the docket and then

5  the impact on following a rule-based process. I can't think of

6  a single precedent for it. And I think that the irreparable

7  harm is continuing. It may have been there before. But it's

8  certainly here now. It needs to stop now.

9          And just take a look at what's happened in the last

10  couple of days. We're facing show cause orders out of the MDL.

11  We're now facing the prospect the court wants to take a look at

12  whether the parties have conducted themselves appropriately in

13  the mediation. That's at least the essence of it.

14          And so now we're going to have the MDL during the

15  course of this case which is now pending, still activated to

16  look at us and take action with respect to us. In fact, I

17  think we should extend our request for a TRO to include the

18  individual attorneys because I think it's going to happen. I

19  think you're going to see orders from this Court that start to

20  go after the attorneys. And then, it's almost, you know, it's

21  remarkable.

22          So there's now a tag-along action, a tag-along

23  request that's been filed to the JPMDL asking for this case,

24  this entire case, to be transferred to the MDL. I mean, there

25  was consideration of doing that in the early '90s because there

Case 3:19-md-02885-MCR-HTC Document 3731 Filed 08/09/22 Page 145 of 160

1 was an MDL for all asbestos claims in federal court before a

2 Judge Weiner, in 1991. And he kind of looked at it, and well,

3 you know, maybe we should go ahead and do this. And they took

4 two years to kind of look at it and decide what to do, and they

5 said, we're not going to do this.

6          And we're not going to do it because the bankruptcy

7 case is not just a civil case in the MDL. There's a district

8 court there, right. That is a common feature. But the

9 underlying bankruptcy case and the underlying bankruptcy

10 jurisdiction is only one place and it's a place of the debtors

11 choosing within the rules of the Bankruptcy Code.

12          And so the idea that we're going to have an MDL judge

13 who is -- they're now asking that she -- well, let's just give

14 that whole case back to her and she'll figure out what to do

15 with it. I mean, that is the imminent harm and it's happening

16 every day. It's a distortion to the process. It was rejected

17 by the JPMDL, and they're doing it under far less compelling

18 circumstances. That was all of asbestos. My God, there were

19 cases all over the country.

20          We have one case before one MDL judge, and they're

21 saying, oh, let's tag-along the bankruptcy so that judge has it

22 too, when the heart of our problem comes out of her court. And

23 it's regardless of whether she did what right or she did wrong.

24 It's we're, you know, it's in the fact is indifferent to it.

25 The fact is we've got a docket that's broken and a case that's

43

broken and that invokes the, I think the obligation of the
bankruptcy courts to provide us the relief that we're seeking.

I hope that answers Your Honor's question.  I'm sorry
to go on for -- and it's also, I got a note, Judge Rodgers, the
MDL, is about to remand thousands of cases back to all the
other -- wherever it is that they came from.  So the out-of-
control docket now becomes an out-of- control remand docket.  I
mean, they're kind of saying, well, you know, we're kind of
seeing that it's like Mark Twain and, you know --

THE COURT:  But when you say "about to," it's not
now, correct?

MR. BERNICK:  Somebody else can talk about the
specific timing of that.  I believe that that is the --

THE COURT:  Let me ask this.  Is it within the next
14 days?

MR. BERNICK:  I don't know whether that's in the -- I
suspect not.  But maybe somebody else can answer.  I don't know
the answer to the question.  Somebody else I'm sure will be
able to answer.

What I can tell you right now, there are 343
depositions scheduled between now and September 15.  Sixty-two
of depositions next week.  Expert reports are due for 372
plaintiffs on August 15th.  That's a little bit past 14 days.
Six hundred and nineteen Daubert or summary judgment
oppositions are due on August 9th.  That is the intensity of

1 this litigation. And, again, so I mean, you know, I can say,

2 Your Honor, that, you know, when you talked about the balance

3 of harms associated with the next 14 days, all of the harms are

4 one way. Absolutely all of the harms are one way. That's why

5 we're here now. And that's why we're asking for a TRO.

6 And you could have, again -- well, I'm repeating

7 myself so I'll just proceed unless Your Honor has further --

8 THE COURT: No, go ahead.

9 MR. BERNICK: Okay. Thank you.

10 Let's go to Slide 14.

11 Courts have consistently recognized that the measures

12 are the essential first step is just to be a Chapter 11 case,

13 incontestable. A.H. Robins, I think was handled by Judge

14 Mehridge in the district court, a very esteemed mass tort

15 judge. I think he was on the JPMDL at the time. "It seems

16 incontestable that, if suits are permitted to continue

17 discovery allowed, any effort at reorganization of the debtor

18 will be frustrated, if not permanently thwarted."

19 I mean, this is why we're at the beginning, Slide 15.

20 And I'll move along here, Your Honor. I know that I've been

21 going for a while.

22 This is how the process works. I mean, the whole

23 idea is to centralize and consolidate. And once you have all

24 the claims in one place, and only then can you actually do an

25 estimation. You have the pool of claimants and you can go

102

1    THE COURT: He said he -- I didn't write it down,

2 but, yes. I have a feeling your opposition may know and can

3 fill you on that.

4    MR. BERNICK: Right. That's what I figured, but I

5 thought I would just ask. So, a few things and they're not

6 going to be unfortunately in particular order because there are

7 just so many things that were happening, but that's fine. So,

8 there are a lot of broad statements that have been made that,

9 you know, for example, juries aren't estimators.

10    THE COURT: I'm not --

11    MR. BERNICK: Yeah.

12    THE COURT: Okay.

13    MR. BERNICK: Okay.

14    THE COURT: For rebuttal, let's just focus on the one

15 thing I'm really worried about right now is the TRO.

16    MR. BERNICK: Okay.

17    THE COURT: That's what I'm really concerned about

18 because that's what's in front of me.

19    MR. BERNICK: Right. Well, that was the one thing I

20 did want to make sure is that we're also seeking relief under

21 the stays and the stays are now, whatever they are, they're

22 triggered by the filing of the bankruptcy.

23    THE COURT: Right, as to all the named debtors,

24 correct.

25    MR. BERNICK: Yeah. Well, but under 360(a)(1), it is

Case 23-12825-MBK Doc 373-14 Filed 03/09/22 Page 149 of 591 of 160

103

1  any claim that is made, in effect, against the non-debtor

2  parties.

3         THE COURT:  Right.

4         MR. BERNICK:  Yeah.  And this is not, as you know, an

5  unusual situation.  I mean, it's been said that this is without

6  precedent and it's a Texas Two Step.  It's not a Texas Two

7  Step.  And this exact configuration has been litigated again

8  and again and again.  And I don't want to belabor that with

9  Your Honor, but it's our view that those stays are in place and

10 they cover 3M for the reasons that we've stated.  And I don't

11 think that --

12        THE COURT:  But isn't that what your TRO is for?

13        MR. BERNICK:  No.  The TRO is not that.  The TRO is a

14 broader, is broader relief so that if, in fact, the stays are

15 in place as we believe they are for the reasons that we've

16 indicated, then the effectively the case, the entire litigation

17 is stayed against both the debtor and --

18        THE COURT:  Why do you need a TRO if you think you've

19 got a stay against everybody?

20        MR. BERNICK:  It is a belt and suspenders.  That's

21 what it is.  Again, that one of my charts was you need the TRO

22 as a predicate for using related to jurisdiction and a Section

23 105 injunction.

24        THE COURT:  You mean I have to find a TRO to do

25 something?

104

1          MR. BERNICK:  Yeah, you have to find a --

2          THE COURT:  Which would be to say under 105 I'm

3   extending the stay to 3M.

4          MR. BERNICK:  If the stays are not applicable.  If

5   the stay is applicable --

6          THE COURT:  Okay.

7          MR. BERNICK:  -- then this is a standard -- I'm

8   sorry, Your Honor, I don't mean to teach the Court.  I mean,

9   I'm just --

10          THE COURT:  Well, I guess you may teach me because I

11   disagree with you, but I don't know if you're going to have an

12   apt student here.  The stay doesn't automatically apply to

13   random people.

14          MR. BERNICK:  That's correct.

15          THE COURT:  Unless you're in a 13, you can get a

16   co-debtor stay, right?

17          MR. BERNICK:  Yeah, so that's correct.

18          THE COURT:  So, enlighten me as to why you think 3M's

19   already got a stay in its favor?

20          MR. BERNICK:  Because --

21          THE COURT:  We could have saved two hours.

22          MR. BERNICK:  Well, that's why we stood up and all

23   the slides said stay and.

24          THE COURT:  Well, yes, including the slide you said,

25   oh, by the way, this should say stay too.

Case 2:22-md-03040-MCR-HTC Document 10373-14 Filed 08/09/22 Page 151 of 591 of
160

1      MR. BERNICK:  Yes, right.  That was one of the

2 earlier slides.

3      THE COURT:  You're on an uphill battle here, so --

4      MR. BERNICK:  Sure.

5      THE COURT:  -- if you want to sum up.  I mean, you

6 can make that argument, but --

7      MR. BERNICK:  Well, the argument is pretty simple

8 because it's been adopted in, you know, many cases and --

9      THE COURT:  Well, again, everyone likes to tell me

10 all the -- I don't care about other cases specifically right

11 now.  I want to know this and how the law applies to other

12 things, but I know asbestos has all sorts of great things that

13 have happened to asbestos cases which was mainly your chart.

14 Asbestos is its own special breed that's been --

15      MR. BERNICK:  Right.

16      THE COURT:  -- largely adopted by Congress.

17      MR. BERNICK:  Right.

18      THE COURT:  It hasn't really expanded it pursuant to

19 these other things.  So, it seems to me that now you, maybe I'm

20 wrong, and obviously if you disagree with me you can appeal, if

21 it's interlocutory you maybe can, but that the stay already

22 applies.  But that seems a bold maneuver.  So, but go ahead.

23      MR. BERNICK:  Well, the precedence for that are,

24 again, in that little slide and I'm sorry it wasn't -- for

25 whatever reason I'm sorry it didn't get across.  That's my

Case 23-12990 Doc 855 Filed 08/09/22 Page 152 of 591

1  responsibility. But the stays are -- have been used and the

2  non-bankruptcy cases that we're talking about are <u>Dow Corning</u>,

3  that was breast implants.

4          THE COURT: Right.

5          MR. BERNICK: Okay.

6          THE COURT: But where there's -- where, essentially,

7  a judgment against a non-debtor is a judgment against the

8  debtor?

9          MR. BERNICK: That's correct.

10         THE COURT: Which is one of the showings I thought

11  you would have to make for the TRO. And to get a TRO at a

12  preliminary injunction to extend the stay, those are findings

13  --

14         MR. BERNICK: No, no, actually the TRO is different

15  because under related to jurisdiction it's any impact on the

16  Chapter 11 process.

17         THE COURT: All right.

18         MR. BERNICK: Okay. So -- but that's pretty

19  important for us. That's why it's related to. The stay is our

20  core. Related to jurisdiction really picks up a broader sweep

21  of penumbra around the core issues. So --

22         THE COURT: I don't think you want to use penumbra.

23         MR. BERNICK: Okay. That's true. I don't want to --

24         THE COURT: That hasn't really worked.

25         MR. BERNICK: Yeah, that's right.

Case 23-12990-MBK Doc 73-14 Filed 08/09/22 Page 153 of 591

1  resources of 3M, right.  And so the debtors' --

2          THE COURT:  Well, resources also include legal

3  resources.

4          MR. BERNICK:  Yes.  Well, I would think so.  I mean,

5  we, unfortunately or fortunately, lawyers are essential to the

6  Chapter 11 process.  And so that's why, you know, we're all

7  here and I'm just pointing it out to the Court with complete

8  respect.  Then you get to the question of the -- what's

9  happening in the MDL.  And, yes, I, you know, I have made very

10 strong arguments on behalf of my client about what's happening

11 in the MDL case.  And I think the documentation substantiates

12 what we're saying in this court and in our papers which say

13 exactly the same thing.

14          And what's happened over the last 48 hours actually

15 makes a very troubling and compelling case all by itself that

16 this case, that that case should be stayed insofar as both the

17 debtor and 3M are concerned because effectively what's

18 happening, and I think Your Honor can easily see this, is that

19 the same matters that Your Honor is focused on in connection

20 with our request for a TRO are now being focused on by the MDL

21 judge.  She's asking the same questions of us that are similar

22 questions to the ones that you're asking, there's show cause

23 orders to respond and to discuss these matters, matters before

24 Your Honor in a separate proceeding where our stay and our

25 requests are directed.

Case 3:19-md-02885-MCR-HTC Document 3714 Filed 03/09/22 Page 154 of 591 of
160

1      And I'm also informed that there are communications

2 now between where apparently Judge Rodgers is listening into

3 this and we're now, you know, getting messages about what it is

4 that she apparently has said that she might be prepared to do.

5 And they're not coming through any formal line of communication

6 and so I'm very concerned about that.  I think everybody should

7 be concerned about it.

8      So, and then you have the tag-along where counsel on

9 somebody's behalf is saying, well, this is really not

10 inconsistent with the stay.  Well, of course, it's inconsistent

11 with the stay.  It seeks to move this entire case to a

12 different court, back to the MDL court.  How can that not be

13 inconsistent with the stay?  We're now going to get the MDL

14 panel.

15      I mean, this case is going to set records for the

16 activity of -- activity by -- that's being asked of or

17 instigated by judges that are not involved in this case.  It

18 will set records.  The tag-along, well, it was tried for all of

19 asbestos.  That was completely different case and it wasn't

20 accepted.  Now all of a sudden it's being invoked here.  This

21 case is so special we're going to go back and go to the MDL

22 panel.  You get the MDL judge conducting hearings on what's

23 happening in this court.

24      I'm not aware of any situation where that's ever

25 taken place, in my experience, which is not inconsiderable.

Case 2:12-md-02855-MCE-HB-2 Document 1037-14 Filed 08/09/22 Page 155 of 591

1  And then you've got -- well, and so what is the control that

2  this Court needs to excerpt, it's control that needs to excerpt

3  now.  Now is precisely the moment of fragility.  And the harms

4  and benefits, it's the harms and benefits, the irreparable

5  damage to this proceeding, to the bankruptcy case.  And this

6  case is being harmed right now by the things that are taking

7  place before the MDL judge.

8         And, you know, I am a Chicago boy.  I still live in

9  Chicago, although I've moved around a lot.  And that's basic

10  common sense.  And it's the same basic common sense I feel

11  strongly about and if I'm going too hard, I apologize to Your

12  Honor, but the same basic common sense says this Court is being

13  invoked now for an unbelievably important process.

14         Your Honor should have freedom from having to worry

15  about what the judge in the MDL is doing and what is happening

16  in that case.  That should not be happening, period.  It should

17  not be taking place and yet it's taking place.  It's

18  extraordinary.  And, if nothing else, that's what the TRO is

19  for.

20         There are all these complaints about the TRO.  Well,

21  we didn't get the -- well, that's what happens in every TRO

22  situation.  Yes, it's short notice.  The trustee, I think,

23  requires 24 hours notice.  We gave 24 hours notice.  No, there

24  wasn't discovery.  Yes, they had to prepare it quickly.  We had

25  to prepare it quickly ourselves, much as they think otherwise

Case 2:22-cv-02885-MCS-AGR  Document 37-14  Filed 08/09/22  Page 156 of 591

1    **C E R T I F I C A T I O N**

2              We, KAREN WATSON, TAMMY DeRISI and KELLI R. PHILBURN,

3    court approved transcribers, certify that the foregoing is a

4    correct transcript from the official electronic sound recording

5    of the proceedings in the above-entitled matter, and to the

6    best of our ability.

7

8    /s/ Karen Watson

9    KAREN WATSON

10

11   /s/ Tammy DeRisi

12   TAMMY DeRISI

13

14   /s/ Kelli R. Philburn

15   KELLI R. PHILBURN

16   J&J COURT TRANSCRIBERS, INC.        DATE:  July 29, 2022

17

18

19

20

21

22

23

24

25

# Exhibit D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


IN RE: 3M COMBAT ARMS EARPLUG   )    Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,  )
                              )    Pensacola, Florida
                              )    April 13, 2021
                              )    8:05 a.m.
_____)


VOLUME XI
(Pages 1 to 336)


TRANSCRIPT OF ELEVENTH DAY OF JURY TRIAL
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE, and a jury


**A P P E A R A N C E S**


**FOR THE PLAINTIFFS:**    Aylstock, Witkin, Kreis & Overholtz, PLLC
                      By:  **BRYAN F. AYLSTOCK**
                          *baylstock@awkolaw.com*

                          **NEIL D. OVERHOLTZ**
                          *noverholtz@awkolaw.com*

                          **JENNIFER HOEKSTRA**
                          *jhoekstra@awkolaw.com*

                    17 E Main Street, Suite 200
                    Pensacola, Florida  32502

**APPEARANCES:** (Cont'd)

**FOR THE PLAINTIFFS:**    Laminack, Pirtle & Martines LLP
By: **THOMAS W. PIRTLE**
    *tomp@lmp-triallaw.com*
5020 Montrose Blvd, 9th Floor
Houston, Texas 77006

Pulaski Kherkher, PLLC
By: **KATHERINE CORNELL**
2925 Richmond Avenue, Suite 1725
Houston, Texas 77098

**FOR THE DEFENDANTS:**    Kirkland & Ellis, LLP
By: **ROBERT C. BROCK**
    *mike.brock@kirkland.com*
1301 Pennsylvania Avenue NW
Washington, D.C. 20004

Kirkland & Ellis, LLP
By: **NICHOLAS F. WASDIN**
    *nick.wasdin@kirkland.com*

**MARK J. NOMELLINI**
    *mnomellini@kirkland.com*
300 N Lasalle
Chicago, Illinois 60654

Dechert, LLP
By: **KIMBERLY BRANSCOME**
    *kimberly.branscome@dechert.com*
633 W 5th Street, Suite 4900
Los Angeles, California 90071

Moore, Hill & Westmoreland, PA
By: **CHARLES F. BEALL, JR.**
    *cbeall@mhw-law.com*
350 W Cedar Street, Suite 100
Pensacola, Florida 32502

Case 3:19-md-02885-MCR-HTC Document 3733-1 Filed 08/09/22 Page 160 of 160

09:14:08  1   audiologist is both conducting the exams and might a tech or

09:14:13  2   somebody checks a box as to what earplug was issued or used or

09:14:19  3   so forth?  Can you just describe for the jury what's going on

09:14:22  4   for that tech?

09:14:23  5   **A.**   Yeah.  So there are different circumstances that these

09:14:28  6   audiograms are developed in.  But oftentimes, these happen in

09:14:35  7   multi-man booths, so eight to ten person booths, with multiple

09:14:41  8   booths that subjects are -- servicemembers come in, get tested,

09:14:47  9   and it's a very quick process.  They have to process a lot of

09:14:52  10  people through a short amount of time, so the technicians take

09:14:55  11  the intake data, they enter it into the system, and they, you

09:14:59  12  know, move on to the next crowd.

09:15:00  13      Other times it's a little more relaxed, and so some of

09:15:04  14  these happen in a more formal setting with an audiologist and

09:15:08  15  they have a little bit more time.  But they still are, you

09:15:11  16  know, pressed for time, because they have to, you know, they

09:15:13  17  have to process the whole base in a certain amount of time to

09:15:17  18  stay on regulation.

09:15:17  19      So it's something that these technicians and the

09:15:23  20  audiologists are trying to do their best to capture all of the

09:15:26  21  data, but it doesn't allow for all of the information that we

09:15:31  22  would have liked to have seen.  And so that was my role in the

09:15:35  23  Hearing Center of Excellence, to try to change and facilitate,

09:15:39  24  make that a better system and to develop the processes to

09:15:41  25  capture the information that was needed.

Case 3:19-md-02885-MCR-HTC Document 3733-1 Filed 08/09/22 Page 161 of 160

09:15:44  1   **Q.**  So when soldiers are going through and getting their

09:15:46  2   testing, there are many soldiers in one booth being tested at

09:15:52  3   the same time; is that right?

09:15:53  4   **A.**  Yes, it is.  So, you know, basic trainees and deployment

09:15:57  5   lines, they will come in and they will test in these multi-man

09:16:00  6   booths, and so you have multiple audiometers focusing on

09:16:05  7   several people pushing buttons at the same time.

09:16:07  8   **Q.**  Sounds like a lot going on.

09:16:14  9        **MR. AYLSTOCK:**  Put back up S-Estes-0040, it's the

09:16:23  10  Reference Audiogram previously admitted, Your Honor.

09:16:23  11       **THE COURT:**  All right.

09:16:25  12       **MR. AYLSTOCK:**  And I want, Brian, to go down to the

09:16:28  13  personal hearing protection, Box 24A at the bottom.  Can you

09:16:32  14  blow that up?

09:16:32  15  **BY MR. AYLSTOCK:**

09:16:37  16  **Q.**  It says, "Personal hearing protection," and then it says,

09:16:40  17  "Type issued," and then there's some different options.  Do you

09:16:45  18  see that?

09:16:46  19  **A.**  Yes, I do.

09:16:47  20  **Q.**  And one of the options is -- well, for here it looks like

09:16:50  21  what was put in there is hand-formed earplugs.  Are those

09:16:55  22  foamies?

09:16:56  23  **A.**  That's the foamies.

09:16:57  24  **Q.**  And would that -- we just looked at the instruction, but

09:17:00  25  would that be the only -- is this box meant to tell anybody,

Case 3:19-md-02885-MCR-HTC Document 3731-1 Filed 08/09/22 Page 162 of 160

09:17:05    1    including this jury, the only protection that was worn by Mr.

09:17:10    2    Estes or any soldier, for that matter, when it comes to hearing

09:17:15    3    protection?

09:17:15    4           **MS. BRANSCOME:**  Objection.  Argumentative, including

09:17:18    5    what it communicates to the jury.

09:17:20    6           **THE COURT:**  Overruled.

09:17:22    7           **THE WITNESS:**  Not necessarily.  This form can be

09:17:24    8    filled out in a number of different ways.  And so right here it

09:17:28    9    says type issued, and he was a cadet at West Point I believe

09:17:31    10   for this audiogram, and so it talked about what they were

09:17:34    11   issuing at that time.  But somebody who has been in the service

09:17:38    12   for a long time, the technician may look at what is in his

09:17:45    13   hearing protection case, they may take -- they may ask about

09:17:49    14   what he's using, or they may just mark what is available at the

09:17:53    15   base.  So there are multiple methods to fill out this form.

09:18:00    16   BY MR. AYLSTOCK:

09:18:00    17   **Q.**   And is there a -- well, let me ask you this:

09:18:05    18        There is a thing for triple-flange.  Is in fact the Combat

09:18:10    19   Arms 2, is that considered a triple-flange plug?

09:18:14    20   **A.**   It is described as a triple-flange plug.  So, in the Army

09:18:18    21   training guide, it has a description of the Combat Arms and

09:18:23    22   talks about it as a triple-flange plug.  The two tips of the

09:18:29    23   Combat Arms are triple-flanges welded together with that stem,

09:18:34    24   and so it's a bit confusing.  It was the first type of a

09:18:38    25   double-ended protection.  This was something that hadn't been

Case 3:19-md-02885-MCR-HTC Document 3733-1 Filed 03/09/22 Page 163 of 160

09:18:42  1    seen before and hasn't been seen since.  And so I think that

09:18:45  2    the dissemination of information about this was not widespread.

09:18:50  3    It kind of trickled out through the military.

09:18:54  4        So audiologists and technicians may have never seen this

09:18:58  5    before and struggled with the thought of how to classify it on

09:19:01  6    the type issued or the type worn.  And so, under the

09:19:05  7    triple-flange, it has -- you know, it's classified as

09:19:10  8    triple-flange, and so marking it as triple-flange is one way.

09:19:14  9    Q.  I think we saw in the flange report or the very first --

09:19:19  10   one of the very first documents the jury saw, they described

09:19:21  11   the UltraFit end of the Combat Arms.

09:19:24  12       Is UltraFit a 3M product that is a triple-flange product?

09:19:29  13            **MS. BRANSCOME:**  Objection to the attorney commentary.

09:19:31  14            **THE COURT:**  Overruled.

09:19:34  15            **THE WITNESS:**  It is, and the UltraFit tip is the tip

09:19:37  16   that was used for the Combat Arms.

09:19:40  17   **BY MR. AYLSTOCK:**

09:19:41  18   Q.  So if for example a triple-flange were checked on this box

09:19:44  19   and a suggestion were made that that means that a soldier did

09:19:50  20   not use this plug, would that be in any way accurate?

09:19:55  21   A.  No, it would not.  I would like to comment, that all of

09:19:58  22   these are categories of plugs.  These are not brand names of

09:20:01  23   plugs.  And so you don't see BattlePlugs on there, you don't

09:20:05  24   see SureFire on there, you don't see any branded categories on

09:20:10  25   here.  These are all categories of types of plugs.

Case 3:19-md-02885-MCR-HTC Document 3311-1 Filed 08/07/22 Page 164 of 160

| | | |
|---|---|---|
| 09:20:17 | 1 | **Q.** You don't see Combat Arms Version 2 on here, either, do |
| 09:20:21 | 2 | you? |
| 09:20:21 | 3 | **A.** I don't see it. |
| 09:20:22 | 4 | **Q.** And you even don't see a CVC helmet on here, even though |
| 09:20:25 | 5 | that's certainly a hearing protection device; is that right? |
| 09:20:27 | 6 | **A.** That's true. |
| 09:20:28 | 7 | **MS. BRANSCOME:** Objection. Leading. |
| 09:20:29 | 8 | **THE COURT:** Sustained. It is leading. |
| 09:20:31 | 9 | **MR. AYLSTOCK:** I'm sorry. I'm just trying to move on. |
| 09:20:31 | 10 | **BY MR. AYLSTOCK:** |
| 09:20:32 | 11 | **Q.** Do you see the CVC helmet on this form, Dr. Packer? |
| 09:20:34 | 12 | **A.** I do not. And I don't see tactical communication or other |
| 09:20:38 | 13 | electronic types of hearing protection on there either. |
| 09:20:40 | 14 | **Q.** Now, the jury has also heard a little bit about quad-flange |
| 09:20:45 | 15 | plugs. Did you read Christina Lee's deposition in Mr. Estes's |
| 09:20:49 | 16 | case? |
| 09:20:50 | 17 | **A.** Yes, I did. |
| 09:20:50 | 18 | **Q.** And you know Mr. Estes wore quad-flange as well; is that |
| 09:20:55 | 19 | right? |
| 09:20:55 | 20 | **A.** That's correct. |
| 09:20:56 | 21 | **Q.** And do you recall what she said as far as her understanding |
| 09:20:59 | 22 | of this particular plug as it relates to the audiogram, that |
| 09:21:05 | 23 | box on the audiogram? |
| 09:21:08 | 24 | **A.** Yes. I believe that she indicated that what she had been |
| 09:21:13 | 25 | calling quad-flange was identified as the Combat Arms visually, |

Case 3:19-md-02885-MCR-HTC Document 3731-1 Filed 08/09/22 Page 165 of 160

| | |
|---|---|
| 09:21:18 | 1 |
| 09:21:21 | 2 |
| 09:21:22 | 3 |
| 09:21:25 | 4 |
| 09:21:30 | 5 |
| 09:21:30 | 6 |
| 09:21:30 | 7 |
| 09:21:33 | 8 |
| 09:21:37 | 9 |
| 09:21:42 | 10 |
| 09:21:46 | 11 |
| 09:21:49 | 12 |
| 09:21:57 | 13 |
| 09:22:02 | 14 |
| 09:22:10 | 15 |
| 09:22:11 | 16 |
| 09:22:16 | 17 |
| 09:22:22 | 18 |
| 09:22:24 | 19 |
| 09:22:30 | 20 |
| 09:22:35 | 21 |
| 09:22:43 | 22 |
| 09:22:52 | 23 |
| 09:22:53 | 24 |
| 09:22:56 | 25 |

because she didn't know what else to call it.  It had more than three flanges.

Q.   It's actually got -- it depends on how you look at it, it could have six, and there wasn't a box to check six flange, was there?

A.   That's correct.

Q.   And do you have an understanding as to whether Mr. Estes even wore the quad-flange even though the forms say quad-flange by Christina -- Ms. Lee?

A.   Yeah.  I think that per her testimony, she was indicating what she thought to be the Combat Arms Version 2.

Q.   Now let me ask you this, just to put it succinctly:

     Can that form and that box on that form be reliably used or relied upon in determining whether or not any soldier used the Combat Arms Version 2?

A.   I think that there would be probably rare occurrences where somebody might have actually placed Combat Arms in the comment box on that box.

     MR. AYLSTOCK:   Can we pull up PD-0003?  It's been previously marked as a demonstrative, but it's a photograph of, the testimony is, Mr. Estes actually took of folks while he was at Fort Benning.

BY MR. AYLSTOCK:

Q.   Are those soldiers wearing the Combat Arms Version 2?

A.   Yes, they are.

Case 3:19-md-02885-MCR-HTC Document 3735-15 Filed 03/09/22 Page 166 of 591 of
160

09:22:58  1      MR. AYLSTOCK:  We would request that this be moved

09:23:01  2  into evidence, Your Honor.

09:23:01  3      THE COURT:  It's 11084?

09:23:06  4      MR. AYLSTOCK:  Yes, Your Honor.

09:23:07  5      THE COURT:  All right.

09:23:07  6      (PLAINTIFFS' EXHIBIT P-ESTES-11084:  Received in

09:23:08  7  evidence.)

09:23:08  8  BY MR. AYLSTOCK:

09:23:09  9  Q.  Now, the audio techs that are doing multiple soldiers in

09:23:13  10  these multiple booths, you mentioned distribution channels.

09:23:16  11  Was that one of the main distribution channels for the Combat

09:23:20  12  Arms Earplugs?  Did they have them being issued there regularly

09:23:23  13  to your knowledge, or were they regularly giving out foamies or

09:23:26  14  other earplugs?

09:23:27  15  A.  Yeah, they would be giving out a cheaper version.  So, no,

09:23:32  16  they would not be giving out the Combat Arms necessarily.  The

09:23:35  17  Combat Arms would come in through the unit or for specific

09:23:39  18  types of mission-trained personnel or based on the hearing

09:23:47  19  profile or status of the soldier or used for deployment.  So

09:23:56  20  commonly these were passed out for deployment.

09:24:01  21  Q.  Let me show you P-GEN-2602.

09:24:09  22      MR. AYLSTOCK:  It's been ruled upon, Your Honor, and

09:24:13  23  we would ask that it be published to the jury.

09:24:16  24      THE COURT:  All right.  P-GEN-2602 may be published.

09:24:21  25  BY MR. AYLSTOCK:

# Exhibit E

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS EARPLUG      )   Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,     )
                                   )   Pensacola, Florida
                                   )   September 23, 2021
Re:  *Brandon Adkins*              )   8:02 a.m.
     *7:20cv00012*                 )
                                   )
_____    )


VOLUME IV
(Pages 1 to 326)


TRANSCRIPT OF FOURTH DAY OF JURY TRIAL
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE, and a jury.


**A P P E A R A N C E S**


FOR THE PLAINTIFFS:      Quinn Emanuel Urquhart
                         By: **ADAM B. WOLFSON**
                             *adamwolfson@quinnemanuel.com*
                         865 South Figuero St., 10th Floor
                         Los Angeles, California  90017

                         By: **MATTHEW S. HOSEN**
                             *matthosen@quinnemanuel.com*
                         1109 1st Avenue
                         Seattle, Washington  98101

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*1 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

Appearances (cont'd):

FOR PLAINTIFFS: Aylstock, Witkin, Kreis & Overholtz
                         By:  **BRYAN F. AYLSTOCK**
                              *baylstock@awkolaw.com*

                              **NEIL D. OVERHOLTZ**
                              *noverholtz@awkolaw.com*

                              **JENNIFER HOEKSTRA**
                              *jhoekstra@awkolaw.com*
                         17 E Main Street, Suite 200
                         Pensacola, Florida  32502

                         Ciresi Conlin LLP
                         By:  **MICHAEL A. SACCHET**
                              *mas@ciresiconlin.com*

                              **MEGAN L. ODOM**
                              *mlo@ciresiconlin.com*
                         225 South 6th Street, Suite 4600
                         Minneapolis, Minnesota  55402

                         Bailey Cowan Heckaman, PLLC
                         By: **ROBERT W. COWAN**
                              *rcowan@bchlaw.com*
                         1360 Post Oak Boulevard, Suite 2300
                         Houston, Texas  77056

FOR THE DEFENDANTS:   Kirkland & Ellis, LLP
                         By:  **HARIKLIA KARIS**
                              *hkaris@kirkland.com*

                              **MARK J. NOMELLINI**
                              *mnomellini@kirkland.com*

                              **NICHOLAS F. WASDIN**
                              *nick.wasdin@kirkland.com*
                         300 N Lasalle
                         Chicago, Illinois  60654

Appearances (cont'd):

FOR THE DEFENDANTS:    Kirkland & Ellis, LLP
By:  **ASHLEY E. NEGLIA**
     *ashley.neglia@kirkland.com*

     **SAGHAR ESFANDIARIFARD**
     *saghar.esfandiarifard@kirkland.com*
555 S Flower St., Ste 3700
Los Angeles, California  90071

Moore, Hill & Westmoreland, PA
By:  **CHARLES F. BEALL, JR.**
     *cbeall@mhw-law.com*
350 W Cedar Street, Suite 100
Pensacola, Florida  32502

| | | |
|---|---|---|
| 04:23:30 | 1 | of personal hearing protection, Numbers 1 through 7. |
| 04:23:37 | 2 | Do you see that? |
| 04:23:39 | 3 | **A.** Yes. |
| 04:23:39 | 4 | **Q.** And in this box, the servicemember has the opportunity to |
| 04:23:46 | 5 | check or put in there only one of those options; is that right? |
| 04:23:55 | 6 | **A.** Yes. |
| 04:23:55 | 7 | **Q.** And in this box, No. 6, which is "Other," was checked; is |
| 04:24:03 | 8 | that right? |
| 04:24:03 | 9 | **A.** Yes. |
| 04:24:03 | 10 | **Q.** And then when you move over to Section F, it says:  "Other |
| 04:24:12 | 11 | HPD quad-flange." |
| 04:24:21 | 12 | Do you see that? |
| 04:24:21 | 13 | **A.** Yes. |
| 04:24:21 | 14 | **Q.** And so if a servicemember had multiple types of earplugs, |
| 04:24:26 | 15 | there wouldn't be room to put that.  Is that also fair? |
| 04:24:30 | 16 | **A.** Yes. |
| 04:24:30 | 17 | **Q.** Are you familiar with John Merkley? |
| 04:24:32 | 18 | **A.** Yes. |
| 04:24:32 | 19 | **Q.** He's testified in this case and he testified that this |
| 04:24:38 | 20 | Sections F and G represent the hearing protection that a |
| 04:24:44 | 21 | servicemember was issued the day of their audiogram. |
| 04:24:48 | 22 | Do you agree with that? |
| 04:24:51 | 23 | **A.** If they were issued -- otherwise, if they had the earplugs |
| 04:24:57 | 24 | on them and it was -- and soldiers -- soldiers were instructed |
| 04:25:01 | 25 | to put them on to check the proper fit and condition of the |

Case 3:19-md-02885-MCR-HTC Document 68735-1 Filed 08/09/22 Page 172 of 591
160
Dan Ohama - by videotaped deposition                                    278

04:25:05   1    earplug, yes.

04:25:09   2    **Q.**   So suffice it to say, we can't look at this form and know

04:25:12   3    that it adequately captures all earplugs that that

04:25:15   4    servicemember used; is that fair?

04:25:17   5    **A.**   I would say accuracy could be questioned, yes.

04:25:21   6    **Q.**   Okay.  And shortly after 2004, was the Combat Arms

04:25:38   7    dual-ended issued with the wallet card that we reviewed

04:25:41   8    earlier?

04:25:41   9    **A.**   Was it issued with the wallet card?

04:25:44   10   **Q.**   Yes.

04:25:45   11   **A.**   Initially, I don't think so.  That's why I had emailed I

04:25:49   12   guess somebody at Peltor to say was there a way to provide

04:25:53   13   additional instructions that we could either put into the

04:25:56   14   earplug case --

04:25:57   15   **Q.**   And do you know when those wallet cards began being issued?

04:26:02   16   **A.**   I think it -- we received the first batch from CHPPM

04:26:08   17   around -- before I deployed, so two thousand and maybe six time

04:26:14   18   frame, around there.

04:26:15   19   **Q.**   Let's turn now to Exhibit No. 4 of the wallet card that you

04:26:20   20   were just asked about by 3M's counsel.

04:26:26   21        Let me ask you, generally speaking, Dr. Ohama, in terms of

04:26:31   22   the folding back flanges, is this the only document you've ever

04:26:37   23   seen in your entire military history that talks about the

04:26:41   24   Combat Arms Earplug and mentions folding opposing plug back?

04:26:48   25   **A.**   I believe so, yes.

**Q.** And what I want to talk about now is, on that second bullet point that talks about fold opposing plug back, it specifically states: "For very large ear canals, fold opposing plug back."

Do you see that?

**A.** Yes.

**Q.** We talked earlier about the vast majority of servicemembers having what size ear canals?

**A.** What I would consider to be a medium size.

**Q.** So this one-time statement by 3M during your medical career only applies to a small minority of servicemembers; would that be fair?

**A.** I believe so.

**Q.** Let's talk about that form audiogram that we went through earlier that says quad-flange. If a form like that has one specific earplug mentioned, that doesn't mean, does it, that they didn't get other earplugs also issued to them?

**A.** Yes, it -- I wouldn't say that would have been -- always been accurately indicated -- indicating which earplugs they were using. It just would have depended on who the technician was and what they put on there sometimes.

**Q.** Have you seen that before, Dr. Ohama, where there's inaccurate information on these forms with respect to the types of earplugs that were issued?

**A.** I would say there are times I've seen inaccurate information.

# Exhibit

Case 3:19-md-02885-MCR-HTC Document 6873-1 Filed 08/09/22 Page 175 of 591
Case 7:20-cv-00098-MCR-HTC Document 007251 Filed 08/09/22 Page 175 of 591
160

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

```
GUILLERMO CAMARILLORAZO,        )
                                )
                Plaintiff,      ) Case No: 7:20cv98
                                )
        v.                      ) Tallahassee, Florida
                                ) November 3, 2021
3M COMPANY, 3M OCCUPATIONAL     )
SAFETY LLC, AEARO HOLDING LLC,  )
AEARO INTERMEDIATE LLC,         )
AEARO LLC, and                  )
AEARO TECHNOLOGIES LLC,         )
                                ) 7:50 AM
                Defendants.     ) VOLUME III
_____ )
```

**DAILY TRANSCRIPT OF JURY TRIAL PROCEEDINGS – DAY 3**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 475 through 779)**

Court Reporter:          MEGAN A. HAGUE, RPR, FCRR, CSR
                         111 North Adams Street
                         Tallahassee, Florida 32301
                         850.422.0011 megan.a.hague@gmail.com

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

<u>APPEARANCES</u>:

For the Plaintiff:          Laminack, Pirtle & Martines
                            By:  THOMAS W. PIRTLE
                                 BUFFY K. MARTINES
                                 Attorneys at Law
                                 tomp@lpm-triallaw.com
                                 buffym@lpm-triallaw.com
                            5020 Montrose Boulevard
                            Ninth Floor
                            Houston, Texas 77006


                            Morgan & Morgan PA
                            By:  PAUL J PENNOCK
                                 Attorney at Law
                                 ppennock@forthepeople.com
                            850 Third Avenue
                            Suite 402
                            Brooklyn, New York 11232


                            Aylstock, Witkin, Kreis & Overholtz
                            By:  BRYAN F. ALYSTOCK
                                 JENNIFER M. HOEKSTRA
                                 Attorneys at Law
                                 baylstock@awkolaw.com
                                 jhoekstra@awkolaw.com
                            17 East Main Street
                            Suite 200
                            Pensacola, Florida 32502

APPEARANCES (continued)

For the Defendant:            Kirkland & Ellis LLP
                              By: BARRY E. FIELDS
                                  HARIKLIA "CARRIE" KARIS
                                  Attorneys at Law
                                  barry.fields@kirkland.com
                                  hariklia.karis@kirland.com
                              300 North Lasalle
                              Chicago, Illinois 60654


                              Kirkland & Ellis LLP
                              By: AUSTIN KLAR
                                  Attorney at Law
                                  austin.klar@kirkland.com
                              555 California Street
                              San Francisco, California 94104


                              Kirkland & Ellis LLP
                              By: JUDSON D. BROWN
                                  Attorney at Law
                                  judson.brown@kirkland.com
                              1301 Pennsylvania Avenue N.W.
                              Washington, D.C. 20004


                              Kirkland & Ellis LLP
                              By: DAVID I. HOROWITZ
                                  Attorney at Law
                                  david.horowitz@kirkland.com
                              555 South Flower Street
                              Los Angeles, California 90071


                              Moore Hill & Westmoreland PA
                              By: THOMAS L. HILL
                                  Attorney at Law
                                  lhill@mhw-law.com
                              Maritime Place
                              350 West Cedar Street, Suite 100
                              Pensacola, Florida 32502

1    BY MR. HOROWITZ:

2    Q.   Dr. Spankovich, you defined 15 decibels as the cutoff for

3    normal hearing; right?

4    A.   That is correct.

5    Q.   All right.  So anything over 15 decibels is indicative of

6    hearing loss; right?

7    A.   It's indicative of an elevated threshold.  It doesn't

8    necessarily mean hearing loss.  You want to see a sustained

9    deficit upon further testing to really determine that this is

10   hearing loss.

11        Again, this is not a diagnostic test.  This is a screening.

12   Q.   An audiogram showing a notched pattern with poorer

13   thresholds at 4000 to 6000 hertz is most often suggestive of a

14   noise-induced hearing loss; right?

15   A.   Correct.  And he does not have a notched pattern here.

16   Q.   Okay.  But we typically see noise-induced hearing loss at

17   the 4000 to 6000 thresholds; right?

18   A.   You can see hearing loss related to noise exposure,

19   obviously, at 3000, 2000, 4000, and 6000 and higher frequencies.

20   But, again, the column we observed initially with noise exposure

21   can be a notching configuration, and we are not seeing it.

22   Q.   We do have a 20-decibel reading at 4000; right?

23   A.   Yes.  That is a slightly elevated threshold at 4000 and

24   6000 hertz.

25   Q.   It's above the threshold that you define as normal hearing;

Case 3:19-md-02885-MCR-HTC Document 3731-1 Filed 08/09/22 Page 179 of 591
160
710

Cross-Examination - Dr. Spankovich

1  right?

2  A.   Yes, that is correct.

3  Q.   And at the 6000-hertz section, we have a 25-decibel

4  reading; right?

5  A.   Correct.  So what we are see here is a slight little --

6  Q.   Right.

7  A.   -- slope.

8  Q.   Dr. Spankovich --

9  A.   What it can be related to, potentially, is --

10  Q.   Dr. Spankovich --

11  A.   Yes.

12  Q.   -- please focus on and answer my question.

13  A.   Okay.

14  Q.   At the 6000 hertz-hertz entry, we have a 25-decibel

15  reading; right?

16  A.   That's correct.

17  Q.   And that is 10 decibels above the threshold that you define

18  as normal hearing; right?

19  A.   That is, again, consistent with a slightly elevated

20  threshold.

21  Q.   Now, it's consistent with what you define as mild hearing

22  loss; correct?

23  A.   No, I didn't say mild.

24  Q.   How would you -- it's what you --

25  A.   Slight hearing loss if sustained is between 15 and 25.

Cross-Examination – Dr. Spankovich

1   Mild hearing loss is greater than 25.

2   Q.   You define it as --

3   A.   I don't define it.  It's defined by the American

4   Speech-Language-Hearing Association.

5   Q.   Well, that's what you rely on; right?

6   A.   15 to 25 is slight hearing loss.  The American Academy of

7   Otolaryngology-Head and Neck Surgery defines 15 dB to 25 dB as a

8   nonmaterial hearing impairment.

9   Q.   Okay.  It's --

10  A.   Again, this is where we can see slightly elevated

11  thresholds that could be consistent with a slight hearing loss,

12  but again, it comes down to if this is a sustained shift, we can

13  have some variance in this measure that is (indiscernible) --

14       (Reporter requests clarification.)

15          THE COURT:  Hold on a second.  Let's slow down and

16  let's -- and you've responded.  Counsel will ask you another

17  question.

18  BY MR. HOROWITZ:

19  Q.   He had slight hearing loss at 4000 hertz and 6000 hertz;

20  correct?

21  A.   He has elevated thresholds at those frequencies.  In

22  subsequent testing, his hearing improves at 6000 hertz back to

23  the normal hearing range.

24  Q.   He had slight hearing loss at 4000 hertz and 6000 hertz;

25  correct?

Cross-Examination – Dr. Spankovich

```
 1    A.   Again, his elevators are consistent with what could be a
 2    slight hearing loss, but then you do subsequent testing.  The
 3    6000 hertz again goes back up to 10 dB, within the normal range.
 4    Q.   Do you have your expert report in front of you?
 5    A.   I do not.
 6    Q.   I'm going to pull it up for you.
 7         MR. HOROWITZ:  Can we pull up D-CAMARILLO- -- just for
 8    the witness.
 9         THE COURT:  Just for the witness.
10         MR. HOROWITZ:  D-CAMARILLO-0947.12.
11    BY MR. HOROWITZ:
12    Q.   You issued an expert report in this case; right?
13    A.   Yes.
14    Q.   And it's supposed to set out what your opinions actually
15    are; right?
16    A.   Yes.
17    Q.   All right.
18         MR. HOROWITZ:  Can you turn to page 6 of the report,
19    please?
20         (Discussion was held.)
21         MR. HOROWITZ:  Yeah, the exhibit number is
22    D-CAMARILLO-0947.
23    BY MR. HOROWITZ:
24    Q.   Do you have it in front of you?
25    A.   I have page 1.
```

**Exhibit C**

**Transfer Request 1**

# BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| **IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION** | |
| | **MDL DOCKET NO. 2885** |

## NOTICE OF POTENTIAL TAG-ALONG ACTION

In accordance with Rule 7.1(a) of the Rules of Procedure for the United States Judicial Panel on Multidistrict Litigation, undersigned counsel writes to notify you of the potential tag along action listed on the attached Schedule of Action. Undersigned counsel's firm, Keller Postman LLC, has been identified as a creditor in the tag-along action and is thus a party in the action. In addition, undersigned counsel has enrolled as counsel in the tag-along action.

A docket sheet and the voluntary bankruptcy petition are attached.

*/s/ Ashley C. Keller*
Ashley C. Keller
ack@kellerpostman.com
**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois  60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

Party in Tag-Along Action

1

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

IN RE: 3M COMBAT ARMS EARPLUG
PRODUCTS LIABILITY LITIGATION

**MDL DOCKET NO. 2885**

**SCHEDULE OF ACTIONS**

|  | **Debtors** | **Creditors** | **District** | **Civil Action No.** | **Judge** |
|---|---|---|---|---|---|
| **1.** | Aearo Technologies LLC, et al. | Keller Postman LLC, et al. | Southern District of Indiana Bankruptcy Court | 22-02890-JJG-11 | Jeffrey J. Graham |

*/s/ Ashley C. Keller*
Ashley C. Keller
ack@kellerpostman.com
**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

Party in Tag-Along Action

1

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

IN RE: 3M COMBAT ARMS EARPLUG
PRODUCTS LIABILITY LITIGATION

**MDL DOCKET NO. 2885**

## PROOF OF SERVICE

In compliance with Rule 4.1(a) of the Rules of Procedure for the United States Judicial

Panel on Multidistrict Litigation, I hereby certify that a true and correct copy of the foregoing

Notice of Tag-Along Actions and Schedule of Actions has been electronically filed with the

Judicial Panel on Multidistrict Litigation on July 26, 2022 by using the CM/ECF system, which

will send notice of electronic filing to all parties of record.

**Clerks of the Courts**
*Via First Class Mail*

United States Bankruptcy Court
Southern District of Indiana
116 U.S. Courthouse
46 E. Ohio St. Rm 116
Indianapolis, IN 46204

**Attorney for Debtor**
*Via CM/ECF*

Jeffrey A. Hokanson
Jeff.Hokanson@icemiller.com
Ice Miller LLP
One American Square, Suite 2900
Indianapolis, IN 46282-0200
(317) 236-2100

Dated:  July 26, 2022                */s/ Ashley C. Keller*

Ashley C. Keller
ack@kellerpostman.com
**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois  60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

*Party in Tag-Along Action*

# U.S. Bankruptcy Court
## Southern District of Indiana (Indianapolis)
### Bankruptcy Petition #: 22-02890-JJG-11

*Date filed:* 07/26/2022
*Deadline for filing claims (govt.):* 01/23/2023

*Assigned to:* Jeffrey J. Graham
Chapter 11
Voluntary
Asset
*Creditors:* 0

*Debtor*
**Aearo Technologies LLC**
7911 Zionsville Road
Indianapolis, IN 46268
MARION-IN
Tax ID / EIN: 13-3840356
*fka* **E-A-R Specialty Composites**
*fka* **Aearo Company**
*fka* **Aearo Technologies**

represented by **Jeffrey A Hokanson**
Ice Miller LLP
One American Square
Suite 2900
Indianapolis, IN 46282-0200
317-236-2236
Fax : 317-592-4809
Email: jeff.hokanson@icemiller.com

*U.S. Trustee*
**U.S. Trustee**
Office of U.S. Trustee
46 E Ohio Street, Room 520
Indianapolis, IN 46204
317-226-6101
Email: ustpregion10.in.ecf@usdoj.gov

represented by **Laura A DuVall**
DOJ-Ust
Office of The United States Trustee
Birch Bayh Federal Building and U.S.
Courthouse
46 E. Ohio Street, Ste 520
Indianapolis, IN 46204
317-226-6101
Fax : 317-226-6356
Email: Laura.Duvall@usdoj.gov

**Ronald J. Moore**
DOJ-Ust
Birch Bayh Federal Building and

| Filing Date | # | Docket Text |
|---|---|---|
| | <u>1</u><br>(30 pgs; 3 docs) | Chapter 11 Voluntary Petition (Non-Individual) with Corporate Ownership Statement, List of 20 Largest Unsecured Creditors and List of Equity Security Holders filed by Jeffrey A Hokanson on behalf of Aearo Technologies LLC. List of Secured Creditors due by 08/02/2022. Income & Expense Schedule due by 08/09/2022. Statement of Current Monthly Income (Form 122B) due by 08/09/2022. Debtor's Pay Advices or Statement in Lieu due by 08/09/2022. Joint Debtor's Pay Advices or Statement in Lieu due by 08/09/2022. Attorney Disclosure of Compensation due by 08/09/2022. Statement of Financial Affairs with Declaration due by 08/09/2022. Summary of Assets and Liabilities with Declaration due by 08/09/2022. Schedules A/B through J with Declaration due by 08/09/2022. Schedule A/B with Declaration due by 08/09/2022. Schedule C with Declaration due by 08/09/2022. Schedule D with Declaration due by 08/09/2022. Schedule E/F with Declaration due by 08/09/2022. Schedule G with Declaration due by 08/09/2022. Schedule H with Declaration due by 08/09/2022. Schedule I with Declaration due by 08/09/2022. Schedule J with Declaration due by 08/09/2022. Verification of Creditor List due by 08/09/2022. (Hokanson, Jeffrey) (Entered: 07/26/2022) [Deficient; see # 15] 🛈 |
| 07/26/2022 | <u>2</u><br>(3 pgs) | Appearance filed by Jay Jaffe on behalf of Creditor 3M Company. (Jaffe, Jay) (Entered: 07/26/2022) 🛈 |
| 07/26/2022 | <u>3</u><br>(3 pgs) | Appearance filed by Kayla D. Britton on behalf of Creditor 3M Company. (Britton, Kayla) (Entered: 07/26/2022) 🛈 |

U.S. Courthouse
46 E. Ohio St., Ste 520
Indianapolis, IN 46204
317-226-6101
Fax : 317-226-6356
Email: Ronald.Moore@usdoj.gov

**Harrison Edward Strauss**
DOJ-Ust
Birch Bayh Federal Building
United States Courthouse
46 E. Ohio St, Room 520
Indianapolis, IN 46204
317-226-5707
Email: harrison.strauss@usdoj.gov

| Date | Doc # (pages) | Description |
|---|---|---|
| 07/26/2022 | 4 (3 pgs) | Appearance filed by Harmony A Mappes on behalf of Creditor 3M Company. (Mappes, Harmony) (Entered: 07/26/2022) |
| 07/26/2022 | 5 (3 pgs) | Appearance filed by Elizabeth Marie Little on behalf of Creditor 3M Company. (Little, Elizabeth) (Entered: 07/26/2022) |
| 07/26/2022 | | Receipt of Chapter 11 Voluntary Petition( 22-02890-11) [misc,volp11] (1738.00) Filing Fee. Receipt number A33240981. Fee amount 1738.00 (re: Doc # 1). (U.S. Treasury) (Entered: 07/26/2022) |
| 07/26/2022 | 6 (4 pgs; 2 docs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by Michael Andolina on behalf of Creditor 3M Company. (Attachments: (1) Affidavit) (Andolina, Michael) (Entered: 07/26/2022) |
| 07/26/2022 | 7 (15 pgs; 2 docs) | First Day Motion for Joint Administration of Cases 22-02890, 22-02893, 22-02892, 22-02891, 22-02894, 22-02895 and 22-02896 filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A - Proposed Order) (Hokanson, Jeffrey) (Entered: 07/26/2022) [Terminated on 07/26/2022] |
| 07/26/2022 | 8 (4 pgs; 2 docs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by Matthew Evan Linder on behalf of Creditor 3M Company. (Attachments: (1) Affidavit) (Linder, Matthew) (Entered: 07/26/2022) |
| 07/26/2022 | 9 (4 pgs; 2 docs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by Laura Elizabeth Baccash on behalf of Creditor 3M Company. (Attachments: (1) Affidavit) (Baccash, Laura) (Entered: 07/26/2022) |
| 07/26/2022 | | Judge Jeffrey J. Graham assigned. (Kleis, Eric) (Entered: 07/26/2022) |
| 07/26/2022 | 10 (4846 pgs; 3 docs) | Adversary case 22-50059. Complaint filed by Plaintiff(s) Aearo Technologies LLC, 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC against Defendant(s) Those Parties Listed on Appendix A to the Complaint [91 (Declaratory judgment)], [72 (Injunctive relief - other)]. (Attachments: (1) Appendix A (2) Appendix B) (Hokanson, Jeffrey) (Entered: 07/26/2022) |
| 07/26/2022 | 11 (96 pgs; 4 docs) | Declaration re: Chapter 11 Voluntary Petition, Motion for Joint Administration filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC (re: Doc # 1, 7) (Attachments: (1) Exhibit Evidentiary Support for First Day Motions (2) Exhibit Funding Agreement (3) Exhibit Exhibit C) (Hokanson, Jeffrey) (Entered: 07/26/2022) |

| Date | Doc | Description |
|---|---|---|
| 07/26/2022 | 12 (62 pgs) | Brief in Support re: Declaration, filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC (re: Doc # 11). (Hokanson, Jeffrey) (Entered: 07/26/2022) |
| 07/26/2022 | 13 (81 pgs; 4 docs) | Motion to Retain Noticing, Balloting, or Claims Agents Pursuant to Local Rule S.D.Ind. B-1007-2, filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A (2) Exhibit B (3) Exhibit C) (Hokanson, Jeffrey) (Entered: 07/26/2022) |
| 07/26/2022 | 14 (2 pgs) | Appearance filed by Harrison Edward Strauss on behalf of U.S. Trustee. (Strauss, Harrison) (Entered: 07/26/2022) |
| 07/26/2022 | 15 | **Notice of Incomplete Filing issued to Jeffrey A Hokanson.** Failure to file required item(s) by the due date may result in the striking of the incomplete filing, the dismissal of the Bankruptcy case without further notice, or other action as the Court deems appropriate. **Required item(s):** A text file including names and addresses listed on Schedules D, E, F, G and H must be uploaded through the Creditor Maintenance menu. (re: Doc # 1). **Incomplete Filing due by 8/2/2022.** (cmm) (Entered: 07/26/2022) |
| 07/26/2022 | 16 (12 pgs; 2 docs) | Motion to Extend Time to File Schedules filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A) (Hokanson, Jeffrey) (Entered: 07/26/2022) |
| 07/26/2022 | | Receipt of Motion to Appear Pro Hac Vice( 22-02890-11) [motion,mprohac] (100.00) Filing Fee. Receipt number A33241830. Fee amount 100.00 (re: Doc # 6). (U.S. Treasury) (Entered: 07/26/2022) |
| 07/26/2022 | | Receipt of Motion to Appear Pro Hac Vice( 22-02890-11) [motion,mprohac] (100.00) Filing Fee. Receipt number A33241845. Fee amount 100.00 (re: Doc # 8). (U.S. Treasury) (Entered: 07/26/2022) |
| 07/26/2022 | 17 (33 pgs; 3 docs) | Motion for Authority / Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File One List of the Top Law Firms Representing the Largest Numbers of Tort Plaintiffs Asserting Claims Against the Debtors, (II) Authorizing The Debtors to File One Consolidated Creditor Matrix, (III) Authorizing the Listing of Addresses of Counsel For Tort Claimants in the Creditor Matrix in Lieu of Claimants' Addresses, (IV) Authorizing the Debtors to Redact Personally Identifiable Information, (V) Approving Certain Notice Procedures for Tort Claimants, (VI) Approving the Form and Manner of Notice of the Commencement of these Chapter 11 Cases, and (VII) Granting Related Relief filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A (2) Exhibit B) (Hokanson, Jeffrey) (Entered: 07/26/2022) |

Case 2:22-00-00385-MCR-ZF-3   Document 337-1   Filed 08/09/22   Page 191 of 591

| 07/26/2022 | | Receipt of Motion to Appear Pro Hac Vice(22-02890-11) [motion,mprohac] (100.00) Filing Fee. Receipt number A33241876. Fee amount 100.00 (re: Doc # 9). (U.S. Treasury) (Entered: 07/26/2022) |
| 07/26/2022 | 18 (30 pgs; 3 docs) | Motion for Case Management Order filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A (2) Exhibit 1) (Hokanson, Jeffrey) (Entered: 07/26/2022) |
| 07/26/2022 | 19 (58 pgs; 3 docs) | Motion for Case Management Order filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A (2) Exhibit B) (Hokanson, Jeffrey) (Entered: 07/26/2022) [Amended by # 23 ] |
| 07/26/2022 | 20 (44 pgs) | Motion for Authority / Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Compensation, and Benefit Obligations and (B) Continue Employee Compensation and Benefits Programs, and (II) Granting Related Relief filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Hokanson, Jeffrey) (Entered: 07/26/2022) |
| 07/26/2022 | 21 (35 pgs; 4 docs) | First Day Motion to Pay Pre-Petition Trust Fund Taxes filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A (2) Exhibit B (3) Exhibit C) (Hokanson, Jeffrey) (Entered: 07/26/2022) |
| 07/26/2022 | 22 (57 pgs; 4 docs) | Motion for Authority / Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Continue to Pay Certain Brokerage Fees, and (C) Renew, Supplement, Modify, or Purchase Insurance and Reinsurance Coverage, (II) Approving Continuation of Their Surety Bond Program, and (III) Granting Related Relief filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A (2) Exhibit B (3) Exhibit C) (Hokanson, Jeffrey) (Entered: 07/26/2022) |
| 07/26/2022 | 23 (58 pgs; 3 docs) | Amended First Day Motion for Approval of Cash Management System (Bank Accounts/Business Forms) filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC (re: Doc # 19). (Attachments: (1) Exhibit A (2) Exhibit B) (Hokanson, Jeffrey) (Entered: 07/26/2022) |
| 07/26/2022 | 24 (40 pgs; 4 docs) | First Day Motion to Provide Adequate Assurance to Utilities filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A (2) Exhibit B (3) Exhibit C) (Hokanson, Jeffrey) (Entered: 07/26/2022) |

| 07/26/2022 | 25 (44 pgs; 3 docs) | Motion for Authority / Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Specified Trade Claimants, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (III) Granting Related Relief filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A (2) Exhibit B) (Hokanson, Jeffrey) (Entered: 07/26/2022) 🔗 |
| 07/26/2022 | 26 (2 pgs) | Appearance filed by Ronald J. Moore on behalf of U.S. Trustee. (Moore, Ronald) (Entered: 07/26/2022) 🔗 |
| 07/26/2022 | 27 (2 pgs) | Appearance filed by Laura A DuVall on behalf of U.S. Trustee. (DuVall, Laura) (Entered: 07/26/2022) 🔗 |

*Generated in 3.33 seconds*

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/26/2022 12:57:31 | | |
| **PACER Login:** | agerchen | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 22-02890-JJG-11 Fil or Ent: filed Doc From: 0 Doc To: 99999999 Term: included Format: html Page counts for documents: included |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

Southern District of Indiana
(State)

Case number *(if known)*: _____ Chapter **11**

☐ Check if this is an
amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

06/22

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | |
|---|---|
| 1. **Debtor's Name** | **Aearo Technologies LLC** |
| 2. **All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names, and *doing business as* names | **E-A-R Specialty Composites, Aearo Company, Aearo Technologies** |
| 3. **Debtor's federal Employer Identification Number (EIN)** | **13-3840356** |

4. **Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| 7911 Zionsville Road | |
| Number        Street | Number        Street |
| | P.O. Box |
| Indianapolis        IN        46268 | |
| City        State        Zip Code | City        State        Zip Code |
| | **Location of principal assets, if different from principal place of business** |
| Marion | |
| County | Number        Street |
| | City        State        Zip Code |

| | |
|---|---|
| 5. **Debtor's website** (URL) | https://earglobal.com/en/ |
| 6. **Type of debtor** | ☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))<br><br>☐ Partnership (excluding LLP)<br><br>☐ Other. Specify: _____ |

| Debtor | Aearo Technologies LLC | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

**7. Describe debtor's business**

A. *Check One:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☒ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .
3399

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub- box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box

*Check One:*

☐ Chapter 7

☐ Chapter 9

☒ Chapter 11. *Check all that apply:*

    ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

    ☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, and it chooses to proceed under Subchapter V of Chapter 11. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

    ☐ A plan is being filed with this petition.

    ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

    ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

    ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☒ No

☐ Yes.

| District | | When | MM/DD/YYYY | Case number | |
|---|---|---|---|---|---|
| District | | When | MM/DD/YYYY | Case number | |

| Debtor | Aearo Technologies LLC | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

☐ No
☒ Yes.

List all cases. If more than 1, attach a separate list.

| Debtor | **See Rider 1** | Relationship | **Affiliate** |
|---|---|---|---|
| District | **Southern District of Indiana** | When | **07/26/2022** |
| Case number, if known | _____ | | MM / DD / YYYY |

**11. Why is the case filed in *this district?***

*Check all that apply:*

☒ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No
☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?**

| _____ | | |
|---|---|---|
| Number | Street | |
| _____ | | |
| City | State | Zip Code |

**Is the property insured?**

☐ No
☐ Yes. Insurance agency _____

Contact name _____

Phone _____

---

**Statistical and administrative information**

**13. Debtor's estimation of available funds**

*Check one:*

☒ Funds will be available for distribution to unsecured creditors.
☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

| Debtor | Aearo Technologies LLC | Case number *(if known)* | |
|--------|------------------------|--------------------------|---|
| | Name | | |

| 14. Estimated number of creditors (on a consolidated basis) | ☐ 1-49<br>☐ 50-99<br>☐ 100-199<br>☐ 200-999 | ☐ 1,000-5,000<br>☐ 5,000-10,000<br>☐ 10,001-25,000 | ☐ 25,001-50,000<br>☐ 50,001-100,000<br>☒ More than 100,000 |
|---|---|---|---|
| 15. Estimated assets (on a consolidated basis) | ☐ $0-$50,000<br>☐ $50,001-$100,000<br>☐ $100,001-$500,000<br>☐ $500,001-$1 million | ☐ $1,000,001-$10 million<br>☐ $10,000,001-$50 million<br>☐ $50,000,001-$100 million<br>☐ $100,000,001-$500 million | ☐ $500,000,001-$1 billion<br>☒ $1,000,000,001-$10 billion<br>☐ $10,000,000,001-$50 billion<br>☐ More than $50 billion |
| 16. Estimated liabilities (on a consolidated basis) | ☐ $0-$50,000<br>☐ $50,001-$100,000<br>☐ $100,001-$500,000<br>☐ $500,001-$1 million | ☐ $1,000,001-$10 million<br>☐ $10,000,001-$50 million<br>☐ $50,000,001-$100 million<br>☐ $100,000,001-$500 million | ☐ $500,000,001-$1 billion<br>☒ $1,000,000,001-$10 billion[1]<br>☐ $10,000,000,001-$50 billion<br>☐ More than $50 billion |

## Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

| 17. Declaration and signature of authorized representative of debtor | The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition. |
|---|---|
| | I have been authorized to file this petition on behalf of the debtor. |
| | I have examined the information in this petition and have a reasonable belief that the information is true and correct. |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on     __07/26/2022__
                    MM/ DD / YYYY

**✗**    __/s/ John R. Castellano__                        John R. Castellano
       Signature of authorized representative of debtor        Printed name

Title    __Authorized Signatory__

| 18. Signature of attorney | **✗**    __/s/ Jeffrey A. Hokanson__ | Date   __07/26/2022__ |
|---|---|---|
| | Signature of attorney for debtor | MM/DD/YYYY |

       **Jeffrey A. Hokanson**
       Printed name

       **Ice Miller LLP**
       Firm name

       **One American Square, Suite 2900**
       Number          Street

| **Indianapolis** | **IN** | **46282-0200** |
|---|---|---|
| City | State | ZIP Code |

| **(317) 236-2100** | **Jeff.Hokanson@icemiller.com** |
|---|---|
| Contact phone | Email address |

| **14579-49** | **IN** |
|---|---|
| Bar number | State |

---

[1]   The Debtors have obtained a commitment for $1 billion to fund a trust to resolve all claims determined to be entitled to compensation, based on the analysis of an experienced estimator of claims in chapter 11.

| Fill in this information to identify the case: |
|---|
| United States Bankruptcy Court for the: |
| Southern District of Indiana |
| (State) |
| Case number *(if known)*: _____ Chapter ___11___ |

☐ Check if this is an
amended filing

### Rider 1
### Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor

On the date hereof, each of the entities listed below (collectively, the "Debtors") filed a petition in the United States Bankruptcy Court for the Southern District of Indiana for relief under chapter 11 of title 11 of the United States Code. The Debtors anticipate subsequently moving for joint administration of the chapter 11 cases.

- Aearo Technologies LLC
- Aearo Holding LLC
- Aearo Intermediate LLC
- Aearo LLC
- Aearo Mexico Holding Corp.
- Cabot Safety Intermediate LLC
- 3M Occupational Safety LLC

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | )  | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AEARO TECHNOLOGIES LLC, | ) | Case No. 22-_____(___) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**LIST OF EQUITY SECURITY HOLDERS**[1]

| Debtor | Equity Holders | Address of Equity Holder | Percentage of Equity Held |
|---|---|---|---|
| Aearo Technologies LLC | Aearo LLC | 7911 Zionsville Road, Indianapolis, IN 46268 | 100% |

---

[1] This list serves as the disclosure required to be made by the debtor pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure. All equity positions listed indicate the record holder of such equity as of the date of commencement of the chapter 11 case.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AEARO TECHNOLOGIES LLC, | ) Case No. 22-_____(___) |
| | ) |
| Debtor. | ) |
| | ) |

<u>**CORPORATE OWNERSHIP STATEMENT**</u>

     Pursuant to Rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, the following are corporations, other than a government unit, that directly or indirectly own 10% or more of any class of the debtor's equity interest:

| Shareholder | Approximate Percentage of Shares Held |
|---|---|
| Aearo LLC | 100% |

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case:</strong></td></tr>
<tr><td>Debtor name</td><td>Aearo Technologies LLC, <em>et al.</em></td></tr>
<tr><td>United States Bankruptcy Court for the:</td><td>Southern     District of   Indiana<br>(State)</td></tr>
<tr><td>Case number (If known):</td><td>[●]</td></tr>
</table>

☐ Check if this is an amended filing

# Chapter 11 Cases: List of Law Firms Representing the Tort Claimants    12/15

Aearo Technologies LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, Aearo Mexico Holding Corporation, Cabot Safety Intermediate LLC, and 3M Occupational Safety LLC (collectively, the "Debtors") each filed a petition in this Court on the date hereof for relief under chapter 11 of title 11 of the United States Code. The following is a consolidated list of parties that represent or have represented the known parties that have alleged claims against the Debtors related to tort claims (the "Top Counsel List"). Substantially contemporaneously with this petition, the Debtors have filed a motion seeking authority to file this Top Counsel List in lieu of a list of the 20 largest unsecured creditors for each of the Debtors.[1] This list does not include any person or entity who is an "insider" under section 101(31) of title 11 of the United States Code. The Top Counsel List was prepared with information existing as of the date hereof. The Debtors reserve the right to amend the Top Counsel List based on additional information they may identify. The information contained in the Top Counsel List shall not constitute an admission by, nor shall it be binding on, the Debtors.

| | Name of law firm and complete mailing address, including zip code | Name, telephone number, and email address of law firm contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | **Aylstock, Witkin, Kreis & Overholtz, PLLC**<br>17 E. Main Street<br>Suite 200<br>Pensacola, FL 32502 | Attn: Bryan Frederick Aylstock, Jennifer M. Hoekstra, & Douglass Alan Kreis<br>P: 850-916-7450<br>F: 850-916-7449<br>baylstock@awkolaw.com<br>jhoekstra@awkolaw.com<br>dkreis@awkolaw.com | Litigation | Contingent/ Unliquidated/ Disputed | N/A | N/A | **Undetermined** |
| 2 | **Watts Guerra LLP**<br>4 Dominion Drive<br>Building 3 Suite 100<br>San Antonio, TX 78257 | Attn: Mikal Watts, David Vincent Mclendon, & Erin Rogiers<br>P: 210-448-0500<br>mcwatts@wattsguerra.com<br>dmclendon@wattsguerra.com<br>erogiers@wattsguerra.com | Litigation | Contingent/ Unliquidated/ Disputed | N/A | N/A | **Undetermined** |
| 3 | **Tracey Fox King & Walters**<br>440 Louisiana Street<br>Suite 1901<br>Houston, TX 77002 | Attn: Sean Patrick Tracey, Lawrence Fleming Tracey, & Shawn Fox<br>P: 713-495-2333<br>F: 713-495-2331<br>stracey@traceylawfirm.com<br>sfox@traceylawfirm.com | Litigation | Contingent/ Unliquidated/ Disputed | N/A | N/A | **Undetermined** |

[1]   This list is in substantially the same form as Official Bankruptcy Form 204 for chapter 11 cases setting forth the list of creditors other than insiders, who have the 20 largest unsecured claims against a debtor.

Debtor Name: Aearo Technologies LLC, *et al.*                    Case Number (if known):_____

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4 | **Keller Postman LLC**<br>150 N Riverside Plaza<br>Suite 4100<br>Chicago, IL 60606 | Attn: Ashley Conrad Keller, Nicole Corinne Berg, Ashley Barriere, Hannah Ruth Roberts, & Mitali R Vyas<br>P: 312-948-8477<br>ack@kellerpostman.com<br>ncb@kellerpostman.com<br>Ashley.barriere@kellerpostman.com<br>hrr@kellerpostman.com<br>mv@kellerlenkner.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 5 | **Clark, Love & Hutson, PLLC**<br>440 Louisiana Street<br>Suite 1700<br>Houston, TX 77002 | Attn: Clayton A. Clark, Shelley Van Natter Hutson, & William Michael Moreland<br>P: 713-757-1400<br>F: 713-759-1217<br>cclark@triallawfirm.com<br>bgreif@triallawfirm.com<br>mmoreland@triallawfirm.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 6 | **Thomas J. Henry Law**<br>521 Starr Street<br>Corpus Christi, TX 78401 | Attn: Thomas J Henry & Lesley Catherine Paniszczyn<br>P: 361-985-0600<br>F: 361-985-0601<br>Tjh.3m@thomasjhenrylaw.com<br>lpan.3m@thomasjhenrylaw.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 7 | **The Gori Law Firm, P.C.**<br>156 N Main Street<br>Edwardsville, IL 62025 | Attn: Megan Tomlinson Arvola, Tanja C Engelhardt, Robert Allen Green, David Todd Mathews, & Nicholas Ryan Mayfield<br>P: 618-659-9833<br>marvola@gorijulianlaw.com<br>tengelhardt@gorilaw.com<br>rgreen@gorilaw.com<br>todd@gorijulianlaw.com<br>rmayfield@gorilaw.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 8 | **Pulaski Law Firm, PLLC**<br>2925 Richmond Avenue<br>Suite 1725<br>Houston, TX 77098 | Attn: Katherine Lindsey Cornell, Bret D Stanley, & Steve Faries<br>P:  800-223-3784<br>F:  713-664-4555<br>kcornell@pulaskilawfirm.com<br>bstanley@pulaskilawfirm.com<br>sfaries@pulaskilawfirm.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 9 | **Heninger Garrison Davis, LLC**<br>2224 1st Avenue North<br>Birmingham, AL 35203 | Attn: William Lewis Garrison, Jr., Taylor Christopher Bartlett, & Christopher Boyce Hood<br>P: 205-326-3336<br>F: 205-326-3332<br>lewis@hgdlawfirm.com<br>taylor@hgdlawfirm.com<br>chood@hgdlawfirm.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 10 | **Weitz & Luxenberg P.C.**<br>700 Broadway<br>New York, NY 10003 | Attn: Terea Ann Curtin, Ericarae Garcia, & Michael Edward Pederson<br>P: 212-558-5907<br>F: 646-293-4360<br>tcurtin@weitzlux.com<br>egarcia@weitzlux.com<br>mpederson@weitzlux.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |

Debtor Name: Aearo Technologies LLC, *et al.*                         Case Number (if known):_____

| 11 | **Douglas & London, P.C.**<br>59 Maiden Lane<br>6th Floor<br>New York, NY 10038 | Attn: Michael A London & Virginia E Anello<br>P: 212-566-7500<br>F: 212-566-7501<br>mlondon@douglasandlondon.com<br>vanello@douglasandlondon.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 12 | **Bailey Cowan Heckaman PLLC**<br>1360 Post Oak Boulevard<br>Suite 2300<br>Houston, TX 77056 | Attn: Kenneth Camp Bailey & Robert W Cowan<br>P: 713-425-7100<br>F: 713-415-7101<br>bailey-svc@bpblaw.com<br>rcowan@bchlaw.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 13 | **Junell & Associates, PLLC**<br>3737 Buffalo Speedway<br>Suite 1850<br>Houston, TX 77098 | Attn: Deborah K Levy<br>P: 713-221-3750<br>dlevy@junell-law.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 14 | **Nabers Law Firm, PLLC**<br>3737 Buffalo Speedway<br>Suite 1850<br>Houston, TX 77098 | Attn:  Joseph Scott Nabers & Katerina Dimitrakakos<br>P: 713-422-1200<br>F: 713-422-1210<br>snabers@naberslaw.com<br>kathy@naberslaw.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 15 | **Morgan & Morgan**<br>850 3rd Avenue<br>Suite 402<br>Brooklyn, NY 11232 | Attn:  Paul J Pennock & Jonathan M Sedgh<br>P: 212-738-6839<br>ppennock@forthepeople.com<br>jsedgh@forthepeople.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 16 | **Danziger & De Llano, LLP**<br>440 Louisiana Street<br>Suite 1212<br>Houston, TX 77002 | Attn: Rodrigo De Llano<br>P: 713-222-9998<br>filings@dandell.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 17 | **Seeger Weiss LLP**<br>55 Challenger Road<br>6th Floor<br>Ridgefield Park, NJ 07660 | Attn: Christopher A Seeger, David R. Buchanan, & Maxwell H Kelly<br>P: 212-584-0700<br>F: 973-639-8656<br>cseeger@seegerweiss.com<br>dbuchanan@seegerweiss.com<br>mkelly@seegerweiss.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 18 | **Abraham, Watkins, Nichols, Sorrels, Agosto & Aziz**<br>800 Commerce Street<br>Houston, TX 77055 | Attn: Muhammed S Aziz<br>P: 713-222-7211<br>F: 713-225-0827<br>jdean@abrahamwatkins.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 19 | **Morgan, Collins, Yeast and Salyer**<br>455 2nd St.<br>Paintsville, KY 41240 | Attn: McKinnley Morgan, Roy Collins, Dan Yeast, & Kyle Salyer<br>P: 606-789-1135 | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 20 | **Martin Walton Law Firm**<br>699 S. Friendswood Drive, Suite 107<br>Houston, TX 77546 | Attn: Mike Martin & Gage Walton<br>P: 346-800-0285 | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |

Fill in this information to identify the case and this filing:

| | |
|---|---|
| Debtor Name | Aearo Technologies LLC |
| United States Bankruptcy Court for the: | Southern District of Indiana |
| | (State) |
| Case number (If known): | |

# Official Form 202

## Declaration Under Penalty of Perjury for Non-Individual Debtors  12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐ *Schedule A/B: Assets-Real and Personal Property (Official Form 206A/B)*

☐ *Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)*

☐ *Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)*

☐ *Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)*

☐ *Schedule H: Codebtors (Official Form 206H)*

☐ *Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)*

☐ Amended Schedule

☒ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (Official Form 204)*

☒ Other document that requires a declaration **List of Equity Security Holders and Corporate Ownership Statement**

I declare under penalty of perjury that the foregoing is true and correct.

| | | |
|---|---|---|
| Executed on | 07/26/2022 | */s/ John R. Castellano* |
| | MM/ DD/YYYY | Signature of individual signing on behalf of debtor |
| | | **John R. Castellano** |
| | | Printed name |
| | | **Authorized Signatory** |
| | | Position or relationship to debtor |

Official Form 202                    Declaration Under Penalty of Perjury for Non-Individual Debtors

**OMNIBUS WRITTEN CONSENT BY THE BOARD OF DIRECTORS**
**OF EACH OF THE COMPANIES SET FORTH ON EXHIBIT A ATTACHED HERETO**

The undersigned, being the requisite members of the boards of directors (the "**Boards**") of Aearo Technologies LLC, a Delaware limited liability corporation, and certain of its affiliated entities set forth on **Exhibit A**, each organized and existing under the internal laws of Delaware (each, a "**Company**" and collectively, the "**Companies**"), having considered the filing of voluntary petitions for relief under the provisions of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**" and such petitions, "**Bankruptcy Petitions**") and exploring strategic and/or financial alternatives in light of the Companies' current circumstances, including possibilities of undertaking a restructuring, reorganization, or other transaction and related financing (each of the foregoing and any combination of the foregoing, a "**Restructuring Transaction**");

**WHEREAS,** the Boards have reviewed and considered the following:

1. the presentations by the Companies' management and the legal and financial advisors of the Companies regarding the liabilities and liquidity of the Companies, the strategic alternatives available to them, and the impact of the foregoing on the Companies' business;

2. that certain funding and indemnification agreement, dated July 25, 2022, by and among the Companies and 3M Company, a Delaware corporation;

3. the information and advice previously provided to and reviewed by the Boards; and

4. the related matters reported on at meetings of the Boards on and before the date hereof;

**WHEREAS,** the Boards have had the opportunity to consult with the Companies' management and the legal and financial advisors of the Companies and to fully consider each of the strategic alternatives available to the Companies;

**WHEREAS,** the Boards have determined, in their business judgment, that it is desirable and in the best interests of the Companies and their respective stakeholders for the Companies to file, or cause the filing of, voluntary petitions under chapter 11 of the Bankruptcy Code and that such action will benefit the Companies and their respective stakeholders;

**WHEREAS,** the Boards have determined, in their business judgment, that it is desirable and in the best interests of the Companies and their respective stakeholders for the Companies to file, or cause the filing of, any complaint, appropriate pleading, or document related to a preliminary injunction or temporary restraining order seeking the extension of protections afforded under the Bankruptcy Code to certain of the Companies' affiliates, and that such action will benefit the

Companies and their respective stakeholders; and

      **WHEREAS**, the Boards have determined, in their business judgment, that it is desirable and in the best interests of the Companies and their respective stakeholders for the Companies to appoint a chief restructuring officer ("**Chief Restructuring Officer**") pursuant to their respective articles of organization, limited liability agreements, or any other documents governing the management and affairs of each Company (the "**Organizational Documents**").

### Authorizing the Filing of Bankruptcy Petitions

      **NOW, THEREFORE, IT IS RESOLVED,** that the Companies are authorized to file voluntary petitions for relief under chapter 11 of the Bankruptcy Code and seek necessary relief, including, without limitation, any preliminary injunction or temporary retraining order;

      **FURTHER RESOLVED,** that, in the judgment of the Boards, it is desirable and in the best interests of the Companies, their interest holders, their creditors, and other parties in interest, that the Companies file, or cause to be filed, Bankruptcy Petitions under the provisions of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Indiana or such other court of competent jurisdiction (the "**Court**"). In accordance with the requirements of the Companies' governing documents and applicable law, the Boards hereby consent to, authorize, and approve the filing of the Bankruptcy Petitions;

      **FURTHER RESOLVED,** that, in the judgment of the Boards, it is desirable and in the best interests of the Companies, their interest holders, their creditors, and other parties in interest, that the Companies file, or cause to be filed, any complaint, appropriate pleading, or document related to a preliminary injunction or temporary restraining order seeking the extension of protections afforded under the Bankruptcy Code to certain of the Companies' affiliates. In accordance with the requirements of the Companies' governing documents and applicable law, the Boards hereby consent to, authorize, and approve the filing of such complaints, pleadings, or documents; and

      **FURTHER RESOLVED,** that any director, officer, or other duly appointed officer of the Companies (each an "**Authorized Person**" and collectively, the "**Authorized Persons**") is hereby authorized and appointed to act as signatory and attorney on behalf of the Companies in respect of any Restructuring Transaction, and/or any person to whom such Authorized Persons and/or officers delegate certain responsibilities is hereby authorized to execute (under the common seal of the Companies, if appropriate) and file on behalf of the Companies all petitions, schedules, lists, and other motions, papers, or documents, and to take any and all actions they deem necessary or proper to obtain such relief.

### Retention of Professionals

      **FURTHER RESOLVED,** that each of the Authorized Persons is hereby authorized, empowered, and directed to, on behalf of the Companies, employ: (i) the law firm of Kirkland &

Ellis LLP as general bankruptcy counsel; (ii) the law firm of Ice Miller LLP as co-bankruptcy counsel; (iii) AP Services LLC as financial advisor; (iv) Kroll, LLC, as claims and noticing agent; (v) Bates White LLC as estimation professional; and (vi) any other legal counsel, accountant, financial advisor, restructuring advisor, estimation professional, or other professional the Authorized Persons deem necessary, appropriate, or advisable to retain; each to represent and assist the Companies in carrying out their duties and responsibilities and exercising their rights under the Bankruptcy Code and any applicable law (including, but not limited to, the law firms filing any pleadings or responses); and in connection therewith, the Authorized Persons are hereby authorized, empowered, and directed, in accordance with the terms and conditions hereof, to execute (under the common seal of the Companies, if appropriate) appropriate retention agreements, pay appropriate retainers, and to cause to be filed appropriate applications for authority to retain such services; and

**FURTHER RESOLVED,** that each of the Authorized Persons is hereby authorized, empowered, and directed to execute (under the common seal of the Companies, if appropriate) and file all petitions, schedules, motions, lists, applications, pleadings, and other papers, and to perform such further actions and execute (under the common seal of the Companies, if appropriate) such further documentation that the Authorized Persons in their absolute discretion deem necessary, appropriate, or desirable in accordance with these resolutions.

### Appointment of Chief Restructuring Officer

**FURTHER RESOLVED,** that John Castellano, be, and hereby is, appointed to serve as the Chief Restructuring Officer of each Company;

**FURTHER RESOLVED,** that the CRO shall have such authority with respect to the Companies as is described in that certain engagement letter dated as of July 25, 2022, by and among the Company and AP Services, LLC (the "**Engagement Letter**"); and

**FURTHER RESOLVED,** that the Engagement Letter is hereby approved, and any Authorized Person, acting alone or with one or more other Authorized Persons, be, and each of them hereby is, authorized, empowered, and directed to execute, deliver, and perform each Company's obligations under the Engagement Letter on behalf of the Companies and in its name with such changes therein or additions, deletions, or modifications thereto as the Authorized Person signing the same may approve, such approval to be conclusively evidenced by such Authorized Person's execution and delivery of the Engagement Letter.

### General

**FURTHER RESOLVED,** that in addition to the specific authorizations heretofore conferred upon the Authorized Persons, the Authorized Persons, either individually or as otherwise required by the Companies' governing documents and applicable law, are hereby authorized to execute (under the common seal of the Companies, if appropriate), acknowledge, deliver, and file any and all agreements, certificates, instruments, powers of attorney, letters, forms, transfers, deeds, and other documents on behalf of the Companies relating to the Restructuring Transactions;

**FURTHER RESOLVED,** that each of the Authorized Persons (and their designees and delegates) is hereby authorized and empowered, in the name of and on behalf of the Companies, to take or cause to be taken any and all such other and further action, and to execute (under the common seal of the Companies, if appropriate), acknowledge, deliver, and file any and all such agreements, certificates, instruments, and other documents, and to pay all expenses, including but not limited to filing fees, in each case as in such Authorized Person's or Authorized Persons' absolute discretion, as shall be necessary, appropriate, or desirable in order to fully carry out the intent and accomplish the purposes of the resolution adopted herein;

**FURTHER RESOLVED,** that the Boards have received sufficient notice of the actions and transactions relating to the matters contemplated by the foregoing resolutions, as may be required by the governing documents of the Companies, or hereby waive any right to have received such notice;

**FURTHER RESOLVED,** that all acts, actions, and transactions relating to the matters contemplated by the foregoing resolutions done in the name of and on behalf of the Companies, which acts would have been approved by the foregoing resolutions except that such acts were taken before the adoption of these resolutions, are hereby in all respects approved, confirmed, and ratified as the true acts and deeds of the Companies with the same force and effect as if each such act, transaction, agreement, or certificate had been specifically authorized in advance by resolution of the Boards; and

**FURTHER RESOLVED,** that any Authorized Person is hereby authorized to perform all other acts, deeds, and other actions as the Companies themselves may perform, in accordance with their governing documents and applicable law, howsoever arising in connection with the matters above, or in furtherance of the intentions expressed in the foregoing resolutions, including, but not limited to, the negotiation, finalization, execution (under common seal, whether or not expressed to be a deed, as may be necessary or appropriate), and delivery of any other agreements, certificates, instruments, powers of attorney, letters, forms, transfers, deeds, and other documents whatsoever as the individual acting may in their absolute and unfettered discretion approve or deem or determine necessary, appropriate, or advisable, such approval, deeming, or determination to be conclusively evidenced by said individual taking such action or the execution thereof.

\* \* \* \*

*[Signature pages follow]*

39

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Boards set out on **Schedule 1**, have executed this written consent as of the date first set forth above.

This action is effective as of July 25, 2022

DIRECTORS:

Name: Daniel Renninger

_____
Name: Eric Forbes

_____
Name: Matthew Blaisdell

_____
Name: Roger Meltzer

_____
Name: Jeffrey Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Boards set out on **Schedule 1**, have executed this written consent as of the date first set forth above.

This action is effective as of July 25, 2022

DIRECTORS:

_____
Name: Daniel Renninger

_____
Name: Eric Forbes

_____
Name: Matthew Blaisdell

_____
Name: Roger Meltzer

_____
Name: Jeffrey Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Boards set out on **Schedule 1**, have executed this written consent as of the date first set forth above.

This action is effective as of July 25, 2022.

DIRECTORS:

_____
Name:  Daniel Renninger


_____
Name:  Eric Forbes


_____
Name:  Matthew Blaisdell


_____
Name:  Roger Meltzer


_____
Name:  Jeffrey Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Boards set out on **Schedule 1**, have executed this written consent as of the date first set forth above.

This action is effective as of July 25, 2022

DIRECTORS:

_____
Name:  Daniel Renninger

_____
Name:  Eric Forbes

_____
Name:  Matthew Blaisdell

_____
Name:  Roger Meltzer

_____
Name:  Jeffrey Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Boards set out on **Schedule 1**, have executed this written consent as of the date first set forth above.

This action is effective as of July 25, 2022

DIRECTORS:

_____
Name:  Daniel Renninger

_____
Name:  Eric Forbes

_____
Name:  Matthew Blaisdell

_____
Name:  Roger Meltzer

_____
Name:  Jeffrey S. Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Board set out on **Schedule 2,** have executed this written consent as of the date first set forth above.

This action is effective as of July 25, 2022

DIRECTORS:

Name: Daniel Renninger

Name: Matthew Blaisdell

Name: Roger Meltzer

Name: Jeffrey Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Board set out on **Schedule 2,** have executed this written consent as of the date first set forth above.

This action is effective as of July 25, 2022

DIRECTORS:

_____
Name: Daniel Renninger

_____
Name: Matthew Blaisdell

_____
Name: Roger Meltzer

_____
Name: Jeffrey Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Board set out on **<u>Schedule 2</u>**, have executed this written consent as of the date first set forth above.


This action is effective as of July 25, 2022

DIRECTORS:

_____
Name:  Daniel Renninger


_____
Name:  Matthew Blaisdell


_____
Name:  Roger Meltzer


_____
Name:  Jeffrey Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Board set out on **Schedule 2**, have executed this written consent as of the date first set forth above.


This action is effective as of July 25, 2022

DIRECTORS:

_____
Name:  Daniel Renninger

_____
Name:  Matthew Blaisdell

_____
Name:  Roger Meltzer

_____
Name:  Jeffrey S. Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Boards set out on **Schedule 3**, have executed this written consent as of the date first set forth above.

This action is effective as of July 25, 2022

DIRECTORS:

Name:  Daniel Renninger

Name:  Roger Meltzer

Name:  Jeffrey Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Boards set out on **Schedule 3**, have executed this written consent as of the date first set forth above.


This action is effective as of July 25, 2022

DIRECTORS:

_____
Name:  Daniel Renninger

_____
Name:  Roger Meltzer

_____
Name:  Jeffrey Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Boards set out on **Schedule 3**, have executed this written consent as of the date first set forth above.

This action is effective as of July 25, 2022

DIRECTORS:

_____
Name:  Daniel Renninger

_____
Name:  Roger Meltzer

_____
Name:  Jeffrey S. Stein

## Exhibit A
### Schedules of Boards of Directors of the Companies

### Schedule 1
#### Board of Directors:
**Daniel Renninger, Eric Forbes, Matthew Blaisdell, Jeffery Stein, and Roger Meltzer**

| Entity | Jurisdiction |
|---|---|
| Aearo Technologies LLC | Delaware |
| Aearo LLC | Delaware |
| Cabot Safety Intermediate LLC | Delaware |

### Schedule 2
#### Board of Directors:
**Daniel Renninger, Matthew Blaisdell, Jeffery Stein, and Roger Meltzer**

| Entity | Jurisdiction |
|---|---|
| Aearo Mexico Holding Corporation | Delaware |

### Schedule 3
#### Board of Directors:
**Daniel Renninger, Jeffery Stein, and Roger Meltzer**

| Entity | Jurisdiction |
|---|---|
| Aearo Holding LLC | Delaware |
| Aearo Intermediate LLC | Delaware |
| 3M Occupational Safety LLC | Delaware |

**Exhibit D**

**Transfer Request 2**

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| **IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION** | |
| | **MDL DOCKET NO. 2885** |

## NOTICE OF POTENTIAL TAG-ALONG ACTION

      In accordance with Rule 7.1(a) of the Rules of Procedure for the United States Judicial Panel on Multidistrict Litigation, undersigned counsel writes to notify you of the potential tag along action listed on the attached Schedule of Action. Undersigned counsel's firm, Keller Postman LLC, has been identified as a defendant in the tag-along action and is thus a party in that action.

      A docket sheet and the complaint[1] are attached.

*/s/ Ashley C. Keller*
Ashley C. Keller
ack@kellerpostman.com
**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

Party in Tag-Along Action

---

[1] As the complaint and its attendant documents total approximately 5000 pages, undersigned counsel has only attached the complaint and not the attendant documents. If helpful, undersigned counsel is happy to provide the Panel with a full set of documents.

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

**IN RE: 3M COMBAT ARMS EARPLUG
PRODUCTS LIABILITY LITIGATION**

**MDL DOCKET NO. 2885**

**NOTICE OF POTENTIAL TAG-ALONG ACTION**

|   | Plaintiffs | Defendant | District | Civil Action No. | Judge |
|---|---|---|---|---|---|
| **1.** | Aearo Technologies LLC, et al. | Keller Postman LLC, et al. | Southern District of Indiana Bankruptcy Court | 22-ap-50059 | Jeffrey J. Graham |

*/s/ Ashley C. Keller*
Ashley C. Keller
ack@kellerpostman.com
**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

Party in Tag-Along Action

# BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

**IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION**

**MDL DOCKET NO. 2885**

## PROOF OF SERVICE

In compliance with Rule 4.1(a) of the Rules of Procedure for the United States Judicial Panel on Multidistrict Litigation, I hereby certify that a true and correct copy of the foregoing Notice of Tag-Along Actions and Schedule of Actions has been electronically filed with the Judicial Panel on Multidistrict Litigation on July 29, 2022 by using the CM/ECF system, which will send notice of electronic filing to all parties of record.

**Clerks of the Courts**
*Via First Class Mail*

United States Bankruptcy Court
Southern District of Indiana
116 U.S. Courthouse
46 E. Ohio St. Rm 116
Indianapolis, IN 46204

*Via CM/ECF*

**Attorneys for 3M**
**Michael Andolina**
White & Case
111 S Wacker Dr Suite 5100
Chicago, IL 60606-4302
312-881-5388
mandolina@whitecase.com

**Laura Elizabeth Baccash**
White & Case LLP
111 South Wacker Drive
Suite 5100
Chicago, IL 60606
847-736-0179
laura.baccash@whitecase.com

**Kayla D. Britton**
Faegre Drinker Biddle & Reath LLP
600 E. 96th St.
Suite 600
Indianapolis, IN 46240
317-569-9600
kayla.britton@faegredrinker.com

**Jay Jaffe**
Faegre Drinker Biddle & Reath LLP
600 East 96th Street
Suite 600
Indianapolis, IN 46240
317-569-9600
jay.jaffe@faegredrinker.com

**Jessica Lauria**
White & Case
1221 Avenue of the Americas
New York, NY 10020
212-819-7097
jessica.lauria@whitecase.com

**Matthew Evan Linder**
White & Case LLP
111 S. Wacker Drive
Suite 5100
Chicago, IL 60606
312-568-9353
mlinder@whitecase.com

**Elizabeth Marie Little**
Faegre Drinker Biddle & Reath LLP
600 E. 96th Street
Suite 600
Indianapolis, IN 46240
317-569-4608
elizabeth.little@faegredrinker.com

**Harmony A Mappes**
Faegre Drinker Biddle & Reath LLP
300 N. Meridian St.
Ste. 2500
Indianapolis, IN 46204
317-237-8246
317-237-1000 (fax)
harmony.mappes@faegredrinker.com

**Attorneys for 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, Aearo Technologies, LLC**

**Jeffrey A Hokanson**
Ice Miller LLP
One American Square
Suite 2900
Indianapolis, IN 46282-0200
317-236-2236
317-592-4809 (fax)
jeff.hokanson@icemiller.com

**Adam Arceneaux**
Ice Miller LLP
One American Square
Suite 2900
Indianapolis, IN 46282-0200
317-236-2137
317-592-4604 (fax)
adam.arceneaux@icemiller.com

**Attorneys for Seeger Weiss LLP**
Rubin & Levin, P.C.
135 N. Pennsylvania St, Suite 1400
Indianapolis, IN 46204
317-860-2867
dcaruso@rubin-levin.net

**Meredith R. Theisen**
Rubin & Levin, P.C.
135 N. Pennsylvania St., Suite 1400
Indianapolis, IN 46204
(317) 860-2877
(317) 453-8602 (fax)
mtheisen@rubin-levin.net

**Attorneys for Aylstock, Witkin, Kreis & Overholtz, PLLC**
**Sasha M. Gurvitz**
KTBS Law LLP
1801 Century Park East
Ste 26th Floor
Los Angeles, CA 90067
310-407-4032
310-407-9090 (fax)
sgurvitz@ktbslaw.com

**Nir Maoz**
KTBS Law LLP

1801 Century Park East
26th Floor
Los Angeles, CA 90067
310-407-4000
310-407-9090 (fax)
nmaoz@ktbslaw.com

**Thomas E Patterson**
KTBS Law LLP
1801 Century Park East
Ste 26th Floor
Los Angeles, CA 90067
310-407-4035
310-407-9090 (fax)
tpatterson@ktbslaw.com

**Robert J Pfister**
KTBS Law LLP
1801 Century Park East
26th Floor
Los Angeles, CA 90067
310-407-4065
310-407-9090 (fax)
rpfister@ktbslaw.com

**Michael L. Tuchin**
KTBS Law LLP
1801 Century Park East
Ste 26th Floor
Los Angeles, CA 90067
310-407-4040
310-407-9090 (fax)
mtuchin@ktbslaw.com

**Attorney for Bellweather Plaintiffs Adkins, Wilkerson, & Vaughn**
**Patricia B. Tomasco**
Quinn Emanuel Urquhart & Sullivan
711 Louisiana St.
Suite 500
Houston, TX 77002
713-221-7227
713-221-7100 (fax)
pattytomasco@quinnemanuel.com

Dated:  July 29, 2022

/s/ Ashley C. Keller
Ashley C. Keller
ack@kellerpostman.com
**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois  60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

*Party in Tag-Along Action*

*Associated Cases* ⌄

# U.S. Bankruptcy Court
## Southern District of Indiana (Indianapolis)
## Adversary Proceeding #: 22-50059

*Assigned to:* Jeffrey J. Graham                         *Date Filed:* 07/26/22
*Lead BK Case:* 22-02890-JJG-11
*Lead BK Title:* Aearo Technologies LLC and Aearo LLC
*Lead BK Chapter:* 11
*Demand:*

*Nature[s] of Suit:*  91 Declaratory judgment
                      72 Injunctive relief - other


### Plaintiff
----------------------
**Aearo Technologies LLC**                  represented by **Adam Arceneaux**
7911 Zionsville Road                                      Ice Miller LLP
Indianapolis, IN 46268                                    One American Square
Tax ID / EIN: 13-3840356                                  Suite 2900
                                                          Indianapolis, IN 46282-0200
                                                          317-236-2137
                                                          Fax : 317-592-4604
                                                          Email: adam.arceneaux@icemiller.com

                                            **Jeffrey A Hokanson**
                                                          Ice Miller LLP
                                                          One American Square
                                                          Suite 2900
                                                          Indianapolis, IN 46282-0200
                                                          317-236-2236
                                                          Fax : 317-592-4809
                                                          Email: jeff.hokanson@icemiller.com


### Plaintiff
----------------------
**3M Occupational Safety LLC**              represented by **Adam Arceneaux**
3M Center, Bldg. 224-5N-40                                (See above for address)
St. Paul, MN 55144
Tax ID / EIN: 11-3838764                    **Jeffrey A Hokanson**
                                                          (See above for address)


### Plaintiff
----------------------
**Aearo Holding LLC**                       represented by **Adam Arceneaux**
7911 Zionsville Road                                      (See above for address)
Indianapolis, IN 46268
Tax ID / EIN: 65-1267302                    **Jeffrey A Hokanson**

(See above for address)

*Plaintiff*
-----------------------
**Aearo Intermediate LLC**                    represented by **Adam Arceneaux**
7911 Zionsville Road                          (See above for address)
Indianapolis, IN 46268
Tax ID / EIN: 56-2443760                      **Jeffrey A Hokanson**
                                              (See above for address)


*Plaintiff*
-----------------------
**Aearo LLC**                                 represented by **Adam Arceneaux**
7911 Zionsville Road                          (See above for address)
Indianapolis, IN 46268
Tax ID / EIN: 13-3840450                      **Jeffrey A Hokanson**
                                              (See above for address)


V.

*Defendant*
-----------------------
**Parties Listed on Appendix A to the**       represented by **Parties Listed on Appendix A to the Complaint**
**Complaint,** *Those Parties Listed on*       PRO SE
*Appendix A to the Complaint and John and*
*Jane Does 1-1000*
See Appendix A
See Appendix A, IN 46268


*U.S. Trustee*
-----------------------
**U.S. Trustee**
Office of U.S. Trustee
46 E Ohio Street, Room 520
Indianapolis, IN 46204
317-226-6101
Email: ustpregion10.in.ecf@usdoj.gov

| Filing Date | # | Docket Text |
|---|---|---|
| 07/26/2022 | <u>1</u><br>(4846 pgs; 3 docs) | Adversary case 22-50059. Complaint filed by Plaintiff(s) Aearo Technologies LLC, 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC against Defendant(s) Those Parties Listed on Appendix A to the Complain [91 (Declaratory judgment)], [72 (Injunctive relief - other)]. (Attachments: (1) Appendix A (2) Appendix B) (Hokanson, Jeffrey) (Entered: 07/26/2022) |

| | | |
|---|---|---|
| 07/26/2022 | | Receipt of Complaint( 22-50059) [cmp,cmp] (350.00) Filing Fee. Receipt number A33241048. Fee amount 350.00 (re: Doc # 1). (U.S. Treasury) (Entered: 07/26/2022) |
| 07/26/2022 | 2 (51 pgs) | CORRECTED ENTRY: Debtors' Motion for Declaratory and Injunctive Relief (I) Confirming that the Automatic Stay Applies to Certain Actions Against a Non-Debtor; (II) Preliminarily Enjoining Certain Actions Against a Non-Debtor; and (III) Granting a Temporary Restraining Order Pending an Order on the Preliminary Injunction filed by Jeffrey A Hokanson. ORIGINAL ENTRY: Motion for Preliminary Injunction with Memorandum in Support, filed by Jeffrey A Hokanson on behalf of Plaintiffs 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, Aearo Technologies LLC. (Hokanson, Jeffrey) Modified on 7/26/2022. (cmm) (Entered: 07/26/2022) |
| 07/26/2022 | 3 (8 pgs) | Declaration re: Motion for Preliminary Injunction filed by Jeffrey A Hokanson on behalf of Plaintiffs 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, Aearo Technologies LLC (re: Doc # 2). (Hokanson, Jeffrey) (Entered: 07/26/2022) ℹ |
| 07/26/2022 | 4 (896 pgs; 89 docs) | Declaration re: Motion for Preliminary Injunction filed by Jeffrey A Hokanson on behalf of Plaintiffs 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, Aearo Technologies LLC (re: Doc # 2). (Attachments: (1) Exhibit 1 (2) Exhibit 2 (3) Exhibit 3 (4) Exhibit 4 (5) Exhibit 5 (6) Exhibit 6 (7) Exhibit 7 (8) Exhibit 8 (9) Exhibit 9 (10) Exhibit 10 (11) Exhibit 11 (12) Exhibit 12 (13) Exhibit 13 (14) Exhibit 14 (15) Exhibit 15 (16) Exhibit 16 (17) Exhibit 17 (18) Exhibit 18 (19) Exhibit 19 (20) Exhibit 20 (21) Exhibit 21 (22) Exhibit 22 (23) Exhibit 23 (24) Exhibit 24 (25) Exhibit 25 (26) Exhibit 26 (27) Exhibit 27 (28) Exhibit 28 (29) Exhibit 29 (30) Exhibit 30 (31) Exhibit 31 (32) Exhibit 32 (33) Exhibit 33 (34) Exhibit 34 (35) Exhibit 35 (36) Exhibit 36 (37) Exhibit 37 (38) Exhibit 38 (39) Exhibit 39 (40) Exhibit 40 (41) Exhibit 41 (42) Exhibit 42 (43) Exhibit 43 (44) Exhibit 44 (45) Exhibit 45 (46) Exhibit 46 (47) Exhibit 47 (48) Exhibit 48 (49) Exhibit 49 (50) Exhibit 50 (51) Exhibit 51 (52) Exhibit 52 (53) Exhibit 53 (54) Exhibit 54 (55) Exhibit 55 (56) Exhibit 56 (57) Exhibit 57 (58) Exhibit 58 (59) Exhibit 59 (60) Exhibit 60 (61) Exhibit 61 (62) Exhibit 62 (63) Exhibit 63 (64) Exhibit 64 (65) Exhibit 65 (66) Exhibit 66 (67) Exhibit 67 (68) Exhibit 68 (69) Exhibit 69 (70) Exhibit 70 (71) Exhibit 71 (72) Exhibit 72 (73) Exhibit 73 (74) Exhibit 74 (75) Exhibit 75 (76) Exhibit 76 (77) Exhibit 77 (78) Exhibit 78 (79) Exhibit 79 (80) Exhibit 80 (81) Exhibit 81 (82) Exhibit 82 (83) Exhibit 83 (84) Exhibit 84 (85) Exhibit 85 (86) Exhibit 86 (87) Exhibit 87 (88) Exhibit 88) (Hokanson, Jeffrey) (Entered: 07/26/2022) ℹ |

| 07/26/2022 | 5<br>(16 pgs) | Exhibit / *Exhibits A and B (Proposed Orders)* filed by Jeffrey A Hokanson on behalf of Plaintiffs 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, Aearo Technologies LLC (re: Doc # 2). (Hokanson, Jeffrey) (Entered: 07/26/2022) ⓘ |
| 07/26/2022 | 6<br>(14 pgs; 2 docs) | CORRECTED ENTRY: Debtors' Ex Parte Motion for Approval of Service Procedures for Summons, Complaint, and Other Pleadings filed by Jeffrey A Hokanson. ORIGINAL ENTRY: Motion for Ex Parte Relief filed by Jeffrey A Hokanson on behalf of Plaintiffs 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, Aearo Technologies LLC. (Attachments: (1) Exhibit A - Proposed Order) (Hokanson, Jeffrey) Modified on 7/26/2022. (cmm) (Entered: 07/26/2022) [Granted by # 10 ] ⓘ |
| 07/26/2022 | 7<br>(11 pgs; 2 docs) | CORRECTED ENTRY: Debtors' Ex Parte Motion for Entry of an Order Shortening Notice and Setting an Expedited Hearing on the Debtors' Request for a Temporary Restraining Order filed by Jeffrey A Hokanson. ORIGINAL ENTRY: Motion for Ex Parte Relief filed by Jeffrey A Hokanson on behalf of Plaintiffs 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, Aearo Technologies LLC. (Attachments: (1) Exhibit A - Proposed Order) (Hokanson, Jeffrey) Modified on 7/26/2022. (cmm) (Entered: 07/26/2022) ⓘ |
| 07/26/2022 | 8<br>(3 pgs) | Corporate Ownership Statement Pursuant to FRBP 7007.1 filed by Jeffrey A Hokanson on behalf of Plaintiffs 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, Aearo Technologies LLC. (Hokanson, Jeffrey) (Entered: 07/26/2022) ⓘ |
| 07/26/2022 | 9<br>(4 pgs; 2 docs) | Order Granting *Ex Parte* Motion To Shorten Notice And Setting Expedited Hearing on Debtors'/Plaintiffs' Request For A Temporary Restraining Order (re: Doc # 7). *Hearing to be held on 7/27/2022 at 09:30 AM Eastern in Rm 344 U.S. Courthouse, Indianapolis. Video participation information is included in this order.* **Objections are due immediately before the Hearing Attorney for the Debtors'/Plaintiffs must distribute this order.** *(lat) (Entered: 07/26/2022)* |
| 07/26/2022 | 10<br>(4 pgs) | Order Granting Debtors'/Plaintiff's *Ex Parte* Motion for Approval of Service Procedures for Summons, Complaint, and Other Pleadings (re: Doc # 6). **Attorney for the plaintiffs must distribute this order.** (lat) (Entered: 07/26/2022) |
| 07/26/2022 | 11<br>(2 pgs) | **Summons Issued.** Attorney for Plaintiff must serve the summons and a copy of the complaint on parties pursuant to |

| | | Fed.R.Bankr.P. 7004. *Service to be completed by 08/02/2022. A certificate of service must be filed with the Court by 08/09/2022. Adversary Answer due by 8/25/2022.* (cmm) (Entered: 07/26/2022) |
|---|---|---|
| 07/26/2022 | 12 (9 pgs) | Witness List AND EXHIBIT LIST filed by Jeffrey A Hokanson on behalf of Plaintiffs 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, Aearo Technologies LLC (re: Doc # 9). (Hokanson, Jeffrey) CORRECTION: Missing docket text added in all capitals. Modified on 7/27/2022. (cmm) (Entered: 07/26/2022) ℹ️ |
| 07/26/2022 | 13 (4 pgs) | Appearance filed by Robert J Pfister on behalf of Interested Party Aylstock, Witkin, Kreis & Overholtz, PLLC. (Pfister, Robert) (Entered: 07/26/2022) ℹ️ |
| 07/26/2022 | 14 (38 pgs) | Certificate of Service re: Complaint, Motion for Preliminary Injunction, Declaration, Declaration, Exhibit, Debtors' Ex Parte Motion for Approval of Service Procedures for Summons, Complaint, and Other Pleadings, Debtors' Ex Parte Motion for Entry of an Order Shortening Notice and Setting an Expedited Hearing on the Debtors' Request for a Temporary Restraining Order, Corporate Ownership Statement, Scheduling Order, Order on Motion for Authority, filed by Noticing Agent on behalf of Plaintiff Aearo Technologies LLC (re: Doc # 1, 2, 3, 4, 5, 6, 7, 8, 9, 10). (Baer, Herbert) (Entered: 07/26/2022) ℹ️ |
| 07/27/2022 | 15 (9 pgs) | Witness List AND EXHIBIT LIST filed by Jeffrey A Hokanson on behalf of Plaintiffs 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, Aearo Technologies LLC (re: Doc # 9). (Hokanson, Jeffrey) CORRECTION: Missing docket text added in all capitals. Modified on 7/27/2022. (cmm) (Entered: 07/27/2022) ℹ️ |
| 07/27/2022 | 16 (8 pgs) | Objection to Motion for Preliminary Injunction filed by Robert J Pfister on behalf of Interested Party Aylstock, Witkin, Kreis & Overholtz, PLLC (re: Doc # 2). (Pfister, Robert) (Entered: 07/27/2022) ℹ️ |
| 07/27/2022 | 17 (2 pgs) | Appearance filed by Deborah Caruso on behalf of Interested Party Seeger Weiss LLP. (Caruso, Deborah) (Entered: 07/27/2022) ℹ️ |

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Aearo Technologies LLC, *et al.*,[1] | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Case No. 22-02890-11 |
| | ) | |
| | ) | |
| | ) | |
| 3M OCCUPATIONAL SAFETY LLC, AEARO HOLDING LLC, AEARO INTERMEDIATE LLC, AEARO LLC, AND AEARO TECHNOLOGIES LLC, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Adv. Pro. No. 22-_____ |
| | ) | |
| THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT and JOHN AND JANE DOES 1-1000, | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEBTORS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (I) CONFIRMING THAT THE AUTOMATIC STAY APPLIES TO CERTAIN ACTIONS AGAINST A NON-DEBTOR; (II) PRELIMINARILY ENJOINING CERTAIN ACTIONS AGAINST A NON-DEBTOR; AND (III) GRANTING A TEMPORARY RESTRAINING ORDER PENDING AN ORDER ON THE PRELIMINARY INJUNCTION

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' First Day Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief,* filed contemporaneously herewith. The location of the Debtors' service address for the purposes of these Chapter 11 Cases is: 7911 Zionsville Road, Indianapolis, Indiana 46268

Aearo Technologies LLC ("**Aearo**") and certain other of the debtors ("**Debtors**")[2] in the above-captioned Chapter 11 Cases (the "**Chapter 11 Cases**") that are defendants in over 230,000 pending civil actions in state and federal court ("**Pending Actions**") allege for their Complaint, upon knowledge of their own acts and upon information and belief as to other matters, as follows:

### NATURE OF THE ACTION AND THE NEED FOR RELIEF[3]

1.      The Debtors commenced these Chapter 11 Cases to efficiently and equitably resolve all claims against them relating to certain hearing-protection devices manufactured and distributed by the Debtors and 3M Company ("**3M**") through the consummation of a plan of reorganization that includes the establishment of a claims trust. The relief sought in this adversary proceeding is critical to the Debtors' ability to achieve that purpose. Unless stayed, the Pending Actions will eviscerate a fundamental objective of these Chapter 11 Cases. As long as the Pending Actions are actively proceeding, the value of the estates will be at risk by, among other things, the massive direct and indirect costs of litigation. In fact, more than 100 depositions are scheduled in the Pending Actions in the next two weeks alone, along with several important briefing and expert disclosure deadlines.

2.      "Addressing mass torts through a legislative scheme enacted by Congress within the bankruptcy system… provides a judicially accepted means of aggregating and resolving mass tort claims." *In re LTL Mgmt., LLC*, 637 B.R. 396, 411 (Bankr. D.N.J. 2022). Within that legislative scheme, 11 U.S.C. § 362(a) provides "one of the fundamental protections afforded

---

[2]     Not all of the Debtors have been named defendants in the Pending Actions, as defined herein. Those that have been named as defendants include: 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, and Aearo Technologies LLC. For ease of reference, this Complaint occasionally refers to these entities as the Debtors.

[3]     The Debtors reserve the right to seek further relief, including an injunction under section 105 of the Bankruptcy Code, to extend the automatic stay or enjoin certain claims against non-debtors related to the Debtors' respirator liabilities.

to debtors by the bankruptcy laws" by automatically staying litigation to avoid the inequitable and value-destructive dynamic at issue here. *In re Grede Foundries, Inc.*, 651 F.3d 786, 790 (7th Cir. 2011) (quotation marks omitted).

3.     The Debtors ask this Court to confirm that section 362(a) of the Bankruptcy Code prohibits the defendants in this adversary proceeding (the "**Stay Defendants**"[4]) from seeking to hold 3M and its non-debtor affiliates liable for any Combat Arms Claims outside of the Bankruptcy Court. As used herein, "**Combat Arms Claims**" means any claims against the Debtors or their affiliates, on any theory of liability, relating to the Combat Arms Earplug, version 2 ("**CAEv2**") and civilian versions of the CAEv2 sold commercially to non-military consumers (collectively the "**Combat Arms Earplug**"), including the Pending Actions.

4.     In addition, the Debtors request a preliminary injunction under section 105(a) of Bankruptcy Code to enjoin the Stay Defendants from commencing or continuing Combat Arms Claims against 3M.

5.     Finally, the Debtors also seek a temporary restraining order, entered on shortened notice, to effectuate the requested relief until the Court rules on the Debtors' request for a preliminary injunction for the maximum period permitted by Fed. R. Bankr. P. 7065 expires, whichever occurs sooner. This temporary relief is sought only as to the continued prosecution of Pending Actions with active discovery, pre-trial, trial, appellate, or other deadlines (the "**Active**

---

[4]     The Stay Defendants are all plaintiffs or potential plaintiffs in lawsuits that seek to hold, or may seek to hold, the Debtors or 3M Company liable for the Combat Arms Claims, as such terms are defined herein. These Stay Defendants, with the exception of the John and Jane Doe Stay Defendants, are listed in Appendix A to this Complaint. Appendix A identifies the civil action number (where available) for each lawsuit and the law firms representing each of the Stay Defendants on account of their Combat Arms claims. The Debtors reserve the right to supplement, amend or otherwise modify Appendix A. For the avoidance of doubt, the inclusion of a Combat Arms-related claim on Appendix A is not an admission that such Stay Defendant holds a valid claim against either the Debtors or 3M.

**Litigation**"), which includes the lawsuits of approximately 3,000 Combat Arms plaintiffs (the "**Active Litigants**").[5]

6.      Contemporaneous with the filing of this Complaint, the Debtors filed a motion (the "**Motion**") seeking the same relief requested in this Complaint.

## JURISDICTION AND VENUE

7.      The United States Bankruptcy Court for the Southern District of Indiana (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference from the United States District Court for the Southern District of Indiana, dated July 11, 1984. This is a core proceeding pursuant to 28 U.S.C. § 157 and the Court has "related to" jurisdiction under 28 U.S.C. § 1334(b). The Debtors confirm their consent to the entry of a final order by the Court in connection with this adversary proceeding to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1409.

## BASIS FOR RELIEF

9.      The statutory bases for the relief requested are sections 105(a) and 362(a) of the Bankruptcy Code.

10.      The Debtors have commenced this adversary proceeding pursuant to Bankruptcy Rules 7001(7), 7001(9), and 7065.

## GENERAL BACKGROUND

11.      On July 26, 2022, (the "**Petition Date**"), the Debtors commenced these Chapter 11 Cases by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors

---

[5]      A comprehensive list of the current Active Litigants is contained in Appendix B to this Complaint. The Debtors reserve the right to supplement, amend or otherwise modify Appendix B.

are continuing in possession of their property and are managing their business, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## THE PARTIES

12.     The Debtors manufacture and sell custom noise, vibration, thermal, and shock protection solutions, primarily serving the aerospace, commercial vehicle, heavy equipment, and electronics industries. Aearo is a limited liability company incorporated under the laws of Delaware. Collectively, the Debtors have approximately 330 employees and $108 million in direct sales in 2021. The Debtors are headquartered in Indianapolis, where they have been based for over 40 years and where they have their main operating plant.

13.     Founded in 1902 as the Minnesota Mining and Manufacturing Company in Two Harbors, Minnesota, 3M is an iconic American multinational technology and manufacturing company. 3M develops products across a wide range of markets including pharmaceuticals and chemicals, digital imaging and sound technology, and office supply and consumer goods. 3M's business remains strong, with over $8.8 billion in sales reported through the first financial quarter of 2022, roughly matching their sales from the same period in 2021.

14.     3M acquired the Debtors in April 2008 through a stock purchase for approximately $1.2 billion. The acquisition was initiated with the goal of creating synergies with 3M's existing occupational health and safety business by adding the Debtors' hearing, eyewear, and fall protection product lines.

15.     Each named Defendant in Appendix A is a plaintiff in a Pending Action against the Debtors and 3M seeking to recover on account of Combat Arms Claims. Without the relief requested herein and in the Motion, the Debtors anticipate that the filing of the Chapter 11 Cases will lead Stay Defendants to pursue or initiate Combat Arms Claims against 3M to avoid the automatic stay and interfere with this Court's jurisdiction.

16.     Each of Stay Defendants John and Jane Does 1-1,000 is a prospective plaintiff who may, at any time while the Chapter 11 Cases are pending, seek to commence an action to pursue a Combat Arms Claim against the Debtors or 3M.

### FACTUAL BACKGROUND

17.     The Pending Actions of Combat Arms Claims include: (1) a multi-district litigation ("**MDL**") proceeding in the United States District Court for the Northern District of Florida (the "**MDL Court**") where over 230,000 hearing-injury claims have been brought by U.S. military servicemembers and veterans, and (2) approximately 2,000 lawsuits pending in Minnesota state court. The Combat Arms MDL is the largest MDL in United States history.

### *The Combat Arms Earplugs*

18.     As further detailed in the *Informational Brief of Aearo Technologies LLC* ("**Informational Brief**"), the Pending Actions against the Debtors and 3M allege that a hearing protection device—the Combat Arms Earplug—did not provide appropriate hearing protection due to design defects and, as a result, caused hearing loss and tinnitus in some users. Aearo designed the Combat Arms and made key early decisions that plaintiffs now challenge, and a substantial percentage (approximately 80%) of the lifetime sales of the Combat Arms Earplug occurred prior to 3M's acquisition of the Debtors in 2008. Therefore, the claims against 3M are derived from the Debtors' alleged misconduct. The Debtors stand behind the safety and efficacy of the Combat Arms Earplug. Based on decades of government, military, and other independent testing, the Debtors maintain that the product works as intended, and did not cause any injuries.

19.     In the early 1990s, a military research institute established by French and German governments—Institute de St. Louis ("**ISL**")—invented a level-dependent "filter" to be used in earplugs in which low-level sounds can pass through the filter, but sharp "impulse" noises, like gunfire, are diminished. In early 1997, ISL requested assistance from Aearo Company in

Indianapolis to develop a non-linear earplug based on ISL's filter and Aearo's existing UltraFit earplug, which was a premolded, triple-flanged earplug. Around the same time, a representative from the United States Army Research Laboratory concluded that the non-linear filter was a good option to protect against "impulse noises" such as mortar blasts and gunfire. But the military also needed standard linear ear protection, similar to a traditional foam earplug. Thus, two ISL scientists devised a two-ended device, with one end using the non-linear filter and the other end functioning as a traditional earplug.

20.　　　　In 1997, the manager of the Army's Hearing Conservation Program and chair of the Defense Department's Hearing Conservation Working Group, Dr. Doug Ohlin, indicated that he preferred the two-ended earplug design, which would be easier to dispense in the field to soldiers than two separate earplugs. Heeding Dr. Ohlin's direction, Aearo and ISL developed and manufactured a two-ended earplug designed on the UltraFit. Dr. Ohlin found that these initial samples were too long, in part because because they would not fit in a standard-issue earplug carrier, so he cut down the samples himself to shorten them. Aearo then sent Dr. Ohlin samples of the shortened version of the dual-ended earplug in late April 1999. Dr. Ohlin ultimately found the shortened dual-ended earplugs acceptable, and made a Combat Arms earplug purchase request to the Department of Defense's Joint Readiness Clinical Advisory Board.

21.　　　　At the time 3M acquired the Debtors, the Debtors were already manufacturing and distributing the Combat Arms Earplugs that would ultimately lead to the Combat Arms Claims necessitating the Chapter 11 Cases. In the first two years following the acquisition, the Debtors' business remained independent from 3M. Not until 2010 was the component of the Debtors' business responsible for the significant majority of its earplug sales transferred upstream to 3M.

*The Combat Arms Claims and Pending Actions*

22.     Even though world-class military laboratories tested the Combat Arms, some several times, using multiple testing methods, a well-orchestrated and well-funded lawyer advertising campaign that cut across traditional and social media channels as well as more targeted outlets, bombarded servicemembers and veterans with messages that the Combat Arms Earplugs were to blame for any hearing-related conditions in soldiers who served between 2003 and 2015.

23.     The lawyer-advertising onslaught was wildly successful. In April 2019, the Judicial Panel on Multidistrict Litigation formed MDL No. 2885 to "promote the just and efficient conduct of the litigation."[6] By then, the number of potential tag-along or related actions in federal courts had grown to nearly 700 cases. The MDL centralized claims before one judge charged with overseeing consolidated pretrial proceedings. However, in the MDL, plaintiffs' lawyers helped ensure that some of the most basic tools of MDL practice, including filing fee requirements and medical records releases and production, were shelved or suspended early on. While the MDL Court recognized the need to vet the merits of the inventory of cases in order to filter out claims that could not be supported, plaintiffs' lawyers, in response, claimed burdens in accessing their clients' military records (records that are needed to support their claims). As a result, for nearly two years, more than 99 percent of plaintiffs in the MDL were relieved of any obligation to produce documents substantiating their claims. The Combat Arms MDL is now flooded with a massive volume of claims that still have yet to be vetted—today, more than 110,000 active plaintiffs still have not been required to pay a filing fee, and their claims are languishing on an "administrative" docket.

24.     The MDL bellwether trial process similarly failed to advance any meaningful resolution of the tort claims related to the Combat Arms. Of the 27 plaintiffs designated as bellwethers, eight were dismissed before trial, and six trials resulted in defense verdicts. And those

---

[6]     *In re: 3M Combat Arms Earplug Prods. Liab. Litig.*, 366 F. Supp. 3d 1368, 1369 (J.P.M.L. 2019).

bellwether trials that resulted in plaintiffs' verdicts provided minimal information about value or resolution given the widely disparate outcomes.

25.     Nonetheless, due to flaws in the bellwether process (as detailed more fully in the Informational Brief), thirteen bellwether plaintiffs prevailed at trial, and were awarded wildly divergent compensatory and punitive damages awards ranging from $1.7 million to $77.5 million that were issued against the Debtors and 3M jointly. Those cases are on appeal, pending appeal, or awaiting rulings on post-trial motions.

26.     After the bellwether trials, the remaining claims in the MDL are contained on two dockets: an "administrative docket," which houses claims before they are moved to the "active docket." As of July 22, 2022, approximately 110,000 cases remain on the administrative docket, with more than 120,000 of the claims pending in the MDL on the active docket. The MDL Court has also ordered three "waves" of 500 plaintiffs each to begin producing discovery (the "**Waves**"). Three such waves have been created so far, and after voluntary dismissals, approximately 1,200 cases are currently in active discovery.

27.     In Wave 1, which as of July 22, 2022, includes 374 active cases after accounting for dismissals and moves to subsequent "waves," the parties are preparing *Daubert*, choice of law, and summary judgment motions, with responses due on August 9.

28.     In Wave 2, which as of July 22, 2022, includes 372 active cases after accounting for dismissals and moves to subsequent "waves," expert discovery is ongoing. Defendants' expert disclosures/reports are due August 15. Plaintiffs' rebuttal expert disclosures are due August 25. Depositions of plaintiffs' experts will mostly begin after the rebuttal deadline of August 25, but some may be held sooner. Expert depositions must be completed by September 26. *Daubert* and dispositive motions are due October 6, with responses due October 25.

29. In Wave 3, which as of July 22, 2022, includes 466 active cases, fact discovery is in progress, including records production and written discovery responses. Responses to written discovery are due by August 8. The deadlines for plaintiff and non-plaintiff fact depositions are September 6 and September 30, respectively. Defense medical exams must be completed by September 27. Plaintiffs' expert disclosures/reports are due October 11, and defendants' expert disclosures/reports are due November 10. Rebuttal expert disclosures/reports are due November 21. Expert depositions must be completed by January 10, 2023. *Daubert* and dispositive motions are due January 20, and responses are due February 8. Currently, there are approximately 343 fact depositions scheduled to occur in the Wave cases between July 26 and September 15, 2022.

30. Among Waves 1-3, as of July 22, 2022, approximately 50 depositions are scheduled to occur the week of July 25-29, and approximately 62 depositions are scheduled to occur the week of August 1-6, 2022.

31. In the coming months, the Wave cases will be remanded *en masse* to their transferor courts across the country. The MDL Court stated in June: "As of June 10, 2022, there were 233,883 plaintiffs in the MDL, down from 282,902 at its height in September 2021. That averages [to] 2,500 cases being remanded for trial to each of the 94 districts nationwide." *In Re: 3M Combat Arms Earplug Products Liability Litigation*, 3:19MD02885, 2022-06-10 Mediation Order (Dkt 3188) at 2. The MDL Court observed that "likely no district will be spared the burden" of this litigation, and "the amount of judicial resources required to handle this number of cases is staggering." *Id.* The MDL Court has already scheduled the first trial of a Wave case to begin on October 24, 2022.

32. In addition to the MDL, the Pending Actions include approximately 2,000 cases in Minnesota state court. The first of the Minnesota bellwether trials is currently scheduled to begin on August 29, 2022. Thirty additional bellwether Minnesota cases are in various phases of discovery in preparation for trials scheduled within the next two years.

*Impact of Combat Arms Claims on Debtors' and 3M's Resources*

33.     Continued litigation of the Combat Arms Claims at this unprecedented scale will risk valuable estate assets, redirect resources away from a successful restructuring, and jeopardize a plan reorganization process that would allow the streamlined, systematic, and equitable and efficient resolution of Combat Arms claims.

34.     The cost of litigating thousands of actions in multiple fora is immense. 3M projects that it will spend approximately $99.8 million on attorneys' fees and costs for the third and fourth quarters of 2022, not including any costs or fees associated with the October 24, 2022 trial. Indeed, in the first half of 2022, 3M spent approximately $47.77 million in attorneys' fees and costs in the first quarter of 2022, and approximately $74.5 million in the second quarter—a rate of over $4.7 million per week.

*The Funding Agreement*

35.     In the months prior to commencing these Chapter 11 Cases, the Debtors established an independent decision-making protocol, retained various restructuring advisors, and began taking proactive steps to assess whether they could address their Combat Arms and other liabilities through a chapter 11 restructuring. As part of those efforts, the Debtors evaluated whether they could obtain the financing sufficient to fund successful Chapter 11 Cases, including the professional fees and the creation of a claims trust, while also remaining independent from 3M before and during the restructuring.

36.     Against this backdrop, the Debtors, at the direction of the Disinterested Directors, and 3M determined to enter into a funding agreement pursuant to which 3M would fund the Debtors' Chapter 11 Cases. The Debtors sought to secure funds from 3M to satisfy administrative and professional fees, as well as additional amounts to, among other things, fund a claims trust in exchange for the Debtors' commitment to indemnify 3M and its non-debtor affiliates for losses

related to Combat Arms. And, in light of the shared services historically provided by 3M for the benefit of the Debtors, the Debtors also proposed to 3M that 3M commit to continue such services in the ordinary course going forward.

37.     On July 25 2022, the Debtors and 3M executed the Funding and Indemnification Agreement (the "**Funding Agreement**").[7] As part of the Funding Agreement, 3M has agreed, upon the Debtors' exhaustion of cash, to fund the Debtors' operating and administrative costs and expenditures for the duration of these Chapter 11 Cases and, upon confirmation of a plan of reorganization, to contribute to a trust to ensure Combat Arms claimants entitled to compensation receive payment. In exchange, the Debtors have agreed to indemnify 3M and its non-debtor affiliates for losses related to Combat Arms.

38.     The Funding Agreement therefore ensures that these Chapter 11 Cases will be fully funded, including administrative expenses, general unsecured claims, and any ultimate plan trust.

*The Debtors' Insurance Coverage*

39.     The Debtors and 3M share insurance and reinsurance policies that provide coverage for claims and defense costs related to the Combat Arms Claims. The Debtors have many primary, umbrella, and excess liability insurance policies including, among others, commercial general liability policies that cover defense and indemnity costs related to the Active Combat Arms litigation. These include several insurance policies predating 3M's acquisition of the Debtors, which provide a total limit of approximately $500 million, not including any supplemental defense coverage. Additionally, the Debtors have had insurance coverage under 3M's product liability and other insurance programs, including dozens of primary and excess policies, since April 1, 2008.

---

[7]     The description of the Funding Agreement set forth herein is qualified by reference to the terms of the Funding Agreement, which controls in all respects.

40. Critically, policies covering the 2018-2019 policy period—which include 46 separate policies comprising 18 layers of coverage—are shared between the Debtors and 3M. The policies explicitly provide retroactive coverage for Aearo claims as of April 1, 2008, and Aearo is listed as a named insured. In total, the combined limit of these policies is more than $1.05 billion— more than double the coverage available under the Debtors' separate policies.

41. 3M—on behalf of itself and the Debtors—provided notice of claims to the following insurers: (1) the Debtors' primary and excess insurers for policy periods covering 1997 to 2008, and (2) 3M's tower policy insurers and reinsurers for a policy period covering 2018 to 2019. In those notice letters, 3M and the Debtors requested coverage, including for litigation costs, for their defense of personal injury allegations and other covered claims relating to the Pending Actions. Although none of the insurers has yet acknowledged their coverage obligations, the Debtors and 3M maintain that they are entitled to coverage for the Pending Actions under these policies.

## NATURE OF RELIEF REQUESTED

42. To guard against the irreparable harm the Debtors would suffer if the Stay Defendants are permitted to continue the Pending Actions or commence new actions related to Combat Arms Claims against 3M during the Chapter 11 Cases, the Debtors seek: (a) confirmation that, while the Chapter 11 Cases remain pending, the commencement or continued prosecution of any Combat Arms Claims against 3M is prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code; and, in addition, (b) a preliminary injunction prohibiting the prosecution of the Pending Actions against 3M while the Chapter 11 Cases remain pending. Further, as to the subset of Pending Actions that constitute Active Litigation (defined above), the Debtors also seek a temporary restraining order, entered on shortened notice, to effectuate the requested relief pending an order on the Debtors' request for a preliminary injunction, or for the maximum period permitted by Fed. R. Bankr. P. 7065, whichever occurs sooner.

## CLAIMS FOR RELIEF

### Count I: Declaratory Relief
### Pursuant to Section 362 of the Bankruptcy Code

43.    The Debtors incorporate by reference paragraphs 1 through 42 as if fully set forth herein.

44.    Section 362(a)(1) of the Bankruptcy Code prohibits the "commencement or continuation . . . of a judicial . . . proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1).

45.    In the Seventh Circuit, the automatic stay in section 362(a)(1) enjoins actions against parties who share such an identity of interests with a debtor with respect to those actions that the debtor is, in effect, the real-party defendant in those actions. Here, 3M shares such an identity of interests with the Debtors that the Debtors, in effect, are the real-party defendant in any legal action for Combat Arms Claims brought against 3M. Litigating, settling, or attempting to establish the value of the Combat Arms Claims against 3M would bind the Debtors, including by triggering the Debtors' indemnification obligations to 3M and its non-debtor affiliates under the Funding Agreement. Moreover, because the Debtors and 3M are being tried as jointly liable for the Combat Arms Claims, a judgment against 3M is a judgment against the Debtors. Additionally, prosecution of the Combat Arms Claims against 3M risks depletion of the Debtors' estates via a drawdown of the Debtors' shared insurance policies with 3M. Moreover, the prosecution of Combat Arms Claims against 3M risks binding the Debtors through *res judicata* and/or collateral estoppel.  It also risks creating an evidentiary record that would prejudice the Debtors in any future adjudication of the Combat Arms Claims. Because the Debtors are a real-party defendant in any suit seeking to liquidate and recover on account of a Combat Arms Claim, section 362(a)(1) stays such actions.

46. Section 362(a)(3) of the Bankruptcy Code operates automatically to stay "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Section 362(a)(3) bars the Stay Defendants from bringing actions against co-insured 3M based on the Combat Arms Claims because the right to insurance coverage is property of the Debtors' estates, and such actions would deplete those estate assets. Here, joint insurance coverage for Combat Arms Claims is available to both the Debtors and 3M under various insurance policies. If a Combat Arms Claim is prosecuted against 3M, then 3M may seek coverage under these shared insurance policies to satisfy any judgment, thereby reducing the coverage available to the Debtors' estates. Depleting an estate asset violates the automatic stay and, therefore, Combat Arms Claims against 3M are stayed pursuant to section 362(a)(3).

47. Accordingly, the relief the Debtors seek in this Complaint and in the Motion is necessary and appropriate to protect the integrity of the automatic stay and the Chapter 11 Cases.

**Count II: Preliminary Injunctive Relief**
**Pursuant to Sections 105 and 362 of the Bankruptcy Code**

48. The Debtors incorporate by reference paragraphs 1 through 47 as if fully set forth herein.

49. Section 105(a) of the Bankruptcy Code authorizes and empowers this Court to issue any orders that will further the purposes and goals of the Bankruptcy Code, assist in the orderly and effective administration of the Chapter 11 Cases, aid in the preservation of the assets of the Debtors' estate, and aid in the formulation and confirmation of a Chapter 11 plan that maximizes recovery to all of the Debtors' creditors.[8]

---

[8] Section 105(a) of the Bankruptcy Code provides, in relevant part, that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

50.     Pursuant to sections 105(a) and 362 of the Bankruptcy Code, this Court may enjoin creditor actions against non-debtors where necessary to prevent an adverse impact on the Debtors' estates or to assure the orderly administration of the Debtors' Chapter 11 estates and proceedings, including by fully effectuating the protections of the automatic stay in the context of a mass-tort bankruptcy. An injunction is needed here to prohibit the Stay Defendants from continuing to prosecute the Pending Actions against 3M while the Chapter 11 Cases remain pending. Without such an injunction, the Debtors cannot achieve one of the purposes for which they commenced this reorganization.

51.     To obtain an injunction under section 105(a), the Debtors need only show: (1) the third-party litigation would defeat or impair the bankruptcy court's jurisdiction over the cases before it, (2) there is a likelihood of success on the merits, which means a likelihood of a successful reorganization, and (3) the injunction would serve the public interest. *See In re Caesars Ent. Operating Co., Inc.*, 561 B.R. 441, 450 (N.D. Ill. 2016). The Debtors satisfy each of these factors here.

52.     First, continued prosecution of the Pending Actions would defeat this Court's jurisdiction by depleting available insurance, which is an estate asset; frustrating and implicating the Debtors' indemnification obligations; and leading to discovery burdens on the Debtors, including redirecting resources that are necessary to a successful reorganization.

53.     Without the requested injunction, the Stay Defendants would seek to prosecute the exact same Combat Arms Claims that exist against the Debtors in the Chapter 11 Cases through increasingly piecemeal litigation against 3M outside of the Chapter 11 Cases in the tort system. Indeed, the Stay Defendants already look to 3M and the Debtors as a single entity and allege the same injuries using the same evidence in support of claims against them under a theory of joint and several liability—even though the core allegations in the Pending Actions concern actions that

occurred primarily at Aearo prior to its acquisition by 3M. Permitting the Stay Defendants to litigate claims against the Debtors through actions against an indemnified 3M would prevent the Debtors from establishing a trust to consolidate and collectively resolve all Combat Arms Claims against the Debtors through the Chapter 11 Cases. This non-bankruptcy litigation, if not stayed, would undermine (or eliminate) the parties' and the Court's ability to confirm a plan that treats all Combat Arms claimants fairly and equitably.

54.     Further, continued litigation of the Pending Actions against 3M outside the Bankruptcy Court could bind the Debtors under the doctrines of collateral estoppel and/or *res judicata*. Prosecution of the Pending Actions against 3M also creates a substantial risk that Combat Arms claimants will use statements, testimony, and other evidence generated in those proceedings to try to establish the Combat Arms Claims against the Debtors. This would undermine the automatic stay.

55.     Second, the Debtors' prospects for a successful reorganization are strong, and an injunction will enhance the prospects of a successful reorganization. The Debtors have entered bankruptcy in good faith and in an effort to permanently, fully, equitably, and efficiently resolve current and future Combat Arms Claims through the establishment of a trust. Through the Funding Agreement, the Debtors also have sufficient assets to fund the Chapter 11 Cases and a trust in the amount required by a confirmed plan of reorganization.

56.     Third, granting the requested injunction is in the public interest. Courts have long recognized the public interest in a successful reorganization. This is particularly true where reorganization will aid in the efficient, global, uniform, and equitable resolution of hundreds of thousands of claims.

57.     Accordingly, an injunction barring the Stay Defendants from prosecuting the Pending Actions against 3M while the Chapter 11 Cases remain pending is appropriate and essential to the orderly and effective administration of the Debtors' estates.

### Count III: Application for Temporary Restraining Order

58.     The Debtors incorporate by reference paragraphs 1 through 57 as if fully set forth herein.

59.     To preserve the effectiveness of the automatic stay until this Court has the opportunity to hold a final hearing on the Debtors' request for relief, and to prevent the foregoing irreparable harm upon the Debtors' estates, the Debtors request that, on shortened notice, the Court issue a temporary restraining order prohibiting and enjoining the Active Litigants from continuing to prosecute the Active Litigation against 3M pending an order on the Debtors' request for a preliminary injunction, or for the maximum period permitted by Fed. R. Bankr. P. 7065, whichever occurs sooner.

60.     The issuance of a temporary restraining order is warranted for the reasons set forth herein and as more fully set forth in the Motion. In addition, it is appropriate for the Court to grant the temporary restraining order with shortened notice to the Active Litigants, as set forth in the *Debtors'* accompanying procedural motions.

### PRAYER FOR RELIEF

**WHEREFORE**, the Debtors respectfully request that this Court enter judgment in their favor and request relief as follows:

(a) after notice and a hearing, enter an order and judgment confirming that the commencement or continued prosecution of Combat Arms Claims against 3M while the Chapter 11 cases remain pending violates the automatic stay imposed by section 362(a) of the Bankruptcy Code;

(b) after notice and a hearing, issue a preliminary injunction pursuant to sections 105 and 362 of the Bankruptcy Code prohibiting the Stay Defendants from continuing to prosecute the Pending Actions against 3M while the Chapter 11 Cases remain pending;

(c) after shortened notice and an expedited hearing, issue a temporary restraining order prohibiting the Active Litigants from continuing to prosecute the Active Litigation against 3M pending an order on the Debtors' request for a preliminary injunction, or for the maximum period permitted by Fed. R. Bankr. P. 7065, whichever occurs sooner; and

(d) all such other relief as the Court finds just and equitable.

Indianapolis, Indiana
Dated:  July 26, 2022

*/s/ Jeffrey A. Hokanson*
_____

**ICE MILLER LLP**
Jeffrey A. Hokanson (Ind. Atty. No. 14579-49)
John C. Cannizzaro (Ohio Atty. No. 85161)
Connor Skelly (Ind. Atty. No. 35365-06) (*pro hac vice* pending)
One American Square, Suite 2900
Indianapolis, IN 46282-0200
Telephone:      (317) 236-2100
Facsimile:       (317) 236-2219
Email:            Jeff.Hokanson@icemiller.com
                       John.Cannizzaro@icemiller.com
                       Connor.Skelly@icemiller.com

*Proposed Co-Counsel to the Plaintiffs / Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (*pro hac vice* pending)
Emily Geier (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900
Email:            edward.sassower@kirkland.com
                       emily.geier@kirkland.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chad J. Husnick, P.C. (*pro hac vice* pending)
Spencer A. Winters (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200
Email:            chad.husnick@kirkland.com
                       spencer.winters@kirkland.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Mark McKane, P.C. (*pro hac vice* pending)
555 California Street
San Francisco, California 94104
Telephone:      (415) 439-1400
Facsimile:       (415) 439-1500
Email:            mmckane@kirkland.com

*Proposed Co-Counsel to the Plaintiffs / Debtors and Debtors in Possession*

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION** | |
| | **MDL DOCKET NO. 2885** |

**NOTICE OF POTENTIAL TAG-ALONG ACTION**

In accordance with Rule 7.1(a) of the Rules of Procedure for the United States Judicial Panel on Multidistrict Litigation, undersigned counsel writes to notify you of the potential tag along action listed on the attached Schedule of Action. Undersigned counsel's firm, Keller Postman LLC, is counsel to some of the Defendants in this action. *See 3M Occupational Safety LLC, et al. v. Those Parties Listed on Appendix A to the Complaint and John and Jane Does 1-1000*, 22-ap-50059 (Bankr. S.D. Inc.), Dkt. 1-1 at 3206-3396 (listing Defendants represented by Keller Postman).

A docket sheet and the complaint[1] are attached.

*/s/ Ashley C. Keller*
Ashley C. Keller
ack@kellerpostman.com
**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

Counsel to Defendants in Tag-Along Action

---

[1] As the complaint and its attendant documents total approximately 5000 pages, undersigned counsel has only attached the complaint and not the attendant documents. If helpful, undersigned counsel is happy to provide the Panel with a full set of documents.

1

**Exhibit E**

**Transfer Request 3**

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

**IN RE: 3M COMBAT ARMS EARPLUG
PRODUCTS LIABILITY LITIGATION**

**MDL DOCKET NO. 2885**

**NOTICE OF POTENTIAL TAG-ALONG ACTION**

In accordance with Rule 7.1(a) of the Rules of Procedure for the United States Judicial Panel on Multidistrict Litigation, undersigned counsel writes to notify you of the potential tag along action listed on the attached Schedule of Action. Undersigned counsel's firm, Keller Postman LLC, has been identified as a creditor in the tag-along action and is thus a party in the action. *See* Bankruptcy Petition at 9 (listing Keller Postman LLC as the fourth largest unsecured creditor). In addition, undersigned counsel has enrolled as counsel in the tag-along action. *See In re Aearo Technologies LLC, et al.*, 22-02890 (Bankr. S.D. Ind.), Dkt. 113.

A docket sheet and the voluntary bankruptcy petition are attached.

*/s/ Ashley C. Keller*
Ashley C. Keller
ack@kellerpostman.com
**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

Creditor (party) in tag-along action
Counsel of record in tag-along action

**BEFORE THE UNITED STATES JUDICIAL PANEL**
**ON MULTIDISTRICT LITIGATION**

**IN RE: 3M COMBAT ARMS EARPLUG**
**PRODUCTS LIABILITY LITIGATION**

**MDL DOCKET NO. 2885**

**SCHEDULE OF ACTIONS**

|  | **Debtors** | **Creditors** | **District** | **Civil Action No.** | **Judge** |
|---|---|---|---|---|---|
| **1.** | Aearo Technologies LLC, 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, Aearo Mexico Holding Corp., Aearo Technologies LLC, Cabot Safety Intermediate LLC | Keller Postman LLC, Aylstock, Witkin, Kreis & Overholtz, PLLC, Watts Guerra LLP, Tracey Fox King & Walters, Clark, Love & Hutson, PLLC, Thomas J. Henry Law, The Gori Law Firm, P.C., Pulaski Law Firm, PLLC, Heninger Garrison Davis, LLC, Weitz & Luxenberg P.C., Douglas& London, P.C., Bailey Cowan Heckaman PLLC, Junell & Associates, PLLC, Nabers Law Firm, PLLC, Morgan & Morgan, Danziger & De Llano, LLP, Seeger Weiss LLP, Abraham, Watkins, | Southern District of Indiana Bankruptcy Court | 22-02890-JJG-11 | Jeffrey J. Graham |

| | Debtors | Creditors | District | Civil Action No. | Judge |
|---|---|---|---|---|---|
| | | Nichols, Sorrels, Agosto & Aziz, Morgan, Collins, Yeast and Salyer, Martin Walton Law Firm | | | |

/s/ Ashley C. Keller
Ashley C. Keller
ack@kellerpostman.com
**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

Creditor (party) in tag-along action
Counsel of record in tag-along action

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

IN RE: 3M COMBAT ARMS EARPLUG
PRODUCTS LIABILITY LITIGATION

**MDL DOCKET NO. 2885**

**PROOF OF SERVICE**

In compliance with Rule 4.1(a) of the Rules of Procedure for the United States Judicial

Panel on Multidistrict Litigation, I hereby certify that a true and correct copy of the foregoing

Notice of Tag-Along Actions and Schedule of Actions has been electronically filed with the

Judicial Panel on Multidistrict Litigation on August 2, 2022 by using the CM/ECF system. which

will send notice of electronic filing to all parties of record. For parties not registered to receive

service in this matter via the Court's electronic filing system, service is made via U.S. Mail.:

**Clerks of the Courts**
*Via First Class Mail*

United States Bankruptcy Court
Southern District of Indiana
116 U.S. Courthouse
46 E. Ohio St. Rm 116
Indianapolis, IN 46204

**Pro Se (Claims Agent)**
*Via First Class Mail*

**Kroll Restructuring Administration LLC**
55 East 52nd Street
17th Floor
New York, NY 10055

**Attorneys for 3M**
*Via First Class Mail*

**Michael Andolina**
White & Case
111 S Wacker Dr Suite 5100
Chicago, IL 60606-4302

312-881-5388
mandolina@whitecase.com

**Laura Elizabeth Baccash**
White & Case LLP
111 South Wacker Drive
Suite 5100
Chicago, IL 60606
847-736-0179
laura.baccash@whitecase.com

**Kayla D. Britton**
Faegre Drinker Biddle & Reath LLP
600 E. 96th St.
Suite 600
Indianapolis, IN 46240
317-569-9600
kayla.britton@faegredrinker.com

**Jay Jaffe**
Faegre Drinker Biddle & Reath LLP
600 East 96th Street
Suite 600
Indianapolis, IN 46240
317-569-9600
jay.jaffe@faegredrinker.com

**Jessica Lauria**
White & Case
1221 Avenue of the Americas
New York, NY 10020
212-819-7097
jessica.lauria@whitecase.com

**Matthew Evan Linder**
White & Case LLP
111 S. Wacker Drive
Suite 5100
Chicago, IL 60606
312-568-9353
mlinder@whitecase.com

**Elizabeth Marie Little**
Faegre Drinker Biddle & Reath LLP
600 E. 96th Street
Suite 600
Indianapolis, IN 46240

317-569-4608
elizabeth.little@faegredrinker.com

**Harmony A Mappes**
Faegre Drinker Biddle & Reath LLP
300 N. Meridian St.
Ste. 2500
Indianapolis, IN 46204
317-237-8246
317-237-1000 (fax)
harmony.mappes@faegredrinker.com

**Attorneys for 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, Aearo Mexico Holding Corp., Aearo Technologies LLC, Cabot Safety Intermediate LLC**
*Via First Class Mail*

**Jeffrey A Hokanson**
Ice Miller LLP
One American Square
Suite 2900
Indianapolis, IN 46282-0200
317-236-2236
317-592-4809 (fax)
jeff.hokanson@icemiller.com

**Attorneys for Aearo Technologies LLC**
*Via First Class Mail*

**David Agay**
McDonal Hopkins LLC
300 N. LaSalle Street
Suite 1400
Chicago, IL 60654
312-642-2217
312-280-8232 (fax)
dagay@mcdonaldhopkins.com

**David Bernick**
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
202-389-3201
202-389-5200 (fax)
david.bernick@kirkland.com

**Joshua A. Gadharf**
McDonald Hopkins LLC

300 N. LaSalle
Suite 1400
Chicago, IL 60654
312-280-0111
248-646-5075 (fax)
jgadharf@mcdonaldhopkins.com

**Emily Geier**
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
212-446-4800
emily.geier@kirkland.com

**David Horowitz**
Kirkland & Ellis LLP
333 South Hope Street
Los Angeles, CA 94104
213-680-8400
dhorowitz@kirkland.com

**Derek Hunter**
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
212-909-3371
derek.hunter@kirkland.com

**Chad Husnick**
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
312-862-2000
chusnick@kirkland.com

**Ashley J. Jericho**
McDonal Hopkins LLC
39533 Woodward Ave.
Suite 318
Bloomfield Hills, MI 48304
248-593-2945
248-646-5075 (fax)
ajericho@mcdonaldhopkins.com

**Micah E. Marcus**
McDonal Hopkins LLC
300 N. LaSalle Street
Ste 1400

Chicago, IL 60654
312-280-0111
mmarcus@mcdonaldhopkins.com

**Mark McKane**
Kirkland & Ellis
555 California Street
Suite 2700
San Francisco, CA 94104
415-439-1473
mark.mckane@kirkland.com

**Edward Sassower**
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
212-446-4800
esassower@kirkland.com

**Renee D. Smith**
Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60654
312-862-2310
rdsmith@kirkland.com

**Claire Stephens**
300 N LaSalle
Chicago, IL 60614
773-397-1603
claire.stephens@kirkland.com

**McClain Thompson**
1301 Pennsylvania Avenue
Washington, DC 20004
202-389-5292
mcclain.thompson@kirkland.com

**Anne Gilbert Wallice**
Kirkland & Ellis LLP
601 Lexington
New York, NY 10022
212-390-4511
anne.wallice@kirkland.com

**Spencer Winters**
Kirkland & Ellis LLP
300 N. LaSalle Street

Chicago, IL 60654
312-862-2000
spencer.winters@kirkland.com

**Attorneys for Seeger Weiss LLP**
*Via CM/ECF*

**Deborah Caruso**
Rubin & Levin, P.C.
135 N. Pennsylvania St, Suite 1400
Indianapolis, IN 46204
317-860-2867
dcaruso@rubin-levin.net

**Meredith R. Theisen**
Rubin & Levin, P.C.
135 N. Pennsylvania St., Suite 1400
Indianapolis, IN 46204
(317) 860-2877
(317) 453-8602 (fax)
mtheisen@rubin-levin.net

**John Bougiamas**
Otterbourg P.C.
230 Park Avenue
New York, NY 10169
212-905-3608
jbougiamas@otterbourg.com

**Melanie Louise Cyganowski**
Otterbourg P.C.
230 Park Avenue
New York, NY 10169
212-905-3677
212-682-6104 (fax)
mcyganowski@otterbourg.com

**Jennifer S. Feeney**
Otterbourg P.C.
230 Park Avenue
NY, NY 10169
212-661-9100
jfenney@otterbourg.com

**Adam C. Silverstein**
Otterbourg P.C.
230 Park Avenue
New York, NY 11050

212-905-3628
asilverstein@otterbourg.com

**Robert C Yan**
Otterbourg P.C.
230 Park Avenue
New York, NY 10169
212-661-9100
ryan@otterbourg.com

**Attorneys for Aylstock, Witkin, Kreis & Overholtz, PLLC**
*Via CM/ECF*

**Sasha M. Gurvitz**
KTBS Law LLP
1801 Century Park East
Ste 26th Floor
Los Angeles, CA 90067
310-407-4032
310-407-9090 (fax)
sgurvitz@ktbslaw.com

**Nir Maoz**
KTBS Law LLP
1801 Century Park East
26th Floor
Los Angeles, CA 90067
310-407-4000
310-407-9090 (fax)
nmaoz@ktbslaw.com

**Thomas E Patterson**
KTBS Law LLP
1801 Century Park East
Ste 26th Floor
Los Angeles, CA 90067
310-407-4035
310-407-9090 (fax)
tpatterson@ktbslaw.com

**Robert J Pfister**
KTBS Law LLP
1801 Century Park East
26th Floor
Los Angeles, CA 90067
310-407-4065
310-407-9090 (fax)
rpfister@ktbslaw.com

**Michael L. Tuchin**
KTBS Law LLP
1801 Century Park East
Ste 26th Floor
Los Angeles, CA 90067
310-407-4040
310-407-9090 (fax)
mtuchin@ktbslaw.com

**Attorneys for Bellwether Plaintiffs Adkins, Wilkerson, & Vaughn**
**Patricia B. Tomasco**
*Via CM/ECF*

Quinn Emanuel Urquhart & Sullivan
711 Louisiana St.
Suite 500
Houston, TX 77002
713-221-7227
713-221-7100 (fax)
pattytomasco@quinnemanuel.com

**Eric Winston**
Quinn Emanuel Urquhart & Sullivan LLP
865 South Figueroa Street
Ste 10th Floor
Los Angeles, CA 90017
213-443-3602
ericwinston@quinnemanuel.com

**Attorney for Capital Machinery Systems, Inc.**
*Via First Class Mail*

**Andrea Kochert Townsend**
Plews Shadley Racher Braun LLP
1346 N. Delaware St.
Indianapolis, IN 46202
317-637-0700
317-637-0710 (fax)
atownsend@psrb.com

**Attorneys for Clark, Love & Hutson, PLLC**
*Via CM/ECF*

**Brent Barriere**
Fishman Haygood, LLP
201 St. Charles Avenue
46th Floor

New Orleans, Ste 46th Floor
New Orleans, LA 70170
504-586-5252
504-586-5250 (fax)
bbarriere@fishmanhaygood.com

**Jason Walker Burge**
Fishman Haygood, LLP
201 St. Charles Ave., Ste. 4600
New Orleans, LA 70170
504-586-5241
jburge@fishmanhaygood.com

**Tristan Manthey**
Fishman Haygood, LLP
201 St. Charles Avenue, 46th Floor
New Orleans, LA 70170
504-586-5252
tmanthey@fishmanhaygood.com

**Cherie Nobles**
Fishman Haygood, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, LA 70170
504-556-5252
cnobles@fishmanhaygood.com

**Attorneys for Cory Watson, P.C.**
*Via CM/ECF*

**Kevin M Davis**
Caplin and Drysdale
1 Thomas Circle, NW
Ste 1100
Washington, DC 20005-5812
202-862-7846
kdavis@capdale.com

**Kevin C Maclay**
Caplin and Drysdale
1 Thomas Circle, NW
Ste 1100
Washington, DC 20005
202-862-7841
kmaclay@capdale.com

**Todd E. Phillips**
Caplin and Drysdale

9

One Thomas Circle, NW
Suite 1100
Washington, DC 20005
202-862-7850
tphillips@capdale.com

**Attorneys for Junell & Associates, PLLC**
*Via CM/ECF*

**Karen Hope Beyea-Schroeder**
Schroeder Law Office, PLLC
PO Box 131747
The Woodlands, TX 77393
832-585-9829
kschroeder@junell-law.com

**Deborah K. Levy**
Junell & Associates, PLLC
3737 Buffalo Speedway
Ste 1850
Houston, TX 77098
713-623-7131
dlevy@junell-law.com

**Attorney for Michael Martin**
*Via First Class Mail*

**Michael B. Martin**
Martin Walton Law Firm
699 S. Friendswood Drive
Suite 107
Houston, TX 77546-4580
713-773-2035
832-559-0878 (fax)
mmartin@martinwaltonlaw.com

**Attorneys for U.S. Trustee**
*Via First Class Mail*

**Laura A DuVall**
DOJ-Ust
Office of The United States Trustee
Birch Bayh Federal Building and U.S. Courthouse
46 E. Ohio Street, Ste 520
Indianapolis, IN 46204
317-226-6101
317-226-6356 (fax)
Laura.Duvall@usdoj.gov

10

**Ronald J. Moore**
DOJ-Ust
Birch Bayh Federal Building and
U.S. Courthouse
46 E. Ohio St., Ste 520
Indianapolis, IN 46204
317-226-6101
317-226-6356 (fax)
Ronald.Moore@usdoj.gov

**Harrison Edward Strauss**
DOJ-Ust
Birch Bayh Federal Building
United States Courthouse
46 E. Ohio St, Room 520
Indianapolis, IN 46204
317-226-5707
harrison.strauss@usdoj.gov

**Attorneys for Weitz & Luxenberg, PC**
*Via First Class Mail*

**Michael W. Hile**
Jacobson Hile Kight LLC
108 E. 9th Street
46202
Indianapolis, IN 46202
317-608-1132
mhile@jacobsonhile.com

**Andrew T Kight**
Jacobson Hile Kight LLC
The Elliott House
108 E. 9th Street
Indianapolis, IN 46202
317-608-1131
akight@jhklegal.com

Dated:  August 2, 2022

/s/ Ashley C. Keller
Ashley C. Keller
ack@kellerpostman.com
**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois  60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

Creditor (party) in tag-along action
Counsel of record in tag-along action

*Associated Cases*   ⌄   **ClaimsAgent, NtcAgent, OmniHearing, PlnDue, DsclsDue, JNTADMN, LEAD, CaptionLead**

# U.S. Bankruptcy Court
## Southern District of Indiana (Indianapolis)
### Bankruptcy Petition #: 22-02890-JJG-11

*Date filed:* 07/26/2022
*Deadline for filing claims (govt.):* 01/23/2023

*Assigned to:* Jeffrey J. Graham
Chapter 11
Voluntary
Asset
*Creditors:* 1

| | |
|---|---|
| ***Debtor*** | represented by **David Agay** |
| **Aearo Technologies LLC** | McDonal Hopkins LLC |
| 7911 Zionsville Road | 300 N. LaSalle Street |
| Indianapolis, IN 46268 | Suite 1400 |
| MARION-IN | Chicago, IL 60654 |
| Tax ID / EIN: 13-3840356 | 312-642-2217 |
| *fka* **E-A-R Specialty Composites** | Fax : 312-280-8232 |
| *fka* **Aearo Company** | Email: dagay@mcdonaldhopkins.com |
| *fka* **Aearo Technologies** | |

**David Bernick**
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
202-389-3201
Fax : 202-389-5200
Email: david.bernick@kirkland.com

**Joshua A. Gadharf**
McDonald Hopkins LLC
300 N. LaSalle
Suite 1400
Chicago, IL 60654
312-280-0111
Fax : 248-646-5075
Email: jgadharf@mcdonaldhopkins.com

**Emily Geier**
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
212-446-4800
Email: emily.geier@kirkland.com

**Jeffrey A Hokanson**
Ice Miller LLP
One American Square
Suite 2900
Indianapolis, IN 46282-0200
317-236-2236

Fax : 317-592-4809
Email: jeff.hokanson@icemiller.com

**David Horowitz**
Kirkland & Ellis LLP
333 South Hope Street
Los Angeles, CA 94104
213-680-8400
Email: dhorowitz@kirkland.com

**Derek Hunter**
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
212-909-3371
Email: derek.hunter@kirkland.com

**Chad Husnick**
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
312-862-2000
Email: chusnick@kirkland.com

**Ashley J. Jericho**
McDonal Hopkins LLC
39533 Woodward Ave.
Suite 318
Bloomfield Hills, MI 48304
248-593-2945
Fax : 248-646-5075
Email: ajericho@mcdonaldhopkins.com

**Micah E. Marcus**
McDonal Hopkins LLC
300 N. LaSalle Street
Ste 1400
Chicago, IL 60654
312-280-0111
Email: mmarcus@mcdonaldhopkins.com

**Mark McKane**
Kirkland & Ellis
555 California Street
Suite 2700
San Francisco, CA 94104
415-439-1473
Email: mark.mckane@kirkland.com

**Edward Sassower**
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
212-446-4800

Email: esassower@kirkland.com

**Renee D. Smith**
Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60654
312-862-2310
Email: rdsmith@kirkland.com

**Claire Stephens**
300 N LaSalle
Chicago, IL 60614
773-397-1603
Email: claire.stephens@kirkland.com

**McClain Thompson**
1301 Pennsylvania Avenue
Washington, DC 20004
202-389-5292
Email: mcclain.thompson@kirkland.com

**Anne Gilbert Wallice**
Kirkland & Ellis LLP
601 Lexington
New York, NY 10022
212-390-4511
Email: anne.wallice@kirkland.com

**Spencer Winters**
Kirkland & Ellis LLP
300 N. LaSalle Street
Chicago, IL 60654
312-862-2000
Email: spencer.winters@kirkland.com

*Member Debtor*
**Aearo LLC**
7911 Zionsville Road
Indianapolis, IN 46268
Tax ID / EIN: 13-3840450

represented by **Jeffrey A Hokanson**
(See above for address)

*Member Debtor*
**Aearo Intermediate LLC**
7911 Zionsville Road
Indianapolis, IN 46268
Tax ID / EIN: 56-2443760

represented by **Jeffrey A Hokanson**
(See above for address)

*Member Debtor*
**Aearo Holding LLC**

represented by **Jeffrey A Hokanson**
(See above for address)

7911 Zionsville Road
Indianapolis, IN 46268
Tax ID / EIN: 65-1267302

*Member Debtor*
**Aearo Mexico Holding Corp.**
7911 Zionsville Road
Indianapolis, IN 46268
Tax ID / EIN: 26-0727044

represented by **Jeffrey A Hokanson**
(See above for address)

*Member Debtor*
**Cabot Safety Intermediate LLC**
7911 Zionsville Road
Indianapolis, IN 46268
Tax ID / EIN: 13-3840449

represented by **Jeffrey A Hokanson**
(See above for address)

*Member Debtor*
**3M Occupational Safety LLC**
3M Center, Bldg. 224-5N-40
St. Paul, MN 55144
Tax ID / EIN: 11-3838764

represented by **Jeffrey A Hokanson**
(See above for address)

*Claims Agent*
**Kroll Restructuring Administration LLC**
55 East 52nd Street
17th Floor
New York, NY 10055
855-639-3375

represented by **Kroll Restructuring Administration LLC**
PRO SE

*U.S. Trustee*
**U.S. Trustee**
Office of U.S. Trustee
46 E Ohio Street, Room 520
Indianapolis, IN 46204
317-226-6101
Email: ustpregion10.in.ecf@usdoj.gov

represented by **Laura A DuVall**
DOJ-Ust
Office of The United States Trustee
Birch Bayh Federal Building and U.S. Courthouse
46 E. Ohio Street, Ste 520
Indianapolis, IN 46204
317-226-6101
Fax : 317-226-6356
Email: Laura.Duvall@usdoj.gov

**Ronald J. Moore**
DOJ-Ust
Birch Bayh Federal Building and

U.S. Courthouse
46 E. Ohio St., Ste 520
Indianapolis, IN 46204
317-226-6101
Fax : 317-226-6356
Email: Ronald.Moore@usdoj.gov

**Harrison Edward Strauss**
DOJ-Ust
Birch Bayh Federal Building
United States Courthouse
46 E. Ohio St, Room 520
Indianapolis, IN 46204
317-226-5707
Email: harrison.strauss@usdoj.gov

| Filing Date | # | Docket Text |
|---|---|---|
| 07/26/2022 | 1<br>(30 pgs; 3 docs) | Chapter 11 Voluntary Petition (Non-Individual) with Corporate Ownership Statement, List of 20 Largest Unsecured Creditors and List of Equity Security Holders filed by Jeffrey A Hokanson on behalf of Aearo Technologies LLC. *List of Secured Creditors due by 08/02/2022. Income & Expense Schedule due by 08/09/2022. Statement of Current Monthly Income (Form 122B) due by 08/09/2022. Debtor`s Pay Advices or Statement in Lieu due by 08/09/2022. Joint Debtor`s Pay Advices or Statement in Lieu due by 08/09/2022. Attorney Disclosure of Compensation due by 08/09/2022. Statement of Financial Affairs with Declaration due by 08/09/2022. Summary of Assets and Liabilities with Declaration due by 08/09/2022. Schedules A/B through J with Declaration due by 08/09/2022. Schedule A/B with Declaration due by 08/09/2022. Schedule C with Declaration due by 08/09/2022. Schedule D with Declaration due by 08/09/2022. Schedule E/F with Declaration due by 08/09/2022. Schedule G with Declaration due by 08/09/2022. Schedule H with Declaration due by 08/09/2022. Schedule I with Declaration due by 08/09/2022. Schedule J with Declaration due by 08/09/2022. Verification of Creditor List due by 08/09/2022.* (Hokanson, Jeffrey) (Entered: 07/26/2022) [Deficient; see # 15] ⓘ |
| 07/26/2022 | 2<br>(3 pgs) | Appearance filed by Jay Jaffe on behalf of Creditor 3M Company. (Jaffe, Jay) (Entered: 07/26/2022) ⓘ |
| 07/26/2022 | 3<br>(3 pgs) | Appearance filed by Kayla D. Britton on behalf of Creditor 3M Company. (Britton, Kayla) (Entered: 07/26/2022) ⓘ |
| 07/26/2022 | 4<br>(3 pgs) | Appearance filed by Harmony A Mappes on behalf of Creditor 3M Company. (Mappes, Harmony) (Entered: 07/26/2022) ⓘ |

| 07/26/2022 | 5<br>(3 pgs) | Appearance filed by Elizabeth Marie Little on behalf of Creditor 3M Company. (Little, Elizabeth) (Entered: 07/26/2022) 🛈 |
|---|---|---|
| 07/26/2022 | | Receipt of Chapter 11 Voluntary Petition( 22-02890-11) [misc,volp11] (1738.00) Filing Fee. Receipt number A33240981. Fee amount 1738.00 (re: Doc # 1). (U.S. Treasury) (Entered: 07/26/2022) |
| 07/26/2022 | 6<br>(4 pgs; 2 docs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by Michael Andolina on behalf of Creditor 3M Company. (Attachments: (1) Affidavit) (Andolina, Michael) (Entered: 07/26/2022) [Granted by # 34 ] 🛈 |
| 07/26/2022 | 7<br>(15 pgs; 2 docs) | First Day Motion for Joint Administration of Cases 22-02890, 22-02893, 22-02892, 22-02891, 22-02894, 22-02895 and 22-02896 filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A - Proposed Order) (Hokanson, Jeffrey) (Entered: 07/26/2022) [Terminated on 07/26/2022] 🛈 |
| 07/26/2022 | 8<br>(4 pgs; 2 docs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by Matthew Evan Linder on behalf of Creditor 3M Company. (Attachments: (1) Affidavit) (Linder, Matthew) (Entered: 07/26/2022) [Granted by # 36 ] 🛈 |
| 07/26/2022 | 9<br>(4 pgs; 2 docs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by Laura Elizabeth Baccash on behalf of Creditor 3M Company. (Attachments: (1) Affidavit) (Baccash, Laura) (Entered: 07/26/2022) [Granted by # 35 ] 🛈 |
| 07/26/2022 | | Judge Jeffrey J. Graham assigned. (Kleis, Eric) (Entered: 07/26/2022) |
| 07/26/2022 | 10<br>(4846 pgs; 3 docs) | Adversary case 22-50059. Complaint filed by Plaintiff(s) Aearo Technologies LLC, 3M Occupational Safety LLC, Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC against Defendant(s) Those Parties Listed on Appendix A to the Complain [91 (Declaratory judgment)], [72 (Injunctive relief - other)]. (Attachments: (1) Appendix A (2) Appendix B) (Hokanson, Jeffrey) (Entered: 07/26/2022) 🛈 |
| 07/26/2022 | 11<br>(96 pgs; 4 docs) | Declaration re: Chapter 11 Voluntary Petition, Motion for Joint Administration filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC (re: Doc # 1, 7). (Attachments: (1) Exhibit Evidentiary Support for First Day Motions (2) Exhibit Funding Agreement (3) Exhibit Exhibit C) (Hokanson, Jeffrey) (Entered: 07/26/2022) 🛈 |
| 07/26/2022 | 12<br>(62 pgs) | Brief in Support re: Declaration, filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC (re: Doc # 11). (Hokanson, Jeffrey) (Entered: 07/26/2022) |

| | | |
|---|---|---|
| 07/26/2022 | [13](#)<br>(81 pgs; 4 docs) | Motion to Retain Noticing, Balloting, or Claims Agents Pursuant to Local Rule S.D.Ind. B-1007-2, filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A (2) Exhibit B (3) Exhibit C) (Hokanson, Jeffrey) (Entered: 07/26/2022) [Granted by # 133 ] 🛈 |
| 07/26/2022 | [14](#)<br>(2 pgs) | Appearance filed by Harrison Edward Strauss on behalf of U.S. Trustee. (Strauss, Harrison) (Entered: 07/26/2022) 🛈 |
| 07/26/2022 | 15 | **Notice of Incomplete Filing issued to Jeffrey A Hokanson.** Failure to file required item(s) by the due date may result in the striking of the incomplete filing, the dismissal of the Bankruptcy case without further notice, or other action as the Court deems appropriate. **Required item(s):** A text file including names and addresses listed on Schedules D, E, F, G and H must be uploaded through the Creditor Maintenance menu. (re: Doc # [1](#)). ***Incomplete Filing due by 8/2/2022.*** (cmm) (Entered: 07/26/2022) |
| 07/26/2022 | [16](#)<br>(12 pgs; 2 docs) | Motion to Extend Time to File Schedules filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A) (Hokanson, Jeffrey) (Entered: 07/26/2022) [Granted by # 151 ] 🛈 |
| 07/26/2022 | | Receipt of Motion to Appear Pro Hac Vice( [22-02890-11](#)) [motion,mprohac] (100.00) Filing Fee. Receipt number A33241830. Fee amount 100.00 (re: Doc # [6](#)). (U.S. Treasury) (Entered: 07/26/2022) |
| 07/26/2022 | | Receipt of Motion to Appear Pro Hac Vice( [22-02890-11](#)) [motion,mprohac] (100.00) Filing Fee. Receipt number A33241845. Fee amount 100.00 (re: Doc # [8](#)). (U.S. Treasury) (Entered: 07/26/2022) |
| 07/26/2022 | [17](#)<br>(33 pgs; 3 docs) | Motion for Authority */ Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File One List of the Top Law Firms Representing the Largest Numbers of Tort Plaintiffs Asserting Claims Against the Debtors, (II) Authorizing The Debtors to File One Consolidated Creditor Matrix, (III) Authorizing the Listing of Addresses of Counsel For Tort Claimants in the Creditor Matrix in Lieu of Claimants' Addresses, (IV) Authorizing the Debtors to Redact Personally Identifiable Information, (V) Approving Certain Notice Procedures for Tort Claimants, (VI) Approving the Form and Manner of Notice of the Commencement of these Chapter 11 Cases, and (VII) Granting Related Relief* filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A (2) Exhibit B) (Hokanson, Jeffrey) (Entered: 07/26/2022) [Granted by # 134 ] 🛈 |

| 07/26/2022 | | Receipt of Motion to Appear Pro Hac Vice( 22-02890-11) [motion,mprohac] (100.00) Filing Fee. Receipt number A33241876. Fee amount 100.00 (re: Doc # 9). (U.S. Treasury) (Entered: 07/26/2022) |
|---|---|---|
| 07/26/2022 | 18<br>(30 pgs; 3 docs) | Motion for Case Management Order filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A (2) Exhibit 1) (Hokanson, Jeffrey) (Entered: 07/26/2022) [Granted by # 152 ] 🛈 |
| 07/26/2022 | 19<br>(58 pgs; 3 docs) | Motion for Case Management Order filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A (2) Exhibit B) (Hokanson, Jeffrey) CORRECTION: Document filed in error. See doc. #23 for corrected filing. Modified on 7/26/2022. (cmm) (Entered: 07/26/2022) [Amended by # 23 ] 🛈 |
| 07/26/2022 | 20<br>(44 pgs) | Motion for Authority / *Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Compensation, and Benefit Obligations and (B) Continue Employee Compensation and Benefits Programs, and (II) Granting Related Relief* filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Hokanson, Jeffrey) (Entered: 07/26/2022) 🛈 |
| 07/26/2022 | 21<br>(35 pgs; 4 docs) | First Day Motion to Pay Pre-Petition Trust Fund Taxes filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A (2) Exhibit B (3) Exhibit C) (Hokanson, Jeffrey) (Entered: 07/26/2022) 🛈 |
| 07/26/2022 | 22<br>(57 pgs; 4 docs) | Motion for Authority / *Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Continue to Pay Certain Brokerage Fees, and (C) Renew, Supplement, Modify, or Purchase Insurance and Reinsurance Coverage, (II) Approving Continuation of Their Surety Bond Program, and (III) Granting Related Relief* filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A (2) Exhibit B (3) Exhibit C) (Hokanson, Jeffrey) (Entered: 07/26/2022) 🛈 |
| 07/26/2022 | 23<br>(58 pgs; 3 docs) | Amended First Day Motion for Approval of Cash Management System (Bank Accounts/Business Forms) filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC (re: Doc # 19). (Attachments: (1) Exhibit A (2) Exhibit B) (Hokanson, Jeffrey) (Entered: 07/26/2022) 🛈 |
| 07/26/2022 | 24 | First Day Motion to Provide Adequate Assurance to Utilities |

| | | |
|---|---|---|
| | | (40 pgs; 4 docs) | filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A (2) Exhibit B (3) Exhibit C) (Hokanson, Jeffrey) (Entered: 07/26/2022) 🛈 |
| 07/26/2022 | 25<br>(44 pgs; 3 docs) | Motion for Authority / *Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Specified Trade Claimants, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (III) Granting Related Relief* filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A (2) Exhibit B) (Hokanson, Jeffrey) (Entered: 07/26/2022) 🛈 |
| 07/26/2022 | 26<br>(2 pgs) | Appearance filed by Ronald J. Moore on behalf of U.S. Trustee. (Moore, Ronald) (Entered: 07/26/2022) 🛈 |
| 07/26/2022 | 27<br>(2 pgs) | Appearance filed by Laura A DuVall on behalf of U.S. Trustee. (DuVall, Laura) (Entered: 07/26/2022) 🛈 |
| 07/26/2022 | 28<br>(7 pgs) | Motion for Expedited Hearing and/or Shortened Notice Time on Motion for Case Management Order, filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC (re: Doc # 18). (Hokanson, Jeffrey) (Entered: 07/26/2022) [Amended by # 32 ] 🛈 |
| 07/26/2022 | 29<br>(11 pgs; 2 docs) | Motion for Expedited Hearing and/or Shortened Notice Time on Motion for Authority / *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File One List of the Top Law Firms Representing the Largest Numbers of Tort Plaintiffs Asserting Claims Against the Debtors, (II) Authorizing The Debtors to File One Consolidated Creditor Matrix, (III) Authorizing the Listing of Addresses of Counsel For Tort Claimants in the Creditor Matrix in Lieu of Claimants' Addresses, (IV) Authorizing the Debtors to Redact Personally Identifiable Information, (V) Approving Certain Notice Procedures for Tort Claimants, (VI) Approving the Form and Manner of Notice of the Commencement of these Chapter 11 Cases, and (VII) Granting Related Relief*, filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC (re: Doc # 17). (Attachments: (1) Exhibit A) (Hokanson, Jeffrey) (Entered: 07/26/2022) [Granted by # 45 ] 🛈 |
| 07/26/2022 | 30<br>(11 pgs; 2 docs) | Motion for Expedited Hearing and/or Shortened Notice Time on Motion to Retain Noticing, Balloting, or Claims Agent, filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC (re: Doc # 13). (Attachments: (1) Exhibit A) (Hokanson, Jeffrey) (Entered: 07/26/2022) [Granted by # 47 ] 🛈 |
| 07/26/2022 | 31 | Motion for Expedited Hearing and/or Shortened Notice |

| | | |
|---|---|---|
| | (11 pgs; 2 docs) | Time on Motion to Extend Time to File Initial Documents, filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC (re: Doc # 16). (Attachments: (1) Exhibit A) (Hokanson, Jeffrey) (Entered: 07/26/2022) [Granted by # 49 ] ℹ |
| 07/26/2022 | 32 (11 pgs; 2 docs) | Amended Motion for Expedited Hearing and/or Shortened Notice Time on Motion for Case Management Order, Motion for Expedited Hearing and/or Shortened Notice Time, filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC (re: Doc # 18, 28). (Attachments: (1) Exhibit A) (Hokanson, Jeffrey) (Entered: 07/26/2022) [Granted by # 50 ] ℹ |
| 07/26/2022 | 33 (4 pgs; 2 docs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by Jessica Lauria on behalf of Creditor 3M Company. (Attachments: (1) Affidavit Affidavit in Support of Motion to Appear Pro Hac Vice) (Lauria, Jessica) (Entered: 07/26/2022) [Granted by # 85 ] ℹ |
| 07/26/2022 | | Receipt of Motion to Appear Pro Hac Vice( 22-02890-JJG-11) [motion,mprohac] (100.00) Filing Fee. Receipt number A33243142. Fee amount 100.00 (re: Doc # 33). (U.S. Treasury) (Entered: 07/26/2022) |
| 07/26/2022 | 34 (1 pg) | Order Granting Motion to Appear Pro Hac Vice (re: Doc # 6). **Attorney for Creditor 3M Company must distribute this order.** (hhd) (Entered: 07/26/2022) |
| 07/26/2022 | 35 (1 pg) | Order Granting Motion to Appear Pro Hac Vice (re: Doc # 9). **Attorney for Creditor 3M Company must distribute this order.** (hhd) (Entered: 07/26/2022) |
| 07/26/2022 | 36 (1 pg) | Order Granting Motion to Appear Pro Hac Vice (re: Doc # 8). **Attorney for Creditor 3M Company must distribute this order.** (hhd) (Entered: 07/26/2022) |
| 07/26/2022 | 37 (5 pgs) | Order Granting Motion to Jointly Administer Member Case 22-02891 under Lead Case 22-02890. (order distributed to e-filers only) (cmm) (Entered: 07/26/2022) |
| 07/26/2022 | 38 (5 pgs) | Order Granting Motion to Jointly Administer Member Case 22-02892 under Lead Case 22-02890. (order distributed to e-filers only) (cmm) (Entered: 07/26/2022) |
| 07/26/2022 | 39 (5 pgs) | Order Granting Motion to Jointly Administer Member Case 22-02893 under Lead Case 22-02890. (order distributed to e-filers only) (cmm) (Entered: 07/26/2022) |
| 07/26/2022 | 40 (5 pgs) | Order Granting Motion to Jointly Administer Member Case 22-02894 under Lead Case 22-02890. (order distributed to e-filers only) (cmm) (Entered: 07/26/2022) |

| | | |
|---|---|---|
| 07/26/2022 | [41](#)<br>(5 pgs) | Order Granting Motion to Jointly Administer Member Case [22-02895](#) under Lead Case 22-02890. (order distributed to e-filers only) (cmm) (Entered: 07/26/2022) |
| 07/26/2022 | [42](#)<br>(5 pgs) | Order Granting Motion to Jointly Administer Member Case [22-02896](#) under Lead Case 22-02890. (order distributed to e-filers only) (cmm) (Entered: 07/26/2022) |
| 07/26/2022 | [43](#)<br>(3 pgs) | Appearance filed by Robert J Pfister on behalf of Interested Party Aylstock, Witkin, Kreis & Overholtz, PLLC. (Pfister, Robert) (Entered: 07/26/2022) 🛈 |
| 07/26/2022 | [44](#)<br>(4 pgs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by Nir Maoz on behalf of Interested Party Aylstock, Witkin, Kreis & Overholtz, PLLC. (Maoz, Nir) (Entered: 07/26/2022) [Granted by # [86](#) ] 🛈 |
| 07/26/2022 | | Receipt of Motion to Appear Pro Hac Vice( [22-02890-JJG-11](#)) [motion,mprohac] (100.00) Filing Fee. Receipt number A33243724. Fee amount 100.00 (re: Doc # [44](#)). (U.S. Treasury) (Entered: 07/26/2022) |
| 07/26/2022 | [45](#)<br>(3 pgs; 2 docs) | Order Granting Motion for Expedited Hearing on Debtor's Motion on Motion for Entry of an Order (I) Authorizing the Debtors to File One List of the Top Law Firms Representing the Largest Numbers of Tort Plaintiffs Asserting Claims Against the Debtors, (II) Authorizing The Debtors to File One Consolidated Creditor Matrix, (III) Authorizing the Listing of Addresses of Counsel For Tort Claimants in the Creditor Matrix in Lieu of Claimants' Addresses, (IV) Authorizing the Debtors to Redact Personally Identifiable Information, (V) Approving Certain Notice Procedures for Tort Claimants, (VI) Approving the Form and Manner of Notice of the Commencement of these Chapter 11 Cases (re: Doc #[29](#)). *Hearing to be held on 7/27/2022 at 09:30 AM Eastern in Rm 344 U.S. Courthouse, Indianapolis. Video Participation Information Included in Hearing Notice* **Attorney for the debtor must distribute this order. (hhd) (Entered: 07/26/2022)** |
| 07/26/2022 | [46](#)<br>(2 pgs; 2 docs) | Notice of Jointly Administered Cases (re: Doc # [37](#), [38](#), [39](#), [40](#), [41](#), [42](#), [7](#) on [22-02893-JJG-11](#), [7](#) on [22-02896-JJG-11](#), [7](#) on [22-02894-JJG-11](#), [7](#) on [22-02892-JJG-11](#), [7](#) on [22-02891-JJG-11](#), [7](#) on [22-02895-JJG-11](#)). **ATTORNEY FOR THE DEBTOR MUST DISTRIBUTE THIS ORDER.** (cmm) CORRECTION: Missing docket text added in all capitals. Modified on 7/27/2022. (cmm) (Entered: 07/26/2022) |
| 07/26/2022 | [47](#)<br>(2 pgs; 2 docs) | Order Granting Motion for Expedited Hearing on Debtor's Motion to Retain Noticing, Balloting, or Claims Agents Pursuant to Local Rule S.D.Ind. B-1007-2 (re: Doc #[30](#)). |

| | | |
|---|---|---|
| | | *Hearing to be held on 7/27/2022 at 09:30 AM Eastern in Rm 344 U.S. Courthouse, Indianapolis. Video Participation Information to be Included in Hearing Notice* **Attorney for the debtor must distribute this order.** (hhd) (Entered: 07/26/2022) |
| 07/26/2022 | [48](#)<br>(4 pgs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by Sasha M. Gurvitz on behalf of Interested Party Aylstock, Witkin, Kreis & Overholtz, PLLC. (Gurvitz, Sasha) (Entered: 07/26/2022) [Granted by # [90](#) ] |
| 07/26/2022 | | Receipt of Motion to Appear Pro Hac Vice( 22-02890-JJG-11) [motion,mprohac] (100.00) Filing Fee. Receipt number A33243845. Fee amount 100.00 (re: Doc # [48](#)). (U.S. Treasury) (Entered: 07/26/2022) |
| 07/26/2022 | [49](#)<br>(2 pgs; 2 docs) | Order Granting Motion for Expedited Hearing on Debtor's Motion to Extend Time to File Schedules (re: Doc #[31](#)). *Hearing to be held on 7/27/2022 at 09:30 AM Eastern in Rm 344 U.S. Courthouse, Indianapolis.Video Participation Information to be Included in Hearing Notice* **Attorney for the debtor must distribute this order.** (hhd) (Entered: 07/26/2022) |
| 07/26/2022 | [50](#)<br>(2 pgs; 2 docs) | Order Granting Motion for Expedited Hearing on Debtor's Motion for Case Management Order (re: Doc #[32](#)). *Hearing to be held on 7/27/2022 at 09:30 AM Eastern in Rm 344 U.S. Courthouse, Indianapolis. Video Participation Information to be Included in Hearing Notice.* **Attorney for the debtor must distribute this order.** (hhd) (Entered: 07/26/2022) |
| 07/26/2022 | [51](#)<br>(4 pgs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by Thomas E Patterson on behalf of Interested Party Aylstock, Witkin, Kreis & Overholtz, PLLC. (Patterson, Thomas) (Entered: 07/26/2022) [Granted by # [91](#) ] |
| 07/26/2022 | | Receipt of Motion to Appear Pro Hac Vice( 22-02890-JJG-11) [motion,mprohac] (100.00) Filing Fee. Receipt number A33243903. Fee amount 100.00 (re: Doc # [51](#)). (U.S. Treasury) (Entered: 07/26/2022) |
| 07/26/2022 | [52](#)<br>(6 pgs) | Notice of Submission */ Agenda for First Day Hearing* filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC (re: Doc # [7](#), [11](#), [12](#), [13](#), [16](#), [17](#), [18](#), [20](#), [22](#), [23](#), [24](#), [25](#), [29](#), [30](#)). (Hokanson, Jeffrey) (Entered: 07/26/2022) |
| 07/26/2022 | [53](#)<br>(5 pgs) | CORRECTED ENTRY: Notice of Hearing on (I) First Day Motions and (II) Related Pleadings Filed in Adversary Proceeding filed by Jeffrey A Hokanson. ORIGINAL ENTRY: Notice of Hearing re: Notice of Submission */ |

| | | |
|---|---|---|
| | | *Agenda for First Day Hearing*, filed by Jeffrey A Hokanson on behalf of Debtor Aearo Technologies LLC (re: Doc # 52). *Hearing to be held on 7/27/2022 at 09:30 AM Eastern in Rm 344 U.S. Courthouse, Indianapolis. PARTIES THAT WISH TO LISTEN BUT NOT ACTIVELY PARTICIPATE MAY DO SO BY PHONE AT 551-285-1373 OR 646-828-7669, MEETING ID 160 2312 6397.* (Hokanson, Jeffrey) Modified on 7/26/2022. (cmm) CORRECTION: Missing text added in all capitals. Modified on 7/27/2022. (cmm) (Entered: 07/26/2022) 🛈 |
| 07/26/2022 | 54 (13 pgs) | Objection to Motion for Authority */ Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Specified Trade Claimants, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (III) Granting Related Relief* filed by Harrison Edward Strauss on behalf of U.S. Trustee (re: Doc # 25). (Strauss, Harrison) (Entered: 07/26/2022) 🛈 |
| 07/26/2022 | 55 (7 pgs; 2 docs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by Chad Husnick on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Affidavit) (Husnick, Chad) (Entered: 07/26/2022) [Granted by # 111 ] 🛈 |
| 07/26/2022 | 56 (6 pgs; 2 docs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by Emily Geier on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Affidavit) (Geier, Emily) (Entered: 07/26/2022) [Granted by # 112 ] 🛈 |
| 07/26/2022 | 57 (7 pgs; 3 docs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by Ashley Keller on behalf of Creditor Richard Valle. (Attachments: (1) Affidavit (2) Proposed Order) (Keller, Ashley) (Entered: 07/26/2022) [Granted by # 113 ] 🛈 |
| 07/26/2022 | | Receipt of Motion to Appear Pro Hac Vice( 22-02890-JJG-11) [motion,mprohac] (100.00) Filing Fee. Receipt number A33244394. Fee amount 100.00 (re: Doc # 57). (U.S. Treasury) (Entered: 07/26/2022) |
| 07/26/2022 | 58 (6 pgs; 2 docs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by Spencer Winters on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Affidavit) (Winters, Spencer) (Entered: 07/26/2022) [Granted by # 114 ] 🛈 |
| 07/26/2022 | 59 (6 pgs; 2 docs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by Derek Hunter on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Affidavit) (Hunter, Derek) (Entered: 07/26/2022) [Granted by # 115 ] 🛈 |
| 07/26/2022 | 60 (6 pgs; 2 docs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by Edward Sassower on behalf of Debtor Aearo |

| | | |
|---|---|---|
| | | Technologies LLC. (Attachments: (1) Affidavit) (Sassower, Edward) (Entered: 07/26/2022) [Granted by # 116 ] ℹ️ |
| 07/26/2022 | 61 (7 pgs; 2 docs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by McClain Thompson on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Affidavit) (Thompson, McClain) (Entered: 07/26/2022) [Granted by # 117 ] ℹ️ |
| 07/26/2022 | 62 (7 pgs; 2 docs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by David Horowitz on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Affidavit) (Horowitz, David) (Entered: 07/26/2022) [Granted by # 118 ] ℹ️ |
| 07/26/2022 | 63 (6 pgs; 2 docs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by Micah E. Marcus on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A - Affidavit) (Marcus, Micah) (Entered: 07/26/2022) [Granted by # 125 ] ℹ️ |
| 07/26/2022 | | Receipt of Motion to Appear Pro Hac Vice( 22-02890-JJG-11) [motion,mprohac] (100.00) Filing Fee. Receipt number A33244566. Fee amount 100.00 (re: Doc # 63). (U.S. Treasury) (Entered: 07/26/2022) |
| 07/26/2022 | 64 (10 pgs) | Objection to Motion for Approval of Cash Management System (Bank Accounts/Business Forms) filed by Harrison Edward Strauss on behalf of U.S. Trustee (re: Doc # 23). (Strauss, Harrison) (Entered: 07/26/2022) ℹ️ |
| 07/26/2022 | 65 (6 pgs; 2 docs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by David Agay on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A - Affidavit) (Agay, David) (Entered: 07/26/2022) [Granted by # 127 ] ℹ️ |
| 07/26/2022 | 66 (7 pgs) | Objection to Motion for Authority */ Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Compensation, and Benefit Obligations and (B) Continue Employee Compensation and Benefits Programs, and (II) Granting Related Relief* filed by Harrison Edward Strauss on behalf of U.S. Trustee (re: Doc # 20). (Strauss, Harrison) (Entered: 07/26/2022) ℹ️ |
| 07/26/2022 | | Receipt of Motion to Appear Pro Hac Vice( 22-02890-JJG-11) [motion,mprohac] (100.00) Filing Fee. Receipt number A33244578. Fee amount 100.00 (re: Doc # 65). (U.S. Treasury) (Entered: 07/26/2022) |
| 07/26/2022 | 67 (6 pgs; 2 docs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by Joshua A. Gadharf on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A - Affidavit) |

| | | |
|---|---|---|
| | | (Gadharf, Joshua) (Entered: 07/26/2022) [Granted by # 128] ℹ️ |
| 07/26/2022 | | Receipt of Motion to Appear Pro Hac Vice( 22-02890-JJG-11) [motion,mprohac] (100.00) Filing Fee. Receipt number A33244586. Fee amount 100.00 (re: Doc # 67). (U.S. Treasury) (Entered: 07/26/2022) |
| 07/26/2022 | 68 (6 pgs; 2 docs) | Motion to Appear Pro Hac Vice with Affidavit in Support filed by Ashley Jennifer Jericho on behalf of Debtor Aearo Technologies LLC. (Attachments: (1) Exhibit A - Affidavit) (Jericho, Ashley) (Entered: 07/26/2022) [Granted by # 129] ℹ️ |
| 07/26/2022 | | Receipt of Motion to Appear Pro Hac Vice( 22-02890-JJG-11) [motion,mprohac] (100.00) Filing Fee. Receipt number A33244591. Fee amount 100.00 (re: Doc # 68). (U.S. Treasury) (Entered: 07/26/2022) |
| 07/26/2022 | 69 (7 pgs) | Objection to Motion for Authority *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File One List of the Top Law Firms Representing the Largest Numbers of Tort Plaintiffs Asserting Claims Against the Debtors, (II) Authorizing The Debtors to File One Consolidated Creditor Matrix, (III) Authorizing the Listing of Addresses of Counsel For Tort Claimants in the Creditor Matrix in Lieu of Claimants' Addresses, (IV) Authorizing the Debtors to Redact Personally Identifiable Information, (V) Approving Certain Notice Procedures for Tort Claimants, (VI) Approving the Form and Manner of Notice of the Commencement of these Chapter 11 Cases, and (VII) Granting Related Relief* filed by Harrison Edward Strauss on behalf of U.S. Trustee (re: Doc # 17). (Strauss, Harrison) (Entered: 07/26/2022) ℹ️ |
| 07/26/2022 | 70 (46 pgs) | Certificate of Service re: Motion for Joint Administration, Declaration, Brief, Motion to Retain Noticing, Balloting, or Claims Agent, Motion to Extend Time to File Initial Documents, Motion for Authority *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File One List of the Top Law Firms Representing the Largest Numbers of Tort Plaintiffs Asserting Claims Against the Debtors, (II) Authorizing The Debtors to File One Consolidated Creditor Matrix, (III) Authorizing the Listing of Addresses of Counsel For Tort Claimants in the Creditor Matrix in Lieu of Claimants' Addresses, (IV) Authorizing the Debtors to Redact Personally Identifiable Information, (V) Approving Certain Notice Procedures for Tort Claimants, (VI) Approving the Form and Manner of Notice of the Commencement of these Chapter 11 Cases, and (VII) Granting Related Relief*, Motion for Case Management Order, Motion for Authority *Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the* |

*Debtors to (A) Pay Prepetition Wages, Compensation, and Benefit Obligations and (B) Continue Employee Compensation and Benefits Programs, and (II) Granting Related Relief*, Motion to Pay Pre-Petition Trust Fund Taxes, Motion for Authority */ Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Continue to Pay Certain Brokerage Fees, and (C) Renew, Supplement, Modify, or Purchase Insurance and Reinsurance Coverage, (II) Approving Continuation of Their Surety Bond Program, and (III) Granting Related Relief*, Motion for Approval of Cash Management System (Bank Accounts/Business Forms), Motion to Provide Adequate Assurance to Utilities, Motion for Authority */ Debtors' First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Specified Trade Claimants, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (III) Granting Related Relief*, Motion for Expedited Hearing and/or Shortened Notice Time on Motion for Authority */ Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File One List of the Top Law Firms Representing the Largest Numbers of Tort Plaintiffs Asserting Claims Against the Debtors, (II) Authorizing The Debtors to File One Consolidated Creditor Matrix, (III) Authorizing the Listing of Addresses of Counsel For Tort Claimants in the Creditor Matrix in Lieu of Claimants' Addresses, (IV) Authorizing the Debtors to Redact Personally Identifiable Information, (V) Approving Certain Notice Procedures for Tort Claimants, (VI) Approving the Form and Manner of Notice of the Commencement of these Chapter 11 Cases, and (VII) Granting Related Relief*, Motion for Expedited Hearing and/or Shortened Notice Time, Motion for Expedited Hearing and/or Shortened Notice Time, Motion for Expedited Hearing and/or Shortened Notice Time, Order on Motion for Expedited Hearing and/or Shortened Notice Time, Joint Administration Notice, Order on Motion for Expedited Hearing and/or Shortened Notice Time, Order on Motion for Expedited Hearing and/or Shortened Notice Time, Order on Motion for Expedited Hearing and/or Shortened Notice Time, Notice of Submission */ Agenda for First Day Hearing*, Notice of Hearing on (I) First Day Motions and (II) Related Pleadings Filed in Adversary Proceeding, filed by Noticing Agent on behalf of Member Debtor Aearo Intermediate LLC (re: Doc # 7, 11, 12, 13, 16, 17, 18, 20, 21, 22, 23, 24, 25, 29, 30, 31, 32, 45, 46, 47, 49, 50, 52, 53). (Baer, Herbert) (Entered: 07/26/2022) 🛈

| | | |
|---|---|---|
| 07/27/2022 | 71 | **Notice of Incomplete Filing issued to Edward Sassower.** Failure to file required item(s) by the due date may result in the striking of the incomplete filing, the dismissal of the Bankruptcy case without further notice, or other action as |

| | | |
|---|---|---|
| | | the Court deems appropriate. **Required item(s):** A $100.00 filing fee is due for the Motion to Appear Pro Hac Vice filed on 07/26/2022. (re: Doc # 60). ***Incomplete Filing due by 08/03/2022.*** (Admin) (Entered: 07/27/2022) |
| 07/27/2022 | 72 | **Notice of Incomplete Filing issued to Spencer Winters.** Failure to file required item(s) by the due date may result in the striking of the incomplete filing, the dismissal of the Bankruptcy case without further notice, or other action as the Court deems appropriate. **Required item(s):** A $100.00 filing fee is due for the Motion to Appear Pro Hac Vice filed on 07/26/2022. (re: Doc # 58). ***Incomplete Filing due by 08/03/2022.*** (Admin) (Entered: 07/27/2022) |

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

Southern District of Indiana
(State)

Case number *(if known):* _____   Chapter   11

☐ Check if this is an
amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

06/22

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, "                      ", is available.

| | | |
|---|---|---|
| 1. | **Debtor's Name** | **Aearo Technologies LLC** |
| 2. | **All other names debtor used in the last 8 years** | **E-A-R Specialty Composites, Aearo Company, Aearo Technologies** |
| | Include any assumed names, trade names, and *doing business as* names | |
| 3. | **Debtor's federal Employer Identification Number** (EIN) | **13-3840356** |

4. **Debtor's address**

**Principal place of business**

7911 Zionsville Road
Number        Street

Indianapolis            IN        46268
City                        State    Zip Code

Marion
County

**Mailing address, if different from principal place of business**

_____
Number        Street

_____
P.O. Box

_____
City            State    Zip Code

**Location of principal assets, if different from principal place of business**

_____
Number        Street

_____

_____
City            State    Zip Code

5. **Debtor's website** (URL)     https://earglobal.com/en/

6. **Type of debtor**

☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____

| Debtor | Aearo Technologies LLC | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

**7. Describe debtor's business**

A. *Check One:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☒ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .
3399

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub- box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box

*Check One:*

☐ Chapter 7

☐ Chapter 9

☒ Chapter 11  *Check all that apply:*

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, and it chooses to proceed under Subchapter V of Chapter 11. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☒ No

☐ Yes.

| District | | When | MM/DD/YYYY | Case number | |
|---|---|---|---|---|---|
| District | | When | MM/DD/YYYY | Case number | |

| Debtor | Aearo Technologies LLC | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☐ No
☒ Yes.

| | | | |
|---|---|---|---|
| Debtor | **See Rider 1** | Relationship | **Affiliate** |
| District | **Southern District of Indiana** | When | **07/26/2022** |
| Case number, if known | _____ | | MM / DD / YYYY |

**11. Why is the case filed in "   "?**

*Check all that apply:*

☒ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No
☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?**

| | | |
|---|---|---|
| | Number | Street |
| | | |
| City | State | Zip Code |

**Is the property insured?**

☐ No
☐ Yes. Insurance agency _____
Contact name _____
Phone _____

---

### Statistical and administrative information

**13. Debtor's estimation of available funds**

*Check one:*

☒ Funds will be available for distribution to unsecured creditors.
☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

---

| Debtor | Aearo Technologies LLC | Case number *(if known)* |
|---|---|---|
| | Name | |

**14. Estimated number of creditors (on a consolidated basis)**

- ☐ 1-49
- ☐ 50-99
- ☐ 100-199
- ☐ 200-999
- ☐ 1,000-5,000
- ☐ 5,001-10,000
- ☐ 10,001-25,000
- ☐ 25,001-50,000
- ☐ 50,001-100,000
- ☒ More than 100,000

**15. Estimated assets (on a consolidated basis)**

- ☐ $0-$50,000
- ☐ $50,001-$100,000
- ☐ $100,001-$500,000
- ☐ $500,001-$1 million
- ☐ $1,000,001-$10 million
- ☐ $10,000,001-$50 million
- ☐ $50,000,001-$100 million
- ☐ $100,000,001-$500 million
- ☐ $500,000,001-$1 billion
- ☒ $1,000,000,001-$10 billion
- ☐ $10,000,000,001-$50 billion
- ☐ More than $50 billion

**16. Estimated liabilities (on a consolidated basis)**

- ☐ $0-$50,000
- ☐ $50,001-$100,000
- ☐ $100,001-$500,000
- ☐ $500,001-$1 million
- ☐ $1,000,001-$10 million
- ☐ $10,000,001-$50 million
- ☐ $50,000,001-$100 million
- ☐ $100,000,001-$500 million
- ☐ $500,000,001-$1 billion
- ☒ $1,000,000,001-$10 billion[1]
- ☐ $10,000,000,001-$50 billion
- ☐ More than $50 billion

| | **Request for Relief, Declaration, and Signatures** |
|---|---|

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    __07/26/2022__
      MM/ DD / YYYY

✘   "    "
   Signature of authorized representative of debtor

John R. Castellano
Printed name

Title   __Authorized Signatory__

**18. Signature of attorney**

✘   "    "     Date   __07/26/2022__
   Signature of attorney for debtor       MM/DD/YYYY

Jeffrey A. Hokanson
Printed name

Ice Miller LLP
Firm name

One American Square, Suite 2900
Number       Street

Indianapolis       IN       46282-0200
City       State       ZIP Code

(317) 236-2100       Jeff.Hokanson@icemiller.com
Contact phone       Email address

14579-49       IN
Bar number       State

---

[1]   The Debtors have obtained a commitment for $1 billion to fund a trust to resolve all claims determined to be entitled to compensation, based on the analysis of an experienced estimator of claims in chapter 11.

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case</strong>:</td></tr>
<tr><td colspan="2">United States Bankruptcy Court for the:<br><br>                       Southern District of Indiana<br>                            (State)</td></tr>
<tr><td>Case number <em>(if known)</em>: _____</td><td>Chapter   <u>11</u></td></tr>
</table>

☐ Check if this is an
amended filing

### <u>Rider 1</u>
### <u>Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor</u>

On the date hereof, each of the entities listed below (collectively, the "<u>Debtors</u>") filed a petition in the United States Bankruptcy Court for the Southern District of Indiana for relief under chapter 11 of title 11 of the United States Code.  The Debtors anticipate subsequently moving for joint administration of the chapter 11 cases.

- Aearo Technologies LLC
- Aearo Holding LLC
- Aearo Intermediate LLC
- Aearo LLC
- Aearo Mexico Holding Corp.
- Cabot Safety Intermediate LLC
- 3M Occupational Safety LLC

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | )  | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AEARO TECHNOLOGIES LLC, | ) | Case No. 22-_____(___) |
| | ) | |
| Debtor. | ) | |
| | ) | |

### LIST OF EQUITY SECURITY HOLDERS[1]

| Debtor | Equity Holders | Address of Equity Holder | Percentage of Equity Held |
|---|---|---|---|
| Aearo Technologies LLC | Aearo LLC | 7911 Zionsville Road, Indianapolis, IN 46268 | 100% |

---

[1] This list serves as the disclosure required to be made by the debtor pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure.  All equity positions listed indicate the record holder of such equity as of the date of commencement of the chapter 11 case.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

_____  )
                                         )
In re:                                   )    Chapter 11
                                         )
AEARO TECHNOLOGIES LLC,                  )    Case No. 22-_____(____)
                                         )
                    Debtor.              )
_____  )

### CORPORATE OWNERSHIP STATEMENT

Pursuant to Rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, the following are corporations, other than a government unit, that directly or indirectly own 10% or more of any class of the debtor's equity interest:

| Shareholder | Approximate Percentage of Shares Held |
|---|---|
| Aearo LLC | 100% |

Debtor Name: Aearo Technologies LLC, *et al.*                    Case Number (if known):_____

| 4 | **Keller Postman LLC**<br>150 N Riverside Plaza<br>Suite 4100<br>Chicago, IL 60606 | Attn: Ashley Conrad Keller, Nicole Corinne Berg, Ashley Barriere, Hannah Ruth Roberts, & Mitali R Vyas<br>P: 312-948-8477<br>ack@kellerpostman.com<br>ncb@kellerpostman.com<br>Ashley.barriere@kellerpostman.com<br>hrr@kellerpostman.com<br>mv@kellerlenkner.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
|---|---|---|---|---|---|---|---|
| 5 | **Clark, Love & Hutson, PLLC**<br>440 Louisiana Street<br>Suite 1700<br>Houston, TX 77002 | Attn: Clayton A. Clark, Shelley Van Natter Hutson, & William Michael Moreland<br>P: 713-757-1400<br>F: 713-759-1217<br>cclark@triallawfirm.com<br>bgreif@triallawfirm.com<br>mmoreland@triallawfirm.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 6 | **Thomas J. Henry Law**<br>521 Starr Street<br>Corpus Christi, TX 78401 | Attn: Thomas J Henry & Lesley Catherine Paniszczyn<br>P: 361-985-0600<br>F: 361-985-0601<br>Tjh.3m@thomasjhenrylaw.com<br>lpan.3m@thomasjhenrylaw.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 7 | **The Gori Law Firm, P.C.**<br>156 N Main Street<br>Edwardsville, IL 62025 | Attn: Megan Tomlinson Arvola, Tanja C Engelhardt, Robert Allen Green, David Todd Mathews, & Nicholas Ryan Mayfield<br>P: 618-659-9833<br>marvola@gorijulianlaw.com<br>tengelhardt@gorilaw.com<br>rgreen@gorilaw.com<br>todd@gorijulianlaw.com<br>rmayfield@gorilaw.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 8 | **Pulaski Law Firm, PLLC**<br>2925 Richmond Avenue<br>Suite 1725<br>Houston, TX 77098 | Attn: Katherine Lindsey Cornell, Bret D Stanley, & Steve Faries<br>P:  800-223-3784<br>F:  713-664-4555<br>kcornell@pulaskilawfirm.com<br>bstanley@pulaskilawfirm.com<br>sfaries@pulaskilawfirm.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 9 | **Heninger Garrison Davis, LLC**<br>2224 1st Avenue North<br>Birmingham, AL 35203 | Attn: William Lewis Garrison, Jr., Taylor Christopher Bartlett, & Christopher Boyce Hood<br>P: 205-326-3336<br>F: 205-326-3332<br>lewis@hgdlawfirm.com<br>taylor@hgdlawfirm.com<br>chood@hgdlawfirm.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 10 | **Weitz & Luxenberg P.C.**<br>700 Broadway<br>New York, NY 10003 | Attn: Terea Ann Curtin, Ericarae Garcia, & Michael Edward Pederson<br>P: 212-558-5907<br>F: 646-293-4360<br>tcurtin@weitzlux.com<br>egarcia@weitzlux.com<br>mpederson@weitzlux.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |

Debtor Name:  Aearo Technologies LLC, *et al.*                    Case Number (if known):_____

| 11 | **Douglas & London, P.C.**<br>59 Maiden Lane<br>6th Floor<br>New York, NY 10038 | Attn: Michael A London & Virginia E Anello<br>P: 212-566-7500<br>F: 212-566-7501<br>mlondon@douglasandlondon.com<br>vanello@douglasandlondon.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
|----|----|----|----|----|----|----|----|
| 12 | **Bailey Cowan Heckman PLLC**<br>1360 Post Oak Boulevard<br>Suite 2300<br>Houston, TX 77056 | Attn: Kenneth Camp Bailey & Robert W Cowan<br>P: 713-425-7100<br>F: 713-415-7101<br>bailey-svc@bpblaw.com<br>rcowan@bchlaw.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 13 | **Junell & Associates, PLLC**<br>3737 Buffalo Speedway<br>Suite 1850<br>Houston, TX 77098 | Attn: Deborah K Levy<br>P: 713-221-3750<br>dlevy@junell-law.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 14 | **Nabers Law Firm, PLLC**<br>3737 Buffalo Speedway<br>Suite 1850<br>Houston, TX 77098 | Attn:  Joseph Scott Nabers & Katerina Dimitrakakos<br>P: 713-422-1200<br>F: 713-422-1210<br>snabers@naberslaw.com<br>kathy@naberslaw.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 15 | **Morgan & Morgan**<br>850 3rd Avenue<br>Suite 402<br>Brooklyn, NY 11232 | Attn:  Paul J Pennock & Jonathan M Sedgh<br>P: 212-738-6839<br>ppennock@forthepeople.com<br>jsedgh@forthepeople.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 16 | **Danziger & De Llano, LLP**<br>440 Louisiana Street<br>Suite 1212<br>Houston, TX 77002 | Attn: Rodrigo De Llano<br>P: 713-222-9998<br>filings@dandell.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 17 | **Seeger Weiss LLP**<br>55 Challenger Road<br>6th Floor<br>Ridgefield Park, NJ 07660 | Attn: Christopher A Seeger, David R. Buchanan, & Maxwell H Kelly<br>P: 212-584-0700<br>F: 973-639-8656<br>cseeger@seegerweiss.com<br>dbuchanan@seegerweiss.com<br>mkelly@seegerweiss.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 18 | **Abraham, Watkins, Nichols, Sorrels, Agosto & Aziz**<br>800 Commerce Street<br>Houston, TX 77055 | Attn: Muhammed S Aziz<br>P: 713-222-7211<br>F: 713-225-0827<br>jdean@abrahamwatkins.com | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 19 | **Morgan, Collins, Yeast and Salyer**<br>455 2nd St.<br>Paintsville, KY 41240 | Attn: McKinnley Morgan, Roy Collins, Dan Yeast, & Kyle Salyer<br>P: 606-789-1135 | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |
| 20 | **Martin Walton Law Firm**<br>699 S. Friendswood Drive, Suite 107<br>Houston, TX 77546 | Attn: Mike Martin & Gage Walton<br>P: 346-800-0285 | Litigation | Contingent/<br>Unliquidated/<br>Disputed | N/A | N/A | **Undetermined** |

Fill in this information to identify the case and this filing:

| | |
|---|---|
| Debtor Name | Aearo Technologies LLC |
| United States Bankruptcy Court for the: | Southern District of Indiana |
| | (State) |
| Case number (If known): | |

## Official Form 202

## Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐   *Schedule A/B: Assets-Real and Personal Property (Official Form 206A/B)*

☐   *Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)*

☐   *Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)*

☐   *Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)*

☐   *Schedule H: Codebtors (Official Form 206H)*

☐   *Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)*

☐   Amended Schedule

☒   *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (Official Form 204)*

☒   Other document that requires a declaration **List of Equity Security Holders and Corporate Ownership Statement**

I declare under penalty of perjury that the foregoing is true and correct.

| | | |
|---|---|---|
| Executed on | 07/26/2022 | "                    " |
| | MM/ DD/YYYY | Signature of individual signing on behalf of debtor |
| | | **John R. Castellano** |
| | | Printed name |
| | | **Authorized Signatory** |
| | | Position or relationship to debtor |

Official Form 202                    Declaration Under Penalty of Perjury for Non-Individual Debtors

**OMNIBUS WRITTEN CONSENT BY THE BOARD OF DIRECTORS**
**OF EACH OF THE COMPANIES SET FORTH ON EXHIBIT A ATTACHED HERETO**

The undersigned, being the requisite members of the boards of directors (the "**Boards**") of Aearo Technologies LLC, a Delaware limited liability corporation, and certain of its affiliated entities set forth on **Exhibit A**, each organized and existing under the internal laws of Delaware (each, a "**Company**" and collectively, the "**Companies**"), having considered the filing of voluntary petitions for relief under the provisions of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**" and such petitions, "**Bankruptcy Petitions**") and exploring strategic and/or financial alternatives in light of the Companies' current circumstances, including possibilities of undertaking a restructuring, reorganization, or other transaction and related financing (each of the foregoing and any combination of the foregoing, a "**Restructuring Transaction**");

**WHEREAS,** the Boards have reviewed and considered the following:

1.  the presentations by the Companies' management and the legal and financial advisors of the Companies regarding the liabilities and liquidity of the Companies, the strategic alternatives available to them, and the impact of the foregoing on the Companies' business;

2.  that certain funding and indemnification agreement, dated July 25, 2022, by and among the Companies and 3M Company, a Delaware corporation;

3.  the information and advice previously provided to and reviewed by the Boards; and

4.  the related matters reported on at meetings of the Boards on and before the date hereof;

**WHEREAS,** the Boards have had the opportunity to consult with the Companies' management and the legal and financial advisors of the Companies and to fully consider each of the strategic alternatives available to the Companies;

**WHEREAS,** the Boards have determined, in their business judgment, that it is desirable and in the best interests of the Companies and their respective stakeholders for the Companies to file, or cause the filing of, voluntary petitions under chapter 11 of the Bankruptcy Code and that such action will benefit the Companies and their respective stakeholders;

**WHEREAS,** the Boards have determined, in their business judgment, that it is desirable and in the best interests of the Companies and their respective stakeholders for the Companies to file, or cause the filing of, any complaint, appropriate pleading, or document related to a preliminary injunction or temporary restraining order seeking the extension of protections afforded under the Bankruptcy Code to certain of the Companies' affiliates, and that such action will benefit the

Companies and their respective stakeholders; and

> **WHEREAS**, the Boards have determined, in their business judgment, that it is desirable and in the best interests of the Companies and their respective stakeholders for the Companies to appoint a chief restructuring officer ("**Chief Restructuring Officer**") pursuant to their respective articles of organization, limited liability agreements, or any other documents governing the management and affairs of each Company (the "**Organizational Documents**").

### Authorizing the Filing of Bankruptcy Petitions

> **NOW, THEREFORE, IT IS RESOLVED,** that the Companies are authorized to file voluntary petitions for relief under chapter 11 of the Bankruptcy Code and seek necessary relief, including, without limitation, any preliminary injunction or temporary retraining order;

> **FURTHER RESOLVED,** that, in the judgment of the Boards, it is desirable and in the best interests of the Companies, their interest holders, their creditors, and other parties in interest, that the Companies file, or cause to be filed, Bankruptcy Petitions under the provisions of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Indiana or such other court of competent jurisdiction (the "**Court**"). In accordance with the requirements of the Companies' governing documents and applicable law, the Boards hereby consent to, authorize, and approve the filing of the Bankruptcy Petitions;

> **FURTHER RESOLVED,** that, in the judgment of the Boards, it is desirable and in the best interests of the Companies, their interest holders, their creditors, and other parties in interest, that the Companies file, or cause to be filed, any complaint, appropriate pleading, or document related to a preliminary injunction or temporary restraining order seeking the extension of protections afforded under the Bankruptcy Code to certain of the Companies' affiliates. In accordance with the requirements of the Companies' governing documents and applicable law, the Boards hereby consent to, authorize, and approve the filing of such complaints, pleadings, or documents; and

> **FURTHER RESOLVED,** that any director, officer, or other duly appointed officer of the Companies (each an "**Authorized Person**" and collectively, the "**Authorized Persons**") is hereby authorized and appointed to act as signatory and attorney on behalf of the Companies in respect of any Restructuring Transaction, and/or any person to whom such Authorized Persons and/or officers delegate certain responsibilities is hereby authorized to execute (under the common seal of the Companies, if appropriate) and file on behalf of the Companies all petitions, schedules, lists, and other motions, papers, or documents, and to take any and all actions they deem necessary or proper to obtain such relief.

### Retention of Professionals

> **FURTHER RESOLVED,** that each of the Authorized Persons is hereby authorized, empowered, and directed to, on behalf of the Companies, employ: (i) the law firm of Kirkland &

Ellis LLP as general bankruptcy counsel; (ii) the law firm of Ice Miller LLP as co-bankruptcy counsel; (iii) AP Services LLC as financial advisor; (iv) Kroll, LLC, as claims and noticing agent; (v) Bates White LLC as estimation professional; and (vi) any other legal counsel, accountant, financial advisor, restructuring advisor, estimation professional, or other professional the Authorized Persons deem necessary, appropriate, or advisable to retain; each to represent and assist the Companies in carrying out their duties and responsibilities and exercising their rights under the Bankruptcy Code and any applicable law (including, but not limited to, the law firms filing any pleadings or responses); and in connection therewith, the Authorized Persons are hereby authorized, empowered, and directed, in accordance with the terms and conditions hereof, to execute (under the common seal of the Companies, if appropriate) appropriate retention agreements, pay appropriate retainers, and to cause to be filed appropriate applications for authority to retain such services; and

**FURTHER RESOLVED,** that each of the Authorized Persons is hereby authorized, empowered, and directed to execute (under the common seal of the Companies, if appropriate) and file all petitions, schedules, motions, lists, applications, pleadings, and other papers, and to perform such further actions and execute (under the common seal of the Companies, if appropriate) such further documentation that the Authorized Persons in their absolute discretion deem necessary, appropriate, or desirable in accordance with these resolutions.

### Appointment of Chief Restructuring Officer

**FURTHER RESOLVED,** that John Castellano, be, and hereby is, appointed to serve as the Chief Restructuring Officer of each Company;

**FURTHER RESOLVED,** that the CRO shall have such authority with respect to the Companies as is described in that certain engagement letter dated as of July 25, 2022, by and among the Company and AP Services, LLC (the "**Engagement Letter**"); and

**FURTHER RESOLVED,** that the Engagement Letter is hereby approved, and any Authorized Person, acting alone or with one or more other Authorized Persons, be, and each of them hereby is, authorized, empowered, and directed to execute, deliver, and perform each Company's obligations under the Engagement Letter on behalf of the Companies and in its name with such changes therein or additions, deletions, or modifications thereto as the Authorized Person signing the same may approve, such approval to be conclusively evidenced by such Authorized Person's execution and delivery of the Engagement Letter.

### General

**FURTHER RESOLVED,** that in addition to the specific authorizations heretofore conferred upon the Authorized Persons, the Authorized Persons, either individually or as otherwise required by the Companies' governing documents and applicable law, are hereby authorized to execute (under the common seal of the Companies, if appropriate), acknowledge, deliver, and file any and all agreements, certificates, instruments, powers of attorney, letters, forms, transfers, deeds, and other documents on behalf of the Companies relating to the Restructuring Transactions;

**FURTHER RESOLVED,** that each of the Authorized Persons (and their designees and delegates) is hereby authorized and empowered, in the name of and on behalf of the Companies, to take or cause to be taken any and all such other and further action, and to execute (under the common seal of the Companies, if appropriate), acknowledge, deliver, and file any and all such agreements, certificates, instruments, and other documents, and to pay all expenses, including but not limited to filing fees, in each case as in such Authorized Person's or Authorized Persons' absolute discretion, as shall be necessary, appropriate, or desirable in order to fully carry out the intent and accomplish the purposes of the resolution adopted herein;

**FURTHER RESOLVED,** that the Boards have received sufficient notice of the actions and transactions relating to the matters contemplated by the foregoing resolutions, as may be required by the governing documents of the Companies, or hereby waive any right to have received such notice;

**FURTHER RESOLVED,** that all acts, actions, and transactions relating to the matters contemplated by the foregoing resolutions done in the name of and on behalf of the Companies, which acts would have been approved by the foregoing resolutions except that such acts were taken before the adoption of these resolutions, are hereby in all respects approved, confirmed, and ratified as the true acts and deeds of the Companies with the same force and effect as if each such act, transaction, agreement, or certificate had been specifically authorized in advance by resolution of the Boards; and

**FURTHER RESOLVED,** that any Authorized Person is hereby authorized to perform all other acts, deeds, and other actions as the Companies themselves may perform, in accordance with their governing documents and applicable law, howsoever arising in connection with the matters above, or in furtherance of the intentions expressed in the foregoing resolutions, including, but not limited to, the negotiation, finalization, execution (under common seal, whether or not expressed to be a deed, as may be necessary or appropriate), and delivery of any other agreements, certificates, instruments, powers of attorney, letters, forms, transfers, deeds, and other documents whatsoever as the individual acting may in their absolute and unfettered discretion approve or deem or determine necessary, appropriate, or advisable, such approval, deeming, or determination to be conclusively evidenced by said individual taking such action or the execution thereof.

* * * *

*[Signature pages follow]*

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Boards set out on **Schedule 1**, have executed this written consent as of the date first set forth above.

This action is effective as of July 25, 2022

DIRECTORS:

Name: Daniel Renninger

Name: Eric Forbes

Name: Matthew Blaisdell

Name: Roger Meltzer

Name: Jeffrey Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Boards set out on **Schedule 1**, have executed this written consent as of the date first set forth above.

This action is effective as of July 25, 2022

DIRECTORS:

_____
Name:  Daniel Renninger

_____
Name:  Eric Forbes

_____
Name:  Matthew Blaisdell

_____
Name:  Roger Meltzer

_____
Name:  Jeffrey Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Boards set out on **Schedule 1**, have executed this written consent as of the date first set forth above.


This action is effective as of July 25, 2022.

DIRECTORS:

_____
Name:  Daniel Renninger


_____
Name:  Eric Forbes

*Matthew Blaisdell*
_____
Name:  Matthew Blaisdell


_____
Name:  Roger Meltzer


_____
Name:  Jeffrey Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Boards set out on **Schedule 1**, have executed this written consent as of the date first set forth above.

This action is effective as of July 25, 2022

DIRECTORS:

_____
Name:  Daniel Renninger

_____
Name:  Eric Forbes

_____
Name:  Matthew Blaisdell

_____
Name:  Roger Meltzer

_____
Name:  Jeffrey Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Boards set out on **Schedule 1**, have executed this written consent as of the date first set forth above.

This action is effective as of July 25, 2022

DIRECTORS:

_____
Name:  Daniel Renninger

_____
Name:  Eric Forbes

_____
Name:  Matthew Blaisdell

_____
Name:  Roger Meltzer

_____
Name:  Jeffrey S. Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Board set out on **Schedule 2,** have executed this written consent as of the date first set forth above.

This action is effective as of July 25, 2022

DIRECTORS:

_Daniel J. Renninger_
Name: Daniel Renninger

_____
Name: Matthew Blaisdell

_____
Name: Roger Meltzer

_____
Name: Jeffrey Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Board set out on **Schedule 2,** have executed this written consent as of the date first set forth above.

This action is effective as of July 25, 2022

DIRECTORS:

_____

Name:  Daniel Renninger

_____

Name:  Matthew Blaisdell

_____

Name:  Roger Meltzer

_____

Name:  Jeffrey Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Board set out on **Schedule 2**, have executed this written consent as of the date first set forth above.

This action is effective as of July 25, 2022

DIRECTORS:

_____
Name:  Daniel Renninger

_____
Name:  Matthew Blaisdell

_____
Name:  Roger Meltzer

_____
Name:  Jeffrey Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Board set out on **Schedule 2**, have executed this written consent as of the date first set forth above.


This action is effective as of July 25, 2022


DIRECTORS:


_____
Name: Daniel Renninger


_____
Name: Matthew Blaisdell


_____
Name: Roger Meltzer


_____
Name: Jeffrey S. Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Boards set out on **Schedule 3**, have executed this written consent as of the date first set forth above.

This action is effective as of July 25, 2022

DIRECTORS:

Name:  Daniel Renninger

Name:  Roger Meltzer

Name:  Jeffrey Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Boards set out on **<u>Schedule 3</u>**, have executed this written consent as of the date first set forth above.

This action is effective as of July 25, 2022

DIRECTORS:

_____
Name:  Daniel Renninger

_____
Name:  Roger Meltzer

_____
Name:  Jeffrey Stein

**IN WITNESS WHEREOF,** the undersigned, being the directors of the Boards set out on **Schedule 3**, have executed this written consent as of the date first set forth above.

This action is effective as of July 25, 2022

DIRECTORS:

_____
Name:  Daniel Renninger

_____
Name:  Roger Meltzer

_____
Name:  Jeffrey S. Stein

## Exhibit A
### Schedules of Boards of Directors of the Companies

### Schedule 1
**Board of Directors:**
**Daniel Renninger, Eric Forbes, Matthew Blaisdell, Jeffery Stein, and Roger Meltzer**

| Entity | Jurisdiction |
|---|---|
| Aearo Technologies LLC | Delaware |
| Aearo LLC | Delaware |
| Cabot Safety Intermediate LLC | Delaware |

### Schedule 2
**Board of Directors:**
**Daniel Renninger, Matthew Blaisdell, Jeffery Stein, and Roger Meltzer**

| Entity | Jurisdiction |
|---|---|
| Aearo Mexico Holding Corporation | Delaware |

### Schedule 3
**Board of Directors:**
**Daniel Renninger, Jeffery Stein, and Roger Meltzer**

| Entity | Jurisdiction |
|---|---|
| Aearo Holding LLC | Delaware |
| Aearo Intermediate LLC | Delaware |
| 3M Occupational Safety LLC | Delaware |

**SO ORDERED: July 28, 2022.**



**Jeffrey J. Graham**
**United States Bankruptcy Judge**

SGENERIC (rev 05/2022)

**UNITED STATES BANKRUPTCY COURT**
Southern District of Indiana
46 E Ohio St Rm 116
Indianapolis, IN 46204

In re:

**Aearo Technologies LLC,**
Debtor.

Case No. **22−02890−JJG−11**
JOINTLY ADMINISTERED

## ORDER GRANTING MOTION TO APPEAR PRO HAC VICE

A Motion to Appear Pro Hac Vice was filed on July 26, 2022, by Ashley Keller.

**IT IS ORDERED** that the Motion to Appear Pro Hac Vice is **GRANTED**.

Attorney for Creditor Richard Valle must distribute this order.

###

**Exhibit F**

**Transfer Request 4[1]**

---

[1] Due to their voluminous nature, the exhibits filed with Transfer Request 4 have been omitted but are available upon request of Debtors' counsel.

BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | |
| | MDL DOCKET NO. 2885 |

NOTICE OF POTENTIAL TAG-ALONG ACTION

In accordance with Rule 7.1(a) of the Rules of Procedure for the United States Judicial Panel on Multidistrict Litigation, undersigned counsel writes to notify you of the potential tag along action listed on the attached Schedule of Action. Undersigned counsel's firm, Keller Postman LLC, is counsel to some of the Defendants in this action. *See 3M Occupational Safety LLC, et al. v. Those Parties Listed on Appendix A to the Complaint and John and Jane Does 1-1000*, 22-ap-50059 (Bankr. S.D. Inc.), Dkt. 1-1 at 3206-3396 (listing Defendants represented by Keller Postman).

A docket sheet and the complaint[1] are attached.

/s/ Ashley C. Keller
Ashley C. Keller
ack@kellerpostman.com
**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

Counsel to Defendants in Tag-Along Action

---

[1] As the complaint and its attendant documents total approximately 5000 pages, undersigned counsel has only attached the complaint and not the attendant documents. If helpful, undersigned counsel is happy to provide the Panel with a full set of documents.

1

**Exhibit G**

**Keller TRO Motion**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to: *All Cases* | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## *Ex PARTE* MOTION AND INCOPORATED MEMORANDUM TO ISSUE A TEMPORAY RESTRAINING ORDER TO ENJOIN 3M[1] FROM TAKING ANY ACTION OUTSIDE THE MDL TO ENJOIN PARTIES FROM PURSUING CAEV2 LITIGATION AGAINST 3M

Now into court, comes Plaintiff, Richard Valle, through undersigned counsel, who respectfully asks this Court to issue a Temporary Restraining Order ("TRO") for seven (7) days to enjoin 3M from taking any action outside of this MDL to enjoin other parties from pursuing their CAEV2 claims against 3M. The All Writs Act endows the Court with this authority, and the Court is free to take action regarding 3M because the automatic stay only applies to the Aearo entities. The balance of equities and consideration of judicial resources clearly favor this Court—and not the Bankruptcy Court—to decide the limits of the automatic stay as to this litigation. For these reasons, and as fully detailed below, Plaintiff respectfullys ask for a TRO to

---

[1] 3M refers to 3M Company.

1

enjoin 3M, or any party acting on their behalf, from seeking relief to enjoin parties from pursuing their claims arising out of the CAEv2.

## I.    Legal Standard

The standard to obtain a TRO is identical to that of obtaining a preliminary injunction. *Windsor v. United States*, 379 F. App'x 912, 916-17 (11th Cir. 2010). "To obtain a preliminary injunction, the moving party must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to the movant outweighs the damage to the opposing party; and (4) granting the injunction would not be adverse to the public interest." *Martin v. Kemp*, 341 F. Supp 3d 1326, 1332 (N.D. Ga. 2018).

## II.    The Automatic Stay only Applies to the Debtor.

It is black-letter law that only a debtor in bankruptcy receives the protection of the Bankruptcy Code's automatic stay provision. *See* 11 U.S.C.A. § 362; *In re Stuart*, 594 B.R. 834, 840 (Bankr. N.D. Ga. 2018) ("[T]he automatic stay of 11 U.S.C. § 362(a) protects only the debtor, property of the debtor, and property of the estate. It does not protect non-debtor parties or their property.") (quoting *In re Advanced Ribbons and Office Products, Inc.*, 125 B.R. 259, 263 (9th Cir. BAP 1991)); *see also In re Teknek, LLC*, 563 F.3d 639, 641–50 (7th Cir. 2009) (declining to extend automatic stay to non-debtor, related co-defendants). Where both the

2

debtor and a non-debtor are separately liable for tortious conduct, there is no basis to extend a stay of litigation to the non-debtor. *Id.* **In simple terms, if the non-debtor wishes to receive the benefits of bankruptcy protection, it must also incur its consequences.**

"Defendant 3M Company is not a debtor in the bankruptcy cases; therefore, the automatic statutory stay does not apply to it by operation of law." MDL Dkt. 3329 at 1. Notably, 3M is the subject of multiple jury verdicts for its *own* conduct related to the CAEv2 earplug. That its co-defendant, Aero, has filed for bankruptcy is immaterial. Unless and until 3M files for bankruptcy, Plaintiffs must remain free to continue to pursue their claims in district court, as they have since the inception of this highly complex MDL.

## III. This Court has the authority to interpret the extent of the automatic stay and whether it applies to these proceedings.

This Court has independent authority to interpret the extent and applicability of a Section 362 automatic stay. *Matter of Mahurkar Double Lumen Hemodialysis Catheter Pat. Litig.,* 140 B.R. 969, 973 (N.D. Ill. 1992) ("[I]t is settled that both the bankruptcy court and the court in which the other litigation exists may construe the automatic stay.") (Easterbrook, J.); *In re Baldwin–United Corporation Litigation,* 765 F.2d 343, 347 (2d Cir.1985)) ("Whether the stay applies to litigation otherwise within the jurisdiction of a district court or court of appeals is an issue of law within the competence of both the court within which the litigation is pending."); *Chicago*

*Title Ins. Co. v. Lerner*, 435 B.R. 732, 735 (S.D. Fla. 2010) ("Federal district courts have jurisdiction concurrent with the originating bankruptcy court to determine the applicability of the bankruptcy court's automatic stay."); *Picco v. Global Marine Drilling Co.,* 900 F.2d 846, 850 (5th Cir.1990). This concurrent authority recognizes that a court overseeing multidistrict litigation "may have the perspective needed to manage litigation that involves other parties" and "may be in the best position to decide" the scope of § 362's applicability to the multidistrict action. *Matter of Mahurkar Double Luman Hemodialysis Catheter Pat. Litig.*, 140 B.R. at 973. Included in that authority is the authority to determine whether the requisite "unusual circumstances" exist to warrant extending a stay to non-debtors. *See, e.g.*, *Gray v. Hirsch*, 230 B.R. 239 (S.D.N.Y. 1999); *Variable-Parameter Fixture Dev. Corp. v. Morpheus Lights, Inc.*, 945 F. Supp. 603 (S.D.N.Y. 1996); *Chicago Title*, 435 B.R. 432. Such "unusual circumstances" do not exist where, as here, the debtor and non-debtor are "independently liable" in tort actions. *Variable Parameter*, 945 F. Supp. at 608 (citing *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)). But, crucially, this Court retains the power to make that determination.

**IV.** **This Court should decide the extent of the automatic stay because it has unparalleled knowledge of the litigation and is currently moving thousands of cases through litigation – all of which will be ground to a halt if 3M has its way.**

This Court and the litigants have spent tens of thousands of hours and hundreds of millions of dollars addressing common legal and factual issues

associated with hundreds of thousands of Plaintiffs' claims. Concerns with judicial economy and avoiding duplicative jurisdiction are always important. *See, e.g.*, *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (noting that "[a]s between federal district courts… though no precise rule has evolved, the general principle is to avoid duplicative litigation") *and Weatherly v. Alabama State Univ.*, 728 F.3d 1263, 1270 (11th Cir. 2013) (finding no reversible error where district court, "[f]aced with the potential of duplicative suits and duplicative discovery… found judicial economy militated in favor of keeping the Appellees' claims together in order to avoid wasting resources"). Such concerns are especially acute with MDLs, which exist for the very purpose of avoiding wasted resources and conflicting judgments in high stakes, complex cases like the case at bar.[2] *See, e.g.*, *In re: Schnuck Markets, Inc., Customer Data Sec. Breach Litig.*, 978 F. Supp. 2d 1379, 1381 (U.S. Jud. Pan. Mult. Lit. 2013) (discussing *In re: Gerber Probiotic Prod. Mktg. & Sales Pracs. Litig.*, 899 F.Supp.2d 1378, 1379 n. 2 (U.S. Jud. Pan. Mult. Lit. 2012), where a judge "opined that the action 'should not proceed independently from [the consolidated action], as judicial economy counsels against unnecessary duplication"). It is because of these considerations that MDLs are often

---

[2] Notably, 3M supported consolidation of claims arising out of the CAEv2. *See* Dkt. 98. It is only now, that 3M has lost 13 of 19 bellwether trials with significant jury verdicts that it claims the MDL should be stayed so that a bankruptcy court, with *no* experience with the facts of this case, should resolve the outstanding 233,000 claims. Such a proposition is ludicrous and not grounded in the law.

referred to as akin to *in rem* proceedings. *See, e.g.*, *In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 337 (2d Cir. 1985) *(*"[T]he jurisdiction of a multidistrict court is 'analogous to that of a court in an *in rem* action . . . where it is intolerable to have conflicting orders from different courts.'") (citing 17 C. Wright & A. Miller & E. Cooper, Federal Practice & Procedure § 4225 at 105 n.8 (Supp. 1985)); *In re Vioxx Prod. Liab. Litig.*, 869 F. Supp. 2d 719, 726 (E.D. La. 2012)  ("[C]omplex litigation cases are sufficiently similar to *in rem* proceedings . . . The theory behind the *in rem* analogy is that when complex litigation has reached the point of sufficient advancement, and there has been substantial investment of time

and resources, in essence, a *res* is created.") (Fallon, J.).

At this moment alone, the Court has before it post-trial motions to set aside or undo a jury verdict against 3M. Other final judgments against 3M are on appeal, where 3M has challenged this Court's pre-trial decisions. And scores of other plaintiffs with claims against 3M are subject to wave orders to permit their claims to proceed, relying on the extensive MDL litigation history and countless pre-trial orders. Indeed, fifteen hundred cases have or are currently engaged in Wave discovery. *Daubert* and dispositive motions for approximately three hundred seventy-five Wave 1 cases will be ripe on August 9, 2022, and one Wave 1 case is already set for trial in this district.   *See* MDL Dkt. 3329.

6

## V. Through the All Writs Act, this Court has the authority to enjoin 3M from attempting to argue the stay applies to this case outside of this Court.

This Court has the authority to stop 3M from attempting to duplicate this litigation and litigate the same issues elsewhere. It would make a mockery of these extensive proceedings for 3M, as an independent defendant that is not in bankruptcy, to seek potentially conflicting rulings associated with the CAEv2 earplugs in another tribunal. Both to protect the Court's MDL jurisdiction to address all pretrial proceedings, as well as its jurisdiction over individual cases that have proceeded through a jury verdict, this Court has ample authority to prevent 3M from presenting substantially similar legal or factual arguments elsewhere. *See Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1295 n.15 (11th Cir. 2002) ("The court's power to protect its jurisdiction includes the power to enjoin a dissatisfied party bent on re-litigating claims that were (or could have been) previously litigated before the court from filing in both judicial and non-judicial forums, as long as the injunction does not completely foreclose a litigant from any access to the courts, which this one does not."); *New York Life Ins. Co. v. Deshotel*, 142 F.3d 873, 879 (5th Cir. 1998) (affirming a federal district court's power under the All Writs Act to enjoin a party from relitigating the same or similar issues in another federal court); *Liles v. Del Campo*, 350 F.3d 742, 746 (8th Cir. 2003) (holding that the All Writs Act provides that federal courts may issue injunctions related to proceedings in other federal

courts "when necessary for adjudication or settlement of a case."); *Stott v. Capital Fin. Services, Inc.*, 277 F.R.D. 316, 337–38 (N.D. Tex. 2011) (noting that in cases involving a "limited fund," a "court's enjoining of competing procedures is generally necessary to ensure that the 'limited fund' is not depleted").

Accordingly, this Court should temporarily enjoin for the next 7 days, 3M and any party acting on 3M's behalf, from filing any motion, action, proceeding, brief, or other judicial filing that seeks to enjoin parties from pursuing CAEv2 related claims against 3M in this MDL or in district courts where MDL cases have been remanded. *See In re Managed Care Litig.*, 236 F. Supp. 2d 1336 (S.D. Fla. 2002) (where an MDL court exercises its authority under the All Writs Act to prevent settlement in another federal court).

Dated:  July 27, 2022        */s/ Ashley C. Keller*

Ashley C. Keller (Bar #1029118)
ack@kellerpostman.com
Nicole C. Berg (Pro Hac Vice)
ncb@kellerpostman.com
Ashley Barriere (Pro Hac Vice)
ashleybarriere@kellerpostman.com
**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois  60606
Telephone: (312) 741-5220
Facsimile: (312) 971-3502

*Counsel for Plaintiff Richard Valle*

## CERTIFICATE OF COMPLIANCE
## WITH LOCAL RULES 7.1(F) AND 56.1(E)

I hereby certify that this motion complies with the word limit of Local Rules

7.1(F) and 56.1(E) and contains 1823 words.

*/s/ Ashley C. Keller*

Ashley C. Keller

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2022, I caused a copy of the foregoing to be

filed through the Court's CM/ECF system, which will serve all counsel of record.

/s/ *Ashley C. Keller*
Ashley C. Keller

<u>**Exhibit H**</u>

**MDL Court Order Shortening Notice on Keller TRO Motion**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to All Cases | Judge M. Casey Rodgers<br>Magistrate Judge Gary R. Jones |

## REFERRAL AND ORDER

Referred to Judge Rodgers on:  July 27, 2022

Motion/Pleading:   Ex Parte Motion and Incorporated Memorandum to Issue a Temporary Restraining Order to Enjoin 3M from Taking Any Action Outside the MDL to Enjoin the Parties from Pursuing CAEv2 Litigation Against 3M

Filed by:  Plaintiffs _____ on  7/27/2022 _____ Doc. #   3332 ____

RESPONSES:

_____ on _____ Doc. # _____

JESSICA J. LYUBLANOVITS
CLERK OF COURT

_/s/Donna Bajzik_
Deputy Clerk:  Donna Bajzik

## ORDER

In light of the urgency of the above motion, Defendant 3M Company is directed to file its response, if any, by this afternoon, July 27, 2022, at 1 p.m. Central.  The response must be limited to 10 pages.

**SO ORDERED**, this 27th of July, 2022.

_M. Casey Rodgers_
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

**Exhibit I**

**3M's Objection to Keller TRO Motion**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS
EARPLUG LITIGATION
LIABILITY LITIGATION

This Document Relates to:
*All Cases*

CASE NO.: 3:19-MD-2885-MCR-GRJ

Judge M. Casey Rodgers
Magistrate Judge Gary Jones

---

## DEFENDANT 3M COMPANY'S OPPOSITION TO PLAINTIFF VALLE'S MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiff's motion for a TRO is a misplaced and misguided effort to ask this Court to preemptively rule on the scope of the automatic stay and the implications of the recent chapter 11 filings on the pending proceedings in this MDL. The law is overwhelmingly clear that the bankruptcy court will have the ultimate say on the scope of the automatic stay, including whether it requires a stay of the proceedings in this MDL. As this Court acknowledged this morning, "ultimately Chief Judge Graham will decide" this question, "and then, beyond that, the Seventh Circuit Court of Appeals." 07/27/2022 Tr. at 14:25-15:16; *see also id.* at 15:22-25 (THE COURT: "Again, ultimately, the bankruptcy court and the Seventh Circuit will decide these issues."). And Plaintiff clearly "knows about the debtor's bankruptcy case" and "that the **bankruptcy court** is available to determine whether the stay applies," *In re Sehman*, No. 21-30141-KKS, 2022 WL 548000, at *3 (Bankr. N.D. Fla. Feb. 23,

2022) (emphasis added), as lead counsel for Plaintiff has appeared at the ongoing hearing in the bankruptcy court on this very issue and has participated on the record. This TRO motion is thus nothing more than an effort to get a pre-bite at the apple through a repackaged objection to the Debtors' pending motion—a motion that raises a fundamental question of ***bankruptcy law*** and that is currently and properly being decided by the ***bankruptcy court***. In any event, Plaintiff's request should be denied on the merits, as the law overwhelming provides that 3M's "identity of interests" with the Debtors requires a stay of all proceedings in this MDL, and none of the other TRO factors support extraordinary relief. This Court should deny the TRO.

### A. Emergency Relief From This Court Is Not Warranted Because The Bankruptcy Court Is Deciding The Question Of Bankruptcy Law Presented in This Motion.

Plaintiff plainly has not satisfied his burden of establishing an entitlement to an emergency relief in the form of a TRO when the very question presented in his motion is being considered—and will be shortly decided—by the bankruptcy court. The law is clear that "the bankruptcy court's conclusion governs" the question whether the automatic-stay applies to this MDL. *In re Stieg*, 509 B.R. 148, 151-52 (Bankr. S.D. Ohio 2014). In other words, "the bankruptcy court from which the automatic stay originated" has "the final say." *In re Mid-City Parking, Inc.*, 332 B.R. 798, 803-04 (Bankr. N.D. Ill. 2005); *Richardson v. Koch L. Firm, P.C.,* No.

1:12-CV-00631-JMS, 2012 WL 5904491, at *7 (S.D. Ind. Nov. 26, 2012) (same); *see also Chao v. Hosp. Staffing Servs., Inc.*, 270 F.3d 374, 384 (6th Cir. 2001) ("If a state court and the bankruptcy court reach differing conclusions as to whether the automatic stay bars maintenance of a suit in the non-bankruptcy forum, the bankruptcy forum's resolution has been held determinative."); *BioConvergence LLC v. Attariwala*, 2020 WL 1915269, at *2-3 (S.D. Ind. 2020) ("the bankruptcy court does possess the final word: If the non-bankruptcy court issues a finding as to the application of the stay that the bankruptcy court deems erroneous, the bankruptcy court's resolution of this issue is determinative"). This Court appears to have acknowledged as much during the status conference hearing this morning. *See* 07/27/2022 Tr. at 14:25-15:16, 15:22-25.

The Second Circuit's decision in *In re Baldwin-United Corp. Litig.*, 765 F.2d 343, 348 (2d Cir. 1985), is instructive. In *Baldwin*, the Second Circuit held that a district court's exercise of its authority to determine the applicability of the automatic stay was an abuse of discretion and the district court misused its equitable power by issuing an injunction prohibiting the chapter 11 debtors from applying to the bankruptcy court for any relief against any defendant in the applicable pending multi-district litigation. *Id*. at 348. The Second Circuit found that "to whatever extent a conflict may arise between the authority of the Bankruptcy Court to administer this complex reorganization and the authority of the District Court to

3

administer consolidated pretrial proceedings, the equities favor maintenance of the unfettered authority of the Bankruptcy Court." *Id.* at 348 (emphasis added). The Second Circuit reasoned that although the district court had not enjoined the bankruptcy court itself, the injunction "unduly interfere[d] with the proper administration of the reorganization." *Id.* The Second Circuit noted certain factors weighed against the district court's use of its equitable power, such as the paramount interest of assuring uniformity of decision concerning the reach of the automatic stay in the chapter 11 bankruptcy that involved "an extraordinarily large number of claimants," which is analogous to Aearo's chapter 11 bankruptcy proceedings in Indiana. *Id.* Thus, the equities did not warrant preventing the bankruptcy court from construing its automatic stay and the Second Circuit vacated the injunction issued by the district court. *Id.* at 349.

In fact, the equities tip decisively ***against*** a TRO from this Court. Because the bankruptcy court has the "final say" on the scope of the automatic stay, *id.*, "if a non-bankruptcy court proceeds under an erroneous interpretation of the stay, then there is a risk that the entire action later will be declared void." *In re Sieg*, 590 B.R. at 151 (internal quotation marks omitted). "Under Section 362 of the Code, stay violations are considered void *ab initio*, meaning that the violations are deemed without effect and are rendered an absolute nullity." *In re Holder*, 260 B.R. 571, 577 (Bankr. M.D. Ga. 2001); *In re Credolawson*, 546 B.R. 888, 892 (Bankr. N.D. Ga.

2016) (same). There is no reason for this Court to insert itself into that process by making its own pronouncement about the scope of the automatic stay—a pronouncement that as a matter of well-settled law will give way to the bankruptcy court's ruling on the same question.[1]

### B. The Automatic Stay Applies To These Proceedings.

Moreover, Plaintiff is unlikely to succeed on the merits of his motion, precluding a TRO. Plaintiff is simply wrong that "only a debtor in bankruptcy receives the protection of the Bankruptcy Code's automatic stay provision." *Ex Parte* TRO Mot. at 2. It is well-settled that "the automatic stay under § 362(a)(1) can be extended to third parties where 'unusual circumstances' exist," and "[s]uch unusual circumstances may be found 'where there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor.'" *In re LTL Mgmt., LLC*, 638 B.R. 291, 304 (Bankr. D. N.J. 2002) (quoting McCartney v. Integra Nat'l Bank N., 106 F.3d 506 (3d Cir. 1997)); *see also In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 616 (E.D. Pa. 2009) (explaining that unusual circumstances exist warranting extension

---

[1]     Plaintiff's effort to invoke the All Writs Act is a non-starter. Plaintiff cites **no** bankruptcy court cases, and parties involved in mass tort litigation routinely file for bankruptcy protection.

of the stay to nondebtors when: "(i) the non-debtor and debtor enjoy such an identity of interests that the suit of the non-debtor is essentially a suit against the debtor; or (ii) the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization"); *In re W.R. Grace & Co.*, No. 01-01139 (JKF), 2004 WL 954772, at *2 (Bankr. D. Del. Apr. 29, 2004). "Numerous courts have concurred" with this analysis. *Chicago Title Ins. Co. v. Lerner*, 435 B.R. 732, 735 (Bankr. S.D. Fla. 2010) (citing cases).

Plaintiff also incorrectly claims that, "[w]here both the debtor and non-debtor are separately liable for tortious conduct, there is no basis to extend a stay of litigation to the non-debtor." Ex Parte TRO Mot. at 2-3. In fact, "even assuming direct liability exists, the analysis for whether an extension of the automatic stay is warranted based on 'unusual circumstances' remains unaffected." *In re LTL Mgmt.*, 638 B.R. at 308. The point is that "the debtor's protection must be extended to enjoin litigation against others if the result would be binding upon the debtor's estate." *Robins*, 788 F.2d at 999 (quoting *In re Metal Ctr., Inc.*, 31 B.R. at 462). Accordingly, Plaintiff's "'joint tortfeasor' argument does not preclude extension of the automatic stay to" 3M. *In re LTL Mgmt.*, 638 B.R. at 308.

Indeed, because the automatic stay applies, Plaintiff's motion violates the stay, as it seeks a TRO against "any party acting on [3M's] behalf" from seeking to enjoin parties from pursuing Combat Arms litigation. *Ex Parte* TRO Mot. at 1-2.

6

By its plain terms, the motion seeks to enjoin the Debtors—the party that filed the TRO request on 3M's behalf—from pursuing relief in Bankruptcy Court.  This is a black-and-white stay violation that this Court should not countenance.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for a TRO.

Dated:  July 27, 2022

Respectfully submitted,

s/ Jesse Green
Jesse Green
White & Case LLP
200 South Biscayne Blvd. Suite 4900
Miama, FL 33131
Email: jgreen@whitecase.com

Jessica C. Lauria (*Pro Hac Vice application pending)*
White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:  jessica.lauria@whitecase.com

*Counsel for 3M Company*

**<u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)</u>**

Pursuant to Local Rule 7.1(F), counsel for Defendants certify that this memorandum contains 1,469 words.

Dated:  July 27, 2022                    Respectfully submitted,

                                         s/ Jesse Green
                                         Jesse Green
                                         White & Case LLP
                                         200 South Biscayne Blvd. Suite 4900
                                         Miama, FL 33131
                                         Email: jgreen@whitecase.com

                                         Jessica C. Lauria (*Pro Hac Vice*
                                         *application pending)*
                                         White & Case LLP
                                         1221 Avenue of the Americas
                                         New York, New York 10020
                                         Telephone:  (212) 819-8200
                                         Email:  jessica.lauria@whitecase.com

                                         *Counsel for 3M Company*

1

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY this 27th day of July 2022, a true and correct copy of the foregoing was electronically filed via the Court's CM/ECF system, which will automatically serve notice of this filing via e-mail to all registered counsel of record.

Dated:  July 27, 2022

Respectfully submitted,

s/ Jesse Green
Jesse Green
White & Case LLP
200 South Biscayne Blvd. Suite 4900
Miama, FL 33131
Email: jgreen@whitecase.com

Jessica C. Lauria (*Pro Hac Vice application pending)*
White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:  jessica.lauria@whitecase.com

*Counsel for 3M Company*

**Exhibit K-1**

**First Day Hearing Transcript (A.M.)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA

IN RE:                          .      Case No.  22-02890-JJG
                                .      (Jointly Administered)
AEARO TECHNOLOGIES LLC,  .
ET AL.,                         .      116 U.S.  Courthouse
                                .      46 E.  Ohio Street, Room 116
        Debtors.        .      Indianapolis, IN  46204
. . . . . . . . . . . .  .
AEARO TECHNOLOGIES LLC,  .
ET AL.,                         .
                                .
        Plaintiffs,     .
    V.                          .      Adversary No. 22-50059
                                .
THOSE PARTIES LISTED ON  .
APPENDIX A,                     .
                                .
        Defendants.     .
                                .      Wednesday, July 27, 2022
. . . . . . . . . . . .  .      9:30 a.m.

TRANSCRIPT OF MISCELLANEOUS MOTIONS BY PLAINTIFFS/DEBTORS
BEFORE THE HONORABLE JEFFREY J. GRAHAM
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:        Kirkland & Ellis LLP
                        BY:  CHAD HUSNICK, ESQ.
                             DAVID M. BERNICK, ESQ.
                             SPENCER WINTERS, ESQ.
                        300 North LaSalle Street
                        Chicago, IL  60654


Audio Operator:         Heather Heiser-Davis

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjCourt@jjCourt.com

(609) 586-2311    Fax No.  (609) 587-3599

2

APPEARANCES CONTINUED:

For the Debtors:            Kirkland & Ellis LLP
                           BY:  EMILY GEIER, ESQ.
                           601 Lexington Avenue
                           New York, NY  10022

                           Kirkland & Ellis
                           BY:  JARED MAHER, ESQ.
                                MARK McKANE, ESQ.
                           555 California Street, 27th Floor
                           San Francisco, CA  94104

                           Kirkland & Ellis
                           BY:  DAVID HOROWITZ, ESQ.
                           333 South Flower Street, Suite 3700
                           Los Angeles, CA  90071

For Creditors:             Valenti Hanley & Robinson PLLC
                           BY:  MARK A. ROBINSON, ESQ.
                           One Riverfront Plaza
                           401 W. Main Street, Suite 1950
                           Louisville, KY  40202

For 3M Company:            Faegre Drinker Biddle & Reath LLP
                           BY:  JAY JAFFE, ESQ.
                           600 East 96th Street, Suite 600
                           Indianapolis, IN  46240

                           White & Case LLP
                           BY:  MATTHEW E. LINDER, ESQ.
                                MICHAEL ANDOLINA, ESQ.
                           111 S. Wacker Drive, Suite 5100
                           Chicago, IL  60606

For Aylstock, Witkin,      Klee, Tuchin, Bogdanoff & Stern, LLP
Kreis & Overholtz, PLLC:   BY:  SASHA M. GURVITZ, ESQ.
                           1801 Century Park East, 26th Floor
                           Los Angeles, CA  90067

For Seeger Weiss LLP:      Rubin & Levin, P.C.
                           BY:  DEBORAH CARUSO, ESQ.
                                MEREDITH R. THEISEN, ESQ.
                           135 N. Pennsylvania St., Suite 1400
                           Indianapolis, IN  46204

APPEARANCES CONTINUED:

```
For Seeger Weiss LLP:        Seeger Weiss LLP
                            BY:  CHRISTOPHER SEEGER, ESQ.
                                 DAVID BUCHANAN, ESQ.
                            55 Challenger Road
                            Ridgefield Park, NJ  07660

                            Otterbourg P.C.
                            BY:  MELANIE CYGANOWSKI, ESQ.
                                 ADAM SILVERSTEIN, ESQ.
                            230 Park Avenue
                            New York, NY  10169-0075

For the U.S. Trustee:       U.S. Department of Justice
                            BY:  HARRISON E. STRAUSS, ESQ.
                                 NANCY GARGULA, ESQ.
                                 RONALD J. MOORE, ESQ.
                                 DAMARIS ROISCH-SCHWARTZ, ESQ.
                                 LAURA A. DUVALL, ESQ.
                            46 E. Ohio St., Road 520
                            Indianapolis, IN  46204

For various claimants:      Jacobson Hile Kight
                            By:  ANDREW KIGHT, ESQ.
                            108 E. 9th Street
                            Indianapolis, IN 46202

                            Weitz & Luxenberg
                            By:  LISA BUSCH, ESQ.
                            700 Broadway
                            New York, NY 10003

For various Claimants:      BY:  MARK WENZEL, ESQ.

For Richard Valle:          Keller Postman
                            BY:  ASHLEY KELLER, ESQ.
                            150 N. Riverside Plaza
                            Chicago, IL  60606
```

4

 1          THE COURT:  It's so nice to have so many willing
 2   jurors today.
 3                         (Laughter)
 4          THE COURT:  All right.  Well, as I wait for my
 5   computer to boot up, welcome to Indianapolis.  I'd like to
 6   welcome you all here.  I'd also like to thank Chief Judge Tanya
 7   Pratt for the use of her courtroom.  It's greatly appreciated.
 8   And also bankruptcy Judge Robyn Moberly for allowing us
 9   overflow if needed.  So I normally don't have digs quite this
10   fancy, which you'll see if you go down the hall.  So that might
11   be in your future someday because I don't think she'll let me
12   use her courtroom on a full-time basis.
13          All right.  Is everyone ready to begin?
14          MR. HUSNICK:  We are, Your Honor.
15          THE COURT:  Okay.  Well, let me go ahead and call and
16   I'll call things as they appear on our Court docketing system
17   with the understanding that someone may request that we take
18   things in a slightly different order.
19          All right.  We have Adversary Number 22-50059, Aearo
20   Technologies LLC, et al. vs. Those Parties Listed on
21   Appendix A, i.e., the Tort Claimants.  There's a hearing on the
22   debtors' ex parte motion for request for a temporary
23   restraining order with an objection and a response thereto.
24   And with regard to the Chapter 11 cases, 22-2890, Aearo
25   Technologies LLC, et al., we have several first day motions,

5

1  and forgive me if some of them have rather lengthy titles.

2        It's an expedited hearing of the debtors' motion for

3  entry of an order authorizing the debtors to file one list on

4  the top firms representing the largest number of tort

5  plaintiffs, authorizing the debtors to use one consolidated

6  creditor matrix, authorizing the listing of creditors addresses

7  for counsel rather than the individuals, authorizing the

8  debtors to redact personally identifiable information, proving

9  certain notice procedures with respect to the tort claimants,

10  and approving the form and manner of notice of the commencement

11  of these cases with the U.S. Trustee's objection thereto.

12        Next is an expedited hearing on the debtors' motion

13  to retain a noticing, balancing, and claims agent under our

14  Local Rule 1007-2.

15        Next is an expedited hearing on the debtors' motion

16  to extend time to file schedules; hearing on the debtors'

17  motion for case management order; hearing on debtors' first day

18  motion for interim and final orders authorizing the debtors to

19  pay pre-petition wages, compensation, benefits, continuing

20  employee compensation and benefits programs, and related relief

21  with an objection thereto by the U.S. Trustee; hearing on the

22  debtors' first day motion to pay pre-petition trust fund taxes;

23  hearing on the debtors' first day motion for entry of final

24  orders regarding payment of insurance premiums, continuing

25  brokerage fees, renew supplemental or modify insurance or

1 insurance coverage, and improving continuation of their surety

2 bond program and related relief.

3        Next is a hearing on the debtors' first day motion to

4 provide adequate assurance for utilities; hearing on debtors'

5 first day motion for interim of final orders on debtor's

6 pre-petition claims for specified trade claimants, granting

7 administrative expense priority to all undisputed obligations

8 on account of outstanding orders, and granting related relief

9 thereto with the U.S. Trustee's objection; and a hearing on the

10 debtors' amended first day motion for approval of a cash

11 management system and the Trustee's objection thereto.

12        All right.  May I have appearances by those

13 officially participating in this hearing?  And if you're not at

14 the podium, please speak as loud as you can.

15        MR. HUSNICK:  Good morning, Your Honor.  Chad Husnick

16 with Kirkland and Ellis appearing on behalf of the debtors.

17        THE COURT:  Thank you.

18        MR. BERNICK:  Good morning, Your Honor.  David

19 Bernick, Kirkland and Ellis (indiscernible).

20        THE COURT:  Thank you.

21        MS. GEIER:  Good morning, Your Honor.  Emily Geier,

22 Kirkland and Ellis, appearing on behalf of the debtors.

23        THE COURT:  Thank you.

24        MR. WINTERS:  Good morning, Your Honor.  Spencer

25 Winters, Kirkland and Ellis, on behalf of the debtors.

7

```
 1              THE COURT:  Thank you.

 2              MR. MAHER:  Good morning, Your Honor.  Jared Maher,

 3   Kirkland and Ellis, on behalf of debtors.

 4              THE COURT:  Thank you.

 5              MR. McKANE:  Good morning, Your Honor.  Mark McKane,

 6   Kirkland and Ellis.

 7              THE COURT:  Thank you.

 8              MR. HOROWITZ:  Good morning, Your Honor.  David

 9   Horowitz, Kirkland and Ellis, on behalf of the debtors.

10              THE COURT:  Thank you.

11              MR. ROBINSON:  Good morning, Your Honor.  Mark

12   Robinson for the creditors.

13              THE COURT:  Thank you.

14              MR. JAFFE:  Good morning, Your Honor.  Jay Jaffe,

15   Faegre Drinker Biddle and Reath, for 3M Company, and I'd like

16   to introduce to the Court Mr. Matthew Linder from White Case,

17   Michael Andolina, also from White Case.

18              THE COURT:  Thank you.  Welcome.

19              MS. GURVITZ:  Good morning, Your Honor.  Sasha

20   Gurvitz from the Klee Tuchin firm, KTBS Law LLP, on behalf of

21   Aylstock Witkin.

22              THE COURT:  Thank you.

23              MS. CARUSO:  Good morning, Your Honor.  Debbie Caruso

24   and Meredith Theisen on behalf of Seeger Weiss LLP whose

25   attorneys include Christopher Seeger who is co-lead plaintiffs'
```

8

counsel and member of the plaintiffs' executive committee in the MDL action.

And with me today is David Buchanan who is co-chair of the plaintiff's steering committee in the MDL and both of us will be participating at some level throughout the hearings.

And also on Zoom, we have Melanie Cyganowski and Adam Silverstein who are also counsel for Seeger Weiss.

Thank you, Your Honor.

THE COURT: Thank you. And welcome.

MR. STRAUSS: Good morning, Your Honor. Harrison Strauss for the United States Trustee. With me, I also have the United States Trustee Nancy Gargula, Assistant United States Trustee Ron Moore, and trial attorneys Damaris Rosich-Schwartz and Laura DuVall.

I will be taking the lead in this, but some of my other colleagues have helped with the motion so they may chime in when I flounder.

THE COURT: I don't have that option, so you're lucky to have that.

Thank you.

MR. KIGHT: Judge, Andy Kight, Jacobson Hile Kight, on behalf of a number of claimants represented by the law firm Weitz and Luxenberg PC, and Ms. Lisa Busch is attending by Zoom and will be filing a pro hac motion shortly.

THE COURT: Thank you.

1    MR. WENZEL:  Your Honor, Mark Wenzel, appearing on
2  behalf of the Sean Tracy law firm, also representing a number
3  of plaintiffs in the MDL litigation.
4    THE COURT:  Anyone else?  We have a microphone so I
5  can mostly hear you.
6             (No audible response)
7    THE COURT:  No?
8             (No audible response)
9    THE COURT:  All right.
10    I will ask, because we don't have fancy district
11  court recording even though we get the courtroom, to please
12  state your name when you're speaking just so that the audio
13  recording accurately reflects that.  Also, I'm horrible with
14  names, which is a good reason why I'm a judge because I
15  couldn't get business because I never remembered anyone's name.
16  So that will also help me try to address you correctly as we go
17  forward.
18    With that, I'll turn it over to the debtors and you
19  can lead us off.
20    MR. HUSNICK:  Thank you, Your Honor.  Good morning.
21  Chad Husnick from Kirkland and Ellis, proposed counsel to the
22  debtors.
23    Your Honor, you heard from each of my colleagues so I
24  won't go through who's here with me from my firm.  But before I
25  jump into what I think will be a relatively brief introduction

1  to the case, I did want to introduce you to the two company

2  representatives who are here with us today.

3          First, Mr. John Castellano of AlixPartners, sitting

4  in the front row.  Mr. Castellano is the managing director of

5  AlixPartners and is serving as the debtors' Chief Restructuring

6  Officer.  He is also the debtor's first day declarant in

7  support of the first day motions.

8          The second individual I'd like to introduce you to is

9  Mr. Jeff Stein.  Mr. Stein is serving as one of the debtors two

10  disinterested directors and he is the declarant on the debtors'

11  request for a temporary restraining order in connection with

12  the adversary proceeding.

13          Your Honor, a couple of housekeeping items.  First,

14  we filed an affidavit of service of Kroll Administration, the

15  debtors' proposed notice and claims agent, at Docket Number 70.

16  That affidavit of service is from Mr. Ben Steele.  Kroll served

17  notice of the first day hearing and the first day agenda on the

18  United States Trustee, the top counsel list, 3M's counsel, the

19  attorney for the Southern District -- or the U.S. Attorney for

20  the Southern District of Indiana, the IRS, the Attorneys

21  General for all 50 states, the Department of Veteran Affairs,

22  the Department of Defense, the SEC, and all of the Rule 2002

23  notice parties.

24          We served that via email where we had email notice

25  and via overnight mail in the absence of email addresses.  We

 1  also served the notice of the agenda and the relevant motions

 2  on the cash management banks, the taxing authorities, insurance

 3  brokers, and carriers and utilities.  We did that again via

 4  email where we had the email addresses and overnight delivery

 5  in the absence of that.

 6         Your Honor, unless you have any further questions

 7  about service, we can take that up in individual motions as

 8  well.

 9         THE COURT:  Okay.  I do not.

10         MR. HUSNICK:  Thank you.

11         The first item on the agenda, Your Honor, was the

12  joint administration motion, and so, Your Honor has already

13  entered that and so we'll skip over that.

14         We filed a revised agenda at 849, the Docket

15  Number 84.  In that revised agenda, Your Honor, I'd proposed to

16  go through, as I said, a short introduction to the case and

17  then turn immediately to the adversary proceeding and the

18  requested temporary restraining order.

19         The reason for the reordering, Your Honor, is there's

20  a number of things that have been going on, not the least of

21  which, last night, one of the plaintiffs' law firms, Keller

22  Postman, filed what we believe to be a violation of the

23  automatic stay by filing a request to transfer or tag-along

24  under the JPL rules, the entire bankruptcy case.  And we think

25  that needs to be put to an end sooner than later and so we were

12

1    hopeful to take the TRO up before we get to the first day

2    relief.

3          Your Honor, unless you have any other questions about

4    the agenda, and we can deal with that at the right time, I

5    would propose to do the introduction if I may publish a

6    presentation to the Court.

7          THE COURT:  That's fine.  And then, I will ask

8    though, when we get to the proposed order, whether there's any

9    objection to tackling the TRO first.  Given the amount of

10   people here and the interest, I think that's why we're mostly

11   here so that makes sense.  But I will give people an

12   opportunity to see if there's a difference of opinion on that.

13         You may proceed.

14         MR. HUSNICK:  Thank you, Your Honor.

15         Mr. Bank (phonetic).

16         I'm not seeing it.  There we go.

17         Let me start, Your Honor.  A couple of things.  Just

18   a brief overview of this case.  This case is not a couple of

19   things.  It's not about the debtors' attempt or 3M's attempt to

20   avoid liability to veterans for valid claims compensable in the

21   tort system.  This is not a Texas Two Step or a divisive merger

22   that you've heard so much about in connection with the J&J

23   cases.  And while I personally have no issue with those types

24   of transactions, that's not what we have here.  This is an

25   organic structure as you'll hear about in a moment.

1        Your Honor, this is not a liquidation.  This is a

2   reorganization of an operating business.  And this is not about

3   funded debt or and operational restructuring.  We're here to

4   address the mass tort issues that this company faces both in

5   connection with Combat Arms Earplugs as well as the mask

6   respirator liabilities.

7        This case is, as I said, a reorganization of an

8   existing operating company that has approximately $126 million

9   in annual revenue.  This operating company is facing

10  significant, indeed the largest MDL in United States history,

11  billions of dollars of asserted claims.  One plaintiff even

12  asserted that it's in the trillions.  It's more than 230,000

13  individual claimants.

14       We're seeking to use the Chapter 11 tools where the

15  debtors believe the MDL has fallen short.  It's not that the

16  MDL did something wrong necessarily, it's that the process has

17  failed the debtors, and frankly, we believe failed the

18  plaintiffs.  Right now, we sit with 99.5 percent of the claims

19  remaining unvetted and unresolved on the MDL docket.  That's

20  after having spent three years in the MDL process and nearly

21  $350 million in legal fees.  What we're here to do, Your Honor,

22  is an equitable and expeditious process to provide a 100

23  percent recovery to veteran, service members, and all creditors

24  for valid claims against these debtors.

25       Your Honor, a very brief overview of the business.

1 I'm sure you've had an opportunity to read the volumes of paper

2 that we filed on Your Honor's docket, and we thank you for

3 that. But very briefly, the debtor's business, we basically

4 manufacture film, foam, and other materials that are used to

5 reduce noise, vibration, shock, and heat in a variety of

6 products. We sell those products to original equipment

7 manufacturers, aerospace companies, commercial truck

8 manufacturers, the medical industry, electronics industry, and

9 power generation companies.

10         We have approximately, as I said, $126 million of

11 annual revenue. Roughly, two thirds of that revenue is for

12 sales to third parties and roughly one third of that $126

13 million of revenue is for sales to 3M. 3M then uses the

14 debtors' products in turn in creating its own products and

15 marketing to other third parties.

16         The debtors' products, as you can see, show up in a

17 number of different industries and forms. They're used in

18 airplane frames to control noise. They're used in MRI

19 machines. If you've had an MRI and you hear the bang, bang,

20 bang, going over your head, it's the debtors' material that's

21 in those machines to help try and negate the vibration effect

22 and the sound. They're used in cell phones to try and mute the

23 vibration noises. They're used in generators to try and

24 control the heat produced by electricity generators.

25 Ultimately, as shown by this truck in this photo, the debtors'

15

products can show up in various forms across even a single
completed product like a truck.

    The debtor is located and headquartered right here in
Indianapolis.  We have approximately 172 of our total 330
employees are working out of the Indianapolis headquarters and
the plant that's located in Indianapolis.

    The debtors' remaining employees are generally in
Newark -- I believe that's how it's pronounced -- Newark,
Delaware.  And there are others that are working remotely.  We
do have several facilities internationally.  These are in our
non-debtor affiliates, but they're wholly owned by the debtor
entities, and that includes manufacturing facilities in
Ensenada, Mexico; San Luis Potosí, Mexico; Mississauga, Canada;
and Shenzhen, China.

    Your Honor, just a moment on the organizational
chart.  3M acquired the Aearo debtors in 2008 and you read
quite a bit about that in the first day declaration.  There's
two key points though about that acquisition.  Number one,
Aearo continues to and always has maintained a standalone
business from that of 3M.  It has its own board of directors
and it has its own operations.  Granted, it does share services
from 3M as is typical in a large corporate enterprise, and
we'll talk more about that at the relevant periods of time and
in the first day motions.

    But the second part I want to emphasize here about

1  this corporate structure is this is not something that was

2  created overnight or something that was created last night

3  through a Texas Two Step or a divisive merger.  This is an

4  organic capital structure that existed well before the

5  Chapter 11 filings.

6  The debtors' board is organized as follows.  There

7  are two members who are 3M employees.  That's Mr. Dan Renninger

8  and Mr. Eric Forbes.  There's one employee of Aearo.  He is the

9  president of Aearo, and that is Matthew Blaisdell.  And then,

10  the two remaining directors are disinterested directors who

11  have no connection to 3M or prior connections to the debtors

12  here, and that's Mr. Jeff Stein and Mr. Roger Meltzer, each of

13  whom have experienced serving as disinterested directors in

14  these types of roles.

15  They have been delegated authority over all conflicts

16  matters where there's a conflict between 3M on one hand and the

17  debtor entities on the other hand.  To the extent that there

18  needs to be a determination as to what constitutes a conflict

19  as a matter of corporate governance, Mr. Stein and Mr. Meltzer

20  also have that power under the delegation of authority.

21  Finally, and not least, Mr. Castellano, as I said is

22  the debtors' CRO.

23  Your Honor, I don't need to spend any more time on

24  the professionals because you heard from each of them.  Let me

25  just get right into the events leading to the Chapter 11.  I

1 don't want to be completely duplicative of the things that we

2 said in our first day papers, but I do want to call out a

3 couple of things.

4       As Your Honor is aware from the papers, we have two

5 pieces of separate tort litigation. The Combat Arms, of

6 course, is the largest of those pieces of litigation. We have

7 a much, much smaller piece of litigation related to mask

8 respirators, but we felt we needed to call it out because there

9 will definitely be interest from the plaintiffs and the

10 plaintiffs' bar in these cases.

11       Let me address the Combat Arms briefly. Your Honor,

12 in the late 1990s, the U.S. military was trying to solve a

13 problem. They were trying to create a solution that allowed to

14 block out high level noises like gunfire and explosions, but

15 allow pass-through of lower level sounds like speech.

16       I can't get this thing to move again, Mac.

17       There we go.

18       That problem, Your Honor, created a conundrum for the

19 military and service members. This was the better deaf than

20 dead conundrum. They didn't want to wear the earplugs because

21 if you blocked out all sound, you were at risk of not hearing

22 enemy combatants in the field of battle. To meet this need,

23 the debtors, in close collaboration with the U.S. military and

24 expert scientists at the French-German Institute de Saint-

25 Louis, designed and developed the Combat Arms Earplug

18

1   Version 2. The military ultimately approved these Combat Arms

2   Earplugs for purchase. This was around 1999. And in the early

3   2000s, Combat Arms began being purchased by the United States

4   military for distribution to servicemen and women.

5          These Combat Arms Earplugs were extensively tested,

6   and you can read about that in the papers and I'm sure the

7   plaintiffs will have their own side of the story on that front.

8   But suffice to say, there's significant records around the

9   testing of their Combat Arms Earplugs. They, from our

10  perspective, worked as they were intended to work. They

11  entered service, as I said in 1999, and they were largely

12  viewed as a solution to the better deaf than dead conundrum.

13         What happened in terms of sales is, in the early

14  2000s, they began being sold and they were sold until the

15  product was discontinued in 2015. Eighty percent of all of

16  those sales occurred before 2008. I highlight that because

17  once again, that's the date, April 1, 2008, when 3M purchased

18  the Aearo entities, the stock in the Aearo entities. So 80

19  percent of the sales of the $31.5 million of sales of these

20  products over their lifetime were done prior to that

21  acquisition.

22         The MDL, which is largely based on the single memo

23  discovered in 2015, the plaintiffs' bar seized on that

24  opportunity. The memo, discussed at detail in the

25  informational brief, talked about what was perceived to be a

19

 1   known defect.  We don't have to get into that.  Suffice to say,

 2   the MDL was commenced in 2019.  And after the commencement of

 3   the MDL, the plaintiffs' lawyers orchestrated a massive

 4   advertising onslaught.

 5          Between 2019 and May '22, they spent over $25 million

 6   on television advertising alone.  Radio spots, direct emails,

 7   targeted social emails.  I got one relatively recently on

 8   Facebook and I've never spent a day in the military.  On top of

 9   promising service members that they would be entitled to a

10   substantial or significant financial compensation, some of

11   these were misleading indicating that the debtors had already

12   agreed to a settlement, or frankly, just inaccurate.

13          Stepping back, Your Honor, though, just talking about

14   MDLs, generally.  The problem with the MDL system when there's

15   a significant amount of mass tort claims like this is not an

16   unknown problem.  It's pretty well settled.  The MDL

17   Subcommittee noted that a significant number of claimants,

18   often at the settlement stage, turn out to have unsupportable

19   claims.  Likewise, the author of this article is actually Judge

20   Rodgers overseeing the MDL process noted in her article that a

21   reported 20 to 50 percent of MDL cases often involve claims

22   with, I'm sorry, plaintiffs with unsupportable claims.

23          What we notice here in our case is we have the Combat

24   Arms MDL has now turned out to be twice as large as the

25   remaining 182 currently pending MDLs combined.  It is massive.

20

1    It is the largest MDL in U.S. history by orders of magnitude.

2    There remain 110,000 claimants on the administrative dockets

3    that haven't yet been required to pay a filing fee, serve

4    defendants with a complaint, file attorney appearances, or

5    provide evidence as to the support for their claim.

6            The bottom line here is, Your Honor, there's been

7    very minimal vetting outside of the Bellwether Trials.  And

8    just spending a moment on the Bellwether Trials, I'm not going

9    to go through each one.  But you see them as they pop up here.

10   But you see this curious phenomenon as we get closer to the

11   end, and these are in temporal order across the bottom.  And

12   what I'm flagging here is this.  As we move through the

13   Bellwether Trials and the early results are heard, the jury

14   verdicts start to escalate massively.  Is it a creature of the

15   MDL system?  Who knows?  Is it a creature of additional

16   advertising that happens after the first couple of trials?

17           But it is quite interesting that the jury verdicts in

18   Pensacola alone increased from March 2021 to 350,000 to

19   April 2021, a judgment of 50 million.  That's 150 million, or

20   I'm sorry, 150 times greater.  The bottom line is these jury

21   verdict -- or these Bellwether Trials provided very little

22   guidance to the debtors or the plaintiffs on a constructive

23   negotiation.  It left us with 13 plaintiffs' verdicts, six

24   defense verdicts, and eight dismissals.  All of the 13

25   plaintiff verdicts are either stuck in post-trial motions --

1  some, I think, one for eight months -- or on appeal.

2  Your Honor, we've started the waive process where we

3  move chunks of 500 off the docket and start the discovery

4  process. But it's in the very, very early stages. And what

5  we're discovering there is of the approximately 1500 plaintiffs

6  that have been moved out in the waive process that have been

7  ordered to engage in discovery, hundreds of those have been

8  unable or unwilling to engage in discovery. So it further

9  supports our position that these claims simply have not been

10  vetted.

11  Where do we sit today? We're no closer to

12  resolution, Judge, today, three years into the MDL, than we

13  were at the beginning, and we spent 350 million in legal fees

14  to get here. This quagmire, Your Honor, has led to massive

15  market confusion regarding the size of these liabilities. The

16  plaintiffs, as I said earlier, one plaintiff's lawyer said it's

17  over a trillion dollars. Analysts have published reports that

18  say it's between 1.8 billion and 1.55 trillion. None of these

19  is more than a guess. It certainly can't be right.

20  Your Honor, the other piece of litigation, I'm going

21  to move off Combat Arms and shift gears for a moment, but I

22  promise it won't be nearly as long -- is on the respirators.

23  The debtors' mask respirator litigation, we have accrued

24  approximately $41 million under our -- it's an accounting

25  accrual in our public statements. That's what we report. We

22

believe that number to be accurate. That covers approximately
2059 pending cases where the Aearo debtors are defendants, are
named defendants in the litigation. There are some additional
cases where the debtors have indirect indemnification
obligations of parties.

Importantly, the TRO that Your Honor is considering
today does not relate to the asbestos docket. It's dealing
with the Combat Arms docket today.

Where are we? We're trying to get a fair and
efficient resolution using the Chapter 11 tools. We're trying
to address each of the issues that I pointed out as I moved
through the materials, the lack of vetting of the 230,000
claims that are actively on the docket, or that are sitting on
the docket, whether on the administrative docket or the active
docket, but they're on unvetted. We would propose that a
Chapter 11 process will have verified disclosures established
through a well-known bar date process required under the
Bankruptcy Rules. It will require plaintiffs and claimants to
verify the nature and extent of their injuries so that they can
be properly evaluated.

Through the MDL, we've been unable to resolve
anything more than a small fraction of the cases and it's all
been through a piecemeal process. We would propose, Your
Honor, a consolidated resolution, one where we're dealing with
the plaintiffs *in toto* instead of having one-off trials.

1    Your Honor, we want to ensure fair compensation to
2  all of the plaintiffs, as opposed to the inconsistent jury
3  awards that you saw a couple of slides ago.  It cannot be that
4  150 times greater jury verdict is appropriate.  We would
5  propose, ultimately as part of an estimation process, that the
6  estimation be based on scientifically calculated allocations
7  and determinations of liability.  Ultimately, this is a
8  settlement negotiation, Your Honor.  That's what we intend to
9  do is negotiate with the plaintiffs in an attempt to try and
10 get to settlement using the tools that the bankruptcy process
11 provides.

12    We believe that the Chapter 11 process will provide
13 finality.  Because it has to be negotiated through a global
14 settlement with at least 75 percent of the plaintiffs, at least
15 in the respirator stage, that will engender a great deal of
16 consensus and hopefully avoid what could be years or even a
17 decade or more of litigation.  And that's not to mention the
18 imposition on the federal district courts.  Judge Rogers, I
19 believe, noted that, as she starts to remand the over 230 cases
20 now that the Bellwethers are complete, that could result in an
21 imposition on the 94 federal districts to the tune of 2,500
22 cases per district, which we certainly believe needs to be
23 taken into account when we're addressing the public interest
24 component of the TRO standard.

25    Your Honor, the debtors have done their homework in

1  terms of determining what we believe the estimated liability

2  is.  The preliminary analysis by Dr. Charles Mullin at Bates

3  White, who is an experienced estimator of claims in the

4  Chapter 11 cases, who has testified in many, many large cases,

5  including Takata, the Purdue bankruptcy case, W.R. Grace.

6        Your Honor, Mr. Mullin's preliminary analysis

7  assesses that the total value of claims involving functional

8  hearing loss in the Combat Arms MDL is less than $1 billion.

9  We will present that analysis and his final report at the

10 appropriate time to both the Court and, of course, to the

11 plaintiffs.

12       Your Honor, the last piece I want to summarize is the

13 funding agreement.  I will not spend much time here.  Suffice

14 to say, 3M is committed to funding the resolution of this case.

15 Their lawyers are here.  They will say the same thing.  In

16 support of that commitment, they funded up front $5 million of

17 upfront cash and agreed to fund $1.24 billion into a trust and

18 to fund the operations of the debtors through the Chapter 11

19 cases.  The debtors are cash users during these cases.

20       Critically, really critically, these funds are

21 uncapped.  It is not meant to serve as a cap but is simply what

22 the debtors are committed -- or what 3M is committing up front.

23 3M is committed to provide additional funding to the extent

24 necessary to bring resolution to the cases.  3M has also agreed

25 to provide shared services that have historically been provided

25

to the debtor so that the debtors did not have to go out and
create their own shared service back office.  These services
are being provided for the benefit of the debtors under the
funding agreement.  In exchange, Your Honor, the debtors agreed
to indemnify 3M for the mask respirator liabilities that
originated at Aearo and for the Combat Arms liabilities, again,
that originated at Aearo back in 1999.

        Your Honor, there's a visual aid here just to show
how the funding agreement works.  I'm going to let my
colleague, Ms. Geier, walk through that at the right time.  But
suffice to say, you can see that 3M pays for certain goods
directly to third-party vendors, also provides funding down so
that the debtors can pay for certain of those goods.  But we'll
get into that in more detail.

        So let me end where we began.  This case is a
reorganization of an existing operating company located here in
Indiana.  That operating company has faced millions and
millions of dollars of litigation costs related to the largest
MDL in U.S. history in addition to the mask respirator
liability.  We're simply seeking to utilize the Chapter 11
tools where the MDL fell short to address these issues.  We
believe this is the quintessential case, an example to use the
tools available in 11 to address mass torts.

        Ultimately, we're trying to facilitate an equitable
and expeditious recovery, a hundred percent recovery, to the

1  veteran, service members, and other creditors for all of their

2  valid claims.

3          Your Honor, with that, unless you have any specific

4  questions, we would be ready to turn to the first day agenda.

5          THE COURT:  All right.  I don't yet, since it's just

6  an introduction.  So that being said, we can proceed.  And I

7  guess the first question is, you indicated you wanted to

8  proceed with the TRO first, correct?

9          MR. HUSNICK:  That's correct, Your Honor.

10          THE COURT:  All right.  Does anyone have an objection

11  to proceeding in that manner?

12                  (No audible response)

13          THE COURT:  All right.  Seeing none, let's tackle the

14  TRO first then.

15          MR. HUSNICK:  Thank you, Your Honor.  I'm going to

16  turn the podium to my partner, Mr. David Bernick.

17          THE COURT:  All right.

18          MR. BERNICK:  Good morning, Your Honor.  I'm David

19  Bernick.

20          Just to be clear, we had planned and I don't know if

21  this was clear in the dialogue that took place between the

22  parties, to address both the TRO and the stay at the same time.

23  But we'll go anyway that Your Honor prefers if there's no

24  objection.

25          THE COURT:  Any objection to that?

1                    (No audible response)

2          THE COURT:  All right.  You may proceed.

3          MR. BERNICK:  Your Honor, I'd like to, if we could

4   just show the first slide.

5          We, I think, are getting the most recent deck ready.

6          There we go.

7          If we could go to Slide 2, please.

8          These are essentially the topics I would address here

9   this morning.  And I want to begin with the problem and to a

10  certain extent, this will be a little bit repetitive of what

11  Mr. Husnick has just covered.  But I want to spend a little bit

12  more time on it because the plaintiffs I see, or the state

13  defendants as I see, take the position that there really isn't

14  irreparable harm at this point.  Everything is kind of, okay.

15         And so I want to revisit that a little bit, because

16  from our point of view, this is an extremely urgent case even

17  witnessed the events that have taken place in the last 24

18  hours.  So I spent time on the problem.  And then I want to

19  talk a little bit about the history and evolution of mass tort

20  Chapter 11 cases.

21         Your Honor sits in history here, and the history is a

22  very, very long history.  It goes back actually to the 1980s of

23  Chapter 11s based upon mass tort.  And the reason I bring that

24  up, and we'll talk about some of the specific cases, is that

25  this is a very mature and sophisticated area of law.  There's

1  an enormous amount of jurisprudence that stands in service of

2  Your Honor resolving these matters and addressing these

3  matters, and we would urge the Court to be, you know, a little

4  bit of an Historian here and focus on how the law has evolved

5  because it's really quite a remarkable story and it's very

6  instructive in this case.

7          I then want to talk about the basic phases of mass

8  tort Chapter 11 case, because this first phase that we're in

9  now is one of the most critical.  There's the greatest

10  fragility at this point in time and that's why the motions and

11  the requests for stay, or the confirmation of the stay, that

12  we're here today to address is so critical.  If it's not done

13  right at the outset, that essentially affects everything and I

14  want to spend a few moments talking about that.

15         And then we have the debtors' request for a TRO.

16  That should also be the stay and the TRO, and we'll walk

17  through the standards that pertain to that and how they're met.

18  And then I do want to talk a little bit about the next steps

19  that we have that I think are a logical thing to cover here

20  because, again, it underscores the importance of the relief

21  that we're asking for here.

22         If we could go to Slide 2.  Actually, it's 3.

23         The problem to be solved.  So -- and Mr. Husnick did

24  show a chart that was similar to this.  But we show it here

25  because the problem that we're here to resolve is a problem

1  that goes back, you know, intimately in a detail to the Aearo
2  Company.  We are here asking for a stay to apply to 3M, but the
3  notion that this is anything but a case where the liability
4  really arises from a product, a product made by Aearo, conduct
5  that Aearo engaged in over the years, that's exactly what this
6  case is about.
7          And this chart illustrates this because it shows that
8  the sales of the product, the product is what's giving rise to
9  the litigation, those sales follow the trend that is indicated
10 here.  Most of those sales took place even before 3M made its
11 acquisition in 2008.  Roughly, 80 percent of the claims had
12 occurred prior to that point in time.
13         But there's more.  If we could go to the next slide.
14         The historical conduct associated with the
15 development and original sale of the product is all Aearo
16 conduct.  And it's that conduct that animates really the
17 entirety of their liability case.  There is some after-the-fact
18 conduct that's picked up.  But, again, recognizing that it's
19 the sale of the product that is the origination of the
20 liability, it is what gives rise to the injury, and the conduct
21 associated with that sale is the conduct that's at issue here.
22 That conduct, when it comes to development, you know, really
23 every feature of the product was all Aearo conduct.  And all
24 that we've done here is to indicate through the diamonds that
25 you see here some of the very important aspects of the

30

1  liability case.

2          I flagged the Flange memo -- we made reference to it

3  in our briefs -- because the Flange memo also plays a role down

4  the road here in being one of the original reasons why the

5  litigation all of the sudden began to increase really long

6  after almost all of the product was sold.

7          If we go to the next slide.

8          There it is.  The Flange memo is first used in the

9  deposition in 2015.  But by that time, the product is almost

10 off the market and you've got all of this historical conduct

11 that goes way back.  But this becomes what is now the seed that

12 drives the growth that takes place thereafter.

13         If we could look at Slide 6.

14         This slide indicates the growth of the litigation in

15 terms of claims -- lawsuits that are picked up.  It turns out

16 that the red arrow indicates you see the very precipitous rise

17 in August of 2020.  That's only because the data that was being

18 gathered didn't pick up cases that were simply in the

19 administrative docket.  And once that glitch was fixed, you can

20 see that there had been between November of 2019 and August

21 2020 when you see that arrow rise, there already had been a

22 substantial rise in the cases that were brought but they were

23 brought and put in the administrative docket.

24         As of the time of the MDL, there were 700 cases.  So

25 you can see what is by any stretch of the imagination, you

1 know, a stunning exponential growth.  I literally -- I'm not

2 sure that there's ever been such a rapid growth in case filings

3 ever.  I mean, I know that we have asbestos.  Asbestos, of

4 course, boomed but the cases rose.  I think probably in the

5 aggregate on what's probably a slower basis exponentially.  But

6 in any event, it's a phenomenally rapid rise here.

7          If we go to Slide 6, excuse me, 7.

8          We've now overlaid some of the factors that do relate

9 to what's driving the litigation growth.  So you see here, and

10 it's covered in our briefs, that in November of 2019, the basic

11 records requirements were suspended and then the administrative

12 docket was created.  And that actually does kind of match up

13 pretty well with the red line that we've drawn because that

14 really is what ultimately accounts for all the blue bars that

15 you see here, is the enormous growth of a docket that is kind

16 of a bespoke docket, but it's a docket that's bespoke in a way

17 that departs from standard practices and rules that have been

18 followed in the MDLs for years and years and years in mass

19 torts.

20          We then overlay the verdicts that have taken place

21 and these have taken place and I'm sure, as Mr. Husnick

22 indicates, that they also helped to drive the filings and we

23 simply put them down here.  And during this period of time, and

24 this is a very key feature in the litigation, some of the key

25 depositions that were very helpful and very important in

32

1  flagging and in revealing what actually happened in the very

2  early periods of the development of the product, those key

3  depositions were delayed.  And so a decision was made to go

4  forward with all these Bellwether Trials on a highly compressed

5  schedule and without the benefit of very important deposition

6  testimony, a fact which was remarked on by some of the district

7  judges who were asked to take on this trial caseload of trials

8  that were in this very compressed schedule.

9        And, again, this is really a remarkable condensed,

10  you know, it's just an amazing number of trials to do,

11  particularly Bellwether Trials.  I mean, if you have a mature

12  mass tort and you've done the Bellwethers, then the judges

13  start to, and you know, I know that I've been through this

14  process, Mr. Seeger, who is a very distinguished lawyer who has

15  been on the other side of mass tort cases from me, we know that

16  that the Bellwether cases are, you know, kind of bespoke.

17  They're designed to be informative.  It's very important to get

18  them right and to have enough time between them to be able

19  to -- for the parties to really kind of regroup and figure out

20  if they're doing the right thing in trying these cases.

21        And then you get to the court like Judge Kennelly in

22  the testosterone cases.  He says, well, I'm now going to have

23  multi-track trials and I'm going to get other judges involved.

24  There was no such opportunity here.  All of these things were

25  essentially on a compressed schedule and they're all

33

1  Bellwethers.  This is the time when you're supposed to be
2  really giving the parties an opportunity and spacing the trials
3  so they can be handled.  And there really hasn't been such a
4  period of time as that in this case.  And that, again, is a
5  departure.

6          Now, I can be corrected that there may be other cases
7  very recently that are similar to this, even in the Bellwether
8  process, but if that's so, it is really not the purpose of
9  Bellwethers to be simply, particularly when you have key
10 evidence that's not available, to have such a truncated
11 schedule and include multiple district judges who don't have
12 the same degree of familiarity as the MDL judge.

13         If we go to Slide 8.

14         Again, kind of coming back to something that
15 Mr. Husnick covered, but when you kind of look at a little bit
16 and study it a little bit more, it becomes, you know, very,
17 very helpful.  You know, Your Honor's going to -- we're going
18 to go through an estimation process.  And the estimation
19 process oftentimes is driven by a settlement history.  We don't
20 have a settlement history here.  There are other sources of
21 data, but inevitably, people are going to come back and say,
22 well, what about the cases that were tried?

23         And the cases that were tried are not necessarily the
24 best data for an estimation precisely because there aren't that
25 many of them.  For an estimation, you need more robust data so

1 that you can do a statistical extrapolation that's
2 representative of the claimant pool. Nonetheless, if we just
3 take these, what comes out of it? What do you see? And the
4 answer is, there really isn't a pattern, except that the
5 punitive damages are growing.

6          If you take a look at the compensatory damages, you
7 know, they kind of grow some. You get one that's way off in
8 March. I think that that's a case where punitive damages were
9 not available and the jury came in with a very substantial
10 compensatory award. Again, there are people who know that case
11 better than I do, but that's my understanding.

12          The other thing is that you get all the defense
13 verdicts. So you say, well, what's the pattern? If you're to
14 try to extrapolate this and say, is there a consistent pattern
15 of liability? Is there a consistent pattern even of liability?
16 You'd say, well, you know, you're probably some were cases that
17 were verdicts in favor of the plaintiffs. But then, again,
18 these are Bellwethers. They're designed to be, you know, is
19 there really consistent liability or not?

20          You don't get anything like that. And that's very
21 important here that the record so far does not show that these
22 are clear liability cases. It says these are cases even before
23 a jury that are a mixed bag. How do you estimate on the basis
24 of a mixed bag, even on the issue of liability? And so the
25 liability is very much an issue in the estimation process, as

35

1  well as damages.

2        I do think if we go to slide 8, and Mr. Husnick

3  talked about some of the factors and said that there are many

4  factors that probably drive the verdicts.  And, indeed, that

5  many of those factors are local factors to Pensacola.  But one

6  thing that's a clear common denominator that you can't help but

7  link to these punitive damage awards and that is the

8  unbelievable, over the top efforts to inflame the jury.  You

9  take a look at these quotes.  I've never been in a trial where

10 these kinds of things take place with the regularity that

11 they've taken place here.  And I've tried a lot of cases.

12       So you just can't help but say, what's accounting for

13 the spike?  And it may be local, but the actual stimulus for

14 the verdict is in fact the anger factor, the desire to penalize

15 3M, and there's no question but that the trial record here

16 reflects a concerted effort to inflame the jury.

17       If we go to Slide 9.

18       And I'll just skip through very quickly.  But you

19 know, who's in the, excuse me, 235,000?  You've heard about

20 this.  I mean, this is ultimately, and I want to get to the

21 bottom line point about all this.  You know, the plaintiffs, or

22 the stay defendants talk about the fact that, well, where's the

23 irreparable harm?  And the irreparable harm in this case is an

24 out-of-control docket that cannot be managed.  That's the

25 irreparable harm.  And there's no --

1          THE COURT:  Hasn't that been there since the

2     inception of the MDL?

3          MR. BERNICK:  Well, in this case, you could say, if

4     you went back to 700 cases, 2,500 cases, that it doesn't apply.

5     I mean it's not unusual to have cases that'll have 5,000,

6     10,000, 15,000, 20,000 cases.  That's not unusual.

7          THE COURT:  Right.  But we've been at -- well, we --

8     you have been at this high number for quite some time, correct?

9          MR. BERNICK:  Well, if we go back, it's been about I

10    guess probably 2020, 2021.  If we go back -- I mean, it's right

11    here.  So if we take the thing, it's been over a hundred

12    thousand since August of 2020.  That's correct.

13         And so the experiment that's been run is whether the

14    docket can be managed.  And that is the experiment that has

15    been run over this period of time.  Is it a manageable docket?

16         So if you had Bellwethers that were being conduct --

17    first of all, if you had a docket that had the proper screening

18    procedures for fees and basic record requirements, that's

19    really the counterfactual.  The counterfactual is, what if the

20    management of this case had been different and you had all the

21    measures that have been taken typically in MDLs -- that's the

22    counterfactual -- would this docket have been unmanageable?

23    And the answer is, we don't know, but there's pretty good

24    reason to believe that it wouldn't have been because this

25    docket was created by the case management decisions that the

37

district court made.

It didn't have to happen.  If we had filing fees and
we had basic record requirements, if we waited until the
discovery was done, if we had controls on the kinds of things
that get set, all we know, and that's really -- I'll take the
next slide to answer Your Honors question.

Let's go to Slide 10, this one right here.  No, go
back to 10.

Even today, there are over a hundred thousand that
have never had a filing fee.  And with respect to the ones that
have now been put on the administrative docket or have now been
required to pay a fee or been ordered to pay a fee or have been
now required to provide or been asked to provide information,
it's already had an impact.  So we know that these things
count.

We know, if we go back to that slide, Slide 9,
Slide 8, Slide 7.

We know that these things were not being done.  We
know that the docket grew to an unprecedented level and that's
what we know.  The counterfactual that says, well, what if
things had been done differently?

THE COURT:  Well, and I understand that --

MR. BERNICK:  Yeah.

THE COURT:  -- but I guess the point I'm trying to
make is, and the opposition makes it, but so this has been

1  brewing for a while.  And I understand that there's issues that
2  the debtors have had with how the MDL has been run.  But as I
3  look at it, you're before me on a stay and a TRO.

4          MR. BERNICK:  Right.

5          THE COURT:  Why now?

6          MR. BERNICK:  Because it is irreparable and it's
7  continuing.  I mean, we're now at a situation where what Your
8  Honor is saying is, well, should we have acted earlier?  Yeah,
9  with hindsight, we should have filed earlier.  I don't think
10  that there's too much question about if we knew what was
11  happening, we should have filed.  I mean, Chapter 11 in my
12  experience, and we'll go through some of the cases.  I've been
13  involved in many, many mass tort Chapter 11s and I've tried the
14  cases in the underlying MDLs.

15          Everybody waits before filing Chapter 11.  Nobody
16  sits there and says, gee, we're going to file for Chapter 11
17  now because we see the handwriting on the wall.  So maybe we
18  should have filed in October, in August of 2020.  We would take
19  that point with the benefit of hindsight, we should have.  But
20  we didn't.  What we decided to do is to go through the MDL
21  process.  And what we found in the process of doing that is how
22  unbelievably broken it is.

23          I don't think that there's a single MDL in history
24  that is as broken as this one is.  Witness the numbers, witness
25  the steps that have been taken, witness the verdicts.  Not one.

39

1 And I also don't think, I would submit to Your Honor, the fact

2 that it's been broken for a while doesn't obviate the need for

3 protection now.  I mean, we need protection now because it's an

4 unsustainable broken process that's producing terrible verdicts

5 and costing tens and hundreds of millions of dollars.  That's

6 why you file a Chapter 11 case.

7     There's nothing that says you file a Chapter 11 case

8 because you can see the handwriting on the wall and it's going

9 to happen.  I'm not really familiar with that phenomenon.

10 Maybe it's happened.  But I'm not -- it didn't happen in

11 Manville.  It didn't happen in Grace.  It didn't happen in the

12 Breast Implants.  I mean, I could go on, Combustion

13 Engineering.  They were all filed after there was clear

14 insolvency by the debtor in light of the press of business.

15 I'd be interested at how many anticipatory mass tort Chapter 11

16 cases have been filed.

17     You go through the process, you see if it can work,

18 you see if you win your trials, you see if you change the tide.

19 None of those things worked here because, again, the way it was

20 set up.  You say, well, I'm blaming the district judge.  Well,

21 I am blaming the district judge in the sense that there was a

22 departure from the case management standards that are used in

23 other cases.  I'm not blaming her for the fact that, gee, she

24 tried a lot of things because of the volume.  I mean, it

25 doesn't really make a difference whether you blame her or not.

40

The fact of the matter is that it turns out that with this
volume, it was not sustainable following the usual rules of
litigation.  That's irreparable harm.  And it doesn't stop.

If you have an irreparable harm, an injunction case,
it is ongoing.  I mean, there's always the need to step in.
And so the fact that you could have done it earlier, I don't
understand.  That doesn't really weigh.  How is that -- the
delay means that you're not entitled to the equity?  I don't
think that there's -- I understand the question, but I don't
think that there's an argument there.  And there's a concession
of irreparable harm.

If you take a look at, go through the additional
slides, 7, 8, 9, excuse me, 10, 11, 12.  Right.

So 2017, it's been recognized by Congress that -- and
I'll tell you, Your Honor, there have been countless meetings
sponsored by different organizations to bring judges and
practitioners together to talk about MDLs.  What Congress --
the House of Representative report says here is well
recognized.  Everybody knows that there are too many claims
that are being filed in the MDLs and it happened here.  And
that's the next slide.  It's a class of statement.

This last statement by the MDL judge in the article
that she wrote in 2021, "the sheer volume of unsupportable
claims in some MDLs can grossly distort the true merit and the
size of the litigation."  That is the essence, that is the

41

1  definition of irreparable harm, not only to the litigants but

2  to the courts.

3        This is a case -- I can't think of a case that's more

4  compelling in terms of the acceleration in the docket and then

5  the impact on following a rule-based process.  I can't think of

6  a single precedent for it.  And I think that the irreparable

7  harm is continuing.  It may have been there before.  But it's

8  certainly here now.  It needs to stop now.

9        And just take a look at what's happened in the last

10 couple of days.  We're facing show cause orders out of the MDL.

11 We're now facing the prospect the court wants to take a look at

12 whether the parties have conducted themselves appropriately in

13 the mediation.  That's at least the essence of it.

14       And so now we're going to have the MDL during the

15 course of this case which is now pending, still activated to

16 look at us and take action with respect to us.  In fact, I

17 think we should extend our request for a TRO to include the

18 individual attorneys because I think it's going to happen.  I

19 think you're going to see orders from this Court that start to

20 go after the attorneys.  And then, it's almost, you know, it's

21 remarkable.

22       So there's now a tag-along action, a tag-along

23 request that's been filed to the JPMDL asking for this case,

24 this entire case, to be transferred to the MDL.  I mean, there

25 was consideration of doing that in the early '90s because there

42

1 was an MDL for all asbestos claims in federal court before a

2 Judge Weiner, in 1991. And he kind of looked at it, and well,

3 you know, maybe we should go ahead and do this. And they took

4 two years to kind of look at it and decide what to do, and they

5 said, we're not going to do this.

6 And we're not going to do it because the bankruptcy

7 case is not just a civil case in the MDL. There's a district

8 court there, right. That is a common feature. But the

9 underlying bankruptcy case and the underlying bankruptcy

10 jurisdiction is only one place and it's a place of the debtors

11 choosing within the rules of the Bankruptcy Code.

12 And so the idea that we're going to have an MDL judge

13 who is -- they're now asking that she -- well, let's just give

14 that whole case back to her and she'll figure out what to do

15 with it. I mean, that is the imminent harm and it's happening

16 every day. It's a distortion to the process. It was rejected

17 by the JPMDL, and they're doing it under far less compelling

18 circumstances. That was all of asbestos. My God, there were

19 cases all over the country.

20 We have one case before one MDL judge, and they're

21 saying, oh, let's tag-along the bankruptcy so that judge has it

22 too, when the heart of our problem comes out of her court. And

23 it's regardless of whether she did what right or she did wrong.

24 It's we're, you know, it's in the fact is indifferent to it.

25 The fact is we've got a docket that's broken and a case that's

43

1  broken and that invokes the, I think the obligation of the

2  bankruptcy courts to provide us the relief that we're seeking.

3         I hope that answers Your Honor's question.  I'm sorry

4  to go on for -- and it's also, I got a note, Judge Rodgers, the

5  MDL, is about to remand thousands of cases back to all the

6  other -- wherever it is that they came from.  So the out-of-

7  control docket now becomes an out-of- control remand docket.  I

8  mean, they're kind of saying, well, you know, we're kind of

9  seeing that it's like Mark Twain and, you know --

10         THE COURT:  But when you say "about to," it's not

11  now, correct?

12         MR. BERNICK:  Somebody else can talk about the

13  specific timing of that.  I believe that that is the --

14         THE COURT:  Let me ask this.  Is it within the next

15  14 days?

16         MR. BERNICK:  I don't know whether that's in the -- I

17  suspect not.  But maybe somebody else can answer.  I don't know

18  the answer to the question.  Somebody else I'm sure will be

19  able to answer.

20         What I can tell you right now, there are 343

21  depositions scheduled between now and September 15.  Sixty-two

22  of depositions next week.  Expert reports are due for 372

23  plaintiffs on August 15th.  That's a little bit past 14 days.

24  Six hundred and nineteen Daubert or summary judgment

25  oppositions are due on August 9th.  That is the intensity of

44

this litigation. And, again, so I mean, you know, I can say, Your Honor, that, you know, when you talked about the balance of harms associated with the next 14 days, all of the harms are one way. Absolutely all of the harms are one way. That's why we're here now. And that's why we're asking for a TRO.

And you could have, again -- well, I'm repeating myself so I'll just proceed unless Your Honor has further --

THE COURT: No, go ahead.

MR. BERNICK: Okay. Thank you.

Let's go to Slide 14.

Courts have consistently recognized that the measures are the essential first step is just to be a Chapter 11 case, incontestable. A.H. Robins, I think was handled by Judge Mehridge in the district court, a very esteemed mass tort judge. I think he was on the JPMDL at the time. "It seems incontestable that, if suits are permitted to continue discovery allowed, any effort at reorganization of the debtor will be frustrated, if not permanently thwarted."

I mean, this is why we're at the beginning, Slide 15. And I'll move along here, Your Honor. I know that I've been going for a while.

This is how the process works. I mean, the whole idea is to centralize and consolidate. And once you have all the claims in one place, and only then can you actually do an estimation. You have the pool of claimants and you can go

45

1 ahead. And then, with a plan formulation and confirmation, you
2 also know that, you know, what the scope of the channeling
3 injunction should be. So you can't do any of this if you don't
4 have control. And right now, there is no control and as
5 indicated, it's about (indiscernible). Of course, there are
6 parallel negotiations.

7      Slide 16.

8      Now, the reason I put this out here is that this is
9 an old issue. In every single one of these cases, the issues
10 that we're talking about here were addressed. I happen to know
11 about many of them because I was in <u>Dow Corning</u>, <u>Babcock</u>,
12 <u>Grace</u>, <u>Combustion Engineering</u>, and I was not in <u>Purdue</u>. I was
13 involved in the litigation before then. And in each and every
14 case, we had this kind of proceeding.

15      In many of the cases, it wasn't even contested that
16 you would have a stay for claims against the debtor and the
17 debtors' parent, or people who are other non-debtors, but that
18 certainly has been addressed on multiple occasions by multiple
19 courts of appeal. I also take a look at this, and again, I
20 could be wrong. You know, there have been over a hundred mass
21 tort bankruptcies if you count all the asbestos bankruptcies.
22 And maybe there's one.

23      But I'm not aware of a case where -- they say if you
24 always -- now you know that everyone's going to check this
25 forever. But a case does not come to mind where you have a

1  wholly owned subsidiary where you have a parent and there is
2  not a stay or comparable relief.  In <u>Dow Corning</u>, it was 157.
3  A stay or comparable relief that protects both the debtor and
4  the parent with respect to the liability that the product made
5  by the debtor that is at issue.

6       So, for example, in <u>Quigley</u>, there was a stay
7  injunction, whichever it was, but it did not apply to asbestos
8  products that the parent, Pfizer, had made and put out there.
9  But it did apply to the parent with respect to the product that
10 was made by the subsidiary, by Quigley.

11      But, you know, <u>Dow Corning</u>, the parent, <u>A.H. Robins</u>,
12 it was officers.  <u>W.R. Grace</u>, it didn't have a parent.  <u>Babcock</u>
13 <u>and Wilcox</u>, the parent was McDermott.  <u>Combustion Engineering</u>,
14 that was a case where I was counsel.  And that's a case where
15 ABB of Europe was the parent and the sole source of real
16 financing.  And we actually put together a prepack to get into
17 11.  It took about 35, 40 days.  But the parent was in itself
18 an extremist in terms of its creditors because of the threat of
19 the spill-over to liability.  But I don't think there was even
20 an issue that the stay should apply to the parent.

21      <u>Quigley</u>, I've talked about.  <u>Takata Holdings</u>, I think
22 got the benefit of the stay.  In <u>Purdue</u>, the Sackler families
23 got the benefit of the stay.

24      So I'm not sure that there's a case out there where
25 ultimately there wasn't injunctive or stay relief that covered

 1  the parent, which is exactly what we're talking about here.
 2  And in this case, again, the underlying liability originated
 3  with -- okay, well, I can't read and talk to the Court at the
 4  same time.
 5          So if you'd give me a little note, I might be able to
 6  do better.
 7          Okay.  Sixteen.  Seventeen.
 8          This is the stay.  It's just here.  But Your Honor
 9  has read it.
10          Eighteen.  Legal standards.
11          Of course, you know all of this and I'm going to go
12  through them fairly quickly.
13          Nineteen.  362(a)(1).
14          These are, I think the most instructive cases where
15  effectively the action is an action directed at the debtor.  At
16  the same time, it's directed at the parent and that is exactly
17  what we have here.  We have an inextricable core of liability
18  conduct and the same product.
19          And I'll note that in about 2010, this is way past
20  the peak of sales, the Combat Arms product was declining in the
21  market.  You'll remember that it was way down.  And so, at that
22  point, I believe that some of the operations, if not all of the
23  operations, relating to this legacy product -- That's what it
24  was, was a legacy product. -- got upstream to a 3M entity.
25  That's what happened.

48

1    So at that point in time, you know, essentially the
2  company took that legacy and put it to itself through the
3  operations. Now, of course, again, it doesn't change that the
4  liability conduct took place on, you know, overwhelmingly. You
5  know, they have a couple claims that are based on later
6  theories but the origination of the product and the basic
7  liability, it was all there. But, you know, the company said,
8  well, it's a legacy product. We're going to take this to
9  ourselves.

10   And so the case for the stay then becomes even more
11 compelling. It's already there based upon the actions being
12 driven, derivative essentially, are driven by the underlying
13 liability conduct to Aearo. But then, it actually becomes part
14 of the operations of that sub. And (indiscernible), you've got
15 indemnity even where indemnity is disputed. We had that in
16 W.R. Grace. Actions brought against the non-debtor where the
17 non-debtor is a contribution claim, that's Seventh Circuit.

18   And, you know, the list really goes on and on. We
19 could cite many more cases that come out exactly the same way
20 under 362(a)(1).

21   If we go to Slide 20.

22   This is ironic. The plaintiffs and their -- the stay
23 defendants in their opposition -- and I'll deal with all
24 theirs, at some point before I sit down -- themselves say gee,
25 it's such a shocking surprise that now we're taking the

1   position that Aearo is separate.  And the answer is it's not a

2   question of whether Aearo is separate.  We're not taking the

3   position that Aearo is separate.  To the contrary, we're taking

4   the position that the corporate entity was separate but the

5   liability of the corporate entity has been asserted as our

6   liability.  That's the whole thing that's going on here.  The

7   plaintiffs themselves take the position that there's no

8   difference -- the fact that we filed as one entity of two

9   that's alleged to be liable is not exactly shocking.  It's not

10  a new development.  They have been saying forever that, well,

11  and they've been telling juries, you know, the entity -- 3M,

12  Aearo, they're the same thing.

13          And we have got some of the quotes here.  They have

14  referred to both as 3M, tell the juries they're one in the

15  same, just note Aearo is 3M, so the idea of their objection

16  here though, there's some shocking new development.  We filed

17  an entity with the origination of the liability and the

18  origination of the products are the source of the liability.

19  The liability is being asserted in the courts for both Aearo

20  and 3M, and the liability is essentially the same.  Again,

21  there are a couple post fact acts, but the basic liability is

22  the same.  So, that objection actually is belied by the way

23  that they pursued the underlying litigation.

24          Slide 21 stays actions, (a)(3), property of the

25  estate.  Of course Your Honor is familiar with this, a person

1  who is covered by the insurance, and here the debtors and 3M

2  share 46 insurance policies.  I mean, this is, you know, pretty

3  much a lock.  I mean, I haven't seen -- again, I haven't seen a

4  case where the fact of there being shared insurance policies

5  doesn't qualify under 362(a)(3).  And those are all -- those

6  are all stays to both (a)(1) and (a)(3) that are triggered by

7  operation of statute.  They should be in place now.

8       22, here I think we'll get back to the question that

9  Your Honor has asked, and now we get to TRO and 105, and the

10 test.  And it's kind of an interesting history.  It goes back

11 and expands 20 years.  And you can see how it's evolved

12 somewhat.  And this is important because of the Court's

13 decision in 2019 in the Bush's case.  So, the language in

14 Xonics, and this was pre-Celotex, the Supreme Court case, says

15 related to -- it was related to jurisdiction over proceedings

16 or actions that affect the estate as a race, so its effects.  A

17 few years later the Supreme Court comes around in Celotex and

18 does kind of a canvass of all the circuits, and basically says

19 nine circuits use a test that says does it conceivably have an

20 effect on the estate?  Which is obviously a very broad concept,

21 but it notes that the Seventh Circuit is a little bit --

22 slightly different.  And of course as a result of Xonics, and

23 then the subsequent decision in Home Insurance, it is slightly

24 different.  And then you can see that the language of Xonics

25 carry forward to FedPak and -- to FedPak, and Fisher, all of a

 1  sudden it changes a little bit, it may effect.  The same thing

 2  in Teknek.  And then Judge Easterbrook takes up the Bush case,

 3  and he uses this as an opportunity, because his real point

 4  about the analysis of related to is that it's made ex ante,

 5  it's made at the beginning of the bankruptcy.  It doesn't

 6  depend on the actual effect at the time the bankruptcy is

 7  concluded.  It is ex ante.  It is at the beginning.

 8          And so he then says it now changes, and the paragraph

 9  that we have to take a look at is this -- is a paragraph that

10  -- where he uses the word potential effect.  So what he's

11  saying is if you do the ex ante analysis, right, you're looking

12  at possibilities.  You're not waiting until the end of the case

13  to see does it actually have an impact at the end of the case.

14  You're looking at the beginning of the case to see is this

15  something, the proceeding with respect to which the stay is --

16  or the injunction is requested, is this something that may

17  have, potentially has, based upon what may happen in the future

18  not being known?  It is -- it is designed to be prophylactic.

19  It's broader at the beginning.

20          And, importantly, the beginning is also the point of

21  the greatest fragility because if things aren't done right, not

22  only does the debtor have a big problem, but if things aren't

23  done right the bankruptcy has got a big problem because

24  something that might be enjoined or stayed at the very

25  beginning could have a very big impact later on.  You don't

52

1  wait for it to happen, you act.

2        And so, the analysis at the beginning of the case is

3  one that's purposely broad.  It's not just effects.  It's does

4  it have the potential to affect?  If we take a look at Slide

5  23, and this is -- let's go back to 22, this is a very, very --

6  again, it's the maturity of the jurisprudence.  And Judge

7  Easterbrook is kind of acknowledging, he points out, well, gee,

8  Celotex we said we are kind of a little different.  He kind of

9  says, well, you know, maybe we'll be kind of a little bit more

10  of the same now.

11        So, this is a very deliberate decision, and it bears

12  directly on Your Honor's determination here.  So let's go to

13  Slide 23.  This now is the greatest point of fragility for this

14  Chapter 11, for this Chapter 11, because right now we haven't

15  really -- we haven't really started, and we're faced with this

16  massive litigation that's eating us up and still is evolving,

17  you know, literally every hour, at least every day, with other

18  things that are being done to potentially derail this process.

19  We can't ignore that.  And the potential impact is on the

20  estate.  Again, for related to you don't have to have the --

21  you know, the direct action against the debtor.  Under

22  362(a)(1) you don't have to have actually impact on property

23  because it's the process.  It's the process of Chapter 11 that

24  needs to be protected, and the process of Chapter 11 is

25  unquestionably impaired.  If at the time we're going through

53

1  the initial stages of this case 3M, which is -- which we'll

2  talk about, it's critical to this process.  It's providing

3  funding for this process, support for this process.  3M is out

4  dealing with a proceeding which is taking up all of its effort,

5  and for that matter we're going to need people from -- we're

6  going to need the resources of Aearo people, and people working

7  on this case in order to deal with what is threatened and will

8  take place in the MDL.

9        So, this is all about protecting the process that we

10  have filed.  We are here.  Aearo is not going anywhere.  3M is

11  not going anywhere.  We want to begin this case.  We don't want

12  to begin the case in a way that doesn't recognize the fact that

13  what's happening out there is occupying huge amounts of money

14  and really every smidgen of the time that's available from

15  people who are actually critical to this case, as well.

16        24, basis for the TRO under 105, you know, you know

17  these from the briefs, closely related indemnity.  I'm going

18  to talk about the indemnity in a minute.  The non-debtor is

19  essential shared insurance.  I mean, it's really a pretty

20  compelling list of elements.

21        Slide 25, here they are.  Shared insurance.  Now, I

22  want to get to another point that the plaintiffs raise about

23  the shared insurance.  It's oh, well, you didn't tell us.  You

24  didn't tell the Court that oh, well, gee, it's in here but it's

25  kind of buried.  None of the insurers has yet to acknowledge

54

1  its coverage obligations.  That's a good fact.  It means that

2  the value of the policies is out there and it's intact.  And

3  one thing that the history of this litigation -- mass tort

4  litigation shows is that once a debtor that's an insured is in

5  Chapter 11, the money comes out of those carriers.  I mean,

6  they fight it, but it happens in every single case.  The

7  carriers are the last to come to the table, and the only thing

8  that brings them to the table is they can't keep the time value

9  of money because the whole litigation issue, liability issue is

10 compressed into the Chapter 11 through the estimation process.

11 Now, sometimes it continues on, but Chapter 11 is what the

12 insurance companies hate, because they know that it puts

13 pressure on their coverage defenses.

14        Slide 26, 3M's contribution under the funding

15 agreement, and it covers -- it's soup to nuts.  It's the

16 administration of the estate.  It is contributing money at the

17 outset to begin to fund, and then its funding obligations are

18 uncapped.  I mean, literally the entire liquidity of the

19 Chapter 11 case is based upon essentially insurance and --

20 which again is a shared insurance, so they will be able to get

21 the shared insurance.  They -- in fact, I think under the terms

22 of the funding agreement they get the -- the debtor gets paid

23 when it has exhausted its available resources, including the

24 insurance.  So, they will be able to get the shared insurance.

25 That then brings me to Slide -- let me talk about -- yeah,

55

1    we'll get to it, Slide 27, commit to the indemnity.  Now, they

2    will say, oh, well, you entered into the indemnity days before

3    -- days before the Chapter 11 was filed, and the answer to that

4    is, yes, that's true.  Now, their -- we are looking into it, I

5    can't really speak to it definitively, but I believe that there

6    were some existing obligations even before the indemnity.  But

7    yes, the indemnity is the flip side of the contribution.  What

8    we're saying is if we're going to be here, we're going to be

9    here.  We're not going to be off someplace else.  The -- and

10   that's really what the indemnity says.  This is the

11   consideration, the only consideration for our bringing all the

12   liquidity to the table.  So, yes, it was done immediately

13   beforehand because the company wanted to make these

14   commitments.  But to have them be made in the context of the

15   company getting the access to and protection of the Chapter 11

16   case.

17          If we go back to the Seventh Circuit's test of what

18   is -- what might happen, what is the potential effect on the

19   estate, you know, to the extent that we're not able to

20   participate fully and get protection fully, it obviously puts

21   enormous pressure on, you know, our ability -- on our funding

22   agreement.  And so the idea is that's exactly -- why would you

23   take all of the liquidity that is committed in the funding

24   agreement and say, oh, we'll see what happens.  That liquidity

25   is central to the entire case.  Why would you put that

56

1 liquidity through the funding agreement and potential jeopardy
2 by saying, hey, by the way, 3M, you're going to -- it's not
3 going to -- this case isn't going to do anything for you.
4 You're not part of the case.  We'll continue to soak you for
5 all that same money outside of the case.  That's -- it's -- you
6 know, 3M is a big company, but what company wants to go forward
7 and both fund the entire liability of Aearo with an un -- it's
8 like we're standing there with an uncapped funding obligation
9 so that they can push all of the liability of Aearo for all of
10 the products sold to us to pay without any cap.  And we're also
11 going to be sitting there on the litigation doing the same
12 thing.  They'll get the same -- they will be able to use the
13 same liabilities in exposure to get money from us outside the
14 litigation.  I don't -- it's kind of difficult to contemplate.
15 I don't know, but it's difficult to contemplate that that's
16 going to be something that is -- you know, is going to be
17 tenable.
18        Let's go to 23, 24.  I'm almost done here.  I'm
19 sorry.  105 -- 25, that's the insurance.  26, that's the
20 indemnity.  28, next steps.  So, you know, what I think that --
21 this is all pretty straighforward, and we had a little slide
22 that kind of talked about it, but we want to get going.  We
23 want to use the 230,000 claims here, and to use them to begin
24 the estimation process it will be a very extensive data set
25 that we can use then to conduct the estimation process, and we

1  think that we will be able to save some time.

2       I want to close by just touching on some of the

3  objections so that I cover them now.  Maybe I won't have to

4  respond.  So I have talked about Aearo is back as an allegedly

5  separate entity.  They have never been -- from a liability

6  point of view they have never been treated.  Rather than

7  pursuing appellate relief for the perceived injuries we did

8  pursue appellate relief.  The problem was that the entry of the

9  final orders on post-trial motions were very prolonged

10  schedule.  And that's actually a not unknown device that some

11  of the MDL judges use to maintain the pressure to reach

12  resolution outside of Chapter 11 is to delay the appeals.  And

13  that is what happened here.

14       They say, well, there's an absence of the irreparable

15  harm if it's not granted.  Well, the judge has actually given

16  the definition of irreparable harm, which is a distorted -- a

17  distorted litigation process that's not working.  There's

18  nothing imminent or potentially cataclysmic in the immediate

19  horizon, and I have to say, and maybe this is not appropriate,

20  just kind of get this picture that, well, we're kind of like,

21  you know, Mark Twain picture, rivers rolling by and everything

22  is calm.  It's the opposite.  We're sitting here up against a

23  wall every day.

24       Okay.  The plaintiffs just filed an ex parte motion

25  for a TRO with the MDL court to enjoin 3M or any party acting

58

1  on 3M's behalf from acting to enjoin parties from pursuing 3M

2  for combat arms claims.  So what this says is that we're filing

3  a TRO here.  They are going to -- the folks over here are going

4  to the MDL court to create competing TROs, and any party acting

5  on 3M's behalf.  So it means all my colleagues here are picked

6  up by this TRO, that the MDL has now issued, if this -- I'm

7  sure that this is accurate.  And that -- I mean, so -- okay.

8  I'm going to move the declaration.  I'll remember to do that.

9        So, that's where we are.  And I am not -- again, I am

10 not familiar, I've never -- I have never heard that happen.

11 And yet they are saying, oh, no rush, no TRO, so that they can

12 continue what they're doing in the MDL.  And forgive me for the

13 tone, but it really is -- they say, oh, well, we haven't had

14 discovery regarding the debtor's apparent claim that they alone

15 are now responsible.  Well, they have had tons of discovery,

16 and they will get more discovery on that issue if they want it

17 in the context of this case.  We all know that there is

18 disclosure in bankruptcy that's very robust and extensive, and

19 so what they are really doing is to say, well, we would have

20 preferred to have that outside of bankruptcy, and so that's a

21 reason for not giving us relief.

22        I already addressed the question of, well, the

23 insurers haven't acknowledged coverage obligations.  That's

24 true.  That's good.  The assets there, and they will give it

25 eventually.  That is the carriers.

59

```
 1          I'd like to move into evidence the first day
 2  declaration of Jay Castellano, and the first day declaration of
 3  Mr. Stein.  I know that Your Honor already has those in the
 4  filings, but we would move them into evidence.  And anything
 5  else I need to move in?
 6                    (Counsel confer)
 7          MR. BERNICK:  So, we're -- the Court has told us to
 8  respond by noon central today for the TRO motion, as I've just
 9  mentioned.  So we definitely want the TRO to include
10  representatives -- the same -- representatives of both the
11  debtor and 3M, because right now they are seeking to get the
12  district court to engage with us.
13                    (Counsel confer)
14          MR. BERNICK:  So, DX-4, 5, 6, 7, 8 is the funding
15  agreement, and then the policies we would also move them in.
16  And I am done, Your Honor.  I am sorry if I have gone on too
17  long.
18          THE COURT:  No.  That's fine.  Now, I'm going to ask
19  a very non-East Coast, and possibly Texas question, what am I
20  to do by admitting these declarations into evidence?
21          MR. BERNICK:  Well, they are just --
22          THE COURT:  What weight do they have?
23          MR. BERNICK:  Well, first of all, I am a Chicago boy,
24  so I am not that far off.
25          THE COURT:  I always wondered, because all the East
```

1  Coast, it's like we want a declaration.

2      MR. BERNICK:  Yeah.  Well, I --

3      THE COURT:  It's not subject to cross examination.

4      MR. BERNICK:  Yeah, yeah, yeah.

5      THE COURT:  Most of them are here.

6      MR. BERNICK:  Right.

7      THE COURT:  What am I doing with these other than to

8  put into evidence the dissertation that they have said, which

9  is basically the intro that Mr. Husnick said?

10     MR. BERNICK:  Yeah.  So, you're right.  And I had --

11  I started in Chicago for most of my practice, and then I went

12  to New York, and I -- there are a lot of things that don't make

13  sense about New York practice from my point of view, but as I

14  said --

15     THE COURT:  I said East Coast.  I didn't just pick on

16  New York.

17     MR. BERNICK:  Well, that's true.  But I tell you,

18  it's worse than the East Coast, so -- worse in New York than it

19  is anywhere else, just because it's been around for longer.

20  So, what I would say is pretty simple, which is the

21  declarations are being proffered, and if there's no objection

22  --

23     THE COURT:  Well, proffered is very different than a

24  declaration just going in.

25     MR. BERNICK:  No.  I'm -- I don't want to  --

1          THE COURT:  Oh.  You're going to move?  Okay.

2          MR. BERNICK:  I am moving it in.

3          THE COURT:  Okay.

4          MR. BERNICK:  And then we have the witnesses here --

5               (Unrelated conversation on Zoom)

6          MR. BERNICK:  That's somebody who is on Zoom, I

7 think.

8               (Unrelated conversation on Zoom)

9          THE COURT:  Who is on Zoom right now?  And may I ask

10 is this -- hello?  Please mute them.

11          MR. BERNICK:  Yeah.

12          THE COURT:  And for those of you paying attention and

13 following the rules, that's fine if you want to talk and ask

14 questions, but if you're just talking amongst yourselves on

15 Zoom and not listening to me to tell you to be quiet, it's not

16 a good move.  So, you'll be muted as a punishment.  And to the

17 extent you try to talk you may want to flag someone that

18 they're being muted.  So, go ahead.  I'm sorry.

19          MR. BERNICK:  Yeah.  So, I think the effect of it

20 would be that it's proffered.  If there is an objection we can

21 have the witness take the stand and essentially say, yeah, I

22 testify under oath that this is true and accurate, and then it

23 will be open to cross examination.

24          THE COURT:  Right.

25          MR. BERNICK:  I know that Your Honor is familiar with

62

1 that practice.  So, the idea is not to presume that it's

2 independently admissible.  It's just something they proffer.

3             THE COURT:  So, let me, I guess -- so you would like

4 to proffer the testimony of Mr. Castellano and Mr. Stein?

5             MR. BERNICK:  That's -- and also the -- that's

6 correct.  And then we're also proffering the two -- the four

7 exhibits, DX --

8             THE COURT:  How do you proffer an exhibit?

9             MR. BERNICK:  Move it into evidence.

10            THE COURT:  And it will be into evidence?

11            MR. BERNICK:  For purposes of this proceeding.

12            THE COURT:  That there's insurance policies?

13            MR. BERNICK:  There are insurance policies and the

14 funding agreement.  Again, there are lots of cases where you

15 say, well, you know, the record doesn't -- the Court is --

16            THE COURT:  Oh, I -- and you don't know me that well,

17 but the one thing I am very worried about is protecting the

18 record.

19            MR. BERNICK:  Right.

20            THE COURT:  Mainly because if I am going to get

21 overruled, much less remanded, which is the worst of all things

22 there is, I want it to be on things that I've actually

23 considered, not on something that an enterprising district

24 court or circuit court law clerk found.  So, I guess let me

25 start with the initial.  Is there an objection to the proffered

 1  testimony of Mr. Castellano and Mr. Stein?

 2          MS. CARUSO:  Your Honor, Debbie Caruso.  And, yeah --

 3          THE COURT:  Would you mind either using the podium or

 4  using the --

 5          MS. CARUSO:  I'd be happy to.

 6          THE COURT:  I can hear you, but --

 7          MS. CARUSO:  I know.  Most people can.  And I was

 8  raised in Chicago and grew up there, and my family is there,

 9  and I still think this is -- there's some problems with this

10  process.  Okay?  We don't have videos.  We don't have exhibits.

11  We had half of a day.  They obviously have had months to -- I

12  mean, look at this presentation.  This didn't happen with an

13  emergency filing.  So, we are at an extreme disadvantage to

14  cross examine anybody today, anybody.  And we would like to

15  present argument to the Court on why the TRO is not appropriate

16  today, and we're prepared to do that now, so I would like o

17  maybe postpone the offer, and if it's not going to be postponed

18  we would like we would like to reserve our right to cross

19  examine these witnesses and to review all these exhibits.

20  They're offering these exhibits into evidence.  You've seen

21  what's in these exhibits.  Do they have supporting

22  documentation for the exhibits?  They are summaries of what?  A

23  lot of stuff.  And it's just -- from a due process standpoint

24  it puts us in a horrible position, completely, and an unfair

25  position.

64

1   So, what we would like to do is proceed with our

2 argument on why the TRO should not be entered today, why this

3 should go forward in an orderly fashion with discovery, the

4 opportunity to take depositions, and the opportunity to do

5 document discovery, and that's what we would like to do, Your

6 Honor.

7   THE COURT:  All right.  Let me ask Mr. Bernick this

8 question.  Is that the close of your legal argument, opening?

9   MR. BERNICK:  It is the close -- it is the close of

10 our legal argument, period, and it -- subject of course to

11 whatever it is that they --

12   THE COURT:  Right.

13   MR. BERNICK:  -- have to say.  And with the proffer

14 -- with the proffer, the motion to admit these documents we

15 don't have any further evidence --

16   THE COURT:  So, that would be the -- the proffers are

17 your evidentiary portion?

18   MR. BERNICK:  That's correct.

19   THE COURT:  All right.  Well, let's table that for a

20 moment.  I would like to at least hear legal argument before we

21 move to evidence.  That's how I normally do things.  And we'll

22 go from there.

23   UNIDENTIFIED ATTORNEY:  Okay.

24   MS. GURVITZ:  Thank you, Your Honor.  Sasha Gurvitz

25 of the Klee Tuchin firm, KTBL Law, LLP, appearing on behalf of

the Aylstock Witkin or AWKO firm. In the courtroom with me
today is Jennifer Hoekstra of AWKO, and my partner, Rob
Pfister, who is admitted in Indiana, and also my partner,
Michael Tuchin, both of KTBS Law, are joining me remotely by
this Zoom. My pro hac vice is pending at Docket Number 48, and
our notice of appearance is at Docket Number 43.

Your Honor, AWKO represents approximately 45,000 tort
victims in the 3M MDL proceeding in the Northern District of
Florida. And AWKO serves as the lead counsel for the
plaintiff's steering committee in the MDL. We are here today
in opposition for the request for a TRO, and we filed a brief
opposition to that end which appears on the docket in adversary
proceeding at Docket Number 16.

As I said, Your Honor, AWKO represents approximately
45,000 tort victims with claims against the debtors and 3M.
These are veterans and service members who put their lives at
risk in service to their country, and who suffered injuries
that they attribute to the use of defective combat ear plugs
manufactured, sold and distributed by the debtors and 3M.

Since 2019 and thereafter their claims have been
pending in the MDL, which is a centralized forum explicitly
designed by Congress to facilitate the resolution of mass
claims such as these. The claims have been working their way
through the MDL process, with some cases having proceeded to
trial, resulting in substantial jury verdicts.

1    After participating in the MDL process for more than

2 three years the debtors and 3M apparently became dissatisfied

3 with the results obtained in that form, and so the debtors have

4 sought to opt out of the MDL process, a process specifically

5 designed for litigating these types of claims in favor of the

6 bankruptcy forum.  Counsel for the debtors acknowledged in his

7 opening remarks that ultimately this bankruptcy case is a

8 settlement negotiation.  Otherwise stated, this is a legal

9 tactic employed strategically to get a leg up on the plaintiffs

10 by derailing the MDL.

11    Not only have the debtors shopped a new forum, the

12 debtors have also seized on another alarming trend in

13 bankruptcy, seeking to avail their solvent, non-debtor parent,

14 3M, of all the benefits of bankruptcy without subjecting that

15 non-debtor to the burdens of bankruptcy.  In these

16 circumstances and on essentially no notice the debtors should

17 not be permitted the extraordinary relief of a TRO in favor of

18 this solvent, non-debtor entity.

19    The fact is there is no emergency here.  The debtors

20 have been planning this bankruptcy for at least the last couple

21 of months.  They had time to plan, to prepare visual aids, to

22 strategize.  They filed in the forum of their choosing at the

23 time that suited their interests, not because of any imminent

24 operational shortfall or looming threat coming in the next few

25 days or weeks.

1   No one is disputing that the automatic stay protects

2 the debtors, but 3M is not a debtor.  It is not entitled to the

3 protection of a stay, and it is not entitled to a TRO on this

4 record.  It is not a debtor.  It is solvent.  It is potentially

5 independently liable on these claims.  First and most

6 significantly, there has been no showing of irreparable harm if

7 the TRO is not granted.  The upcoming litigation deadlines in

8 the MDL cited by the debtors in support of the requested relief

9 reflect that the earliest deadline is an August 9th deadline

10 for responses to certain written discovery requests.  No trials

11 are scheduled to commence in the next couple weeks.  No

12 judgments are coming down the pike that will threaten the

13 debtors' ability to reorganize.

14   All that will happen if the TRO is denied is that

15 non-debtor 3M will continue to participate in ongoing

16 depositions and discovery in the MDL.  The debtors claim that

17 ongoing discovery obligations imposed on 3M will distract from

18 their efforts to reorganize their business, but the debtors are

19 protected by the automatic stay.

20   THE COURT:  Are the debtors protected from having to

21 undergo discovery with regard to 3M?

22   MS. GURVITZ:  The debtors are protected from having

23 to undergo discovery directed at the debtors.

24   THE COURT:  Well, but most of these cases are with

25 joint defendants, correct?

1              MS. GURVITZ:  Correct.

2              THE COURT:  And in theory you could attempt to

3    proceed not against the debtor, but against 3M.  And there's

4    discovery coming.  Are those discovery deponents and are those

5    experts, are they debtor experts?  Are they 3M experts?  Are

6    they debtor employees?  Are they 3M employees?

7              MS. GURVITZ:  I think that's a matter that probably

8    merits further fleshing out, and further briefing to --

9              THE COURT:  But we don't quite know yet?

10             MS. GURVITZ:  Exactly.

11             THE COURT:  So, there could be harm?

12             MS. GURVITZ:  There are allegations in the record

13   that support the position that 3M has independent liability

14   here as opposed to derivative liability here.  So there is a

15   basis for proceeding in -- with discovery with respect to

16   independent liability of 3M, and at this stage in the

17   proceedings there isn't a record that supports cutting off

18   those rights.

19             THE COURT:  No.  I'm just asking --

20             MS. GURVITZ:  Yes.

21             THE COURT:  If nothing happens today, if all we had

22   was a petition, what would happen in the depositions?  Would

23   you proceed?

24             MS. GURVITZ:  I think the depositions --

25             THE COURT:  And when I say you, I mean is it likely

69

1  that the tort plaintiffs would proceed?

2          MS. GURVITZ:  I think the depositions could proceed

3  as to 3M.

4          THE COURT:  But we're not sure if it involves debtor

5  employees versus 3M employees, correct?

6          MS. GURVITZ:  I think to the extent it involves 3M

7  employees, 3M experts --

8          THE COURT:  Okay.

9          MS. GURVITZ:  -- it could proceed, and it should.

10         THE COURT:  But that's a fine line, isn't it?

11         MS. GURVITZ:  Not necessarily.  I mean, in the -- the

12 debtors haven't developed that fulsome of a record to this

13 point, and we haven't --

14         THE COURT:  We don't really have a record yet.

15         MS. GURVITZ:  Right.  And we haven't developed any

16 record.  We haven't had the opportunity to develop any record,

17 but like the debtors, for example, say sort of obliquely in

18 their first day declaration that in 2010 the debtors' business

19 was upstreamed to 3M, that suggests that perhaps from and after

20 2010 or from 2010 until 2015 this was really all about 3M.

21         THE COURT:  Possibly.  But in the pending litigation

22 there's multiple defendants, generally speaking, at least for

23 the purposes of today, the debtors and 3M.

24         MS. GURVITZ:  Yes.  I believe as far as we know the

25 witnesses are 3M.

1          THE COURT:  Understood.  Understood.

2          MS. GURVITZ:  Yes.

3          THE COURT:  But what's in front of us today, that's

4   where we sit.

5          MS. GURVITZ:  Yes.

6          THE COURT:  Okay.  Go ahead.

7          MS. GURVITZ:  Thank you, Your Honor.  So, 3M has been

8   participating in the MDL since 2019, and as a solvent entity it

9   is more than capable of continuing to do so, and so it should.

10  As we were just discussing this is not a situation in which we

11  believe this is a case about derivative liability where

12  plaintiffs are trying to get indirectly what they cannot get

13  directly by going after directors and officers, for example,

14  for the debtors' misconduct.  This is a situation in which 3M

15  itself is potentially independently liable.  Failure to grant

16  the TRO will also not upend the funding agreement which the

17  debtors cite as essential to their reorganization efforts.

18  There is no indication in the funding agreement or otherwise

19  that 3M's payment commitment is in any manner conditioned on

20  the debtors obtaining or even seeking a TRO protecting 3M.

21  Irrespective of whether the Court grants the TRO today, 3M's

22  obligation under the funding agreement will remain exactly the

23  same.  Nor will it deplete the debtors' pool of potential

24  funding as the commitments from 3M are uncapped.  Nor will 3M's

25  participation in the discovery that is ongoing in the MDL

1 diminish the debtors' estates or irreparably harm the debtors.

2      The debtors make much of shared insurance coverage,

3 but there is no evidence of any imminent risk to shared

4 insurance. The insurers have not accepted coverage to this

5 point, so any harm is hypothetical, as counsel essentially

6 acknowledged in his remarks. And in any event, even if shared

7 insurance was at risk, which there is no evidence is the case,

8 the Court need not and should not enjoin litigation against 3M

9 to protect the estate asset. Rather, the Court could simply

10 enjoin 3M from drawing against shared insurance, thereby

11 preserving the asset for the benefit of the estate consistent

12 with the debtors' fiduciary duties.

13      The final argument that the debtors make relates to

14 their indemnity obligations in favor of 3M under the funding

15 agreement, but this argument is simply too cute by half. The

16 debtors cannot be permitted to manufacture indemnity

17 obligations on the eve of bankruptcy and then cite those same

18 obligations as the basis for granting extraordinary relief on

19 essentially no notice and essentially no record to a solvent

20 non-debtor.

21      On the flip side, if the TRO is granted, the tort

22 victims will suffer irreparable harm. The MDL is a centralized

23 procedure for handling over 200,000 claims. The schedules for

24 discovery and pretrial issues and other matters that are

25 established in the MDL are complex and carefully calibrated,

72

and are relied upon by thousands of attorneys and hundreds of
thousands of victims in scheduling many sequenced and
interdependent deadlines.  Taking these matters off calendar
will have far-reaching, disruptive consequences for these
parties and will interfere with the process established by the
MDL judge.

      Mr. Bernick's discussion of irreparable harm takes
the long view.  But as the Court noted that's not what's at
issue today.  This is not the preliminary injunction hearing.
This is a TRO.  It's about imminent harm in the next few weeks.
The absence of irreparable harm alone is reason to deny the
TRO.

      THE COURT:  Let me ask -- let me ask this.  Have the
plaintiffs considered just extending the deadlines so as to
allow the Court to have a hearing on the preliminary
injunction?

      MS. GURVITZ:  Extending the deadlines in the --

      THE COURT:  Right.  Because right now what is at
issue are these 62 depositions are due -- are happening next
week, 372 expert reports due on August 15th, and then Daubert's
01:47:31) reports due next week of a number of which I don't
know, because I didn't write it down.  Have we considered, or
has there been any discussion, I understand it's short notice,
but let me ask this.  If those were continued by agreement of
the parties, doesn't that obviate the need for a TRO and set up

1 a preliminary injunction hearing?  Because at that point you

2 can argue, Your Honor, there's no irreparable harm right now

3 because everything has been continued.

4          MS. GURVITZ:  But wouldn't that just be conceding the

5 relief requested in the TRO?

6          THE COURT:   But I am asking -- because you are

7 saying your people are going to be harmed by it if we stop

8 those deadlines.  They are saying they are going to be harmed

9 if they continue.  That's the crux right now of the next two

10 weeks or so.  So, I am asking, has that been considered?

11          MS. GURVITZ:  So, my understanding from our client is

12 that the discovery that's coming up in the next couple of weeks

13 in the MDL is case-specific discovery as opposed to discovery

14 necessarily directed at the debtors or at 3M.  So it's not

15 something that --

16          THE COURT:  Almost everything is case-specific right

17 now, right, because we're getting ready for the remand of

18 waves?

19          MS. GURVITZ:  But I don't believe it's as to 3M

20 witnesses or the debtors' witnesses in particular.

21          THE COURT:  Well, we're going to have to get to that.

22          MS. GURVITZ:  Right.

23          THE COURT:  And, obviously, that's going to be a key

24 decision.  But my question is has it been discussed?  Because

25 isn't your argument greatly strengthened if you say, Judge, all

1  they're saying is all these things are happening, we are

2  willing to move those so we can have a preliminary injunction

3  hearing that's briefed, that will have exciting exhibits, that

4  will have things in front of me, isn't that what you're arguing

5  that should happen?

6         MS. GURVITZ:  I think in part -- I -- I think in part

7  the issue is that moving things in the MDL has consequences.

8         THE COURT:  And I understand that.  But that's the

9  big issue.  Your concern is we don't want a TRO that's going to

10  have irreparable harm on all these things, and I'm just asking,

11  what have we asked about this?  Can we move these things two

12  weeks?  Is that going to irreparably harm the trial schedules

13  of those matters?  You may not have had an opportunity --

14         UNIDENTIFIED SPEAKER:  This hasn't the time, Your

15  Honor.

16         THE COURT:  Okay.

17         UNIDENTIFIED SPEAKER:  Yeah, we had --

18         THE COURT:  But that's a question -- that's a

19  question because, you know, we're reaching the noon hour,

20  that's a question I have to ask you all, because doesn't that

21  strengthen your position if you're willing to move everything

22  to look back and say what irreparable harm between now and a

23  preliminary injunction hearing.  That really strengthens your

24  argument, saying there shouldn't be a TRO.

25         MS. GURVITZ:  I understand, Your Honor, but I think

1  that kind of takes us to the bigger point of the debtors have

2  had time to plan and strategize to get --

3        THE COURT:  And I understand.  And it is -- and I

4  understand I am approaching this from a lifetime bankruptcy

5  perspective.  To me it's normal, because that's what happens.

6  To most everyone in the outside world it's like how can this

7  happen?  How can you be allowed to prepare and to do this and

8  spring this upon everyone?  Every -- but that's a common

9  creditor argument.  Obviously, to file a bankruptcy you have to

10  do due diligence to see if you can do it, and these things, and

11  they're well lawyered, they know what -- I mean, I understand

12  that they threw you into a strange forum in the middle of

13  nowhere.  I mean, there's not even an ocean nearby.  I mean,

14  what have they done to you?  So, I understand that.  But -- so

15  yes, they've had time to plan.  That's unquestionable.  But

16  that's the case in every bankruptcy, and I would be out of

17  business if I said you couldn't plan before a bankruptcy.

18        MS. GURVITZ:  Right.  And I appreciate that

19  perspective as someone who frequently represents debtors.

20  Certainly debtors, you know, they don't file, in most cases, or

21  at least in many cases they don't truly file on a whim on an

22  emergency on one day.  They plan for it and they pick the day.

23  But they don't always ask for emergency injunctive relief at

24  the first day without an opportunity for the other side to

25  present meaningful arguments to engage in basic discovery to

76

1   brief the issues.  So, I think that's what's different here.

2                THE COURT:  Okay.

3                MS. GURVITZ:  So -- and that really actually takes me

4   to sort of my closing point, which is that there's just no

5   basis for short circuiting the process for injured veterans and

6   service members to get notice of the extraordinary relief being

7   sought as to non-debtor 3M, to have an opportunity to take

8   basic discovery, to brief their positions, and to be

9   meaningfully heard by this Court, and to do so on a prompt but

10  fair timetable approved by this Court.

11               These veterans and service members do not deserve to

12  be jammed up on one or two days' notice with a stay that will

13  permanently derail the MDL process.

14               At the end of the day, today in opposing the TRO the

15  victims are seeking to preserve the status quo.  The debtors

16  and 3M are seeking to disrupt the status quo on no notice, on

17  no record, and with no meaningful opportunity for discovery or

18  briefing that would greatly, I believe, aid the Court and the

19  parties.

20               So, that's the issue.  Can they get this

21  extraordinary relief before Your Honor gets to hear both sides

22  of the story on a developed record?  We believe that they

23  cannot, and that they have not met their burden to do so.

24               THE COURT:  All right.  So, is it the argument, then,

25  at least now, that, A, there's not irreparable harm?  Okay.  I

1 didn't get a chance to ask counsel this, but I will ask you,

2 and then I will ask him, Ms. -- it's sad I have to use all my

3 paper to figure out people's names, what is the estimated cost

4 of what's going to happen in the next two weeks from the

5 plaintiff's perspective?  Do you have an idea of the number of

6 hours or costs or expenses which may be expended?

7            MS. GURVITZ:  In --

8            THE COURT:  Assuming that --

9            MS. GURVITZ:  -- the handling --

10            THE COURT:  -- there's no -- that there's no TRO in

11 place, what do you think you would -- what would it cost the

12 plaintiffs time-wise and hourly-wise, or expenses?  I

13 understand you're probably on contingency, but I am assuming

14 you are still keeping track of hours, how much are you going to

15 expend on the items that were listed of things on the horizon

16 within the next two weeks?

17            MS. GURVITZ:  The MDL?

18            THE COURT:  Yes.

19            MS. GURVITZ:  That's not something I am prepared to

20 opine on.

21            THE COURT:  Okay.  But can you guesstimate?  Is it

22 100,000?  Is it 50,000?  Is it a million?

23            MS. HOEKSTRA:  So, Your Honor, Jennifer Hoekstra.

24            THE COURT:  Come on down.  You're on the Price is

25 Right.

1              (Laughter)

2         MS. HOEKSTRA:  Not a venue I'm comfortable normally

3    speaking in, Your Honor.  Apologies for that.  From plaintiff's

4    perspective there are 50 depositions, probably somewhere

5    between 15 and 20 defense medical exams that are currently

6    scheduled.  Each of those involves a plaintiff taking the day

7    off of work, a plaintiff rescheduling if necessary, possibly

8    using multiple vacation days.  There's a lot of factors that go

9    into the estimation.  It's not just attorney hours from our

10   perspective.

11        We have now -- we're in the third wave of the remands

12   in terms of the depositions that are ongoing.  We have gone

13   through this process twice.  Scheduling the depositions is a

14   herculean effort.  There are hundreds of us who have to get

15   together and coordinate schedules to get them done within a

16   certain time frame.  Moving 40 of them will probably result in,

17   you know, twice the effort of hours that go into the actual

18   deposition in terms of resetting everything.  That is the

19   concern that is being raised.

20        In terms of attorney hours, man hours, probably

21   100,000, 150,000 hours total between the depositions, the

22   different individuals, and the follow up that goes along with

23   it.  Within the 14 days, as well, is the response to the

24   dispositive motions from the wave one, which is due August 9th.

25   There were almost 400 motions filed last Thursday.  The

1  responses to all of those motions are due for wave one on the
2  ninth of August.  Shifting that shifts the calendar, and that
3  is the concern about any sort of stay.

4  THE COURT:  Okay.  So, would it be fair to categorize
5  what you said as there's a lot that's going to go on and it's
6  taken a lot of effort to get there?

7  MS. HOEKSTRA:  Correct.

8  THE COURT:  All right.

9  MS. HOEKSTRA:  And it's not new.  These orders have
10  been in place since November, February and May in terms of what
11  all the deadlines are.

12  THE COURT:  All right.  Thank you.

13  MS. GURVITZ:  Thank you.  So, I think unless Your
14  Honor has further questions, to close I would just like to
15  emphasize the point that the debtors have been focused in their
16  presentation, I would say primarily on argument and not on
17  evidence, and that the concerns animating the TRO were
18  generally concerns relating to burdens on non-debtor 3M, and
19  burdens that are inherent in the MDL process.  And we heard a
20  lot about the ineffectiveness of the MDL process and the way
21  it's gone off course, and that's not what the TRO determination
22  is about.

23  The TRO determination is about whether in the next
24  few days there will be irreparable harm to the debtors if the
25  TRO is not granted, and there is simply not evidence on that

1   point, and given the allegations or position that 3M is
2   independently liable on these claims, a position we believe
3   they have not contested in the underlying litigation, it
4   doesn't seem like there could be a showing in that regard,
5   given the stage of the litigation and the nature of the claims,
6   and the fact that we're not dealing here with derivative
7   liability, we are not dealing with claims against officers and
8   directors who are busy running the bankruptcy case.  That's not
9   the type of situation.  This is not a case like A.H. Robbins,
10  where the plaintiffs are trying to get indirectly at the
11  debtors' liability.

12          3M is a solvent non-debtor proper target of
13  litigation.  If 3M wanted protection of the automatic stay it
14  should have filed for bankruptcy.  It chose not to.  It has to
15  live with those consequences.

16          THE COURT:  Okay.

17          MS. GURVITZ:  Thank you, Your Honor.

18          THE COURT:  All right.  I'll hold back.  Ms. Caruso?

19          MS. CARUSO:  Yes.  Your Honor, Seeger Weiss filed a
20  joinder to the objection, and briefly, we will not rehash what
21  has been discussed here.  I understand we are getting towards
22  the noon hour.  But we would like to present argument by
23  Melania Cyganowski.  However, we have to unmute her because she
24  is muted.

25          THE COURT:  Oh.

 1             MS. CARUSO:  She is on Zoom.

 2             THE COURT:  Was she one of -- oh.  Sorry.

 3             MS. CARUSO:  Yes, yes, yes.  And also, David

 4   Buchanan, who I think will be very helpful to hear from because

 5   David is with Seeger Weiss, and he has been living this MDL

 6   case.  And that would be the conclusion of our arguments on

 7   this issue.

 8             THE COURT:  Let me ask briefly a very important

 9   question, because I have read all the studies about what

10   happens just before lunchtime, usually in criminal cases, what

11   would you anticipate the approximate -- assuming we unmute her,

12   what would be the approximate time frame in which you think the

13   testimony would be?  Are we talking a half an hour?

14             MS. CARUSO:  Oh.  This isn't testimony.  This is

15   argument.

16             THE COURT:  I'm sorry.  Legal argument.

17             MS. CARUSO:  Not more than 30 minutes, and probably

18   not 30 minutes.

19             THE COURT:  Okay.  That's fine.

20             MS. CARUSO:  Thank you.

21             THE COURT:  All right, ma'am.  You may proceed.

22             MS. CYGANOWSKI:  Thank you, Your Honor.  For the

23   record, Melanie Cyganowski of Otterbourg P.C., counsel to

24   Seeger Weiss, as Ms. Caruso noted, one of the lead counsel in

25   the MDL, and also counsel independently to thousands of

1  plaintiff entities.

2       If I might, Your Honor, let me begin by answering the

3  questions you raised at the conclusion of counsel's argument,

4  namely administrative scheduling in connection with the MDL.

5  And I think frankly this also goes to the heart of the TRO

6  that's being requested.  This morning, prior to the hearing

7  before you there was a hearing in the MDL court before Judge

8  Rodgers, and she frankly chastised debtors' counsel and counsel

9  for the 3M/Aearo parties for not coming before her at any time

10  prior to unilaterally canceling the depositions.

11       These are regular scheduling issues.  The MDL Court

12  is regularly available for conferences to deal with these

13  issues.  It makes no sense, and in fact is turning federal

14  jurisprudence on its head that we're running to bankruptcy

15  courts when we're dealing with scheduling issues in an MDL, or

16  otherwise complaining of an administrative schedule that as an

17  aside both Aearo and 3M voluntarily agreed to as the admin

18  schedule was being put together and agreed to by the -- and

19  implemented by the Court.

20       So to specifically answer your questions, I don't

21  think we here today at the podium can agree to waive or stop

22  these depositions.  I would, however, encourage all parties to

23  seek a conference before Judge Rodgers, and I'm sure all of

24  this can be dealt with before her, who knows her calendar best.

25  I myself am a former U.S. Bankruptcy Judge.  I sat in the

83

1  Eastern District of New York for 14 years.  It's now been 14

2  years since I sat on the bench.  But I well remember the

3  scheduling difficulties and all the other balances of hardships

4  and equities that a court needs to do.

5        Frankly, this is not the job of a bankruptcy court to

6  be overseeing how an MDL calendar is scheduled, nor is it one

7  for this Court to be dealing with issues of which debtors'

8  counsel now complains.  I mean, if they were so upset with the

9  MDL there are other remedies that Congress has put in place.

10 There could be mandamuses to the Court of Appeals.  There could

11 be appeals to the Court of Appeals.  There could be seeking

12 reconsideration of the administrative process that's ongoing in

13 the MDL court.  The bankruptcy system was not designed, as this

14 Court well knows, to handle issues of this sort.

15       But coming back to the central issues that are here,

16 and to go over the points without repeating unnecessarily what

17 counsel has said, and what our papers says, simply put there's

18 no exigency here for a TRO.  There's no melting ice cube.

19 There's no melting acid.  There's no large judgment about to

20 enter.  There's nothing other than at best these depositions.

21       To put a finer point on it, until today not one

22 employee who testified in connection with the MDL depositions

23 was an Aearo employee.  They were all 3M employees.  Until a

24 few days ago when this artificial, my words, indemnification

25 agreement was imposed upon the debtor there was no identity of

84

1 interest, and the 3M defendant in the MDL voluntarily said that

2 they were the sole party responsible for the judgments and the

3 sole party that was participating in these trials.

4        With you in court is Mr. Buchanan, who can go through

5 this with more specificity.  He has been living through these

6 cases.  But it's important for the Court to know that Aearo

7 employees are not at the central core of the discovery that's

8 taking place before the MDL.

9        We believe for the reasons that have also been noted

10 that more time should happen.  We were counsel to another MDL

11 in the LTL/J&J case.  We were in North Carolina when Judge

12 Whitley heard from those parties that the TRO had to proceed.

13 He placed it on a slower calendar.  It took three weeks before

14 we had an orderly TRO hearing.  Ultimately the TRO was granted

15 in favor in order to -- in Judge Whitley's terms he did not

16 want to send a case on fire to New Jersey when he transferred

17 it.  But the point is that for those three weeks the world

18 didn't come to an end.  Johnson & Johnson didn't stop doing

19 what Johnson & Johnson did.  There was an orderly process for

20 discovery to take place, and we had an orderly evidentiary

21 hearing that gave the Court a record for him to proceed.

22        With respect to the overall case and where we stand,

23 from our point of view, from the plaintiffs' point of view we

24 are greatly concerned that this case is following the Texas

25 two-step.  Some can call that a dance.  Here it's a slightly

85

different rhythm. Here there's no divisive merger here but the same artificial construct where you have a solvent parent and joint tortfeasor here at 3M seeking the protection of the Bankruptcy Court without taking on any of the burdens.

We all agree, as counsel pointed out, and there's absolutely no dispute that the automatic stay arises with respect to debtors immediately upon the filing, but there is now this new mantra. We heard this in <u>LTL/J&J</u> most recently, that all non-debtor affiliates get the benefit of the automatic stay merely because there's this pre-petition indemnification agreement which artificially constructs the argument that there's an identity of interest. There will come a time when we will explore that. We believe we will be able to point out to the Court that it's not an arm's length agreement. This was the pivotal question that Judge Rodgers asked today. Was it in fact an arm's length agreement, or was it simply a subterfuge to defraud the plaintiffs? Today is not the day to answer that question, but it will be before you at some point.

We have heard the overall refrain before. MDLs don't work. All claims flow from ambulance chasing plaintiff's bar. The company has done no wrong. There's no liability, that they want an equitable and expeditious way to proceed. History, however, does not bear that out. In the Texas two-step cases they are still going on. There is no confirmed plan. There is no settlements in sight. It's, simply put, a way to deprive

1    plaintiffs of their right to a jury.

2         When we've looked at their points, and I have to say

3    I -- I have never, ever as a litigant heard an attack as

4    vicious as I heard debtors' counsel do today with respect to

5    Judge Rodgers and the MDL.  I have not been a part of that MDL,

6    but I find it unimaginable that Judge Rodgers did not do a

7    proper job throughout the case, and moreover, that she did so

8    most times, if not all times, with the consent of the parties

9    who are today complaining before you.

10        The defendant companies, the debtor companies, so

11   that we don't get confused as to who is on which side, have

12   lost trials consistently over the past few years.  They have

13   lost them before different judges, before different juries, in

14   different jurisdictions.  It's truly an artificial argument to

15   blame everything today, and the reason for the TRO, and the

16   reason for the reach for this Court to give this overarching

17   blanket stay over all of these non-debtor parties merely

18   because they are in an MDL, is this the precedent that we are

19   now going to be setting in bankruptcy courts that any

20   defendants in any MDL would simply do what Aearo has done in

21   this court today?  My hope is that this court will find, as we

22   believe, that there is no basis in that argument.

23        I also find it astonishing, and frankly am having

24   difficulty processing what I believe is an absurd inconsistency

25   about on one hand complaining that the MDL does not

1 appropriately and properly process all these thousands or

2 hundreds of tort cases, whatever they may be, but yet

3 complaining that the process by which discovery and bellwethers

4 are taking place is too rushed.

5   The bottom line is that a so-called out of control

6 docket, I wrote the words when counsel said it, he specifically

7 said the irreparable harm today is an out of control docket.

8 How is that possibly sufficient to satisfy the standards?

9   For all these reasons, Judge, and those in our

10 papers, and I leave it for others to also argue, I believe that

11 first there's no basis whatsoever for the TRO on this record to

12 be granted.  I believe on this record whether or not you admit

13 the declaration, which I believe you should not admit, that's

14 not what we do on the East Coast, as they say.  We wait until

15 the witness has been cross examined.  At the end of the cross

16 examination counsel then offers the declaration into the record

17 in evidence.  It is not offered at the beginning without any

18 foundation, assuming that there is an evidentiary basis

19 sufficient.  But I believe that even if that declaration were

20 placed into the record, based on that alone and what's before

21 the Court there is no basis for this Court to find irreparable

22 harm is taking place, especially when balanced against the

23 undue prejudice which is being placed upon the plaintiffs in

24 the MDL.

25   In the event that the Court is not prepared to make

1   that ruling, we minimally request that the evidentiary hearing

2   on the TRO be deferred for a few days.  There's no reason why

3   we cannot depose the gentleman on the first day declaration.

4   There is no reason why we can't look behind the so-called

5   indemnification agreements to see, you know, whether or not

6   they were indeed at arm's length.  And nothing will jeopardize

7   that.

8         And I would also urge that this -- that the parties

9   contact and meet with Judge Rodgers so that they can deal with

10   the scheduling issues so that the two courts can appropriately

11   coordinate the respective matters pending before it.  Thank

12   you.

13         THE COURT:  All right.

14         MR. WINSTON:  Your Honor, this is Eric Winston on

15   Zoom.  May I be heard?

16         THE COURT:  There's one in the courtroom that's

17   already been stated as coming, then you can be heard, sir.

18         MR. WINSTON:  Thank you, Your Honor.

19         THE COURT:  All right.

20         MR. BUCHANAN:  I think it's still morning, Your

21   Honor.  Dave Buchanan --

22         THE COURT:  Still morning here.

23         MR. BUCHANAN:  Dave Buchanan of Seeger Weiss.  I am

24   co-chair of the plaintiff's steering committee and the MDL.  My

25   partner, Chris Seeger, is co-lead counsel in the MDL.  We

1  represent thousands of clients individually, and obviously have
2  responsibility in the MDL on behalf of the 235,000 cases or
3  claims that are currently in that court.  I was struck, as my
4  co-counsel was, by the statements that were just made by
5  defense counsel as to the way this litigation has been managed,
6  as if it's been managed singularly by the Court without the
7  input and consent of both sides.

8          The administrative docket process that comes under
9  criticism in this courtroom by Mr. Bernick was a process that,
10 in fact, defendants endorsed.  It followed a practice that
11 defendants endorsed where they agreed to toll all claims, toll
12 all claims did not need to be filed.  And by, I think, the fall
13 of 2019, there were 180,000 claims that defendants were aware
14 of that had been tolled.

15         It wasn't until, and then there was an administrative
16 docket that was created thereafter to facilitate the obtaining
17 of records because of certain conditions required to get
18 records from the military, but it wasn't until April of this
19 year, a date that coincides seemingly with the defendants'
20 statement as to when they first started to consider an
21 alternative way of resolving their liability, that the
22 defendants raised any complaint or concern about the
23 administrative docket and the fact that complaints had not been
24 brought into the system formally.

25         Since that time, more than half of the cases on the

administrative docket have indeed been transitioned, half of
the cases that have been brought over, a process that the
defendants have agreed to, a process that they sought, now a
process they complain about. And so what is it really that
underlies and that gives rise to this broken system that the
defendants complain about?

The results of the system they joined in supporting,
a Bellwether system, a Bellwether process that began with a
random sample of cases, random, from those cases then on the
docket. That sample was then reviewed by the plaintiffs and by
the defendants and the plaintiffs had picks and the defendants
has picks and the Court had picks, random picks by the Court.
And through that process, I think there were -- we saw it on
one of the slides, but in terms of estimation and that's why I
raise it because in this court Mr. Bernick is proposing a
different way of valuing cases than the parties had agreed to
value cases, a Bellwether process.

Twenty-seven Bellwethers were selected randomly.
From that, plaintiffs prevailed in 13 of the 19 that went to
trial and 18 were dismissed --

UNIDENTIFIED ATTORNEY: Eight.

MR. BUCHANAN: -- eight were dismissed, excuse me.
So what we have really are the arguments that you saw in
slides, arguments that defense counsel here proffered to juries
19 times. Seventy percent of the time they lost. Seventy

1   percent of the time the arguments about liability, the

2   arguments about how damaged somebody was, the arguments about

3   whether somebody had the plug or not, everything that litters,

4   if you will, the informational brief followed by debtors'

5   counsel, all the issues about this plug and how great it was or

6   how much the military liked it or didn't like it.

7          All those arguments have been vetted by very good

8   estimators, 19 juries and fairly consistently or at least 70

9   percent of the time the juries have rejected those arguments,

10  over and over and over again to the tune of very significant

11  verdicts.  Why do verdicts get better?  Well, what ends up

12  happening over time is their witnesses say things, their

13  witnesses admit things when they're in a courtroom and when

14  they're not in a deposition.

15         They make admissions that they can't then run from in

16  subsequent trials and that's what we had in these cases.

17  Liability that, yes, included a flange memo, that, yes, also

18  included the company's chief courtroom representative, Mr.

19  Berger, who said over and over and over again in the later

20  trials, not in the early trials, that this was the most

21  variable earplug the company had ever made, the most variable

22  earplug, an earplug that works sometimes and not others.  Of

23  course, those are statements of one witness, then a 3M

24  consultant at that point in time who became a 3M employee after

25  3M acquired the company.

1    The statement that all of this relates to Aearo

2   employees also struck me because we were told three years ago

3   when we were trying to figure out how to do discovery in this

4   case that Aearo had no employees.  After 2010, all employees

5   had been absorbed into 3M.  3M had the employees.  They've

6   worked from 3M since the time of the transition in 2009, 2010.

7   Certainly an issue we'd like to explore as we now see the

8   company saying it's got hundreds of employees.

9    Well, certainly, in the course of the litigation when

10  those employees were deposed, those people who still worked

11  there, they were 3M employees.  As the litigation progressed,

12  they had one counsel, one counsel for debtors and 3M at these

13  depositions.  And there's no dispute that 3M sold this product

14  on its own until 2015.

15   3M made its own determinations that this product was

16  flawed.  They made their own determinations that this product

17  was not safe for use in the very settings they promoted it for.

18  3M made their own affirmative statements about this product,

19  their own misrepresentations about this product.  They have

20  their own independent liability for this product.

21   Perhaps that's why at no point did 3M ever try to

22  distinguish itself and say it had no liability in any claim in

23  the MDL, a statement that I think was acknowledged before Judge

24  Rodgers this morning.  At no point did they seek such a

25  finding.  They come here now and try and draw a different

93

1 characterization of their role, that merely it was all the acts

2 of a sub.  There is independent liability of 3M for their acts,

3 the acts of a non-debtor.

4      Well, highlight that beyond what happened after 3M

5 took the company over with its own liability, an issue that

6 gave rise in the discovery of some of the findings and facts

7 about this case arose out of a litigation involving just 3M and

8 a competitor of 3M, <u>Moldex v. 3M</u>.  That gave rise to an

9 investigation by the U.S. Government against 3M, an

10 investigation by the Criminal Investigation Command of the

11 Department of the Army in conjunction with the Department of

12 Justice against 3M.  And you know who settled it?  3M settled

13 it.  3M resolved those claims, not Aearo, not Aearo.

14      And when the time was taken, when the time came when

15 these issues arose in 2015 and 2016, it was 3M that determined

16 that the product couldn't be sold in the manner that it -- with

17 the claims they had made, with the claims of safety that they

18 had made.  That was 3M.  And it was 3M who also chose to keep

19 it a secret and never tell anybody that was still using it.  It

20 was 3M that never recalled this product.  3M has independent

21 liability from Aearo.  That's why it was never contested before

22 juries.

23      So, where are we today?  We have tens of thousands of

24 veterans who've used the product.  Yes, made, marketed and sold

25 by 3M, certainly after the acquisition of Aearo.  Independent

94

liability with regard to 3M's actions and inactions. U.S. Government didn't know, soldiers didn't know, and 3M knew it all and said nothing.

So, 3M was happy with this administrative docket. They were happy with the process that, frankly, they touted in their securities filings for years. There's only 10 or 15,000 cases on the docket. They were happy with that number and it was perceived the litigation that was of scale, 10 or 15,000 cases.

Over time, analysts started to figure out that there was a bigger case. At that point, 3M had to deal with its administrative docket and the fact that the estimator, the 19 juries who had seen this case 13 out of 19 times said your case, your defense is no good. The case and the defense that you were presented with and they'd like different estimators, non-Seventh Amendment jury estimators to evaluate, that defense has been rejected over and over again.

Respectfully, Your Honor, I'll defer to my counsel, my bankruptcy counsel with regard to whether or not the showings have been made on the TRO, but certainly we welcome the opportunity to take on the merits of this. Thank you, Your Honor.

THE COURT: All right. Mr. Winston.

MR. WINSTON: Good morning, Your Honor, or I think it's still morning. Thank you, very much, for allowing me to

95

1  appear by Zoom.  We're trying to get our pro hac vice

2  applications on file.

3          THE COURT:  Right.

4          MR. WINSTON:  Your Honor, I'm with --

5          THE COURT:  But I am going to preface this, by the

6  way, if you could be brief, that would even be better.  But go

7  ahead.

8          MR. WINSTON:  Less than five minutes, I promise.  I'm

9  with Quinn Emanuel, Your Honor, and we are among the counsel

10 representing some of the veterans and service members that were

11 injured.  We represent, you know, several thousand.  We've

12 actually done three of the Bellwether trials, all of which

13 resulted in plaintiff verdicts.  And my colleague, Adam Wilson,

14 who may be on the Zoom somewhere, is one of the members of the

15 executive committee.

16         I just want to highlight a couple of facts and then

17 suggest one possible solution here.  The facts that I -- have

18 been touched upon, but I just want to make sure Your Honor

19 knows, you asked about discovery that's coming up.  Fact

20 discovery of the debtors and 3M, that's over.  All of the fact

21 discovery that you're hearing about is of the plaintiffs which

22 3M has been taking and then unilaterally counsel.  It's up to

23 them whether they want to take it.  But this is not a question

24 of officers of the debtors or even the debtors' parent being

25 distracted because that's all over.

96

1    The expert depositions and reports, that's still fair
2  game for both sides, but that's overwhelmingly 3M's
3  responsibility and they've been paying for it.  The other fact
4  I just want to mention, this came up in front of Judge Rodgers
5  today which I didn't hear counsel for the debtors mention is
6  that in her questioning of both 3M and the debtors' counsel
7  today about how the MDL has gone, she commented that thousands
8  of cases have been resolved just this year which I think to us
9  suggests that the MDL is working the way it's supposed to work.
10 That process now has been just tremendously disrupted.

11    And then the third fact I just want to bring up, and
12 this goes to why we think we need discovery and can't --
13 there's nothing that can be resolved on today's record is
14 exactly what are the obligations of the debtors vis-a-vis 3M
15 and now this artificial indemnification agreement because, as
16 you've heard, it has been represented in the MDL that 3M is
17 completely responsible for this.  And if that is, in fact, the
18 case, I have no idea what the debtors were doing entering into
19 an indemnity agreement and equally important how it would be
20 bad, much less, you know, have a material adverse effect on the
21 estate for liability to be established that 3M has to pay for.

22    When counsel raised the Queenie case, that was the
23 question was whether the liability of the non-debtors would
24 have a material -- immediate, material adverse effect on the
25 debtors' estates because it would effectively be a judgment

1    against the debtor.  Here, it's the opposite.  It's a question

2    of whether it's a judgment against 3M.  And, indeed, the vast

3    majority of the cases that have been discussed, <u>A.H. Robbins</u>,

4    <u>Purdue Pharma</u>, those were the cases where the tort fees are

5    filed for bankruptcy.  The tort fees are here, 3M hasn't and

6    that's the problem.

7            Which brings me to the proposal and I think this goes

8    to a question you posed to one of the other plaintiff's counsel

9    and we just want to address, at least give our suggestion and

10   that's this.  Deadlines might be able to be moved, there's

11   obviously been a lot of disruptions already and it's hard to

12   get people to leave their jobs for the day and get depositions

13   rescheduled.  But I think if we go before the MDL judge and

14   agree to work out a schedule for several weeks to see if we can

15   reset depositions, reset deadlines, if it can be done, and hit

16   pause for just a week or two and allow the parties to actually

17   discuss things, as opposed to what happened where we have less

18   than 24 hours notice of this TRO trying to disrupt everything,

19   that might be the right path here which actually probably would

20   save just a huge amount of money and might obviate the need for

21   a TRO altogether which, I mean, since from our perspective

22   nothing was immediate anyway.  I don't think there's any cost

23   to the plaintiff's side.

24           So, Your Honor, that's it.  I said less than five

25   minutes.  Hopefully I kept my promise.

1    THE COURT:  You're close.  All right.  There also is

2  a request from a Ms. Keller.  You, too, have the ability to

3  speak briefly.

4    MR. KELLER:  Hi, Your Honor, this is Ashley Keller.

5  It's actually Mr. Keller, but you are --

6    THE COURT:  Oh, sorry.

7    MR. KELLER:  -- not the first and won't be the last

8  to make that mistake.  And I had not actually intended to speak

9  today, so I didn't file anything.  But at the very beginning,

10 the debtor and debtors' counsel said that my firm, and me in

11 particular since I signed the papers, violated the automatic

12 stay.  So very briefly with your permission, I'd like to speak

13 to that issue.

14    THE COURT:  Well, it did catch my attention.  Go

15 ahead.

16    MR. KELLER:  Yeah.  So, what we filed was a notice

17 for the JPML, the Judicial Panel on Multi district Litigation,

18 saying that this case is related to cases that the JPML has

19 consolidated in Florida.  In no sense is that a violation of

20 the automatic stay and you notably didn't hear debtors' counsel

21 explain how it is.  This is not an action against the debtor or

22 the estate.  This is not an attempt to impact estate property.

23 It's not bringing a claim of any kind.  And so if you look at

24 the statutory text of Section 362, this is none of the things

25 that are contemplated by the automatic stay and it's also not

1    the sort of filing that we could have made prior to the

2    commencement of this proceeding.

3            The only purpose of a potential notice of tag-along

4    is to notify the JPML that in our opinion, which we have in

5    good faith, this is the sort of proceeding that has overlapping

6    questions of law and fact that deserves to be sent to where the

7    JPML has already created an MDL.  It's, essentially, a request

8    to transfer.  It wouldn't make the debtor suddenly not be

9    bankrupt.  It wouldn't unfile the bankruptcy.  It would just be

10   sending this proceeding to a different tribunal.

11           Now I understand my friend's argument that in the

12   nineties there were asbestos cases and maybe they'll

13   successfully persuade the Judicial Panel on Multi-district

14   Litigation that that precedent should apply and --

15           THE COURT:  Let me just ask a brief question out of

16   curiosity because there's nothing in front of me, but who

17   determines the right jurisdiction and whether it should be

18   transferred, the transferor or the transferee court?

19           MR. KELLER:  It's actually neither, Your Honor.  It's

20   the Judicial Panel on Multi-district Litigation which is a

21   panel of differently selected Article III judges.

22           THE COURT:  Well, no, I know what the panel is,

23   but --

24           MR. KELLER:  I apologize.  I didn't mean to explain

25   something you already knew.

1       THE COURT:  It just raises the question of whether or

2  not then that they can just -- well, it raises a lot of

3  questions, but nothing's in front of me.  But thank you for

4  informing.  Anything else I should know about that particular

5  filing?

6       MR. KELLER:  Well, the only thing I'll conclude with,

7  Your Honor, is I think it's quite likely that the panel is

8  going to set a briefing schedule, not because they think we're

9  right or they think the debtors are right, but because,

10 essentially, when someone tags a case, then they set a briefing

11 schedule.  We, obviously, agree with everything that's already

12 been said by our able colleagues as to why you shouldn't grant

13 an injunction and you'll take the TRO request based on those

14 arguments.

15      But I just want to be clear that it's our position

16 that we should not be enjoined regardless of what you do from

17 responding to the Judicial Panel on Multi-district Litigation

18 where, essentially, the debtor gets to file a response and

19 papers about why the case shouldn't be sent Northern District

20 of Florida, but we have to proceed with our hands tied behind

21 our back and, you know, to comply with your order not say

22 anything.  So, we would just request that if briefing is

23 ordered by the JPML, we get to put in our papers.

24      THE COURT:  Well, that's not an issue for me today.

25 You proceed how you think you are legally entitled to proceed

1  and if something comes in front of me, I'll make a legal

2  determination of what happened, but thank you.

3  　　　　MR. KELLER:  Very good, Your Honor, thank you.

4  　　　　THE COURT:  All right.  So, is there any other legal

5  argument to be made before I would open evidence?

6  　　　　　　　　(No audible response)

7  　　　　THE COURT:  Do you want to have a chance to -- first,

8  if there's anymore, you can respond briefly, but I do want to

9  at least hear anyone else.

10  　　　　MR. BERNICK:  I apologize for getting up from my

11  chair --

12  　　　　THE COURT:  Just give me a little bit of time to hear

13  if anyone else has anything.

14  　　　　MR. BERNICK:  Oh, I'm sorry.

15  　　　　THE COURT:  All right.  Either you've been muted or

16  you're not.  So you have a 10-minute or less legal rebuttal

17  before we'll take a break and then we'll take evidence.

18  　　　　MR. BERNICK:  Okay.  I'm sorry for popping up in my

19  chair.  I guess I didn't hear who the last gentleman

20  represented.

21  　　　　THE COURT:  His name was Ashley Keller and I didn't

22  catch -- I didn't write down, but somewhat involved in it.

23  　　　　MR. BERNICK:  Well, I'm just -- if he's speaking, I'm

24  assuming he's representing some party to this case.  If he's

25  not, then --

1    THE COURT:  He said he -- I didn't write it down,
2  but, yes.  I have a feeling your opposition may know and can
3  fill you on that.

4    MR. BERNICK:  Right.  That's what I figured, but I
5  thought I would just ask.  So, a few things and they're not
6  going to be unfortunately in particular order because there are
7  just so many things that were happening, but that's fine.  So,
8  there are a lot of broad statements that have been made that,
9  you know, for example, juries aren't estimators.

10    THE COURT:  I'm not --

11    MR. BERNICK:  Yeah.

12    THE COURT:  Okay.

13    MR. BERNICK:  Okay.

14    THE COURT:  For rebuttal, let's just focus on the one
15  thing I'm really worried about right now is the TRO.

16    MR. BERNICK:  Okay.

17    THE COURT:  That's what I'm really concerned about
18  because that's what's in front of me.

19    MR. BERNICK:  Right.  Well, that was the one thing I
20  did want to make sure is that we're also seeking relief under
21  the stays and the stays are now, whatever they are, they're
22  triggered by the filing of the bankruptcy.

23    THE COURT:  Right, as to all the named debtors,
24  correct.

25    MR. BERNICK:  Yeah.  Well, but under 360(a)(1), it is

103

1  any claim that is made, in effect, against the non-debtor

2  parties.

3           THE COURT:  Right.

4           MR. BERNICK:  Yeah.  And this is not, as you know, an

5  unusual situation.  I mean, it's been said that this is without

6  precedent and it's a Texas Two Step.  It's not a Texas Two

7  Step.  And this exact configuration has been litigated again

8  and again and again.  And I don't want to belabor that with

9  Your Honor, but it's our view that those stays are in place and

10  they cover 3M for the reasons that we've stated.  And I don't

11  think that --

12           THE COURT:  But isn't that what your TRO is for?

13           MR. BERNICK:  No.  The TRO is not that.  The TRO is a

14  broader, is broader relief so that if, in fact, the stays are

15  in place as we believe they are for the reasons that we've

16  indicated, then the effectively the case, the entire litigation

17  is stayed against both the debtor and --

18           THE COURT:  Why do you need a TRO if you think you've

19  got a stay against everybody?

20           MR. BERNICK:  It is a belt and suspenders.  That's

21  what it is.  Again, that one of my charts was you need the TRO

22  as a predicate for using related to jurisdiction and a Section

23  105 injunction.

24           THE COURT:  You mean I have to find a TRO to do

25  something?

104

1        MR. BERNICK:  Yeah, you have to find a --

2        THE COURT:  Which would be to say under 105 I'm

3  extending the stay to 3M.

4        MR. BERNICK:  If the stays are not applicable.  If

5  the stay is applicable --

6        THE COURT:  Okay.

7        MR. BERNICK:  -- then this is a standard -- I'm

8  sorry, Your Honor, I don't mean to teach the Court.  I mean,

9  I'm just --

10        THE COURT:  Well, I guess you may teach me because I

11  disagree with you, but I don't know if you're going to have an

12  apt student here.  The stay doesn't automatically apply to

13  random people.

14        MR. BERNICK:  That's correct.

15        THE COURT:  Unless you're in a 13, you can get a

16  co-debtor stay, right?

17        MR. BERNICK:  Yeah, so that's correct.

18        THE COURT:  So, enlighten me as to why you think 3M's

19  already got a stay in its favor?

20        MR. BERNICK:  Because --

21        THE COURT:  We could have saved two hours.

22        MR. BERNICK:  Well, that's why we stood up and all

23  the slides said stay and.

24        THE COURT:  Well, yes, including the slide you said,

25  oh, by the way, this should say stay too.

105

1          MR. BERNICK:  Yes, right.  That was one of the

2     earlier slides.

3          THE COURT:  You're on an uphill battle here, so --

4          MR. BERNICK:  Sure.

5          THE COURT:  -- if you want to sum up.  I mean, you

6     can make that argument, but --

7          MR. BERNICK:  Well, the argument is pretty simple

8     because it's been adopted in, you know, many cases and --

9          THE COURT:  Well, again, everyone likes to tell me

10    all the -- I don't care about other cases specifically right

11    now.  I want to know this and how the law applies to other

12    things, but I know asbestos has all sorts of great things that

13    have happened to asbestos cases which was mainly your chart.

14    Asbestos is its own special breed that's been --

15          MR. BERNICK:  Right.

16          THE COURT:  -- largely adopted by Congress.

17          MR. BERNICK:  Right.

18          THE COURT:  It hasn't really expanded it pursuant to

19    these other things.  So, it seems to me that now you, maybe I'm

20    wrong, and obviously if you disagree with me you can appeal, if

21    it's interlocutory you maybe can, but that the stay already

22    applies.  But that seems a bold maneuver.  So, but go ahead.

23          MR. BERNICK:  Well, the precedence for that are,

24    again, in that little slide and I'm sorry it wasn't -- for

25    whatever reason I'm sorry it didn't get across.  That's my

1  responsibility.  But the stays are -- have been used and the

2  non-bankruptcy cases that we're talking about are <u>Dow Corning</u>,

3  that was breast implants.

4          THE COURT:  Right.

5          MR. BERNICK:  Okay.

6          THE COURT:  But where there's -- where, essentially,

7  a judgment against a non-debtor is a judgment against the

8  debtor?

9          MR. BERNICK:  That's correct.

10          THE COURT:  Which is one of the showings I thought

11  you would have to make for the TRO.  And to get a TRO at a

12  preliminary injunction to extend the stay, those are findings

13  --

14          MR. BERNICK:  No, no, actually the TRO is different

15  because under related to jurisdiction it's any impact on the

16  Chapter 11 process.

17          THE COURT:  All right.

18          MR. BERNICK:  Okay.  So -- but that's pretty

19  important for us.  That's why it's related to.  The stay is our

20  core.  Related to jurisdiction really picks up a broader sweep

21  of penumbra around the core issues.  So --

22          THE COURT:  I don't think you want to use penumbra.

23          MR. BERNICK:  Okay.  That's true.  I don't want to --

24          THE COURT:  That hasn't really worked.

25          MR. BERNICK:  Yeah, that's right.

1          THE COURT:  So, go ahead.

2          MR. BERNICK:  Yeah.  So but and point of fact, you

3  have insurance policies, then you're under (a)(3), right,

4  363(a)(3).  That's property of the estate.  It is -- and there

5  are -- we cite in our brief, there are many cases that on the

6  basis of the (a)(3) provision which stay applies, that is a

7  sufficient basis for the stay to apply all by itself under

8  (a)(3).  You never reach the preliminary injunction Rule 105.

9  So the precedent is clear.  It's Circuit precedent in the Sixth

10  Circuit.

11          I believe, you have to track the cases, I believe

12  it's also in the Third Circuit where the question is- is the

13  case, essentially, against the third party debtor and that

14  qualifies under (a)(1).  (a)(3) is completely independent.

15  Those matters are ripe now because they apply by operation of

16  the filing.  And we have supported that.  That's why we want to

17  put in the insurance policies and the declarations also go to

18  the question of judgment against, that the judgment will run

19  against, it's, essentially, a case against the debtor, one's a

20  case against the third party.  And these are all clear vectors,

21  clear analyses that don't require any kind of stand or 105.  So

22  that -- but it's in our briefs.  I would just ask Your Honor to

23  take a look at it.

24          With respect to the other arguments, I do want to

25  address Your Honor with respect to the questions that you've

1 posed on the next three weeks because I know that that's what

2 your focus is. So over the next three weeks, we know and

3 there's no dispute about it and they're not prepared to at

4 least at this point back down from it, that you have all the

5 depositions. All those depositions are going to be taken by

6 3M. So, all the 343 depositions between now and September 15,

7 yes, that's right, they're not depositions of the personnel,

8 but they're depositions that will be taken by 3M.

9          The expert reports are 372 plaintiffs. They

10 presumably they relate to all the defendants. And then you've

11 got 619 <u>Dauber</u> or summary judgment oppositions. Those are

12 Dauber and summary judgment motions against all of the

13 defendants. The cost to us is about $3.8 million a week. And

14 the people who are involved include people in this -- and that

15 are involved in this case, as well, because this case requires

16 the knowledge --

17          THE COURT: What people?

18          MR. BERNICK: What?

19          THE COURT: The employees or the attorneys?

20          MR. BERNICK: The attorneys. Okay. Then you get the

21 problem of --

22          THE COURT: Do you think that the automatic stay

23 protects attorneys?

24          MR. BERNICK: Well, in this particular case it may be

25 that it should, but the question is resources of the debtor and

1  resources of 3M, right.  And so the debtors' --

2          THE COURT:  Well, resources also include legal

3  resources.

4          MR. BERNICK:  Yes.  Well, I would think so.  I mean,

5  we, unfortunately or fortunately, lawyers are essential to the

6  Chapter 11 process.  And so that's why, you know, we're all

7  here and I'm just pointing it out to the Court with complete

8  respect.  Then you get to the question of the -- what's

9  happening in the MDL.  And, yes, I, you know, I have made very

10  strong arguments on behalf of my client about what's happening

11  in the MDL case.  And I think the documentation substantiates

12  what we're saying in this court and in our papers which say

13  exactly the same thing.

14          And what's happened over the last 48 hours actually

15  makes a very troubling and compelling case all by itself that

16  this case, that that case should be stayed insofar as both the

17  debtor and 3M are concerned because effectively what's

18  happening, and I think Your Honor can easily see this, is that

19  the same matters that Your Honor is focused on in connection

20  with our request for a TRO are now being focused on by the MDL

21  judge.  She's asking the same questions of us that are similar

22  questions to the ones that you're asking, there's show cause

23  orders to respond and to discuss these matters, matters before

24  Your Honor in a separate proceeding where our stay and our

25  requests are directed.

1    And I'm also informed that there are communications

2  now between where apparently Judge Rodgers is listening into

3  this and we're now, you know, getting messages about what it is

4  that she apparently has said that she might be prepared to do.

5  And they're not coming through any formal line of communication

6  and so I'm very concerned about that.  I think everybody should

7  be concerned about it.

8    So, and then you have the tag-along where counsel on

9  somebody's behalf is saying, well, this is really not

10  inconsistent with the stay.  Well, of course, it's inconsistent

11  with the stay.  It seeks to move this entire case to a

12  different court, back to the MDL court.  How can that not be

13  inconsistent with the stay?  We're now going to get the MDL

14  panel.

15    I mean, this case is going to set records for the

16  activity of -- activity by -- that's being asked of or

17  instigated by judges that are not involved in this case.  It

18  will set records.  The tag-along, well, it was tried for all of

19  asbestos.  That was completely different case and it wasn't

20  accepted.  Now all of a sudden it's being invoked here.  This

21  case is so special we're going to go back and go to the MDL

22  panel.  You get the MDL judge conducting hearings on what's

23  happening in this court.

24    I'm not aware of any situation where that's ever

25  taken place, in my experience, which is not inconsiderable.

1   And then you've got -- well, and so what is the control that
2   this Court needs to excerpt, it's control that needs to excerpt
3   now.  Now is precisely the moment of fragility.  And the harms
4   and benefits, it's the harms and benefits, the irreparable
5   damage to this proceeding, to the bankruptcy case.  And this
6   case is being harmed right now by the things that are taking
7   place before the MDL judge.

8           And, you know, I am a Chicago boy.  I still live in
9   Chicago, although I've moved around a lot.  And that's basic
10  common sense.  And it's the same basic common sense I feel
11  strongly about and if I'm going too hard, I apologize to Your
12  Honor, but the same basic common sense says this Court is being
13  invoked now for an unbelievably important process.

14          Your Honor should have freedom from having to worry
15  about what the judge in the MDL is doing and what is happening
16  in that case.  That should not be happening, period.  It should
17  not be taking place and yet it's taking place.  It's
18  extraordinary.  And, if nothing else, that's what the TRO is
19  for.

20          There are all these complaints about the TRO.  Well,
21  we didn't get the -- well, that's what happens in every TRO
22  situation.  Yes, it's short notice.  The trustee, I think,
23  requires 24 hours notice.  We gave 24 hours notice.  No, there
24  wasn't discovery.  Yes, they had to prepare it quickly.  We had
25  to prepare it quickly ourselves, much as they think otherwise

1   because of the oppressive business.  And it's standard, that's

2   what TROs are all about and that's why they are short-lived.

3         So, if you take a look at the harms and benefits to

4   this process in the next two weeks, it's kind of phenomenally

5   imbalanced.  We should have peace for the next two weeks so

6   that everybody can focus on this case, not what's happening out

7   in California.  We should be focused here and we're prepared,

8   of course, to engage in the discovery that's necessary for that

9   process.  Say, well, we haven't had discovery.  Nobody has

10  discovery for a TRO.

11        If we had to put on all the evidence today, yeah, we

12  could keep on going and going and going and going.  We haven't

13  done that.  It's a TRO.  So, yes, we want peace for 14 days,

14  peace from the MDL, peace from the JPMDL.  They can control all

15  of this stuff if they want.  But, instead, no, they're saying

16  you got to keep on, you know, slogging away at the discovery

17  and we're certainly not backing off of all the requests that

18  we're making through the other judicial venues, through the MDL

19  and the -- they're not stepping back from all of that.

20        I mean, Your Honor, it is unprecedented and

21  completely contrary to the whole purpose of what's supposed to

22  be happening here and the irreparable harm is to this process

23  every single day and it should not be tolerated.  And I'm

24  sorry, again, to rale along, but that is the artificial

25  construct.  Artificial construct, the idea that a parent, a sub

1    of a parent files for Chapter 11 and seeks to be included,

2    that's not a construct.  This is not a Texas Two Step.

3            That goes all the -- I mean, there are countless

4    cases involving parents and I have said show me the case where

5    the parent is still litigating liability that is intertwined

6    with it.  We heard all these arguments about how there's

7    liability that 3M has separately once it acquired the deal.

8    Sure, there may be claims against 3M.  Are they inextricably

9    intertwined with this product developed by Aearo in Aearo's

10   history?  Absolutely.

11           And the intertwining has been recognized as a basis

12   for stays and preliminary injunctions going all the way back to

13   A.H. Robbins, a non-asbestos case in -- excuse me -- in 1986,

14   all the way forward through Dow Corning.  Virtually every one

15   of the parent cases involves the same thing, inextricably

16   intertwined and that is not asbestos law, that is non-asbestos

17   law.

18           So all these arguments that Mr. Buchanan, that he is

19   a very effective advocate, does very well and he laid it out

20   before the Court, they do nothing to address the test which is

21   are they intertwined, do they lead to potential findings and

22   taint the record.  That was recognized in Manville in the --

23           THE COURT:  All right.

24           MR. BERNICK:  So, I'm done.

25           THE COURT:  But I'm going to need evidence on that.

1        MR. BERNICK:  Yeah, what -- yup.

2        THE COURT:  Right.

3        MR. BERNICK:  Well, with respect to that, you could

4 actually just read -- no, it's in the cases that we've cited.

5        THE COURT:  No, no, no, no, I need to know the

6 intertwining of the debtors and 3M.

7        MR. BERNICK:  Yes.

8        THE COURT:  I don't know if the cited cases you told

9 me are going to tell me that.

10       MR. BERNICK:  No, no, no.

11       THE COURT:  That's a big deal.

12       MR. BERNICK:  Yes, that's a totally big deal.

13       THE COURT:  Okay.  I'm going to need evidence on

14 irreparable harm.

15       MR. BERNICK:  Yeah.

16       THE COURT:  And you're going to have to -- I mean,

17 these are my concerns right now.

18       MR. BERNICK:  Right.

19       THE COURT:  Okay?

20       MR. BERNICK:  Yeah.

21       THE COURT:  I understand there's bigger issues with

22 regard to preliminary injunction versus TRO.

23       MR. BERNICK:  Right.

24       THE COURT:  As far as the TRO, which is my main focus

25 right now because you can not prevail on a TRO, but prevail on

1  a preliminary injunction.

2            MR. BERNICK:  That's right, yes.

3            THE COURT:  So, I need to know what irreparable harm

4  is now.

5            MR. BERNICK:  Yeah.

6            THE COURT:  Okay.  When you reference, this is for

7  later --

8            MR. BERNICK:  Right.

9            THE COURT:  -- okay, when you reference all these bad

10 things are going to happen, I need evidence, okay.  I don't

11 know -- I haven't seen a document stating that the Northern

12 District of Florida is ignoring the Bankruptcy Court and will

13 do whatever it wants.  Haven't seen anything like that, okay.

14 So, I don't know, you keep talking about the last 48 hours

15 things have happened that show it.  Well, I'll need to have

16 some documentary evidence or good testimony on that as to what

17 it is --

18            MR. BERNICK:  Okay.

19            THE COURT:  -- because that's going to be your

20 biggest hurdle with me for a TRO is what's the difference

21 between now and two weeks from today.

22            MR. BERNICK:  Right.

23            THE COURT:  Okay.

24            MR. BERNICK:  Right, it's very difficult.  No, I --

25            THE COURT:  I know you're thinking how can I not have

116

1  convinced him of that, that's silly.

2          MR. BERNICK:  No, no, no.

3          THE COURT:  But there you go.  That's all I'm doing

4  because that's my concern.

5          MR. BERNICK:  I totally --

6          THE COURT:  Because you're telling me it's 3.8

7  million a week, okay.  When we're setting up a trust of a one

8  billion dollars, 3.8 million a week may not rise to the level

9  of irreparable harm even though 99.9 percent of cases that

10  would be in this district, okay.

11         MR. BERNICK:  We're not --

12         THE COURT:  But you're going to have to convince me

13  of that.

14         MR. BERNICK:  I totally get that, Your Honor.

15         THE COURT:  Because it's one thing to say and all the

16  things you want 14 days from now --

17         MR. BERNICK:  Right.

18         THE COURT:  -- versus now.

19         MR. BERNICK:  Yeah, I totally --

20         THE COURT:  Okay.

21         MR. BERNICK:  -- understand that.

22         THE COURT:  That's going to be your burden because

23  that is your burden.

24         MR. BERNICK:  That is our burden.  I still come

25  back --

1          THE COURT:  I know, I know.

2          MR. BERNICK:  -- for the stays.

3          THE COURT:  That's fine, but that's where you're

4  going to have the difficulty with me.

5          MR. BERNICK:  Yeah, sure.

6          THE COURT:  Because right now I see it as business as

7  usual with some things looming that could be different.  All

8  your argument's about is an MDL manageable at this size versus

9  not.  Those are things that in a preliminary injunction make

10  sense because now I'm looking at it am I going to do it or not,

11  period --

12          MR. BERNICK:  Right.

13          THE COURT:  -- as opposed to do I have to do it now.

14          MR. BERNICK:  I get that, Your Honor.

15          THE COURT:  Okay.

16          MR. BERNICK:  But that is why we made the stay

17  points, as well, and I would urge Your Honor to consider those

18  and I know you will.

19          THE COURT:  Well, and I'll consider them, but

20  generally speaking when I've seen it done and when I've done

21  it, if we're going to look back at our past experience, I've

22  used it under 105(a).

23          MR. BERNICK:  Right, but that -- I understand that.

24  And although I would suggest, Your Honor, is that (a), I

25  believe it's in our papers.

118

1          THE COURT:  Well, but, again, it's -- if you get one,
2  you get the other.
3          MR. BERNICK:  Well --
4          THE COURT:  Because if you're going to show us it's
5  inexplicably intertwined, that's good for you --
6          MR. BERNICK:  Right.
7          THE COURT:  -- because that's going to bolster your
8  showing under 105(a), as well.
9          MR. BERNICK:  Yes, yes, yes, yes.
10          THE COURT:  Okay.  The difficulty, what you're really
11  asking me is if we have common defendants, if one goes into
12  bankruptcy, everything's stayed forever.
13          MR. BERNICK:  No -- not --
14          THE COURT:  I don't -- well, that's kind of what I'm
15  hearing.
16          MR. BERNICK:  Then --
17          THE COURT:  And that's a really broad ruling that I'm
18  pretty sure won't go over well if someone's looking at what
19  precedent does this create.
20          MR. BERNICK:  Yeah.  So, I -- that is, again, I think
21  it's in -- you know, I will say I haven't communicated it,
22  obviously, and I'll take responsibility for that.
23          THE COURT:  Well, I'm not worried about that.  I'm
24  just saying these are the things that are concerning the judge
25  and when we turn to evidence look at it.

1                MR. BERNICK:  Right.

2                THE COURT:  The other thing you want to consider is,

3    too, is do you want to proceed on the TRO based upon what I've

4    said.  That's a decision you have to make, too, because if you

5    put on testimony today, that's obviously not part of the

6    record.  And I'm just going to tell you now I'm not letting in

7    85 exhibits most likely based on the testimony of a

8    disinterested director and a chief restructuring officer.

9    Going to have to have some pretty good foundation to get it in

10   because even if you stipulate to in evidence, I may not let it

11   in if it doesn't meet the criteria.

12               MR. BERNICK:  Sure.  So, the insurance policies

13   triggered directly, shared insurance triggers --

14               THE COURT:  Again, I know you're going to tell me

15   that --

16               MR. BERNICK:  Yeah.

17               THE COURT:  -- most likely.

18               MR. BERNICK:  Yeah.

19               THE COURT:  But you're saying and here's the

20   insurance policy I want into evidence, you're going to have to

21   lay a foundation for that.

22               MR. BERNICK:  Well, we can -- I think we can do that

23   with --

24               THE COURT:  You probably can.  I'm just telling you

25   this is what you're going to have to do.

1          MR. BERNICK:  Right.

2          THE COURT:  You're not just going to get a ream of

3   evidence in and say, but, Judge, here it is.

4          MR. BERNICK:  Okay.  I get that.

5          THE COURT:  Okay.  I'm a simple, small mind that

6   needs to see it in front of me and in the record because what

7   they're saying is correct.  There's nothing in the record to

8   support a TRO at this point.  But we haven't taken evidence

9   yet, so you have an opportunity to do that.

10         MR. BERNICK:  Right.

11         THE COURT:  But I'm saying that's -- I'm not just

12  going to let it in.  You have to get it in --

13         MR. BERNICK:  Yes.

14         THE COURT:  -- just like an old fashioned hearing.

15         MR. BERNICK:  Okay.

16         THE COURT:  All right.

17         MR. BERNICK:  So, I appreciate the clarity and we'll

18  caucus and --

19         THE COURT:  Okay.

20         MR. BERNICK:  -- figure out what to do.

21         THE COURT:  And to the extent you all can talk and if

22  you think you can move all the dates, that's another thing to

23  look at.  I don't know if you have to get in front of an MDL

24  judge to do that or if you can voluntarily agree.  I don't

25  know.  But when I'm hearing that the depositions are by 3M of

 1  other people, generally the deponent taker has some control

 2  over when they take it.

 3          MR. BERNICK:  Fair enough.

 4          UNIDENTIFIED ATTORNEY:  Judge?

 5          THE COURT:  Yes.

 6          UNIDENTIFIED ATTORNEY:  We are willing to talk and

 7  we --

 8          THE COURT:  Well, talking is good.

 9          UNIDENTIFIED ATTORNEY:  -- actually I think

10  everyone's gotten notice that the magistrate judge in the MDL

11  would agree to extending the depositions.

12          THE COURT:  Again, things I don't know.

13          UNIDENTIFIED ATTORNEY:  No, no.  Yeah, yeah, I --

14          THE COURT:  And it does make me a little nervous,

15  I'll be honest, that I have three, four, five different people

16  weighing in on what's going on.

17          UNIDENTIFIED ATTORNEY:  Right.  But we're willing --

18          THE COURT:  Makes me very -- but that's good.

19          UNIDENTIFIED ATTORNEY:  -- to sit down and talk.

20          THE COURT:  All right.  So, how long do you need to

21  talk and make sure you're not hungry for the afternoon session?

22          UNIDENTIFIED ATTORNEY:  Are we doing the evidence in

23  the afternoon session or is that what we're talking about

24  because I -- you know, we have first day motions and to me --

25          THE COURT:  I know.

122

1          UNIDENTIFIED ATTORNEY:  -- it would make sense to do

2   that another day.

3          UNIDENTIFIED ATTORNEY:  Your Honor --

4          THE COURT:  Well, but it's a -- it's a TRO.  The

5   difficulty I have and for those of you who can't hear the

6   question is can we just delay the TRO.  Generally speaking, TRO

7   needs to be held right away.  With all due respect to my

8   colleague who delayed it three weeks which probably was

9   strategically brilliant, I'm not so sure I feel comfortable on

10  a TRO waiting three weeks because at that point it's not really

11  a TRO anymore.  But if you want to talk about that and discuss

12  it, I'm willing to listen.

13         UNIDENTIFIED ATTORNEY:  Okay.

14         MR. BERNICK:  So, I think we could probably at least

15  on our side, clock us in about an hour if Your Honor wants a

16  longer --

17         THE COURT:  Well, I was thinking 1:30, but I didn't

18  know.  And I know as an attorney, you never want to tell the

19  judge, oh, that, you know, that time frame is wrong, but I also

20  know eating is important.

21         MR. BERNICK:  Yes, that's true.

22         THE COURT:  So, I don't want someone to pass out in

23  the middle of the hearing because they haven't eaten.  So, I

24  want to make sure you at least can grab a bite to eat which we

25  don't provide.  I'll give you water, but I'm not giving you

1 │ food.  So, does 1:30 work for everybody?

2 │       MR. BERNICK:  Okay here.

3 │       THE COURT:  And those on Zoom don't get to weigh in,

4 │ sorry.  From the Trustee's office?  Most of you are here, so

5 │ that worries me a little bit.

6 │       UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

7 │       THE COURT:  Okay.  From the tort claimant area, does

8 │ that work?

9 │       UNIDENTIFIED ATTORNEY:  That's fine, Your Honor,

10 │ thank you.

11 │       THE COURT:  All right.  Well, let's adjourn then

12 │ until 1:30 Eastern Time and thank you and we'll talk then.

13 │                * * * * *

14 │

15 │

16 │

17 │

18 │

19 │

20 │

21 │

22 │

23 │

24 │

25 │

124

1                 **C E R T I F I C A T I O N**

2            We, KAREN WATSON, TAMMY DeRISI and KELLI R. PHILBURN,

3    court approved transcribers, certify that the foregoing is a

4    correct transcript from the official electronic sound recording

5    of the proceedings in the above-entitled matter, and to the

6    best of our ability.

7

8    /s/ Karen Watson

9    KAREN WATSON

10

11   /s/ Tammy DeRisi

12   TAMMY DeRISI

13

14   /s/ Kelli R. Philburn

15   KELLI R. PHILBURN

16   J&J COURT TRANSCRIBERS, INC.          DATE:  July 29, 2022

17

18

19

20

21

22

23

24

25

**Exhibit K-2**

**First Day Hearing Transcript (P.M.)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| IN RE: | . | Case No. 22-02890-JJG |
| | . | (Jointly Administered) |
| AEARO TECHNOLOGIES LLC, | . | |
| ET AL., | . | 116 U.S. Courthouse |
| | . | 46 E. Ohio Street, Room 116 |
| Debtors. | . | Indianapolis, IN 46204 |
| . . . . . . . . . . . . . | . | |
| AEARO TECHNOLOGIES LLC, | . | |
| ET AL., | . | |
| | . | |
| Plaintiffs, | . | |
| V. | . | Adversary No. 22-50059 |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| APPENDIX A, | . | |
| | . | |
| Defendants. | . | Wednesday, July 27, 2022 |
| | . | 1:30 p.m. |
| . . . . . . . . . . . . . | . | P.M. Session |

TRANSCRIPT OF MISCELLANEOUS MOTIONS BY PLAINTIFFS/DEBTORS
BEFORE THE HONORABLE JEFFREY J. GRAHAM
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:        Kirkland & Ellis LLP
                        BY:  CHAD HUSNICK, ESQ.
                             DAVID M. BERNICK, ESQ.
                             SPENCER WINTERS, ESQ.
                        300 North LaSalle Street
                        Chicago, IL  60654


Audio Operator:         Heather Heiser-Davis

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**

**(609) 586-2311    Fax No.  (609) 587-3599**

2

APPEARANCES CONTINUED:

For the Debtors:            Kirkland & Ellis LLP
                           BY:  EMILY GEIER, ESQ.
                                DEREK I. HUNTER, ESQ.
                           601 Lexington Avenue
                           New York, NY  10022

                           Kirkland & Ellis
                           BY:  JARED MAHER, ESQ.
                                MARK McKANE, ESQ.
                           555 California Street, 27th Floor
                           San Francisco, CA  94104

                           Kirkland & Ellis
                           BY:  DAVID HOROWITZ, ESQ.
                           333 South Flower Street, Suite 3700
                           Los Angeles, CA  90071

For Creditors:             Valenti Hanley & Robinson PLLC
                           BY:  MARK A. ROBINSON, ESQ.
                           One Riverfront Plaza
                           401 W. Main Street, Suite 1950
                           Louisville, KY  40202

For 3M Company:            Faegre Drinker Biddle & Reath LLP
                           BY:  JAY JAFFE, ESQ.
                           600 East 96th Street, Suite 600
                           Indianapolis, IN  46240

                           White & Case LLP
                           BY:  MATTHEW E. LINDER, ESQ.
                                MICHAEL ANDOLINA, ESQ.
                           111 S. Wacker Drive, Suite 5100
                           Chicago, IL  60606

For Aylstock, Witkin,      Klee, Tuchin, Bogdanoff & Stern, LLP
Kreis & Overholtz, PLLC:   BY:  SASHA M. GURVITZ, ESQ.
                           1801 Century Park East, 26th Floor
                           Los Angeles, CA  90067

For Seeger Weiss LLP:      Rubin & Levin, P.C.
                           BY:  DEBORAH CARUSO, ESQ.
                                MEREDITH R. THEISEN, ESQ.
                           135 N. Pennsylvania St., Suite 1400
                           Indianapolis, IN  46204

3

APPEARANCES CONTINUED:

For Seeger Weiss LLP:          Seeger Weiss LLP
                              BY:  CHRISTOPHER SEEGER, ESQ.
                                   DAVID BUCHANAN, ESQ.
                              55 Challenger Road
                              Ridgefield Park, NJ  07660

                              Otterbourg P.C.
                              BY:  MELANIE CYGANOWSKI, ESQ.
                                   ADAM SILVERSTEIN, ESQ.
                              230 Park Avenue
                              New York, NY  10169-0075

For the U.S. Trustee:         U.S. Department of Justice
                              BY:  HARRISON E. STRAUSS, ESQ.
                                   NANCY GARGULA, ESQ.
                                   RONALD J. MOORE, ESQ.
                                   DAMARIS ROISCH-SCHWARTZ, ESQ.
                                   LAURA A. DUVALL, ESQ.
                              46 E. Ohio St., Road 520
                              Indianapolis, IN  46204

For Various Claimants:        Jacobson Hile Kight
                              By:  ANDREW KIGHT, ESQ.
                              108 E. 9th Street
                              Indianapolis, IN 46202

                              Weitz & Luxenberg
                              By:  LISA N. BUSCH, ESQ.
                              700 Broadway
                              New York, NY 10003


                              BY:  MARK WENZEL, ESQ.


For Richard Valle:            Keller Postman
                              BY:  ASHLEY KELLER, ESQ.
                              150 N. Riverside Plaza
                              Chicago, IL  60606

For Early Vetting             Blasingame, Burch, Garrard &
Subcommittee:                   Ashley, P.C.
                              BY:  SARA E. SCHRAMM, ESQ.
                              440 College Avenue, Suite 320
                              Athens, GA  30601

4

```
 1                        (audio problems)
 2           THE COURT:  Ah, why don't you go ahead.
 3                        (Laughter)
 4           MS. GEIER:  Okay.  Your Honor, so --
 5           THE COURT:  Oh?
 6           COURTROOM DEPUTY:  I'm still working on Zoom.
 7                   (court personnel speaking)
 8           THE COURT:  Oh, so we've got phone working, but not
 9  Zoom.
10           COURTROOM DEPUTY:  Okay.  Are we on?  I'm not
11  touching the -- Fred said don't touch anything.
12           Can you hear Zoom people here, Debbie?
13           UNIDENTIFIED SPEAKER:  I just got an email.  I
14  thought Adam was --
15           THE COURT:  Can people on Zoom hear us?  Email your
16  people.
17           UNIDENTIFIED SPEAKER:  They're emailing us, too,
18  okay.  So -- yes, they can hear.
19           THE COURT:  Well, I don't have any control.  We're
20  back.
21           All right.
22           UNIDENTIFIED SPEAKER:  I can hear, Your Honor.
23           THE COURT:  Okay.  Were we on the record, by the way?
24           COURTROOM DEPUTY:  We were on the record.
25           THE COURT:  Oh, we're still on the record.
```

5

1   Excellent.

2          Go ahead.

3          MS. GEIER:  And we'll continue to be.  Okay, Your

4   Honor.

5          Just for the folks joining us, we are at Agenda

6   Item 1 in the first day pleading section of the second amended

7   agenda seeking relief on the cash management motion, Docket

8   Number 23.

9          So Your Honor, this is actually pretty narrowly

10  tailored relief.  I will run through just very briefly the

11  intercompany and then also the cash management system.

12         The cash management system is six accounts.  They're

13  all at authorized depositories.  Not much interesting there.  I

14  will circle back to one of the UST's concerns at the end just

15  to touch on their concern and explain that a bit more.

16         On the intercompany transactions, they sort of form

17  three buckets.  You have Aearo obligations that are paid, and I

18  just want to explain these so that I can say what relief we're

19  actually seeking in that context.  But in these three buckets,

20  you have Aearo obligations that are paid by 3M or another non-

21  debtor affiliate.  So that is just the way that it has worked

22  historically.  3M pays sort of these obligations.  They include

23  things like taxes and payroll.  So those will continue to be

24  paid by 3M.  But as you can see from the various first day

25  motions, we are seeking relief for all of those things so it's

6

1  still going to be in compliance with the Bankruptcy Code.

2      Those obligations, the payments that 3M makes on

3  Aearo's behalf, 3M or other non-debtor affiliate, makes on

4  Aearo's behalf will be not reimbursable.  So that's part of the

5  funding agreement.  Section 2(d) says that 3M and its

6  non-debtor affiliates will not be reimbursed for those

7  payments.  So each of those payments that goes out the door

8  does not come back.

9      The second category is shared services.  Shared

10 services and they lumped in the use of intellectual property in

11 there as well.  So 3M provides various administrative, IT,

12 sales supports to the debtors and those services will continue

13 to be provided during the cases and also not reimbursed or paid

14 for by Aearo directly.  That's located in Section 5(e) of the

15 funding agreement as a covenant by the payer to continue

16 providing those services and to not seek cash reimbursement of

17 those items during the cases.

18      The third category, and the category where we

19 actually are seeking relief, is for intercompany obligations,

20 intercompany transactions that are actually for the purchase

21 and sale of goods.  So these debtors purchase some of their raw

22 materials from non-debtor affiliates.  It's about $600,000 a

23 month which represents about 13 percent of their acquired

24 goods.  That portion we would like to continue what is

25 essentially an arms length payment structure there so that

1  Aearo can purchase those goods and money will exchange hands.

2  　　　　How that ties into the cash management system,

3  previously, that was netted through a non-debtor affiliate of

4  the Aearo debtors which was 3M Financial Management Company.

5  They were able to -- they were sort of the functioning

6  centralization of the cash management or the cash pooling

7  system so everything would run through FMC and be netted in

8  that process.  Because we ceased to have the debtors' cash pool

9  with 3M and the non-debtor affiliates anymore, we actually want

10  to continue making those payments back and forth, and we

11  actually have to do that on a cash basis as opposed to just

12  intercompany netting because now Aearo debtors have their

13  accounts no zero balancing.  They're not participating in the

14  global cash pooling.

15  　　　　So how that ties in and why I was explaining that is

16  it circles back to one of the concerns raised by the United

17  States Trustee, both in conversations and in their filed

18  objection at Docket Number 64, a concern that the funds that

19  are in the FMC account, the accounts there, would, you know,

20  the debtors didn't have adequate custody and control.  They

21  wanted to know that those were in authorized depositories and

22  that the debtors had adequate custody and control.

23  　　　　So just to connect it to the ceasing of the cash

24  pooling arrangement, that was a positive balance in favor of

25  the Aearo entities as of the filing date, $38 million is the

8

1  positive balance there because we are a contributor of cash

2  into the system.  That 38 million still sits in the non-debtor

3  accounts which are authorized depositories.  But that is

4  essentially an unsecured intercompany claim that the debtors

5  have against 3M and its affiliates.

6           We have access to those funds.  In fact, the funding

7  agreement specifically acknowledges in the exhaustion of cash

8  that we will actually use those funds before seeking any

9  funding request from 3M.  So I don't think that there's any

10 real concern that the debtors will never be able to access

11 those funds since it's actually accounted for in the funding

12 agreement.

13          But for that reason, I don't think that there's

14 anything more that we should do with respect to the FMC

15 accounts.  I don't think that -- we do not currently have an

16 intention to move those funds.  If Your Honor tells us

17 otherwise, we'll of course take that back and figure that out

18 for the final hearing.

19          The second issue was with respect to tracing and

20 tracking of intercompanies, and we did submit a revised order

21 that would reflect the continued, you know, the continued

22 tracking and tracing of those intercompanies.  We submitted it

23 to Your Honor.  I believe the UST has reviewed.  I have not

24 confirmed that they are signed off on the order because we do

25 have this open issue.  But, with that, I think those are the

1   two items and otherwise we would just request entry of the

2   order, the interim order on cash management.

3           THE COURT:  Okay.  Mr. Strauss or anyone with regard

4   to cash management.

5           MR. STRAUSS:  Thank you, Your Honor.  Harrison

6   Strauss for the United States Trustee.

7           I believe she gave a very accurate rendition of the

8   situation with our objection to the cash management.  We have

9   been working with them in the last couple of days.  They have

10  done a very good job of resolving a lot of our issues, but we

11  are at various states of agreement on a lot of other issues

12  which ended up the reason why we ended up filing our

13  objections, even though there are -- I think we have some

14  resolution.

15          They have agreed on what I believe are called the

16  consecration accounts to change the language, adding in that

17  they will be able to track and trace the money attributable to

18  each debtor.  So I believe that issue is ultimately resolved.

19  As she said, we have not had a chance to finally make a

20  decision on the language that they have proposed that we have

21  received but we will review what they gave us and get back to

22  them on that.

23          The other issue with regard to the 3M held accounts,

24  they have informed us that they are authorized depositories

25  now, so that's great.  However, we still have a problem with

1 the account being in the name of 3M that even though they may

2 be able to direct the funds, we still believe that the money

3 that, I believe it's about $30 million, should be moved into an

4 account controlled by the debtor that they have direct control

5 over. I think that's the only issue that really isn't in some

6 form of agreement at this point on the cash management motion.

7        THE COURT: Okay.

8        Anyone else wish to be heard with regard to cash

9 management?

10        MS. SCHRAMM: Yes, Your Honor. And just really a

11 clarification.

12        The affidavit states that the debtor will not request

13 payment of the post-petition intercompany claims, and I just

14 wanted to make sure that 3M, who is paying expenses and so

15 forth that may create post-petition intercompany claims, will

16 not seek an administrative claim in this proceeding. Is that

17 right?

18        MS. GEIER: Your Honor, with respect to the direct

19 obligations that are paid by 3M to third parties on behalf of

20 Aearo, there is no intention to seek any reimbursement for that

21 at any point. With respect to the shared services, which run

22 approximately $1 million a month, I believe that 3M may be

23 still reflecting on their books and records. I can't speak to

24 what they would be seeking in these cases as to a claim, but

25 it's absolutely understood that, you know, any final result

1 would require the payment of all claims. That is part of the

2 funding agreement, that all claims would be paid through the

3 funding. So I don't think that that is -- I don't -- it

4 certainly wouldn't come ahead of anyone else in this process,

5 if I can put it that way.

6         THE COURT: All right. But if I wanted to ask you

7 then, are you saying that they're not administrative claims and

8 they're just -- I mean, that's the real question.

9         MS. GEIER: I could point Your Honor to specific

10 language in the funding agreement and to yourself. I think

11 that might clear up the point. I apologize.

12         MS. SCHRAMM: I did read it. I was a bit confused on

13 what the carry-forward claims would be for 3M.

14         MS. GEIER: Well, if I'm honest, I'm a little

15 confused as well at times because there is such a thing as

16 accounting, and that I don't understand at all. And then

17 there's the legal significance. We are obviously concerned

18 about the legal significance and that is what we are speaking

19 to here. But if they continue to carry it on their books and

20 records, that is not really in our purview.

21         So Section 5(e), provision of services, contains the

22 proviso that the payer shall continue providing or cause other

23 payer affiliates to continue providing, as applicable, the

24 shared services, notwithstanding any defaults under the shared

25 services agreement or intellectual property, et cetera. And

12

1  during the pendency of any bankruptcy case, no amount shall
2  become due and owing or payable by an Aearo entity to the payer
3  or any payer affiliate on account of the shared services.

4         So that, from our perspective, means that whatever
5  happens during these cases will not be interfered with by --
6  but --

7         MS. SCHRAMM:  But does due and owing mean that there
8  will be a claim?  And maybe this is for another day, Your
9  Honor.  I don't --

10        THE COURT:  It might be, but this guy got up, so
11 we'll let him --

12        MS. SCHRAMM:  Okay.

13        THE COURT:  -- speak.

14                      (Laughter)

15        MR. LINDER:  Good afternoon, Your Honor.  Matt Linder
16 of White and Case on behalf of 3M company.  I'm happy to
17 clarify.

18        The intent of Section 5(e) of the agreement is to
19 make clear that there will be no administrative expense
20 asserted on account of those shared services or other amounts
21 paid by 3M on behalf of the debtors.

22        MS. SCHRAMM:  Or an unsecured claim, also?

23        MR. LINDER:  No priority of claim, including
24 administrative claim --

25        MS. SCHRAMM:  Thank you.

13

1          MR. LINDER:  -- unsecured claim.

2          MS. SCHRAMM:  And one other clarification.  As was

3    discussed prior to the funding under the funding agreement, the

4    debtor will exhaust the 38 million, at least that's what I

5    understand.  That will now be in an account in the debtors'

6    name.

7          THE COURT:  Well, I haven't ruled on that, yet.

8          MS. SCHRAMM:  Oh, okay.  Oh, how presumptuous of me.

9    Okay.  So it will be in an account to be determined.

10         Am I correct in thinking that the funding is going to

11   be 240 plus the 38 million that the debtor is going to use?  Or

12   is the 38 million going to reduce the 240 million of funding to

13   pay expenses?

14         MS. GEIER:  That's a great question.  I think it's

15   worth clarifying for the record as well.  In the definition of

16   permitted funding use contains a proviso that requires, you

17   know, that is, it is the burden on the debtors that we do have

18   to exhaust our cash and assets in this process, including it

19   specifically refers to the cash located in that account as a

20   result of the cash centralization mechanism.

21         The language I think is specific enough to allay any

22   concern on this front that the uses described so we only can

23   use funds until the cash received or by the Aearo entities in

24   the ordinary course, whatever cash they have.  So right now,

25   the debtors have $6.6 million.  That has to be used first,

1  subject to a minimum balance of five.

2         Then, the 38 million has to be used, again, subject

3  to a minimum balance of five, before a funding request would

4  actually be made.  So before an actual funding request to 3M to

5  fund the cases or whatever, you know, the purpose of the

6  request is --

7         THE COURT:  Whatever the use is for, right?

8         MS. SCHRAMM:  So will the 240 be reduced by 38

9  million plus six?  Or is it, you can use the 38, you can use

10  the six, and we'll also fund 240?

11         MS. GEIER:  It would reduce it.  It would be net of

12  it because the Aearo debtors, we have to use the cash first.

13         So, for example, on the 240, we would have to use the

14  38 first before.

15         THE COURT:  You might want to return --

16         MS. SCHRAMM:  Okay.  So that might be another day,

17  too, Your Honor.  But it's really unclear in all of the filings

18  that the -- so really the funding is if there's 42 million

19  right now, the funding's only what, 238?  Or no, 200.

20         THE COURT:  Yeah.

21         MS. SCHRAMM:  202.  It's a lot less than the 240.

22         THE COURT:  Go ahead.

23         MS. GEIER:  So although the money does have to be

24  spent on the accounts, just wanted to clarify one point.  The

25  240 is a 3M number.  It is not the debtors' number.

```
 1            THE COURT:  Is that part of the uncapped amount?

 2            MS. GEIER:  It is uncapped.  Everything is uncapped.

 3   So we wouldn't -- whatever that number ends up being, yes, the

 4   38 --

 5            THE COURT:  It was 158 --

 6            MS. GEIER:  We use the 38 first.  But it could be --

 7            THE COURT:  If it's 350 --

 8            MS. GEIER:  -- anything.

 9            THE COURT:  Okay.

10            MS. GEIER:  Mm-hmm.

11            THE COURT:  And we probably could survive on an

12   interim order with a slight bit of -- because I don't think

13   we're burning that much.

14            MS. SCHRAMM:  And that's my last point, that this

15   should be an interim order.  You know, we don't have a

16   committee formed yet.

17            THE COURT:  I think it's set up to be an interim

18   order.

19            MS. SCHRAMM:  Is it?  Okay.  Thank you.

20            MS. GEIER:  That's correct, Your Honor.

21            THE COURT:  Okay.  Everyone nodded yes.  I was happy.

22            MS. SCHRAMM:  Okay.

23            THE COURT:  All right.

24            MS. SCHRAMM:  Okay, good.  Thank you.

25            MS. GEIER:  That's it.  If you want to make it a
```

1 final order, we're happy to be done with the issue.

2         THE COURT: Well, I'm sure you would, but --

3         MS. GEIER: I did have that in my notes to offer it,

4 but --

5         THE COURT: Well --

6         MS. GEIER: -- probably cross that out.

7         THE COURT: -- I mean, I used to work with someone

8 who said, if you don't ask, you don't get.

9         MS. GEIER: That's right.

10         THE COURT: But he also asked some really bad things,

11 so we'll let that slide.

12         All right. So the only open issue then with regard

13 to cash management on an interim basis is where the 38 million

14 is sitting, other than other things you think you've agreed to

15 but we don't know for sure yet?

16         MR. STRAUSS: Correct. I believe that is the only

17 outstanding issue.

18         THE COURT: Okay.

19         MS. GEIER: And, Your Honor, if that's not something

20 that you're prepared to rule on today, I think we can continue

21 to discuss --

22         THE COURT: Well, it seems continue to me, and I

23 understand that I'm not -- my experience generally isn't with

24 someone as well off as the parent company here, allegedly on

25 paper, but it does seem like we should put the 38 million in

17

something controlled by the debtor should something bizarre

happen.  You kind of already admitted if I told you to, you'd

do it, so I'm going to take that opening and say it should be

in the debtors' plural name just in case something bizarre

happens.  Since if it's their money and everyone agrees that

they can use it, to me, it doesn't seem to harm anybody to put

it an account that says the debtor.

            MS. GEIER:  Understood, Your Honor.  If we could

speak with 3M and make sure that we can -- and get agreement on

that front since it is outside of the funding agreement

itself --

            THE COURT:  It is.

            MS. GEIER:  -- we can --

            THE COURT:  I know there's a couple of lawyers over

here for 3M right now.

            MS. GEIER:  Yeah.  I think if we could confer on that

real quick --

            THE COURT:  That's fine.

            MS. GEIER:  -- and then come back.  We can do that.

            THE COURT:  Okay.

            So do you want to --

            MS. GEIER:  Do you want to us to pause and do that

right now, or do you --

            THE COURT:  Let's do it --

            MS. GEIER:  -- want to take --

1       THE COURT:  -- because then I can accomplish

2  something today --

3       MS. GEIER:  Okay.

4       THE COURT:  -- and do one motion.

5       MS. GEIER:  Thanks, Your Honor.

6       THE COURT:  Let's adjourn for a brief moment of like

7  five minutes just so we don't catch anything on the record.

8       (Recess taken 00:25:38/Reconvened at 00:25:54)

9       THE COURT:  I don't know what you did.

10      COURTROOM DEPUTY:  (Indiscernible) privacy.

11      THE COURT:  I'm not allowed to run the machine.  Ah,

12  there.  Oh, we're back.  She said we're back.

13      All right.  Let's go back on the record in the Aearo

14  cases.  We've had a brief sidebar with a flurry of activity and

15  we're back with Ms. Geier.

16      MS. GEIER:  Thank you so much, Your Honor.

17      Yes.  So that was a pretty brief recess and they did

18  agree that if Your Honor wants the funds moved that they will

19  move the funds --

20      THE COURT:  Okay.

21      MS. GEIER:  -- into the account.  I would ask --

22  we'll probably put in some language that gives a little bit of

23  time for the debtors to move it, maybe five days or so, just to

24  make sure that it happens because I don't know how the money

25  moves around so it seems like a five-day buffer in there should

1  be plenty of time.

2          THE COURT:  Well, would that be acceptable to the

3  U.S. Trustee?

4          MR. STRAUSS:  Yes, Your Honor.

5          THE COURT:  All right.

6          All right.  So, with that and with the caveats, are

7  there any objections in the courtroom with regard to a modified

8  interim order with regard to cash management?

9                    (No audible response)

10          THE COURT:  All right.  Seeing no one and realizing

11  that I don't control the Zoom so I don't get to see the little

12  raised hands.  Anyone on Zoom?  You can do a little raised hand

13  and someone will tell me if it is.

14                    (No audible response)

15          THE COURT:  Did anyone raise their hand?

16          COURTROOM DEPUTY:  No.

17          THE COURT:  All right.

18          All right.  With that then, I think with these

19  modifications, I can approve the cash management first day

20  motion on a modified basis given the changes you already

21  discussed with the U.S. Trustee, the feature changes, which

22  apparently are being resolved which makes me a little nervous

23  because I won't know if you do resolve them, but we'll tackle

24  at the next hearing.  And then, the fact that, within five days

25  that 3M will transfer the 38 million-ish in the non-debtor 3M

1  account to a debtor 3M account.

2          All right.  And then, I guess we can tackle it now.

3  I was going to probably circle back, but maybe we'll circle

4  back when we're done, with regard to a final hearing date and

5  objection periods.

6          MS. GEIER:  Absolutely, Your Honor.  I think that we

7  might take that up in the context of the case management order.

8          THE COURT:  Well, this is just for the final hearing

9  on the first day motions, so.

10          MS. GEIER:  Yeah.  I think any time that Your

11  Honor --

12          THE COURT:  Sure, I don't --

13          MS. GEIER:  -- would like in the next few weeks --

14          THE COURT:  We'll find out.  Okay.  That's fine.

15          All right.  And you also had another one, correct?

16          MS. GEIER:  Flexible.

17          I do.  I have one more.

18          THE COURT:  All right.

19          MS. GEIER:  It's Agenda Item Number 2 on the first

20  day pleading section of the second amended agenda.  It's Docket

21  Number 20.  This is the wages motion.

22          Through this motion, the debtors seek to pay all --

23  well, certain pre-petition wages and benefit obligations and

24  continue those programs in the ordinary course of business.

25          We haven't made any changes to the interim order to

1  walk through Your Honor, but just to give a very high level

2  summary of the debtors' employees. So while the debtors use

3  shared services through 3M, that's helpful and part of the

4  system. But at the end of the day, this is its own complete

5  business where there are 300 employees, over 300 employees

6  working full-time, mostly located in Indiana.

7      We certainly appreciate actually making sure that we

8  can get this relief today because there are those individuals

9  that are paying attention wondering how this is going to affect

10 them. So being able to inform those employees that this

11 process is not meant to infect their rights and their

12 compensation is very important to the debtors and appreciate

13 being able to make these heard.

14     Debtors are not seeking any wages or any bonus

15 programs, you know, until the final order so I don't think that

16 that's really up for today. We are not seeking any payments

17 over the statutory cap today, either. We don't currently have

18 any wages over the statutory cap. If there were to be wages

19 that came due during that period of time, there are certain

20 sales bonus programs where we just don't know if individuals

21 will meet their targets and the like. If that were to happen,

22 then we would inform the U.S. Trustee of exactly who those

23 individuals were and we can address it at that time. But I

24 think we can take that up at the final hearing.

25     I think that was the extent of the United States

22

1  Trustee's objection at Docket Number 66.  Not to speak for

2  them, but I think that that covers that issue at least for

3  today.

4              THE COURT:  Okay.  All right.

5              Mr. Strauss, are you still in the hot seat for the

6  U.S. Trustee?

7              MR. STRAUSS:  I am.  I'm here all day here, Your

8  Honor.

9              THE COURT:  There you go.

10             MR. STRAUSS:  That is accurate.  Our concern is that

11 with the bonuses, it appears that there will be some employees

12 that will be above the statutory 507 limits.  However, those

13 amounts are not yet known.  So we filed our objection just to

14 maintain our objection until the final hearings.  And if there

15 are people that are to be paid out more, we have asked for

16 their identities and positions and how much that would be in

17 case at that time, we may end up objecting to those.

18             But we understand that the interim order does

19 indicate they will not pay more than the statutory amount.  So

20 we're really just protecting our objection in case in the

21 future there are claimants who may get more with the bonus.

22             THE COURT:  Okay.  Thank you.

23             Anyone in the courtroom have a further objection with

24 regard to what I'll colloquially dub the wages motion?

25             MS. SCHRAMM:  Thank you, Your Honor.  I just have the

1  same clarification because I believe the wages and benefits and

2  employee matters are going to be paid by 3M that, again, 3M is

3  not going to assert any claim in this proceeding with respect

4  to those payments.

5        MS. GEIER:  Yes, Your Honor.  And I'm sure we'll

6  cover that in each motion going forward to save Sara the trip

7  coming back, up and forth.

8        MS. SCHRAMM:  I think we could just agree that with

9  respect to any of the payments made by 3M in any of the motions

10  or otherwise, they will not assert a claim in this proceeding.

11        MS. GEIER:  I don't have the brain power or hours of

12  sleep to process all of the motions that we have on hand, but I

13  can definitely confirm that on the wages motion --

14        MS. SCHRAMM:  Okay.

15        MS. GEIER:  -- that is not a reimbursed expense.  And

16  I think --

17        THE COURT:  What you're really saying is we kind of

18  do have to.

19        MS. GEIER:  I don't --

20        THE COURT:  But your colleague may help you.  It

21  takes a village.

22        MS. SCHRAMM:  We can do it motion-by-motion.  That's

23  fine.

24        THE COURT:  I don't care.

25        MS. SCHRAMM:  I was just trying to speed --

1          THE COURT:  I'm here all day.  Unless you can say

2     that it's the case that it's the same across the board, that

3     would save time.

4          MR. LINDER:  Your Honor, Matt Linder again, White and

5     Case, on behalf of 3M Company.

6          This was something that we discussed in connection

7     with the funding agreement and 3M's agreements to provide

8     shared services during the cases.  3M Company will not be

9     seeking any type of claim or any reimbursement from the debtors

10    during the cases on account of any of the payments it makes

11    pursuant to the funding agreement.  So that applies across the

12    various relief requested in all of the first day motions.

13         THE COURT:  Okay.

14         MS. SCHRAMM:  Thank you.

15         THE COURT:  Thank you.

16         MR. LINDER:  Thank you, Your Honor.

17         THE COURT:  All right.

18         Anyone else in the courtroom?

19                   (No audible response)

20         THE COURT:  Seeing none, anyone on Zoom or the

21    telephone?  I don't want to take away the AT&T people.  Anyone?

22         COURTROOM DEPUTY:  I do not see (indiscernible).

23         THE COURT:  All right.

24         With that then, I think we can -- and what was the

25    other one?  Was it the everyday win or everyday now program

 1  where you can win things every day?

 2          MS. GEIER:  Are you referring to the employee stock

 3  purchase program?

 4          THE COURT:  No, no.  It was a fun little incentive

 5  program I thought that the Court should I implement just for

 6  judges.

 7          MS. GEIER:  Well, that is on final order, but if you

 8  want to --

 9          THE COURT:  No, I just --

10          MS. GEIER:  -- talk about implementing on a more

11  global scale, we can certainly --

12          THE COURT:  I would like to know more.

13          MS. GEIER:  -- bring -- I would also love to be a

14  part of that (indiscernible) --

15          THE COURT:  I would like a win every day or whatever

16  it was.

17          All right.  So with that, I will approve the first

18  day wages motion on an interim basis with the caveat as stated

19  by the United States Trustee that no interim award would exceed

20  the priority amount listed in the Bankruptcy Code, as well as

21  the now stated for all first day motions, that no amounts paid

22  under the wages motion by 3M will result in any type of claim

23  in these cases.

24          And no one's yelling at me that I stated that wrong,

25  so I think we're good.

1          All right.

2          MS. GEIER:  All right.  Thank you, Your Honor.

3          THE COURT:  Thank you.

4          MS. GEIER:  With that, I will turn it over to my

5   partner, Spencer Winters.

6          THE COURT:  Thank you.

7          MR. WINTERS:  Good afternoon, Your Honor.  Spencer

8   Winters of Kirkland and Ellis LLP on behalf of the debtors.

9          I'll start with the trade claims motion, which is at

10  Docket Number 25 and Agenda Item 3.  This is a category of the

11  claims the debtors paid directly.  The motion requests interim

12  authority to pay trade claims not to exceed about a million

13  dollars during the interim period.

14         Specifically, the motion requests authority to pay

15  503(b)(9) claims with approximately 480,000 coming due during

16  the interim period.  It also requests authority to pay lien

17  claims, foreign claims, and critical vendor claims.

18         The U.S. Trustee objected to all of this relief on

19  various bases.  In an effort to resolve the U.S. Trustee's

20  objection and streamline the hearing today, we revised the

21  proposed order to adjourn everything except the 503(b)(9)

22  claims to the final hearing.  I believe the Court has that

23  revised order with a redline in its binder which we also

24  supplied to the U.S. Trustee.

25         With that change, lien claims, foreign claims, and

1  critical vendor claims are no longer at issue today.  Although
2  we would have preferred to have that relief in case we get
3  billed for any of those estimated amounts during the interim
4  period and a vendor refuses to provide go-forward services or
5  goods, we're comfortable that we can make it to the final
6  hearing without an issue and we'll come back to the Court in
7  the interim, if necessary.

8         We do, though, think it's necessary and appropriate
9  to have the ability to pay up to $480,000, and there will be
10 that cap in the order, of 503(b)(9) claims during the interim
11 period.  And we think that's a very modest ask that's more than
12 justified by the facts and circumstances of this case.

13        I'll start with the legal standard that applies.  We
14 don't think it's KMart, which on its face doesn't apply to
15 administrative claims.  Instead, the debtors only need to show
16 that the relief is necessary to avoid immediate and irreparable
17 harm.  Under that standard, authority to pay 503(b)(9) claims
18 is routinely granted in this and in other courts in the Seventh
19 Circuit.

20        As set forth in Mr. Castellano's declaration, failure
21 to have any ability to pay pre-petition suppliers of goods
22 within the next few weeks would result in immediate and
23 irreparable harm.  The debtors' products are utilized in highly
24 regulated industries, including commercial vehicle, aerospace,
25 and electronics industries.  The debtors' products go through

1 an intensive qualification process with their customers. Once
2 a product is accepted by a customer, the debtors often cannot
3 deviate from the prototype, and every component in the
4 product's on record, no matter how minor, is fixed within that
5 product record as is a supplier of each material. In most
6 instances, the debtors have only one supplier and changing
7 materials or suppliers would require new trials.

8 This is doubly true of the vendors that are estimated
9 to hold 503(b)(9) claims. None of these vendors have long-term
10 supply contracts with the debtors and the vast majority, if not
11 all of them, supply raw materials or other goods that are
12 either fixed within a product on record, cannot be sourced from
13 another supplier, or otherwise highly specialized or unique.
14 Accordingly, non-payment of these vendors could damage the
15 estates to a far greater degree than non-payment would benefit
16 these estates. This is only more so the case where we're
17 talking about administrative claims that are entitled to be
18 paid in full in any case.

19 I'll note, as the Court has heard several times
20 already, the debtors signed a funding agreement with 3M that
21 obligates 3M to fund all allowed claims in these cases,
22 administrative or general unsecured. That's an uncapped
23 commitment from a company with billions in revenue. And
24 against that backdrop, payment of $480,000 of administrative
25 claims should be uncontroversial. Nonetheless, we understand

the U.S. Trustee continues to object to the motion

notwithstanding the deferral of lien claims, foreign vendor

claims, and critical vendor claims to the second day.

Contrary to the U.S. Trustee's assertion, it's more

than appropriate to authorize payment of 503(b)(9) claims at

the first day hearing, as is routinely done in first day

hearings here and across the country.  The debtors are running

a business that makes components for airplanes and freight

vehicles.  They need to be able to pay suppliers of raw

materials and other goods to protect the business.  Payment of

suppliers that have administrative claims already is a very

appropriate way to do that during the interim period.

For these reasons, unless the Court has any

questions, we'd respect that the Court enter the proposed

interim order.

THE COURT:  All right.  Are these all for goods?

MR. WINTERS:  They are, Your Honor.

THE COURT:  Okay.  All right.

Mr. Straus.

MR. STRAUSS:  Thank you, Your Honor.

We do not have an objection to moving off three of

the proposed groups and we understand that, yes, the only

amount that is being sought now are the approximately $480,000

for the 503(b)(9) claimants.

Our concerns are, first off, that while they have

1   sent some of this information to us on who these claimants are

2   and I believe some of the amounts are in there as well, it

3   hasn't been made public.  It hasn't been available to creditors

4   who these claimants are, how much is going to these claimants,

5   so that for the sake of public policy of being transparent,

6   who's getting paid and giving an opportunity for these parties

7   to object to their payments.

8           There are administrative claims that will, should

9   ultimately be paid at confirmation at a later date, so the harm

10  of them not being paid their amounts now, we agree that does

11  not go under the <u>KMart</u> standard.  But, ultimately, there's not

12  a strong basis to pay these claims on a first day basis.  More

13  time can be given and more disclosures can be made before these

14  claims should be paid.

15          THE COURT:  All right.

16          So you said you have received some information,

17  correct?

18          MR. STRAUSS:  Yes, we have.

19          THE COURT:  All right.

20          And I could be wrong, but wasn't the list of all the

21  vendors, and I don't know if it was all critical vendors versus

22  all trade claimants, was that attached as an exhibit to one of

23  the declarations?

24          MR. WINTERS:  It was not, Your Honor, not the list of

25  all vendors covered by the motion.  We would, Your Honor, be

31

 1  happy to provide reporting to the U.S. Trustee of claims that

 2  are paid.  Ultimately, it's really on the claimant and the

 3  debtor to ensure that the payment is authorized by the order,

 4  which only authorizes payment of Section 503(b)(9) claims.  And

 5  if a payment is unauthorized, that's really on us and the

 6  recipient, and it could ultimately be avoided if it's not

 7  consistent with the order.

 8          We'd be happy to provide periodic reporting or

 9  reporting upon request to the U.S. Trustee of the vendors that

10  are named.  The debtors would prefer not to have to publicly

11  file a list of all their vendors and amounts owing, but would

12  be happy to provide reporting.

13          THE COURT:  All right.  And what is the 480 take us

14  through?

15          MR. WINTERS:  The 480 is an estimate of what comes

16  due in approximately 30 days.

17          THE COURT:  All right.

18          What comes due and, well, I don't know when the final

19  hearing will be, so hold that thought.

20          Mr. Strauss, what about basically a reporting

21  requirement, understanding this is an interim order which isn't

22  final and, therefore, in theory, if I were to rule on a final,

23  a different basis would have to be recouped?

24          MR. STRAUSS:  That they would report to us with who

25  they paid and how much they paid?

1          THE COURT:  Correct.

2          MR. STRAUSS:  Okay.  You know, at the end of the day,

3   this is a matter of transparency and allowing the public to

4   know what is going on.  While it's great that we would know,

5   that doesn't do anything for the creditors or other interested

6   parties who might want to know where this money is going.

7          THE COURT:  All right.  Any response to that?

8          MR. WINTERS:  Your Honor, I think we could expand

9   that to provide the reporting to any party in interest that

10  requests it on a confidential basis.  We add a provision to the

11  order.

12         THE COURT:  Okay.

13         MR. STRAUSS:  Unless it's allowed to be wrongly -- I

14  knew I would flounder.

15                       (Laughter)

16         THE COURT:  Well, it's hard to play telephone when

17  they whisper something, you turn around and you can't remember

18  what they said.

19         MR. STRAUSS:  Well, it's also harder to play

20  telephone through a mask, Your Honor.  So, no.

21         At the end of the day, Judge, this is a Section 107

22  sort of issue.  The public has a right to know what's going on

23  in this case as do all the claimants.  And while we absolutely

24  appreciate the debtors would give that information to any party

25  in interest, that doesn't indicate the public's right to know.

33

1    So unless the list of people being paid is allowed to

2 be sealed under Section 107 under the standards of Section 107,

3 then that list should be made publicly available so the public

4 at large, and of course all the parties in interest, would then

5 have the ability to look at it.

6    THE COURT:  All right.  Is the theory then because

7 other 503(b)(9) claimants have to file something stating the

8 amount?

9    MR. STRAUSS:  Sometimes, Judge, that does happen.

10 But in this case, they're asking for relief on a first day

11 basis without giving the world the knowledge of who's exactly

12 getting what.  If an admin claimant files an admin claim or an

13 application for admin expenses, everybody knows what that is,

14 and any party in interest can object should they choose to.

15    In this instance, what we're being told is that, at

16 least initially, the original plan was is that my office and

17 the debtor would know who was paid, and obviously, whoever was

18 being paid would know.  But that would leave the burden on my

19 office and on the debtor to realize that we have a 503(b)(9)

20 claimant who isn't truly a 509(b)(9) [sic] -- who doesn't truly

21 hold a 509(b) [sic] -- yeah.  Can't even talk.

22    THE COURT:  Doesn't hold a claim.

23    MR. STRAUSS:  Doesn't hold that claim, Judge.

24    I'm not going to even try to say it anymore.  I'm

25 going to mess that up a hundred times.

34

1          And so, this does, by making it publicly available,

2     it gives everybody the ability to take a look at it and make

3     sure that these claims are in fact legitimate claims to be paid

4     on the administrative level.

5          THE COURT:  Okay.

6          MR. WINTERS:  Your Honor, the reason we'd prefer not

7     to file it is because it can cause a bit of a run on the bank.

8     You know, we're deferring critical vendor relief, all the other

9     vendors to the second day hearing.  We'd rather not be

10    filing --

11         THE COURT:  What run on the bank would it be?

12         MR. WINTERS:  Other creditors, other vendors that

13    were attempting to let them know that they need to wait until

14    the second day hearing, for example --

15         THE COURT:  Right.

16         MR. WINTERS:  -- or wait until later, are going to

17    look at the docket and see, well, you're paying this guy,

18    you're paying that guy, I want to get paid.  At the end of the

19    day, if --

20         THE COURT:  But isn't -- I mean, ultimately, I mean,

21    I like how everyone calls it critical vendor.  No one calls it

22    key vendors anymore.  That's a bad word.

23         But I mean, ultimately, isn't that what they're

24    entitled to do?  I mean, if they're really the critical

25    vendors, and I understand we're not trying to do KMart, we're

35

1 just doing 503(b)(9). But isn't the idea that these are people

2 that have to get paid now because it's critical for your

3 business? And understanding that not everybody is always

4 critical, at least at that moment, I mean, aren't you really

5 saying that we don't want people to know if they're critical or

6 not?

7          MR. WINTERS: Yes, Your Honor. I think we do want to

8 be able to tell people that we're going to defer their payment

9 if we can, right, and that they need to wait until, for

10 example, the second day hearing, or even later to get paid.

11          THE COURT: Right.

12          MR. WINTERS: And it doesn't help to be putting out

13 the names of people that we are.

14          THE COURT: Well, I understand it doesn't help, but

15 you we are in bankruptcy.

16          MR. WINTERS: Yeah. I understand, Your Honor. No,

17 that's I think we can --

18          THE COURT: It's a good thought and it is a good

19 point in the fact that -- I mean, yes, you can try to seal it.

20 I'm not a huge fan of trade secrets all the time but if you're

21 already saying we just want to do this small subset of people

22 we think are going to get paid anyway, because we're not doing

23 KMart, it's not a critical vendor, it's not a key vendor, it's

24 these people are entitled to a 503(b)(9) claim. We're going to

25 pay everybody. So they're just getting paid now then later. I

36

1  understand that.  But, I mean, at that point, don't you at

2  least need to disclose it?

3          MR. WINTERS:  Your Honor, if I could have a moment to

4  confer with Mr. Castellano.  I think that right now we don't

5  necessarily know who has a 503(b)(9) claim, right.  We'll know

6  when we're billed for what we got in the 20 days.

7          THE COURT:  Right.

8          MR. WINTERS:  So I think it would be a publicly filed

9  report of payments made under, you know, a periodic publicly

10 filed report of payments made under the provision, maybe

11 monthly which I can confer with Mr. Castellano --

12         THE COURT:  Well, because that's kind of -- I mean,

13 because this is of course just interim.

14         MR. WINTERS:  Yeah.

15         THE COURT:  So I'm trying to get us between now and a

16 final hearing date of which we don't know yet, but may end up

17 being between 14 and 30 days --

18         MR. WINTERS:  Yeah.

19         THE COURT:  -- away.  And I get it, you don't really

20 know.  But if you don't know, then do you really have to pay?

21 I mean, I think, and then he is nodding his head, so I'm kind

22 of cutting him off because he can't talk to you.  But I think

23 you know who has to get paid when.  I mean, so the question is

24 you would know who's probably coming up, and maybe you don't,

25 but I'd like to know at least.

1    MR. WINTERS:  Yeah, we could file -- I think we could
2  probably file --
3    THE COURT:  Well, I'll let you talk to your client
4  who's going there and I won't pick on your wife like I picked
5  on the other husband, so.
6    For the record, I used to think North Dakota was the
7  Midwest until I realized that we're nowhere near the mid or the
8  west, so my idea of Midwest is a bit skewed as well.
9                        (Laughter)
10    THE COURT:  I now find out we're just the great
11  plains and no one cares.  We have tornadoes.
12                        (Pause)
13    MR. WINTERS:  Your Honor, if it works for the Court,
14  I think we'd prefer and could get comfortable with filing after
15  the fact.  So when payments are made within a reasonable period
16  of time, we would file a report of what we paid.  The concern
17  with filing a list now saying what we think maybe we owe people
18  is that it's an estimate right now.  It's an estimate of what,
19  again, has been unbilled for that period.  We don't want to put
20  out a list that says we owe you all 480,000 --
21    THE COURT:  With the understanding it's on an interim
22  basis and --
23    MR. WINTERS:  That's right.  But they're all going to
24  come and say, give me my --
25    THE COURT:  Oh, I have no doubt.  Everyone who's ever

38

1   been paid in a bankruptcy says that. Okay. That's fine.

2           MR. WINTERS: Right.

3           THE COURT: All right. If we know who's getting paid

4   when, does that satisfy the -- I like the way we just keep

5   going down. Does that satisfy the concerns of the U.S.

6   Trustee?

7           MR. STRAUSS: Your Honor, as long as everyone knows

8   who's getting paid and when and how much, then that satisfies

9   our concerns regarding public access.

10          THE COURT: Was that your proposal?

11          MR. WINTERS: My proposal, Your Honor, yes, is that

12  we would file some form of periodic report. We can call it

13  within five business days of making the payment of who's been

14  paid and we'll just update it.

15          THE COURT: Pursuant to the --

16          MR. WINTERS: Yes. Pursuant to the --

17          THE COURT: -- interim critical vendor orders. Okay.

18          All right. I think that satisfies transparency and

19  allows you to pay who you need to and we could be arguing about

20  a lot of money, we could be arguing about not a lot of money,

21  between now and a final hearing. All right.

22          Any other objection or concern with regard to the

23  trade -- critical vendor motion for -- I'll let the U.S.

24  Trustee because they're almost as many as Kirkland and Ellis.

25                          (Laughter)

```
 1              MR. STRAUSS:  None from us, Your Honor.
 2              THE COURT:  Thank you.
 3              All right.  Any other objection from anyone in the
 4    courtroom?
 5                        (No audible response)
 6              THE COURT:  Seeing none, any objection from anyone on
 7    the telephone or via Zoom?
 8                        (No audible response)
 9              THE COURT:  All right.
10              Based upon that, I think the Court will approve an
11    interim order on payment of pre-petition claims of 503(b)(9)
12    only with the caveat that within five days of payment, you file
13    a report.  And I don't --
14              Can we do a -- would it be a notice of submission or
15    report to court or a supplement to the motion?  What works?
16              COURTROOM DEPUTY:  A notice of submission.
17              THE COURT:  Use a notice of submission event.
18              MR. WINTERS:  Understood, Your Honor.
19              THE COURT:  And that'll allow you to file it and
20    won't generate anything on that.
21              All right.  Do you get to do another one?
22              MR. WINTERS:  I do, Your Honor.
23              THE COURT:  Excellent.
24              MR. WINTERS:  Next, I'll address the insurance
25    motion, which is at Docket Number 22 and Agenda Item 4.
```

1          THE COURT:  Okay.

2          MR. WINTERS:  This is another category where 3M pays

3    on behalf of the debtor and is not seeking reimbursement.  The

4    obligations covered by the motion include insurance premiums

5    for 3M policies that cover the debtors' deductibles and

6    self-insured retentions in connection with applicable policies,

7    brokerage fees in connection with those policies, and premiums

8    on three surety bonds.  The debtors believe all these

9    obligations are current.  Nonetheless, payment of premiums and

10   related obligations is critical to maintaining insurance

11   coverage and thereby avoids harm to the estate.

12          Unless the Court has any questions, and I do believe

13   this one's uncontested, we would respectfully request that the

14   Court enter the proposed order.

15          THE COURT:  All right.  The Court has no questions.

16   Does anyone in the courtroom have any questions or concerns

17   with regard to the insurance motion?

18                    (No audible response)

19          THE COURT:  Seeing none, does anyone on the telephone

20   or Zoom have any questions or objection with regard to the

21   insurance motion?

22                    (No audible response)

23          THE COURT:  None.  All right.  I didn't think that

24   would garner any objections.

25          Based upon that, the Court will approve the insurance

41

1  motion on an interim basis with a final hearing to be set

2  shortly.

3      MR. WINTERS:  Thank you, Your Honor.

4      Next, I'll take the taxes motion, which is at Docket

5  Number 21 and Agenda Item 5.

6      As Ms. Geier described, taxes are a category of

7  claims that 3M pays on the debtors' behalf in the ordinary

8  course of business.  Under the funding agreement, 3M will

9  continue to do so post-petition without seeking reimbursement.

10 Although 3M historically allocated a portion of the income

11 taxes it paid to the debtors, this motion does not seek

12 authority to pay such allocations to 3M after the petition

13 date.

14     Accordingly, out of an abundance of caution, the

15 debtors seek interim authority to pay any unpaid taxes that are

16 asserted directly against them, although the debtors do not

17 expect this to be the case.  As of the petition date, the

18 debtors estimate that there are approximately 1.3 million of

19 accrued taxes and fees attributable to the debtors consisting

20 of $950,000 of income taxes, $380,000 of property taxes and

21 fees, and $700 of sales and use tax.

22     As set forth in the motion, to the extent that these

23 are asserted against the debtors, certain of these amounts may

24 be held in trust, may be entitled to priority, or may be

25 entitled to secured status.  There may also be significant

1 adverse consequences to non-payment.  Again, under the funding

2 agreement, 3M makes these payments on the debtors' behalf

3 without reimbursement.

4          Unless the Court has any questions and, again, I

5 think this one's uncontested, the debtors would respectfully

6 request that the Court enter the proposed order.

7          THE COURT:  All right.

8          Anyone in the courtroom have any questions or

9 objections with regard to what has been dubbed the taxes

10 motion?

11               (No audible response)

12          THE COURT:  Seeing none, anyone on the telephone or

13 Zoom have any objections or questions with regard to the taxes

14 motion?

15               (No audible response)

16          THE COURT:  Anyone?

17          COURTROOM DEPUTY:  No.

18          THE COURT:  Okay.

19          All right.  The Court will approve the taxes motion

20 on an interim basis and we'll set a final hearing along with

21 the other interim orders.

22          MR. WINTERS:  Thank you, Your Honor.

23          Next, I'll address the utilities motion, which is at

24 Docket Number 24, Agenda Item 6.  The utility providers covered

25 by this motion all provide services directly to the debtors,

1 with the exception of the telecom providers are paid directly

2 by the debtors.

3          There are about just under 20 utility providers and

4 the debtors pay such providers about $30,000 a month.  The

5 debtors believe all utility providers are paid current.  The

6 debtors expect, again, that both administrative claims and

7 general unsecured claims in this case will receive a full

8 recovery.  But nonetheless, the debtors propose to set aside an

9 amount equal to the debtors' average monthly utility expenses

10 of about $300,000 into an existing segregated bank account.

11          The interim order includes streamlined procedures

12 through which a utility provider can contest whether they have

13 adequate assurance.  Specifically, the utility provider can

14 serve a notice requesting additional or different adequate

15 assurance.  The debtors can seek to resolve that request.  And

16 if not, a hearing can be scheduled before the Court.  Until

17 then, the utility providers are prohibited from discontinuing

18 service.

19          Entry of the interim order is consistent with the

20 Court's authority under Section 366 and 105 of the Bankruptcy

21 Code, and failure to prove these streamline procedures at this

22 stage would likely consume the first 30 days of the case with

23 unneeded adequate assurance disputes.  Moreover, these

24 procedures are customary in this district and others.

25          We did slightly revise the proposed order to address

44

1 U.S. Trustee comments, and I believe the Court has that as does

2 the U.S. Trustee. And with that change, I think this pleading,

3 as well, is uncontested, Your Honor. So with that, we'd

4 respectfully request that the Court enter the proposed order.

5         THE COURT: Okay.

6         For the United States Trustee, it looks like you

7 changed one thing from are authorized to shall. Was that the

8 substance of the U.S. Trustee's comments?

9         MR. STRAUSS: At least to that extent, yes, Your

10 Honor.

11         THE COURT: Okay. Any other objection then to the

12 utility motion?

13                 (No audible response)

14         THE COURT: Mr. Strauss, any other?

15         MR. STRAUSS: Oh. No, Your Honor. We addressed all

16 of it as he said.

17         THE COURT: Great.

18         Anyone in the room may have a question or objection

19 with regard to the utilities motion?

20                 (No audible response)

21         THE COURT: Seeing none, any objections on Zoom or on

22 the telephone with regard to the utilities motion?

23                 (No audible response)

24         THE COURT: Anyone?

25         COURTROOM DEPUTY: No.

45

1          THE COURT:  I feel like I'm scaring her.

2          All right.  With no objections, the Court will grant

3    the utility motion on an interim basis with the one

4    modification made by the U.S. Trustee and on an interim basis

5    and we'll set the final hearing shortly on that.

6          MR. WINTERS:  Thank you, Your Honor.

7          With that, I'll cede the podium to my colleague,

8    Mr. Hunter.

9          THE COURT:  Thank you.

10         MR. HUNTER:  Good afternoon, Your Honor.  For the

11   record, Derek Hunter, Kirkland and Ellis.

12         Looks like I'm batting cleanup up today, taking us

13   through the procedural motions at the end of the first day

14   portion of the agenda with the next item being our claims agent

15   retention application.  This is for Kroll to be our claims

16   agent here.

17         We, first of all, want to thank the Court for

18   entering the motions to expedite.  We had a few of those for

19   these procedural motions that are not first day motions under

20   the local rule so we appreciate that.  In the lead up to the

21   filing, Kroll worked with -- us and Kroll worked with both the

22   U.S. Trustee and the Clerk's office, had an initial call with

23   them, to make sure that if Kroll was going to be the claims

24   agent, we would work seamlessly with the Clerk's office.  And I

25   think we had some helpful conversations to make sure Kroll was

1  working the right way for the Clerk's office.

2           And, you know, Kroll has already done some important

3  noticing in the cases, has the case website up.  That's very

4  helpful for parties.  I think actually the Court's website now

5  links to Kroll's website so that parties in interest kind of

6  can have a singular landing page for information about the

7  cases.

8           Kroll is obviously very experienced.  They've worked

9  in a lot of other complex cases and we think they're well-

10 suited to serve as the claims and noticing agent here.  I

11 believe the motion is uncontested with those comments from the

12 Clerk's office and the U.S. Trustee that we worked through

13 before the filing.  And so unless Your Honor has any questions,

14 we would respectfully request that the Court enter the order

15 for the Kroll retention application which is at Docket

16 Number 13.

17          THE COURT:  All right.  Any objection to the proposed

18 employment of Kroll as the claims and noticing agent for the

19 debtors?  Anyone in the courtroom.

20                    (No audible response)

21          THE COURT:  All right.  I don't see anyone.

22          Anyone on Zoom or the telephone?

23          COURTROOM DEPUTY:  No.

24          THE COURT:  None.

25          All right.  With that being said, the Court will

1 approve the application for entry of an order authorizing the

2 employment of Kroll Restructuring Administration LLC's claims,

3 noticing and solicitation agent.  And I believe we have a

4 proposed order on the docket.  Would that be accurate?

5          MR. HUNTER:  Yes, Your Honor.

6          THE COURT:  All right.  So, very good.  That will be

7 granted.

8          MR. HUNTER:  Thank you, Your Honor.

9          Next on the agenda is what I'll refer to as the

10 creditor matrix motion instead of going through the full title.

11 A few pieces of procedural relief here.  You know, the motion

12 originally requested to file a top 20 law firm list in lieu of

13 a general unsecured list.  Also to file a consolidated creditor

14 matrix, list addresses for tort claimants on the creditor

15 matrix, approving certain redactions, and then, also notice

16 procedures in the form of commencement.

17          The U.S. Trustee did file an objection.  We were

18 engaged with them before they filed the objection and have

19 continued to since the filing of their objection.  Their

20 objection is primarily aimed at the top 20 list.  And, you

21 know, as Mr. Husnick described, we have Combat Arm claims.

22 That was really the topic of today's long conversation this

23 morning, but there are respirator claims.  And of course we're

24 talking about, you know, unsecured claims, you know, as part of

25 the first day motions.  And so, you know, I think the list we

48

1  put out we think was the right reflection of kind of the

2  constituents that should be on a committee.  But nonetheless,

3  you know, in response to the U.S. Trustee's objection, we made

4  proposed revisions to the order which I believe you have, Your

5  Honor, which basically meet the Trustee where they were in

6  their objection, which is we will file three top 20 lists, one

7  for Combat Arms firms, one for respirator firms, and one for

8  unsecured creditors.

9       Obviously, we, you know, spent the time leading up to

10 the filing to prepare the top law firm lists, so I think we

11 need a few days just to make sure what we file is accurate.  So

12 the language in the proposed revised order provides that we

13 will file that within five business days.  But otherwise,

14 unless, you know, the U.S. Trustee has any issues with that

15 timeline, I think we tried to address their concerns in their

16 objection.

17      So if, you know, I'm happy to walk through the

18 language but, you know, that was meant to address their

19 concerns.

20      THE COURT:  Okay.  All right.  Well, I am looking at

21 the proposed redline, which does appear to resolve that issue.

22 Does the, or excuse me, do the proposed changes satisfy the

23 U.S. Trustee's limited objection to the motion?

24      MR. STRAUSS:  Yes, Your Honor.  Thank you.

25      THE COURT:  Okay.  All right.

1    Does anyone in the courtroom have an objection to the

2    proposed, I guess I should call it correctly, the -- I'm going

3    to just basically call it the service list motion with the

4    understanding that there will be essentially a 1007 list with

5    regard to tort claimants, respirator claimants, and trade

6    claimants?

7                    (No audible response)

8         THE COURT:  Seeing none, any objection or questions

9    from anyone on Zoom or the telephone with regard to this

10   motion?

11        COURTROOM DEPUTY:  No.

12        THE COURT:  All right.

13        The Court will approve that motion as modified in

14   Court, the modification being the inclusion of three top 20

15   lists as opposed to just a single tort claim list.

16        And have you uploaded this order or is this just a

17   redline that has not been uploaded?

18        MR. HUNTER:  This is just a redline that has not been

19   uploaded.  We hadn't heard from the U.S. Trustee yet.  You

20   know, we just kind of did it overnight.  So since they're good,

21   we can upload it after the hearing.

22        THE COURT:  Okay.  Very good.  I will approve the

23   order when it's uploaded.

24        MR. HUNTER:  Thank you, Your Honor.

25        Next on the agenda at Docket Number 16 is our SOFA

1  and schedules extension motion.  By this motion, we're seeking

2  an additional 20 days in addition to the 14 days we already get

3  to file our schedules and SOFAs.  You know, we engaged with the

4  U.S. Trustee before the filing.  You know, frankly, we had a

5  longer extension there originally.  They had some concerns and

6  we worked with them on that.  And so we understand this time

7  period is a period they're supportive of.  It's consistent and,

8  frankly, within other complex cases in this district.

9          THE COURT:  Some non-complex cases too.

10          MR. HUNTER:  So, yeah, I guess we didn't negotiate

11  too hard on that one with the U.S. Trustee.  But, you know, I

12  think we can get it done.  And so, you know, we think the U.S.

13  Trustee is supportive and it's an appropriate timeline to get

14  our schedules and statements on file.

15          And so unless the Court or any other parties have any

16  questions, we respectfully asked that the Court enter the

17  order.

18          THE COURT:  All right.

19          Any objections or questions from anyone in the

20  courtroom with regard to the schedules and SOFA extension

21  motion?

22                  (No audible response)

23          THE COURT:  Seeing none, any questions or objections

24  from anyone on the telephone or Zoom with regard to that

25  motion?

1          COURTROOM DEPUTY:  No.

2          THE COURT:  All right.  The Court will grant that

3     motion and I think we have an order on that already.

4          MR. HUNTER:  Yes, Your Honor.

5          THE COURT:  All right.  Very good.

6          MR. HUNTER:  Thank you, Your Honor.

7          The last item on the first day agenda portion is our

8     case management procedures.  This is at Docket Number 18.  We

9     shared the motion with the UST in advance of the filing, were

10    able to incorporate a couple of small comments from them in the

11    procedures that were filed, and then want to thank Ms. Elmer,

12    your staff attorney, for engaging with us post-filing on some

13    edits that we've worked through.

14         Those are the changes you see reflected in the

15    redline.  Apologies, it's in an exhibit to the order so it's a

16    bit back there.  But just a couple of changes primarily to

17    clarify that the parties need to file and serve a notice of

18    request for relief.  You know, obviously, we talk about the

19    omnibus hearing structure, but parties still need to notice if

20    they're going to be trying to serve a request for relief for an

21    omnibus hearing.  And then, requiring parties to make efforts

22    to share notices with the Court before they file those.

23         Those were the, I think the primary changes that we

24    received.  And then, actually, you know, since the filing of

25    the redline, we received a couple more.  I think they came from

52

1  the clerk maybe, but those were fine.  We're happy to work

2  those in.  I think, primarily, you know, clarifying where we

3  direct parties, you know, what website and then language about

4  where folks should be seeking hard copies, you know, we're

5  happy to delete that, so received some comments from chambers

6  and worked through those.

7        And so, I think we have a couple tweaks to make to

8  the order that you have, but we can make those after the

9  hearing and submit that one.  So, otherwise, we understand that

10 the order is uncontested.  And so unless Your Honor or any

11 other parties have questions, we would respectfully request

12 that the Court enter the case management procedures order.

13       THE COURT:  All right.

14       Any -- oh, we do have a question.

15       MS. SCHRAMM:  Ye of little miffs.

16       My --

17       THE COURT:  If you could approach the microphone just

18 so we can hear.  Thank you.

19       MS. SCHRAMM:  Sure.  Absolutely.

20       My comments, and this may have already been fixed by

21 some of the other comments, is Paragraph 21 on how you have to

22 appear *pro hac vice* in this Court.  And it says that a motion

23 must be filed by a member of the bar of this Court.  And I

24 think the *pro hac vice* motion needs to be filed by the foreign

25 attorney who is appearing, just a little knit.

53

1        Paragraphs 23, 24, and 25 state that if a hearing's

2   going to take longer than an hour, the debtor can remove it

3   from the omnibus.  I don't have a problem with that, but I

4   think that it should be communicated to and with the consent of

5   the parties that are involved in that matter.

6        And then Paragraph 24.  That deals with disclosures

7   that are filed in contested matters.  And at the end of that

8   paragraph, it says failure to properly -- failure to provide

9   timely notices as set forth in this paragraph in the discretion

10  of the debtor may result in the exclusion of such evidence.

11  And I think that should be the Court that should do that and

12  not the debtor.

13       So those are my comments.

14       THE COURT:  All right.  Any pushback with regard to

15  those comments?

16       MR. HUNTER:  Those seem all fine, Your Honor.  We can

17  make those in the order that we upload.

18       THE COURT:  Okay.  I am glad I get to decide what's

19  excluded as evidence, so that's (indiscernible).

20       MS. SCHRAMM:  I am, too.

21       THE COURT:  All right.  Any other questions or

22  objections with regard to the case management order in the

23  courtroom?

24                  (No audible response)

25       THE COURT:  All right.  Seeing and hearing none,

54

1    anyone on Zoom or the telephone?

2            COURTROOM DEPUTY:  No.

3            THE COURT:  All right.  The Court will grant the case

4    management motion as modified in Court as well as the

5    additional modifications raised by Ms. -- yes.

6            MS. SCHRAMM:  I forgot one point.

7            THE COURT:  You have more?

8            MS. SCHRAMM:  Yeah.  Just one.

9            So the case management motion is not going to be

10    interim, at least --

11            THE COURT:  Correct.

12            MS. SCHRAMM:  -- it wasn't set up to be.  But I do

13    believe the Committee should at least be able to offer some

14    modifications when the Committee is formed and the council is

15    chosen.

16            THE COURT:  They could, but I mean, here's the

17    difficulty.  I mean, this is kind of a standard order which I

18    may or may not have drafted in a previous life.

19            MS. SCHRAMM:  Part of it you did.

20            THE COURT:  Yeah.  For other cases.  So, I mean, my

21    thought is, would a committee be prohibited by coming in and

22    doing a 9024 motion and asking for a modification or even

23    asking for an amended order on that?  I mean, they're not

24    barred by that.

25            MS. SCHRAMM:  I don't think they would.  I was just

55

1 trying to streamline the procedure.  But that is fine, Your

2 Honor, because that actually did happen in USA Gymnastics where

3 the (indiscernible) --

4      THE COURT:  My only concern is having an interim case

5 management order, and I don't know how it worked in USAG,

6 but --

7      MS. SCHRAMM:  I don't think it -- I can't remember if

8 it was interim, but I do know there was some leeway for the

9 committee to come in and review it.

10      THE COURT:  All right.  Would we be amenable to

11 putting in a paragraph that should any committee be appointed

12 that they can request changes to the case management order?

13      MR. HUNTER:  Yeah.  We plan to work with the

14 Committees on all its relief and so I think they have that

15 right anyways if they want to, you know, to actually file, you

16 know, actual relief.  And so, you know, we're happy to engage

17 with them and put something into just make clear that, you

18 know, the rights are reserved there.

19      THE COURT:  All right.  I get leery of interim case

20 management orders, but I don't mind amending them, which I know

21 may not sound right, but I just --

22      MS. SCHRAMM:  Understand.

23      THE COURT:  -- because there's a question of whether

24 they have to follow the interim if they're waiting for a final

25 and I don't really want that because this case is already going

56

1  to be complicated enough and I would like them to follow the

2  case management as possible.

3          MS. SCHRAMM:  I think that's great, Your Honor.

4          THE COURT:  Okay.  All right.

5          If you want to drop a paragraph in there with respect

6  to that, that would be great and it can be not a final order,

7  but it'll just be an order.  And then, to the extent we need to

8  modify it, we can do that at a later date.

9          MR. HUNTER:  Will do, Your Honor.

10         THE COURT:  All right.  Thank you.

11         MR. HUNTER:  Okay.  I think that takes us through the

12  first day agenda, so I believe we're turning back to the

13  adversary proceeding at this point.

14         THE COURT:  Not yet.

15         All right.  Final hearings on the first day motions.

16  One thought is to have them on either Wednesday, August 17th,

17  or Thursday, August 18th.  What day or dates work better for

18  people, and do we like mornings?  Do we like afternoon?

19         I'm not quite as concerned about the first day

20  motions being morning or afternoon because I think we can

21  probably get through them in either a morning or afternoon.

22  But what date would be best for people?  I don't know about

23  conflicts or other issues going on.  I'm sure this is top

24  priority for all of you, so you'll make it available, but just

25  in case.

57

1          MR. HUNTER:  Yeah.  I think we're flexible, Your
2   Honor.  You know, frankly, for a final hearing on these
3   motions, we don't even have to be back in front of you in three
4   weeks if the following week is good for you.  But we're
5   flexible either one of those days or the following week
6   whenever the Court's availability has, you know, we we'll make
7   it work.  So we're flexible.

8          THE COURT:  Okay.  And the reason I'm asking this now
9   is because I think we'll probably start picking Wednesdays as
10  possible future omnibus dates.  For some reason that works
11  pretty well for me.  I don't know why, but it does.  But we'll
12  probably peg it off there.  So my first instinct would be to do
13  it the 17th.  And then because I think we're supposed to set
14  future omnibus dates from that hearing.  So my thought is we'll
15  start from that date if that works for people.

16         MS. SCHRAMM:  Well, what time are you thinking?

17         THE COURT:  Well, no one answered me if they
18  wanted -- I mean, I know some people in the courtroom generally
19  prefer later than earlier.  But I want to let everyone make
20  a --

21         MS. SCHRAMM:  That's the standing ITT omnibus bus
22  date on Wednesdays.

23         THE COURT:  It is?  I mean, what time?

24         MS. SCHRAMM:  At 1:30.

25         THE COURT:  1:30.  So a morning might work better?

58

1      MS. SCHRAMM:  It would.  But I know a lot of folks
2 are traveling, so it may not work well for people that are
3 traveling.

4      THE COURT:  All right.  Well, that -- okay, hold that
5 thought because here comes another issue.

6      Judge Pratt is traveling right now and she was kind
7 enough to let me use this courtroom.  When I set hearings, I
8 can control one courtroom, which is a nice, quaint little
9 courtroom down at 311.  It's about half the size, without a
10 jury box, of this room.

11      So when we talk about this, I guess I'm certainly
12 willing, there's a mirror courtroom across the hall.  I'm
13 willing to open that up and have people come in if they need
14 to, we can Zoom it in there.  But the thing is, I can't always
15 guaranty I'm going to get a big courtroom.  And so the
16 courtroom I'm going to probably schedule it in is going to be
17 the small courtroom.  So when you're thinking about who needs
18 to come -- I love everyone from Kirkland and Ellis, but we may
19 not be able to accommodate the small fleet of brilliant young
20 men and women that you have coming here every day.

21      We may have to minimize it to those that are
22 absolutely necessary with the understanding that you have
23 messaging apps that you can fling messages out.  But I can try
24 to get bigger courtrooms and I'll ask, but all I can do is ask.
25 I carry zero weight anywhere above myself because I carry a

59

1  cool title, but I'm just one of the lowest branch of the judges
2  here in the courtroom, or courthouse, so there's probably going
3  to be a small room that when we're setting these in with the
4  hope that I'll try to get a bigger room if we really need to.

5        For instance, the preliminary injunction trial
6  probably wouldn't work that well in my courtroom.  We may have
7  to find a bigger one.  But all I can do is set it in my
8  courtroom and try to get a bigger one and send later notice.
9  But that's the scheduling problem I'm going to have is I can
10  only guaranty you my courtroom.  So when you talk about travel
11  plans, the airport loves you all to travel here, the hotels
12  love you to travel here.  I don't know how many I can really
13  squeeze in in my courtroom to travel here.

14        But we can use the other courtroom for overflow.  But
15  I just don't send 60 attorneys to a hearing scheduled in 311
16  because they're going to just be wandering aimlessly.

17        MR. HUNTER:  Yeah.  Understood, Your Honor.  And
18  usually the first day hearings, one of the better attended ones
19  and, you know, hopefully for the second day and, and our --

20        THE COURT:  They're not here for the first day
21  hearing.  I hate to tell you that but that's not what they're
22  here for.

23        MR. HUNTER:  Yeah.

24        THE COURT:  So would a nine o'clock on the 17th work
25  for people?

 1             MR. LINDER:  Your Honor, Matt Linder, again.

 2             Just a clarifying question.  Will you be permitting

 3     Zoom attendance going forward at the second day hearing and

 4     future hearings in addition to in-person hearings?

 5             THE COURT:  Yes.

 6             MR. LINDER:  Okay.  Thank you, Your Honor.

 7             THE COURT:  That's my goal.  We railed for having a

 8     setup where we can do hybrid hearings.  I think we can do

 9     hybrid hearings every time I've tried to have a hybrid hearing,

10     they've bailed on me and they don't do it and they just don't

11     appear.  But that would be the hope, A, because it's easier for

12     people, and B, because I have a small courtroom, and C, because

13     what are we on?  I don't know what variant we're on, but --

14     there's just times when someone who needs to be here can't and

15     I don't want to penalize people or move hearings when everyone

16     else has made plans.

17             So, yes, I obviously it's great if you're here and I

18     think it's maybe more effective, but you've got to do what

19     you've got to do and I'll allow Zoom to allow people to attend

20     if they can't fly here.

21             MR. HUNTER:  Okay.  Great.  I think on the debtors'

22     side, Your Honor, 9:00 a.m. on the 17th is fine for us, and we

23     can work out the --

24             THE COURT:  Hang on.

25             MR. HUNTER:  Oh --

1                        (Court confers with clerk)

2           THE COURT:  All right.  Yes.

3           MR. HUSNICK:  Yes, I spoke too soon.  So our CRO has

4 a conflict on the 17th and obviously he's important,

5 particularly for second day relief.  Could we take you up on

6 the offer for the 18th?

7           THE COURT:  Well, I mean, I've already taken someone

8 else up on their offer when they threw something out they

9 didn't want to do, so I guess I'll have to -- does the 18th

10 work?  Certainly ITT can't be on the 18th, too, right?

11           UNIDENTIFIED SPEAKER:  The 18th worked very well.

12 Thank you.

13           THE COURT:  All right.  Do you want to do 1:30 on the

14 18th for a final hearing?

15           MR. HUSNICK:  Does the morning happen to be

16 available?

17           COURTROOM DEPUTY:  We can, yeah.

18           MR. HUSNICK:  Okay.  That'd be preferred, Your Honor,

19 if it's okay with the Court.

20           THE COURT:  All right.  And let's do it early because

21 then we can make that the -- make that an omnibus date for the

22 first one.

23           COURTROOM DEPUTY:  Okay.  An omnibus day.

24           THE COURT:  Yeah, for the first one.  It's kind of

25 quick for a first time, right?

62

1          COURTROOM DEPUTY:  Right.  I think the case

2    management order would contemplate --

3          THE COURT:  Front and second one, all right.  Okay.

4          COURTROOM DEPUTY:  (Indiscernible)

5          THE COURT:  Okay.  All right.  So we'll do it at 8/18

6    at 9:00.  And I'll save Room 311 and it will be the same Zoom

7    information and telephone information that we used today and

8    that will be for final hearings on all of the interim orders

9    set today and we'll do objection -- I do have a calendar on my

10   phone.  If that's a Thursday, probably objection is due that

11   Monday but I need to look at the date.

12         COURTROOM DEPUTY:  Judge.

13         THE COURT:  Yes.

14         COURTROOM DEPUTY:  Clarify.  Tell them it's the Zoom

15   telephone number, not AT&T.

16         THE COURT:  Oh, it's the Zoom telephone number, not

17   the AT&T number.

18         So the objections would be if it's on the 18th, on

19   the 15th.  On or before August 15th to the final orders on

20   those motions.  And any orders of which -- have not been

21   submitted, if they could be submitted within, I'll say, five

22   days of today that would be great.  I suspect it will be

23   sooner, but I have to give you a deadline, so there's a tickler

24   if you don't do it.

25         MR. HUSNICK:  I suspect it will be sooner, Your

63

1   Honor, but thank you.

2         THE COURT: Okay. All right. And then the case

3   management order so -- you keep trying to get away. You're not

4   free yet.

5         I anticipate setting omnibus dates going forward in

6   the future. I had picked Wednesdays but now I've been told

7   that some people have a conflict on Wednesdays because of the

8   continuing saga of ITT.

9         COURTROOM DEPUTY: Somewhat.

10        THE COURT: Somewhat.

11        COURTROOM DEPUTY: Yeah, not everyone.

12        THE COURT: Yeah, do you have them monthly?

13        UNIDENTIFIED SPEAKER: We do.

14        THE COURT: What day of the month?

15        UNIDENTIFIED SPEAKER: There --

16        THE COURT: Or what -- is it like second like

17   Wednesday, third Wednesday?

18        UNIDENTIFIED SPEAKER: So let's see. It's the third

19   Wednesday of the month.

20        THE COURT: So if I started kind of -- pardon? Yeah.

21        UNIDENTIFIED SPEAKER: Let me spoke right. Yes,

22   because August -- yeah, third Wednesday of the month.

23        THE COURT: Okay. So if I started taking the second

24   Wednesdays --

25        UNIDENTIFIED SPEAKER: No, I'm so used to going to

64

1   omnibus hearing on Wednesday.  I'd be disappointed if --

2           THE COURT:  There you go.

3           UNIDENTIFIED SPEAKER:  -- it's another day, okay?

4           THE COURT:  All right.  So how about a first omnibus

5   hearing date of September 14th.  It's going to shock you, but

6   that's a Wednesday.  Because these are omnibus dates, I'd like

7   to start at 9:00 because I don't know what's going to be

8   scheduled.  Does that work for most people?

9           MR. HUSNICK:  I see no objections.

10          THE COURT:  Well, I see furtive movements, but they

11  don't seem angry furtive movements, so -- all right.  So let's

12  set August -- excuse me, September 14th as the first omnibus

13  date at 9:00 a.m.  Same Zoom information and use the Zoom

14  telephone number and I'm going to say Room 311 with the

15  understanding that that could change if it's a big hearing and

16  it might require movement.

17          The second omnibus hearing date to put in the case

18  management order would be October 12th, which is also the

19  second Wednesday at 9:00.  Any -- is that dates don't work or

20  is that a different issue?

21          UNIDENTIFIED SPEAKER:  Different issue.

22          THE COURT:  Excellent.  Okay.  All right.

23          And then what about -- we're going to have to finesse

24  a little bit here.  What -- oh, no.  I might not.  November 9th

25  at 9:00 a.m. for the third omnibus hearing date.

1    Are we supposed to set four?  Oh, I guess I've got it
2  in front of me.  Maybe I could look.  Oh, wow, we really do go
3  out.  They do set five.  Well, what's in December?  Let me
4  look.  December 14th.

5    MR. HUSNICK:  Your Honor, we can also, you know,
6  delete (d) and (e) in this paragraph.  For example, if we only
7  want to schedule three out and keep some flexibility for later
8  on.

9    THE COURT:  Well, hey, you've got them now.  If you
10  want to put them in, get them while they're hot.

11    MR. HUSNICK:  Okay.

12    THE COURT:  I mean, one party chose Indianapolis as a
13  filing location.  Maybe this will be the new trend.  Yeah, we
14  can always amend or delete.  All right.

15    So 12/14 and 11 -- 1/11 and all at 9:00 a.m.  So if
16  you could include that in the proposed -- or in the actual
17  order, they'll be set and that will lock it in.  Use Room 311
18  for all of them and, like I said, we'll -- to the extent we see
19  something big coming, we'll try to accommodate a bigger
20  courtroom, but all I can do is ask.

21    All right.  Now you may be free from the first day
22  motions.

23    MR. HUSNICK:  Thank you, Your Honor.

24    THE COURT:  Thank you.  Would you all like to recess
25  briefly before we tackle the next?

66

1          MR. PFISTER:  This is Rob Pfister.  I'm not sure if

2    you can hear me on the Zoom.  I was wondering --

3          THE COURT:  I can.

4          MR. PFISTER:  Oh, wonderful.  And thank you, Your

5    Honor.  Rob Pfister from the Klee Tuchin firm.  I'm one of

6    those who always appears in person, but one of those COVID

7    variants caught me this week, so unfortunately I can't be there

8    in person and I certainly do appreciate the opportunity to

9    appear by Zoom.

10          I wanted to give Your Honor an update because I --

11   the parties have been having discussions regarding the

12   preliminary injunction -- pardon me -- regarding the temporary

13   restraining order request and I wanted to give Your Honor an

14   update as to where the plaintiff speaking as one voice in this

15   regard sees the state of play.

16          So first, there's one thing I want to clarify and

17   that will segue into where I think the state of play is.

18   Mr. Bernick's argument, at one point I think he referenced that

19   there was -- he thought there was an email from the MDL judge.

20   It was an ex parte email about, you know, hearing dates or

21   listening in or something like that.  I want to clarify.

22          We got to the bottom of that and it appears that what

23   he's referring to was an email -- it is from a judge, but it's

24   from Judge David Herndon, who is a retired judge, who serves as

25   the special master overseeing the very complex discovery in the

1 MDL.

2 　　　　And the second point is that the email was not ex

3 parte.  It was actually addressed to attorneys at my client's

4 firm, the Aylstock firm, and then two attorneys for the

5 defendants at the Kirkland & Ellis firm.  So that email is what

6 Mr. Bernick was referring to.  And what that email said was

7 that -- and I believe this was during colloquy that you had

8 about, you know, why didn't or could the plaintiff simply talk

9 with the defendants and see about, you know, moving dates a

10 little bit to give Your Honor some time to really consider the

11 matter.

12 　　　　And what Judge Herndon's email said was that the

13 matter set in the next few weeks can be moved except for

14 responses.  So given that email and given Your Honor's

15 comments, which I thought, you know, were very helpful and

16 potentially could help the parties get to an agreement here,

17 what happened is, is we responded to counsel for the debtors

18 including counsel there in the courtroom.  This was right at

19 the lunch hour.  And stated that the leadership for the

20 plaintiffs in the MDL will agree to move all deadlines three

21 weeks forward, except for responses to motions, and that we

22 believe this obviates the need for a TRO and are available to

23 discuss.  So that three weeks proposal we made was inclusive of

24 all these depositions at that deference during argument and the

25 like.

1    We received a response also over the lunch hour from

2   Mr. Horowitz of Kirkland who has -- who basically countered our

3   three weeks in two ways, both of which aren't -- were a problem

4   for us.  One was that it was effectively a stay of the entire

5   MDL, so it would essentially be a stipulated TRO.  It wouldn't

6   just be moving dates out three weeks, you know, for depositions

7   and the like, but that it would -- the entire proceedings in

8   the MDL would be stayed and the stay would be through a ruling

9   by this court on the preliminary injunction motion and again

10  that, you know, regardless of the dispositional time on that.

11    So we responded and this was during the hearing.  I

12  just can give Your Honor the latest and greatest report.  We

13  responded back to the debtor and have indicated on behalf of

14  all plaintiffs in the MDL that we are prepared to, again,

15  continue all depositions by three weeks, continue the discovery

16  cutoff dates that have not already expired by three weeks.

17  They have requested and we've agreed to ask that the movants

18  who filed that motion for a TRO that you heard about, that was

19  not filed by our firm, but the movants -- we agreed to request

20  that those movants withdraw their TRO without prejudice or

21  alternatively that the District Court, you know, stay any and

22  all proceedings with respect to that TRO motion for three

23  weeks, and that we would -- in all of these proposals, I think

24  even the defendants had indicated that what they would like to

25  do is proceed with briefing on the summary judgment and Daubert

69

1  motions due August 9th.  I suspect those are likely done.  That

2  could be the reason for that.

3         Then the last condition was that -- just as a matter

4  of going before the District Court that we would promptly go

5  before Judge Rodgers for approval of this.  We certainly expect

6  that if the parties went on a consensual basis that Judge

7  Rodgers would approve this and seek to enter any necessary

8  orders to accomplish that.

9         So that's the proposal and we have not heard back,

10  unless I've missed an email in the last just few minutes since

11  I've been speaking.

12         THE COURT:  Some people might think you have, but I

13  have no idea.

14         MR. McKANE:  Your Honor, could I weigh in just for a

15  minute?

16         THE COURT:  Yeah.  McKane?

17         MR. McKANE:  Correct, Your Honor.  Thank you very

18  much.

19         THE COURT:  One name out of this.  All right.  Hang

20  on, sir.

21         Go ahead, Mr. McKane.

22         MR. McKANE:  Thank you, Your Honor.  And for the

23  record --

24         THE COURT:  Oh, we just lost your mic, though.  Did

25  you hit the off button?

```
 1              COURTROOM DEPUTY:  No, I didn't.

 2              MR. McKANE:  Hear me?

 3              THE COURT:  No.

 4              COURTROOM DEPUTY:  Is there a button on the

 5   microphone?

 6              THE COURT:  Look at the base.  Do you have a little

 7   green light?

 8              MR. McKANE:  I don't see a green light.

 9              THE COURT:  Okay.  Push the push button.  Oh, you're

10   on, I think.  Hit the mic.

11              MR. McKANE:  No.

12              THE COURT:  Oh.

13              MR. McKANE:  Now?

14              COURTROOM DEPUTY:  No.

15              THE COURT:  No.

16              MR. McKANE:  How about now?

17              THE COURT:  No, but we're getting closer.

18              MR. McKANE:  Let me see where in the light come

19   out --

20              THE COURT:  Is the one behind you?  See if that one

21   works.  Or there's the game show microphone if you want to --

22              MR. McKANE:  Your Honor, there is a green light here.

23              THE COURT:  Oh, okay.  You're good.

24              MR. McKANE:  I apologize.  And I'll stand.

25              Your Honor, at approximately 3:20 the debtors
```

 1  responded to certain of the plaintiffs' counsel who are kind of
 2  lead in some of these discussions and what we believe would be
 3  most efficient, rather than kind of detailing the two rounds of
 4  back and forth in the effort to try to resolve the issue, we'd
 5  ask that we could have a brief adjournment to maybe 15 minutes
 6  to 4:00 to see if we can get to a response and get to common
 7  ground.
 8          THE COURT:  Did you say -- oh, so you want 15 minutes
 9  or you want --
10          MR. McKANE:  I'm asking for 15 minutes so at -- oh,
11  sorry, at 3:45.  Come back at 3:45.
12          THE COURT:  I'm not got at math, but that really
13  confused me.  Yeah, that's fine and maybe we can get your
14  microphone working.
15          Let's take an adjournment until 3:45.
16          MR. McKANE:  Thank you, Your Honor.
17          THE COURT:  And we'll see where we are then.
18          MR. McKANE:  Thank you, Your Honor.
19          THE COURT:  Okay.  I just want to let you know,
20  people on Zoom, your screen will go black.  So there you go.
21          COURTROOM DEPUTY:  Thank you.
22          (Recess at 3:30 p.m./Reconvened at 3:45 p.m.)
23          THE COURT:  I'm sorry.  Please be seated.
24          MR. PFISTER:  Thank you, Your Honor.  It's Rob
25  Pfister again.  Can you still hear me?

1    THE COURT:  I can, but can I call the case again?

2    MR. PFISTER:  Oh, you can, of course.

3    THE COURT:  We're on the record.  Thanks.  It's those

4    little things that make me happy.

5    All right.  We are going back on the record on --

6    well, it's the legal case, Case 22-2890, Aearo Technologies,

7    LLC, as well as adversary 22-50059, the full title being 3M

8    Occupational Safety, LLC, Aearo, et al., versus those parties

9    listed on a very long exhibit, Appendix A.

10    All right.  Now you can go ahead, sir.

11    MR. PFISTER:  Thank you, Your Honor.  Once again, for

12    the record, Rob Pfister from KTBS on behalf of the Aylstock

13    firm and speaking, in this instance at least, for the

14    plaintiffs' steering committee and all plaintiffs' counsel.

15    It appears, Your Honor, that the last 15, 20 or

16    however many minutes it's been has not moved the needle.  The

17    parties are still apart on the fundamental issues.  And the

18    fundamental issues being this question of a full stay of the

19    MDL where everything is just shut down versus our more limited

20    plan to obviate the debtor's claim of irreparable harm of the

21    three-week extensions and the like.  Nothing I said, to be

22    clear, was inaccurate when I spoke previously.  I just hadn't

23    seen the one final response from the debtors which, again, was

24    not acceptable.

25    So the way we see this, Your Honor, is, you know,

73

we've certainly taken the Court up on what I think was an
extremely helpful suggestion of talking about pushing some
deadlines out.  I -- and again, we are -- are and were willing
to do so without conceding that this would be irreparable harm.
We were willing to address their claims that, you know, within
the next three weeks terrible things would happen and bells
would be rung that couldn't be unrung.

        But with that consensual resolution no longer on the
table or at least, again, unless they've had a change of heart
in the last few minutes, I think where that leaves us is
argument portion of the TRO hearing has concluded.  We're now
onto the evidentiary portion.

        Given the hour, I mean, I will -- if -- I can just
state right now, you know, there is no evidence before the
Court.  If the debtors intend to offer the first day
declaration and then I believe there were two additional
declarations that were offered in support of the TRO request, a
couple things about that.

        Number one, those declarations don't have in them
certain of the statements that were referenced in argument by
counsel by Mr. Bernick as facts that we don't agree are facts.
I'm thinking in particular of the -- I think it was three
million dollars a week -- I believe that came from
Mr. Bernick -- that is allegedly being spent.  So certain of
the information upon which they would ask the Court to rely to

74

1    grant a temporary restraining order isn't even in those

2    declarations.

3            Second point I'd make about those declarations, you

4    know, and I see first day declarations all the time.  I know

5    they're rife with hearsay.  I never object to them because they

6    aren't offered in support of, you know, substantive important

7    evidentiary matters.  But, I mean, if we are going into, you

8    know, Mr. Castellano's, what, 96-page -- I'm sure that includes

9    exhibits but, you know, extremely lengthy declaration, you

10   know, the declaration itself just looking at paragraph 5, you

11   know, basically says this is all hearsay.  You know, he says,

12   "I base it on my personal knowledge and a bunch of stuff that

13   people have told me."

14           If they offer that declaration into evidence, I don't

15   think it's competent evidence because it's hearsay and you

16   can't cure hearsay by crossing the witness.  You can identify

17   hearsay by crossing the witness, but you can't cure the issue.

18   Fact is, hearsay is just not admissible.

19           So I don't think (a) the declarations that they have

20   and allegedly are prepared to tender, you know, say what they

21   need them to say.  I don't think they're admissible and if they

22   do come in -- or let's put it this way.  If they do simply call

23   the witnesses to the stand and in a, you know, traditional

24   context try and elicit the testimony they want, you know, in

25   proper form, I mean, there will be cross-examination.

1    So I want to be clear.  We are not in any, you know,

2  sense here trying to be obstructive or impediments, you know,

3  to any process.  Trust me with the COVID diagnosis and

4  everything, I don't want to take anybody's time or do things

5  that ought not be done.

6    That said, this is extraordinarily consequential

7  relief.  Extraordinarily consequential relief.  You know, the

8  debtor gets an automatic stay because it's the debtor and it's

9  automatic and we're not here about that.  We're here about a

10  non-debtor and I don't think they have the proper showing.

11  They can try and make one evidentiarially, but I think that's

12  going to lead to lengthy proceedings.

13    So with that, I'll pause, Your Honor.

14    THE COURT:  All right.  Who is the lucky designee for

15  the debtors?

16    MR. HUSNICK:  It's the reason I'm short after all

17  these years, Your Honor.  So --

18    THE COURT:  Oh, we just lost that microphone again.

19    MR. HUSNICK:  If I could stand, Your Honor.

20    THE COURT:  That's fine.

21    MR. HUSNICK:  Okay.  So I'm a little disappointed to

22  hear the report that we just got, but we spent a good chunk

23  of -- needed the whole time over recess at trying to talk

24  amongst one another to try to see what we might be able to

25  agree on.  And at least I was left with a pretty strong

1 impression that there was actually a lot of agreement, but

2 there still are some very significant points of disagreement.

3     So at least to my understanding there -- counsel are

4 here for the claimants, are agreeable to continue the

5 depositions by three weeks.  Also, to continue any unexpired

6 deadlines in the MDL by three weeks and will further ask

7 Mr. Keller, who has -- apparently has some position in the

8 leadership of the MDL plaintiffs group.  It's not clear that he

9 has clients, but I can't make a representation about that.  But

10 that they'll ask him to withdraw his request of the MDL court

11 for a TRO and also to withdraw his tag-along request at the

12 Panalon Multi-District (phonetic) litigation.

13     If all these things, in fact, are agreed and take

14 place that obviously obviates the major concerns that we have

15 with what's happening in the MDL litigation over the next three

16 weeks.

17     Now we get to the parts that are a little bit harder.

18 First, they report that the judge will, of course, have to --

19 judge in the MDL will have to approve these changes because

20 it's that court's schedule and if, in fact, we're very

21 reluctant to have any activity from the court there, but if, in

22 fact, the court in the MDL will approve those changes and do so

23 promptly, we think that that goes a long way to solving the

24 problem of the next three weeks.

25     As to withdrawing the TRO and the tag-along, I would

1  think that given the structure of the counsel's committee --
2  plaintiffs' counsel's committee in the MDL, they could prevail
3  upon Mr. Keller.  But if he -- if they can't prevail upon
4  Mr. Keller, perhaps this Court can prevail on Mr. Keller not to
5  get the JP MDL involved and figuring out where this is going to
6  go.

7          THE COURT:  Well, I mean, that would be great.  The
8  Court could get involved if there was a motion in front of me
9  and even assuming I have jurisdiction over it.  I don't know.

10          MR. HUSNICK:  Well, we think that it's part again --
11  I won't mention the stays, but it's part of the relief that
12  we're seeking is to shut down proceedings that are outside of
13  this case.  And so it really would be part of the TRO, but I
14  would expect that if Your Honor were to make it clear to
15  Mr. Keller that you think that that's appropriate, it may be
16  that there doesn't have to be --

17          THE COURT:  Well, but again, I kind of hinted at
18  that.  There's nothing in front of me with respect to whatever
19  has been filed.  I haven't seen it.

20          MR. HUSNICK:  Well, yeah, okay.  That --

21          THE COURT:  I don't know what it says.

22          MR. HUSNICK:  Yeah.

23          THE COURT:  I'm not -- I mean --

24          MR. HUSNICK:  Sure.  Yeah.

25          THE COURT:  I don't get to shoot from the hip

78

1 anymore. I'm not an attorney. I actually -- well, in theory I

2 have to, you know, follow the law and go by procedure and

3 there's nothing in front of me, so --

4          MR. HUSNICK: That's --

5          THE COURT: I appreciate your invitation to just tell

6 him what to do and not to do, but there's nothing procedurally

7 for me to do that, so I can't solve that for you.

8          MR. HUSNICK: Well, I got a little bit ahead of

9 myself. So I'm responding to report to the Court in advance of

10 our providing some evidence to the Court --

11          THE COURT: Right.

12          MR. HUSNICK: -- on the subject.

13          THE COURT: Because I was going to ask, what are the

14 discrepancy -- what are the disagreements between the parties,

15 because it seems like you're most of the way there from what I

16 remember being -- things coming up in the next few days.

17          MR. HUSNICK: Right. So now we get to the point of

18 disagreement and this will be the subject that we're going to

19 submit before Your Honor, the orders that have been entered and

20 things that have been said in connection with the MDL very

21 directly on the specific question of what else is going to

22 happen in the MDL over the next three weeks, because we're very

23 concerned, as we indicated this morning, and you will see the

24 evidence of it that the MDL is continuing to take action or is

25 taking action that we believe is damaging to the bankruptcy

1 process, even as it's starting.

2          And you don't have that before you, but we will

3 provide the evidence of it in the form of orders and emails and

4 they'll be before Your Honor.  So we would ask for the

5 opportunity to provide that evidence, but that is, I think, the

6 only thing that is left of this --

7          THE COURT:  Well, what is it?  What -- I mean, I get

8 a little nervous of trying to tell a District Court what to do;

9 (a) they're constitutional.

10          MR. HUSNICK:  Right.

11          THE COURT:  And (b) that particular judge has been

12 appointed by the panel to run it; and (c) generally, you know,

13 they're pretty smart people and understand what the stay is and

14 what they can and can't do.  So what is it exactly you think is

15 transpiring right now that concerns you?

16          MR. HUSNICK:  I think it might be better if --

17          MR. PFISTER:  Your Honor, I'm loathe to interrupt

18 counsel, but I just -- can I just be clear on one tiny thing

19 that you --

20          THE COURT:  And I -- Mr. Pfister, correct?

21          MR. PFISTER:  It is, Your Honor.  It is, yes.

22          THE COURT:  Thank you.

23          MR. PFISTER:  And I apologize again.  I don't -- I

24 don't normally appear by Zoom.  I don't normally interrupt

25 counsel, but I just want to be very clear.

80

1          We gave a proposal for a complete resolution.  We

2    didn't say, here's all the stuff you want and now you go to the

3    judge and then you ask for the two things you want.  I think

4    that's a great way if you can get by with that negotiation.

5    But our offer was a consolidated offer and we made an offer --

6          THE COURT:  Well, I understand.  Your offer, I'm

7    assuming, was based upon that's what it is.

8          MR. PFISTER:  Exactly.  It's not --

9          THE COURT:  All right.

10          MR. PFISTER:  -- take what we've given and now, okay,

11    you know, the few things we wanted or the few things -- other

12    things, you know, now you convince -- now you convince the --

13          THE COURT:  But can I --

14          MR. PFISTER:  So with that, I'll --

15          THE COURT:  Can I listen to what those are, though?

16          MR. PFISTER:  Of course.  Apologies.  Thank you.

17          THE COURT:  Because it may run the other way

18          MR. PFISTER:  (Nods affirmatively.)

19          THE COURT:  So all right.

20          Go ahead.

21          MR. HOROWITZ:  Your Honor, for the record, David

22    Horowitz of Kirkland & Ellis.

23          THE COURT:  All right.

24          MR. HOROWITZ:  Proposed counsel to the debtors.  I

25    have here some other relevant correspondence --

 1          THE COURT:  Okay.

 2          MR. HOROWITZ:  -- and orders that Mr. Bernick was

 3  just referencing.

 4          THE COURT:  Okay.

 5          MR. HOROWITZ:  And with the Court's indulgence I'd

 6  like to take a shot at moving them into evidence for purposes

 7  of the hearing.

 8          THE COURT:  Well, again, I'm just -- right now I

 9  would just like to hear what it is.  I haven't taken any

10  evidence, right.

11          MR. HOROWITZ:  Right.

12          THE COURT:  And given where we're at, the whole

13  evidence and everything -- here's what I'm trying to get to.

14          MR. HOROWITZ:  Yeah.

15          THE COURT:  A lot of what was expressed as a concern

16  by the debtors appears to have -- that -- it could be agreed

17  to.  I don't want to say it's agreed to.  It could be agreed

18  to.  I'm curious as to hear -- now, I understand that's what I

19  want to hear, what are these other things that you've stated,

20  because when I wrote down the things it was the depositions,

21  the Daubert stuff and expert -- three things, essentially which

22  appear to have been discussed, plus the motion of which has

23  been mentioned that I don't know about to tag along TRO and all

24  that stuff.  So I'm just curious as to what else was the hang-

25  up.

1        MR. HOROWITZ:  There was the motion that Mr. Bernick

2 referenced, was a motion filed by the Keller Postman firm.

3        THE COURT:  Right.

4        MR. HOROWITZ:  Yeah.

5        THE COURT:  Which isn't -- right, okay.

6        MR. HOROWITZ:  Right.  And what we were seeking and

7 their agreement to was to pause the proceedings in the MDL,

8 including that TRO.

9        THE COURT:  Well, I think they said they would ask

10 him to -- or they had -- if there was an agreement, they would

11 ask him to withdraw.  Am I misstating that?

12        MR. HOROWITZ:  If there is -- their agreement would

13 be that they wouldn't withdraw it or that Mr. Keller was not

14 party to the agreement that they would impose on Mr. Keller to

15 withdraw the motion.

16        THE COURT:  Okay.

17        MR. HOROWITZ:  But there was no agreement to withdraw

18 the motion, nor was there any agreement to withdraw the tag-

19 along notice that was filed.

20        THE COURT:  But they didn't file it?

21        MR. HOROWITZ:  That Mr. Postman's firm filed.  That's

22 correct, Your Honor.

23        THE COURT:  Right.  So it's not like they could,

24 right?

25        MR. BERNICK:  I'm sorry, my understanding of

1 Mister --

2         THE COURT:  Because of where I'm -- you know, come

3 close to a microphone, please.

4         MR. BERNICK:  Mr. Buchanan can speak to this much

5 better than I am, but I believe that Mr. Keller does have a

6 position within the leadership of the MDL on the plaintiff

7 side.  He's not, you know, at the top committee, but he's on

8 one of the committees.  So he's within the committee's

9 structure of the -- Mr. Buchanan or somebody could clarify

10 that.

11         THE COURT:  Okay.  All right.  So -- and I'll get to

12 that.  So there's the -- you -- the debtors want more with

13 respect to the, what I'll call the Keller filings.  Would that

14 be accurate?

15         MR. HOROWITZ:  That's correct, Your Honor.

16         THE COURT:  Okay.  And what else is in the debtor's

17 mind as stumbling block?

18         MR. HOROWITZ:  Well, sure, Your Honor.  We have a

19 series of -- I mean, we were -- had to respond to that motion

20 and we had asked that they commit that they won't file anything

21 else in the MDL in the next three weeks pending a hearing on a

22 preliminary injunction motion and they wouldn't commit to that.

23         So what we're trying to avoid is having to run back

24 into this court to deal with what's going on in that court.

25 And what we want to do now is buy peace for just the next

84

```
 1  week --
 2              THE COURT:  Oh, I understand, but let --
 3          MR. HOROWITZ:  Yeah.
 4              THE COURT:  -- me pose this question.
 5          MR. HOROWITZ:  Yeah.
 6              THE COURT:  Let's assume the tort claimants file
 7  something tomorrow.  Something.  I don't know what, but they
 8  file something.  When would you have to respond by pursuant to
 9  the case management rules in the MDL?
10          MR. HOROWITZ:  Well, I -- so, Your Honor, just for
11  reference they filed a motion for TRO -- or the Keller firm
12  filed --
13              THE COURT:  Well, no.  Just generally speaking,
14  what's the response deadline?
15          MR. HOROWITZ:  Generally speaking, I'd have to say, I
16  don't know.  It's usually like 14 days for a motion.  That
17  said, they filed an ex parte today this morning while we were
18  in court and we had to respond within several hours.
19              THE COURT:  Okay.
20          MR. HOROWITZ:  Or three of them had to respond within
21  several hours.  So I don't know that the ordinary Local Rules
22  are necessarily going to be in play given what happened this
23  morning.
24          MR. PFISTER:  Your Honor, I'm happy to
25  (indiscernible) going on here --
```

1    MR. HOROWITZ:  Your Honor, I have if you want, Your

2 Honor, the --

3    THE COURT:  Hold on --

4    MR. HOROWITZ:  -- (indiscernible), yeah.

5    MR. PFISTER:  I'm happy to explain what's really

6 going on.  I think they're dancing around the issue.  But

7 they're not concerned that we're going to file anything; we're

8 not going to file anything.  They're trying to offer up a

9 transcript of a hearing this morning in front of the MDL judge.

10 And what I am virtually certain that they are concerned about

11 is there was a -- as I understand it, there was a court-ordered

12 mediation prepetition that I believe occurred last week and the

13 parties were all directed -- all the parties were directed to

14 act in good faith and, you know, conduct themselves in good

15 faith in that mediation.

16    And at this morning's hearing, the MDL judge sua

17 sponte -- and I don't mean any disrespect by referring to her

18 as the MDL judgment.  I apologize.  I should call her Judge

19 Rodgers.  She sua sponte brought up the issue of when the

20 funding agreement was signed in this case, not by the debtor

21 but by the non-debtor, by 3M.  And the fact that that was, in

22 fact, signed either the day of the mediation or the day after

23 the mediation and indicated that she had some grave concerns as

24 to the good faith in which the non-debtor preceded in that

25 mediation, and I think that's the elephant in the room.  I

86

1  think that's -- it's nothing to do with this Keller motion, so

2  far as I can tell.  I think that's what they're saying.

3       And, you know, to be clear when we agree to postpone

4  things for three weeks we're not going to run into another

5  court.  That's not -- you know, that's not how we operate.  But

6  the offer that we made addresses their issues.  It does not

7  address their issues that are not related to this case and I

8  just really don't think it's appropriate for them to be, you

9  know, airing that sort of thing, so thank you.

10       MR. BERNICK:  Your Honor, there are actually -- see,

11  the problem is not just counsel filing Mr. Keller.  There are

12  sua sponte show cause orders that are being filed by the Court

13  in the MDL.  And they're show cause orders with respect to

14  what's happened in the mediation.  They're show cause orders

15  with respect to matters that are being discussed here.

16       And so literally, as we go through each day, we get

17  these ex parte orders and what Mr. Horowitz was going to do was

18  to put those orders into the record, as well as the hearings

19  that were, again, just conducted this morning into the very

20  matters that are pending before Your Honor.  It's that that we

21  want to stop.  It's that that we want to stop, and so we're

22  prepared to make an evidentiary record.

23       And then there are communications that are taking

24  place directly with the MDL judge through -- not directly, but

25  the MDL judge talking with retired Judge Herndon, who I guess

1 is a special master of -- in the court.  And the plaintiffs

2 here and, again, that's a whole question about whether that

3 kind of -- you know, I'm not going to get into whether it's --

4 whether there's an issue or problem with it, but the fact of

5 the matter is, there's a real timeline of communication between

6 the MDL court through Judge Herndon and the plaintiffs.  And so

7 we're now learning about positions that what the Court might be

8 willing to do, not willing to do, and they're coming in real

9 time.

10         And there are emails that reflect this, right.  And

11 so we want to put those emails into the record as well and it's

12 precisely this.  I mean, of all the things that are left, there

13 really -- given at least what was represented, I understand is

14 part of a package deal about what's actually happening in the

15 ongoing discovery proceedings, my sense is that we're not all

16 that -- we're really not that far apart.

17         It's this other stuff that is related to, you know,

18 mediation and whether we're operating in good faith because of

19 the Chapter 11.  The Chapter 11.  That's the problem in the

20 next 14 days and that's why even though the plaintiffs are

21 agreeable and are prepared to -- you know, to cooperate in this

22 process, I take that at face value, then we've got a problem.

23         THE COURT:  But even -- I mean, given the hour where

24 we're at and if I continue this, you're not going to get any of

25 the protections you would get if you agreed at this point.

88

1  Right?  If I say, I'm going to continue the TRO hearing at a

2  later date so I can hear evidence.

3          MR. BERNICK:  Um-hum.

4          THE COURT:  In the interim there's no protection,

5  correct?

6          MR. BERNICK:  That's right.  There's no protection

7  and, you know, all I can say, Your Honor, I get -- well, I'm

8  interrupting you, so --

9          THE COURT:  No, go ahead.

10          MR. BERNICK:  No, I get that.  And we're -- I

11 think -- I hope it's pretty obvious (a) we have heard you

12 pretty loud and clear since the first thing this morning that

13 the -- for a variety of reasons that you made very clear that

14 we've got a hill to climb on a TRO, right?  We also have said,

15 well, we think we also have the stay, but that is what it is.

16 You know, that issue is out there.  It's triggered.  To what

17 extent it's triggered, it's there.

18          And so our further proceedings on that stay can in a

19 way -- we wanted to put in the insurance policy because it's

20 such a clear thing and we were going to do it through a small

21 part of a deposition and that would be that.

22          So we're there I think really in all respects, except

23 we've got this tension that's developed between this proceeding

24 and the MDL and we think it's very -- it's very corrosive.

25 And so look --

1           THE COURT:  Okay.  This --

2           MR. BERNICK:  -- at this point --

3           MS. CYGANOWSKI:  Your Honor --

4           THE COURT:  Yes.

5           MS. CYGANOWSKI:  Your Honor, yes, with apology for

6    interrupting and the problem with being on the Zoom, Melanie

7    Cyganowski, counsel to Seeger Weiss.  With all due respect, and

8    I appreciate that the Court knows this intuitively, what

9    counsel for the debtor is requesting is that the bankruptcy

10   step -- the Bankruptcy Court step in to admonish or indeed stay

11   a United States District Court, an MDL court from exercising

12   its rights and powers under the All Writs Act where if the

13   court -- if Judge Rodgers decides sua sponte that she wishes to

14   call in litigants who are before her for what she perceives to

15   be improper behavior before her, that is not within, I

16   respectfully submit, the automatic stay.  That goes well beyond

17   any powers of the Bankruptcy Court.

18           We all know that as sitting jurists you have the

19   right and power to administer your courtroom.  And if you

20   believe that litigants are acting inappropriately or improperly

21   or not in good faith before you, that is your right to control

22   your courtroom, to issue contempt if you believe that

23   appropriate.  That is far beyond the scope of the automatic

24   stay.

25           So I don't understand what the debtors are seeking at

90

1 this time before you.

2    MR. BERNICK:  Well, that kind of answers the question

3 of what I think at least according to experienced counsel are

4 predicting lies ahead of us in the next three weeks.

5    So, yeah, I suppose that we all can -- we can all

6 step up and address whatever concerns that court has about

7 conduct that's directly tied, including our position in

8 mediation, directly tied to a lot of different things,

9 including the filing of this case.

10    And so we'll have inquiry into why we filed this

11 case, and what our strategies were, and why did we do this and

12 that and the mediation with sanctions threatened on the

13 lawyers, and potential, you know, sanctions threatened on the

14 company.  Is that something that is appropriate for a company

15 if it decides to file a Chapter 11 proceeding, to have an MDL

16 judge then come in and say, well, I think that you really

17 haven't dealt forthrightly with this court, including in

18 connection with that filing.

19    I would think that there -- the issue of whether a

20 case is filed improperly or properly is generally resolved by

21 the Bankruptcy Court and by the District Court sitting over the

22 Bankruptcy Court.  But I think that what you heard just now

23 illustrates the problem.

24    Could we live with that?  I suppose we could, you

25 know, live with it.  It'd be -- I don't know what the -- what's

91

 1  planned, but it doesn't seem to us to be appropriate.  It is

 2  something that bears directly on this --

 3          THE COURT:  But isn't that the difficulty --

 4          MR. BERNICK:  What?

 5          THE COURT:  When we're talking about irreparable harm

 6  that you don't know what is planned and what's coming in the

 7  future?  I don't know what's coming in the future.  I don't

 8  know what's been scheduled.  I don't know what a district judge

 9  will do.  I don't know who the district judge will direct it

10  to.  I don't know any of that.

11          The only things I knew at this point and that were

12  stated before and other than a concern that something may

13  happen where the depositions and the deadlines and such like

14  that and running rate of 3.8 million a week.

15          MR. BERNICK:  Right.  We do have all these.  And I

16  understand the late hour, but we are prepared to submit these

17  materials, which bear out our source of information.  You've

18  now heard it I think reasonably directly and, you know, I

19  suppose it's obviously up to Your Honor.  We would prefer not

20  to have any of this take place.  And we are concerned that it

21  does directly bear upon this process.

22          And, Your Honor, I would add I think it is

23  irreparable because it goes to the company's reputation and

24  decision to file in this court and take advantage of the rights

25  that it has under the Code.  And if we have an MDL judge who's

92

1  chastising and sanctioning us, including this lawyers but the

2  lawyers is the least of the problem, I suppose, but chastising

3  the company for its conduct in connection with filing this

4  case, I think that that is irreparable harm to the bankruptcy

5  process in this case.

6          MR. PFISTER:  Your Honor, I want to be clear.  We are

7  talking about a non-debtor, so I -- first of all, I echo every

8  thing Ms. Cyganowski said but the only thing I would add to

9  that is, it's a non-debtor.  So Judge Rodgers has not indicated

10 any incident to make any findings or rulings with respect to

11 the debtors.  She's talking about 3M, which is a non-debtor

12 litigant before her court that she -- that is subject to her

13 orders and she expressed today grave concerns based on the

14 timing of her mediation order and how -- and what it required

15 in terms of good faith participation and the fact that the

16 lawyers for 3M company, which is not a debtor in this court,

17 were bound to mediate in good faith.

18         And the proceedings that she is contemplating are not

19 proceedings with respect to the debtor and I must say, I mean,

20 I hate to kind of pull a gotcha, but this may be the hundredth

21 time that I've heard the lawyers on the debtors' side refer to

22 the company, you know, when they're talking about 3M or 3M and

23 Arrow and just the danger of these non-debtor cases.  You just

24 don't know whose behalf you're speaking on.

25         And frankly, again, I hesitate to raise this, but in

93

what capacity can the debtor as fiduciary when it has been
presented with something that obviates its claim of irreparable
harm of three -- you know, on their allegation three -- you
know, three million dollars a week or something and the
opposite side is saying, you know, fine.  We'll voluntarily
stay it.

        And the concern is, good gracious, what are we going
to do with this judge in Florida with respect to our non-debtor
parent?  Frankly, Your Honor, it's a perversion of the process.

        MR. BERNICK:  Your Honor, I have a report to make
from our client who has been watching and listening and if we
can -- if we can lock down the three things that we talked
about, which are continue the depositions, continue the
unexpired deadlines, and make a request of Mr. Keller to
withdraw his TRO and his tag-along, and that will be approved
by Judge Rodgers.  If that is a resolution that the Court finds
satisfactory and plaintiffs -- we will take that deal.

        THE COURT:  All right.  Mr. Pfister, you -- since
you're the hot mic right now, is that deal still on the table?

        MR. PFISTER:  As long as I understood it correctly,
which is just make -- let me go over it.  All depositions will
be continued by three weeks, all unexpired deadlines in the
MDL, unexpired discovery deadlines will be extended by three
weeks.  And I didn't hear whether it was -- that Mr. Keller
would or would be implored to but, in any event, something to

94

1  do with Mr. Keller and -- which, again, I don't think is the

2  problem -- and his TRO motion or the JPML tag-along, and that

3  it would be subject to the sign-off of District Judge Rodgers,

4  then yes, that is acceptable to us, Your Honor.

5       THE COURT:  All right.  So let me ask this.  When

6  would Judge Rodgers be able to review and issue a decision with

7  regard to whether or not she would be willing to go along with

8  the proposals that the parties appear to be in agreement with?

9       MS. HOEKSTRA:  Sorry, Your Honor.  Jennifer Hoekstra

10  from Aylstock.

11       THE COURT:  Okay.  Get a microphone.

12       MS. HOEKSTRA:  I think that one is broken.

13       THE COURT:  Yeah, that one's broke, so --

14       MS. HOEKSTRA:  This one is on, perhaps?

15       MR. BERNICK:  You can borrow ours.

16       MS. HOEKSTRA:  Think this one is on, however.

17       Our understanding is we could likely get some time

18  tomorrow morning with the Court.  Part of the reason we need

19  the judge to sign off is the Northern District of Florida Local

20  Rules require any scheduling changes to be approved by the

21  judge and we're trying not to violate any of the rules of the

22  MDL court while honoring everything in front of the bankruptcy.

23       THE COURT:  Rules are good.

24       MS. HOEKSTRA:  I like that.

25       MR. PFISTER:  And we are agreeable, Your Honor --

1          THE COURT:  So --

2          MR. PFISTER:  -- to making it conditional if, you

3    know, for any reason the judge doesn't approve it or something.

4    I understand the debtor would preserve its rights, of course.

5          THE COURT:  All right.  So what are we -- all right.

6          So apparently at that point then, what would I do?

7    Continue this hearing with the hope that you could get it

8    approved and that assuming that that happens that there'd be an

9    agreed entry?

10         MR. PFISTER:  What I would suggest, Your Honor, is

11   continue the hearing on the TRO portion of the motion.  I don't

12   know if we could say, you know, to some very early point and

13   then if the parties advise chambers that the relief has been

14   entered, then the TRO portion of the motion can be denied, and

15   then set a hearing on the balance of the injunction motion at

16   an appropriate date with a briefing schedule and some

17   discovery.

18         MR. BERNICK:  Well, I would think that --

19         THE COURT:  Go ahead.

20         MR. BERNICK:  -- I would object a little bit.  The

21   TRO motion has been resolved and, therefore, rendered moot.

22         THE COURT:  Well, in our simple parlance here, a lot

23   of times we just do an agreed entry, which is indicating that

24   the parties agree that so long as these dates are continued

25   that there's no reason to proceed with the TRO and it would be

96

moot, but that gives us a nice event on our docketing system
that would resolve the matter. And then the Court can issue a
notice setting the preliminary injunction hearing.

Now, I'm slightly concerned because everybody keeps
mentioning all these briefs that they're going to do on a
preliminary injunction, so I'm going to ask -- oh, I'm going to
get your name -- it starts with a B. Hang on. Bernick.

MR. BERNICK: Yeah, Mr. Bernick.

THE COURT: All right.

MR. BERNICK: David Bernick.

THE COURT: How long do you think in the debtors'
perspective when should a preliminary injunction hearing be
held?

MR. BERNICK: Well, we've been talking about -- I
should probably caucus with my colleagues here, but we got
three weeks in the MDL, so it may be that that's a good time.
But if you'd just give me a moment, they would know -- they
know better than I do.

THE COURT: Well, because ultimately I'm going to ask
the tort claimants the same question. I mean, I had an idea in
mind of when I thought it should be held, but frankly, I don't
know what you're planning on hitting me with. When everyone
talks about briefs that makes me a little nervous. I don't
know what you're planning to do. I don't want to give you too
much time to create a 65-page brief with 89 appendices that I'm

97

1 supposed to digest the night before.

2          But two to three weeks seems to me like the time
3 frame.  I don't know if you want to go right to three weeks
4 because I probably need to issue a decision, don't I?

5          MR. BERNICK:  Right.

6          THE COURT:  So we're talking probably two to three
7 weeks-ish.

8          MS. HOEKSTRA:  Your Honor, I thought the parties said
9 that they wanted to do some discovery.

10          THE COURT:  And what --

11          MS. HOEKSTRA:  Prior to briefing.

12          THE COURT:  But doesn't that kind of defeats things
13 because we've only got a three-week time period.

14          MS. HOEKSTRA:  Well, not for the preliminary
15 injunction.  I don't -- we don't have to have a three-week time
16 period.

17          THE COURT:  No, we don't but the idea was a TRO gets
18 us between now and then the preliminary injunction hearing.  So
19 it seems like anything longer than that, then have we really
20 resolved the TRO or have we just pushed the thing out.

21          MS. HOEKSTRA:  Well, if the TRO isn't resolved isn't
22 the hearing going to be rescheduled?

23          THE COURT:  I haven't set the --

24          MS. HOEKSTRA:  Yeah, I'm just saying --

25          THE COURT:  -- preliminary injunction, but --

98

1          MS. HOEKSTRA:  -- (indiscernible) the MDL court does

2   not continue the deadlines, can't there be a placeholder

3   hearing for the TRO?

4          THE COURT:  The T --

5          MS. HOEKSTRA:  I'm just assuming the preliminary

6   injunction is going to take longer as far as doing discovery

7   and which typically is done with the preliminary injunction.

8          MR. BERNICK:  I don't -- well, my -- I guess I would

9   say very simply that really particularly in light of the fact

10  that the TRO hasn't come -- and I'm not pointing fingers at

11  all.  I understand exactly why.  Totally fine with that.  But

12  it leaves us in a position where we don't have relief at this

13  point.  And presumably after three weeks, which is all we're

14  getting from the arrangement that we have, we're going to be

15  back to the races all over again.

16         So I would think that we would do it in a shorter

17  period of time and that will of necessity probably encourage

18  both sides to be streamlined in their presentations.  What we

19  don't want to have is discovery that gets into the motives or

20  reasoning behind the filing of the Chapter 11 case.  That's not

21  relevant and it would be very time consuming and would be a

22  problem.

23         So I think that shorter is better and if there are

24  disputes about the scope, all I can say is that maybe we'd have

25  to bring them back, but we'd be in favor of a streamlined

1  process and if any of my colleagues have a different view and

2  they're closer to the evidence.  Maybe Mr. McKane can --

3            THE COURT:  All right.

4            MR. BERNICK:  -- speak very briefly.

5            THE COURT:  I'll let him speak.  I do have a couple

6  people on Zoom that actually follow directions and raise their

7  hands, so because they played nice I'll let them go.

8            But go ahead, Mr. McKane.

9            MR. McKANE:  No, Your Honor, I'm happy to let them go

10 and then respond.

11           THE COURT:  That's fine.

12           MR. McKANE:  I think the short answer is we would --

13 I think you set the hearing.  We work backwards from that.  We

14 would ask for that hearing to be, you know, within the three-

15 week window recognizing that you may need to issue an order or,

16 you know, give you sufficient time as well.  That would at

17 least suggest maybe like August 11th or 12th for the hearing

18 dates and then working back, but even that might jam you a

19 little bit, but we want to be -- at least give you time to

20 rule.

21           THE COURT:  Well, if I have to be jammed, I have to

22 be jammed.  All right.

23           Mr. Keller, you were one of the hand raisers.  Go

24 ahead.

25           MR. KELLER:  Thank you, Your Honor.  Can you hear me

1 okay?

2          THE COURT:  I can, yes.

3          MR. KELLER:  I apologize for not appearing on screen.

4 I have to confess again, I didn't anticipate that I'd be

5 speaking today, otherwise I'd be wearing appropriate courtroom

6 attire and you would see me on screen.  So it won't happen

7 again, but I wasn't planning to be part of this proceeding.

8          But since my firm's name came up a couple of times, I

9 just wanted to clarify things and not leave ambiguity in this

10 proceeding.  So first, there were a couple of inaccuracies, you

11 know, where my friend on the other side asked whether Keller

12 Postman represented any clients.  Keller Postman is listed I

13 think as the fourth largest creditor of the estate.  We

14 represent tens of thousands of clients who wore the uniform of

15 the United States, so we definitely have a stake and are

16 fighting hard for them.

17          I got a promotion that I didn't deserve.  I am not on

18 MDL leadership.  I applied, but Judge Rodgers is a very smart

19 person and picked my partner, Nicole Berg.  So those are

20 personal appointments and she has that position and obviously I

21 support her in that, but I have no formal leadership position

22 in the MDL.

23          And I have immense respect for this Court and this

24 proceeding and I'm obviously following it carefully, so I hope

25 this doesn't come off the wrong way when I tell you the

1  plaintiffs' leadership made good on their promise to the other
2  side in negotiations asking me to pull down the two things that
3  were just mentioned, the motion with Judge Rodgers, as well as
4  my tag action with the JPML.  I am not going to pull those
5  filings.  I think the motion is correct and righteous on behalf
6  of my clients and that Judge Rodgers has jurisdiction to decide
7  it and it's no disrespect to this court when I say it will be
8  up to her whether she wants to delay it, but I am not going to
9  voluntarily pull it down.

10          And I similarly, you know, expressed to Your Honor
11  before that tagging this case with the JPML was entirely
12  proper.  You've noted before there's nothing in front of you
13  that would call that into question.  If the debtor wants to
14  file a motion saying I violated the automatic stay I will
15  gladly briefly that issue, but until then I think that what
16  I've done is correct.  And unless Your Honor tells me otherwise
17  through proper briefing and due process that it was incorrect,
18  I'm not pulling it down.

19          THE COURT:  You have to take whatever actions you
20  believe are in your best interest.

21          MR. KELLER:  Well, I'm actually fighting for the
22  interest of my clients, Your Honor, but that's right.  I have
23  to zealously represent them and I will continue to do so.

24          THE COURT:  All right.  And someone from a law firm
25  with an acronym.

1    MR. AYLSTOCK:  Yes, Your Honor.  This is Brian

2    Aylstock.  Very nice to meet you and good afternoon.  I was

3    court-appointed lead counsel for the plaintiffs in the MDL.

4    Mr. Pfister is my counsel, along with his colleagues.

5         I did want to correct one thing because I was on the

6    email chain with Mr. Horowitz and involved in the agreement or

7    proposed agreement.  Our last, best, final offer did not

8    include a request to pull down the tag-along for Mr. Keller.

9    We did not file that.  He filed that, but in our view there's

10   nothing irreparable or even imminent.  It was filed in the

11   normal course and the JPML is weeks or sometimes months go by

12   without even a briefing schedule.  There's a JPML hearing I

13   believe tomorrow.  Obviously won't be on that.  And they're

14   usually every two to three months.  So there's nothing imminent

15   about it.  I just wanted to correct the record because

16   Mr. Horowitz misstated what we had said as what we would agree

17   to.  And simply -- oh, not that we wouldn't do it, but there's

18   no -- nothing irreparable or imminent about a JPML tag-along.

19        THE COURT:  All right.

20        MR. AYLSTOCK:  Thank you, Your Honor.

21        MR. McKANE:  Your Honor, I think we were asking to

22   set a preliminary injunction hearing and then work backwards

23   from there.

24        THE COURT:  Correct.  You indicated you might want to

25   respond after that.

103

1      MR. McKANE:  I'm sorry?

2      THE COURT:  Did you have any response or are we just

3  setting a date?

4      MR. McKANE:  Oh, to the statements from Mr. Keller?

5  I --

6      THE COURT:  You don't have to.  I thought that's what

7  you said you were going to do, so --

8      MR. McKANE:  No, Your Honor.  I -- there are lots of

9  things that I wanted to say, but I'm trying to move forward in

10  a constructive manner.

11      THE COURT:  All right.  So I will ask -- I'm assuming

12  we still have an agreement as to the TRO?

13      MR. BERNICK:  Yes, Your Honor, we do.

14      THE COURT:  All right.  Despite recent developments.

15  All right.  August -- oh, I can probably -- I mean, ultimately

16  everything is moveable.  I think that's what it's going to have

17  to be.

18      MR. McKANE:  Your Honor, if it might be helpful,

19  we're happy to confer with plaintiffs' counsel and depending on

20  the scope of the discovery if they're looking at it, if they

21  want to moot -- we understand it's locked at three weeks.  We

22  take them at their word that it's locked at three weeks.

23      But if they want material discovery and a schedule

24  that addresses something more and they're willing to extend

25  their agreement to four weeks, we would engage there, too.  We

104

1   just want to make absolutely clear, we're not trying to jam you

2   or them necessarily.

3          THE COURT:  Well, and again, I --

4          MR. McKANE:  It's just that to the extent we have an

5   agreement right now.  Apologize.

6          THE COURT:  I might just slightly -- respectfully

7   disagree as to the need for discovery in a preliminary

8   injunction, as opposed to a permanent injunction.  So I will --

9   if it helps, I'm certainly willing to let you discuss.  If I

10  were to set a hearing now, it would be August 15th with

11  rollover to the morning of August 16th creating --

12         MR. McKANE:  Your Honor, we're ready to go.  We'll do

13  that.

14         THE COURT:  -- creating an Arrow week because that

15  gives us we're within the three weeks.  I don't think you have

16  to have full discovery, but I understand you can do discovery

17  and depositions.  You've got a head start.  You have the

18  declarations of what at least they thought they were going to

19  testify to.  But in my view, much like the TRO, I think these

20  things have to be addressed and I don't want to push it any

21  further than that.  Plus, it might be jammed.  I don't know if

22  I'll have a decision, but worse case scenario, I can give you

23  an opinion without -- I can give you an oral ruling with

24  opinion to follow just to stay within the three weeks.  But I

25  think this is the best resolution, as I did, I hint.  I'm not

1  sure it's a TRO issue give where we're at, but I think there

2  are legitimate issues raised with respect to whether a

3  preliminary injunction is appropriate.

4      So I think we'll set a hearing on the preliminary

5  injunction for August 15th at 9:00 -- starting at 9:00 a.m.

6  Again, I'll put it in Room 311 and to the extent I can move it,

7  we can always issue a second notice moving it.

8      Couple things I'm going to mention before we move on

9  and before I forget; because we really like to time things

10  well, CM-ECM will be down for regular maintenance tonight

11  starting at 8:30.  It will be down roughly 30 minutes to give

12  us a the latest and greatest version.  Normally I ignore those,

13  but given that I've got half the lawyers in Indianapolis in

14  here and across the country, I thought I'd mention that now.

15      And we're also going to have to work on -- this is an

16  internal matter, but trying to figure out how we're going to do

17  things in the adversary because people are appearing on behalf

18  of many claimants that aren't listed on the docket.  Rightly

19  so, because my docket would crash by the time we did it.  We'll

20  be working on that, but don't be surprised if either the

21  Clerk's Office or chambers reaches out to someone.  I'm trying

22  to figure out how we can do that.  I mean, I've got some

23  experience in bond cases where you're listed as just -- it's

24  basically a placeholder name that we can do things, but those

25  are some things that we have to do as well to make sure that we

106

can give people notice and you appear on the docket, but not

just an interested party, which doesn't give you all the rights

you might want on an adversary proceeding.

And so what would -- so 8/15 is a Monday.

MS. HOEKSTRA:  Judge, we do have the 17th.  Would it

make sense to put all this on one day?

THE COURT:  No.  We saw how that worked today.

MS. HOEKSTRA:  Well, the first day motions will

probably go quickly.

THE COURT:  Maybe.  I don't know.  I'm leery.  I

would rather set it earlier and if we have to roll over, say,

I'll give first day motions an hour on the 17th and everything

else gets the rest of it.

My thought is at that point you're in town.  People

would be in town and it would give us some flexibility, but I'm

not going to just flop it on the same day because I'm a worst

case scenario-type person.  A worst case scenario is it's not a

one-day hearing.  And frankly, it's the biggest issue in the

case honestly probably at this point, so I suspect it will take

at least one day, if not more.

MR. McKANE:  Your Honor, we agree with that.

THE COURT:  All right.

MR. PFISTER:  We agree with that, too, Your Honor.

The one thing I would ask -- the one further thing I'd ask

for --

 1          THE COURT:  I know who you are, but do you want to

 2   state your name for the record, please.

 3          MR. PFISTER:  Oh, I apologize.  Rob Pfister from the

 4   Klee Tuchin firm on behalf of the Aylstock firm.

 5          Is a briefing schedule on the TRO and I ask that

 6   because, you know, the debtor has put in its declarations and

 7   briefs and --

 8          THE COURT:  Well, we're not a TRO anymore.  This

 9   would be preliminary injunction.

10          MR. PFISTER:  Pardon me.  On the preliminary

11   injunction.  I misspoke.  The debtor has put in its motion and

12   its evidentiary submissions and, you know, to the extent -- and

13   the time for --

14          THE COURT:  Well, nothing is in evidence right now

15   except for the declaration with respect to the first day

16   motions.

17          MR. PFISTER:  Correct, yes.

18          THE COURT:  There is no evidence in the record right

19   now.

20          MR. PFISTER:  Right.  I misspoke --

21          THE COURT:  I'm anticipating live people --

22          MR. PFISTER:  Probably declarations, yes.

23          THE COURT:  -- testifying.

24          MR. PFISTER:  Oh, okay.

25          THE COURT:  Because that's what I want.

1          MR. PFISTER:  Okay.

2          THE COURT:  So it's going to be live people

3     testifying.  We're not going to be testifying with a piece of

4     paper.  It's going to be real live testimony.

5          MR. PFISTER:  Excellent.  Okay.  So --

6          UNIDENTIFIED SPEAKER:  Understood, Your Honor.

7          MR. PFISTER:  Okay.  Very good.  Thank you.

8          THE COURT:  And if you want to do a briefing

9     schedule, I'm not going to set a briefing schedule because,

10    again, I -- I don't know what you want to do.  If you want to

11    file briefs, that's great.

12         So maybe say if you're going to file a brief, file a

13    brief on or before the 11th, which gives me Friday and the

14    weekend to look at it, but I'm not going to set a briefing

15    schedule because I -- it's going to be evidence honestly.

16         MR. PFISTER:  Right.

17         THE COURT:  It's going to be facts.  I -- the

18    standards I don't think anyone is going to dispute.  We're not

19    at a TRO so it's -- which is the same standard as a preliminary

20    injunction, but it's the same thing.  I understand there's also

21    the request for a stay in there as well, but they're one and

22    the same largely.

23         MR. PFISTER:  Speaking (indiscernible) has the better

24    view on that than Mr. Bernick.  I'll weigh in, but --

25         THE COURT:  Well, you could change your opinion on

109

1  that in a little bit, too --

2          MR. PFISTER:  -- if he's uncomfortable, I won't.

3          THE COURT:  -- so I appreciate you telling him I'm

4  right, but I suspect everyone will tell me I'm wrong at some

5  point, so it's just a matter of time, and then we'll go from

6  there.

7          I would ask debtors to prepare an order setting the

8  preliminary injunction hearing, as well as what I just stated

9  as far as if you want to file a brief, file it by then on the

10  11th.  And if you can do that within three days as opposed to

11  the five.

12         MR. McKANE:  Absolutely, Your Honor.  We were just

13  going to --

14         THE COURT:  And not from 7:30 to 8:00 tonight.

15         MR. McKANE:  That's exactly where I was going.

16         THE COURT:  Do not do that because you'll get

17  rejected.  All right.

18         With some trepidation based upon previous cases in

19  the district, is there anything else that we need to address

20  today?

21         MR. BERNICK:  Not from the debtor.  Thank you, Your

22  Honor.

23         THE COURT:  All right.  Nothing from the debtors?

24         MR. McKANE:  Nothing from the debtors and thank you

25  for your time.

1           THE COURT: All right. Anything from the tort

2 claimants?

3           MS. HOEKSTRA: No, Your Honor.

4           THE COURT: Wait, did I miss something? Hang on.

5 Let's see if I messed up. All right. Anything from the U.S.

6 Trustee's Office?

7           UNIDENTIFIED SPEAKER: No, Your Honor.

8           THE COURT: All right. So two other Klee matters.

9 We need an agreed entry because that's how I said I wanted to

10 resolve the TRO and --

11           MR. McKANE: I'll do it in three days.

12           THE COURT: That's fine. And when I get an order or

13 an agreed order from parties, I assume it's been circulated and

14 is agreed to by the parties. If there is a dispute, please

15 email chambers and say there's a dispute and I can do a

16 telephonic with regard to those brief issues on something if

17 there's a dispute with regard to what's in an order.

18           MS. HOEKSTRA: And, Your Honor, just to clarify

19 that --

20           THE COURT: Come to a microphone.

21           MS. HOEKSTRA: I know. Do have a loud voice. Just

22 to clarify, there's no discovery schedule, but obviously we can

23 contact the debtors' counsel and work out deposition dates that

24 we're going to want to take.

25           THE COURT: If that works, that's fine. Yes.

1          MS. HOEKSTRA:  Okay.

2          THE COURT:  But if the schedule doesn't work and you

3  come here and say, I couldn't depose them, it's probably not

4  going to be a mistrial or excluded evidence, but -- because,

5  again, I think you get all of your good stuff and a permanent

6  injunction, not a preliminary injunction.  I could be wrong,

7  but to the extent they agree, that's fine.

8          MS. HOEKSTRA:  Well, the preliminary injunction is a

9  final order, so -- and it will go on perhaps to confirmation of

10  the plan, so it's not --

11          THE COURT:  Perhaps.

12          MS. HOEKSTRA:  -- unusual to do discovery prior to

13  that.

14          THE COURT:  But it's not also completely usual, so --

15          MS. HOEKSTRA:  Well, hopefully we can work it out.

16          THE COURT:  Well, that's always the hope.

17          All right.  Anything else?

18          MR. McKANE:  Once again, no, Your Honor.

19          THE COURT:  Okay.  Nothing from the tort claimants,

20  nothing from the U.S. Trustee?

21          UNIDENTIFIED SPEAKER:  Correct.

22          THE COURT:  The gallery, which is mostly everyone

23  else I just mentioned.  I love it.

24          Anyone on Zoom or telephone that is not represented

25  by any of the three parties I just stated?

1      MS. CYGANOWSKI:  Your Honor, Melanie Cyganowski,

2  counsel for Seeger Weiss.  Just a quick question and I don't

3  know if the U.S. Trustee is prepared to answer this.  And that

4  is, whether or not there is an intention to appoint a committee

5  within the next three weeks so that the committee would be

6  participating in connection with the preliminary injunction

7  hearing given the importance in its impact on all the tort

8  claimants.

9      THE COURT:  They're conferring right now.

10     UNIDENTIFIED SPEAKER:  We are working to -- we're

11 going to start working on that.  In other words, first day.  So

12 hopefully, but we can't give a timeline.

13     THE COURT:  All right.  So did you hear that?  Their

14 intent is they'll start work on it as soon as they can, but

15 they can't guarantee anything will be formed by that point.

16     MS. CYGANOWSKI:  I appreciate it, Your Honor.  Thank

17 you.

18     THE COURT:  Did I accurately state that?

19     UNIDENTIFIED SPEAKER:  Yes, Your Honor.

20     THE COURT:  Okay.  Sometimes I get in lawyer mode and

21 slightly change things the way I want to hear them when I

22 restate them, so I apologize.

23     All right.  All right.  Seeing nothing, thank you for

24 your time.  I appreciate it.  I look forward to working with

25 you.  Everything was very well presented.  I appreciate

113

1  everyone being courteous and decorous with each other, even

2  though I know you've been through a lot and have some probably

3  it will be a mild understatement slight disagreements with

4  regard to how the case is going, but thank you for that.  I

5  look forward to working with you.

6        To the extent we can be of assistance on anything on

7  our end that might make things work smoother, feel free to

8  suggest them.  Not to me because I don't make any decisions on

9  that end, but we'll try to make this case run as smoothly as --

10 on our end as we can for you all and I will look forward to

11 seeing you what appears to be one or two times in August.

12        UNIDENTIFIED SPEAKER:  Thank you, Your Honor.  And

13 thank you to your staff for their time.  We know we dumped a

14 lot of paper on you in a 24-hour span and thank you for the

15 Office of the United States Trustee for working with us to try

16 and narrow the issues as much as possible.

17        THE COURT:  Very good.  All right.  Thank you

18 everyone.  Safe travels back if you're going anywhere and with

19 that, we are adjourned.

20        ATTORNEYS:  Thank you, Your Honor.

21             *  *  *  *  *  *

22

23

24

25

1 **C E R T I F I C A T I O N**

2       We, KAREN WATSON and RUTH ANN HAGER, court approved

3 transcribers, certify that the foregoing is a correct

4 transcript from the official electronic sound recording of the

5 proceedings in the above-entitled matter, and to the best of

6 our ability.

7

8 /s/ Karen Watson

9 KAREN WATSON

10

11 /s/ Ruth Ann Hager

12 RUTH ANN HAGER

13 J&J COURT TRANSCRIBERS, INC.     DATE:  August 1, 2022

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit L**

**MDL Court Denial of Keller TRO Motion**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to: All Cases | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## ORDER

Plaintiff Richard Valle's *Ex Parte* Motion for a Temporary Restraining Order ("TRO"), ECF No. 3332 is pending. 3M Company filed a response in opposition, ECF No. 3337. Plaintiff's motion requests a TRO "for seven days to enjoin 3M from taking any action outside of this MDL to enjoin other parties from pursuing their CAEv2 claims against 3M." ECF No. 3332 at 1.

A district court may grant a TRO or preliminary injunction only when there is (1) a substantial likelihood of success on the merits; (2) the plaintiff will suffer irreparable injury absent an injunction; (3) the threatened injury to the plaintiff outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction would not be adverse to the public interest. *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1307 (11th Cir. 2010). A restraining order is "an extraordinary and drastic remedy" and may be granted only where the moving party has "clearly established" that each of these four requirements is satisfied. *Siegel v.*

Case 3:19-md-02885-MCR-GRJ Document 3373 Filed 08/09/22 Page 584 of 591

*LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal marks omitted). Given that there is presently no automatic stay in place as to 3M Company and the bankruptcy court's decision on whether the automatic stay will apply to 3M Company will not be made until August 18 or later, as well as the fact that the parties have stipulated to continuing Wave 3 discovery deadlines within the MDL, the Court finds that Plaintiff has failed to show irreparable harm absent a seven-day TRO. Accordingly, Plaintiff's *Ex Parte* Motion for a TRO, ECF No. 3332, is **DENIED**.

**DONE AND ORDERED** this 28th day of July 2022.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

## Exhibit M

**Email from Ashley Barriere of Keller Postman**

| From: | Ashley Barriere |
|-------|-----------------|
| To: | jgreen@whitecase.com; jessica.lauria@whitecase.com |
| Cc: | Smith, Renee D.; Horowitz, David I.; Ashley Keller; Nicole Berg; Frank Dylewski; Amanda Hunt; dave@herndonresolution.com |
| Subject: | In re 3M MDL 2885 |
| Date: | Wednesday, August 3, 2022 1:02:10 PM |

---

**This message is from an EXTERNAL SENDER**
Be cautious, particularly with links and attachments.

Counsel—

We intend to renew our motion seeking the relief sought by the Motion for the Temporary Restraining Order against 3M Company filed last week. MDL Dkt 3332. As 3M opposed that motion, MDL. Dkt. 3335, we assume your position has not changed and will oppose this motion. We are, however, happy to meet and confer over the next hour if you prefer.

Many thanks,
Ashley


**Ashley Barriere**
Associate

# Keller | Postman

312.210.7307 | Email | Bio | Website

<u>**Exhibit N**</u>

**MDL Court Briefing Schedule on PI Motion**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS
EARPLUG PRODUCTS
LIABILITY LITIGATION

Case No. 3:19md2885

This Document Relates to All Cases

Judge M. Casey Rodgers
Magistrate Judge Gary R. Jones

## ORDER

Plaintiff Richard Valle has filed an Emergency Motion for Preliminary Injunction Against 3M Company. *See* ECF No. 3358. Given the urgency of the above motion, Defendant 3M Company is directed to file its response, if any, by August 9, 2022 at 5 p.m. Central. Plaintiff's reply, if any, is due by August 10, 2022 at 5 p.m. Central. Oral argument on the matter will be held on August 11, 2022 at 10 a.m. Central at the United States District Court, One North Palafox Street, Courtroom 5, Pensacola, Florida. Each side must advise the Court of who will argue on its behalf by August 10, 2022 at 5 p.m. Central. Counsel who will present argument must appear in person.

**SO ORDERED**, on this 3rd day of August, 2022.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

**Exhibit O**

**Chad Husnick Letter**

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

Chad Husnick
To Call Writer Directly:
+1 312 862 2009
chad.husnick@kirkland.com

300 North LaSalle
Chicago, IL 60654
United States

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

August 4, 2022

**By Email**

Ashley C. Keller
Nicole C. Berg
Ashley Barriere
Frank G. Dylewski

**KELLER POSTMAN LLC**
150 North Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Phone: (312) 741-5220
Facsimile: (312) 971-3502

> Re: *In re Aearo Technologies LLC, et al.*, Case No. 22-2890-JJG-11
> (Bankr. S.D. Ind.)

Dear Counsel:

On July 26, 2022 (the "Petition Date"), Aearo Technologies LLC and its debtor affiliates (collectively, the "Debtors") commenced the above referenced cases pending under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Indiana (the "Bankruptcy Court"). As counsel for the Debtors, I write in regards to the motion seeking a preliminary injunction (the "Motion"), which your law firm filed on August 3, 2022, before the United States District Court for the Northern District of Florida in *In re 3M Combat Arms Earplug Liability Litigation* (MDL No. 2885) [MDL Docket No. 3358].

Your filing of the Motion violates the automatic stay imposed under section 362(a) of the Bankruptcy Code,[1] which enjoins "all parties" from taking certain actions against the Debtors or interfering with property of their estate. These acts include (i) "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or

---

[1] Similarly, the four "Notice[s] of Potential Tag-Along Action" that your law firm filed before the United States Judicial Panel on Multidistrict Litigation (in the week following the Petition Date) also constitute violations of the automatic stay.

Austin   Bay Area   Beijing   Boston   Brussels   Dallas   Hong Kong   Houston   London   Los Angeles   Munich   New York   Paris   Salt Lake City   Shanghai   Washington, D.C.

# KIRKLAND & ELLIS LLP

August 4, 2022
Page 2

other action or proceeding against the debtor," and (ii) "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate," which is broadly defined under section 541 of the Bankruptcy Code to include "all legal or equitable interests of the debtor" as of the Petition Date. *See* 11 U.S.C. §§ 362(a)(1), (3), 541.

Among other things, the Motion seeks to enjoin 3M Company ("3M") from "supporting" the Debtors' restructuring efforts, thereby interfering with property of the Debtors' estates within the meaning of section 541 of the Bankruptcy Code. And if granted, the relief requested in the Motion would interfere with certain contracts of the Debtors, including the Funding and Indemnification Agreement[2] as well as various other agreements requiring 3M to provide certain Shared Services (as defined in the Funding and Indemnification Agreement) to the Debtors.

Your repeated attempts to interfere with the Debtors' property or otherwise impede their restructuring efforts outside of the Bankruptcy Court constitute willful violations of the automatic stay. Pursuant to established case law, actions taken in violation of the automatic stay are void, and parties may be subject to imposition of fees, costs, and expenses, including attorneys' fees and punitive damages, among other things. *See Randolph v. IMBS, Inc.*, 368 F.3d 726, 728 (7th Cir. 2004); *Cent. States, Se. and Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369 (7th Cir. 1992); *Fidelity Mortg. Inv'rs v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir. 1976), *cert. denied*, 429 U.S. 1093 (1977); *see also* 11 U.S.C. § 362(k). The Debtors hereby reserve all of their rights at law and in equity with respect to any damages that may arise from, or relate to, actions taken by you and/or your client in violation of the automatic stay or other applicable law, including recovery of fees, costs, and expenses associated with objecting to the Motion and prosecuting a motion to enforce the automatic stay.

The Debtors request that you immediately withdraw or appropriately amend the Motion. Please confirm in writing by tomorrow at 10:00 a.m. (prevailing Central Time) whether you intend to withdraw or appropriately amend the Motion consistent with the foregoing.

Sincerely,

Chad Husnick

---

[2]     The term "Funding and Indemnification Agreement" refers to that certain funding and indemnification agreement dated as of July 25, 2022, by and among the Debtors and 3M, attached as Exhibit B to the Debtors' first day declaration [Docket No. 11-2].