# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS
EARPLUG LITIGATION
LIABILITY LITIGATION

This Document Relates to:
*All Wave 1 Cases*

CASE NO.: 3:19-MD-2885-MCR-GRJ

Chief Judge M. Casey Rodgers
Magistrate Judge Gary Jones

**DEFENDANT'S RESPONSE TO PLAINTIFFS' OMNIBUS MOTION AND MEMORANDUM OF LAW TO EXCLUDE DEFENDANT'S WAVE 1 EXPERT OPINIONS AND TESTIMONY**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

ARGUMENT .........................................................................................2

I.   James Crawford, M.D. ............................................................2

    A.   Crawford's Opinion That Tinnitus Rarely Occurs Without Noise-Induced Hearing Loss Is Reliable. ...................2

    B.   Crawford Supported His Opinion That 95% of People With Tinnitus Develop Coping Strategies. .....................3

    C.   Crawford Supported His Opinion That Noise-Induced Hearing Loss Does Not Affect Low Frequencies. ...................................................................4

    D.   The Court's Prior Decisions Dispose of Plaintiffs' Objection to Crawford's Testimony Regarding DD2215 and DD2216. ..................................................5

    E.   Crawford's Opinions On Test-Retest Variability Are Based On Ample Experience. ...............................................5

    F.   Crawford's Opinion Regarding The Prevalence of Hearing Loss in Diabetics Is Reliable. .........................................6

    G.   Crawford's Ototoxicity Opinions Are Reliable. .........................7

    H.   Crawford's Somatic Tinnitus Opinion Is Well-Supported. ..................................................................8

    I.   This Court Has Already Permitted Crawford's Testimony on Military Hearing Loss Prevalence. .....................9

    J.   Crawford's Opinion Regarding Ruptured Eardrums Caused By Blast Exposure Was Disclosed And Well-Supported. ........................................................10

II.   Jennifer LaBorde, Au.D. ......................................................10

    A.   LaBorde's Opinions Concerning Noise-Induced Tinnitus and Hearing Loss Are Supported By Her Clinical Experience And Scientific Literature. .........................10

B.    LaBorde's Blast and Head Injury Opinions Are Sufficiently Supported By Reliable and Scientific Data. ...................................................................12

III.    Karthik Rajasekaran, M.D. ...............................................15

A.    Plaintiffs Misconstrue Rajasekaran's Testimony Regarding the Opinions He Intends To Offer. ...........15

B.    Rajasekaran is Highly Qualified to Provide Opinions Regarding Hearing Protection Devices. ...................16

C.    Rajasekaran Is An Expert With Knowledge Of What Causes Hearing Loss And Tinnitus. ................17

D.    Rajasekaran's Opinions on Cochlear Synaptopathy, Hidden Hearing Loss, and Otoacoustic Emissions are Within His Area of Expertise and Supported by Scientific Literature. ...................................................18

E.    Rajasekaran's Opinions Regarding Tobacco, Substances in Fuel, And Alcohol Are Well-Supported. ...................................................................20

F.    Rajasekaran's Opinions Regarding Ototoxic Medications Are Admissible Based on His Education, Training, And Experience. ......................22

G.    Rajasekaran Never Opined That There Are "No Known Causes of Tinnitus." ...................................23

IV.    M. Charles Liberman, Ph.D. ...............................................24

A.    Liberman's Opinions On Hidden Hearing Loss Diagnosis Are Based On Ample Experience. ...........26

B.    Liberman's Opinions Relating to TBI and Ototoxicity Are Based On His Significant Research And Experience. ...........................................................28

V.    John Bertelson, M.D. ...............................................29

VI.    W. Chatham, M.D. ...............................................34

VII.    Kenneth Billheimer, Au.D. ...............................................36

A.    Billheimer Is Qualified to Offer His Opinions. ........36

B.    Billheimer's Opinions Are Reliable. ........................37

        C.       Billheimer's Opinions Are Helpful to the Jury..........................41

VIII.   Jennifer Tufts, Ph.D...................................................................42

        A.       Tufts is Qualified to Render Her Opinions...............................42

        B.       Tufts's Opinions Are Reliable. ...................................................44

IX.     Richard Neitzel, Ph.D..............................................................46

X.      Gregory Flamme, Ph.D.; Mark Stephenson, Ph.D.; Steve
        Tasko, Ph.D.; And William Murphy, Ph.D..........................................50

        A.       SASRAC'S Opinions Are Reliable. ...........................................51

        B.       Murphy's Opinions Should Not Be Excluded. ..........................55

XI.     E. Scott Elledge, M.D................................................................59

        A.       Elledge Is Well-Qualified to Offer His General
                 Opinions. ...................................................................................61

        B.       Elledge's Opinions Are Based on His Medical
                 Expertise And Experience Implementing A Military
                 Hearing Conservation Program....................................................64

XII.    Dennis Driscoll.......................................................................67

XIII.   Stan Phillips, M.D. ..................................................................69

XIV.    Consistent With The Parties' Joint Stipulation, The
        Court's Prior Daubert Rulings Should Apply To All
        General Experts In Wave Cases. ........................................................70

CONCLUSION ...................................................................................72

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Arevalo v. Coloplast Corp.*,
   2020 WL 3958505 (N.D. Fla. July 7, 2020) ......................................................20

*Aycock v. R.J. Reynolds Tobacco Co.*,
   769 F.3d 1063 (11th Cir. 2014) ........................................................................32

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ................................................................................. *passim*

*DeLuca by Deluca v. Merrell Dow Pharms., Inc.*,
   911 F.2d 941 (3d Cir. 1990) ..............................................................................53

*Garcia v. Scottsdale Ins. Co.*,
   2019 WL 1318090 (S.D. Fla. Mar. 22, 2019) ..................................................39

*Hendrix ex. rel. G.P. v. Evenflo*,
   609 F.3d 1183 (11th Cir. 2010) ..........................................................................7

*Hendrix v. Evenflo*,
   255 F.R.D. 568 (N.D. Fla. 2009) ......................................................................16

*In re Aearo Technologies LLC, et al.*,
   Case No. 22-02890-JJG-11 (Bankr. S.D. Ind.) ..................................................1

*In re Abilify (Aripiprazole) Prod. Liab. Litig.*,
   299 F. Supp. 3d 1291 (N.D. Fla. 2018) ............................................................61

*In re Omeprazole Patent Litig.*,
   2005 WL 818821 (S.D.N.Y. Feb. 18, 2005) ....................................................57

*In re Processed Egg Prods. Antitrust Litig.*,
   81 F. Supp. 3d 412 (E.D. Pa. 2015) ..................................................................37

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ..........................................................................................44

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
   326 F.3d 1333 (11th Cir. 2003) ..........................................................................3

**Page(s)**

*United States v. Frazier,*
    387 F.3d 1244 (11th Cir. 2004) ...................................................15, 30

**Statutes**

11 U.S.C. Chapter 11 ...................................................................1

11 U.S.C. § 362 .........................................................................1

**Rules**

Fed. R. Civ. P. 26(a)(2)...........................................................16, 56

Fed. R. Civ. P. 37 ......................................................................57

Fed. R. Evid. 403 .................................................................40, 46

Fed. R. Evid. 703 ......................................................................46

## INTRODUCTION

Plaintiffs' motion to exclude Defendant's[1] Wave 1 general experts mischaracterizes the experts' opinions, ignores their qualifications and the methodologies they use, and selectively quotes and misinterprets deposition testimony.   At most, Plaintiffs' points are suitable for "[v]igorous cross-examination" and the "presentation of contrary evidence"—not exclusion.   *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).   Plaintiffs' motion should be denied.[2]

---

[1] On July 26, 2022, Defendants 3M Occupational Safety, LLC, Aearo Holding LLC, Aearo Intermediate LLC, and Aearo Technologies LLC filed voluntary petitions for relief under Chapter 11, Title 11 of the U.S. Code in the U.S. Bankruptcy Court for the Southern District of Indiana.   *See In re Aearo Technologies LLC, et al.*, Case No. 22-02890-JJG-11 (Bankr. S.D. Ind.) (Jointly Administered).   Those debtors do not join in this Response due to their filing for bankruptcy and operation of the automatic stay, *see* 11 U.S.C. § 362.   Defendant 3M reserves all rights with respect to the Motion, pending in the U.S. Bankruptcy Court for the Southern District of Indiana, Case No. 22-02890, Adv. Proc. No. 22-50059, for Declaratory and Injunctive Relief (I) Declaring that the Automatic Stay Applies to Certain Actions Against a Non-Debtor or (II) Preliminarily Enjoining Certain Actions Against a Non-Debtor and (III) Granting a Temporary Restraining Order Pending an Order on the Preliminary Injunction.

[2] Internal quotation marks, citations, modifications, and deposition objections are omitted from quotes unless otherwise indicated.   This memorandum uses *supra* and *infra* to cross-reference the pages containing relevant authorities.

# ARGUMENT

## I.    James Crawford, M.D.

Crawford is a board-certified otolaryngologist and neurologist who served in the Army for twenty-four years.  He was the Chief of Otology/Neurotology at the Madigan Army Medical Center and represented the Army on the Executive Committee of the Hearing Center of Excellence.  Ex. 1, Crawford Report 2, App'x B.

### A.    Crawford's Opinion That Tinnitus Rarely Occurs Without Noise-Induced Hearing Loss Is Reliable.

Crawford's opinions that tinnitus associated with noise rarely occurs in the absence of noise-induced hearing loss and that tinnitus is not a precursor to or symptom of noise-induced hearing loss occurring later in time are grounded in his clinical experience over 25 years with more than 100,000 patients, 50–60% of whom had tinnitus.  Ex. 2, Kelley Trial Tr. 2393:19–25; Ex. 1, Crawford Report at 20. Plaintiffs seek to exclude Crawford's opinion because they disagree with his conclusion and rely on documents reporting that tinnitus might be an early sign of NIHL.  PltfsMot. 5-6.  But the sources Plaintiffs cite do not contradict, much less require exclusion of, Crawford's opinion.  Instead, they report that tinnitus may present when hearing loss is "not considerable" or "obvious"—not, as Plaintiffs maintain, when hearing loss is nonexistent.  PX4 at 5; PX3 at 2.

Moreover, Plaintiffs' disagreement with Dr. Crawford's opinion based on his clinical experience goes to weight and credibility, not admissibility, and can be

addressed through cross-examination and competing expert testimony.  *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003).

### B.    Crawford Supported His Opinion That 95% of People With Tinnitus Develop Coping Strategies.

Plaintiffs incorrectly assert (PltfsMot. 5-6) that Crawford has no support for his opinion that 95% of people with tinnitus develop coping strategies and have no significant problem with it.  *See* Ex. 1, Crawford Materials Considered 4-6, *citing* Ex. 3, Humes, *Noise and Military Service* 119 (2006) ("Most people with tinnitus report few problems"), Ex. 4, Michiels, *Diagnostic Criteria for Somatosensory Tinnitus* 2 (2018) ("[Tinnitus] occurs in approximately 10% to 15% of adults and is experienced as severely annoying by 1.6%"), Ex. 5, Yurgil, *Prospective Associations Between Traumatic Brain Injury and Postdeployment Tinnitus In Active-Duty Marines* 1 (2016) ("1% to 3% of patients with tinnitus experience long-term health consequences").  Further, Crawford has considerable clinical experience with this issue, having seen tens of thousands of patients with tinnitus in his decades of practice.  His opinion is reliably supported by literature and clinical experience, and properly disclosed, addressing the Court's concerns articulated in *Beal*.  *See Beal* Dkt. 130 at 12 n.5 (excluding opinions "without a reliably supported and properly disclosed scientific basis.").

### C. Crawford Supported His Opinion That Noise-Induced Hearing Loss Does Not Affect Low Frequencies.

Crawford's materials considered list includes sources supporting his opinion that noise-induced hearing loss does not affect low frequencies. *See* Ex. 1, Crawford Materials Considered 4, *citing* Ex. 3, Humes, *Noise and Military Service* 21 ("[A] hallmark of noise-induced hearing loss is the appearance of a hearing loss for high-frequency sounds … Frequently, hearing is normal or near normal at lower frequencies (<1000 Hz)"). Plaintiffs cite other sources they believe contradict Crawford's opinion, but the literature they cite is either irrelevant to or supportive of Crawford's opinions. Joseph 2018, for example, describes *blast*-induced hearing loss, not *noise*-induced hearing loss; as Crawford explains, these two types of injury are different and can cause different patterns of hearing loss. PX9; Ex. 1, Crawford Report 21–22. The ACOEM Guidance Statement likewise supports Crawford's opinion. Ex. 6, Mirza, *Occupational Noise-Induced Hearing Loss* 498 (2018) ("In early NIHL, average hearing thresholds at the lower frequencies of 500, 1000, and 2000 Hz are better than average thresholds at 3000, 4000, and 6000 Hz"). Ultimately, Plaintiffs' concerns are suitable for cross-examination, not a basis for exclusion.

### D. The Court's Prior Decisions Dispose of Plaintiffs' Objection to Crawford's Testimony Regarding DD2215 and DD2216.

This Court has held that "Dr. Crawford's experience is a sufficiently reliable basis for his opinions and explanations of the Hearing Center of Excellence, the regulations governing the Army Hearing Program, and the importance of training and instruction relating to, and fitting of, hearing protection devices." Dkt. 1651 at 16; *see also* Dkt. 1910 at 8. Crawford's explanation of Forms DD2215 and DD2216 is based on his experience and falls well within the scope of the Court's holding. Crawford did not "concede[] under oath that these forms do not accurately report HPD use;" he instead acknowledged that he "heard that testimony" from someone else. PltfsMot. 7-8; PX11 at 116:13–118:19. At bottom, Plaintiffs disagree with Crawford's testimony about the forms and believe other evidence contradicts it, but this is an issue for cross-examination, not a basis for exclusion.

### E. Crawford's Opinions On Test-Retest Variability Are Based On Ample Experience.

Crawford's opinions regarding what constitutes generally accepted test-retest variability for military screening and diagnostic audiograms are based on his experience as an otologist and neurotologist in the U.S. Army for 24 years in roles including Professional Supervisor of the Hearing Conservation Program at Ft. Lewis, Regional Director of the DoD Hearing Center for Excellence, and Assistant Program Director and Chief Otologist and Neurotologist at the Madigan Army

Medical Center.  Crawford's firsthand experience is, as this Court has already held, sufficient basis for his general opinions regarding the Army Hearing Program. Dkt. 1651 at 16; *see also* Dkt. 1910 at 8.  Plaintiffs cite to a different standard for test-retest variability for screening audiograms, PltfsMot. 8, but that contrary evidence is grounds for cross-examination, not exclusion.

### F.    Crawford's Opinion Regarding The Prevalence of Hearing Loss in Diabetics Is Reliable.

Plaintiffs do not, and cannot, dispute that diabetes is associated with hearing loss.  Instead, Plaintiffs challenge Crawford's basis to opine that hearing loss is twice as prevalent in individuals with diabetes as those without.  PltfsMot. 17.  But Spankovich, Plaintiffs' expert, has cited research showing exactly that.  Ex. 7, Spankovich, *Evaluation and Management of Patients with Diabetes and Hearing Loss* 6 n.12 (2019) (*citing* Ex. 8, Bainbridge, *Diabetes and hearing impairment in the United States* 1 (2008) ("For low/mid frequency hearing impairment … age-adjusted prevalence estimates … were **21.3**% … among … adults with diabetes and **9.4**% … among … adults without diabetes") (emphases added)).  And Plaintiffs' claim that Crawford cited no support for this statistic is incorrect.  Ex. 1, Crawford Materials Considered 4 (*citing* Ex. 9, Katz, *Handbook of Clinical Audiology* 631 (2015)).  There is therefore no basis to exclude his opinion.

6

### G.   Crawford's Ototoxicity Opinions Are Reliable.[3]

***Salicylates***.   Crawford's opinion that salicylates can cause hearing loss or tinnitus are reliable.  Contrary to Plaintiffs' implication, Crawford's sources do not say that salicylate-induced hearing loss and tinnitus always resolve, merely that they "usually" do.  Ex. 10, Coelho, *Classification of Tinnitus* 520 (2020); *see also* Ex. 3, Humes, *Noise and Military Service* 6 (identifying salicylates as risk factor for tinnitus).   Plaintiffs' belief that they have evidence contradicting Crawford's opinions is not grounds for exclusion.

Nor is Crawford's opinions being grounded in "possibility" rather than "probability" a basis for exclusion.  PltfsMot. 9.  This Court has repeatedly held that defense experts need not "prove alternative-cause theories with … probability." Dkt. 2218 at 45 & n.26.  Consideration of "*possible* causes" is in fact the appropriate way to conduct a differential etiology.  Dkt. 2290 at 21 (quoting *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1195 (11th Cir. 2010)) (emphasis added).

***Toxic Solvents***.   Plaintiffs' arguments on this issue rest entirely on their reading of the Court's decision in *Beal*, which nowhere mentions solvents.  Dkt. 142. Crawford provides a reliable basis for his opinion.  *See* Ex. 1, Crawford Materials Considered C-4, *citing* Ex. 3, Humes, *Noise and Military Service* 47 (noting

---

[3]   Defendant acknowledges the Court's prior rulings regarding the ototoxicity of marijuana and preserve their arguments on that issue.  *See* Dkt. 3321.

"exposures to solvents" can "produce hearing loss"). What's more, Plaintiffs' expert agrees with this conclusion and Plaintiffs' evidence supports it. *See* Dkt. 1605, Defs.' 1/8/21 Omnibus *Daubert* Mot. at Ex.7 (Packer General Report 18-19) ("A variety of … exposures may result in cochlear SNHL, including … [o]totoxic medications, including … industrial solvents"); PX5 ¶ 2-8(b) ("Organic solvents are the most commonly identified chemical ototoxins").

### H.    Crawford's Somatic Tinnitus Opinion Is Well-Supported.

Crawford's opinion that "[s]omatic tinnitus is widespread among tinnitus sufferers" is supported not only by his 25 years of clinical experience treating tinnitus, but also by the literature he considered when drafting his report. *See* Ex. 1, Crawford Materials Considered 4–6, *citing* Ex. 11, Levine, *Somatic Tinnitus* 109 (2004) (reporting prevalence of up to 80%), Ex. 12, Shore, *Neural Mechanisms Underlying Somatic Tinnitus* 107 (2007) (reporting prevalence of "[a]pproximately two-thirds of individuals with tinnitus"), Ex. 13, Ralli, *Somatic Modulation of Tinnitus* 112 (2016) (reporting prevalence of "one to two-thirds of [tinnitus patients] with different patient series ranging between 65% and 83%"), Ex. 4, Michiels, *Diagnostic Criteria For Somatosensory Tinnitus* 2 (2018) (reporting prevalence of "16% to 83%"), Ex. 14, Michiels, *Conservative Therapy For The Treatment of Patients With Somatic Tinnitus Attributed To Temporomandibular Dysfunction* 2 (2018) (reporting prevalence of "36–43%"). Plaintiffs cite both Michiels articles to

support their argument that somatic tinnitus is less common than noise-induced tinnitus; but neither says that.

Nor is a diagnosis of somatic tinnitus required for Crawford's opinions to be helpful and relevant. Defense experts can provide "evidence of potential alternative causes … without needing to prove those alternative-cause theories with certainty or probability." Dkt. 2218 at 45 & n.26; *see also Kelley* Dkt. 131 at 9-10 (rejecting argument that alternative cause diagnosis was required). Where evidence of somatic tinnitus is offered as an alternative cause, Crawford's opinion on the condition will be both relevant and helpful.

## I.     This Court Has Already Permitted Crawford's Testimony on Military Hearing Loss Prevalence.

This Court has already rejected Plaintiffs' challenge to Crawford's statement that "Servicemembers … have significant threshold shifts at higher rates than considered appropriate in industrial hearing conservation programs." That same language was present in Crawford's Group D General Expert Report, Plaintiffs challenged its admissibility, and the Court denied their motion. Ex. 1, Crawford Report 31; Dkt. 2716 at 7; Dkt. 2845 at 21. Plaintiffs have identified no reason for the Court to revisit or change its past ruling.

### J. Crawford's Opinion Regarding Ruptured Eardrums Caused By Blast Exposure Was Disclosed And Well-Supported.

Plaintiffs object to Crawford's opinion that ruptured eardrums occur from blast exposures even when wearing earplugs, arguing it was not disclosed or supported. Plaintiffs mischaracterize Crawford's report, which repeatedly explains that blasts can rupture eardrums. Ex. 1, Crawford Report 21–22 ("proximity to an IED … may result in ruptured eardrums"; "post-blast symptoms include[e] … tympanic membrane perforation"). Crawford nowhere qualified that opinion as depending on whether hearing protection was worn. His opinion is supported by "personal experience" over 25 years of clinical work that included "taking care of patients that have had that exact scenario." Ex. 15, Crawford Dep. 78:4-6. His opinion is also supported by literature included on his materials considered list. Ex. 1, Crawford Materials Considered C-3, *citing* Ex. 16, Fausti, *Auditory And Vestibular Dysfunction Associated With Blast-Related Traumatic Brain Injury* 798, 805 (2009).

## II. Jennifer LaBorde, Au.D.

### A. LaBorde's Opinions Concerning Noise-Induced Tinnitus and Hearing Loss Are Supported By Her Clinical Experience And Scientific Literature.

LaBorde's opinion that noise-induced tinnitus is not likely to occur in the absence of noise-induced hearing loss is properly supported, reliable, and does not warrant exclusion. LaBorde's opinion is based on 23 years of clinical experience

treating over 12,000 patients for hearing loss and tinnitus, including military veterans with noise-induced hearing loss and tinnitus, as well as established literature.  Ex. 17, LaBorde Report 2-3; *see also, e.g.*, Ex. 18, Dawes, et al., *Natural History of Tinnitus in Adults: A Cross-Sectional and Longitudinal Analysis* 7 (2020); Ex. 3, Humes, *Noise and Military Service: Implications for Hearing Loss and Tinnitus* 117 (2006).

Plaintiffs' arguments for exclusion are meritless.  LaBorde's opinions regarding noise-induced tinnitus do not contradict her prior testimony, which Plaintiffs mischaracterize.  To illustrate, Plaintiffs misconstrue LaBorde's testimony from *Kelley* to insinuate that she believes noise-induced tinnitus will present before hearing loss manifests because tinnitus is an early warning sign of an auditory injury. PltfsMot. 13.  However, LaBorde actually testified that "tinnitus *can* be an indicator of something happening in the auditory system" with the clarification that *"that auditory symptom [tinnitus] is not 100 percent attributed to only hearing related issues.*"  Ex. 2, 04/05/2022 Kelley Trial Tr. 2089:9-16 (emphasis added).  When asked again if she agreed whether "tinnitus may be an early indicator of damage to the auditory system" LaBorde did not affirm the complete sentiment as Plaintiffs erroneously imply.  *Id.* 2090:1-4.

The materials Plaintiffs cite to argue that noise-induced tinnitus occurs without or before hearing loss (Noise Manual, Army Hearing Program Pamphlet 40-

501, and 3M Technical Bulletins) do not contradict LaBorde's opinion. PltfsMot. 13 n.36. According to those sources, tinnitus can present when hearing loss is "not considerable" or "obvious"—not when the hearing loss is nonexistent. PX4 at 5; PX3 at 2.

At most, Plaintiffs' challenges to LaBorde's opinions regarding noise-induced tinnitus and hearing loss go to weight or credibility—not admissibility—and are not grounds for exclusion. Even if LaBorde's opinion were at odds with her past testimony—and it is not—this Court has held on multiple occasions that an expert's alleged contradiction, or failure to consider a specific factor or piece of evidence, does not automatically render that opinion or testimony unreliable or inadmissible. *See* Dkt. 1910 at 32, 38; *see also* Dkt. 1780 at 12. Rather, Plaintiffs' purported challenges to LaBorde's opinion and testimony are appropriately addressed through cross-examination. *Id.*

### B. LaBorde's Blast and Head Injury Opinions Are Sufficiently Supported By Reliable and Scientific Data.

LaBorde's opinions concerning blasts and head injuries are properly supported by scientific data, are reliable, and do not warrant exclusion. In conjunction with her 23 years of clinical experience, LaBorde relied on peer-reviewed studies published in reliable medical and scientific journals, including JAMA Network, to support her head injury and blast opinions. *See, e.g.*, Ex. 19, Boutté, et al., *Neurotrauma Biomarker Levels and Adverse Symptoms* 1 (2021);

Ex. 20, Tate, *Serum Brain Biomarker Level, Neurocognitive Performance, and Self-Reported Symptom Changes* 1 (2013); Ex. 16, *Fausti*, et al., *Auditory and Vestibular Dysfunction Associated with Blast-Related Traumatic Brain Injury* 1 (2009). Plaintiffs do not challenge the *reliability* of the literature LaBorde relies on, or the method she used, but instead take issue only with the persuasiveness of the *conclusions* that LaBorde draws from the literature. Again, this is a basis for cross-examination, not exclusion.

Plaintiffs argue that Boutté (2021) does not support LaBorde's opinion that "repeated exposures to lower-level blasts over time can result in…concussion-like symptoms, including hearing loss, tinnitus, and difficulty understanding speech" due to sustained brain inflammation, but this is incorrect.  Ex. 17, LaBorde Report 17. The Boutté study compared the serum biomarker levels between the control group and study population (consisting of servicemen and law enforcement with exposure to low-level blasts) and discovered that concentrations of Gilal fibrillary acidic protein (GFAP) were higher in the study population versus the control group. Ex. 19, Boutté, *Neurotrauma Biomarker Levels* 4.   This supports LaBorde's opinions because GFAP is a biomarker for brain inflammation.  *Id.* 2.  And the two most common symptoms reported from participants with elevated biomarkers for brain inflammation within the study population were "ear ringing (44 participants [58%]) [and] deafness (25 [33%])." *Id.* At 4.  This squarely supports LaBorde's

opinion that "repeated exposures to lower-level blasts over time can result in…concussion-like symptoms, including hearing loss, tinnitus, and difficulty understanding speech" due to sustained brain inflammation.  Ex. 17, LaBorde Report 17.

Similarly, the Carr study (2020) compared the medical records of over 50,000 soldiers with a military occupational specialty ("MOS") with a high likelihood of blast exposure to another 50,000 soldiers with a MOS without a high likelihood of blast exposure.  Ex. 21, Carr, et al., *Association of MOS-Based Blast Exposure With Medical Outcomes* 1 (2020).  The Carr study found that "service members in occupations that likely include repeated exposure to blast are at some increased risk for neurosensory conditions that present in medical evaluations." *Id.*  With regard to specific symptoms, the blast-related-MOS control study group "was more likely to have an ambulatory encounter for tinnitus…" *Id.* 6.  This does not contradict LaBorde's opinions—it bolsters them.

Finally, contrary to Plaintiff's argument, LaBorde does not ignore studies that noise from blast exposures can cause auditory damage. PltfsMot. 16.  LaBorde does not dispute that noise from blast exposures can cause cochlear damage and/or hearing loss.  Ex. 22, LaBorde Dep. 26:15-21.  Instead, LaBorde offers additional etiologies and mechanisms by which blasts and head injuries can result in hearing loss and tinnitus separate and apart from noise and cochlear damage.  Ex. 17,

LaBorde Report at 17-18.  There is no "analytical gap" between LaBorde's opinions and the evidence proffered by Plaintiffs.  PltfsMot. 16.  Plaintiffs simply do not like LaBorde's analysis and interpretation of the literature, which is not a basis for exclusion.  *See United States v. Frazier*, 387 F.3d 1244, 1272 (11th Cir. 2004).

## III.   Karthik Rajasekaran, M.D.

### A.   Plaintiffs Misconstrue Rajasekaran's Testimony Regarding the Opinions He Intends To Offer.

Plaintiffs contend that Rajasekaran seeks to testify on "opinions not disclosed in his general expert report, including … opinions concerning: the CAEv2, 3M's conduct, military fault, military HCPs, safer alternative designs, damages, or any individual plaintiff."   PltfsMot. 17. This assertion misconstrues Rajasekaran's deposition testimony, where he explained, "I don't know what I'd be asked in trial," but that he would offer opinions within the scope of his report, which includes "a broad overview of hearing [and] tinnitus."   Ex. 23, Rajasekaran Dep. 85:18-86:4. Plaintiffs' attorney agreed "that's a fair answer."  *Id.* 86:5-19.  Rajasekaran further explained that he "tried to summarize … six years of training in 20 pages." *Id.* 86:20-87:4.   When pressed on whether he has opinions regarding the 3M litigation not covered in the report, Rajasekaran explained "[a]ll I can talk about is my medical knowledge on hearing and tinnitus. And if there's some other question about specifics about hearing or tinnitus, or any of the other main topics I discuss in my report, I can still have an opinion . . . ." *Id.* at 87:5-20.  This Court should reject

Plaintiffs' unsupported speculation that Rajasekaran's willingness to answer questions at trial means he will "attempt to offer opinions at trial not contained within his expert report." PltfsMot. 16. Rajasekaran's opinions have been properly disclosed in accordance with Rule 26(a)(2).

### B. Rajasekaran is Highly Qualified to Provide Opinions Regarding Hearing Protection Devices.

Plaintiffs challenge Rajasekaran's qualifications to opine on "HPD-related" issues. PltfsMot. 17. But as the Court previously explained, "[t]he qualifications standard for expert testimony is 'not stringent' and '[s]o long as the witness is minimally qualified, objections to the level of [his] expertise [go] to credibility and weight, not admissibility.'" *Beal* Dkt. 142 (citing *Hendrix I*, 255 F.R.D. at 585).

Rajasekaran is not an expert as to what constitutes the ideal hearing protection device, nor is he offering opinions comparing the quality or design of different hearing protection devices. Ex. 23, Rajasekaran Dep. 16:14-17:4; 107:14-108:18. However, he is a board-certified otolaryngologist with six years in practice and over ninety peer-reviewed publications who serves as a peer-reviewer on the *Laryngoscope* journal and as an Editorial Board Member of the *ORL: Journal for Oto-rhino-laryngology and its Related Specialties*. Ex. 24, Rajasekaran Report 2; Rajasekaran CV 10-20. In his regular clinical practice, Rajasekaran recommends the use of hearing protection to his patients who are noise-exposed and "counsel[s] patients on how to use hearing protective devices properly." *Id.* at 9-10; Ex. 23,

16

Rajasekaran Dep. 106:12-107:14.  Just as other clinicians, including Spankovich, have been permitted to testify regarding hearing protection devices, Rajasekaran has ample experience working with hearing protection, and Plaintiffs' overreaching argument to exclude his opinions "concerning HPDs" should be denied.

### C.    Rajasekaran Is An Expert With Knowledge Of What Causes Hearing Loss And Tinnitus.

Plaintiffs play semantic games with Rajasekaran's testimony in an effort to exclude his well-supported opinions on hearing loss and tinnitus.  Although Rajasekaran testified that he does not "diagnose causes," this does not mean that he is unfamiliar with the causes of hearing loss and tinnitus.  Ex. 23, Rajasekaran Dep. 103:20-105:1.  Nor does it mean he lacks "relevant experience" in identifying potential causes of hearing loss and tinnitus.  PltfsMot. 18.  Rajasekaran's clinical experience assisting hearing loss and tinnitus patients involves "document[ing] . . . potential causes of hearing loss" in his patients.  *Id.* 106:12-107:13.  Rajasekaran's experience, training, education, board certification, appointment as an Assistant Professor at the University of Pennsylvania's Medical School, and accomplishments establish that he is well-qualified to identify potential causes of hearing loss and tinnitus. *Id.*  That he does not describe that process as "diagnosing causes" in his clinic is not surprising, since healthcare providers typically diagnose medical conditions and recommend treatments, which necessarily involves a review of potential causes.

**D.**     **Rajasekaran's Opinions on Cochlear Synaptopathy, Hidden Hearing Loss, and Otoacoustic Emissions are Within His Area of Expertise and Supported by Scientific Literature.**

Plaintiffs incorrectly describe Rajasekaran's opinions contained in his section on Otoacoustic Emissions ("OAEs") as *ipse dixit*.  PltfsMot. 19.  Plaintiffs chose not to question Rajasekaran about OAEs at his deposition and cannot point to any evidence demonstrating that the opinions in his report fall outside of Rajasekaran's education, training, and experience.  Further, Rajasekaran included references to articles supporting his OAE opinions on his materials considered list. Ex. 24, Rajasekaran Materials Considered 5, 7; *compare, e.g.* Ex. 25, Uchida, *The Effects of Aging on Distortion-Product Otoacoustic Emissions in Adults with Normal Hearing* (2008) ("The clinical utility of OAEs has been described as a noninvasive objective test to predict audiometric status . . . when a behavioral audiogram is not easily obtained.") with Ex. 24, Rajasekaran Report 19 ("Otoacoustic emissions (OAEs) are an objective measure . . . typically used in new newborns or other patients who are difficult to assess with standard audiometry ....").

Rajasekaran's opinions on hidden hearing loss (HHL) and cochlear synaptopathy are also supported by Rajasekaran's years of experience.  When questioned about HHL and cochlear synaptopathy, Rajasekaran explained "[i]t's actually not a diagnosis . . . . [T]here are no ICD-9 or -10 codes for that."  Ex. 23, Rajasekaran Dep. 175:25-176:4.  That Rajasekaran has served as an "active member

of the American Medical Association, the American Academy of Otolaryngology, the American Head and Neck Society, the American Society of Clinical Otolaryngology . . . the Pennsylvania Academy of Otolaryngology" "a Diplomat of the American Board of Otolaryngology," "a peer-reviewer for *Laryngoscope* and a Journal Editorial Board Member for *ORL: Journal for Oto-rhino-laryngology and its Related Specialties*," and does not "know of any doctors making [a HHL or cochlear synaptopathy] diagnosis" shows that HHL and cochlear synaptopathy are not generally accepted medical diagnoses or conditions in the relevant field of practice.  Ex. 24, Rajasekaran Report 1; Ex. 23, Rajasekaran Dep. 176:20-177:6. Thus, Rajasekaran needed to apply his well-qualified research skills to investigate this novel subject, which is "in its infancy," by searching for and reviewing HHL articles.  Ex. 23, Rajasekaran Dep. 177:13-18; 178:4-7.

Finally, Plaintiffs insist that Rajasekaran's opinions on HHL and cochlear synaptopathy should be excluded because he "doesn't diagnose the *cause* of patients' hearing loss."  PltfsMot. 18-19 (emphasis added).  But HHL and cochlear synaptopathy are not *causes* of hearing loss, they are (theoretical) *outcomes* of causes.  *See* Ex. 36, Spankovich Report 51-53 (opining that cochlear synaptopathy is a possible outcome of "a robust TTS").  Moreover, as discussed above, it is not the case that Rajasekaran does not diagnose causes of patients' hearing loss.  *See supra* Section III(3).  The Court should not exclude Rajasekaran's well-supported

opinions on HHL, cochlear synaptopathy, and OAEs.  *Arevalo v. Coloplast Corp.*, 2020 WL 3958505, at *17 (N.D. Fla. July 7, 2020).

**E.   Rajasekaran's Opinions Regarding Tobacco, Substances in Fuel, And Alcohol Are Well-Supported.**

Contrary to Plaintiff's argument, nowhere in Rajasekaran's report does he claim that fuel or tobacco *cause* hearing loss.  PltfsMot. 19.  Rather, Rajasekaran states that "substances in gasoline and diesel fuel . . . can contribute to hearing loss, especially at levels of exposure in occupational settings" and "nicotine (found in tobacco) causes vasoconstriction, accompanied by a decrease in oxygen, which in turn can harm the hair cells and decrease cochlear function."  Ex. 24, Rajasekaran Report 8. Rajasekaran identifies "[b]enzene, toluene, and xylene" as the substances in gasoline and diesel fuel that can contribute to hearing loss. *Id.*   These are confirmed ototoxic substances.  Ex. 26, at 17–18, European Agency for Safety and Health at Work (collecting literature); Ex. 27, Occupational Safety & Health Admin.; Ex. 28, USACHPPM.

Although this Court determined that it has not yet been presented with evidence "that tobacco is ototoxic such that it could be a cause of any Plaintiff's [auditory injury]," Dkt. 2218 at 34-35, that is not the claim made by Rajasekaran's report. There is an "accumulating body of epidemiological research suggesting a positive association between smoking and hearing impairment." *E.g.*, Ex. 26, at 22, European Agency for Safety and Health at Work; Ex. 29, Flamme (2022); Ex. 30,

Istrate, (2021) (finding a "clear correlation between the risk of sensorineural hearing impairment . . . and cigarette smoking"). Indeed, over a decade ago, one of Plaintiff's general experts found a "[p]ositive history of smoking also significantly increased odds of bilateral and overall [noise-induced hearing threshold shifts]." Ex. 31, D-GEN-3406. Even exposure to second-hand tobacco smoke is shown to be "associated with a 1.8-fold increase in the risk of hearing loss among adolescents," and a 1.94-fold increase in the risk of hearing loss among adults. Ex. 32, Lalwani (2011); Ex. 33, Lin (2020). Regardless, Rajasekaran's limited opinion that nicotine-induced vasoconstriction can harm cochlear hair cells is well supported. *See* Ex. 34, Emamifar, *Is Hearing Impairment Associated with Rheumatoid Arthritis? A Review* (2016) ("Nicotine-related vasoconstriction and subsequent decrease in oxygen concentration, due to cigarette smoking, can harm external hair cells and results in declining cochlear function. This can cause SNHL.").

Finally, Rajasekaran does state that a causal link exists between heavy alcohol consumption and damage to the auditory brain stem, hearing loss, and tinnitus. Ex. 24, Rajasekaran Report 8. While the Court has previously addressed the admissibility of alcohol consumption as a cause of hearing loss and tinnitus in other contexts, *see, e.g.*, *Beal* Dkt. 142, 21, it has not specifically addressed certain scientific evidence relied upon by Rajasekaran. *See* Ex. 35, Smith & Riechelmann, *Cumulative Lifelong Alcohol Consumption Alters Auditory Brainstem Potentials*

21

514 (2004) ("This study revealed an increase in neural transmission time within the auditory brainstem caused by long-term alcohol consumption and thus cumulative lifelong alcohol consumption."). Rajasekaran's opinions regarding heavy alcohol consumption and damage to the auditory brain stem, hearing loss, and tinnitus are supported by relevant peer-reviewed literature and should not be excluded.

F.     **Rajasekaran's Opinions Regarding Ototoxic Medications Are Admissible Based on His Education, Training, And Experience.**

Rajasekaran's opinions on ototoxic medication are supported by his education, training, experience, and his review of relevant literature. This Court has held that an expert can proffer opinions on ototoxic medications where: (1) the Court already ruled that a Plaintiff's use of those ototoxic medications is "arguably relevant" to their alleged hearing loss and/or tinnitus, *see* Dkt. 2845 at 29–30 (citing Dkt. 1330) or (2) the expert has presented scientific evidence that there is a causal link between those medications and auditory injury. Plaintiffs fault Rajasekaran's report for failing to cite authority for the widely accepted fact that "certain medications" are ototoxic. PltfsMot. 20-21. Plaintiffs do not make clear which "certain medications" they believe Rajasekaran should be precluded from discussing, but the Court has already determined that various medications may be relevant to Plaintiffs' hearing loss and tinnitus. Dkt. 1330.

Plaintiffs incorrectly insist that Rajasekaran's literature review relating to vancomycin was incomplete and his opinion as to NSAIDs insufficient. PltfsMot.

22

20 n.62.    However, when questioned specifically about the ototoxicity of vancomycin, Rajasekaran described his process for understanding whether medication is ototoxic.  Specifically, Rajasekaran refers to "bod[ies] of literature" to make that determination, including "reviews" that look at all available studies and at studies that "prove and disprove" ototoxicity and "provide an assessment" of the ototoxicity thereto.  Ex. 23, Rajasekaran Dep. 155:5-18.

Further, Rajasekaran did not "concede[] he does not know the dosage level at which NSAIDs could potentially cause auditory injury."  PltfsMot. 28.  He stated that "we don't have that data," but that it was possible that 400 milligrams of Advil could cause hearing loss.  Ex. 23, Rajasekaran Dep. at 157:22-158:11.  The Court has already explained that NSAIDs "are clearly relevant to the claims of hearing loss and tinnitus" because "there is scientific evidence showing a cochleotoxic affect." Dkt. 1330 at 5.

### G.    Rajasekaran Never Opined That There Are "No Known Causes of Tinnitus."

Confusingly, Plaintiffs move to exclude testimony from Rajasekaran that there are "no known causes of tinnitus."  PltfsMot. 29.  Rajasekaran does not offer such an opinion, so Plaintiffs' motion on this point should be denied as moot. Plaintiffs themselves cite to Rajasekaran's report, which they admit "references several causes of tinnitus including acoustic neuromas and temporomandibular joint disorder (TMJ)." *Id.*

IV.   **M. Charles Liberman, Ph.D.**

Liberman is a professor of otolaryngology at Harvard Medical School, and for the last 26 years has been the director of Eaton-Peabody Laboratories, the largest research group in the world devoted to the study of hearing and deafness.  Ex. 37, Liberman Report 1.  For over 40 years, he has studied sensorineural hearing loss in both animals and humans.  *Id.*  Liberman has published over 200 papers and delivered over 200 lectures and addresses on his hearing loss research.  *Id.* 1-2.  In particular, in 2009 he co-discovered the noise- and age-induced cochlear nerve degeneration now known as "cochlear synaptopathy" (a potential physiological explanation for a subjective hearing complaint sometimes referred to as "hidden hearing loss" ("HHL")) in mice.  *Id.* 1, 15; *see* Ex. 38, Kujawa & Liberman, *Adding Insult to Injury: Cochlear Nerve Degeneration after "Temporary" Noise-Induced Hearing Loss* (2009).  Since that time, he has been investigating the hypothesis of HHL through autopsying human cadavers and animal experiments.  Ex. 37, Liberman Report 1, 14-20.

Based on his extensive research and his knowledge of the literature, Liberman explains that HHL is not a hearing condition that can be diagnosed in humans.  *Id.* 19-21.  Animal studies demonstrate that some noise exposures causing a temporary threshold shift can cause HHL, but others do not.  *Id.* 15.  Moreover, animal species vary in whether they can recover from HHL after a noise exposure; for example,

HHL in the strain of mice that Liberman experimented on in 2009 was irreversible, but for guinea pigs the primary neural degeneration was only temporary. *Id.* 17. Thus, studies on one group of animals cannot be extrapolated to others, and particularly cannot be extrapolated to humans. *Id.*

Liberman also explains that measures such as auditory brainstem response (ABR) and distortion product otoacoustic emissions (DPOAEs) cannot reliably diagnose HHL. *Id.* 20. While studies vary on whether there is a correlation between these measures and the presence of the HHL at the group level, no study concludes that ABR, DPOAE, or other measures can predict HHL in any particular individual, including because of these tests' wide degree of variability. *Id.* 18-20. Moreover, various other causes such as environmental exposures, head injuries, prior exposure to pathogens or toxins, head size, and other factors and conditions can all result in high ABR and similar measures. *Id.* 19-20. Liberman opines that all known auditory tests have proven to be insufficient, either alone or combined, to reliably rule in HHL as an explanation of an individual's hearing issues. Ex. 39, Liberman Dep. 39:13-43:21. Liberman further explains that the literature on both animals and humans do not support the claim that hearing injury interacts with aging to produce worse outcomes years after the initial noise exposure. Ex. 37, Liberman Report 11-12, 21.

Plaintiffs move to exclude three of Liberman's opinions—those relating to HHL diagnosis, TBI, and ototoxicity. Given Liberman's extensive experience

researching sensorineural hearing loss in general and HHL in particular, Plaintiffs' motion to exclude these opinions is meritless.

### A. Liberman's Opinions On Hidden Hearing Loss Diagnosis Are Based On Ample Experience.

Plaintiffs claim that Liberman is not qualified to diagnose HHL in a particular individual.  PltfsMot. 22-23.  This ignores that Liberman has submitted a *general* report at this stage and is not diagnosing any particular individual.  Instead, he explains that there is no diagnostic test that can show that anyone has HHL or age-accelerated hearing loss.  Liberman is eminently qualified to offer those opinions as a pioneer in the fields of HHL and how age affects sensorineural hearing loss.

Liberman explained repeatedly during his deposition and throughout his expert report that no test or combination of tests can reliably diagnose a particular individual with HHL, even if one uses the least demanding definition of "diagnose." Liberman demonstrated that a differential diagnosis is not possible because all the tests, either combined or alone, are only able to explain 10% of the statistical variance—meaning only 10% percent of subjects have a statistically significant correlation when tests were examined in trying to diagnose HHL.  If "you can only explain 10 percent of the variance, it does not pass muster as anything remotely useful in diagnosing something." Ex. 39, Liberman Dep. 167:22-168:1, 259:2-6 (noting that in all electrocochleographic testing "the variance is so high that as a diagnostic metric on [a] case-by-case basis, it fails.").

Plaintiffs argue that Liberman uses an unreasonably high standard to diagnose HHL, but this is incorrect. PltfsMot. 23-24. Liberman is experienced in applying a variety of diagnostic methods, including differential diagnosis. As he explained, "diagnostic tests before they make it into the clinic and into regular use by clinicians are derived, honed, researched, perfected by people like me … we are at the forefront of the field in trying to develop diagnostics for cochlear synaptopathy" Ex. 39, Liberman Dep. 34:21-35:19. This specifically includes consideration of differential diagnosis. Liberman explained that "in these scientific experiments that we do where we are trying to establish is it possible to diagnose cochlear synaptopathy, we are performing all of the tests that any clinician would have in their battery and then some. And so we are absolutely doing differential diagnosis." *Id.* 46:3-47:7. Similarly, when plaintiffs' counsel claimed Liberman was unaware of how clinicians used differential diagnosis, Liberman responded "[n]o, I wouldn't agree with that" and explained that he and a colleague "are constantly discussing the fundamental question here, which is can we as researchers, one a clinician scientist and one a basic scientist, can we devise a reliable diagnostic for synaptopathy." *Id.* 270:15-271:16. More broadly, Liberman explained that when he uses the term "diagnose" he means whether there is "a test that an audiologist or an otologist or a research scientist can give [a] person after which we can say yes, you have cochlear synaptopathy" and noting "[a]t present state of the art, that is impossible." *Id.* 31:5-

19.  Thus, contrary to Plaintiffs' assertions, Liberman considered whether HHL could be diagnosed using differential diagnosis or any other kind of diagnostic treatments, and concluded that it cannot.

## B.   Liberman's Opinions Relating to TBI and Ototoxicity Are Based On His Significant Research And Experience.

Finally, Plaintiffs misunderstand and mischaracterize Liberman's opinions related to traumatic brain injuries and ototoxicity.  PltfsMot. 24-25.  As noted previously, Liberman opines that cochlear synaptopathy cannot be diagnosed because there is no way to determine whether any particular individual has synapse damage.  Ex. 37, Liberman Report 18-21.  Additionally, even if a synapse death could be shown in a living individual, there would be no way to determine if this synapse death occurred due to noise, aging, a TBI, ototoxic drugs, or due to some other mechanism.  Liberman noted that TBIs are "one example of one of the other things that can contribute to hearing and noise abilities that isn't directly tied to auditory nerve response [or] auditory nerve wave health."  Ex. 39, Liberman Dep. 200:17-202:2.  Moreover, there is "evidence in animal models that exposure to ototoxic drugs" as a "side effect cause hearing loss and hair cell damage."  *Id.* 264:19-265:12; *see also id.* 29:18-30:2 (noting that drug treatments, among other things, can affect conclusions in cochlear synaptopathy studies in humans); *id.* 44:18-46:1 (noting that in relationship to cochlear synaptopathy outer hair cells "tend to be damaged first in aging and noise damage and ototoxic drugs and a variety

of cochlear insults."); *id.* 179:3-21 (noting it is important to exclude individuals with ototoxic drug exposure when conducting cochlear synaptopathy studies).

Thus, in discussing TBI and ototoxic drugs, Liberman was noting the numerous mechanisms that may cause cochlear synaptopathy and make an already impossible diagnosis even more complicated. These opinions are based on his own studies related to ototoxictity and knowledge that cochlear synaptopathy studies must take into account complicating factors like traumatic brain injuries and ototoxic drug exposure. This testimony further illustrates the explanations in his report that "there are many different reasons why physiological responses such as the ABR or EFR can be reduced in amplitude unrelated to noise." Ex. 37, Liberman Report 20. That ABR and other tests can be affected by alternative causes such as TBI and ototoxic drugs is clearly within Liberman's expertise, supports his opinion that diagnosing HHL is impossible, and should be admitted.

## V.   John Bertelson, M.D.

Bertelson is a highly-credentialed neurologist with more than two decades of experience, including at Mayo Clinic, the Harvard Medical School's McClean Hospital, Dent Neurologic Institute, and presently at Senior Adult Specialty Healthcare. Ex. 40, Bertelson Report 1. Bertelson serves in two academic appointments, as Associate Professor of Neurology at Texas Tech University School of Medicine and as Assistant Professor of Neurology and Psychiatry at the

University of Texas-Austin Dell Medical School.   *Id.*   His practice consists of diagnosing and managing potential neurologic disorders in adults, practicing extensively in both inpatient and outpatient settings.   *Id.*   Bertelson's opinions are supported by his extensive knowledge, skills, experience, training, and education.

***TBI, Hearing Loss, and Tinnitus Opinions.*** Plaintiffs do not dispute Bertelson's expertise in traumatic brain injury (TBI), a condition he has treated extensively during his career.   Instead, Plaintiffs seek to exclude Bertelson's opinions regarding certain *symptoms* of TBI, specifically the relationship between TBI and hearing loss and tinnitus.   PltfsMot. 26.   As part of Bertelson's opinions, he notes that "[s]ymptoms such as headache, hearing loss, tinnitus, disorders of taste and smell, fatigue, sleep disturbance, and cognitive dysfunction can occur with varying frequency due to mild, moderate, and severe brain injuries even when neuroimaging is normal."   Ex. 40, Bertelson Report 6.   Plaintiffs contend that Bertelson is not qualified to offer such an opinion because he has only written a limited amount on the subject of TBI, is not an expert in otology or hearing protection, and would potentially seek input from other doctors regarding a diagnosis of hearing loss and tinnitus.   PltfsMot. 26.   Plaintiffs miss the mark entirely. Bertelson has diagnosed and treated patients with TBI and mTBI for years, Ex. 41, Bertelson Dep. at 64:5-20; 84:20-24, and it is well accepted that a witness may be "qualified as an expert by … experience." *United States v. Frazier*, 387 F.3d 1244,

1259 (11th Cir. 2004); ECF 1680 at 72-73.  The fact that Bertelson would potentially seek input from a specialist in hearing or tinnitus is unremarkable given his expertise is in neurology—just as an otolaryngologist's expertise in hearing is not diminished merely because he or she seeks input from audiologists.

Moreover, hearing loss and tinnitus are well known symptoms of TBI, including in literature cited in Bertelson's report.  *E.g.*, Ex. 42, *VA/DOD 2016 Clinical Practice Guidelines* ("Hearing difficulties, including altered acuity and sensitivity to noise, occur acutely in the majority of individuals who sustain a blast-related mTBI" and "A retrospective study published in 2012 reported that 75.7% of the Veterans with a history of mTBI reported tinnitus."); Ex. 5, Yurgil (2015) ("our prospective, longitudinal data suggest that TBI may be a significant risk factor for new-onset tinnitus.")  It is only reasonable that a neurologist who has treated TBI patients for years is familiar with the common and well documented symptoms of TBI, including hearing loss and tinnitus.

***PTSD Opinions.*** Plaintiffs contend that Bertelson is not qualified to render opinions relating to PTSD.  PltfsMot. 26.  In his report, Bertelson discusses the association between PTSD and tinnitus, and cites to literature suggesting both that PTSD may contribute to tinnitus (Ex. 43, Fagelson (2007); Ex. 44, Kreuzer (2014)) but also that there may not be a direct association between the conditions (Ex. 5, Yurgil (2016)).  Far from "parrot[ing] the opinions of others in his report," PltfsMot.

26, Bertelson offers a balanced explanation of the science in this area.  Bertelson

Report at 8 ("Tinnitus in these settings [in patients with PTSD] likely is explained

by a combination of physiological, neurological, and psychological factors.")  What

Plaintiffs perceive to be Bertelson "backtracking" from his opinions in his deposition

is merely Bertelson acknowledging a difference of opinions on this issue.  Ex. 41,

Bertelson Dep. at 97:9-15 ("Q: Are you intending to offer an opinion that there is …

consistent association between PTSD and tinnitus? A. Well, it wouldn't be

consistent, because not every article would indicate that. But I would offer an

opinion that individuals with PTSD would be at a higher likelihood of reporting

tinnitus.")   Plaintiffs fault Bertelson for offering "uncertain" opinions, but

Defendant's experts can rebut Plaintiff's causation theory "without needing to prove

those alternative-cause theories with certainty or probability." ECF 2218 at 45-46;

*Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1069-70 (11th Cir. 2014)

(reversing for "improperly shift[ing] the burden of proof" onto defendants to show

"alternative causes … to a reasonable medical certainty").   Plaintiffs are free to

cross-examine Bertelson on these opinions, but his opinions should not be excluded.

**Servicemember-Specific Opinions.** Plaintiffs argue that Bertelson is not

qualified to offer opinions specific to servicemembers because he does not routinely

treat servicemembers, has never been employed by the VA, and has never been a

member of the military.  PltfsMot. 27.  Bertelson's opinions that TBI and mTBI are

common among servicemembers and can be caused by blast and non-blast related events are well-supported.  The fact that Bertelson has not served in the military or worked in a VA hospital is not dispositive—the Court has allowed non-servicemember experts (including Djalilian and Spankovich) to opine on military-related topics.  Bertelson's decades of neurology experience, and clinical experience treating a variety of patients with TBI, is sufficient to support his opinions about common causes and symptoms of TBI, even where those intersect with the military.  Ex. 41, Bertelson Dep. 74:24-75:7.

Bertelson's opinion that TBI and mTBI are common conditions among servicemembers is supported by substantial literature and is "common medical knowledge."  Ex. 41, Bertelson Dep. at 69:5-11; *see also* Ex. 42, *VA/DOD 2016 Clinical Practice Guidelines* ("[A]ccording to data from the DoD, 235,046 Service Members … were diagnosed with a TBI between 2000 and 2011. Similarly, the Defense and Veterans Brain Injury Center (DVBIC) estimates that over 1.7 million people sustain a TBI every year in the United States.").[4]  Bertelson's related opinion that TBI "likely increase[s] the risk of tinnitus and hearing loss in military personnel" is self-evident, as servicemembers are at a heightened risk for TBI and mTBI, and tinnitus and hearing loss are documented symptoms of those brain

---

[4] https://www.cdc.gov/traumaticbraininjury/military/index.html.

injuries.   Finally, Bertelson's opinions referencing blast exposure are likewise supported by ample literature.   *See* Ex. 40, Bertelson Reference List (*citing* Ex. 5, Yurgil (2016)); *see also* Ex. 45, Henry, *Noise Outcomes in Servicemembers Epidemiology (NOISE) Study: Design, Methods, and Baseline Results* (2020); Ex. 46, Clifford, *Impact of TBI, PTSD, and Hearing Loss on Tinnitus Progression in a US Marine Cohort* (2019).

Finally, Plaintiffs contend that Bartelson's experience treating NFL players for contact-induced TBIs does not support his opinions regarding military TBIs. However, military TBIs are often contact-induced, such as from airborne jumps. Further, while the mechanism of action for sports injuries differs from some military injuries, Plaintiffs do not suggest that the *symptoms* of sports TBIs are different from the *symptoms* of military TBIs.   Plaintiff's concerns are suitable for "[v]igorous cross-examination" and "presentation of contrary evidence"—but not exclusion of Bertelson's opinions.

## VI.   W. Chatham, M.D.

Plaintiffs do not dispute the reliability of Chatham's discussion of autoimmune-induced hearing loss—unsurprising, since their own experts agree autoimmune disorders can cause hearing loss.   *See* Dkt. 1605, Defs.' 1/8/21 Omnibus *Daubert* Mot. at Ex. 1 (Lustig General Report 3, 10, 26, 27); *id. at* Ex.7 (Packer General Report 9, 19); *id.* at Ex.14 (Arriaga General Report 14, 26); Dkt. 2042,

Defs.' 9/17/21 Omnibus *Daubert* Mot. at Ex.19 (Crane General Report 9); *id.* at Ex.56 (Djalilian General Report 2, 10, 23); *id.* at Ex. (Hall General Report 67).  Their only objection is that Chatham does not offer an opinion regarding a specific plaintiff.  PltfsMot. 31-32.  But throughout this litigation, both parties have routinely proffered experts to speak generally on topics that will be helpful to the jury, without tying their opinions to a specific plaintiff.  This Court has repeatedly approved that practice.  *E.g.*, Dkt. 1680 at 44 (rejecting argument that general testimony "without Plaintiff-specific facts will be unhelpful"); Dkt. 1651 at 2 ("While none of the experts tie their opinions to any specific Plaintiff in this case, this portion of their testimony will be helpful in assisting the jury").  There is no dispute that expert testimony on the various causes of hearing loss is both relevant and helpful to the jury.

The *Kelley* ruling is not to the contrary; it merely held that where he was acting as a case-specific expert, Chatham's testimony should be on the symptoms and conditions relevant to that plaintiff.  Dkt. 2898 at 7-8.  Moreover, the Court's concerns with Chatham's Kelley report have been addressed in his Wave 1 report.  The discussion of systemic autoimmune conditions is now detailed and specific, and his report cites considerable support for the opinion that autoimmune hearing loss can occur without systemic autoimmune disease—a point Plaintiffs do not dispute and which their expert has confirmed.  Ex. 47, Chatham Report 7; Dkt. 42 (Kelley)

at Ex.18 (Gershwin Rebuttal Report) 4 (discussing organ specific autoimmune disease of the ear, without any co-existent rheumatologic disease).

## VII.   Kenneth Billheimer, Au.D.

Billheimer has decades of experience in the field of audiology—as a military audiologist and in private practice. He reviewed testing of the CAEv2 conducted by independent, third-party laboratories, including military labs, concluding that both ends of the CAEv2 "perform[] as expected."   Ex. 48, Billheimer Report 13. Plaintiffs' attempts to undermine Billheimer's qualifications and opinions are unavailing.

### A.    Billheimer Is Qualified to Offer His Opinions.

Billheimer has *significant* experience conducting REAT tests in his audiology practice.  He "conservatively" estimated that in his 40 years of audiology practice he has conducted REAT testing on different earplugs over 500 times.   Ex. 49, Billheimer Dep. 37:15-21, 38:4-7.

Plaintiffs assert that Billheimer is not qualified to offer his opinions because "he has never conducted the tests on which he opines"—that is, he "has never performed testing pursuant to ANSI S3.19 or S12.6."  PltfsMot. 32-33. If that were sufficient grounds for disqualification, almost no expert who has been allowed to opine on the testing of the CAEv2 in the MDL possesses the requisite qualifications. As Plaintiffs acknowledge, this Court has allowed ENT experts to opine on "REAT

testing of the CAEv2" based on their "experience-based expertise" "as … clinician[s]," even if they have never conducted any REAT testing. Dkt. 1680 at 111; *see* PltfsMot. 34.   Billheimer's extensive experience in conducting REAT tests— which is in stark contrast to many of Plaintiffs' experts who have never conducted any REAT testing at all—is a more than sufficient basis to opine regarding the testing conducted on the CAEv2. *See In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 418 (E.D. Pa. 2015) ("To be 'qualified' to render expert testimony under *Daubert*, [an expert] must merely possess specialized expertise, and this requirement is interpreted liberally." (internal quotation marks omitted)).

### B.    Billheimer's Opinions Are Reliable.

Billheimer was clear in his expert report and in his deposition: he based his opinions on the third-party, independent testing conducted on the CAEv2 and *not* on Aearo's internal testing. Ex. 48, Billheimer Report 2 (Billheimer was tasked with "evaluat[ing] the performance of the [CAEv2]" "as shown in testing conducted … by independent, third-party laboratories, including laboratories run by the military"); Ex. 49, Billheimer Dep. 21:5-14 (Billheimer based opinions on studies conducted by "U.S. Army Aeromedical Research Lab; U.S. Air Force Research Lab; Dr. Abel, Canadian Military Research Lab, and so on"). Choosing third-party testing of the CAEv2—as opposed to internal testing by Aearo—for the bases of his opinions was deliberate: as Billheimer explained in his report, military regulations require the

services, when selecting hearing protection devices, to downgrade or disregard manufacturer testing in favor of testing conducted by military labs.   Ex. 48, Billheimer Report 3 (citing Ex. 50, D-GEN-3094 at 49-50 (Air Force regulation identifies manufacturer tests conducted pursuant to ANSI S3.19 as the "Least Preferred" "Method[] for Selecting Attenuation Values for HPDs for Continuous Noise"); Ex. 51, D-GEN-3095 at 18-19 (regulation requiring Navy to "assure" a "hearing protection product" has "been evaluated by an approved laboratory" and defining "approved lab" as "one that … is not affiliated with a manufacturer or product")).

Plaintiffs' argument that Billheimer "omi[tted] from [his] report … any analysis of ANSI S3.19 testing that 3M abandoned" thus misunderstands the scope of his opinions.   PltfsMot. 36. To be clear, those tests were not completed, and accordingly they do not constitute ANSI S3.19 tests. But more to the point, Billheimer evaluated and opined on the *third-party* testing that the military itself relies on, not on manufacturer testing that the military downgrades or disregards.

On this score, plaintiffs did not identify a single *third-party* test that Billheimer supposedly ignored.   Instead, they claim that Billheimer "failed to consider numerous reasons why various tests lacked credibility." PltfsMot. 34. To be sure, all studies have limitations, but such limitations go to their weight, not to the admissibility of Billheimer's opinions regarding the totality of third-party

testing. *See Garcia v. Scottsdale Ins. Co.*, 2019 WL 1318090, at *2 (S.D. Fla. Mar. 22, 2019).   Besides, plaintiffs proffered "reasons" are in actuality plaintiffs' arguments and mischaracterizations of these tests, which Billheimer rebutted.

Plaintiffs assert "that several participants were excluded from the WHISPr study due to improper fit," and that Billheimer was unaware of this supposed "fact." PltfsMot. 38.  But Billheimer questioned the veracity of this claim, given that it was nowhere included in the WHISPr study itself.  Ex. 49, Billheimer Dep. 98:21-25 ("I would question that if that, in fact, is the case, … [w]hy wasn't that—if people were excluded for improper fit, why was it not included in the study?").  The claim is especially dubious, as Billheimer pointed out, because elsewhere the WHISPr study authors *did* document that they excluded tactical headsets that did not work.  Ex. 49, Billheimer Dep. 99:17-100:3. "So if there were other exclusions for other reasons," Billheimer explained, "I would have to question why the authors [of the WHISPr report] … would not include that in the study?" *Id.*

Plaintiffs also argue that "Billheimer did not realize that 50% of participants in the Abel study found the CAEv2 to be uncomfortable."  PltfsMot. 38.  Perceived comfort is very different from testing and analysis of the attenuation an earplug provides. All protective equipment is uncomfortable—but Plaintiffs do not explain how this fact is relevant either to Billheimer's opinions or to any Plaintiff's claims.

Plaintiffs also assert that "[t]he Johnson blast study finished with only four participants."  PltfsMot. 38. But this is simply a feature of the Johnson blast study, which itself states that "not enough subjects were exposed to provide a definitive answer." Ex. 49, Billheimer Dep. 168:1-2.  Plaintiffs can question Billheimer about this aspect of the Johnson study at trial if they like, but it does not undermine Billheimer's opinions, which are based on the totality of third-party studies of the CAEv2. Indeed, in addition to the Johnson blast study, Billheimer reviewed other impulse studies conducted by the Air Force Research Laboratory, the U.S. Army Aeromedical Research Laboratory, the Army Research Laboratory, the French-German Research Institute of Saint-Louis, NIOSH, and the Michael & Associates Laboratory—all of which, when taken together, led Billheimer to conclude that "the nonlinear yellow end of the earplug works as designed" and that "the linear, green end of the earplug provides a level of protection that is expected for a solid, preformed triple flanged earplug." Ex. 48, Billheimer Report 9-13.

Finally, Plaintiffs fault Billheimer for "cit[ing] a test by Michael & Associates, which supposedly achieved an NRR of 23."  PltfsMot. 37. This Court has precluded Defendant from using the Michael report on hearsay and Rule 403 grounds, which Defendant has appealed. The fact that this study has been excluded by the Court does not change Billheimer's overall opinions, which are based on a whole body of third-party testing, not just the Michael test.  Moreover, Plaintiffs

40

misrepresent the facts, claiming that "patients with variable data had been excluded" from the Michael study, a fact Billheimer purportedly was unaware of.  PltfsMot. 37. It has never been established that this is true, and Kevin Michael testified in connection with the Moldex litigation that he did not know whether any test subjects were excluded from the Michael test on account of high variability. Ex. 52, Michael Dep. 62:5-8.

In short, Plaintiffs have failed to show that Billheimer's opinions are unreliable.  Billheimer relied on and properly evaluated all of the available testing that matters to the military when it is selecting hearing protection devices for soldiers—that is, third-party testing in world-class labs, including military labs. Plaintiffs' criticisms of the studies on which Billheimer relies are, at most, a basis for cross-examination, not exclusion.

### C.   Billheimer's Opinions Are Helpful to the Jury.

Plaintiffs' last argument—that Billheimer's opinions "ignor[e] real-world performance" and are therefore "unhelpful to the jury," PltfsMot. 39—can easily be set aside.

Plaintiffs claim that Billheimer relied only "on cherry-picked testing results to determine the CAEv2's general effectiveness." PltfsMot. 39  As explained in the previous section, Plaintiffs did not identify a *single* third-party test of the CAEv2

that Billheimer did not rely on and evaluate. Plaintiffs cannot change this fact merely by repeating the argument again.

Plaintiffs also point to the CID report and the so-called Air Force letter to argue that Billheimer "ignore[d] other testing and real-world performance." PltfsMot. 39. The CID report and Air Force letter are not analytical, scientific testing of the CAEv2, and Plaintiffs do not cite any actual study Billheimer failed to consider in connection with these documents. That Billheimer supposedly "did … not know that the Air Force had called the CAEv2 defective and discontinued its use," PltfsMot. 39—after the Air Force did not perform any testing of the CAEv2 to arrive at this conclusion—is irrelevant to Billheimer's opinions. Any conclusion to the contrary would make a mockery of this Court's limiting instructions proscribing the evidentiary use of the CID investigation and Air Force letter.

Billheimer is qualified, his opinions are based on the *entire* body of third-party studies of the CAEv2, and they are both reliable and helpful to the jury. Plaintiffs' motion with respect to Billheimer should be denied in its entirety.

## VIII. Jennifer Tufts, Ph.D.

### A.   Tufts is Qualified to Render Her Opinions.

Tufts is qualified to analyze the testing data on the CAEv2 and competitor earplugs and to render an opinion about the performance of those products. Tufts is a professor of audiology at the University of Connecticut, holds a Ph.D. in

Communications Disorders with a focus in audiology, and is a licensed audiologist.[5] Ex. 53, Tufts Report 1, 31.  In her academic research, Tufts has "used real-ear attenuation at threshold tests and related techniques to study issues related to fitting and evaluating hearing protectors." *Id.* at 2.  She also worked for Michael & Associates as a graduate student, where she "evaluated real-ear attenuation at threshold according to ANSI S3.19 and ANSI S12.6-1997 for commercial hearing protection devices."  Ex. 54, Tufts Dep. 69:15-18.

Despite Tufts's extensive experience testing hearing protectors and analyzing the results, Plaintiffs argue she is unqualified to render an opinion because she is "not a doctor of audiology"—*i.e.*, she does not have an "Au.D." degree.  *See Id.* at 16:4-13.  But Plaintiffs do not explain why the absence of an Au.D. degree would preclude someone—particularly someone with Tufts's extensive experience, advanced degree in audiology, and status as a licensed audiologist—from competently analyzing the results of testing on a hearing protector.  Indeed, Plaintiffs' own testing expert McKinley does not have an Au.D. degree.  *See* Ex. 55, McKinley Wave 1 General Report 1.  Plaintiffs also make the conclusory assertion that Tufts has not otherwise "demonstrated the knowledge, skill, experience, training, or education necessary to opine about ANSI tests and what they show about

---

[5] *See* https://slhs.uconn.edu/person/jennifer-tufts/.

the effectiveness of HPDs," PltfsMot. 41, but they do not explain why her experience performing REAT tests in general, and ANSI tests in specific, and interpreting their results in her academic work is inadequate.

### B.     Tufts's Opinions Are Reliable.

Plaintiffs argue that Tufts's opinions are unreliable because 3M retained her as an expert in 2019, approximately three years before she issued her report in May 2022, and before she reviewed the test reports that support her opinions.  But the date of Tufts's retention is irrelevant.  Tufts did not commit to render any particular opinion when she was retained in 2019.  Tufts did not formulate her opinions until she reviewed the testing data she received in 2022, and her expert report explains in detail why the data supports her opinion that the CAEv2 is an effective earplug that compares favorably to its competitors.  Ex. 53, Tufts Report 20.  Contrary to Plaintiffs' argument, Tufts's report makes clear that her opinions are "bas[ed] … upon professional studies" and are therefore reliable.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Plaintiffs also argue that Tufts's opinions are unreliable because she considered only test reports provided by 3M, but Plaintiffs do not identify a single test of the CAEv2 or a competitor earplug that Tufts failed to consider.  Instead, Plaintiffs attempt to undermine Tufts's opinion by claiming she was unaware of assertions Plaintiffs make about the testing she evaluated.  But all the supposed

"facts" Plaintiffs identify are either disputed or irrelevant to Tufts's opinions, which are based entirely on the objective testing data.  For example, Tufts's evaluation of the CAEv2's performance in the 213015 test is not impacted by the supposed fact that Berger invented the CAEv2 (which Berger himself disputes), nor with Berger's supposed testimony that the test showed insufficient protection (which Plaintiffs do not cite).  Plaintiffs also criticize Tufts for being unaware that subjects were excluded from the WHISPr study because they could not get a good fit, but that alleged fact appears nowhere in the over 100-page report from the study.  Ex. 56, P-GEN-1296.  At most, Plaintiffs' arguments are fodder for cross-examination, not a basis exclusion.

Finally, Plaintiffs argue that Tufts's opinions are unreliable because she "applied no discernable standards."  PltfsMot. 42.  But Tufts's report meticulously reviews the mean attenuation and standard deviations recorded in every test on the CAEv2 and its competitor earplugs, among other metrics, and concludes that "[n]one of the test results suggest that the CAEv2 is defective."  Ex. 53, Tufts Report 20.  The results are, instead, "consistent with [Tufts's] expectations for a well-designed premolded flange plug"—expectations which Tufts has developed after years of experience testing hearing protectors and analyzing the results of those tests.  *Id*. 7.  That Tufts believes that a Noise Reduction Rating, calculated from a single test, does not tell someone everything they need to know about the performance of an earplug,

does not call into question her review of the full body of testing on the CAEv2 or her conclusion that none of the testing indicates deficient performance.

## IX.   Richard Neitzel, Ph.D.

Plaintiffs' arguments that Dr. Neitzel cannot offer opinions about the CAEv2's attenuation to the extent those opinions rely on the Michael report or opinions about ototoxicity are misplaced and should be denied.[6]

Plaintiffs request to exclude Dr. Neitzel's CAEv2 attenuation opinions "to the extent they rely on the Michael report."  PltfsMot. 46.  Defendant reads Plaintiffs' motion as seeking to exclude Dr. Neitzel's opinions that rely explicitly on Michael's testing of the CAEv2—specifically, opinions that Michael's testing corroborates Aearo's internal REAT data. PX49 (Neitzel Report) §D.  Plaintiffs' argument is misplaced.  Although this Court has precluded Defendant from using the Michael report on hearsay and Rule 403 grounds—a ruling which 3M has appealed—that evidentiary ruling does not affect whether Dr. Neitzel can properly rely on Michael's testing in forming his opinions.  Indeed, as FRE 703 explains, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be

---

[6] Plaintiffs' reference to this Court's prior exclusion of Dr. Neitzel is a red herring, PltfsMot. 45; that Order addressed entirely different opinions than those Plaintiffs take issue with here. *See* ECF No. 1701.

admissible for the opinion to be admitted."  Whether Dr. Neitzel may ultimately present his opinions based on Michael's testing to the jury (which 3M continues to assert should be permitted[7]) is a separate issue and does not warrant exclusion of this opinion under *Daubert*.

To be clear, Dr. Neitzel's overall opinions regarding the attenuation provided by the CAEv2 are based on his review of "[t]he **complete body** of independent REAT testing," and the "***full body*** of independent impulse testing."  PX49 (Neitzel Rpt.) 28 (emphasis added).  Dr. Neitzel reviewed over a dozen studies from independent laboratories, including the Air Force Research Laboratory, the U.S. Army Research Laboratory, the US Army Aeromedical Research Lab, the French-German Research Institute of Saint-Louis (ISL), NIOSH, and the Canadian laboratory of Dr. Sharon Abel.  That complete body of testing data supports Dr. Neitzel's opinions that the CAEv2 works as intended—opinions which Plaintiffs do not challenge aside from the specific opinion that Michael's testing corroborates Aearo's internal REAT results.  PX49 (Neitzel Report) 24.[8]

---

[7] 3M incorporates its prior arguments on the Michael report by reference herein. *See, e.g.*, *Baker v. 3M,* No. 7:20cv039, ECF No. 103.

[8] Dr. Neitzel includes "the full body of independent testing which [he] reviewed and considered in forming [his] opinions" in his materials considered list.  PX49 (Neitzel Report) 25.

Plaintiffs also unfairly criticize Dr. Neitzel's ototoxicity opinions.  PltfsMot. 46–49.  As an industrial hygienist and public health professional with years of specialization in research relating to occupational hearing conservation programs, for which "consideration of ototoxic exposures is a recommended practice," PX49 (Neitzel Report) 35, Dr. Neitzel is qualified to opine that exposure to ototoxic agents, including those from burn pits and ototoxic medications and exposures, can cause or exacerbate hearing loss, tinnitus, or balance disorders.

***Burn Pits***. Plaintiffs mischaracterize Dr. Neitzel's deposition testimony on burn pits.  Plaintiffs state that Dr. Neitzel "confirmed he did not and could not identify any research, anywhere, indicating there is a proven link between burn pit exposure." PltfsMot. 46.  To the contrary, Dr. Neitzel testified that while studies on burn pits themselves are "relatively [] rare," "the concept that these materials [such as fuels, paints, chemicals, etc.] are being burned in these burn pits … has been well established" and "there's been lots of studies documenting that people nearby are going to be exposed to some of these potentially ototoxic agents."  PX50 (Neitzel Dep.) 166:4–24.  The available scientific literature cited in Dr. Neitzel's report supports that servicemembers are at risk of ototoxic exposures, including "combined exposures" like those found in military burn pits. PX49 (Neitzel Report) 42–43.

***Ototoxic Medications***. Plaintiffs claim Dr. Neitzel does not have sufficient expertise in ototoxic medications.  As discussed *supra*, consideration of ototoxic

exposures (including pharmaceutical agents) is a common and recommended practice in hearing conservation programs—an area in which Dr. Neitzel is undisputedly qualified.   And Dr. Neitzel clearly testified that advising on medications' ototoxicity risks is something he does in his practice:

> *Q. But are you telling employers, your workers, if they take the following medications, they're at risk for ototoxicity?*
>
> *A. Yes*. At a broad level, making them aware that there are classes of medications that could put their workers at risk. Again, not making any inferences about an individual, but just educating, typically the management who are responsible for these workers' health.

PX50 (Neitzel Dep.) 16:10–19 (emphasis added).  Plaintiffs also seek to exclude Dr. Neitzel's opinions about ototoxic medications because he did not perform a differential diagnosis.  But Dr. Neitzel is not a case-specific expert witness and is not directly testifying about the specifics of each Plaintiff's particular ototoxic exposures. Instead, he, like other general experts retained by both Plaintiffs and 3M, is offering general expert testimony that will be helpful to the trier of fact, including: "[e]xposures to ototoxic substances, including pharmaceutical agents and industrial chemicals, represents a serious but underrecognized risk to hearing health, including among current and veteran military service members" and "[s]ome ototoxic substances can cause hearing loss even in the absence of noise, while other substances can cause potentiation or result in synergistic effects on hearing when

exposures occur concurrently with elevated noise exposure." PX49 (Neitzel Report) 43.

*Ototoxic Exposures*. Plaintiffs argue Dr. Neitzel's opinions on ototoxic exposures are "not[] helpful" because they "do not 'fit' any particular case." PltfsMot. 49. Again, this ignores that Dr. Neitzel is not a case-specific expert witness. His testimony will be helpful to the jury by explaining, among other things, the mechanisms and types of ototoxic damage, specifically their effect on the ear, and types of ototoxic substances. PX49 (Neitzel Report) 35–43. This will assist the jury in understanding the evidence and determining fact issues, including the potential effects of an individual Plaintiff's exposure to ototoxins.

## X.    Gregory Flamme, Ph.D.; Mark Stephenson, Ph.D.; Steve Tasko, Ph.D.; And William Murphy, Ph.D.

Plaintiffs seek to exclude the opinions of Stephenson and Stephenson Research and Consulting members Flamme, Stephenson, Tasko, and Murphy (together "SASRAC"). As Plaintiffs acknowledge, Flamme and Stephenson have previously submitted multiple reports in this MDL. Plaintiffs do not challenge the qualifications of their colleagues Tasko and Murphy, who both have decades of experience in the hearing sciences. *See* Ex. 58, Amended Flamme *et al.* Report ("SASRAC Report") at 14-22.

### A.     SASRAC'S Opinions Are Reliable.

*Opinion 3.* SASRAC's Opinion 3 discusses the DoD's role in identifying noise exposures/hearing protection device characteristics, and that hearing protection manufacturers lack visibility into the DoD's process are reliable. Indeed, Stephenson has offered testimony on these very issues at multiple trials without objection—including about the military's role in conducting testing and whether the military develops their own instructions and training.  Ex. 57, Stephenson-Baker Tr. at 218:3-17.  While SASRAC does not intend to offer legal opinions, they may offer opinions based on their personal experience with DoD and/or NIOSH as to their observations as to the DoD's role in each of these areas.  Dkt. 1651 at 2-3.  Each SASRAC witness has extensive experience interacting with DoD and therefore may ground their opinions in that experience.  Ex. 58, SASRAC Report at 6-7 (Flamme); 9-11 (Stephenson); 16 (Tasko); 18-20 (Murphy).  Accordingly, these opinions are reliable.

*Opinion 7.* SASRAC's Opinion 7 is largely a rebuttal to Plaintiff's expert opinions regarding cochlear synaptopathy.  As the Court has previously observed in the context of case-specific bellwether opinions, to the extent Plaintiffs offer opinions about the principles of cochlear synaptopathy, Defendant's experts should be entitled to rebut those opinions with "opinions on the absence of a demonstrated relationship between synaptopathy and accelerated age-related hearing loss" and the

limitations to tests other than the audiogram.  Dkt. 2845 at 19.  The Court has never held that hidden hearing loss opinions are beyond all criticism.  To the contrary, the Court has explained that hidden hearing loss opinions fall into the large category of opinions that "'should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from a jury's scrutiny.'" Dkt. 1933 at 4-5 (quoting *In re Neurontin Mktg., Sales Prac., & Prod. Liab. Litig.*, 612 F. Supp. 2d 116, 159 (D. Mass. 2009)).

Plaintiff's remaining argument that SASRAC should not be permitted to opine on a list of well-documented additional auditory dysfunction and tinnitus risk factors is not persuasive.  SASRAC references a number of articles that support a strong relationship between these factors and tinnitus and hearing difficulties.  *E.g.* Ex. 45, Henry, *Noise Outcomes in Servicemembers Epidemiology (NOISE) Study: Design, Methods, and Baseline Results* (2020).

**Burn Pits/JP-8.**[9]  SASRAC's JP-8 and related burn pit[10] opinions are reliable and helpful.  The Court has determined that "the anatomy and physiology of the

---

[9] With respect to Plaintiff's arguments on burn pits, smoking, and effective quiet, Defendant recognizes that the Court has previously offered rulings on the respective topics but have set forth below their arguments for preservation purposes.

[10] According to Air Force data, "per one hundred pounds of material that is being burned, one gallon of JP-8 fuel is used as an accelerant." Ex. 59, 1/11/2022 Flamme Dep. at 172:10-14.

inner ear are 'very comparable' across mammalian species, including humans" and rats. Dkt. 1933.  To the extent that ruling applies here, there is ample literature based on animal modeling in rats that establishes a causal relationship between JP-8 and hearing impairment. PX71-73.  Flamme has also testified about his work in connection with the World Trade Center, wherein JP-8 fuel was determined to be a contributing factor to the development of tinnitus.  Ex. 59, 1/11/2022 Flamme Dep. 171:2-15.  All of this data renders SASRAC's opinions about burn pits and attendant JP-8 exposure reliable.

*Smoking.* Plaintiffs next challenge SASRAC's opinions that smoking is a risk factor associated with tinnitus.  Plaintiffs are incorrect that "[n]o scientific literature establishing a causal link between smoking and tinnitus is cited in the Flamme & Stephenson report."  PltfsMot. 53-54.  To be sure, SASRAC cites a report co-authored with NIOSH and presented at the National Hearing Conservation Association this month.  Ex. 58, SASRAC Report at 119 *(citing* Ex. 29, Flamme (2022)*).*  This report used "descriptive statistic and logistic regression" models and analyzed data from the NHANES database. Ex. 29, Flamme (2022) at 5.  Using a multivariable statistical model, the study found a "4-fold increased odds of moderate trouble [with tinnitus], starting at 2.15 pack-years." *Id.* at 10.  That is sufficient to establish a causal relationship. *See DeLuca by Deluca v. Merrell Dow Pharms., Inc.*,

911 F.2d 941, 958-959 (3d Cir. 1990) ("A relative risk of 2 means that the disease more likely than not was caused by the event.")

SASRAC's study is consistent with data conclusions drawn by Plaintiff's expert. In 2012, Djalilian analyzed noised-induced hearing threshold shifts based on the same NHANES data recently analyzed by SASRAC and found a "positive association of smoking history with increased odds of bilateral and overall NITS." Ex. 31, D-GEN-3406 at 5.

Finally, SASRAC's opinions are helpful. Countless general experts have been permitted to testify about potential causes of hearing loss and tinnitus. *See, e.g.*, Ex. 60, (Spankovich-Vilsmeyer Tr.) at 235:8-17; 246:3-18. Should the court find SASRAC's opinions reliable, there is no reason to preclude such opinions as unhelpful at trial.

***Effective Quiet.*** As previously explained, Stephenson has "actually studied" effective quiet and has a publication from his time at the Air Force "looking at what effective quiet is." Ex. 61, 9/10/2021 Stephenson Dep. 58:16-59:9. Stephenson's article explains that "long exposures of more than 16h above 90 dBA should be avoided while long exposures of 80-90 dBA should be followed by a recovery period free from the noise, at least as long as the exposure." Ex. 62, Stephenson, *Identification of the Minimum Level of Noise Capable of Producing an Asymptotic Temporary Threshold Shift* (1980) at 1. Moreover, the 1998 NIOSH Criteria for a

Recommended Standard provides similar guidance, stating that temporary threshold shifts from noise overexposure can reverse "*if* the ear is allowed to rest in a quieter environment."   Ex. 63, D-GEN-1417 at 60.   In other words, "if exposures are repeated, the temporary threshold shift may not reverse completely, and a permanent threshold shift begins to develop." *Id.*   Those conclusions are consistent with the Schaal article, which assessed the effects of areas designated as "effective quiet" but which exceeded the 70 dBA threshold.   PX55 at 6.   In those instances, the authors concluded that "auditory rest may not be occurring" and thus "permanent hearing loss may be a result." *Id.*   All of this data provide a reliable basis for SASRAC's opinions.

### B.    Murphy's Opinions Should Not Be Excluded.

Plaintiff's motion seeks to penalize Murphy for complying with the *Touhy* process and adhering to the advice of the government's attorneys.   ***First***, as a threshold matter, 3M had no role in the government's decision to limit Murphy's declaration and later testimony to only *published* studies.

Nevertheless, on June 6, 2022, Murphy received Plaintiff's notice of deposition seeking, among other things, "[a]ll raw data from any testing performed on CAEv2."  What Plaintiff's motion fails to disclose is that on June 17, 2022, *prior* to serving the response to the deposition notice, 3M informed the government and Plaintiffs that "Dr. Murphy *has* responsive documents in his possession from his file

while at NIOSH" (emphasis added) and requested guidance from the government as to "whether he is permitted to produce such documents outside of a formal *Touhy* process and will proceed in accordance with their guidance."  Ex. 64, E-mail Chain. On June 24, 2022, DOJ noted that records from his time at NIOSH were "not his records to produce and he should return them to NIOSH." *Id.* 3M informed Plaintiffs that it "ha[d] not viewed these documents," "[did] not have copies of them," and that Murphy had already provided "the facts and data he considered in forming his opinions pursuant to Federal Rule of Civil Procedure 26(a)(2)(B)(iii)." *Id.*

Critically, Plaintiffs' motion acknowledges that Murphy testified that none of the REAT testing that he performed while at NIOSH formed a basis of his opinion and was considered as part of his opinions in this case.  PltfsMot. 57-58.  To require Murphy to provide REAT data that the government instructed Murphy not to produce circumvents the *Touhy* process and the Federal Rules of Civil Procedure, all to give Plaintiffs materials that were not the basis for Murphy's opinion.

***Second***, Murphy is not the only expert to have previously tested the CAEv2 during government service and not produce the results with their expert opinions. For example, at no time did Mr. McKinley produce a 2012 PowerPoint conducted on the CAEv2 during his time at the Air Force.  Ex. 65, D-GEN-3729.  Nor did McKinley produce the results of WHISPr.  Rather, it was through the *Touhy* process

that Defendant was able to obtain the results from that study.  That is the process that Plaintiffs are required to follow here.

*Third*, Murphy's adherence to the Government attorneys' request was substantially justified.  Under Rule 37, a person's actions are "not 'without substantial justification' as the terms has been defined, and given a degree of leniency . . . when the issue is privilege." *In re Omeprazole Patent Litig.*, 2005 WL 818821, at *15 (S.D.N.Y. Feb. 18, 2005).  Murphy operated in response to the Government's request, presumably on the basis of the privileges afforded under *Touhy* and other governmental privileges—that he was not authorized to retain any of the documents from his file at NIOSH at home after retirement and thus he immediately returned that data.  To produce data to the contrary could put Murphy at risk of violating the *Touhy* process and the Government's claims over those documents.

*Fourth*, Murphy is not cherry-picking data.  Indeed, Murphy spoke freely about what he remembered of the results of the testing.  PltfsMot. 57.  Nevertheless, Plaintiffs suggest that Murphy did not consider this data in order to cherry pick good test results.  This argument presupposes that the data in Murphy's testing is somehow *unsupportive* of his conclusions in this case—a fact not yet established.  Moreover, this argument ignores the fact that Murphy can only rely on data that the government has permitted him to disclose.  Should Plaintiff submit a *Touhy* request to the

government seeking this data and it becomes publicly available, Murphy (and other experts) will have every opportunity to review it and provide supplemental opinions related to that information.

**Fifth**, Plaintiffs incorrectly state that "[Murphy] also testified that as of June 17, 2022, when Defendants responded to Plaintiffs' document requests in connection with his Wave 1 deposition, he possessed **only** impulse/manikin data and handwritten notes from Major Mark Little." PltfsMot. 57. Murphy never testified that he **only** had those materials on June 17, 2022—Plaintiff's counsel interjected a number of questions regarding specific materials and did not ask Murphy to confirm during that questioning that he had identified every document in his possession at that time. PX61 30:6-40:11. When Plaintiff's counsel eventually asked "Any other testing that you've done specifically on the CAEv2?" Murphy replied by discussing the REAT testing at issue in extensive detail. Ex. 66, Murphy Dep. 81:22-86:12. Murphy did not "cover up the existence of this test data" and certainly never acted in "bad faith"—contrary to Plaintiffs' argument and also the abuse hurled at Murphy by Plaintiffs' counsel during his deposition. *Id.* at 200:5-6 (Incorrectly yelling "You have already been caught lying once in this damn deposition."); 201:3-4 ("This is ridiculous. Jesus Christ. I can't wait to get you in front of a jury, Murphy."). At no point in time did Murphy misrepresent the records in his possession or his past

studies of the CAEv2—he volunteered this information when asked during his deposition.

*Finally*, whether Plaintiff may cross-examine Murphy at trial about the "REAT testing and his failure to turn it over" is premature and not a proper inquiry on *Daubert*. Indeed, the Court has precluded similar questioning about the propriety of maintaining government documents from a hybrid expert witness—at motion *in limine*. Dkt. 1716 at 18. Nor is it sufficiently precise at this juncture to ascertain the types questioning that would be permitted and the limits to such questioning.

## XI.   E. Scott Elledge, M.D.

Elledge, an otolaryngologist with a career spanning 28 years, including four years spent as a U.S. Army otolaryngologist, offers hearing conservation opinions based on his experience treating active-duty soldiers' and veterans' auditory issues and his assessment of military HPDs. Because Plaintiffs cannot impugn the knowledge garnered in Elledge's practice and military service—and its relevance to Plaintiffs' central case theories—they resort to criticizing him for joining private practice before the CAEv2's introduction, for not implementing regulations revised after he left the military, and for other inconsequential shortcomings with little import to his opinions. PltfsMot. 61-66. Elledge's deposition and report make clear that his opinions flow directly from his qualifications and experience, and that those opinions are grounded in fact, reliable, and helpful to the jury.

As an otolaryngologist at Womack Army Medical Center at Fort Bragg, North Carolina from 1991 to 1994, Elledge was an active participant in the Army's Hearing Conservation program. Ex. 67, Elledge Dep. 226:22-25; Ex. 68, Elledge Report 2-3. This experience included two years as Chief of the Otolaryngology service at Womack. Ex. 68, Elledge Report 3. During his time in the service, he met with the Hearing Conservation Program's head audiologist daily. Ex. 67, Elledge Dep. 225:14-18. During these daily meetings, Elledge would discuss all aspects of the Hearing Conservation Program, ranging from details as to the overall success of the implementation of screening programs to discussions of individual Hearing Conservation Program patients. *Id.* 225:19-226:3. Elledge needed rock-solid insights into the operation and processes of the Hearing Conservation Program to care for the enlisted men and women in his patient population. *Id.* 227:13-20. His job as an otolaryngologist necessitated understanding whether screening was effective, whether the Hearing Conservation Program was "catching people accurately and early enough to impact saving their hearing," and whether their hearing protection was adequate or if they needed to be "refer[red] to audiology for a custom mold." *Id.* 227:13-228:1; 229:6-13. His care for, and interaction with, patients was highly personalized, as he would personally evaluate each patient's causative exposures and, where appropriate, recommend tailor-made mitigation solutions including personalized earplugs. *Id.* 51:22-53:53; *see also id.* 81:5-8 (Elledge recommended

patient's "hearing protection needed to be changed or reevaluated… numerous times."). More recently in his private practice, "a lot of [Elledge's] patients had military service, and [he's] taken care of a lot of people that served in the Middle East." *Id.* 77:22-78:4.

Plaintiffs seek to diminish Elledge's qualifications and exclude his testimony about the Army's Hearing Conservation Program for reasons that do not bear on the admissibility of his opinions. Elledge is well-qualified, and Plaintiffs' criticisms warrant cross-examination, not exclusion. *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1347 (N.D. Fla. 2018). Plaintiff's motion should be denied.

### A.   Elledge Is Well-Qualified to Offer His General Opinions.

Plaintiffs correctly state that "[a]n expert must 'ha[ve] sufficient 'knowledge, skill, experience, training, or education' to form a reliable opinion about an issue that is before the court." PltfsMot. 61. Elledge's background qualifies him in each of these regards. He was trained in the details of the Hearing Conservation Program by the physician he replaced at Fort Bragg and the staff head of audiology, with whom he met daily. Ex. 67, Elledge Dep. 107:4-10, 225:14-18. Due to his responsibilities with the Hearing Conservation Program, Elledge constantly worked with audiologists who conducted testing with soldiers in the field, engaging "daily" in dialogue concerning treatment decisions based on their data and, where

appropriate, authoring profiles for patients that exhibited troubling auditory issues. *Id.* 102:18-104:16. Elledge's engagement in the entire Hearing Conservation Program process was comprehensive, even entailing personalized fit testing of corpsmen in Elledge's office. *Id.* 111:15-25. He was named Chief of the Otolaryngology service at Womack Army Medical Center, due to his knowledge of and skills relating to the Hearing Conservation Program and its policies and procedures. Ex. 68, Elledge Report 3. Elledge has remained knowledgeable about and up-to-date on Hearing Conservation Programs through his participation in the society of military otolaryngologists, with whom he meets regularly, including to hear program updates from the chiefs of the Army, Navy, and Air Force training programs. Ex. 67, Elledge Dep. 230:19-231:12.

Plaintiffs attempt to undercut Elledge's experience and suggest his testimony that he is "not a hearing conservationist" means he cannot offer any opinions in this case. But a full review of the record establishes his ample qualifications to opine on the Army's Program, including his critical involvement in implementing a hearing conservation program "virtually identical" to the program at issue in this case. Ex. 67, Elledge Dep. 84:17-25.

In an attempt to sidestep this highly probative experience, Plaintiffs highlight a single statement from Elledge and suggest he described the programs merely as "very similar" and that he "did not actually compare them," despite Plaintiff's

attorney describing Elledge's comparison of the programs as "fair" at his deposition. Ex. 67, Elledge Dep. 83:25-84:6 ("Q: So while you were in the service, you personally would not have been implementing that DOD Instruction 6055.12 from 1996. Is that true? A: We implemented the same principles. When I reviewed it, I didn't see any significant changes from what our policy was in in 1994. Q: Fair."); 158:14-160:22 (further demonstrating a comparison of the regulations Elledge implemented during his service with those issued in 2004 and 2010). Plaintiffs' cherry-picked testimony and overblown emphasis on Elledge's understandable difficulty reciting year-over-year program revisions from the 1990s by memory is no basis for exclusion.

Plaintiffs insist that Elledge "was not involved in the … day-to-day implementation, or enforcement of the HCP at Fort Bragg." PltfsMot. 62. To the contrary, Elledge was "responsible for the Hearing Conservation Program" on a daily, supervisory basis. Ex. 67, Elledge Dep. 102:18-104:16. He directly observed "the audiology corpsmen and audiologists that . . . worked underneath [his] department of otolaryngology" in the military's Hearing Conservation Program. *Id.* 102:18-104:16. In particular, he was "responsible for" the "medical evaluation and treatment phase of the Hearing Conservation Program." *Id.* 113:24-114:12. Elledge's experience with the Hearing Conservation Program, including supervising

its medical personnel, treating individuals enrolled in it, and evaluating the Army's regulations of it more than adequately qualify him to offer opinions about it.

Plaintiffs further ask that Elledge's opinions regarding military testing of HPDs be excluded because he "has no experience in military procurement." PltfsMot. 63. Elledge never stated, however, that his understanding of the military's *testing* of devices was based on any experience in *procurement*. Rather, he developed that understanding during his involvement in the Hearing Conservation Program and exposure to device testing during nine years of service in the Army. Ex. 67, Elledge Dep. 142:14-23 ("Q: Okay. And what is the basis for that opinion, aside from what you heard while you were in the service . . . A: Well, I think that should count for a lot. I was in for nine years. Q: Well, certainly. Your service counts. There's no question."). Elledge is well-qualified as an expert for the purposes of the opinions he offers in this case.

### B. Elledge's Opinions Are Based on His Medical Expertise And Experience Implementing A Military Hearing Conservation Program.

Plaintiffs further seek to exclude Elledge's opinions on a combination of baseless and irrelevant assertions. First, they insist that "he is not familiar with the specific [HPD] fitting and training procedures used by the military." PltfsMot. 64. But Elledge discussed the fitting process with the audiologists he supervised and routinely oversaw audiologists fitting service members with earplugs in his office.

Ex. 67, Elledge Dep. 109:24-110:11; 111:15-22. While Plaintiffs are correct that Elledge did not perform scientific analysis or review data related to rates of earplug usage among service members, he treated numerous service members from 1991 until 1994, reviewing their patient histories, and learning about their earplugs usage through intimate, personalized diagnosis and treatment. *Id.* 116:16-117:7.[11]

Finally, Plaintiffs find fault with Elledge's materials considered, attempting to undercut his opinion by insisting it is somehow deficient for lack of review of "internal 3M documents," "testing data or published literature evaluating the efficacy of HPDs in particular combat scenarios," and "documents in the public domain about Army hearing conservation other than the regulations and publications provided by Defendants' attorneys." PltfsMot. 64-65. But Defendant offers Elledge to opine on the military's Hearing Conservation Program: it does not offer Elledge to opine on any topic encompassing 3M documents. Any review of 3M documents would have no impact on Elledge's knowledge of the military's Hearing Conservation Program.

While Elledge does not cite to literature regarding HPDs in particular combat scenarios, he primarily discusses combat scenarios in two sections. First, in discussing the Military's hearing conservation approach with respect to combat,

---

[11] Plaintiffs' argument that Elledge does not know about prevalence of earplug use after he left the service is irrelevant to his opinion.

Elledge cites to Plaintiffs' experts Marshall, Edens, and Huston. Ex. 68, Elledge Report 4. Second, Elledge discusses combat scenarios in the context of describing 1998's DA PAM 40-501. *Id.* 5. No further literature review would be necessary.

Finally, Plaintiffs challenge the materials Elledge relied upon in formulating his opinions on the Army's hearing conservation program. PltfsMot. 65. But the framework of Elledge's opinion relies on the interplay between his training, knowledge, and experience working as an otolaryngologist at Fort Bragg, the 1996 DoD Instruction Manual 6055.12, the 1998 DA PAM 40-501, and the 2008 Army Hearing Program Special Text 4-02.50. Elledge's expertise goes directly to this topic. Plaintiffs do not identify any other "documents in the public domain about Army hearing conservation" that would be necessary to support Elledge's proffered opinions, and no explanation as to how Elledge's opinions are insufficient for failure to consider such documents.

In sum, Elledge's decades of practice and education—including his experience overseeing a Hearing Conservation Program from 1991 to 1994 with procedures virtually identical to the current Hearing Conservation Program— provide more than enough foundation to assist the jury with his report's opinions concerning Hearing Conservation Programs. Plaintiffs' selective criticism of Elledge's opinions and their misguided disapproval of the materials he reviewed

does not warrant wholesale exclusion of his highly relevant opinions.  Plaintiffs'

motion as to Elledge must be denied.

## XII.  Dennis Driscoll

Plaintiffs move to exclude Driscoll's opinions because he "performed no

analysis of any Plaintiff's noise exposures" and is merely "parroting" information

from literature and databases.  PltfsMot. 67.  Even a cursory review of Driscoll's

report shows that Plaintiffs are incorrect.

First, Driscoll is offering a general expert opinion, not a case-specific opinion,

thus it is unremarkable that he has not analyzed any specific plaintiff's noise

exposures.  For that same reason, Driscoll is not offering opinions regarding whether

a given plaintiff did or did not suffer noise-induced hearing loss.

Second, far from offering "no analysis," Driscoll's report contains a detailed

analysis of civilian noise sources and exposure to the human ear.  A significant

portion of Driscoll's report is comprised of tables analyzing sources of occupational

and recreational noises, with details about those noises.  These tables required two

levels of analysis.  First, Driscoll performed an in-depth review of the methodology

used to collect and measure these noise levels before citing them in his report:

> I did a lot of research with regard to noise levels for
> different types of sources, some nonmilitary occupations.
> And when I collected a lot of this research, I would review
> the document based on was it a peer-reviewed journal or
> textbook; is it conducted in a standard protocol acceptable
> for measuring noise levels and reporting them or noise

exposures. ***I'd look at the instrumentation that was used. Was it acceptable based on ANSI standard Type 2 instrument, and then how the instruments were employed and what metrics they were reporting. So essentially, I'm combining those documents that I've read and accepted with my 40 years of experience in measuring noise and analyzing data to present the appropriate information in my report***, which is how I did that.

I didn't use every reference I collected because some of them didn't have the protocol that was explained well enough to be what I would consider acceptable and beyond question.

Ex. 69, Driscoll Dep. 169:24-170:20.  Second, once he confirmed the veracity of the data, Driscoll performed calculations to determine for each noise source the time required before a person would exceed the recommended noise exposure limit for a day, both with and without the use of foam earplugs. Ex. 70, Driscoll Report 19-29. These calculations clearly "offer insights 'beyond the understanding and experience of the average citizen.'"  Dkt. 1910 at 13 (citation omitted).

Finally, other portions of Driscoll's report offer further analysis on civilian noise exposure from train yards, construction, and motorcycle usage.  Ex. 70, Driscoll Report 10-13, 15-16.  These opinions are based on Driscoll's decades of experience as an acoustical engineer.

The Court has previously denied Plaintiffs' motions to exclude Driscoll's opinions on subjects within the scope of his expertise as an acoustical engineer.  *See* Dkt. 1701 (McCombs) at 11-12 (permitting opinion on peak sound pressure

experienced by plaintiff while applying "real-world" NRR of an earplug); Dkt. 1910 (Hensley) at 13 (permitting testimony that "recited the estimated sound pressure levels produced by several military weapons systems" and that "analyzed and explained the peak sound pressure level that Hensley would have faced during two mortar attacks"). Here again, the Court should deny Plaintiffs' motion, and permit Driscoll to offer his detailed analysis that falls well beyond the scope of an average juror's understanding and experience.

## XIII.  Stan Phillips, M.D.

Phillips is an ENT with 25 years of clinical experience diagnosing and treating patients with hearing loss and tinnitus. In his practice, Phillips regularly encounters patients with neck and jaw issues that have caused or worsened their tinnitus, and when appropriate he has diagnosed patients with somatic tinnitus and prescribed treatments for the underlying somatosensory issues. Ex. 71, Phillips Report at 7. Phillips's opinions are the product of precisely the same types of facts, data, and methodologies that the Court has repeatedly found to be relevant, reliable, and admissible.

Plaintiffs move to exclude Phillips's opinions regarding somatic tinnitus, not because his opinions are unreliable or unsupported, but because Phillips "does not purport to diagnosis [sic] any plaintiff with somatic tinnitus … he simply opines that somatic tinnitus is a subtype that exists." PltfsMot. 68. Plaintiffs argue that Phillips'

opinion would be unhelpful and confusing "in all cases where the individual plaintiff has not been reliably diagnosed as having tinnitus with a somatic cause." *Id.*

Phillips is not required to diagnose individual plaintiffs with somatic tinnitus for his opinions on the subject to be helpful and relevant as a general expert. Defense experts can provide "evidence of potential alternative causes … without needing to prove those alternative-cause theories with certainty or probability." Dkt. 2218 at 45 & n.26. The Court routinely permits general opinions regarding medical conditions without requiring the expert to diagnose a specific plaintiff. *E.g.* Dkt. 2290 at 8 ("In the Court's view, the admissibility of these opinions will depend on their helpfulness and fit in the context of a particular case and trial. In cases where an individual plaintiff has been reliably diagnosed with central auditory processing disorder, hyperacusis, or misophonia—whether by Dr. LaBorde herself, or by another medical or audiological expert—Dr. LaBorde's general expert testimony about these disorders will be admissible to provide relevant context and insights on the conditions."). In remanded cases where evidence of somatic tinnitus is offered as an alternative cause for a specific plaintiff, Phillips's opinions on the subject will be both relevant and helpful.

## XIV. Consistent With The Parties' Joint Stipulation, The Court's Prior Daubert Rulings Should Apply To All General Experts In Wave Cases.

Plaintiffs argue that "Defendants' experts' opinions should be excluded or limited consistent with the Court's adjudication of other arguments made throughout

this omnibus motion and in prior rulings," and include a bulleted list summarizing their interpretation of the Court's prior rulings.  PltfsMot. 68-72.

On May 5, 2022, the Parties entered into a joint stipulation which states, "The parties understand that the Court will not reconsider its prior *Daubert* rulings and the parties may not brief *Daubert* issues previously considered and adjudicated by the Court.  Based on this understanding, the parties will instead file on the master MDL docket a single omnibus *Daubert* preservation motion.  The parties understand that the Court has ruled that prior general *Daubert* rulings will apply to all Wave cases."  Dkt. 3072 at 9.  Consistent with that stipulation, both parties filed omnibus *Daubert* preservation motions for Wave 1.  *See* Dkt. 3320; Dkt. 3321.

It is Defendant's position, and the Parties joint stipulation, that "the Court has ruled that prior general *Daubert* rulings will apply to all Wave cases."  Dkt. 3072 at 9.  For the purposes of preservation, Defendant incorporates its prior arguments in response to Plaintiffs' prior omnibus motions to exclude experts in bellwether Groups A-D.  Dkt. 1627 (Group A); Dkt. 1902 (Group B); Dkt. 2196 (Group C); Dkt. 2847 (Group D).  The Court's prior rulings stand on their own.  To the extent Plaintiffs' summary bullet points misstate or go beyond the scope of the Court's prior rulings, Plaintiffs' request should be denied.

# CONCLUSION

Defendant respectfully requests that the Court deny Plaintiffs' motion to exclude Defendant's general expert's opinions.

Dated:  August 9, 2022

Respectfully submitted:

*/s/ Charles F. Beall, Jr.*
Larry Hill
Florida Bar No. 173908
lhill@mhw-law.com
Charles F. Beall, Jr.
Florida Bar No. 66494
cbeall@mhw-law.com
Haley J. VanFleteren
Florida Bar No. 1003674
hvanfleteren@mhw-law.com
MOORE, HILL & WESTMORELAND, P.A.
350 West Cedar Street
Maritime Place, Suite 100
Pensacola FL 32502
Telephone: (850) 434-3541

*/s/ Kimberly Branscome*
Kimberly Branscome
DECHERT LLP
633 W. 5th St., Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5762
kimberly.branscome@dechert.com

*Counsel for Defendant 3M Company*

**CERTIFICATE OF COMPLIANCE WITH THE COURT'S WORD LIMIT**

Pursuant to Dkt. 3072, I hereby certify that the foregoing contains 16,180 words and complies with the Court's directive that Daubert challenges to general experts have no more than 1,350 words per expert report (*i.e.*, the total word count for the omnibus brief is 17,550 = 1,350 words multiplied by 13, the number of challenged general expert reports). Pursuant to the parties' stipulation on June 14, 2022, both sides also consented to an additional 2,000 words to be used if necessary for the *Daubert* challenge to the joint report of Flamme, Stephenson, Tasko, and Murphy and response to that *Daubert* challenge.

Dated:  August 9, 2022            Respectfully submitted,

                                        */s/ Kimberly Branscome*
                                        Kimberly Branscome
                                        DECHERT LLP
                                        633 W. 5th St., Suite 4900
                                        Los Angeles, CA 90071
                                        Telephone: (213) 808-5762
                                        kimberly.branscome@dechert.com

                                        *Counsel for Defendant 3M Company*

73

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2022, I caused a copy of the foregoing to be file through the Court's CM/ECF system, which will serve all counsel of records.

*/s/ Kimberly Branscome*
Kimberly Branscome