# EXHIBIT 23

Karthik Rajasekaran, M.D.

1

2

            UNITED STATES DISTRICT COURT

3

            NORTHERN DISTRICT OF FLORIDA

4

                PENSACOLA DIVISION

5

                    -   -   -

6

7    _____    :
                                       : Case No. 3:19-md-2885
8    IN RE:                            :
                                       :
9    3M COMBAT ARMS EARPLUG            :
     PRODUCTS LIABILITY                :
10   LITIGATION                        : Judge M. Casey Rodgers
     _____     :
11                                     :
     This Document Relates to:         : Magistrate Judge
12                                     :
     All Wave 1 Cases                  : Gary R. Jones
13   _____     :

14

15             Friday, June 24, 2022

16

17       Remote videotaped deposition of KARTHIK

     RAJASEKARAN, M.D., held at the location of the

18

     witness, commencing at 10:08 a.m., on the above

19

     date before Nancy J. Taguinot, RPR, CCR(NJ),

20

     Registered Professional Reporter and Notary Public.

21

22

                    -   -   -

23

24

25

```
 1              R E M O T E   A P P E A R A N C E S

 2    On behalf of the Plaintiff:

 3         CLARK, LOVE & HUTSON, PLLC
           BY:  MICHAEL MORELAND, ESQUIRE
 4         440 Louisiana Street, Suite 1700
           Houston, Texas 77002
 5         TEL:  (713)757-1400
           EMAIL:  MMoreland@triallawfirm.com
 6
      On behalf of the Defendant:
 7
           DECHERT LLP
 8         BY:  JENNA C. NEWMARK, ESQUIRE
           Three Bryant Park
 9         1095 Avenue of the Americas
           New York, New York 10036
10         TEL:  (212)698-3500
           EMAIL:  jenna.newmark@dechert.com
11

12         DECHERT, LLP
           BY:  NOAH BECKER, ESQUIRE
13                 and
               STEFANIE TUBBS, ESQUIRE
14         Cira Centre
           2929 Arch Street
15         Philadelphia, Pennsylvania 19104-2808
           TEL:  (215)994-4000
16         EMAIL:  noah.becker@dechert.com
                   stefanie.tubbs@dechert.com
17

18    ALSO PRESENT:

19         JAMES VONWIEGEN, Videographer

20                      -  -  -

21

22

23

24

25
```

Karthik Rajasekaran, M.D.

1            it, I suspect it's not going to be -- it's not

2            going to be effective.  I don't really know

3            how -- I mean, there's -- there's so many

4            factors, it's hard for me to give a yes or no

5            answer to that question.

6       BY MR. MORELAND:

7            Q.    Okay.  So you can't give me the opinion

8       that if the hearing protection device does not fit

9       appropriately in the patient, it would not work

10      effectively.  You're just not able to answer that.

11           A.    That's correct.

12                 MS. NEWMARK:  Objection.

13      BY MR. MORELAND:

14           Q.    Are you familiar with the concept of

15      seal as it's related to hearing protection device?

16                 MS. NEWMARK:  Objection.  Vague.

17                 THE WITNESS:  Yeah.  I -- my level of

18           expertise is really about hearing, ringing --

19           the fitting, I have -- I have a whole team of

20           people who are experts in that, even figuring

21           out what's the best type of hearing protection,

22           because there's multiple different types.  Not

23           every hearing protection is suitable for every

24           patient.

25                 So I'm not -- I'd be the last guy to --

Karthik Rajasekaran, M.D.

```
 1            probably not the last guy, but I'm certainly

 2            not an expert in -- in what makes the best

 3            hearing device for protection or hearing

 4            protection device.

 5    BY MR. MORELAND:

 6        Q.      And you mentioned you had a vast array

 7    of team members to assist you in that.  You did not

 8    discuss this litigation with them; correct?

 9        A.      That's correct.

10        Q.      I assume, based on your answers thus

11    far, that you have no opinion on the merits of any

12    particular plaintiff's claim; is that true?

13        A.      I honestly haven't even seen any of the

14    claims, so I wouldn't even know what they are.

15        Q.      So can you answer my question?  You

16    would have no opinion on any --

17        A.      Yes.  I have no opinion.

18        Q.      Okay.  Thank you.

19                Do you agree with me that there may be

20    some service members that were injured as a result

21    of the Combat Arms Earplugs?

22                MS. NEWMARK:  Object to form.  Calls

23            for speculation, foundation.

24                MR. MORELAND:  Form is fine, Jenna.

25                MS. NEWMARK:  I can make -- I can
```

```
 1        A.      Yes.
 2        Q.      And can we agree that your expert
 3   report opinion contains -- excuse me.  Strike that.
 4                Can we agree that your expert report
 5   contains all of your opinions as they relate to
 6   this litigation?
 7        A.      Could you say that again, please?
 8        Q.      Yes.
 9                Can we agree that the reports you've
10   given, or the report that we're going to talk about
11   here in just a minute, it's 22 pages, it's dated
12   May 11th, 2022.  Do you know what I'm talking
13   about?
14        A.      Yes.
15        Q.      Okay.  I think you maybe testified
16   earlier you have a copy of it in front of you.
17        A.      Yes.
18        Q.      Does this report contain all of the
19   opinions that you would give at trial related to
20   this litigation?
21        A.      There could be other -- other things
22   that are relevant.  I don't know what I'd be asked
23   in trial.  If -- if it's in my scope, then I would
24   discuss it.
25                This was just a broad overview of
```

1  hearing, tinnitus; but, you know, I'm a practicing

2  clinician.  There are other things that may be

3  relevant if I'm asked; and if I do have an opinion,

4  I would -- I would offer that opinion.

5      Q.    Let me ask you this:  Because I --

6  that's a fair -- that's a fair answer.  And I'm not

7  trying to be tricky.  I'm trying to understand.

8  Because I get -- this is the only opportunity that

9  all the plaintiffs in this litigation have to take

10  your deposition and go through your report.  Okay?

11          I'm trying to make sure that all of the

12  opinions related to this litigation that you hold

13  are contained within this report.  Does that make

14  sense?

15      A.    Right.  Yes, it makes sense.  I'm

16  saying there are other opinions too.  I mean, if

17  you're asking do I have a different opinion than

18  what I've discussed on the -- on the report?  Is

19  that what you're asking?

20      Q.    No.

21      A.    Then the answer to that question is

22  it's hard for me to answer that.  I -- you know,

23  our residency is five years.  I've tried to

24  summarize five years of training, actually, six

25  years of training in 20 pages.  So there's probably

Karthik Rajasekaran, M.D.

1    more things that I could discuss.  I just provide a

2    very, very broad overview of the things that I have

3    knowledge about as it relates to hearing and

4    tinnitus.

5        Q.    Okay.  So would it be fair for me to

6    say that you have opinions regarding the 3M

7    litigation that are not covered in this 22-page

8    report?

9            MS. NEWMARK:  Objection.  Misstatements

10           testimony.

11           THE WITNESS:  I guess I don't know

12           anything about a 3M litigation.  All I can --

13           all I can talk about is my medical knowledge on

14           hearing and tinnitus.  And if there's some

15           other question about specifics about hearing or

16           tinnitus, or any of the other main topics I

17           discuss in my report, I can still have an

18           opinion -- I didn't -- I wasn't able to write

19           everything in 22 pages.  I mean, it would be

20           like a 500-page document.

21   BY MR. MORELAND:

22       Q.    Are there any materials that you rely

23   upon other than what's included in your report in

24   coming to your conclusions?

25       A.    My clinical experience.

Karthik Rajasekaran, M.D.

```
 1    small grants that I have that's to help

 2    underrepresented patients.  That's just an

 3    application that I -- that's maybe two hours of

 4    work and then I get money and then I use that to

 5    help patients who can't pay for things.  Sometimes

 6    it's hearing aids.  I don't make that

 7    determination, I just have that money for people

 8    who can't do it.

 9              Then there's other things where I have,

10    again, research fellows or residents who use -- I

11    am the principal investigator, like, the senior

12    person.  They do it.  I help guide them to do the

13    project.

14              So it's about surrounding yourself with

15    the right team, the right resources, and then

16    making time in the day to be efficient.  So I would

17    say I'm probably very efficient in how I do things.

18    More efficient than I was five years ago, and I'm

19    still trying to be even -- even more, so.

20       Q.    What percentage of your practice is

21    related to diagnosing causes of noise-induced

22    hearing loss?

23       A.    I don't diagnose causes, but a good

24    portion of my practice is dedicated to hearing --

25    hearing loss, tinnitus, like, ear-related
```

Karthik Rajasekaran, M.D.

1    complaints.  So any patient that -- like, part of

2    what I do is head and neck cancer.  So as part of

3    the comprehensive care that we provide at Penn,

4    patients get a hearing test before they get

5    chemotherapy.  So I have to help patients

6    understand the implications of those hearings tests

7    both before and after treatment.

8              Then I -- like, about once a month or

9    so I have a clinic where I see patients who don't

10   have good insurances.  An overwhelming part of that

11   practice is hearing-related complaints.

12             So I -- I don't go into -- I don't --

13   because there's not much that I can really help in

14   terms of why something happened.  I don't --

15   that's -- that's really not my area of expertise.

16   My area is to help them understand where they are

17   now and what we can do to help them or if we can

18   help them at all.

19             Sometimes they may -- their hearing

20   loss is profound and then I have -- like, I don't

21   do cochlear implantation.  I have one of my

22   partners do that, if they meet the criteria.  Or

23   there's -- you know, there's a whole variety of

24   causes and I help -- I help try to understand and

25   counsel patients on, like, their hearing-related

Karthik Rajasekaran, M.D.

```
 1   complaints.
 2        Q.     And then if I heard correctly, part of
 3   your -- part of the time you spend helping treat --
 4   helping treat patients who have hearing loss or
 5   tinnitus that are -- I think the word you used was
 6   underserved; is that correct?
 7        A.     Yes.  Like, are -- maybe that's the
 8   wrong word.  They have Medicaid insurance.  So not
 9   very good.  Like -- so one would assume they have
10   lower-paying income jobs.  Put it that way.
11        Q.     Okay.  Now, the only reason I asked is,
12   candidly, I think that's a noble cause and I'm
13   grateful that there's folks like you doing that.
14        A.     I appreciate.  Thank you.
15        Q.     All right.  So -- so -- all right.  Do
16   you -- can you give me a rough estimate of how many
17   of the patients you treat are either service
18   members or -- or veterans?
19        A.     I wouldn't know.  I honestly don't
20   know.  I don't work in the VA, so.  But, I mean --
21   I honestly don't know.
22        Q.     I guess then that's not -- probably not
23   a standard question you would ask a patient?
24        A.     No.  It doesn't matter to me.  I --
25   often the way I figure it out is they come in with
```

Karthik Rajasekaran, M.D.

```
 1    a hat saying, you know, veteran, Vietnam, Korean,

 2    but I actually don't even ask patients their

 3    occupation.  It's not my place.

 4              If they write -- if they volunteer that

 5    information, that's fine.  I -- sometimes I only

 6    understand it when we talk about the implications

 7    of treatment.  So I ask, "Well, what do you do?

 8    Because you'll have to do -- tell your job X, Y and

 9    Z."  But --

10         Q.    So --

11         A.    I treat them all.

12         Q.    Yeah.  You -- you essentially, I mean,

13    it might be relevant in the sense that, "Hey,

14    you're exposed to this particular type of

15    occupational noise.  Here's some recommendations."

16    Is that -- am I understanding that correctly?

17         A.    Well, yeah.  I mean, wouldn't know -- I

18    ask them some of the basic questions.  "Hey, are

19    you exposed to loud noise?"  Or -- and -- if it's a

20    patient that has hearing-related complaints, and if

21    they say yes, and I write that down as part of the

22    documentation, as one of the -- as one of the

23    potential causes for hearing loss.

24              And then I ask them do they wear any

25    hearing protection when they're at this noisy
```

Karthik Rajasekaran, M.D.

1    place, and I document that too.  And then I tell

2    them, look -- you know, if I feel like they're not

3    protecting their ears or even if they are, I tell

4    them, look.  The audiologist is going to talk to

5    you more about this because there are certain

6    recommendations as to the types and things like

7    that and per noise there's certain parameters as to

8    how -- the types of earplugs and -- or hearing

9    protection.

10           And I tell them I am by far the

11   farthest from an expert on this, but they should

12   really listen to what the audiologist has to say

13   about it.

14       Q.    Okay.  So would it be fair for me to

15   say that you are not an expert in hearing

16   protection devices?

17       A.    Not in the types of devices, no.

18       Q.    And if you were to have to have -- or

19   if a patient required a more in-depth conversation

20   about a hearing protection device, you would defer

21   that to your competent audiologist team member; is

22   that fair?

23       A.    Yes.

24       Q.    I'm going to run through just a couple

25   of types of hearing protection devices and -- and I

Karthik Rajasekaran, M.D.

```
 1   want you to tell me if you intend to offer any

 2   opinions on each ones.  Is that okay?

 3        A.     Sure.  Yes.

 4        Q.     So SureFire Sonic Defenders EP3?

 5        A.     No opinion.

 6        Q.     Okay.  SureFire Sonic Defenders EP4?

 7        A.     No opinion.

 8        Q.     EP7?

 9        A.     No opinion.

10        Q.     Moldex BattlePlugs?

11        A.     No opinion.

12        Q.     UltraFit?

13        A.     They all have interesting names, but I

14   have no opinion.

15        Q.     Okay.  And I think you already said

16   this, but all -- the same is true of the Combat

17   Arms Earplugs; true?

18        A.     Correct.  I have no opinion.

19        Q.     I am at a point where I'm about to

20   start going through -- I got a little bit of other

21   background, but then I'm going to get into the

22   report.  I'm happy to keep going forever,

23   actually --

24             MS. NEWMARK:  No.  We'll take a break.

25        We'll take a -- 10 minutes?
```

Karthik Rajasekaran, M.D.

```
 1                 Are you aware of any body of literature
 2    that suggests or has found that vancomycin is not
 3    ototoxic?
 4         A.     Is not?  I'm not aware.
 5         Q.     Okay.  And so you would not have
 6    considered any study that came to the conclusion
 7    that vancomycin was not ototoxic; fair?
 8                 MS. NEWMARK:  Object to form.
 9         Misstates prior testimony, foundation.
10                 THE WITNESS:  No, that's not what I
11         said.  I -- usually when coming with --
12         coming -- like, the body of the literature that
13         I usually refer to considers -- these are
14         usually, like, reviews.  They -- they look at
15         all the body.  Like, the studies that prove and
16         disprove and they provide an assessment based
17         on the literature.  So that's how I generally
18         get my opinions.
19    BY MR. MORELAND:
20         Q.     Okay.  But you told me you're unaware
21    of any literature that says vancomycin is not
22    ototoxic; right?
23         A.     Yes.  I'm unaware of that, yeah.
24         Q.     Okay.  So, I mean, I'm -- how could you
25    have considered something you were unaware of?  Is
```

Karthik Rajasekaran, M.D.

```
 1        We're back on the record.
 2   BY MR. MORELAND:
 3        Q.     We just got back from a short break.
 4   Doctor, are you ready to go?
 5        A.     Yes.
 6        Q.     Did you get an opportunity to speak
 7   with any of your lawyers during that break?
 8             MS. NEWMARK:  Objection.
 9             THE WITNESS:  Yes.
10   BY MR. MORELAND:
11        Q.     Let's talk about NSAIDs.  In your
12   practice, the patients that you treat for hearing
13   loss, how often is the hearing loss caused by
14   NSAIDs?
15        A.     No way of telling.  NSAIDs are very
16   commonly prescribed for -- like, people -- not
17   even -- I apologize.  They're not prescribed.
18   People take NSAIDs for a whole variety of things.
19   They have a headache, ibuprofen.  So there's no way
20   of being able to quantify that or make an
21   association.
22        Q.     Okay.  At what dosage level would an
23   NSAID cause hearing loss?
24        A.     Again, we don't -- we don't have that
25   data.
```

Karthik Rajasekaran, M.D.

```
 1       Q.     Would the -- would the recommended

 2  daily dosage cause hearing loss?

 3              MS. NEWMARK:  Objection to form.

 4              THE WITNESS:  Again, we don't know.

 5  BY MR. MORELAND:

 6       Q.     I mean, could I take 400 milligrams of

 7  Advil after this deposition and potentially have

 8  hearing loss?

 9       A.     We don't know.

10       Q.     I guess I'm asking, is that possible?

11       A.     Hypothetically, yes.

12       Q.     And that would include ibuprofen and

13  aspirin?

14       A.     Yes.

15       Q.     The last sentence on page 7.  I just

16  want to make sure that I'm understanding the

17  relationship here.  Is the -- is the medication --

18  are the ototoxic medications in and of themselves

19  ototoxic or is it a progression of processing

20  through the kidneys and then the kidney disease or

21  failure can lead to hearing loss?  Does that make

22  sense?

23              MS. NEWMARK:  Object to form.

24              THE WITNESS:  I think I know what

25       you're asking.  But I -- I can answer how I
```

Karthik Rajasekaran, M.D.

```
1        Q.      And you could have a mild TBI without
2   hearing loss; true?
3        A.      True.
4        Q.      With respect to mild TBIs, in your
5   experience, if there is hearing loss, is it
6   temporary in nature?
7        A.      Typically, yes.
8        Q.      And -- and I apologize.  I'm kind of
9   going slowly through the report, but I think
10  ultimately that's good news for everybody.
11               Let's talk briefly about hidden hearing
12  loss.  It's on page 11 at the bottom.
13       A.      Yes.
14       Q.      And do you agree that cochlear
15  synaptopathy is real?  It is something that can
16  happen to a patient?
17               MS. NEWMARK:  Object to form.  Calls
18          for speculation.
19               THE WITNESS:  That -- currently, the
20          literature does not -- it is not something I
21          treat or see in my practice.  All that I'm
22          aware of are mouse models.  So currently no, I
23          don't believe in that.
24  BY MR. MORELAND:
25       Q.      Understanding that you don't believe in
```

Karthik Rajasekaran, M.D.

1    it, it is a diagnosis in your area of expertise; is

2    that true?

3         A.     It's actually not a diagnosis.  Like,

4    there are no ICD-9 or -10 codes for that.

5         Q.     Well, setting aside insurance, can a

6    person be diagnosed with cochlear synaptopathy?

7         A.     No.

8         Q.     Okay.  If you look on page 12 at the

9    very top, you say, "Hidden hearing loss is not a

10   widely accepted diagnosis."  Do you see that?

11        A.     Yes.

12        Q.     So I guess my question is, if it's not

13   widely accepted, is it accepted at all?

14        A.     I don't know.  I think the people doing

15   the papers, they seem to accept it.  So there's --

16   they're starting to do some research on it and

17   those people are, therefore, perhaps accepting it,

18   but -- which I why I didn't write it is not a

19   conclusive statement.

20        Q.     And that's really what I was getting

21   at, is -- in your report you say it's not a widely

22   accepted diagnosis, but you understand or you

23   appreciate that there are doctors making that

24   diagnosis; is that fair?

25        A.     I actually don't know of any doctors

Karthik Rajasekaran, M.D.

1    making that diagnosis.  I am only aware of some

2    people doing research on this.

3         Q.    Okay.  Okay.

4               Is that a topic of conversation amongst

5    you and your colleagues?

6         A.    No.

7               MS. NEWMARK:  Objection.

8               THE WITNESS:  I did not even know

9         anything about this until I started writing

10        this report and I came across this.  It's --

11        it's in it's infancy, as far as I can tell.

12   BY MR. MORELAND:

13        Q.    Did you search PubMed for hidden

14   hearing loss?

15        A.    Yes.

16        Q.    Did you search PubMed for cochlear

17   synaptopathy?

18        A.    I may have.

19        Q.    Did you do any other type of literature

20   search for cochlear synaptopathy?

21        A.    No.

22               MS. NEWMARK:  Object to form.

23   BY MR. MORELAND:

24        Q.    Are you critical of the authors that

25   are doing the work and have found in the animal

Karthik Rajasekaran, M.D.

1    models what they believe to be hidden hearing loss?

2         A.    By "critical" what -- could you explain

3    what that means?  Like, critical how so?

4         Q.    In their findings.

5         A.    I mean, it's a mouse model.  So it's

6    very much in its infancy.  So am I critical in that

7    respect?  Yes.

8         Q.    Go ahead.

9         A.    It is -- I mean, there are a lot of

10   mouse model projects out there.  I would say a lot

11   of them don't come into -- they're not translatable

12   to humans.

13        Q.    We talked at the very beginning of the

14   deposition about sort of the evolving nature of

15   medicine.  Do you remember that?

16        A.    Yes.

17        Q.    Okay.  And can you rule out the

18   possibility of hidden hearing loss understanding

19   the evolution of medicine through research?

20        A.    I --

21             MS. NEWMARK:  Object to form.

22        Foundation.

23             THE WITNESS:  It's not even -- it's --

24        it's not even something that is on our radar.

25        It's very, very much in its infancy, like many

Karthik Rajasekaran, M.D.

```
 1              C E R T I F I C A T E

 2

 3          I, Nancy J. Taguinot, RPR, CCR(NJ),

 4   Registered Professional Reporter and Notary Public,

 5   certify that the foregoing is a true and accurate

 6   transcript of the remote deposition of said

 7   witness, who was first duly sworn by me on the date

 8   and place hereinbefore set forth.

 9

10          I further certify that I am neither

11   attorney nor counsel for, nor related to or

12   employed by, any of the parties to the action in

13   which this remote deposition was taken, and

14   further, that I am not a relative or employee of

15   any attorney or counsel employed in this action,

16   nor am I financially interested in this case.

17

18

19

20

21

22          Nancy J. Taguinot, RPR, CCR(NJ)
            Notary Public
23

24

25
```