# EXHIBIT 49

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF FLORIDA
 2                   PENSACOLA DIVISION
 3
                         - - -
 4
 5   IN RE:  3M COMBAT ARMS        :   CASE NO.
     EARPLUG PRODUCTS LIABILITY    :   3:19-MD-2885
 6   LITIGATION                    :
     _____:
 7   This Document Relates to:     :
                                   :
 8   All Wave 1 Cases              :
 9
                         - - -
10
11                Tuesday, June 14, 2022
11
                         - - -
12
13        Remote videotaped stenographic deposition of
14   KENNETH D. BILLHEIMER, Au.D., conducted at the location
15   of the witness in Palm Springs, California, commencing
16   at approximately 9:03 a.m., on the above date, before
17   Rosemary Locklear, a Registered Professional Reporter,
18   Certified Realtime Reporter and California CSR (#13969).
19
20
21                       - - -
22
23
24           GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 971.591.5672 Fax
25                  deps@golkow.com
```

```
 1    APPEARANCES:   (All appearances via remote technology)
 2
 3            AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
              BY:  DANIEL J. THORNBURGH, ESQUIRE
 4            DThornburgh@awkolaw.com
              17 East Main Street, Suite 200
 5            Pensacola, Florida 32502
              (850) 202-1010
 6            Appearing on behalf of the Plaintiffs
 7
 8            KIRKLAND & ELLIS, L.L.P.
              BY:  PAUL SAMPSON, ESQUIRE
 9            paul.sampson@kirkland.com
              60 East South Temple
10            Salt Lake City, Utah 84111
              (801) 877-8100
11                   and
              KIRKLAND & ELLIS, L.L.P.
12            BY:  F. CHADWICK MORRISS, ESQUIRE
              chad.morriss@kirkland.com
13            1301 Pennsylvania Avenue, N.W.
              Washington, DC 20004
14            (202) 389-5000
              Appearing on behalf of the Defendants
15
16
     ALSO PRESENT:
17
18
              SEAN McALEER, Video Operator
19
              BRIAN MARBUT, CourtCom, L.L.C., Trial
20            Technologist
21
22                            - - -
23
24
25
```

```
 1                    I N D E X

 2

 3   WITNESS                                      PAGE

 4

 5   KENNETH D. BILLHEIMER, Au.D.

 6

 7              By Mr. Thornburgh                   8

 8

 9                    - - -

10

11                EXHIBIT INDEX

12   NUMBER                                      MARKED

13

14   Billheimer-1    2-page email dated 7/7/06 to    87
                     Brian Myers from Thomas Sidor,
15                   3M_MDL000018856 -
                     3M_MDL000018857
16
     Billheimer-2    1-page email dated 11/27/02 to   87
17                   Brian Myers from Michael
                     McLain, plus attachments,
18                   3M_MDL000332845 -
                     3M_MDL000332847
19
     Billheimer-3    6-page document dated 6/27/06   102
20                   entitled "E-A-RCal Attenuation
                     Test Report," plus
21                   attachments, 3M_MDL000473611 -
                     3M_MDL000473619
22
     Billheimer-4    3-page document,               103
23                   3M_MDL000004550 -
                     3M_MDL000004552
24

25
```

Kenneth D. Billheimer, Au.D.

```
 1                    EXHIBIT INDEX (Continued)

 2    NUMBER                                              MARKED

 3

 4    Billheimer-5    1-page document dated 6/30/05,      112
                      3M_MDL000016445
 5

      Billheimer-6    6-page document dated 12/13/18      119
 6                    entitled "Memo For See
                      Distribution," CID File0001 -
 7                    CID File0006
 8    Billheimer-7    1-page document dated 7/30/19       126
                      entitled "Memorandum for
 9                    43EX/4BOX Civilian Personnel"
10    Billheimer-8    MP4 file                            132
11    Billheimer-9    32-page document dated 5/11/22      132
                      entitled "Expert Report of
12                    Dr. Kenneth Billheimer, Au.D."
13    Billheimer-10   5-page article dated 9/2003         137
                      entitled "Sound Attenuation of
14                    the Indoor/Outdoor Range E-A-R
                      Plug"
15

      Billheimer-11   36-page document dated 5/2008       151
16                    entitled "An investigation of
                      the attenuation provided by
17                    the Surefire EP3 Sonic
                      Defender earplug"
18

      Billheimer-12   278-page document dated 5/1998      164
19                    entitled "Blast Overpressure
                      Studies," 3M_MDL000014015 -
20                    3M_MDL000014292
21    Billheimer-13   5-page document dated 6/30/99       174
                      entitled "ARL-HRED Hearing
22                    Protection Device Assessments
                      in Reverberating Environments"
23

      Billheimer-14   1-page email dated 10/23/01 to      182
24                    Elliott Berger, et al., from
                      William J. Murphy,
25                    3M_MDL000024875
```

Kenneth D. Billheimer, Au.D.

```
 1                    EXHIBIT INDEX (Continued)

 2     NUMBER                                            MARKED

 3

 4     Billheimer-15    63-page document dated 11/2014      201
                        entitled "Assessment of Four
 5                      Passive Hearing Protection
                        Devices for Continuous Noise
 6                      Attenuation, Impulsive Noise
                        Insertion Loss, and Auditory
 7                      Localization Performance"

 8     Billheimer-16    19-page document dated 3/2007       201
                        entitled "Hearing Protection
 9                      Evaluation for the Combat Arms
                        Earplug at Idaho National
10                      Laboratory," 3M_MDL000002154 -
                        3M_MDL000002172
11
       Billheimer-17    52-page document dated 12/2012      203
12                      entitled "A Comparison of the
                        Single-sided (Gen II) and
13                      Double-sided (Gen I) Combat
                        Arms Earplugs (CAE):  Acoustic
14                      Properties, Human Performance,
                        and User Acceptance"
15
       Billheimer-18    4-page document,                    212
16                      3M_MDL000313390

17     Billheimer-19    5-page document dated 1/25/00       218
                        entitled "E-A-RCal Attenuation
18                      Test Report,"
                        3M_MDL000188143 -
19                      3M_MDL000188147

20     Billheimer-20    5-page document dated 1/25/00       221
                        entitled "E-A-RCal Attenuation
21                      Test Report," plus
                        attachments, 3M_MDL000195517 -
22                      3M_MDL000195524

23     Billheimer-21    1-page memo dated 4/17/00 to        239
                        Elliott Berger from Ron
24                      Kieper, 3M_MDL000627115

25
```

Kenneth D. Billheimer, Au.D.

```
 1                    EXHIBIT INDEX (Continued)
 2    NUMBER                                               MARKED
 3
 4    Billheimer-22   6-page document dated 7/10/00      246
                      entitled "How Folding the
 5                    Flanges Back Affects REAT
                      Results of the Ultrafit
 6                    Earplug End of the Combat Arms
                      Plug," 3M_MDL000005285 -
 7                    3M_MDL000005290
 8    Billheimer-23   141-page document entitled        259
                      "Peltor," 3M_MDL000716257 -
 9                    3M_MDL000716397
10    Billheimer-24   9-page email dated 7/12/14 to      260
                      Elliott H. Berger from Larry
11                    Dick, 3M_MDL000008470 -
                      3M_MDL000008478
12
13
      (Exhibits retained by the court reporter and attached to
14    transcript.)
15
16                            - - -
17
18
19
20
21
22
23
24
25
```

```
 1    Q.      Sure.

 2            To the extent that 3M had additional internal

 3    studies that were performed by it, would you have

 4    expected that those internal studies be provided to you

 5    by 3M or 3M's counsel?

 6    A.      I don't -- I don't know how to answer that

 7    question.

 8    Q.      Would it --

 9    A.      I'm sorry.

10    Q.      Would it matter to you at all that 3M didn't or

11    3M's counsel did not provide you with all of the

12    internal company studies that were performed on the

13    Combat Arms earplug?

14            MR. SAMPSON:  Objection to form.

15            THE WITNESS:  In that it wouldn't -- it wouldn't

16    change my opinion as I formed it, I would say I would

17    like to have had all the documents that --

18            MR. THORNBURGH:  Okay.

19    BY MR. THORNBURGH:

20    Q.      Did you --

21    A.      -- I was given.

22    Q.      Sure.  Sorry.  I thought you were done answering

23    the question.

24            MR. THORNBURGH:  Can you read back that

25    response, Madam Court Reporter.  I just want to make
```

Kenneth D. Billheimer, Au.D.

```
1    sure I understood it.

2            (The court reporter read the requested portion

3    of the record.)

4    BY MR. THORNBURGH:

5    Q.      Dr. Billheimer, how do you know your opinion

6    wouldn't change if you didn't review and consider

7    internal company studies that were not provided to you?

8    A.      The basis of my opinion was formed on the

9    research that I looked at:  U.S. Army Aeromedical

10   Research Lab; U.S. Air Force Research Lab; Dr. Abel,

11   Canadian Military Research Lab, and so on.

12           So I formed my opinion based on research that I

13   was provided and looked at, and it would have

14   definitely -- that's how I formed my opinion.

15   Q.      Sure.

16   A.      Did I answer your question?

17   Q.      Well, yeah, I think it does.

18           So I think what you're saying is what the -- to

19   the extent that you did not receive internal studies

20   that were conducted by 3M that showed a negative or a

21   negative attenuation value -- let me ask a better

22   question.

23           To the extent that 3M or 3M's lawyers did not

24   provide you with internal company studies, REAT studies,

25   under either 3.19 or 12.6, it doesn't matter to you
```

```
 1   because you aren't relying or basing your opinions on

 2   the -- all the studies that were done internally by 3M.

 3             MR. SAMPSON:  Objection.  Form.  Foundation.

 4             THE WITNESS:  I don't think I said that, so let

 5   me correct that.

 6             I did receive REAT studies that were done at 3M

 7   and I did review them.  I did receive internal documents

 8   of 3M.

 9   BY MR. THORNBURGH:

10   Q.     Did --

11   A.     My opinion is formed on the basis of I looked at

12   that data, but we have to -- we have to stop and think

13   of the military.

14             So the military provided the Combat Arms earplug

15   to the soldier.  The military doesn't look at 3M's

16   internal data, 3.19; they do the research on the earplug

17   themselves independently.

18             So 3M, you're looking at -- we're looking at two

19   different things.  We're looking at something the

20   military doesn't rely on to determine the efficacy of

21   the earplug.

22   Q.     You agree --

23   A.     And that's --

24   Q.     Sorry.  I thought you were done.

25   A.     I'm not.
```

Kenneth D. Brillimeier, Au.B.

```
 1   A.        No.

 2   Q.        Did you go to the shooting range and shoot

 3   the -- a gun with the Combat Arms Version 2 yellow end

 4   of the earplug in your ear?

 5   A.        No.

 6   Q.        Did you go to the shooting range and shoot a gun

 7   with the green end of the Combat Arms Version 2 in your

 8   ear?

 9   A.        No.

10   Q.        Did you put the Combat Arms green end in your

11   ear and stand next to a steady-state noise that's

12   greater than 85 decibels for a period of eight hours or

13   more?

14   A.        No.

15   Q.        Is it fair to say that you've done REAT testing

16   before?

17   A.        Yes.

18   Q.        Is it fair to say that you did not do REAT

19   testing in this case?

20   A.        That's correct.

21   Q.        Were you asked to perform REAT testing in this

22   case?

23   A.        No.

24   Q.        Do you know how to do REAT testing?

25   A.        Of course.
```

```
1   Q.      And you have access to a lab, don't you?

2   A.      I have -- are you asking me if I have access to

3   a lab now?

4   Q.      Yeah.

5   A.      No.

6   Q.      3M has a lab; right?

7   A.      Yes.

8   Q.      And as an expert witness, it's reasonable to

9   assume that you'd have access to that lab; right?

10          MR. SAMPSON:  Objection to form.

11  BY MR. THORNBURGH:

12  Q.      Did you -- did you ask 3M if you could do REAT

13  testing on its earplug at 3M's lab?

14  A.      No.

15  Q.      When was the last time you did REAT testing?

16  A.      It would have been when I was at the University

17  of the Pacific, and I left the University of the Pacific

18  in 2019.

19  Q.      Okay.  So did you do REAT testing in 2019 or

20  sometime before that?

21  A.      During the year of 2019.

22  Q.      Okay.  And what --

23  A.      I left the university at the end of 2019.

24  Q.      What earplug did you test under real-ear

25  attenuation at threshold?
```

Kenneth D. Brittnemer, Au.D.

```
 1    A.        It would have been in that instance the

 2    musicians' earplug, the Etymotic Research ER-15, ER-25

 3    with the silicone Westone mold.

 4    Q.        How many times have you performed REAT testing

 5    on different earplugs?

 6    A.        Okay.  So keep in mind that I've been practicing

 7    for 40 years.  So, conservatively, 500.

 8    Q.        You have not published any of your REAT results

 9    in any peer-reviewed article, have you?

10    A.        That's correct.

11    Q.        You've never been published on REAT results,

12    REAT testing, in any peer-reviewed article; correct?

13    A.        Specifically on REAT testing for an earplug, no.

14    Q.        That's what I asked; right?

15    A.        No.

16    Q.        Have you ever done impulse testing using a

17    manikin or ATF?

18    A.        No, I have not.

19    Q.        And you likewise have never published any

20    research concerning manikin testing or ATF testing and

21    earplugs; correct?

22    A.        That's correct.

23    Q.        In fact, in your Curriculum Vitae you identified

24    two publications during your entire career; correct?

25    A.        That's correct.
```

Kenneth D. Brilhelmer, Au.D.

```
 1   Q.      One publication says, "Advance For Audiology,

 2   Outcome Measures in Hearing Aid Evaluations"; right?

 3   A.      Correct.

 4   Q.      You didn't provide us with a date of that

 5   publication.

 6           What was the date of that publication?

 7   A.      You know what?  I don't recall the date.

 8   Q.      How many decades ago?

 9   A.      Probably two.  Two to three.

10   Q.      So 20 to 30 years ago; correct?

11   A.      Sure.  Yes.

12   Q.      And the only other publication you identified in

13   your Curriculum Vitae is the California Academy of

14   Audiology newsletter editor; correct?

15   A.      That's correct.

16   Q.      Were you the editor of that newsletter?

17   A.      I was.

18   Q.      And for how long were you the editor of the

19   newsletter?

20   A.      For two years.

21   Q.      During what period of time?

22   A.      I don't recall that either, but --

23   Q.      Well --

24   A.      -- we go back about 20 years, when the academy

25   was first started.  I was one of the founding --
```

Kenneth D. Billheimer, Au.D.

```
 1              MR. SAMPSON:  Objection.  Form.  Foundation.

 2              THE WITNESS:  I'm not aware of that.

 3    BY MR. THORNBURGH:

 4    Q.      Do you -- do you -- why aren't you aware of

 5    that, Dr. Billheimer?

 6    A.      It's not in the study, as I recall.

 7    Q.      Well, the authors of the study testified about

 8    it.

 9    A.      I just told you I haven't seen the testimony.

10    Q.      Wouldn't that be important information for you

11    to consider when evaluating the safety and efficacy of

12    the study -- of the earplug in terms of the WHISPr

13    study?

14    A.      Well, first of all, I don't know what they

15    testified.  So if they testified that it was an

16    effective hearing protector, and I quote, works as

17    advertised, then I wouldn't even need to see that

18    because I've read it myself.

19    Q.      Well, Mr. Bill -- Dr. Billheimer, Rich McKinley

20    did not testify to that.

21              MR. SAMPSON:  Objection.  Form.  Foundation.

22              THE WITNESS:  It doesn't -- it doesn't make any

23    difference.

24              What I -- what I just said, and maybe it wasn't

25    clear, is I read the study and the study basically shows
```

Kenneth D. Brittheimer, Au.D.

1  that the Combat Arms earplug is an effective hearing

2  protector.  That's what the study -- that's the result

3  of this study.

4  BY MR. THORNBURGH:

5  Q.      Do you know how many of those test subjects

6  were -- how many test subjects were excluded because a

7  proper fit could not be achieved?

8          MR. SAMPSON:  Objection.  Form.  Foundation.

9          THE WITNESS:  No, I'm not.

10  BY MR. THORNBURGH:

11  Q.      And is it -- based on your, the way you're

12  responding to my question, is it fair for me to assume

13  that, in your opinion, it didn't matter?

14  A.      It wasn't in the study.

15  Q.      So it doesn't matter what the authors testified

16  to --

17  A.      I would --

18  Q.      -- about that?

19  A.      I would question -- sorry.  I didn't mean to

20  interrupt.

21          I would question that if that, in fact, is the

22  case, why it wasn't.  There are five authors in that

23  study.  Why -- scientific research.  Why wasn't that --

24  if people were excluded for improper fit, why was it not

25  included in the study?

Kenneth D. Brinnehmer, Au.D.

1    Q.      Did you read the testimony to figure out why?

2    A.      I told you I didn't read the testimony.

3    Q.      Would it be helpful if you had read the

4    testimony to figure out why there are --

5    A.      No.

6    Q.      -- a large number of individuals that were

7    excluded from the study because a proper fit could not

8    be achieved?

9    A.      No, it wouldn't change --

10           MR. SAMPSON:  Objection.  Form.  Foundation.

11           THE WITNESS:  No, it wouldn't change my opinion

12   at all because if it -- if it -- if, in fact, that were

13   the case, why was it not included in the study?

14   BY MR. THORNBURGH:

15   Q.      The only way for you to know is if you read the

16   testimony of the authors.

17   A.      I'll give you an example.  Included in that

18   study, as I recall, they -- it was on tactical headsets

19   and the Combat Arms earplugs.  Correct?  Okay.

20           In the course of the study, ten of the units of

21   the tactical headsets didn't work, were excluded, and so

22   on, and that was the -- that was put in -- into the

23   study.

24           So if there were other exclusions for other

25   reasons, I would have to question why the authors -- and

Kenneth D. Brillhart, Au.D.

1  there were five of them -- why it wouldn't be -- you

2  just don't withhold information like that.  Why would

3  you not include that in the study?

4  Q.    Why would 3M's counsel not provide you with the

5  testimony that answered that question for you?

6  A.    That has nothing to do with the question.

7        MR. SAMPSON:  Objection.  Form and --

8  BY MR. THORNBURGH:

9  Q.    Doesn't it concern you that 3M is not providing

10 you with all of the information you need to formulate

11 your opinions?

12       MR. SAMPSON:  Objection.  Form.

13       THE WITNESS:  Again -- again, you just told me

14 what it was and I told you that it wouldn't have

15 influenced me at all.

16 BY MR. THORNBURGH:

17 Q.    How many -- how many -- how many people are

18 excluded from the study for not being able to achieve a

19 proper fit?

20       MR. SAMPSON:  Objection.  Form.  Foundation.

21       THE WITNESS:  It's not in the study.

22 BY MR. THORNBURGH:

23 Q.    So you don't know.

24 A.    I don't know.

25 Q.    You under -- you understand that -- well, strike

Kenneth D. Billheimer, Au.D.

1   that.

2          MR. THORNBURGH:  Mr. Marbut, can you pull up

3   P-GEN-131.

4          MR. SAMPSON:  Hey, Dan, are you going to take a

5   while on this one?  I'm ready for a break.

6          MR. THORNBURGH:  You know where I'm going so --

7          MR. SAMPSON:  No, actually, I don't.  I don't

8   know the -- I don't have the numbers memorized.  But I

9   do need to go to the bathroom.  But you can continue.

10          MR. THORNBURGH:  No.  No.  That's fine.  That's

11   fine.

12          I don't know.  I guess you guys are West Coast

13   so it's like 11:00 there?  It's 1:00, my time, so I'm

14   not sure if we want to take a lunch break now, if you

15   want to go another hour or so and then take a lunch

16   break.  But let me know.

17          MR. SAMPSON:  Yeah.  I mean, it's 12:10 my time,

18   11:10, Dr. Billheimer.  We're all over the place.

19          THE WITNESS:  I go with the flow.  I don't -- I

20   don't -- it doesn't make any difference.

21          MR. THORNBURGH:  It might make sense, then, to

22   go ahead and go on a lunch break now and then -- and

23   then reconvene at -- in an hour or 45 minutes, whatever

24   you guys think.

25          MR. SAMPSON:  Yeah.  Let's say 50 minutes, how

Kenneth D. Brittlemmer, Au.D.

```
 1   A.        I did.  I've read the whole report.

 2   Q.        And what was the recommendation of -- by Johnson

 3   Blast or, sorry, by Dan Johnson and the other

 4   individuals involved in the study?

 5   A.        I just don't recall.  I've read the entire study

 6   but I -- several times.  I don't recall what the final

 7   recommendations were, with the exception of moving the

 8   filter in the study because it was towards the end and

 9   more towards what would be the middle.

10           MR. THORNBURGH:  Mr. Marbut, if you could turn

11   to 140.

12   BY MR. THORNBURGH:

13   Q.        Let me ask you this question:  How many test

14   subjects were tested using the French Number 1 plug?

15   A.        To the best of my recollection, it started out

16   at 27.

17   Q.        How many completed the study on the French

18   Number 1 plug?

19   A.        Four.

20   Q.        And --

21   A.        All -- completed all levels of the study.

22           MR. THORNBURGH:  And if we turn to Page 144,

23   Mr. Marbut.

24   BY MR. THORNBURGH:

25   Q.        Do you see it says, "not enough subjects" -- on
```

```
 1    the second paragraph, "not enough subjects were exposed
 2    to provide a definitive answer"?
 3    A.      I see that.
 4            MR. SAMPSON:  Oh, there it is.  Yeah.
 5    BY MR. THORNBURGH:
 6    Q.      And do you agree that -- with the conclusion
 7    here that there were not enough studies or study
 8    subjects involved in this study who were exposed to the
 9    impulse noises to provide a definitive answer concerning
10    the protective -- the ability of the French Number 1
11    filter to or the ISL filter to be protective?
12    A.      I'll agree with it's not enough subjects were
13    exposed to provide a definitive answer, period.  I'll
14    agree with what it says.
15    Q.      And if we turn to your expert report, number
16    one, you don't -- you don't -- you didn't identify that
17    statement or that conclusion in your expert report, did
18    you?
19    A.      I did not.
20    Q.      And if we turn back to Page 10 of your expert
21    report, you include some data on Page 10.
22            Do you see that?
23    A.      I do.
24    Q.      And do you see that, if we look at the line
25    showing 100 shots for the French Number 1 plug --
```

Kenneth D. Brummett, Au.D.

```
 1   A.       I see that.

 2   Q.       Okay.  And how many unacceptable TTSs occurred

 3   at the peak level of 181?

 4            MR. SAMPSON:  Objection.  Form.  Foundation.

 5            THE WITNESS:  At 181?

 6            MR. THORNBURGH:  Yeah.

 7            THE WITNESS:  We are looking at 20 -- 20 -- 20

 8   percent.

 9            MR. THORNBURGH:  Okay.

10   BY MR. THORNBURGH:

11   Q.       And to you, is that acceptable, that one out of

12   five subjects had an unacceptable temporary threshold

13   shift?

14   A.       Under the guidelines of the study, yes, I am.

15   Under the guidelines of this study.

16            Unacceptable TTS was 25, and that was the

17   guidelines of this study.

18   Q.       Yeah.  But my question was, in your opinion, as

19   a Doctor --

20   A.       I --

21   Q.       As a Doctor of Audiology, spending your career

22   treating soldiers, would 20 percent be acceptable?

23   A.       It would not be in today's age, but it wasn't

24   the guideline in this study.  So, no, it would not be.

25   Actually, no temporary threshold shift would be
```

Kenneth D. Billheimer, Au.D.

```
 1   STATE OF CALIFORNIA              )

 2   COUNTY OF LOS ANGELES            )

 3           I, ROSEMARY LOCKLEAR, a Certified Shorthand

 4   Reporter of the State of California, duly authorized to

 5   administer oaths pursuant to Section 2025 of the

 6   California Code of Civil Procedure, do hereby certify

 7   that

 8           KENNETH D. BILLHEIMER, Au.D., the witness in

 9   the foregoing deposition, was by me duly remotely sworn

10   to testify the truth, the whole truth and nothing but

11   the truth in the within-entitled cause; that said

12   testimony of said witness was stenographically reported

13   by me, a disinterested person, and was thereafter

14   transcribed under my direction into typewriting and is a

15   true and correct transcription of said proceedings, to

16   the best of my ability.

17           I DO FURTHER CERTIFY that I am neither a

18   relative nor employee nor attorney nor counsel of any of

19   the parties to this action, and that I am neither a

20   relative nor employee of such attorney or counsel, and

21   that I am not financially interested in the action.

22

23

24   ROSEMARY LOCKLEAR, RPR, CRR, CSR 13969

25   Dated:  June 17, 2022
```

Kenneth D. Brilhimer, Au.D.

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4            Please read your deposition over carefully and

 5    make any necessary corrections.  You should state the

 6    reason in the appropriate space on the Errata Sheet for

 7    any corrections that are made.

 8            After doing so, please sign the Errata Sheet

 9    and date it.

10            You are signing same subject to the changes

11    you have noted on the Errata Sheet, which will be

12    attached to your deposition.

13            It is imperative that you return the original

14    Errata Sheet to the deposing attorney within thirty (30)

15    days of receipt of the deposition transcript by you.  If

16    you fail to do so, the deposition transcript may be

17    deemed to be accurate and may be used in court.

18

19

20

21

22

23

24

25
```

```
 1                        E R R A T A

 2                        - - - - - -

 3

 4   PAGE  LINE  CHANGE

 5   ____  ____  _____

 6   REASON:_____

 7

 8   PAGE  LINE  CHANGE

 9   ____  ____  _____

10   REASON:_____

11

12   PAGE  LINE  CHANGE

13   ____  ____  _____

14   REASON:_____

15

16   PAGE  LINE  CHANGE

17   ____  ____  _____

18   REASON:_____

19

20   PAGE  LINE  CHANGE

21   ____  ____  _____

22   REASON:_____

23

24

25
```

Kenneth D. Billheimer, Au.D.

```
 1                  ACKNOWLEDGEMENT OF DEPONENT

 2

 3

 4         I, _____, do hereby certify

 5   that I have read the foregoing pages, and that the same

 6   is a correct transcription of the answers given by me to

 7   the questions therein propounded, except for the

 8   corrections or changes in form or substance, if any,

 9   noted in the attached Errata Sheet.

10

11

12

13   _____

14   KENNETH D. BILLHEIMER, Au.D.              DATE

15

16   Subscribed and sworn

     to before me this

17   _____ day of _____, 20____.

18

     My commission expires:_____

19

20   _____

     Notary Public

21

22

23

24

25
```

Kenneth D. Brinkmeyer, Au.D.

```
 1                      LAWYER'S NOTES

 2    PAGE LINE

 3    _____    _____  _____

 4    _____    _____  _____

 5    _____    _____  _____

 6    _____    _____  _____

 7    _____    _____  _____

 8    _____    _____  _____

 9    _____    _____  _____

10    _____    _____  _____

11    _____    _____  _____

12    _____    _____  _____

13    _____    _____  _____

14    _____    _____  _____

15    _____    _____  _____

16    _____    _____  _____

17    _____    _____  _____

18    _____    _____  _____

19    _____    _____  _____

20    _____    _____  _____

21    _____    _____  _____

22    _____    _____  _____

23    _____    _____  _____

24    _____    _____  _____

25    _____    _____  _____
```