# EXHIBIT 66

```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF FLORIDA
 2                         PENSACOLA DIVISION

 3   IN RE:   3M COMBAT ARMS          )   Case No.:
     EARPLUG PRODUCTS LIABILITY       )   3:19-md-2885
 4   LITIGATION                       )
                                      )   Judge M. Casey
 5   --------------------------       )   Rodgers
                                      )   Magistrate Judge
 6   THIS DOCUMENT RELATES TO:        )   Gary R. Jones
                                      )
 7   All Wave 1 Cases                 )

 8                             - - -

 9

10   REMOTE VIDEOTAPED DEPOSITION OF WILLIAM MURPHY, PH.D.

11                   TUESDAY, JUNE 28, 2022

12                             - - -

13

14            Remote videotaped deposition of WILLIAM

15   MURPHY, PH.D., held remotely at the location of the

16   witness, commencing at approximately 10:03 a.m., on

17   the above date, before Juliana F. Zajicek, Registered

18   Professional Reporter, Certified Shorthand Reporter

19   and Certified Realtime Reporter.

20

21

22                             - - -

23             GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
24                   Deps@golkow.com
```

```
 1              A P P E A R A N C E S :
              (ALL PARTIES APPEARED REMOTELY)
 2


 3   ON BEHALF OF THE PLAINTIFF:

 4        THE MONSOUR LAW FIRM
          404 North Green Street
 5        Longview, Texas 75601
          903-999-9999
 6        BY:   DOUGLAS C. MONSOUR, ESQ.
                doug@monsourlawfirm.com
 7
                    -and-
 8
          AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
 9        17 East Main Street, Suite 200
          Pensacola, Florida 32502
10        850-202-1010
          BY:   DOUGLASS A. KREIS, ESQ.
11              dkreis@awkolaw.com

12                  -and-

13        QUINN EMANUEL
          865 South Figueroa Street, 10th Floor
14        Los Angeles, California 90017
          213-443-3000
15        BY:   MATTHEW HOSEN, ESQ.
                matthosen@quinnemanuel.com
16

17

18

19

20

21

22

23

24
```

```
 1                 A P P E A R A N C E S :
              (ALL PARTIES APPEARED REMOTELY)
 2


 3   ON BEHALF OF THE DEFENDANTS:

 4        DECHERT LLP
          US Bank Tower
 5        633 West 5th Street, Suite 4900
          Los Angeles, California 90071-2032
 6        213-808-5715
          BY:  ALLIE OZUROVICH, ESQ.
 7             allie.ozurovich@dechert.com;
               CRAIG J. CASTIGLIA, ESQ.
 8             craig.castiglia@dechert.com

 9                  -and-

10        DECHERT LLP
          35 West Wacker Drive, Suite 3400
11        Chicago, Illinois 60601-1608
          312-646-5823
12        BY:  CHRISTOPHER BURRICHTER, ESQ.
               christopher.burrichter@dechert.com
13

14   ON BEHALF OF THE CDC/OCOO/OGC:

15        HHS OFFICE OF THE GENERAL COUNSEL
          PUBLIC HEALTH DIVISION
16        CDC/ATSDR BRANCH
          12501 Ardennes Avenue, Suite 301
17        Rockville, Maryland 20852
          301-443-8068
18        BY:  L. MICHAEL RAFKY, ESQ.
               ejv9@cdc.gov
19

20   ALSO PRESENT:

21        KINGREY SULLENS, Legal Assistant,
              The Monsour Law Firm PC
22
     THE VIDEOGRAPHER:
23
          ZACH HONE,
24        Golkow Litigation Services
```

1        Is -- is this it?

2     A.    Yep.

3     Q.    Okay.  And this is a document entitled --

4     MR. MONSOUR:  We'll mark this as exhibit -- what

5  exhibit number are we on?

6     THE VIDEOGRAPHER:  This will be 6.

7     MR. MONSOUR:  Six.

8              (WHEREUPON, a certain document was

9               marked William Murphy, Ph.D.

10              Deposition Exhibit No. 6, for

11              identification, as of 06/28/2022.)

12  BY MR. MONSOUR:

13    Q.    This document, just so I can identify it,

14  it says:  "Impulse Peak Insertion Loss for Hearing

15  Protection Devices Tested with an Acoustic Shock

16  Tube."

17    A.    Yes.

18    Q.    And the authors are William J. Murphy,

19  Pamela S. Graydon, Matthew Strobel and Katrina

20  Freeland, correct?

21    A.    Yes.

22    Q.    Okay.  All right.  Any other testing that

23  you've done specifically on the CAEv2?

24    A.    In work that Major Little and I were doing

1    in 2001 and 2002, I was in the process of developing a

2    new real-ear attenuation at threshold system for the

3    NIOSH Hearing Protection Device Laboratory, and one of

4    the things that we were doing was testing different

5    products and doing real-ear attenuation tests of

6    people and we did not have a formal study, but those

7    tests were conducted and there were about 12 tests

8    with the green side and I think nine tests with the

9    yellow side of the earplug.

10        Q.    Okay.  And where are those results

11   recorded?

12        A.    Those results are with the government.

13        Q.    Okay.

14        A.    In my preparation for my Touhy deposition,

15   I presented that information to Mr. Rafky and to

16   Ms. Brandy Vaughn, at one time it was Brandy Anderson,

17   and I believe the person at the DOJ was a Jacqueline

18   Snead.  Is that -- somebody might be able to correct

19   me.  I don't see Mr. Rafky on here.

20        MR. RAFKY:  No, I am on, Bill.  Jackie Snead is

21   the -- I believe she is the lead DOJ attorney.

22        THE WITNESS:  Okay.  Thank you, Michael.

23   BY THE WITNESS:

24        A.    I presented that information to them in

 1   various draft versions of my -- I don't know what you

 2   call it -- a deposition document, my -- my responsive

 3   to the -- to the Touhy request.

 4   BY MR. MONSOUR:

 5        Q.   Okay.  All right.  So was that -- that was

 6   produced to us in your Touhy depo response?

 7        A.   The REAT data were not.

 8        Q.   Okay.  The REAT data were not.

 9             What was your REAT data for the Combat

10   Arms Version 2 version that you did?

11        A.   I am not sure if I can answer that.  That

12   is something that you'd have to get approval from

13   Michael for me to discuss.

14        Q.   He hasn't objected yet, so --

15        MR. RAFKY:  I'm sorry.  Can you -- can you

16   repeat the question?

17        MR. MONSOUR:  Sure.

18   BY MR. MONSOUR:

19        Q.   When you were testing, when you were doing

20   REAT testing on the Combat Arms Version 2, identify,

21   if you would, the type of REAT testing that you were

22   and the results of the REAT testing?

23        MR. RAFKY:  Actually, I would object to that

24   question given it is not really -- I don't think it is

1  covered by the expert report that was filed for

2  Dr. Murphy's deposition here today.

3      MR. MONSOUR:  I don't understand what you are

4  saying.

5      MR. RAFKY:  I think it is outside the scope of

6  the expert testimony that he is giving.

7      MR. MONSOUR:  Well, I -- I beg to disagree,

8  unless you've got a government objection, I'm going to

9  ask him these questions.  I think he is -- I mean, if

10 he has done testing on a product, I need to know what

11 the results are.

12     MR. RAFKY:  Okay.  Well, I'll go ahead and put

13 my objection on the record.

14          But go ahead, Dr. Murphy.

15 BY MR. MONSOUR:

16     Q.    Okay.  So what type of REAT testing did

17 you do on the CAEv2 and what were the results?

18     A.    So at that time I can tell you that it was

19 not S3.19, 1974 testing.  The subjects involved in the

20 tests were given an instruction.  I personally don't

21 remember what instruction was provided other than, you

22 know, to reach over, grab your ear and insert the

23 earplug.

24          The testing -- and -- and let me -- let me

1  preface this and say that because we were developing

2  our data acquisition system, our REAT system, we never

3  presented the data.  The system may have been

4  completely functional.  I don't know for sure.  In

5  other words, there is -- trying to figure out

6  what's -- what's going on and whether you worked all

7  of the bugs out of the software and -- and the data

8  acquisition, that's certainly a thing that we were

9  trying to do at that point in time.

10             The first study that I recall that we

11  published data from was something in 2004, '5, '6 when

12  the tests were taken using what I would call the NIOSH

13  HPD lab data acquisition system in our REAT

14  laboratory.  And it did not cover any of the Combat

15  Arms Earplug Version 2, Version 3, 4, whatever.  It

16  didn't have any of those.  It used different earmuffs

17  and earplugs in that testing.

18             Now, you've asked me what were the results

19  from the tests.  I don't remember specific results.  I

20  can tell you that out of the 12 persons there were

21  perhaps two of them that didn't get high levels of

22  attenuation.

23             The testing that we conducted with them,

24  you asked me what kind of testing.  At that point in

 1    time we were looking at -- not combat -- the ANSI

 2    S12.6-1997 document or standard and that describes in

 3    it an Informed-User-Fit and a Naive-Subject-Fit or an

 4    untrained user fit.

 5              And the persons who were involved in the

 6    testing, some of them were persons working in my

 7    section at the time and one of those persons was me.

 8    So I would not have counted as a naive subject.  It

 9    would have been then a Method A type test.  But,

10    again, we were providing the persons with the

11    protectors and presuming that they knew how to insert

12    an earplug.

13        Q.    Okay.  So would that be what is called the

14    experimenter supervised under the ANSI 12.6?

15        A.    That would be correct, Method A.

16        Q.    Okay.  Method A.

17              So how many people did you test?  You said

18    12?

19        A.    There are 12 tests in the attenuation data

20    for the green side and there are nine tests for the

21    attenuation data for the yellow side.

22              I can tell you that from what I recall,

23    you know, prior to working on my deposition document

24    for the Touhy request, is I reviewed that.  I was able

```
 1         Q.    This is ridiculous.  Answer my questions,
 2   sir.
 3         MS. OZUROVICH:  Doug --
 4   BY MR. MONSOUR:
 5         Q.    This is not a joke.  You have already been
 6   caught lying once in this damn deposition.  This is
 7   ridiculous.  Will you listen to my questions and
 8   answer them, please.
 9         MS. OZUROVICH:  Doug --
10   BY MR. MONSOUR:
11         Q.    Have you talked to Elliott Berger about --
12         A.    Mr. Monsour, I was in the -- I was in the
13   process of answering your question.
14         Q.    -- whether or not this was a labeling
15   test, the 015, yes or no?
16         MS. OZUROVICH:  Doug --
17   BY THE WITNESS:
18         A.    I'm sorry, repeat the question without
19   yelling at me.
20   BY MR. MONSOUR:
21         Q.    Have you ever talked with Elliott Berger
22   and asked him whether or not the 015 test was a
23   labeling test?
24         A.    No.
```

```
 1        MS. OZUROVICH:  We -- we are -- we are going to
 2  go off the record.  I think we need to take a break.
 3        MR. MONSOUR:  This is ridiculous.  Jesus Christ.
 4  I can't wait to get you in front of a jury, Murphy.
 5        MS. OZUROVICH:  Doug, let's take ten, okay.
 6        THE VIDEOGRAPHER:  Off record.  Time is 3:51.
 7              (WHEREUPON, a recess was had
 8               from 3:51 to 4:01 p.m.)
 9        THE VIDEOGRAPHER:  Back on record.  Time is
10  4:01.
11        MR. MONSOUR:  All right.  Zach, we just sent you
12  something.  Can you pull it up.
13        THE VIDEOGRAPHER:  Did you send it in the last
14  20 minutes or?
15        MR. MONSOUR:  Yes, yes, the Berger testimony.
16        THE VIDEOGRAPHER:  Yes, yes.  I've got it.
17  BY MR. MONSOUR:
18     Q.   All right.  Here is the clips of Elliott
19  Berger's testimony, do you see that?
20     A.   I do.
21     Q.   Go to Page 9.  You can see it says Elliott
22  Berger there, can't you?  Go to Page 9.
23     A.   I see it at the very top, Elliott Berger
24  MS, yes.
```

```
  1                    REPORTER'S CERTIFICATE

  2

  3            I, JULIANA F. ZAJICEK, a Registered

  4    Professional Reporter and Certified Shorthand

  5    Reporter, do hereby certify that prior to the

  6    commencement of the examination of the witness herein,

  7    the witness was duly remotely sworn by me to testify

  8    to the truth, the whole truth and nothing but the

  9    truth.

 10            I DO FURTHER CERTIFY that the foregoing is

 11    a verbatim transcript of the testimony as taken

 12    stenographically by me at the time, place and on the

 13    date hereinbefore set forth, to the best of my

 14    availability.

 15            I DO FURTHER CERTIFY that I am neither a

 16    relative nor employee nor attorney nor counsel of any

 17    of the parties to this action, and that I am neither a

 18    relative nor employee of such attorney or counsel, and

 19    that I am not interested directly or indirectly in the

 20    outcome of this action.

 21

 22

 23               [signature: Juliana F. Zajicek]

 24            JULIANA F. ZAJICEK, Certified Reporter
```