# EXHIBIT 68

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to<br>*All Wave 1 Cases* | ) Case No. 3:19-md-2885-MCR-GRJ<br>)<br>) Judge M. Casey Rodgers<br>) Magistrate Gary R. Jones<br>)<br>)<br>) **CONFIDENTIAL – SUBJECT TO**<br>) **PROTECTIVE ORDER**<br>) |

# EXPERT REPORT OF E. SCOTT ELLEDGE, M.D., F.A.C.S.

**MAY 11, 2022**

**Expert Report of E. Scott Elledge, M.D., F.A.C.S.**
*In Re: 3M Combat Arms Earplug Products Liability Litigation,* **MDL No. 2885**

### I.     BACKGROUND

#### A.     Introduction

The military has a vested interest in preserving the hearing health of its service members. Hearing protection and preservation is vital in order to allow for adequate training and combat readiness, and much of what the military does involves the use of noise emitting equipment and weapons. In my experience as a former medical officer in the Army, protection of service members' hearing is vital so that hearing changes do not inhibit the military's ability to leverage its robust training of soldiers and force service members to change their military occupational specialties (MOS). Nevertheless, the military hearing conservation programs face a unique challenge. The military must balance providing adequate hearing protection while still allowing for vital verbal communication and not sacrificing situational awareness. Additionally, the military noise environment is often unpredictable. Quiet reconnaissance missions that require unoccluded hearing can unexpectedly become sources of toxic noise exposures. Industrial settings where noise sources are quantifiable and predictable still often result in overexposure. Without the luxury of this predictability, ensuring that soldiers are always in the best position to protect their hearing is almost impossible.

The military is very involved in the regulation of hearing protection for service members. However, hearing conservation principles demonstrate that personal protective equipment is the last resort of any hearing conservation program, and has serious limitations. First, in order for hearing protection to be effective, each soldier must be individually fit with and trained on the hearing protection device that best works for them. Ears and auditory canals come in different shapes and sizes, and a plug that works well for many may not work well for some. Second, hearing protection devices all provide different levels or different kinds of attenuation. Therefore, training on when, how, and which hearing protection to use is vital to any attempt to conserve hearing in the military. Finally, soldiers are exposed to some of the loudest noises on earth, that are often unpredictable. Given the obvious limits of all hearing protection, no matter how effective, no hearing protection device can prevent auditory damage from all of these sounds.

I have been asked in this case to utilize my knowledge and background as the former head of Otolaryngology at a military installation, to provide opinions about military hearing conservation programs, their strengths and weaknesses, and how they actually operate.

#### B.     Professional Background

As a private practice otolaryngologist for 28 years and a former U.S. Army otolaryngologist I have unique knowledge and experience with the Army hearing conservation program. As a medical officer at Fort Bragg, North Carolina from 1991-1994, I evaluated numerous active-duty soldiers for their hearing issues, ear related injuries, and medical problems. I worked closely with the staff audiologists from the hearing conservation clinics who were managing the audiological screening for the hearing conservation program at Fort Bragg.

When screening audiograms conducted by audiology technicians identified threshold shifts in soldiers, they were referred to our staff audiologist who did additional testing to confirm the accuracy of the screening test. If after this additional testing there still were concerns, they would be referred to one of our otolaryngologists on staff. Our duties involved discussing each soldier's history, test results, and potential issues with the staff audiologists to facilitate providing medical care to these soldiers. Additionally, in this position I learned a lot about the military's hearing conservation program, its requirements, and how it functioned. I was familiar with the services and hearing protection devices offered by the hearing conservation clinics and their practices for fitting soldiers with hearing protection devices.

Additionally, for 2 years in the military I served as Chief of the Otolaryngology service at Womack Army Hospital Fort Bragg, North Carolina. I was intimately involved in the administration of the hearing conservation program and writing hearing profiles for service members who had hearing changes related to noise exposure. Many times their hearing loss was related to a medical problem that we could address with medication or surgery. For example, when I reported to duty at Fort Bragg, it was virtually empty, but in the ensuing months the soldiers that had served in the Desert Storm operation began to return home. These soldier populations experienced a very high number of tympanic membrane ruptures due to the acoustic injury caused by scud missiles. As a result, I did an unusually large number of tympanoplasties or eardrum repair procedures in those years (many more than an ENT doctor typically encounters in routine otolaryngology practice). Treating these soldiers required obtaining a detailed history, including their noise exposures while deployed and the hearing protection they utilized, and therefore provided me with a tremendous understanding of how the military hearing conservation program was implemented in the field. In my experience, soldiers at this time very rarely wore hearing protection while deployed, and almost never wore hearing protection when in combat or situations where maintaining situational awareness was essential. Since my time in the military, I have continued to stay informed of the changes and updates that have occurred in the military hearing conservation programs.

## II.  OPINIONS

### A.  Hearing Conservation Overview

"Hearing conservation" is a term used to describe the controls used to prevent people who are exposed to noise from experiencing hearing damage. These controls are generally organized into a hierarchy, with some controls being more important and effective than others. An inverted pyramid produced by the National Institute for Occupational Safety and Health illustrates this general concept well:[1]

---

[1] To be clear, the data and information from the National Institute for Occupational Safety and Health addresses the civilian workforce, rather than the military, and is not specific to hearing conservation. With that said, the hierarchy of controls set forth in this period is generally applicable to hearing conservation programs and helps to provide an effective illustration of the concept.

2



At the highest level are the processes of elimination and substitution, which work by eliminating a hazard at its source. At the next level are engineering controls, which essentially work by placing a barrier between a person and the noise hazard. Examples include modifications intended to reduce the noise from a vehicle, such as a muffler. Next, administrative controls work to keep people further distanced from the noise source, or to limit the amount of time that people are exposed to noise.

The last resort is the use of personal protective equipment (earplugs and other hearing protection devices), which is generally the least effective means of protecting people from hearing damage for several reasons. First, because no hearing protection device can completely block out all sound, they are only partial or adjunct solutions to the prevention of noise-induced hearing loss. Additionally, even if an earplug effectively blocks sound from traveling through the middle ear into the cochlea, it is still possible that sound can travel through the temporal bone and harm the cochlea. Second, hearing protection devices can and often do fail due to human error (i.e. forgetting to wear hearing protection or failing to insert an earplug properly on a consistent basis).

Monitoring hearing levels is also an essential aspect of an effective hearing conservation program. As we did when I was the ENT Chief at Fort Bragg, medical practitioners and other health and safety professionals must regularly administer audiograms to people who are exposed to significant steady state or impulse noise in order to assess whether the exposure has caused a shift in the person's hearing thresholds. If such a shift is detected early, the person can be removed from the hazard and protected from further hearing damage. Without effective monitoring and responses to changes in hearing, no hearing conservation program can effectively protect people exposed to regular noise from suffering injury.

In sum, a personal hearing protection device is not intended to be a person's sole protection of their hearing system. Any effective hearing conservation program will (a) implement the controls referenced above to the extent possible, (b) ensure people exposed to noise are regularly monitored for changes in their hearing thresholds, and (c) remove people who display injury from the source of noise exposure. Unfortunately, as described further below, military hearing conservation is unique. Elimination of noise, substitution, engineering controls, and administrative

controls are simply not an option in many military environments. This often results in the military relying on the least effective control most of the time, hearing protection devices.

### B. Military Hearing Conservation Approach

I reviewed the military's guidance relating to hearing conservation training and hearing protection devices for service-members. While the military advocates for personal protective devices per the DoD 6055.12 standards from 1996, section 6.6.1 indicates that personal protective devices are clearly viewed as a stopgap; a temporary and only partial solution to military noise hazard. Per section 6.6.1, "use of personal hearing protectors for limiting noise exposure is considered an interim measure, while engineering control measures are being explored. Such devices are a permanent measure only if engineering and administrative controls are not technologically, economically, or operationally feasible." This is consistent with my experience in the military as there are serious limitations for all hearing protection devices and no hearing protection device will provide complete protection from noise hazards.

Additionally, I considered how the military balances the importance of hearing conservation against their need for soldiers to understand their surroundings and maintain situational awareness in the field. While hearing conservation habits are stressed by command leadership as early as basic training, the military still must balance the need for soldiers to be able to hear directions and be aware of their surroundings in conflict. As plaintiff expert Sergeant Major (retired) Christopher Marshall points out in his report, the military is dedicated to hearing conservation only insofar it doesn't affect the mission. According to table 1.1 of his report, many Army Safety Program standards were "mission dictated" in combat, meaning that depending on the situation, hearing conservation may not be a priority. Such a priority creates a tension between the health of the service members and the capabilities the military needs from service members in combat. In my experience with treating numerous soldiers that have experienced combat related auditory injuries, the military consistently prioritizes the mission over the hearing health of its service members.

Finally, through my analysis of military research, training practices, and instruction, and my involvement with the military hearing conservation programs, the military failed to conserve soldiers' hearing, ultimately often tolerating mere medical readiness over hearing conservation. This is also demonstrated in the expert reports of Sergeant Major (retired) Blaine Huston, Brigadier General (retired) Timothy J. Edens, and Sergeant Major (retired) Christopher Marshall. The military's medical readiness standard adopts a "war readiness focus" that requires hearing protection be on the person of all service-members, but often does not ensure service members know how to use or fit the hearing protection properly. In fact, a service member could have extremely diminished hearing capability, but still be considered "medically ready" for combat.

### C. Military Hearing Conservation Program Regulations

#### 1. DoD Instruction Manual 6055.12 (1996)

The Department of Defense publishes the DoD instruction manual 6055.12 which dictates the policies and procedures for military hearing conservation programs. Each service branch then develops their own policies, while considering the guidance provided in DoD 6055.12.

Also available to hearing conservation programs, are a number of training and instructional tools that address hearing conservation principles like the effects of noise on hearing, the purpose of hearing protection, and the importance of reporting any concerns about the proper fit and use of hearing protection. Personnel also complete a 20-hour course instituted by the Council on Accreditation for Occupational Hearing Conservation (CAOHC) that provides education about various personal hearing protection devices and hearing conservation principles.

The 1996 version of DoD 6055.12 was in effect from approximately 1996 to 2004.[2] The 1996 DoD regulations note in section 6.6.1 that "hearing protectors to limit noise exposure is considered to be an interim protective measure, while engineering control measures are being explored. Such devices shall constitute a permanent measure, only if engineering controls are not technologically, economically, or operationally possible." Additionally, section 6.6.5 states that soldiers are allowed to choose their personal hearing protection from the devices approved by the military, they were not simply required to wear the hearing protection issued to them. Enclosure 4 of the regulations provided the National Stock Numbers (NSNs) for earplugs, noise muffs, noise muff replacement seals, and noise muff replacement filters that have been approved by all Military Service medical authorities. For preformed plugs, the DoD stated in section 6.6.7 that they "shall be fitted and issued only under the supervision of personnel who have been specifically trained to fit earplugs." Likewise, section 6.6.9 required that "[m]edically trained personnel must examine the fit and condition of preformed and custom earplugs at least annually."

### 2. DA PAM 40-501 (1998)

Department of the Army pamphlet 40-501 is the Army's codification of similar requirements. The Army recognized that hearing loss is not always preventable and emphasized that hearing loss can adversely impact communication and mission readiness. Sections 2-2 to 2-4 confirm my comments above about hearing protection being the last resort in hearing conservation programs. DA PAM section 5-1 states "[t]he most desirable hearing conservation measure is reducing noise levels at their source and eliminating harmful health effects." The section on hearing protection confirms that soldiers do not just have to wear the hearing protection they are issued, but gives Army personnel the ability to select the type of hearing protection device they would like to use, unless it is medically contraindicated or inappropriate for a particular noise hazardous environment. DA PAM 40-501, 6-1.b (1998).

DA PAM 40-501 required soldiers in training, noncombat, or nonindustrial scenarios, to wear hearing protection if steady state noise is greater than or equal to 85 dBA, or double hearing protection (over the ear hearing protection worn over the in the ear hearing protection) if the noise is greater than 108 dBA. For impulse noise under 140 dBP, hearing protection was not required, for impulse noise ranging from 140 to 165 dBP hearing protection was required, and for impulse noises greater than 165 dBP double hearing protection was required.

In combat scenarios, the requirements dissipated. The regulations note that hearing protection can improve readiness and prevent injuries that can impair ability to communicate and detect necessary sounds in combat. But the regulations ultimately state that soldiers in combat

---

[2] The 2004 and 2010 DoD also contain substantially similar requirements.

5

"should NOT wear hearing protectors when they impair necessary hearing, for example, with dismounted infantry operations." This is a great example of how the military puts mission readiness before hearing conservation.

Additionally, the Army regulations note that in situations where noise levels rise infrequently and unpredictably, wearing hearing protection may be impractical and unnecessary per Section 3-4. In my experience, this failure to wear hearing protection on a constant basis in the military often results in severe and acute overexposure to noise. For example, many of the soldiers returning from Operation Desert Storm reported being unexpectedly exposed to scud missiles while not wearing hearing protection, which resulted in severe auditory injury and tympanic membrane perforations.

The Army regulations also required that for preformed earplugs, "medically trained personnel must fit and examine these earplugs at least annually to ensure proper fit and condition" and demanded that triple-flange earplugs, which were available when I was Chief of Otolaryngology at Fort Bragg, be the first type of earplug medically trained personnel attempt to fit. If these cannot be fitted for an individual, they must be fitted with another plug. Similar to the DoD regulations, soldiers would only receive custom molded plugs when they could not be fit with any other hearing protection device.

### 3. Army Hearing Program Special Text 4-02.501 (2008)

In 2008 the Army published Special Text 4-02.501, which provides techniques and procedures intended to help prevent noise induced hearing loss in order to ensure maximum combat effectiveness. The Special Text was designed to be used in concert with other publications, including DA PAM 40-501 (1998). The Special Text noted the increased numbers of hearing loss that occurred as a result of Operation Iraqi Freedom, mainly caused by IEDs, and reccomended restructuring the Army hearing conservation model.

The first part of this new program was hearing readiness, a process aimed to ensure soldiers have the hearing capability to perform their duties and have the correct personal protective equipment. Army Hearing Program ST 4-02.501 (2008) at 13. The purpose, largely covered by DA PAM 40-501, was to identify early changes in hearing and provide education, individual counseling, and hearing protection. Id. Similar to DA PAM 40-501, the Special Text focuses on mission readiness, noting "[p]oor hearing jeopardizes the unit mission and increases the likelihood of a serious mishap . . . ." Additionally, for the first time in the military, soldiers were instructed to wear hearing protection while deployed, including nonlinear hearing protection, like the Combat Arms earplugs, while conducting dismounted ground operations. Notably, the document indicates that "[a]s reported by audiologists who served in Iraq, no Soldier seen at the CSH that reported wearing the CAE when exposed to an explosion had ruptured eardrums." Army Hearing Program ST 4-02.501 (2008) at 13.

The special text also implemented: (1) clinical services, which focused on delivering audiological services as far forward on the battlefield as possible, (2) operational hearing services, which focused on providing information about "noise assessment and reduction and hearing protection to reduce the impact of noise and NIHL on military operations," and (3) it reinforced the hearing conservation principles, as described in DA PAM 40-501.

6

### 4. *Training and Fitting Required*

As the Chief Otolaryngologist at Fort Bragg, it was my experience that the military alone was responsible for the instructional materials given to soldiers, and for training soldiers on how to fit hearing protection devices. The trainings were often distributed from USACHPPM (now known as the Army Public Health Command) in the form of presentations, instructions, and wallet cards. I never observed or was given instructions directly from the manufacturer of a hearing protection device.

Based on DoD 6055.12 and DA PAM 40-501, and my personal experience treating members of the military, the military required soldiers wearing preformed earplugs to be trained on the use of and individually fit with the plugs, and this must be done annually. *See. also* LTC Fallon Dep. Tr. at 75:11-76:1; LTC Merkley Dep. Tr. at 24:17-26:13; LTC Battler Dep. Tr. 23:4-24:24. Based on my experience, this would have involved being fit with various hearing protection devices until a specific hearing protection device was inserted and was confirmed to provide a good acoustic seal. LTC Merkley Dep. Tr. 36:11-15. If the medically trained personnel were unable to achieve a proper fit with a preformed plug, then the aforementioned regulations required them to fit the soldier with other hearing protection devices until they found one that achieved a sufficient acoustic seal. LTC Fallon Dep. Tr. at 265:7-266:17; LTC Battler Dep. Tr. at 24:11-22. The DoD regulations as early as 1996 recognize that all earplugs could potentially loosen and would need to be reseated. But, in my experience, if a preformed earplug did loosen it would be immediately noticeable because the sound in one ear would be louder than the other. LTC Merkley Dep. 227:4-18; LTC Battler Dep. Tr. 60:1-61:15.

In my experience, the military would not rely on the manufacturer's instructions to train or fit the soldiers with a hearing protection device, nor would it rely on the manufacturers themselves to train the soldiers. In my experience, the military hearing conservation programs used internal training materials and fit soldiers with hearing protection devices themselves. There are several reasons why this was the best option. First, the military developed its own regulations assuming responsibility for training and education, leveraging its prior experience and infrastructure already in place, which made it uniquely capable of accomplishing this awesome task. Second, the military is in the unique position of knowing precisely what each soldier needs. The military understands the noise environments that a soldier might experience and what hearing protection device might be best for a given soldier or MOS. The military considers personal protective hearing devices to be a part of the uniform. Finally, the military, fitting tens of thousands of soldiers every year, quickly gains experience and expertise in fitting that surpasses any manufacturer.

### 5. *Annual Testing*

In addition to annual fitting and training on preformed plugs, the military regulations also require annual audiometric testing in order to monitor soldier's hearing thresholds. This testing required soldiers to bring their hearing protection that they routinely used to the appointment, which was supposed to be recorded as their hearing protection in their audiogram. DoD 6055.12 enclosure 12 (1996). Additionally, the soldiers would be asked to fill out a questionnaire, which asked, among other things, whether they were experiencing tinnitus or subjective noise in their ears. If the soldier reported experiencing this, tinnitus would have been noted in the notes section

of their audiogram. If a soldier reported that he was not experiencing tinnitus, it would not have been noted in his audiogram.

My work as an ENT physician in the military required that I be familiar with and able to interpret these annual audiograms and I came across them on a daily basis. As noted above, the initial annual audiograms were screening audiograms that were conducted to quickly identify changes in hearing from a reference audiogram. A shift in these screening audiograms is not sufficient to show someone has hearing loss, or noise induced hearing loss in particular. Rather, we routinely saw soldiers who experienced temporary threshold shifts that completely resolved by the next day. However, if a soldier's hearing did not resolve upon subsequent retesting, that soldier would then be referred to an ENT, like myself. In the military we defined normal hearing as -10 to 25 decibels (dB).

**Ranges of Hearing**
- -10 - 25 dB HTL Normal hearing
- 26 - 40 dB HTL Mild hearing loss
- 41 - 65 dB HTL Moderate hearing loss
- 66 - 90 dB HTL Severe hearing loss
- 90 + dB HTL Profound hearing loss

Department of the Army, Army Hearing Program 3D Infantry Division (Mechanized) Hearing Program (2007); Noise and Military Service, Implications for Hearing Loss and Tinnitus (2006) at 21; NIOSH, Criteria for a Recommended Standard, Occupational Noise Exposure (1998) at 19.

When these patients were referred to me, I would conduct a complete history, including their noise exposure and hearing protection history, and try to determine what may have caused the shift in hearing. Often these changes were due to things unrelated to noise, like conductive hearing loss due to a cold or otitis media. If we determined the soldier's hearing change was most likely due to noise, they would be issued and fit with new hearing protection, given general hearing conservation education, and potentially removed from the noise source that likely caused the shift.

Ultimately, however, the military hearing conservation is not about preventing hearing loss, a likely impossible goal under the circumstances, but rather focuses on medical readiness. Brigadier General Edens' expert report argues hearing falls into the same risk management scheme as any other safety issue for the military. He also states that in order to maintain soldier safety, every soldier must satisfy the military's readiness standard. This standard has many components that include physical ability and medical readiness. However, in practice, the military's standard for medical readiness is inadequate to protect a soldier's hearing. Instead of focusing on individual hearing capability metrics, the military satisfies the medical readiness standard if the unit possesses hearing protection. In my experience, a service member can have barely functional hearing and still be considered "medically ready" if the service member has hearing protection. Only in

8

extreme circumstances would a soldier not be considered medically ready, and this would often result in the soldier being reassigned to a different MOS with less noise exposure.

      6.    *Testing*

It is my understanding and experience that hearing protection devices used by the military and issued to servicemembers were thoroughly tested by the military before they were used. In my experience, the hearing conservation programs did not rely on manufacturer testing, but relied on the testing conducted by the military itself.

Notably, in the table of military approved hearing protectors contained in Table 6-1 of DA PAM 40-501 (1998), no noise reduction ratings (NRR) as calculated under ANSI S3.19-1974 are included for any of the plugs. Additionally, the USACHPPM guidance notes that NRRs as calculated by ANSI S3.19-1974 have been widely criticized as being an oversimplification and a compromise, since studies have shown that users in the field typically get a fraction of the protection. Similarly, the Air Force Research Lab has called ANSI S3.19 experimenter fit test results, "not practical." United States EPA Workshop on Hearing Protector Devices (2003) at 134.

Rather than rely on ANSI S3.19 results from manufacturers, DA PAM section 6-2 states that "[a]ttenuation data based on method B (subject fit) of ANSI S12.6-1997 will be used to evaluate the potential effectiveness of hearing protectors." Likewise, the United States Army Center for Health Promotion and Preventive Medicine (USACHPPM) 2006 guidance on hearing protection states that all earplugs approved by the Army "have been tested for attenuation characteristics in accordance with (IAW) the ANSI, S12.6-1997." TG 41 Personal Hearing Protective Devices - Their Fitting, Care, and Use at 13.

The DoD first authorized the Air Force to conduct Method B testing in 1998, and pursuant to that authorization the Air Force Research Laboratory (AFRL) at Wright-Patterson Air Force Base provided independent assessments of hearing protection devices for the DoD. United States EPA Workshop on Hearing Protector Devices (2003) at 139. Indeed, up until 2016 the Air Force's preferred method for selecting hearing protection devices for use in continuous noise was Method B testing done by AFRL, whereas manufacturer ANSI S3.19 testing was least preferred.

Table A4.1. Preferred Methods for Selecting Attenuation Values for HPDs for Continuous Noise.

| | |
|---|---|
| 1 - Most Preferred | AFRL ANSI measured values utilizing the ANSI S12.6 |
| 2 | Other independent laboratories values utilizing the ANSI S12.6 |
| 3 | Manufacturer values utilizing the ANSI S12.6 |
| 4 - Least Preferred | Manufacturer values utilizing ANSI S3.19 derated by 50% for earplugs and 25% for earmuffs |

Air Force Instruction 48-127, Occupational Noise and Hearing Conservation Program (2016) at 49. This is consistent with my time working with the hearing conservation program at Fort Bragg,

9

where manufacturer NRRs were not relied on, but military testing and instructions were utilized to ensure plugs were providing adequate attenuation.

### III. CONCLUSION

In sum, the military's hearing conservation program has a vested interest in protecting the hearing of its service members, but hearing protection devices alone do not allow for adequate protection. First, a personal hearing protection device should not be a person's sole protection of their hearing system. Any effective hearing conservation program will also mitigate exposure, ensure service members exposed to noise are regularly monitored for changes in their hearing thresholds, and people with hearing injuries are removed from noise exposure. Elimination of noise, substitution, engineering controls, and administrative controls are not an option in many military environments. This often results in the military relying on the least effective control most of the time, hearing protection devices. Hearing protection devices are the least effective control because they must be individually fit, service members must be trained, and then they are ultimately responsible for their use. Adequate hearing conservation using this technique is likely impossible due to the volume of soldiers, varying degrees of effective training from unit to unit, and the unpredictability of combat environments. While good hearing conservation habits are stressed to service members, the military must still balance the need for soldiers to be able to communicate and be aware of their surroundings in conflict with their need for hearing protection. As such, the military hearing conservation is not about preventing hearing loss but about making sure every service member is medically prepared for combat, a standard that includes individual hearing protection. In my experience, the military's medical readiness standard does not adequately account for hearing protection or shifts in hearing capability. Instead of focusing on individual hearing capability metrics, the military satisfies the medical readiness standard if the unit possesses hearing protection. Using this standard, a service member could have barely functional hearing and still satisfy the medical readiness standard if they possess hearing protection.

Dated: May 11, 2022

*E. Scott Elledge, MD*

_____
E. Scott Elledge, MD

# MATERIALS CONSIDERED

# APPENDIX: LIST OF MATERIALS CONSIDERED

## Case Materials

All documents cited in my report that are not cited herein.
Each cited document as well as any attachments to that document.

## EXPERT REPORTS

Blaine Huston General Expert Report
Christopher Marshall General Expert Report
Timothy J. Edens' General Expert Report

## DEPOSITION TESTIMONY

Deposition of Eric Fallon Volume 1, dated September 3, 2020 and related deposition exhibits

Deposition of Eric Fallon Volume 2, dated September 4, 2020 and related deposition exhibits

Deposition of John Merkley, dated February 26, 2020 and related deposition exhibits

Deposition of Kathy Gates, dated May 29, 2020 and related deposition exhibits

Deposition of Leanne Battler, dated September 10, 2020 and related deposition exhibits

Deposition of Lorraine Babeu, dated March 10, 2020 and related deposition exhibits

## SUPPLEMENTAL DOCUMENTS

Air Force Instruction 48-127, dated 2/26/2016 (D-GEN-3094)
Army Hearing Program, Special Text 4-02.501, Headquarters, Department of the Army, dated 2/1/2008 (D-GEN-0829)
Audiogram - Counseling Presentation (D-GEN-3076)
Audiometric Testing and Follow-Up Presentation (Slide 46) (D-GEN-3075)
Booklet: USACHPPM TG 41, Personal Hearing Protective Devices: Their Fitting, Care, and Use (March 2006) (D-GEN-0788)
Department of Defense Instruction Number 6055.12, DoD Hearing Conservation Program (HCP), dated 03/05/2004 (S-GEN-0068)
DoD Instruction 6055.12 Hearing Conservation Program, dated 08/14/2019 (D-GEN-0583)
Hearing Conservation Program, Department of the Army Pamphlet 40-501, dated 12/10/1998 (D-GEN-1962)
NIOSH Occupational Noise Exposure (1998) (D-GEN-1417)
Papers and Proceedings, U.S. Environmental Protection Agency Workshop on Hearing Protection Devices, Washington D.C., March 27-28, 2003 (D-GEN-0764)

Scott Elledge, MD
May 11, 2022

Regulation: Army Hearing Program 3D Infantry Division (Mechanized) Hearing Program, dated 2007-01-10 (D-GEN-0099)

Report: Department of Defense Instruction, Number 6055.12, Subject: DoD Hearing Conservation Program (HCP), dated 3/5/2004 (D-GEN-0356)

Report: Department of Defense Instruction, Number 6055.12, Subject: DoD Hearing Conservation Program (HCP), dated 04/22/1996 (S-GEN-0003)

Report: DoD Instruction Memo re Hearing Conservation Program (HCP), A. Carter, dated 12/3/2010 (D-GEN-0414)

Report: Noise and Military Service: Implications for Hearing Loss and Tinnitus, L. Humes, L. Joellenbeck et al., eds. (2006) (D-GEN-0639)

Scott Elledge, MD
May 11, 2022