EXHIBIT C

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to: *All Wave 1 Cases* | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## <u>DECLARATION OF JENNIFER M. HOEKSTRA IN SUPPORT OF PLAINTIFFS' REMAND WAVE 1 MOTION FOR SUMMARY JUDGMENT ON SUCCESSOR LIABILITY</u>

1.     My name is Jennifer M. Hoekstra, and I am a partner at Aylstock, Witkin, Kreis & Overholtz, PLLC. I am a member of the Discovery & ESI Subcommittee.

2.     I respectfully submit this declaration in support of the Plaintiffs' Remand Wave 1 Motion for Summary Judgment on Successor Liability.

3.     Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge or my review of relevant documents. I am over the age of 18 and submit this Declaration on behalf of the above-captioned Plaintiff. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

4.     Attached hereto as Exhibit 1 is a true and correct copy of the Court's September 19, 2022 Case Management Order No. 52. Dkt. 3467. This order required 3M Company to file answers to the Remand Wave Plaintiff's Individual Short Form

Complaints on or before October 3, 2022 for Wave 1, 2 and 3 and within 14-days of any future Wave orders for those cases.

5.       Attached hereto as Exhibit 2 is a true and correct copy of 3M Company's Answer to Second Amended Short-Form Complaint for Christopher Cabiness, Case No. 7:20-cv-30523, Dkt. 48, filed on September 27, 2022. This answer includes a denial that 3M Company is "independently and solely liable for the Combat Arms Earplugs version 2("CAEv2") liabilities as a successor in interest to any Other Defendants. Defendants is not liable for damages caused is whole, or in part, by the conduct of Other Defendants."   The Answer also include apportionment and superseding causes – "including but not limited to Plaintiff, Other Defendants and the United States." (*See* Defenses and Affirmative Defenses para. 21, 23 and 24). Further 3M Company included statements disavowing successor interest to the Other Defendants and indicated in Defenses and Affirmative Defenses para. 37 that:

> (a) "Defendant was not involved in the sale, marketing, or manufacturing of the CAEv2 before Aearo became Defendant's subsidiary in 2008.

> (b) Defendant did not make any representations to the United States military about the CAEv2 before Aearo became Defendant's subsidiary in 2008.

> (c) Defendant was not involved in the design of the CAEv2.

This complaint is exemplar of those filed in answer to Amended Short Form Complaints filed by various Plaintiffs to remove the Aearo Debtors following the July 26, 2022 bankruptcy filing for the Aearo Debtors.

6.     Attached hereto as Exhibit 3 is a true and correct copy of 3M Company's Answer to Short-Form Complaint for Lakobi Keon Hopson, Case No. 7:20-cv-12063, Dkt. 23, filed on September 29, 2022. This Answer includes apportionment and superseding causes – "including but not limited to Plaintiff, Other Defendants and the United States." (*See* Defenses and Affirmative Defenses para. 21, 23 and 24). Further 3M Company included statements disavowing successor interest to the Other Defendants and indicated in Defenses and Affirmative Defenses para. 37 that:

(a) "Defendant was not involved in the sale, marketing, or manufacturing of the CAEv2 before Aearo became Defendant's subsidiary in 2008.

(b) Defendant did not make any representations to the United States military about the CAEv2 before Aearo became Defendant's subsidiary in 2008.

(c) Defendant was not involved in the design of the CAEv2.

This complaint is exemplar of those filed in answer to Short Form Complaints filed by various Plaintiffs which had not been amended to remove the Aearo Debtors following the July 26, 2022 bankruptcy filing for the Aearo Debtors.

3

7.     Attached hereto as Exhibit 4 is a true and correct copy of 3M Company's Redline of the Amended Answer to Amended Short-Form Complaint for Jay Beal, Case No. 7:20-cv-000006 exchanged between the parties on September 27, 2022. This template answer includes a denial that 3M Company is "independently and solely liable for the Combat Arms Earplugs version 2("CAEv2") liabilities as a successor in interest to any Other Defendants. Defendants is not liable for damages caused is whole, or in part, by the conduct of Other Defendants." The redline exemplar Answer also include apportionment and superseding causes – "including but not limited to Plaintiff, Other Defendants and the United States." (*See* Defenses and Affirmative Defenses para. 21, 23 and 24). Further 3M Company included statements disavowing successor interest to the Other Defendants and indicated in Defenses and Affirmative Defenses para. 37 that:

(a) "Defendant was not involved in the sale, marketing, or manufacturing of the CAEv2 before Aearo became Defendant's subsidiary in 2008.

(b) Defendant did not make any representations to the United States military about the CAEv2 before Aearo became Defendant's subsidiary in 2008.

(c) Defendant was not involved in the design of the CAEv2.

This complaint is exemplar redline showing 3M Company's changes from the Answer to a Short Form Complaint filed in the Jay Beal Bellwether case (Case No. 7:20-cv-000006) to show the redline changes applied to all Answers filed in Wave

4

cases by 3M Company between September 19 and October 3, 2022 relating to independent and sole liability for the Combat Arms Earplugs version 2 following the July 26, 2022 bankruptcy filing for the Aearo Debtors.

8.      Attached hereto as Exhibit 5 is a true and correct copy of Defendant 3M Company's Response to the Motion to Transfer Related Actions for Coordinated Pretrial Proceedings filed February 19, 2019. 3M Company supported centralization in 2019 during proceedings with the JPML and indicated that "3M acquired Aearo in 2008. . . The acquisition added, among other things, hearing protection, eyewear protection, and fall protection to 3M's product lines, including the Combat Arms Earplugs." Ex. 5 at 3. The company went on to confirm that "After acquiring Aearo in 2008, 3M continued to sell CAE2 through 2015." *Id.* at 4.

9.      Attached hereto as Exhibit 6 is a true and correct copy of Defendants' Amended Answer to Master Long Form Complaint filed February 3, 2020. Plaintiffs alleged that "Defendant 3M is liable for Aearo Defendants' conduct;" in response 3M said no response was required and specifically responded that "To the extent a response is required, Defendants admit that Aearo Technologies LLC is a successor of Aearo Company I. Defendants further admit that the Aearo Defendants are indirect, wholly-owned subsidiaries of 3M."

Specifically, in their answer to the Master Complaint, Defendants admitted the allegations in paragraphs 18 and 19.  See Case No. 3:19-md-02885, ECF 800 at ¶¶ 18-19. In those paragraphs, Plaintiffs allege:

> 18. On or about November 15, 2007, 3M and/or 3M Occupational Safety LLC (collectively, "3M Defendants") acquired Aearo Holding LLC, Aearo Intermediate LLC, Aearo LLC, and Aearo Technologies LLC (collectively, "Aearo Defendants") for approximately $1.2 billion.
>
> 19. Defendant Aearo Technologies LLC's sole member is Defendant Aearo LLC, whose sole member is Defendant Aearo Intermediate LLC, whose sole member is Defendant Aearo Holding LLC, whose sole member is Defendant 3M Occupational Safety LLC, whose sole member is Defendant 3M.

Case No. 3:19-md-02885, ECF 704 at ¶¶ 18-19. Thus, 3M Company owns and controls 100% of the other five named defendants.

Further, 3M Company answered jointly with the Aearo Debtor Defendants and jointly agreed with the following statements, never previously indicating in more than 3 years of MDL CAEv2 litigation or the preceding decade of patent and qui tam disputes that 3M Company was not independently and solely liable:

> ¶5. Defendants admit selling the Dual-Ended Combat Arms Earplug to the United States to the military and/or to distributors for more than a decade. Defendants admit selling ARC Earplugs and/or Indoor/Outdoor Range Earplugs to non-military purchasers and/or to distributors for more than a decade. Defendants are without sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 5 of the Master Complaint.

¶11. Defendants admit providing the Dual-Ended Combat Arms Earplug to the United States military and/or to distributors between approximately 1999 and approximately 2015.

¶30. Defendants admit that the Dual-Ended Combat Arms Earplug is a one-sized, dual-ended, triple-flanged earplug. Defendants admit that they, in collaboration with the United States military, created, manufactured, constructed, assembled, designed, tested, promoted, advertised, marketed, and distributed the Dual-Ended Combat Arms Earplug. Defendants admit that they sold the Dual-Ended Combat Arms Earplug to the United States Military and/or to distributors between approximately 1999 and approximately 2015, and sold the ARC Earplug and/or the Indoor Outdoor Range Earplug to non-military purchasers and/or distributors between approximately 2000 and approximately 2015.

¶33. Defendants admit that they, in collaboration with the United States military, designed the Dual-Ended Combat Arms Earplug to principally be used as a hearing protection device, and included a dual-mode feature enabling users to choose the required level of protection based on the type of activity that required hearing protection.

¶34. Defendants admit that they, in collaboration with others, designed the green end to act like a traditional earplug, providing steady and continuous protection from ambient noise.

¶35. Defendants admit that at times the olive-colored end of the Dual-Ended Combat Arms Earplug was referred to as the "closed," "blocked," or "linear" end.

¶45. Defendants admit that they licensed various patents from ISL.

¶46. Defendants admit that they, in collaboration with the United States military, created the Dual-Ended Combat Arms Earplug by attaching an Ultrafit-type earplug to either end of a plastic stem with a small opening in the center.

¶51. Defendants admit that the Combat Arms Earplug was jointly created by Defendants and the United States military.

7

¶53. Defendants admit that they sold the Dual-Ended Combat Arms Earplug to the United States Military and/or distributors between approximately 1999 and approximately 2015, and sold the ARC Earplug and the Indoor/Outdoor Range Plug to non-military purchasers and/or distributors between approximately 2000 and approximately 2015.

¶60. Defendants admit that, in addition to selling the Dual-Ended Combat Arms Earplug, Defendants also sold the ARC Earplug and the Indoor/Outdoor Range Plug.

¶77. Defendants admit that they have tested their hearing protection devices at the E-A-RCAL laboratory since at least December 1999.

¶89. Defendants admit that they were conducting tests of the Dual-Sided Combat Arms Earplug at the E-A-RCAL Laboratory in December 1999.

¶90. Defendants admit conducting a test, identified as Test 213015, which involved the closed, blocked, or linear end of the of the Dual-Ended Combat Arms Earplug.

¶91. Defendants admit conducting a test, identified as Test 213016, which involved the open, unblocked, or non-linear end of the of the Dual-Ended Combat Arms Earplug.

¶98. Defendants admit that, when conducting a labeling test, they would normally select ten test subjects from a panel of individuals.

¶99. Defendants admit that they determine the NRR by measuring a subject's hearing without an earplug, with the closed end inserted to achieve a best fit, and with the open end inserted to achieve a best fit.

¶100. Defendants admit [Defendants monitored the results of each subject during the testing.]

¶101. Defendants admit that, after evaluating test data from eight subjects who participated in Test 213015, Defendants decided not to test the final two subjects.

¶102. Defendants admit that, after concluding Test 213015, they examined potential ways to address the variability in test results.

¶106. Defendants admit that, after concluding Test 213015, they examined potential ways to address the variability in test results.

¶107. Defendants admit that the geometry of a subject's earcanal opening sometimes prevented the deep plug insertion required for maximum attenuation values.

¶113. Defendants admit that, using data generated during Test 213016 of the open end of the Dual-Ended Combat Arms Earplug, an NRR of -2 was obtained.

¶118. Defendants admit that they reported the NRR as 0.

¶125. Defendants admit [Defendants identified this test as "Test 213017" and used a different panel of subjects than they used in Test 213015.]

¶126. Defendants admit that, for certain subjects, the fitting technique used in Test 213017 was different from that used in Test 213015.

¶132. Defendants admit that one subject was retested.

¶143. Defendants admit that, in June 2004, they administered Test 215009 of the open end of the Dual-Ended Combat Arms Earplug. The test involved ten subjects and Defendants calculated an NRR of -1.

¶149. Defendants admit that, in April 2006, they administered Test 215012 of the open end of the Dual-Ended Combat Arms Earplug. The test involved ten subjects and Defendants calculated an NRR of 5.

¶152. Defendants admit explaining that the open end of the Dual-Ended Combat Arms Earplug enhances situational awareness by allowing users to hear low-level sounds, like speech, while receiving protection from unexpected impulse noise.

¶154. Defendants admit that they sold the Dual-Ended Combat Arms Earplug to the United States Military and/or to distributors between approximately 1999 and approximately 2015, and sold the ARC Earplug and/or the Indoor Outdoor Range Earplug to non-military purchasers and/or distributors between approximately 2000 and approximately 2015.

¶155. Defendants admit that the Dual-Ended Combat Arms Earplug was discontinued on or about November 2015.

¶173. Defendants admit that certain instructions on certain products included the statement quoted in Paragraph 173 of the Master Complaint. Defendants further state that certain packaging and labeling also included other statements and instructions. Defendants further state that representatives of the military informed defendants that the military would provide instructions concerning the use of earplugs. Defendants further state that the packaging and labeling used varied, depending upon the product and the time period.

¶189. Defendants admit that they discontinued the Dual-Ended Combat Arms Earplug on or about November 2015.

¶207. Defendants admit that the Dual-Ended Combat Arms Earplug was discontinued on or about November 2015.

¶211. Defendants admit developing a single-sided earplug with multiple tip sizes.

¶229. Defendants admit that a 22 NRR was calculated for the closed end of the Dual-Ended Combat Arms Earplug in Test 213017.

¶239. Defendants admit that they filed suit to stop Moldex's alleged infringement of 3M's patents and recover damages.

¶240. Defendants admit [[t]he lawsuit accused Moldex of infringing U.S. Patent No. 6,070,693 ("'693 patent"), which Defendants had purchased and/or licensed from ISL and ultimately used to design and develop the Dual-Ended Combat Arms Earplug.]

¶241. Defendants admit that, in their answer, Moldex denied that it was infringing the '693 patent.

¶242. Defendants admit that the complaint sought injunctive relief to stop infringement of the '693 patent.

¶243. Defendants admit that they sent a covenant not to sue to Moldex.

¶244. Defendants admit [3M Defendants argued that the district court no longer had jurisdiction to hear their '693 patent claim or Moldex's dispositive motion of noninfringement.].

¶245. Defendants admit [3M Defendants then moved to dismiss their infringement claims regarding the '693 patent with prejudice and to dismiss Moldex's counterclaims of noninfringement and invalidity of the '693 patent without prejudice.].

¶246. Defendants admit [On June 19, 2013, the district court dismissed with prejudice 3M Defendants' claims against Moldex relating to the '693 patent.].

¶247. Defendants admit [The district court also dismissed without prejudice Moldex's claim for a declaration that BattlePlugs did not infringe the '693 patent.].

¶248. Defendants admit filing a covenant not to sue, which ended the lawsuit against Moldex.

¶249. Defendants admit that Moldex filed the lawsuit described in Paragraph 249 of the Master Complaint.

¶250. Defendants admit that Moldex made the allegation described in Paragraph 250 of the Master Complaint.

¶251. Defendants admit that the district court found that Moldex had shown "3M [wa]s not immune" to Moldex's malicious prosecution claim.

¶252. Defendants admit [The district court then granted Moldex's motion for summary judgment on the objective baselessness of 3M Defendants' '693 patent claim, holding that "[n]o reasonable litigant could realistically expect success on the merits of 3M's claim that Moldex Metric infringed the '693 Patent."}.

¶256. Defendants admit [On May 12, 2016, Moldex filed a sealed *qui tam* complaint against Defendant 3M under the False Claims Act, 31 U.S.C. § 3729 et seq. *See United States ex rel. Moldex-Metric, Inc. v. 3M Co.*, Case No. 3:16-cv-01533 (D.S.C.).].

¶257. Defendants admit [Moldex alleged, on behalf of the United States, that Defendant 3M sold the Dual-Ended Combat Arms Earplug to the "U.S. military for more than a decade without its knowledge of the defect."].

¶258. Defendants admit that the United States elected to intervene in the *qui tam* action.

¶259. Defendants admit that they paid $9.1 million to settle the *qui tam* action filed by Moldex.

¶260. Defendants admit that Paragraph 260 of the Master Complaint [As one government official put it: "3M should have told the US Government about the slippage issues" with the Dual-Ended Combat Arms Earplug.] contains a quote from a government report.

¶282. Defendants admit that, in collaboration with the United States military, they designed, manufactured, and sold the Dual-Ended Combat Arms Earplug.

¶454. Defendants admit that they earned revenue from selling the Dual-Ended Combat Arms Earplug.

Further, 3M Company and the Aearo Debtors failed to raise any

Affirmative Defenses against other Defendants in their Master Answer,

Amended Master Answer, or any individual answers to the Bellwether

Plaintiff's Short Form Complaints.

10.     Attached hereto as Exhibit 7 is a true and correct copy of an excerpt of

the Brian Myers 30(b)(6) deposition taken October 18, 2019. Mr. Myers engaged in

the development and sale of the CAEv2 while at Aearo, worked post-acquisition by

3M Company from 2008-2010 to integrate the Aearo earplug business into 3M and

from 2012 onward headed up the 3M Business Group which included hearing

protection. During his testimony as a Corporate Representative for 3M Company,

Brian Myers, who had been employed by both Aearo and then 3M Company after

the 2008 acquisition, testified that he "didn't know there was an Aearo anymore."

Ex. at 14-15.

11.     Attached hereto as Exhibit 8 is a true and correct copy of an excerpt of

the Elliott Berger 30(b)(6) deposition taken November 13, 2019. Mr. Myers engaged

in the development and manufacture of the CAEv2 while at Aearo, worked post-

acquisition by 3M Company as part of the integrated Aearo earplug until his

retirement in 2018. During his testimony as a Corporate Representative for 3M

Company, Elliott Berger, who had been employed by both Aearo and then 3M

Company after the 2008 acquisition, testified that 3M Company was the exclusive

patent holder of three patents relating to the CAEv2 after "3M acquired Aearo and

their assets and liabilities" in 2008"  Ex. at 12:2-17, 177:8-19.

12.     Attached hereto as Exhibit 9 is a true and correct copy of an excerpt of the Brian S. McGinley 30(b)(6) deposition taken April 3, 2013 in the Moldex-Metric Litigation. Mr. McGinley testified that 3M acquired Aearo in 2008 and explained the current status (as of 2013) of the Aearo Company as "rolled up under 3M parent . . . There is one legal entity held outside of 3M parent, but it's not related to the safety business." Ex. at 17:25-18:13.

13.     Attached hereto as Exhibit 10 is a true and correct copy of an excerpt of the Choice of Law, Bellwether Group A Evidentiary Hearing on January 8, 2021, where Brian Myers testified on behalf of 3M Company. During his testimony, Brian Myers, who had been employed by both Aearo and then 3M Company after the 2008 acquisition, testified that the Aearo headquarters "was liquidated; it ceased to exist." See Ex. at 265:17–266:11.

14.     Attached hereto as Exhibit 11 is a true and correct copy of the November 14, 2007 Agreement and Plan of Merger among Aearo Holding Corp., 3M Company and Titan Acquisition Subsidiary. Also noted as Trial Exhibit P-GEN-01196. The Governing Law is Delaware; see Ex. at pg. 42.

15.     Attached hereto as Exhibit 12 is a true and correct copy of the August 15, 2022 Transcript of Hearing on Aearo Debtors' Motion to Declaratory and Injunctive Relief before the Honorable Jeffrey J. Graham, S.D. IN Bankruptcy Court. 3M purchased the stock of Aearo and its affiliates on April 1, 2008. Aug. 15

Tr. 65:8–10. The Aearo Debtors' Head, Eye, Ear, Hearing and Face Safety business, including the CAEv2 Earplug business, was transferred to 3M in 2010 (the "Upstream"). Aug. 15 Tr. 74:21–75:22, 173:6–12; see also Ex. 16 at 65. The Upstream was a transfer of the "assets and liabilities" of the earplug business to 3M. Aug. 15 Tr. 208:11–18. The payment obligations under the Shared Services Agreement do not change depending on how much 3M incurs in litigation defense costs for itself and for the Aearo Debtors. Aug. 15 Tr. 157:10–12. After 2016, 3M never charged the Aearo Debtors under the Shared Services Agreement. Aug. 15 Tr. 159:11–16.

16.     Attached hereto as Exhibit 13 is a true and correct copy of the August 16, 2022 Transcript of Hearing on Aearo Debtors' Motion to Declaratory and Injunctive Relief before the Honorable Jeffrey J. Graham, S.D. IN Bankruptcy Court. The Aearo Debtors did not establish that any employees of the CAEv2 Earplug business remained in the employ of the Aearo Debtors after the Upstream. Aug. 16 Tr. 147:2–7. Indeed, the Aearo Debtors' witness on the CAEv2 Earplug protection business, Mr. Myers, became a 3M employee on April 1, 2008 when 3M acquired Aearo. Aug. 16 Tr. 108:4–5. Mr. Myers, who was responsible for running the 3M hearing protection business, testified at a 2019 deposition in the MDL (as a designated corporate representative of 3M) that he did not know there was an "Aearo" in existence anymore after the Upstream. Aug. 16 Tr. 118:15–119:8 &

15

125:23–126:2.  After the hearing protection business was integrated into 3M, 3M continued to make, market, and sell CAEv2 Earplugs. Aug. 16 Tr. 136:4–7, 139:20–140:5 & 140:14–17. After the CAEv2 Earplug business was "upstreamed" to 3M, 3M had the ability to change, and did change, the instructions or warnings for the CAEv2 Earplugs. Aug. 16 Tr. 146:15–21 & 146:7–14.

17.     Attached hereto as Exhibit 14 is a true and correct copy of the August 17, 2022 Transcript of Hearing on Aearo Debtors' Motion to Declaratory and Injunctive Relief before the Honorable Jeffrey J. Graham, S.D. IN Bankruptcy Court.

18.     Attached hereto as Exhibit 15 is a true and correct copy of the Support Services Agreement between 3M and Aearo Technologies effective April 1, 2008 also known as the "Shared Services Agreement", admitted during the August 15, 2022 Bankruptcy Hearing on Debtor's Motion to Declaratory and Injunctive Relief as Exhibit 43. Following the 2008 acquisition, 3M and the Aearo Debtors entered into a Shared Services Agreement (the "Shared Services Agreement"), Ex. 43, pursuant to which 3M took control of essentially all functions of Aearo's hearing protection business, including "selling, marketing, general, and administrative services," as well as "back-office" functions such as finance, accounting, treasury, insurance, human resources, procurement, IT, and legal. Ex. 43 at 16–22; see also Aug. 15 Tr. 67:21–69:1.

19.    Attached hereto as Exhibit 16 is a true and correct copy of the 3M and Aearo Omnibus Meeting Minutes for July 19, 2022, , admitted during the August 15, 2022 Bankruptcy Hearing on Debtor's Motion to Declaratory and Injunctive Relief as Exhibit 144. The Upstream generated the 2010 Receivable on the Aearo Debtors' books of approximately $965 million. Ex. 144 at 65. The Aearo Debtors' books and records also show that the Aearo Debtors' transferred approximately $498 million of goodwill to 3M as part of the Upstream. Ex. 144 at 65; see also Aug. 15 Tr. 175:8–12. The books and records further show that approximately $106 million of net intangibles were "upstreamed" to 3M. Ex. 144 at 65; see also Aug. 15 Tr. 175:13–15.

20.    Attached hereto as Exhibit 17 is a true and correct copy of the "Flange Report" P-GEN-00001, "How Folding the Flanges Back Affects REAT Results of the UltraFit Earplug End of the Combat Arms", July 10, 2000 which was marked as an exhibit during the October 7, 2015 deposition of Jeffrey Hamer in the Moldex Litigation (Depo Ex. 5211).

21.    Attached hereto as Exhibit 18 is a true and correct copy of the November 3, 2015 email chain between Brian Myers, Davinder Bains, Luis Maio, and others regarding the 3M Company's decision to stop shipping the CAEv2 commercially in which Mr. Myers informed 3M employees that "we cannot

distribute this with the current NRR on the package" and "We cannot ship any further products with current labeling."

22.     Several of the sixteen bellwether trials involved plaintiffs who acquired and used CAEv2 before 3M Company's 2008 acquisition. Yet 3M Company never moved for judgment as a matter of law or sought post-judgment relief on that basis. Further, in the pretrial stipulations in all the bellwether trials, 3M never placed any blame on Aearo and never asserted that it was not responsible for sales of the CAEv2 before its acquisition of Aearo in 2008. *See* Bellwether Pretrial Stipulations at the following dockets entries:  Estes, 7:20-cv-00137, Dkt. 77; Keefer, 7:20-cv-00104, Dkt. 84; Baker, 7:20-cv-00039, Dkt. 99;  Hacker, 7:20-cv-00131, Dkt. 100; Vaughn, 7:20cv134, Dkt. 100; Blum, 7:20-cv-00122, Dkt. 69; Beal, 7:20-cv-00006, Dkt. 112; Adkins, 7:20-cv-00012, Dkt. 73;  McCombs, 7:20-cv-00094, Dkt. 83;  Wayman, 7:20-cv-00149, Dkt. 119; Vilsmeyer, 7:20-cv-00113, Dkt. 80; Sloan, 7:20-cv-00001, Dkt. 111; Camarillorazo, 7:20-cv-00098, Dkt. 78; Palanki, 7:20-cv-83053, Dkt. 78; Finley, 7:20-cv-00170, Dkt. 82; and Kelley, 7:20cv153, Dkt. 97.  Further, during the prior 16 bellwether trials, Defendant 3M Company never requested a jury issue to apportion fault between 3M and the Aearo Defendants or any other defendant. *See* Bellwether Jury Verdict Forms at the following dockets entries:  Estes, 7:20-cv-00137, Dkt. 184; Keefer, 7:20-cv-00104, Dkt. 186; Baker, 7:20-cv-00039, Dkt. 183; Hacker, 7:20-cv-00131, Dkt. 202; Vaughn, 7:20cv134, Dkt. 169; Blum, 7:20-cv-

00122, Dkt. 117; Beal, 7:20-cv-00006, Dkt. 176; Adkins, 7:20-cv-00012, Dkt. 118; McCombs, 7:20-cv-00094, Dkt. 154; Wayman, 7:20-cv-00149, Dkt. 185; Vilsmeyer, 7:20-cv-00113, Dkt. 139; Sloan, 7:20-cv-00001, Dkt. 184; Camarillorazo, 7:20-cv-00098, Dkt. 170; Palanki, 7:20-cv-83053, Dkt. 133; Finley, 7:20-cv-00170, Dkt. 174; and Kelley, 7:20cv153, Dkt. 173.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

DATED: October 4, 2022

Jennifer M. Hoekstra,
LA Bar No. 31476
AYLSTOCK, WITKIN, KREIS &
OVERHOLTZ, PLLC
jhoekstra@awkolaw.com
17 East Main Street, Suite 200
Pensacola, FL 32502
Phone: (850) 202-1010