# EXHIBIT 12

```
                 UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF INDIANA

IN RE:                     .      Case No.  22-02890-JJG
                           .      (Jointly Administered)
AEARO TECHNOLOGIES LLC,    .
ET AL.,                    .      116 U.S.  Courthouse
                           .      46 E.  Ohio Street, Room 116
          Debtors.         .      Indianapolis, IN  46204
. . . . . . . . . . . .    .
AEARO TECHNOLOGIES LLC,    .
ET AL.,                    .
                           .
          Plaintiffs,      .
     V.                    .      Adversary No. 22-50059-JJG
                           .
THOSE PARTIES LISTED ON    .
APPENDIX A,                .
                           .
          Defendants.      .
                           .      Monday, August 15, 2022
. . . . . . . . . . . . .   .      9:00 a.m.

          TRANSCRIPT OF HEARING ON DEBTORS' MOTION FOR
                DECLARATORY AND INJUNCTIVE RELIEF
             BEFORE THE HONORABLE JEFFREY J. GRAHAM
              UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis LLP
                          BY:  CHAD HUSNICK, ESQ.
                          300 North LaSalle Street
                          Chicago, IL  60654

                          Kirkland & Ellis
                          BY:  MARK McKANE, ESQ.
                          555 California Street, 27th Floor
                          San Francisco, CA  94104

Audio Operator:           Heather Heiser-Davis

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.
```

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**

**(609) 586-2311    Fax No.  (609) 587-3599**

2

APPEARANCES CONTINUED:

```
For 3M Company:             Faegre Drinker Biddle & Reath LLP
                            BY:  JAY JAFFE, ESQ.
                            600 East 96th Street, Suite 600
                            Indianapolis, IN  46240

                            White & Case LLP
                            BY:  MICHAEL ANDOLINA, ESQ.
                            111 S. Wacker Drive, Suite 5100
                            Chicago, IL  60606

                            White & Case LLP
                            BY:  JESSICA LAURIA, ESQ.
                                 GREGORY STARNER, ESQ.
                            1221 Avenue of the Americas
                            New York, NY  10020-1095

For Aylstock, Witkin,       Klee, Tuchin, Bogdanoff & Stern, LLP
Kreis & Overholtz, PLLC:    BY:  ROBERT J. PFISTER, ESQ.
                            1801 Century Park East, 26th Floor
                            Los Angeles, CA  90067

For Seeger Weiss LLP:       Otterbourg P.C.
                            BY:  MELANIE CYGANOWSKI, ESQ.
                                 ADAM SILVERSTEIN, ESQ.
                            230 Park Avenue
                            New York, NY  10169-0075

                            Seeger Weiss LLP
                            BY:  DAVID BUCHANAN, ESQ.
                            55 Challenger Road
                            Ridgefield Park, NJ  07660

For the U.S. Trustee:       U.S. Department of Justice
                            BY:  HARRISON E. STRAUSS, ESQ.
                            46 E. Ohio St., Road 520
                            Indianapolis, IN  46204

For Clark Love & Hutson:    Fishman Haygood LLP
                            BY:  TRISTAN MANTHEY, ESQ.
                                 BRENT BARRIERE, ESQ.
                            201 St. Charles Avenue, Suite 4600
                            New Orleans, LA  70170-4600

For Bellwether             Quinn Emanuel Urquhart & Sullivan, LLP
Claimants:                 BY:  ERIC WINSTON, ESQ.
                           865 S. Figueroa Street, 10th Floor
                           Los Angeles, CA  90017
```

```
APPEARANCES CONTINUED:

For Bailey Glasser          Bailey Glasser LLP
Plaintiffs:                 BY:  KEVIN W. BARRETT, ESQ.
                            209 Capitol Street
                            Charleston, WV  25301

                    - - - - -
```

4

<u>**I N D E X**</u>

<u>**WITNESS FOR THE DEBTORS**</u>                                        <u>**PAGE**</u>

JOHN R. CASTELLANO

   Direct Examination by Mr. McKane                        54
   Cross-Examination by Mr. Pfister                        122
   Redirect Examination by Mr. McKane                      207
   Recross Examination by Mr. Pfister                      209
   Recross Examination by Mr. Glasser                      213


CHRISTOPHER SULLIVAN

   Direct Examination by Mr. Rogers                        217
   Cross-Examination by Mr. Manthey                        251

**WWW.JJCOURT.COM**

<u>**I N D E X**</u>

| <u>**DEBTORS' EXHIBITS**</u> | <u>**ID**</u>. | <u>**EVD**</u>. |
|---|---|---|
| 1 Two Harbors Insurance Company Policy | | 222 |
| 2 Castellano Decl.,Exhibit B - Funding and Indemnification Agreement | | 113 |
| 20 3M Occupational Safety LLC Limited Liability Company Agreement (LLCA)(2013) | | 87 |
| 24 Aearo Holding LLC Limited Liability Company Agreement (LLCA)(2013) | | 86 |
| 28 Aearo Intermediate LLC Limited Liability Company Agreement (LLCA)(2013) | | 85 |
| 32 Aearo LLC Limited Liability Company Agreement (LLCA)(Effective 2008) | | 85 |
| 37 Aearo Technologies LLC Limited Liability Company Agreement (LLCA)(Effective 2008) | | 82 |
| 41 Cabot Safety Intermediate LLC Change of Registered Agent (2017) | | 88 |
| 43 Support Services Agreement between 3M and Aearo Technologies (effective April 1, 2008) | | 66 |
| 67 Spreadsheet re Combat Arms Litigation Expense 2018-2022 | | 118 |
| 69 Email from S. Stevenson to Tower Insurers re notice of Combat Arms claims | | 238 |
| 70 Letter from S. Stevenson to Insurers re Claim Notification for 3/1/2018 to 3/1/2019 excess liability policies | | 232 |
| 76 Email from S. Stevenson to primary Aearo Legacy insurers re notice of Combat Arms Claims | | 245 |
| 77 Letter from S. Stevenson to Aearo Legacy Insurers re Notice of Combat Arms claims | | 244 |
| 119 Letter from Liberty to S. Broin re payment for Combat Arms claim | | 247 |

6

**I N D E X**

| **DEBTORS' EXHIBITS** | **ID**. | **EVD**. |
|---|---|---|
| 141 3M and Aearo Omnibus Meeting Minutes for July 12, 2022 | | 90 |
| 144 3M and Aearo Omnibus Meeting Minutes for July 19, 2022 | | 76 |
| 146 3M and Aearo Omnibus Meeting Minutes for July 25, 2022 | | 99 |
| 176 Tower Insurance Policy (2018-2019) - Hamilton Re $12.5M po $25M xs $250M (Layer 1), $17.5M po $60M xs $750M (Layer 2) | | 232 |
| 200 Tower Insurance Policy (2018-2019) - Axis $20M xs $950M | | 234 |
| 247 Aearo Legacy Insurance Policies Rule 1006 Summary Chart | | 241 |
| 248 Insurance Tower Rule 1006 summary chart | | 229 |

| **DEFENDANTS' EXHIBITS** | **ID**. | **EVD**. |
|---|---|---|
| AG Email From Connor Casas to McDonald Hopkins Group Dated June 24, 2022 re Draft Funding and Indemnification Agreement for June 24, 2022, re Draft Funding and Indemnification Agreement for Project Crane | | 151 |

7

1          THE COURT:  All right.  Well, good morning everyone.

2          Why don't we go ahead and get started.  This is

3   Adversary Number 22-50059, 3M Occupational Safety LLC, Aearo

4   Holdings LLC, et al. versus Those Parties Listed on Appendix A

5   of the Complaint.

6          We are here today on the debtors' motion for

7   declaratory and injunctive relief with objections thereto.  May

8   I have appearances by those who intend to offer arguments or

9   statements.  I'll start in the courtroom, please.

10         MR. HUSNICK:  Good morning, Your Honor.  Chad Husnick

11   with Kirkland and Ellis on behalf of the debtors.

12         THE COURT:  Thank you.

13         MR. PFISTER:  Good morning, Your Honor.  Rob Pfister

14   from the Klee Tuchin firm on behalf of the Aylstock Witkin

15   firm.  In the courtroom today, I don't want to announce

16   everybody, but we have Mr. Brian Aylstock who is the lead

17   counsel in the Combat Arms MDL proceeding.  And we have a

18   number of claimant individuals represented by the firm,

19   including Mr. Will Wayman, Mr. Jay Beal, Mr. Ron Sloan, and

20   Luke Vilsmeyer.

21         At the appropriate time, Your Honor, prior to the

22   opening statements, I'd like to indicate how the claimants are

23   coordinating because I think we've coordinated pretty well and

24   who will be speaking and on whose behalf they will be speaking.

25         THE COURT:  Okay.

8

1          MR. PFISTER:  Thank you.

2          MR. McKANE:  Your Honor, if you're still hearing

3   appearances, Mark McKane of Kirkland and Ellis on behalf of the

4   debtors.

5          THE COURT:  Okay.  Thank you.

6          MS. CYGANOWSKI:  Good morning, Your Honor.  Melanie

7   Cyganowski of Otterbourg PC, together with my partner, Adam

8   Silverstein.  We are counsel to the firm of Seeger Weiss LLP

9   who is counsel to thousands of the plaintiffs as well as

10  co-leader in the MDL leadership.  Also present are, among

11  others, many of our combat veterans in Court today.

12         THE COURT:  Thank you.  Also make sure your

13  microphones are on.  I noticed for some reason, they didn't all

14  pop on right away, which is nice to know, but we'll find that

15  out as we go.  You've actually had more experience in this

16  courtroom than I have, so you're doing well.

17         MS. LAURIA:  Good morning, Your Honor, Jessica

18  Lauria, White and Case, on behalf of 3M Company.  I'm here with

19  Mr. Jaffe as well as my partners, Mike Andolina and Greg

20  Starner.  Thank you.

21         THE COURT:  Thank you.

22         MR. STRAUSS:  Good morning, Your Honor.  Harrison

23  Strauss, the United States Trustee, way in the back here.

24         THE COURT:  Thank you.  Hey, at least you got a seat.

25         THE COURT:  All right.  Anyone else want to make an

9

1  official appearance understanding that if someone raises their
2  hand, I'll try to get to you.  Same with those of you on Zoom.
3  I think you can have the raise-hand feature, if you can do
4  that, that would be helpful.  I'll try to get to you if I can,
5  understanding that we have tried to streamline this as much as
6  we can.

7          I guess a few opening things before you all do your
8  opening.  Thank you to Judge Sweeney for use of the courtroom.
9  When I was in here, we had a lot more technology stuff, but I
10 think he had a big trial himself so I think he borrowed a lot
11 of the technology, which is no longer here which is
12 unfortunate, but we'll play the hand we're dealt.  So let's go
13 for that.

14         Please try to silence your cell phones if you haven't
15 already.  We tried to make sure you could get in without the
16 very exciting invention of the YONDR bag, which hides your
17 phone.  But hopefully you have those, but just try to hide
18 those and silence them if you can.  I know people always try to
19 do that but then something bizarre happens.  I'm not a judge
20 who takes your phone because I don't want them because I can't
21 sell them, but try to maintain that because the worst case
22 scenario, I'll have the courtroom deputy take them as we go.

23         Please try to use the podium.  We have a lot of
24 people listening on the phone.  The acoustics in the courtroom
25 aren't bad, but to the extent that you're one of the main

1  questioners, I would hope that you can come to the podium and

2  use the microphones there.  Once again, just make sure that you

3  use your microphone button to make sure it's lit up green so we

4  have the best chance to hear you.

5          With that being said, I probably have a few more

6  things to say, but why don't I go ahead and let the parties get

7  started with your openings which I think I already told you I

8  try to time limit if at all possible such that we can get to

9  the evidence which is the most important reason why we're here

10 today.

11         I lied.  One other thing.  Room 311 is open, which is

12 my courtroom, if you want to go there and spread out.  I know

13 we all like each other sort of for now, but as the hearing

14 progresses and it gets warm in here, you're certainly welcome

15 to go in there.  There's a Zoom feed in there.  You're equally

16 present there as you are here, but I understand that it's a

17 full courtroom so if you want to spread out, you're certainly

18 welcome to do that.

19         Go ahead.

20         MR. HUSNICK:  Thank you, Your Honor.  Good morning.

21 For the record, Chad Husnick with Kirkland and Ellis appearing

22 on behalf of the Aearo debtors.

23         Your Honor, as you noted at the outset, we're here on

24 the debtors' motion for a preliminary injunction.  Your Honor,

25 I'm going to try, and I'm going to stick to Your Honor's

1  timeline assuming this actually works.  There we go.

2         The purpose of the preliminary injunction, Your

3  Honor, is to protect this Court's jurisdiction, to enable this

4  Court to allow the Aearo debtors to reorganize their businesses

5  and to resolve the claims, the 230,000 claims that have been

6  filed against each of the Aearo debtors.  The preliminary

7  injunction is necessary, you're going to hear through the

8  evidence this morning that I'll summarize, to allow the debtors

9  to use the tools that are available to them under the

10  Bankruptcy Code to achieve that goal and to provide,

11  ultimately, what I hope to be a 100 percent recovery to the

12  veterans, service members, and other creditors for all of their

13  valid claims.

14         But, Your Honor, the proof as to why a preliminary

15  injunction is necessary is evident in what has happened in the

16  absence of a TRO over the last two weeks.  The first 14 days of

17  this case, Your Honor, have demonstrated the proof of why these

18  debtors need a preliminary injunction in order to move these

19  cases forward.  Just a couple of examples, few examples.

20         The Keller Postman firm, while we were sitting in the

21  first day hearing, files a motion to obtain a temporary

22  restraining order in the Florida MDL to stop various

23  representatives of 3M from assisting the debtors in

24  participating in front of Your Honor, as they are permitted to

25  do under Section 1109(b) of the Bankruptcy Code as a party in

1  interest.  Now, that TRO was denied.  But then the motion was
2  renewed in the form of a preliminary injunction in front of the
3  MDL.  That remains pending as of this morning.  But let there
4  be no doubt, Your Honor, if the MDL court were to have granted
5  that preliminary injunction, the debtors would have had to have
6  been in a different position and unable to present all the full
7  evidence to Your Honor because we rely on the shared services
8  from 3M and those representatives do have a statutory right to
9  participate.

10        But it didn't stop there.  The Quinn Emanuel firm
11  filed a motion to estop 3M on certain successor liability
12  claims.  Well, successor liability claims, it's well known
13  under the bankruptcy law, Emoral is the Third Circuit seminal
14  case on this topic, that those types of claims are property of
15  the estate.  That violated the automatic stay.  It was an
16  attempt to try and grab an asset of this estate.  We'll deal
17  with that at another time.

18        But the one that gave me the most amount of
19  heartburn, Your Honor, that's setting aside Keller Postman's
20  Friday night filings.  What was this?  An adversary proceeding
21  to withdraw the reference and then I'm going to transfer it
22  over to the MDL with a JPM tag along.  Creative.  Mr. Keller
23  and I took bankruptcy from the same professor.  Someday, we'll
24  talk about the academic issues associated with his filings.
25  But today, it just demonstrates the need for the relief.

1          The one that gave me the most heartburn though, Your

2    Honor.  We negotiated a temporary détente for two weeks.  And

3    lead counsel for the plaintiffs, his counsel, Mr. Pfister,

4    stood here and told Your Honor, we're not going to file

5    anything.  We're not going to run to another court.  That's

6    not, you know, that's not how we operate.

7          Well, Your Honor, that's exactly how they operate.

8    They went down to that court and stood up and said, we

9    absolutely endorse that motion that Mr. Keller filed and

10   Mr. Wilson, the two motions I previously mentioned.  We join in

11   that.  Their word, Your Honor, their credibility with me at

12   least, is shot.  Suffice to say, the Aylstock firm's about

13   face, their turning back on their word to this Court and to

14   these parties in interest, along with all of the other scorched

15   earth litigation tactics we've seen over the last 14 days,

16   demonstrates why a preliminary injunction is necessary for the

17   debtors to focus on their Chapter 11 case and move this process

18   forward.  We have to resolve these claims and if we don't have

19   the attention of the plaintiffs' bar in discussing those claims

20   with the debtors, we're not going to move this forward.

21          The next slide, Your Honor, just summarizes, as a

22   demonstrative if I can get it to move, everything that has

23   happened in 14 days.  The print is pretty small because it's a

24   ton of stuff.  A ton.  And every single one of these, we have

25   to follow along with because there's relief being asked.  It's

14

1    being embedded in there, for example, the relief in the TRO

2    motion that says that the debtors shouldn't be able to take

3    certain actions because they're restricting the funds flow that

4    would come into the funding agreement.  They're restricting the

5    performance of 3M representatives who provide services to the

6    debtors.

7            The bottom line, we have to watch everything that's

8    going on outside of your courtroom.  That's what the

9    preliminary injunction is for.  That is why this precise relief

10   has been granted time and time again in courts across the

11   country.  The LTL Management, Aldrich Pump, Purdue Pharma,

12   Bestwall, USA Gymnastics right here in Indiana, TK Holdings,

13   Caesars Entertainment in Chicago, A.H. Robins.  In fact, the

14   only bankruptcy court that's listed here, the Caesars

15   Entertainment one, that denied the preliminary injunction,

16   initially, was told by the Seventh Circuit, no, no, no.  You

17   have authority to grant this preliminary injunction to protect

18   your jurisdiction and to enhance the likelihood of reorganizing

19   your debtors.  And that's exactly what that bankruptcy judge

20   did on remand.

21           Your Honor, the Bankruptcy Code's core principles,

22   you're more familiar with them probably than I am, so I'm not

23   going to lecture you on the law.  Suffice to say, we believe

24   Your Honor has jurisdiction under 1334 to issue the preliminary

25   injunction.  We think that's well settled under the Seventh

 1  Circuit's Fisher case and its progeny.

 2       We believe you also have authority under 362 to

 3  enjoin actions against non-debtors.  We briefed all of these

 4  issues.  We don't need to talk about it because at the bottom

 5  line, the evidence you're going to hear, Your Honor, is the

 6  same, whether I'm asking you to apply 362 or whether I'm asking

 7  you to find that it's a valid extension of the automatic stay

 8  under 105.

 9       And we're going to show you all of those facts.  But

10  the bottom line is, if the efforts at this critical stage of

11  the case is to defeat and interfere with Your Honor's

12  jurisdiction and Your Honor's ability to control these cases,

13  that is exactly why a preliminary injunction is necessary,

14  appropriate, and consistent under all of the well settled law.

15       Very briefly, the Seventh Circuit standard

16  conveniently the plaintiffs' lawyers forgot to mention the Bush

17  vs. United States text.  We spent a lot of time trying to

18  create a distinction under the law and the development of the

19  cases that deal with preliminary injunctions saying that, well

20  in the Seventh Circuit that doesn't work because the Xonix and

21  Home Insurance cases have a different standard for what

22  constitutes related to subject matter jurisdiction for Your

23  Honor.  That's just flat wrong.

24       Yes, the Celotex court observed there might be a

25  slight difference.  I think the word they used was a slightly

1   different test was the concept.  And Judge Easterbrook in the

2   Bush case acknowledged that the Supreme Court had said that.

3   But then he went on to say, after addressing all of the cases

4   and the differences and made the following observations, every

5   circuit in the country has applied an *ex ante* analysis as to

6   whether there's a effect on the estate, or a potential effect

7   on the estate.  And he said, we agree.  So the Seventh Circuit

8   looks at it as to whether there's a potential effect standing

9   here today.

10          Well, it's hard to say, Your Honor, when we have

11  dueling briefs coming from the plaintiffs.  One says that 3M is

12  a blue chip company with a market capitalization of over 85

13  billion and A-plus credit rating.  That's the Aylstock

14  objection at Page 13.  But another set of plaintiffs that

15  you're going to hear from today wrote that the claims trust

16  could eclipse a $100 billion making 3M woefully insolvent.

17          I questioned the credibility of these statements, but

18  I make clear that there is at a minimum a potential effect that

19  brings this squarely within Your Honor's subject matter

20  jurisdiction.  The Seventh Circuit standard is very, very well

21  settled.  I don't think there's any dispute about it.  Defeat

22  or impair the bankruptcy court jurisdiction, likelihood of

23  successful restructuring, and whether it's in the public

24  interest.  Importantly, there is no balancing the harms test

25  under Seventh Circuit law.  Some courts go there.  I would

1  submit that when we go there with the evidence, it'll be clear

2  that it supports the issuance of the preliminary injunction.

3          Let's talk about the first factor and the evidence

4  that we're going to show.  The evidence will fall into four

5  buckets on this first factor.  That is, defeat or impair the

6  bankruptcy court's jurisdiction.

7          The first bucket is that the claims against the

8  debtors, or sorry, the claims against 3M that we're seeking to

9  have enjoined are in effect claims against the debtors.  It's

10  not that they're in effect, they're the identical claims and

11  we're going to show that in the evidence.  Common insurance,

12  indemnity obligations, and distraction from resolution of the

13  cases.  That's the very high level of the factors that have

14  generally been considered across the cases.

15          Turning to inextricably intertwined.  Your Honor, the

16  debtors are going to put on evidence from Mr. Brian Myers.

17  He's the vice president of global business leader

18  restructuring, or I'm sorry, regulatory strategy.  He will

19  testify that the Combat Arms Earplugs were designed by Aearo,

20  that the Combat Arms were NRR tested and labeled by Aearo, and

21  that approximately 80 percent of the Combat Arms Earplug sales

22  occurred prior to the 2008 acquisition of Aearo by 3M.

23          The plaintiffs' core claims, and this is going to

24  come in either through the stipulated set of facts that my

25  partners are going to discuss with you or through taking of

1  judicial notice on certain of the complaints.  But suffice to

2  say what you're going to see in the different levels of

3  complaints that have been filed, that there's shared conduct

4  core claims.

5       There is a core set of factual assertions that are

6  made in every single of the 230,000 claims.  And the jury

7  verdict forms are going to show the same thing, which we'll

8  seek to have admitted into evidence.  That was a behind-the-

9  back, Your Honor.  Sorry.

10      Inextricably intertwined.  I just want to summarize

11  this with this demonstrative.  What you're going to see is that

12  this core set of factual assertions in every single complaint,

13  design, manufacture, testing, sale, instructions when it comes

14  to failure to warn, and ultimately, there may be extra facts in

15  certain of the complaints that need to be made.  But you can't

16  get to a claim against 3M without making all of the assertions

17  about the activities that happened prior to the acquisition

18  that were done by the Aearo debtors.  It simply -- 3M didn't

19  exist on the scene when all of these things happened.

20      Your Honor, what I show on this next slide is a

21  demonstrative to demonstrate the Friday night filing that we

22  got from Mr. Keller, which was an adversary complaint by one of

23  the plaintiffs against 3M.  These are identical to the 3M

24  claims.  How can you not conclude that those are inextricably

25  intertwined?  They're the same exact claims for the same exact

19

1   conduct for the same exact damages and liabilities.

2        Your Honor, on the next slide, we just show this a
3   slightly different way.  We're showing all of the conduct prior
4   to the 2008 acquisition, all of the assertions that they're
5   making in that complaint relate to prior to the acquisition.
6   Mr. Maciel -- I apologize if I'm not pronouncing this veteran's
7   name correctly -- all of the damages that he's asserting in his
8   claim happen after the acquisition, yet all of his assertions
9   as to bad acts occur prior.  They cannot argue that these
10  aren't inextricably intertwined with the 230,000 claims.  In
11  fact, they've made 230,000 statements to the contrary.

12        It doesn't stop there, Your Honor.  What you see on
13  this chart -- excuse me -- is a summary of certain of the
14  trials and the timelines for its assertions within the
15  pleadings as to when the damages are.  That's how it's set out
16  and when the bad acts occurred and when they wore the Combat
17  Arms Earplugs.  But what it's meant to show, and let's focus on
18  the top three, Estes, Keefer, and Hacker.  Those three cases
19  were tried together because, Your Honor, plaintiffs asserted
20  there was the same web of conduct.

21        The plaintiffs have taken this position time and time
22  again.  These debtors are in bankruptcy because they have
23  230,000 reasons why they need to try and reorganize their
24  business.  This isn't a non-operating business.  This is a real
25  business.  It may not be as big as the plaintiffs want it to

1  be, but it is what it is.

2          Your Honor, let me turn to common insurance and I'll

3  move through these latter ones much quicker because we believe

4  you can stop your analysis at inextricably intertwined.  It's

5  that clear.

6          Your Honor, the other evidence is going to show --

7  Mr. Sullivan is going to testify as to the debtors' insurance

8  policies.  He's the vice president of insurance for 3M who

9  monitors all the policies for the combined enterprise.  He will

10  testify that there's $1 billion in shared insurance.  The

11  debtors have approximately $500 million in pre-acquisition

12  legacy policies, some of which 3M has made claims under.  So

13  those are shared policies as well.

14          And you'll also hear that 3M and the debtors both

15  notified the carriers and requested coverage as to the Combat

16  Arms litigation.  We will introduce those policies into

17  evidence for Your Honor to review.

18          Indemnity obligations.  You're going to hear from

19  Mr. Stein, the debtors disinterested director, testifying as to

20  the indemnity that existed in the corporate organizational

21  documents entered in 2013 and the funding agreement as well.

22  Let there be no doubt.  There was an existing indemnity at the

23  time that these debtors entered into the funding agreement.  It

24  didn't alter materially the state of play as to the indemnity.

25  What it did is it gave these debtors the ability to satisfy

21

1  these obligations and be certain that they're going to have
2  sufficient resources.  This was an arms length negotiation.
3  You'll hear about that from Mr. Stein.

4          The corporate organizational documents will be
5  offered into evidence and the funding agreement will also be
6  offered into evidence.

7          Your Honor, the final issue on this prong,
8  distraction from resolution of the cases.  Your Honor, I don't
9  think you need to look any further than what's gone on in the
10  first 14 days of these cases.  As I said, we have to monitor
11  every hearing, attend every deposition, read every pleading,
12  travel to every hearing, and respond to every allegation
13  because all of these allegations and actions that are being
14  taken in other fora affect these cases, affect these debtors.

15          Mr. Castellano is going to testify that absent the
16  relief, he believes that a successful reorganization will be
17  distracted from the need to defend these actions in the other
18  forums.  Hard to disagree with him on that front.

19          Your Honor, the first two weeks, as I said, show
20  exactly why we need this relief.  The likelihood of successful
21  restructuring, Your Honor, this is a relatively low bar in the
22  Seventh Circuit.  It's actually a low bar across all the
23  circuits.  Suffice to say, Mr. Castellano and Mr. Stein will
24  testify that the debtors have a reasonable likelihood of
25  successful reorganization of this standalone business which is

22

1  headquartered here in Indianapolis, has about 800, or 108

2  million in direct sales and 330 million, or 330 W2 employees.

3  The funding agreement provides the resources to ensure that we

4  can satisfy our obligations and Mr. Castellano will testify

5  that we are using this to reorganize a business that is saddled

6  with billions of dollars of asserted claims.

7         The public interest theory, Your Honor, or factor.

8  Again, not a very high bar under the Seventh Circuit precedent.

9  What you have here, Your Honor, is significant case law that

10 talks about this factor being satisfied because there's an

11 interest in promoting a successful reorganization.  I thought

12 the best line came out of the Gathering Restaurants case.  In

13 the context of a bankruptcy case, "the public interest means

14 the promotion of a successful reorganization which should be

15 one of the paramount concerns of a bankruptcy court."  So too

16 here, Your Honor.

17        The equitable treatment of claims is yet another

18 basis for in the best interest.  What we've seen as we saw on

19 the first day hearing as to the jury verdicts, they're all over

20 the map.  Some are zero.  A healthy amount are zero.  Some are

21 in the low single digit millions.  And then, some reached as

22 high as 77 million.

23        Your Honor, I think the Dow Corning case observed

24 best when it said, "It is anything but just when presenting the

25 identical proofs, one plaintiff suffering nearly identical

23

1   injury or illness wins a multimillion dollar verdict against a

2   defendant while another takes nothing."  That's the public

3   interest in trying to address these issues.  But it doesn't

4   stop there, Your Honor.  It's about the burden on the

5   judiciary.

6           Your Honor will have into evidence the mediation

7   order that was issued by the judge in the MDL district.  And

8   what you're going to see is that under the MDL proceeding, it's

9   winding down.  We've done the 19 bellwether trials.  The court

10  is preparing to remand the cases back to the transfer courts

11  for trial after resolving a few other motions.  That's going to

12  result in each of the 94 federal districts facing, on average,

13  approximately 2,500 cases.  That's more than 30 percent of the

14  federal case load right now.  That, Your Honor, is in the

15  public interest to try and use the Chapter 11 cases to

16  restructure and reorganize these debtors and resolve those

17  claims.

18          Your Honor, in the judge's own words, the judicial

19  resources required to handle this number of cases is

20  "staggering."  I agree.  Your Honor, before I conclude, I just

21  want to say that a lot of time was spent trying to create a

22  narrative around what the cases say.  They started with this is

23  an extraordinarily unusual situation that the request here is

24  unusual.  Preliminary injunctions are a well-established tool

25  in the mass tort area specifically and generally across the

24

1  United States.  You can see that from these cases.  Right here

2  in this jurisdiction, they use the same tool in the USA

3  Gymnastics case.  It's not uncommon.  It's not novel.  It's

4  necessary.

5         The second thing you're going to hear about is like,

6  uh, these debtors are solvent.  You don't need to weigh in on

7  this, Your Honor.  Let's go on our merry way.  That solvent

8  debtor analysis has been rejected uniformly by the bankruptcy

9  courts and the appellate courts.  Not necessarily in the

10 context of mass torts, et cetera, but generally, there's no

11 solvent debtor exception to access to bankruptcy.  Why is that?

12        Well, a lot of times bankruptcy is necessary to

13 resolve a quagmire of issues facing a debtor, even though we

14 know the value of the debtor is significantly in excess of the

15 liabilities.  That's what we have here.  We have a quagmire of

16 litigation that we need to try to resolve.  The Bankruptcy Code

17 provides us with the tools to resolve these issues.  Whether

18 it's a negotiated resolution, which I hope for and do believe

19 that we can obtain, or a litigated resolution, the Bankruptcy

20 Code provides those tools.

21        There is also the other element you're going to hear

22 is the solvent payor exclusion from the preliminary injunction.

23 They try to piece together different pieces of the Seventh

24 Circuit's preliminary injunction standard to require that a

25 debtor payor, so somebody that's paying into the debtor.  If

1  they're solvent, you can't benefit.  That's just wrong.

2  There's nothing in the cases that say that.  In fact, the <u>Bush</u>

3  case doesn't really focus necessarily on the -- it says one

4  element is the amount of the recovery.  The other element in

5  the <u>Bush</u> case is the allocation of the recovery.  And if you're

6  going to get inequitable recoveries amongst plaintiffs, that's

7  enough for Your Honor to be weighing in on this issue to help

8  control Your Honor's own docket.  That's a potentially effect

9  to the distributions.

10        The bottom line, Your Honor, as I conclude, you are

11  the only Judge in the United States who can facilitate this

12  reorganization of these debtors.  That is why we filed these

13  bankruptcy cases for the Aearo debtors.  You have the

14  jurisdiction.  You have exclusive jurisdiction over the

15  debtors.  You are the only Court that is awarded, in addition

16  to that exclusive jurisdiction over the debtors, original but

17  not exclusive jurisdiction to reach outside of your Court to

18  ensure that you can reorganize the debtors.

19        That is the power that was given to you by Congress.

20  That is the power that we beg for you to use today so that we

21  can push these cases forward.

22        Thank you.

23        THE COURT:  Thank you.

24        MR. HUSNICK:  And then to say, I believe Ms. Lauria

25  wants to make a comment in support of the injunction before I

26

1  sit down, but.

2          THE COURT:  Briefly, yes.

3          MS. LAURIA:  Thank you, Your Honor.  Jessica Lauria,

4  White and Case on behalf of 3M company.  And I will be brief.

5  I don't intend to re-argue the points that you just heard from

6  Mr. Husnick.  But I did think it was important for the Court to

7  hear from 3M Company today in light of the flurry of filings

8  that appeared in front of you yesterday pertaining to the MDL,

9  and put a little bit of context around what happened in the MDL

10 last week because the Aearo debtors were not present and also

11 to set the stage for why I think this hearing is so critically

12 important to all of the parties.

13         Your Honor, before I do that, let me just briefly say

14 what I think this is not.  Contrary to I think the suggestions

15 and the filings in front of you, this is not about the

16 bankruptcy court versus the MDL court.  That's not what this is

17 about.  As Mr. Husnick referenced, the MDL court in June

18 entered an order requiring mediation.  And in that order, as

19 Mr. Husnick indicated, the judge noted that the MDL was

20 entering into a new phase.  And that new phase would provide

21 for 230,000 claims going back down to the district courts or

22 the courts from whence they came.

23         And because of that, on average, we were looking at

24 each of the 2,500, or excuse me, each of the 94 district courts

25 receiving on average, 2,500 cases.  It simply is not possible

27

1  for the tort system, not the MDL court, but the tort system, to

2  adjudicate that number of cases in the lifetimes of the

3  veterans that are the claimants in those cases.

4          So as we look at this proceeding, it's not about

5  bankruptcy versus MDL.  It's about this Court affording

6  equitable and efficient resolution to those 2300 claimants

7  while at the same time providing finality to the Aearo debtors

8  and the co-defendants in that case, such as my client 3M.

9          In terms of the MDL proceeding and what transpired

10  over the last 14 days, and you will have received pleadings on

11  this from the plaintiffs yesterday, Mr. Keller, and it was

12  referenced by Mr. Husnick, did file a second motion for a TRO

13  in front of the MDL court.  And I think what was extremely

14  concerning about how that proceeding transpired is it really

15  did infringe upon five basic issues that should be in front of

16  this Court not a non-bankruptcy court proceeding over the

17  claims itself.

18          For example, Mr. Keller sought findings with no

19  evidentiary record that this bankruptcy case was essentially

20  wrongly filed by the Aearo debtors.  And just to be clear, Your

21  Honor, Mr. Husnick and his team of restructuring lawyers on

22  behalf of the Aearo debtors were not present in the courtroom.

23  3M Company was there but not the debtors themselves.  And to my

24  knowledge, the only way a party can get dismissal or those

25  types of factual findings pertaining to a case in front of you

28

1   is under 1112 of the Bankruptcy Code.  So that was part one.

2           Part two, the motion before the court literally

3   sought, and I'm going to quote it, "to enjoin 3M Company from

4   supporting and/or advocating in favor of any other party

5   seeking to enjoin any parties from pursuing CAEv2 related

6   claims against 3M in this MDL or the district courts where the

7   cases have been remanded."  As Your Honor knows very well,

8   11 U.S.C. 1109 provides all parties in interest, including a

9   creditor, which is what 3M Company is, including an equity

10  security holder, which is what 3M Company is, from raising,

11  appearing, and being heard on any issue in a case under

12  Chapter 11.

13          This TRO was in essence attempting to be used to

14  prevent a party from appearing in front of you, which is a

15  statutory right that all parties in interest are granted.  It's

16  a right of due process.  And if that relief had been granted,

17  as Mr. Husnick said, not only could I not be standing at this

18  podium appearing in front of you today, Your Honor, but the

19  witnesses that the Aearo debtors are seeking to put on could

20  not be heard.  If called to the stand, they couldn't respond to

21  questions.  As Your Honor knows, 3M Company has support

22  obligations under the funding agreement and the shared services

23  agreement and those would have been impaired.

24          Third, Your Honor, the plaintiffs requested that the

25  district court, the MDL court, decide the very stay issue that

29

1    is in front of this Court today.  They did that knowing that

2    there had been, I think we're probably up to hundreds of pages

3    of briefing before Your Honor, witness depositions had occurred

4    and were continuing to occur, evidence was being produced.  But

5    they did that knowing that the Aearo debtors were not present

6    and knowing that this proceeding would be going forward today.

7            Fourth, they indicated that they were seeking that

8    relief because in a potential future estimation proceeding in

9    front of Your Honor, that Your Honor, or a federal district

10   court sitting in Indiana, may not know how to apply principles

11   of *res judicata* or collateral estoppel.  I think that's

12   patently false.  I think Your Honor knows very well how to do

13   that.

14           And finally, Your Honor, this was all ostensibly to

15   prevent my client from seeking an injunction in this Bankruptcy

16   Court with respect to the MDL.  As you know, Your Honor, the

17   debtor is the movant in this case, not my client.  The only

18   other mechanism that I'm aware of that would provide the same

19   type of injunctive relief is a plan of reorganization.  It's

20   the debtors' exclusive period.  But the debtor wasn't present

21   in that hearing.  3M Company was.

22           And so, with that, Your Honor, I'm going to go ahead

23   and cede the podium.  But I did want to make sure that the

24   Court was aware how important this proceeding is to all of the

25   parties.  And, again, set the stage so that the Court doesn't

1  buy into this narrative that I think you're going to hear about

2  that this is in some way bankruptcy versus MDL.  It's not, Your

3  Honor.  It's an opportunity to provide an efficient and

4  equitable resolution to the veterans while giving finality and

5  certainty to the Aearo debtors and 3M Company.

6          Thank you, Your Honor.

7          THE COURT:  Thank you.

8          MR. PFISTER:  Good morning, Your Honor.  Once again,

9  Rob Pfister from the Klee Tuchin firm.

10          As I previewed when I made my appearance, I'd like to

11  give, before we turn to Ms. Cyganowski for our substantive

12  opening statement, I'd like to give Your Honor an overview of

13  who is speaking for whom here.  We saw that issue on the first

14  day of the case and we're already seeing it at today's hearing.

15          Let me start with saying there's been extraordinary

16  coordination on behalf of the claimants in this Court.  I trust

17  Your Honor saw that in connection with discovery.  I trust Your

18  Honor saw that in connection with the briefing that was filed.

19  And I trust Your Honor will see that today where we will have

20  an effective and efficient evidentiary presentation with one

21  questioner and one cross-examiner per witness.

22          All that said, I do not speak for everyone in this

23  courtroom and Mr. Husnick's opening remarks about dueling

24  briefs and about lead counsel's, I think the quote was

25  "credibility is shot," those are without merit.  I do not speak

1   for everyone in this courtroom.  The vast majority of folks who

2   I do speak for I stand behind everything I've said.  I stand

3   behind everything we've done.  And I don't think that personal

4   attacks and further distractions are really in order.  So with

5   that, let me just give the Court an overview of the opposition

6   and what Your Honor will hear today.

7          We submitted an opposition to the debtors' motion for

8   preliminary injunction which is Docket 106 on the adversary

9   proceeding.  We filed that on behalf of 10 firms representing

10  claimants in the MDL.  There are four other firms who filed

11  three separate objections.  The opposition that we filed, the

12  lead opposition, is on behalf of my client, the Aylstock firm.

13  Brian Aylstock, as I mentioned, is the lead counsel in the

14  Combat Arms MDL proceeding.  That's the top leadership position

15  in the plaintiffs' leadership structure.

16         In addition to the Aylstock firm, the opposition we

17  filed was on behalf of the Seeger Weiss firm and it is

18  represented here today by Otterbourg, that's Ms. Cyganowski,

19  and by Rubin and Levin.  It was also filed on behalf of Clark

20  Love and Hutson which is represented by Fishman Haygood.  And

21  you will hear questioning from individuals from that firm.

22         It was filed on behalf of Quinn Emanuel which

23  represents claimants, including bellwether plaintiffs in the

24  MDL proceeding.  It was filed on behalf of the firms of Cory

25  Watson, Heninger Garrison Davis, and The Gori Law Firm, all of

1  which are represented by the firm of Caplin and Drysdale.

2          It was filed on behalf of Tracey Fox King and Walters

3  and The Johnson Law Group, both of whom are represented by

4  SmithAmundsen.  And it was filed on behalf of Weitz and

5  Luxenberg, which is represented by Jacobson Hile Kight.

6          Those are the 10 firms on behalf of which the

7  response was filed.  Four other firms filed three separate

8  oppositions, the Bailey Glasser and Pulaski Kherkher firm filed

9  an opposition.  Bailey Glasser also contributed substantially

10 to our discovery efforts and is in full coordination with us

11 today.  The Paul Firm represented by Saeed and Little filed its

12 opposition.

13         The Paul Firm is co-lead counsel of the consolidated

14 litigation that's pending in Minnesota state court.  The

15 Minnesota claims are brought on behalf of civilians and

16 government contractors as opposed to the veterans and service

17 member claims like those in the MDL.

18         And then, finally, the firm of Keller Postman filed

19 an opposition brief.  Mr. Ashley Keller is here today.  He is

20 not part of the group on whose behalf I speak.  But I have

21 agreed to introduce him and introduce the witness he intends to

22 present just, again, to streamline proceedings.

23         So in terms of how we're going to allocate our time,

24 as I said, Ms. Cyganowski from Otterbourg will be delivering

25 our substantive opening remarks.  For the debtors' witnesses, I

1    will be cross-examining Mr. Castellano.  Dave Buchanan of the

2    Seeger Weiss firm will be cross-ex examining Mr. Myers.

3    Tristan Manthey of the Fishman Haygood firm will be

4    cross-examining Mr. Sullivan.  And Eric Winston of the Quinn

5    Emanuel firm will be cross-examining Mr. Stein.

6            The one other witness I will mention is Mr. Heaton

7    who is an affirmative witness from Keller Postman.  And as I've

8    indicated, I'm introducing Mr. Keller's firm and his witness

9    but I want to be crystal clear that the relief that is sought

10   and the statements that are made in the Keller Postman filing

11   are not relief that is sought or statements that have been made

12   by every other claimant.  And when I stand up in Court, and I

13   say I represent claimants, I represent the individuals who are

14   on our signature block.

15           So I want that to be clear.  I do take very seriously

16   when opposing counsel says my credibility is an issue.  And

17   with that, Your Honor, I will turn it over to Ms. Cyganowski

18   for our substantive opening statement.

19           THE COURT:  Thank you.

20           MS. CYGANOWSKI:  Your Honor, if it may please the

21   Court.  Melanie Cyganowski, Otterbourg, counsel to Seeger Weiss

22   LLP, as we noted, co-leader in the pending MDL.  Present in

23   Court with us today is Mr. Christopher Seeger, Mr. David

24   Buchanan, and also present is client, Black Hawk Pilot, Will

25   Wayman.  Thank you for your service, sir.

1            Your Honor, this morning, I rise on behalf of the

2      hundreds of thousands of service members and veterans who have

3      been harmed by 3M's defective Combat Arms Earplugs Version 2.

4      Lest we not forget or somehow inadvertently minimize, the

5      debtors today are urging this Court to exercise its equitable

6      powers under Section 105 to enjoin all third-party litigation

7      by these service members and veterans against 3M, the debtors'

8      parent company, which is not a debtor before this Court.

9            We all understand the core bankruptcy precepts to

10     allow the honest but unfortunate debtor to reorganize its debts

11     and obligations.  But I submit, Your Honor, that our bankruptcy

12     process was never intended to provide a platform on which

13     Fortune 500 corporate parents might realize all the benefits of

14     bankruptcy, including an all-encompassing injunction, without

15     any of the burdens that fall upon a debtor merely by

16     artificially providing a pathway by allowing its obsolete

17     subsidiaries to file for bankruptcy.

18            Indeed, if the injunction is granted, 3M, a

19     Fortune 500 company generating over $30 billion in revenues

20     year after year, will have successfully engineered this

21     bankruptcy to prevent plaintiffs with permanent hearing loss

22     from getting their day in court before a jury.  At the same

23     time, it will allow 3M to continue its business operations

24     unabated, including the issuance of massive dividends to its

25     shareholders.

1          These words may sound harsh but they pale when

2    compared to the findings made by the MDL judge, Judge Rodgers,

3    in an order issued last night in the Cupit decision.  Debtors'

4    counsel chastised the plaintiffs' bar for supposedly going

5    behind this Court, but somehow conveniently ignores its

6    broadside attack on the MDL court and the MDL process.  For her

7    part, Judge Rodgers focused on the actions of the debtors

8    before this Court and wrote the following, and I quote:

9          "A short time ago, mere weeks according to Aearo's

10   bankruptcy filings, 3M and Aearo devised a scheme to escape the

11   MDL and this Court for good.  The plan was for Aearo to file

12   for Chapter 11 bankruptcy protection and then seek an extension

13   of the statutory automatic stay for 3M Company who would remain

14   completely solvent and never file a bankruptcy petition itself.

15         "To pull this off," Judge Rodgers writes, "the

16   entities executed a funding and indemnity agreement on the eve

17   of Aearo's bankruptcy filing allocating 100 percent of 3M's

18   liability for the CAEv2 claims in the litigation to Aearo.  By

19   voluntarily assuming all of the liability for the largest MDL

20   in federal judiciary's history," Judge Rogers notes that "Aearo

21   obviously wound up in deep financial distress.  3M Company, for

22   its part, would save the day by funding Aearo's operations and

23   capital needs during the bankruptcy proceedings, as well as the

24   subsequent claims trust, but desires the same protection

25   afforded the Aearo debtors under the bankruptcy stay.

1          "Thus, for bankruptcy purpose," and I'm quoting Judge

2    Rodgers, "the defendants need Aearo to be viewed as the real

3    party defendant when it comes to the CAEv2 liability in this

4    litigation and the parties' funding and indemnity agreement to

5    be viewed as validly creating an identity of interest between

6    the depletion of Aearo's assets in bankruptcy and continued

7    litigation against 3M in the MDL."  And I'm citing Pages 6 and

8    7 of the Cupit order.

9          Today, Your Honor, by its adversary proceeding and

10   motion, the Aearo debtors are asking this Court to utilize its

11   equitable powers to enjoin all third-party litigation,

12   including the MDL litigation against 3M.  But fundamental to

13   seeking equitable relief, as this Court well knows, is that the

14   asking party must warrant the grant of the relief and not come

15   to this Court with unclean hands.  We submit that during the

16   course of this preliminary injunction hearing, it will become

17   evident that neither the asking party nor the party in whose

18   favor the injunction is being asked to protect meet this

19   standard.

20         Again, in the words of the Cupit court, the "naked

21   duplicity inherent in this newly concocted narrative pervades

22   the bankruptcy record."  The law in this Circuit is clear.

23   Section 105 is an extraordinary and drastic remedy that must be

24   used sparingly and cautiously.  The Seventh Circuit has spoken

25   clearly and unequivocally in <u>Fisher</u> and <u>Caesar Entertainment</u>.

1      The burden is squarely on the debtors to demonstrate

2  that the third-party litigation which they are seeking to

3  enjoin will "defeat or impair the bankruptcy court's

4  jurisdiction over the case if not enjoined."  Said another way,

5  the gating issue is whether continued litigation against 3M

6  would diminish the amount of assets to be distributed to the

7  debtors' creditors.  The short answer is no.  In stark contrast

8  to the circumstances presented in Caesar Entertainment, there

9  is simply no possibility that the ultimate distribution to

10 creditors by the Aearo debtors will be adversely impacted by

11 the continuance of litigation against 3M.

12      The Seventh Circuit also teaches in Fisher and

13 Caesars Entertainment that assuming that the first prong is

14 satisfied, which we do not believe it will be, but if it is,

15 the debtor must also show that there is a likelihood of success

16 on the merits, meaning the likelihood of a successful

17 reorganization and that the injunction would serve the public

18 interest.  Again, we believe that the evidence at the hearing

19 will not affirmatively answer these inquiries.

20      Not only will the issuance of an injunction not

21 enhance the prospects for a successful resolution of the

22 disputes before this Court, but more importantly, the public

23 interest would not be served by permitting a scheme of naked

24 duplicity to be rewarded by the grant of equitable relief.

25      The MDL court was deeply concerned in her words over

38

1   3M Company's sudden bankruptcy eve about face regarding the
2   entity responsible for the CAEv2 claims in the MDL litigation.
3   Yet it recognized that the controversy was not yet ripe for
4   determination by her court stating that "Aearo's new liability
5   is on the record only in the bankruptcy court."  Nonetheless,
6   the MDL court noted clearly that "3M company's statements and
7   course of conduct since the start of the MDL are premised on
8   two truths.  First, that 3M Company is directly and
9   independently responsible for the CAEv2 liability in this
10  litigation.  And second, that it's subsidiaries are parties in
11  name only."

12          Counsel for 3M this morning suggested that the MDL
13  court is not cognizant of the interplay of the federal courts.
14  We are confident that she is.  But let me also note that
15  Ms. Lauria misspoke when she talked about the relief sought by
16  Mr. Keller.  Indeed, when examined, the relief that was sought
17  by Mr. Keller was that 3M should not use this Court to
18  collaterally attack the rulings of the MDL court.

19          But what are the implications of the MDL court's
20  findings at this time?  First, we submit that the evidence will
21  show, consistent with the MDL court's conclusions, that both
22  before and after the bankruptcy filing by the five subsidiaries
23  of the 3M companies, that 3M remained the only responsible
24  party that bears all the burdens and liabilities associated
25  with the Combat Arms litigation.

1          This flows from the course of conduct by the 3M
2  Company throughout the MDL litigation as well as the corporate
3  actions which it took after the 2008 acquisition of Aearo,
4  including those taken in 2010 when it effectively merged all of
5  Aearo's operations, businesses, and employees into the 3M
6  Company.  This conclusion also follows from the circular
7  untapped funding agreement entered into on the eve of
8  bankruptcy by the Aearo debtors in which 3M agreed to pay in
9  full all allowed and channeled creditors' claims under a
10  confirmed plan of reorganization ostensibly in return for the
11  Aearo debtors' illusory obligation to purportedly indemnify 3M
12  for that same payment.
13          As the MDL court noted before this bankruptcy, all of
14  the Combat Arms litigation liabilities rested with 3M.  By
15  virtue of the funding agreement, we submit, Your Honor, that
16  this remains true as we stand here today.
17          Second, during this hearing, the debtors will argue
18  and will put on evidence that 80 percent of the Combat Arms
19  litigation liabilities are Aearo's and not 3M's.  The fallacy
20  of this argument is set forth in detail by the Cupit court on
21  Pages 3 to 5, where among other things, the court stated that
22  throughout the MDL litigation, Aearo was a party in this
23  litigation in name only.  And further, the court stated, even
24  in the 16 bellwether trials, 3M maintained its posture of
25  singularity and control.  Just as in discovery, the six

40

1  defendants, referring to 3M and the five subsidiaries that

2  filed as debtors here, presented a united front at each

3  bellwether trial with 3M calling all the shots never once

4  asserting cross-claims against the other separate defendants

5  for indemnification, presenting evidence that would have

6  permitted a jury to allocate fault differently to any of the

7  defendants or asking for jury instructions or a verdict form

8  that would enable juries to apportion fault among the six

9  defendants.  And the MDL court goes on and on.

10       The 3M company and the Aearo debtors, they may want

11  to whitewash and forget the years of the MDL litigation which

12  happened in the past, but we do not and this Court cannot.  For

13  the purposes of what is before the Court today, the Court need

14  not reach the issue as to whether the Aearo defendants or 3M

15  are judicially estopped from now asserting a defense grounded

16  upon successor liability.  But what is critical is that the

17  Court cannot give any credence to the arguments being now

18  posited by the Aearo debtors and 3M which attempt to argue that

19  any party other than 3M is the responsible party liable for the

20  Combat Arms litigation.

21       More fundamental to the bankruptcy issues being

22  presented today, the bottom line is that it does not matter

23  because even if 3M Company and the Aearo debtors share

24  liability, whether it's joint and several or as successor,

25  every dollar paid or to be paid by 3M reduces dollar for dollar

41

1  every claim by a claimant against the Aearo debtors.  And to

2  the extent that this creates an indemnity claim in favor of 3M,

3  3M has agreed to pay this liability under the funding agreement

4  with no further obligation owing by the Aearo debtors.

5       Third, the debtors will argue and we heard this

6  morning that with respect to insurance, claims made against 3M

7  insurance inures to the detriment of the Aearo debtors.  But

8  this, again, falls short since any depletion of insurance will

9  be replenished by 3M's funding obligation under the funding

10 agreement.

11      And not to be ignored is that 3M's insurance program

12 manager, Mr. Christopher Sullivan, who's expected to testify

13 during these hearings, has stated under oath that the policies

14 are not going to be depleted at any time soon and there is no

15 imminent risk to coverage depletion.  Again, however, it does

16 not matter because the funding agreement will, according to its

17 terms, replenish any potential loss to Aearo's creditors.

18      Fourth, the debtors and 3M will argue that 3M has

19 indemnity claims against Aearo based on this indemnification

20 agreement entered into by the Aearo debtors on the eve of this

21 bankruptcy.  We agree with the MDL court that the legitimacy of

22 this agreement is in doubt and is clearly in dispute.  But that

23 is for another day and another motion.  To the extent it bears

24 on the issue as to whether the preliminary injunction should

25 issue, the clear answer is that it cannot because even assuming

42

1  the legitimacy of this indemnification agreement, and even

2  assuming that 3M may have indemnity claims against Aearo on

3  account of judgments or legal fees incurred in defending the

4  litigation, it does not matter because under the funding

5  agreement, 3M has agreed to fund Aearo's indemnity obligation

6  to 3M without recourse.

7        The bottom line is that under any scenario, unlike in

8  <u>Caesars</u>, no creditors' distribution will be impacted by

9  continued litigation by the claimants against 3M.  The MDL

10  court chastised 3M for ignoring judicial actions taken in the

11  past.  The same, however, applies to conduct which they took in

12  the past.  Try as they might, the debtors cannot escape from

13  evidence adduced at the hearing, which will show, among other

14  things, the following:  that 3M never disputed the assumption

15  of liability for the Combat Arms litigation, whether accrued

16  before or after acquisition of Aearo in 2008; that 3M paid in

17  full for the Pecan (phonetic) settlement; that 3M paid in full

18  for the posting of all the bonds against it and all the named

19  defendants; that 3M never made any claim of indemnity or cross-

20  claim against any of the Aearo debtors; that 3M never made any

21  corporate financial charge on its books or Aearo's books for

22  liability accruing to Aearo; and that particularly in and after

23  2010, 3M affirmatively integrated everything from Aearo,

24  including all of Aearo's employees and operations post-merger

25  into 3M, so much so that you will hear from Mr. Brian Myers,

43

1  the business director of personal safety at 3M, that there

2  effectively was no Aearo existing post-merger.

3          So where does that leave us?  We believe that this

4  bankruptcy is a sham which was contrived to deprive the

5  230,000-plus service members and veterans from their

6  constitutional right to a jury.  We believe that the notion

7  that there is an independent director is part of the concoction

8  to give a false air of respectability to an independence

9  between the parents and subsidiaries that has not existed since

10 at least 2010.

11         But today is not the day for a hearing on a motion to

12 dismiss.  That is indeed for another day.  Today, the question

13 is whether public interest allows the grant of equitable

14 injunctive relief and whether the debtors have demonstrated, as

15 is their burden, that their ability to pay the claims of all of

16 their creditors will be impacted by the continued litigation

17 against 3M, their non-debtor parent.  We submit, Your Honor,

18 that the answer is a resounding no, that they have and will

19 utterly fail to make this showing.  The balance of equities

20 does not fall in favor of the petitioning debtors.  The public

21 interest does not favor the grant of an injunction.  And

22 however parse, the equitable relief sought by the debtors

23 should be denied.

24         Thank you.

25         THE COURT:  Thank you.

44

1            MR. BARRETT:  Your Honor, I will take less than 30

2    seconds.  My name is Kevin Barrett.  I'm with the law firm of

3    Bailey and Glasser.

4            We filed an objection that was very targeted to the

5    unclean hands issues that Ms. Cyganowski has raised.  We are

6    fully cooperating with them but I just wanted to make sure that

7    we reserved our ability to both cross-examine witnesses if we

8    need to and to make closing.

9            THE COURT:  All right.

10            MR. BARRETT:  Thank you, Your Honor.

11            THE COURT:  Anyone else?

12                      (No audible response)

13            THE COURT:  Seeing none, a couple of things I want to

14    point out before we begin.  Much has been made about what's

15    going on in the MDL.  This Court can't do anything with what's

16    happened to the MDL.  I don't think that's really relevant

17    here.  I'm not here to sanctify or vilify what Judge Rodgers

18    has done.  Simply the fact is that what's happened in the MDL

19    has happened.  I can't look at it.  I can't tell you it's

20    great.  I can't tell you it's bad.  I don't think any of that's

21    relevant to what we're doing today.

22            I just want to say that because there's been a lot of

23    ink spilled regarding that and I just don't think that's

24    relevant now because what we have is a bankruptcy trying to

25    interpret bankruptcy issues understanding the MDL is there and

45

1   things have happened in the MDL.  But as to the propriety of

2   what's happened there, I don't think it's relevant.  So I just

3   want to throw that out there because if it does come up, I

4   think that's probably the avenue that wouldn't be beneficial to

5   anyone.  I'm not here with you in Court, thank goodness,

6   because I'm just a bankruptcy court.  So I want you all to at

7   least realize that as we go forward.

8          And I want to focus on the issues, mainly because

9   this is a big trial but ultimately it's the facts before me.

10  It's not the relationship necessarily of the parties amongst

11  each other.  It's just what do the facts show and what does the

12  case law tell me to do based upon those facts.  I'd love to

13  tell you, and everyone talks about how crystal clear the

14  Seventh Circuit law is, I'm just going to tell you it's not

15  exactly crystal clear because I am relatively positive both of

16  you would tell me the Seventh Circuit tells me to do different

17  things.  But I just want to throw that out there that I'm going

18  to apply the law as it is, but it is anything less than crystal

19  clear because, frankly, I don't have that case on all fours to

20  rely on.

21         It also would be really nifty if LTL's appeal were

22  actually decided.  It's not.  So that's just another case out

23  there.  Not that it's binding, but it would be nice to know.

24  But I can't control that either.  So I can only look at what's

25  in front of me today based upon the Seventh Circuit law as it

46

1 has been applied previously.

2          With that little caveat, I'll also point out I've

3 been told for those of you sitting in the nice counsel boxes,

4 you do have to push your mic to talk.  That's probably so that

5 a jury doesn't hear you say things like, "That's stupid," or

6 "The judge is an idiot," which is a great thing for a jury.

7 Our jury probably doesn't care.  They've already made up their

8 minds.  So you don't have to worry about that, but please do

9 push the button if you're talking.  In theory, mine is working

10 because the green light's on.  The witness stand, I don't know,

11 but if you're a witness, make sure the light's on.  Fingers

12 crossed.  If not, just keep pushing it if you can.

13          That being said, would you all like to begin or do

14 you want a brief five-minute intermission before the

15 festivities begin this morning?

16          MR. HUSNICK:  Your Honor, if you would like a five

17 minute break, we're happy to take one.  We're also happy to

18 power through.  We recognize that at the first day hearing you

19 had a stated preference for lunch at noon, and we're happy

20 to --

21          THE COURT:  Well, that's only because of the studies

22 of bad things happen when a judge gets hungry.

23          MR. HUSNICK:  Oh, yeah.  We're very --

24          THE COURT:  I'm not hungry yet, so we're good there.

25          MR. HUSNICK:  All right.  You let us know whenever

47

1  you want to take that lunchtime break.  Our first witness is

2  here in the courtroom and I will come up to the podium.  But

3  that examination we expect will run about an hour.

4          THE COURT:  Okay.  So you're deferring.  Is that

5  accurate?

6          MR. HUSNICK:  Yeah.

7          THE COURT:  Well, I mean, this is your chance to

8  really just say yes or no to a judge.

9                          (Laughter)

10          MR. HUSNICK:  Your Honor, why don't we take five

11  minutes?

12          THE COURT:  All right.  Is there any opposition to

13  that?

14          MR. PFISTER:  Pardon me, Your Honor.  No opposition.

15          Thank you.

16          THE COURT:  Okay.

17          Now, just want to warn you.  These aren't my

18  chambers.  So when I say five minutes, don't all sprint out

19  there because in theory, I'd like to like dart past you so I

20  don't get caught up.  So give me 30 seconds head start.  I'm

21  not very fast, but I think that'll at least give me a head

22  start.  So why don't we take a five-minute intermission.

23          I'm just going to say let's start at 10:25.  Slightly

24  more but that gives me a little lead time to get ahead of you.

25          MR. HUSNICK:  Thank you, Your Honor.

48

1                          (Recess)

2            THE COURT:  All right.  Well, let's go ahead and go

3    back on the record in Adversary 22-50059.  We are about to

4    begin our presentation of evidence through witnesses.

5            I will ask, is there any motion or anyone that

6    believes that we need to separate witnesses?

7            Can you slightly move to the left?

8            Thank you.

9            Or come up so I can actually see you.

10           MR. PFISTER:  Thank you, Your Honor.  For the record,

11   Rob Pfister.

12           I do think it would be appropriate to invoke the rule

13   on witnesses who aren't present in the courtroom.  We

14   understand and I don't believe anyone's previewed this, but

15   Mr. Stein has COVID and is not able to be here personally.  I

16   would certainly expect that he wouldn't be observing or

17   watching the proceedings.  And Mr. Castellano, obviously, is

18   the debtors' representative.  Now, he of course is going first,

19   so I don't think there's an issue with that.  But as to the

20   other two witnesses, I don't see any reason why we wouldn't

21   invoke the standard rule.

22           THE COURT:  Well, may I ask why?

23           MR. PFISTER:  Exactly.  I just think that there's a

24   purpose for the rule which is when one witness watches the

25   testimony, especially if it tends to touch on those issues,

1  it's typically the better practice in my experience to invoke

2  that.  I don't feel strongly if Your Honor doesn't -- I didn't

3  rise to invoke the rule to begin with.  So that's --

4          THE COURT:  But you kind of did.

5          So, all right.  So you're invoking the rule because

6  the rule is there.

7          MR. PFISTER:  I am invoking the rule because I think

8  the rule has a salutary effect generally, which is each witness

9  should be providing their own testimony and shouldn't

10  necessarily be colored by what another witness says.

11  Obviously, there are exceptions.  If this were Mr. Castellano,

12  who's the chief restructuring officer, you know, he is a

13  party's representative.  But I believe the other two witnesses,

14  there would not be any exceptions that would apply to those

15  witnesses.  And all else being equal, I think it would be

16  appropriate.  But, again, I'm not -- it's not a hill that's

17  particularly important.

18          THE COURT:  Okay.

19          MR. PFISTER:  Okay.

20          THE COURT:  Is there a response?

21          MR. McKANE:  There is Your Honor.

22          We are prepared to honor the rule.  We recognize that

23  it is in existence.  It is relatively rare in a bankruptcy

24  context to invoke the rule.  These witnesses are testifying on

25  events that have happened, you know, frankly, over the last few

50

1  weeks and months.  There's no effort to conform testimony.

2  This isn't a question about their witness's credibility or

3  candor in any way.  But if Your Honor wants us to comply with

4  the rule, we are in a position to do so.

5          THE COURT:  Okay.  Well, I like the fact that

6  nobody's really advocating strongly one way or the other

7  because I know -- well, I shouldn't say I know.  There's a high

8  likelihood of probability that I will not be the last set of

9  eyes and ears to hear this.  Why don't we just go ahead and

10  protect the record?  I believe we have access to Judge McCord's

11  courtroom, which I know we do.  If we can ask my assistant to

12  open that and we can put them in there because there is no Zoom

13  set up in that courtroom, that would be great.

14          THE CLERK:  (Indiscernible)

15          THE COURT:  McCord's room would be better.  So with

16  that being said, I think -- is Mr. Castellano the first

17  witness?

18          MR. McKANE:  Yes, Your Honor.

19          THE COURT:  All right.  He can come up and get

20  settled if you want.  I'll swear him in a moment.

21          For those other witnesses, if you can go ahead and

22  stand up, we'll escort you down there.  It's just the courtroom

23  across from my office.  It's all of 60 feet.  Well, that's

24  wrong, but not far from here.

25          MR. McKANE:  Your Honor, if I can help you, there are

51

 1   no other witnesses for the debtors in the courtroom today.

 2            THE COURT:  Really.  Well, that makes it easy.

 3            MR. McKANE:  They are very close --

 4            THE COURT:  To the courtroom.

 5            MR. McKANE:  They are at our Indiana counsel's office

 6   --

 7            THE COURT:  Well, there you go.  Okay.

 8            MR. McKANE:  -- just a five minute walk.

 9            THE COURT:  So is it Mr. Stein the only possible one

10   that might be affected?

11            MR. McKANE:  So there are Mr. Stein, through his

12   counsel -- well, through the district directors, is aware that

13   there is a potential of invoking the rule and we can confirm

14   that he is not monitoring the proceedings.  I want to address

15   his health situation in a moment if I can if we can come back

16   to that.

17            THE COURT:  Well, why not?  We're here.

18            MR. McKANE:  In fact, you want me to do that now?

19            THE COURT:  Sure.

20            MR. McKANE:  So, Your Honor, Mr. Stein did test

21   positive for COVID.  We immediately alerted the other side.  He

22   then took a second test and went into the doctor.  He has been

23   diagnosed, not with COVID, but with COVID induced pneumonia.

24   He is under medication and so we anticipate, you know, this --

25   not a surprise, that this matter may roll over to tomorrow and,

1   to the extent possible, we will have him be our last witness.

2          THE COURT:  Okay.  That seems to be a reasonable

3   accommodation.  And as much as I love live testimony, I don't

4   really want COVID or COVID induced pneumonia, bronchitis, COVID

5   induced bad things.  But we can address that.

6          So, but I would ask, at least you notify his counsel

7   to the extent that he is monitoring these to kindly disengage

8   from what I'm sure is the most exciting part of his day.  But

9   if you could do that, that will preserve the record and to the

10  extent that a reviewing court wants to look at it, at least we

11  will have dotted our I's and crossed our T's.

12         MR. McKANE:  We will do so.  And I can represent that

13  from counsel for the (indiscernible) directors that it has been

14  done.

15         THE COURT:  Excellent.  Okay.

16         Well, that was much easier than we thought.  We don't

17  have to worry about that.  So why don't we proceed?

18         MR. McKANE:  Your Honor, just before we call

19  Mr. Castellano to the stand, there were a series of requests

20  for judicial notice that have been filed.

21         THE COURT:  Ah, yes.  Okay.

22         MR. McKANE:  And I have an update.

23         THE COURT:  Okay.

24         MR. McKANE:  Because I don't think either side is

25  going to ask for the Courts to rule on those motions because I

53

1  can -- this is an approximate amount of time, but over a span

2  of approximately 12 hours yesterday, the debtors worked with a

3  series of the filing objectors to try to narrow and address

4  those issues, including with a stipulation of facts.  We

5  recognized at that time we did not have the United States

6  Trustee's Office on board with that.  I know over the course of

7  this morning, one of the debtors' lawyers have been walking the

8  United States Trustee's Office through what is believed to be a

9  compromise situation and we hope to be able to present that to

10  Your Honor for your consideration this afternoon.

11        THE COURT:  Okay.  Well, that's happy news because I

12  was a little bit worried about letting in hundreds of exhibits.

13  But y'all kindly told me what you wanted.  But to the extent

14  you can stipulate, that would even be better.  Obviously,

15  relevancy is a separate issue but I'll be, as the trier fact,

16  the determinant of that.

17        MR. McKANE:  Understood, Your Honor.

18        With that, Your Honor, the debtors call their chief

19  restructuring officer, Mr. John Castellano to the stand.

20        THE COURT:  All right.  Please come forward, sir.

21        We had to move that around because it's all situated

22  for the jury and not for me.  Before you take a seat, will you

23  please raise your right hand?

24        *JOHN CASTELLANO, DEBTORS' WITNESS, SWORN

25        THE COURT:  All right.  Please be seated.

1            I will tell you before we begin.  Despite the fact we

2  do have a court reporter here for both sides, the official

3  record is verbal and electronic only so please do not nod your

4  head because that is very hard to pick up on a microphone,

5  please say yes or no.  To the extent anyone objects to the line

6  of questioning, if you would stand up, remember to push your

7  microphone button, and also state your name for the record so

8  your name is preserved for posterity as being the objecting

9  party.

10            With that, Mr. Mckane, it's your witness.  You may

11  proceed.

12            MR. McKANE:  Thank you, Your Honor.

13            And for the record, Mark McKane of Kirkland and

14  Ellis, proposed counsel for the Aearo debtors.

15                         DIRECT EXAMINATION

16  BY MR. McKANE:

17  Q    Good morning, Mr. Castellano.

18  A    Good morning.

19  Q    Let's start with some background.  I introduced you as an

20  officer of Aearo, but who is your employer?

21  A    I'm a managing director for AlixPartners.

22  Q    And, sir, you're a managing director in what practice

23  group?

24  A    Turnaround and restructuring services.

25  Q    And how long have you worked in the restructuring space?

Castellano - Direct/McKane                              55

1  A     About 26 years.

2  Q     And, sir, you are the chief restructuring officer at

3  Aearo?

4  A     Correct.

5  Q     And have you served in that capacity before?

6  A     I have.

7  Q     And could you describe some of the engagements in which

8  you served as a chief restructuring officer?

9  A     So I was a chief restructuring officer for HCR ManorCare

10  which is one of the largest skilled nursing facilities in the

11  country; chief transformation officer, which effectively was a

12  chief restructuring officer for McDermott International, about

13  a $10 billion EPC contractor; and then, I was the chief

14  restructuring officer for Triangle USA Petroleum, an oil and

15  gas company.

16  Q     And, sir, approximately how many times have you served as

17  an interim officer in a restructuring capacity?

18  A     This is my 14th assignment.

19  Q     And when did you become the chief restructuring officer of

20  Aearo?

21  A     July 25, 2022.

22  Q     And, sir, is that the same day that Aearo decided to file

23  for bankruptcy?

24  A     That's correct.

25  Q     What are your responsibilities as the chief restructuring

Castellano - Direct/McKane                    56

1  officer?

2  A    So as the chief restructuring officer, first and foremost,

3  my team and I really are -- the intent is to provide bandwidth

4  to the management team so that they can focus on running the

5  day-to-day business while someone addresses and attends to the

6  actual reorganization and restructuring of the debtors.  So

7  specifically, you know, helping the company with treasury

8  functions, communications with vendors, as well as a series of

9  bankruptcy administrative tasks, as well.

10 Q    And, sir, in your role as the chief restructuring officer,

11 are you supported by a team at AlixPartners?

12 A    I am, yes.

13 Q    In the post-petition period, what are you and your Alix

14 team focused on?

15 A    So a number of activities.  One thing primarily right now

16 is effectively acting as, in a treasury function for the

17 debtors.  We're also responsible for preparing monthly

18 operating reports and schedules of assets and liabilities.  We

19 are assisting with significant amount of communications with

20 vendors and customers subsequent to the filing, as well as

21 providing just review of just how the bankruptcy itself will

22 impact the books and records of Aearo Technologies, the

23 debtors.

24 Q    And as part of your post-petition efforts, are you

25 providing cash forecasting for the debtors?

Castellano - Direct/McKane                    57

1  A    Yeah.  That I encompass -- I encompass that under the

2  treasury function tasks.  That's correct.

3  Q    All right.  So let's go back in time a little bit to the

4  pre-petition period.

5       When did the Alix team first become involved with Aearo?

6  A    Our engagement letter was signed the first week of May,

7  somewhere around May 4th or May 5th.

8  Q    Okay.  And just to be clear, May 4th of this year?

9  A    I'm sorry.  May 4th or 5th of 2022, correct.

10 Q    And by whom was AlixPartners engaged?

11 A    So our engagement letter was a joint engagement letter.

12 It was with Kirkland and Ellis and 3M on behalf of certain of

13 its affiliates.

14 Q    And at that time, what was AlixPartners engaged to do?

15 A    So AlixPartners was brought in to assist with contingency

16 planning at that point in time to assess what impact a

17 potential Chapter 11 filing could have and what preparation

18 would be necessary to prepare prospective debtors at that point

19 in time.

20 Q    And, sir, in May of 2022, had Aearo decided to file for

21 bankruptcy?

22 A    No, there were no decisions as it relates to filing for

23 bankruptcy.

24 Q    And, sir, I believe you already stated this, but the date

25 that Aearo decided to file.

Castellano - Direct/McKane                    58

1  A     July 25, 2022.

2  Q     And, sir, how do you know that?

3  A     I attended and participated in a board meeting that

4  evening.

5  Q     All right.

6        So, sir, between early May when you get engaged and

7  July 25th, during that two and a half months, what were you and

8  the Alix team doing?

9  A     Again, generally speaking, it was contingency planning

10 which required a significant amount of diligence on the Aearo

11 businesses spanning operations assessment, vendor assessment,

12 liquidity forecasting, really trying to understand how Aearo

13 interacts with 3M.  Aearo is approximately $100 million dollar

14 business sitting inside of a $35 billion conglomerate, so

15 there's just a significant amount of diligence necessary to

16 understand what a Chapter 11 filing, how that could potentially

17 impact the Aearo operations.

18 Q     All right.  And, sir, coming into the situation in May of

19 this year, what steps did you and your team undertake to get

20 your bearings of the situation?

21 A     So we began a series of discussions with key members of

22 3M's team because the functions that needed to be assessed were

23 services provided by 3M to the Aearo companies at that time

24 pursuant to the shared services agreement.  So really it was a

25 significant amount of diligence as it relates to treasury,

1   human resources, procurement, IT, evaluating the shared

2   services agreement itself to really understand the operations

3   of Aearo and what potential impact a Chapter 11 filing could

4   have on it.

5   Q    As part of that effort, did you evaluate Aearo's assets

6   and liabilities?

7   A    Yeah.  A typical step in any contingency planning process

8   is to take effectively a trial balance and understand what is

9   included in the balance sheet, what's included in the income

10  statement, and understand the history of those financial

11  statements.

12  Q    And, sir, to be clear, did you lead that effort for

13  AlixPartners?

14  A    I led that with my team, correct.

15  Q    And in your experience as a restructuring advisor, is it

16  typical to have a multi-month contingency planning process?

17  A    Yes.  It's not unusual at all to commence contingency

18  planning and then, what we call in our sector, put it on the

19  shelf.  No decisions have been made to file or you're working

20  through other transaction structures and you prepare and you

21  pause.  That's happened numerous times in my career.

22  Q    So to be clear, does the fact that you start prepping a

23  case mean you eventually file that case?

24  A    No.  No, it doesn't.  I mean, commencing contingency

25  planning is not akin to making a decision to file.

Castellano - Direct/McKane                    60

1   Q    So let's transition to discuss some basics of the Aearo

2   business if that's okay.

3        What products does Aearo make?

4   A    So Aearo designs solutions to control unwanted energy,

5   unwanted energies like noise, shock, excessive change in

6   thermal conditions or vibration.  Products that they

7   manufacture to control that energy would include damping and

8   isolation materials, acoustic absorbers, barriers, and thermal

9   control products.

10  Q    And, sir, to whom do they sell these products?

11  A    So their primary divisions would be the commercial vehicle

12  space, aerospace companies, various electronic manufacturers,

13  power generators, and then specialty equipment like

14  construction or agricultural equipment.  Again, things that

15  need to be protected from unwanted energy.

16  Q    And where does Aearo make these products?

17  A    So Aearo's headquarters are here in Indianapolis.  They

18  have a plant here in Indianapolis.  They also have a facility,

19  a manufacturing facility, Newark, Delaware.  They have another

20  manufacturing facility that is in Maquiladora in Mexico.  And

21  then they have a contract manufacturing sales organization in

22  Shenzhen, China.

23  Q    And does Aearo have direct employees?

24  A    Yes, it does.

25  Q    Approximately how many?

Castellano - Direct/McKane                    61

1  A    The Aearo debtors have approximately 330 direct employees.

2  Aearo's non-debtor affiliates have approximately 400 direct

3  employees.

4  Q    And when you refer to non-debtor affiliates, are those

5  affiliates of the debtor below the top debtor filer that are

6  not filers in these cases?

7  A    That's correct.  That would be specifically referencing

8  Mexico as well as China.

9  Q    And can you give the Court a sense that the size of the

10 Aearo business in terms of revenue?

11 A    So in terms of third-party revenue, Aearo generates a

12 little over $100 million a year.  Aearo also produces product

13 on behalf of 3M and sells that to 3M and that's around $25

14 million a year.

15 Q    All right.  So the $100 million that you referenced,

16 that's third-party sales?

17 A    That's correct.

18 Q    And, sir, to the extent that you could strip or set aside

19 tort liability, how would you characterize the health of the

20 Aearo business?

21 A    Yeah.  So Aearo's products are in quite demand, especially

22 in the commercial vehicle space, as well as in the aerospace

23 sector.  And they have healthy growth margins ranging anywhere

24 from 15 to 20 percent a year.  The last two years have been

25 challenging as a result of the pandemic and inflation.  But it

Castellano - Direct/McKane                                      62

1  does have healthy gross margins.

2  Q    And, sir, as the chief restructuring officer, are you

3  generally apprised of the objections that have been filed to

4  Aearo's preliminary injunction motion?

5  A    Yes, I am.

6  Q    All right.  And, sir, in one of those injunctions --

7  sorry.  In one of those objections filed on behalf of The Paul

8  Firm, they make the assertion that these debtors have nothing

9  to reorganize.  Is that accurate?

10 A    I would not agree with that statement.

11 Q    Why not?

12 A    So the debtors are facing significant contingent

13 liabilities as a result of the Combat Arms litigation.  It is a

14 real business and they are five of the six defendants named in

15 these lawsuits that number well over 235,000.  They are

16 responsible for those issues and they need to address the

17 litigation that they're facing.  So this is a business that

18 does need to reorganize.

19 Q    So let's transition briefly to another topic.  If we could

20 cover Aearo's corporate structure.

21      Sir, approximately [*sic*] debtor entities are there?

22 A    There's seven debtor entities.

23 Q    Yeah.  There's no approximation needed.  Sorry about that.

24      And you're the chief restructuring officer of each entity?

25 A    Correct.

Castellano - Direct/McKane                    63

1  Q    All right.  And, sir, did you prepare a demonstrative aid

2  to show the Aearo corporate structure?

3  A    I did.

4           MR. McKANE:  Your Honor, may I approach?

5           THE COURT:  You may.

6  BY MR. McKANE:

7  Q    Mr. Castellano, I'm handing you what has been marked as

8  Castellano Dem-1.

9           MR. McKANE:  May I approach Your Honor?

10          THE COURT:  You may.

11          Thank you.

12          The one on the far right.

13 BY MR. McKANE:

14 Q    And Mr. Castellano, do you recognize what has been marked

15 as Castellano Dem-1?

16 A    I do.

17 Q    What is it?

18 A    This is a simplified organizational structure specifically

19 highlighting the Aearo companies.

20 Q    And would it aid you in testifying today to utilize this

21 demonstrative?

22 A    Yes, it will.

23          MR. McKANE:  Your Honor, may I publish the

24 demonstrative aid?

25          THE COURT:  You may.

Castellano - Direct/McKane                    64

1           If you can.

2    BY MR. McKANE:

3    Q    And, Mr. Castellano, do you see that on the screen?

4    A    I do.

5    Q    Can you walk the Court through, using the Aearo structure

6    chart, the debtor entities?

7    A    Certainly.  So on this particular structure chart, you'll

8    see seven legal entities that are highlighted and dashed red.

9    Those represent the debtors.  There's a chain of debtors going

10   up from 3M Occupational Safety down to Aearo Technologies LLC.

11        The green star represents that those five of the seven

12   debtors are defendants in the Combat Arms litigation.  And

13   there's two additional debtor entities, Cabot Safety

14   Intermediate and Aearo Mexico Holding.  Additionally, the two

15   legal entities that sit below Aearo Technologies LLC, I'll

16   refer to Aearo de Baja, which is the Mexican operations I

17   referenced earlier, and then Aearo Trading, which is the

18   contract manufacturing office in Shenzhen.

19   Q    And, sir, those last two entities, the Mexican and Chinese

20   entities, those are the non-debtor affiliates -- those are two

21   of the non-debtor affiliates that you referenced in your

22   testimony earlier?

23   A    Correct.

24   Q    And which entity is the ultimate parent of 3M Occupational

25   Safety LLC?

Castellano - Direct/McKane                          65

1   A    3M Company itself.

2   Q    And is 3M Company publicly traded?

3   A    Yes, it is.

4   Q    All right.  Sir, as part of your pre-petition work, did

5   you undertake an effort to understand how Aearo became part of

6   3M?

7   A    I did, yes.

8   Q    Now, when did Aearo become a member of the 3M corporate

9   family?

10  A    3M purchased Aearo and its affiliates on April 1, 2008.

11  Q    Okay.  And, sir, earlier in your testimony you used the

12  phrase "shared services."  Is there a shared services

13  agreement?

14  A    There is, yes.

15  Q    And in your pre-petition work and in your role as chief

16  restructuring officer, have you familiarized yourself with the

17  shared services agreement?

18  A    Yes.  My team and I spent a significant amount of time on

19  the shared services agreement.

20          MR. McKANE:  Your Honor, may I approach?

21          THE COURT:  You may always approach.  It will save

22  literally seconds off the time frame.

23          Thank you.

24  BY MR. McKANE:

25  Q    Mr. Castellano, do you recognize what has been previously

Castellano - Direct/McKane                          66

1  marked as Exhibit 43 in the upper right hand corner?

2  A    I do.

3  Q    Now, what is it?

4  A    This represents the shared services or specifically the

5  support services agreement between 3M as well as the Aearo

6  companies.

7          MR. McKANE:  Your Honor, the debtors would like to

8  move Exhibit 43 into evidence.

9          THE COURT:  Any objection to the admission of what

10  has been designated Exhibit 43?

11          MR. PFISTER:  No objection, Your Honor.

12          THE COURT:  Thank you.

13          Anyone else?

14          MR. McKANE:  And --

15          THE COURT:  Seeing none -- go ahead.

16          MR. McKANE:  No, I apologize, Your Honor.

17          THE COURT:  I know.  Don't steal my line.

18          Seeing none, the Court will admit Exhibit 43 into

19  evidence.

20          (Debtors' Exhibit 43 admitted into evidence)

21          MR. McKANE:  And, Your Honor, we're happy to do

22  whatever pleases the Court with regards to exhibits.  If you

23  want a binder at the end of the day consolidating all of them,

24  we can do that, or you want it at the end of the proceedings,

25  just whatever direction --

Castellano - Direct/McKane                    67

 1              THE COURT:  Let's play it by ear.

 2              MR. McKANE:  Very good, Your Honor.

 3              THE COURT:  Because I don't know yet.

 4              MR. McKANE:  Fair enough.

 5              THE COURT:  So I have a little box, but I'm not sure

 6    I'll be able to contain the files or exhibits you've given me,

 7    so -- propose to give me, so we'll see.

 8              MR. McKANE:  All right.

 9              Your Honor, may we publish Exhibit 43?

10              THE COURT:  You may.

11    BY MR. McKANE:

12    Q    Now, Mr. Castellano, the shared services agreement, do you

13    see it's dated April 1st, 2008?

14    A    Correct.

15    Q    All right.  Is this the shared services agreement that

16    remains in place today?

17    A    It is, yes.

18    Q    And is this the agreement that to your knowledge that's

19    been in place for the entire time at Aearo?

20    A    Yes.  It is the agreement that's been in place.

21    Q    All right.  So, Mr. Castellano, starting at a high level,

22    30,000 feet, can you describe the shared services arrangement

23    between Aero and 3M?

24    A    Certainly.

25         So 3M -- whenever 3M acquires a company, they integrate

1    that company from a back -- what I'll call a back-office

2    technical assistance perspective to get efficiency of scale but

3    more importantly to also ensure consistency of policies and

4    procedures across their portfolio of companies.

5        So this shared services agreement touches on effectively

6    all critical back-office functions as well as a number of

7    health and safety, technical assistance, and engineering

8    assistance functions to allow Aearo the ability to grow its

9    business yet still ensure compliance with standardized policies

10   and procedures in place by 3M.

11   Q    And, sir, just to make sure we're on the same page with

12   regards to the language like back-office function, can you

13   describe some of the departments, if you will, that would

14   comprise the back office?

15   A    Certainly.

16       So it's fairly extensive.  It would include finance,

17   accounting, treasury, insurance, human resources, procurement,

18   IT.  Effectively, the infrastructure necessary to support Aearo

19   is provided by 3M.  And as an example, simple functions such as

20   paying employee or paying vendors, those systems are provided

21   by 3M.  And, again, that goes to the efficiency of managing

22   those back-office functions.

23   Q    All right.  Sir, just there are a bunch of lawyers in the

24   room, legal back office, as well?

25   A    I'm sorry.  Yes.  Legal is another critical function

Castellano - Direct/McKane                    69

1  provided by 3M.

2  Q    All right.  Sir, when you testified earlier today that

3  Aearo had approximately 330 employees, does that include any of

4  these back-office personnel?

5  A    No, it doesn't.

6      The back-office personnel that I'm referring to are

7  provided by 3M pursuant to this agreement.

8  Q    All right.  Let me direct your attention to Paragraph 2.2

9  which is on PDF Page 6.

10     Sir, do you see that, sir, Mr. Castellano, that services

11 that are provided are listed on Appendix A -- or Appendix 1,

12 excuse me?

13 A    Yes, I see that.

14 Q    All right.

15         MR. McKANE:  And if we could go to Appendix 1, which

16 is numbered Page 15.

17 BY MR. McKANE:

18 Q    Sir, did your team evaluate whether the 3M is actually

19 providing the services that are described in Appendix 1?

20 A    Yes.

21     As part of our diligence, as I testified previously or

22 earlier, it was important to understand how Aearo actually

23 conducts its business.  And since the shared services is such a

24 critical component of the infrastructure for Aearo, we did

25 spent -- my team and I did spend a significant amount of time

Castellano - Direct/McKane                                70

1  ensuring that, A, the services were in fact being provided

2  today as well as the accuracy of the description of these

3  services.

4       So we conducted a round of interviews, an extensive round

5  of interviews to ensure that this in fact actually is bring

6  provided by 3M to Aearo.

7  Q    And, sir, Roman numeral 1 on that same page where it says

8  laboratory technical assistance and manufacturing services,

9  were you able to confirm that 3M provides these services to

10 Aearo?

11 A    Yes.  They do.

12 Q    And what is comprised in laboratory technical assistance

13 and manufacturing services?

14 A    Yes.

15      So 3M wants to ensure that all of its subsidiaries have

16 access to the best technology, the best engineering designs, so

17 they want to offer to their subsidiaries that centralized

18 function.  So, for example, to the extent that there are

19 changes in environmental or health and safety requirements, 3M

20 will ensure that Aearo is operating its production facilities

21 in a safe manner and will identify and implement capital

22 investment in their facilities to ensure safety and compliance.

23      They'll do the same thing from an engineering and

24 technical assistance, again, to allow that business to be able

25 to grow but yet in a controlled fashion consistent with

Castellano - Direct/McKane                          71

1  policies and procedures across all 3M companies.

2  Q    And if we could turn to Page 17, the next page.

3       Sir, there's another description regarding selling,

4  marketing, general and administrative services.  Do you see

5  that, sir?

6  A    I do.

7  Q    And were you able to confirm that 3M is actually providing

8  these selling, marketing, general, and administrative services

9  to Aearo?

10 A    Yes.

11      And in this particular -- this particular area here, it's

12 a combination of both IT systems as well as training the

13 salesforce to ensure, again, that they can capitalize on the

14 skills that they have and capitalize on the marketplace that

15 they participate in.

16 Q    And, sir, if you could turn to the next page, Page 18,

17 there's a whole series of A through I believe R functions that

18 may be provided.  Were you able to verify that Aearo receives

19 these services as well from 3M?

20 A    Yeah.

21      And the vast majority of these particular services I would

22 reference as the back-office infrastructure and, again, this is

23 where you'll see finance, treasury, insurance, legal,

24 purchasing, human resources, among -- among other -- among

25 other functions.

Castellano - Direct/McKane                                   72

1  Q    Sir, practically speaking, can Aearo function without

2  these shared services?

3  A    No.

4       These functions are critical.  And, again, the way I'd

5  characterize it, this is the infrastructure that supports Aearo

6  so that it can grow its business in the marketplace that it

7  participates in.  But it does need access to these services to

8  ensure that it can continue its day-to-day operations.

9       So these are joint -- this to me is a joint aggregation of

10 what Aearo brings to the marketplace as well as the support

11 necessary from 3M so that it can actually do that.

12 Q    All right.  Let me ask you this, can Aearo pay its own

13 employees without these shared services?

14 A    No, it cannot.

15 Q    Can Aearo prepare its own books and records without these

16 services?

17 A    Aearo does not have one accountant actually on its staff.

18 It relies entirely on 3M for, broadly speaking, a finance and

19 accounting function.

20 Q    And does Aearo have any in-house counsel?

21 A    So there is one in-house lawyer that is also the corporate

22 secretary.  However, that person is a 3M employee, and that

23 individual focuses on commercial agreements: sales, purchasing

24 with -- sales agreements, purchasing contract with vendors,

25 again, more on the commercial side for the Aearo business.

Castellano - Direct/McKane                    73

1  Q    Does Aearo have any in-house legal counsel -- litigation

2  counsel, excuse me?

3  A    No, it does not.

4  Q    Let's transition to another topic.

5       You mentioned the April 2008 acquisition, and we've just

6  covered the support agreement.  As part of the contingency

7  planning process, did the Alix team conduct any diligence about

8  the 2008 acquisition?

9  A    We did.

10 Q    And what did your team do?

11 A    So just to get an understanding of the transaction that

12 occurred on April 1st, 2008, we reviewed a Duff & Phelps

13 valuation report that was provided to 3M, and it was a

14 valuation report to value identifiable tangible, and

15 identifiable intangible assets.  That valuation report was

16 necessary for 3M to properly reflect the purchase accounting

17 that occurred as a result of the acquisition, the $1.2 billion

18 acquisition.

19      That effectively set up the opening balance sheet for the

20 Aearo companies.

21 Q    All right.  And as part of you and your team's diligence,

22 did you identify any other transactions between 3M and Aearo

23 between 2008 and the present?

24 A    We did.

25 Q    And how many additional transactions?

Castellano - Direct/McKane                    74

1  A    So there was a set of transactions in 2009 and another set

2  of transactions in 2010.

3  Q    All right.  Let's start with 2009.  What happened in 2009,

4  any transfer between Aearo and 3M?

5  A    Yeah.

6      So 3M, as I understand it, has a policy where they

7  aggregate the intellectual property of an acquisition into

8  their own specific intellectual property legal entities.  So in

9  2009, the Aearo companies transferred the intellectual property

10 trade names-trademarks know-how to ultimately these two 3M

11 legal entities.

12     The IP -- we confirmed the IP was actually transferred

13 itself.  And this was reflected in Aearo's books and records up

14 the chain through the legal entities as an actual dividend

15 contribution to reflect the transfer of the intellectual

16 property to ultimately 3M.

17 Q    And, sir, did your diligence uncover any other activity in

18 2009 in terms of a transfer or dividend between Aearo and 3M?

19 A    Not in 2009, no.

20 Q    What about in 2010?

21 A    So in 2010, the -- 3M wanted to ensure and more properly

22 align its reporting units.  And Aearo then recorded a

23 transaction to transfer what was approximately 80 percent of

24 the Aearo business -- that business was the Head, Eye, Ear,

25 Hearing, and Face Safety business -- to transfer that to 3M's

1  Occupational Health and Environmental Safety Division for

2  management reporting purposes.

3  Q    For management reporting purposes, what does that mean?

4  A    So from a management reporting perspective, it's not

5  uncommon for an organization regardless of their size to look

6  at its business differently than just on a consolidated basis.

7  So the Occupational Health and Environmental Safety Division

8  wanted to just aggregate this particular division of Aearo into

9  its overall results so it could evaluate it from an operating

10 and performance perspective.

11      At the end of the day, management reports on a

12 consolidated basis will total the total consolidated financial

13 statements that get published, but this is more from an ability

14 to run the business on a day-to-day basis.  That's something

15 smaller than just the consolidated results.

16 Q    And, sir, how was this 2010 transfer recorded?

17 A    So there were journal entries recorded on Aearo's books

18 and records that effectively moved this division over to 3M and

19 then 3M correspondingly recorded the same transactions on its

20 books and records to reflect that this -- this business unit of

21 Aearo is now a business unit within this one 3M division for

22 management reporting purposes.

23 Q    And did you and your team share what you learned with the

24 Aearo boards?

25 A    We did.

Castellano - Direct/McKane                          76

1  Q    And did you present your findings at an Aearo board

2  meeting?

3  A    Yes, on a summary basis.

4  Q    Mr. Castellano, I'm going to hand you what has been

5  previously marked as Exhibit 144.

6       Mr. Castellano, do you recognize Exhibit 144?

7  A    I do.

8  Q    What is it?

9  A    These are meetings of a board meeting from July 19th,

10 2022.

11 Q    And, sir, do you see the list of attendees on Page 1?

12 A    I do.

13 Q    Do you see your name?

14 A    Yes.

15         MR. McKANE:  Your Honor, the debtors move into

16 evidence Exhibit 144.

17         THE COURT:  Any objection to what has been designated

18 Exhibit 144?

19         MR. PFISTER:  No objection, Your Honor.

20         THE COURT:  All right.  Seeing no objection, the

21 Court will admit Exhibit 144.

22         (Debtors' Exhibit 144 admitted into evidence)

23         THE COURT:

24 BY MR. McKANE:

25 Q    Mr. Castellano, do you see upper right-hand corner Exhibit

Castellano - Direct/McKane                    77

1  144 and then Page 1 of 74?

2  A    I do.

3  Q    All right.  Using that pagination, can we go to Page 58 of

4  74?

5  A    Yes, I see that.

6  Q    All right.  And, sir, do you recognize Page 58 of 74?

7  A    Yes.

8       It's a cover page of a presentation my team prepared in my

9  direction for this meeting.

10 Q    All right.  Let me direct your attention further to Page

11 65 of 74, and let me know when you're there.

12 A    I'm there, yes.

13 Q    All right.  And, sir, Page 65 of 74 is a one-page -- is

14 one page of that presentation entitled "2010 Aearo Safety

15 Product Business Transferred to 3M."  Do you see that, sir?

16 A    I do.

17 Q    Can you explain to the Court what you were trying to

18 communicate to the Aearo board with regards to this slide?

19 A    Yes.

20      So as I previously stated, effective January 1st, 2010, 3M

21 wanted to transfer the Head, Eye, Ear, Hearing, and Face Safety

22 Division of Aearo to its Occupational Health and Safety

23 Division.

24      So if you look on the left-hand side of the page and maybe

25 I'll just focus you on the net assets transferred line, which

1  is approximately $648 million, so what that represents is the

2  net book value of this particular division's assets and

3  liabilities that were then correspondingly recorded on 3M's

4  balance sheet effectuating the transfer for management

5  reporting purposes of this particular division.

6  Q    All right.  And, sir, you said these are net assets

7  transferred, correct?

8  A    That's correct.

9  Q    Were any Aearo liabilities transferred to 3M as part of

10  the 2010 transaction?

11  A    There were.

12  Q    Okay.  And are those summarized on this slide, as well?

13  A    Yes.

14      There's a section for liabilities.

15  Q    All right.  And, sir, can you walk the Court through the

16  liabilities that were specifically transferred from the Aearo

17  debtors to 3M in 2010?

18  A    Certainly.

19      So these liabilities represent ordinary course working

20  capital liabilities of this particular division of Aearo.  The

21  vast majority of these, if you look, the line that's called AP

22  represents -- that stands for accounts payable, and that would

23  be for vendor invoices, third-party vendor invoices that this

24  particular division was obligated on.

25      The ICE/P represents intercompany AP.  Aearo does purchase

Castellano - Direct/McKane                          79

1    raw materials from 3M for its production processes, and this

2    would be -- this would be the obligation that was outstanding

3    as of January 1st, 2010 from a working capital perspective.

4        And then the accrued expenses and other liabilities

5    effectively just represent accruals, so expenses that have been

6    incurred yet haven't matured for things like payroll, benefits,

7    and other -- other expenses accordingly.

8    Q    And, sir, was your team able to validate what was

9    specifically transferred from the Aearo entities to 3M in 2010?

10   A    Yeah.

11       My team reviewed the -- the journal entries and the

12   supporting documentation that culminated in this particular

13   summary.

14   Q    And, sir, did the supporting documentation include a

15   purchase and sale agreement?

16   A    No.

17       The supporting documentation was just the journal entries

18   and the -- the work papers that supported these numbers.  There

19   were no agreements that were entered into between Aearo and 3M

20   for this transfer.

21   Q    Were there any tort liabilities transferred in 2010?

22              MR. PFISTER:  Objection. Foundation, Your Honor.

23              THE COURT:  Response?

24              MR. McKANE:  I think, Your Honor, the witness has

25   already established the foundation by his specific review of

Castellano - Direct/McKane                    80

1  the specific journal entries that were -- that evidence the

2  transfer.

3            THE COURT:  All right.  Go ahead.

4            THE WITNESS:  So, no, there were no tort liabilities

5  transferred as there were no tort liabilities in existence at

6  this time.

7  BY MR. McKANE:

8  Q    And, sir, as part of your diligence in the 2008, 2009, and

9  2010 transactions, did you or your team identify any

10 documentation in which 3M assumed Aearo's tort liabilities?

11 A    We found no documentation where there was an assumption of

12 tort liabilities.

13 Q    And as part of that same diligence for that same

14 transactions, did you or your team identify any documentation

15 that suggested that Aearo tort liabilities were transferred to

16 3M?

17 A    No.

18      We found no evidence of any documentation supporting that.

19 Q    And from 2010 to the present, are you aware of any

20 transfer of tort liabilities from Aearo to 3M?

21 A    No, we are not.

22 Q    Let's change topics.

23      In your capacity as chief restructuring officer, have you

24 become familiar with the debtors' organizational documents?

25 A    Yes, I have.

1  Q    And, sir, are you aware of the fact that Aearo, the Aearo

2  entities are LLCs, limited liabilities companies?

3  A    Yes, I am aware of that.

4  Q    And as an LLC, do those entities have operating

5  agreements?

6  A    Yes, they do.

7  Q    And as part of your pre-petition diligence, did you review

8  the LLCs?

9  A    We did, as part of our pre-filing diligence.

10 Q    Mr. Castellano, I am handing you what has been previously

11 marked as Exhibit 37.

12      Exhibit 37, the top says, "Limited Liability Company

13 Agreement Of Aearo Technology, LLC."  Do you see that, sir?

14 A    I do.

15 Q    Do you recognize this document?

16 A    Yes.

17 Q    What is it?

18 A    This is the LLC agreement for this particular legal entity

19 in the chain of companies for Aearo.

20           MR. McKANE:  Your Honor, the debtors move Exhibit 37

21 into evidence.

22           THE COURT:  Any objection?

23           MR. PFISTER:  No objection, Your Honor.

24           THE COURT:  All right.  Seeing none, Exhibit 37 is

25 admitted.

Castellano - Direct/McKane                    82

1            MR. McKANE:  Thank you, Your Honor.

2            (Debtors' Exhibit 37 admitted into evidence)

3  BY MR. McKANE:

4  Q    Aearo Technology, LLC, is a member of what entity?

5  A    Well, it's a member of the direct legal entity that sits

6  above it which would be Aearo, LLC.

7  Q    Right.

8            MR. McKANE:  And if we could put up the

9  organizational demonstrative that we used earlier.  Just using

10 the org chart that -- thank you, sir.

11 BY MR. McKANE:

12 Q    Where is Aearo Technologies, LLC?

13 A    So that would be the bottom legal entity in the group of

14 five legal entities you see on this chart.

15 Q    The lowest of the entities with a green start.  Correct?

16 A    That's correct.

17 Q    As part of your pre-petition work, did you familiarize

18 yourself with any indemnification obligations of Aearo to 3M?

19 A    Yes.

20      We did -- we did review this particular document in that

21 regard.

22 Q    And what is your understanding of any potential Aearo

23 indemnification obligations to 3M as reflected in this

24 document?

25 A    So as reflected here, Aearo provides an indemnification as

1  defined in this particular document for its member and any

2  affiliates of its member.

3  Q    All right.  If we could go to Section 20 of the agreement

4  which I believe spans Pages 7 and 8.

5  A    Yes, I see that.

6  Q    What is your understanding of the covered -- the scope of

7  covered persons that's described in Section 20A of the Aearo

8  Technologies, LLC agreement?

9  A    So the scope of covered person is a broad definition

10 whereby the company is -- in this particular document, the

11 company would be Aearo Technologies, LLC -- providing to the

12 fullest extent possible an indemnification to a member and any

13 affiliate of the member as identified here and resulting in the

14 defined term "covered person."

15 Q    And is the indemnity that you referenced in Section 20B of

16 the agreement?

17 A    Yes.

18      It's expanded further in that -- in that statement.

19 Q    All right.  And, sir, in your experience is an

20 indemnification obligation like this unusual in an LLC

21 agreement?

22 A    No, I don't think this is unusual based on my experience.

23 Q    And have you reviewed the LLC agreements for --

24      MR. McKANE:  -- if we could go back to the

25 organizational chart for a minute, I'll re-ask my question.

Castellano - Direct/McKane                 84

1  BY MR. McKANE:

2  Q    And, sir, have you reviewed the LLC agreements for the

3  debtor entities above Aearo Technology?

4  A    I did.

5  Q    And that's specifically Aearo, LLC above to 3M

6  Occupational Safety, LLC?

7  A    That's correct.

8         MR. McKANE:  And, Your Honor, I apologize.  I will

9  get my steps in today.

10  BY MR. McKANE:

11  Q    I'm handing you what has been previously marked as Exhibit

12  32.

13     Mr. Castellano, Exhibit 32 -- what has been previously

14  marked as Exhibit 32 is the LLC company agreement of Aearo,

15  LLC.  Do you see that on the top of the page, sir?

16  A    I do.

17  Q    Do you recognize this document?

18  A    Yes, I do.

19  Q    Is this the LLC agreement for Aearo, LLC?

20  A    It is.

21         MR. McKANE:  Your Honor, we move Exhibit 32 into

22  evidence.

23         THE COURT:  Any objection to the admission of what's

24  been designated Exhibit 32?

25         MR. PFISTER:  No objection, Your Honor.

Castellano - Direct/McKane                    85

1              THE COURT:  All right.  Hearing none and seeing no

2   one else object, I will admit Exhibit 32.

3              (Debtors' Exhibit 32 admitted into evidence)

4   BY MR. McKANE:

5   Q    Mr. Castellano, I've handed you what's been previously

6   marked as Exhibit 28.  On the top of the page it says it is the

7   limited liability company agreement of Aearo Intermediate, LLC.

8        Do you see that, sir?

9   A    I do.

10  Q    Do you recognize this document?

11  A    Yes.

12  Q    Is this the LLC agreement for Aearo Intermediate, LLC?

13  A    Yes, it is.

14             MR. McKANE:  Your Honor, we move Exhibit -- what has

15  been previously marked as Exhibit 28 into evidence.

16             THE COURT:  All right.  Any objection to the

17  admission of what's been designated as Exhibit 28?

18             MR. PFISTER:  No objection, Your Honor.

19             THE COURT:  All right.  Hearing no objection and

20  seeing no other objection, the Court will admit Exhibit 28.

21             (Debtors' Exhibit 28 admitted into evidence)

22  BY MR. McKANE:

23  Q    Mr. Castellano, I've handed you what's been previously

24  marked as Exhibit 24, the LLC agreement for Aearo Holding, LLC.

25       Do you see that, sir?

Castellano - Direct/McKane                86

1  A    I do.

2  Q    Do you recognize it?

3  A    Yes.

4  Q    Is this the LLC agreement for Aearo Holding, LLC?

5  A    Yes, it is.

6          MR. McKANE:  Your Honor, we move Exhibit 24 into

7  evidence.

8          THE COURT:  All right.  Any objection to the

9  admission of what's been designated Exhibit 24?

10         MR. PFISTER:  No objection, Your Honor.

11         THE COURT:  All right.  Hearing and seeing none, the

12 Court will admit.

13         (Debtor's Exhibit 24 admitted into evidence)

14 BY MR. McKANE:

15 Q    Mr. Castellano, I've handed you what's been previously

16 marked as Exhibit 20 which is in its title on the top the

17 Limited Liability Company Agreement of 3M Occupational Safety,

18 LLC.

19       Do you see that, sir?

20 A    I do.

21 Q    Do you recognize this document?

22 A    Yes.

23 Q    What is it?

24 A    It's the LLC agreement for 3M Occupational Safety, LLC.

25         MR. McKANE:  And, Your Honor, we move Exhibit 20 into

Castellano - Direct/McKane                    87

1  evidence.

2          THE COURT:  Any objection to the admission of what's

3  been designated Exhibit 20?

4          MR. PFISTER:  No objection, Your Honor.

5          THE COURT:  All right.  Hearing none and seeing no

6  other objections, the Court will admit.

7          (Debtors' Exhibit 20 admitted into evidence)

8          MR. McKANE:  Your Honor, could I have just one brief

9  second?

10         THE COURT:  You may.

11                      (Pause)

12  BY MR. McKANE:

13  Q    Mr. Castellano, I'm going to have a couple of questions

14  about that set of exhibits I just showed you: 32, 28, 24, and

15  20.  But before that, I need to move in one more.

16  A    Okay.

17  Q    And, Mr. Castellano, what has been previously marked as

18  Exhibit 41 is the limited -- on its title on the top says

19  Limited Liability Company Agreement of Cabot Safety

20  Intermediate, LLC.

21         Do you see that, sir?

22  A    I do.

23  Q    Do you recognize this document?

24  A    Yes.

25  Q    What is it?

Castellano - Direct/McKane                    88

 1  A    It's the LLC agreement for Cabot Safety Intermediate, LLC.

 2  Q    Thank you.

 3            MR. McKANE:  Your Honor, we move Exhibit 41 into

 4  evidence.

 5            THE COURT:  All right.  Any objection to what's been

 6  designated Exhibit 41?

 7            MR. PFISTER:  No objection, Your Honor.

 8            THE COURT:  All right.  Hearing none and seeing no

 9  one else, I will admit.

10            (Debtors' Exhibit 41 admitted into evidence)

11            MR. McKANE:  And if we could go back to the

12  organizational chart demonstrative we used earlier today.

13  BY MR. McKANE:

14  Q    Mr. Castellano, the exhibits we just referred to -- that

15  were moved in evidence for Aearo Technology, Aearo, Aearo

16  Intermediate, Aearo Intermediate Holdings, and Occupational

17  Safety, LLC, those are the Aearo debtor entities that are named

18  defendants in the Combat Arms litigation.  Correct?

19  A    That's correct.

20  Q    All right.  And you're familiar with the operating

21  agreements for all of those debtor entities that are

22  defendants?

23  A    I am.  Yes.

24  Q    Do each of them have the same Section 20 indemnification

25  provisions that we just covered with regards to Aearo

Castellano - Direct/McKane                    89

1  Technology, LLC?

2  A     They do.

3  Q     Now, sir, we've been -- you were talking earlier today,

4  you were testifying earlier today about the July 19th board

5  meeting.  Did you attend other board meetings in the pre-

6  petition period for Aearo?

7  A     I did.

8            MR. McKANE:  And, Your Honor?

9                        (Pause)

10  BY MR. McKANE:

11  Q     Mr. Castellano, do you recognize what has been previously

12  marked as Exhibit 141?

13  A     I do.

14  Q     And, sir, do you -- what is this document?

15  A     It's a summary of the minutes of the meeting that was held

16  with the Aearo board of directors on July 12th, 2022.

17  Q     And are you listed as attending this board meeting?

18  A     Yes.

19            MR. McKANE:  Your Honor, debtors move Exhibit 141

20  into evidence.

21            THE COURT:  Any objection thereto?

22            MR. PFISTER:  No objection, Your Honor.

23            THE COURT:  All right.  Hearing none and seeing no

24  other objection, I will admit.

25            MR. McKANE:  Thank you, Your Honor.

Castellano - Direct/McKane                    90

1          (Debtors' Exhibit 141 admitted into evidence)

2   BY MR. McKANE:

3   Q     Did the AlixPartners team give a presentation at the July

4   12th board meeting?

5   A     We did.

6   Q     And let me direct your attention to Page 7 of the PDF,

7   Page 7 at the top of the page.

8   A     Yes, I see that.

9   Q     All right.  What is this document?

10  A     This is a summary presentation that my team prepared in my

11  direction as it relates to an update for the board on liquidity

12  and cash management materials.

13  Q     And, sir, July 12th, approximately how many weeks before

14  the filing of the bankruptcy was this?

15  A     It would be about two weeks.

16  Q     What is Project Crane?

17  A     When we were engaged to join this team here, Project Crane

18  was the code name identified for this -- for this initiative to

19  maintain confidentiality.

20  Q     And are project names or code names unusual in your

21  experience as a restructuring advisor?

22  A     No, they're not.

23  Q     Let's look at Page -- PDF Page 10.  Let me know when

24  you're there, sir.

25  A     I'm there.

Castellano - Direct/McKane                        91

1  Q    All right.  Do you see on the left-hand side there are

2  three boxes on the left with the first box saying "Chapter 11

3  Overly Pre and Post-Filing?"

4  A    Yes, I do.

5  Q    All right.  So let me direct your attention to the first

6  bullet in that first box in the right-hand side.

7  A    Yes, I'm there.

8  Q    Do you see where it says, "To prepare for the filing,

9  Aearo plans to permanently suspend its automatic sweep with FMC

10 on July 15th in order to establish a stand-alone treasury

11 operation for Aearo."  Do you see that, sir?

12 A    Yes, I do.

13 Q    What is the AlixPartners team trying to convey to the Alix

14 -- to the Aearo boards with regards to suspending an automatic

15 sweep with FMC?

16 A    So Aearo does have its own cash accounts.  Aearo has its

17 own customers and collects from its customers.  However, as I

18 had mentioned previously, pursuant to the shared services

19 agreement, Aearo's treasury operations are all managed on a

20 consolidated basis with 3M.

21     So on a daily basis, to the extent that there's any cash

22 sitting in Aearo's primary concentration account, it would get

23 swept to the in-house treasury function at 3M, which here it's

24 referenced as FMC, and that stands for 3M Financial Management

25 Corporation, which would then manage all of the domestic

1  treasury operations for all of 3M's businesses again pursuant

2  to the shares services agreement.

3      And we did describe this structure in the cash management

4  motion on the first day, as well.

5  Q    Mr. Castellano, did Aearo suspend the automatic sweep on

6  July 15th?

7  A    Yeah.

8      So as part of any contingency planning process, it's

9  important to understand operationally what you need to do and

10 what may happen in order to commence a Chapter 11 proceeding.

11 So in the event a decision was made that Aearo would commence

12 Chapter 11, we needed to ensure that Aearo would have access to

13 its own cash and then that cash would be segregated from

14 effectively anyone else so that it could manage its own assets

15 on its own behalf.

16     And it's important to test changes such as this to ensure

17 that there isn't an unintended consequence or a knock-on effect

18 and you would not typically do this immediately before a filing

19 if such a decision was made, so we did suspend this on July

20 15th so that we could assess the impact it would have.

21 Q    And does this exercise, suspending the automatic sweep, in

22 any way mean that Aearo decided to file for bankruptcy on July

23 15th?

24 A    No.  there was no decision to file on July 15th.

25 Q    And could the suspension of the automatic sweep to FMC be

Castellano - Direct/McKane                93

1  unwound or reversed?

2  A    Yes.

3       While the phrase here does say permanently suspended, this

4  is a system change that could have been reversed relatively

5  easily.

6            MR. McKANE:  If we could go back on page?  Page 9 of

7  the agreement.  Sorry, of the presentation.

8  BY MR. McKANE:

9  Q    There again boxes on the left-hand side?

10 A    Yes.

11 Q    Two of those boxes refer to Aearo debtors and Aearo non-

12 debtors.

13 A    I see that, yes.

14 Q    Why in July 12th are you referring to Aearo debtors and

15 Aearo non-debtors?

16 A    Whenever you commence a contingency plan and in order to

17 understand what's necessary to prepare for a potential Chapter

18 11 filing, at some point you have to draw a box around who may

19 become a debtor and who may not be a debtor.

20      It's important to be able to do diligence on those

21 businesses so you can understand, you know, what relief you may

22 need from court or what implications a Chapter 11 filing may

23 have.  This is typical contingency planning procedures.

24      So what we're identifying here represents some bullet

25 points as it relates to prospective Aearo debtors as well as

Castellano - Direct/McKane                    94

1  Aearo non-debtors.

2  Q    And, sir, if we could cover one more page in this

3  presentation.  If we could go to Page 17 of 24.

4       And, sir, do you see Page 17 which is entitled "Initial

5  Professional Fee Estimates Have Been Forecasted Through Year

6  End '22."  Do you see that, sir?

7  A    I do.

8  Q    What does this page -- what are you trying to convey with

9  this page to the Aearo boards?

10 A    Yeah.

11      So in the event a decision is made to commence Chapter 11

12 proceedings, we wanted to have an estimate of what may be

13 incurred from a professional fee perspective, professional fees

14 associated with a restructuring.  Again, it's not uncommon when

15 you're commencing contingency planning proceedings to evaluate

16 the liquidity requirements of what may incur.

17      This is, obviously, an estimate.  There isn't anything

18 that says that that's what this will cost.  But it is just an

19 estimate of, you know, based on, you know, what we think could

20 potentially happen here --

21 Q    And --

22 A    -- for the balance of 2022.

23 Q    I apologize.

24

25      And, Mr. Castellano, what is the total professional

Castellano - Direct/McKane                    95

1  projected fees that may have been incurred in 2022?

2  A    What this schedule here represents is approximately $95

3  million.

4  Q    Now, sir, $95 million is a significant number.  How can

5  Aearo afford paying $95 million for a bankruptcy proceeding

6  based on your testimony earlier that its third-party revenues

7  are $100 million?

8  A    Yeah.

9       So pursuant to the funding agreement, one of the permitted

10 funding uses would allow Aearo to fund the operation of a

11 Chapter 11 proceeding.  So it would have access to pay for

12 these expenses pursuant to the funding agreement.

13 Q    All right.  Mr. Castellano, I want to switch topics.

14      Let's discuss why we're here.

15      When did Aearo file for bankruptcy?

16 A    July 25th -- I'm sorry, July 26th, 2022.

17 Q    And who made the decision that Aearo should file for

18 bankruptcy?

19 A    The Aearo board of directors.

20 Q    And, sir, with regards to the board meetings of the Aearo

21 directors, with regard to the meeting, the board meetings -- so

22 let me back up for a second.  I'll rephrase, make it a better

23 question.

24      Were there a series of board meetings that occurred of the

25 Aearo boards in the period of time from when you got involved

1 in May up through the bankruptcy filing?

2 A    Yeah.

3       We had a number of board meetings.  We typically scheduled

4 at least one a week, and at times we had multiple board

5 meetings during a week.

6 Q    And to the best of your ability, did you attend the Aearo

7 board meetings?

8 A    Most of them.

9 Q    And did you prepare a demonstrative aid with a timeline of

10 those board meetings to aid you in testifying today?

11 A    Yes, I did.

12 Q    Mr. Castellano, is this the timeline of Aearo board

13 meeting that you prepared to aid you in testifying today?

14 A    Yes, it is.

15 Q    And would it aid you in testifying?

16 A    I'm sorry.  Can you repeat the question?

17 Q    Would it aid you in testifying today?

18 A    Yes, it will.

19       MR. McKANE:  Your Honor, may we publish Castellano

20 Demonstrative Number 2?

21       THE COURT:  Any objection thereto?

22       MR. PFISTER:  I don't object to the publication of

23 the demonstrative.  I think it leaves out certain key dates,

24 but we can cover that in cross.

25       THE COURT:  Correct.  All right.

Castellano - Direct/McKane                    97

1           MR. McKANE:  All right.

2  BY MR. McKANE:

3  Q    Mr. Castellano, I kind of want to work backwards from the

4  date on the far right-hand side, the July 26th Aearo filing.

5           Do you see that, sir?

6  A    I do.

7  Q    What actions occurred on the day before, July 25th?

8  A    On the day before, Aearo executed and entered into its

9  funding agreement with 3M and then subsequently had the meeting

10 to authorize the Chapter 11 filing.

11 Q    And then there are -- and what day was the 25th?

12 A    That was a Monday.

13 Q    There are -- there's an entry here on July 23rd.  Do you

14 see that, sir?

15 A    I do.

16 Q    All right.  That's a Saturday?

17 A    Correct.

18 Q    What happened on Saturday, the 23rd?

19 A    So on Saturday, the 23rd, the 3M board met to authorize

20 entry into the funding agreement.  That was critically

21 important to the Aearo board, which then subsequently met

22 Saturday afternoon to get an update on 3M's decision to enter

23 into the funding agreement.  And then the Aearo board agreed to

24 then enter into that funding agreement subsequent to 3M making

25 that decision to support the funding agreement.

1  Q     Why was there an Aearo board meeting on a Saturday, to

2  your knowledge?

3  A     Yeah.

4        I mean it was -- this is -- this was a critically

5  important element in the board's decision as to whether or not

6  to commence the Chapter 11 proceedings.

7  Q     When you say "this," are you referring to entry of the

8  funding agreement?

9  A     Yes.  I apologize.

10       Entry into the funding agreement was a critically

11 important element in the board's assessment of making a

12 decision as to whether or not to file these Chapter 11 cases.

13 Q     And did the board have a view at all with regards to

14 whether it would -- the Aearo board would enter into the

15 funding agreement before the 3M board would enter into the

16 funding agreement?

17 A     No.

18       The Aearo board wanted to ensure that the 3M board agreed

19 to enter into the funding agreement that was negotiated by the

20 disinterested directors before it made any decisions to move

21 forward with whatever actions it was deciding to take on behalf

22 of Aearo.

23 Q     Mr. Castellano, I've handed you what's been marked as

24 Exhibit 146.  Do you recognize 146?

25 A     I do.

Castellano - Direct/McKane                99

1  Q    What is it?

2  A    It's the summary of the minutes of the meeting from -- the

3  minutes of the board of directors meeting from July 25th, 2022.

4  Q    The Aearo board's?

5  A    The Aearo board's.

6  Q    And, sir, were you in attendance at this meeting?

7  A    Yes, I was.

8  Q    And I see you're listed.

9        And are these the minutes of that meeting?

10 A    That's correct.

11        MR. McKANE:  Your Honor, we move Exhibit 146 into

12 evidence.

13        THE COURT:  Any objection to the admission of 146?

14        MR. PFISTER:   No objection, Your Honor.

15        MR. McKANE:  All right.

16        THE COURT:  Hearing none -- hold on -- and seeing

17 none, I will admit Exhibit 146 into evidence.

18        (Debtors' Exhibit 146 admitted into evidence)

19        MR. McKANE:  I apologize, Your Honor.

20        THE COURT:  It's all right.  Now you can go.

21        MR. McKANE:  If we could publish 146.  And just go to

22 the list of attendees.

23 BY MR. McKANE:

24 Q    Mr. Castellano, you're listed here as AlixPartners in the

25 list of attendees for the July 25th board meeting.

Castellano - Direct/McKane                    100

1       Do you see that, sir?

2   A   I do.

3   Q   At that point, were you still an advisor to Aearo?

4   A   At the beginning of the meeting, I was an advisor, yes.

5   Q   All right.  And as an advisor to Aearo, did you recommend

6   that the Aearo debtors file for bankruptcy?

7   A   Yes, I did.

8   Q   Why?

9   A   Aearo's facing significant amount of contingent

10  liabilities for which it is named as a defendant, five of its

11  legal entities named as a defendant in those -- in those cases.

12  It was facing over $300 million of judgments for the cases that

13  had already been decided.

14      And in order to reorganize its business and bring all the

15  claims into one forum with the objective of reaching a

16  comprehensive global solution in an equitable and efficient

17  manner, the board did make the decision to file.  I supported

18  that decision.  And it also at this point in time had an

19  ability to fund these cases pursuant to the funding agreement.

20  Q   And, sir, in your answer, you referenced a global

21  resolution for Aearo.  What is the value of a global resolution

22  for Aearo?

23  A   So Aearo is facing not only claims coming out of the MDL,

24  they also have claims coming out of the State of Minnesota, and

25  there's likely future claims.

1   So commencing these proceedings and with the intent of a

2   global resolution to bring finality to this litigation so that

3   the Aearo business can reorganize and continue to grow would be

4   a benefit to the claimants as well as the debtors themselves.

5   Q    Mr. Castellano, you referenced future claims.  Do you just

6   means claims not filed?

7   A    Claims not filed, correct.

8   Q    As a restructuring professional, do you believe Aearo has

9   a viable path forward in this bankruptcy?

10  A    Yes, I do.

11  Q    Why is that?

12  A    Bankruptcy is a forum to bring all of the constituents

13  together, utilize the tools of Chapter 11 to reach a global

14  solution in a much more efficient and equitable way to be able

15  to do that.  And I believe that as -- you know, where we're at

16  now, there's no reason to believe that we can't achieve that

17  resolution.

18  Q    Now, sir, I want to talk about why we're specifically here

19  today, okay?

20  A    Yes.

21  Q    All right.  You're the chief restructuring officer of

22  these debtors.  Why are the debtors asking Judge Graham for the

23  preliminary injunction?

24  A    So the need for this preliminary injunction is to allow

25  for effectively a number of factors so that we can prosecute --

1  the debtors can prosecute these Chapter 11 cases.

2      There's -- if the preliminary injunction isn't granted, I

3  believe there will be issues with process, there will be issues

4  with people, issues with resources, and issues with property

5  that would impact the overall objective of trying to reach a

6  global solution here.

7  Q    Let's go through each of those.

8      You mentioned people.

9  A    Correct.

10 Q    If the Combat Arms litigation continues against 3M, how

11 will that impact Aearo with regards to its access to people?

12 A    So as I mentioned in my testimony previously, Aearo relies

13 on a significant amount of infrastructure support, back-office

14 support coming from 3M.

15     And if Aearo is in Chapter 11 wanting to pursue a global

16 resolution with the claimants but the cases still continue to

17 pursue against 3M, there's a number of resources that 3M has

18 that Aearo would need access to.  And it's likely that they

19 would be significant distracted if they were continuing to

20 assist 3M in its own litigation.

21 Q    All right.  Sir, let's get specific.

22     You mentioned back-office functions.  Previously, you

23 mentioned that legal is one of those back-office functions.

24 What lawyers would be impacted by a continuation of the Combat

25 Arms litigation against 3M?

1 A    So Eric Rucker who is an associate general counsel, has a

2 significant amount of familiarity with the MDL cases.  Courtney

3 Enloe who's head of litigation is very familiar with these

4 cases, as well as Kate Warner, another associate general

5 counsel.

6      There's likely other lawyers within 3M, but those three

7 would be instrumental to assisting the debtors prosecute these

8 Chapter 11 cases.

9 Q    Now, sir, you mentioned insurance was a back-office

10 function.  Do you recall that?

11 A    Correct.

12 Q    Are there certain insurance professionals at 3M that would

13 be directly impacted by the continuation of the Combat Arms

14 litigation against 3M?

15 A    Yeah.

16      So insurance is an important asset of the estate, and the

17 debtors share an insurance policies with 3M.  Two individuals

18 that have a significant amount of familiarity with those

19 insurance policies would be Chris Sullivan and Joanne Sum-Ping,

20 both of which the debtors would need access to over the course

21 of a Chapter 11 case.

22      And, again, if these cases continue against 3M, there

23 would be a significant amount of distraction.

24 Q    If you needed information about the insurance policies

25 that the Aearo debtors board share with 3M, who do you call?

1  A    Chris Sullivan is very familiar with these -- with those

2  policies.

3  Q    And if you need legal assistance with the insurance

4  policies with regard they're jointly shared between 3M and

5  Aearo, who do you call?

6  A    Chris Sullivan and Eric Rucker.

7  Q    All right.  You mentioned finance and accounting as back-

8  office functions before.  Do you recall that?

9  A    Correct.

10 Q    Who in the finance or accounting function would be

11 involved in the Combat Arms litigation if it continued against

12 3M?

13 A    Yeah.

14      So that's --

15           MR. PFISTER:  Objection.  Foundation, Your Honor.

16           THE COURT:  Response?

17           MR. McKANE:  Your Honor, I'm happy to lay more

18 foundation to the extent I haven't.  I think the witness has

19 testified at length about the need of the back-office

20 functions, his preparation as an advisor.  And I can make clear

21 with regards to those efforts if necessary how that tied to the

22 pre-petition and post-petition period with regards to

23 additional litigation regarding 3M.

24           MR. PFISTER:  That's not the foundation.  Objection,

25 Your Honor.  Pardon me.  That's not the foundation objection,

Castellano - Direct/McKane                              105

1  Your Honor.  It's the portion of the question where he asks the

2  witness about these people being involved in the MDL

3  proceedings and that's where there's no foundation.

4            THE COURT:  Okay.  Response to that?

5            MR. McKANE:  I can rephrase.

6            THE COURT:  That would be good because I think I do

7  need a little bit more as to that particular objection.

8            MR. McKANE:  Understood.

9            THE COURT:  So I'll sustain it.  Go ahead and --

10            MR. McKANE:  All right.

11  BY MR. McKANE:

12  Q    We were talking about back-office functions, finance, and

13  accounting.  Do you recall that, sir?

14  A    Correct.

15  Q    As part of your efforts working with the Aearo debtors

16  pre-petition, are there particular people with the accounting

17  function that you interacted with?

18  A    Yes, there were.

19  Q    All right.  And as part of your interaction with those

20  individuals, both -- let's talk about accounting, right.  Did

21  you interact with them specifically regarding the contingent

22  liabilities of the debtors?

23  A    Yes.

24        We -- we asked them a number of questions as it relates to

25  that impact, yes.

Castellano - Direct/McKane                    106

1  Q    Based on your interactions with those personnel and those
2  contingent liabilities, and to be clear, are those contingent
3  liabilities the Combat Arms litigation for which Aearo and the
4  3M are co-defendants?
5  A    They are, yes.
6  Q    Who are those people based on your direct interactions
7  with them that you believe would be directly impacted if the
8  Combat Arms litigation continued against 3M and would be less
9  available to you?
10         MR. PFISTER:  Objection, Your Honor.  Foundation.  He
11 still has not laid it as to those individuals' role in the
12 Combat Arms MDL litigation.
13         THE COURT:  We do need to know what -- I mean he's
14 speaking about functions as far as his discussions with regard
15 to contingent liability, but I have no idea how it affects the
16 MDL or has anything to do with the MDL at this point.
17         MR. McKANE:  Sure.  I'll tie it up to the extent I
18 can.
19 BY MR. McKANE:
20 Q    Can you identify some of the -- one of the accounting
21 personnel you were interacting with?
22 A    Certainly.
23      Teri Reinseth is the chief accounting officer.  And,
24 again, just to go back to my previous testimony, Aearo has no
25 accountants on staff, so the entire accounting function is

Castellano - Direct/McKane                    107

 1  provided by 3M.

 2  Q    All right.  And what is your understanding of how the

 3  chief accounting officer, Teri Reinseth, is involved in

 4  supporting the Combat Arms teams in the ongoing litigation?

 5           MR. PFISTER:  Objection, Your Honor.  Foundation.

 6  This is foundation for a question that lacks foundation.  I

 7  don't understand how this witness could possibly know how an

 8  accountant at 3M is involved in prosecuting the -- or

 9  defending, rather, the MDL case.

10           THE COURT:  Well, I mean I'll let him lay the

11  foundation.  I do need to know the answer because I don't know

12  what foundation -- I mean I don't know what familiarity he has

13  yet, so.

14           MR. McKANE:  All right.

15           THE COURT:  I think you can count it as a continuing

16  objection and let's find out if there is foundation or not.

17  BY MR. McKANE:

18  Q    Did you speak with Ms. Reinseth about what efforts 3M is

19  undertaking in accounting with regards to the Combat Arms

20  litigation?

21  A    Yes.

22       I mean there's support --

23           MR. PFISTER:  Well, pardon me, Your Honor, I didn't

24  object to the "did you speak" part, but if he's now purporting

25  to give hearsay, I'm going to have to object on hearsay

Castellano - Direct/McKane                     108

1  grounds.

2        THE COURT:  If he's stating what he said, that is

3  hearsay.

4        MR. McKANE:  Sure.

5  BY MR. McKANE:

6  Q    What is your understanding based on your overall

7  interactions with all the accountants and your review of the

8  materials about whether the 3M accounting team is involved in

9  supporting the Combat Arms litigation effort for 3M?

10        MR. PFISTER:  Once again, he's asking -- objection.

11        THE COURT:  Let him answer and I'll rule on the

12  objection.  Thank you.

13        MR. PFISTER:  Thank you.

14        THE WITNESS:  Yeah.  Given how extensive the Combat

15  Arms litigation is and the expense associated with that and the

16  fact that there are no Aearo accountants, in order to support

17  that process for how long that may potentially take, there will

18  need to be finance and accounting support which is provided by

19  3M to Aearo.  In the event these cases continue against 3M,

20  Aearo will not -- Aearo will be impacted by having access to

21  those individuals.

22        MR. PFISTER:  Your Honor, both objection and I'll

23  move to strike the entire answer.  He answered the wrong

24  question.  He answered the question that counsel was trying to

25  get him to answer without foundation which is his statement

Castellano - Direct/McKane                    109

1  that he's --

2           THE COURT:  Well, again, I mean this isn't a jury

3  trial, so I mean I'm going to allow it.  I don't really know

4  how relevant his opinion of what happens is.  I think I can

5  make a decision on that myself, whereas, you know, if there's a

6  jury here, you have to worry about -- I mean this is what I do.

7  Right or wrong, it's what I do.  So I'll give it whatever

8  relevance and weight it merits.

9           MR. PFISTER:  Understood, Your Honor.  Thank you.

10          THE COURT:  Thank you.

11          MR. McKANE:  And for what it's worth, Your Honor, the

12  Seventh Circuit has repeatedly allowed preliminary injunction

13  evidence to be (indiscernible).

14          THE COURT:  I kind of already made my answer, so I

15  mean that's great you think I'm right.  But I've already ruled,

16  so.

17  BY MR. McKANE:

18  Q    At a high level with regards to legal, insurance, and

19  accounting, what are you concerned as the chief restructuring

20  officer about the availability of these people to aid in the

21  debtors' reorganization efforts?

22  A    Again, given the complexity of these Chapter 11 cases and

23  in order to achieve a global solution, having the distraction

24  of continuing litigation in other jurisdictions and the fact

25  that Aearo relies upon 3M for substantial amount of the support

Castellano - Direct/McKane                          110

1 services, more importantly, that 3M has the background in these

2 cases, I think that would be a significant impact and

3 potentially jeopardize these Chapter 11 proceedings.

4 Q    All right.  You mentioned people in one of your earlier

5 answers.  You also mentioned property.  Let's discuss property.

6     What type of property of the debtors would be affected by

7 continuing the Combat Arms litigation against 3M?

8 A    So as I think I had mentioned previously, the debtors

9 share an insurance policies with 3M, and those insurance

10 policies are assets of the estate.

11     In the event the litigation continues against 3M, to the

12 extent that defense costs are incurred or judgments are

13 accrued, that will ultimately go against those policies which

14 potentially will deplete an asset of this estate.

15          MR. PFISTER:  Pardon me, Your Honor, I'll move to

16 strike the answer.  I think it's without foundation.  The

17 question wasn't necessarily without foundation; the answer was.

18 And we have a separate witness testifying on insurance.

19          THE COURT:  Well, I think it's -- I mean I guess I'll

20 give you my same answer.  I understand you're objecting, but

21 I'll weigh the relevancy.  Obviously, someone who's designated

22 as the insurance expert may have more relevant testimony as to

23 that than the CRO, but we'll give it the weight it deserves as

24 we consider it.

25          MR. PFISTER:  Thank you, Your Honor.

Castellano - Direct/McKane                          111

1  BY MR. McKANE:

2  Q    And, sir, you mentioned claims against the policies.  When

3  you verify claims accruing against the policies, what do you

4  mean?

5  A    So I don't think necessarily the claim actually has to be

6  physically paid out to potentially deplete an asset of the

7  estate.

8       I think to the extent that a claim is awarded, that to me

9  is accruing, and I do view that as differently than actually

10 being paid out.  And I do think that an accrual of a claim can

11 impact the value of that policy.

12 Q    All right.  So we talked about people, we talked about

13 property.  You also mentioned resources.  Do you recall that,

14 sir?

15 A    Yes.

16 Q    What type of resources would be affected by a continuation

17 of the Combat Arms litigation against 3M?

18 A    So pursuant to the funding agreement, the Aearo debtors

19 have provided indemnification to 3M.  And contained in the

20 funding agreement, there's a payment priority of how the Aearo

21 debtors can access the funding agreement, effectively utilizing

22 first its own cash and the cash flow from its operations.

23 Q    Mr. Castellano, I've handed you what's been marked as

24 Exhibit 2, which is a cover page.  And if you turn to the

25 second page, 2 of 28 on the top, it says "Funding and

Castellano - Direct/McKane                    112

1   Indemnification Agreement."

2        Do you see that, sir?

3   A    I do.

4   Q    Do you recognize it?

5   A    Yes.

6   Q    What is it?

7   A    This is the funding and indemnification agreement between

8   Aearo Technologies and 3M.

9            MR. McKANE:  Your Honor, the debtors move into

10  evidence what's been previously marked as Exhibit 2.

11           THE COURT:  Any objection to the admission of what

12  has been designated as Exhibit 2?

13           MR. PFISTER:  I don't object to the admission of

14  Exhibit 2, Your Honor.  But on this and just given the

15  testimony and I'm sure Your Honor's tired of me standing up

16  with foundation objections, as long as there's a standing

17  objection with regard to, you know, the documents speak for

18  themselves and the witness is just providing his interpretation

19  and that's all the Court's, you know, hearing his testimony

20  for, I won't keep rising on that.

21           But to answer the Court's specific question, I have

22  no objection on that.

23           MR. McKANE:  Your Honor, can I respond?

24           THE COURT:  Okay.

25           MR. McKANE:  Just the concept of a standing

Castellano - Direct/McKane                    113

1  objection, you know, with regards to every exhibit in a case I

2  think could get a little overbroad.  What I would --

3            THE COURT:  Well, again, he's not objecting to the

4  exhibit.  He's objecting to what he thinks the testimony might

5  be.

6            MR. McKANE:  Exactly.  It's untimely.

7            THE COURT:  Which I can't really know right now

8  because he hasn't testified as to this.  Now if we get into the

9  same situation you might get the same answers as we went, but

10 let's take it as we go because I don't think we can just have a

11 standing objection as to foundation as to every witness because

12 I don't know how I make a record at that point.

13            So let's just take it as it comes.

14            MR. PFISTER:  Okay.  Thank you, Your Honor.

15            THE COURT:  All right.  But any objection -- you said

16 no specific objection to the admission of Exhibit 2.

17            Any other objection as to the exhibit?

18                  (No audible response)

19            THE COURT:  Seeing none, Exhibit 2 is admitted.

20            MR. McKANE:  Thank you, Your Honor.

21            (Debtors' Exhibit 2 admitted into evidence)

22 BY MR. McKANE:

23 Q    You mentioned in an earlier answer prior to your payment,

24 let me direct your attention to Page 7 of the funding

25 agreement.  And that's Page 8 of 28 in the top, 7 on the

Castellano - Direct/McKane                    114

1  bottom.

2       Are you there, sir?

3  A    Yes.

4  Q    And let me direct your attention to the bottom of the page

5  that starts "provided however."

6  A    Yes, I see that.

7  Q    And, sir, does this proviso of the "provided however"

8  paragraph, is this the portion of the agreement to your

9  understanding that addresses the priority of payment that you

10 referenced in your earlier testimony?

11 A    Yes, it does.

12 Q    All right.  Can you walk the Court through your

13 understanding of the priority of payment scheme that is

14 embedded in the funding agreement?

15 A    This proviso is attached to the permitted funding uses

16 definition contained in the funding agreement.  So it begins by

17 saying, you know, "Clauses A through E shall be permitted to

18 the extent" and when you walk through "to the extent" or the

19 clauses after "to the extent," effectively it represents --

20 Q    Let me pause you right there.

21      You said "A through E shall be permitted funding uses

22 solely to the extent."  So just to make similar level setting,

23 if you go one page earlier, do you see the definition of

24 "permitted funding uses?"

25 A    I do, yes.

1  Q     And do you see then Sections A through E immediately above

2  the "provided however?"

3  A     Yes, I do.

4  Q     Okay.  With that understanding, please continue in

5  explaining the priority of payment that's embedded with regards

6  to permitted funding uses under the funding agreement?

7          MR. PFISTER:  Objection, Your Honor.  This question

8  he didn't limit it to your understanding.  He said explain the

9  priority of --

10          MR. McKANE:  I'll rephrase.

11          THE COURT:  All right.  Go ahead, please.

12 BY MR. McKANE:

13 Q     Sir, what is your understanding of the priority of payment

14 scheme embedded in the "permitted funding use" section of the

15 funding agreement?

16 A     Yeah.

17       So Aearo will have access to the funding agreement

18 provided that it utilizes effectively its own cash as well as

19 the cash flows generated by its operations and its assets.

20 That's what's embedded effectively in (i) and (ii).

21 Q     Okay.  In (i), here's a reference to the initial payment.

22       Was there an initial payment by 3M already?

23 A     Yes, there was.

24 Q     And how much?

25 A     It was $5 million.

Castellano - Direct/McKane                                116

1  Q    And then with regards to cash received or to be received

2  by Aearo entities on account of operations, do you have a sense

3  as to what the current cash on hand situation is?

4  A    I do.

5       The current cash situation is approximately $40 million,

6  but that takes into consideration (ii)(x) which references

7  effectively going back to my previous testimony, there was

8  prior to July 15th the Aearo companies swept their cash up to

9  3M Financial Management Company.  So there was cash there which

10 effectively was transferred back down to Aearo pursuant to our

11 first day hearing.

12      So effectively, romanette (x) represents cash flows from

13 Aearo's operations must be utilized in that order of priority.

14 Q    Okay.  And so after the initial payment after cash from

15 business and related activities, what's the next step in the

16 priority of payments as you understand them?

17 A    It comes from Aearo's assets as well as potentially any

18 recoveries from insurance.

19 Q    And under what circumstances can Aearo then turn to 3M for

20 a permitted funding use?

21           MR. PFISTER:  Objection, Your Honor.  No --

22           MR. McKANE:  What is your understanding?  I

23 apologize.

24           MR. PFISTER:  Thank you.

25           THE WITNESS:  So my understanding once Aearo exhausts

1  these options for effectively liquidity or cash flows, it can

2  then turn to the funding agreement and request a transfer from

3  3M pursuant to the funding agreement.

4  BY MR. McKANE:

5  Q    And, Mr. Castellano, as part of your efforts as a

6  restructuring advisor and then as the chief restructuring

7  officer, do you have an understanding of the Combat Arms

8  defense spend that has occurred historically and is projected?

9  A    I do, yes.

10  Q    And as part of those diligence efforts, how did you get an

11  understanding of that historical and projected spend?

12  A    Yeah.

13      So as part of our pre-filing diligence, I felt it was

14  important to understand the magnitude of the costs incurred to

15  date.  So I had requested counsel to pull together an analysis

16  of what had been incurred to date plus a projection.

17  Q    Mr. Castellano, do you recognize what has been previously

18  marked as Exhibit 67?

19  A    I do.

20  Q    What is it?

21  A    This is a summary by quarter of the defense costs incurred

22  by 3M going back to 2019 actuals through the second quarter of

23  2022 and a projection for the balance of 2022.

24      MR. McKANE:  Your Honor, the debtors move Exhibit 67

25  into evidence.

Castellano - Direct/McKane                    118

1            THE COURT:  Any objection?

2            MR. PFISTER:  No objection.

3            THE COURT:  I'm sorry.

4            MR. PFISTER:  Pardon me, Your Honor.  I didn't mean

5    to speak over you.  No objection.

6            THE COURT:  Okay.  Any other objection to the

7    proposed Exhibit 67?

8                      (No audible response)

9            THE COURT:  Seeing none, it is admitted.

10           (Debtors' Exhibit 67 admitted into evidence)

11   BY MR. McKANE:

12   Q    And, sir, what has been the defense spend to date through

13   the close of the second quarter of 2022 for the Combat Arms

14   litigation?

15   A    As represented on the schedule, it would be $347 million.

16   Q    And, sir, are these amounts that the Aearo debtors have

17   paid?

18   A    No, they are not.

19   Q    All right.  Who paid these amounts?

20   A    3M did.

21   Q    And what is the projected spend in the second half of 2022

22   on the Combat Arms litigation?

23   A    If it continues in its current form, it's approximately

24   $100 million.

25   Q    And what does that translate into dollars per week?

1 A     It's about $3.8 million a week.

2 Q     All right.  Now, sir, I think we addressed people,

3 property, resources.  I believe in that testimony you gave

4 earlier you mentioned process.

5       Do you recall that?

6 A     Correct.

7 Q     When you used the term "process," what were you referring

8 to?

9 A     What I was referencing is utilizing the Chapter 11 process

10 to bring all of the claimants together and reach a negotiated

11 solution.  And having access to those people, resources, and

12 property or not having access, I should say, I do believe will

13 jeopardize the ability of these debtors to effectuate what our

14 intent is to an efficient and equitable Chapter 11 process.

15 Q     And, sir, why is it important that -- why is it your

16 belief that an injunction that stops the Combat Arms litigation

17 against 3M aids in the debtors' restructuring process?

18 A     So as CRO, I'm concerned about the overall estate, the

19 overall enterprise which includes all of the constituents --

20 claimants, vendors, employees, this particular business.

21      And I think having everyone focused on this process in

22 what forum not -- without any distractions of any other

23 litigation in any other jurisdictions, I do believe we can

24 achieve the objectives we want to achieve.  And I think without

25 that, there would be distractions which I do think would impede

Castellano - Direct/McKane                    120

1  progress in these particular cases.

2  Q    And, sir, can these debtors, the Aearo debtors reorganize

3  without addressing the Combat Arms liabilities?

4  A    No, I can't see how -- I don't think they can do that.

5           MR. McKANE:  Your Honor, if I could just have one

6  moment to confer with counsel?

7           THE COURT:  You may, yes.

8                    (Pause)

9           MR. McKANE:  Your Honor, the debtors have no further

10 witnesses [sic] for Mr. Castellano at this time.

11          THE COURT:  No further questions?

12          MR. McKANE:  What did I say?

13          THE COURT:  Witnesses?

14          MR. McKANE:  Oh, yeah.  I apologize.  It's getting

15 close to lunch.  I think I'm --

16          THE COURT:  See, that's why we have to break a line

17 so people don't -- there we go.

18          All right.  Well, let's do that.  A couple of things.

19 First, we're reaching out now to the presiding judge's CRD to

20 find if they're going to lock behind us or what they're going

21 to do.  So -- are they going to lock it?

22          THE CLERK:  Yes, they will.

23

24          THE COURT:  Okay.  So they will lock it, so

25 everything will be secure other than don't wander on in, expect

Castellano - Direct/McKane                    121

1   to get in too early back here.  So -- because you have the same

2   access I do which is when they open it, it's open.

3            Let's go ahead and reconvene at 1.  I think that will

4   give us enough time.  Just remember there's one or two of you

5   here.  We only have certain entrances open, so if you all come

6   flying in at 12:58, you're probably not all going to get up

7   here by 1.  So make sure your most important person goes first.

8   Just try to do it -- we have a couple of entrances open, but

9   just understand there may be a line.

10           With that, I thank everyone for your time and

11  attention this morning, I guess, and into the afternoon.  And

12  we will reconvene again at 1:00.  Thank you.

13           MR. McKANE:  Thank you, Your Honor.

14           MR. PFISTER:  Thank you, Your Honor.

15                          (Lunch Recess)

16           THE COURT:  Let's go back on the record on Adversary

17  22-50059.  We're here on the debtors' motion for a declaratory

18  and injunctive relief.

19           I believe that we had finished the direct examination

20  of John Castellano.  Is that correct?

21           UNIDENTIFIED SPEAKER:  That is correct, Your Honor.

22  May he resume?

23           THE COURT:  He may, yes, please come forward.

24           Just to remind you, Mr. Castellano, you remain under

25  oath.  So you may be seated.

Castellano - Cross/Pfister                    122

1          All right.  Since we last talked, Mr. Pfister, but

2   are you handling the cross-examination for the undersigned

3   party or not?

4          MR. PFISTER:  I am, Your Honor

5          THE COURT:  All right.  You may come forward.

6          MR. PFISTER:  Thank you.

7                        CROSS-EXAMINATION

8   BY MR. PFISTER:

9   Q    Good afternoon, Mr. Castellano.

10  A    Good afternoon.

11  Q    It's good to see you again, sir.

12  A    Yes.

13  Q    Now, I believe you testified on direct that you have been

14  the chief restructuring officer of the debtors since the

15  petition date.  Is that correct?

16  A    Well, it was July 25th.

17  Q    The day before the petition date.

18  A    Correct.

19  Q    Okay.  And before that you were a consultant, right?

20  A    An advisor, yes.

21  Q    Advisor.  And that was from May of 2022, the beginning of

22  May, all the way through July 25th.  Correct?

23  A    That's correct.

24  Q    Okay.  And you testified already that your engagement for

25  the advisory service was under a separate engagement letter

1  that changed at the time of the bankruptcy filing or the day

2  before the bankruptcy filing.  Correct?

3  A    That's correct.

4  Q    Okay.  Now, in your work, it's not just yourself, but you

5  have a team of Alix Partners' employees who assist you.  Is

6  that right?

7  A    Yes, it is.

8  Q    Okay.  And that's a team of 12 to 14 full-time employees.

9  Right?

10  A    That sounds about right, yes.

11  Q    And that's been 12 to 14 full-time employees from when you

12  started in early May through June and through all of July, and

13  it continues even post-petition.  Correct?

14  A    Yes, the only thing I would say is the team, whenever you

15  start an engagement it doesn't immediately start with that

16  size.  I can't remember exactly when we grew to that size, but

17  it would have been late May, early June we were at that

18  capacity.

19  Q    But I believe you testified at least at your deposition

20  that that ramped up pretty quickly, right?  You had almost a

21  full team in place pretty soon.  Correct?

22  A    Yeah, late may would be pretty soon.

23  Q    Okay.  Now, you're not an attorney, right?

24  A    Correct.

25  Q    And none of the 12 to 14 full-time employees who work with

1  you at Alix, from Alix Partners with the debtors are attorneys.

2  Right?

3  A    Correct.

4  Q    And you don't have any view on the merits of the earplug

5  litigation, right?

6  A    I do not.

7  Q    You don't have any view as to whether 3M ultimately owes

8  any money on account of the earplug litigation.

9  A    I do not.

10  Q    And you don't have any view whatsoever as to whether the

11  debtors ultimately owe any monies on account of the earplug

12  litigation, right?

13  A    Can you repeat the question on more time, please?

14  Q    I said and you don't have any view as to whether the

15  debtors ultimately owe any money as to the earplug litigation.

16  Correct?

17  A    No settlements have been reached, so no I don't.

18  Q    I'm not talking about settlements, I just want to make

19  sure, I'm talking about liabilities and substantive, you know,

20  claims that you don't have any view as to whether the debtors

21  owe the earplug litigation claimants any money, right?

22  A    I don't believe any liability has been determined at this

23  point.

24  Q    Okay.  Aside from whether there's been a determination,

25  you don't have any view of the merits of the claims, that is

Castellano - Cross/Pfister                          125

1 whether they're well founded, whether there's defenses to them

2 or anything of that nature, you have no view.  Right?

3 A    I wasn't asked, I wasn't asked to have a view on the

4 claims.

5 Q    Okay.  I'm going to try it one more time.  Not whether you

6 were asked to have a view, but you don't have any view as to

7 whether the claims have any merit.  Correct?

8 A    Correct, yes.

9 Q    Okay.  Now, and you don't have insight into the conduct of

10 the multi-district litigation proceedings in Florida, do you?

11 A    I mean other than reading just the informational brief, I

12 don't have any other knowledge of it.

13 Q    Other than reading the debtors' informational brief, is

14 that right?

15 A    That's correct.

16 Q    Okay.  And so did you read the order from Judge Rodgers

17 that was entered yesterday?

18 A    No, I did not.

19 q    So you don't have any basis to disagree with Judge Rodgers

20 that "Aero has no meaningful role for identity in this

21 litigation?"

22 A    Again, I have not read the order, so I'm not taking a

23 position on what the contents of the order were.

24 Q    No, no, no, I'm not asking about the order, so I'm using

25 the order to ask a question, which is there's a statement that

Castellano - Cross/Pfister                    126

1  was made by the Judge in the MDL proceeding where the Judge

2  wrote "Aero has no meaningful role or identity in this

3  litigation."  You don't have any basis to disagree with that,

4  do you?

5  A    Other than the fact that Aero was a named defendant, so

6  again I can't equate the two because I've not read the order.

7  Q    Okay.  You don't have any basis to dispute what Judge

8  Rodgers wrote last night, and I'll quote the sentence here.

9  "Here, 3M Company's statements and course of conduct since the

10 start of the MDL are premised on two truths, that 3M Company is

11 directly and independently responsible for the CAEv2 liability

12 in this litigation and that its subsidiaries are parties in

13 name only."  You don't have any basis to disagree with Judge

14 Rodgers on that point, do you?

15        UNIDENTIFIED SPEAKER:  Objection, Your Honor.  At

16 some point you're asking him to speculate.  He's already said

17 he hasn't read the order, he hasn't had a view of the claims.

18 At some point, he's just using the witness to read the order in

19 the record.

20        THE COURT:  Any response?

21        MR. PFISTER:  Yeah.  That's not what I'm doing.  I'm

22 ensuring, because this witness gave testimony that bankruptcy

23 was necessary in order to ensure that all these claims get

24 equitably and appropriately and whatever other words he used

25 resolved, I'm trying to establish that the witness has no

Castellano - Cross/Pfister                    127

1  knowledge of what happened in the MDL or what the MDL court has
2  said about the debtors' conduct and 3M's conduct in the MDL.
3  So I think it's directly tied to the testimony they elicited.

4       THE COURT:  All right.  Again, I guess I'll allow it
5  understanding I'm the finder of fact and to the extent that
6  you're asking a non-lawyer questions about what an order says
7  that's not in evidence and all that applies, I guess I'll take
8  it for what it's worth.

9       MR. PFISTER:  Thank you, Your Honor.  And this is a
10 short line of questioning.  I'm just trying to ensure that we
11 don't have any more claim of a foundation that we actually
12 have.
13 BY MR. PFISTER:
14 Q   And you don't have any basis -- well, let me ask you this.
15 As the debtors' chief restructuring officer, do you believe
16 that it would be good for the debtors if another party, in this
17 case 3M, were directly and independently responsible for the
18 CAEv2 liability being asserted in the MDL?

19       UNIDENTIFIED SPEAKER:  Objection to the form, Your
20 Honor, to the extent he's asking in terms of responsible
21 meaning legally responsible.

22       THE COURT:  I guess I'll let him answer the question.
23 If he has a means to clarify it, that's fine.

24       Can you go ahead and answer that, sir?

25       THE WITNESS:  Can you rephrase the question, or

Castellano - Cross/Pfister                    128

1  repeat the question?

2              MR. PFISTER:  Sure.

3  BY MR. PFISTER:

4  Q    So as the debtors' chief restructuring officer, do you

5  understand that it would be good for the debtors if another

6  party, in this case being 3M, were directly and independently

7  responsible for the CAEv2 liability being asserted in the MDL?

8  A    I mean I guess at this, at this position I can't take a

9  perspective in terms of who has responsibility for these

10  particular claims.

11  Q    So now I want to be really precise in my question and I'd

12  like you to be precise in your answer if you could which is not

13  does, you know, which party does have liability, I'm not asking

14  you that.  But I'm asking you in your capacity as the debtors'

15  chief restructuring officer who is giving testimony here today

16  whether in that capacity not as a legal matter, that it's your

17  understanding that it would be good for these debtors over

18  which you are the chief restructuring officer if another party,

19  that is 3M, were directly and independently responsible for the

20  CAEv2 liability being asserted in the MDL?

21              UNIDENTIFIED SPEAKER:  Objection, Your Honor.  He's

22  asking for basically an opinion for him to opine because it's

23  speculation.

24              THE COURT:  All he's asking is as far as of a CRO if

25  he has any position.  He is the CRO, so I think --

1          UNIDENTIFIED SPEAKER:  Understood, Your Honor.

2          THE COURT:  I think he can answer that question.

3          THE WITNESS:  Yes, so as CRO my duties and my

4   objective is to the debtors to resolve these cases, resolve

5   these cases consensually as much as possible.  That's my

6   perspective at this point.

7   BY MR. PFISTER:

8   Q    Okay.  And respectfully, I'm not trying to harp, but I do

9   want an answer to my question which I don't think you have

10  answered.  Because you are the restructuring officer, it is do

11  you have an opinion that it would be good for the debtors if

12  another party, in this case 3M, were directly and independently

13  responsible for the CAEv2 liability being asserted in the MDL?

14  A    I mean it's hard for me to sit here and speculate who has

15  responsibility.  Again, the objective is to resolve these

16  claims as consensually as we possibly can.

17  Q    Okay.  So I'm really trying to be, I'm not trying to trick

18  you, I'm really trying to, I'm just trying to get your opinion.

19  Okay.  So I'm not asking you, do you Mr. Castellano, have an

20  opinion as to who is liable, right?  That is not my question.

21  It is you are the debtors' chief restructuring officer, and do

22  you have an opinion as to whether it would be good for these

23  debtors of which you are the chief restructuring officer,

24  right, if there was another party like 3M that was directly and

25  independently responsible for the CAEv2 liability in the MDL.

1          UNIDENTIFIED SPEAKER:  And, Your Honor, I would just
2  object to the phrasing as an opinion.  He can answer as a view
3  or understanding.
4          THE COURT:  I think I've answered that.  But he can
5  answer as an opinion as a CRO, yes.
6          THE WITNESS:  Just one more time, please?
7  BY MR. PFISTER:
8  Q    Sure.  I'll try and go slow.  And again, I promise I'm not
9  trying to trick you.  You are the debtors' chief restructuring
10 officer.  We can agree on that.  Right?
11 A    Correct.
12 Q    Okay.  You've given testimony here today about that
13 touches on the MDL proceeding.  Correct?
14 A    Yes.
15 Q    Okay.  You understand or you stated I believe that as of
16 the petition date, there were something like over 230,000 cases
17 with claims asserted against the debtors in the MDL.  Correct?
18 A    Yes.
19 Q    Okay.  All that's a given.  So now what I'm asking is, do
20 you as the chief restructuring officer, have an opinion as to
21 whether it would be good for the debtors if another party like
22 3M were directly and independently responsible for the
23 liability being asserted in the MDL.
24 A    I'm struggling with the speculation of liability.  That's
25 what I'm having trouble with.

Castellano - Cross/Pfister                    131

1  Q    Okay.  Don't know how to make it any clearer other than to
2  speak more slowly.  And I don't want to, I don't want to do
3  that.  So if the answer is you have no opinion, you can tell me
4  that.  But what I'm asking is, you're the debtors' chief
5  restructuring officer, do you have an opinion one way or the
6  other as to whether it would be good for these debtors if there
7  was another party that was directly and independently liable in
8  the MDL.
9  A    It's really tough for me to go and have an opinion on that
10 at this point.  Obviously, the objective is to resolve all of
11 these claims as consensually as possible.  And that's really
12 the objective of trying to reorganize these debtors as I think
13 I stated previously.
14 Q    Okay.  I mean I really do find this astonishing that
15 you're the chief restructuring officer and you've already
16 testified that these debtors are operationally healthy.  Right?
17 A    Correct.
18 Q    Okay.  And that what you need this bankruptcy case to do
19 is to resolve the debtors' contingent tort liabilities.  Right?
20 A    Correct.
21 Q    That's the whole purpose of this case.  Right?
22 A    That's right, yes.
23 Q    Okay.  So the whole purpose of this case is to resolve the
24 debtors' contingent tort liabilities.  The vast majority of
25 those tort liabilities, aside from the Minnesota state cases,

Castellano - Cross/Pfister                    132

1  the vast majority of those cases are pending in the MDL.  You

2  understand that?

3  A    Yes.

4  Q    Okay.  I just don't know, I'm not sure why you're

5  struggling with this.  But given those facts and your role as

6  the debtors' chief restructuring officer and the reason that

7  these debtors filed for bankruptcy being the resolution of

8  these contingent liabilities in the MDL, can you tell me

9  whether you have an opinion that it would be good for the

10 debtors if another party in the MDL, 3M, a non-debtor, was

11 directly and independently responsible for the MDL liability?

12         UNIDENTIFIED SPEAKER:  Objection, Your Honor.  Asked

13 and answered.  The witness testified, "It would be really tough

14 for me to go and have an opinion on that at this point."

15         THE COURT:  Well, let's let it, let's do one more

16 college try and see if we can get it.

17         THE WITNESS:  Again, the objective is to resolve

18 these cases, so that is my opinion.  If we could resolve these

19 cases, that would be good for the debtors.

20 BY MR. PFISTER:

21 Q    Okay.  The Judge said one more college try.  I'm not going

22 to keep banging my head against the wall on this one.

23         THE COURT:  Honestly, I think he did answer it that

24 time.

25         MR. PFISTER:  Okay.  Okay, very good.

Castellano - Cross/Pfister                          133

1  BY MR. PFISTER:

2  Q    So you established that you don't have any personal view

3  on the merits of the litigation.  We've established that you

4  don't have any personal view on whether the debtors or 3M owe

5  anyone any money in connection with the MDL litigation.  Let me

6  ask you just a few more questions about the MDL litigation.

7          You aren't aware that there have been, or you weren't

8  aware, that is prior to your deposition, that there have been

9  appeal bonds that were posted in connection with the MDL

10 litigation.  Isn't that right?

11 A    That's right.  Prior to the deposition, I wasn't aware of

12 that.

13 Q    Okay.  And so you weren't aware that the entity that

14 posted those appeal bonds was the 3M Company.  Correct?

15 A    That's correct, yes.

16 Q    And you didn't know that no debtor posted any appeal bond

17 in connection with the MDL.  Right?

18 A    Correct.

19 Q    Okay.  Now, you also weren't aware, at least prior to your

20 deposition last week, that there was what's called a *qui tam*

21 action against 3M that concerned these earplugs.  Do you recall

22 that?

23 A    I do recall the testimony in the deposition.

24 Q    Okay.  So you were not aware as the CRO that there had

25 been this *qui tam* action.  Right?

Castellano - Cross/Pfister                    134

1 A    Correct.

2 Q    And you weren't aware that 3M settled the *qui tam*

3 litigation for $9.1 million.  Right?

4 A    I'm not sure I was aware of that at our deposition, but

5 I'm now aware of it since you told me.

6 Q    Okay.  Since I told you at the deposition.

7 A    I didn't remember if there was a dollar amount actually.

8 Q    Gotcha.  Now, are you aware that certain defendants, or

9 pardon me, that certain plaintiffs in the MDL litigation with

10 judgments had their judgments reduced on the basis of arguments

11 that 3M made regarding how many defendants there are in the

12 litigation?

13 A    Can you do that one more time?  There's a lot there.

14 Q    Sure.  Are you aware that the defendants in the MDL

15 persuaded the Judge in the MDL to reduce some jury verdicts in

16 several cases on the basis that there's only one defendant, 3M?

17 A    I was not aware of that, no.

18 Q    Okay.  So I'm going to ask you, I'll ask it a little more

19 precisely because I want to make sure I've got the names and

20 everything correct.  So I'm going to ask you whether you've

21 heard this -- well, first of all let me just ask.  Have you

22 read the MDL court's order last night?

23 A    I think --

24          UNIDENTIFIED SPEAKER:  That's been answered, Your

25 Honor.

1          THE WITNESS:  Yeah, I thought I answered that

2  earlier.  I did not read that though.

3          THE COURT:  You can answer it again, that's fine.

4          MR. PFISTER:  Okay.

5          THE WITNESS:  Correct.

6  BY MR. PFISTER:

7  Q     So when Judge Rodgers wrote in her order that, "In post-

8  trial briefing on statutory cap issues in the Weyman and Vaughn

9  cases, the defendant stood firm that "3M Company owns and

10 controls 100 percent of the other five named defendants

11 rendering any suggestion that they are six separate parties for

12 purposes of this litigation illusory."  You've never heard that

13 sentence before?

14 A     No, I did not.

15 Q     Okay.  So Judge Rodgers was referring specifically to two

16 individuals, and I wanted to get their names right, it's Mr.

17 Weyman and Mr. Vaughn.  Are you aware that in May of 2022, so

18 this is when you were the, not the chief restructuring officer,

19 you were an advisor to Aero, correct, in May of '22.

20 A     That's right, yes.

21 Q     Okay.  Are you aware that that reduction of Mr. Weyman's

22 judgment was from $55 million to $21.7 million?  Are you aware

23 that that happened while you were the chief restructuring

24 officer?

25          UNIDENTIFIED SPEAKER:  Objection to form.  I think

Castellano - Cross/Pfister                    136

1  counsel misspoke.  There have been no judgments.

2          THE COURT:  You said judgment.

3          MR. PFISTER:  I apologize.  I can re-ask it as

4  verdict.

5          THE COURT:  Please do.

6          MR. PFISTER:  Counsel is correct.

7  BY MR. PFISTER:

8  Q    Are you aware that while you were an advisor to the Aero

9  entities, that 3M in the MDL case got an order from Judge

10 Rodgers reducing Mr. Weyman's jury verdict from $55 million to

11 $21.7 million on the ground that there was only one real

12 defendant in the MDL?

13 A    I was not aware of that, no.

14 Q    Are you aware that Mr. Weyman is here in court today?

15 A    I didn't know that either.

16 Q    Mr. Weyman is the gentleman here in the jacket.  Do you

17 know anything about Mr. Weyman's case?

18 A    I do not, no.

19 Q    Do you know anything about the evidence that the jury

20 heard?

21 A    Since I don't know the case, I don't know the evidence

22 either.

23 Q    Okay.  Now are you aware also in May of '22, 2022, so also

24 when you were an advisor to the Aero entities, that Mr. Vaughn

25 who is actually not here today, but that his judgment, pardon

Castellano - Cross/Pfister                    137

1  me, that his jury verdict was reduced from $2.2 million to $1.4

2  million on those same grounds?  That is that 3M persuaded the,

3  persuaded Judge Rodgers that there had really only been one

4  defendant.  Are you aware of that?

5  A    I am not, no.

6  Q    Okay.  What, can you tell me what you know about Mr.

7  Vaughan's case?

8  A    I don't know anything about Mr. Vaughn's case.

9  Q    Okay.  Now, these proceedings, if they were going on while

10 you were an advisor to the debtors, these aren't anything that

11 you heard about in your capacity as an advisor to the debtors?

12 A    No.  The objective was to commence contingency planning

13 proceedings, and that's what we were focusing on.

14 Q    So nobody called up in May or maybe even June of 2022 and

15 said, good news, we slashed $30 million from a judgment, from a

16 verdict, pardon me, and we, against, in favor of Mr. Weyman,

17 and we slashed in half a judgment for Mr. Vaughn and we did it

18 on the grounds that 3M and Aero really are just one defendant.

19 Nobody, that news didn't circulate at the company?

20 A    Did not.

21 Q    Now you did provide in response to Mr. McKane's questions

22 some testimony that I will get to about fair and efficient

23 resolutions to these contingent liabilities.  Do you recall

24 that?

25 A    I do.

Castellano - Cross/Pfister                    138

1   Q    Okay.  But you don't have a view personally as to -- well

2   strike that.  You don't have a view as Aero's chief

3   restructuring officer as to whether the MDL can provide a fair

4   and efficient resolution of the Combat Arms claims, do you?

5   A    So the perspective at this point is to bring all of the,

6   as I said previously, is to bring all of these claims into one

7   forum in an attempt to reach a comprehensive solution

8   efficiently and equitably as possible.

9   Q    Okay.  I understand that testimony, I appreciate it.  But

10  what I'm asking is a little bit different, which is, because

11  you gave that testimony in response to your counsel's question.

12  So in response to my questions, what I want to confirm is what

13  you told me at your deposition.  So I'll start again.  You

14  don't have any view as to whether the MDL can provide a fair

15  and efficient resolution of the claims that are pending before

16  the MDL, right?

17  A    Again, at this point, I mean recognizing the vast majority

18  of the claims we have very little information about which is

19  what we commenced these proceedings for.  So at this point I

20  don't have a perspective on the MDL.

21  Q    Okay.  Well, now, you were going most of the way to get to

22  an answer to me, but then you threw in that part about how we

23  don't have any information about the claims.  So since that's

24  something that's been --

25           UNIDENTIFIED SPEAKER:  Your Honor, I move to strike.

Castellano - Cross/Pfister                    139

1   That's not a question; that's commentary.

2            MR. PFISTER:  Well, it's a preface to a question, but

3   I'll withdraw, Your Honor.

4            THE COURT:  Again, I mean there's no jury, so --

5            MR. PFISTER:  Okay.

6   BY MR. PFISTER:

7   Q    I just want to make sure that the record is clear that you

8   as the debtors' chief restructuring officer have no view as to

9   whether the MDL can provide a fair and efficient resolution of

10  the claims that are pending in the MDL.

11  A    I guess the perspective here is how much time it will take

12  to be able to achieve, to achieve that given what's transpired

13  thus far.

14  Q    That sounds like a view.  So I'm going to go to your

15  deposition, the transcript of the deposition that we did.  Do

16  you recall when I deposed you last week?

17  A    Yes, I do.

18  Q    And you recall that it was a deposition that was under

19  seven hours, right?

20  A    Correct.

21  Q    Okay.  Okay.  Let me --

22            MR. PFISTER:  Your Honor, may I get a copy of the

23  deposition transcript and hand it to the witness?

24            THE COURT:  You can.  And just as a warning to you,

25  when you start questioning you tend to veer a little bit away

Castellano - Cross/Pfister                     140

1    from the microphone.

2              MR. PFISTER:  I apologize.

3              THE COURT:  So stay there so we get your record.

4              MR. PFISTER:  Thank you.

5              Your Honor, may I approach?

6              THE COURT:  You all may approach.  It's all good.

7              MR. PFISTER:  Thank you.  9 through 16.

8    BY MR. PFISTER:

9    Q    So, sir, I'm going to read to you, this is a transcript of

10   the deposition that I took of you last week.  I'm going to read

11   you the question and I'm going to read your answer, and I'm

12   going to ask you if I did it correctly.  Okay?

13             "Q.  Okay, what's your view as the debtors' chief

14   restructuring officer as to whether the MDL can provide a fair

15   and efficient resolution of the Combat Arms claims?

16             "A.  Yeah, as the chief restructuring officer, my

17   objective is to assist the company in navigating the chapter 11

18   process.  I wasn't brought in here to evaluate the MDL

19   process."

20             Did I ask that question and did you give that answer?

21   A    I did, yes.

22   Q    Thank you.  Now, do you also recall at your deposition

23   when I asked you some questions on the funding agreement that's

24   attached as an exhibit to your first day declaration?

25   A    Yes.

Castellano - Cross/Pfister                     141

1  Q    And you testified that neither you nor Alex Partners had
2  any role whatsoever in negotiating the funding agreement.
3  Isn't that right?
4  A    That's correct.  But I think I also in my deposition
5  indicated where we did have input.
6  Q    And in that sense your only role with respect to at least
7  talking to the board about the funding agreement had to do with
8  the provision of budgets and forecasts.  Isn't that right?
9  A    That's correct, yes.
10 Q    So when I tried to ask you some questions about the
11 funding agreement, and in fact it was even about those
12 permitted use provisions that Mr. McKane asked quite a few
13 questions about, you didn't have any basis, at least when I was
14 asking the questions, to provide an answer to those.  Isn't
15 that right?
16 A    Again, I didn't negotiate, I didn't lead the negotiations
17 for the funding agreement; that was done by the disinterested
18 directors.  What I thought I was answering this morning were
19 some questions as it related to the definition of those
20 particular provisions of the funding agreement.
21 Q    Okay.  So I just want to be clear because I made a bunch
22 of foundation objections and wasn't thing to obstruct anything,
23 but I just want to be clear that you personally, Mr.
24 Castellano, did not have any role in negotiating those
25 permitted use provisions of the funding agreement in

Castellano - Cross/Pfister                    142

1  particular.  Right?

2  A    No, it was driven by the disinterested directors and their

3  counsel.

4  Q    So driven by is a little different than have any role.

5  And what I'd like an answer to is that you, Mr. Castellano,

6  didn't have any role in negotiating those permitted use

7  provisions of the funding agreement.  Will you agree with me

8  there?

9  A    I guess it depends on what you mean by role.  I mean I was

10  aware that it was being negotiated.

11  Q    Okay.  Aside from the fact that you were aware that there

12  was a funding agreement being negotiated, right, you Mr.

13  Castellano, did not have any role in negotiating those

14  provisions of the funding agreement that you testified about in

15  response to questions from Mr. McKane.  Correct?

16  A    Again, the disinterested directors were leading those

17  negotiations; I was not leading those negotiations.

18  Q    Okay.  I'm going to try a third time because, you know,

19  I'm not asking who's leading the negotiations.  My question is

20  very precise.  It is I want to confirm that you, Mr.

21  Castellano, did not have any role in negotiating the provisions

22  of the funding agreement that you looked at when counsel asked

23  you questions.  Those are the permitted use funding agreement

24  provisions.  Do you agree with me there?

25  A    Yes.

Castellano - Cross/Pfister                                    143

1   Q    Thank you.  And by that same token, you have no basis to

2   provide any testimony to the Court as to what those provisions

3   mean beyond what is written on the page.  Isn't that right?

4   A    Again, I was very familiar with the document as it was

5   being negotiated, so I do understand what those provisions

6   mean.

7   Q    Well, wait.  You say you understand what the provisions

8   mean.  Is that what I just heard you say?

9   A    Correct.

10  Q    Okay.  Now isn't it the case though that at your

11  deposition when I was asking you some questions about what

12  those same provisions mean that I don't know if it was you or

13  it was your counsel, but somebody said you didn't draft the

14  document and you couldn't possibly testify to it.  Do you

15  recall that?

16  A    It was a long deposition, but I do recall that.

17  Q    You do recall that?  I recall that.  So about the,

18  specifically, you know, the document speaks for itself I think

19  was a statement that was used several times, right?

20  A    Correct.

21  Q    And you didn't at that point, you know, volunteer and say,

22  well no, I've got some understandings that I'd like to convey,

23  right?

24  A    No, I don't believe I did.

25  Q    Okay.  So the testimony you just gave in response to your

Castellano - Cross/Pfister                               144

1    counsel's examination was not testimony that you were willing
2    to give when I was asking you those same questions at your
3    deposition, is that right?
4                UNIDENTIFIED SPEAKER:  Objection to form.  He's not
5    established that they were the same questions.
6                MR. PFISTER:  I did.
7                UNIDENTIFIED SPEAKER:  They were very --
8                THE COURT:  Again, let him answer and I'll figure it
9    out.
10               UNIDENTIFIED SPEAKER:  Okay.
11               THE WITNESS:  Again, I can't recall the specific
12   questions in the deposition.
13   BY MR. PFISTER:
14   Q    Okay.  Thank you.  Now, you did testify in response to Mr.
15   McKane's questions about the engagement agreement under which
16   Kirkland & Ellis which at the time was co-counsel, or pardon
17   me, is currently.  Let me step back, sorry.  I intend to
18   compound sometimes.  You understand, right, that Kirkland &
19   Ellis is counsel to both 3M and the debtors in the MDL.
20   A    Yes.
21   Q    Okay.  And when you testified in response to your lawyer's
22   questions about the engagement agreement that you signed, I
23   just want to make sure it's clear, that engagement agreement
24   was with Kirkland & Ellis, right?
25   A    Correct.

Castellano - Cross/Pfister                    145

1  Q    And it was with the 3M Company, correct?

2  A    3M, I think it's defined as 3M and certain of its

3  affiliates.

4  Q    And when it said and certain of its affiliates, it didn't

5  say Aero anywhere, did it?

6  A    That's correct.

7  Q    Okay.  And in fact when I was asking you questions about

8  who retained you, what you said is 3M retained you or wanted to

9  retain you in order to do some contingency planning.  Do you

10 remember that?

11 A    Yes.

12 Q    Okay.  You didn't say Aero retained you, right?

13 A    That's correct.

14 Q    Okay.  Now you worked under that same engagement letter,

15 the one that you signed right at the beginning, you worked

16 under that same engagement letter from early May all the way up

17 until July 25th of 2022.  Right?

18 A    Correct.

19 Q    There were no changes to it.

20 A    Correct.

21 Q    And you had no position throughout that time, you had no

22 formal position, I believe was your words, with any of the Aero

23 entities.  Right?

24 A    That's correct.

25 Q    Okay.  Now, your counsel showed you and I believe --

Castellano - Cross/Pfister                    146

1              MR. PFISTER:  If I may publish it again, Your Honor,

2    it's Castellano Demonstrative 2, it's already been published to

3    the witness.

4              THE COURT:  All right.

5              MR. PFISTER:  Okay.  And counsel you should have a

6    copy of it.

7    BY MR. PFISTER:

8    Q    And do you, sir, have a copy of it?  It's called Aero's

9    prepetition process, Castellano Demonstrative 2.

10   A    I can see it on the screen.

11   Q    Okay.  So you, I believe you testified in response to your

12   counsel's questions that you helped prepare this demonstrative.

13   Is that right?

14   A    Correct.

15   Q    And that this demonstrative would help you with your

16   testimony.  Isn't that right?

17   A    Yes.

18   Q    Okay.  Now, and your retention, pardon me, your engagement

19   as an advisor for Aero predates this, right?

20   A    It does.

21   Q    The first entry here is June 21.  Do you see that?

22   A    Yes.

23   Q    And you had already been an advisor with the Aero entities

24   for about a month and a half before then.  Correct?

25   A    Correct.

Castellano - Cross/Pfister                   147

1  Q    Okay.  Now, I want you to look, if you would please, at

2  the June 30th entry.  Do you see where it says June 30th W&C

3  circulates draft funding agreement?

4  A    I do.

5  Q    Did you write that?

6  A    I'm sorry, did I write what?

7  Q    Did you write June 30th, W&C circulates draft funding

8  agreement?  Because you said you helped prepare this, so I'm

9  just trying to find out what you did as opposed to what your

10 counsel did.

11 A    No, I reviewed a draft of this and discussed this with

12 counsel, so I didn't actually type those words in.

13 Q    Okay.  Did you ask why the first draft that's listed on

14 this demonstrative was the June 30 draft that W&C circulated?

15 A    No, I didn't ask that question.

16 Q    And W&C, that means White & Case, right?

17 A    Correct.

18 Q    And White & Case is counsel for 3M.  Right?

19 A    Correct.

20 Q    And I believe you testified, well it's in your first day

21 declaration, that the funding agreement, right, in order to

22 avoid any conflicts, that was negotiated between White & Case

23 which represented 3M and then a firm called McDonald Hopkins

24 which is conflicts counsel and counsel to the disinterested

25 director.  Did I get that right?

Castellano - Cross/Pfister                    148

1  A     Correct.

2  Q     And that Kirkland & Ellis didn't have any role in those

3  negotiations.  Right?

4  A     No, not once McDonald Hopkins was leading those

5  negotiations, that's right.

6  Q     But let me ask you about that not once part.  Kirkland &

7  Ellis, my question was Kirkland & Ellis had no role in

8  negotiating this funding agreement.  Is it your testimony that

9  Kirkland & Ellis did have a role prior to a certain point?

10 A     So there was a, the initial draft of the funding agreement

11 was June 24th, and I believe that was a Kirkland & Ellis draft,

12 and then everything thereafter was McDonald Hopkins.

13 Q     Oh, okay.  So you knew, I mean I've got it here, I'm not

14 going to bother showing it to you, but so you actually knew

15 that Kirkland & Ellis had drafted, had prepared the first draft

16 of the funding agreement on June 24th.

17 A     That's correct.

18 Q     How long have you known that?

19 A     I recall that, now I don't remember, June 24th, I guess.

20 Q     You've known it since June 24th?

21 A     Again, I can't remember how far back.

22 Q     Okay.  But you knew it around the time that Kirkland &

23 Ellis prepared that first draft.  Is that right?

24 A     That's right.

25 Q     Okay.  Have you seen the draft of the funding agreement

Castellano - Cross/Pfister                    149

1  that Kirkland & Ellis prepared?

2  A    At some point in time I probably did.

3  Q    When do you think you saw it?

4  A    Probably around the end of June.

5  Q    Right around the time it was created?

6  A    Something like that.

7  Q    But I thought you didn't have any role in negotiating the

8  funding agreement?

9  A    I did not have a role in negotiating the funding

10 agreement.

11 Q    You just saw the drafts and where they came from?

12 A    Correct.

13 Q    Okay.  You can take that, well no before you do that -- so

14 sitting here today you can recall pretty clearly that the first

15 draft came from Kirkland & Ellis and even that it came on June

16 24th.  When you were, your counsel I believe his express

17 question was, you know, will this demonstrative help you in

18 your testimony, and you said yes.  When you looked at this

19 demonstrative, even though you didn't draft it, did you ask why

20 doesn't it show on here that on June 24th the original funding

21 agreement came from Kirkland & Ellis?

22 A    No, we were just trying to hit some of the highlights of

23 some of these key meetings.

24 Q    So why is it a highlight that on June 30th White & Case's

25 circulation of a funding agreement, why did that merit

1  inclusion, but the June 24th first draft of the funding

2  agreement from Kirkland & Ellis, that didn't merit inclusion?

3  A    Because by June 30th, White & Case was working with

4  McDonald Hopkins, McDonald Hopkins was working substantively

5  with the disinterested directors to negotiate the funding

6  agreement.

7  Q    So that's why the June 30th date is important or was

8  important in your mind when preparing for your testimony

9  because it's at that date that all of the right people were in

10 place.  Is that right?

11 A    I'm not sure what you mean by right.

12 Q    Well, I'll go ahead and withdraw that.  I do just want to

13 make sure we're all looking at the same, or we're all thinking

14 about the same first draft.

15        MR. PFISTER:  Your Honor, may I, I know you said I

16 can always approach, but it's going to be a habit where I ask

17 if I can approach.

18        THE COURT:  All right.  Well maybe I'll change the

19 answer just to make it excising.

20                        (Laughter)

21        THE COURT:  Make sure you give my staff attorney one,

22 please.

23 BY MR. PFISTER:

24 Q    So you have, you should have before you sir a document

25 that's been marked as Exhibit AG.  Do you have that?

Castellano - Cross/Pfister                151

1  A    I do, yes.

2  Q    Now, you are not a, and it's a cover, just so the record

3  is clear, it's a cover email from somebody at Kirkland to some

4  folks at McDonnell Hopkins, some other people at Kirkland it

5  looks like.  I don't see you as a to or a cc on here.  Do you?

6  A    I do not.

7  Q    Okay.  And it attaches to it a document called funding and

8  indemnification agreement.  And the top of it says, K&E draft,

9  6/24/22 privileged and confidential attorney work product.  Do

10 you see that?

11 A    I do.

12 Q    Okay.  Even though you're not on this email --

13         MR. PFISTER:  And, Your Honor, I'm going to go ahead

14 and offer into evidence Exhibit AG.

15         THE COURT:  Any objection to the admission of what

16 has designated Exhibit AG?

17         UNIDENTIFIED SPEAKER:  No, Your Honor.

18         THE COURT:  All right.  No objection, I will admit

19 Exhibit AG into evidence.

20            (Exhibit AG admitted into evidence.)

21 BY MR. PFISTER:

22 Q    So, sir, if you look at this draft funding agreement

23 prepared by Kirkland & Ellis, is this the one you're referring

24 to that you saw sometime you think around the end of June?

25 A    It probably is, it could very well be.

Castellano - Cross/Pfister                    152

1   Q    Okay.  And it looks a lot, I'm not going to ask you to
2   redline it but it looks a lot like the final funding agreement,
3   doesn't it?
4   A    I'm sure there were changes from this version to the final
5   agreement.
6   Q    But it's not like, you know, you're looking at it and you
7   can't, if you didn't have the cover page to it, you couldn't
8   tell what it was, right?  It's pretty much the same document,
9   it's just an earlier verison, is that right?
10  A    I would agree it's an earlier version.
11  Q    An earlier version of what's clearly the same document.
12  A    I'm not going to comment that it's the same document
13  without seeing the changes to it, but --
14  Q    Understood.
15  A    --- relatively the same document.
16  Q    Relatively the same document.  Okay.  That's fine.  Now,
17  you were retained in May, I believe you said May 4th or May 5th
18  of 2022 by Kirkland and by 3M to help 3M, not the Aero
19  entities, but 3M, with contingency planning.  I have that right
20  so far?
21  A    The only thing I would qualify again it was with 3M and
22  certain of its affiliates.
23  Q    Pardon me.  Yes.  And certain of its affiliates not
24  listing specifically Aero.  Right?
25  A    That's correct.

1  Q    Okay.  And you had your team of advisors who went in to

2  work on this project and you may not have gotten all 12 to 14

3  of them staffed up, you know, that first week, but it happened

4  pretty quickly, right?

5  A    Correct.

6  Q    Okay.  So you had yourself, you had 12 to 14, and it's not

7  12 to 14 part-time people, right, it's 12 to 14 full-time

8  people, yeah?

9  A    Correct.

10 Q    And you yourself are full-time on this, right?

11 A    Relatively full-time.

12 Q    Right.  Okay.  And, so you go in in early May.  You didn't

13 meet yourself the president of the debtors for a full month

14 into your assignment, did you?

15 A    Three or four weeks, that's probably, that's probably

16 about right.

17 Q    And the president of the debtors is somebody named Matthew

18 Blaisdell.

19 A    That's correct.

20 Q    Okay.  And I think you maybe said about a month, so I'll

21 let you skate with three or four weeks, but in addition to not

22 actually meeting him, you didn't have any phone calls with him.

23 Right?

24 A    That's correct, yes.

25 Q    You didn't email him, right?

Castellano - Cross/Pfister                    154

1  A    Correct.

2  Q    You didn't send him any text messages, right?

3  A    Correct.

4  Q    And this is the president of the company that Alix

5  Partners is providing contingency planning to, right?

6  A    That is the president of the company, that's correct, yes.

7  Q    Okay.  And to your knowledge, Mr. Blaisdell, the president

8  of the company had no role whatsoever in selecting Alix

9  Partners for this engagement, right?

10  A    Correct.

11  Q    In fact, the person who reached out to your partner about

12  the engagement was a K&E restructuring lawyer named Josh

13  Sussberg, right?

14  A    That's correct.

15  Q    So there were some items I was going to cover with you

16  about the debtors being operationally healthy and no reason for

17  filing this bankruptcy other than the tort litigation, but I

18  think your counsel has already established that with you, so

19  I'm not going to burden you with that.  But I do just want to

20  make sure that we're all clear that Aero's business before the

21  bankruptcy filing was a profitable business operationally?

22  A    It had a gross profit level, yes.

23  Q    And maybe there were some effects by Covid or inflation,

24  but notwithstanding those effects, the business was still

25  healthy, right?

Castellano - Cross/Pfister                    155

1  A    Yes.

2  Q    And there would be no reason but/for the what you called

3  the contingent tort liabilities for this debtor operationally

4  to seek bankruptcy protection.  Right?

5  A    Yeah, I mean if there weren't any contingent liabilities

6  that it was facing it would have no, it would have no

7  substantive debt obligations.

8  Q    Well not only would it have no substantive debt

9  obligational, but it wouldn't have any reason to seek

10 bankruptcy protection.  Isn't that right?

11 A    That's correct, yes.

12 Q    Okay.  And I was also going to cover with you, but I think

13 your counsel has saved us the time.  I just want to confirm

14 though that the $347 million in alleged defense costs that have

15 been paid in respect of the earplug litigation, that every

16 dollar of that has been paid by 3M.  Right?

17 A    That's correct, yes.

18 Q    Not a single dollar was paid by the Aero entities.

19 Correct?

20 A    Yes.

21 Q    And I know your counsel asked you some questions about the

22 shared services agreement, but let me just be clear.  So the

23 shared services agreement is the agreement under which the

24 debtors get some back office support from 3M.  Right?

25 A    It's more than just back office.  I think it's pretty

Castellano - Cross/Pfister                  156

1  substantive as I discussed this morning.  But yes, that's

2  correct.

3  Q    Right.  It's the legal and the accounting and the

4  insurance and the IT and the HR, I think are the things you

5  mentioned.

6  A    And some operational areas as well too.

7  Q    Okay.  Now, under that shared services agreement, Aero

8  does at least owe some kind of payment to 3M in respect of

9  those shared services.  Is that right?

10  A    Yes, prior to the petition date, that's correct.

11  Q    And you and your team did a lot of investigation into how

12  much Aero owed 3M on account of the shared services agreement

13  and the services provided thereunder for the last several

14  years, right?

15  A    Correct.

16  Q    And what you determined was that Aero's, what Aero owed to

17  3M on account of that, the services that are provided under the

18  shred services agreement was around a million dollars a month.

19  Right?

20  A    Correct.

21  Q    And did that million dollars a month, that amount, did not

22  change based on how much money was spent by 3M in defending

23  against the earplug claims.  Right?

24  A    That's correct, yes.

25  Q    And you also did some analysis and you figured out that

Castellano - Cross/Pfister                    157

1  how much Aero might owe 3M under that shared services agreement

2  wouldn't vary at all depending on whether 3M, you know, posted

3  bonds of some of the MDL judgments.  Isn't that correct?

4  A     Correct, yes.

5  Q     And you also determined that under that shared services

6  agreement, Aero's payment obligations to 3M wouldn't change

7  from that roughly million dollars a month if 3M settled the

8  earplug litigation.  Right?

9  A     Correct, yes.

10  Q     So no change depending on how much there was in defense

11  costs, right?

12  A     Yes.

13  Q     No change depending whether there were any bonds posted

14  right?

15  A     Correct.

16  Q     No change depending on whether there were any verdicts

17  that were paid, right?

18  A     Correct, yes.

19  Q     Okay.  Now, at your deposition, didn't you tell me that

20  Aero actually paid 3M that million dollars a month going back?

21  A     I did, yes.

22  Q     You said, right, that Aero paid historically.  At times

23  you said incurred, but I did find some paids there.  You

24  testified that it paid it.  Right?

25  A     I did, yes.

1  Q    That's not actually true, is it?

2  A    So Aero's 3M did not charge every single month what Aero

3  was required to pay.  But Aero's obligation was about a million

4  dollars a month.

5  Q    Okay.  So its obligation was a million dollars a month,

6  but you just told me that sometimes 3M didn't charge it.

7  Right?

8  A    That's right.

9  Q    Now, when 3M didn't charge it, did Aero send it anyway?

10 A    Because of the way that everything is managed on a central

11 treasury basis, Aero never would send anything because it would

12 just all get debited and credited pursuant to the shared

13 services agreement within their own treasury management system.

14 So there wasn't a matter of sending anything.

15 Q    So it's in fact the case, isn't it then, that even this

16 million dollars a month which doesn't vary depending on defense

17 costs, verdicts, settlements, bonded judgments, even that

18 million dollars a month that Aero is supposed to have paid to

19 GM, 3M, pardon me, under the shared services agreement, even

20 that didn't get paid?

21 A    Again, 3M would actually have to record the transactions

22 to actually reflect it in the books and records.  Because

23 again, 3M is responsible for all of the books and records.  So

24 if 3M didn't do that, Aero, Aero wouldn't have that particular

25 charge.

Castellano - Cross/Pfister                    159

1  Q    Okay.  Did it ever get paid?  And I don't mean post-

2  petition.  Let's just say, let's say this.  Let's say prior to

3  July 1 of 2022, did that million dollars a month ever get paid?

4  A    I believe historically it did from what we were told.

5  Q    It did.  When did it get paid?

6  A    I think, again, this was all recorded through 3M's

7  treasury management system.  So again, it wasn't as if Aero was

8  physically directing monies, it would be when 3M actually

9  recorded it.  And I believe up through 2016, they were charging

10 the Aero subsidiaries.

11 Q    Okay.  So up through 2016, they were actually charging the

12 Aero subsidiaries, the roughly million dollars a month under

13 the shared services agreement.  But after 2016, they just

14 didn't bother to charge it?

15 A    From the assessment of the books and records, that's what

16 it appears to be.

17 Q    Okay.  And this is the same shared services agreement,

18 right, that is in effect today post-bankruptcy, right?

19 A    Yes, it is.

20 Q    Okay.  Hasn't been amended, right?

21 A    Correct.

22 Q    Okay.  And this agreement, you testified in response to

23 your counsel's questions, is really important because the Aero

24 debtors just can't function without 3M's IT and legal and

25 accounting and human resources and insurance support.  Right?

Castellano - Cross/Pfister                    160

1  A    Yes, that's right.

2  Q    So it's just so important, but yet since 2016, 3M just

3  hasn't bothered to collect the million dollars a month that it

4  has been entitled to collect?

5  A    Again, 3M did not record those transactions, but they

6  continued to provide the services pursuant to the shared

7  services agreement.

8  Q    Okay.  Why didn't you tell me that in your deposition?

9  Why did you say that they paid?

10  A    Because I was focusing on the costs and what they needed

11  to incur for that.  That's what I was focusing on in my

12  deposition with you.

13  Q    I see.  And you know already that your counsel has sent

14  over corrections to your deposition.  But that one wasn't one

15  of them.  Do you know why?

16  A    That, because I thought I was, what I was saying in there

17  was the charges for shared services.

18  Q    Well, maybe you'll get another chance with another errata

19  sheet.  But there are some points where you said incurred, and

20  I thought, darn it, maybe I misheard him.  But there were some

21  points where you said paid, and you do recall those today?

22  A    Yes, I do.

23  Q    Okay.  So maybe we should correct those.  Now, beyond the

24  dollars costs, right, so we're still talking about the earplug

25  litigation, and I'm talking about the pre-petition time period,

1  right?  So the case isn't stayed as to Aero, it's not stayed as

2  to 3M.  We're in prepetition.  Are you with me there?

3  A    Okay, yes.

4  Q    Okay.  You were there as an advisor with 12 to 14 people

5  at the company, you hadn't met the president, but you were

6  there as an advisor with 12 to 14 people for roughly three

7  months.  Right?  May, June, July?  Two and a half months?

8  A    Two and a half months.

9  Q    Gotcha.  Okay.  And during that time, there was a lot of

10 stuff going on in the earplug litigation.  Is that right, or do

11 you just not know?

12 A    I don't know what specifically was going on in the earplug

13 litigation during that time.  I was focusing on contingency

14 planning.

15 Q    Gotcha.  Okay.  So during, I want to focus very

16 specifically on that time prepetition where there's no stay as

17 to the Aero entities, and there's no stay as to 3M, right.  You

18 were there as an advisor with your 12 to 14 full-time people,

19 okay, and you did not see any disruption or distraction or

20 other inconvenience operationally to the Aero debtors during

21 that two and a half months.  Isn't that right?

22 A    When you say operationally, what are you referring to?

23 Q    Well, we just talked about how operationally, right, Aero

24 was healthy and everything's fine.  So I'm talking

25 operationally, you didn't see in that two and a half months,

Castellano - Cross/Pfister                          162

1  you didn't see any distraction, did you?

2  A    Operationally, I agree with that, yes.

3  Q    Right?  Okay.  And that's as to the 330 Aero employees,

4  the direct employees, right, none of those people were

5  distracted?

6  A    Correct.

7  Q    And that's as to the 400 employees of Aero's non-debtor

8  subsidiaries, the ones in China and Mexico and other places.

9  Right?

10  A    Correct.

11  Q    Okay.  None of those people you saw in two and a half

12  moths were distracted from their work as a result of 3M and the

13  Aero defendants being defendants, active defendants, in the

14  MDL.  Right?

15  A    That's correct, yes.

16  Q    And it was also during that time that 3M was providing the

17  services under the shared services agreement, the same shared

18  services agreement that's been in place, you know, for a long

19  time and that's in place going forward, they were providing

20  those same shared services, the accounting, the insurance, the

21  legal, the human resources, the technology, they were providing

22  all of that to the Aero entities.  Right?

23  A    Yes, they were.

24  Q    And you were talking to the same people that Mr. McKane

25  asked you about.  I'm not going to get the names right, but the

Castellano - Cross/Pfister                                       163

1  individuals from the legal counsel's office right, you were

2  talking to those people?

3  A    Or people on my team were.

4  Q    But also you personally I thought, right?

5  A    More so on the accounting, the accounting and treasury

6  side.

7  Q    Okay.  But you were talking, right, to the people on the

8  accounting and treasury side of 3M who were providing shared

9  services to the Aero entities.  You were doing that during this

10 two and a half month pre-bankruptcy period.  Right?

11 A    I was, yes.

12 Q    Now, did any of them seem distracted and unable to help

13 you?

14 A    Well, I wouldn't say they were unable to help.  They had,

15 they were definitely very busy.

16 Q    Okay.  Were they very busy on the MDL case?

17 A    Yeah.  I can't -- I don't recall if it was the MDL case.

18 There was just a lot going on for them.

19 Q    Okay.  Well, I mean, 3M's a -- I think you said that Aearo

20 is $100 million subsidiary nestled within a $35 billion

21 conglomerate.  Is that what you said earlier?

22 A    That is, yes.

23 Q    Okay.  So if these people are like the head of, you know,

24 legal and the head of accounting and the head of insurance and

25 the head of IT and the head of human resources for a $35

Castellano - Cross/Pfister                            164

1  billion conglomerate like 3M, wouldn't you assume that they're

2  just generally going to be a bit busy?

3  A    It's a complex organization.  So people are busy, yes.

4  Q    All right.  But there was never a point in the two and a

5  half months when the litigation was actively ongoing prior to

6  the bankruptcy filing when these people who provide such

7  critical services, even though sometimes 3M doesn't charge for

8  it, when the people who provided these critical services, they

9  just couldn't get back to you or they couldn't answer your

10 questions or they couldn't help your team or they couldn't --

11 you know -- the wheels started falling of, because these folks

12 were just too darn busy with something else, right?

13 A    We found a way to work with them to get what we needed to

14 get done accomplished.

15 Q    Right.  And even when you say you think they were busy,

16 you don't have any idea if what they were busy on had anything

17 to do with the MDL, right?

18 A    Not specifically, no.

19 Q    Well, do you think generally?  That's --

20 A    Well, they were -- I mean, again, there was a lot that

21 they had underway related to just normal operations and other

22 things which, you know, again, I just assumed included the MDL,

23 as well.

24 Q    But you say you just assumed included the MDL?

25 A    We spent -- again, the amount of work that we were doing

Castellano - Cross/Pfister                     165

1   with them for the contingency planning effort was pretty

2   extensive.

3   Q    Okay.  But you just don't know one way or the other

4   what -- you know -- the reason that maybe JoAnn from accounting

5   didn't pick up your call on the first ring, but instead got it

6   on the second ring, you just have no way of knowing whether

7   that was because she was busy on the MDL or not, right?

8   A    That's right.

9   Q    Okay.  And you're not going to speculate on that, are you?

10  A    No.

11  Q    Thank you.  You're not aware of any Aearo employees having

12  ever testified at any trials in the earplug litigation, are

13  you?

14  A    I'm not aware of who testified in any of the earplug

15  trials.

16  Q    So that being the case, you're not aware of a single one

17  of the 330 direct employees having testified at any trial, and

18  not just the two and a half months, but in -- in Aearo's -- you

19  know -- in the last five years, let's say.  You're not aware of

20  any one of those 330 people having been -- having testified as

21  a witness, are you?

22  A    I'm not aware of that, no.

23  Q    And the same is true, right, of the 400 plus employees of

24  the non-debtor subsidiaries, the people in China and Mexico,

25  you're not aware of a single one of those people having

Castellano - Cross/Pfister                                    166

1   testified at any trial or deposition or anything else in the

2   MDL, right?

3   A    That's correct, yes.

4   Q    And if I expand that, because I don't want to leave out

5   the Minnesota folks, if I expand that to -- both questions to

6   include also the Minnesota litigation, is the same answer true?

7   You're not aware of any Aearo 330 direct employees having

8   testified in any of the Minnesota litigation?

9   A    I am not aware of that.

10  Q    And the same with the 400 plus Aearo non-debtor subsidiary

11  employees?  You don't know whether they -- you have no

12  knowledge of anybody having testified in the Minnesota?

13  A    That's correct, yes.

14  Q    Okay.  Now, what about document production?  Are you aware

15  of whether any of the -- you know -- aside from testifying,

16  whether any of the 330 Aearo employees ever gathered, looked

17  at, you know, reviewed any documents in connection with any of

18  the earplug litigation?

19  A    I'm personally not aware if the debtor did not.

20  Q    Okay.  And you're just -- the same -- you're personally

21  not aware of whether any of the 400 employees of the non-debtor

22  subs, you know, forget testifying, but had to collect documents

23  or review documents or verify discovery responses, for example?

24  You're not aware of any of that happening, right?

25  A    Correct.

Castellano - Cross/Pfister                    167

1  Q    Okay.  Now, I want to switch gears a little bit to what

2  you said in your first day declaration regarding this

3  upstreaming of Aearo's assets.  But let me do that, I think the

4  best way, is to ask you, please, to pull out what you have in

5  front of you as Exhibit 144, which is the meeting minutes of

6  July 19th of 2022.  Do you have that document?

7  A    Yes, I do.

8  Q    Okay.  And I believe the page your counsel directed you to

9  was the one that says page 65 of 74 at the top?

10 A    Yes, I have it.

11 Q    Okay.  And is this the page you looked at with Mr. McKane,

12 specifically it says at the top, "2010 Aearo Safety Products

13 business transferred to 3M"?

14 A    Correct.

15 Q    Okay.  And you prepared this slide where it says that in

16 2010 Aearo Safety Products' business was transferred to 3M?

17 A    Members of my team did.

18 Q    You reviewed it though, right?

19 A    Yes.

20 Q    And you wouldn't have allowed them to present it to the

21 board of Aearo if you hadn't confirmed to your own satisfaction

22 that it was correct, right?

23 A    Yes, correct.

24 Q    Okay.  Now, there's -- there's some information on here

25 that -- you know -- in an accounting format, that is, but I

Castellano - Cross/Pfister                    168

1  want to first cover a few things that your counsel asked you or

2  that you said in response to your counsel's question.  With

3  respect to this 2010 -- what you call Aearo Safety Products

4  business transferred to 3M, you and your team looked and you

5  couldn't find any agreements or instruments that evidenced a

6  sale.  Is that right?

7  A    That's correct.

8  Q    You couldn't find a sale agreement, right?

9  A    Correct.

10  Q    You couldn't find something called a bill of sale,

11  correct?

12  A    That's right.

13  Q    You looked for all of those things, right?

14  A    We asked the people that were involved -- that are still

15  there that are involved, and nothing -- nothing came up.

16  Q    And this is an -- a pretty important issue.  So it's

17  not -- it's something that I would gather you put a lot of

18  those, you know, 12 to 14 people who work full-time on.  Would

19  that be a fair assumption?

20  A    We spent a lot of time on this, yes.

21  Q    You spent a lot of time on this, right?

22  A    (No audible response.)

23  Q    Okay.  Now, at your deposition what you told me was that

24  all you could find were journal entries.  Do you remember that?

25  A    Yes.

Castellano - Cross/Pfister                    169

1  Q    But I think in response to your counsel's question you
2  found journal entries and work papers.  Did you do something
3  after your deposition to go back and look for more?
4  A    Not at all.
5  Q    Okay.  So you had work papers in addition to the journal
6  entries?
7  A    Well, so the journal entry comes attached with it a
8  schedule.  That's all.  So to me, it is a journal entry, but it
9  has something attached to it.
10 Q    So it's the same journal entries.  When you say journal
11 entries and work papers in response to Mr. McKane's question,
12 you mean the same journal entries and only the same journal
13 entries that you testified about at deposition and that you're
14 aware have been produced to us, right?
15 A    That's correct, yes.
16 Q    So there's not -- you didn't go do some new document
17 search and find new stuff?
18 A    Did not at all.
19 Q    Okay.  Now, there is -- the first line on the top of this
20 page under 2010 transaction, "IC rec/pay."  Do you see that
21 line?
22 A    IC rec.
23 Q    It says -- it has a big B beside it.
24 A    Yes, I do see that.  Yes.
25 Q    Okay.  First of all, right below the dotted line do you

Castellano - Cross/Pfister                    170

1  see where it says, "safety products, assets and liabilities

2  transferred"?

3  A    Yes, I do.

4  Q    Okay.  So this is about the safety products.  You see --

5  and IC means intercompany, correct?

6  A    Yes.

7  Q    So based on your review of the journal entries, because

8  that's all there was, you determined that there was an

9  intercompany receivable of over $965 million.  Is that right?

10  A    That's correct, yes.

11  Q    Okay.  And that, at least in accounting terms, according

12  to your understanding, is $965 million that is due to the Aearo

13  entities from 3M, right?

14  A    Yes.  But you'd also have to take into consideration the

15  intercompany payable that's associated with that, as well, too.

16  Q    Well, let's -- let's let me ask about that, because if we

17  look over on the side where it says comments, you see right by

18  C -- so there's a bunch of privilege redactions, but then do

19  you see there where it says, "No agreement to setoff the

20  receivable and payable balances to a net balance due has been

21  located"?

22  A    Correct.  I do see that, yes.

23  Q    So it's not actually true that you have to setoff, right?

24  It -- you're not -- you haven't located any authority for that,

25  and that's why you in fact show that it's a receivable from 3M

Castellano - Cross/Pfister                    171

1  of 965 plus million dollars, and also a payable to 3M of $316

2  million, correct?

3  A    And that's how it's reflected on their trial balance.

4  Q    And when you say "their," you mean the Aearo balance?

5  A    I'm sorry, Aearo.

6  Q    And it's the same -- it's reflected on 3M's, as well,

7  right?

8  A    Yes.

9  Q    Okay.  And this has been the same in the sense of the same

10 intercompany receivable and the same intercompany payable,

11 that's been the same since 2010, right?

12 A    For these particular transactions.

13 Q    Tell me what you mean by that?

14 A    So pursuant to the short services agreement, 3M does clear

15 treasury transactions and other transactions through

16 intercompany accounts, but so the intercompany balances would

17 be slightly different, but for these particular balances.

18 These have not changed since 2010.

19 Q    Okay.  So I'm -- I -- I think we're on the same page.  Let

20 me just make sure.  To reconstruct this you went back 12 years,

21 right?  You looked at journal entries and work papers/journal

22 entries, same thing from 12 years ago, and you came up with

23 these numbers, this $965 million payable from 3M, and then this

24 $316 million payable to 3M, correct?

25 A    Yes.

Castellano - Cross/Pfister                    172

1  Q    Okay.  These two numbers, that is the intercompany

2  receivable and the intercompany payable from this 2010

3  transaction, those have not budged in 12 years, right?

4  A    For this particular transaction, that's correct, yes.

5  Q    I just want to make sure I'm -- I -- you're -- we're on

6  the same page.  When you say for this particular transaction, I

7  just want to make sure we're talking about the 2010

8  transaction, if you had looked at the books in 2010 you would

9  have seen an intercompany receivable of 965 million, and you

10 would have seen an intercompany payable of 316 million, right?

11 A    That's correct, yes.

12 Q    And if you look at those same books today for this

13 transaction you would see that same intercompany receivable of

14 965 million and that same intercompany payable of 316 million,

15 right?

16 A    That's right.

17 Q    Okay.  So those numbers as to this transaction or this

18 2010 upstreaming, those numbers haven't budged, right?

19 A    Correct.

20 Q    Okay.  And you did a lot of diligence on this to make

21 sure, right?

22 A    Yeah, we did.  We spent a lot of time looking at this.

23 Q    Because this was an important issue, right?

24 A    It was important to understand these intercompany

25 balances.

Castellano - Cross/Pfister                    173

1  Q    And it was important -- well, I'll withdraw that.  This is

2  -- and I apologize if I asked this -- but this is also

3  consistent with what your understanding of 3M's books and

4  records is, right?

5  A    My understanding of that, that's correct, yes.

6  Q    Okay.  And this transfer included the hearing protection

7  business, right?

8  A    Yeah.  I think it was called Head, Eye, Hearing, Face

9  Safety Division, I think, something to that effect.

10 Q    Okay.  But it encompassed the assets and -- it encompassed

11 the business of the earplugs, right?

12 A    Yes, it did.

13 Q    Okay.  And that's why, when debtors' counsel on the first

14 day of the case, you know, had a presentation -- first day

15 presentation and then it had a big truck and it showed, you

16 know, insulation under, around the engine, and airline -- you

17 know -- airplane turbines, you know, insulation for the sound.

18 It didn't show anything to do with earplugs, right?

19 A    That's correct, yes.

20 Q    And that's because that business had been transferred to,

21 in your understanding, that whole business have been

22 transferred to 3M in 2010, right?

23 A    That's correct, yes.

24 Q    That's why today the 330 employees aren't -- aren't

25 burdened by the MDL and don't have -- and that's -- and that's

Castellano - Cross/Pfister                              174

1  why today, right, Aearo doesn't pay 3M any part of the defense

2  costs of the MDL, right?  It's all because that -- that

3  business, the earplug business, pardon me, the earplug business

4  got transferred up to 3M in 2010, right?

5           MR. McKANE:  Objection to form.  There are multiple

6  questions.  I just want to know which one he wants the witness

7  to answer.

8           THE COURT:  I think it was kind of a compound

9  question, so.

10          MR. PFISTER:  I do have a tendency to give it

11 compound.

12          THE COURT:  Yes.  Let's --

13          MR. PFISTER:  I apologize.

14          THE COURT:  -- let's -- one at -- one at a time.

15          MR. PFISTER:  Okay.  I apologize.

16 BY MR. PFISTER:

17 Q    The reason that debtors' business today doesn't have

18 anything to do with, you know, earplugs, but instead has to do

19 with industrial applications of, you know, acoustic thermal

20 insulation and the like, the reason for that is because in 2010

21 the earplug part of the Aearo business, that went up to 3M.  Do

22 you agree with me with that?

23 A    That was transferred in 2010.

24 Q    Right.  It hasn't been part of Aearo since 2010, right?

25 A    It has not.

Castellano - Cross/Pfister                    175

1  Q    Okay.  Now, looking at this, we're still on page 3472

2  of -- pardon me -- we're on page 65 of 74 of the Aearo Safety

3  Products.  What this balance sheet shows -- pardon me.  This

4  balance sheet shows assets, including intangible assets, right?

5  A    Correct.

6  Q    It has net intangibles.  Do you see that?

7  A    I do.

8  Q    Okay.  And it has goodwill on it, as well, doesn't it?

9  A    Correct.

10 Q    Okay.  And it shows that Aearo transferred goodwill of

11 $498 million, right?

12 A    That -- yeah, that rolls to the total assets.

13 Q    Yep.  And it shows that Aearo transferred net intangibles

14 of approximately $106 million, right?

15 A    Correct.

16 Q    Okay.  And it shows that Aearo transferred accounts

17 payable and accrued expenses that were associated with the

18 business, as well, doesn't it?

19 A    Yes, it does.

20 Q    Okay.  And it shows that Aearo transferred its other

21 liabilities where it lists them as $180 million [sic]?

22 A    Yes.

23 Q    It shows that those were transferred, too, right?

24 A    That would be $180,000.

25 Q    Pardon me, $180,000 of other liabilities; those were

Castellano - Cross/Pfister                          176

1 transferred, as well.  Is that right?

2 A    Correct.

3 Q    Okay.  Now, even though these numbers that are reflected

4 on -- pardon me.  Even though these numbers that are reflected

5 on Aearo's books and records, these haven't budged, that is,

6 the numbers that are on this page 65 for the safety products

7 business being transferred to 3M in 2010 -- let me just first

8 foundationally ask that.

9      It's not just the receivable and the payable that haven't

10 budged.  It's all of these numbers, right?

11 A    That's correct.  These line items roll up to those totals,

12 as is indicated on the page.

13 Q    So none of these line items have changed in the last dozen

14 years, right?

15 A    Correct, because these were transferred on January 1st,

16 2010.

17 Q    Well, they were transferred on 20 -- January 1st, 2010,

18 and then they haven't changed between January 1st, 2010, and

19 today, right?

20 A    Correct.

21 Q    Okay.  So there -- kind of two parts there.  So now, a lot

22 has happened.  Well, let me -- let me strike that.  You weren't

23 aware at your deposition, but you're aware now, right, that 3M

24 paid a $9.1 million Qui Tam settlement that related to its

25 earplug business, right?

Castellano - Cross/Pfister                    177

1  A     That's correct.

2  Q     Okay.  And even though that happened after 2010, that

3  hasn't changed any of those numbers, right?

4  A     Those numbers haven't changed.

5  Q     Okay.  So none of the $9.1 million Qui Tam settlement was

6  ever recorded as an expense on the books and records of the

7  debtors.  Is that right?

8  A     Not to my knowledge.

9  Q     And you looked at it pretty hard, right?

10 A     Well, I looked at this transaction --

11 Q     Okay.

12 A     -- pretty hard.

13 Q     Now, the $347 million of defense costs that 3M says that

14 it spent in the MDL or in the earplug litigation over the last

15 three years, none of that has been recorded on the Aearo books

16 and records, right?

17 A     That's correct.

18 Q     Okay.  Aearo has never demanded that 3M pay the $965

19 million receivable, has it?

20 A     Not to my knowledge, no.

21 Q     All right.  And Aearo -- and even if you were to net that,

22 and I know your note says, you know, there's no basis to net

23 it, but let's say you were to net it, has Aearo ever demanded

24 that 3M pay the net of $648 million?

25 A     No.  And again, being a subsidiary, it did not -- it did

1  not ask for that particular money back, that's right.

2  Q    Well, and it didn't even ask for it after the bankruptcy

3  petition was filed, did it?

4  A    That's correct.

5  Q    All right.  And you sitting here today, the chief

6  restructuring officer of the debtors, you don't know of any

7  plans for these debtors to ask 3M to pay either the $965

8  million or the net $648 million, right?

9  A    Although the debtor said today is, we have the funding

10 agreement as financial support for these proceedings.

11 Q    Well, that doesn't quite answer my question.  Once again,

12 let's try it again.  So sitting here today as the chief

13 restructuring officer of debtors in bankruptcy, they're called

14 debtors-in-possession, right?

15 A    Yes.

16 Q    And you understand that once you're a debtor-in-possession

17 you owe fiduciary duties not just to your corporate parent,

18 right, your stockholders, but you owe fiduciary duties to your

19 entire creditor body, right?  You get that?

20 A    Absolutely, yes.

21 Q    Okay.

22 A    Yeah.

23 Q    And so the bankruptcy hasn't been pending that long, but

24 it has been pending for a few weeks now, right?  Correct?

25 A    Correct, yes.

Castellano - Cross/Pfister                            179

1  Q    Okay.  And so things have changed, right, once you become

2  a debtor-in-possession.  You'll agree with me there?

3  A    We are now debtors-in-possession.  So yes, I agree with

4  that.

5  Q    And the duties that you owe --

6  A    Yeah.

7  Q    -- there's now an expanded universe of duties that you

8  owe, right?

9  A    Yes, to all the constituents of the debtors.

10 Q    Including all the creditors?

11 A    I consider them a constituent.

12 Q    Understood.  So notwithstanding that change, you sitting

13 here today as the chief restructuring officer of these debtors-

14 in-possession, you're not aware of any plans to ask 3M to pay

15 either the $965 million receivable or the net $648 million

16 receivable?

17 A    We have not made any plans to make that request at this

18 point.

19 Q    Okay.  Not only have you not made any plans, you're just

20 not aware of any plans at all, right?

21 A    That's correct, yes.

22 Q    Okay.  Now, to your knowledge, 3M has never demanded

23 indemnity from Aearo, whether pre-petition or post-petition,

24 under any agreement that predates the funding agreement in this

25 case.  Isn't that right?

Castellano - Cross/Pfister                    180

1   A    I'm not sure I follow the question.

2   Q    Sure.  So to your knowledge, 3M has never demanded

3   indemnification or indemnity from Aearo under any agreement

4   that predates the funding agreement in this case, right?

5   A    What do you mean by demand?

6   Q    Asked.  Has it ever asked for indemnification?

7   A    Well, but an indemnification does exist in the LLC

8   agreements.

9   Q    Okay.  That's a little bit different than what I'm asking.

10  So has 3M ever said, there is an indemnification that predates

11  this funding agreement, pay us money?  Did it ever ask Aearo to

12  pay it any money?

13  A    I am not aware of that.

14  Q    Has it ever sent a reservation of rights letter or any

15  similar type of notice or prerequisite to a demand to Aearo for

16  indemnification, other than under the funding agreement?

17  A    I'm not aware of that either.

18  Q    Okay.  So when you just said that it owes -- the debtors

19  owe an indemnification, are you talking about the LLC

20  agreements that your counsel asked you some questions about?

21  A    Yes.

22  Q    Because you don't know of any -- oh, I'm sorry.  Before I

23  move on, the $965 million receivable from 3M, that was never

24  disclosed in your first day declaration, was it?

25  A    It was not, no.

Castellano - Cross/Pfister                    181

1  Q    Okay.  Pardon me.  Now, this LL -- and now, I'm going to
2  ask a similar question on the LLC.  So you think -- I believe
3  it's your testimony just now that there is an indemnification
4  obligation that is embodied in some of these LLC -- or in these
5  LLC agreements that your counsel showed you.  Is that your
6  testimony?
7  A    Yes.
8  Q    All right.  That's not in your first day declaration
9  either, is it?
10 A    I don't believe it is.
11 Q    When did you first discover this indemnification
12 obligation in the LLC agreements?
13 A    It was before the filing.
14 Q    And before the filing you thought this is an
15 indemnification obligation that applies to the MDL?
16 A    Well, it was part of the diligence -- as I said this
17 morning in my testimony -- as part of the diligence we did
18 look, I did look at the LLC agreements to understand what was
19 contained in there, and I did identify that there was an
20 indemnification pursuant to the LLC agreements.
21 Q    So pre-filing you looked -- I believe you that pre-filing
22 you looked through the indemnification -- or the LLC
23 agreements.  I'm with you there.  But I want to focus on this
24 indemnification piece.  So pre-filing you had concluded that
25 there was an indemnification obligation that potentially or

Castellano - Cross/Pfister                    182

1  actually required Aearo to indemnify 3M in respect of the MDL

2  liabilities?

3  A    No, I don't think I said that.  I -- what I thought I said

4  was there was an indemnification agreement buried in the -- or

5  there was an indemnification obligation buried in the LLC

6  agreement.

7  Q    Okay.  So you knew there was an indemnification -- pre-

8  filing you knew there was an indemnification obligation buried

9  in the LLC agreements, yes?

10  A    Yes.

11  Q    But pre-filing you had never come to the conclusion that

12  that 2013 provision in these LLC agreements had any

13  applicability to the MDL liabilities, right?

14  A    I'm not sure I'm following the question.

15  Q    Okay.  Let me break it down.  Pre-filing, you knew that

16  there was an indemnification provision paragraph in the LLC

17  agreements, yes?

18  A    Yes.

19  Q    Pre-filing, you never reached the conclusion or even

20  suspected that the indemnification obligation in those LLC

21  agreements had any possible application to the MDL, correct?

22  A    Again, the objective was to understand what was in the LLC

23  agreement.  I wasn't thinking of it in the context of what does

24  it apply to; just needed to understand what was contained in

25  those LLC agreements.

Castellano - Cross/Pfister                 183

1  Q    Okay.  I -- respectfully, I don't think you're answering

2  my question.  Let me try it again.  I get that you had looked

3  at the LLC agreements from 2013 pre-filing.  We've established

4  that.  I get that your testimony is that you were aware, pre-

5  filing, that these indemnification provisions are in these LLC

6  agreements.  Are you with me there?

7  A    Yes.

8  Q    Okay.  What I'm asking you is a little more specific.

9  It's pre-filing, did you, John Castellano, ever think that

10 these 2013 indemnification paragraphs in these LLC agreements

11 had any conceivable applicability to the MDL?

12 A    These were broad indemnification language in the

13 agreements.  So again, I didn't make an assessment of what it

14 could or could not apply to.

15 Q    Okay.  I still don't think you quite answered me.  So I'm

16 going to try again.  You knew there were indemnification

17 provisions in the LLC agreements from 2013 pre-filing.  You

18 looked at them pre-filing.  You knew they were, in your words,

19 broad, right?

20 A    Correct.

21 Q    But pre-filing, did you, John Castellano, ever think in

22 your mind, these indemnification provisions in these 2013 LLC

23 agreements have any possible application in the MDL -- or to

24 the MDL liabilities?

25        MR. McKANE:  Objection, asked and answered.  The

Castellano - Cross/Pfister                184

1  witness testified, quote, "I didn't make an assessment of what

2  it could or could not apply to."

3         THE COURT:  Doesn't that answer your question?

4         MR. PFISTER:  Your Honor, if it answers it, I'm

5  satisfied with the record.

6         THE COURT:  Okay.

7         MR. PFISTER:  Thank you.

8  BY MR. PFISTER:

9  Q    You never disclosed these 2013 -- these indemnification

10 provisions from 2013 in your first day declaration, did you?

11        MR. McKANE:  Also asked and answered.

12        THE WITNESS:  These specific ones we did not, I did

13 not, no.

14        THE COURT:  I'll allow him to answer.

15        MR. McKANE:  Okay.

16 BY MR. PFISTER:

17 Q    And if these indemnification provisions actually do have

18 some relationship to -- or some nexus to the MDL litigation,

19 that would be a pretty important point for people to know who

20 were reading your first day declaration, wouldn't it?

21 A    It is an important point.  We also identified at my first

22 day declaration a funding agreement and the terms of the

23 funding agreement.

24 Q    Definitely identified that, but what I'm saying is, it

25 would have been important and it would have been something you

Castellano - Cross/Pfister                                    185

1  would have called out in your first day declaration if these

2  2013 LLC operating agreement provisions had a potential impact

3  on where the liability resides in respect of the MDL, correct?

4  A    Can you just one more time?  I'm sorry.  It was a long

5  question.

6  Q    It would have been important and you would have included

7  it in your first day declaration if you thought, when you were

8  signing your first day declaration, that these 2013 LLC

9  indemnification agreement provisions -- pardon me -- operating

10  agreement provisions pertaining to indemnity had any potential

11  applicability to liability in the MDL, correct?

12          MR. McKANE:  Objection, asked and answered, to the

13  extent he's already said, I didn't make an assessment as to

14  what it could and could not apply to.

15          MR. PFISTER:  Well, in this one, Your Honor, he did

16  ask me to repeat the question, to be fair.

17          THE COURT:  He did, and -- but, your -- I mean --

18  your question kind of gets a little vague.

19          MR. PFISTER:  Okay.

20          THE COURT:  I mean, I think there's a way you can ask

21  the question without necessarily trying to frame it in a yes or

22  no answer.  I know that it's not my cross and not what cross

23  likes to do.  But I think you just have a simple question you

24  could ask that would get you there.

25                          (Laughter)

Castellano - Cross/Pfister                    186

 1           THE COURT:  But you get paid more than I do, so I'm
 2  not going to -- I'm not going to do it for you.  But there's a
 3  way I think you can ask him without having such a long, drawn
 4  out question as to why it was or was not mentioned.
 5           MR. PFISTER:  I've got -- problem is, I got a roomful
 6  of really good trial lawyers.  And if I just start asking --
 7           THE COURT:  Well, now's a chance to see how you're
 8  doing.  It's like an oral exam.
 9           MR. PFISTER:  -- if I just start asking -- ask
10  questions of witnesses on cross that say why --
11           THE COURT:  Just give you hard times.
12                          (Laughter)
13  BY MR. PFISTER:
14  Q   Mr. Castellano, with that, there's no way I can resist --
15  there's no way I can not ask you.  Why didn't you mentioned in
16  your first day declaration the indemnification provisions in
17  the 2013 LLC agreements?
18  A   As it related to indemnification we were focusing on the
19  indemnification that was subsumed in the funding agreement,
20  which -- which I believe we did disclose.
21  Q   So you didn't mention it because you had disclosed the
22  indemnification obligations in the funding agreement?  That's
23  your testimony?
24  A   The funding agreement was a critical element of these
25  Chapter 11 filings, and I know we disclosed the funding

1   agreement in my first day declaration.

2   Q    So did you make a conscious decision that because you had

3   disclosed the funding agreement, that's why you didn't want to

4   -- that's why you didn't need or want to disclose the 2013

5   indemnification language from the 2013 operating agreements?

6   A    We were focusing on a critically important document as it

7   related to the commencement of these Chapter 11 cases, which

8   was the funding agreement.

9   Q    Well, your first day declaration is something like 96

10  pages.  So you had a kind of a low threshold for what's

11  important enough to disclose.  Would that be a fair statement?

12  A    Yeah, not all 96 pages.  There's exhibits there.

13  Q    That is true.

14  A    There's -- the funding agreement specifically I believe is

15  attached to my declaration, as well, too.

16  Q    Fair point.  Okay.  I'm not going to harp on that.  I do

17  have one last line of questioning that I want to ask you about.

18  So we've talked at some length about pre-petition and the --

19  what you personally saw in the two and a half to three months

20  that you and a team of 12 to 14 people were advisors to the

21  Aearo entities, right?

22  A    I'm sorry.  Was -- I don't know what question you just

23  asked me.

24  Q    My question was, earlier in my examination we talked about

25  the -- what you personally saw and what you personally did in

Castellano - Cross/Pfister                    188

1  the two and a half to three months that you and your team were

2  advising the debtors pre-petition, right?

3  A    We discussed a lot of things.  So I'm not sure if it was

4  anything in particular that I saw, but we definitely discussed

5  a lot.

6  Q    Got it.  That was just a preface --

7  A    Okay.

8  Q    -- to say, now, I want to switch to post-petition and

9  post-bankruptcy, because -- and this is how your counsel ended

10 his examination of you, where he asked you in words or

11 substance how it was going to affect the debtors if the

12 litigation against 3M is not stayed.  You do remember that line

13 of questioning, right?

14 A    I do, yes,

15 Q    Okay.  So the reason I set it up that way is because I

16 want you now to focus on going forward, you know.  The debtors

17 are asking this Court to enjoin litigation against 3M, and you

18 have provided testimony about how not granting that request

19 will harm the debtors.  So my questions are, the -- you sitting

20 here today are not aware of a single one of the 330 employees

21 of the debtors who will be pulled away from his or her job as a

22 result of the MDL litigation continuing against 3M, correct?

23 A    I'm not aware of what the future could hold for those 330

24 employees as it relates to the MDL litigation.

25 Q    Well, none of us are aware of what the future will hold,

1  for sure.  I get you there.  But what I'm saying is, is sitting

2  here today providing testimony, you are not -- you can't tell

3  the Court, you can't identify a single one of the debtors' 330

4  direct employees who you think will be pulled away from their

5  operational job duties if litigation against 3M continues,

6  correct?

7  A    As it relates to their operational employees, yeah, I

8  can't identify that today.

9  Q    Okay.  And the same thing is true, right, of the 400

10 employees of the non-debtor subsidiaries.  Sitting here today,

11 you cannot tell the judge about a -- the -- of a single one of

12 those 400 or so non-debtor employees who is going to be pulled

13 away from his or her job duties, operationally, on account of

14 the MDL litigation continuing against 3M, correct?

15 A    Yeah.  Again, I can't predict what is going to happen to

16 them pursuant, if the MDL litigation continues.  I can't

17 predict what that will -- what impact that will have on the

18 operational employees today.

19 Q    Well, that's a little different, though, and I don't want

20 to be persnickety.  But when you say you can't predict, I'm

21 saying, you gave testimony, indirect, in response to Mr.

22 McKane's questions about, you know, things that you foresaw as

23 potential problems.

24      And I'm going to cover them, you know, things about 3M

25 shared services and all the like.  What you didn't tell him and

Castellano - Cross/Pfister                    190

1  what I'm confirming on my examination is that you sitting here

2  today can't identify a single one of the 400 plus employees of

3  the debtors' non-debtor subsidiaries that is going to be pulled

4  away or distracted if the 3M -- if 3M does not -- if 3M

5  continues to have to litigate in the MDL?

6  A    Yeah.  I can't identify an impact.

7  Q    Okay.  And instead, the testimony that you gave in

8  response to your counsel's direct examination concerned the

9  shared services that 3M provides under the shared services

10 agreement to the debtors, right?

11 A    Correct.

12 Q    Okay.  And it concerns your -- or it involves your concern

13 that there may be, for want of a better word, a degradation or

14 impact on the services that 3M provides under the shared

15 services agreement to the debtors if 3M continues to be a

16 defendant in the MDL, right?

17 A    I think I used the word distraction.

18 Q    Distraction.  Thank you.  So that's the fundamental

19 nature, right, of the harm to the debtors if the -- if 3M is

20 not shielded from -- if injunctive relief is not granted in

21 3M's favor, right, distraction to 3M's employees and the

22 services they provide to the debtors, right?

23 A    Yes.

24 Q    Okay.  So you talked with counsel about some categories of

25 employees who were going to be distracted.  I just want to be

Castellano - Cross/Pfister                191

1  crystal clear as to the nature of these distractions.  The

2  first people who were going to be distracted if the litigation

3  continues against 3M were people in the 3M legal department,

4  right?

5  A    Correct.

6  Q    And you listed the names of some people.  You had Eric

7  Rucker and Courtney Enloe and Kate Warner, right?

8  A    Yes.

9  Q    Those are three people who you could identify as being

10 people in the 3M legal department who are going to be

11 distracted in helping the debtors under the shared services

12 agreement if litigation against 3M is not enjoined, correct?

13 A    Yeah.  I think what I said is if the litigation isn't

14 enjoined they have skills that would be beneficial to the

15 debtors in their Chapter 11 case and they would be distracted

16 from providing those skills and services.

17 Q    You have no clue how much of Mr. Rucker's time is spent in

18 connection with the MDL litigation, right?

19 A    Specifically, no.

20 Q    Generally, no, right?

21 A    I know that he is the associate general counsel and he's

22 intimately involved with the MDL process.

23 Q    How many cases has he tried in the MDL?

24 A    I do not know.

25 Q    Do you think he's tried any?

Castellano - Cross/Pfister                    192

1  A    I don't know.

2  Q    How many depositions do you think he's defended in the

3  MDL?

4  A    I don't know.

5  Q    All right.  How many times has he been down to -- or in

6  any court proceeding in MDL -- in the MDL?

7  A    I can't answer that.

8  Q    What percentage of his day does he spend working on the

9  MDL?

10  A    Again, I don't know that.

11  Q    Okay.  Let me ask you the same questions about Courtney

12  Enloe.  You have no idea -- is it Ms. or Mr. Enloe?

13  A    It's Ms.

14  Q    Ms., okay.  You have no idea the extent to which Ms. Enloe

15  -- how much of her day or her workload consists of the earplug

16  litigation, right?

17  A    I do not.

18  Q    You don't know how many times she's had to go to different

19  legal proceedings, depositions, trials, et cetera, right?

20  A    But again, similar to Mr. Rucker, again, these are

21  individuals that have intimate knowledge of the MDL process

22  that would be beneficial to the debtors in the event -- in the

23  event that the injunction isn't granted against 3M.

24  Q    But they won't be beneficial to the debtors in the event

25  the injunction is granted against them?

1  A    No.  I'm sorry.  If I -- yeah, I -- I didn't probably

2  characterize that correctly.  They will be instrumental to

3  support the debtors in these Chapter 11 cases.  If they're

4  distracted with continuing litigation going on with 3M I do

5  think that that will be a detriment to the debtors in terms of

6  trying to achieve its overall objectives.

7  Q    But you've got no basis to say that in the sense, as to

8  these three individuals, because you don't know how much of

9  their time they spend on the earplug litigation, right?

10 A    Yeah.  I can't quantify it and I also can't predict what

11 will happen when all of these cases get remanded back to the

12 federal jurisdictions.

13 Q    And these are just 3M's in-house counsel, right?  They're

14 not outside counsel?

15 A    Yeah.  They're employees of 3M.

16 Q    Right.  And 3M doesn't defend the earplug litigation in-

17 house, does it?

18 A    It uses outside counsel.

19 Q    Right.  And there's a large number of lawyers involved on

20 the defense side in the earplug litigation.  Is that a fair

21 statement?

22 A    I'm sure there is, but 3M also manages that internally.

23 Q    Okay.  We also talked or you also talked in response to

24 your counsel's questions about the insurance individuals, and I

25 believe -- at 3M -- who provide shared services to the debtors.

Castellano - Cross/Pfister                    194

1  And I believe you mentioned in particular a gentleman named
2  Chris Sullivan, who will be testifying in this proceeding, and
3  an individual named JoAnn Suping (phonetic).  Is that right?
4  A    Correct.
5  Q    Okay.  Do you have any idea how much of Mr. Sullivan's
6  time is spent in connection with 3M's defense of the MDL?
7  A    No, I don't.  Again, I would characterize it similar to
8  what I did on the legal side, that you know, this is someone
9  that is very familiar with insurance policies and there would
10 be a distraction if the MDL -- or if the litigation against 3M
11 continued.  That would prohibit him and JoAnn from providing
12 assistance to the debtors.
13 Q    Well, hold on.  That was a little bit different now,
14 because you said a distraction and then you said that would
15 prohibit them from providing assistance to the debtors.  Is
16 that what you meant?
17 A    A distraction.
18 Q    Right.  It would distract them.  It wouldn't prohibit
19 them.
20 A    Fair point, yes.
21 Q    Okay, because in fact, the litigation has been going on
22 for -- it went on for two and a half months before bankruptcy,
23 and Mr. Sullivan and Ms. Suping were in fact able to help the
24 debtors in their shared services, right?
25 A    Yes, they were.

Castellano - Cross/Pfister                    195

1  Q    Okay.  So that it certainly would not prohibit them from

2  helping the debtors.  At most, what you're testifying to is

3  that it would distract them, right?

4  A    That's right.

5  Q    Now, can you tell me whether there are any other people in

6  the insurance department of the $35 billion 3M conglomerate who

7  might be able to sub in for Mr. Sullivan or -- and/or Ms.

8  Suping in helping the debtors?

9  A    Yeah.  I don't know who would have knowledge of the

10  insurance policies as those two individuals do.

11  Q    So it might -- in your judgment it might just actually

12  just be those two?

13  A    I don't know if there's -- if there are others.

14  Q    Okay.  I mean, it's possible, right, that Mr. Sullivan or

15  Ms. Suping could leave 3M, right?  They could get jobs

16  somewhere else?

17  A    Anyone can get a job anywhere else, I guess, yes.

18  Q    Okay.  Would that hinder the debtors' reorganization

19  efforts?

20  A    Well, someone has institutional knowledge and they left an

21  organization, yeah, I do think that that can hinder an

22  organization.

23  Q    And that's really the same nature of the hindrance, right,

24  that you're testifying about today, isn't it?  It's the same

25  hindrance that it would be if these folks just moved on or

Castellano - Cross/Pfister                    196

1   retired or, you know, something like that, right?

2              MR. McKANE:  Objection, form, it's compound.  Again,

3   I don't know which question he wants.

4              THE COURT:  Well, we're getting close to relevance

5   here, too.

6              MR. McKANE:  Yeah.  Your Honor, I apologize.  We've

7   been going for like an hour and 15 minutes.  Is there an

8   opportunity where we could potentially take a five-minute

9   break?

10             MR. PFISTER:  I am please to take a break right now,

11  because I'm actually almost finished, and this would be helpful

12  because then I can confer with my colleagues.

13             THE COURT:  All right.  Well, you've been a lot

14  braver this morning when you didn't want to say when we

15  stopped.  All right.  It is 2:51.  Why don't we go ahead and

16  reconvene at 3:00 o'clock.

17             MR. McKANE:  Thank you, Your Honor.

18                 (Recess at 2:51 p.m., until 3:00 p.m.)

19             THE COURT:  I kind of thought I'd see more people

20  frantically running for the courtroom when I walked by them,

21  but I guess not.

22             THE CLERK:  No.  I'm just being comfier with late.

23             THE COURT:  You're pretty early for you.  I give you

24  credit on that.  All right.

25             MR. PFISTER:  Okay.  And just for timing purposes,

Castellano - Cross/Pfister                    197

1  Your Honor, I am nearly finished.  Just a few more questions.

2           THE COURT:  Back on the record.

3           MR. PFISTER:  I'm sorry.  Apologize.

4           THE COURT:  So you know, got to make it official.

5           All right.  We're back on the record on case

6  number -- adversary -- excuse me -- No. 22-50059.  Before you

7  jump into what you were about to say, I do have to remind you,

8  because I am borrowing a courtroom I am bound by their own

9  rules, which is why you don't see a nice coffee cup with me,

10 drinking to remain caffeinated, and we also have to leave by

11 5:00.

12          So I just want to remind you that of now, because

13 about 4:50 I'll start getting nervous that we have to vacate.

14          MR. McKANE:  Your Honor --

15          THE COURT:  Remember to push the button.

16          MR. McKANE:  Thank you for the reminder, Your Honor.

17 With regard to that timing, you know, at the lunch break the

18 courtroom was locked.  Will it be -- is that also the situation

19 at 5:00 o'clock for the evening, or should we extract any

20 electronic equipment?

21          THE CLERK:  I generally lock it at 5:00.

22          THE COURT:  Well, I would.  I was -- if you have

23 laptops or something, take them with you.

24          MR. McKANE:  Out of an abundance of caution.  Okay.

25          THE COURT:  Because if you don't, that's when they

1  disappear.  As far as the ever exciting boxes of paper,

2  generally speaking, no one steals boxes of paper.  So I think

3  you're going to be okay there, but if you have phones, laptops,

4  anything that might be sold by, you know, a desperate federal

5  judge or an employee, on eBay, don't leave it here.

6                        (Laughter)

7            MR. McKANE:  All right.  Thank you, Your Honor.

8            THE COURT:  All right.  And they are going to lock

9  it, right, Heather?

10           THE CLERK:  Yes.  Yes, they are.

11           THE COURT:  Excellent.  Okay.

12           THE CLERK:  They store it in our courtroom well, as

13 well.

14           THE COURT:  Well, we can store things in my

15 courtroom, which I can control better, but again, I would not

16 leave anything electronic behind.  All right.  That being said,

17 Mr. Pfister, you may ask these last couple questions in this

18 short closeup, which allegedly is going to happen.

19           MR. PFISTER:  It is, Your Honor.  I promise.

20           THE COURT:  And you're a lawyer, so I assume short

21 means two hours or less.

22                        (Laughter)

23           MR. PFISTER:  I promise, it will not be -- not be

24 long.

25           THE COURT:  And you may continue.  I just remind you,

Castellano - Cross/Pfister                    199

1  you are still under oath.

2            THE WITNESS:  Yes.

3            THE COURT:  All right.  Go ahead.

4            MR. PFISTER:  Thank you, sir.

5                 CROSS-EXAMINATION RESUMED

6  BY MR. PFISTER:

7  Q    Do you have Exhibit 20 in front of you, Mr. Castellano?

8  It is one of the limited liability company agreements that you

9  looked at on your direct.  And in particular, it's the one with

10 3M Occupational Safety, LLC.

11 A    Yes, I have it in front of me.

12 Q    Okay.  And do you see on the cover page there that 3M

13 Occupational Safety, LLC, is called the company?

14 A    Correct.

15 Q    And that 3M Company, as its sole equity member is called

16 the member?

17 A    Yes, I see that.

18 Q    And the provisions in particular that you looked at with

19 your counsel on direct examination were in section 20 of this

20 document, and identical provisions were in the other documents.

21 Do you recall that?

22 A    Yes, I do.

23 Q    Okay.  Now, looking at 20A, because that's where the

24 definition of the term "covered persons" is, right?  Yeah,

25 right.  Right.

Castellano - Cross/Pfister                    200

1  A    Yes.

2  Q    Okay.  And so the covered persons -- and let me just

3  preface this by saying, you didn't have any role in drafting

4  this agreement -- this operating agreement, right?

5  A    Correct.

6  Q    You're just interpreting this document, both in response

7  to my questions and in response to your counsel's questions,

8  just based on your experiences as a restructuring professional,

9  right?

10 A    Correct.

11 Q    Not any special legal knowledge, right?

12 A    Correct.

13 Q    Okay.  So the definition of covered persons is -- is

14 there.  Do you see that?

15 A    I do.

16 Q    And in response to your counsel's questions about

17 indemnity you were focused in section 20B on whether a covered

18 person is entitled to indemnification from the company.  Is

19 that right?

20 A    Correct.

21 Q    Okay.  So I want to direct you to a few provisions of

22 section 20B and whether a covered person is ever entitled to

23 indemnification from the company, and this is just in the

24 nature of following up on your counsel's questions.  Now,

25 first, the indemnity, would you agree with me that at least

Castellano - Cross/Pfister                    201

1  based on the words on the page here, the indemnity is "for any

2  act or omission performed or omitted by such covered person in

3  good faith."  Do you see that?

4  A    Yes, I see that.

5  Q    Okay.  So it has to be, "any act or omission performed or

6  omitted by such covered person in good faith on behalf of the

7  company."  Do you see that?

8  A    Yes.

9  Q    Okay.  And it has to be -- there's a proviso there about,

10 "except that no covered person is entitled to be indemnified in

11 respect of loss by such person's bad faith or willful

12 misconduct."  Do you see that, too?

13 A    I do.

14 Q    Okay.  This provision is in a LLC agreement from 2013,

15 right?

16 A    Correct.

17 Q    So in order -- in your judgment, not as a legal matter,

18 but just -- again, just picking up on testimony that you gave

19 in response to your counsel, this would have to cover -- in

20 order to be in respect of the MDL it would have to be based on

21 acts or omissions in good faith that were performed on behalf

22 of the company, so the debtors here, and not on behalf of 3M.

23 Would you agree with me there?

24 A    If you're asking if it says on behalf of the company, that

25 is what section 20B references.

Castellano - Cross/Pfister                    202

1  Q    Okay.  I'm asking a little more.  Let me try it this way.

2  The acts or omissions to be indemnified, if they were acts on

3  behalf of 3M and not on behalf of Aearo, those would not be

4  entitled to indemnification.  Isn't that right?

5           MR. McKANE:  Objection to form.  If he would rephrase

6  it as his understanding, I think he could resolve the

7  objection.

8           MR. PFISTER:  As long as we can agree that the

9  testimony on direct was based on his understanding, I'll -- I'd

10 certainly rephrase to that, Your Honor.

11          THE COURT:  I mean, I think that's all he can testify

12 to.  So that's fine.

13          MR. PFISTER:  Okay.

14 BY MR. PFISTER:

15 Q    So let me try it that way, sir.  Based on your

16 understanding of section 20B -- section 20, rather, of the 2013

17 indemnification provisions in the 2013 LLC agreements, acts or

18 omissions on behalf of 3M would not be entitled to

19 indemnification, correct?

20 A    Yeah.  I mean, company is defined as, in this particular

21 instance, 3M Occupational Safety, LLC.  So I think what this is

22 saying here is, in good faith on behalf of the company as a

23 defined term as in the beginning of the document.

24 Q    Right.  So 3M Occupational Safety, LLC, that's one of the

25 debtors, right?

Castellano - Cross/Pfister                    203

1  A    Correct.

2  Q    Okay.  So that's not 3M Company, right?

3  A    Correct.

4  Q    Okay.  So 3M Company is the one for which relief is being

5  sought today, right?

6  A    Relief is being sought today for 3M, the company.

7  Q    Right.  But 3M Occupational Safety, LLC, as a debtor,

8  that's an entity protected by the automatic stay, right?

9  A    Correct.

10 Q    Okay.  So my question is, under your understanding of this

11 indemnification provision, if there are acts or omissions on

12 behalf of 3M Company, those would not be entitled to

13 indemnification under this provision, right?

14 A    Yeah.  Look, I can only tell you what the words say on

15 this page here as it relates to acts or omissions on behalf of

16 the company, being 3M Occupational Safety, LLC.

17 Q    Yep.  No, I'm with you there.  I just want to make it

18 really clear that you're not saying -- or let me do it not in a

19 double negative.  I just want to be very clear that under your

20 understanding of this document, acts or omissions on behalf of

21 3M Company are not entitled to indemnification?

22 A    Yeah.  This is referencing the company, not 3M.

23 Q    Shall we try third time's a charm?  I want to be

24 absolutely clear that under your understanding of this

25 provision --

Castellano - Cross/Pfister                    204

1          MR. McKANE:  Objection, Your Honor.  The third -- the

2    start of the answer to that question was, yeah, this is

3    referencing the company, not 3M.  Anything beyond that is asked

4    and answered.

5          THE COURT:  Well, and ultimately, aren't we going to

6    get to the point where the document speaks for itself and I'm

7    going to have to interpret what it means anyway?

8          MR. PFISTER:  I think we are.  I just want to be very

9    clear, both -- if the debtors -- it's the witness's

10   understanding and it's also the fact that he didn't include it

11   in the first day declaration, I think this is an issue solely

12   as a result of the line of questioning on direct.

13          And I just want to make sure the witness's

14   understanding is, is that acts or omissions on behalf of 3M

15   Company are not entitled to indemnification.  That's my

16   question.

17          THE COURT:  Well, I think yes, but boy, isn't that

18   nice and clear.  Would you like to answer that question?

19          THE WITNESS:  I'm not sure which question it was

20   right then.

21                         (Laughter)

22          THE COURT:  We were doing so well.  Can you rephrase

23   that how you just did the last time, specifically saying 3M.

24          MR. PFISTER:  I will try -- I will try and repeat it

25   exactly.

Castellano - Cross/Pfister                    205

1          THE COURT:  Okay.

2   BY MR. PFISTER:

3   Q    I want to be clear, under your understanding of this

4   document, acts or omissions on behalf of 3M Company are not

5   entitled to indemnification?

6   A    And again, I will say, acts or omissions on behalf of the

7   company as defined in this document, referencing 3M

8   Occupational Safety, LLC.  That's my understanding of this --

9   of this section.

10  Q    Okay.  I think -- I think that's clear enough that the

11  witness is saying that 3M Company, acts or omissions on behalf

12  of 3M Company as opposed to somebody else would not be entitled

13  to indemnification.  So I'm not going to keep harping on it.

14  And then finally, you agree with me, don't you, that the

15  provision doesn't apply to any willful misconduct, right?

16  A    That's correct.

17  Q    And you agree with me, don't you, that the indemnity is,

18  "provided out of and to the extent of the company's assets"?

19          THE COURT:  I'm sorry.  Where are you reading?

20          MR. PFISTER:  Oh.  It's from section 20B.  It's the

21  last proviso.

22          THE WITNESS:  Yes.  And what was your question?  I'm

23  sorry.

24  BY MR. PFISTER:

25  Q    My question was -- so let me just read the proviso so

Castellano - Cross/Pfister                206

1  we're all together.  It's, "Provided, however, that any
2  indemnity under this section 20 by the company shall be
3  provided out of and to the extent of company assets only, and
4  the members shall not have personal liability on account
5  thereof."
6       So that's the proviso I was directing your attention to
7  and I'm just asking you to confirm with me that it's your
8  understanding that the indemnity provided under section 20 is
9  only provided out of and to the extent of the company's assets?
10 A    I'll agree that that's what those words say.
11 Q    And you don't have any reason to believe that those words
12 mean anything other than what they say, do you?
13 A    I believe the words are what they say in this -- in this
14 document.
15 Q    Okay.
16          MR. PFISTER:  I don't have further questions at this
17 time, Your Honor.
18          THE COURT:  All right.  Before I ask for redirect I
19 will give an opportunity to those parties who have filed
20 objections if they believe that they have any additional cross-
21 examination of Mr. Castellano.  Some ill time shifting in
22 chairs; I may have got nervous there.  So is that no one has
23 additional questions for this witness?
24          MR. GLASSER:  No on behalf of Bailey and Glasser,
25 Your Honor.

 1          THE COURT:  Thank you.

 2          MR. GLASSER:  I'm Brian Glasser.

 3          THE COURT:  Thank you.

 4          All right.  I'm going to take the absent of a yes as

 5  a no.  You may do redirect, if you so desire.

 6          MR. McKANE:  Thank you, Your Honor.  And for the

 7  record, again, it's Mark McKane, Kirkland and Ellis, proposed

 8  counsel to the debtors.  I have very few questions on redirect.

 9                     REDIRECT EXAMINATION

10  BY MR. McKANE:

11  Q    Mr. Castellano, you were asked a whole variety of

12  questions.  But one of the things I want to establish, you were

13  asked, what is the purpose of these Chapter 11 cases.  And I

14  just want to make clear for the record, you know, what is your

15  -- what are you -- what are the debtors trying to achieve with

16  these Chapter 11 cases?

17  A    The debtors are trying to achieve bringing a global

18  resolution to all of the claims that it's facing, with the

19  intent of reaching an equitable and efficient solution, using

20  the tools available to it in Chapter 11.  The debtors want to

21  see finality to the contingent obligations that it's facing.

22  Q    And sir, is the resolution of those contingent liabilities

23  a necessary predicate for the debtors to be able to reorganize?

24  A    Yes, it is.

25  Q    Sir, just briefly, what has been previously marked and

Castellano - Redirect/McKane                    208

1    covered in your cross in Exhibit 144, and that same page 65 of
2    74.
3              MR. McKANE:  We could put that up on the screen.
4              THE WITNESS:  Yes, I see that.
5    BY MR. McKANE:
6    Q    Sir, the -- is the balance on the left-hand side, you were
7    asked a series of questions about that?
8    A    Correct.
9    Q    All right.  Sir, is this balance sheet stagnant?
10   A    Well, these transactions are stagnant.
11   Q    Right.  Right.  What does this show?
12   A    This shows the journal entries that were recorded January
13   of 2010 to reflect the transfer of this division within Aearo
14   to a division within 3M.
15   Q    And when -- sir, when you referenced the business being
16   transferred, was it the business entity?  Was it a corp that
17   was transferred or was it assets and liabilities?
18   A    These are assets and liabilities.
19   Q    And with regard to these specific assets and liabilities,
20   I want to direct your attention to the liabilities at the
21   bottom half?
22   A    Right.  Yes, I see that.
23   Q    What -- are these the balance -- excuse me.  Strike that.
24   Were these the liabilities that had been previously recorded
25   and specifically entered in the Aearo balance sheets?

1  A     As of January of 2010.

2  Q     And were there any tort liabilities on the Aearo balance

3  sheets at that time?

4  A     There were not.

5  Q     All right.  And sir, you were asked about your first day

6  declaration.  You recall that?

7  A     Correct.

8  Q     Right.  Does the debtors have an obligation to file

9  statements of financial affairs?

10  A     Yes, we do.

11  Q     Right.  Is this the type of accounting entries that would

12  be recorded and -- and reported in the statements of financial

13  affairs?

14  A     Yeah.  The balance -- the intercompany balances will be on

15  the statement of financial affairs and it will also be on the

16  monthly operating report, because we have to provide a balance

17  sheet, which these balances will be reflected.

18          MR. McKANE:  Your Honor, I have no further questions.

19          THE COURT:  All right.  Any recross based upon those

20  brief questions?

21          MR. PFISTER:  I have just one question, Your Honor.

22          THE COURT:  Okay.  You may come forward.

23                    RECROSS EXAMINATION

24  BY MR. PFISTER:

25  Q     Sir, if a court determines that 3M is solely liable for

1   all of the earplug liabilities, that would achieve a global

2   resolution from the debtors' perspective.  Isn't that right?

3   A    I'm sorry.  One more time, please.

4   Q    Sure.  If a court determined that 3M is solely liable for

5   all of the earplug liabilities, that would achieve the global

6   resolution that you testified the debtors are seeking, correct?

7   A    Again, that's -- you're asking me to speculate in terms of

8   what may happen here.  I'm still not sure I'm following the

9   question.

10  Q    Okay.  Your counsel asked you some redirect questions

11  about what the purpose of the Chapter 11 is, and you gave

12  testimony about what the debtors' intent is, and it's about a

13  global resolution.  You with me there?

14  A    Yes.

15  Q    Okay.  And my question is, if a court determines that 3M

16  and not the debtors, 3M is solely liable for all of the earplug

17  liabilities, that is a global resolution from the debtors'

18  perspective, right?

19  A    Again, I don't know what implication that would have as it

20  relates to the funding agreement and the indemnification that

21  the Aearo companies are providing.  Again, I'm not sure I know

22  what -- what question you're asking me.

23           MR. PFISTER:  I'm -- I won't press the issue further,

24  Your Honor.  Thank you.

25           MR. GLASSER:  Your Honor, I have redirect on the

211

1  point raised.

2          THE COURT:  All right.  Understanding you didn't

3  do --

4          MR. McKANE:  Objection, Your Honor.  I

5          THE COURT:  -- you didn't really do --

6          MR. GLASSER:  It's on the exact point raised by the

7  redirect.  There was nothing to add to our cross, but he raised

8  a point.

9          THE COURT:  How many questions are you going to ask?

10 Let me ask that.

11         MR. GLASSER:  It's about four questions on two

12 issues.  It will be under five minutes.

13         MR. McKANE:  Object -- Your Honor, I object to

14 someone doing a recross when they haven't done any cross, and

15 they released their rights to cross when specifically asked.

16         THE COURT:  It is a bit odd that you're trying to do

17 recross when you didn't do cross.  Isn't this something you

18 could ask other counsel who --

19         MR. GLASSER:  Your Honor, I didn't -- I didn't do it

20 because it was adequate -- he brought up a brand new issue,

21 whether it's static.  He basically said -- he basically --

22         THE COURT:  I don't really know if that's new.

23         MR. GLASSER:  Five minutes, Your Honor.

24         THE COURT:  And who do you represent?

25         MR. GLASSER:  Bailey and Glasser.  We object on -- we

212

1  object -- we filed an objection.

2          THE COURT:  All right.  You get a brief chance, and

3  if this goes off the rails -- well, I'm just going to say going

4  forward, if you don't have cross going forward, then you don't

5  get recross.

6          MR. GLASSER:  Okay.  Thank you.

7          THE COURT:  But you are an objecting party.  That's

8  true.  And you could have stood up and said, Your Honor, this

9  is beyond the scope of direct.  You shouldn't be getting into

10 this, but you didn't.

11         MR. GLASSER:  It wasn't, Your Honor, beyond the scope

12 of direct.

13         THE COURT:  It is -- it is -- okay.  You're going to

14 get your five questions.  Going forward, if you don't somehow

15 either do or preserve the right to cross, you don't get to jump

16 up and do recross because something caught your eye.

17         MR. GLASSER:  Okay.

18         THE COURT:  Okay.  This was the whole specific reason

19 I wanted -- I can't -- I know there's a lot of tort claimants

20 here, and I understand that some of you filed objections.  So

21 that gives you additional rights, but at the end of the day, if

22 each of you want to do cross or recross, I'm never going to

23 finish this and we're going to be having wave three of trials

24 before I get to the end.

25         MR. GLASSER:  Okay.

1          THE COURT:  So as a part of judicial economy, that's

2    why I'm trying to do this.  So get your five questions in and

3    state your name for the record, not just who you represent.

4    And understand going forward, I will look very dimly upon this

5    going forward unless we have the shocking gasp from the

6    courtroom and something comes up.  But absent that, this isn't

7    going to happen again.

8          MR. GLASSER:  Yes.

9          THE COURT:  So shoot your shot now.

10          MR. GLASSER:  Okay.  Brian Glasser, on behalf of the

11   Bailey and Glasser objection.

12          THE COURT:  Thank you.

13                      RECROSS EXAMINATION

14   BY MR. GLASSER:

15   Q    When counsel stood up and asked about the lack of -- that

16   the balance sheet is static, you also looked at the income

17   statements.  Isn't that correct, sir, in your diligence of

18   Aearo and 3M during the 12-year period after 2010?

19   A    I did look at an income statement.  That's correct.

20   Q    And when you testified that there were no charge backs

21   with respect to the $9.1 million Qui Tam settlement, the $347

22   million in defense costs -- that was true based on your review

23   of the income statements, as well, isn't that a fact?

24   A    Well, the income statements didn't have those charges in

25   there.  I wasn't even aware there was a Qui Tam settlement.

Castellano - Recross/Glasser                    214

1  Q    Okay.  So, therefore, neither on the static balance sheet

2  nor on the active income statement were there charge backs from

3  3M on account of tort liability during the 12 years after 2010

4  that you ever saw, isn't that true?

5  A    I'm sorry, can you just break that down for me, please?

6  Q    Yes.  During the 12 years subsequent to the 2010

7  transaction, you saw no charge backs on either the balance

8  statement or income statements, correct?

9  A    Charge back would have flowed through the income statement

10  so I have not seen that on the income statement.

11           MR. GLASSER:  No further questions, Your Honor.

12           THE COURT:  All right.  Any redirect based upon

13  recross?

14           MR. McKANE:  There's no re, re, re but, Your Honor,

15  could we ask that Mr. Castellano be released?  He actually has

16  to testify tomorrow in another court.

17           THE COURT:  Well, I think we are done we are done at

18  this point.  Let me ask you this.  Has anyone subpoenaed him to

19  testify --

20           MR. McKANE:  No.

21           THE COURT:  -- other than yourself?

22           MR. McKANE:  Your Honor, I think as an officer, I

23  mean, they have all reserved the right to examine him, meaning,

24  like, just generally any witness on any person's list.

25           THE COURT:  Right.

1            MR. McKANE:  All I'm asking is that he be released

2   from the courtroom today so he can go to that court to testify.

3            THE COURT:  Okay.  That's fine.

4            Any objection to Mr. Castellano being released from

5   the courtroom?

6            MR. McKANE:  Yeah, yeah -- sorry, I apologize, Your

7   Honor.  I didn't mean to speak over you.  To be absolute

8   clear, he's not leaving the city or the state.  He's simply

9   just leaving the courtroom.

10           THE COURT:  Okay.

11                         (Laughter)

12           THE COURT:  If you leave the city limits of

13  Indianapolis --

14                         (Laughter)

15           UNIDENTIFIED ATTORNEY:  Your Honor, we have no

16  further questions for the witness so I think he's done.

17           THE COURT:  Okay.  All right.  I know everyone

18  reserved the right to recall witnesses in rebuttal and that

19  stuff.  Is he available should that happen tomorrow?  When does

20  the testifying occur?

21           MR. McKANE:  In the morning?

22           THE WITNESS:  It's going to start in the morning.

23  It's a contested confirmation hearing, Your Honor.  I can't

24  predict how long that may take.

25           THE COURT:  Well, I mean, my cases all go fast.  I

1 don't know how long yours will go but -- that's fine.  It is

2 what it is.

3           MR. McKANE:  Your Honor, to be fair, we are not on

4 the pace that we had hoped to be on.

5           THE COURT:  I understand.

6           MR. McKANE:  All right.

7           THE COURT:  I think we may all agree on that one

8 single point.  So, all right, he may be excused and he may

9 leave the courtroom.  Please leave all exhibits on the witness

10 stand as they are the official court exhibits.  Thank you.

11          MR. McKANE:  All right.  Your Honor, I'd cede the

12 podium to my partner, Mr. Brent Rogers.

13          THE COURT:  All right.

14                    (Technical difficulties)

15          THE COURT:  All right.  You may proceed.  Please

16 state your name.

17          MR. ROGERS:  Your Honor, thank you.  Good afternoon.

18 Brent Rogers from Kirkland and Ellis, proposed counsel for the

19 debtors.

20          Your Honor, the debtors call Mr. Chris Sullivan.

21          THE COURT:  All right.  Come forward.  Please raise

22 your right hand.

23               CHRIS  SULLIVAN, WITNESS, SWORN

24          MR. ROGERS:  Good afternoon, Mr. Sullivan.

25          THE WITNESS:  Good afternoon.

1          MR. ROGERS:  Would you please introduce yourself to

2    the Judge?

3          THE WITNESS:  Yes, hi, Judge.  I'm Chris Sullivan,

4    vice-president of insurance at 3M.

5          THE COURT:  Thank you.

6                    DIRECT EXAMINATION

7    BY MR. ROGERS:

8    Q    And what do you do as vice-president of insurance at 3M,

9    Mr. Sullivan?

10   A    I develop and execute the strategies around global

11   property and casualty insurance for the company.

12   Q    Who do you report to at 3M?

13   A    Sarah Grauze, SVP and treasurer.

14   Q    Do you have a big team, sir?

15   A    Fairly small team, including me, four -- a total of four.

16   Q    Who are the other people on your team in the insurance

17   department at 3M?

18   A    Susan Broin is the claims manager for the insurance

19   department.  Shelley Darst is a insurance analyst.  And we have

20   a new member joining the team today who will manage global

21   insurance.

22   Q    Does your team, besides being employed -- you're an

23   Employee of 3M, is that correct?

24   A    That's correct.

25   Q    And do you also have responsibilities with respect to 3M

Sullivan - Direct/Rogers                    218

1  subsidiaries?

2  A    Yes.

3  Q    What kinds of responsibilities do you have in the

4  insurance space with respect to 3M subsidiaries?

5  A    Yeah, we interact with subsidiaries and divisions and

6  different business groups in helping them assess their risk and

7  make sure we have appropriate coverages in place.  We help them

8  with contractual risk management and a variety of other areas

9  as well.

10 Q    Do you provide services to Aearo, the Aearo subsidiaries

11 that are the debtors in this case?

12 A    Yes.

13 Q    Let's take a moment to describe your background in

14 insurance, generally.  How long have you been working in the

15 insurance base?

16 A    Approximately 18 years.

17 Q    Okay.  And can you give us at a very high level -- walk us

18 through your experience in insurance?

19 A    Sure.  Going backwards in time, prior to joining 3M, I was

20 at Swiss Re Corporate Solutions which is the commercial

21 insurance division of the Swiss Re group.  I was there for

22 approximately six years.

23        Prior to Swiss Re, I was at Ascendant Company which

24 is a wholesale distributor of business essential products, a

25 Fortune 500 Company, serving as their corporate risk manager.

Sullivan - Direct/Rogers                              219

1           And prior to Ascendent, I was at Marsh in the

2   commercial insurance brokerage base as a client executive

3   helping clients navigate risk issues and place appropriate

4   insurance coverages.

5   Q    Do you hold any certifications in insurance?

6   A    Yeah, I have three certifications.  The first is the

7   Chartered Property and Casualty Underwriter Certification.

8   That goes by CPCU.  The second is Associate in Risk Management.

9   That goes by ARM.  And the third is Associate in Re-Insurance

10  which is ARE.

11  Q    Okay.  I want to shift our attention to the issues that

12  we're talking about here today, Mr. Sullivan.  Are you familiar

13  with the litigation relating to the Combat Arms Earplug?

14  A    Yes, I am.

15  Q    Do you play any role on the insurance side with regard to

16  that litigation?

17  A    Absolutely.

18  Q    What's your general role with respect to the Combat Arms

19  litigation?

20  A    Well, a number of different areas with respect to the

21  Combat Arms litigation.  One would be sharing information with

22  carriers -- and there's many of them, around legal developments

23  in the underlying litigation -- things of that nature.

24           Others is interacting with carriers -- non-claims

25  personnel from carriers, such as, underwriters or leadership

Sullivan - Direct/Rogers                                    220

1  carriers to keep them apprised of developments as well.

2  Q    Why are you interacting with carriers about the Combat

3  Arms litigation?

4  A    Because they have quite a lot of limits at stake.

5  Q    What do you mean by that?

6  A    Well, many carriers participate on two different insurance

7  programs that are applicable to the Combat Arms litigation.

8  And that's a lot of constituents to manage and keep apprised of

9  developments.

10 Q    What are the two different insurance programs relating to

11 the Combat Arms litigation?

12 A    There's one that we refer to as the 3M tower.  That's a

13 2018, 2019 policy year.  And another that we refer to as the

14 Aearo legacy program which spanned from 1997 through 2008.

15 Q    And you mentioned that there are a lot of carriers

16 involved with regard to the Combat Arms litigation.  Can you

17 give us a ball park figure of how many carriers you interact

18 with regarding the litigation?

19 A    Many, many dozens.

20 Q    Now, you mentioned two separate sets of policies. And I

21 think the first one you mentioned was a 3M 2018/2019 tower, is

22 that right?

23 A    That's correct.

24 Q    Okay.  Let's talk about that tower first.  Why is it

25 called an insurance tower?

1 A    It's referred to as a tower because it is built in layers
2 where carriers participate excess over carries under them
3 attaching at lower limits.  And it's built in layers in that
4 way until you reach the requisite limits you're seeking or you
5 can buy in the market.
6 Q    And at a high level, what are the key features of the 3M
7 2018/2019 tower?
8 A    The key features are it is an integrated occurrence or
9 Bermuda form which allows 3M to notice a claim of occurrence in
10 that policy year and that policy limit, retentions, policy
11 terms and conditions would apply for that single year.
12 Q    What are the total policy limits available in the 3M
13 2018/209 tower?
14 A    1.05 billion.
15 Q    And how much of that is still available today?
16 A    The full limits.
17 Q    All right.  I want to talk about the tower -- let me hand
18 you first what's been previously marked as Debtor's Exhibit 1.
19        MR. ROGERS:  Your Honor, may I freely move about?
20        THE COURT:  Oh, that's a new one.  Yes.
21                    (Laughter)
22        THE COURT:  Like Southwest Airlines.
23        MR. ROGERS:  My apologies, Your Honor.  I've been
24 watching on the Zoom, but I haven't been paying close attention
25 to who else needs copies of this.

Sullivan - Direct/Rogers                     222

1          THE COURT:  The young lady on the right there who's

2   my staff attorney, and then the other side gets one, too.

3   Seems fair.

4   Q    Mr. Sullivan, I just handed you what's been marked as

5   Exhibit Number 1.  Do you recognize it?

6   A    Yes, I do.

7   Q    What is it?

8   A    It's the Two Harbors insurance company policy issued to 3M

9   company.

10  Q    And what's the relationship between the Two Harbors

11  insurance company policy and the 3M tower that we've been

12  talking about?

13  A    Two Harbors insurance policy -- the 3M tower, the simplest

14  way to put it is the 3M tower is largely reinsuring the Two

15  Harbors insurance company policy.

16          MR. ROGERS:  Your Honor, I move to admit Exhibit

17  Number 1 into evidence.

18          THE COURT:  Any objections to the admission of what

19  has been designated Exhibit 1?

20          UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

21          THE COURT:  All right.  Hearing that and seeing no

22  other objections, Exhibit 1 is admitted.

23          (Debtor's Exhibit 1 admitted into evidence)

24          MR. ROGERS:  May I display the exhibit, Your Honor?

25          THE COURT:  You may.

Sullivan - Direct/Rogers                    223

1  Q    Let's look at the first page of the Two Harbors policy,

2  Exhibit Number 1, Mr. Sullivan, who is the named insured on the

3  policy?

4  A    3M Company.

5  Q    Now, is 3M Company the only named insured on this policy?

6  A    3M Company would encompass a broad definition for a named

7  insured, including entities, subsidiaries, affiliates, et

8  cetera.

9  Q    Let's turn to Page 38 of the policy.  And we're looking

10 here at Endorsement 22, do you see that, sir?

11 A    Yes, I have that here, yeah.

12 Q    What is an endorsement to an insurance policy?

13 A    An endorsement amends an insurance policy in some way.

14 Q    How does Endorsement Number 22 amend the Two Harbors

15 policy?

16 A    This policy adds Aearo Technologies, Inc. as an additional

17 named insured.

18 Q    So, are both 3M and Aearo Technologies, Inc. named

19 insureds on the Two Harbors policy?

20 A    Yes.

21 Q    Let's go back to the first page of the Tow Harbors policy.

22 There's a section there, Item 2.  What does Item 2 tell us

23 about the policy?

24 A    Item 2 lists the per occurrence limit that I referred to

25 earlier of $1.05 billion.

1  Q    Okay.  And it says there defense costs inclusive.  What

2  does that mean?

3  A    That means defense costs erode the limit available.

4  Q    If you look a little bit farther down in Item 2, it says

5  per occurrence retention.  And below that it says per

6  occurrence self-insured retention.  And both of those are 25

7  million.  Do you see those?

8  A    That's correct.

9  Q    What's the per occurrence retention in self-insured

10 retention?

11 A    The per occurrence retention we can refer to it, well,

12 it's referred to as -- in the second line as a per occurrence

13 self-insured retention.  That is the amount that needs to be

14 satisfied in order to access the limits of the 3M tower.

15 Q    And how is the per occurrence self-insured retention

16 satisfied under the Two Harbors policy?

17 A    Through paid judgments and settlements only.

18 Q    What about defense costs?  Does that satisfy the self-

19 insured retention?

20 A    They do not.

21 Q    So, if I'm understanding correctly, does 3M or Aearo need

22 to pay at least $25 million in settlements or judgments before

23 the self-insured retention is satisfied?

24 A    Yes, they do.

25 Q    And once the self-insured retention is satisfied, what

1  kinds of costs and expenses are covered by Two Harbors policy?

2  A    Well, defense costs would be -- defense costs, legal

3  expenses would be one.  Settlement and other judgments, paid

4  judgments, verdicts, would be another main category.

5  Q    Let's turn to Page 56 of the Two Harbors policy, please.

6  And call out the coverage section.

7  A    Okay.

8  Q    Looking at the coverage section of the Two Harbors policy,

9  can you tell us what type of coverage this policy generally

10  provides?

11  A    Under damages it provides coverages for personal injury

12  which include bodily injury, property damage or advertising

13  liability.

14  Q    Is it your understanding that the Combat Arms litigation

15  involved personal injury claims?

16  A    Yes.

17        MR. ROGERS:  Okay.  I want to look at another

18  provision of the Two Harbors policy.  I believe it's the page

19  right before this, Mr. Young.

20  Q    And there's a notice there.  Do you see that?

21  A    Yes, I do.

22  Q    And I want to direct your attention, Mr. Sullivan, to the

23  second paragraph of the notice that begins coverage applies?

24  A    Yes.

25  Q    Can you explain to the Court what this provision of the

1  notice and the Two Harbors policy means?

2  A    This is a provision that states that only if notice of

3  occurrence, which I had described previously, is given to the

4  reinsured during the policy period does it apply.  And then the

5  first date in which that notice is given will govern the

6  applicable limits available, retentions, terms, conditions and

7  exclusions of the policy.

8  Q    What about for litigation like the Combat Arms litigation

9  where claims started being filed in one year and they continue

10 even today.  How is that handled under the Two Harbors policy?

11 A    All attributable claims in the future would relate back to

12 this policy -- in this policy of 2018 to 2019.

13 Q    And I think you said this but what is the policy period

14 for the Two Harbors policy?

15 A    March 1, 2018 to March 1, 2019.

16 Q    So, are claims that for which 3M and Aearo have given

17 notice within that policy period, those are the claims that

18 would be addressed by the Two Harbors policy?

19 A    Yes.

20 Q    If you turn to Page 4 of the Two Harbors policy, do you

21 see, Mr. Sullivan, there's a chart there titled schedule of

22 reinsurance participants?

23 A    Yes.

24 Q    What does that schedule represent?

25 A    This is a listing of all carriers that compose the 3M

Sullivan - Direct/Rogers                           227

1  tower and their various participations in layers of insurance.

2  Includes policy numbers and premium amounts as well.

3  Q    And have you helped us prepare a summary chart of the

4  policies in the Two Harbors tower?

5  A    Yes, I have.

6  Q    I'm going to hand you what's been previously marked as

7  Exhibit 248.

8  A    Thank you.

9  Q    Do you recognize Exhibit 248, Mr. Sullivan?

10  A    Yes, I do.

11  Q    What is it?

12  A    This is the listing of carriers and their --

13          THE COURT:  Can I have a copy?

14          MR. ROGERS:  My apologies, Your Honor.

15          THE COURT:  I mean, you didn't really remember

16  everyone else.

17                      (Laughter)

18          THE COURT:  Thank you very much.  I'm sorry to

19  interrupt.  Go ahead.

20  A    That's okay.  This is a listing of carriers that

21  participate on the 3M tower and the various layers and

22  participations that -- in which they are featured.

23  Q    And is this the chart that you helped prepare?

24  A    Yes.

25  Q    What did you do to help prepare this chart?

Sullivan - Direct/Rogers                          228

1  A    Verified the accuracy.

2  Q    And is the chart, Exhibit 248, true and accurate to the

3  best of your understanding?

4  A    Yes, it is.

5       MR. ROGERS:  Your Honor, I move to admit Exhibit 248

6  into evidence as a Rule 1006 exhibit.

7       THE COURT:  All right.  Any objection to the

8  admission of what has been designated Exhibit 248?

9       UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

10      THE COURT:  All right.  He said that.  I see no other

11 party objecting.  Exhibit 248 is admitted.

12      (Debtor's Exhibit 248 admitted into evidence)

13      MR. ROGERS:  Your Honor, as I said, Exhibit 248 is a

14 Rule 1006 exhibit.  We have all of the polices on our exhibit

15 list.  If Your Honor prefers to have those policies in the

16 record, as well, we're happy to move those in but we thought we

17 could save some paper by using a Rule 1006 instead.

18      THE COURT:  Well, let me ask this.  Will anyone

19 object to the use of the summary without the plethora of

20 insurance documents of which it is formed if I try to consider

21 it in the record or is there an objection to that?

22      UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

23      THE COURT:  Okay.  All right.  And I don't see any

24 objection.  He was trying to object -- he couldn't object, I

25 couldn't see him.  So, all right.  I think it's safe now that

Sullivan - Direct/Rogers                                    229

1  we have the summary, no one has objected to that summary not

2  containing the official policy so I think we can use that, at

3  least, as a summary of the policies under the 3M tower of

4  Exhibit 1.

5         MR. ROGERS:  Thank you, Your Honor.

6  Q   Mr. Sullivan, have you also helped us to prepare a more

7  graphical representation of the 3M tower?

8  A   Yes, I have.

9  Q   And would it help you in your testimony today for us to

10 show that graphical representation?

11 A   Yes, it would.

12        MR. ROGERS:  Can we pull up the graphic, Mr. Young?

13        Any objection to the publication of the graphic?

14        UNIDENTIFIED ATTORNEY:  Well, I'd like a copy to have

15 in my hand.

16        MR. ROGERS:  Sure.

17        THE COURT:  I wouldn't mind one either because it's

18 kind of small and if I'm really looking at the exhibit I won't

19 see what's going on.  So, if you have more than one?

20        Now, they're zooming in.  I can see better.

21        Thank you.

22 Q   Okay.  Mr. Sullivan, what is this graphic showing us?

23 A   This is a visual depiction of the carriers that constitute

24 the 3M tower.  And you could see here the layered effect that I

25 described to sort of form the tower itself.

Sullivan - Direct/Rogers                    230

1  Q    It looks a little bit like a layer cake going from top to

2  bottom is that right?

3  A    Yes.

4  Q    And at the very bottom there's sort of an orange-ish

5  looking layer, what is that?

6  A    That's the $25 million self-insured retention I described

7  earlier.

8  Q    Okay.  And if we look at the next layer above that, do you

9  see there's, it looks like three carriers there -- AIG Europe,

10  Ironshore and Star, is that right?

11  A    That's correct.

12  Q    Can you describe this layer in general terms for us?

13  A    Yes, this layer provides $75 million total above that $25

14  million self-insured retention.  And you could see AIG Europe

15  provided 65 million of that, Iron Shore 7.5 million and Star

16  7.5 million for that total.

17  Q    Now, we talked a little bit earlier about the self-insured

18  retention, the $25 million, right?

19  A    Yes.

20  Q    And I think you said that self-insured retention has not

21  been satisfied yet, correct?

22  A    That's correct.

23  Q    And why hasn't it been satisfied yet?

24  A    There haven't been any paid judgments or settlements.

25  Q    Are there outstanding verdicts against 3M and Aearo in the

Sullivan - Direct/Rogers                    231

1  Combat Arms litigation?

2  A    Yes.

3  Q    And do you have a general understanding of the magnitude

4  of those verdicts?

5  A    I believe the range is zero to approximately $77 million.

6  Q    And what about the total?  Do you have an understanding of

7  what the total magnitude of the verdicts might be?

8  A    Maybe around 300 million.

9  Q    What would happen if 3M were to pay more than $25 million

10 on those verdicts tomorrow?

11 A    We would satisfy the self-insured retention and seek

12 recovery from the tower.

13 Q    Now, we saw Aearo is a named insured on the Two Harbors

14 policy, right?

15 A    Correct.

16 Q    Is Aearo also a named insured on all of the excess

17 policies in the insurance tower?

18 A    Yes.

19 Q    Let's take a look at an example of one of those excess

20 policies.  Let me hand you what's been previously marked as

21 Exhibit 176.

22         MR. ROGERS:  This time I will remember one for the

23 Court.

24         THE COURT:  Thank you.

25 Q    Do you recognize Exhibit 176?

Sullivan - Direct/Rogers                    232

1  A    Yes.

2  Q    What is it?

3  A    This is a policy issued by Hamilton Rege (phonetic).

4  Q    Is it one of the policies in the 2018/2019 3M tower?

5  A    Yes, it is.

6         MR. ROGERS:  Your Honor, we move Exhibit 176 into

7  evidence.

8         THE COURT:  Any objection to the admission of 176?

9         UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

10         THE COURT:  All right.  Hearing that and seeing no

11  other objections, 176 is admitted.

12         (Debtor's Exhibit 176 admitted into evidence)

13         MR. ROGERS:  And may I display it please, Your Honor?

14         THE COURT:  You may.

15  Q    Let's look at Item 1 on the first page there, Mr.

16  Sullivan.  Who's the named insured on the Hamilton Rege tower

17  policy?

18  A    3M Company.

19  Q    Is Aearo Technologies also a named insured on the Hamilton

20  Rege policy?

21  A    Yes.

22  Q    Let's turn to Page 53 of the policy.  And Page 53 we see

23  another endorsement.  How does this endorsement modify the

24  Hamilton Rege policy?

25  A    This endorsement adds Aearo Technologies, Inc. as an

Sullivan - Direct/Rogers                    233

1  insured.

2  Q    Is the policy period in the Hamilton Rege policy the same

3  as the policy period in the Two Harbors policy?

4  A    Yes.

5  Q    And does it provide the same kind of coverage for personal

6  injury claims as the Two Harbors policy?

7  A    Yes, it does.

8  Q    Let's look at one more example of a insurance policy in

9  the 3M tower.  I'm going to hand you what's been marked as

10 Exhibit Number 200.

11 A    Thank you.

12 Q    Do you recognize Exhibit 200, Mr. Sullivan?

13 A    Yes, I do.

14 Q    What is it?

15 A    It's a policy issued by Access Surplus Insurance Company.

16 Q    Is it a policy in the 3M 2018/2019 tower?

17 A    Yes, it is.

18 Q    How is this policy different, if at all, from the Hamilton

19 Rege policy?

20 A    This is a direct commercial insurance policy.

21 Q    And what does that mean?

22 A    Some of the policies in the 3M tower are reinsurance

23 policies.  This is a commercial insurance policy.  The

24 difference there is a nuance with licensing between insurers

25 and reinsurers.

Sullivan - Direct/Rogers                    234

1          MR. ROGERS:  Your Honor, I move to admit Exhibit

2   Number 200 into evidence.

3          THE COURT:  Any objection to the admission of Exhibit

4   200.

5          UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

6          THE COURT:  All right.  Hearing that and seeing none,

7   it is admitted.

8          (Debtor's Exhibit 200 admitted into evidence)

9   Q    Why does 3M have both direct insurance and reinsurance in

10  the 3M 2018/2019 tower?

11  A    It's a strategy to access the global marketplace.

12  Especially when you want to buy large limits of insurance.  And

13  some of that capacity, which we could use interchangeably with

14  the word limits is sourced from the reinsurance marketplace and

15  other capacities sourced through the commercial insurance

16  marketplace.

17  Q    if we look at Item Number 1 on the first page, or Page 2

18  of the exhibit, who's the named insured on the access policy?

19  A    3M Company.

20  Q    And if we turn to Page 14 of the document, do you see

21  there's an endorsement there?

22  A    Yes, I do.

23  Q    And what does that endorsement say about the access

24  policy?

25  A    This is a retroactive date insurance -- I'm sorry,

Sullivan - Direct/Rogers                           235

1  retroactive date endorsement clarifying and stating the

2  retroactive dates of the policy and including Aearo

3  Technologies in this listing.

4  Q    And does the access policy that we're looking at provide

5  the same kind of personal injury coverage that we've seen in

6  the Hamilton Rege and the Two Harbors policies?

7  A    Yes, it does.

8  Q    And are the Hamilton Rege and access policies that we've

9  looked at representative of the insurance and reinsurance in

10 the 3M tower?

11 A    Yes.

12 Q    Do the other policies in the 3M tower all provide coverage

13 for personal injury, for instance?

14 A    Yes, they do.

15 Q    And do they all share that 2018/2019 policy period?

16 A    Yes.

17 Q    And do they all name both 3M and Aearo as insureds?

18 A    Yes, they do.

19 Q    Now, did Aearo and 3M provide notice of the Combat Arms

20 litigation to the insurers in the 3M tower?

21 A    Yes.

22 Q    How did they do that?

23 A    Through written communication and e-mail primarily.

24 Q    I'm going to hand you what's been previously marked as

25 Exhibit 70.  Do you recognize Exhibit 70?

Sullivan - Direct/Rogers                    236

1  A    Yes, I do.

2  Q    What is it?

3  A    This is a claim notification for the 3M tower that we've

4  been discussing about the Combat Arms Earplug litigation.

5           MR. ROGERS:  Your Honor, I move Exhibit Number 70

6  into evidence.

7           THE COURT:  Any objection to the admission of Exhibit

8  70?

9           UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

10          THE COURT:  All right.  Hearing that and seeing none,

11 Exhibit 70 is admitted.

12          (Debtor's Exhibit 70 admitted into evidence)

13 Q    Let's look at what -- first of all, the date of the letter

14 is February 26, 2019, is that right?

15 A    That's correct.

16 Q    Is that the date that 3M and Aearo gave notice of the

17 Combat Arms litigation under the 3M tower?

18 A    Yes.

19 Q    And if we look at the letter, the first paragraph there,

20 what is the first paragraph telling us?

21 A    It's telling us that on behalf of 3M Company and Two

22 Harbors Insurance Company, a integrated occurrence is being

23 declared in connection with the 3M Combat Arms Earplug Version

24 2.

25 Q    Why is it called an integrated occurrence, by the way?

Sullivan - Direct/Rogers                         237

1  A     It essentially allows the policyholder to integrate

2  related occurrences together into a single policy year and

3  single claim.

4  Q     Now, it says there on behalf of 3M Company and Two Harbors

5  Insurance Company.  Why doesn't it also say on behalf of Aearo

6  Company?

7  A     Well, 3M Company being the first named insured has the

8  duty to -- has certain duties including filing notice of claim.

9  And it would be assumed that Aearo and other entities and

10 subsidiaries are represented therein.

11 Q     In your dealings with the insurance carriers and the 3M

12 tower, are you acting on behalf of just 3M or both 3M and

13 Aearo?

14 A     Both.

15 Q     How did 3M transmit this letter to the insurance carriers?

16 A     This was sent via e-mail and fax.

17 Q     I'm going to hand you what's been previously marked as

18 Exhibit 69.

19 A     Thank you.

20 Q     Do you recognize Exhibit 69?

21 A     Yes, I do.

22 Q     What is it?

23 A     This is the e-mail claim notification.

24 Q     When you say the e-mail claim notification, are you

25 referring to the claim notification and the Two Harbors policy?

Sullivan - Direct/Rogers                    238

1   A    Yes.

2   Q    Or the 3M tower?

3   A    Yes.

4          MR. ROGERS:  Your Honor, move to admit Exhibit 69

5   into evidence.

6          THE COURT:  Any objection to admission of Exhibit 69?

7          UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

8          THE COURT:  Hearing that and seeing no other

9   objection, Exhibit 69 is admitted.

10          (Debtor's Exhibit 69 admitted into evidence)

11   Q    Let's look at the two end cc lines of the Exhibit 69 of

12   the e-mail.  Who was this e-mail sent to?

13   A    This was sent to the participants listed in the various

14   exhibits in the 3M tower and includes claim e-mail, in-boxes,

15   as well as individual claim handlers, carriers and underwriters

16   as well in some cases.

17   Q    And so then, if we look at the substance of the e-mail, is

18   this the transmittal e-mail for the letter that we just looked

19   at?

20   A    Yes, it is.

21   Q    Now, once notice was given under the 3M tower, had there

22   been subsequent discussions with the insurers in that tower

23   about the Combat Arms litigation?

24   A    Yes, absolutely.

25   Q    I think you mentioned that earlier.  Can you describe at a

Sullivan - Direct/Rogers                                239

1  high level what those discussions had been?

2  A    Yeah, the discussions had primarily been relating to the

3  underlying litigation status, keeping insurers and carriers

4  apprised of updates and key developments.

5  Q    In the course of those discussions, have any of the

6  insurers in the 3M tower every denied coverage for the Combat

7  Arms claims?

8  A    No, they haven't.

9  Q    Have they ever denied coverage to 3M in particular?

10 A    No.

11 Q    Have they ever denied coverage to Aearo?

12 A    No.

13 Q    Now, we're sitting here more than three years after the

14 notice was given in February of 2019, right?  Is it surprising

15 to you that no carriers have actually made an payments out of

16 the 3M tower to either 3M or Aearo?

17 A    No.

18 Q    Why not?

19 A    Well, first the $25 million self-insured retention has not

20 been satisfied.

21 Q    Is there any other reason why it's not surprising to you?

22 A    The litigation is complex -- involves multiple claimants

23 and some 230,000 and others in state court.  So, it's quite a

24 volume of activity and data for insurers to understand their

25 exposure and the ultimate claim outcome.

Sullivan - Direct/Rogers                                    240

1  Q    Has 3M or any of its subsidiaries, to your knowledge,

2  given notice of any other claims besides the Combat Arms

3  litigation against the 3M tower?

4  A    No.

5  Q    Okay.  I want to turn now to the Aearo legacy policies,

6  the second bucket of policies that you talked about at the

7  start of your testimony today.  Can you describe the Aearo

8  legacy policies at a high level?

9  A    Yeah, absolutely.  The Aearo legacy policies span from

10  1997 to 2008.  They are occurrence based policies, so the

11  policies are triggered when an alleged occurrence took place in

12  the policy years.  So, multiple policy years could apply.

13  Q    Is that different from the 3M tower?

14  A    Yes.  Yes, it is.

15  Q    Now, have you also helped us prepare a chart to summarize

16  the policies in the Aearo legacy program?

17  A    Yes.

18  Q    I'm going to hand you what's been previously marked as

19  Exhibit 247.  Do you recognize Exhibit 247, Mr. Sullivan?

20  A    Yes, I do.

21  Q    What is it?

22  A    This is the listing of carriers on the Aearo legacy

23  program.

24  Q    And is this the chart that you helped us prepare?

25  A    Yes, I did.

Sullivan - Direct/Rogers                    241

1  Q    And what did you do to help us prepared it?

2  A    Verified that the information was accurate.

3  Q    And is it accurate to the best of your understanding?

4  A    Yes.

5         MR. ROGERS:  Your Honor, move to admit Exhibit 247

6  into evidence.

7         THE COURT:  Any objection to the admission of 247?

8         UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

9         THE COURT:  All right.  Hearing none and seeing none,

10 it is admitted.

11        (Debtor's Exhibit 247 admitted into evidence)

12        MR. ROGERS:  And, Your Honor, again, this is a Rule

13 1006 exhibit that summarizes multiple other exhibits that we

14 have on our exhibit list.  I'm happy to move those into

15 evidence if anyone thinks it's required.  Otherwise, we'll rely

16 on the Rule 1006 summary.

17        THE COURT:  All right.  Any objection to the reliance

18 of the debtors on the summary provided in 247?

19        UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

20        THE COURT:  All right.  We will rely on this then.

21 Go forward.

22        MR. ROGERS:  Can we display the exhibit, please, Mr.

23 Young?

24 Q    Can you explain briefly, Mr. Sullivan, the information

25 contained in Exhibit 247?

1  A    Yes.  In the far left column you could see the layering

2  similar to what I described previously -- carriers writing

3  coverage above layers written by other carriers here.  And

4  these policies typically consist of primary general liability,

5  umbrella and excess coverage.  And you could see that there's -

6  - if you put your attention on the policy period, you could see

7  these are, generally, individual single year policies.

8  Q    And what about the limits of liability column?  What does

9  that represent?

10  A    So, if we look at layer one, that very first row under

11  Royal Surplus Lines, the one million would be in each

12  occurrence limit and the two million would be an aggregate

13  limit on the policy.

14  Q    Do you have a sense of what the total limits available in

15  the Aearo legacy policies is?

16  A    Approximately, $550 million.

17  Q    Have you also helped us create a graphic to show the Aearo

18  legacy policies in a more visual way?

19  A    Yes.

20  Q    Would it help your testimony to display the graphic?

21  A    This is fine.  The physical copy is fine.  Thank you.  I

22  don't know if I'll be able to see the writing there.

23  Q    Understood.  Can you tell us what we're looking at in this

24  graphic here?

25  A    This is the visual depiction of the Aearo Legacy program

1  chart that we just reviewed, and if you -- from left to right,

2  you can see the individual policy here.  Starting in 1997,

3  ending you know with a 20 -- I'm sorry, 2007 policy year.  And,

4  from bottom to top, the dark royal blue layer is the primary

5  general liability coverage that I described earlier, and then

6  you can see the layering effect that we discussed when I

7  described the 3M Tower.

8  Q    And why does the Aearo Legacy policy -- why do these group

9  of policies end in 2007, to your understanding?

10 A    That would have been tied to the acquisition date by 3M.

11 Q    And what kind of -- what kind of coverage do the Aearo

12 Legacy Insurance policies provide?

13 A    A current space coverage.

14 Q    And what -- do they cover personal injury like the 3M

15 Tower does?

16 A    Yes.

17 Q    Who's the named insured on the Aearo Legacy Insurance

18 program policies?

19 A    It would be Aearo entities.

20 Q    Did 3M and Aearo provide notice to the insurers of

21 potential claims relating to the Combat Arms litigation, the

22 insurance being the Aearo Legacy insurers?

23 A    Yes.

24 Q    How did they do that?

25 A    Via e-mail and writing.

Sullivan - Direct/Rogers                    244

1  Q    I'm going to hand you what's been previously marked as

2  Exhibit 77.

3  A    Thank you.

4  Q    Do you recognize Exhibit 77?

5  A    Yes, I do.

6  Q    What is it?

7  A    This is the claim notification to the Aearo Legacy

8  insurers.

9         MR. ROGERS:  Your Honor, move Exhibit 77 into

10 evidence.

11        THE COURT:  Any objection to the admission of Exhibit

12 77?

13        UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

14        THE COURT:  All right.  Hearing that and seeing no

15 other objection, Exhibit 77 is admitted.

16        (Debtor's Exhibit 77 admitted into evidence)

17 Q    So, if we -- if we look at the top of the letter, Exhibit

18 77, who's it addressed to?

19 A    To Aearo Legacy insurers.

20 Q    And if you look a little bit farther down on the letter

21 there's a section there titled, notice to insurers and Aearo's

22 Legacy liability program, do you see that?

23 A    I do.

24 Q    And, who does the -- who does this letter say will be

25 looking to Legacy Aearo insurers for the benefit of the

Sullivan - Direct/Rogers                              245

1 | coverage for the Combat Arms litigation?

2 | A    3M and Aearo.

3 | Q    And how was this letter sent to the insurers?

4 | A    This was sent via e-mail.

5 | Q    I'm going to hand you what's been previously marked as

6 | Exhibit 76.

7 | A    Thank you.

8 | Q    Do you recognize Exhibit 76?

9 | A    I do.

10 | Q    What is it?

11 | A    This is the what I would describe as the cover e-mail to

12 | the letter we just reviewed.

13 | Q    And let's look at the two line in the e-mail again.  Who

14 | was the e-mail sent to?

15 | A    The insurers in the Aearo Legacy program.

16 |          MR. ROGERS:  Your Honor, move to admit Exhibit 76

17 | into evidence.

18 |          THE COURT:  Any objection to the admission of Exhibit

19 | 76?

20 |          UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

21 |          THE COURT:  All right.  Hearing that and seeing no

22 | other objections, Exhibit 76 is admitted.

23 |          (Debtor's Exhibit 76 admitted into evidence)

24 | Q    If we look at the first paragraph of the e-mail that was

25 | sent on June 28, 2019, on whose behalf did -- on whose behalf

Sullivan - Direct/Rogers                 246

 1  was notice provided under these policies?

 2  A    On behalf of Aearo and 3M.

 3  Q    And since the notice was sent out in June of 2019 under

 4  the Aearo Legacy program policies, have there been discussions

 5  with the Aearo Legacy insurers about the Combat Arms

 6  litigation?

 7  A    Yes.

 8  Q    And can you generally describe what those discussions have

 9  been?

10  A    Similar to the 3M Tower discussions around status updates,

11  key developments, defense costs, et cetera.

12  Q    In the course of those discussions with the Aearo Legacy

13  insurers, has any carrier denied coverage for the Combat Arms

14  litigation?

15  A    No, not currently.  One carrier initially had denied

16  coverage but has since retracted that position.

17  Q    Has any carrier acknowledged coverage under the Aearo

18  Legacy policies?

19  A    Yes.

20  Q    Who's that?

21  A    Liberty Mutual.

22  Q    I'm going to hand you what's been previously marked as

23  Exhibit 119.

24  A    Thank you.

25  Q    Do you recognize Exhibit 119?

Sullivan - Direct/Rogers                    247

1  A    I do.

2  Q    What is it?

3  A    This is claim correspondence from Liberty Surplus

4  Insurance Company.

5  Q    When was the correspondence received?

6  A    February 17, 2022.

7  Q    So this year?

8  A    This year.

9        MR. ROGERS:  Okay.  Your Honor, move to admit Exhibit

10  119 into evidence.

11        THE COURT:  Any objection to the admission of Exhibit

12  119?

13        UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

14        THE COURT:  All right, hearing that and seeing no

15  other, the Court will admit Exhibit 119.

16        (Debtor's Exhibit 119 admitted into evidence)

17  Q    Looking at the -- who this is addressed to, Mr. Sullivan,

18  who did Liberty Mutual send this letter to?

19  A    This was sent to Susan Broin, claims manager for 3M.

20  Q    And is she one of the people that works in your

21  department?

22  A    Yes.

23  Q    Does she report to you?

24  A    She does.

25  Q    Let's turn to the second page of the document and there's

1  a large paragraph about half way down in the letter.  The first

2  sentence there says, Liberty therefore encloses with this

3  letter four checks to 3M Company in the amount of one million

4  dollars each, paren, four million dollars total, end paren, as

5  per the occurrence limit owed under the nine thirty two

6  thousand three, nine thirty two thousand four, and then it goes

7  on to name a couple of policies.  Did I read that correctly?

8  A    You did.

9  Q    And what was Liberty doing in this letter?

10 A    Paying for -- paying their policy limits related to the

11 Combat Arms litigation.

12 Q    Did they actually cut a check?

13 A    They cut four checks, one million each for a total of four

14 million.

15 Q    Who did the cut those checks to?

16 A    Those were sent to 3M Company.

17 Q    Has any insurer in the Aearo Legacy program every taken

18 the position that 3M doesn't have access to the Aearo Legacy

19 Insurance policies?

20 A    No.

21 Q    I want to wrap up, Mr. Sullivan, and ask you a couple

22 questions about the Combat Arms litigation and the impact of

23 continued litigation against 3M.  If litigation against 3M in

24 the MDL, what is 3M's position with respect to coverage for

25 that litigation under the 3M Tower policies?

Sullivan - Direct/Rogers                          249

1  A     3M's position is that we would be entitled to the limits

2  in the 3M Tower.

3  Q     And if -- if litigation against 3M continues in the MDL,

4  will 3M pursue coverage and payment under the 3M Tower

5  policies?

6  A     Yes.

7  Q     If litigation against 3M in the MDL continues, what is

8  3M's position with respect to coverage available in the Aearo

9  Legacy policies?

10 A     3M's position would be we were entitled to coverage under

11 that policy.

12 Q     And if the litigation continues in the MDL against 3M,

13 will 3M pursue coverage under those policies?

14 A     Yes.

15        MR. ROGERS:  Can I have a moment, Your Honor?

16        THE COURT:  You may.

17        MR. ROGERS:  Your Honor, no further questions for the

18 witness at this time.

19        THE COURT:  All right.  Who gets the honor of being

20 the initial lawyer to do cross with regard to insurance?

21        MR. MANTHEY:  That would be me, Your Honor.

22        THE COURT:  All right.

23        MR. MANTHEY:  Tristan Manthey with the Fishman

24 Haygood firm.  Could you just give me one second --

25        THE COURT:  Yes.

1          MR. MANTHEY:  -- to get my bearings.  I'm trying to

2  get used to readers and it's not been a good transition.

3          THE COURT:  It gets worse.  Just to let you know.

4          MR. MANTHEY:  I'm figuring that out real quick.

5          THE COURT:  Sometimes they put three lenses in the

6  same thing and just have to keep bobbing your head.

7          MR. MANTHEY:  I am there and --

8          THE COURT:  But go ahead.

9          MR. MANTHEY:  -- I am figuring that out real quick,

10 so to the extent I get disoriented, I'm going to blame that.

11 First, Your Honor, I didn't get a chance to introduce myself

12 officially when we started.  I know we were doing appearances

13 based upon those who would have speaking parts on the openings,

14 et cetera.  First, I'm here -- again, Tristan Manthey with

15 Fishman Haygood Firm.  I'm here with my partner Brent Barriere.

16 We represent the firm of Clark, Love, Hutson, LLC.  Clark, Love

17 Hutson is a law firm that represents approximately 15,000

18 claimants.  Ms. Shelley Hutson is co-lead counsel.  She's here

19 today.  Mr. Clark Clayton is a member of the settlement

20 committee.  Unfortunately he couldn't make it today.  And we

21 also have Michael Moreland who is a member of the steering

22 committee and the pending MDL in the courtroom.

23          I wanted to also introduce two of our claimants who

24 are here in the courtroom.  First, Mr. Ron Sloan.  Mr. Sloan is

25 an army veteran of 21 years.  He served two tours in Iraq and

1  Afghanistan.  He has permanent hearing loss, tinnitus, and a

2  jury verdict against 3M for $55 million.  I also wanted to

3  introduce Mr. David Clodfelter (phonetic), army specialist of

4  five years and a member of the -- a former member of the --

5  boy, that's a big misstatement -- Indiana National Guard for

6  three years.  He also suffers from hearing loss and tinnitus.

7  In his case, he's not as far as advanced as Mr. Sloan.  His

8  discovery is completed.  Experts' reports have been taken but

9  he wants to move forward with this case.  And, I believe, Mr.

10  Clodfelter is right back there.  So, I wanted to make those

11  brief introductions.  Moving on to the cross examination of Mr.

12  Sullivan, may I proceed?

13         THE COURT:  You may.

14                    CROSS EXAMINATION

15  BY MR. MANTHEY:

16  Q    Mr. Sullivan, it's good to see you again.

17  A    Likewise.

18  Q    How long have you been working for 3M?

19  A    Since June of 2021.

20  Q    Okay.  So, 3M and -- we had this discussion -- we're going

21  to call them the Combat Arms claims.  I think that's what you

22  were comfortable with --

23  A    Yeah, sure.  Yeah.

24  Q    -- in regard to the litigation, and I'll try to keep

25  consistent with that.  So, the Combat Arm claims arose before

Sullivan - Cross/Manthey                    252

1  your employment at 3M, right?

2  A    Correct.

3  Q    And you're employed by 3M and not the debtors, correct?

4  A    Correct.

5  Q    Okay.  You did testify that you do provide services on

6  behalf of the debtors, though, correct?

7  A    Yes.

8  Q    In connection with the discovery that was propounded upon

9  the debtors in these bankruptcy cases, did you gather any of

10  the insurance documents that were produced and responsive to

11  the requests made by the claimants?

12  A    Yes, I did.

13  Q    Okay.  Excuse me one second.  Which documents did you

14  gather for the debtors?

15  A    Are you referring to the documents as part of this

16  proceeding?

17  Q    No.  I'm referring to there were a number of documents

18  produced by the debtors in these bankruptcy cases by the

19  Kirkland & Ellis firm, and I believe at our deposition, or at

20  your deposition, I asked you a number of times whether you

21  produced that document in connection with these bankruptcy

22  cases and I believe your testimony was consistently that you

23  had not.  Does that refresh your memory?

24  A    It does.  And I misspoke in my initial response and I

25  apologize for that.  I did not.

Sullivan - Cross/Manthey                        253

1  Q    Okay.  The documents you were referring to were the

2  documents that were gathered at the Kirkland & Ellis firm in

3  connection with, what you testified to, as sessions in

4  preparation for your deposition, isn't that true?

5  A    Yes, correct.

6  Q    Okay.  Do you know who Joseph Castellano is?

7  A    I do not.

8  Q    If the Court grants the preliminary injunction today, who

9  was the beneficiary of that injunction?

10        UNIDENTIFIED ATTORNEY:  Objection.  Calls for a legal

11  conclusion, Your Honor.

12        MR. MANTHEY:  Your Honor, I don't think it calls for

13  a legal conclusion.  He's here testifying --

14        THE COURT:  All right, he can answer it.  I mean,

15  I'll give it the weight that it is --

16        MR. MANTHEY:  Your Honor --

17        THE COURT:  -- from a layperson testifying.

18        MR. MANTHEY:  -- it's pretty --

19        THE COURT:  It's not going to be a binding legal

20  opinion.

21  A    Can you kindly repeat your question?

22  Q    Sure.  If the Court grants a preliminary injunction today,

23  who is the beneficiary?

24  A    3M Company.

25  Q    And you work for 3M company, correct?

Sullivan - Cross/Manthey                    254

1  A    That's correct.

2  Q    All right.  In your direct testimony you identified two

3  categories of insurance available for coverage of the Combat

4  Arm claims.  The first was the 3M Tower, correct?

5  A    That's right.

6  Q    And we're going to call that the 3M Tower like we did your

7  deposition and like you did in your direct testimony.  You okay

8  with that?

9  A    I am.

10 Q    Okay.  And the other source was the Aearo Legacy program,

11 correct?

12 A    Correct.

13 Q    And again, we'll refer to that to the Aearo Legacy program

14 for consistency.  Are there any -- is there any other available

15 coverage for the Combat Arm claims?

16 A    No.

17        MR. MANTHEY:  Okay.  Your Honor, all the exhibits I'm

18 going to use in connection with this witness have already been

19 admitted, so I will just proceed that way and if you're okay

20 with publication and reference --

21        THE COURT:  That's fine.

22        MR. MANTHEY:  -- it should all be in front of the

23 witness.

24 Q    Let me get the first exhibit I'd like you to look at which

25 was 248, which is -- and again, this is the plaintiff's 248,

Sullivan - Cross/Manthey                     255

1  the debtor's 248.  It was the 2018-19 insurance Tower, right?

2  A    This one?  No, no, no.

3  Q    It's Exhibit 248 --

4  A    I see.  Thank you.

5  Q    -- in the right corner.  Let me know when you have it.

6  A    I have that here.

7  Q    Who paid the premiums for the 3M Tower policy?

8  A    3M Company.

9  Q    Okay.  Did the debtors pay any of the premiums related to

10  the 3M Tower?

11  A    There's a premium allocation process that is spread

12  equitably amongst divisions and business groups.

13  Q    But you don't know whether the debtor has actually paid

14  any dollars towards the insurance premiums, do you?

15  A    I don't know if there's a further allocation at the

16  division level downward.

17  Q    Right, and I think you testified at your deposition that

18  you didn't believe that the allocation extended to individual

19  entities, correct?

20  A    That is correct.

21  Q    Okay.  And the individual entities would include the

22  debtor entities here, right?

23  A    Right.

24  Q    Okay.  And you confirmed on direct that the coverage under

25  the 3M Tower is 1.05 billion dollars, correct?

Sullivan - Cross/Manthey                    256

1  A    That'S right.

2  Q    And that the -- the first Combat Arms claim was reported

3  during the year 2018-19, right?  The policy period from 2018-

4  19, correct?

5  A    Yeah, that was the year -- policy year in which the Combat

6  Arms' claim was submitted -- current claim was submitted under

7  the 3M Tower.  Yes.

8  Q    So, that no other policy periods in -- that are

9  potentially provide coverage for the Combat Arms' claims,

10 correct?

11 A    Only with the exception of the Aearo program, which we --

12 the Aearo Legacy program, which we --

13 Q    Which we're going -- we've identified that already as a

14 buck of insurance, correct?

15 A    (No audible response).

16 Q    And, again, you testified that 3M is the named insured

17 under the 3M Tower, correct?

18 A    Correct.

19 Q    And you also identified that the 3M related companies or

20 affiliates are covered under the 3M Tower, correct?

21 A    That's correct.

22 Q    And that offers coverage to multiple national and

23 international companies of 3M, correct?

24 A    That's right.

25 Q    And you deal with all of that, correct?

1 A     Yes.

2 Q     So, you don't just deal with the Combat Arms' claims, you

3 deal with any claims under these policies, correct?

4 A     Yes.   My -- my team and I and others at 3M manage claims.

5 Q     And that management extends to the multiple companies that

6 3M owns, correct?

7 A     Yes.

8 Q     Both international and national companies, right?

9 A     Correct.

10 Q    And you testified you're not aware of any other claims

11 that have been made against this 3M Tower, correct?

12 A     Correct.

13 Q    We talked about litigation fees and expenses that have

14 been incurred in connection with the 3M litigation.   That's

15 been a hot topic of discussion throughout this case, and the

16 debtors disclosed that 3M has incurred upwards of 307 -- $347

17 million with approximately $122 million so far in 2022 alone.

18 Do you understand that to be about the amount that 3M has

19 incurred in connection with legal fees and expenses for Combat

20 Arm claims?

21 A     Yes, I do.

22 Q    And 3M has paid that, correct?

23 A     That's my understanding, yes.

24 Q    The debtors have not paid any of those dollars, correct?

25 A     I don't know for certain if the debtors haven't paid any

Sullivan - Cross/Manthey                    258

1  of those.

2  Q    Who would know that?

3  A    3M finance, 3M legal.

4  Q    Okay.  And if -- strike that.

5            MR. MANTHEY:  Your Honor, if we can - I'd like to

6  direct the witness to another exhibit --

7            THE COURT:  That's fine.

8            MR. MANTHEY:  -- which was introduced into evidence

9  already.  And that is going to be -- it was Debtor's Exhibit

10 48, I believe.  Let me -- let me double check.  One second.

11           THE COURT:  248 perhaps.

12           MR. MANTHEY:  I think I got that number wrong.  One

13 second, Your Honor.

14           THE COURT:  Well, I don't see a 48.

15           MR. MANTHEY:  It is actually Exhibit 69 and Exhibit

16 70.

17 Q    Let me know when you get those exhibits up?

18 A    Okay.

19 Q    And we're going to start with Exhibit 70.

20 A    Bear with me sorry -- 69?

21 Q    Right.

22 A    Okay.  I have Exhibit 69.

23 Q    All right.  Can you go to 70?  70 was the companion.  Do

24 you remember 69 was cover --

25 A    Yes.

Sullivan - Cross/Manthey                     259

1  Q    -- e-mail and 70 was the letter?

2  A    Yes, yes.  I have that in front of me.  Thank you.

3  Q    I'm having as much difficulty as you trying to keep these

4  organized, so take your time.

5  A    Okay.  I have them here.  Thank you.

6  Q    Okay.  I believe you testified that as to this exhibit,

7  the notice, even though it states clearly -- first, tell me who

8  it states the notices on behalf of?

9  A    3M company and Two Harbors Insurance Company.

10 Q    Okay.  And I think you testified that Aearo was also

11 included in this notice, correct?

12 A    Yes.

13 Q    And you testified because 3M Company is the first named

14 insured and that's why they're listed here and Aearo is not,

15 correct?

16 A    Yes.  Aearo is an insured of 3M Company, yes.

17 Q    Okay.  Do you know why it states -- well, first, can you

18 read the sentence for the Court starting at we are declaring an

19 integrated occurrence?

20 A    Yes.  It says, we are declaring an integrated occurrence,

21 IO, in connection with claims alleging injury or damage in

22 connection with 3M's Combat Arms Earplugs Version 2.

23 Q    And do you know why it says 3M's Combat Arms Earplugs

24 Version 2?

25 A    I do not.

Sullivan - Cross/Manthey                    260

1  Q    It doesn't say Aearo, does it?

2  A    No, it doesn't.

3  Q    Okay.  And then the next paragraph there's a statement

4  that says, and I'll let you read it again for the Court?

5  A    This says, 3M sold Combat Arms Earplugs Version 2.

6  Q    And can you read the second sentence?

7  A    3M has received numerous lawsuits in recent months

8  alleging, among other things, personal injury.

9  Q    Okay.  Is there any reference to Aearo in that paragraph?

10 A    No, there's not.

11 Q    I think when you were describing the scope of your duties

12 one of them included, you know, providing notice to all these

13 insurers that are listed in the 3M policy, correct?

14 A    Correct.

15 Q    Okay.  And I think Exhibit 69 represents the cover e-mail,

16 correct?

17 A    Yes, for the -- for the claim letter we just reviewed.

18 Yes.

19 Q    And that claim letter was the notice letter, right?

20 A    Yes.

21 Q    And it looks like there's a whole bunch of e-mail

22 addresses listed here, do you see that?

23 A    Yes.

24 Q    And that's to be noticed to all of the insurers in the 3M

25 Tower, correct?

Sullivan - Cross/Manthey                   261

1  A    Correct.

2  Q    And it looks like there's a two paragraph e-mail put

3  together by Mr. Scott Stevenson, correct?

4  A    Yes.

5  Q    And Mr. Stevenson reports to you, correct?

6  A    Mr. Stevenson retired.

7  Q    Stevenson retired.  The person who is taking his place

8  reports to you, correct?

9  A    Yes, that's Susan Broin.

10 Q    Okay.  Do you know -- do you have any idea how long it

11 took him to put together this e-mail?

12 A    Could you repeat that?  I'm sorry.

13 Q    Do you have any idea how long it took him to put together

14 this e-mail to provide notice to all the 3M Tower?

15 A    No, I don't.

16 Q    Look -- it doesn't look like a very extensive e-mail, does

17 it?

18 A    I'm sure it's carefully worded, but not long.

19 Q    Okay.  And what about the attached letter that Exhibit 70

20 that looks like it's three paragraphs with a P.S. it looks

21 like, how long do you think it took him to prepare that notice?

22 A    I couldn't speculate.

23 Q    Okay.  How long does it usually take you to prepare

24 notices to insurers like this?

25 A    Longer than I would like.

Sullivan - Cross/Manthey                    262

1  Q    Okay.  And it's common, isn't it, to send out e-mails to

2  the mass group to provide them information related to, let's

3  say, updates on the Combat Arms' claims, correct?

4  A    Yes.

5  Q    Okay.  Same with providing updates of legal expenses

6  incurred, correct?

7  A    Yes.

8  Q    Okay.  I think we've established that notice has been

9  provided to the insurers listed in the 3M Tower, you would

10  agree with that, correct?

11  A    Yes, I would.

12  Q    Okay.  No demand for payment has been made by 3M on any of

13  the insurers in the 3M Tower, correct?

14  A    Correct.

15  Q    And that is true because the insurers in the 3M Towers

16  only have to pay claims when the retention is paid by 3M,

17  correct?

18  A    When the retention is satisfied by paid judgments or

19  settlements.

20  Q    Okay.  And -- and that would usually be by 3M writing a

21  check?

22  A    Yes.

23  Q    Okay.  And I think you testified that 3M hasn't written a

24  check in connection with the 3M's Combat litigation or claims

25  for any settlements or judgments, correct?

Sullivan - Cross/Manthey                    263

1  A    Correct.

2  Q    And that is a -- been a decision that 3M made voluntarily,

3  correct?

4  A    I suppose so, yes.

5  Q    Why do you suppose so if --

6  A    Well, I wouldn't -- I wouldn't -- I wouldn't know what

7  decisions have or have not been made, but I'm not aware of any

8  payments being made.

9  Q    Okay.  And they've not made any involuntary payments that

10 you're aware of, correct?

11 A    Not that I'm aware of.

12 Q    Okay.  Under the 3M Tower, in order for settlements to be

13 paid by the insurers they would have to approve the

14 settlements, correct?

15 A    When you say approved, can you clarify that?

16 Q    Agree to the settlement that 3M is entering into in

17 connection with the policy?

18 A    That could vary from carrier to carrier.

19 Q    Okay.  But to date, again, has there been any discussions

20 with any insurers seeking the approval of any settlement?

21 A    No.

22 Q    Okay.  3M is not on the verge of paying the retention, are

23 they?

24 A    On the -- can you define what you mean by on the verge?

25 Q    Imminently, is there any discussion regarding payment of

Sullivan - Cross/Manthey                                          264

1  the retention that you're aware of by 3M?

2  A    Not that I'm aware of.

3  Q    Okay.  All right, let's turn our attention to the Aearo

4  Legacy program, and I'm going to direct your attention to

5  Exhibit 247.

6  A    I have that.

7  Q    All right.  And this is very much like Exhibit 248,

8  correct?  248 was the listing of the Towers, the Tower

9  policies, correct?

10 A    The way the information is, is listed is very similar.

11 Q    Okay.

12 A    Showing layers, and the carriers' participations, et

13 cetera, and their limits.

14 Q    I'm curios, when counsel asked you questions about that he

15 said you -- you prepared these for us, isn't that what he

16 testified to or isn't that what he stated in his question?

17 A    I can't recall exactly how he asked his question.

18 Q    Okay.  When he said us, you don't recall who he was

19 referring to?

20 A    I don't recall him saying you prepared these for us.

21 Q    Okay.  You don't recall us going over that same exact

22 question in your deposition and the answer being that us was

23 Kirkland & Ellis and you recalled it being Kirkland & Ellis so

24 that's what your interpretation of us was?

25 A    I suppose so, yes.

1  Q    Okay.  And Kirkland & Ellis represent the debtors in these

2  bankruptcy cases, correct?

3  A    Correct.

4  Q    They do not represent 3M in these bankruptcy cases, do

5  they?

6  A    That's my understanding.

7  Q    Okay.  You testified that the Aearo Legacy program

8  provides $550 million of potential coverage for the Combat

9  Arms' claims, correct?

10  A    That's right.

11  Q    And these insurance policies were issues from anywhere

12  from 1997 to 2008, correct?

13  A    Correct.

14  Q    And in 2008 the reason there's no further Aearo Legacy

15  policies is because that's when 3M acquired Aearo, correct?

16  A    Correct.

17  Q    Okay.  And you've reviewed these Aearo Legacy Insurance

18  policies, correct?

19  A    Yes.

20  Q    And 3M is not listed as an additional insured on any of

21  these policies, correct?

22  A    These policies were issues before 3M acquired Aearo, so,

23  yes, that's correct.

24  Q    So, the answer is, yes, that's correct, to my question,

25  right?

Sullivan - Cross/Manthey                    266

1  A    That's right.

2  Q    Okay.  And 3M didn't pay the premiums related to the

3  insurance policies under the Aearo Legacy program, correct?

4  A    That's correct.

5  Q    And let's go to -- and I may have to go back to where I

6  was standing to find this other exhibit.  One second.

7           THE COURT:  Not to put any pressure on you, but you

8  got about ten minutes before I'm going to start giving my close

9  on what's going to --

10           MR. MANTHEY:  Okay.

11           THE COURT:  -- happen in the future, so.

12           MR. MANTHEY:  I will try to wrap up in ten minutes.

13           THE COURT:  And you can roll over.  I'm just letting

14  you know I --

15           MR. MANTHEY:  Okay.

16           THE COURT:  That's coming.

17           MR. MANTHEY:  I understand, Your Honor, and I

18  appreciate it.  I'm just keeping track of some of these

19  exhibits has not been the easiest.

20  Q    This exhibit -- just exit the exhibit.  I'd like you to --

21  it was Debtor's, I believe, Exhibit 77.  That's it.

22  A    Yes, I have that here.

23  Q    Okay.  Sorry, Your Honor.  This was the notice that 3M

24  provided to the insurers in the Aearo Legacy program related to

25  the Combat Arms' claims, correct?

Sullivan - Cross/Manthey                 267

1  A    That's right.

2  Q    And that notice was provided June 28, 2019, correct?

3  A    That's right.

4  Q    And that's more than three years ago, correct?

5  A    Correct.

6  Q    And I believe you testified that of the available $550

7  million in which you believe is available, you think that all

8  but $4 million is still available, correct?

9  A    That's correct.

10 Q    And let's go to that -- that document, which was -- what

11 was the lettering for the number I gave you Debtor's Exhibit

12 Liberty Mutual?  Yeah, the Liberty Mutual --

13          THE COURT:  119.

14          UNIDENTIFIED SPEAKER:  119.

15          MR. MANTHEY:  Thank you, Your Honor.

16          THE COURT:  That's why I get the medium box.

17 Q    You have that in front of you?

18 A    I do.

19 Q    Okay.  And this is the letter from Liberty Mutual where

20 they provided $4 million in individual checks each of $1

21 million, correct?

22 A    That's correct.

23 Q    And each of these payments was payable to 3M, correct?

24 A    Yes, 3M Company.  Yes.

25 Q    Were any of these checks -- did any of these checks

1  include Aearo as an additional payee?

2  A    Not to my knowledge.

3  Q    Why were the checks on the Aearo Legacy Insurance Program

4  paid to 3M instead of Aearo?

5  A    I may be speculating here, but Liberty and other insurers

6  in the Aearo Legacy program, sorry, excuse me, have not made

7  the distinction between the two, so that may be why.

8  Q    Okay.  Well, let's look at the letter for a second.

9  A    Okay.

10  Q    I'm going to turn to the second page.  I think you focused

11  on the fourth paragraph where it says, Liberty therefore

12  encloses with this letter four checks to 3M Company in the

13  amount of $1 million each.  I want to focus on the paragraphs

14  before that.  Do you see, first, the heading of this letter?

15  The heading above the second paragraph of the letter?

16  A    Yes, I do.

17  Q    Okay.  And what does that say?

18  A    It says partial payment of Sloan verdict under the 2003

19  through 2007 Liberty primary policies.

20  Q    Okay.  And then in the first paragraph underneath that,

21  why don't you read the first sentence for us?

22  A    It says, on January 27th the jury returned a verdict in

23  the Sloan case for $15 million in compensatory damages.

24  Q    Continue on for me please?

25  A    Mr. Sloan served in the army from June 1994 to March 2015.

1  He alleges he used the Combat Arms Earplugs between mid 2004

2  and 2015.  Mr. Sloan claims to have noticed tinnitus and

3  hearing loss beginning in February 2005 before, quote, before

4  his first deployment.

5  Q    Okay.  And then the next paragraph, why don't you read

6  that also?

7  A    Based on the recent verdict in the Sloan case referenced

8  above of $15 million, Liberty believes that if coverage for

9  Aearo is determined to exist under the two thousand -- nine

10  thirty two thousand three through nine thirty two thousand

11  seven Liberty primary policies that Liberty's indemnity

12  obligation, if any, is exhausted by payment of the $1 million

13  per occurrence limit under each of the 2003, and it lists four

14  policies, total $4 million.  It is Liberty's position that

15  Aearo's manufacturer of your product is a single occurrence,

16  and at most one per occurrence limit per policy year is owed in

17  indemnity.

18  Q    So, Liberty paid this $4 million, again, separately four

19  different checks of $1 million each, as partial payment of the

20  Sloan verdict, that appears what they're stating, correct?

21  A    That's what they're stating.

22  Q    Okay.  What did 3M do with the $4 million?

23  A    The -- those checks are currently locked in a vault.

24  Q    They have not been deposited?

25  A    They have not.

1 Q    Okay.  And why are they locked in a vault?

2 A    Because discussions had been ongoing with Liberty about

3 their attempt to exhaust their policy limits and kind of

4 related discussions around defense funding.  They're paying for

5 defense of the litigation.

6 Q    So, it would appear that 3M hasn't even recovered the $4

7 million, wouldn't that be correct?

8 A    3M has not deposited those checks.

9 Q    So, 3M has not recovered one dollar under the Aearo Legacy

10 program, correct?

11 A    That's correct.

12 Q    Okay.  So, why didn't you disclose that on your direct

13 testimony by your attorney?

14 A    I believe I said 3M had received checks, four checks,

15 totaling $4 million.

16 Q    Okay.  And I think there was also a question about the

17 exhausting of the policy and how much had been exhausted and I

18 think there was reference that the $4 million went against the

19 $550 million, isn't that correct?

20         UNIDENTIFIED ATTORNEY:  Objection, Your Honor.  I

21 think it misstates the record.

22         THE COURT:  Well, I think I know what I heard, but if

23 you -- so I think we're --

24         MR. MANTHEY:  Your Honor, I think you did hear what

25 -- you know what you heard.  I'll withdraw the question.

271

1 Q    Are you aware of any imminent payments by any of the

2 insurers under the Aearo Legacy program to 3M for the Combat

3 Arms' claims?

4 A    I am not aware of any.

5 Q    Okay.  What has been your participation in the MDL

6 litigation?

7 A    Can you clarify what you mean by participation?

8 Q    Other than providing --

9           THE COURT:  Do you have two minutes or less?

10          MR. MANTHEY:  I don't.

11          THE COURT:  Okay.  Let's stop there.

12          MR. MANTHEY:  Okay.

13          THE COURT:  Put a marker on there.  We can recall the

14 witness.  Are you available for testifying tomorrow?

15          THE WITNESS:  Yes.

16          THE COURT:  Okay.  All right, so we'll recall -- hold

17 it because I have to tell you -- I know that those

18 participating in the discovery conference are aware of this,

19 but I cleared tomorrow as an additional trial day.  I'm also

20 working to clear Wednesday as an additional trial date given

21 our very fast paced of 1.4 witnesses per day.  We only have six

22 witnesses but we're going pretty slow, so we're going to work

23 on that.  We will be in this courtroom tomorrow.  We can start

24 as early as eight.  I am still required to have you all leave

25 by five.  What are peoples' thoughts about starting by -- per

1  clarification, it is eight o'clock Eastern, not any other time

2  zone.  But, that's as early as I can start here, but I wonder

3  does it make sense to do that or do the parties need additional

4  time given who's coming and travel and things related to that?

5          MR. McKANE:  Your Honor, I can speak for the debtors.

6          THE COURT:  Yes.

7          MR. McKANE:  And for the record, Mark McKane,

8  Kirkland & Ellis.

9          THE COURT:  Thank you.

10          MR. McKANE:  This witness and the next witness, which

11  we're actually taking out of order as an accommodation to

12  claimants, are -- and the witness after that, are all ready to

13  go and we'd be prepared to start at eight in the morning.

14          THE COURT:  Okay.

15          MR. PFISTER:  And for the claimant's side, Your

16  Honor, Rob Pfister.  We -- we also believe eight o'clock would

17  be a good start time.

18          THE COURT:  Okay.

19          MR. PFISTER:  I should also add, Your Honor, I'm not

20  sure there will be six witnesses.  Four from the debtor.  I

21  know Mr. Keller has a witness.

22          THE COURT:  I know but I --

23          MR. PFISTER:  Yeah.

24          THE COURT:  I haven't been here forever, but I've

25  been here long enough to prepare for the worst.

1            MR. PFISTER:  Understood.

2            THE COURT:  So that's what I'm doing.

3            MR. PFISTER:  Understood.  We think 8 o'clock would

4  be a good start time.

5            THE COURT:  Okay --

6            UNIDENTIFIED ATTORNEY:  And, Your Honor, I apologize,

7  at eight in the morning there's water only in the courtroom, is

8  that correct?

9            THE COURT:  Right, and you all managed to bring in

10  water today, huh?  A lot of you?

11            UNIDENTIFIED ATTORNEY:  There is water in the

12  courtroom.  I --

13            THE COURT:  I didn't know that because I have been

14  paying for water myself to bring in for you.  But I just

15  suspect given the projected legal fees that a lot of the

16  lawyers can afford to bring their own waters, so if you want to

17  bring in water, yes, there is no coffee.  I am just as upset

18  about that as you.  That is not my coffee cup.  That is not my

19  water cup.  But, no, it's just water only.

20            UNIDENTIFIED ATTORNEY:  All right, thank you, Your

21  Honor.

22            THE COURT:  When you come in we have to use the

23  entrance known as B2.  It's also the handicap.  It is on the

24  northeast side.  It's kind of you go down, and that's the exit

25  you can get in before normal business hours.  You can get in

274

1  there by eight.  You have to let them know what you're coming

2  in for.  That we're starting early.  But, that's the only exit

3  you can get in without setting off an alarm.  I say that

4  because when you all left the preliminary -- or the TRO on the

5  first day motion, you went out the wrong exits and you set off

6  the alarms and I got in trouble, so -- but they can't fire me,

7  so I'm still here.  But don't do that.

8          Again, you can leave exhibits.  You can leave

9  documents in here if you want.  If it's electronic, take it

10 with you out of an abundance of caution.  All the exhibits that

11 are official exhibits on the witness stand stay there.  If

12 needed, I have cleared Wednesday.  Wednesday would be in my own

13 courtroom, because I can control it.

14         If you're wondering what the size of my courtroom is,

15 Mr. Pfister, if you turn to your right, that's my courtroom.

16 That's the extent of my courtroom.  I will attempt to open up

17 the twin corridor across the hall.  I can give overflow there.

18 That's all I can guarantee, so some of you may have to have a

19 very important conversation with people you're with and say who

20 can actually come if less space is limited to about 50 people

21 or who can't come.  You can also attend by Zoom, but I just --

22 I don't have this courtroom Wednesday.  I know I have my

23 courtroom and it's probably time because of what's going on and

24 the pace that we get used to being in my courtroom, because

25 it's the only courtroom I can tell you when we can start, when

275

1  we can end, and when we can use it.  So, that might be what

2  we're going for.  Plus, you're stuck there Thursday anyway, so

3  it's kind of a preliminary viewing of the courtroom.  So,

4  that's where we're at.

5       UNIDENTIFIED ATTORNEY:  Your Honor, would you want to

6  discuss closings at the end of the day tomorrow?

7       THE COURT:  It seems a bit, how should we say,

8  optimistic to discuss closings right now.

9       UNIDENTIFIED ATTORNEY:  Agreed.

10       THE COURT:  And there's going to be a lot of

11  questions because that's when I get to ask questions of you

12  all, and I know everyone says the law is settled, it's not

13  necessarily settled, but there's also other questions I have to

14  ask you all, too, as far as what you've proven and want proven.

15  So, we need to -- so I think probably tomorrow would be the

16  appropriate time.  You know, if we're at two o'clock and we

17  have to discuss it, that would be great.  I'm more than willing

18  to discuss that and give you a little bit of time to prep and

19  come back, but I don't know if we'll get there.

20       UNIDENTIFIED ATTORNEY:  Understood, Your Honor.

21       THE COURT:  And, frankly, it's an important enough

22  issue, I want to develop the record as fully as I can, (a) that

23  I can make the best decision, but as I said, I'm probably not

24  the last person to look at this.  I want whatever it is to be

25  right on whatever that decision is.  You all deserve that and

276

1  especially the claimants.  Let's get it right, whatever that

2  decision is, with the understanding there will be someone

3  probably looking at it after me.  But, let's make as full of a

4  record as we can so that that decision can also be made as

5  properly and as right as we can.  So, we'll discuss that as

6  well.

7        Some things I'm looking for, I think one of the

8  things that the claimants raised was an excellent point, which

9  is what does the funding mean?  Is this a zero sum gain

10 regardless?  Those are things I'm hoping to hear from tomorrow

11 because that's important under the analysis under Caesars and

12 all of the other shotgun approaches the Seventh Circuit has

13 taken to looking at 105(a).  But, they raise some points of

14 that.

15       Obviously, all the other things we haven't gotten to.

16 I know we're laying a lot of foundation with things going on,

17 but those are things I'd like to hear.  Obviously, it's the

18 debtor's burden of proof, so the claimants don't really have to

19 make those showings, but those are things that have been raised

20 that I think are of interest to the Court from what I've seen

21 so far.

22       You're all doing very well as far as being cordial.

23 Just remember there's no jury.  If you're not quite getting the

24 exact or specific answer you want, but it's pretty much there,

25 I'll probably get it there.  Maybe not.  I'm only a bankruptcy

1  judge, but I probably know where we're going and I can make

2  inference from what's being said and not said, so you don't

3  have the jury where everything has to be presented there.  You

4  have a trier of fact who in theory has done this before.  So,

5  but obviously you can try your own case the way you want.  If I

6  look impatient that may be telling you that I'm getting

7  impatient.  Anything else before I shush you all out of here in

8  seven minutes or less?

9          UNIDENTIFIED ATTORNEY:  Nothing from the claimants,

10  Your Honor.

11          THE COURT:  Thank you.

12          UNIDENTIFIED ATTORNEY:  I have nothing further for

13  the debtors.  Thank you for your time.

14          THE COURT:  All right, thank you.  All right, so I'm

15  going to officially continue this until eight o'clock tomorrow.

16  No further notice will be given because I hope you're all here

17  or on Zoom.  And with that, I look forward to seeing you well

18  caffeinated tomorrow, oh Lordy, at eight o'clock and we'll jump

19  in.  Thank you all.

20          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

21          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

22                    *  *  *  *  *

23

24

25

278

# **C E R T I F I C A T I O N**

We, KAREN K. WATSON, DIPTI PATEL, THERESA PULLAN, ELIZABETH REID-GRIGSBY, ALYCE STINE and WENDY ANTOSIEWICZ, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Karen K. Watson                     /s/ Dipti Patel

KAREN K. WATSON                         DIPTI PATEL


/s/ Theresa Pullan                      /s/ Elizabeth Reid-Grigsby

THERESA PULLAN                          ELIZABETH REID-GRIGSBY


/s/ Alyce Stine                         /s/ Wendy Antosiewicz

ALYCE STINE                             WENDY ANTOSIEWICZ

J&J COURT TRANSCRIBERS, INC.            DATE:  August 17, 2022