# EXHIBIT 13

```
                   UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF INDIANA

IN RE:                   .      Case No.  22-02890-JJG
                         .      (Jointly Administered)
AEARO TECHNOLOGIES LLC,  .
ET AL.,                  .      116 U.S.  Courthouse
                         .      46 E.  Ohio Street, Room 116
         Debtors.        .      Indianapolis, IN  46204
. . . . . . . . . . . . .
AEARO TECHNOLOGIES LLC,  .
ET AL.,                  .
         Plaintiffs,     .
    V.                   .      Adversary No. 22-50059
                         .
THOSE PARTIES LISTED ON  .
APPENDIX A,              .
         Defendants.     .
                         .      Tuesday, August 16, 2022
. . . . . . . . . . . . .      8:00 a.m.
```

TRANSCRIPT OF HEARING ON DEBTORS' MOTION FOR
DECLARATORY AND INJUNCTIVE RELIEF (DAY 2)
BEFORE THE HONORABLE JEFFREY J. GRAHAM
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

```
For the Debtors:          Kirkland & Ellis LLP
                          BY:  CHAD HUSNICK, ESQ.
                               NICHOLAS WASDIN, ESQ.
                               BRENTON ROGERS, P.C.
                          300 North LaSalle Street
                          Chicago, IL  60654

                          Kirkland & Ellis LLP
                          BY:  MARK McKANE, ESQ.
                          555 California Street, 27th Floor
                          San Francisco, CA  94104

Audio Operator:           Heather Heiser-Davis
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**

**(609) 586-2311    Fax No.  (609) 587-3599**

                                                                          2

APPEARANCES CONTINUED:

For the Debtors:          Kirkland & Ellis LLP
                          BY:  DAVID I. HOROWITZ, P.C.
                          555 South Flower Street, 37th Floor
                          Los Angeles, CA  900714

For 3M Company:           Faegre Drinker Biddle & Reath LLP
                          BY:  JAY JAFFE, ESQ.
                          600 East 96th Street, Suite 600
                          Indianapolis, IN  46240

                          White & Case LLP
                          BY:  MICHAEL ANDOLINA, ESQ.
                          111 S. Wacker Drive, Suite 5100
                          Chicago, IL  60606

                          White & Case LLP
                          BY:  JESSICA LAURIA, ESQ.
                               GREGORY STARNER, ESQ.
                          1221 Avenue of the Americas
                          New York, NY  10020-1095

For Aylstock, Witkin,     Klee, Tuchin, Bogdanoff & Stern, LLP
Kreis & Overholtz, PLLC:  BY:  ROBERT J. PFISTER, ESQ.
                          1801 Century Park East, 26th Floor
                          Los Angeles, CA  90067

                          Aylstock, Witkin, Kreis &
                            Overholtz, PLLC
                          BY:  JENNIFER HOEKSTRA, ESQ.
                          17 E. Main Street, Suite 200
                          Pensacola, FL  32502

For Seeger Weiss LLP:     Otterbourg P.C.
                          BY:  MELANIE CYGANOWSKI, ESQ.
                               ADAM SILVERSTEIN, ESQ.
                          230 Park Avenue
                          New York, NY  10169-0075

                          Seeger Weiss LLP
                          BY:  DAVID BUCHANAN, ESQ.
                          55 Challenger Road
                          Ridgefield Park, NJ  07660

3

APPEARANCES CONTINUED:

```
For the U.S. Trustee:      U.S. Department of Justice
                           BY:  HARRISON E. STRAUSS, ESQ.
                                LAURA A. DUVALL, ESQ.
                           46 E. Ohio St., Road 520
                           Indianapolis, IN  46204


For Clark Love & Hutson:   Fishman Haygood LLP
                           BY:  TRISTAN MANTHEY, ESQ.
                                BRENT BARRIERE, ESQ.
                           201 St. Charles Avenue, Suite 4600
                           New Orleans, LA  70170-4600


For Belwether Claimants:   Quinn Emanuel Urquhart & Sullivan, LLP
                           BY:  ERIC WINSTON, ESQ.
                           865 S. Figueroa Street, 10th Floor
                           Los Angeles, CA  90017


For Bailey Glasser        Bailey Glasser LLP
Plaintiffs:               BY:  BRIAN GLASSER, ESQ.
                               KEVIN W. BARRETT, ESQ.
                          209 Capitol Street
                          Charleston, WV  25301


For Richard Valle:         Keller Postman
                           BY:  ASHLEY KELLER, ESQ.
                                ASHLEY BARRIERE, ESQ.
                           150 N. Riverside Plaza, Suite 4100
                           Chicago, IL 60606
```

- - - - -

4

<u>**I N D E X**</u>

<u>**WITNESS  FOR  THE  DEBTORS**</u>                                    <u>**PAGE**</u>

CHRISTOPHER SULLIVAN
  Cross-Examination Resumed by Mr. Manthey                8
  Redirect Examination by Mr. Rogers                    12
  Recross Examination by Mr. Manthey                    21

BRIAN MYERS
  Direct Examination by Mr. Wasdin                     107
  Cross-Examination by Mr. Buchanan                    119

MICHAEL DAI
  Direct Examination by Mr. Silverstein                166

JEFFREY STEIN
  Direct Examination by Mr. McKane                     201
  Cross-Examination by Mr. Winston                     268


<u>**WITNESS  FOR  CLAIMANTS**</u>                                       <u>**PAGE**</u>

JAMES B. HEATON
  Direct Examination by Ms. Barriere                    32
  Voir Dire Examination by Mr. Rogers                   40
  Direct Examination Resumed by Ms. Barriere            50
  Cross-Examination by Mr. Rogers                       68
  Redirect Examination by Ms. Barriere                 101
  Recross Examination by Mr. Rogers                    102

<u>**I N D E X**</u>

| <u>**DEBTORS' EXHIBITS**</u> | | <u>**ID**</u>. | <u>**EVD**</u>. |
|---|---|---|---|
| 66 | Aearo CAE Yearly Sales | | 113 |
| 71 | Kennedy v. 3M Company, and DOES, ONE Through FIFTY, inclusive Complaint and Demand for Jury Trial | | 15 |
| 142 | 3M and Aearo Omnibus Meeting Minutes for July 14, 2022 | | 235 |
| 148 | Photo re Combat Arms Earplugs packaging; D-Gen-0509, Copyright 2007 | | 111 |
| 304 | In Re 3M Combat Arms - [704] Master Long Form Complaint and Jury Trial Demand; Adv. Dkt. [004-02] | | 19 |
| 554 | Omnibus Meeting Minutes for July 23, 2022 - Disinterested Director Session | | 222 |

| <u>**CLAIMANTS' EXHIBITS**</u> | | <u>**ID**</u>. | <u>**EVD**</u>. |
|---|---|---|---|
| A | Roll-up of Sales by Year (Exhibit A) | | 115 |

| <u>**DEFENDANTS' KELLER POSTMAN LLC'S EXHIBITS**</u> | | <u>**ID**</u>. | <u>**EVD**</u>. |
|---|---|---|---|
| GL | 3M Company 2021 10-K | | 60 |
| GM | 3M Company June 30, 2022 10-Q | | 62 |

## I N D E X

**DEFENDANT/CLAIMANT SEEGER WEISS EXHIBITS**                     **ID**.     **EVD**.

|     |                                                                    |     |
|-----|--------------------------------------------------------------------|-----|
| B   | 3M Email Thread with attachment "Losing your hearing is not a requirement for serving your country" | 142 |
| K   | Management Team Org Chart                                           | 136 |
| EU  | CAEv2 Blister Pack Insert                                           | 147 |
| EY  | 3M Hearing Solutions Catalog                                        | 144 |
| FE  | 3M CAEv2 Brochure (Colored)                                         | 141 |
| GF  | May 9-10, 2022 3M Board Minutes                                     | 183 |

1          THE COURT:  All right.  Counsel, are we all ready?

2          MR. PFISTER:  We are, Your Honor.

3          UNIDENTIFIED SPEAKER:  Yes, for the debtors.

4          THE COURT:  Look at you two, using the push buttons

5    and everything.  We have come so far in so short a time.

6          All right.  Well, let's go back on the record in

7    Adversary 22-50059.  This is the preliminary injunction and

8    declaratory relief motion by the debtors, opposed by several of

9    the tort claimants.

10          We are in the cross-examination of debtors' witness,

11   Mr. Sullivan, correct?

12          UNIDENTIFIED SPEAKER:  Correct.

13          THE COURT:  All right.  So if you can come up here.

14   What I'm going to do is I'll place you under oath in a little

15   bit, just again, even though you already under your oath.  Like

16   I said, I'm not the last person who will do this, so I'm going

17   to try to do everything by the book.  So at least they can't

18   make fun of bankruptcy judges for not handling witnesses

19   (indiscernible).

20          But I will say on a personal note, we all are

21   benefitting from great wisdom today because both my courtroom

22   deputy and my relief courtroom deputy who had birthdays, one on

23   Saturday and one on today, so we are all benefitting from that.

24   I'm saying that also because I did not get a card for either

25   (indiscernible).  So I'm putting it on the record that it is a

Sullivan - Cross/Manthey (Resumed)                    8

1  birthday.  So happy birthday to Brian Bernhardt in my

2  courtroom.  If you see him say happy birthday.

3                          (Applause)

4            THE COURT:  It's better than a card.  Why don't we

5  begin?  I think Mr. Manthey, you were doing cross, correct?

6            And before I begin, please raise your right hand.

7        CHRISTOPHER SULLIVAN, DEBTORS' WITNESS, SWORN

8            THE COURT:  All right.  You can take off your mask so

9  you don't fog up your glasses.

10           We have a lot of manufacturing power in here.  Could

11 we do a mask that doesn't fog up glasses?

12           There it goes.  Okay.  All right.

13           We are, I think I stopped you mid-question, so

14 hopefully you've marked where you begin because I can't tell

15 you exactly where you left off other than it was Document

16 Number 119.

17           MR. MANTHEY:  Thank you, Your Honor.

18           I will get to that question.  I have one before that.

19           THE COURT:  All right.  You may proceed.

20           MR. MANTHEY:  Thank you, Your Honor.

21                    CROSS-EXAMINATION RESUMED

22 BY MR. MANTHEY:

23 Q    Mr. Sullivan, I want to take you back to some of your

24 testimony yesterday.  Is that okay?

25 A    Yes.

1  Q    All right.  And I want to be very clear on one point.  The

2  $4 million Liberty Mutual checks that are sitting in the vault,

3  I assume it's a 3M vault, correct?

4  A    That's correct.

5  Q    Okay.  That are payable to 3M and related to the Sloan

6  verdict, correct?

7  A    Correct.

8  Q    They were issued in connection with the pre-2008 Aearo

9  legacy policy, correct?

10 A    That's correct.

11 Q    All right.  And those were Liberty Mutual policies where

12 the insured was Aearo and not 3M, correct?

13 A    Correct.

14 Q    Okay.  Thank you.

15      I think where we were when we took a break for the evening

16 is I was going to ask you your role in the MDL litigation.  Do

17 you know anything about the MDL litigation?

18 A    I do.

19 Q    Okay.  What has been your role other than monitoring the

20 MDL litigation?

21 A    My role has been, excuse me.  My role has been to

22 communicate updates with carriers primarily.

23 Q    Okay.  Have you participated in the MDL litigation?

24 A    I have not.

25 Q    Okay.  So you've not been to Pensacola for the MDL

1 litigation, correct?

2 A    No, I have not.

3 Q    Were you aware that there was a mediation protocol issued

4 in the MDL litigation?

5 A    Yes.

6 Q    Okay.  Did you participate in that mediation?

7 A    I did not.

8 Q    Okay.  Isn't it true that in addition to your in-house

9 counsel, you have coverage counsel that assist you with the

10 coverage issues related to the 3M and Aearo legacy program,

11 correct?

12 A    Yes, we do.

13 Q    And who is that coverage counsel?

14 A    That's the firm of McCarter and English.

15 Q    And who do they represent?

16 A    They represent 3M.

17 Q    They do not represent the debtors, do they?

18 A    Not to my knowledge.

19 Q    Okay.  Yesterday, you testified that 3M has not recovered

20 one dollar from either the 3M tower or the Aearo legacy

21 program, correct?

22 A    Can you repeat the question?  Sorry.

23 Q    Yesterday, you testified that 3M has not recovered one

24 dollar from either the 3M tower or the Aearo legacy program,

25 correct?

Sullivan - Cross/Manthey (Resumed)                    11

1  A    Well, we did receive four checks totaling
2  (indiscernible) --
3  Q    Right, but you haven't --
4  A    -- each.
5  Q    -- you haven't cashed those checks because you have a
6  dispute with cashing those checks, right?  A dispute with
7  Liberty Mutual, right?
8  A    The discussions with Liberty are around a defense funding
9  agreement to help offset some of the defense costs.
10 Q    Right.  So you're not accepting the $4 million checks
11 because of the conditions that they put on those checks,
12 correct?
13 A    The discussions are ongoing, so we have not cashed the
14 checks.
15 Q    Okay.  So you have not recovered any monies under the 3M
16 tower or the Aearo legacy program, correct?
17 A    Well, I might view the four checks totaling $4 million --
18 Q    Okay.
19 A    -- as recovery.
20 Q    All right.  So in three years since the notice has been
21 provided to the various carriers in the 3M tower and the Aearo
22 legacy program, the available coverage has only been depleted
23 by the $4 million that you've identified that Liberty Mutual
24 paid?
25 A    That's correct.

Sullivan - Redirect/Rogers                12

1  Q    Okay.

2           MR. MANTHEY:  Just give me one second, Your Honor.  I

3  think I'm --

4           THE COURT:  Sure.

5           MR. MANTHEY:  -- done.

6           Thank you, Your Honor.

7           THE COURT:  All right.  Any other cross-examination

8  of Mr. Sullivan by those who have filed objections in this

9  adversary?

10                      (No audible response)

11          THE COURT:  All right.  And of course we know if we

12 don't do cross-examination that we don't get to do recross,

13 right?

14                         (Laughter)

15          THE COURT:  Okay.  Excellent.

16          Any redirect?  Mr. Rogers.

17          MR. ROGERS:  Yes, Your Honor.

18          THE COURT:  All right.  You may proceed.

19                    REDIRECT EXAMINATION

20 BY MR. ROGERS:

21 Q    Good morning, Mr. Sullivan.  How are you this morning?

22 A    Good morning.  Well, thank you.

23 Q    Do you have Exhibit Number 70 in front of you?  It's the

24 notice letter relating to the 3M policies?

25 A    Give me a moment here, please.

 1            THE COURT:  You're not the only one.

 2   BY MR. ROGERS:

 3   Q    We've also pulled it up on the screen for you Mr. Sullivan

 4   if that's easier.

 5   A    I'll look at the screen.  Thank you.

 6   Q    You were asked some questions yesterday about Exhibit

 7   Number 70 --

 8            THE COURT:  Just a moment.

 9            MR. ROGERS:  Sure.

10            THE COURT:  For the smart people on my left, can you

11   let them know that the side monitors are not on, or if they're

12   on, they're not working?

13            THE CLERK:  Yes.

14            THE COURT:  A well-oiled machine, the federal

15   judiciary.

16            But you can see it, correct, Mr. Sullivan?

17            THE WITNESS:  I can, yes.

18            THE COURT:  All right.  For the interest of time,

19   let's go forward since he can see it and I can see it as well

20   on paper with the hope that the wonderful people from IT will

21   soon make those working.

22            MR. ROGERS:  May I proceed, Your Honor?

23            THE COURT:  You may.

24            MR. ROGERS:  Thank you.

25   BY MR. ROGERS:

1  Q    You were asked some questions yesterday about Exhibit

2  Number 70 by counsel for the claimants.  Do you remember that?

3  A    Yes.

4  Q    And in particular, the second paragraph of the letter

5  there, you were asked some questions about that second

6  paragraph.  Do you recall those questions?

7  A    Yes.

8  Q    And this is the paragraph that says 3M sold Combat Arms

9  Earplug Version 2.  3M has received numerous lawsuits in recent

10 months alleging among other things personal injury.  And you

11 were asked some questions about those two sentences.  Do you

12 remember those?

13 A    I recall.

14 Q    And the next sentence there says, "As an example, please

15 see the attached complaint."  Do you see that?

16 A    I do.

17 Q    Okay.  Now I want to refer you back to -- so did 3M attach

18 a complaint to the notice letter that they sent to the

19 insurers?

20 A    Yes.

21 Q    I want to refer you now to Exhibit Number 69, which is the

22 email transmitting the notice letter.  And it's up there on

23 your screen if you don't have the hard copy in front of you.

24      And I want to take a look at the first paragraph there of

25 the email.  And you see the last sentence there says, "I am

Sullivan - Redirect/Rogers                    15

1  also attaching a copy of the Robin Kennedy lawsuit per my

2  attached letter."

3  A     Yes, I see it.

4  Q     Okay.  So let me hand you what's been previously marked as

5  Exhibit Number 71.

6         Do you recognize Exhibit 71 as the Robin Kennedy complaint

7  that was attached to the notice letter?

8  A     Yes, I do.

9         MR. ROGERS:  Your Honor, we move Exhibit Number 71

10 into evidence.

11        THE COURT:  Any objection to the admission of what

12 has been designated Exhibit 71?

13        MR. MANTHEY:  No objection, Your Honor.

14        THE COURT:  All right.  Hearing that and seeing no

15 other objection, the Court will admit Exhibit 71.

16        (Debtors' Exhibit 71 admitted into evidence)

17 BY MR. ROGERS:

18 Q     Mr. Sullivan, I want to direct your attention to Page 6 of

19 the complaint, and in particular, Paragraph 20.

20 A     I have that here.

21 Q     It says there, these earplugs were originally created by a

22 company called Aearo Technologies, and then there's a

23 definition there.  Do you see that?

24 A     I do.

25 Q     And how do they define Aearo Technologies?

1  A    It's defined as Aearo or 3M/Aearo.

2  Q    Okay.  Now, I want to turn your attention to some of the

3  factual allegations in the complaint that was attached to the

4  notice letter.

5      So if you take a look at Page 7 of the complaint, there's

6  a section there titled "History of Testing, January 2000

7  Testing."  Do you see that section?

8  A    I see that section.

9  Q    And I want you to skim through Paragraphs 26 through 40

10 and tell me against whom does the plaintiff allege these

11 factual allegations?

12 A    3M and Aearo appears.

13 Q    It's 3M/Aearo?

14 A    3M/Aearo.

15 Q    Okay.  And then if you look at the next section, "February

16 2000 Testing," that's on Page 9 of the complaint.

17 A    Okay.

18 Q    There are some factual allegations in a few paragraphs

19 there.

20     And who are those allegations against Mr. Sullivan?

21 A    3M/Aearo.

22 Q    Okay.  And then there's a section titled "Defendants'

23 Representations and Omissions" that runs from Paragraphs 46

24 through 66.  Do you see references there also to 3M/Aearo?

25 A    I do.

1  Q    Okay.  Now, this complaint, Robin Kennedy complaint that

2  was attached to the notice letter, that's one of the earlier

3  complaints that was filed in the Combat Arms litigation.  Is

4  that correct?

5  A    Yes.

6  Q    And have there been complaints since filed by other

7  claimants?

8  A    Yes.

9  Q    And were there complaints filed in the MDL that's pending

10 in Florida?

11 A    Yes.

12 Q    And have you seen those complaints?  Are you generally

13 familiar with them?

14 A    Yes.

15 Q    I'm going to hand you what's been previously marked as

16 Exhibit 304.

17          THE COURT:  Thank you.

18 BY MR. ROGERS:

19 Q    Do you recognize Exhibit 304, Mr. Sullivan?

20 A    Yes.

21 Q    What is this?

22 A    This is the master long form complaint for the Combat Arms

23 litigation.

24          MR. ROGERS:  Your Honor, debtors move Exhibit 304

25 into evidence.

1           THE COURT:  Any objection to the admission of

2   Exhibit 304.

3           MR. MANTHEY:  We actually do have an objection, Your

4   Honor.  I think this is --

5           THE COURT:  And just for the record, can you please

6   state your name since there is an objection?

7           MR. MANTHEY:  Sure.

8           THE COURT:  Thank you.

9           MR. MANTHEY:  Tristan Manthey on behalf of the

10  claimants.

11          This document is outside the direct exam that was

12  just conducted, or cross -- I mean on cross.  I'm sorry, Your

13  Honor.

14          MR. ROGERS:  Your Honor, the cross-examination was

15  with respect to who was the defendants in the litigation that

16  was given notice to the insurers.  So that's the purpose of

17  admitting this into evidence.

18          THE COURT:  All right.  Any response thereto?

19          MR. MANTHEY:  Yes, Your Honor.

20          The notice was as to one simple lawsuit and the

21  questions were related to the notice of that lawsuit.  Wasn't

22  as to the MDL litigation.

23          THE COURT:  But wasn't that lawsuit contained in the

24  MDL litigation?

25          MR. MANTHEY:  Not originally, no.

 1            THE COURT:  But that's where it was, right?  The
 2   Sloan case that I think you were referencing.
 3            MR. MANTHEY:  No, I think this relates -- he's --
 4            THE COURT:  Well, I don't know quite what it relates
 5   to, but I mean, on cross, you did bring up as far as what
 6   claims were paid, Liberty paid I think on the Sloan verdict.
 7            MR. MANTHEY:  Correct.
 8            THE COURT:  And I think you went -- we're talking
 9   about who was it directed to, was a 3M?  Aearo wasn't
10   mentioned.  I think where we might be going is trying to show
11   that it's for both.  I don't know.  But if that's where we're
12   going, is foundation really proper -- excuse me.  Is a scope
13   foundation -- is a scope objection really proper here if that's
14   where they're going, understanding that if they're not, it may
15   not be relevant?
16            MR. MANTHEY:  We're okay with your ruling, Your
17   Honor.
18            THE COURT:  Well, gee thanks.
19            MR. MANTHEY:  I have a feeling I know where that
20   ruling is going.
21            THE COURT:  I'm going to overrule the objection on
22   the fact that I think where they're going is that way.  If I'm
23   mistaken, obviously, it probably won't be relevant.
24            (Debtor's Exhibit 304 admitted into evidence)
25            MR. ROGERS:  Thank you, Your Honor.

Sullivan - Redirect/Rogers                    20

1  BY MR. ROGERS:

2  Q    Mr. Sullivan, who are the defendants in the master long

3  form complaint in the MDL?

4  A    3M Company, 3M Occupational Safety LLC, Aearo Holding LLC,

5  Aearo Intermediate LLC, Aearo LLC, and Aearo Technologies LLC.

6  Q    And is 3M seeking insurance coverage under the 3M tower

7  for the cases pending in the MDL?

8  A    Yes.

9  Q    And is 3M seeking coverage under the Aearo legacy policies

10 for the cases pending in the MDL?

11 A    Yes.

12          MR. ROGERS:  May I have a moment, Your Honor?

13          THE COURT:  You may.

14          MR. ROGERS:  Thank you, Your Honor.  No further

15 questions.

16          THE COURT:  All right.

17          MR. ROGERS:  Okay.

18          THE COURT:  Now, Mr. Manthey, any recross based upon

19 the questions on redirect?

20                (No audible response)

21          THE COURT:  I'll take that as a yes.

22          MR. MANTHEY:  Tristan Manthey on behalf of the

23 claimants, again, Your Honor.

24          May I proceed?

25          THE COURT:  You may.

Sullivan - Recross/Manthey                    21

1                         RECROSS EXAMINATION

2  BY MR. MANTHEY:

3  Q    Mr. Sullivan, can you go to Exhibit 71?

4       That was the exhibit that you just went over in regard to

5  the lawsuit filed by Robin Kennedy.

6  A    Thank you.

7  Q    Let me know when you have it in front of you.

8  A    I have that now.  Thank you.

9  Q    Okay.  Let me direct your attention to the second page.

10  A    Okay.

11  Q    Do you see where it says "defendants" at the bottom left

12  corner?

13  A    I do.

14  Q    Okay.  Who are the defendants to this lawsuit?

15  A    The defendants are noted as 3M Company and DOES, ONE

16  through FIFTY, inclusive.

17  Q    Is Aearo a defendant in this lawsuit?  Or are they a named

18  defendant in that caption?

19  A    Can you clarify your question for me please?

20  Q    Does Aearo appear on this page?

21  A    No, they don't.

22  Q    Okay.  And then let me direct your attention to the sixth

23  page.

24       I think counsel brought you through Paragraph Number 20.

25  Do you see Paragraph 20?

1  A    I do.

2  Q    Okay.  And then what does Paragraph 21 say?  Can you read

3  that for the Court?

4  A    Paragraph 21 says, "Defendant 3M acquired Aearo in 2008,

5  including Aearo's liabilities, and thus 3M is liable for

6  Aearo's conduct as alleged herein."

7  Q    Okay.

8          MR. MANTHEY:  Thank you, Your Honor.  No further.

9          THE COURT:  All right.

10          I'm going to drop the res, but any additional direct?

11          MR. ROGERS:  No, Your Honor.

12          THE COURT:  All right.  I believe that you may be

13  excused.

14          THE WITNESS:  Thank you.

15          THE COURT:  Thank you.

16                    (Witness excused)

17          THE COURT:  All right.  Debtors, who is the next

18  witness to whom you would like to ask questions in prosecution

19  of your case?

20          MR. HOROWITZ:  Good morning, Your Honor.  David

21  Horowitz of Kirkland and Ellis LLP, proposed counsel for the

22  debtors.

23          Before we call a witness, I did want to raise one

24  issue with respect to the factual stipulation that my partner,

25  Mr. McKane referenced yesterday.

1              THE COURT:  Okay.

2              MR. HOROWITZ:  So as you know, Your Honor, each side,

3    or certain of the claimants and the debtors each submitted

4    request for judicial notice throughout the last weekend over

5    the weekend.  And I wanted to update you on that issue because

6    we think we've largely resolved on the issues there.

7              So on Sunday, as Mr. McKane noted, we worked

8    tirelessly with counsel for the claimants over the course of 12

9    to 14 hours going back and forth on certain factual

10   stipulations.  The stipulated facts cover much of the

11   procedural history of the MDL, including court orders,

12   statements by the parties as reflected in transcripts,

13   pleadings, and correspondence.  And rather than have, you know,

14   put witnesses on the stand to testify to, you know, the

15   contents of pleadings and things of that nature, we determined

16   that it would be in everyone's interest and in the interest of

17   efficiency to simply stipulate to certain of those facts.

18             So we're in agreement.  We provided the stipulation

19   to the U.S. Trustee yesterday.  I have not had a chance to

20   catch up with them this morning, but we --

21             THE COURT:  We made it easier to find them today.

22             MR. HOROWITZ:  That is true, Your Honor.  But we got

23   so well, we didn't have a chance to chat.  I haven't heard

24   whether or not there's any objection to the facts going in from

25   them.  And I'm sorry to put them on the spot, but I just wanted

24

1  to raise it early enough in the day.

2         So we have some facts.  They're embodied in about 75

3  or 80 or so pages.  They're double spaced, a lot of block

4  quotes, so it's not as long as you would think, Your Honor, but

5  there are 175 facts, but they are very basic background

6  information about the MDL.  There are not exhibits attached to

7  this, the transcripts aren't attached.

8         We understand, you know, Your Honor's preference to

9  not introduce bulk exhibits.  We don't intend to do that.  But

10 as with our Rule 1006 summaries, all of the transcripts, the

11 pleadings, whatever else we reference in here, we're prepared

12 to file as needed if the Court so desires.  But as it stands,

13 there's only one attachment which is a recent printout of the

14 MDL docket since the filing of the Chapter 11 case and nothing

15 else.

16        So with that said, I just, frankly, interested in

17 Your Honor's preferences as to how to go about dealing with the

18 stipulated facts.  Obviously, reading them would take quite

19 some time.  We could just file them on the docket or we could

20 otherwise, you know, admit them some other way.

21        THE COURT:  I would just file them on the docket just

22 simply because then there's a record and just ask that they be

23 incorporated.  I mean, it's one of those things.  I mean, what

24 you're asking, essentially, are they stipulated facts or is it

25 a judicial notice of what's going on?

1          MR. HOROWITZ:  So I'll put it thus.  So certain of
2     the facts are facts that would not typically fall within the
3     judicial notice bucket.

4          THE COURT:  Okay.

5          MR. HOROWITZ:  So, for example, there are currently X
6     cases pending, but that's based on a review of a BrownGreer,
7     you know, case administrator docket.  It's not on a public
8     filing.  That's a fact.

9          THE COURT:  Okay.

10          MR. HOROWITZ:  But then there are other things that
11     would normally fall within the judicial notice bucket, like
12     "the Court said X in its order dated Y."  so we have phrased
13     the facts in a way that would comport with how judicial notice
14     would typically work.  So rather than saying, "the court may
15     take judicial notice of the following statement," it says "the
16     MDL court made the following statement" or "plaintiff X
17     testified to the following."

18          THE COURT:  Okay.

19          MR. HOROWITZ:  Yeah.

20          THE COURT:  All right.  Well, I guess let me ask the
21     initial question and I will ask.  Has the U.S. Trustee had an
22     opportunity to review them to make sure that they really are
23     joint stipulated facts?  Or is there any dispute as to what
24     should come in?

25          MS. DUVALL:  Your Honor, we have not.

26

1          THE COURT:  Can you please state your name for the
2  record, ma'am?

3          MS. DUVALL:  Excuse me.  Laura DuVall on behalf of
4  the U.S. Trustee.

5          We have not had an opportunity to completely review
6  the document.

7          THE COURT:  Okay.

8          MS. DUVALL:  I know they were handed to Mr. Strauss
9  yesterday.  He has (indiscernible).

10          THE COURT:  Okay.

11          MS. DUVALL:  He was unable to complete his review
12  yesterday.

13          THE COURT:  Okay.  But there are several large block
14  quotes.

15                         (Laughter)

16          THE COURT:  It's not as bad as you think it will be.

17          MS. DUVALL:  (Indiscernible)

18          THE COURT:  That's okay.  So that's understood.  All
19  right.

20          MS. DUVALL:  So, no, at this point, I mean, I think
21  it's not on the docket.

22          THE COURT:  Okay.

23          MS. DUVALL:  I don't think we are in a position to
24  consent that he can stipulate to these facts.

25          THE COURT:  Okay.  All right.

27

1          But based upon what you've said, and I hate to

2  generically refer to them as the tort claimants, but are the

3  law firms who represent the tort claimants that are here and

4  involved, have they stipulated to those facts?

5          MR. HOROWITZ:  I'll let them confirm, but --

6          MR. PFISTER:  Yes, Your Honor.

7          MR. HOROWITZ:  Yeah.

8          THE COURT:  And it's a new day, so remember to state

9  your name for the record, please?

10          MR. PFISTER:  Yes, Your Honor.  Rob Pfister from the

11  Klee Tuchin firm on behalf of the claimants who filed what I'll

12  call the joint brief if that makes it easier.

13          We are signed off and stipulated on the facts.

14          THE COURT:  Okay.

15          MR. PFISTER:  And the other objectors I understand

16  are still review, are confirming.  They can confirm for

17  themselves.  But my understanding is they're signed off.

18          THE COURT:  Okay.

19          MR. PFISTER:  Yeah.

20          THE COURT:  Well, let's find out.

21          MR. GLASSER:  Brian Glasser, Your Honor, for the

22  Bailey Glasser objectors, and we are signed off.

23          THE COURT:  Thank you.

24          MR. KELLER:  Ashley Keller for Keller Postman, Your

25  Honor.  We're signed off as well.

28

1           THE COURT:  Okay.  Thank you.

2           MR. HOROWITZ:  And there was, I'm forgetting the

3  gentleman's last name, but the Minnesota claimants had also

4  signed off on the stipulated facts.

5           MR. PFISTER:  That's Mr. Paul.

6           MR. HOROWITZ:  Yes, Mr. Paul.  I'm not sure if -- I

7  don't see him, though.

8           THE COURT:  Did Mr. Paul not want to stay over in

9  Indianapolis?

10          I know it's not Pensacola, but I mean, it's not bad.

11          All right.  But your understanding is they have

12  stipulated.

13          MR. HOROWITZ:  That's correct, Your Honor.  There are

14  only a few facts with respect to Minnesota to be clear, and he

15  signed off on those.

16          The other thing I'll just note for the record, and

17  this is contained in the stipulation, is because each side has

18  submitted some stipulated facts about what the other side said

19  or what certain claimants said, the facts, or what was said,

20  are not being offered for the truth of the matter, but rather

21  for the fact that it was said that it's contained within the

22  stipulation and in something in that respect will be consistent

23  with an RJN or request for judicial notice.

24          THE COURT:  Okay.

25          MR. HOROWITZ:  So, look, Your Honor, we'll file them

1  and I'll continue to talk with Ms. DuVall of Trustee's Office

2  throughout the day just to hopefully get, just get agreement

3  for the record purposes.

4          THE COURT:  Okay.  All right.

5          What I would recommend then is to file what you have

6  and then I would ask the U.S. Trustee if they're able to either

7  indicate if you have an objection or if you don't,

8  understanding that, of course, whatever I deem is relevant to

9  the decision will be part of whatever opinion and order I do,

10 and the others will just be submitted.

11         MR. HOROWITZ:  Fully understand.

12         THE COURT:  I mean, I think I've indicated I want to

13 stay away from a lot of what's happened in the MDL because I

14 don't think it's relevant.  But I do think it's relevant for a

15 lot of, at least a number of cases, what's going on and what

16 the current position is and where we're at, I think definitely

17 is probably relevant to what's going on.

18         MR. HOROWITZ:  And just for the record, from our

19 perspective, Your Honor, a lot of the statements we have in

20 here go to the intertwining factor that Mr. Husnick talked

21 about earlier.  So that's the purpose for which we are

22 submitting them.

23         THE COURT:  All right.

24         Well, hopefully, we can know whether that's

25 stipulated to from everybody or not when we get to closing.

1  That would be helpful.  And more importantly, the chance I get

2  to look at it beforehand would be also helpful.

3              MR. HOROWITZ:  We'll get them on file, Your Honor.

4              THE COURT:  Because I can't wait to have your argue

5  facts I haven't seen or heard.  So hopefully, we can get that

6  done.

7              MR. HOROWITZ:  Sure thing.

8              THE COURT:  All right.

9              MR. HOROWITZ:  Thank you, Your Honor.

10             THE COURT:  Thank you, Mr. Horowitz.

11             All right.  So that being said, who's next?  And I

12  have to remind you because we do have a record that's not

13  visual, it's audio, to always state your name just so we know

14  who you are and -- because, otherwise, you'll be unknown voice

15  when the transcript comes in and that's kind of sad when they

16  don't even know who you are.

17             So go ahead.

18             MR. ROGERS:  Your Honor, Brent Rogers, Kirkland and

19  Ellis, proposed counsel to the debtors.

20             As an accommodation to the claimants, we understand

21  that the claimants have one witness to offer today who has a

22  scheduling conflict and we have agreed to allow that witness to

23  testify out of order in the middle of our case.  So I believe

24  the next witness will be a witness for the claimants.

25             THE COURT:  Okay.

1          MR. PFISTER:  Yeah.  Your Honor, this is Mr. Pfister

2  for the claimants who filed the joint brief.  To be clear, this

3  is not our witness.  This is the Keller brief and the Keller

4  objector --

5          THE COURT:  Okay.

6          MR. PFISTER:  -- is their witness.

7          THE COURT:  All right.

8          But they did file an objection so I will allow it.

9  And I think they did file a witness and exhibit list indicating

10 that there would be a witness called, so let's see where it

11 takes us.  You're going to mess up my pen color order, but

12 that's all right.

13         I have to let them call you as a witness before I can

14 swear you in, so hang tight.

15                    (Pause)

16         MS. BARRIERE:  Good morning, Your Honor.  Ashley

17 Barriere on behalf of Keller Postman and our client Charles

18 Rataj.

19         THE COURT:  All right.

20         MS. BARRIERE:  Good morning, Mr. Heaton.

21         THE COURT:  All right.  Well, first I have to know

22 who you're calling as a witness and then I'll swear him in and

23 then we'll go from there.

24         MS. BARRIERE:  J.B. Heaton, Your Honor.

25         THE COURT:  All right.

1            Will you please raise your right hand, sir?

2            JAMES B. HEATON, CLAIMANTS' WITNESS, SWORN

3            THE COURT:  All right.  Please be seated.

4            It's a new day.  So I'll remind you, once again, we

5  are audio only, so please make sure you speak into the

6  microphone as best you can and answer questions yes or no.  And

7  don't nod your head or use hand gestures because they are not

8  recorded.

9            You may proceed.

10            MS. BARRIERE:  Thank you, Your Honor.

11            Again, this is Ashley Barriere on behalf of Keller

12  Postman as well as Charles Rataj.

13                        DIRECT EXAMINATION

14  BY MS. BARRIERE:

15  Q    Good morning, Dr. Heaton.

16  A    Good morning.

17  Q    Can you please state your full name for the record?

18  A    My full name is James Breckinridge Heaton, III,

19  B-R-E-C-K-I-N-R-I-D-G-E.

20  Q    A mouthful.

21        And where do you live, Dr. Heaton?

22  A    I live in Chicago, Illinois.

23  Q    And what is your current occupation?

24  A    My current occupation I characterize as being a financial

25  researcher.  Under that rubric, I do consulting to different

 1  parties, typically investors, some insurance companies, some

 2  others.

 3          I do a little bit of expert witness work as here.

 4  And I also do investing on my own proprietary account.

 5  Q    And what does that entail on a day-to-day basis?

 6  A    Well, it would depend on which of those three I'm most

 7  involved with.  If it was, I guess, last week, it involved

 8  mostly preparing my declaration for you.  Sometimes, it would

 9  be looking at a litigation scenario that perhaps an

10  institutional investor has exposure to and working with them.

11      I do a fair amount of statistical modeling related to my

12  published research for my own investments and so sometimes,

13  it's that kind of work.

14  Q    And how long have you been a financial researcher?

15  A    In the capacity that I've just used that term, for I guess

16  it'll be five years in October.

17  Q    Have you ever been qualified as a witness on assessing a

18  company's solvency in court?

19  A    Yes.

20  Q    And what was that case?

21  A    That was in the Intelsat bankruptcy.

22  Q    Prior to being a financial researcher, did you hold any

23  other positions or occupations?

24  A    Yes.  Most recently, before Halloween of October --

25  Halloween of 2017, I was a partner at a firm called Bartlit

1  Beck and I had been there for 18 years.  Fourteen of those, I
2  was a partner.  Before that, I was in graduate school.  But
3  before that, I had a job after my undergraduate work at a, I
4  think what we would call a litigation support firm that did
5  work that would support expert witness testimony.
6  Q    Are you still licensed as an attorney?
7  A    I am licensed in Illinois and I am licensed in New York.
8  Q    Now you mentioned I believe your graduate work.  What
9  degrees do you hold?
10 A    I hold a J.D. and an MBA and a Ph.D. in Finance from the
11 University of Chicago.  And I hold a Bachelor's Degree in
12 Finance from the University of Illinois at Urbana-Champaign.
13 Q    Did this education require any training in statistics?
14 A    Yes.
15 Q    And what about any specific training in accounting?
16 A    Yes.
17 Q    Have you ever taught any courses?
18 A    Yes, I've taught courses at the law schools of
19 Northwestern University, the University of Chicago, Duke
20 University, and I have taught finance courses in the business
21 schools of the University of Chicago and Duke University.
22 Q    Have you ever received any awards for your teaching?
23 A    For my teaching, I received a best instructor award at
24 Duke University for my corporate restructuring course.
25 Q    And you mentioned restructuring, but just to confirm, do

1   any of the courses that you taught involve bankruptcy?

2   A    Yes.

3   Q    Okay.

4   A    Actually, all of them touch on bankruptcy but none of them

5   were only devoted to bankruptcy.

6   Q    Okay.  Have you ever published any articles or any other

7   type of publications?

8   A    Yes.  I published, I think 37, what I would characterize

9   as academic or scholarly pieces, so not op-eds or things like

10  that.  And I think of those, 16 are peer reviewed in finance

11  journals or law and economics journals.  And the rest would be

12  either in law reviews, which are student edited not peer

13  reviewed, or professional journals that also take some mix of,

14  you know, what I think of as kind of academic but bordering on

15  more very practical practitioner relevant (indiscernible).

16  Q    Have you ever published on insolvency?

17  A    I published a number of articles on solvency testing and

18  the detection of insolvency so the word insolvency is much

19  broader than that.  But as to solvency testing and detecting

20  insolvency, I believe, and this may be a fact only appreciated

21  by about half of the room, that I've published more on that

22  topic than anyone else around.

23  Q    Okay.  Have you ever received any awards for your

24  publications?

25  A    I have.  To be clear, the award, the prize papers I have

Heaton - Direct/Barriere                                    36

1  are not in that insolvency set.  But I don't think -- I hope

2  that's not a bad reflection on them.  But I have received a

3  best paper award on making inferences about prices and

4  detecting whether they should be rationally or irrationally,

5  use the term behavioral, behaviorally determined.  I received a

6  best paper prize in 2002 from the Review of Financial Studies.

7  And then in 2010, I received a runner-up prize in the Review of

8  Finance for some related research.  And I should say, both of

9  those I had co-authors.  So I only shared those awards.

10 Q    Are you sometimes asked to peer review the work of others?

11 A    Yes, I am.

12 Q    And for what type of journals are you asked to peer review

13 the work of others?

14 A    I'm a peer reviewer for both finance journals and for law

15 and economics journals.

16 Q    Have your publications ever been cited in any judicial

17 opinions?

18 A    My publications have been cited in 20 judicial opinions

19 that I'm aware of that are published or unpublished but on

20 Westlaw.  So those are the ones I can know about.

21 Q    Now, I know we talked about that you've served as an

22 expert in that insolvency case in bankruptcy.  Have you ever

23 served as an expert in any other cases?

24 A    Yes.  I haven't been doing this for that long, nor do I do

25 that much of this, but I have been qualified twice as an expert

1  in business valuation and cost of capital determination in

2  business valuation.

3  Q    Okay.  Now, turning now to this case, Dr. Heaton, what

4  were you asked to do in this case?

5  A    I was asked to look at really three issues.

6       First, what is the likely minimum value of the claims that

7  exist against 3M based on the data that is available.

8       Second, I was asked to compare that value to 3M Company's

9  free cash flow generation.

10      And third, I was asked to express an opinion on whether if

11 an injunction were to issue and there were to be a condition on

12 that injunction that 3M not be allowed to pay dividends, make

13 share or purchases, or spinoff its healthcare business during

14 the pendency of that injunction, would that harm 3M Company in

15 any way.

16 Q    And just to clarify, when you say claims against 3M, are

17 you referring to the claims arising out the Combat Arms

18 Version 2?

19 A    Yes, I'm talking -- I only was asked to look at the likely

20 minimum value of those claims not, for example, the per

21 fluorinated compound claims and other claims that exist.

22 Q    Okay.  And if I refer to those claims as the CAEv2 claims,

23 will you understand I'm also referring to the Combat Arms

24 Version 2 claims?

25 A    Yes, I understand.

1  Q    Okay.  Were you asked to do a 502(c) valuation in this
2  case?
3  A    No.  I was not asked to do a valuation that ultimately a
4  court might do under 11 U.S.C. 502(c).  I was actually asked to
5  look at a likely minimum value of the claims, again, the Combat
6  Arms claims, against 3M Company.
7  Q    Okay.  Did you prepare a declaration in this matter?
8  A    Yes.
9  Q    What were the facts and data you relied on to prepare that
10 declaration?
11 A    The data were pretty self-contained.  The data are the
12 fact that there are 27 bellwether cases.  The fact that of
13 those 27, 14 were either dismissed or 3M Company prevailed.
14 And in 13 of those, the plaintiffs prevailed.  There's the
15 amount of the verdicts in the cases where the plaintiffs
16 prevailed and the number of claims that were pending in June of
17 2022 according to an order from district court Judge Rodgers
18 and some financial information on 3M Company's free cash flow
19 from 3M Company's securities and exchange filing.
20 Q    Did you use any scientific principles to render your
21 opinion?
22 A    Yes.  I used a very basic test called an exact binomial
23 test, which is a test designed to allow one to test a
24 hypothesis about essentially any zero-one kind of outcome.  You
25 could think of it as if you had a coin and you had a certain

1  number of flips and maybe some of them came up heads and you

2  wanted to make an inference about whether it was a fair coin,

3  50-50, that's the kind of test you would use.  But it's used

4  very widely because as you can imagine, there are a lot of

5  inference problems that have this kind of yes-no zero-one sort

6  of angle.

7      I also rely on some research on share repurchases and

8  dividends, how they are substitutes, and some of my own, I

9  guess, you know, background financial knowledge, as well.

10 Q    Now, the exact binomial tests you just discussed, is that,

11 I think you said it's widely used.  Is that correct?

12 A    It's widely used and it's one of the oldest tests that

13 actually goes back to a -- it's actually a 1934 paper in

14 Biometrika.  But I mean, it's widely used because it's quite

15 simple.  And as I said, these kinds of questions come up all

16 the time.  You know, there are cases in court, for example,

17 where, you know, was this person discriminated against or not,

18 you know, hired or not hired, that kind of thing.  So here,

19 it's win or loss for 3M Company.

20 Q    Okay.  Do you believe that your testimony will be helpful

21 in assisting the Court understand 3M's likely minimum liability

22 arising out of the CAEv2 claims?

23 A    I think so.  Yes.

24         MS. BARRIERE:  Your Honor, at this time, I'd like to

1  tender Dr. Heaton as an expert for estimating the likely

2  minimum amount of liabilities associated with the CAEv2 claims,

3  3M's ability to fund those claims, and the economic effect on

4  3M of an injunction as if they're enjoined from paying

5  dividends, stock repurchases, and spinoffs.

6          THE COURT:  All right.  Is there an objection?

7          MR. ROGERS:  Your Honor, may I voir dire the witness?

8  We do object.

9          THE COURT:  Okay.  That helps.  Yes, you may.

10          MR. ROGERS:  Your Honor, Brent Rogers, Kirkland and

11  Ellis, proposed counsel for the debtors.

12          May I proceed?

13          THE COURT:  You may.

14                    VOIR DIRE EXAMINATION

15  BY MR. ROGERS:

16  Q    Good morning, Dr. Heaton.

17  A    Good morning.

18  Q    Good to see you again.

19  A    Good to see you.

20  Q    You mentioned an exact binomial hypothesis test that you

21  ran in this case.  Is that correct?

22  A    Yes, sir.

23  Q    And that was the test that you used to determine what you

24  call the minimum likely outcome or minimum likely liability for

1  3M in the Combat Arms litigation, right?

2  A    It's two-sided so it would have a minimum and a maximum,

3  correct.

4  Q    Okay.  But that's the test you used to determine this

5  minimum likely outcome, right?

6  A    Correct.

7  Q    And that exact binomial hypothesis test is based on an

8  assumption that the bellwether claims are representative of the

9  entire population of Combat Arms claims.  Isn't that true?

10  A    Yes, sir.

11  Q    And you yourself did not do any analysis to determine

12  whether those bellwether claims were in fact representative of

13  the larger population of Combat Arms claims, did you?

14  A    That's incorrect because I reviewed, or I was, I guess I

15  asked counsel how the bellwether process was performed.  The

16  bellwether process is also described in some documents.  So to

17  your point, my concern, when you do a test like this, you need

18  to have some basis for thinking that your sample is

19  representative.  And one way you can get that is if you're

20  lucky and you draw randomly and you happen to get the right

21  representation.  But here, it's much better because there were

22  professionals brought in and the parties got involved and the

23  Court got involved to design it so it was representative.

24  Q    I'm going to show you what's been marked as Exhibit 600.

1      Dr. Heaton, do you recognize Exhibit 600 as a copy of the

2  declaration that you submitted in this case?

3  A    With attachments, correct.

4  Q    And if I could refer you, sir, to Pages 4 and 5 of the

5  declaration.  Do you see there that it's the --

6  A    Hold on.  Hold on, counselor, I'm not there yet.

7       All right.  I have Pages 4 and 5.

8  Q    Do you see there that there's an opinion titled "The

9  Likely Minimum Value of the 3M CAEv Claims Against 3M Exceeds

10 $100 Billion"?

11 A    Yes, sir.

12 Q    Is that your opinion, sir?

13 A    Yes, sir.

14 Q    And is the basis for that opinion contained in

15 Paragraphs 12 through 20 of your declaration?

16 A    Yes, sir.  Paragraph 12 through 20 describe the analysis

17 that underlies that conclusion.  That's correct.

18 Q    And would you agree with me, sir, that there is not one

19 paragraph of that section that says anything about the

20 bellwether selection process in the MDL?

21 A    No paragraph there discusses the process.  The first

22 paragraph describes that everything came from the bellwether

23 verdicts.  And as we discussed at my deposition, you know, and

24 I think you and I agreed that we understood that that was the

1  bellwether process in Florida.

2  Q    So nothing in your declaration says anything about the

3  process by which bellwethers were selected in the MDL.  Isn't

4  that true?

5  A    That's correct.

6  Q    And nothing in your declaration says anything about the

7  orders in the MDL that were issued to set up the bellwether

8  selection process.  Isn't that right?

9  A    That's correct.

10 Q    And you'll recall we sat down together on Saturday for a

11 deposition, right?

12 A    Yes, we did.

13 Q    And do you remember that I showed you PTO 23 out of the

14 MDL?  Do you remember that?

15 A    Yes, sir.

16 Q    And PTO 23 was the order that outlined the bellwether

17 selection process in the MDL, right?

18 A    (No audible response)

19 Q    Would you like to see a copy?

20 A    No, no.  I'm just trying to remember 23.  That was the 23

21 had on the top.  Yes.  We looked at that.  Yeah.

22 Q    And Saturday was the first time you had seen that

23 document, wasn't it?

24 A    That was the first time I had seen that document, but I

1  was familiar with the facts underlying that from counsel's

2  description to me of how the bellwether verdicts were selected.

3  Q    Okay.  Now, other than counsel's description to you of how

4  the bellwethers were selected, you didn't look at the facts of

5  the bellwether cases at all, did you, sir?

6  A    No.  My analysis is based entirely on the data that came

7  out of the bellwether process that 3M company and the claimants

8  and district court Judge Rodgers designed and evaluated.  I

9  have no opinion on that process other than that, as it was

10 described to me and as have we've since confirmed is true about

11 that process, it was selected and stratified with the intent of

12 being representative.  And your client and the claimants and

13 the Court all agreed with that conclusion.

14 Q    And you didn't do anything to independently confirmed that

15 the bellwether cases were in fact representative of the larger

16 population of MDL claimants, did you?

17 A    That's correct.  If one believed that that process was not

18 representative, contrary to your positions in front of the

19 district court judge, you would not want to find this to be a

20 reliable indication of the minimum likely liability that 3M

21 Company faces because this exact binomial test does rest on

22 that assumption.

23 Q    In your declaration, you've disclosed all the materials

24 that you considered in forming your opinions in this case.  Is

1  that right?

2  A    Well, we all have, you know, background knowledge.  We

3  don't, you know, I've taken a hundred expert depositions in my

4  life probably and, you know, there's the always trying to find

5  where's the line of where, you know, I know how to do cashflow

6  analysis because I read these five books back here seven years

7  ago.  So I think the basis of everything in here is clear.

8  It's clear that I used the bellwether verdicts.

9      There's no dispute that I know about whether there are

10 some other bellwether verdicts that might refer to.  I've heard

11 the same number, you know, throughout the day yesterday.  So I

12 do think the basis of everything is there.

13 Q    And there's no citation in this report to, for instance,

14 PTO 23, right, because you hadn't seen it before you read the

15 report, correct?

16 A    As I said before in answer to that exact question, that's

17 correct.

18 Q    And there's no citation in here to any transcripts from

19 the MDL hearing at which the bellwether selection process was

20 described.  Is that right?

21 A    It's correct.  My assumption is that the bellwether

22 process provides a plausible basis to believe that, as it was

23 designed with input from the parties, including your client,

24 well, I'm sorry, your old client, but maybe this client, I'm

1  not sure, and the claimants and the district court judge and

2  the district court judge's firm selected to help and the

3  statisticians working with them that, that provides me a

4  plausible basis to come in and say, what does that data mean

5  given that assumption about 3M's likely liability.

6      But I will be the first to say, if the trier of fact

7  decided I don't think that is a representative sample, then the

8  trier of fact should ignore what I am saying here.

9  Q    So my question was a little simpler though, sir.  My

10  question was just, do you cite any transcripts from the MDL

11  hearings at which the bellwether selection process was

12  described?

13  A    No, I do not.

14  Q    And you don't cite any orders from the MDL court

15  describing the bellwether selection process, correct?

16  A    No, I do not.

17  Q    And you didn't cite any assumptions that were given to you

18  by counsel about the bellwether selection process, do you?

19  A    No.  I think we discussed that in the deposition and you

20  already knew what they were and I knew what they were and so,

21  no.  But they're not cited in the text of the report.  It's not

22  a report, it's a declaration.

23  Q    Right.  And there's nothing in the declaration, there's no

24  citations whatsoever in the declaration, about the bellwether

47

1  selection process, correct?

2  A     I am not second guessing the bellwether process.  I am

3  taking that as an input and I am in full candor saying if it is

4  representative, then this is a basis to make an inference about

5  the likely minimum exposure that 3M Company has.  And if it is

6  not representative, something on which I have no opinion, then

7  the trier of fact should not rely on that analysis.

8        MR. ROGERS:  Your Honor, based on that last Q and A

9  and the rest of the Voir Dire, we do object to the proffer of

10 this witness as an expert.  I don't think there's any basis

11 whatsoever for him to say that the bellwether cases are in any

12 way representative of some larger population of cases such that

13 he can draw any conclusions about a minimum liability under his

14 binomial hypothesis test.

15        THE COURT:  All right.

16        Ms. Barriere, do you have a response to that?

17        MS. BARRIERE:  I do, Your Honor.

18        Counsel does not dispute the expert qualifications.

19 He does not dispute the methodology of the exact binomial test.

20 He's disputing the data he relied on which goes to the weight

21 of the testimony and not to the admissibility.

22        THE COURT:  All right.

23        I mean, what we're looking at here is he's basing it

24 off the bellwether test and I think you argue that while he

25 didn't go into the bellwether process.  But, again, I'm a

48

1  bankruptcy court.  There were bellwether trials run by the MDL.

2  I'm not in a position to say whether they were proper

3  bellwether or not, but that's all we have right now.  So I

4  think based upon I can look at what is in front of me.  It may

5  be based on a bellwether there.

6          Now, if you want to argue me later that the

7  bellwether weren't there or if there's appeals or somehow

8  that's done, that may be relevant.  But I think for the

9  purposes of just relying on the bellwether, I'll allow it

10 understanding it is what it is.  It's 27 cases out of many

11 hundreds of thousands of cases and I'll give it what relevance

12 I deem appropriate.

13         MR. ROGERS:  Your Honor, may I just make one more

14 statement for the record?

15         THE COURT:  Okay.

16         And you wonder why I wanted a third day.

17                     (Laughter)

18         THE COURT:  Go ahead.

19         MR. ROGERS:  With apologies, Your Honor.

20         The only other thing I would say is that the witness

21 has said that if the trier of fact finds that the bellwethers

22 were not representative, his opinion bears no weight.  Whether

23 the bellwethers were representative or not of outcomes in the

24 MDL is not an issue before Your Honor --

25         THE COURT:  Correct.

49

1       MR. ROGERS:  -- in the preliminary injunction.  So I

2  don't see how there's going to be any finding of fact about

3  whether the bellwethers were representative or not.  And so his

4  opinion just simply doesn't fit the issues that are in front of

5  Your Honor.  And we think under Daubert for various reasons,

6  his opinion should not come into evidence.

7       THE COURT:  Well, and I guess my ruling would still

8  stand in the fact that, I mean, he said he has based it off the

9  bellwether.  You're right, I can't -- I'm not here to say

10  whether they were proper, whether they were improper, were they

11  were representative, I just know they were.  And, generally,

12  under the bellwether process, they are supposed to be

13  representative of the claims and that's all I can go on.

14       But I mean, generally speaking, that's what

15  bellwethers are in the MDL federal system.  So I have to assume

16  that it was followed here.  Is that correct or not?  I don't

17  know.  But I have to assume it is because that's what was ruled

18  and there hasn't been any appeal or anything telling me that

19  the bellwethers were improper.

20       And also understanding it that I'm looking at it in

21  the context of a preliminary injunction hearing under 105 and

22  under the sections of the automatic stay in the Bankruptcy Code

23  on a preliminary basis.  This isn't a judgment.  This isn't a

24  final order.  No matter how I rule, it's not a final order,

25  it's interlocutory, so I'm going to allow it.

1        MR. ROGERS:  Understood, Your Honor.  Thank you.

2        THE COURT:  Thank you.

3                    DIRECT EXAMINATION RESUMED

4   BY MS. BARRIERE:

5   Q    All right.  Dr. Heaton, with that, what is your opinion

6   regarding the likely minimum value of the CAEv2 claims against

7   3M?

8   A    My opinion, based as counsel elicited, on the assumption

9   that the MDL bellwether process is representative enough for

10  this inference to be worth anything, is that 3M Company's

11  likely minimum liability on the Combat Arms claims exceeds $100

12  billion.  The number I come up with is 111 and change, but of

13  course, you know, we don't want to have false precision.  I

14  would say, you know, $100 billion or so.

15  Q    And taking a step back, what do you mean by likely minimum

16  value?

17  A    Well, my understanding is that counsel's objection, and in

18  the alternative, is that if a preliminary injunction issues, it

19  issues with a condition on what 3M can do with its resources.

20  Obviously, people disagree about how good the claims are, how

21  not good the claims are.  My job was simply to say, what can

22  the data tell us?

23       So assuming that there's representativeness, could one

24  reject the hypothesis, you know, what's the best 3M can hope

1  for resting only on the data.  And, as I think we'll get to, I

2  come up with that being a win percentage far below what they've

3  actually experienced.  They've won 52 percent and because it is

4  a small sample out of hundreds of thousands, that data would be

5  consistent with them losing only 23.8 percent.  So I'm trying

6  to essentially say, what can the data say about a likely best

7  case for 3M company.

8  Q    Okay.  And is that sometimes -- I think you may refer to

9  your report as like a reasonable lower bounds.

10 A    Yeah.  I would -- a likely minimum.  You know by likely,

11 you know, I mean --

12 Q    Okay.

13 A    -- a reasonable lower bound, not the absolute best case

14 that could ever come out.  But based on the data, what does the

15 data tell us about, you know -- it's really what does the data

16 say about what hypothesis you wouldn't be able to reject on the

17 low side, on the side that's most favorable to 3M Company.

18 Q    Okay.  Before we get into the details of your calculation

19 at a very high level, can you describe to me how you make your

20 calculation?

21 A    Yes.  So at a high level, there are going to be three

22 components.  I will use the exact binomial test to come up with

23 a loss percentage.  How many cases, what percentage of cases

24 will 3M lose that's consistent with that data.  And, again,

1  because we have -- 27 is a lot of bellwether trials, but it's

2  not a lot relative to 233,000 claims.

3       So I need to find a way to say, okay, well, you know, that

4  could be consistent with a whole lot of true underlying

5  probability so I'm going to get that number.  That's going to

6  be this 23.8 percent.

7       Then, I need to turn to, okay, well, I assume that 3M

8  Company will only lose 23.8 percent.  What will the verdicts be

9  in those cases?  And here, the verdicts, you know, the median

10 verdict is over 8 million, the mean is over 20 million, but I'm

11 not -- I don't want to look at those.  I want to look at, you

12 know, the bottom parts, I'm going to find that, and that

13 number's going to be 2.42 million.

14      And then, I have to go to the third component which is,

15 how many cases will 3M Company actually face.  If it was

16 233,000 that their cases could fall out from there, what did

17 the data tell us at least about a recent dropout rate?  I'm

18 going to apply that and then we're going to apply all those

19 together.

20 Q    Okay.  So starting with the loss percentage that you

21 referenced, how did you estimate that?

22 A    So that is what I estimate with this exact binomial test.

23      And what I -- what I do first is, you know, just quickly a

24 way to think about this is, you know, you flip a coin 20 times,

Heaton - Direct/Barriere                                  53

1   13 times -- let's say 27 times, you know, 13 times, it comes up

2   tails.  That coin could be fair, it could be biased one way or

3   another.

4        And so that's what this test is going to do.  It's going

5   to try to put a range on that.  So what I do, it's very simple,

6   the inputs are basically the 13 losses and the 27 total trials.

7   And I'm going to pick a 99 percent confidence interval.  So I'm

8   going to really try to widen the range of what's possible.

9        And when I do that calculation, it goes from 23.8 percent

10  loss -- loss frequency for 3M up to 73.1 percent consistent

11  with that data because, again, only 20 -- you know, 13 out of

12  27 is not a lot in a statistical sense.  And that's where I get

13  my 23.8 percent.

14  Q    Okay.  And just to confirm, when you say 13 losses, do

15  those include voluntary dismissals as well as losses in front

16  of the jury?

17  A    Yeah.

18       So I understand there are 19 verdicts and that there are 8

19  dismissals.  That's the 27; 19 plus 8 is 27.  Of the 19

20  verdicts, 13 were against 3M and so 6 were for 3M.  And that's

21  where those numbers come from.

22  Q    Okay.  So after you come up with your range of 23.8 to

23  73.1 percent for the loss percentage, what is the next step in

24  your analysis?

1  A     So the next step, so we have our -- our loss frequency,

2  likely minimum loss frequency.

3        Now we want to have -- give it a loss what is the amount

4  of the verdict in such a case.  And the 13 verdicts that go

5  against 3M company range from a little over a million dollars

6  to 77 million dollars.  Big range.  The median, the middle

7  value, half above, half below is 8 million.  The mean is 20

8  million.  So there's a lot of numbers you could think about.

9        But if you look at the verdicts and you were to trim off

10 the million here and the 77 million on the other side, you see

11 that the next four are all right around 2.2 to 2.4 million

12 dollars.

13       That tells me that the first quartile, so the -- so

14 essentially, you know, rank them all smallest to largest, and

15 then the first 25 percent, that will be the first quartile,

16 that one -- that verdict is 2.42 million.  And then the next

17 one above that is I think 2.45 million.

18       So that whole bottom of the tail except for that one

19 outlier of one million, kind of like an outlier on the 77

20 million, that tells me that if you lose and you get essentially

21 the low end of the verdicts that have come in, then 2.42 is,

22 you know, nicely supported right there.

23       And so I use the 2.42 million as the verdict amount for

24 the 23.8 percent of the cases that 3M would lose.

1  Q    And just to confirm, do you believe that 2.42 million is

2  the most likely verdict that 3M will face if it lose a case?

3  A    It's not -- there wouldn't be a basis in the data to say

4  that that's the most likely verdict because it's neither --

5  when we think about most likely, we usually think about central

6  tendencies like the median, which is not affected by outliers.

7       So the median here is about 8.2 million.  That's not

8  affected by the fact that you have a million dollars on one end

9  and 77 million on the other end.  And the mean verdict here is

10  over 20 million, so we've heard the number people are saying

11  like around 300 million.  It's actually if you took the 20.49

12  million times the 13, you'd get that number.  It's like 260

13  million.

14  Q    Okay.

15  A    So it's not designed to be a most likely.

16       Again, the whole thing is designed to be a likely minimum.

17  Q    Okay.  What is the next step you took after determining

18  the most likely minimum verdict?

19  A    The next step is we have the loss frequency, we have the

20  amount of the verdict given a loss.  Now we need to know what

21  are the likely number of cases that 3M company would face.

22       My understanding is that in June 2022, the number was

23  233,000-plus.  That number was the result of essentially a

24  doubling of cases from '19 getting up to a higher number, and

1  then 17 percent fell out to get down to the 233,000.  So I want

2  to make sure I'm always based on the data, to the extent

3  possible, there's the least amount of judgment.

4      And what I'm really doing to assist the trier of fact is

5  kind of combining these numbers in a way that, you know, has a

6  basis in the data.  So I take that 17 percent and I just drop

7  the 233,000 down by another 17 percent.  And that gets us to

8  193,000 cases.

9  Q   Okay.  So when you -- once you've gotten your cases, now

10 what's your next step?

11 A   So now I have all the three components, and I'm going to

12 multiply them together, and essentially probably easiest to

13 think about multiplying the 23.8 percent loss frequency times

14 the 193,000 cases to get a number of about 46,000.

15     So there will be -- so while there are 233,000 cases

16 pending in June of 2022, the likely minimum analysis says 3M

17 will win all but 46,000.  When it loses those cases, it will

18 lose $2.42 million each.  You multiply that, and you get the

19 $101 billion.

20 Q   How does your analysis compare if to say one were to take

21 the number of cases of June 2022 which you said were 233,000

22 and to multiply that by the average verdict of I think you said

23 upwards of $20 million with the plaintiff win of 48 percent?

24 How does your calculation compare to that calculation?

1  A    I don't know that I've done that calculation.

2      What I -- the calculation that I -- you know, one way to

3  think about it is if 260 million is the actual experience, if

4  instead you said those 13 had been lost at 2.42 million, that

5  number would become like 30 million, 31 million.

6  Q    Okay.  Can you characterize the assumptions you took in

7  your analysis as either pro-plaintiff or pro-3M?

8  A    It might not be exactly the way I put it because I think

9  it's just -- it just is what it is.  I mean it's -- but it's --

10 since it's -- it's the likely minimum, I mean certainly if you

11 were the claimants, you'd say I hope that doesn't happen.  And

12 if you were 3M company, you'd say, well, you know, that's

13 better than losing $20 million on average per case.

14 Q    Okay.  Did you examine 3M's ability to pay the likely

15 minimum liability of $111 billion?

16 A    Yes, I did.

17 Q    And what analysis did you do to assess that?

18 A    The analysis that I did was simply to compare 3M company's

19 free cash flow which is their cash flow from operations,

20 basically what the business generates, less their capital

21 expenditures, what they have to spend to keep the business

22 going.  And that number's $5.85 billion for 2021, and it's on

23 average 5.67 billion.  It's a pretty stable and mature company

24 for the last four years.

1  Q    Okay.

2  A    And I compare that to the -- I just divide 100 or 111.

3  You know, I kind of want to round down to 100 because I don't

4  want false precision, you know.

5  Q    Yeah.

6  A    A hundred billion dollars divided by 5.85 is about 17

7  times.

8       So, in other words, if 3M company did nothing but devote

9  all of its free cash flow to save in case that's what it ended

10  up facing, it would take 17 years of 3M company cash flow to

11  meet 111 -- $100 billion obligation.

12  Q    So breaking it down because I know most of us in the room

13  aren't great with statistics or finance, why did you examine

14  free cash flow?

15  A    Free cash flow is the standard measure that you use --

16  that one -- that valuation analysts use to value companies

17  because that's the cash flow that the business is generating

18  from its operations but reduced by the fact that, you know,

19  when the, you know -- when the equipment making the masks that

20  fog up the glasses, you know, when that runs down, you got to

21  replace that.

22       So it's a -- that's the measure we use to think about what

23  a business is worth.  That's the source of cash to do things

24  like pay down debt, you know, buy companies, you know, pay off

1  liabilities.  That's -- that's why we would -- you know, one

2  would use free cash flow.

3  Q    Okay.  And I think you mentioned this, but what was 3M's

4  free cash flow for the year ending in 2021?

5  A    It was $5.85 billion.

6  Q    And what did you rely on to make this determination?

7  A    It's a standard measure, and 3M company reports it as a

8  non-GAAP measure in its financial statements and I got that

9  number from the 2021 3M company 10-K.

10 Q    Dr. Heaton, is the document I just handed you, do you

11 recognize this as 3M Company's 2021 10-K?

12 A    Yes, I do.

13 Q    And this is what you relied on to come up with 3M's 2021

14 free cash flow?

15 A    Yes, on Page 39.

16          MS. BARRIERE:  Your Honor, I would like to admit

17 Exhibit GL, 3M's 2021 Form 10-K as an exhibit.

18          THE COURT:  Any objection to the admission of what

19 has been designated Exhibit GL?

20          MR. ROGERS:  No objection from the debtors, Your

21 Honor.

22          THE COURT:  All right.  Hang on, I get to say my

23 thing.

24          Seeing no objection, the Court will admit Exhibit GL

1  into the record.

2            (Claimant's Exhibit GL admitted into evidence)

3  BY MS. BARRIERE:

4  Q     Now, Dr. Heaton, was 3M's cash flow of 5.85 billion for

5  the year ending 2021, was that consistent with 3M's prior cash

6  flows for the years preceding 2021?

7  A     Yes.

8         As I mentioned in the answer to your prior question, the

9  average for the prior four years was 5.67 billion.

10 Q     Okay.  How does 3M's free cash flow compare to the likely

11 minimum value of the claims at issue here?

12 A     As I said before, it would take -- you'd just divide 100

13 billion by 5.85.  You get about 17.

14 Q     Right.

15 A     Meaning it would take 17 years of free cash flow to meet

16 the likely minimum Combat Arms cases if, even -- even if all

17 that free cash flow were sort of stored away and saved for that

18 possibility.

19 Q     Does 3M have any other liabilities to pay from the same

20 free cash flow?

21 A     Yes.

22 Q     And did you do any review of 3M's liabilities other than

23 the CAEv2 claim to determine ballpark what 3M's liabilities

24 are?

1  A    Yeah.

2      So if you looked in Exhibit GL, you'd find that they have

3  liabilities of about $30 billion of which $16 billion is

4  contracted debt, so bonds, bank debt, things like that.

5  Q    Based on your review, does 3M devote all of its free cash

6  flow to paying off its liabilities?

7  A    No.

8      3M company's practice is to pay out most -- I should say,

9  sorry, 85 percent or so in 2021 of its free cash flow as either

10 dividends or share repurchases.  So basically, they just give

11 that money to their shareholders without getting anything back

12 for it.

13 Q    And you mentioned 2021.  Has this practice, 3M's practice

14 of paying dividends, stock repurchases, has that continued in

15 2022?

16 A    Yes.  It's actually even sped up in 2022.

17     So through the six months June 30, they've actually paid

18 out more in dividends and net share repurchases than they

19 generated in free cash flow, so they've actually drawn their

20 cash and marketable securities balances down from where they

21 were at year end.

22 Q    And you mentioned a June 30 document.  What document did

23 you rely on to determine 3M's practice in 2022 spending its

24 free cash flow?

Heaton - Direct/Barriere                                    62

1  A    That's 3M company's Form 10-Q filed with the Securities

2  and Exchange Commission for the six months ended June 30th,

3  2022.

4  Q    Dr. Heaton, the document I just handed to you, does this

5  look like a true and correct copy of the 3M's June 30th, 2022

6  10-Q?

7  A    Yes, ma'am.

8           MS. BARRIERE:  At this time, I would like to admit

9  Exhibit GM, 3M's June 30th, 2022 10-Q into the record.

10          THE COURT:  Any objection thereto?

11          MR. ROGERS:  No objection, Your Honor.

12          THE COURT:  All right.  Exhibit GM is admitted.

13          (Claimant's Exhibit GM admitted into evidence)

14  BY MS. BARRIERE:

15  Q    Now, Dr. Heaton, we've been discussing dividends and share

16  repurchases.  Are those related in any way?

17  A    Yes.

18       Dividends and share repurchases are considered to be just

19  substitute ways to pay out cash to your shareholders.  When you

20  pay a dividend, you pay a cash amount to all holders of stock

21  of your company.  When you pay out cash as a share repurchase,

22  you are paying out cash to the shareholder who sells you back

23  their share and which then you take that share and you put it

24  back into your treasury stock.

1  Q    Okay.

2  A    So as a -- from a -- so financial economists -- and I cite

3  one of the many papers on this.  Financial economists consider

4  these just substitute methods of paying out money to -- paying

5  out cash to a company's shareholders.

6  Q    Okay.  Other than paying dividends and stock repurchases,

7  is 3M paying out value to its shareholders in any other way

8  that you're aware of?

9  A    Yes, I am.

10       On the very same day that 3M company caused Aearo to file

11  for bankruptcy in the same 8-K which is how you announce

12  corporate events, 3M company announced that it was going to

13  spin off its healthcare business to its shareholders.  So that

14  is another way of taking assets that belong to one corporation

15  and essentially putting them in another corporate form and

16  spinning out those shares to their shareholders.

17  Q    Is 3M's healthcare business a significant part of 3M's

18  business?

19  A    In terms of quantifying, it's around 25 percent of their

20  revenues, but it's a higher percentage of their profitability

21  because overall, that part of the business is more profitable

22  than other parts of the business.

23  Q    Okay.  Did you come to an opinion about 3M's ability to

24  pay its likely minimum liability on the CAEv2 claims here given

1  its free cash flow?

2  A    Yes, I did.

3      If they have $5.85 billion in cash flow and they pay out

4  most of it, 85 percent, in dividends and share repurchases and

5  they intend to further reduce the value of 3M company by this,

6  you know, a spinoff to shareholders that will then put those

7  assets out of reach and would further reduce the free cash flow

8  for future years, they do not appear to have the ability to pay

9  the likely minimum on the Combat Arms claims under -- if they

10  have the ability to pay dividends, make share repurchases, and

11  do that very big spinoff at the same time.

12  Q    Okay.  If the Court were to issue an injunction or

13  otherwise prevent 3M from paying further dividends, making

14  additional stock repurchases, or spinning off its healthcare

15  business as a condition of the injunction against the CAEv2

16  claimants, would those conditions harm 3M at all?

17          MR. ROGERS:  Your Honor, I object.  There's no motion

18  to enjoin 3M pending in this case.

19          MS. BARRIERE:  I can clarify my question, Your Honor,

20  to not -- to --

21          THE COURT:  I think -- well, yeah.  Go ahead and

22  clarify it and we'll see where that goes.

23  BY MS. BARRIERE:

24  Q    If there was a condition as to preventing 3M as a

1    condition of the injunction against the CAEv2 claimants that

2    they would not voluntarily agree not to spin off their

3    healthcare business or other assets, not issue stock dividends

4    or make stock repurchases, would that harm 3M at all?

5            MR. ROGERS:  Again, Your Honor.  I object to the

6    relevance of this line of questioning.  There's no motion to

7    enjoin 3M and nothing pending -- there's no jurisdiction to

8    enjoin 3M in this case.

9            THE COURT:  I mean, again, I'm the trier of fact.  He

10   can answer.  I'll give it the relevancy I deem appropriate.

11           So he may answer the question.  Objection overruled.

12           THE WITNESS:  A corporation is not harmed by not

13   being able to pay dividends or make share repurchases or make

14   spinoffs because each of those three are gratuitous, and I mean

15   that in the sense of for no consideration, not in a pejorative

16   way.

17           They are transfers of assets out for no consideration

18   in return, and that -- for example, that's why all three of

19   those can be challenged as fraudulent transfers by, you know,

20   other kinds of debtors.

21           So, no, the corporation because it's -- it would

22   simply be keeping all the property that it would otherwise pay

23   out for no consideration is not harmed.

24   BY MS. BARRIERE:

1  Q    Would such a condition be beneficial to the debtors in

2  this case?

3  A    Well, yes.  I mean of course.

4  Q    And explain your answer.  Why would it be beneficial to

5  institute a condition as to 3M not disposing of its assets in

6  terms of stock repurchases, share dividends, or the spinoffs?

7  Why would that be beneficial to the debtors in this case?

8  A    Well, the debtors -- the debtors are supported only by a

9  funding agreement that is intended to fund any claims if claims

10 are made by the claimants in that bankruptcy -- in this

11 bankruptcy proceeding.

12     Pardon me.  I forgot where I was sitting.

13     And so, yes.  and you would expect had this been an arms-

14 length, you know, relationship.  You would expect that you

15 would want the person guaranteeing your viability to not, you

16 know, be spinning off, you know, a third of their value and

17 then making all these share repurchases.

18     So I guess it's just sort of common sense, yes, that as

19 the -- as a beneficiary of the funding agreement, you want your

20 funder to be viable in paying the claims you say you have to

21 the bankruptcy court.  I don't know if that makes sense.

22 Q    Yes.

23     Will the debtors be harmed in any way if this condition is

24 imposed on 3M?

Heaton - Cross/Rogers                                67

1   A    I'm sorry, would the debtors be --

2   Q    Harmed.

3   A    The debtors would be benefitted if it is?

4   Q    If it is.  But conversely, would they be harmed?  Would

5   the debtors be harmed in any way if the condition is imposed on

6   3M that 3M --

7   A    I'm sorry.  Are you saying if it's imposed?

8   Q    Sorry, if it is imposed.  If the condition as to 3 --

9   A    Oh, the debtors.  No, the debtors aren't harmed.  The

10  debtors wouldn't be harmed at all because it doesn't impact

11  them except to make their funder creditworthy where they might

12  not otherwise be creditworthy, depending on how the cases

13  turned out.

14  Q    Dr. Heaton, is there anything else you want to add

15  regarding your opinions in this case?

16           MR. ROGERS:  Objection, Your Honor.  It's --

17           THE WITNESS:  No.

18           MS. BARRIERE:  It's fine.

19           MR. ROGERS:  -- not ordinarily --

20           THE COURT:  Yeah, three people ruled against you

21  there before I even had a chance.

22           MS. BARRIERE:  That's fine, Your Honor.

23           THE COURT:  Sustained.

24           MS. BARRIERE:  No other questions.

25           THE COURT:  All right.

Heaton - Cross/Rogers                    68

1            Mr. Rogers, would you like to cross-examine the

2    witness?

3            MR. ROGERS:  I would, Your Honor.

4            THE COURT:  All right.

5            MR. ROGERS:  May I proceed, Your Honor?

6            THE COURT:  Just go ahead and state your name for the

7    record, and you may proceed.

8            MR. ROGERS:  Brent Rogers, Kirkland & Ellis, proposed

9    counsel to the debtors.

10                        CROSS-EXAMINATION

11   BY MR. ROGERS:

12   Q    Your opinion, sir, is that $100 billion is the likely

13   minimum liability that 3M faces in the Combat Arms litigation.

14   Is that true?

15   A    Correct.

16   Q    And that's based on an analysis that you did that is for

17   which the input, the main input was the bellwether cases.

18   Right?

19   A    That's correct.

20   Q    Okay.  Let' talk about the analysis that you did to get to

21   that number.

22        You would agree with me, sir, that predicting outcomes in

23   real-world litigation is a profoundly complex enterprise.

24   Right?

25   A    Absolutely.

Heaton - Cross/Rogers                      69

1  Q    And that's especially true in a huge litigation like the

2  Combat Arms litigation that involves hundreds of thousands of

3  claims.  Right?

4  A    I agree 100 percent.

5  Q    Now you have personally been involved in modeling

6  litigation liabilities for hedge fund clients.  Right?

7  A    Yes, I have.

8  Q    And you've modeled litigation outcomes for insurance

9  companies.  True?

10 A    Yes, sir.

11 Q    And when you've done that kind of modeling of litigation

12 for your clients, you've typically done what's called outcome-

13 based tree modeling.  Is that true?

14 A    Yes.

15      In those instances, that is exactly what I do.  Correct.

16 Q    And what you do there is you try to figure out all the

17 things that can happen in the litigation and then you assign

18 probabilities to the likelihood of each outcome.  Correct?

19 A    Correct, sir.

20 Q    And those decision trees for real-world litigation, again,

21 are profoundly complex.  Aren't they?

22 A    Absolutely.

23 Q    And I assume that when your hedge fund client or your

24 insurance client hire you to do that kind of work, you spend a

25 fair amount of time on it?

Heaton - Cross/Rogers                              70

 1  A    Always the time that it requires.  Correct.

 2  Q    Now you didn't do anything like an outcome-based decision

 3  tree model in this case.  Did you, sir?

 4  A    No.

 5       This is a different kind of analysis, but you're exactly

 6  right.  I did not do any decision tree modeling.  That's really

 7  for individual cases, not for mass -- a mass tort kind of

 8  aggregate estimate.  But I did not do that analysis here,

 9  correct.

10  Q    What you did you said on direct was you did an analysis

11  based on the data that was available.  Right?

12  A    Correct, sir.

13  Q    And that was the bellwether cases.  Correct?

14  A    The bellwether outcomes and verdicts and the total claims

15  numbers.  Correct.

16  Q    Right.

17       So the data that you looked at were the bellwether

18  outcomes and verdicts and the total -- the verdicts that came

19  out of that, the amount of the verdicts.  Right?

20  A    Some of the data, the important part and other than the

21  claims and the claims declination that had occurred.

22  Q    Understood.

23       So you didn't look at things like the characteristics of

24  the particular bellwether plaintiffs.  Right?

25  A    That's correct.

Heaton - Cross/Rogers                                   71

1   Q    You didn't look at to see how old they were.  Right?

2   A    That's correct.

3   Q    You didn't look to see what branch of the military they

4   were in.  Right?

5   A    That's correct.

6   Q    You didn't look to see what injuries they were claiming.

7   Right?

8   A    That's correct.

9   Q    And you didn't -- in fact you didn't look at any of the

10  characteristics that might have affected the verdicts in those

11  bellwether cases.  Right?

12  A    That's correct.

13  Q    And you also didn't look at the characteristics of the

14  Combat Arms claimants as a whole.  Did you?

15  A    That's correct.

16  Q    You didn't do any statistical analysis to determine

17  whether the bellwether cases were truly representative of the

18  Combat Arms claims as a whole.  Did you?

19  A    Correct, as we discussed earlier.

20  Q    Now before we go on, the bellwether, they're a sample of a

21  larger population.  Is that a fair characterization?

22  A    A much larger population.

23       It is a fair characterization, yes.

24  Q    They're a very small sample, 27 out of over 200,000.

25  Right?

1  A     Correct.

2  Q     And so I want to talk a little bit about what it means for

3  a sample to be representative.

4       Would you agree with me that a representative sample has

5  approximately the same distribution of characteristics that

6  we're measuring as the population from which it was drawn?

7  A     Yes.  As a general statement, I agree with that.

8  Q     So you would agree that you wouldn't want to end up with a

9  sample of claimants in the Combat Arms litigation who are all

10  in the same age range, served in the same branch of the

11  military, and alleged the same injuries.  Right?

12  A     I think you're going a little too far.

13       What matters is that you are representative of

14  characteristics that generate the outcome you're interested in.

15  So there may be differences among people that don't affect

16  that, but you certainly want the sample to be representative of

17  the characteristics that drive whatever it is you're studying,

18  in my case, the -- you know, the likely low end frequency of

19  loss.

20  Q     And you don't know if the likely low end frequency of loss

21  is driven by age, for instance, of the claimant?

22  A     I don't.

23  Q     And you don't know if the likely low end of liability is

24  driven by the branch of military service.  Do you?

25  A     I do not.

Heaton - Cross/Rogers                     73

1  Q    And you don't know if the likely low end of liability is

2  driven by the injuries claimed.  Right?

3  A    I mean beyond common sense, no.

4  Q    And common sense tells you that the more severe the

5  injuries claimed, the greater the likelihood of a larger

6  verdict.  Is that true?

7  A    I mean I'd be speculating, but I'm certainly willing to

8  say that would be my guess if I had to make one.

9  Q    But you -- one of the reasons -- well, let me rephrase.

10      You understand -- let's talk about the bellwether

11  selection process a little bit.

12      You understand that it wasn't just a random sample from

13  the entire population of Combat Arms claimants.  Correct?

14  A    Not only do I understand it, but I would hope that wasn't

15  true.  Correct.

16  Q    And the reason why you hope that wasn't true is because if

17  you did a random sample of claimants, you might end up with

18  bellwethers who are all 32 years old, served in the Army, and

19  alleged tinnitus but not hearing loss.  Right?

20  A    I think that -- I think that was my way of putting it in

21  our Saturday discussion.  Correct.

22  Q    And that would be a bad thing to have claimants who are

23  all the same age, served in the same branch of the military,

24  and alleged the same injury.  That would be a non-

25  representative sample.  Right?

1  A    Yes.  That's why you typically don't do just randomized.

2  Q    Now in this case, isn't it true, sir, that the bellwether

3  claimant were all in the same age range, all served in the same

4  branch of the military, and all alleged the same injuries?

5  A    I understand that to be true, but partly because that --

6  those are the highest frequencies in the underlying population.

7  So I believe they match that, but again I know some of that

8  from what we -- from what you showed me in the deposition.

9       When I wrote the report, I was not at all concerned with

10 second-guessing the bellwether processes.  As I've said before,

11 this calculation as to that frequency and the -- and the

12 severity of a verdict is dependent on the weight one gives to

13 the representativeness of that bellwether sample and a fact on

14 which I have no opinion and no basis for an opinion other than

15 I think consistent with what His Honor said, that's what's

16 supposed to happen and I do know the parties all had input and

17 the Court had input and its own independent expert.  So --

18 Q    Were you aware that the defendants advocated for a

19 different process of bellwether selection?

20 A    Again, I don't know anything about how that process went.

21 No.

22 Q    Okay.  And you mentioned a little bit before that you're

23 aware that there was a prevalence analysis that was done on the

24 pool of potential claimants to be included in the bellwethers?

25 A    I'm only aware of it because you showed it to me and we

1  went over it in the deposition.  I wasn't aware of that until I

2  read through the briefs after my declaration.  Again, I wasn't

3  interested in second-guessing you guys or Judge Rogers.

4  Q    Okay.  Well, if -- you are now aware, aren't you, sir,

5  that all of the bellwether claimants are in the same age range,

6  served in the same branch of th military, and alleged the same

7  injuries.  Correct?

8  A    I understand that choice was made, yes, because that is

9  very representative of the biggest part of the group but that

10 there are -- it is not representative in the sense there are

11 other branches of service and that there are other ages and,

12 you know, that that was one of the -- I do understand that to

13 be true.

14 Q    And the age range of all of the claimants in the

15 bellwether pool was 30 to 49.  You understand that now, don't

16 you?

17 A    I understand it from our discussion on Saturday.  Correct.

18 Q    Yeah.  And you understand it from the court order that we

19 looked at on Saturday.  Right?

20 A    I'm including that in the discussion.  That wasn't

21 pleasure reading for me.

22 Q    Understood.

23      So you understand that in the larger pool of Combat Arms

24 claimant, for instance, there are plaintiffs who are younger

25 than 30 or older than 49.  Right?

Heaton - Cross/Rogers                          76

1  A     I understand that from our Saturday deposition.   Correct.

2  Q     And do you know the distribution of ages across the total

3  pool of Combat Arms claimants?

4  A     I do not.

5  Q     But you certainly know that the distribution of ages in

6  the bellwether claims is not representative of the distribution

7  of ages in the total pool.   Right?

8  A     I think that overstates it.

9       I mean every -- every sample is a data reduction of a

10 population.   So whether it is -- you're sort of treating

11 representative as if it's a black or white issue.   It certainly

12 means that to the extent that people of different ages or

13 different branches of service differ in the propensity to win

14 or lose at trial, that those people are not reflected.

15      But you can't look at -- representativeness is kind of a

16 spectrum, not a -- not a zero-one.

17 Q     Okay.   And so -- but you don't know what percentage of the

18 total Combat Arms claimants are younger than 30 or older than

19 49.   Right?

20 A     That's correct.

21      I'm not -- I'm not quibbling at all with -- with that.

22 I'm just saying as a general matter how we're using the term.

23 Q     And you don't know what proportion of the total pool of

24 Combat Arms claimants served in branches of the military other

25 than the Army.   Right?

Heaton - Cross/Rogers                                   77

1  A     That's correct.

2  Q     You don't know if the proportion of those who served in

3  the Army as a majority or a minority of the claims in the total

4  pool.  Right?

5  A     I do not know anything about the characteristics of the

6  underlying population other than based on our Saturday

7  discussion that there are ages outside the age range, there are

8  branches outside the branch selected, and that I do think the

9  injuries -- you know, there are injuries that are either/or or

10 both on hearing loss and tinnitus or tinnitus as you like to

11 say.

12       I took the parties and Judge Rodgers' bellwether numbers

13 and -- and used them here with no independent judgment other

14 than that process that you all did and Her Honor that that's --

15 that's why it's plausible that this would be an estimate of the

16 likely minimum.  If instead I had heard these are 27 cases that

17 plaintiffs were allowed to select all on their own, I wouldn't

18 be here.

19 Q     Do you know why the selection process focused on these

20 particular characteristics -- age, military service, and

21 injuries claimed?

22 A     Only from what I have read of how Judge Rogers

23 characterized it.

24 Q     And you didn't do any independent analysis to determine

25 whether those factors had any impact on verdicts?

Heaton - Cross/Rogers                    78

1  A    Well, I think I've answered this many times, but no.

2  Q    And you mentioned that if the plaintiffs were just simply

3  allowed to select 27 cases, you wouldn't be here.  Right?

4  A    Correct.

5  Q    Because that would be a non-representative sample of the

6  pool.  I think we can agree on that.

7  A    I would be -- I would be skeptical that it would be a

8  representative sample, and I would not be willing to sit here

9  and testify.  Correct.

10 Q    Now you're aware that the final stage of the bellwether

11 selection process was one in which the defendants and the

12 plaintiffs were allowed to select certain cases for

13 bellwethers?

14 A    Yes.

15      No, I've always understood that.

16 Q    Right.

17      And so you understood that the plaintiffs were allowed to

18 select some of the cases in the bellwethers.  Right?

19 A    As were you.

20 Q    And you understand that the cases  the plaintiffs selected

21 were not representative of the overall pool.  Right?

22 A    I don't know.

23 Q    You have no idea because you didn't look?

24 A    I mean I -- I keep saying it, but yes, you're right.  I

25 didn't.

Heaton - Cross/Rogers                    79

1        That wasn't part of my analysis.  It wasn't an oversight.
2   It was a -- it was a methodological choice.
3   Q    Now the bellwether cases obviously had different outcomes.
4   Right?  They didn't all come out the same?
5   A    Correct, sir.
6   Q    And you don't have any idea why that is, why they had
7   different outcomes.  Right?
8   A    I mean I have a general idea, but specifically as to each
9   case, no.  I would answer your question no.
10  Q    You didn't do any assessment of why the outcomes were
11  different in the different bellwether cases.  Right?
12  A    That's correct.  I did not.
13  Q    You didn't look at the characteristics of the juries in
14  those cases.  Correct?
15  A    That's correct.
16  Q    And you don't know if the bellwether jury pools were
17  representative of jury pools across the country.  Right?
18  A    I don't even know what it would mean to be representative
19  of a jury -- you know, from my own experiences, you know, in --
20  you know, on teams.  I don't even know if such a thing exists.
21  I just don't.
22  Q    You didn't read the opening statements or closing
23  arguments in the bellwether trials.  Right?
24  A    That's correct.
25  Q    You didn't read any testimony at all in those cases?

Heaton - Cross/Rogers                    80

1  A    That's correct.

2  Q    You didn't look at any of the evidence that was presented

3  in those cases?

4  A    That's correct.

5  Q    And you assumed that each of the outcomes in those cases

6  was independent of one another.  Correct?

7  A    I don't mean to quibble, but I don't know if you know

8  exactly what you're asking about the independence.  But I think

9  in the way you mean it, yes, that they are independent draws

10 from the underlying population that may have significant

11 correlations across things.  But I think in a -- in a sort of a

12 lay sense that you're asking it, yes, I've assumed that each

13 one is -- is drawn, correct.

14 Q    And did you assume that a verdict in one bellwether trial

15 did not have any impact on a verdict in another bellwether

16 trial?

17 A    That's correct.

18 Q    And you understand, don't you, that some of the bellwether

19 trials were consolidated trials.  Right?

20 A    Yes.  But verdicts were given next to each person, I

21 understand.

22 Q    Right.

23      So there were some trials where three plaintiffs were in

24 the same trial.  Right?

25 A    I know there was -- was one of them that had three in one.

1  Yes, correct.

2  Q    Is it fair to characterize what you did, sir, as a one-

3  size-fits-all analysis?

4  A    That's the term I used with you in -- in our deposition,

5  yes.

6  Q    Now I think you said this on direct, but at the end of the

7  day, the outcomes in the bellwether cases favored the defendant

8  slightly.  Right?

9  A    Yes.  About 52 percent of the outcomes were favorable to

10  3M Company, and about 48 percent were favorable to the

11  claimants.

12  Q    So you included in the defense wins column the eight cases

13  that the plaintiffs voluntarily dismissed.  Right?

14  A    Of course, yes.

15  Q    Now is that an indiction to you that the plaintiffs didn't

16  feel very strongly about those cases?

17  A    Something must have transpired in going through those

18  cases, maybe working them up for trial -- and here I'm just

19  speaking from experience that -- that made them feel like that

20  was the right choice.  But, again, I'm -- I'm just telling -- I

21  think I'm just answering common sense that if they thought

22  those were great cases, they -- they wouldn't have dismissed

23  them, they would have tried them.

24  Q    And you know, don't you, that setting aside the 27

25  bellwether cases, plaintiffs have also voluntarily dismissed

Heaton - Cross/Rogers                                    82

1   other cases out of the MDL.  Right?

2   A    I understand that, yes.

3   Q    And do you have any idea how many they voluntarily

4   dismissed?

5   A    Well, I only know the reductions that have taken place,

6   but I don't -- you know, other than knowing what the numbers

7   were, I don't know the -- you know, how the distinctions are

8   made one way or the other, you know, why those cases went away.

9        But that's why I reduced the case number down to as -- you

10  know, like I do I mean consistent with the data.  Maybe it's

11  not enough, but it is what it is.  It's based on the 17

12  percent.  Everybody can see it.  It's transparent.

13  Q    So let's unpack that a little bit.

14       So you know and you testified that between September of

15  2021 and June of 2022, the docket of claims in the MDL shrunk

16  by about 17 percent.  Right?

17  A    Yes, sir.

18  Q    And that was approximately a nine-month period.  Right?

19  A    I think that's about a nine-month period.  Yeah.

20  Q    And in that nine-month period, the docket shrunk by about

21  50,000 cases.  Does that sound about right?

22  A    I recall it being like 289 or something and maybe it goes

23  to 233.  But I may be off on the first number, but something

24  like that would be consistent with your question.  Yes.

25  Q    And your analysis assumes that going forward from today,

1  the docket will shrink another 17 percent.  Right?

2  A    Yes.

3  Q    And that assumption is simply based on the 17 percent

4  number from that nine-month period.  Right?

5  A    Yeah.

6       It might -- it might not shrink that much, or it might

7  shrink more.  But all we know is there was that seven -- you

8  know, at first it doubled and then it came down a little bit.

9  And so I'm just saying 17 percent.  I don't mean to

10 characterize it as one little or not little, but 17 percent.

11 And I just assumed it goes down another 17 percent.

12 Q    You didn't do any analysis to determine why the docket

13 shrunk by 17 percent over those nine months.  Did you?

14 A    No.

15      I mean kind of I think consistent with your earlier

16 question, if people are withdrawing their claims, then somebody

17 has made a judgment on that side.  I mean if it were up to you,

18 you'd have them probably withdraw all of them.  You know, they

19 made the decision so I'm assuming that, you know, there was a

20 reason consistent with your prior question.  But I don't know

21 what those reasons were.

22 Q    You didn't do any inquiry into what stage of litigation

23 those claims were at when they were taken out of the MDL

24 docket.  Right?

25 A    That's correct.

1  Q    So, for instance, you didn't look to see how many cases

2  plaintiffs voluntarily dismissed or had dismissed when they

3  were required to pay a filing fee.  Right?

4  A    That's correct.

5  Q    And you don't know how many plaintiffs in the MDL still

6  have yet to pay the filing fee?

7  A    I don't know the number.

8       I know there's a dispute among the parties about whether

9  filing fees should be paid and what effect that would have on

10 cases or not have.  But I don't know what the percentages are.

11 Q    And you don't know what percentage of claimants are

12 dismissing their claims when they're required to produce

13 discovery in the MDL.  Do you?

14 A    No.

15      I know that that's been a reason asserted, but I don't

16 know what the percentages or numbers are because I didn't have

17 any reason to look at that given the method that I applied.

18 Q    And you don't have any idea how many of the cases on the

19 MDL docket have yet to produce any discovery.  Do you?

20 A    Correct.

21 Q    Now when you were looking at outcomes of the bellwether

22 cases, you were looking at verdicts.  Correct?

23 A    I was looking at both.  I was looking at, you know, the

24 dismissals, those weren't verdicts, right.  But then -- so what

25 19 were verdicts and 8 were dismissals.

1  Q    You understand that there have been no actual payments on

2  those verdicts.  Right?

3  A    I learned that in our deposition and then obviously I've

4  been in court for the last couple of days or yesterday and so I

5  understand that on that, as well.  I didn't -- that wasn't

6  something -- I don't think I knew that one way or the other

7  when I did the declaration.

8  Q    And you agree with me, sir, that the amount that 3M or

9  Aearo ultimately pay on those verdicts may not be equal to the

10 amount of the verdict awarded at trial.  Right?

11 A    Sure.

12      I mean you have -- you've had one verdict reduced that I

13 know of by Judge Rogers.  You have appellate -- you know, you

14 may still be in post-trial briefing on some things.  you have

15 appellate rights, and maybe, you know, you'll prevail there.

16 And I do say in the report that, you know, unless -- unless you

17 prevail on appeals, and obviously if those numbers change,

18 those numbers change.

19 Q    Some of those verdicts could be reduced in post-trial

20 motions phases.  Right?

21 A    Of course.

22 Q    And some of those verdicts could be overturned on appeal.

23 Right?

24 A    Of course.

25 Q    And you mentioned you're aware that there are appeals

1  pending in some of the cases that resulted in a plaintiff

2  verdict.  Right?

3  A    I am.  Yes.

4  Q    Now in your analysis, you assumed away those appeals.

5  Right?

6  A    I didn't assume it away.

7       I said if you don't prevail on appeal.  So it's not --

8  it's not an unrecognized issue, but it's clear.  I've made it

9  clear, I hope, that, you know, I have not -- you know, I've

10 given the benefit to 3M in some ways but I haven't because I

11 have no basis to  because, as we've discussed, I'm not an

12 expert in or have done an investigation, you know, of all these

13 details.  And that would be the only way one could even put a

14 probability as I do in other work on, you know, the likelihood

15 of prevailing.

16      By the way, that's a really hard probability to generate

17 anyway, so.

18 Q    So in generating your minimum likely liability for 3M, you

19 assumed that 3M loses all of the appeals that are now pending.

20 Correct?

21 A    I don't even know what all is.  I have some, you know,

22 understanding of some of the issues.  But, yes, this is a --

23 this is conditioned on, you know, those bellwether verdicts

24 being at the numbers that they -- that they are.

25 Q    And that an actual payment will be made at that number.

1  Right?

2  A     Well, that's a kind of a different question.  Right?

3        I mean my opinion is about their minimum liability.

4  Whether 3M will actually be in a position to pay those depends

5  kind of on the -- on the, I guess, what 3M does, like how much

6  more it can pay out, right?  Maybe it could self essentially

7  judgment proof if it's allowed to pay money out.

8        So I'm talking about liability.  I'm not -- I'm not

9  talking about what -- I'm not trying to predict what you're

10 actually going to pay.  I mean clearly you're hard at work to

11 try to not pay that.  I get that.  I'm grown up and been here a

12 long time.  I don't know what you're actually going to pay.

13 I'm talking about liability.

14 Q     So just I want to make sure that I'm being clear here.

15       You're assuming that the ultimate liability to 3M is equal

16 to the verdicts in the bellwether cases.  You're using the

17 verdicts in the bellwether cases to determine ultimate

18 liability.  Is that right?

19 A     But only on a minimum -- on a minimum basis, right.

20       I mean if I were to do an expected basis, the number would

21 be much higher, right, because here you only lose 46,000 cases

22 and when you lose them, you don't pay 77 million or 50 million

23 or 30 million or any of those numbers.  You pay 2.42 million.

24       So there's an awful lot of downward bias in here, but as

25 we discussed before, it does assume that you have liability for

1   the low end, the 2.42 million number, and that you have

2   liability in 23.8 percent of the cases and that that 23.8

3   percent is on the 193,000.

4        So, you know, your actual liability is probably much

5   higher, but your minimal liability is probably $100 billion.

6   Q    Now you looked at -- we've established that you looked at

7   the bellwether cases in the MDL.  You didn't look at any other

8   sources of comparator verdicts or comparator resolutions of

9   cases like this.  Did you?

10  A    I don't think there are things that are truly comparable

11  to -- so I don't even think that that those things exist.  I

12  mean injuries against 233 -- well, some number, right, of

13  people who have served in combat -- you know, look, this is a

14  real -- you know, this is a case -- this is different from

15  somebody who says, you know, talc gave me cancer, right.

16       I mean this is a totally different kind of case.  This is

17  different from somebody who says my airbag blew up and now I

18  can't hear.  I mean these are people who served in war, right.

19  These are people who served, you know, our country.  And that's

20  going to matter to people out there in the world.  So I don't

21  think you have a comparator.

22  Q    Let's talk about just the injuries.

23       The injuries alleged in these cases relate to hearing loss

24  and tinnitus.  You understand that, right?

25  A    I think it's hearing loss and tinnitus, but yes.

Heaton - Cross/Rogers                                    89

1  Q    Understood.

2       I've been told you can say it either way, so.

3  A    Well, we talked about this.

4            THE COURT:  I'm referring to it as tinnitus, so

5  that's how I think of it.  And if you want me to say tinnitus,

6  it's not going to happen.  So I don't look stupid on the

7  record, let's call it tinnitus going forward.

8            MR. ROGERS:  You got it, Judge.

9            THE COURT:  Thank you.

10           THE WITNESS:  That may be our Midwestern thing.  I

11 don't know.

12 BY MR. ROGERS:

13 Q    All right.  So the injuries that are being alleged in the

14 Combat Arms litigation are hearing loss and tinnitus.  You

15 understand that, right?

16 A    I do understand that.

17 Q    And there are other cases out there where plaintiffs have

18 alleged hearing loss and tinnitus.  Correct?

19 A    I understand that hearing loss and tinnitus are the

20 primary injuries that are alleged, yes.

21 Q    That wasn't my question.

22      You understand there are other --

23 A    I didn't understand --

24 Q    -- there are cases outside the Combat Arms litigation

25 where plaintiffs have alleged hearing loss and tinnitus?

Heaton - Cross/Rogers                                90

1  A     Understood the injury could be --

2  Q     That was just my question is are there cases like that

3  where the injury is the same?

4  A     I'm not a -- I'm not a scientist, so I don't really know.

5        I don't know whether the form of hearing -- I know the ear

6  is pretty complicated.  And I don't know.  I don't know

7  whether there are -- whether, you know, hearing loss -- here's

8  what I know.  I know that from what you told me on Saturday

9  that the Takata airbag cases that you said there was hearing

10  loss there.  Okay.  I believe you.

11  Q     That was just my question.  Just if there are other cases

12  --

13  A     Yeah, but I don't know if that's the same injury.

14  Q     Right.

15  A     I don't know.

16  Q     So let me try to simplify this.

17  A     Sir, I'm sorry.  I'm sorry.  I didn't mean to be

18  difficult.

19  Q     Did you look for any cases with comparable injuries to the

20  Combat Arms claims?

21  A     I did not do any valuation nor am I qualified to opine on

22  even know what a similar injury would be.

23  Q     You're aware of the concept of litigation funding.  Right?

24  A     I've written on it and am aware of it.  Yes.

25  Q     And you know that litigation funders commonly do an

Heaton - Cross/Rogers                                91

1  analysis to determine a likely return on their investment in

2  litigation.  Right?

3  A    I -- I think they all try to do that.  Some do it well,

4  and some don't.

5  Q    And you were hired by Mr. Keller of the Keller Postman

6  firm.  Correct?

7  A    I was hired by the Keller Postman firm.

8       I don't think Mr. Keller is personally on the hook for me.

9  Q    You understand that Mr. Keller is very familiar with

10  litigation funding, as well.  He used to own the litigation

11  funding firm.

12  A    He started one of the -- one of the handful of main firms

13  that kind of on the high end of the market.  Yes.

14  Q    But you didn't ask Mr. Keller or anyone else for that

15  matter if the litigation funders in these cases have done an

16  analysis of the likely outcomes.  Did you?

17  A    I'm familiar with how litigation funders operate.

18       They don't look like me, okay.  They don't -- they don't

19  have 18 years of experience.  They don't have finance Ph.D.s

20  and work on this stuff all the time.

21  Q    Did you ask if they did the work, sir?

22  A    I would never ask.

23       It wouldn't matter to me one way or the other what a

24  funder said.

25  Q    Now you're not offering any opinion that the jury verdicts

1  in this case reflect the scientific merits of the underlying

2  cases.  Do you?

3  A    I don't even really understand the question except, you

4  know, to say like do I have a view on the evidence.  I don't.

5  Q    And you're not trying to determine in your analysis if the

6  plaintiffs in the bellwether cases who got plaintiff verdicts

7  actually had meritorious claims.  Right?

8  A    No.

9      I don't have any knowledge of those underlying details as

10 we talked about a lot, and so no.

11 Q    You don't think much of the jury system, do you, sir?

12 A    That's not true.

13     I know the article that you're talking about.  I think

14 that we put too much in front of juries that would be better

15 decided by -- by judges.

16 Q    Let me show you what's been previously marked as Exhibit

17 605.

18     This is the article you just mentioned in your testimony.

19 Isn't it, sir?

20 A    Yes.

21 Q    What's the title of the article?

22 A    I didn't write the title.  That's written by the Law360

23 editors.  But I agree with it.

24     "Jury Trials Are In Decline For Good Reason."

25 Q    Okay.  And this is the article that you wrote in Law360,

Heaton - Cross/Rogers                                 93

1  you said?

2  A    I wrote it for Law360.  Correct.

3  Q    And you, sir, think the decline in jury trials is a good

4  thing for society.  Don't you?

5  A    I do.

6        Because as I said before, I think that we put too much of

7  some kind of cases in front of juries that would be more

8  efficiently decided by judges.  I do believe that.

9  Q    In general, you'd like to see fewer cases put in front of

10  juries.  Wouldn't you?

11  A    Yes.

12        Partly because it's so hard on the jurors and partly

13  because I think there are cases that reward the wrong kinds of

14  skills on both sides, defense side and plaintiff side.

15  Q    And we'll talk about that in a second.

16        But part of the reason why you've applauded the decline in

17  jury trials is because jurors like every human being are prone

18  to make mistakes.  Right?

19  A    Like me, like probably you.  I don't know.  Maybe you're

20  more perfect.  But, yes, correct.

21  Q    And another reason why you've applauded the decline in

22  jury trials is because jurors are prone to prejudice, again,

23  like every human being.  Right?

24  A    Yes.

25  Q    And a third reason is because jurors can be prone to

Heaton - Cross/Rogers                              94

1   irrationality.  Right?

2   A    Again, like -- like me and like every other human being

3   I've ever met.

4   Q    Is it fair to say that you've described jurors as

5   gullible?

6   A    Like -- like other human being, yeah.

7   Q    In fact, in this article, if you look at the paragraph on

8   the first page, the second paragraph from the bottom -- I'm

9   sorry, the third paragraph from the bottom, you wrote -- you're

10  writing about the decline in jury trials.

11       You wrote, "No doubt this is a disappointment to a certain

12  class of trial lawyers who feel they could convince anyone of

13  anything.  But that skill common to conmen and charlatans as

14  well is of no social value if it is used to persuade the

15  gullible of a position that is barely within reason and almost

16  certainly wrong."

17       Did you write that, sir?

18  A    I write it and I believe it.

19  Q    Jurors can be persuaded by rhetoric that's not tied to the

20  merits of the case.  Would you agree with that?

21  A    Like everyone.

22  Q    And lawyers can sometimes inflame jurors' passions to

23  award damages that are disproportionate to the harm.  You would

24  agree with that.  Wouldn't you?

25  A    Yes.

Heaton - Cross/Rogers                                95

1      Or to minimize harm and escape liability when they

2 shouldn't.

3 Q    And I think you said already that you didn't read any of

4 the opening statements or closing arguments in the bellwether

5 trials.  Right?

6 A    I think I said it many times already.  Yes.

7 Q    Yeah.  These are the trials you are looking to as

8 representative of what would happen if the litigation against

9 3M continued.  Right?

10 A    Well, the system is what the system is.

11      Yes, this is a -- this is a sort of an opinion piece, but

12 the system we have is the system we have.  And either that

13 system or if people decide to make their claims in your

14 bankruptcy proceeding instead of just not and waiting for 3M,

15 then that's the -- that's who you'll -- that's the system you

16 face.

17      So, again, mine is a -- is a statistical analysis based on

18 the bellwether process, but now I stand by the views that I

19 wrote here.  I don't think you should use skills such as, you

20 know, people have, I've seen, you know.  When people are able

21 to use those skills to -- to create an injustice whether it's

22 on one side or the other, I don't think you think that's a good

23 thing either.

24 Q    Do you think it's a good thing if the plaintiff lawyer in

25 the bellwether trial suggested that the defendants were

Heaton - Cross/Rogers                              96

1  thankful to Osama Bin Laden?

2          MS. BARRIERE:  I'm going to object, Your Honor, to

3  the relevancy here.  This is getting outside the scope of --

4          THE COURT:  Where are we going on this?

5          MR. ROGERS:  Your Honor, these are the bellwether

6  trials and cases that he says he's --

7          THE COURT:  But I can't get into the bellwether

8  trials.  I don't know what about if people like Osama Bin Laden

9  or not.  It doesn't matter to me because I can't look at them.

10 Okay?

11         MR. ROGERS:  Okay.  Understood, Your Honor.

12         THE COURT:  So --

13         MR. ROGERS:  I'll move on.

14         THE COURT:  Thank you.

15 BY MR. ROGERS:

16 Q    Now your analysis assumes that 193,000 cases against 3M

17 are taken to trial.  Is that correct?

18 A    No.

19 Q    You assumed that 193,000 cases will either go to trial or

20 be dismissed beforehand.  Right?

21 A    Correct.

22 Q    Okay.  And you agree with me that if your analysis is

23 correct, there are decades of litigation in store for 3M and

24 the claimants.  Isn't that true?

25 A    No.

1  Q    How are they going to resolve 193,000 cases in less than

2  years or decades?

3  A    Ultimately, the proper party will file for bankruptcy, 3M

4  Company.

5  Q    Your opinion is that 3M will file for bankruptcy.  Is that

6  right, sir, if the cases against it continue?

7  A    Well, it's not in my declaration, but if you ask, combined

8  with the -- you know, the Combat Arms combined with the PFAS

9  cases.  I think it's -- and combined with the fact that you're

10  spinning out assets away to kind of to check them out in the

11  escape pod, I think it's more and more likely that within the

12  next several years we'll see a 3M bankruptcy.

13       That's the answer to your question, yes.

14  Q    You understand that there is a -- that the Court in the

15  MDL has issued an order indicating that the Court is prepared

16  to start remanding cases across the country.  Right?

17  A    Yes.

18  Q    Now would you agree with me that in the tort system,

19  claimants with comparable damages can get different

20  compensation?

21  A    I don't know that anyone has really done a study where you

22  had sort of on person who's identical over here, one person

23  who's identical over here, and they got a different result.  I

24  mean, obviously, that would be super hard to do.

25       So it seems like kind of back of the pants like

Heaton - Cross/Rogers                    98

1  speculation.  I don't know the answer to that.  I'm like a

2  social scientist, so I don't want to just sort of say I agree

3  with you.  I don't know.  I don't think there's any evidence of

4  that.

5      I think that there are people who say this seemed a lot

6  like this case and this one turned out different from that.

7  But as we've been discussing, every case has its differences.

8  So I just -- I won't agree with that.  I don't know.  It could

9  be true.

10 Q    Would you agree with me that bankruptcy trusts can provide

11 more predictable compensation to claimants?

12 A    Yeah, unfortunately, it can be predictably low.  But, yes,

13 predictability is definitely there.

14 Q    Now you testified on direct about a spinoff that was

15 announced at 3M.  Is that right?

16 A    The same day as the bankruptcy filing.  Correct.

17 Q    And you know that that spinoff hasn't happened yet.

18 Right?

19 A    And hopefully it won't.

20 Q    When is it slated to happen, sir?

21 A    I don't know the date.

22         MR. ROGERS:  May I have a moment, Your Honor?

23         THE COURT:  You may.

24                     (Pause)

25         MR. ROGERS:  Your Honor, I have no further questions

1  for the witness.

2         At this time, the debtors renew our objection to this

3  testimony on two grounds under Daubert.  First, the testimony

4  does not fit the issues, there is no pending motion to enjoin

5  3M from any activity and, therefore, the testimony is

6  completely irrelevant to the issues before Your Honor.

7         And, second, we renew our objection that the data and

8  analysis that Dr. Heaton has -- the data he's relied on and the

9  analysis he's performed is insufficient under Daubert.  He has

10  not done any statistical analysis of the Bellwether cases to

11  determine whether they're representative, which he admits is a

12  fundamental underpinning of his opinion.

13         THE COURT:  All right.

14         I guess I'll ask, Ms. Barriere, do you have any

15  response to that, I guess, renewed objection?

16         MS. BARRIERE:  Your Honor, I would just, I guess, re-

17  assert the point that opposing counsel does not take issue with

18  the methodology, he takes issue with the weight as to afford

19  Dr. Heaton's testimony.

20         Furthermore, there is no injunction pending against

21  3M, but in our objection, we asked the Court to add the

22  condition to the debtors' objection which it has the authority

23  to do and we cite extensive case law in our objection as to

24  enter a condition as to the injunction regarding the claimants.

25  So that is the issue before the Court.

1          THE COURT:  I know they've argued -- I don't know if

2  I have the power to do it, but they have argued it.

3          And as far as the objection thereto, again, I

4  understand <u>Daubert</u>'s very important, but I also am a trier of

5  fact who's a judge not a jury.  So some stuff comes in that

6  probably in bankruptcy that would never come in in a jury

7  trial.  I understand that the limitations of what he's done or

8  what he's based it on.  I understand your concerns.  I suspect

9  I'll hear them again at closing.

10          But I think for the purposes of where we are and what

11  it was offered for, I will overrule those objections and allow

12  it understanding that I think counsel is right, I view it as a

13  weight issue and how I think it is -- how it should be weighted

14  and relevant to the analysis of whether or not a preliminary

15  injunction should issue from the bankruptcy court as to

16  litigation to 3M.

17          So would you like to do any redirect of the witness?

18          MS. BARRIERE:  I would, Your Honor.  I wasn't sure if

19  I needed to afford counsel --

20          THE COURT:  Well, that's true.  I mean this is the

21  claimant's objection, but does anyone else wish to cross-

22  examine the witness?

23                    (No audible response)

24          THE COURT:  I see a bunch of glances at each other.

25          All right.  I'm going to take the lack of anyone

Heaton - Redirect/Barriere                    101

1  standing up -- I'm going to talk very slowly, the lack of

2  anyone standing up as people are declining the opportunity to

3  cross the witness.

4        Okay.  You may do redirect if you so desire.

5        MS. BARRIERE:  Sure, Your Honor.  Just --

6        THE COURT:  Well, let me ask, how long do you

7  anticipate redirect to go?

8        MS. BARRIERE:  Ninety seconds.

9        THE COURT:  I can do 90 seconds.

10                 REDIRECT EXAMINATION

11 BY MS. BARRIERE:

12 Q    Dr. Heaton, again, Ashley Barriere on behalf of Keller

13 Postman and CAEv2 plaintiff Charles Rataj.

14       During opposing counsel's cross-examination, you were

15 asked what you were and were not aware of with the Bellwether

16 selection process.  Is that correct?

17 A    Correct.

18 Q    Were you aware that defendants submitted to the MDL court

19 in 2020, and I quote, "Defendants believe the Court has

20 followed an appropriate path in overseeing the selection of 25

21 Bellwether candidates who in turn will be subject to random

22 selection for Bellwether trials."

23       Were you aware of that?

24 A    I wasn't aware of the exact language, but that was part of

25 what was told to me at the beginning of the case.  And it's

Heaton - Recross/Rogers                    102

1  consistent with what was told to me.  Correct.

2  Q    Okay.  And just one further question.

3       Were you aware of that in the same filing defendant said,

4  "The combination of Bellwether discovery and review of data

5  from the 1,509 cases will assist the parties and the court in

6  better understanding the key characteristics of the plaintiff

7  population."

8       Were you aware of that representation to the MDL court?

9  A    Again, I wasn't aware of the exact quote, but that was

10 discussed with me in, and it's also just consistent with my own

11 experience in the world.

12 Q    Sure.

13          MS. BARRIERE:  No further questions, Your Honor.

14          THE COURT:  All right.

15          Any recross based upon that?

16          MR. ROGERS:  Very brief, Your Honor.

17          THE COURT:  Ninety seconds brief?

18          MR. ROGERS:  Ninety seconds.

19

20          THE COURT:  All right.

21                    RECROSS-EXAMINATION

22 BY MR. ROGERS:

23 Q    You were just read a couple of quotes by your counsel.

24 Right?

25 A    It's not my counsel, but the counsel that retained me.

103

1 Correct.

2 Q    Counsel that retained you read you a couple of quotes from

3 the record.  Right?

4 A    And I said I hadn't heard those quotes.  That's correct.

5 Q    But you said you had heard something similar to those

6 quotes or they were consistent with what you had heard.  Right?

7 A    The quotes were consistent with what I was told at the

8 beginning of the case when I inquired about the process.

9 Correct.

10 Q    Told by counsel.  Right?

11 A    Yes, by Mr. Keller.

12 Q    Do you know when those statements that counsel just read

13 were made?

14 A    2020.

15 Q    Do you know if there were any changes to the Bellwether

16 selection process after that?

17 A    No, I don't -- I don't know the time path of the -- of the

18 effort among the parties and the court.  I don't.

19         MR. ROGERS:  No further question, Your Honor.

20         THE COURT:  And, again, are you going to bite the

21 apple one more time?

22         MS. BARRIERE:  No, Your Honor.  I'm done.

23         THE COURT:  Okay.  I saw your grabbing stuff.

24         I know we're taking the witness out of order.

25         Here's Mr. McKane.

104

1          MR. McKANE:  Your Honor, I'm going to renew my

2     boldness and ask you if it's an appropriate time to take a

3     break after 2 hours and 15 minutes.

4          THE COURT:  Well, your boldness, yes, but you have to

5     give me 90 seconds now.

6          Ms. Barriere, there have been two exhibits that have

7     been submitted and I guess I'll ask Mr. Rogers, that have not

8     been admitted.  Do you wish for them to be admitted, and is

9     there objection thereto if you do wish to admit them.

10         MR. ROGERS:  I believe you're referring to Dr.

11    Heaton's declaration and his --

12         THE COURT:  600 and 605.

13         MR. ROGERS:  Yep.  And his article, and we did not

14    move for those to be admitted into evidence.

15         THE COURT:  Okay.

16         And, Ms. Barriere, did you move to admit them?

17         MS. BARRIERE:  I did not, Your Honor.

18         THE COURT:  All right.  They will not be admitted.

19         All right.  Now you get your wish, Mr. McKane, I

20    might as well.

21         You may be excused as a witness.

22         And let's take a -- what time is it?  Let's reconvene

23    at 10:30.

24                         (Recess)

25         THE COURT:  -- in Adversary 22-50059.  This is the

105

1  preliminary injunction and declaratory relief.

2          We have finished as an accommodation to the tort

3  claimants one of their witnesses.  And I think we're back now

4  to the debtors' case in chief in support of their motion.  And

5  -- but we get an update from Mr. Horowitz first.  So go ahead,

6  sir.

7          MR. HOROWITZ:  Yes.  Thank you, Your Honor.

8          For the record, David Horowitz of Kirkland & Ellis,

9  proposed counsel for the debtors.

10          Scheduling issue, we have submitted an affidavit from

11  Jessica Berman of Kroll who's a service agent or claims agent.

12          THE COURT:  Yes.

13          MR. HOROWITZ:  There have been no objections filed

14  with respect to the service of the summons, adversary

15  proceeding papers, or the PI papers.  I've reached out to

16  counsel for the claimants and the U.S. Trustee to just re-

17  confirm that there are no objections to service.  I've received

18  email confirmation from each of those people.

19          And what I want to just do is just confirm for the

20  record that there are no objections to the manner in which the

21  pleadings were served in these papers pursuant to Adversary

22  Docket Number 10 which was our ex parte motion for service

23  procedures by email on counsel of record or overnight mail or

24  email is not available because I'd like to release the witness

25  if we could.

106

1          THE COURT:  All right.  Does anyone here have any

2    objection to the release of the witness, Mr. Horowitz, given

3    the -- on the basis that there is no objection as to service of

4    the motion referenced?

5          Just remember to state your name for the record and

6    push the button if you have a microphone.

7          MR. PFISTER:  Robert Pfister.  No objections from the

8    claimants on the joint brief, Your Honor.

9          THE COURT:  Thank you.

10          MR. GLASSER:  Brian Glasser, Your Honor.  No

11   objection.

12          THE COURT:  Thank you.

13          MR. KELLER:  Ashley Keller, Your Honor.  No

14   objection.

15          THE COURT:  Thank you.

16          MR. PAUL:  Rick Paul.  No objection.

17          THE COURT:  Thank you.

18          MS. DUVALL:  And Laura Duvall for the U.S. Trustee.

19   No objection.

20

21          THE COURT:  All right.  Does that give you

22   satisfaction and comfort?

23          MR. HOROWITZ:  It does, Your Honor.  And thank you,

24   everyone, for the courtesies.

25          THE COURT:  All right.  Thank you.

 1            You know we have other hearings this week if she

 2 wants to stay for those.

 3            UNIDENTIFIED SPEAKER:  I'll tell her.

 4            THE COURT:  Okay.

 5            All right.

 6            MR. WASDIN:  Your Honor, the debtors' next witness is

 7 Brian Myers.

 8            THE COURT:  All right.  Please come forward.

 9            Come on up.

10            MR. MYERS:  Sit here?

11            THE COURT:  Yes.

12            MR. MYERS:  I'm sorry.

13            THE COURT:  That's right.  I forgot you guys have

14 been in separate rooms.

15            All right.  Before you take a seat, please raise your

16 right hand.  Thank you.

17             BRIAN MYERS, DEBTORS' WITNESS, SWORN

18            THE COURT:  Please be seated.

19            State your name for the record, and you may proceed.

20            MR. WASDIN:  Nick Wasdin with Kirkland & Ellis,

21 proposed counsel to the debtors.

22                       DIRECT EXAMINATION

23 BY MR. WASDIN:

24 Q    I guess it's still morning, so good morning, Mr. Myers.

25 Could you just take a second and tell the Court your name and

                         Myers - Direct/Wasdin                  108

1  where you work?

2  A    My name -- my name is Brian Myers.  I work for 3M in St.

3  Paul, Minnesota.

4  Q    How long have you worked at 3M?

5  A    Since April the 1st of 2008 when they acquired Aearo.

6  Q    What's your current title?

7  A    I'm the Vice-President/Business Leader of Regulatory

8  Strategy.

9  Q    Prior to joining 3M in April of '08, did you work at Aearo

10 and certain of its predecessor companies?

11 A    I did.

12 Q    Can you just give the Court an overview of your time at

13 Aearo?

14 A    Sure.

15      So in November of 1989, I joined what was at that time

16 Cabot Corporation there in Indianapolis in a manufacturing role

17 associated with hearing protection.

18      Ultimately, in the early '90, I ended up as the

19 marketing/business manager for that hearing protection

20 business, and I served in that capacity both for Cabot, Cabot

21 Safety and then ultimately Aearo until it was acquired by 3M

22 in, as I said, April 1st, 2008.

23      And then I went for another I think until the end of 2010

24 continuing in that role with 3M.  Then I left the hearing

25 protection business for about four and a half years until the

1   middle of 2015.  When I came back, I had a set of businesses

2   including hearing protecting that I managed, and I did that

3   until August the 1st of this month.  And now I'm in the

4   regulatory strategy area.

5   Q    Going back to your time at Aearo, while you were at Aearo,

6   did you have involvement and responsibility for the Combat Arms

7   Version 3 earphone?

8   A    I did.

9   Q    What was your role with respect to the CAEv2?

10  A    So I was in marketing.

11       So what I did is listen to the proposal.  Part of my -- in

12  -- this would have been in 1997 is when it started, trying to

13  determine did this seem like a product we could make, was there

14  a market for it, you know, those kinds of business questions.

15       So we decided ultimately that it seemed like it was a --

16  it was a product we should pursue, and we resourced it and

17  prioritized it and developed it and then ultimately

18  manufactured and marketed it.

19       And I was kind of as the marketing manager with sort of

20  the I'll call it the project manager as we moved through key

21  milestones keeping other functions on -- you know, on the due

22  dates and things like that so that it moved along.

23  Q    What group at Aearo had responsibility for product design?

24  A    That would be the technical group.

25  Q    Did you interact with the technical group in your role as

1  -- in your marketing function and in your role as the sort of

2  informal project manager?

3  A    I did.

4       So they were one group that we, you know, kept dates on

5  and tried to make sure that we were progressing appropriately.

6  Q    And did you attend meetings with the technical group to

7  understand the progress of the design?

8  A    I did.

9  Q    When was the Combat Arms Version 2 designed?

10  A    So the idea of the two-ended plug which is the Version 2

11  came in early 1998.  That design was -- we worked on that

12  design through early '99 to mid -- to mid-1999.

13  Q    And when were the first sales of the Combat Arms Version 2

14  earplug?

15  A    At the end of 1999.

16  Q    Was the design of the Combat Arms Version 2 earplug

17  changed after the 3M acquisition of Aearo in 2008?

18  A    Not to my knowledge.

19          MR. WASDIN:  Your Honor, may I approach?

20          THE COURT:  You can always approach.  You can also

21  move freely about.

22          MR. WASDIN:  Thank you.

23  BY MR. WASDIN:

24  Q    Mr. Myers, I've handed you a document that was pre-marked

25  as Exhibit 148.  Do you recognize this?

Myers - Direct/Wasdin                    111

1  A    Yes, I do.

2  Q    What is it?

3  A    So this is what we would call a blister card.

4       A piece of packaging that we would actually put the

5  product -- you see kind of the big empty space in the rectangle

6  on the left at the bottom.  We would put the product there and

7  put a clear blister card over that to seal the product against

8  this card.  So this would have been a part of the product sold.

9            MR. WASDIN:  Your Honor, we would move Exhibit 148

10 into evidence.

11           THE COURT:  Any objection to the admission of what

12 has been designated Exhibit 148?

13           MR. BUCHANAN:  No objection, Your Honor.

14           THE COURT:  All right.  Hearing that and seeing no

15 other objection, the Court will admit it.

16           (Debtors' Exhibit 148 admitted into evidence)

17           MR. WASDIN:  Can we please publish Exhibit 148?

18           And if we can turn to the backside and call at the

19 right side of the document with the lighter color with text.

20 BY MR. WASDIN:

21 Q    Mr. Myers, I'm afraid that our print job here is not

22 perfectly clear.  But if you look down to the bottom left-hand

23 corner of the backside of the package that we're looking at,

24 can you tell what the date of this particular package was?

25 A    Yeah.

1    There's a copyright 2007 Aearo Technologies, so 2007 is

2    when this was created.

3  Q    Above that, there are two boxes that have some text in

4    them but at the top have noise reduction ratings of 22 on the

5    left and then zero on the right.

6    Do you see that?

7  A    I do.

8  Q    What are noise reduction ratings?

9  A    So they are a part of the labeling of a hearing protector

10   in the U.S.  It's a calculation -- it's a single number

11   calculation that's done based on testing of -- of a product on

12   human ears.

13  Q    What group at Aearo had responsibility for doing the

14   testing to determine the NRR for the Combat Arms Version 2

15   earplug?

16  A    That would be the technical group.

17  Q    When was that testing completed?

18  A    The testing on this was done in late 1999 into 2000.

19  Q    What were the noise reduction ratings that were determined

20   from the Aearo testing?

21  A    So for one end, the green steady state end what you see

22   above the box was 22, and the yellow level to pin it in was

23   zero.

24  Q    Did the noise reduction ratings of 22 and 0 ever change

25   over the life of the product?

Myers - Direct/Wasdin                    113

1  A    I don't believe so.

2  Q    Mr. Myers, I've handed you a document that we pre-marked

3  as Exhibit 66.  Can you tell us what is this?

4  A    It's a data table of the sales revenue of the Combat Arms

5  Earplug Version 2 through the life of the product.

6  Q    Did you assist in compiling this data and creating

7  portions at least of Exhibit 66?

8  A    I did.

9      I worked with a gentleman named Dave Viele on this.

10        MR. WASDIN:  Your Honor, we would move Exhibit 66

11  into evidence.

12        THE COURT:  Any objection to the admission of what

13  has been designated Exhibit 66?

14        MR. BUCHANAN:  No objection, Your Honor.

15        THE COURT:  All right.  Hearing none and seeing no

16  other objection, it is admitted.

17        (Debtors' Exhibit 66 admitted into evidence)

18  BY MR. WASDIN:

19  Q    Mr. Myers, can you tell us where did these sales revenue

20  data in Exhibit 66 come from?

21  A    So it came from two separate systems.

22      So there was an SAP-1 system that is the earlier part of

23  the data up and through about 2010, and then in 2010 our system

24  changed to what was called a WDSR system.  And that's where

25  orders were taken, revenues reported, product shipping was --

Myers - Direct/Wasdin                    114

 1  was involved.

 2  Q    And what years are covered here in terms of sales of the

 3  Combat Arms Version 2?

 4  A    So from 1999 which was the first sales through the year

 5  2016.

 6  Q    And if you look to the column on the right under combined

 7  totals, what was the total amount of -- the total dollar amount

 8  of Combat Arms Version 2 sales over the life of the product?

 9  A    So for the U.S., and I'm looking at kind of the table in

10  the middle, the total was $30,317,402.82.  And then globally as

11  a total, it was $31,524,486.43.

12  Q    Did you do work to try to figure out what portions of

13  those totals occurred prior to 3M's acquisition versus after?

14  A    Yeah, we did.

15       And that's summarized on the second page.

16  Q    So let's take a look at the second page of Exhibit 66.

17       And can you walk us through -- let's start with the

18  domestic sales, the total amount of $30,317,402.  What portion

19  of that occurred prior to 3M's acquisition of Aearo?

20  A    So it was -- it's 80.6 percent calculated there.

21  Q    And so what portion would have occurred after 3M's

22  acquisition of Aearo?

23  A    Roughly 20 percent.

24  Q    And does that division, approximately 80-20 pre-

25  acquisition, hold also for the global sales, as well?

Myers - Direct/Wasdin                    115

1  A    It does.  It's about the same; 80-20.

2  Q    Mr. Myers, I've handed you another document.  This one was

3  premarked as Claimants' Exhibit A down at the bottom right-hand

4  corner.  Can you tell me whether or not you recognize this

5  document?

6  A    I do recognize this document.

7  Q    What is this?

8  A    So this was an original query to determine the sales

9  revenue associated with the Combat Arms earplug over the life

10  of the -- of the Combat Arms Earplug Version 2.

11  Q    Approximately when was this query performed?

12  A    I'm going to say it was maybe three years ago.  It was

13  some time ago.  I don't -- I don't recall the date.

14  Q    Okay.  What were the --

15           MR. WASDIN:  Your Honor, we'll go ahead and just put

16  Exhibit A -- we'd move it into evidence.

17           THE COURT:  Any objection to what has been designated

18  Exhibit A?

19           MR. BUCHANAN:  No objection, Your Honor.

20           THE COURT:  All right.  Hearing that and seeing no

21  other objection, the Court will admit it.

22           (Claimants' Exhibit A admitted into evidence)

23  BY MR. WASDIN:

24  Q    And, Mr. Myers, were you personally involved in sort of

25  the collection process that resulted in this data table, as

Myers - Direct/Wasdin                    116

1  well?

2  A    I was.

3  Q    What years are covered here for sales of the Combat Arms

4  Version 2 earplug?

5  A    The same year span, 1999 through 2016.

6  Q    Exhibit A, Claimant's Exhibit A on the combined totals

7  comes out to 46 million.  Do you see that?

8  A    I do.

9  Q    So that's a little bit higher than the 30 million or 31-

10 million-dollar total that was reflected in Exhibit 66 that we

11 just went through.  Right?

12 A    It is.

13 Q    Can you just sort of tell us why this one -- did you do

14 any sort of work to figure out why this one was higher than the

15 30 million we looked at on Exhibit 66?

16 A    Yeah.

17      So in discussions with Dave Viele, what it came to learn

18 was that in the original inquiry there was an error where he

19 found all of the -- he pulled records on all of the orders that

20 had Combat Arms in it, but it pulled data on the entirety of

21 the order.

22 So, for example, if a distributor had ordered $1,000 worth of

23 safety products but only $100 of it was Combat Arms earplugs,

24 it would have pulled the full $1,000 so it tended to inflate

25 the revenue number.

Myers - Direct/Wasdin                    117

1  Q    And looking back to Exhibit 66, the other spreadsheet with

2  the 30 million-dollar figure, does that fix the issue of

3  inflation of the sales data for the reason you just described?

4  A    I believe it does.

5  Q    All right.  But even focusing on the larger number that's

6  on claimant's Exhibit A, the 46 million, if you just sort of

7  look across the years, how does that total break down as

8  between pre-3M acquisition and post?

9  A    So I don't have a cut of the first quarter of 2008, so

10 kind of depending on the assumptions that you make about that,

11 that would say the revenue of Aearo before the acquisition was

12 on the order of 70 to 75 percent of that total revenue.

13 Q    So whatever chart you use, is it fair to say that a

14 substantial portion of the Combat Arms Version 2 sales occurred

15 prior to 3M's acquisition?

16 A    Yes.

17 Q    I just have one more thing to ask you about.  Earlier you

18 described how your role in the hearing protection business

19 transitioned to 3M after 3M's acquisition.  Is that right?

20 A    Yes.

21 Q    What's your current understanding of Aearo's business?

22 A    So Aearo has a business that is --

23        MR. BUCHANNAN:  Excuse me.  Objection, foundation.

24 If this is just learned in the last couple of weeks, Your Honor

25 I guess I'd like to qualify that, but --

Myers - Direct/Wasdin                    118

1          THE COURT:  All right.  Response?

2          MR. WASDIN:  Your Honor, he can certainly speak to

3   his understanding and if Mr. Buchanan has cross-examination he

4   wants to do about when he got it, he can certainly do that and

5   it would go to weight.

6          THE COURT:  I'll allow it because I think ultimately

7   it does go to weight and you do have cross-examination

8   available should something catch your ear, so you may proceed.

9   BY MR. WASDIN:

10  Q    Mr. Myers, what's your understanding Aearo's current

11  business?

12  A    So my understanding is that they make specialty foams

13  where we actually wore some -- one of their specialty foams to

14  make hearing protection.

15  Q    Counsel for the claimants made the statement during --

16  during the opening statement that when you came you would

17  testify that you didn't know there was an Aearo anymore.  Are

18  you aware that you said something like that in a 2019

19  deposition?

20  A    Yes.

21  Q    Can you tell the Court what you meant by that testimony?

22  A    I think I was -- my -- the perspective I was of it was

23  from we're talking about Combat Arms Earplugs.  We're talking

24  about hearing protection and that was a business that I was

25  running.  And I went from that date in 2008 to short of a year

Myers - Cross/Buchanan                    119

1  from that reporting to Legacy Aearo people, like Gary Warren

2  and Jim Floyd and Mike McClain who left after the acquisition,

3  and my organization started reporting into Legacy 3M

4  organizations, like to Brian McGinley and Julie Bushman and

5  Mike Fayel (phonetic), those kinds of folks.

6  Q    So you were talking about your experience in the hearing

7  protection business?

8  A    Exactly.

9           MR. WASDIN:  Your Honor, I don't have anything else

10 from Mr. Myers at this time.

11          THE COURT:  Okay.  All right.  Mr. Buchanan, I think

12 I know you're coming, so come on up.

13          MR. BUCHANAN:  Thank you, Your Honor.  May I use this

14 shelf for my box?

15          THE COURT:  Be careful.  Yeah.

16          MR. BUCHANAN:  Thank you.

17          THE COURT:  One of them is a shelf and one of them is

18 part of the evidence, so --

19          MR. BUCHANAN:  Okay.  Great.

20          THE COURT:  I don't want you to use the evidence one

21 because I can break the shelf, but not the evidence.

22                     CROSS-EXAMINATION

23 BY MR. BUCHANAN:

24 Q    Good morning, Mr. Myers.

25 A    Good morning.

1  Q    My name is Dave Buchanan from Seeger Weiss here on behalf

2  of claimants today.  We've had a chance to meet a few times,

3  right?

4  A    Yes.

5  Q    We had a chance to meet in 2019 when you said what you

6  just recounted in testimony with Mr. Wasdin, right?

7  A    I think you were there, yes.

8  Q    Yeah.  That was when you were testifying as a corporate

9  representative for 3M defendants in litigation relating to the

10 Combat Arms, correct?

11 A    I think I was testifying on behalf of all defendants,

12 whoever they were.

13 Q    And notices were served on behalf -- on behalf of the

14 plaintiffs there, I guess defendants, and you were designated

15 as a representative to speak on topics at that deposition,

16 correct?

17 A    That was my understanding.

18 Q    You investigated and worked with lawyers for 60 hours?

19 A    I don't recall the exact number, but --

20 Q    You interviewed dozens of employees, 3M and former Aearo

21 employees, correct?

22 A    I did talk to -- I think we went through a list in the

23 deposition, maybe a couple of dozen.

24 Q    Couple of dozen current 3M employees, former 3M employees,

25 former Aearo employees, all with counsel as you were preparing

1  for that deposition.  I think it was the first or second

2  deposition in the products liability case, correct, sir?

3  A    I don't know what number it was.

4  Q    I'm going to pass you a transcript.

5         THE COURT:  Just to remind you for the record, don't

6  talk if you're away from the microphone, so just --

7         MR. BUCHANAN:  Thank you.

8         THE COURT:  -- hang onto that and come back.

9         MR. BUCHANAN:  Thank you, Your Honor.  I did need

10 that reminder.  Thank you.

11        Mr. Myers, your prior transcript.

12        Your Honor.

13 BY MR. BUCHANAN:

14 Q    From that last line of questioning with Mr. Wasdin, sir,

15 and Mr. Wasdin was presented to you at trial in the products

16 liability cases, correct, examined you?  That's right?

17 A    Yes.

18 Q    I take it, sir, by that exchange that you anticipated that

19 your prior testimony may be an issue today, is that fair?

20 A    Well, you had asked me about it in the deposition.

21 Q    And you, in fact, reviewed it before that time.  Correct,

22 sir, getting ready for a deposition last week, correct?

23 A    I had -- I had looked at some documents.

24        MR. BUCHANAN:  Let's -- can we pull up DK-1 and play

25 it?

1        For the record, Your Honor, this is an excerpt of

2   Mr. Myers' deposition.  It's page 9.  I think it's 14, line 12

3   to 15, line 1.

4        THE COURT:  Hang on, there is an objection.  I think

5   an objection is coming.

6        MR. WASDIN:  Thank you, Your Honor.  We would just

7   object to playing the deposition or, for that matter, reading

8   the transcript in on hearsay grounds.  He's free to ask him

9   about it, but --

10        THE COURT:  And your name being, for the record?

11        MR. WASDIN:  Your Honor, I'm sorry.  Nick Wasdin with

12   Kirkland & Ellis.

13        THE COURT:  Thank you.

14        All right.  Mr. Buchanan.

15        MR. BUCHANAN:  Yes.  I think counsel opened the door

16   on this in this primary examination on this very topic as to

17   what his understanding was on it and the witness's reaction in

18   the actual interchange I think needs to be seen, rather than

19   read, Your Honor.

20        THE COURT:  I mean, I'll overrule.  I'll allow it.

21   I'll give the weight whatever it deserves because I don't quite

22   know what you're going after, so let's find out.  I think I

23   know, but let's get there first.

24        MR. BUCHANAN:  I don't know if we have sound.

25        THE COURT:  I hope we do.

Myers - Cross/Buchanan                    123

1              MR. BUCHANAN:  Not yet.

2              THE COURT:  What do you want to do because we're

3    using this through Zoom and I don't know how we get volume on

4    that.

5              MR. BUCHANAN:  Yeah, it slows things down for that,

6    Your Honor.

7              If not, we'll move on.

8              THE COURT:  No pressure.

9              MR. BUCHANAN:  What I propose to do, Your Honor, just

10   to move this along is I will read it and then we'll -- we can

11   play it without the audio.

12             We're on page 14 --

13             THE COURT:  I've got to be honest with you.  If we're

14   just playing it without audio -- that's because the Zoom is

15   picking up me now.

16             MR. BUCHANAN:  Hold on.

17             THE COURT:  Okay.  Can I talk.  Okay.  I think I can

18   talk.  Okay.

19             I'm not sure how reading it with audio playing when

20   it's not synched is going to be helpful to me unless, like, he

21   falls over or he's flabbergasted or something.  I don't know if

22   that's going to help you as far as --

23             MR. BUCHANAN:  Fair enough, Your Honor.  I'm trying

24   to move it along.  I'm trying to --

25             THE COURT:  No, I understand and I appreciate it and

Myers - Cross/Buchanan                    124

1  obviously technology is great when it works and when it's not

2  it's befuddling, but such as technology which is why some

3  people are using -- from your term are going to use nice, old-

4  fashioned -- oh, there's our Zoom back again.  So if you don't

5  have a solution in 30 second, if you just want to read it, that

6  would be fine understanding you objected and I'll overrule it

7  because I'll give it the weight it deserves on whether it's

8  impeachment or not, but --

9           MR. BUCHANAN:  That's fine, Your Honor.

10          THE COURT:  -- that's the best I can do it.

11          MR. BUCHANAN:  And we certainly could submit the

12 clip, but I can read it now.

13          THE COURT:  Okay.

14          MR. BUCHANAN:  So the record will reflect it.  We're

15 on page --

16          THE COURT:  Hold on.

17          Mr. Wasdin.

18          MR. WASDIN:  I'm sorry.  Mr. Wasdin with Kirkland &

19 Ellis.  I do appreciate that Your Honor just signaled that you

20 had overruled this, but just for the record, we would also

21 object to the reading of the transcript on hearsay grounds.

22          THE COURT:  Okay.

23 BY MR. BUCHANAN:

24 Q    Again, we're reading from -- sir, on the first page,

25 October 18, 2019, it's the first deposition you gave in the

1  Combat Arms litigation.  You gave it as a corporate

2  representative of 3M, correct, sir?

3  A    I don't know if it was the first deposition that I gave.

4  Q    Okay.

5  A    But I did give a -- this -- this deposition.

6  Q    All right.  On page 14, sir, we're on line 12, question,

7  "Okay, now I represent plaintiffs in the multi-district

8  litigation in re: Combat Arms Products liability litigation.

9  Do you understand that?"  You answered that you were

10 representing.  Question, "Plaintiffs, including soldiers around

11 America who've brought claims against 3M?"  Your answer, "Yes."

12 Question, "Okay, and Aearo, the company Aearo.  Do you

13 understand that?" and you answered, "I didn't know that there

14 was an Aearo anymore, but" -- and then you trail off.

15           On that date, sir, were you asked those questions and

16 did you give those answers?

17 A    I think that's accurate.  I would point that I was going

18 to say but something and I don't know what that was.

19 Q    Okay.  Well, you didn't submit any errata to your

20 transcript, correct, sir, that reflected a change to that

21 answer, correct?

22 A    I don't know if we did or not.

23 Q    I'll represent to you, sir, that you did not correct that.

24 At that point in time, sir, you were designated as a 30(b)(6)

25 on topics you had spent 60 hours preparing for, interviewing

1  current and former 3M employees, correct?

2  A    Yes.

3  Q    Interviewing former Aearo employees, correct?

4  A    I don't know.  I think we talked about that in my

5  deposition.  I was -- I didn't know who they worked for, what

6  entities they worked for.

7  Q    And you also served as a manager of the business line that

8  included hearing protection devices at that point in time,

9  correct?

10  A    I wasn't just the manager of hearing protection.

11  Q    You had other business lines reporting to you at that

12  point of time, correct?

13  A    I may have had like fall protection at that point in time,

14  but I don't recall.

15  Q    So you had hearing protection reporting to you, sir, in

16  the fall of 2019.  Just separate out the corporate

17  representative component.  Your business --

18  A    Only by --

19  Q    -- responsibilities -- go ahead.

20  A    I'm sorry.  I -- you switched gears.  I thought we were

21  still talking about late -- earlier than that.  Fall of 2019.

22  Yes, I had several businesses.

23  Q    At that point in time one of the businesses that reported

24  in to you at 3M corporation or 3M Company was hearing

25  protection, correct?

Myers - Cross/Buchanan                    127

1  A    That's accurate.

2  Q    During the period of time that hearing protection reported

3  in to you between 2015 and 2021 you had responsibility for the

4  Combat Arms, correct?

5  A    It is -- it is or was a hearing protector that we sold.

6  Q    Yes, the Combat Arms Version 2, you stopped selling that

7  in 2015, but there were later versions of the Combat Arms that

8  you continued to have responsibility for, correct?

9  A    Up until August the 1st of this month.

10 Q    After the bankruptcy here.  After the bankruptcy petition

11 was filed?

12 A    I don't -- I'm not sure of the date it was filed, but up

13 until August the 1st I had responsibility for hear -- the

14 hearing protection business.

15 Q    You had profit and loss responsibility for the hearing

16 protection businesses of 3M as of November or October of 2019,

17 the date of this testimony.  Correct, sir?

18 A    Yes.

19 Q    And at that point in time, sir, your testimony is, as

20 read, you "did not know there was an Aearo anymore," correct?

21 That's what you stated.

22 A    Yes.  And again, I -- I was going to go on to say

23 something, but I don't know what.

24 Q    You're not the only person, sir, who's given prior

25 testimony on this, though, right?  Have you reviewed any other

Myers - Cross/Buchanan                    128

1  3M employees' testimony concerning their awareness or not of

2  Aearo's existence after it was integrated into 3M between 2008

3  and 2010?

4  A    I don't know that I have.  Nothing comes to mind.

5  Q    Did you --

6         MR. BUCHANNAN:  Could I have Exhibit EV?  Assuming

7  our technology -- excuse me -- I'm assuming we'll have to show

8  the page, but I'll pass these out now.  These are the EV.

9  BY MR. BUCHANAN:

10 Q    Do you see before you, sir, the transcript of testimony

11 from a Brian S. McGinley?

12 A    Yes.

13 Q    Okay.  I'd like to direct your attention, sir, to page 17

14 and it continues on to page 18.

15        MR. WASDIN:  Your Honor --

16        MR. BUCHANAN:  I have some questions for you as to --

17        THE COURT:  Hold that thought.

18        MR. BUCHANAN:  -- as to reading this.

19        THE COURT:  Go ahead.

20        MR. WASDIN:  Nick Wasdin with Kirkland & Ellis.

21 Again, we would put in a hearsay objection to the reading of

22 out-of-court testimony.  Now we're not even talking about

23 Mr. Myers anymore here.

24        THE COURT:  All right.  Yeah, I mean, this is not his

25 deposition, correct?

Myers - Cross/Buchanan                129

1          MR. BUCHANAN:  Understood.  He will have relevant

2    testimony to this, I believe.  I'm not going to be able to ask

3    him these questions after we proffer this testimony in our

4    case, Your Honor.

5          THE COURT:  Come again?  You won't be able to?

6          MR. BUCHANAN:  Well, he -- I wouldn't think you'd

7    want me to call Mr. Myers to ask him questions after we play

8    his testimony or read this testimony.

9          THE COURT:  All right.  Well, was there a McGinley on

10   the witness list?

11         MR. BUCHANAN:  The transcript is on the exhibit list,

12   Your Honor.

13         THE COURT:  Well, the transcript is, but -- okay.

14         MR. WASDIN:  Your Honor, what is the current status

15   of the -- Your Honor, if this witness is not on their witness

16   list, that's one issue for them.  And a second one, this

17   transcript is, you know, from another proceeding.  I don't see

18   an evidentiary basis for them to play it in this one.

19         THE COURT:  All right.  Again -- and I'll let you

20   respond, I guess, rather than --

21         MR. BUCHANAN:  Well, 3M was represented in that other

22   proceeding.  They have --

23         THE COURT:  Well, I understand that, but I guess

24   my --

25         MR. BUCHANAN:  -- identical interests in this issue.

Myers - Cross/Buchanan                    130

1          THE COURT:  But I guess my initial question is, I'm

2   confused as to why he would be reviewing a transcript of a

3   third party in his direct.  And I know you said you may want to

4   recall him.  I don't know what the ultimate strategy is, but I

5   guess as I'm sitting here I guess I -- I mean, if he reads what

6   another person says, isn't that just hearsay?  I mean, that's

7   what they said?

8          MR. BUCHANAN:  Well, the transcript I think is going

9   to come in for substantive evidence, Your Honor, but this

10  witness has relevant testimony as to Mr. McGinley's position as

11  well.

12         THE COURT:  All right.  Well --

13         MR. BUCHANAN:  Mr. McGinley was his boss.

14         THE COURT:  I'm going to allow it understanding I'll

15  give it the weight it deserves and if I find what you're saying

16  ultimately ends up being hearsay, I'm not going to find it to

17  be relevant.

18         MR. WASDIN:  And, Your Honor, just to make clear on

19  the record, we disagree that a deposition transcript from

20  another proceeding that merely exists as an exhibit on their

21  exhibit list is going to come in in their case as

22  substantive --

23         THE COURT:  Well, and we haven't gotten there yet, so

24  you're not going to be prejudiced by him saying he's going to

25  get it in because I know you said you won't, so that's coming

1 attraction for later, but for now I'll allow it and give it the

2 relevance understanding that at least as of now, I think it

3 might be of dubious relevance, but perhaps you can change that

4 opinion as we go forward.

5         MR. BUCHANAN:  Thank you.  With that, Your Honor, may

6 we play the clip?  We have it working now.

7         THE COURT:  Okay.

8         (Video clip played of deposition of Mr. McGinley:)

9 "Q   What is the current status of the Aearo company that was

10 acquired by 3M?

11 "A   That's a -- it's not that complicated, I guess.  For the

12 most part, the company is rolled up under 3M parent.  So all of

13 the safety products, if you want to say it that way, is rolled

14 up under 3M parent.  There is one legal entity held outside 3M

15 parent, but it's not related to the safety business.

16 "Q   What is that entity?

17 "A   It's E-A-R Specialty Composites.

18 "Q   But it's not related to hearing protection products?

19 "A   Not directly, no.

20 "Q   So the primary Aearo, you said, has been rolled up into

21 3M?

22 "A   Yes, that's correct.

23 "Q   And what do you mean by "rolled up"?

24 "A   It operates inside of 3M Company.  It's part of 3M

25 Company.

1  "Q   Does it have -- is it its own subsidiary or is it actually

2  part of a different 3M subsidiary?

3       "MR. MYERS:  Objection, vague.  Might call for a

4  legal conclusion.

5       "You can answer.

6  "A   My understanding is that it's 3M Company, period."

7                      (End of video clip.)

8       MR. BUCHANAN:  Sir --

9       MR. WASDIN:  Your Honor --

10      MR. BUCHANAN:  -- you worked for --

11      MR. WASDIN:  I'm sorry.  I don't even know what he

12  was going to play before he did, but we would object and move

13  to strike all of that testimony.  It was from a witness who's

14  not in court.  It was just played on video apparently from a

15  transcript that exists, clearly ambiguous.  It's just pure

16  hearsay and I would object.

17      MR. BUCHANAN:  Your Honor, I'm advised it was a

18  30(b)(6) transcript.  This is the company providing this

19  testimony in 2013.

20      THE COURT:  Well, again, I'm going to give it the

21  relevance it deserves.  Right now I don't know what it is.  I

22  don't know if he's a 30(b)(6), you see, because it's not in

23  evidence.  And I don't think Mr. Myers is going to be able to

24  testify to that because he wasn't there.  So I don't know where

25  you're going about this really being into evidence and right

1  now it's probably not getting into evidence because I don't

2  know what you're using it for.

3          MR. BUCHANAN:  Your Honor, I -- I'll -- we'll connect

4  it up in our case, Your Honor, and we'll proffer the testimony

5  formally in our case.  My question for Mr. Myers, given his

6  testimony about his awareness is, did you work for Mr. McGinley

7  when you are at 3M, sir.

8          THE COURT:  All right.  I think you can ask that

9  question.

10          MR. BUCHANAN:  Because that's his personal knowledge

11  of who he worked for.

12          MR. WASDIN:  Your Honor, I don't object to that

13  question, but I don't understand why we just played an out-of-

14  court statement --

15          THE COURT:  Well --

16          MR. WASDIN:  -- for --

17          THE COURT:  -- you're not alone.  But right now,

18  it's -- I don't know what it is, but it's not in evidence yet,

19  so let's -- I mean, I don't know what we're using it for, but

20  go ahead.

21          You may answer that question.

22          THE WITNESS:  Okay.  Yes, I did report to

23  Mr. McGinley, not at the time of this deposition.

24  BY MR. BUCHANAN:

25  Q    You reported to Mr. McGinley shortly after Aearo was

Myers - Cross/Buchanan                               134

1 integrated into 3M, correct, sir?

2 A    Yeah, I don't know what the timing was, but that was one

3 of those changes that I alluded to when I said I was working

4 for Aearo folks and then I started working for 3M folks.  And I

5 worked for Brian, if memory serves me, until the end of 2010

6 when I left the business.

7 Q    And in that period of time, sir, just for our knowledge,

8 when Aearo was being integrated into 3M, that was between 2008

9 to 2010, correct, sir?

10 A    There were activities taking place then.  I don't know if

11 there was a final date or when that ended.  I don't know how

12 that would be characterized.

13 Q    That deposition excerpt we just read and that we'll be

14 submitting separately in our case was from 2013.  The

15 integration had already happened as of 2013, correct, sir?

16 A    Again, I don't know.  Maybe that's his perspective.  I

17 don't know what all took place in terms of -- of changes, et

18 cetera, and I don't know that everybody would agree that that

19 was true.

20 Q    Okay.  Passing you, sir, what's been marked as Exhibit K

21 for pre-identification.  Could you turn to the second page,

22 sir, and tell me what we have here?

23 A    Is there a date?  I don't see a date, but this was -- the

24 second page is an organizational chart for the Hearing, Head,

25 Eye and Face Portfolios.

Myers - Cross/Buchanan                    135

1   Q    Given the acronyms on it, sir, do you recognize that it is

2   a 3M org chart?

3   A    I don't know whether it would have been 3M or Aearo or

4   some other entity.  I don't know.

5   Q    Well, Mr. McGinley, sir, was he at Aearo or was he at 3M.

6   A    So Mr. McGinley was a Legacy 3M person, so --

7   Q    Can you --

8   A    It was -- he was a 3M employee and I think at that --

9   depends upon when this document was created, but I think I was

10   a 3M employee by that time.

11   Q    Okay.  Let's go to .3.  We see on this page, sir, you

12   directly reporting in to Brian McGinley, the witness's

13   testimony we just played to you, on this particular org chart.

14   Correct, sir?

15   A    Could you repeat that question?

16   Q    You're reporting in to Mr. McGinley on this org chart,

17   correct, sir?

18   A    Yes.

19            MR. BUCHANAN:  Your Honor, claimants offer Exhibit K

20   in evidence.

21            THE COURT:  Any objection to admission of what has

22   been designated Exhibit K?

23            MR. WASDIN:  No objection, Your Honor.

24            THE COURT:  All right.  Exhibit K is admitted.

25            (Plaintiff's Exhibit K admitted into evidence)

Myers - Cross/Buchanan                    136

1        Oh, can my staff attorney have a copy of Exhibit K,

2   please?

3   BY MR. BUCHANAN:

4   Q    So after, sir, 2008 to 2010 when the company was

5   integrated, when Aearo was integrated into 3M, 3M continued to

6   sell the Combat Arms, correct?

7   A    Yes.

8   Q    3M manufactured the Combat Arms, correct?

9   A    I don't know what entity manufactured it.

10          MR. BUCHANAN:  Can I please have Exhibit EZ?

11          THE COURT:  Thanks.  Oh, you gave me two.

12  BY MR. BUCHANAN:

13  Q    Here before you, sir, is Exhibit EZ.  It's a complaint

14  that was filed by 3M Company against Moldex-Metric.  Do you

15  remember that dispute between 3M and Moldex several years back?

16  A    I wasn't in the business at the time, so I don't recall

17  this.

18  Q    Stamped at the top, now we can't see it, 2012.  Also on

19  the last page as well, March of 2012.  But I direct your

20  attention, sir, to page 3 or .3 in the top right corner,

21  paragraph 11 and it reads:

22          "3M Co. manufactures and sells, pursuant to an

23       exclusive sub-license, personal hearing protection

24       products embodying one or more inventions described and

25       claimed in the 693 patent, including Combat Arms

1      Earplugs."

2              Do you see that, sir?

3          MR. WASDIN:  Your Honor, I would object to that

4  question and move, frankly, to strike the reading of a

5  complaint that's not in evidence, that's just pure allegations

6  from some other lawsuit.

7          MR. BUCHANAN:  These are allegations of 3M Company,

8  Your Honor.

9          MR. WASDIN:  Your Honor, let me -- he said that a few

10  times to -- in response to my objections, but this is an

11  adversary proceeding where the debtors are the plaintiffs.  3M

12  is not a party to this proceeding.

13          THE COURT:  I mean, it is a 3M complaint that says

14  what 3M says.  I mean, it comes down to relevance again, in my

15  opinion, so I'll allow it.  I think I know where they're going

16  at this point, I think, but I'll allow it because it is a 3M

17  document that says what 3M says, at least alleges in there.

18  Now, what weight or relevance it has is a whole separate issue.

19          MR. BUCHANAN:  Thank you, Your Honor.

20  BY MR. BUCHANAN:

21  Q    And sir, now we talked about this last week, you don't

22  have a basis to dispute that, correct, that 3M was

23  manufacturing and selling the Combat Arms Earplugs as of 2012?

24  A    Only that I don't know what entity --

25  Q    Okay.

Myers - Cross/Buchanan                    138

1  A    -- would have been manufacturing that.

2          MR. BUCHANAN:  Could I please have EP?

3  BY MR. BUCHANAN:

4  Q    We're scrolling forward in time a little bit here, sir.

5  Now we're up to 2015.  This is right around the time when you

6  were coming back into the hearing protection business at 3M, is

7  that right?

8  A    Yeah.  I think I -- I came back later than the date on

9  this document.

10 Q    This is an answer of 3M to a complaint filed by Moldex, a

11 separated dispute and it reflects here -- let's go to .4 in

12 paragraph 14.  There's some initial denials by the company in

13 the answer.  Then there's the admission of the company, "To the

14 extent that a response is required, 3M denies the allegations

15 in paragraph 14, except admits that it has "manufactured and

16 sold five versions of its Combat Arms non-linear earplug, each

17 of which used" -- and then it continues.  Do you see that, sir?

18          MR. WASDIN:  Your Honor, I would object on hearsay

19 grounds.

20          THE COURT:  Gentlemen, what are you asking?  For him

21 to just say that's what it says?

22          MR. BUCHANAN:  Well, I'm going to ask him whether

23 he's got any reason to disagree with it.  He was in the role

24 and there's some I think contention --

25          THE COURT:  Well --

Myers - Cross/Buchanan                      139

 1          MR. BUCHANAN:  -- here that there was another
 2   affiliate who was manufacturing the product, Your Honor.
 3          THE COURT:  But didn't he just say that he came back
 4   later in 2015?
 5          MR. BUCHANAN:  Well, then I'd offer that paragraph,
 6   Your Honor, as an admission of 3M Company on a relevant issue
 7   here.
 8          THE COURT:  And I'm allowing an admission of 3M in an
 9   adversary by the debtors to extend the automatic stay to 3M?
10          MR. BUCHANAN:  I'm sorry.  Are you looking -- I can't
11   tell whether --
12          THE COURT:  I'm asking, how in the world am I -- is
13   it -- how can I allow an admission when they're not even a
14   technical party --
15          MR. BUCHANAN:  I'll reframe it --
16          THE COURT:  -- to this adversary?
17          MR. BUCHANAN:  I'll reframe, Your Honor.
18          THE COURT:  Okay.
19   BY MR. BUCHANAN:
20   Q    Sir, as of 2015 when you re-entered the hearing protection
21   business would you have any basis to disagree with the
22   company's statement, 3M Company, the company you worked for,
23   statement that it manufactured and sold the Combat Arms
24   Version 2?
25          MR. WASDIN:  Your Honor, objection on hearsay

Myers - Cross/Buchanan                           140

1  grounds.

2          THE COURT:  I mean, he can say if he agrees or

3  disagrees and I'll give it the way it deserves.

4          THE WITNESS:  Only that I don't know what legal

5  entity manufactured it.

6          MR. BUCHANAN:  Okay.

7  BY MR. BUCHANAN:

8  Q    After 2008, sir, did the company continue to market the

9  Combat Arms Earplug?

10 A    We continued to sell it.  And you said the Combat Arms

11 Earplug and we had several versions at that time.

12         MR. BUCHANAN:  Could I have FE, please?

13 BY MR. BUCHANAN:

14 Q    Sir, after Aearo was integrated into 3M, 3M continued to

15 make representations and claims about the product, the Combat

16 Arms Version 2, correct?

17 A    The sales force did, sure.

18 Q    When you say "the sales force," we have a 3M piece of

19 marketing collateral here from 2010 on the Combat Arms

20 Earplugs.  Do you see that, sir?

21 A    I do see that, yes.

22 Q    Let's go to the second page and this piece of 3M marketing

23 collateral.  The duel-ended Combat Arms Earplug, you'd agree,

24 sir, is featured in this marketing, correct?

25 A    It is.

Myers - Cross/Buchanan                    141

1  Q    Okay.  Let's go to the last page.  We have the date from

2  2010.  We see some representations about the protection that's

3  afforded and we see the copyright, correct, sir?

4  A    On the very last page, yes.

5         MR. BUCHANAN:  Your Honor, claimant is offering

6  Exhibit FE in evidence.

7         THE COURT:  Any objection?

8         MR. WASDIN:  No objection, Your Honor.

9         THE COURT:  All right.  I will admit Exhibit FE.

10        (Plaintiff's Exhibit FE Admitted into Evidence)

11        MR. BUCHANAN:  Can I have Exhibit B, please.  I can

12  go to the second page, Mr. Marbet (phonetic).

13  BY MR. BUCHANAN:

14  Q    And went to 2012, right, sir, from the first page?

15  A    Oh, the email is dated 2012, yes.

16  Q    And 3M after integrating Aearo's hearing protection

17  business continued to make claims about the Combat Arms

18  Earplug, correct, sir?

19  A    This is marketing material from 3M, it appears.

20  Q    Okay.  "Hear the action now, hear life later."  Do you see

21  that?

22  A    I see those words.

23  Q    "You protect us, we protect you."  Do you see those?

24  A    I do see those words.

25  Q    And we have a Combat Arms Earplug reflected the double-

Myers - Cross/Buchanan                    142

1  ended version on the bottom right of the page, right next to

2  the 3M defense logo.  Do you see that?

3  A    Yes, I do.

4           MR. BUCHANAN:  Okay.  Now, plaintiffs offer Exhibit B

5  in evidence, Your Honor.

6           THE COURT:  Any objection to the admission of

7  Exhibit B?

8           MR. WASDIN:  No objection, Your Honor.

9           THE COURT:  All right.  Exhibit B is admitted.

10          (Plaintiff's Exhibit B Admitted into evidence)

11          MR. BUCHANAN:  Could I have EY?

12 BY MR. BUCHANAN:

13 Q    Do you have EY before you, sir?

14 A    Yes.

15 Q    Okay.  There's a cover email, but then you get into it.

16 The cover email is from -- what do we have, 2014 here.  And

17 then we get into the actual marketing piece attached.  Do you

18 see that, 3 -- you see that same style of marketing --

19 A    I do, yes.

20 Q    -- collateral that we were looking at in the other

21 documents, right?

22 A    Yes, it looks very similar.

23 Q    "Hear the action now, hear life later," again same tag

24 line?

25 A    Yes.

1  Q    Off to the left we see other claims and statements

2  using "Losing your hearing is not a requirement for serving

3  your country."  Do you see that?

4  A    I do.

5  Q    Then we can go to the .6.  There's some statements about

6  the Combat Arms Version 2.  Right, sir?  And the dual end

7  design towards the bottom.

8          Please, Mr. Marbet (phonetic), there you go.

9          THE WITNESS:  Yes.

10 BY MR. BUCHANAN:

11 Q    And so after the integration of Aearo into 3M, 3M

12 continued through a sales force, through its defense group,

13 through marketing collateral, and through sales representatives

14 to market and promote the Combat Arms, correct, sir?

15 A    I don't know ultimately what happened with this piece and

16 whether it was used for marketing or -- I don't know what

17 the -- what happened with this piece that you're asking me

18 about.

19 Q    Well, you do see marketing claims listed for the Combat

20 Arms Version 2 by 3M in 2014, correct, sir?

21 A    Yes.

22 Q    Okay.  You also spent some time looking at a label with

23 Mr. Wasdin.  The label was from 2007.  After 3M integrated

24 Aearo into itself, 3M had the ability to change the label for

25 the product, right?

Myers - Cross/Buchanan                    144

1   A    I suppose it could have.

2   Q    Not only that they could have, you know that they did,

3   right?

4   A    I recall that there was a change made to the label.  I

5   don't recall the timing.

6   Q    And there are labels, sir, after 2008 that reflect 3M's

7   name and 3M's branding on the Combat Arms Version 2, correct,

8   sir?

9   A    You mean, just in terms of the branding?  There likely

10  are.  I don't -- there isn't one that comes to my mind right

11  away.

12  Q    Not one that we looked at just a few days ago?

13  A    I don't recall.  I'm sorry.

14         MR. BUCHANAN:  Okay.  Could I have Exhibit EU,

15  please?

16  BY MR. BUCHANAN:

17  Q    Before you now, sir --

18         MR. BUCHANAN:  Actually, pointing out the record.

19  I'm not sure that I moved EY in evidence, Your Honor.  Save you

20  the trouble for which --

21         THE COURT:  No, you did not.

22         Any objection to admission of what has been

23  designated Exhibit EY?

24         MR. WASDIN:  No objection.

25         THE COURT:  All right.  EY is admitted.

Myers - Cross/Buchanan                    145

1        (Plaintiff's Exhibit EY admitted into evidence)
2   BY MR. BUCHANAN:
3   Q    Before you, sir, we have this document entitled Combat
4   Arms Earplugs.  Do you see that?
5   A    Yes.
6   Q    Okay.  It reflects the double-ended design, right?
7   A    It does.  It's Version 2.
8   Q    Okay.  And then there's language.  It's like a package
9   insert that would go with a blister pack, sir.  Is that what
10  this is?
11  A    So it appears to be that format.  I don't know that this
12  was exactly that one or -- I'm not sure.  I was looking for
13  some sort of a part number on here.
14  Q    You can go to the next page, sir, and there's certainly
15  the 3M log on the bottom left.  3M Personal Safety Division.  I
16  think that's the division you told us earlier where you
17  ultimately had responsibility when you returned to hearing
18  protection in 2015, correct?
19  A    That's correct.
20  Q    And when you returned to that business in 2015 the company
21  3M was making, marketing and selling the Combat Arms Version 2,
22  correct?
23  A    Yes.
24  Q    We see at the top, I think the reason I pulled this out,
25  sir, was 3M had the ability to change the label for the product

Myers - Cross/Buchanan                                146

1  if it wanted to.  Correct?

2  A    Yeah, I think I said I suppose they could have.

3  Q    And, in fact, they did as of this point in time, made

4  changes to the fitting instructions and instructions for use,

5  correct, sir?

6  A    I would need to compare to see, but --

7  Q    You have a recollection, sir, that at a point in time 3M

8  removed a fitting tip that was in the instructions for use for

9  the Combat Arms Version 2, correct, sir?

10 A    Yes, there was a change in the fitting instructions.  I

11 don't recall the specifics of that change and I don't know that

12 this -- I can see a 2014 date on here, but I don't know if this

13 reflects that change or if it happened sooner than that.  I

14 don't know.

15 Q    And we've had in the MDL and injury litigation a lot of

16 discussion about these documents in different contexts, and I'm

17 not asking you the precision around each of those terms.  I

18 just want to know during this period of time after Aearo was

19 integrated into 3M whether 3M had the ability to change the

20 warnings for the Combat Arms Version 2 if it wanted to.

21 A    Yeah, I think they could have.

22 Q    And, in fact, you're aware they did make changes to the

23 instructions and fitting tips for the Combat Arms Version 2,

24 correct?

25 A    I know of at least one change that happened, but I don't

Myers - Cross/Buchanan                              147

1  know what the timing was of that.

2  Q    During the time 3M was selling the product -- I guess we

3  should start with when the companies were integrated many of

4  the Aearo people came to 3M, right?

5  A    I know that I did and I know that in the same room where I

6  signed the documents there were maybe a dozen of us.  That's --

7  that's what I know.

8  Q    3M continued to make findings on the safety -- or

9  performance of the Combat Arms Version 2 in its window of time

10 with the Combat Arms Version 2, correct, sir?

11 A    I don't know.  I'm not sure what you're referring to.

12          MR. BUCHANAN:  Can I have Exhibit ER?

13          A ruling on that, Your Honor.  I'd like to offer the

14 last one in evidence.

15          THE COURT:  Any objection to the admission of what I

16 think you're referring to, which is Exhibit EU?

17          MR. BUCHANAN:  That is the exhibit I was referring

18 to.  Thank you, Your Honor.

19          MR. WASDIN:  Can I -- I'm sorry, my version is not

20 scanned.  Is it the document that also bears PGNJ216?

21          MR. BUCHANAN:  Yes.

22          MR. WASDIN:  No objection to that, Your Honor.

23          THE COURT:  Okay.  Hey, you got to the bottom for the

24 no objection part.

25          I will admit Exhibit EU.

1          (Plaintiff's Exhibit EU admitted into evidence)

2          COURT CLERK:  We need to mark it EU, Judge.

3          THE COURT:  Does court attorney have EU?

4          COURT CLERK:  ER.

5          THE COURT:  ER, Your Honor.  I'm sorry.

6          MR. WASDIN:  Oh, ER.

7          MR. BUCHANAN:  Pass them out.

8  BY MR. BUCHANAN:

9  Q    So there's obviously been a dispute in the MDL litigation,

10 sir, about the ability of the Combat Arms to reduced loud

11 noises, very loud noises from gunshots and other types of

12 explosions.  You're aware of that, correct, sir?

13 A    It's been a -- certainly a topic of discussion.

14 Q    And you've testified in those proceedings, correct?

15 A    I did.

16 Q    And I guess while we're on that, sir, you've provided

17 test -- in terms of current 3M employees there's been you,

18 who's provided live testimony in those proceedings, correct?

19 A    Well, I know that I have, yes.

20 Q    You know that a Mr. Eric Fallon has, correct?

21 A    I was aware that he had from time to time.

22 Q    And you know that a former 3M employee has come live and

23 testified in those proceedings, a consultant to the law firm of

24 Kirkland & Ellis.  His name is Elliott Berger.  You're aware

25 he's testified in those proceedings, correct?

Myers - Cross/Buchanan                    149

1  A    I was aware that he had testified.  I didn't know if he

2  had testified since he had retired or not.

3  Q    Okay.

4  A    I don't know that.

5  Q    Are you aware of any current Aearo employee who's provided

6  testimony in the MDL proceedings?

7  A    Again, I don't -- was Elliott a 3M employee or an Aearo

8  employee?  I'm not sure.

9  Q    The record will reflect a 3M employee.  You worked with

10 him at 3M, correct, sir?

11 A    Well, I worked with him.  He was in the technical group,

12 but again, I -- I didn't have knowledge of who was an Aearo

13 employee and who was a 3M employee, other than myself and the

14 people in that room when I signed the paper.

15 Q    Sitting here today, sir, are you aware of any current

16 Aearo employees who's provided testimony in the MDL

17 proceedings?

18 A    I would only say no because I don't know who's an Aearo

19 employee.

20 Q    And you held the position as somebody who had

21 responsibility for hearing protection up until two weeks ago at

22 3M, correct?

23 A    Yes.

24 Q    You had global profit and loss responsibility for the

25 Hearing Protection Group until August 1st, correct?

Myers - Cross/Buchanan                    150

1  A    Yes.

2  Q    Before you, sir, is Exhibit ER.  This document is from

3  2014.  It's an exchange before some individuals.  We see

4  Mr. Berger's name on the first page.  We scroll down.  I think

5  you indicated he used to be at Aearo but here he's listed as a

6  3M "Division Scientist," correct?

7  A    I'm sorry.  Where -- what page?

8  Q    The first page and it's also on your screen if that's

9  easier.

10  A    Oh, maybe I -- yes.  Yeah, that's what his -- his closing

11  line says:  Division Scientist, 3M Personal Safety Division.

12  Q    Okay.  And he's having an exchange with an individual

13  named Mr. Madison, Ted Madison, on the second page?

14  A    Yes.

15  Q    And here on this page Mr. Madison states, "We need to be

16  very clear that CAEs," -- it's Combat Army earplugs -- "will

17  not reduce the 190 db explosions to a safe level of 140 dbs or

18  less."  Do you see that, sir?

19         MR. WASDIN:  Your Honor, I would object on hearsay

20  ground just reading in somebody's out-of-court email into the

21  email here.  And I would also object on foundation grounds

22  given that Mr. Myers was not only not on the document, but not

23  even in the business during this time period.

24         MR. BUCHANAN:  It's not offered for hearsay, Your

25  Honor.  It's offered to show that 3M itself was actually

1  evaluating and had knowledge of safety issues.  There's another

2  firm to determine whether there was a risk or not.

3         THE COURT:  Okay.  And this -- and I'll just ask a

4  broad question.  And this is going to be relevant to the

5  preliminary injunction how?

6         MR. BUCHANAN:  I believe the funding agreement, Your

7  Honor, resolves that issue entirely, but defense counsel

8  elicited testimony to suggest that basically this was all

9  Aearo's situation and not 3M's situation but for the sales.

10 And I'm trying to address that 3M itself had knowledge,

11 investigation and information that it kept to itself.

12        THE COURT:  Fine.  And I don't know if -- all right,

13 I'll let you respond instead of --

14        MR. WASDIN:  Your Honor, first, that was a

15 mischaracterization of the testimony on direct.  The question

16 is way beyond the scope of direct.  The question can't be

17 answered by this witness because he lacks foundation.  And at

18 this point I would also just note for the record that I think

19 my direct exam was 19 minutes and we're nearing about an hour

20 of cross.

21        THE COURT:  All right.  I do have trouble where we're

22 going on this.  I mean, so far you've given me lots of

23 marketing materials of 3M and I mean -- and I -- I'm not quite

24 sure this is the witness to do it, so I'll sustain the

25 objection.

Myers - Cross/Buchanan                    152

1          MR. BUCHANAN:  Thank you, Your Honor.  I do have one

2   issue further with regard to 3M on this and I'm mindful of Your

3   Honor's instruction.

4          THE COURT:  All right.

5          MR. BUCHANAN:  The witness was specifically involved

6   in it.

7   BY MR. BUCHANAN:

8   Q    Sir, when the company withdrew the product from the market

9   in 2015 you were involved in that decision, correct, sir?

10  A    Yes.

11  Q    You, sir, gave the instruction following testimony in an

12  unrelated proceeding about improprieties and problems with the

13  product.  Correct, sir?

14  A    I'm sorry, I don't understand.

15  Q    This whole MDL litigation began following the withdrawal

16  of the product in 2015 from the market, right, and some other

17  things happened after that, but that was the inception of

18  issues.  Correct, sir?

19  A    Yeah.  I don't know what -- I'm not sure what the timing

20  was, whether it happened at the same time or different times.

21  I don't know.

22  Q    Shortly after testimony in those other proceedings, sir,

23  you met with lawyers for 3M, correct?

24  A    I'm sorry.  I was coughing.

25  Q    There was an unrelated proceeding involving a competitor

1 called Moldex, correct?

2 A    We looked at some Moldex documents before, if that's what

3 you're referring to.

4 Q    And you're aware there was testimony in that proceeding.

5 It's been shown to you a number of times from a Jeffery Haner,

6 the head of 3M's lab, correct?

7 A    I saw a video in a deposition three years ago.  I think

8 that's the only time I've seen it.

9 Q    You provided testimony about what transpired after that,

10 correct?

11 A    You mean, the email that I wrote and some of those things?

12 Q    Shortly after that deposition, sir, you were involved in

13 meetings with 3M lawyers, correct?

14 A    That's correct.

15 Q    The decision was made to stop selling the Combat Arms,

16 correct?

17 A    I -- I authored an email to stop shipping the Combat Arms.

18 Q    Please tell me, sir, about any communications you had with

19 any employee of Aearo before you made the determination to stop

20 selling the Combat Arms.

21 A    I don't -- I don't know of any.  I'm not aware of any.

22 Q    All of your communications, sir, following your decision

23 to stop selling the Combat Arms were with 3M employees or 3M

24 lawyers, right?

25 A    I don't know.  There may have been Aearo employees.  I

Myers - Cross/Buchanan                    154

1  don't know who reports into which entity.

2  Q    When 3M stopped selling the Combat Arms, sir, it did not

3  issue a recall, did it?

4  A    No.

5  Q    Whatever the issues were, sir, whatever the findings were

6  coming out of Mr. Haner's deposition, that information was not

7  shared and there were no product problems that were shared

8  outside of 3M with the military or other people by 3M, correct?

9           MR. WASDIN:  Your Honor, I object to the scope of

10 that question and I also object on foundation grounds with this

11 witness.  It's a very broad question.

12          MR. BUCHANAN:  Only as to his knowledge, Your Honor.

13          THE COURT:  On behalf of 3M?

14          MR. BUCHANAN:  I'm sorry?

15          THE COURT:  Only as to who?  See, the difficulty is

16 that we're -- when you say 3M, who do you mean?  I know you're

17 trying to conflate them into one, but we're also getting a

18 little loosey-goosey over who's what.

19          MR. BUCHANAN:  I'll be more specific.

20          THE COURT:  That would be wonderful.

21          MR. BUCHANAN:  Sure.

22 BY MR. BUCHANAN:

23 Q    When 3M Company -- 3M Company made the determination to

24 stop selling the Combat Arms, sir, in 2015, correct?  You are

25 aware of that?

Myers - Cross/Buchanan                    155

1  A    So -- so I'm not sure who -- you asked me who I was aware

2  of as a part of that decision.  I don't know who all was a part

3  of that decision.

4  Q    Sir, you sent a communication on behalf of 3M Company to

5  stop selling the Combat Arms Version 2, correct?

6  A    I sent an email to say, stop shipping it.

7  Q    You sent an email, sir, telling the team, your sales team

8  and the Personal Safety Division to dispose -- throw in the

9  trash -- all existing CAV2 stock.  That was your decision on

10 behalf of 3M Company.  Correct, sir?

11 A    Again, I don't know who all was involved in the decisions

12 that were made there.

13 Q    The people you know were involved were from 3M Company

14 that you were dealing with, correct?

15 A    I'm not sure who they worked for.

16 Q    Did you have any communications with anybody from Aearo,

17 sir?

18 A    I don't know because I don't know who would have reported

19 to Aearo.

20 Q    As of 2019, sir, you weren't aware that Aearo existed in

21 the hearing protection field, correct?  We cited your

22 testimony.

23 A    My -- yeah, my testimony was essentially that I was

24 reporting in to 3M folks.

25 Q    Sir, I'd like to talk about that sales chart that you did

Myers - Cross/Buchanan                    156

1  with Mr. Wasdin -- you discussed with Mr. Wasdin.  There were

2  two charts that were discussed.  There was a chart from, I

3  think you said had been prepared three years ago in the MDL

4  litigation and one that had been prepared a few weeks ago, is

5  that right?

6  A     Yes.

7  Q     The one that had been prepared I guess a few years ago,

8  that had sales of 45 million dollars, is that right?

9  A     I think it was 46, honestly.

10 Q     Okay.

11 A     Yeah.

12 Q     That's a sales chart that you as a representative of 3M in

13 litigation concerning the Combat Arms Version 2 have actually

14 offered affirmative testimony on more than one occasion live in

15 court, correct?

16 A     I think that's correct.

17 Q     The sales chart that Mr. Wasdin showed you that reflected

18 30 million dollars in sales, I think that's, what, a third less

19 sales that was prepared on the eve of bankruptcy.  Is that

20 right?

21 A     About a third less, yes.

22 Q     I think you said the range of -- the range and difference

23 is about five to ten percent between the two, is that right?

24 Let me give you a better question.  Thank you.

25        I think you said in the sales chart that -- well, let me

Myers - Cross/Buchanan                    157

1  ask -- did counsel or somebody at counsel's direction ask you

2  to prepare the sales chart?

3  A    Well, which one are we talking about?

4  Q    The one that reflected the 30 million dollars in sales.

5         THE COURT:  If you wanted to use exhibit numbers that

6  would be helpful.

7         MR. BUCHANAN:  Okay, Your Honor.

8         THE COURT:  Between Exhibit A and 66, I think that

9  would clarify the record and help the witness.

10         MR. BUCHANAN:  66 --

11         THE WITNESS:  Should I pull it back out?

12         MR. BUCHANAN:  You can.

13         Can we pull it up for him, Mr. Marbet (phonetic)?

14  BY MR. BUCHANAN:

15  Q    Exhibit 66, sir, is the one that was prepared shortly

16  before the bankruptcy filing, is that right?

17  A    Yes.

18  Q    For three years in the products liability case with those

19  many thousands of people and their claims, the sales that the

20  defendants there represented existed for the Combat Arms

21  Version 2 for 46 million dollars.  Is that right?

22  A    That's what was on the original schedule.

23  Q    Okay.  I know I asked you, sir, when we took your

24  deposition if you actually had the backup for the chart that

25  you produced to us and you said, no, you didn't have backup

Myers - Cross/Buchanan                    158

1  information or the number of units.  Is that right?

2  A    So let me make sure.  So you're talking about the data

3  that --

4  Q    Underlies Exhibit 66.

5  A    Okay.  And at that time I had not explored units because

6  you were interested in the deposition.  I did go back and ask

7  the question about units.

8  Q    Okay.

9  A    And it's about the same number, 80/20.

10 Q    So it's 80 -- so about 20 percent of the units sold were

11 sold on the most recent spreadsheet, Exhibit 66, after the time

12 of the merger, correct?

13 A    After -- the date that I used was April 1, 2008.

14 Q    And with your caveat on Exhibit A about that stub period

15 there in 2008, about 70 to 75 percent of the sales occurred

16 prior to the merger from your earlier analysis, is that right?

17 A    So the -- again, you're characterizing it as a merger.  I

18 don't know what the legal connotations of that are, so I'll

19 just say from the April 1, 2008 date is kind of what I was

20 thinking about.  Seventy to seventy-five percent of the sales

21 in the -- I don't know if it's Exhibit A or what it is, but the

22 one that totaled 46 million dollars, seventy to seventy-five

23 percent of those sales occurred before the April 1, 2008 date.

24 I think that's your question.

25 Q    That is.  Thank you.  So 20 to 25 percent happened after

1    3M in the one version.  That would be the Exhibit A.  And

2    you're saying about 20 percent of the sales happened by dollars

3    on Exhibit 66.  Correct?

4    A    Yes.

5    Q    All right.  Again, by units sold I think you approximated

6    for us, sir, the released -- or about a million pair, perhaps

7    more that were sold, using your Exhibit 66 analysis, after the

8    date of the merger, April 1, 2008?

9    A    In the deposition we kind of talked through that and I

10   think that's the round-about number that we came to.

11   Q    And so you'd expect, sir, that if your earlier chart was

12   the right estimate it would go up proportionally about the same

13   way, about another five to ten percent of sales, if we're using

14   the 46 million dollars, correct, sir?

15   A    I'm not sure I follow because I think there were errors in

16   that first chart that would create a problem in doing that.

17   Q    Let's talk about that.  The areas you're talking --

18          THE COURT:  Let me ask you.  How long do you

19   anticipate talking about it?

20          MR. BUCHANAN:  We should probably break for lunch,

21   Your Honor.

22          THE COURT:  Oh, that's encouraging.  All right.

23          Why don't we go ahead and break because I don't know

24   when this is going to end and now is as good as later.  Let's

25   reconvene at 1:00.  Please leave all of the exhibits on the

Myers - Cross/Buchanan                    160

1  witness stand.  Those are the official exhibits.  And once

2  again, are we locking the courtroom in between?

3          COURT CLERK:  We have to lock it.

4          THE COURT:  Okay.  So the courtroom will be locked as

5  soon as we're done, so make sure that you take what you think

6  you need, especially to get back in the building.  And with

7  that, we're adjourned until 11:00.  Thank you.

8          MR. BUCHANAN:  Thank you, Your Honor.

9                      (Lunch recess)

10          THE COURT:  All right.  Please be seated.  Okay.

11          MR. HOROWITZ:  It's time another Horowitz breaking

12  news update, Your Honor.

13          THE COURT:  I can't wait for it.  It's like getting

14  special bulletins.  All right.  Well, let's go back on the

15  record on adversary #22-50059.  I can't wait.

16          MR. HOROWITZ:  And we're going to start, duh-nah-nah,

17  duh-nah-nah before I --

18          THE COURT:  There you go.  It gives me an update.  I

19  like it.

20          MR. HOROWITZ:  Okay.

21          THE COURT:  All right.  So have you settled the

22  matter?

23          MR. HOROWITZ:  Your Honor, well, settled the matter

24  of --

25          THE COURT:  Okay.

Myers - Cross/Buchanan                    161

1          MR. HOROWITZ:  -- does the U.S. Trustee have any

2    objection to the stipulated facts going in.  The answer is they

3    do not.  Those facts have been filed as docket #122 on the

4    adversary proceeding docket.

5          THE COURT:  All right.

6          MR. HOROWITZ:  And that is it.

7          THE COURT:  Very good.

8          MS. DUVALL:  Laura Duvall, the U.S. Trustee.  I can

9    confer that is true.  We had objected and --

10          THE COURT:  Okay.  Thank you.  I can confirm she was

11   diligently flipping pages during the previous parts of the

12   hearing, so I know she was looking.  All right.  Thank you.

13   Well, I can't wait to hear the 3:00 update, Mr. Horowitz.  All

14   right.

15          Where we left off, we had our witness, Mr. Myers, was

16   on the stand and was being cross-examined by Mr. Buchanan.  So

17   if we could go ahead and retake the stand, Mr. Myers.

18          And Mr. Buchanan, if you want to come to the podium

19   and get settled we can continue with the cross-examination.

20          Mr. Myers, I will remind you that you remain under

21   oath from this morning.  All right.

22          Mr. Buchanan, once he's settled you may begin.

23          MR. BUCHANAN:  Thank you, Your Honor.

24   BY MR. BUCHANAN:

25   Q    Mr. Myers, we're going to tighten this up.  I understand

Myers - Cross/Buchanan                         162

1  there's some confusion, though, in the last few minutes of our

2  discussion and my questioning with regard to those two sales

3  exhibits.

4         MR. BUCHANAN:  Can we pull up Exhibit A, quickly?  I

5  think the confusion was sown by me as an wrong exhibit number

6  for these.

7  BY MR. BUCHANAN:

8  Q    Do you have them before you in large copy, sir?

9  A    I do.

10 Q    Okay.  To be clear, Exhibit A is the version of sales that

11 was produced in the MDL litigation and used throughout those

12 proceedings really from inception until this moment, correct,

13 sir?

14 A    That's accurate.

15 Q    Let's go to Exhibit 66.  And that Exhibit A is the version

16 that reflects sales of $46 million, correct?

17 A    Roughly, yes.

18 Q    Exhibit 66 is the version that was produced to us at your

19 deposition last week, correct?

20 A    I know that we produced it at the deposition.  I don't

21 know if it was produced before that.  I don't know.

22 Q    Exhibit 66 was prepared in the week leading up to the

23 bankruptcy proceedings, is that right?

24 A    It was prepared in July.

25 Q    Not sure if I said Exhibit 2.  Exhibit 66 was prepared

163

1 shortly before the bankruptcy filing, correct?

2 A    Yes.

3          MR. BUCHANAN:  Thank you.  I have no further

4 questions at this time.

5          THE COURT:  Okay.  All right.  Any -- I think it's

6 just redirect at this point.  Any redirect of the witness?

7          MR. WASDIN:  No, Your Honor.

8          THE COURT:  All right.  And I apologize.  Before I do

9 that, any other party who filed an objection who wishes to

10 cross-examine the witness?

11                    (No response.)

12          All right.  Seeing nobody and you declined on direct,

13 so, Mr. Myers, you may be excused.  Just leave everything up

14 there except for your water and your mask.

15                    (Witness excused.)

16          THE COURT:  I am fascinated by the shifting of chairs

17 in between presentation.  When you come to my courtroom you

18 don't get to do that because there's only eight chairs, but

19 anyway.

20          MR. MCKANE:  Your Honor, for the record, Mark McKane,

21 Kirkland & Ellis, proposed counsel for the debtors.  Like we

22 made an accommodation for Mr. Heaton's testimony, there has

23 been a request made that we accommodate Mr. Dai and 3M with

24 regards to his availability.  Mr. Dai is in the courtroom -- or

25 is on his way over from the witness room right now and he will

164

1 be the next witness.

2          THE COURT:  Okay.

3          MR. PFISTER:  And just to clarify, Your Honor, this

4 is Rob Pfister on behalf of the claimants on the joint brief.

5 The accommodation is to us as we're calling Mr. Dai as a

6 hostile witness in our -- he would be in our case in chief

7 after the debtors rest.

8          THE COURT:  Okay.

9          MR. ANDOLINA:  That's correct, Your Honor.  This is

10 Mike Andolina, White & Case, on behalf of 3M Company.  We just

11 went to get Mr. Dai from the witness room.

12          THE COURT:  Okay.

13          MR. ANDOLINA:  I suspect Your Honor does not want to

14 take a break while we get Mr. Dai.  We'll get Mr. Dai --

15          THE COURT:  Well, I'm kind of excited that the cross-

16 examination ended so quickly, so -- no, that's fine.

17          MR. ANDOLINA:  We're trying to --

18          THE COURT:  I do see that you're here live and not

19 trying to use technology today.

20          MR. ANDOLINA:  Did appreciate the Court's comment

21 about my costume changes and I've been getting a lot of abuse

22 about being Cher from my colleagues, so I look forward to many

23 more costume changes before Your Honor.

24          THE COURT:  Well, I hope not.  I hope everything

25 works, but there you go.

1          MR. ANDOLINA:  No technology today, Your Honor.

2          THE COURT:  All right.

3          MR. SILVERSTEIN:  So good afternoon, Your Honor.

4  Adam Silverstein of Otterbourg, P.C., representing the Seeger

5  Weiss firm.  So on behalf of all the claimants, I think except

6  for Mr. Keller and his clients and Mr. Paul, we'd call Mr. Dai.

7          THE COURT:  Okay.  And is -- oh, I thought that was

8  him.  What witness room did you put him in?

9          MR. ANDOLINA:  301, Your Honor, down the hallways,

10 but we had to knock --

11         THE COURT:  301.

12         MR. ANDOLINA:  Yes.  That's where they --

13         THE COURT:  How did we get access to 301?

14         MR. ANDOLINA:  He must have pulled some strings, Your

15 Honor.

16         THE COURT:  I didn't pull any strings, no.

17         MR. ANDOLINA:  I clearly I didn't.

18         THE COURT:  So there we go.  Okay.  Who knew?

19         MR. ANDOLINA:  Your Honor, while we're waiting for

20 Mr. Dai, just for the record we have -- 3M Company has

21 voluntarily agreed to produce Mr. Dai.  We have negotiated with

22 counsel for the plaintiffs an agreement to limit his testimony

23 as to the 30(b)(6) categories on which we produced him for

24 deposition.  I'll also note that Mr. Pfister informed me

25 yesterday that the expectation of the examination of Mr. Dai

Dai - Direct/Silverstein                    166

1  was -- that it was going to be very brief, less than 30

2  minutes.  We certainly hope that schedule will be maintained

3  with respect to his questioning.

4          THE COURT:  And I noticed Mr. Silverstein didn't say

5  that, though.

6          MR. SILVERSTEIN:  I'm happy to be held --

7          MR. ANDOLINA:  He was copied on the email, Your

8  Honor.

9          MR. SILVERSTEIN:  I'm happy to be held to that.

10          THE COURT:  All right.  I will not put my watch on

11  the stand, but I am gladdened by that.

12          Please come forward, Mr. Dai.  Before you take a

13  seat, will you please raise your right hand?

14                          MICHAEL DAI, SWORN

15          THE COURT:  All right.  Please be seated.

16          MR. SILVERSTEIN:  Good afternoon, Mr. Dai.  Nice to

17  see you again.

18          THE WITNESS:  Likewise.

19                          DIRECT EXAMINATION

20  BY MR. SILVERSTEIN:

21  Q    You are the vice president, associate general counsel and

22  corporate secretary of 3M Company.

23  A    That is correct.

24  Q    And you are their member of the 3M legal department for

25  over 20 years.

Dai - Direct/Silverstein                    167

1 A     That's correct.

2 Q     Since 1999?

3 A     Yes.

4 Q     Okay.

5         THE COURT:  Can you just state your name again for

6 the record and also the witness's name and spell it for me,

7 please.

8         MR. SILVERSTEIN:  Adam Silverstein of Otterbourg,

9 P.C. representing Seeger Weiss.

10        THE COURT:  Thank you.

11        MR. SILVERSTEIN:  And Mr. Dai, I'll let you spell

12 your name.

13        THE WITNESS:  Michael Dai, D-A-I.

14        THE COURT:  Thank you.  Sorry about that.

15 BY MR. SILVERSTEIN:

16 Q    Mr. Dai, at some point you came to learn that 3M Company

17 had been served with a subpoena to produce a corporate

18 representative to testify on its behalf as to certain topics.

19 A     That is correct.

20 Q    You were the corporate representative, lucky enough as it

21 was, to be chosen by 3M and designated to testify on six of

22 those seven topics, correct?

23 A     That's correct.

24 Q    And, in fact, what seems like a lifetime ago but was only

25 last Tuesday, you did appear and answer the questions of myself

Dai - Direct/Silverstein                                  168

1   and Mr. Barrett on behalf of 3M as to those topics, right?

2   A    That's correct.

3   Q    The topics that 3M agreed to produce you to testify about

4   included, among others, the negotiation and drafting of the

5   funding agreement?

6   A    Yes.

7   Q    Correct?

8          THE COURT:  And sorry to interrupt you.  Again, we

9   are audio only, so you did say yes, but you started nodding

10  your head, so just make sure you affirmatively answer yes or

11  no.  We won't pick up any head nods.

12         Go ahead.  I'm sorry.

13  BY MR. SILVERSTEIN:

14  Q    It included the inter-company charges and contracts, if

15  any, between 3M and the debtors concerning the Combat Arms

16  Earplug tort liability and expenses?

17  A    That is one of topics, yes.

18  Q    Another topic was any assignments, assumptions or

19  contracts between 3M and any of the debtors concerning the

20  Combat Arms Earplug liability and expenses?

21  A    That is correct.

22  Q    It also included 3M's ability to appoint or remove the

23  debtor's directors during the course of this year, is that

24  right?

25  A    That is correct.

Dai - Direct/Silverstein                         169

1          MR. ANDOLINA:  Your Honor, Mike Andolina, White &

2   Case, on behalf of 3M Company.  It may assist the Court.  We

3   have copies of the categories and of the objections that were

4   agreed upon.  I'd just offer to provide the document to the

5   Court with respect to the various categories that

6   Mr. Silverstein is asking about.  I apologize.  Should have

7   done that before he began his questioning, but it may help the

8   Court.

9          MR. SILVERSTEIN:  I'm hoping that we don't have any

10  disputes about the questions and it's not necessary for the

11  Court to do that, but I have no problem with the Court seeing

12  what the documents are.

13         THE COURT:  Well, let's hold off and see if we need

14  them.  Excuse me.  To the extent we do, great; if not --

15  BY MR. SILVERSTEIN:

16  Q    Mr. Dai, in order to testify as to those topics, you did

17  some preparation.

18  A    I did.

19  Q    That preparation involved reading the public filings in

20  this case, including the first day declaration and other

21  filings of the debtor?

22  A    That is correct.

23  Q    It included speaking with 3M's chief accounting officer,

24  Teri Reinseth?

25  A    Correct.

Dai - Direct/Silverstein                    170

1 Q    It included reviewing the debtor's interrogatory

2 responses?

3 A    Some of them.

4 Q    It included viewing the debtor's organizational documents?

5 A    Yes.

6 Q    Including its operating agreements?

7 A    Yes.

8 Q    And in the case of the negotiation of the funding

9 agreement, it included your own personal experience?

10 A    Yes.

11 Q    Okay.  I want to start by talking briefly about your

12 experience with the negotiation.  You were involved with

13 negotiating and the drafting of the funding and indemnification

14 agreement on behalf of 3M, is that right?

15 A    I was one of the team members involved in that.

16 Q    And if it's okay with you, to shorten the title of it, can

17 we just refer to it as the funding agreement?

18 A    Yes.

19 Q    Okay.  And, in fact, Mr. Dai, you signed the funding

20 agreement on behalf of the 3M Company, right?

21 A    I signed on behalf of 3M Company, yes, in my capacity as

22 corporate secretary.

23         MR. SILVERSTEIN:  And just so we can see it, not that

24 there's a dispute about it, but if Mr. Marbet (phonetic) could

25 put up Exhibit 2, page 21 of 28.

1 BY MR. SILVERSTEIN:

2 Q    Mr. Dai, that is your signature on the funding agreement

3 on behalf of 3M Company?

4 A    That is correct.

5 Q    So I'd like to ask you some questions now about the deal

6 that 3M cut in the funding agreement.  Under the deal that 3M

7 cut, there is no cap on 3M's funding obligations to the

8 debtors?

9 A    That is correct, pursuant to the terms of the agreement.

10 Yes.

11 Q    And so while in the funding agreement 3M has committed to

12 fund one billion dollars to a trust to pay tort claimants, the

13 one billion dollars does not represent a cap on the funding

14 commitment?

15 A    That is correct.

16 Q    If additional funding is required pursuant to the terms of

17 the funding agreement in order to fund a plan of

18 reorganization, 3M has committed to do that?

19 A    That is correct.

20 Q    So let's drill down on that for a moment.  In the funding

21 agreement am I correct that 3M has agreed to fully fund every

22 claim either channeled into a trust under a confirmed plan of

23 reorganization or that is allowed under the confirmed plan of

24 reorganization to the extent that the debtor's assets are

25 insufficient to pay them?

Dai - Direct/Silverstein                    172

1  A    That is my understanding.

2  Q    All right.  So if the debtor's assets are insufficient to

3  pay creditor claims because the debtor's insurance runs out and

4  money is needed to pay the creditors, pursuant to the terms of

5  the funding agreement 3M has agreed to fund that amount, that

6  shortfall?

7  A    The shortfall according to the terms of the agreement,

8  yes.

9  Q    And if the debtor's cash runs out and money is needed in

10  order to pay creditors pursuant to a plan of reorganization

11  pursuant to the terms of the funding agreement, 3M has

12  committed to fund that shortfall as well?

13  A    That is after exhausting the assets including the

14  insurance recoverables, yes.

15  Q    So if all of the assets, including insurance and cash, run

16  out and money is needed to pay creditors in full at the plan

17  confirmation stage, 3M is committed to fund the shortfall?

18  A    That is correct.

19  Q    And that includes monies that may be owed by the debtor to

20  3M pursuant to the indemnity obligations in the funding

21  agreement.

22  A    That is correct.

23  Q    So that any amounts that the debtor has agreed to

24  indemnify 3M for under the funding agreement, 3M has committed

25  to fund that amount to the debtor in order to pay 3M itself?

Dai - Direct/Silverstein                      173

1  A    It is in totality as the funding commitment that 3M will
2  be standing behind all the payments called for under the
3  agreement.
4  Q    So if 3M were to have indemnity or contribution claims on
5  account of continued litigation in the MDL and there are
6  insufficient assets of the debtor to pay those indemnity claims
7  pursuant to the funding agreement, 3M has committed to fund
8  that amount?
9            MR. ANDOLINA:  Objection.  Calls for speculation.
10           THE WITNESS:  I don't have the agreement -- well, I
11 guess this agreement --
12           THE COURT:  I'm going to let him answer.  I mean,
13 yeah.  Go ahead.
14           THE WITNESS:  There is a provision in the funding
15 condition that talks about outside the bankruptcy proceedings
16 where 3M's responsibility will be in terms of funding.
17           MR. SILVERSTEIN:  Okay.
18 BY MR. SILVERSTEIN:
19 Q    I -- so we're clear, in this bankruptcy proceeding if 3M
20 had or asserted indemnity or contribution claims against the
21 debtor and the debtor had insufficient funds to pay those
22 claims, 3M has committed to fund them in a plan of
23 reorganization?
24 A    3M is committed to fund whatever that's agreed upon
25 pursuant to the terms of the funding agreement, yes.

Dai - Direct/Silverstein                          174

1  Q    And those terms -- your under -- 3M's understanding of

2  those terms is that any shortfall in order to pay 3M's

3  indemnity obligations are committed to be funded by 3M?

4  A    That is correct.

5  Q    Okay.  And once the funds -- excuse me -- once 3M funds

6  the amount necessary to pay the indemnity obligations under the

7  funding agreement, there is no further repayment obligation by

8  the debtor to 3M, is that right?

9  A    That is correct.

10 Q    Okay.  Now, by the way, 3M's funding obligations are not

11 conditioned on the debtors obtaining a stay or an injunction in

12 favor of 3M, is that right?

13 A    It is not conditioned upon that.

14 Q    All right.  Whether or not 3M's funding commitment is

15 conditioned on the debtors obtaining a stay or an injunction in

16 favor of 3M was a specific point of negotiation in the

17 negotiations in which you were -- to which you were privy.

18 A    Yes, to my knowledge, it was a point of a contention.

19 Q    3M wanted the condition in the funding agreement and your

20 understanding is that the disinterested directors pushed back

21 on that?

22 A    That is my understanding.

23 Q    And so the result in the funding agreement is that even if

24 the debtors lose this motion to extend the stay or obtain an

25 injunction in favor of 3M, 3M's understanding is it still has

Dai - Direct/Silverstein                                     175

1  the same funding obligations in the funding agreement?

2  A     That is 3M's understanding.

3  Q     Okay.  One other point on the funding agreement.  3M

4  agrees that under the funding agreement the debtors had the

5  right to cut a final binding settlement with any of the

6  plaintiffs in the MDL, any one or more of the plaintiffs in the

7  MDL before the bankruptcy and 3M had committed to fund that

8  amount.

9          MR. ANDOLINA:  Objection to -- "binding" is a legal

10 conclusion as part of that question.  Form of the question,

11 Your Honor.

12         THE COURT:  Response?

13         MR. SILVERSTEIN:  We can look at the words, but it's

14 right in the funding agreement.  Maybe I can ask it this way.

15 BY MR. SILVERSTEIN:

16 Q     Is it 3M's understanding that the deal it cut in the

17 funding agreement required it to fund any final binding

18 settlement that the debtors entered into with plaintiffs in the

19 MDL before the bankruptcy was filed?

20 A     I recall that is one of the provisions.

21 Q     Am I also right that to your knowledge once the debtor was

22 armed with that funding capacity after signing the funding

23 agreement, you are not aware of any efforts by the debtors to

24 reach out to Mr. Aylstock or Mr. Seeger or Mr. Buchanan or any

25 other plaintiff's attorney in an effort to try to reach a final

Dai - Direct/Silverstein                          176

1  binding settlement agreement?

2  A    Not to my knowledge.

3  Q    Okay.  I want to talk just very few brief minutes about

4  the negotiation of the funding agreement, which I understand

5  was an arm's length negotiation.  You and the other members of

6  the 3M negotiating team, to your knowledge, never had any

7  contact with any officer or director or employee of the

8  debtor's?

9  A    That is correct, to my knowledge.

10 Q    And 3M agrees that the very first draft of the funding

11 agreement was prepared and circulated to the debtor's counsel,

12 the McDonald Hopkins firm, on behalf of the debtors by the

13 Kirkland firm?

14 A    That is not my understanding.  My understanding was the --

15 at least to my knowledge, the -- before the deposition where

16 you show me some internal com -- email communication between

17 McDonald Hopkins firm and the Kirkland's firm, my understanding

18 was that debtors in disinterested directors' counsel prepared

19 the first draft of the funding agreement.

20          MR. SILVERSTEIN:  Okay.  Let's just put up Exhibit AG

21 for a moment, which is in evidence.  And I should say that

22 Exhibit 2 was in evidence also that we looked at.

23 BY MR. SILVERSTEIN:

24 Q    So this is the email that we looked at together at your

25 deposition and Exhibit AG was sent by a Kirkland & Ellis

1  attorney and it says, "Please find a funding and

2  indemnification agreement for Project Crane," which we'll talk

3  about in a moment, "as well as a deck summarizing the key terms

4  of the agreement--all of which remains subject to ongoing

5  review and revision."  And it was sent to, among others,

6  attorneys at McDonald Hopkins.

7       Now, is it your testimony today on behalf of 3M that the

8  agreement that was sent by Kirkland & Ellis was prepared by

9  McDonald & Hopkins?

10          MR. ANDOLINA:  Objection, Your Honor.  These are

11  questions related to a document that Mr. Dai is not copied on,

12  so I'd object to this line of questioning.

13          THE COURT:  Response?

14          MR. SILVERSTEIN:  I thought we established that

15  Mr. Dai was the corporate representative here to testify about

16  the negotiation and funding of the -- negotiation and drafting

17  of the funding agreement.  This is directly within that topic

18  and Mr. Dai gave testimony about this very subject at his

19  deposition.

20          THE COURT:  Well, he can probably answer to the

21  extent he knows anything about it.  Again, it's relevancy.

22          MR. ANDOLINA:  Understood, Your Honor.

23          THE WITNESS:  I wasn't aware of this until our

24  depo -- the deposition that we were together and you show me

25  this document.

Dai - Direct/Silverstein                     178

1            MR. SILVERSTEIN:  Right.

2  BY MR. SILVERSTEIN:

3  Q    And you agreed with me at the deposition that this email

4  appears to be Kirkland & Ellis on behalf of the debtors

5  circulating the first draft of the funding agreement to the

6  debtor -- to -- I'm sorry.  You agreed with me that this email

7  appears to be Kirkland & Ellis on behalf of 3M Company

8  circulating the first draft of the funding agreement to the

9  debtor's disinterested counsel -- disinterested directors'

10 counsel?

11           MR. ANDOLINA:  Objection, compound.

12           THE COURT:  You did start adding extra things in

13 there, so --

14           MR. SILVERSTEIN:  I'll try one more time and then

15 we'll move on.

16           THE COURT:  That's fine.

17 BY MR. SILVERSTEIN:

18 Q    Mr. Dai, you agree with me that at your deposition when I

19 showed this email and draft agreement to you we were in

20 agreement that this email appears to be Kirkland & Ellis on

21 behalf of 3M circulating the very first draft of the funding

22 agreement to counsel for the disinterested directors, the

23 McDonald Hopkins firm?

24           MR. ANDOLINA:  Same objection.  It's still compound.

25 I believe it also assumes facts not in evidence, Your Honor.

Dai - Direct/Silverstein                    179

1          THE COURT:  Well, and I don't know what he said at

2     the deposition is the difficulty.

3          MR. SILVERSTEIN:  I'm --

4          THE COURT:  As I look at the email I don't know if

5     it's the first draft or not.

6          MR. SILVERSTEIN:  Okay.

7          THE COURT:  Because the email just says, "attached is

8     a draft."

9          MR. SILVERSTEIN:  Fair enough.

10    BY MR. SILVERSTEIN:

11    Q    You agree that it is a draft that Kirkland & Ellis sent on

12    behalf of 3M to counsel for the disinterested directors?

13    A    I cannot authenticate that.  I -- the email appears to

14    show an internal exchange between the two firms and is a draft.

15    Q    Okay.  I want to come back to one of the terms used in

16    this email, Project Crane.  The team that negotiated the

17    funding agreement for 3M was known as the Project Crane Team,

18    is that right?

19    A    Project Crane Team is involved in the negotiation of the

20    funding agreement.

21    Q    All right.  The Project Crane Team was assembled by 3M's

22    general counsel Kevin Rhodes in March of this year, is that

23    right?

24    A    That is correct.

25    Q    The team consisted of you, correct?

Dai - Direct/Silverstein                    180

1  A     Correct.

2  Q     Two colleagues of yours in the 3M legal department,

3  Maureen Harms and Haley Schaffer?

4  A     That is correct.

5  Q     3M's chief accounting officer Teri Reinseth?

6  A     Yes.

7  Q     3M's corporate development leader, Jerry Will?

8  A     Yes.

9  Q     And a member of 3M's corporate strategy department, Aman

10 Gupta?

11 A     Yes.

12 Q     No officer, director or employee of any of the debtors was

13 assigned to the Project Crane Team, is that right?

14 A     That is correct.

15 Q     And do you know who Matthew Blaisdell is?

16 A     I do -- I do know who he is.

17 Q     He's the president of Aearo?

18 A     He's the president of several Aearo entities, I believe.

19 Q     He was not one of the Project Crane team members?

20 A     He is not, he is not one of the team members, yes, that's

21 correct.

22 Q     Now, Project Crane was assisted by outside advisors in

23 connection with this work.  Correct?

24 A     That's correct.

25 Q     And investment banking firm, PJT Partners was one of those

1  advisors?

2  A    Yes.

3  Q    Alix Partners was one of those advisors, a financial

4  advisory firm?

5  A    Yes.

6  Q    Kirkland & Ellis, now the debtors' counsel was one of the

7  advisors.

8  A    Yes.

9  Q    Okay.  And in fact, Mr. Husnick, who is sitting at

10  debtors' counsel's table was the lead Kirkland attorney on the

11  engagement for the Project Crane team.  Correct?

12  A    He's one of the lawyers from the Kirkland team.

13  Q    Okay.  And the goal or mission of the Project Crane team

14  was to explore alternatives to mass tort litigation including

15  the Combat Arms earplug litigation.

16  A    Yes.  The goal is to explore alternatives to the tort

17  litigation for a global resolution.

18  Q    And your understanding of the purpose for which you and

19  the other team members were exploring those alternatives to

20  mass tort litigation was the MDL Bellwethers had just come to

21  an end and Judge Rodgers had just started to issue waive orders

22  sending 1500 cases back to the district courts from which they

23  had come.

24  A    That was the factual background around that time.

25  Q    And after the formation of the project Crane Team, you

1  participated in a series of 3M virtual board meetings

2  discussing the progress of the Project Crane team in which you

3  participated and Mr. Husnick participated.  Is that right?

4  A    I participated in the capacity as corporate secretary to

5  the Board and Mr. Husnick participated in some of them.

6          MR. STEIN:  Okay.  I'm going to ask Mr. Marbet

7  (phonetic) to put on the screen and I'm going to hand all

8  around an exhibit marked for identification as Exhibit GF which

9  was produced to us yesterday by 3M.

10  BY MR. STEIN:

11  Q    So as corporate secretary, Mr. Dai, you're familiar with

12  3M's board minutes in general?

13  A    Yes.

14  Q    Can you identify what Exhibit GF is, please?

15  A    It is a set of the board minutes for 3M board of directors

16  meetings spanning May 9th through May 10th, 2022.

17  Q    And could you please just look through them to yourself

18  briefly.  As at your deposition, I won't ask you anything

19  specific without giving you the opportunity to read it, but I

20  just want you to look through to see if there's anything else

21  in these, in this package that you can identify because it

22  appears to be a compendium of a few board minutes, and I just

23  want you to confirm that.

24  A    Excuse me.  Confirming?

25  Q    Can you confirm that this is a compendium of board minutes

1  for May 9th and 10th, 2022, July 22nd, 2022 and July 23rd,

2  2022?

3  A    It is a collection of May 9th to May 10th, 2022, June 7th,

4  2022, July 22nd, 2022, and July 23rd, 2022 board minutes.

5  Q    Okay.  Thank you.

6          MR. STEIN:  And, Your Honor, at this point, Claimants

7  would move Exhibit GF into evidence.

8          THE COURT:  Any objection to the admission of what

9  has been designated Exhibit GF?

10          UNIDENTIFIED SPEAKER:  No objection, Your Honor.

11          THE COURT:  All right.  Exhibit GF is admitted.

12          (Exhibit GF admitted into evidence.)

13  BY MR. STEIN:

14  Q    Mr. Dai, we're not going to go through this in great

15  detail.  But just looking at the first page you'll see that

16  these are the board minutes from May 9th through 10th.  I'm

17  going to ask you and Mr. Marbet on the screen to move to page 4

18  of those minutes, and you'll see that you were in attendance at

19  this point in time.  Do you see that, Mr. Dai, the penultimate

20  full paragraph, it says Michael Dai, Vice President, joined the

21  meeting?

22  A    Yes, I do.

23  Q    Okay.  And fast forwarding now to page 6 you'll see

24  there's a discussion of list, litigation risk management update

25  and that Mr. Husnick presented while you were present virtually

Dai - Direct/Silverstein                184

1  in this meeting.

2  A    That's correct.

3  Q    Okay.  Fast forwarding to the July 22nd, 2022 minutes, and

4  these were not Bates numbered, so it's a little bit difficult

5  to find them, but just by flipping pages you can get to the

6  first page of the July 22nd, 2002 minutes.  You see that you

7  were in attendance, and that among others, Mr. Husnick was in

8  attendance at this meeting.  Do you see that?

9  A    Yes.

10 Q    And on page 2 among the topics of discussion at this

11 meeting was Combat Arms, MDL and Project Crane.  Do you see

12 that?

13 A    Yes.

14 Q    And one of the things that occurred during this board

15 meeting was that there was an update provided on the MDL court

16 ordered mediation and settlement discussions.  Do you see that?

17 A    Yes.

18 Q    Fast forwarding to a few pages to the July 23rd, 2022

19 minutes.  This is the next day, there was another board

20 meeting.  Correct?

21 A    That is correct.

22 Q    You were in attendance and Mr. Husnick was in attendance

23 via Microsoft Teams, I should qualify.

24 A    Yes.

25 Q    So the day after, there was an update on via MDL

Dai - Direct/Silverstein                      185

1  settlement and mediation negotiations.  On page 7 and 8 there

2  was a discussion of Project Crane.  Do you see that?

3  A    Yes.

4  Q    And under Project Crane, there's a, after the word

5  appears, it says strategic alternatives to manage litigation.

6  That was how the project was thought of, is that right?

7  A    The project was --

8  Q    Project Crane was thought of as a strategic alternative to

9  managing 3M's litigation.  Correct?

10  A    It's exploring alternatives, strategic alternatives to

11  manage litigation, yes.

12  Q    And on page 8, the day after the discussion of the update

13  on settlement negotiations in the mediation, 3M was talking

14  about a potential funding and indemnification agreement and the

15  funding of a trust.  Is that right?

16  A    That is correct.

17  Q    And in fact, the board resolved to approve your signing of

18  the funding agreement at that meeting.  Is that right?  If you

19  look at page 14.

20  A    Yes, the board adopted resolution authorizing 3M Company

21  officers to enter into the funding agreement conditioned upon

22  Aearo entities agreeing to the funding agreement also making

23  the chapter 11 filing.

24  Q    And the reason that the board received presentations on

25  the Project Crane team was because that was a team exploring

Dai - Direct/Silverstein                    186

1  strategic alternatives to managing 3M's litigation.  Correct?

2  A    3M Company is co-defendant with several subsidiaries

3  including Aearo entities in Combat Arms litigation.

4  Q    So there would be, are you aware of any minutes of the

5  debtors' board discussing an update on the MDL litigation or

6  the progress of the Project Crane team in May or June?

7  A    I'm not aware.

8  Q    Were you ever invited to the debtors' board to give any

9  presentation or to appear to discuss the Project Crane team's

10 progress to the debtors?

11            UNIDENTIFIED SPEAKER:  Object.  Outside the scope of

12 testimony.

13            MR. STEIN:  I think it's been asked and he's provided

14 an answer if that's okay, Your Honor.

15            THE COURT:  Okay, we'll move on.

16 BY MR. STEIN:

17 Q    I want to switch subjects, Mr. Dai, and talk about the

18 liabilities and expenses relating to the Combat Arms

19 litigation.  You're aware that the first products liability

20 claims relating to Combat Arms earplugs were filed in the

21 2018/2019 time period, right?

22 A    That is correct.

23 Q    And since then, 3M agrees that the total of all fees and

24 expenses defending the Combat Arms earplug litigation is

25 approximately $347 million.

Dai - Direct/Silverstein                    187

1   A    That is correct.

2   Q    That entire amount has been paid out of pocket by 3M

3   Company.

4   A    That is true.

5   Q    There's not a single intercompany charge or transfer on

6   the books of, books and records of 3M since the inception of

7   the Combat Arms earplugs litigation was filed where 3M charged

8   or debited any of that amount to any of the debtors.

9   A    Not to my knowledge.

10  Q    And this was one of the topics on which you were prepared

11  to testify at your deposition, correct?

12  A    That is correct.

13  Q    And it included discussion with Ms. Reinseth, the chief

14  accounting officer, of 3M Company, right?

15  A    That is correct.

16  Q    And after that preparation, did you testify under oath on

17  behalf of 3M on that subject and sitting here today on that

18  subject, you are not aware of any intercompany charge whereby

19  3M Company has debited to any of the debtors a single penny of

20  the $347 million spent defending Combat Arms earplug

21  litigation.

22  A    I'm not aware of any recharge.

23  Q    And you are aware or you became aware at your deposition

24  that the 3M Company posted a number of bonds in the MDL

25  litigation.

Dai - Direct/Silverstein                    188

1  A    That's correct.

2  Q    Totaling approximately $7.25 million.

3  A    I don't recall the number.

4  Q    None of the obligations to the sureties under those bonds

5  have been charged by 3M Company to any of the debtors, correct?

6  A    That is correct.

7  Q    Okay.  I'm going to switch subjects on you again and then

8  we're almost done.  And I apologize we're going a little bit

9  past the 30 minutes, but we're in the homestretch.  You've

10 never spoken with John Castellano, correct?

11 A    I have not.

12 Q    Mr. Castellano testified here yesterday including about

13 his inspection of Aearo's books and records.  You have no

14 knowledge of what's on Aearo's books and records, correct?

15 A    Not to my knowledge.

16 Q    So I want to ask you about 3M's books and records.  After

17 researching the matter, 3M has not found any intercompany

18 receivables or payables between 3M and the debtor entities

19 recorded on its books with respect to the 2010 upstreaming of

20 the earplug business.  Correct?

21 A    Please repeat the question.

22 Q    After researching the matter, 3M has not found any

23 intercompany receivables or payables between 3M and any of the

24 debtor entities recorded on 3M's books with respect to the 2010

25 upstreaming of the earplug business.

Dai - Direct/Silverstein                    189

1  A    There's book entry of the balance sheet back in 2010 time

2  frame that Ms. Reinseth was able to locate showing books and

3  records, showing balance sheet relating to certain personal

4  safety product lines of Aearo Technology's entities recorded

5  from the Aearo entities books and records to 3M company's books

6  and records.

7  Q    Okay.  That's the balance sheet.  Now I am repeating a

8  question I asked you at your deposition, we can look at it in a

9  moment if you'd like.  But with regard to receivables or

10 payables, 3M after looking into the matter has not found any

11 receivables or payables recorded between 3M and any of the

12 debtor entities on its books specifically with respect to the

13 2010 transaction.  Is that right?

14       UNIDENTIFIED SPEAKER:  Objection.  I believe that's

15 the same as the previous question that was answered.

16       THE COURT:  I'm going to allow it because he is

17 specifically saying 3M records as opposed to records that Aearo

18 had that 3M incorporated, so I think it's slightly different.

19 So you may answer the question.

20       THE WITNESS:  So the accounts payables and accounts

21 receivables, the balance sheet that I mentioned was reflected

22 on that book entry that I mentioned, right, recording from the,

23 from the Aearo entities books and records and balance sheet

24 including accounts payables and receivables into the 3M

25 Company's books and records.

Dai - Direct/Silverstein                    190

1  BY MR. STEIN:

2  Q    Well, I'm going to ask you a question and you can answer

3  it.  Were there any intercompany receivables and/or payables

4  between 3M and any of the debtor entities that were recorded

5  specifically with respect to the 2010 transaction?

6  A    Not to my knowledge.

7  Q    Thank you.  And 3M looked for and found no documents at

8  all that support the debtors' assertion in its first day

9  pleadings that, "3M never assumed any debtor tort liabilities."

10 Is that right?

11          UNIDENTIFIED SPEAKER:  Objection to form, double

12 negative.

13          THE COURT:  I'll admit I was a bit confused by the

14 question, so if you could re-ask please.

15          MR. STEIN:  Sure, I'll re-ask it.

16 BY MR. STEIN:

17 Q    Are there any documents at all that support the statement

18 in -- withdrawn.  Are there any documents at all that support

19 the debtors' statement that "3M never assumed any debtor tort

20 liabilities"?

21          UNIDENTIFIED SPEAKER:  Same objection.

22          THE COURT:  It's not a double-negative this time I

23 don't think.

24 (Laughter)

25          THE COURT:  I'll allow it.

Dai - Direct/Silverstein                    191

1              THE WITNESS:  After research we could not find any

2    documents showing 3M assuming any liabilities relating to the

3    Combat Arms.

4    BY MR. STEIN:

5    Q    All right.  And 3M has looked for and found no

6    communications concerning 3M's assumption or non-assumption of

7    any liabilities.  Correct?

8    A    That is correct.

9    Q    Okay.  One more switches, two more switches of subject,

10   but they're each very, very brief.  You read the debtors'

11   operating agreements, I think, you testified to prepare for

12   your testimony.  You testified at your deposition on behalf of

13   3M that you were aware of no contracts, assignments or

14   assumptions between 3M and any of the debtors in effect at any

15   time since 2018 regarding Combat Arms earplug liabilities.

16   Correct?

17   A    I did respond to that question.

18   Q    In the way I just said, correct?

19   A    Yes.

20   Q    Okay.  Last switch of subjects.  Just very quickly, 3M's

21   power to remove the directors.  Are you aware that 3M is the

22   sole member of one of the debtors here at 3M Occupational

23   Safety LLC?

24   A    That's correct.

25   Q    And the other debtors are wholly-owned LLC subsidiaries of

Dai - Direct/Silverstein                          192

1  3M Occupational Safety or some other LLC that 3M is a sole

2  member of.  Right?

3  A    That is correct.

4  Q    Okay.  And 3M believes and understands that under the

5  Delaware Limited Liability Company Act and the terms of the

6  operating agreement, 3M has the power to remove the

7  disinterested directors of 3M Occupational Safety, Mr. Stein

8  and Mr. Meltzer at any time?

9  A    Under the LLC agreement, between 3M Company as the sole

10  member, and 3M Occupational Safety LLC, 3M Company has the

11  ability to remove or appoint directors.

12  Q    Okay.  So 3M agrees that it had the ability to remove Mr.

13  Stein and Mr. Meltzer as directors of 3M Occupational Safety if

14  it had so chosen had those directors voted against putting the

15  entity into bankruptcy or signing the funding agreement or for

16  whatever other reason it wanted.

17            UNIDENTIFIED SPEAKER:  Objection.  Calls for

18  speculation.

19            MR. STEIN:  I'm asking about their ability.  3M's

20  understanding of its ability to act.

21            THE COURT:  Well, I think your question goes beyond

22  that though, because you give all these different examples of

23  what might be.  I mean maybe you want to just ask do they have

24  the power.  I think it starts calling for speculation when you

25  go in for all these acts and things like that.

Dai - Direct/Silverstein                               193

1          MR. STEIN:  Fair enough.

2          THE COURT:  I know you guys are all very aware

3    because you have all these trial attorneys over here and you

4    want to ask all your really good --

5          MR. STEIN:  We're trying as bankruptcy lawyers to do

6    our best.

7          THE COURT:  I know.  So let's just roll with it, and

8    --

9          MR. STEIN:  Then this will be the last question, so

10   so we're clear.

11         THE COURT:  All right.

12   BY MR. STEIN:

13   Q    3M understood that at any point in time, at least up to

14   the filing of the bankruptcy, it had the power to remove Mr.

15   Stein or Mr. Meltzer from 3M Occupational Safety and appoint a

16   new, appoint new directors if that is what it had wanted to do.

17   A    Pursuant to the LLC agreement between 3M company and 3M

18   Occupational Safety LLC, 3M Company as the sole member, does

19   have the power to appoint or remove directors.

20         MR. STEIN:  Mr. Dai, I thought I was done.  Can you

21   bear with me one moment, Your Honor?

22         THE COURT:  Looks like a small post-it note.

23         MR. STEIN:  I need a minute, a second to read this.

24         THE COURT:  I don't even know what the, I'm hoping

25   it's a third party post-it note.  Wait, that's two post-it

Dai - Direct/Silverstein                           194

1  notes.  You sent him two post-it notes.  I see.

2  (Laughter)

3            UNIDENTIFIED SPEAKER:  I have very large handwriting.

4            MR. STEIN:  I apologize to the Court.  May I have

5  just one moment?

6            THE COURT:  You may.

7            MR. STEIN:  Thank you.  I'm standing here on behalf

8  of others and I want to make sure everything is asked --

9            THE COURT:  That's fine.

10            MR. STEIN:  -- and we don't have to have followup

11  questions.

12            Mr. Dai, I apologize, just bear with me one moment.

13  Thank you, Mr. Dai.

14            Mr. Marbet, can you just put up Exhibit AG one more

15  time, the email and draft from Kirkland & Ellis?

16            And again, I apologize.  I'm reorganizing and I think

17  I only have one question, and I just needed a moment to get to

18  it.

19  BY MR. STEIN:

20  Q    Mr. Dai, on behalf of 3M as a designated representative to

21  answer questions on topics concerning the negotiating and

22  drafting of the funding agreement, when you were asked under

23  oath about this document at your deposition, did you testify

24  that this email appears to be Kirkland & Ellis's sending on

25  behalf of 3M to the counsel for the disinterested directors for

Dai - Direct/Silverstein                    195

1  the debtors the first draft of the funding agreement?

2          UNIDENTIFIED SPEAKER:  Objection, asked and answered.

3          THE COURT:  I mean he is asking as a 30(b)(6) witness

4  did he testify to that.  I think he can answer that if that was

5  his testimony.

6          THE WITNESS:  You asked me the question about at the

7  deposition have I seen this document before.

8  BY MR. STEIN:

9  Q    And as 30(b)(6) -- withdrawn.  As 3M's 30(b)(6) witness

10 designated to testify as to the negotiation and funding of the,

11 the negotiating and drafting of the funding agreement at your

12 deposition, and I'll find it in a moment.  But at your

13 deposition, do you recall that you testified that this email

14 appears to be Kirkland & Ellis sending the first draft of the

15 funding agreement to counsel for the disinterested directors of

16 the debtors on behalf of 3M?

17 A    I don't recall your question on that specific form, but

18 this appears to be an email exchange between Kirkland firm and

19 McDonald firm transmitting a draft of a funding agreement.

20         MR. STEIN:  Just one brief moment, Your Honor.

21         THE COURT:  Thank you.  See, some post-it notes are

22 good.

23         MR. STEIN:  The shorter, the better in my view.  This

24 one was very brief.

25 BY MR. STEIN:

Dai - Direct/Silverstein                    196

1  Q    Mr. Dai, do we agree that Kirkland on behalf of the 3M

2  Project Crane team prepared the very first draft of the funding

3  agreement and circulated it to the attorneys for the

4  disinterested directors at the debtors' McDonald Hopkins firm?

5  A    Was it the question you're reading back to me?

6  Q    I'm reading it and I'm asking it again.

7  A    Not to my knowledge.

8          MR. STEIN:  Okay.  Then can we show the witness his

9  deposition testimony?

10         UNIDENTIFIED SPEAKER:  Counsel, can you give me the

11 page cite?

12         MR. STEIN:  Yes, it's page 102, lines 9 through 18.

13 And this will be very brief because it's in black and white,

14 and then we can move on.

15         UNIDENTIFIED SPEAKER:  For the record, Your Honor, we

16 did object at the time to the foundation and scope of the

17 question.

18         THE COURT:  Okay.  Could you repeat where you're at

19 so I can also follow along in black and white?

20         MR. STEIN:  Your Honor, page 102 beginning at line 9

21 of Mr. Dai's 30(b)(6) testimony in which he was designated as

22 3M's witness as to the negotiation and drafting of the funding

23 agreement.

24 BY MR. STEIN:

25 Q    Mr. Dai, is it correct that you were asked, "Do we agree

1 that Kirkland on behalf of the 3M Project Crane team prepared

2 the very first draft of the funding agreement and circulated it

3 to the attorneys for the disinterested directors at the

4 debtors' McDonald Hopkins firm?"  Mr. Hurwitz popped up again

5 and Mr. Andolina objected.  And your answer afer the objections

6 was, "That's what the email shows."  Is that what your

7 testimony was?

8 A    That was, yes.

9 Q    Okay.  And your testimony is different today?

10        UNIDENTIFIED SPEAKER:  Objection.  Asked and

11 answered.

12        THE COURT:  I mean he can answer what he said today.

13 I'm familiar with it, but he can answer.

14 BY MR. STEIN:

15 Q    Is your answer different today from what it was one week

16 ago?

17 A    I wasn't focusing on the very first draft because there

18 was not, certainly not my knowledge whether it was the very

19 first draft.  And I stand by what I said about it looks,

20 appear, I cannot authenticate yet, so it's like a copy of the

21 email exchange between the two firms.

22 Q    With Kirkland on behalf of 3M sent a draft of the funding

23 agreement to counsel for the disinterested directors of the

24 debtors.

25        UNIDENTIFIED SPEAKER:  Objection.  The question says

Dai - Direct/Silverstein                    198

1  3M Project Crane team.  That was the question.

2  BY MR. STEIN:

3  Q    Okay.  It appears to be an email from Kirkland on behalf

4  of the 3M Project Crane team to counsel for the disinterested

5  directors of the debtors of a draft of the funding agreement.

6  A    I don't have personal knowledge on behalf of 3M Project

7  Crane team, now reading your question again.

8  Q    Okay.  But just so that we're clear on that and I can sit

9  down and Mr. Andolina can get up, your testimony today is

10 different than it was one week ago to the question that I asked

11 you.  Is that right?

12         UNIDENTIFIED SPEAKER:  Objection.  I don't believe

13 his testimony is different.

14         THE COURT:  I mean the difficulty here, and see this

15 is why I like and this is why I hate having people publish

16 things on screens because I don't get to read more.  If we're

17 really going after this, if I read further there's objections,

18 he says I don't know, I don't know if it's the first funding

19 agreement.  That's exactly what he's testified to today.  So I

20 don't know where we're going, but ultimately as you pointed

21 out, it's in black and white.

22         Right now his testimony seems incredibly consistent

23 with what he is saying now which is he's not sure, it's a

24 draft, he doesn't know if it's the first one, and I know we

25 really want to get into semantics, but I, I mean, if it really

1  is black and white what you said and I'll see it, and I've seen

2  it and I don't think it helps you here.

3          MR. STEIN:  I'm prepared to sit down.

4          THE COURT:  All right.  Thank you.

5          MR. STEIN:  Thank you.

6          THE COURT:  All right.  And because of an earlier

7  mistake, I don't get to have you go next yet.  I have to ask is

8  there anyone else who thinks they want to have direct testimony

9  of Mr. Dai who has filed an objection in this adversary

10 proceeding?

11         Seeing no one stand up, they are forever silenced on

12 that issue.  Mr. Andolina, or your choice, people can come up

13 and cross if you so desire.

14         MR. ANDOLINA:  Your Honor, no cross.  I would like to

15 let Mr. Dai get back from one Annapolis to another.

16         THE COURT:  Well this is the best Annapolis.

17         MR. ANDOLINA:  I completely agree.

18         THE COURT:  Charles Barkley agreed too in the

19 commercials.  If you don't watch college basketball you won't

20 figure that one out.

21         All right.  If there's no cross, I don't think we get

22 redirect if there's no direct, you may be excused Mr. Dai.

23         UNIDENTIFIED SPEAKER:  Your Honor may I be excused

24 from this seat?

25         THE COURT:  Yes.

1              UNIDENTIFIED SPEAKER:  Thank you.

2              THE COURT:  That was my favorite part watching you

3     guys switch seats, so I don't want to stop that.  Keep going.

4              MR. McKANE:  Thank you, Your Honor.  Good afternoon,

5     Your Honor.  For the record, Mark McKane, Kirkland & Ellis on

6     behalf of the debtors.  Our last witness is Mr. Jeff Stein.

7              Mr. Stein as we referenced yesterday on the record

8     was diagnosed with Covid induced pneumonia over the weekend, so

9     he will be remote.  Because of that, we need to alert him to

10    join the Zoom.  And if we could just probably take a two to

11    five minute break to enable that to happen.

12             THE COURT:  That's fine.  I'll even give you more

13    than that because I don't like doing things on -- let's

14    reconvene at 2:10.  Does that give you sufficient time?  That's

15    seven minutes.

16             MR. McKANE:  We will endeavor.

17             THE COURT:  All right.  Do you need more just to make

18    sure it works?  Not that we've had technical difficulties

19    today.

20             MR. McKANE:  Your Honor, if we could just --

21             THE COURT:  Want to do 2:15 just out of an abundance

22    of caution?

23             MR. McKANE:  That would be wonderful.

24             THE COURT:  All right.  Let's do that.  Let's take a

25    brief adjournment.  We will reconvene at 2:15.

1                    (Recess)

2           THE COURT:  All right.  We are back on the record on

3    Adversary No. 22-50059.  We are about to begin the direct

4    examination of Mr. Stein who is on video.  And I'm assuming we

5    have audio and everything.  Excellent.

6           Now I'm going to apologize to you before we begin,

7    because as you can see this is set up such that it looks like

8    I'm going to ignore you or stare at the U.S. Trustee, one of

9    the two.  But I just want to let you know it's because I'm

10   looking at the screen.

11          So with that being said, you may begin, Mr. McKane.

12          MR. McKANE:  Do you want to swear in the witness?

13          THE COURT:  I will if you're ready to begin.

14          MR. McKANE:  Yes, I'm ready to begin.

15          THE COURT:  All right.

16          Mr. Stein, will you raise your right hand?

17               JEFFREY S. STEIN, DULY SWORN

18          THE COURT:  Go ahead.

19          MR. McKANE:  Thank you, Your Honor.

20                    DIRECT EXAMINATION

21   BY MR. McKANE:

22   Q    Good afternoon, Mr. Stein.

23   A    Good afternoon.

24   Q    Can you hear me okay?

25   A    Yes, I can.

Stein - Direct/McKane                                    202

1  Q    All right.  Would you please introduce yourself to the

2  Court including where you work?

3  A    Yes.  My name is Jeffrey S. Stein, and I am the founder

4  and managing partner of Stein Advisors.

5  Q    And, sir, can you describe what lines of work Stein

6  Advisors is in?

7  A    Stein Advisors is a consulting firm that provides advisory

8  services to companies experiencing financial and/or operational

9  distress.

10 Q    And, sir, how long have you worked in that field?

11 A    I have been in what I would describe as the distressed and

12 special situations investment vertical for my entire career of

13 approximately 30 years.

14 Q    And sir, at Stein Advisors what type of engagements or

15 roles do you have in the distressed or special situations area?

16 A    The roles can be most accurately categorized as follows.

17 First is corporate executive and those include certain as an

18 executive chairman or chief restructuring officer.  The second

19 is trustee and those include serving as a liquidating and

20 litigation trustee.  And the third is independent director

21 serving in that capacity for both public and private companies.

22 Q    And, sir, what is your role in this bankruptcy?

23 A    I am an independent and disinterested director on the

24 boards of the various Aearo entities.

25 Q    And specifically are you on the boards of the Aearo

1  entities that are in bankruptcy?

2  A    Yes.

3  Q    As a disinterested director, what are your duties and to

4  whom do you owe them?

5  A    As a disinterested director, I have a fiduciary duty to

6  all of the constituents of the various Aearo entities.  That

7  includes employees, vendors, tort claimants and 3M.  And I

8  serve in a capacity in which, with my colleague Mr. Meltzer,

9  there are any conflict matters between the debtors and the

10 parent company 3M.  Those conflict matters and the

11 determination whether or not such a conflict exists are the

12 purview exclusively of the disinterested directors.

13 Q    Okay.  And let's talk about some of your prior experience

14 and lead that into how you became an Aearo director.  Okay?

15 A    Yes.

16 Q    When did you become a director for the Aearo debtor

17 entities that you mentioned earlier?

18 A    I believe it was on June 13th of 2022.

19 Q    And, sir, prior to your appointment to the Aearo boards,

20 did you have any affiliation with Aearo?

21 A    No.

22 Q    And prior to the appointment, to your appointment to the

23 Aearo boards, did you have any prior affiliation with 3M?

24 A    No.

25 Q    How did it come to be that you became a director at Aearo?

Stein - Direct/McKane                                204

1  A    I received an inquiry from an attorney at Kirkland & Ellis
2  indicating that they were working on a matter that was
3  incredibly challenging and complex, that there may be a need
4  for one or more independent directors, and that they thought my
5  background experience would be well suited, and in that regard
6  would I be interested in submitting my name for consideration.
7  Q    Had you worked with Kirkland & Ellis before?
8  A    Yes.
9  Q    And can you provide some examples in which you worked for
10 a company in a officer capacity and Kirkland was counsel to the
11 company?
12 A    Yes.  In an officer capacity, recently I served as the
13 chief restructuring officer of Whiting Petroleum in which
14 Kirkland & Ellis served as counsel to the debtor.  Prior to
15 that, I served as chief restructuring officer of Philadelphia
16 Energy Solutions in which Kirkland & Ellis was also counsel to
17 the debtor.
18 Q    Did you have a role in Westmoreland Coal?
19 A    Yes.  Going back even further, I was also the chief
20 restructuring officer of Westmoreland Coal in which Kirkland &
21 Ellis represented the debtor.
22 Q    And, sir, from time to time have you served as a director
23 or an officer for a company in which Kirkland was on the other
24 side of the table?
25 A    In that regard, I believe there are several examples in

1   which Kirkland & Ellis was adverse to me.  The most recent of

2   which include GWG Holdings in which I currently serve as chief

3   restructuring officer.  Kirkland & Ellis represents an

4   adversarial claimant in that case.  Prior to that and ongoing I

5   served as liquidating trustee of the estate of Ditech Holding,

6   and Kirkland & Ellis represents the largest lender of that

7   estate.  And then prior to that and ongoing I serve as chairman

8   of the board of Ambac Financial Group and Kirkland & Ellis

9   represents a counterparty in a very significant ongoing

10  litigation that we have with the U.S. Army.

11  Q    And sir, you said Ambac?

12  A    Yes, that is correct, Ambac Financial.

13  Q    And that's an ongoing matter?

14  A    Yes, it is an ongoing matter.

15  Q    And you also GWG, is that right?

16  A    Yes.

17  Q    And with regard, and that's an active matter as well?

18  A    Yes.

19  Q    And with regard to GWG, who specifically at Kirkland &

20  Ellis represents that major creditor in GWG?

21  A    The lead partner in that matter is Chad Husnick.

22  Q    All right.  And sir, have you worked, so you've worked

23  for, with and against Kirkland & Ellis.  Is that fair?

24  A    Yes, that is correct.

25  Q    And, sir, you're aware that one of the firms that's

Stein - Direct/McKane                                206

1  objecting to the motion is the Quinn Emmanuel firm.  Do you

2  know that?

3  A    Yes.

4  Q    And have you worked with Quinn Emmanuel before?

5  A    Yes, I'm working with Quinn Emmanuel on a current matter.

6  Q    Okay.  And what matter is that, sir?

7  A    Quinn Emmanuel represents Ambac Financial Group, as I

8  testified to previously where I serve as chairman of the board,

9  in a multi-billion dollar litigation matter.

10 Q    So you've worked with and against Quinn Emmanuel.

11 A    Yes.

12 Q    All right.  Just a few more kind of introductory points.

13 Mr. Stein, are you being compensated for your work as a

14 director of Aearo?

15 A    Yes.

16 Q    How much?

17 A    The total compensation is $500,000 per year.

18 Q    And is that paid out on a quarterly basis?

19 A    Yes, it is paid quarterly in advance.

20 Q    Is there a per diem or any other fees that you receive in

21 addition to the fixed compensation?

22 A    No.

23 Q    So there are no additional fees for testifying?

24 A    No.

25 Q    All right.  I believe you referenced the date you were

Stein - Direct/McKane                          207

1  appointed the director of Aearo and that was in mid-June.  Is

2  that right?

3  A    Yes.

4  Q    Walk me through the process of what you did once you were

5  appointed.  What steps did you take once you became, once you

6  were appointed to the Aearo boards?

7  A    Upon my appointment, the first course of action that I

8  undertook was to engage in a call with Roger Meltzer, the other

9  newly appointed independent and disinterested director.  Mr.

10 Meltzer and I do not know each other, at least we did not prior

11 to this engagement and had not worked together before.  So I

12 wanted to ensure that we engaged in a dialogue to share our

13 respective backgrounds and experiences and then begin

14 discussing the need to engage on this matter to begin

15 performing a due diligence on this matter with the company and

16 its professionals.  And then most importantly Mr. Meltzer and I

17 discussed the fact that there were almost certainly going to be

18 conflict matters that would fall within our purview and

19 therefore we needed to retain independent legal counsel to

20 represent us in this matter.

21 Q    Did you take any actions to familiarize yourself with the

22 Aearo business operations and financial affairs?

23 A    Yes.

24 Q    Based on that effort, what did you come to learn about the

25 health of Aearo?

1  A    The Aearo entities as an enterprise are now relatively

2  small, approximately $100 to $150 million in annual revenue,

3  approximately 650 total employees including both debtor and

4  non-debtor entities.  And the business itself notwithstanding

5  the ongoing litigation matters was relatively stable.

6  Q    And those litigation matters that you referenced include

7  the Combat Arms litigation matters?

8  A    Yes.

9  Q    What did you come to understand with regard to the Combat

10 Arms litigation matters?  What was the status of those

11 litigation matters as you understood it when you arrived on the

12 scene in mid-June?

13 A    At the time Mr. Meltzer and I were appointed to the board,

14 it was our understanding that the Combat Arms litigation

15 matters had been part of an ongoing MDL that I believe had been

16 ongoing for approximately three years, that approximately $350

17 million in defense costs had been expended, that there were

18 approximately 230,000 cases outstanding which represented the

19 vast majority.  I believe one statistic was approximately 99

20 percent of the cases filed remained outstanding.  Separate and

21 apart from that, we were informed that there was a separate

22 litigation in the state of Minnesota that included another

23 2,000 cases, and that finally there was likely to be additional

24 claims filed going forward.

25 Q    And are the Aearo debtors that you're on the board

Stein - Direct/McKane                                209

1  defendants in both the MDL and the Minnesota litigation?

2  A    Yes.

3  Q    Okay.  And who else was a defendant in that litigation?

4  A    I apologize counsel, I was coughing.  Could you repeat the

5  question, please?

6  Q    I understand, Mr. Stein, not a problem.  I'm happy to

7  repeat it.  I was just asking other than the five Aearo debtor

8  defendants who else was a co-defendant in those cases?

9  A    3M is a co-defendant in those cases.

10 Q    And what did you come to understand about the relative

11 involvement of 3M and Aearo with regards to that ongoing set of

12 litigation?

13           UNIDENTIFIED SPEAKER:  Foundation.

14           THE WITNESS:  Up to that point in time --

15           THE COURT:  Hold on.

16           THE WITNESS:  I'm sorry.

17           THE COURT:  Response?

18           MR. McKANE: I'm happy to lay more foundation.

19 BY MR. McKANE:

20 Q    Mr. Stein, can you hear me, sir?

21 A    Yes.

22 Q    Okay.  Did you undertake an effort to get an understanding

23 as to what involvement the Aearo companies had had in the

24 litigation?

25 A    Yes.

1  Q    Okay.  With that basis of understanding, what did you come

2  to learn about the relative involvement between 3M and Aearo

3  with regards to the Combat Arms litigation?

4         UNIDENTIFIED SPEAKER:  Objection, foundation.  He

5  hasn't answered what he did.

6         THE COURT:  Right.  You said he became familiar, I

7  think it might help to say how did you become familiar.

8         MR. McKANE:  I'm happy to follow up.

9         THE COURT:  And then we'll go from there.

10 BY MR. McKANE:

11 Q    Mr. Stein, I didn't anticipate this being an issue of

12 contention, but what steps did you undertake to get a sense of

13 the relative involvement of Aearo and 3M in the Combat Arms

14 litigation?

15 A    AS part of our onboarding efforts, Mr. Meltzer and I

16 conducted extensive due diligence to understand the background

17 context of the Aearo business of the Combat Arms litigation and

18 its current status.  And in that context, we discussed with

19 current members of the Aearo board and management team as well

20 as professionals representing the company the details

21 surrounding the history in relation to how those matters had

22 been managed and by whom up until that point in time.

23 Q    All right.  Earlier in your testimony you mentioned that

24 approximately $350 million had been spent on the Combat Arms

25 litigation.  Do you recall that?

Stein - Direct/McKane                    211

1  A     Yes.

2  Q     Do you have an understanding as to who between the Aearo

3  debtors and 3M paid for that, made that, made the $350 million

4  in payments?

5  A     Yes, to my knowledge it was 3M.

6  Q     Did you evaluate whether 3M had any ongoing obligation to

7  continue to fund the defense costs in the Combat Arms

8  litigation?

9  A     Yes.

10  Q     And what did you learn?

11  A     We concluded that there was no formal arrangement or

12  obligation of any kind for 3M to continue that effort.

13  Q     Was that a concern of yours?

14  A     Yes.

15  Q     Why?

16  A     In relation to my previous testimony, the Aearo debtors as

17  an enterprise are very small.  The enterprise itself does not

18  have the means to defend a class of tort claims this large

19  requiring this much time, effort and funding.  And our concern

20  was that it would overwhelm the company.

21  Q     Mr. Stein, are you aware that there have been a series of

22  objections filed to the debtors' motion for declaratory relief

23  in a preliminary injunction?

24  A     Yes.

25  Q     And, sir, are you aware that the Klee Tuchin firm, or

1  KTBS, filed a motion on behalf of one set of the claimants'

2  lawyers?

3  A    Yes.

4  Q    Sir, in the Klee Tuchin brief, there is an assertion that

5  the debtors' indemnification obligations flow solely from the

6  funding agreement.  It's in paragraph 28.  Are you generally

7  familiar with that allegation or assertion?

8  A    Excuse me, counsel.  Yes.

9  Q    Okay.  Do you agree with that assertion that the debtors'

10 indemnification obligations flow solely from the funding

11 agreement?

12 A    No.

13 Q    All right.  Mr. Stein, I'm going to try to publish so you

14 can see it Exhibit 37, which is a document that's previously

15 been admitted in these cases.  Okay?  Mr. Stein, do you see

16 Exhibit 37?

17 A    Yes.

18 Q    For the record, Exhibit 37 is the limited liability

19 company agreement of Aearo Technologies LLC.  Are you familiar

20 with this agreement, sir?

21 A    Yes.

22 Q    Let me direct your attention to Section 20(a) on page 7.

23 Do you see Section 20(a), sir?

24 A    Yes.

25 Q    Is section 20(a) the provision that you understand would

1  include 3M as a covered person?

2  A    Yes.

3  Q    Now, let me direct your attention to Section 20(b).  Mr.

4  Stein, is Section 20(b) the section that you understand gives

5  rise to Aearo's potential indemnification obligation to 3M

6  including potentially for the Combat Arms litigation?

7  A    Yes.

8  Q    And sir, do you have an understanding as to whether this

9  same section 20(a) and 20(b) are included in all of the LLC

10  agreements for the Aearo debtors for whom you are a director?

11  A    To my knowledge, the exact same language is included in

12  each agreement.

13  Q    All right.  Sir, did 3M to your knowledge ever seek

14  indemnification from Aearo for the Combat Arms liabilities

15  under the LLC agreements?

16  A    No, not to my knowledge.

17  Q    And sir, do you have any assurance or guarantee from 3M

18  that they would not seek indemnification under any of these LLC

19  agreements?

20         UNIDENTIFIED SPEAKER:  Objection, calls for

21  speculation.

22         THE COURT:  Response?

23         MR. McKANE:  I'm asking whether based on his -- I can

24  reframe it if you want me to.

25         THE COURT:  Why don't you reframe it?

Stein - Direct/McKane                     214

1          MR. McKANE:  I'm happy to reframe it.

2   BY MR. McKANE:

3   Q    Mr. Stein, did the issue of indemnification come up in

4   your negotiations with 3M?

5   A    Yes.

6   Q    And based on your assessment of the situation, both you

7   know understanding the Aearo entities as you took them and then

8   in your engagement with 3M, right, prior to entry of the

9   funding agreement, did you have any assurance, did you believe

10  that there is any assurance or guarantee from 3M that they

11  would not seek indemnification?

12  A    No, I was not aware of any such assurance or guarantee.

13  Q    All right, sir, I want to turn to your role as a

14  disinterested director, okay.  Did the Aearo -- and by the way,

15  sir, if at any point in time you need me to pause so you can

16  drink or, you know, time a cough let me know.

17  A    Thank you.

18  Q    I don't know if you can time a cough.

19          THE COURT:  I was going to say, I would be impressed

20  if he can time a cough.  A man of many talents perhaps.

21  BY MR. McKANE:

22  Q    All right.  Just delay a predicate.  Did the Aearo, did

23  the Aearo boards delegate any special authority to you and Mr.

24  Meltzer as directors?

25  A    Yes.

1  Q    And approximately, when did the Aearo boards make that

2  delegation?

3  A    I believe it was commensurate with our appointment to the

4  respective boards.

5  Q    What is your understanding of the delegation of authority

6  to you and Mr. Meltzer as disinterested directors?

7  A    In our capacity as disinterested directors, Mr. Meltzer

8  and I have been delegated the authority to determine if there

9  are any conflict matters that exists between 3M and the debtor.

10 In that regard, I'm referring to the debtors at large.  We make

11 the determination and if we believe that a conflict exists, we

12 are then charged with the exclusive authority to address that

13 matter on behalf of the full board.

14 Q    Okay, sir, I just want to make it absolutely clear.  You

15 have the ability to identify what is a conflict matter, is that

16 right?

17 A    Yes.

18 Q    And then you have the ability to resolve any conflict

19 matter that you previously have identified.  Is that right?

20 A    Yes.

21 Q    And in a general sense, if there's a conflict, what steps

22 would you undertake?

23 A    Assuming that Mr. Meltzer and I conclude that there is a

24 conflict, we would immediately inform the full board and the

25 other professionals supporting the matter.  Mr. Meltzer and I

Stein - Direct/McKane                   216

 1 would then engage with our independent legal counsel to begin
 2 evaluation of the matter.
 3 Q    Okay.  You mentioned independent legal counsel.  Did the
 4 debtors retain separate legal counsel that take directions
 5 solely from you and Mr. Meltzer?
 6 A    Yes.
 7 Q    And who is that?
 8 A    The law firm of McDonald Hopkins.
 9 Q    And why was the law firm of McDonald Hopkins selected?
10 A    When Mr. Meltzer and I began our deliberations we
11 immediately concluded that we needed to retain independent
12 legal counsel.  We discussed firms that we had worked with
13 individually and that we were aware of collectively.  Some were
14 conflicted from the matter.  Although neither one of us had
15 worked with McDonald Hopkins before, I was aware of their
16 efforts in another case, specifically the Intelsat case in
17 which I was quite impressed how they represented their clients,
18 and thought if they were not conflicted that they would provide
19 excellent representation for us in this matter.  Mr. Meltzer
20 and I subsequently interviewed Mr. Agay from McDonald Hopkins
21 and concluded that we should retain them on our behalf.
22 Q    And sir, in addition to legal counsel, do you have access
23 to Alix Partners as a financial advisor as well?
24 A    Yes.
25 Q    You mentioned that some of the firms that you considered

1  other than McDonald Hopkins were conflicted.  How were they

2  conflicted or with whom was the conflict?

3  A    I do not recall all the firms that we considered, but to

4  the extent they were conflicted, they were conflicted with 3M.

5  Q    All right.  And what if any potential conflicts, sorry,

6  what if any matters have you identified as conflict matters

7  that you and -- strike that, I apologize, terrible question.

8  What conflict matters have you and Mr. Meltzer identified to

9  date?

10 A    To date, Mr. Meltzer and I have identified two conflict

11 matters.  The first is the funding agreement between 3M and the

12 Aearo entities.  And the second is the leasing of an owned real

13 estate asset by the Aearo entities back to 3M.

14 Q    Okay.  And you mentioned the funding agreement, do you

15 mean specifically the negotiation of the funding agreement?

16 A    Yes.

17 Q    And in addressing those matters, did you and Mr. Meltzer

18 convene meetings solely of the disinterested directors?

19 A    Yes.

20 Q    And how would you characterize the cadence of those

21 meetings in the pre-petition period?

22 A    I would note that there were a combination of ad hoc

23 meetings, formal meetings, individual conversations between Mr.

24 Meltzer and me.  Between Mr. Meltzer and McDonald Hopkins.

25 Between McDonald Hopkins and me.  And I would describe them as

Stein - Direct/McKane                          218

1  vigorous and intense

2  Q    And, sir, in your testimony today, did you help prepare a

3  time line demonstrative that reflects the meetings?

4  A    Yes.

5          MR. McKANE:  Your Honor, may I approach you and your

6  staff?

7          THE COURT:  Still.

8          MR. McKANE:  Still?

9          THE COURT:  Still yes.

10          MR. McKANE:  Thank you.

11  Q    Mr. Stein, do you see the demonstrative that's marked

12  Stein DM-1?

13  A    Yes.

14  Q    And on this demonstrative are a series of references to

15  Aearo board meetings and Aearo DD meetings?

16  A    Yes.

17  Q    Is this a true and accurate reflection of the meetings and

18  other key events in the Aearo pre-petition process?

19  A    To the best of my recollection, yes.

20  Q    Let's start on the left-hand side.  In the weeks leading

21  up to and immediately after July 4th, in these meetings, what

22  did you come to conclude were the options available to the

23  Aearo debtors with respect to the Combat Arms litigation?

24  A    In our deliberations, both solely as to disinterested

25  directors and then with the full board we had concluded that

Stein - Direct/McKane                                          219

1  there were two potential options.  The first was to maintain

2  the status quo, to continue in the ordinary course and allow

3  the litigation matters to continue in their respective forms or

4  to consider bankruptcy to utilize the forum of the bankruptcy

5  and the law under the Code to pursue an alternative course of

6  action.

7  Q    And, sir, did you and Mr. Meltzer evaluate the pros and

8  cons of each approach?

9  A    Yes.

10  Q    And did the full Aearo board consider the pros and cons of

11  those approaches?

12  A    Yes.

13  Q    Did you reach a conclusion in your own mind of what you

14  thought the Aearo debtors would need if they were to go down

15  the Chapter 11 path?

16  A    Yes.

17  Q    And what did you conclude?

18  A    I concluded, in conjunction with Mr. Meltzer and the full

19  board that the bankruptcy option that I testified to previously

20  was only viable if the Aero entities had the means to prosecute

21  the case.

22  Q    And when you say the means to prosecute the case, what

23  specifically do you mean?

24  A    I'm referring to specifically to cash and other sources of

25  funding that would allow for the ongoing operation of the

Stein - Direct/McKane                    220

1  business, the funding of the bankruptcy case and the continued

2  funding of any expenses associated with the ongoing litigation

3  matters.

4  Q    All right.  And, sir, we'll get into the details in a

5  minute, but did Aearo eventually receive that cash and other

6  funding in the funding and indemnification agreement?

7  A    Yes, the funding and indemnification agreement provided

8  the means that I testified to previously that enabled the Aearo

9  debtors and the board to even consider the bankruptcy path as a

10 viable option.

11 Q    And did you participate in the negotiations of the funding

12 agreement?

13 A    Yes.

14 Q    Were Aearo and 3M represented by counsel in those

15 negotiations?

16 A    Yes.

17 Q    Who represented Aearo?

18 A    As I testified to previously, this matter was delegated to

19 Mr. Meltzer and me as instant directors and, therefore, Aearo

20 is represented by our counsel, McDonald Hopkins.

21 Q    Okay.  And, sir, who represented 3M in those negotiations?

22 A    The law firm of White and Case.

23 Q    And approximately when did you begin the negotiations of

24 the funding agreement?

25 A    I believe the negotiations began as per the time line, at

Stein - Direct/McKane                          221

1  the end of June, on or about June 30th.

2  Q    And did you discuss the funding agreement negotiations in

3  those Aearo disinterested director meetings?

4  A    Yes, we discussed them both in the formal meetings and

5  then, as I testified to previously, in the ad hoc meetings and

6  in the individual conversations.

7  Q    And are there minutes for at least one of those meetings

8  -- the formal meetings?

9  A    Yes, I believe there are minutes for one formal meeting.

10 Q    Mr. Stein, I'm going to ask that you -- are you able to

11 see what's on the screen?

12       MR. McKANE:  I'm going to ask that we publish what

13 has been marked as Exhibit 5 which is the, on its face, the

14 meeting minutes for July 23rd for the disinterested directors.

15 --  I apologize -- it is Exhibit 554, I apologize.

16 A    Yes.

17 Q    You recognize, even though there's an Exhibit 5 sticker on

18 it for the purposes of this deposition, sorry, this hearing,

19 it's Exhibit 554 in the upper right-hand corner.  I apologize

20 for the confusion on the record.

21       Mr. Stein, did you participate in the disinterested

22 director session on July 23rd?

23 A    Yes.

24 Q    And are these the minutes of the July 23rd board meeting

25 of the disinterested directors?

Stein - Direct/McKane                      222

1  A    Yes.

2         MR. McKANE:  Your Honor, we move Exhibit 554 into

3  evidence.

4         THE COURT:  Any objection to the admission of Exhibit

5  554?

6         UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

7         THE COURT:  All right.  Hearing that and seeing no

8  other objections, Exhibit 554 is admitted.

9         (Debtor's Exhibit 554 admitted into evidence)

10 Q    Mr. Stein, I'd like to direct your attention to Page 5 of

11 the PDF.  So, 5 in the upper right-hand corner.

12 A    Yes.

13 Q    And do you see it's a presentation titled Presentation for

14 the Disinterested Directors Funding and Indemnification

15 Agreement.  Do you see that, sir?

16 A    Yes.

17 Q    Do you recall this presentation?

18 A    Yes.

19 Q    And who prepared this presentation for the disinterested

20 directors?

21 A    It was prepared by McDonald Hopkins.

22 Q    And who presented the information in this presentation to

23 the directors?

24 A    It was presented by McDonald Hopkins.

25 Q    Okay.  And what was the purpose of this presentation?

1 A    The purpose of this presentation was to ensure that Mr.

2 Meltzer and I had an opportunity to fully deliberate on the

3 funding agreement, its historical context, the various matters

4 that were negotiated between the parties, those points that

5 were important to each party, how disagreements on those points

6 were resolved and to openly determine in our business judgment

7 if entering into the funding and indemnification agreement was

8 in the best interest of the Aearo debtors.

9 Q    All right.  And, sir, you mentioned some of the areas of

10 the contention was -- let me direct your attention to Page 9 of

11 14, the one with the heading that says 3M's Commitment.  Do you

12 see that, sir?

13 A    Yes.

14 Q    Mr. Stein, do you see Page 9 of 14?

15 A    Yes.

16 Q    Based on your negotiations of the funding agreement, what

17 did you understand 3M's position to be with regards to its

18 commitment?  What was its opening ask?

19 A    The opening ask from 3M is that it not fund a trust

20 outside of a Chapter 11 plan in settlement.

21 Q    And what was Aearo's position on that issue?

22 A    The initial Aearo position was that we wanted the funding

23 regardless.  And we wanted an initial cash contribution of $1

24 billion.

25 Q    And you wanted it actually deposited in the account?  Is

1  that fair?

2  A    Yes.  We wanted to cash deposited into a trust account.

3  Q    And, sir, where did the parties land on that -- on the 3M

4  commitment issue?

5  A    Ultimately, through vigorous negotiation which includes

6  many other points and counter points, the parties agreed that

7  3M would provide an uncapped funding commitment to ensure

8  prosecution of the bankruptcy case and resolution of all of the

9  outstanding claims and causes of action.

10        There would be an initial commitment which has no

11  impact on the uncapped funding from part of the agreement of

12  $1.24 billion which consisted of $1 billion to fund the trust

13  and $240 million for bankruptcy case and related expenses.

14  Q    Mr. Stein, let's turn to another issue that was addressed

15  in the negotiations on the next page, Page 10 of 14.  Was the

16  assumption of liabilities and indemnification a topic of the

17  negotiations between Aearo and 3M?

18  A    Yes.

19  Q    And based on the negotiations, what did you understand

20  3M's position to be regarding the assumption of liabilities and

21  indemnification?

22  A    As I recall, initially, 3M wanted to Aearo entities to not

23  only indemnify but also assume liabilities.  And there was an

24  ongoing dispute relative to whether or not that would include

25  payor affiliates.  And if it did, if the payor affiliates would

Stein - Direct/McKane                                          225

1  also be bound for the funding obligation.

2  Q    And where did the parties land on the issue of the

3  assumption of liabilities and indemnification?

4  A    Ultimately, the parties agreed that there would only be an

5  indemnification provided, no assumption of liabilities and that

6  the payor affiliates did not need to be included as obligated

7  parties because there was additional language, I believe it's

8  referred to as the permitted funding use to ensue that any

9  indemnification obligations to those payor affiliates would

10 ultimately be the obligation of 3M.

11 Q    Now, sir, under the funding agreement, you've undertaken

12 an obligation to -- Aearo has undertaken an obligation to

13 indemnify 3M for all earplug related liabilities.  Why take on

14 that commitment?

15 A    In our deliberations, as we discussed previously, Mr.

16 Meltzer and I were of the belief that there was an already

17 existing indemnification obligation from Aearo to 3M that may

18 have included the tort claims.  And that this additional

19 indemnification was requested by 3M as what I would describe as

20 an indemnification enhancement or wrap around the existing

21 indemnification because I believe 3M wanted to try and make

22 that indemnification as bullet proof as possible in exchange

23 for providing the uncapped funding to prosecute the case.

24 Q    And, sir, as a fiduciary to Aearo, considering what you

25 got and what you gave, do you believe the funding agreement is

Stein - Direct/McKane                            226

1  in the best -- in Aearo's best interest?

2  A    Yes.

3  Q    Why?

4  A    I believe the funding agreement provides very fair and

5  balanced treatment to both parties but, in particular, with

6  respect to the Aearo debtors, it provides a means to pursue the

7  bankruptcy alternative which would not otherwise exist.  The

8  funding agreement, in and of itself, is quite unique.  It does

9  not have any interest payment requirements.  It does not have

10 any fee requirements.  In fact, it's never even required to be

11 repaid, which I find compelling on behalf of the Aearo debtors.

12       And I believe that in exchange for that providing the

13 indemnification enhancement and the other, what I would refer

14 to as gives and takes, resulted in a funding agreement that was

15 attractive to the Aearo debtors, provided the means to pursue

16 one of our two options.  And the option that Mr. Meltzer and I

17 and the full board concluded was in the best interest of

18 maximizing the value of the debtor's estates on a risk adjusted

19 basis.

20 Q    Now, sir, you mentioned earlier that you had a general

21 familiarity with the objections that had been filed to the

22 debtor's request for a preliminary injunction and declaratory

23 relief.  In addition to the KTBS firm, another firm on behalf

24 of -- Bailey and Glasser filed an objection as well.  It's at

25 Docket 100.  In that objection there's an assertion made that,

Stein - Direct/McKane                                    227

1  quote, no independent and honest debtor with or without a

2  funding promise would voluntarily assume billions of dollars of

3  liability before filing a bankruptcy -- or full filing

4  bankruptcy, excuse me.  Do you see that allegation, sir?

5  A    Yes.

6  Q    Do you agree with that assertion?

7  A    No.

8  Q    Why not?

9  A    I believe the Aearo debtors are already liable as named

10 defendants in each of the cases.

11 Q    Well, we're cover that topic further later on.  Let's go

12 back to the presentation you received from McDonald Hopkins'

13 firm.  And let me direct your attention to Page 11 which is on

14 your screen.  Do you see that, sir?

15 A    Yes.

16 Q    Were the conditions around the funding obligation an issue

17 that was negotiated between Aearo and 3M?

18 A    Yes.

19 Q    Again, based on the negotiations, what was your

20 understanding of 3M's position regarding the conditions around

21 funding?

22 A    Initially and really throughout negotiations until the

23 conclusion of the negotiations, 3M asserted that it would not

24 provide funding unless an extension of the automatic stay in

25 the Combat Arms litigation was granted.

Stein - Direct/McKane                                        228

1  Q    And what was Aearo's position in the negotiations on that

2  issue?

3  A    Mr. Meltzer and I were adamant that we would not agree to

4  that condition, primarily because the means to file for

5  bankruptcy is, in and of itself, not adequate.  There needs to

6  be a clear and viable path toward prosecuting the case and

7  resolving the case and we were not willing to take the risk

8  that the automatic stay would not be extended, in which event

9  we would have, essentially, a free-fall bankruptcy accompanied

10  with no funding or ability to prosecute the case and,

11  potentially, facing the threat of liquidation.

12  Q    Mr. Stein, in your last answer you referenced that there

13  needs to be a clear and viable path through the restructuring.

14  That was part of your answer.  Did I capture that correctly?

15  A    Yes.  I was referring to what I would describe as a

16  proactive bankruptcy filing such as this one.  Not a reactive

17  bankruptcy filing where a company is forced to file for

18  exogenous events or other reasons.

19  Q    And, sir, do you believe that the Aearo debtors have a

20  clear and viable path through the restructuring?

21  A    Yes.

22  Q    Sir, let me direct your attention to Page 12 of the PDF.

23       Are you there, sir?

24  A    Yes.

25  Q    Were the events of default and enforcement mechanism of

Stein - Direct/McKane                                   229

1  the funding agreement negotiated between 3M and Aearo?

2  A    Yes.

3  Q    Based on the negotiations, what did you understand 3M's

4  position to be regarding the events of default and enforcement

5  mechanisms for the funding agreement?

6  A    Initially, as I testified before previously, 3M required

7  the automatic stay to be granted, otherwise it would be in

8  default.  There were certain other conditions including

9  conversion or dismissal of the bankruptcy cases, appointment of

10 a trustee and so forth.  None of which were acceptable to Mr.

11 Meltzer or me.

12 Q    And, sir, where did the parties land with regards to the

13 issue of events of default and enforcement of the funding

14 agreement?

15 A    The parties agreed that those events of default would be

16 eliminated and that there would be no ability for the agreement

17 to be terminated.  The only remedy for the parties in this

18 context is to pursue specific performance.

19 Q    And, sir, let me direct your attention to the next page of

20 the presentation.  Sir, was the issue of 3M's wherewithal and

21 viability an issue in the negotiations between 3M and Aearo

22 regarding the funding agreement?

23 A    Yes.

24 Q    Based on the negotiations, what did you understand 3M's

25 position to be regarding what commitments they would make about

1  their wherewithal and viability?

2  A    Mr. Meltzer and I were adamant about trying to pursue as

3  much protection as possible for the Aearo entities.  This

4  included requesting credit enhancement and support, requesting

5  additional provisions such as anti-layering which would mean

6  incremental, a debt above, any funding required under the

7  funding agreement, formal maintenance of an ongoing investment

8  grade credit rating and a trigger to fully fund the trust if,

9  in fact, the company was not able to maintain that credit

10  rating.

11        In the negotiations, 3M was extremely adamant about

12  its unwillingness to forgo any strategic flexibility.

13  Therefore, Mr. Meltzer and I deliberated on the matter, engaged

14  with Alix Partners, understood that there was going to be a

15  prospective spin-off of one of the businesses.  And, as a

16  result therefrom, engaged with a representative from 3M as well

17  as their investment advisor, P.J. Teet to understand the

18  current financial wherewithal of the company -- the post spin-

19  off financial wherewithal expected to occur within the next 18

20  months.  And Mr. Meltzer and I concluded that 3M is a viable

21  entity at this time and, ultimately, were able to agree on

22  language in which 3M committed to maintain commercially

23  reasonable efforts as it relates to its current investment

24  grade credit rating.

25  Q    And how, specifically, were you and Mr. Meltzer able to

Stein - Direct/McKane                                    231

1  get comfortable with the resolution that you reached with

2  regards to 3M's wherewithal viability?

3  A    Mr. Meltzer and I considered the wherewithal from both the

4  asset side and the liability side, which is to say that we

5  assessed the validity of the funding agreement and the

6  financial wherewithal required therein to prosecute the case

7  and then we compared that to the liability side in terms of

8  what were potentially the estimated total claims that could

9  result from a claims estimation process in bankruptcy court,

10 the later of which was based on an independent evaluation of

11 the claims by the Bates White firm.

12 Q    Okay.  And what do you understand the Bates White firm to

13 be?

14 A    I understand the Bates White firm to be an advisory and

15 consulting firm that assesses and evaluates the validity,

16 viability and value of tort and other related claims.

17 Q    And what input did you get from the Bates White firm

18 regarding the liability side as you referenced it in your

19 earlier answer?

20           UNIDENTIFIED ATTORNEY:  Objection.  Hearsay.

21           THE COURT:  Just asking what he heard.

22           MR. McKANE:  Absolutely.  And it goes to his state of

23 mind.

24           THE COURT:  What's the relevance?

25           MR. McKANE:  Well, I believe that claimants in this

Stein - Direct/McKane                    232

1   case had put 3M's wherewithal and viability at issue.

2           THE COURT:  I mean, I think you can rephrase the

3   question as far as not asking what they said but --

4           MR. McKANE:  Sure.

5           THE COURT:  -- what impact it had.

6           MR. McKANE:  Absolutely.

7           THE COURT:  That would be acceptable.  But you can't

8   ask what they said because that is hearsay.

9           UNIDENTIFIED ATTORNEY:  Your Honor, sorry to press

10  this a little bit, but Mr. Bates or Mr. Radha (phonetic) I

11  forget which one was going to be called as a witness here and

12  they yanked him.  So, we're hearing from somebody else.

13          MR. McKANE:  No, to be fair, Mr. Bates was not the

14  person at that firm who provided insights on this issue.  The

15  person who did was never listed as a witness and I'm happy to

16  address the issue.  There's no gamesmanship here.  I will

17  address, you know, Mr. Stein's state of mind.  They will

18  because they have the materials.  They've been produced to him.

19          THE COURT:  Well, I know you all know more than I do.

20  I mean, you've had three years to fight over this and, plus,

21  depositions all week.  And I've enjoyed so far people talking

22  about, well, you talked about that on Saturday.  Well, yeah --

23  I'm, like, okay, great.  I read papers.

24          But rephrase the question.  I think you can ask him

25  what his state of mind was after talking to them.

1        MR. McKANE:  Sure.  Absolutely.

2        THE COURT:  As an independent (indiscernible) he can

3   say what impression he got from them.  He can do that but he

4   can't say verbatim what they told him.

5        MR. McKANE:  Absolutely.  And I apologize, Your

6   Honor.

7   Q    Mr. Stein, you there, sir?

8   A    Yes.

9   Q    Did one of the principals at the Bates White form present

10  to the Aearo boards?

11  A    Yes.

12  Q    Did they separately present to the Aearo disinterested

13  directors at one of their meetings?

14  A    Yes.

15  Q    Okay.  What takeaways did you have based on those meetings

16  with regards to the potential scope of claims in the Combat

17  Arms litigation?

18  A    As I recall, there is a detailed analysis.  But the

19  conclusion was that a conservative estimate of the total

20  potential damages was estimated to be approximately $1 billion.

21  Q    All right.  And, sir, with regards to 3M's assets, you

22  mentioned that you got (indiscernible) with 3M's assets after a

23  potential spin-off.  Do you recall that in your earlier

24  testimony?

25  A    Yes.

1 Q    I think you mentioned a presentation or information that

2 you received that helped you get (indiscernible) after a

3 potential spin-off, do you recall that?

4 A    Yes.

5        THE COURT:  While we have a moment and before I

6 forget, while you are doing that, if you or someone could place

7 a copy of Exhibit 544 on the witness stand -- I'm sorry, 554

8 because that was published and used electronically.

9        MR. McKANE:  Right.

10        THE COURT:  But I would like a copy on the witness

11 stand since that becomes the official record.

12        MR. McKANE:  Absolutely, Your Honor.  I believe that

13 554 and this document, 142, would be the only ones.  Do you

14 want me to put it on the stand once it's admitted?

15        THE COURT:  Well, yes.

16        MR. McKANE:  If it is admitted -- I don't want to be

17 presumptuous.

18        THE COURT:  Well, wasn't 554 already admitted?

19        MR. McKANE:  Yeah, 554 was admitted.

20        THE COURT:  So, that one I want on there now.  The

21 other one we'll get to if we're able to, but just because I

22 forget, I at least want to make sure the record has all the

23 exhibits.

24 Q    Mr. Stein, what you see on the screen which has been

25 previously marked as Exhibit 142 is labeled Omnibus Meeting

1  Minutes for July 14, 2022, for Certain Aearo Debtors for their

2  board meeting.  Do you recognize that?

3  A     Yes.

4  Q     Did you attend that meeting?

5  A     Yes.

6          MR. McKANE:  Your Honor, I'd like to admit Exhibit

7  142 into evidence.

8          THE COURT:  Any objection to the admission of 142?

9          UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

10          THE COURT:  All right.  Hearing none and seeing no

11  other objection, I will admit Exhibit 142.

12          (Debtor's Exhibit 142 admitted into evidence)

13          MR. McKANE:  All right.  And I'll place it with the

14  witness.

15          THE COURT:  Thank you.

16  Q    Mr. Stein, with regards to this meeting, can we go down

17  the list of attendees?  Do you see, sir, there were two

18  attendees from the PJT Partners Firm-- Mr. O'Connell and Mr.

19  Eberle?

20  A     Yes.

21  Q     Who's PJT?

22  A     PJT is a global investment advisory firm that has, among

23  its many lines of business, a well-respected restructuring

24  practice.

25  Q     All right.  And, sir, the name right above that?  Mr.

1  Jerry Will of 3M?  Just generally, no need for titles, who's

2  Mr. Will?

3  A    As I recall, he's an executive at 3M and I thought he was,

4  ostensibly, the director of business development.

5  Q    Let me direct your attention below the attendees to Number

6  3 of these board meetings.  Was one of the topics of the July

7  14th Aearo boar meetings a special topic regarding a spin-off

8  transaction?

9  A    Yes.

10  Q    What do you recall about that meeting with regards to a

11  potential spin-off transaction?

12  A    I recall that we received a presentation that Mr. Will and

13  PJT were leading which discussed the current state of 3M, the

14  health care business specifically.  The reasons why 3M was

15  contemplating a spin-off.  The mechanics and time line of how

16  that spin-off would be executed.  And then the net impact on

17  the 3M Company that would remain post spin-off.

18  Q    All right.  And so let me direct your attention to Page 4

19  of 19 of that document.  Do you see that cover page there's a

20  reference to Project Galaxy?

21  A    Yes.

22  Q    Sir, is Project Galaxy the healthcare spinoff that you're

23  referring to?

24  A    Yes.

25  Q    And, Mr. Will, see in reference to the senior vice-

1  president of corporate development?

2  A    Yes.

3  Q    Sir, this presentation on Project Galaxy, you mentioned

4  that it addressed 3M as a both pre and post potential spin?

5  A    Yes.

6  Q    Is that spin -- that healthcare spinoff -- what is your

7  understanding as to whether that's going to happen any time

8  soon?

9  A    As I recall, this process will occur over the course of

10 the next 18 months.

11 Q    Okay.  And just ballpark, would that be the close of 2023,

12 approximately?

13 A    Yes.

14 Q    Okay.  Now, let me direct your attention to Page 6 of 19,

15 where it's -- do you see the box that says timing and

16 approvals?

17 A    Yes.

18 Q    Is that timing the reference to expect to close by year

19 end 2023 consistent with your understanding?

20 A    Yes.

21 Q    All right.  And with regards to 3M, after the spinoff did

22 you receive a projection of 3M performance with regards to --

23 projected performance after the spin in 2023?

24 A    Yes.

25 Q    Okay.

Stein - Direct/McKane                              238

1            MR. McKANE:  Actually, Your Honor, could I just check

2    something with counsel on a confidentiality issue?

3            THE COURT:  You may.

4            MR. McKANE:  Your Honor, I apologize.  There's some

5    material not public information that I just want to be

6    sensitive to.

7    Q    Mr. Stein, did you receive information both at the status

8    quo and on a go forward basis post spin in this presentation

9    from 3M?

10   A    Yes.

11   Q    And was this information sufficient for you to satisfy you

12   with regard to 3M wherewithal?

13   A    Yes.

14   Q    And did you have an opportunity to address those issues

15   with your counsel and financial advisor?

16   A    Yes.  Mr. Meltzer and I individually and in conjunction

17   with the full board addressed this matter with our

18   professionals, in addition to the presentation we received from

19   Mr. Will and PJT, and concluded that although 3M would be a

20   smaller company post spinoff, it would continue to be a large

21   and well capitalized company that had the wherewithal to

22   satisfy the terms and conditions of the funding agreement.

23   Q    All right.  And, sir, the funding agreement is already in

24   evidence as Exhibit 2.  Are you familiar with those terms, the

25   final terms of the funding agreement?

Stein - Direct/McKane                    239

1  A    Yes.

2  Q    And are you familiar with the priority of payment scheme

3  that is incorporated in the funding agreement?

4  A    Yes.

5  Q    Mr. Stein, do you have an understanding of what are the

6  sources of funds that are available to Aearo under the funding

7  agreement?

8  A    Yes.

9  Q    What are those sources of funds?

10 A    There are three sources of funds available, and there's a

11 clear hierarchy in regard to their utilization under the

12 funding agreement.  The first is existing cash and cash

13 generated from the operations of the Aearo debtors.  The second

14 is cash proceeds from the outstanding insurance policies that

15 provide coverage to the Aearo debtors.  And then finally, when

16 those resources have been exhausted, the Aearo debtors can

17 request the funding under the funding agreement from 3M.

18 Q    Sir, are any of those sources riskless?

19 A    No.

20 Q    Why not?

21 A    Beginning with cash and cash flow from operations at the

22 Aearo debtors, first the business is relatively small, but like

23 any other business it is susceptible to deterioration in

24 performance to the impact of a recession or other exogenous

25 events.

1          As it relates to the second, which is the insurance

2   policies, first, those policies have limits.  Essentially

3   there's a cap on the amount of coverage that is available, and

4   as that coverage is utilized the amount remaining is

5   diminished.  Separately, as those insurance policies are in

6   fact utilized, if and when payments are made, that certainly

7   impacts the ability of the Aearo debtors to procure similar

8   insurance in the future.  And to the extent it can be procured

9   it will certainly be more costly.

10         And then finally, the funding agreement is supported

11  by 3M, although 3M is an ongoing enterprise similar to the

12  Aearo debtors.  It, although quite viable at this time, is also

13  certainly susceptible to deterioration in performance, the

14  impact of a recession or other exogenous events.

15  Q    Okay.  Sir, in your view is it harmful to the debtors'

16  estate for the combat arms litigation to continue against 3M?

17  A    In my opinion, yes.

18  Q    Why?

19  A    I believe that if the combat arms litigation continues

20  outside of the bankruptcy forum it will first result in a

21  degradation of the assets of the Aearo debtors as they will be

22  utilized and impacted potentially by external litigation.  In

23  addition to that, I believe that it will fully distract from

24  the primary objective of these cases, which is to reorganize

25  the Aearo debtors.  And I believe this forum is the only forum

1  that would provide an opportunity to effectuate a global

2  resolution that would include all outstanding claims and causes

3  of action, not just the MDL, but also claims outstanding in the

4  state of Minnesota and any potential future claims.  And if the

5  litigation continues externally resources will be distracted

6  from the pursuit of that initiative.  And I continue to believe

7  that the bankruptcy forum and the focus on reorganizing the

8  companies represents the best path forward to maximize the

9  value of the Aearo debtors on a risk-adjusted basis and is

10 wholly consistent with my fiduciary duties.  Therefore I

11 support the relief that we are requesting today.

12 Q    All right.  Just turning to transition topics for a

13 minute, sir, and let's -- I covered the decision on filing for

14 bankruptcy, can you recall the time line forms from back up?

15 And can we focus on the right third of the time line?  Okay.

16 Mr. Stein, were you aware that 3M was engaged in a mediation

17 with certain members of the plaintiff's leadership regarding a

18 potential settlement of the MDL at some point in July?

19 A    Yes.  I was made aware of that fact.  I do not recall

20 exactly when, however.

21 Q    Right.  Right.  Without getting into the details of the

22 mediation, what did you learn about the outcome of the

23 mediation?

24          UNIDENTIFIED ATTORNEY:  Objection.  Hearsay.

25          MR. McKANE:  Sorry.

Stein - Direct/McKane                             242

1          THE COURT:  Can you rephrase?

2          MR. McKANE:  I can rephrase.

3  Q    What was your understanding as you -- you know, in late

4  July about the outcome of the mediation as you deliberated

5  about the funding agreement and a potential filing for

6  bankruptcy?

7          UNIDENTIFIED ATTORNEY:  Objection.  Lacks foundation.

8  He doesn't know the date of it. The question said late July.

9          THE COURT:  I think we probably do need additional,

10 because he was aware of it, but not sure when.

11         MR. McKANE:  Sure.

12         THE COURT:  And now we're jumping to negotiation.  So

13 I think we need a little bit more.

14         MR. McKANE:  I'm happy to establish more.  Okay.

15 Q    Mr. Stein, in the second half of July did you -- were you

16 asked to evaluate whether to -- the Aearo board should enter

17 into a funding agreement?

18 A    Yes.

19 Q    Right.  And in late July were you asked as a member of the

20 Aearo boards to evaluate whether to file for bankruptcy?

21 A    Yes.

22 Q    All right.  Previously I believe you mentioned that it was

23 important to you to have the funding agreement in place before

24 you made a decision as to whether to file for bankruptcy?  Is

25 that right?

Stein - Direct/McKane                              243

1  A     Yes.

2  Q     Okay.  Did you, as part of your efforts in addressing

3  those issues, come to learn about whether 3M would enter -- the

4  timing of when and if 3M would enter into the funding

5  agreement?

6  A     Yes.

7  Q     Was the mediation that was ongoing a timing consideration

8  with regards to when or if 3M would enter into the funding

9  agreement?

10 A     To my knowledge, yes.

11 Q     And what was your understanding?

12 A     My understanding was that 3M wanted to determine if in

13 fact there was a viable path forward, presumably through

14 mediation, that might have obviated the need to execute the

15 funding agreement.

16        UNIDENTIFIED ATTORNEY:  Your Honor, I would move to

17 strike.  This is all hearsay.  It's not being offered for the

18 effect on here.  They're basically just parroting what 3M

19 allegedly said to him.

20        THE COURT:  Yes.  I mean, does he have any personal

21 knowledge as far as what 3M thought?  I mean --

22        MR. McKANE:  It related -- the issue was the timing,

23 and it wasn't really the -- I'll ask him to clarify.  It's not

24 his knowledge about the positions taken, it was the timing

25 that's important, and it's the fact that as I understand it,

Stein - Direct/McKane                                    244

1  and more importantly, Mr. Stein understands it, that the -- it

2  is the mediation, timing and resolution drove whether the

3  funding -- the timing of the funding agreement and ultimately

4  without the funding agreement whether there would be a decision

5  to file for bankruptcy.

6          THE COURT:  All right.  But how did he get the

7  understanding?

8          MR. McKANE:  Sure.  I'll establish that

9  understanding.

10          THE COURT:  Okay.

11          MR. McKANE:  Okay.

12          THE COURT:  And let me ask this.  How long do you

13  anticipate going?

14          MR. McKANE:  I'm sorry?

15          THE COURT:  How long -- how many more questions do

16  you have for Mr. Stein?

17          MR. McKANE:  Oh.  I might have, like, one and a

18  quarter topics.

19          THE COURT:  Okay.

20          MR. McKANE:  So, I mean, like we -- lawyers, that's a

21  question -- I mean, don't know how many questions you have --

22          THE COURT:  Take a little bit of time, because I do

23  want to at least give him a break, because I know he's been

24  coughing.  And there's going to need to be cross examination.

25  And I'm also watching the clock --

 1          MR. McKANE:  Yeah.

 2          THE COURT:  -- before I lose my lease on this

 3  facility.

 4          MR. McKANE:  Yeah.

 5          THE COURT:  So, go ahead.  You know, doing as much as

 6  you can to --

 7          MR. McKANE:  Try and tighten it up.

 8          THE COURT:  Tighten it up.  Go fast.  Go concisely

 9  and clearly, and all those good things, and not write on the

10  screen.

11          MR. McKANE:  Yeah.  That's the hardest one.

12  BY MR. McKANE:

13  Q    Mr. Stein, were there a series of Aearo board meetings in

14  the second half of July?

15  A    Yes.

16  Q    And do you see on the demonstrative there's references to

17  Aearo board meetings on the 14th, 17th, 19th, 23rd and 25th?

18  A    Yes.

19  Q    And in those board meetings did -- you know, not all of

20  them, but during -- in the course of those board meetings did

21  the Aearo board receive just a general update on the status of

22  the combat arms litigation, including the mediation?

23  A    Yes.

24  Q    Okay.  And what was your takeaway?  What was your

25  understanding -- what was your takeaway at those board meetings

1 about the timing of the mediation vis-a-vis the funding

2 agreement?

3 A    My understanding was that the timing was such that clarity

4 on the mediation path, whatever that might mean, was very

5 relevant in relation to the timing of approving the funding

6 agreement.

7 Q    All right.  And what is your understanding as to when 3M

8 -- did you come to learn in an Aearo board meeting as to

9 whether 3M had already authorized the entry of the funding

10 agreement?

11 A    Yes.

12 Q    Okay.  And what day was that?

13 A    I believe it was July 23rd.

14 Q    And is that a Saturday?

15 A    I do not recall, but I believe so.

16 Q    Right.  And did the Aearo DD's meet to evaluate whether to

17 enter into the funding agreement upon learning that the 3M

18 board had authorized entry into the funding agreement?

19 A    Yes.

20 Q    All right.  Let me direct your attention to Exhibit 146.

21 And for the record, Exhibit 146 is a document already in

22 evidence.  It's the omnis board meetings of the Aearo board for

23 July 25th.  Do you recognize this document, sir?

24 A    Yes.

25 Q    Is this the meeting at which the -- all the members of the

Stein - Direct/McKane                    247

1  Aearo boards evaluated whether to decide to file for

2  bankruptcy?

3  A    Yes.

4  Q    And was there a formal vote to authorize the bankruptcy

5  filing?

6  A    Yes.

7  Q    Did you vote to authorize the bankruptcy filing?

8  A    Yes.

9  Q    Was the decision unanimous?

10  A    Yes.

11  Q    Why did you vote in favor of authorizing a bankruptcy

12  filing?

13  A    As I testified to previously, the board was considering

14  two options for the company going forward, status quo and the

15  filing for bankruptcy.  Upon execution of the funding

16  agreement, which provided the means for filing for bankruptcy,

17  and after extensive deliberation, the board determined that

18  filing for bankruptcy, utilizing the bankruptcy forum, the

19  claims estimation process, and creating a consolidated

20  opportunity for all of the parties to engage, provided a clear

21  path forward to resolve all of the outstanding claims and

22  causes of action, and to ensure that the Aearo debtors would be

23  able to compromise all claims in an efficient, fair and

24  equitable manner, and successfully emerge from bankruptcy as a

25  going concern.

Stein - Direct/McKane                                   248

1  Q    Sir, you just testified that one of the reasons that you

2  supported a bankruptcy filing was that it provided a

3  consolidated opportunity for all of the parties to engage.  Do

4  you recall that, sir?

5  A    Yes.

6  Q    What is the value -- is there -- sorry.  Strike that.  Is

7  there value to the Aearo debtors in obtaining a global

8  resolution of the combat arms litigation?

9  A    Yes.

10  Q    And in your business judgment can the Aearo debtors

11  reorganize without the filing for bankruptcy?

12  A    No.

13  Q    Now -- and sir, with regards to the motion that's pending

14  here today, the motion for preliminary injunction and

15  declaratory relief, do you believe that the debtors can achieve

16  the consolidated opportunity for all parties to engage without

17  the relief sought in the motion for preliminary injunction and

18  declaratory relief?

19  A    No.  I think it will be very challenging and difficult to

20  do so.

21  Q    Why not?  Why?

22  A    As I testified to previously I believe that the bankruptcy

23  forum provides the best path forward for resolving all of these

24  matters globally.  Based upon my deliberations I believe it's

25  the only forum, and therefore I believe that by seeking and

1  hopefully receiving this relief the assets and resources of the

2  Aearo debtors will be used exclusively with the purpose of

3  effectuating this reorganization, which I believe is the best

4  path forward to maximize the value of the enterprise on a risk

5  adjusted basis.  It will ensure that everyone is focused, that

6  there's no distraction from the perspective of the Aearo board

7  and employees of 3M, of the plaintiffs and their counsel such

8  that the parties, I hope, will be able to engage in a manner

9  that will result in a path forward that resolves all of these

10 matters fairly and equitably, and ensures an efficient

11 reorganization of the debtors such that the companies can

12 emerge as a going concern and continue to grow their business.

13          MR. McKANE:  Your Honor, if I could have one minute

14 to confer with co-counsel?

15          THE COURT:  You may.

16          MR. McKANE:  Your Honor, the debtors have no further

17 questions for Mr. Stein at this time.

18          THE COURT:  Okay.  All right.  Let's take a brief

19 break so that Mr. Stein can get some water, maybe a lozenge or

20 whatever he needs, and then we will do cross examination of the

21 witness.  Before we do that, let me ask, and I know there's

22 multiple parties, but of the objecting tort claimants, just as

23 a preview, I know we've had a couple pieces of testimony

24 already out of order, how many witnesses do you anticipate

25 calling on your behalf, and what I'll call for lack of a better

1  term your case-in-chief against the declaratory relief

2  preliminary injunction?

3          MR. PFISTER:  Good afternoon, Your Honor.  For the

4  record, Rob Pfister from the Klee Tuchin firm on behalf of the

5  claimant signing the joint brief.  Our current expectation, and

6  I am going to have to circle up and confirm with everyone, but

7  our current expectation is that our only affirmative witness in

8  our case-in-chief was Mr. Dai, who we took out of order, and

9  therefore that we will not have any witnesses once Mr. Stein

10  concludes.

11          THE COURT:  Okay.  Well, take this opportunity in the

12  break so you can poll your people.  I just am curious, because

13  we are reaching that point where I would kind of like to know,

14  and it would help me structure on how we are going to proceed

15  forward.

16          MR. PFISTER:  I believe it's highly likely that Mr.

17  Stein is the last witness, so it's --

18          THE COURT:  I know, but I would really like more of

19  a, like, yeah, I talked to them and this is the exact answer,

20  so because of that I am going to give us 14 minutes.  Let's

21  reconvene at four so you can talk to your people.  And I don't

22  know if they're all here still or not.  Mr. Stein can get some

23  relief.  And I will say I am very glad we have Zoom available

24  because he is trying his very best, but I am glad I am not in

25  his direction, being coughed on, so -- let's take a break, Your

1   Honor.

2           THE WITNESS:  Thank you, Your Honor.

3           THE COURT:  We'll reconvene at four.

4           UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

5           UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

6                     (Recess)

7           THE COURT:  And I'm about to get an update not from

8   Mr. Horowitz, from a Mr. Husnick which I wait for with bated

9   breath.

10          MR. HUSNICK:  Good afternoon, Your Honor, Chad

11  Husnick with Kirkland & Ellis on behalf of the Aearo debtors.

12  Your Honor, I normally rise with only good settlement news.

13  Not so today.  I'm just only rising to inform the Court that we

14  did receive a ruling in the MDL on the Keller Postman motion

15  for a preliminary injunction.

16          We are still reviewing the scope of the order that

17  the Court issued and we do not believe that it has any effect

18  on these proceedings here today.  That said, I should note we

19  believe that the order does go too far insofar as it cuts off

20  certain funding resources under certain circumstances in this

21  case which we believe would be a violation of the automatic

22  stay.  That is an issue that can be addressed in connection

23  with our automatic stay motion on Thursday.

24          So, once again, I don't believe it has any effect on

25  the pending proceedings here today, but we did want to bring it

Stein - Direct/McKane                    252

1  to Your Honor's attention if you wanted to review the order or

2  anything else.

3          THE COURT:  All right.  So I know that an order was

4  issued -- excuse me -- Sunday evening.  Is this a different

5  filing?

6          MR. HUSNICK:  This is a different order, Your Honor.

7  There were two motions that were filed.  There was actually

8  three.  The first motion was the TRO motion that you heard

9  about on the first day which --

10          THE COURT:  Right.

11          MR. HUSNICK:  -- was denied.

12          THE COURT:  And that was denied.

13          MR. HUSNICK:  Then there was the Quinn Emanuel

14  motion.  That was the motion that was denied on Saturday --

15          THE COURT:  On Sunday.

16          MR. HUSNICK:  Sunday, sorry, thank you.

17          THE COURT:  And that was an individual defendant.  It

18  started with a C, right?

19          MR. HUSNICK:  Calpit (phonetic).

20          THE COURT:  Calpit.  Thank you.

21          MR. HUSNICK:  Yes.

22          THE COURT:  Okay.

23          MR. HUSNICK:  And then the third motion, which was a

24  renewed motion on the TRO, but at this time for a preliminary

25  injunction that's seeking the same relief.  Notwithstanding

Stein - Direct/McKane                                    253

1  that, we had clarified on -- not we, but there have been

2  clarification on the record in the colloquy between Judge

3  Rodgers and the movant that there would not be any relief with

4  respect to the debtors.

5          There's a limitation in her order that says, Judge

6  Rodgers' order says that 3M is precluded from either directly

7  or indirectly including financial support from doing certain

8  things.  None of those things that she's addressing in her

9  order are relevant for today.  They may be relevant at some

10  point down the line.  They may not be ever relevant.  But

11  suffice to say, we think interfering with performance under an

12  executory contract is a clear violation of the automatic stay,

13  but we can address that at another time.

14          THE COURT:  Okay.

15          MR. HUSNICK:  Thank you, Your Honor.

16          MR. PFISTER:  Good afternoon, Your Honor.  For the

17  record, Rob Pfister on behalf of the claimants signing the

18  joint brief.  With respect to the order that was just entered,

19  only thing I'll agree with counsel for the debtors on is that's

20  it's not something to address right now.  We -- it's an order.

21  If the parties are going to address it, we should address it on

22  a proper record.  So I would in that sense disagree with his

23  characterizations.

24          But let me get back to the question Your Honor asked

25  which is about the evidentiary hearing.  So, I know lawyers

1   caveat.  I only have one caveat and, first of all, it is true

2   there are no more witnesses.  But the only caveat I have to

3   give is that we are working on the assumption that we'll get

4   into evidence with Mr. Stein everything that we think we'll get

5   into evidence with Mr. Stein in terms of documents.  So there

6   are several documents that will be offered in the cross

7   examination of Mr. Stein.  We have every expectation that those

8   documents will come in.  If that is the case, there will be no

9   further witnesses from the claimants' side.

10          To the extent that there are documents that are

11  offered, but are not admitted and we need to call someone for a

12  foundational, to provide foundational testimony or something of

13  that nature, that would be the sole exception.  I do not expect

14  that that will happen, but I don't want to stand here and say

15  absolutely no more witnesses and then there's a document that

16  for some reason we would need to get a foundational witness in.

17  I think it's extremely unlikely.  But I did want to say it with

18  that caveat.

19          I think the answer is Mr. Stein will be almost

20  certainly the last witness in this hearing.  And the other

21  thing I can say with pretty good measure of certainty is that

22  Mr. Winston, who will be conducting the cross of Mr. Stein,

23  will certainly be able to start today, but I don't think

24  there's any realistic likelihood that he would be able to

25  finish today.

1        So, I hope I answered the Court's questions on -- in

2   terms of witnesses.  The only issue then would be at the close

3   of our case or at the close of the debtors' case.  There may be

4   evidentiary matters where we're offering exhibits and the like.

5   We are in contact with the debtors' counsel and we'll see if we

6   can work out anything and just have a stipulation in that

7   regard.  But if the debtors say we rest and then, you know,

8   it's claimants' turn, we may offer -- we may have evidentiary

9   issues to raise with the Court.  Not saying we will, saying

10  it's a possibility, but not witnesses.

11        THE COURT:  All right.

12        MR. PFISTER:  Okay.  With all those caveats, the only

13  thing I would suggest, Your Honor, is given the hour, and I

14  know we do have to vacate at 5 p.m., if given that we will

15  finish almost, you know, we'll finish witness testimony

16  tomorrow morning, if there is, you know, guidance or direction

17  the Court wanted to give with respect to the timing or

18  substance of closing arguments.  What we want to do is be

19  helpful to the Court in terms of addressing issues, addressing

20  things that you want, that you are concerned about and that you

21  want to hear about and doing it in the format that's most

22  helpful to you.  So, if there's any guidance the Court would

23  have for the parties in that regard, I'm sure the debtors would

24  also be interested in hearing.

25        THE COURT:  Well, Mr. McKane's standing, so I'm

1  curious to see --

2        MR. McKANE:  No, I'm standing and I'm leaning into

3  the mic.  And, for the record, Mark McKane, Kirkland & Ellis,

4  proposed counsel for the debtors.  I just want to be absolutely

5  clear because, you know, there have been various times when Mr.

6  Pfister rises and he makes clear that he represents the

7  claimants on the brief.  That statement was, you know, in

8  response to the claimants' side.  And I just want, you know,

9  and, you know, I just want to make it clear that that includes

10  all of the objectors on the claimants' side including Mr.

11  Keller's, the West Virginia firm, the Minnesota firm, as well I

12  just want to make certain we have full closure, that there are

13  no anticipated witnesses other than with the extended caveats

14  we just heard.

15        MR. PFISTER:  That is my understanding, Your Honor,

16  and if anyone has a contrary understanding, now would certainly

17  be the time for them to come up and replace me at the podium.

18  But I don't see anyone rising.

19        MR. GLASSER:  I can be brief.  I'm Brian Glasser from

20  the West Virginia firm, Your Honor, and I agree with what Mr.

21  Pfister said.  We just (indiscernible) behind it.  There is --

22  there's at least one evidentiary issue we're going to want to

23  raise with the Court in the morning and it could take five or

24  ten minutes.  And there may be more based on what comes in or

25  doesn't come in with Mr. Stein.  There is no plan right now for

Stein - Direct/McKane                    257

1  another witness.  It is the case that we will get to closing

2  tomorrow.  So, we're asking for guidance.

3        MR. PFISTER:  And, Your Honor, we're not trying --

4  there should be no cloak and dagger here.  If there's an issue

5  with regards to an exhibit, you know, we're not the only people

6  that can engage on this and, you know, in fact, we urge the

7  claimants to reach out to our -- Mr. Rogers, Mr. Horowitz, Ms.

8  Smith, all the folks that they engaged with over the weekend.

9  We tried to address a number of issues to see if there is a

10 dispute or not.

11       THE COURT:  All right.  Well, it seems as if there

12 might be because we've had two people mention it, so it would

13 be nice if you talk about it beforehand and see if you can

14 resolve it.  If you can't, I will address it.  Closings make

15 your case and I'm going to ask lots of questions.  I don't have

16 a game plan.  I don't have a way it goes.  But my thought as I

17 think, I said before, a closing is, okay, you've told me what

18 you think you need to prove and now tell me what you've proven

19 and why the law says.  And then I'm going to throw lots of

20 questions at you because that's how I'm going to make a

21 decision.

22       I know I talked about ruling from the record.  I

23 don't know if I'm going to be able to do that, especially now

24 that you're telling me that the cross will continue on to

25 tomorrow which means that the redirect also will continue into

Stein - Direct/McKane                              258

1  tomorrow.  You're telling me that there may be evidence things

2  you want to talk about and then finally maybe we'll get to

3  closing.  And what you're telling me is that I may not have a

4  closed case with everything done until possibly late tomorrow

5  afternoon.

6         And you may have all had the wonderful opportunity of

7  arguing a case in which I did not make a pre-decision, so I

8  have to review everything and try to decide it.  You've all had

9  a great opportunity every lawyer wants which is to make your

10 case.  I want to make sure you make that case and I don't want

11 to box myself into a hole and now I have to make a decision at

12 6:30 tomorrow because you've closed evidence.  So I'm just

13 telling you that.  I want you to make your case and I know I

14 said I would try to rule as quickly as I can.

15        Don't look for a ruling from the bench if we're

16 spilling over testimony and evidence into tomorrow which it

17 sounds like we are which is fine, that's fine.  But that's what

18 it will be.

19        MR. PFISTER:  Understood, Your Honor.

20        THE COURT:  Mr. McKane?

21        MR. McKANE:  Yeah, I absolutely understood and, Your

22 Honor, when we were here on the first day hearing, the parties

23 entered into an agreement to kind of maintain some levels.

24 Some of the claimants entered into that agreement, as well.  No

25 one wants to jam Your Honor, right.  We raised that concern on

Stein - Direct/McKane                    259

1  the first day.

2          THE COURT:  Right.

3          MR. McKANE:  And so we reiterate it here and, you

4  know, Your Honor has the ability with regards to a TRO to order

5  it, but it may be better if the parties agreed to it.  And we'd

6  be prepared to engage with the objectors absolutely to maintain

7  a stand down of all filings for a period of time to enable --

8          THE COURT:  I mean, ultimately, and I recall there

9  were depositions and things filed, they were moved.  And I

10 understand there may be some filings and there's been filings

11 going on while this has been going on and they've all been met.

12 You know, are there trials?  I know there's -- one is starting.

13 For some reason in my mind and I was talking to my staff

14 attorney, what is the first date of which there's a trial or

15 something?  I don't care who talks, just someone say who they

16 are or whisper or hand Post-it notes, just tell me.

17         UNIDENTIFIED ATTORNEY:  Yeah, there's no trial until

18 October, but there are depositions that would renew --

19         THE COURT:  Okay.

20         UNIDENTIFIED ATTORNEY:  -- you know, and that was the

21 stand down was with regard to --

22         THE COURT:  Right.  No, and I understand that.  And

23 it had to be approved by the district judge in charge of the

24 MDL.

25         UNIDENTIFIED ATTORNEY:  Right.

1            THE COURT:  She approved that.

2            UNIDENTIFIED ATTORNEY:  Right.

3            THE COURT:  Was there at that point a reset of dates?

4  Honestly, I know you've told me what was in the order.  I can't

5  specifically recall.

6            UNIDENTIFIED ATTORNEY:  No, understood, Your Honor.

7  I -- some -- those dates were -- they were just -- they weren't

8  reset, but there are, I can represent to you, depositions

9  currently scheduled for Thursday and Friday.

10            THE COURT:  Okay.

11            MS. HOEKSTRA:  Sorry, Jennifer Hoekstra.  Part of --

12  for claimants, sorry.  Part of the agreement was that all of

13  the dates would be shifted by three weeks.  However, dates that

14  were set past the three-week mark were still held.  So, there

15  are depositions intended to move forward end of this week.

16            THE COURT:  All right.  So, there may be some things

17  that happen, but there's other than what I'll call continuing

18  litigation matters, there's nothing that might establish any

19  liability or anything within the imminent horizon.

20            UNIDENTIFIED ATTORNEY:  No, Your Honor, I can say

21  that only with regard to the fact that, you know, the agreement

22  covered depositions.

23            THE COURT:  Right.

24            UNIDENTIFIED ATTORNEY:  The Keller firm was not part

25  of that agreement --

Stein - Direct/McKane                    261

1          THE COURT:  Right.

2          UNIDENTIFIED ATTORNEY:  -- and we saw a lot of

3  activity --

4          THE COURT:  Right.

5          UNIDENTIFIED ATTORNEY:  -- from the Keller firm with

6  regards to motions practice.  What we would like to do is try

7  to get some window of time to allow you to rule that a --

8          THE COURT:  Well, you can talk to them, but, I mean,

9  I'm just asking what's there --

10          UNIDENTIFIED ATTORNEY:  Right.  Understood.

11          THE COURT:  -- because my goal is not to give you the

12  fastest decision, it's one that is the best understanding that

13  other people will be looking at it.  So --

14          UNIDENTIFIED ATTORNEY:  Right.

15          THE COURT:  -- I mean, this was a concern I started

16  to have when I learned all of these very excited stipulated

17  facts that were about to come in which I still haven't seen

18  yet, but I had printed so I could look at them.  But I'm going

19  to need some time to digest that.  I would hope that maybe we

20  could have done stuff, but it what it is.  I know in the LTL I

21  took four or five days on a combined motion, but it was several

22  days.

23          So, perhaps I was overly optimistic on how we could

24  do and I was told four witnesses, maybe six at most and, you

25  know, we're all very excited early on and everything's going to

Stein - Direct/McKane                        262

1   go smoothly and quickly when we're talking about it.  Then when

2   we get here, you know, you get to find all of your favorite

3   restaurants in Indianapolis after four days, but, okay.

4           I don't think, honestly, I'm not going to issue any

5   TROs or anything because, again, I need to look at the facts.

6   If you -- and I don't know if I'm going to have time to even

7   look at the facts to find out if the TRO is appropriate --

8           UNIDENTIFIED ATTORNEY:  Understood.

9           THE COURT:  -- because they're much the same factors

10  and if I'm gone that far, I'm probably pretty close to issuing

11  a decision and a couple days may not matter.  But, obviously,

12  if you can agree that would be great.  I know we have some

13  matters, you've complained about what certain firms have filed.

14  You filed motions to enforce the stay.  I think that's part of

15  the exciting festivities on Thursday which may not be a writing

16  day apparently, but we'll tackle those when they come, but

17  we'll do it.  I mean, if we can finish up with closings and

18  everything tomorrow, that would be excellent because at least

19  then the case is closed and we can start working on it.

20          UNIDENTIFIED ATTORNEY:  Yeah, understood, Your Honor.

21          THE COURT:  All right.  So, that being said, I think

22  4:45 is our hard close for today because you all have to move

23  stuff.  I know some of your folks, colleagues, are moving stuff

24  from my courtroom to the other courtroom so that at least that

25  can be opened up, but we can use that tomorrow which would be

Stein - Direct/McKane                              263

1    great.  But, ultimately, we do have to clean up and make this

2    as nice as we can today and throw everything into my courtroom

3    and deal with it tomorrow.  So, that's probably going to take

4    some time.

5              I know we're all highly paid professionals here which

6    means it will take us twice as long to do anything as it should

7    because we're used to billing hours.  So, I'm hoping 15 minutes

8    it's done.  I'm going to strongly encourage it.  So, I'll ask,

9    I know you -- I think you said Mr. Winston --

10             MR. PFISTER:  Yes.

11             THE COURT:  -- is going to be doing it.

12             MR. PFISTER:  Mr. Winston will be doing the cross.

13             THE COURT:  Would you like to proceed now and stop at

14   4:45 and continue in the morning?  That would be my preference,

15   but I don't know what you've got and how you would like to

16   proceed.

17             MR. WINSTON:  Your Honor, for the record, Eric

18   Winston of Quinn Emanuel on behalf of three Bellwether

19   plaintiffs and thousands of more.  I would prefer to get

20   started now and --

21             THE COURT:  All right.

22             MR. WINSTON:  -- go to 4:45.

23             THE COURT:  Okay.  And I guess I'll ask this then

24   before you begin.  Any other questions with regard to closing?

25   I think I was perfectly vague on how I like it, but I do intend

1  to ask questions at that point.

2          UNIDENTIFIED ATTORNEY:  Totally understand, Your

3  Honor.  Just length of time.  If you have -- we're happy to

4  go -- if you don't put a limit on us --

5          THE COURT:  We've done such a good time on timelines,

6  haven't we?  We were going to have a, you know, a chess clock

7  at one point, remember that?  Thank God that didn't happen.

8          MR. PFISTER:  The guidance Your Honor gave on the

9  opening statements, if it's any help, really I think made them

10 much shorter.  I know they weren't 15 minutes.

11         THE COURT:  Yes, we didn't stick to the time limit at

12 all --

13         MR. PFISTER:  We didn't.

14         THE COURT:  -- but they were shorter.

15         MR. PFISTER:  But they would have been -- I can

16 almost be positive, Your Honor, they would have been much

17 longer had you not given us that guidance.

18         THE COURT:  But that's the problem.  Whatever I give

19 you, you're going to exceed.  This is exactly what my kids ask.

20 And it's hours more.  So much of it will depend upon when we

21 end.  I would anticipate starting closing arguments in the

22 afternoon.

23         MR. PFISTER:  Okay.

24         THE COURT:  So, if we do that, it would be

25 approximately, if I just do one to five-ish, probably two hours

Stein - Direct/McKane                265

 1  for the debtors and two hours for the claimants, understanding
 2  I have multiple claimants and they may wish to add things.
 3  But, again, that's -- I'm going to give you that as a rough
 4  estimate.  I have questions.  I have a lot of questions.  I've
 5  tried to -- you guys are all highly paid, skilled lawyers.

 6          I didn't think it was my job to ask questions during
 7  the thing or during questioning because that's your litigation
 8  strategy.  You should be entitled to do that.  But when it
 9  comes to the legal aspects and now how the facts apply to the
10  law, I do have questions of all the sides.

11          And I'm not going to say that at, for example, 3:01,
12  Mr. Husnick, Mr. McKane, your time is over.  I know you only
13  answered three of my questions, but too bad.  Now comes the
14  claimants and then you only get an hour in before I start
15  asking questions because what good does that do?

16          Now, do we have a problem if we start running over?
17  Well, it's my courtroom.  At least we can run over some.  But,
18  so I don't know.

19          MR. PFISTER:  Okay.

20          THE COURT:  I mean, again, be as concise as you can.
21  I don't need a lot of errata facts because a lot of those
22  you've stipulated to.  But the Seventh Circuit, everyone says
23  we all agree on the law and the cases you both cited are pretty
24  universal.  But there is no process of which the Seventh
25  Circuit has given to do this.  They say, okay, here's this

1  test, here's this test, but there's really no binding case that

2  says this is how you proceed.  I think the <u>Girardi</u> (phonetic)

3  case, you know, they talk about it a lot, but it doesn't say

4  what to do.  And that's an unpublished case from Illinois.  But

5  it isn't.

6         There's lots of cases that give me snippets of what

7  the Seventh Circuit will do, but there's no case that says for

8  all of you out there this is the approach you do.  There's not.

9  So I understand that you both will give me exact same cases and

10  tell me different things.  That's fine.  But focus on those

11  things.  You've all briefed them, you know the cases.  What do

12  those cases say that's required in the Seventh Circuit to do

13  this?

14         I know the debtors are saying the stay applies under

15  declaratory relief, so they're going to argue under 361 it's

16  363 alone.  But then we get into the 105 issues and what are

17  the tests for there.  And there's more than one test even

18  though there's only a couple elements.  There's more than one

19  test as they apply them because it's 105, but then there's an

20  injunction.  Seventh Circuit doesn't say exactly which path to

21  go under.  What great opportunity for all of you lawyers to

22  argue what you want.  It's really the pits for me because I

23  don't have a wonderful authority telling me exactly how I apply

24  it.

25         So, again, there's some flexibility there, but it is

Stein - Direct/McKane                    267

1   unclear or at least there isn't a certain avenue to go.  So a

2   lot of my questions will be, well, should we do this, should we

3   do this, what is the impact.  Be prepared for those.  Can we do

4   it in two hours apiece?  I hope so.  I don't have that many

5   questions.  Hopefully you'd have a lot of answers.  But I don't

6   know.

7            MR. PFISTER:  Understood.  And, Your Honor, for

8   the -- on the claimants' side, we will endeavor to coordinate

9   and make sure we have as tight a presentation as possible for

10  you.

11           THE COURT:  And just a reminder, you all have

12  wonderful briefs.  I'm not a jury.  All that wonderful language

13  you do, I just kind of like a fact, fact, fact.  That's what I

14  do.  So, I mean, you're welcome to use it, but a lot of the

15  statements that have been made in the briefs and stuff where we

16  start getting into the -- just try to stick to the facts.

17  Obviously, maybe harms are relevant, you can bring that up and

18  public interest, that's fine, but don't -- try not to

19  grandstand if you can.  This is not the time.

20           MR. PFISTER:  Understood, Your Honor.

21           THE COURT:  All right.

22           MR. PFISTER:  Thank you.

23           THE COURT:  I don't think I helped at all, but at

24  least I gave you some answers and I took away some time from

25  Mr. Winston.  So, anything else before we begin the cross

1  examination of Mr. Stein?

2                   (No audible response)

3            THE COURT:  Shaking no.  Mr. Winston, if you would be

4  kind enough to state your name for the record?  Mr. Stein, I'll

5  remind you that you continue to be sworn under oath.  And I

6  guess I'll just check because we haven't talked to you.  Can

7  you hear us?

8            MR. STEIN:  Yes, I can, Your Honor.

9            THE COURT:  Excellent.  You may proceed.

10           MR. WINSTON:  Thank you, Your Honor.  For the record,

11 Eric Winston of Quinn Emanual Urquhart & Sullivan on behalf of

12 three Bellwether plaintiffs and thousands more.

13               JEFFREY STEIN, WITNESS, PREVIOUS SWORN

14                      CROSS EXAMINATION

15 BY MR. WINSTON:

16 Q    Good afternoon, Mr. Stein.  Sorry you're not here with us

17 in person today.  It's good to see you on Zoom, though.  You're

18 looking pretty good.

19 A    Thank you.

20 Q    Mr. Stein, I'm going to begin my questions and probably

21 spend most of my time before we have to break today on the

22 funding agreement itself.  Mr. Stein, you signed the funding

23 agreement on behalf of the Aearo debtors, correct?

24 A    Yes.

25 Q    And you signed that on July 25th, 2022?

Stein - Cross/Winston                    269

1  A     Excuse me.  Yes.

2  Q     And on that same day, the Aearo board authorized the Aearo

3  debtors to file for these Chapter 11 cases?

4  A     Yes.

5  Q     And you, obviously, approved that board resolution,

6  correct?

7  A     Yes.

8  Q     And then the next day the Aearo debtors filed in the

9  morning their Chapter 11 cases, correct?

10 A     Yes.

11 Q     Now the funding agreement obligates 3M to commit to

12 provide funding to the Aearo debtors if certain conditions are

13 met, correct?

14 A     Yes.

15 Q     But none of those conditions required the Aearo debtors to

16 file for bankruptcy in order to access the funding, right?

17 A     Yes.

18 Q     Nor is 3M's funding obligations conditioned on the

19 imposition of any stay of any litigation associated with the

20 Combat Arms Earplugs, right?

21 A     Yes.

22 Q     So, even if this Court, which gave us guidance about

23 what's going to be argued tomorrow and hopefully the lawyers

24 that are going to argue it were listening, refuses to grant the

25 preliminary injunction and 3M has to continue to defend itself

Stein - Cross/Winston                          270

1   in the MDL and elsewhere, 3M cannot refuse to fund under the

2   funding agreement, right?

3   A    Yes.

4   Q    In fact, and Mr. McKane covered this with you, 3M tried to

5   include that as a condition to its funding obligations that

6   there be an imposition of the stay of litigation against 3M,

7   but you and Mr. Meltzer did not agree to that, right?

8   A    Yes.

9   Q    And just to be clear, 3M's funding obligation does not

10  require an estimation proceeding through a bankruptcy case,

11  correct?

12  A    Yes, that is correct.

13  Q    And Mr. McKane already covered this with you, but let's

14  just confirm it.  3M's funding obligations are uncapped, right?

15  A    Yes.

16  Q    And by uncapped that means regardless of the adjudicated

17  aggregate amount of any Combat Arms Earplugs liabilities, 3M is

18  committing to pay all of the allowed liabilities of the Aearo

19  debtors pursuant to the funding agreement, right?

20  A    Yes.

21  Q    And this uncapped obligation of 3M includes providing

22  funding to Aearo to pay the indemnity obligations to 3M that

23  are in the funding agreement, right?

24  A    Yes.

25  Q    I mean, it's a little circular, but that's the way the

Stein - Cross/Winston                     271

1 funding agreement works, if there's an indemnity obligation,

2 Aearo might be liable for it, but they can just ask 3M to pay

3 Aearo to pay back 3M, right?

4 A    Yes.

5        UNIDENTIFIED ATTORNEY:  Objection to form.

6 Apologize.

7 Q    And this uncapped funding --

8        THE COURT:  Hang on, hang on a second.

9        UNIDENTIFIED ATTORNEY:  Objection to form with

10 regards to the start of the question, it's a little circular.

11 It's a commentary.  I just want to know where the question

12 starts.

13        THE COURT:  I mean, it's not a gold star question,

14 but, I mean, I think it's fine and he did answer.

15        UNIDENTIFIED ATTORNEY:  Understood.

16        THE COURT:  So --

17 Q    And this uncapped funding obligation exists regardless if

18 insurance and insurance proceeds are unavailable, right?

19 A    Excuse me.  Yes.

20        MR. WINSTON:  And, by the way, Mr. Stein, I mean, if

21 you ever just need a glass of water, whatever, just please do

22 so.  I know it's not a fun thing you're dealing with.

23 Q    This uncapped obligation of 3M exists regardless of the

24 litigation costs that are being incurred or might be incurred

25 in any litigation over the Combat Arms Earplug claims, correct?

Stein - Cross/Winston                           272

1  A    Yes.

2  Q    Now, the funding agreement mentions 3M providing a billion

3  dollars to fund trusts that might be established through a plan

4  of reorganization, right?

5  A    Yes.

6  Q    And this billion dollar amount that 3M has committed and

7  set forth in the funding agreement, that was included because

8  it was important to 3M, correct?

9  A    Yes.

10  Q    But the billion dollar figure wasn't actually important to

11  Aearo, correct?

12  A    Yes, that is correct.

13  Q    At the end of the day, it really doesn't matter where the

14  Combat Arms claims are determined, 3M is still on the hook

15  under the funding agreement if the conditions therein have been

16  met, correct?

17  A    Yes.

18  Q    Let's call up Exhibit 2 which is the funding agreement

19  itself.  And if we could go to Page 6.  I'm sorry, I was

20  looking at the page numbers at the bottom.  I think it's

21  actually Page 7.  Sorry, thank you.  Mr. Stein, can you read

22  this?

23  A    Now I can.

24  Q    Okay.  And if you scroll down a little bit, do you see the

25  definition of permitted funding use?

Stein - Cross/Winston                      273

1  A    Yes.

2  Q    And the lead in the permitted funding use says in

3  accordance with Section 2(b), each of the following uses and

4  then it goes on (a) and (b), right?

5  A    Yes.

6  Q    And there's actually a (c), (d) and (e) on the next page,

7  as well, correct?

8  A    Yes.

9  Q    And this is part of what you negotiated for over the weeks

10 in which you were an independent director negotiating the

11 funding agreement, right?

12 A    Yes.

13 Q    And Mr. McKane asked you questions about a priority of

14 payments before the 3M funding obligation kicks in, do you

15 recall that?

16 A    Yes.

17 Q    And I think you said first cash or cash from operations of

18 the Aearo debtors, is that right?

19 A    Yes.

20 Q    And then insurance proceeds?

21 A    Yes.

22 Q    Was there any other assets after insurance proceeds?

23 A    I do not believe I testified to any other assets.

24 Q    Okay.  And it's your understanding of what you answered to

25 Mr. McKane that first the Aearo debtors have to look to their

Stein - Cross/Winston                                        274

1  own cash, then they have to look to insurance proceeds, and

2  then they can ask 3M for funding, correct?

3  A    Yes.

4  Q    Okay.  If you could scroll down to the next page and go to

5  the proviso.  Oh, but back up, please.  Back up, back up, back

6  up, back to Page 8.  There you go.  Stop right there.  Now if

7  we could call out the proviso, the one that starts with

8  provided, however.  It's in this proviso that you were

9  attempting to answer Mr. McKane's questions regarding the

10 priority of payments, right?

11 A    Excuse me, counsel.  I would like to read it.

12 Q    Sure.

13 A    Yes.

14 Q    And there isn't actually a hierarchy of payments in this,

15 is there?

16 A    I believe there is an ordinal ranking of the way in which

17 the assets are to be utilized.

18 Q    All right.  So, if I'm looking at (ii) which is after the

19 initial payment, right?

20 A    Yes.

21 Q    It says any cash received or to be received by the Aearo

22 debtors on account of, and then there's an (x), that's their

23 business and related activities, do you see that?

24 A    Yes.

25 Q    Then it says or (y) their assets, including insurance

Stein - Cross/Winston                          275

1  recoveries, do you see that?

2  A    Yes.

3  Q    So doesn't the or tell you that there is no hierarchy of

4  payments?

5  A    Upon reading it now, I believe that the or would collapse

6  the first two components in what I referred to previously and

7  essentially they would represent one component that must be

8  considered and utilized prior to utilizing the funding

9  agreements.

10 Q    And, in fact, it's not just limited to insurance proceeds,

11 it's any assets of the Aearo debtors, right?

12 A    Yes.

13 Q    And one thing I didn't hear any questions on is the last

14 clause after insurance recoveries where it says is or are

15 projected to be, in each case or collectively, insufficient to

16 pay or satisfy such liabilities or amounts in full or otherwise

17 maintain the minimum balance, do you see that?

18 A    Yes.

19 Q    So, this sentence actually says that if the Aearo debtors

20 determine that their assets are insufficient or projected to be

21 insufficient to pay or satisfy such liabilities, they can ask

22 3M for funding, right?

23 A    Yes.

24 Q    And that's your determination since as the disinterested

25 directors you have say so over any conflicted matters, right?

1  A     Yes.

2  Q     And the funding agreement is one of the two conflicted

3  matters that you testified to with Mr. McKane, correct?

4  A     Yes.

5  Q     You could in theory today make the determination that the

6  asset base of the Aearo debtors is insufficient to pay all of

7  the Combat Arms Earplug claims and ask for 3M today for such

8  funding, right?

9          UNIDENTIFIED ATTORNEY:  Objection to form, it's

10 asking for hypothetical.

11         MR. WINSTON:  I've already gone through the

12 foundation of what it says and I'm now asking him with that

13 foundation, he could do it today, that's what he negotiated

14 for.  At least I think he did.

15         UNIDENTIFIED ATTORNEY:  He's asking for him to pose a

16 question that's like without the aid of counsel or his

17 co-disinterested director on his own could he make the

18 determination that 3M must fund, I'm going to go back up, that

19 the asset base is insufficient to pay the Combat Arms.  So

20 maybe it's better to say that he's asking him to speculate

21 because he alone can't make that decision without consulting

22 his co-disinterested director.

23         THE COURT:  All right.  Any response?  I mean, he

24 can't himself do that, correct?

25         MR. WINSTON:  Actually, that's fair point.  I don't

1  know, you know, in terms of whether it requires unanimity, but

2  let me rephrase and see if we could go that way.

3  Q    Do you believe that the Aearo debtors under this clause

4  could make a determination today that they have the

5  insufficient assets to pay all Combat Arms Earplug liabilities

6  that they have and ask 3M for funding today, correct?

7  A    I believe that the plain language of the agreement would

8  afford the disinterested directors the opportunity to conduct

9  that evaluation and potentially reach that conclusion.

10 Q    Is that a yes?

11 A    No, it's what I just testified to if you want the court

12 reporter to read it back.

13         THE COURT:  Well, we don't have one.  I mean, they

14 have one, but it's not the official record.

15 Q    Suffice it to say, between the filing of the bankruptcy on

16 I believe July 26th and today, you have not spoken to Mr.

17 Meltzer about whether the Aearo debtors should make such a

18 request to 3M, correct?

19 A    No, I have not.  That is correct.

20 Q    Hasn't come up at all in any of your deliberations with

21 Mr. Meltzer, has it?

22 A    No, it has not.  That is correct.

23 Q    And it hasn't come up in any of the board meetings that

24 you've attended of the Aearo debtors, correct?

25 A    No, it has not.  That is correct.

Stein - Cross/Winston                    278

1   Q    So, if you were concerned about the Aearo debtors lacking
2   the ability to satisfy its liabilities, you would no doubt talk
3   to Mr. Meltzer and ask should we ask 3M for money, wouldn't
4   you?
5   A    I'm sorry, counsel, I do not believe I understand the
6   question.  Could you repeat it or rephrase it, please?
7   Q    Sure.  Let me ask it this way.  Between July 26th, the
8   petition date, and now there has been nothing that you are
9   aware of that has caused you to seek to invoke this clause and
10  ask 3M for funding, right?
11  A    No, there has not been, that is correct.
12  Q    All right.  And that's because the Aearo debtors right now
13  are not in a position where their assets are about to run out,
14  right?
15  A    At this time, that is correct.
16  Q    Okay.  Let me shift gears a little bit.  Got five minutes
17  left.
18        THE COURT:  You have five minutes, yes.
19  Q    I want to ask some questions about the decision-making
20  process you undertook for the funding agreement and Mr. McKane
21  put in front of you a demonstrative.  Why don't we put that one
22  back up, Stein Demonstrative 1?  Mr. Stein, did you have any
23  input in the preparation of this document?
24  A    Yes.
25  Q    Okay.  And there are a number of references to Aearo DD

Stein - Cross/Winston                        279

1  Meeting, do you see that?

2  A    Yes.

3  Q    It goes throughout.  Seems like it's, you know, once a

4  week or so and sometimes more than once a week.  And then

5  there's the July 23rd Aearo DD Meeting to authorize entry into

6  the funding agreement.  We saw that in Exhibit 554 earlier, do

7  you recall that?

8  A    Yes.

9  Q    So all of these other Aearo DD Meetings, June 23rd, June

10  28th, July 2nd, July 11th, July 14th, July 17th and July 19th,

11  there are no minutes of any such meetings, correct?

12  A    No, there are not.  That is correct.

13  Q    Okay.  So, just to make sure that this demonstrative is

14  not misleading, when it says Aearo DD Meeting, you're not

15  referring to a formal board meeting of the disinterested

16  directors, correct?

17  A    I would view them as having been formal on a per se basis,

18  but by the letter of what I would describe as corporate

19  governance law, no, they were not formally in the meetings.

20  Q    Okay.  Let's get back up Exhibit 554, please.  Actually,

21  no, I'm sorry, I apologize.  I want to go back to the

22  demonstrative.  My mistake.  There is a reference in this

23  demonstrative to a June 30th, W&C circulates draft funding

24  agreement, correct?

25  A    Yes.

1  Q    As far as I can tell, there are no other references to

2  circulating -- circulations of drafts of the funding agreement

3  either before or after June 30th, do you see that?

4  A    Yes.

5  Q    Now, there were, in fact, multiple drafts of the funding

6  agreement after June 30th and before July 23rd, right?

7  A    Yes.

8  Q    And there was at least one draft before June 30th that you

9  received, correct?

10 A    Yes.

11 Q    Is there a reason why that draft is not referenced on this

12 demonstrative that you helped prepare?

13 A    No, not particularly.  The demonstrative is not all

14 inclusive.  It does not include every call, every meeting,

15 every date in which a document was received or exchanged.  It's

16 not endeavoring to achieve that.  It's endeavoring to provide

17 the Court a general overview of the process.

18 Q    And Mr. McKane elicited some testimony from you, sir,

19 regarding the mediation process that had been going on and I

20 objected about foundation on dates, do you recall that?

21 A    Yes.

22 Q    I don't see on this demonstrative any reference to the

23 mediation process.  I don't think it's there.  Is there a

24 reason why it wasn't put on there?

25 A    Again, there was no reason in particular why any item was

281

1 excluded.  This was really designed just to be a general

2 overview of the process.

3 Q    I see.  Okay.  So, let's take this down.  Let's go back to

4 --

5      THE COURT:  Well, (indiscernible) beyond there

6 because you're getting wound up, and it's not going to happen.

7 All right.  So, here's a couple things.  If you need to store

8 things and I think I've already told you don't ever store

9 electronic devices here, but you can store them in Courtroom

10 310 which is across from mine.

11      My courtroom deputy has selected an e-mail of a lucky

12 few of you who may be representing people of whom we think we

13 are missing exhibits from the witness stand which makes it the

14 official.  It goes to local because those are right now, so

15 this is a great chance for you to talk to your local counsel

16 and find out if you're missing exhibits.  But please meet with

17 my courtroom deputy, Heather Heiser-Davis, to make sure we can

18 get those together and they can be transported safely to the

19 vault.  Yes.  And then to the courtroom in the morning.  Other

20 than that, okay.

21      UNIDENTIFIED ATTORNEY:  Your Honor, when would you

22 like to start tomorrow?  I hate to ask those kind of questions.

23      THE COURT:  That was you're stealing my thunder and

24 taking away valuable packing time.  You know, we've made such

25 great time today that I think we're going to have to start at

282

1  eight o'clock tomorrow again which surprised me because I

2  didn't think you guys all could get in here until just before

3  eight, but you guys were all here really early, not that much

4  later than me and I was here at seven.  So, I don't know who

5  you know, but good job.  So, let's start at eight o'clock in

6  Room 311.

7          Reminder, I have one-half of the courtroom available.

8  The other courtroom will be available, as well, which might be

9  the other half absent the jury box.  I'll try to accommodate

10 you, as many as I can.  I'll ask if there's another courtroom

11 that we can use, but I don't know.  I would encourage you if

12 you're not essential to view by Zoom or to call in and listen

13 in because that will allow us to be in there and have as many

14 people.  And, like I said, I can only ask for additional space

15 other than those two.  The title of chief bankruptcy judge

16 doesn't do much other than I can maybe get bankruptcy space,

17 but that's it.  So, anything else?

18          MR. WINSTON:  Your Honor, since we're in the -- maybe

19 in the middle of the cross, can I get --

20          THE COURT:  We're going to be in the middle of the

21 cross, yes.

22          MR. WINSTON:  Working on that.  Can I get the

23 admonition for the witness since we're going overnight?

24          THE COURT:  What admonition would you like?

25          MR. WINSTON:  That not to speak to counsel or anyone

283

1 else about the case.

2          THE COURT:  You mean the continuing separation of

3 witnesses --

4          MR. WINSTON:  Yes.

5          THE COURT:  -- which may or may not have been

6 violated by a witness sitting in the room earlier.  Not

7 debtors' witness, but the claimants' witness.  Yes.  Mr. Stein,

8 there was a separation of witnesses just because we have that

9 rule and so I would encourage you not to talk to any counsel

10 here.  You can talk to your individual counsel, but not about

11 proceedings or the case today.

12          MR. WINSTON:  Thank you, Your Honor.

13          MR. STEIN:  I understand and, excuse me, acknowledge,

14 Your Honor.

15          THE COURT:  All right.  And go to bed early.

16          MR. STEIN:  Thank you, Your Honor.

17          THE COURT:  All right.  Anything else before we

18 officially adjourn?  I do appreciate those packing up already.

19 You get brownie points which are worth nothing.  Anything else?

20          UNIDENTIFIED ATTORNEY:  No, Your Honor.

21          THE COURT:  All right.  We are adjourned.  I'll see

22 you tomorrow at eight.  Please don't talk about the case

23 because just like you I have to pack up my little moving box

24 from here too and so don't taint the record by telling me

25 anything I shouldn't hear.  Thank you.

284

1                              * * * * *

# C E R T I F I C A T I O N

We, KAREN K. WATSON, DIPTI PATEL, RUTH ANN HAGER,
ALYCE H. STINE, TAMMY DeRISI and KELLI R. PHILBURN, court
approved transcribers, certify that the foregoing is a correct
transcript from the official electronic sound recording of the
proceedings in the above-entitled matter, and to the best of
our ability.


/s/ Karen K. Watson                  /s/ Dipti Patel
KAREN K. WATSON                      DIPTI PATEL


/s/ Ruth Ann Hager                   /s/ Alyce H. Stine
RUTH ANN HAGER                       ALYCE H. STINE


/s/ TAMMY DeRISI                     /s/ Kelli R. Philburn
TAMMY DeRISI                         KELLI R. PHILBURN
J&J COURT TRANSCRIBERS, INC.         DATE:  August 18, 2022