# EXHIBIT 14

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| IN RE: | . | Case No.  22-02890-JJG |
| | . | (Jointly Administered) |
| AEARO TECHNOLOGIES LLC, | . | |
| ET AL., | . | 116 U.S.  Courthouse |
| | . | 46 E.  Ohio Street, Room 116 |
| Debtors. | . | Indianapolis, IN  46204 |
| . . . . . . . . . . . . | . | |
| AEARO TECHNOLOGIES LLC, | . | |
| ET AL., | . | |
| Plaintiffs, | . | |
| V. | . | Adversary No. 22-50059 |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| APPENDIX A, | . | |
| Defendants. | . | |
| | . | Wednesday, August 17, 2022 |
| . . . . . . . . . . . . . | . | 8:00 a.m. |

TRANSCRIPT OF HEARING ON DEBTORS' MOTION FOR
DECLARATORY AND INJUNCTIVE RELIEF (DAY 3)
BEFORE THE HONORABLE JEFFREY J. GRAHAM
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis LLP
                          BY:  CHAD HUSNICK, ESQ.
                               NICHOLAS WASDIN, ESQ.
                               BRENTON ROGERS, P.C.
                          300 North LaSalle Street
                          Chicago, IL  60654

                          Kirkland & Ellis LLP
                          BY:  MARK McKANE, ESQ.
                          555 California Street, 27th Floor
                          San Francisco, CA  94104

Audio Operator:           Heather Heiser-Davis

Proceedings recorded by electronic sound recording, transcript
               produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**

**(609) 586-2311    Fax No.  (609) 587-3599**

2

APPEARANCES CONTINUED:

For the Debtors:          Kirkland & Ellis LLP
                          BY:  DAVID I. HOROWITZ, P.C.
                          555 South Flower Street, 37th Floor
                          Los Angeles, CA  900714

For 3M Company:           Faegre Drinker Biddle & Reath LLP
                          BY:  JAY JAFFE, ESQ.
                          600 East 96th Street, Suite 600
                          Indianapolis, IN  46240

                          White & Case LLP
                          BY:  MICHAEL ANDOLINA, ESQ.
                          111 S. Wacker Drive, Suite 5100
                          Chicago, IL  60606

                          White & Case LLP
                          BY:  JESSICA LAURIA, ESQ.
                               GREGORY STARNER, ESQ.
                          1221 Avenue of the Americas
                          New York, NY  10020-1095

For Aylstock, Witkin,     Klee, Tuchin, Bogdanoff & Stern, LLP
Kreis & Overholtz, PLLC:  BY:  ROBERT J. PFISTER, ESQ.
                          1801 Century Park East, 26th Floor
                          Los Angeles, CA  90067

                          Aylstock, Witkin, Kreis &
                            Overholtz, PLLC
                          BY:  JENNIFER HOEKSTRA, ESQ.
                          17 E. Main Street, Suite 200
                          Pensacola, FL  32502

For Seeger Weiss LLP:     Otterbourg P.C.
                          BY:  MELANIE CYGANOWSKI, ESQ.
                               ADAM SILVERSTEIN, ESQ.
                          230 Park Avenue
                          New York, NY  10169-0075

                          Seeger Weiss LLP
                          BY:  DAVID BUCHANAN, ESQ.
                          55 Challenger Road
                          Ridgefield Park, NJ  07660

3

APPEARANCES CONTINUED:

For the U.S. Trustee:     U.S. Department of Justice
                          BY:  HARRISON E. STRAUSS, ESQ.
                               LAURA A. DUVALL, ESQ.
                          46 E. Ohio St., Road 520
                          Indianapolis, IN  46204

For Clark Love & Hutson:  Fishman Haygood LLP
                          BY:  TRISTAN MANTHEY, ESQ.
                               BRENT BARRIERE, ESQ.
                          201 St. Charles Avenue, Suite 4600
                          New Orleans, LA  70170-4600

For Belwether Claimants:  Quinn Emanuel Urquhart & Sullivan, LLP
                          BY:  ERIC WINSTON, ESQ.
                          865 S. Figueroa Street, 10th Floor
                          Los Angeles, CA  90017

For Bailey Glasser       Bailey Glasser LLP
Plaintiffs:              BY:  BRIAN GLASSER, ESQ.
                              KEVIN W. BARRETT, ESQ.
                          209 Capitol Street
                          Charleston, WV  25301

For Richard Valle:        Keller Postman
                          BY:  ASHLEY KELLER, ESQ.
                               ASHLEY BARRIERE, ESQ.
                          150 N. Riverside Plaza, Suite 4100
                          Chicago, IL 60606

For various law firms:    Caplin and Drysdale
                          BY:  KEVIN MACLAY, ESQ.
                          One Thomas Circle NW, Suite 1100
                          Washington, DC 20005

                          - - - - -

4

**I N D E X**

**WITNESS FOR THE DEBTORS**                               **PAGE**

JEFFREY STEIN
  Cross-Examination Resumed by Mr. Winston          10
  Cross-Examination by Mr. Keller                   75
  Redirect Examination by Mr. McKane                78


**DEBTORS' EXHIBITS**                           **ID**.    **EVD**.

 138 3M and Aearo Omnibus Meeting Minutes for             37
     June 21, 2022


**DEFENDANTS'/CLAIMANTS' EXHIBITS**            **ID**.    **EVD**.

 GD  Order by Judge Rodgers in MDL (MDL ECF 3386)         27


**CLOSING ARGUMENTS**                                     **PAGE**

   By Mr. Husnick                                  118

   By Mr. Pfister                                  179

   By Ms. Cyganowski                               215

   By Mr. Maclay                                   241

   By Mr. Keller                                   257

   By Mr. Barrett                                  277

   By Ms. Duvall                                   285

   By Mr. Husnick                                  286

1          THE COURT:  All right.  Counsel, are we all ready?

2          MR. HUSNICK:  Yes, Your Honor.

3          THE COURT:  I see the 17 inch computer maybe doesn't

4  work so well with my computer, or on my table, huh?

5          All right.  Let's go ahead and get started this

6  morning.  We're here on Adversary Number 22-50059.  And we are

7  here on a motion for declaratory relief and preliminary

8  injunction by the debtors with opposition by several

9  constituents representing tort claimants.

10          We are here on Day 3 of what was originally a one-day

11  trial and we are about to begin or soon to continue the cross-

12  examination of witness Mr. Stein.  But Mr. Husnick is in front

13  of me and I think -- is this just going to be the general

14  intro?

15          MR. HUSNICK:  No, a very quick update.

16          THE COURT:  Okay.  All right.

17          MR. HUSNICK:  A couple of things and --

18          THE COURT:  So why don't we go ahead and, fingers

19  crossed.  I will say, again, this is the quaint and small

20  courtroom that I have.  I apologize.  Nobody may want to be in

21  Indiana after being in my courtroom, but the good news is I can

22  control when we're in here and how long we're here and you are

23  allowed to drink coffee in my courtroom.  Just don't spill it

24  because I already had my yearly cleaning of the carpets.

25          All right.  Mr. Husnick, you may proceed and then we

6

1 will jump into the work on continuing cross-examination.

2       MR. HUSNICK:  Thank you, Your Honor.  I guess the

3 only downside is that, you know, this plastic screen will stop

4 you from strangling me later today while we're arguing.

5       THE COURT:  There you go.

6       MR. HUSNICK:  Your Honor --

7       THE COURT:  They're not very strong though, so don't

8 strain very hard.

9       MR. HUSNICK:  Your Honor, Chad Husnick with Kirkland

10 and Ellis on behalf of the Aearo debtors.

11       Your Honor, just three brief things to update and

12 then one question.  Your Honor had asked us at the conclusion

13 or hinted at the conclusion of yesterday as to whether the

14 parties could work together on some sort of, you know, modest

15 extension of the agreed TRO.  We did work for several hours

16 last night to try and get there -- not TRO.  The agreed

17 détente, I'll call it.

18       We're not there.  We have some parties, a lot of

19 them, but there's a group that is not inside so we are where we

20 are and we're ready to move forward.  Unfortunately, we will

21 probably have a hearing on Thursday.  There are a number of

22 motions to adjourn that we filed.  I believe we communicated

23 with Your Honor's chambers on those motions.  A lot of that I

24 believe now is agreed to adjourn most of the second day relief

25 to the September omnibus hearing.

1          That takes me to exhibits.  Mr. McKane tells me that
2    we'll address exhibit issues after the conclusion of Stein's
3    cross any remaining exhibit issues that there are.
4          THE COURT:  I'm like, okay.
5          MR. HUSNICK:  There was the one issue I believe
6    Mr. Pfister suggested might come up at the end of the hearing.
7          THE COURT:  Oh, there was, yes.
8          MR. HUSNICK:  I don't know if that's still extant,
9    but I think it is, but --
10         THE COURT:  Well, we'll find out.
11         MR. HUSNICK:  In any event.  And then, the last thing
12   is an offer.  We realize the complexity of these issues will
13   have significant arguments this afternoon on all of these
14   issues and facts.  We would offer to do, Your Honor, if it
15   would be helpful, findings and conclusions from both sides if
16   that's something that you thought would be helpful.  We realize
17   that takes a little bit of time but it might be something that
18   Your Honor may be interested in for summarizing the evidence.
19         THE COURT:  I'll think about that.  I mean, it's
20   always nice to have people try to write down what they think
21   they've proven but I also know that you all will then give me
22   an additional 30 to 45 pages.  But let me think about it.
23   That's a fair offer and I will consider that as we proceed
24   today.
25         MR. HUSNICK:  Fair point, Your Honor.

8

1          Thank you for your time and I'll turn the podium over
2    to Mr. Pfister.
3          THE COURT:  All right.
4          MR. PFISTER:  Thank you, Your Honor.  Rob Pfister for
5    the claimant group that filed the joint brief.  I will turn the
6    podium over to Mr. Winston to continue the cross-examination if
7    that's acceptable.
8          THE COURT:  Excellent.  Thank you.
9          MR. PFISTER:  Thank you.
10         THE COURT:  All right.  And I'll ask, Mr. Winston,
11   I'll give you the option.  You may proceed from the table if
12   you so desire or you can come up to the podium.  It's up to
13   you.  Generally, I used to have people argue from the tables
14   but everyone really seems to like the podium so I gave you a
15   podium.  But then you also have the awkward thing of turning
16   around.
17         MR. WINSTON:  Right.
18         THE COURT:  And you won't see me do things to you if
19   you're turned around.  So I will let you decide where you want
20   to begin questioning.
21         MR. WINSTON:  So I actually talked to Mr. McKane
22   about this and if Your Honor would be okay, if we could rotate
23   the podium 90 degrees so that we could look at the witness.
24         THE COURT:  I can't wait to see how many lawyers it
25   takes to turn the podium.

9

1                     (Laughter)

2          THE COURT:  Okay.  The only thing I would say, we did

3  attempt to minimize government liability by taping down all the

4  cords.

5          MR. WINSTON:  Yeah.

6          THE COURT:  So do your best not to rip up the tape.

7  We do have more tape.  But as long as the microphone stays

8  (indiscernible), then you can do whatever you want.

9          MR. WINSTON:  The good thing is bankruptcy lawyers

10  tend to be both efficient and equitable, so.

11          THE COURT:  Yeah, that's what we tell people.  We

12  don't get invited to many parties though, either.

13          MR. WINSTON:  Nope.

14          THE COURT:  All right.

15          MR. WINSTON:  Is this --

16          THE COURT:  That's fine with me as long as you're

17  comfortable.

18          MR. WINSTON:  Okay.  Thank you so much.

19          THE COURT:  All right.  And I see Mr. Stein has not

20  fully recovered yet.

21          Before we begin, Mr. Stein, I will go ahead and swear

22  you in again.  You remain under oath, but out of an abundance

23  of caution, let's do it again.  Will you please raise your

24  right hand?

25          JEFFREY STEIN, DEBTORS' WITNESS, SWORN

1          THE COURT:  All right.  Can you hear us okay?

2          THE WITNESS:  I can hear you, Your Honor.  The

3  microphone at the podium is slightly muffled.  So I can hear,

4  but it's just not quite as clear.

5          THE COURT:  Okay.

6          MR. WINSTON:  Can you hear me okay, Mr. Stein?

7          THE WITNESS:  I can.  And if for whatever reason, I

8  do not hear the question clearly, I will ask you to repeat it,

9  please.

10          MR. WINSTON:  Not a problem.  I'll try to speak up

11  today.  It's not my nature, but I'll try my best.

12          May I proceed, Your Honor?

13          THE COURT:  You may.  Go ahead.

14          MR. WINSTON:  Thank you.

15                  CROSS-EXAMINATION RESUMED

16  BY MR. WINSTON:

17  Q    At the break yesterday, Mr. Stein, I was just starting to

18  ask some questions about the decision making process you

19  undertook for the funding agreement.  So I want to continue on

20  with that line of questions.

21      You do recall being asked questions yesterday by

22  Mr. McKane regarding that special board meeting of just you,

23  Mr. Meltzer, and McDonald Hopkins where you voted to authorize

24  the funding agreement, right?

25  A    Yes.

1           MR. WINSTON:  Let's call up Exhibit 554, which I

2 believe has been admitted.

3 BY MR. WINSTON:

4 Q     Mr. Stein, can you see Exhibit 554?

5 A     Yes.

6 Q     And these are the minutes of that board meeting, correct?

7 A     Yes.

8 Q     And at that board meeting, you and Mr. Meltzer approved

9 the funding agreement, correct?

10 A     Yes.

11 Q     And it was also at this meeting you approved that lease

12 between one of the Aearo debtors and 3M, correct?

13 A     Yes.

14 Q     And these were the two matters for which you and

15 Mr. Meltzer determined that there was a conflict with 3M,

16 right?

17 A     Yes.

18 Q     And I believe I heard you say yesterday on direct that you

19 engaged in extensive deliberations during this meeting.  Is

20 that right?

21 A     Yes.

22           MR. WINSTON:  Can we see when the meeting started?

23           Can you scroll down a little bit?

24 BY MR. WINSTON:

25 Q     Do you see that the meeting started at 2:28 p.m. Eastern?

1 A    Yes.

2          MR. WINSTON:  And if we go to the next page, please.

3          Next page.

4          There we go.

5          And blow up where it says when the meeting ended.

6 BY MR. WINSTON:

7 Q    Do you see the adjournment time?

8 A    Yes.

9 Q    And the meeting ended at 2:53 p.m. Eastern time?

10 A    Yes.

11 Q    So you and Mr. Meltzer and your counsel engaged in

12 extensive deliberations over those two conflict matters in less

13 than 30 minutes, right?

14 A    No.  That is not an accurate description of what

15 transpired, in general.  It's an accurate transcription of the

16 time frame of the meeting and only the meeting.

17 Q    At this meeting, McDonald Hopkins gave you that written

18 presentation that Mr. McKane went through with you yesterday,

19 correct?

20 A    I'm sorry, Counsel, can you repeat that please?

21 Q    Sure.  At this meeting, McDonald Hopkins gave you that

22 written presentation that Mr. McKane showed you yesterday?

23 A    Yes.

24          MR. WINSTON:  Can we turn to Page 54, DD54?

25 BY MR. WINSTON:

1  Q    And you covered this, I believe, yesterday with

2  Mr. McKane.  This is the timeline and diligence that you and

3  Mr. Meltzer went through.

4  A    Yes.

5  Q    And if you look at the fourth big bullet point, the one

6  that starts with "Disinterested Directors," it says

7  "Disinterested directors and McDonald Hopkins attended several

8  meetings of the Aearo entity boards regarding the Chapter 11

9  process, the Combat Arms litigation, Project Galaxy, and other

10 matters."  Do you see that?

11 A    Yes.

12 Q    And where it says the "Aearo entity boards," those are the

13 meetings in which we saw on the timeline in the demonstrative

14 yesterday, correct?

15 A    Yes.

16 Q    And there are minutes of those board meetings, correct?

17 A    Yes.

18 Q    And according to this page, in the sub-bullet points of

19 what I just read, there were detailed presentations at most of

20 these meetings, right?

21 A    Yes.

22 Q    And you testified yesterday that you and Mr. Meltzer did

23 extensive due diligence in the period between your appointment

24 and the petition date, right?

25 A    Yes.

Stein - Cross/Winston                                    14

1   Q    Now, you were never given any access to a data room from

2   which you could access documents, right?

3   A    Not that I recall.

4   Q    And you cannot recall you and Mr. Meltzer ever exchanging

5   any emails between the two of you over the two conflict

6   matters, the funding agreement and the lease, right?

7   A    No.  I recall that we discussed them telephonically, but

8   not via email.

9   Q    Okay.  Now, at one point in the negotiation, 3M sought to

10  condition its funding on a request of the extension of the

11  automatic stay to 3M for the Combat Arms litigation, right?

12  A    Yes.

13  Q    But that condition was dropped at least by July 23rd,

14  right?

15  A    Yes.

16  Q    And yesterday, Mr. McKane pointed out that 3M sought to

17  make it an event of default if the automatic stay was not

18  extended to litigation against 3M, right?

19  A    Yes.

20  Q    And that condition was dropped as well?

21  A    Yes.

22  Q    And 3M tried to make it an event of default if the case

23  were dismissed or converted or a Chapter 11 trustee or receiver

24  was appointed, right?

25  A    Yes.

Stein - Cross/Winston                          15

1   Q    And you pushed back and that condition was dropped as

2   well, right?  Well, that event of default was dropped as well,

3   right?

4   A    Yes.  That is correct.

5   Q    Now, nowhere in this detailed presentation is there any

6   mention of using Aearo debtors' right under the funding

7   agreement outside of a bankruptcy filing, is there?

8   A    No.

9   Q    And there's nothing in the presentation mentioning whether

10  3M instead of Aearo should be fully liable for the Combat Arms

11  liabilities, is there?

12  A    No.

13  Q    Now, the Aearo debtors have not admitted liability to any

14  claimant in the Combat Arms Earplug cases, right?

15  A    To my knowledge, that is correct.

16  Q    And that includes the plaintiffs that have obtained

17  verdicts in jury trials, correct?

18  A    Again, to my knowledge, that is correct.

19  Q    Now, I'm sorry, Mr. Stein, that you're not here in person.

20  That's unfortunate.  But there have been several of the

21  claimants watching these proceedings in person and that would

22  include those gentlemen who have obtained bellwether verdicts,

23  right?

24       MR. HUSNICK:  Objection to form.  (Indiscernible)

25  question.

1          THE WITNESS:  I'm sorry, Counsel, I don't think I

2  understand the question.

3          MR. WINSTON:  I'll --

4          THE COURT:  (Indiscernible) not fair because we have

5  separation of witnesses, so he never saw anybody in a

6  courtroom.

7          MR. WINSTON:  I withdraw the question.  I apologize.

8  I'm sorry.

9  BY MR. WINSTON:

10 Q    Now, if the Aearo debtors are in fact not liable on the

11 Combat Arms liabilities for any reason, from the Aearo debtors'

12 perspective, that would be a good thing, right?

13 A    If in a vacuum, with no other considerations, the Aearo

14 entities were not liable in any way, shape, or form, that would

15 be beneficial to the Aearo entities.

16 Q    And if the reason why the Aearo debtors are not liable is

17 because 3M is instead responsible, that would be beneficial

18 from the Aearo debtors' perspective as well, right?

19 A    Again, I'm sorry, Counsel, there was some background

20 noise.  Can you repeat that question, please?

21 Q    Not a problem.

22      If the reason why the Aearo debtors are not liable for the

23 Combat Arms claims is because 3M is instead liable, that would

24 be beneficial from the Aearo debtors' perspective, right?

25 A    Again, in a vacuum, that is correct.

Stein - Cross/Winston                          17

1  Q    Now, you've seen statements by 3M's chairman and CEO since

2  the bankruptcy filing that 3M will retain responsibility for

3  the Combat Arms litigation, correct?

4  A    Yes.  I believe I reviewed that particular language during

5  my deposition.

6  Q    And given this statement by 3M's chairman and CEO, at

7  least as of your deposition, you've (indiscernible) believed it

8  was worth inquiring whether 3M was relieving the Aearo entities

9  of all prospective Combat Arms liability, right?

10 A    Yes.

11 Q    But at least as of August 10th, the day of your

12 deposition, you had not made that inquiry, right?

13 A    Excuse me.  I discussed the matter with Mr. Meltzer and

14 engaged with our legal counsel in a broader and much more

15 fulsome review of the totality of the transcript that was

16 utilized during my deposition.  And our conclusion was that

17 that language was based upon the fact that there is a funding

18 agreement in place with the Aearo entities and a full

19 indemnification of those liabilities by the Aearo entities.

20 Q    Now, we'll come back to the indemnification I suspect in

21 more detail.  But that indemnification is one where 3M pays it

22 in full if Aearo can't, right?

23 A    Again, I'm sorry, Counsel, it's somewhat difficult to

24 hear.  Can you repeat, again, please?

25 Q    Sure.

1      That indemnification, which I promise we will cover in a
2  little bit more detail later, that indemnification obligation
3  is one that 3M will pay Aearo to pay back 3M if the Aearo
4  debtor assets are insufficient, right?
5  A    Yes.
6  Q    Okay.  Now, you can't recall reading any pleadings in the
7  MDL as of the petition date, right?
8  A    No, I do not recall having done so.  And, yes, that is a
9  correct statement.
10 Q    And it's correct that you can't recall reading any
11 deposition or trial transcripts in the MDL, right?
12 A    Yes, that is correct.
13 Q    You can't recall reviewing any materials specific to any
14 bellwether trials, correct?
15 A    Yes, that is correct.
16 Q    You haven't read any of the appellate briefs from
17 judgments in the MDL, correct?
18 A    No, I have not.  Yes, that is correct.
19 Q    And you don't know whether there's been any appeal bond
20 posted where any plaintiff has prevailed, right?
21 A    No, I do not.  Yes, that is correct.
22 Q    Now, yesterday, I believe you testified that you were
23 aware of a mediation going on in the MDL?
24 A    Yes, I became aware of it at some point in time post my
25 appointment to the boards of the Aearo entities.

Stein - Cross/Winston                                        19

1  Q     But you did not attend any -- you did not attend any

2  mediation sessions in the MDL, right?

3  A     No, I did not.  That is correct.

4  Q     Nor did -- I apologize for talking over you.

5        Nor did Mr. Meltzer, right?

6  A     To my knowledge, no, he did not.  That is correct.

7  Q     Nor did any McDonald Hopkins attorney, correct?

8  A     Again, to my knowledge, no, they did not.  That is

9  correct.

10 Q     And if you became aware of the existence of the mediation

11 after your appointment, that was occurring during the

12 negotiations over the funding agreement, right?

13 A     To my knowledge, that is correct.

14 Q     And the funding agreement is one of the two matters that

15 you determined raised a conflict for which you and Mr. Meltzer

16 had exclusive authority on behalf of the Aearo debtors, right?

17 A     Yes.

18 Q     And despite not reviewing any pleadings, transcripts,

19 bellwether specific materials, and not attending the mediation,

20 you signed the board resolution on July 25th to cause the Aearo

21 debtors to file for bankruptcy, right?

22 A     Yes.

23 Q     Now, I want to switch topics a little bit.  You testified

24 yesterday on direct that you did not accept 3M's request that

25 the Aearo debtors assume the Combat Arms liabilities under the

1 funding agreement, right?

2 A    Again, I'm sorry, Counsel, can you please repeat that

3 question?

4 Q    Sure.

5      You testified yesterday on direct that you did not accept

6 3M's request that the Aearo debtors assume Combat Arms

7 liabilities under the funding agreement, correct?

8 A    Yes, that is correct.

9 Q    So while 3M was able to get that indemnification provision

10 out of the Aearo debtors, it was not able to get an assumption

11 of liabilities from the Aearo debtors, right?

12 A    Yes, that is correct.

13 Q    And you would agree with me, sir, that it would be

14 damaging to the Aearo debtors' estates if the Aearo debtors

15 gave up a legal argument that 3M had already assumed Aearo

16 debtor tort liabilities, right?

17 A    I'm sorry, I don't believe I understand the question.  Can

18 you repeat it, please?

19 Q    Sure.

20      You agree with me that it would be damaging to the Aearo

21 debtors' estates if the Aearo debtors gave up a legal argument

22 that 3M had assumed Aearo debtor tort liabilities, right?

23           MR. McKANE:  Objection, Your Honor.  Embedded in

24 there is asking him to understand what the legal argument is

25 and what it would take to waive or surrender a legal argument.

1  I mean, beyond -- even an experienced director would seek legal

2  counsel on that issue.

3          MR. WINSTON:  I'm not asking that --

4          THE COURT:  Well, I mean, and --

5          MR. McKANE:  -- surrender a legal argument was the

6  question.

7          THE COURT:  Well, again, and I think I'll allow it

8  only because I understand that he is not an attorney or at

9  least not acting as an attorney in this case and has

10 independent counsel.  And this would be just what he thinks,

11 understanding it's not a legal conclusion.  I mean, it's

12 phrasing.  I'm not going to take "surrender" as a legal

13 definition, but just, would he walk away from it or what like

14 that.  So I'll allow it and you can answer Mr. Stein if you're

15 able.

16         THE WITNESS:  Thank you, Your Honor.

17         In a vacuum, yes.

18 BY MR. WINSTON:

19 Q    Prior to your deposition, sir, you did not see any of the

20 discovery responses that the Aearo debtors had served in this

21 adversary proceeding, correct?

22 A    No, I did not.  That is correct.

23 Q    And because you hadn't seen any such discovery responses,

24 obviously, you didn't authorize the Aearo debtors to make any

25 representations in those discovery responses concerning whether

Stein - Cross/Winston                                    22

1  3M had assumed Aearo debtor tort liabilities, right?

2  A    No, I did not.  That is correct.

3  Q    Have you seen Judge Rodgers' 10-page order from this past

4  Sunday in the MDL?

5  A    Yes.

6  Q    You do know that after Judge Rodgers' order was issued, my

7  law firm sent a letter to your counsel asking whether the

8  independent directors would cause the Aearo debtors to withdraw

9  the preliminary injunction motion, right?

10 A    Yes.

11 Q    And then on Monday night, two nights ago, or, yeah, two

12 nights ago, your counsel sent my firm a letter stating that the

13 independent directors were still considering the request but

14 the independent directors remained convinced for the need for a

15 preliminary injunction notwithstanding Judge Rodgers' order,

16 right?

17 A    Yes.

18            MR. WINSTON:  Let's call up Exhibit GD, please.

19            May I do the Southwest Airlines move, Your Honor, and

20 move up --

21            THE COURT:  You may, yes.

22            MR. WINSTON:  Thank you.

23            THE COURT:  You just don't have much space to move

24 around.

25            MR. WINSTON:  So one to you, Your Honor.

 1          THE COURT:  One to me and one to my staff counsel.
 2  And then, I guess out of an abundance of caution, one on the
 3  witness stand.
 4  BY MR. WINSTON:
 5  Q    Mr. Stein, what has been marked as Exhibit GD, do you
 6  recognize this document, sir?
 7  A    Yes.
 8  Q    Is this the 10-page order from Judge Rodgers that was
 9  issued Sunday night?
10  A    Yes, I believe so.
11          MR. WINSTON:  Your Honor, I move for admission of
12  Exhibit GD.
13          MR. McKANE:  And, Your Honor, we object to moving it
14  into evidence.  But we have no issue with Your Honor taking
15  judicial notice of another order in another court.
16          THE COURT:  Okay.
17          MR. WINSTON:  May I respond?
18          THE COURT:  Well, I was going to ask a question, but
19  go ahead.
20          MR. WINSTON:  Oh, no, I --
21          THE COURT:  No, you wanted it.  You're --
22          MR. WINSTON:  Okay.  So certainly, we are asking Your
23  Honor to take judicial notice under Rule 2001 of the Federal
24  Rules.  It is being offered for two purposes.  One is to see
25  its affect on Mr. Stein which is not hearsay.  But statements

Stein - Cross/Winston                                    24

1  attributable to 3M, we believe are admissible as party opponent

2  admissions because 3M has appeared and argued in this adversary

3  proceeding in support of the preliminary injunction motion.

4          THE COURT:  Well, can I ask you something?

5          Has anyone actually appeared and argued?

6          MR. WINSTON:  I believe Ms. Lauria for 3M stood up

7  on --

8          THE COURT:  She spoke in an opening.

9          MR. WINSTON:  In support of (indiscernible).

10         THE COURT:  Does an opening count as arguing?

11         MR. WINSTON:  I would think it does.

12         THE COURT:  Okay.

13         MR. McKANE:  Your Honor, may I respond?

14         THE COURT:  You may.

15         MR. McKANE:  All right.  As to the first point, what

16  would be admissible is the effect on the listener in terms of

17  how he reacts, right?  Not what triggers the reaction, right.

18  So that's number one why it's inadmissible.

19         Number two is 3M is not a party to this matter.  It's

20  very straightforward.  It's an adversary proceeding.  There are

21  plaintiffs and defendants.  There is a means by which to become

22  a party file, you file a motion to intervene, and there's a

23  ruling on it.  They are now a party, and in fact, the whole

24  purpose of this motion is to extend the stay to the

25  non-parties.

1          THE COURT:  All right.

2          MR. McKANE:  But we, again, have no issue with Your

3    Honor taking judicial notice of the filing of this order in

4    another jurisdiction.

5          THE COURT:  And, again, I mean -- well, do you want

6    one last --

7          MR. WINSTON:  Yeah.  No, I -- we are on common ground

8    that it's going to be when I show this order to Mr. Stein, it's

9    going to be admitted.

10          THE COURT:  Well, it will be admitted.  But --

11          MR. WINSTON:  What he says in reaction is what we're

12    seeking to elicit that's going to be relevant.

13          THE COURT:  So, it gets in, but then how are you

14    going to use it?

15          MR. WINSTON:  Well, as I said, I'm going to show

16    various provisions of it to Mr. Stein, and Mr. Stein, whatever

17    he says is what we are eliciting testimony on.

18          THE COURT:  So you think you're going to somehow get

19    to an admission of a party opponent, a party who is not part of

20    the adversary proceeding?

21          MR. WINSTON:  Only those statements attributable to

22    3M in the order. Only because --

23          THE COURT:  No.  You can't do that.

24          MR. McKANE:  Yeah, Your Honor --

25          THE COURT:  You can say what -- you're kind of

1    winning right now.

2         You can say what the order says and it says what it

3    says, and whatever Judge Rodgers says in the order is what she

4    says in the order.  I don't know how I can take what she says

5    in the order in her court involving litigants that aren't the

6    debtors, they weren't there, make it an admission of a party

7    opponent to 3M who obviously is looming large over everything,

8    over the MDL and this case, whether we say it or not, they are

9    looming large.  But they are not a party to the adversary.

10   They are neither a plaintiff, they are neither a defendant.  I

11   don't believe that they've intervened in the case.

12        So in the context of an adversary proceeding in

13   bankruptcy court, I don't know how I can take this order, which

14   you're right will get in one way or the other, but as an

15   admission of a party opponent.

16        MR. WINSTON:  I took my shot, Your Honor, and I'll be

17   happy to move on.

18        THE COURT:  But I will allow the order to be entered

19   and I've got, I wish we wouldn't, all these judicial notices do

20   make my head spin a little bit.  But I will allow it as an

21   order entered by a court.  And I can take judicial notice that

22   this order was entered on such and such a date by Judge Rodgers

23   on a Sunday night, which is rather impressive.  And you can

24   talk about the order, but all I'm saying is the order is here

25   and the order says what it says.  I can't get into the matter

1  asserted.  And I certainly can't do an admission of a party

2  opponent of a party who's not in the adversary proceeding.

3           MR. WINSTON:  Understood, Your Honor.  Thank you.

4           THE COURT:  All right.

5           MR. WINSTON:  All right, Your Honor.

6           THE COURT:  Okay.  You may proceed.

7           MR. WINSTON:  Thank you.  Let's turn --

8           THE COURT:  Well, I guess officially, I will admit

9  Exhibit GD into evidence for judicial notice purposes and the

10 fact that the order exists and here is an order.

11     (Exhibit GD is admitted into evidence for judicial notice

12                          purposes)

13          MR. WINSTON:  If we could turn to Page 3 of the

14 order.

15 BY MR. WINSTON:

16 Q   Mr. Stein, there is a sentence in this order that says,

17 "At no point since the beginning of the MDL, over the years of

18 intensive discovery, motions practice, and bellwether trials,

19 did 3M ever hint much less represent that any entity other than

20 itself was responsible for the CAEv2 claims in this

21 litigation."

22     Do you see that sentence that I just read?

23 A   Yes.

24 Q   I had asked you some questions about whether you had

25 looked at any documents in the MDL and I think you largely

Stein - Cross/Winston                                          28

1  testified you had not.  Do you have any reason to disagree with
2  this statement in the MDL order?
3  A    I have no basis to either agree or disagree with any of
4  the statements in the order.
5  Q    Okay.  And you've done no investigation since Sunday night
6  whether this statement is correct or incorrect, right?
7  A    Again, I have no basis to either agree or disagree.
8  Q    And later on in this same paragraph, it says, "Quite the
9  contrary, 3M comported itself as the sole entity, besides the
10 federal government or individual plaintiffs, of course,
11 directly and independently responsible for the plaintiff's
12 claim."
13      Do you see that sentence?
14 A    Yes.
15 Q    And you have no basis to agree or disagree with that
16 sentence, correct?
17 A    I have no basis to either agree or disagree.  That is
18 correct.
19 Q    But you would agree with me that it would be beneficial
20 for the Aearo debtors to resolve the Combat Arms claims if 3M,
21 in fact, is directly and independently responsible for the
22 Combat Arms claims, right?
23 A    In a vacuum, with no other factors under consideration,
24 yes, I would agree with that statement.
25 Q    And as far as you know, well, maybe you don't know, has 3M

1 ever raised in the MDL or any individual case, any form of

2 successful liability defense?

3 A    I am not aware of what defenses 3M has or has not raised

4 in the matter.

5         MR. WINSTON:  Can we go to Page 9 of the order,

6 please?

7 BY MR. WINSTON:

8 Q    In the second full paragraph, do you see the sentence that

9 reads "3M Company statements and course of conduct since the

10 start of the MDL are premised on two truths, that 3M is

11 directly and independently responsible for the CAEv2 liability

12 in this litigation and that its subsidiaries are parties in

13 name only."

14        Do you see that?

15 A    Yes.

16 Q    And you have no basis to agree or disagree with that

17 assertion, right?

18 A    I have no basis to either agree or disagree.

19 Q    And yet you were aware before authorizing the bankruptcy

20 filing that the Aearo debtors are named defendants in the MDL,

21 right?

22 A    Yes.

23 Q    Given what Judge Rodgers has written and acknowledging you

24 don't have a basis to either agree or disagree with it, isn't

25 the easiest solution at this stage to permit 3M to file

1  whatever successful liability defense that it thinks it has in

2  the MDL and you and Mr. Meltzer can then decide whether the

3  Aearo debtors should oppose it?

4  A    I'm not certain that I would be capable of responding to

5  that without deliberating with Mr. Meltzer and engaging with

6  legal counsel.

7  Q    But you didn't consider that possibility before

8  authorizing the bankruptcy filing, right?

9  A    Again, I'm sorry, Counsel, can you repeat that please?

10 Q    You did not consider that option when you authorized the

11 bankruptcy filing, did you?

12 A    No, we did not.  That is correct.

13 Q    Now, by filing for bankruptcy and ringing that bell, the

14 Aearo debtors now have the protection of the automatic stay, as

15 best you understand it, right?

16 A    Yes.

17 Q    And Mr. McKane went through your background.  You're

18 pretty experienced in bankruptcy matters, aren't you?

19 A    Yes.

20 Q    So the Aearo debtors could ask the MDL court to determine

21 whether 3M is directly and independently responsible for all

22 Combat Arms claims and the automatic stay protects the Aearo

23 debtors from any retaliation by 3M, doesn't it?

24         MR. McKANE:  Objection to the form of the question.

25 That's asking him what legal procedures are available --

1          THE COURT:  You are now getting into squarely legal

2  conclusions (indiscernible).

3          MR. WINSTON:  Okay.  I'll move on.

4          THE COURT:  And not simple legal conclusions, either.

5  BY MR. WINSTON:

6  Q    Do you believe, sir, that a judicial determination that 3M

7  is directly and independently liable would be that efficient

8  and equitable outcome to achieve a global resolution you've

9  been seeking?

10  A    I'm not certain that would achieve the objectives.  I

11  would need to deliberate with Mr. Meltzer and further evaluate

12  the matter with legal counsel to ensure that all of our

13  objectives would be fully satisfied if that course of action

14  was in fact undertaken.

15  Q    Well, we have the protection of the automatic stay now,

16  right?

17  A    Yes.

18  Q    And you have the heavily negotiated funding agreement,

19  correct?

20  A    Yes.

21  Q    And that heavily negotiated funding agreement ensures that

22  one way or another, Aearo debtors are going to be able to pay

23  all liabilities in full, right?

24  A    Yes.

25  Q    So why wouldn't that be, sitting here today, an efficient

1  and equitable outcome for the Aearo debtors to seek to have 3M

2  directly and independently responsible for the Combat Arms

3  claims?

4              MR. McKANE:  Objection.  Asked and answered.

5              THE COURT:  In all honesty, I think you asked that

6  question.

7              MR. WINSTON:  I'll move on.  Sorry, Your Honor.  I

8  thought it was a little different, but I do apologize.

9  BY MR. WINSTON:

10  Q    Now you, as a experienced CRO and independent director in

11  bankruptcy, you don't believe that 3M could terminate the

12  shared services agreement without seeking relief from stay,

13  right?

14  A    Excuse me, Counsel, I assume you were --

15              MR. McKANE:  Objection.  Objection.

16              Mr. Stein, please.

17              Again, he's asking whether he knows whether 3M could

18  terminate.  That's again, a legal conclusion.

19              THE COURT:  I think as the negotiator, someone who

20  has said they're heavily involved in negotiation, he could say

21  what his interpretation of the funding agreement allows or

22  doesn't allow.  I think he can ask that question.

23              MR. McKANE:  Agreed.

24              THE COURT:  But I mean, and which I think is what you

25  were asking, but maybe I'm mistaken.

1          MR. WINSTON:  A little bit different.  Let me ask the

2    question.

3          THE COURT:  I'm going to just take this brief moment.

4    Just so all of you know, and I want to make sure you know this.

5    None of the microphones in the courtroom are for amplification.

6    They're all for the sound system.  And I heard a little bit of

7    whispering.  Be careful what you whisper, okay, because it is

8    on the live feed.

9          And not only that, becomes part of the record because

10   it's picked up by the microphones.  They're also on during

11   breaks and you'd be surprised on what people start saying over

12   breaks when the microphones are on that you don't really want

13   for public consumption.  So I just want to mention that.

14         It was fine what you did, but just be aware of that,

15   you know.  Keep your comments, "The Judge is an idiot," keep it

16   a little quiet, and then once I leave, say it and not on your

17   side of the microphone.  But they're just for sound system.

18   Don't go on the record if you don't want to.  But it also helps

19   Mr. Stein here, and I tried to silence, or have the table

20   microphone silent so that the only microphones are the counsel

21   podium and this, but they still pick up.  So just be a word of

22   warning of the fun things in Room 311.

23         Go ahead.  I am sorry for interrupting.

24         MR. WINSTON:  Not a problem, Your Honor.  Thank you.

25   BY MR. WINSTON:

1  Q    Let me try it this way.  I think we covered, Mr. Stein,

2  that you are an experienced CRO and independent director in

3  bankruptcy cases, correct?

4  A    Yes.

5  Q    And in those capacities, you're generally familiar with

6  what the Bankruptcy Code provides for debtors, right?

7  A    Generally, yes.

8  Q    And, in fact, I asked you whether the Aearo debtors have

9  the benefit of the automatic stay and I believe you said yes.

10  A    Yes, you did ask me that question and I believe my

11  response was yes.

12  Q    Okay.  Now you're not a lawyer, right?

13  A    No, I am not.

14  Q    All right.  You have no reason to believe that 3M could

15  terminate the shared services agreement today without first

16  seeking relief from stay, correct?

17  A    To be clear, Counsel, are you referring to the shared

18  services agreement that exists between --

19  Q    I am.

20  A    -- 3M and the Aearo entities for the purposes --

21  Q    I am.

22  A    -- of providing business services?

23  Q    I am.  I do apologize.  Okay.  I'm still interrupting.

24  I'm sorry.

25       Mr. Stein, I was interrupting you.  Will you please

1 finish?

2 A    Please.  Thank you for clarifying.  Excuse me.

3      The answer is yes.

4 Q    Okay.  All right.  Let me switch topics.  I want to cover

5 a little bit more on how you got engaged in this engagement.

6      You became the independent director on June 13, 2022,

7 right?

8 A    Yes, I did, with Mr. Meltzer.

9 Q    And I believe you -- well, I don't think you -- I didn't

10 cover this actually yet, but the first draft of the funding

11 agreement, that was prepared by Kirkland and Ellis, correct?

12 A    Yes, that is correct.

13          MR. WINSTON:  Let's call up Exhibit AG, which I

14 believe has been admitted.

15          THE COURT:  It has, yes.

16 BY MR. WINSTON:

17 Q    Mr. Stein, can you see Exhibit AG?

18 A    Yes.

19 Q    And this is an email from Connor, I can't even read it.

20 This is what happens when my eyes are going.  A Kirkland

21 lawyer --

22          THE COURT:  Casas.

23 BY MR. WINSTON:

24 Q    Casas, thank you, to a large group of people including

25 attorneys from McDonald Hopkins, right?

1  A     Yes.

2  Q     And attached to this email is what you believe to be the

3  first draft of the funding agreement, correct?

4  A     Yes.

5  Q     And as of this date, June 24th, Kirkland and Ellis was

6  representing the Aearo debtors, right?

7  A     Yes.

8  Q     But Kirkland and Ellis had also been representing 3M at

9  least in the MDL, correct?

10 A     Yes.

11 Q     So when Kirkland and Ellis compared the draft funding

12 agreement, it could have been done at the direction of 3M,

13 right?

14         MR. McKANE:  Objection.  (Indiscernible) establish

15 foundation.

16         MR. WINSTON:  Your Honor, I just asked him if

17 Kirkland, who represented one or two parties.

18         THE COURT:  He could answer the question.

19         THE WITNESS:  I have no knowledge of anyone directing

20 Kirkland and Ellis in this capacity at all.

21 BY MR. WINSTON:

22 Q     And you did not direct Kirkland and Ellis to prepare this

23 draft, right?

24 A     No, I did not.

25 Q     And by June 24th, you and Mr. Meltzer had decided that

1  there was a conflict with respect to the funding agreement,

2  correct?

3  A    Yes.

4  Q    And, in fact, you had already hired McDonald Hopkins by

5  this date, right?

6  A    Yes.

7         MR. WINSTON:  In fact, let's call up Exhibit 138,

8  please.  This one I don't think has been admitted yet.

9  BY MR. WINSTON:

10 Q    Exhibit 138 is the omnibus meeting minutes for June 21,

11 2022.  Among others, it says, Mr. Stein, you attended this

12 board meeting.  Do you recall seeing these minutes before?

13 A    Yes.

14 Q    And, in fact, on your demonstrative, this was the first

15 entry on the demonstrative, the June 21st board meeting, right?

16 A    I do not recall because the demonstrative is not in front

17 of me, but I will take your comments at face value.

18         MR. WINSTON:  Your Honor, we move to have Exhibit 138

19 admitted into evidence.

20         THE COURT:  All right.  Any objection to the

21 admission of 138?

22         MR. McKANE:  No objection.

23         THE COURT:  All right.  Exhibit 138 is admitted.

24      (Debtors' Exhibit 138 is admitted into evidence)

25 BY MR. WINSTON:

1  Q    And if we scroll down on Exhibit 138, same page, just a

2  little bit, do you see also in attendance an attorney from

3  McDonald Hopkins?

4  A    Yes.

5  Q    As well as attorneys from Kirkland and Ellis, correct?

6  A    Yes.

7  Q    So by this date, you had your own counsel, right?

8  A    Yes.

9  Q    They attended the board meeting on your behalf, correct?

10 A    Not on my behalf since I was in attendance, but in

11 conjunction with me and Mr. Meltzer.

12 Q    Fair point, on behalf of the disinterested directors,

13 right?

14 A    Yes.

15 Q    And yet, three days later, Kirkland and Ellis is sending a

16 draft of the funding agreement and you did not authorize

17 Kirkland and Ellis to do so, right?

18 A    No, we did not.  That is correct.

19 Q    Yesterday on direct, we heard that this is not the only

20 case where you have been appointed as a fiduciary where

21 Kirkland and Ellis was also counsel to the company where you

22 were appointed, right?

23 A    Yes.

24 Q    You mentioned Whiting Petroleum, Westmoreland Coal, and it

25 said in my rough Phillip Energy Solutions.  I think he might

1  have meant Philadelphia Energy Solutions.  Is that correct?

2  A    Yes, it was Philadelphia Energy Solutions.

3  Q    Right.  So the three that you mentioned were Whiting

4  Petroleum, Philadelphia Energy Solutions, and Westmoreland

5  Coal, correct?

6  A    Yes.

7  Q    Now, you didn't mention TRU Taj, Toys "R" Us name, but in

8  that case you were an independent director and Kirkland was

9  company counsel, right?

10  A    Yes.

11  Q    And you didn't mention Intelsat.  That's another Kirkland

12  case, right?

13  A    Yes.

14  Q    And you were a fiduciary in that one?

15  A    I was during the pendency of the bankruptcy.

16  Q    Thank you for the clarification.

17       You also did not mention Nordic Aviation.  That's one

18  where you were a fiduciary and Kirkland was company counsel.

19  A    I thought I did mention that, but I will defer to the

20  transcript.  But regardless, I was and they were company

21  counsel.

22  Q    If it's in the transcript, I apologize for asking about it

23  again.  How about North Yard?  Did you mention that one?

24  A    I do not recall if I mentioned it or not.

25  Q    That's another fiduciary Kirkland case?

1  A    Yes.

2  Q    And last, Pedro North Atlantic (phonetic).

3  A    I believe I did mention that as well, yesterday.  But

4  nonetheless, yes.

5  Q    And that's one, you and I have fond memories of that one,

6  right, Mr. Stein?

7  A    Yes, we do, Mr. Winston.

8  Q    And it was a Kirkland and Ellis restructuring partner who

9  first contacted you regarding the possibility of serving as an

10 independent director for the Aearo debtors, right?

11 A    Yes.

12 Q    But you don't know whether he was contacting you on behalf

13 of 3M or on behalf of the Aearo debtors, right?

14 A    As I recall, when I was first contacted, the name of the

15 prospective company was not disclosed.  So no, it was not clear

16 to me in what capacity, either Aearo or 3M, was reflected in

17 that conversation.

18 Q    Now, the compensation for your services as an independent

19 director is $500,000 per year, right?

20 A    Yes.

21 Q    And that's paid quarterly in advance, yes?

22 A    Yes.

23 Q    So you've received some payments so far out of the

24 500,000?

25 A    Yes.

1  Q    Now, while you're serving as an independent director,

2  today, for the Aearo debtors, you're also currently serving as

3  the executive chairman of Tribune Resources, right?

4  A    Yes.

5  Q    Tribune Resources is another case in which Kirkland is

6  company counsel, right?

7  A    Yes.

8  Q    And you're also currently serving as an officer of LIBERTY

9  Steel, correct?

10 A    Yes, I am the chief restructuring officer of LIBERTY Steel

11 Group Holdings.

12 Q    And you're also currently an officer of GWG, right?

13 A    Yes, I am the chief restructuring officer of GWG Holdings.

14 Q    That's the case you mentioned yesterday in response to a

15 question about working with my firm, right?

16 A    No.

17 Q    No, I got that wrong.  Apologize.

18      I'll withdraw that question.

19      So right now, in addition to this role at $500,000 a year,

20 you have at least three other fiduciary duty roles, correct?

21 A    Yes.

22 Q    Are you being compensated for each of those three?

23 A    Yes.

24 Q    Now, you do know that 3M, under the LLC operating

25 agreement, has the power to remove you as a director if it so

Stein - Cross/Winston                                42

1  chooses to do so?

2  A     Yes.

3  Q     All right.  I want to go back to the indemnity obligation

4  in the funding agreement.

5        Now, under the funding agreement that you've signed with

6  the Aearo debtors, the Aearo debtors have agreed to indemnify

7  3M for any losses, as that term is defined in the funding

8  agreement, 3M incurs relating to the Combat Arms Earplug

9  liabilities, correct?

10 A     Yes.

11 Q     Now, we've covered this several times, but even if Aearo

12 has to pay 3M on account of an indemnity obligation, Aearo can

13 have 3M funded so that Aearo has the cash to then pay 3M for

14 that indemnity obligation, right?

15 A     Yes.

16 Q     And one of the beauties of the funding agreement you

17 negotiated is that if 3M gets funding -- sorry, if the Aearo

18 debtors get funding from 3M to pay 3M on account of an

19 indemnity obligation, the Aearo debtors have no obligation to

20 pay back the funding, right?

21 A     Yes.

22 Q     All right.

23            MR. WINSTON:  Let's go back to Exhibit 554.  That's

24 the July 23rd board minutes, and go to the McDonald Hopkins

25 presentation at Page 57.

Stein - Cross/Winston                                    43

1  BY MR. WINSTON:

2  Q    Mr. Stein, can you see this page okay?

3  A    Yes.

4  Q    Now, this is the page I believe you were shown yesterday

5  on direct, correct?

6  A    I believe it was one of the pages that I was shown

7  yesterday, yes, that is correct.

8  Q    All right.  Now, if you look at the resolution column on

9  the right, do you see the third bullet point?

10 A    Yes.

11 Q    Now, I don't think you were asked any questions about this

12 particular bullet point, so let me read it.

13     "The agreement to indemnify 3M was viewed as non-

14 substantive concession since 3M funding obligations of the

15 Aearo entities."

16     Did I read that right?

17 A    I'm not certain I understand your comment.  This is with

18 respect to, I believe, the Payor Affiliates in terms of the

19 non-substantive concession, so I want to make sure I understand

20 the question so I can respond properly.

21 Q    Okay.  Fair point.

22     So the second bullet point refers to "Aearo entities

23 agreed to indemnify the Payor Affiliates," right?

24 A    Without funding from Payor Affiliates, yes.

25 Q    Okay.  And that was viewed as a non-substantive concession

1  since 3M funding indemnity obligations of the Aearo entities,

2  right?

3  A    Yes.

4  Q    And that was the analysis of your counsel, correct?

5  A    Yes.

6  Q    And you did not agree with your counsel's analysis, right?

7  A    I'm sorry, Counsel, I could not hear that.  Could you

8  repeat it, please?

9  A    Sure.

10      You did not disagree with your counsel's analysis, right?

11 A    No, I did not.

12 Q    So undertaking an indemnity obligation to 3M's affiliates,

13 that was viewed as a non-substantive concession because of the

14 way the funding agreement works, right?

15 A    No, I would not categorize it that way.  The non-

16 substantive concession was with respect to the fact that we

17 were extending in this agreement the indemnification to the

18 Payor Affiliates without a corresponding obligation for the

19 Payor Affiliates to fund.

20 Q    Got it.

21      MR. WINSTON:  All right.  Let's go back to the

22 funding agreement itself, Exhibit 2, please.

23      And if we could go to, I believe it's Page 5, which

24 has the definition of losses.

25 BY MR. WINSTON:

Stein - Cross/Winston                               45

1  Q    Do you see the definition of losses, Mr. Stein?

2  A    Yes.

3  Q    Now, this is for purposes of the indemnification of 3M's

4  losses that would trigger the indemnity obligation, right?

5  A    I believe so, but I would need to review in the context of

6  the entire document.  But for now, I will take that statement

7  at face value.

8  Q    Okay.  And losses includes judgments, correct?

9  A    Yes.

10 Q    And reasonable attorney fees?

11 A    Yes.

12 Q    So for any of the defense costs in the MDL, the Aearo

13 debtors have agreed to indemnify 3M, right?

14 A    Yes.

15 Q    And if 3M actually pays any bellwether plaintiff who has

16 prevailed in a jury trial, the Aearo debtors would indemnify 3M

17 for that payment as well, correct?

18 A    Under the funding agreement, that is correct.

19 Q    The definition of losses in the funding agreement does not

20 exclude a judgment resulting from 3M's gross negligence, does

21 it?

22 A    Excuse me.  I'm sorry, Counsel, can you repeat that

23 question please?

24 A    Sure.

25      The definition of losses does not exclude a judgment

1  resulting from 3M's gross negligence, does it?

2  A    No, not as I read the plain language.

3  Q    And it doesn't exclude a judgment resulting from 3M's

4  fraud, does it?

5  A    Again, no, not as I read the plain language.

6  Q    There have been plaintiff verdicts in several of the

7  bellwether trials with the Combat Arms Earplugs, correct?

8  A    To my knowledge, yes, that is correct.

9  Q    Now, you haven't reviewed any of the verdict forms, right?

10 A    No.

11 Q    So when you agreed to this indemnity definition of loss,

12 you hadn't done so in the context of looking at any verdict

13 forms, right?

14 A    No, not specifically.

15 Q    All right.

16        MR. WINSTON:  Let's call up Exhibit CO, please.

17 BY MR. WINSTON:

18 Q    What has been marked as Exhibit CO is the verdict form for

19 plaintiff Luke Estes in the District Court for the Northern

20 District of Florida, the MDL case.  Now, you've not seen this

21 before, right?

22 A    No, I have not.

23 Q    Now, you have some general familiarity of the existence of

24 the bellwether trials, correct?

25 A    Generally, yes.

Stein - Cross/Winston                              47

1  Q    Do you know anything about Mr. Estes' military service

2  history?

3  A    No, I do not.

4  Q    Do you have any idea if he went to West Point?

5  A    No, I do not.

6  Q    Or his rank?

7            MR. McKANE:  Objection, Your Honor.  He's already

8  said he doesn't know.  This is just -- he already established

9  he doesn't have the foundation for the question.

10            THE COURT:  All right.

11            And your response?

12            MR. WINSTON:  I can move on.  I'll withdraw the

13  question.

14  BY MR. WINSTON:

15  Q    If you could turn to Page 2 of the verdict form.

16       Do you see where it says plaintiff's claim?

17  A    Yes.

18  Q    Do you see where it says in Number 6, fraudulent

19  misrepresentation?

20  A    Yes.

21  Q    And it's been checked proven, right?

22  A    Yes.

23  Q    And do you see where it says fraudulent concealment in

24  Item 7?

25  A    Yes.

Stein - Cross/Winston                                      48

1  Q    That's also been proven, correct?

2  A    Yes.

3  Q    If you can turn back to Page 1, it says "We, the jury, in

4  the above entitled and numbered case, unanimously find by a

5  preponderance of the evidence, as follows on Plaintiff's Luke

6  Estes' claims and 3M's affirmative defenses, based on the

7  Court's instructions on the law and the evidence."

8       Do you see that?

9  A    Yes.

10 Q    Do you have any understanding today, having read this

11 verdict form, that the Aearo debtors have indemnified 3M for

12 fraudulent misrepresentation and fraudulent concealment?

13 A    I'm sorry, Counsel, I don't believe I understand the

14 question.

15 Q    Having read this verdict form today, did you realize that

16 the Aearo debtors are indemnifying 3M for fraudulent

17 misrepresentation and fraudulent concealment?

18       MR. McKANE:  And I object to the form of the

19 question.  He can ask if he has an understanding at all, but

20 with it as phrased, he's asking him to make a legal conclusion

21 about the jury form, the verdicts that were rendered that are

22 on appeal, and an application of the term "loss" without

23 looking at any of the provisions of the funding agreement.

24 That requires legal analysis on multiple levels.

25       MR. WINSTON:  Happy to rephrase for his

1 understanding.

2          THE COURT:  Go ahead.

3          MR. WINSTON:  Okay.

4 BY MR. WINSTON:

5 Q    Is it your understanding, based upon your negotiations of

6 the funding agreement, your extensive diligence over the month

7 from which you are appointed to the petition date, and having

8 looked at this verdict form, is it your understanding that the

9 Aearo debtors are indemnifying 3M for fraudulent

10 misrepresentation and fraudulent concealment?

11 A    It is my understanding that under the funding agreement,

12 the Aearo debtors are indemnifying 3M for all of the Combat

13 Arms liabilities, whatever results therefrom.

14 Q    And that would include fraudulent concealment and

15 fraudulent misrepresentation if it is determined that 3M

16 engaged in fraudulent concealment and fraudulent

17 misrepresentation, correct?

18          MR. McKANE:  Same objection.

19 BY MR. WINSTON:

20 Q    That's your understanding.

21          Is that your understanding, Mr. Stein?

22 A    As I just testified to, whatever results therefrom.

23 Q    Okay.  But the good thing that you negotiated in the

24 funding agreement is that whatever that dollar amount may be

25 for fraudulent concealment and fraudulent misrepresentation,

1  the Aearo debtors can simply ask 3M to pay for it, right?

2  A     Again, as I testified to, the funding agreement provides

3  indemnification for all Combat Arms litigation claims in

4  exchange for uncapped funding to pay any legitimate liabilities

5  resulting therefrom.

6  Q     All right.

7        Let's switch to a different indemnity.  Yesterday, you

8  testified that prior to the petition date, sorry, prior to

9  signing the funding agreement, there was an existing indemnity

10 obligation on behalf of the Aearo debtors in favor of 3M,

11 right?

12 A     Yes.

13 Q     You testified that you believe that this indemnification

14 was contained within the Aearo debtor LLC agreements, correct?

15 A     I do not recall exactly what I testified to other than the

16 fact that there is an existing indemnification provision within

17 the Aearo entity LLC agreements.

18 Q     And you were showed an example of the LLC agreement

19 indemnity provisions, correct, yesterday?

20 A     Yes.

21 Q     And you testified in response to a question by Mr. McKane

22 that to your knowledge, 3M has never sought indemnity under any

23 LLC agreement, correct?

24 A     To my knowledge, yes, that is correct.

25 Q     But you believe, or at least believed as of entering into

Stein - Cross/Winston                              51

1  the funding agreement, that there was no assurance or guaranty

2  from 3M that it would not seek indemnity under those LLC

3  agreements, right?

4  A    Yes.

5  Q    And you testified yesterday that the issue of

6  indemnification came up in your negotiations with 3M, correct?

7  A    Yes.

8  Q    Now, to be clear, you personally did not have any direct

9  communications with a 3M representative over the funding

10 agreement, right?

11 A    No, I did not.

12 Q    It all went through your counsel.

13 A    Yes.

14 Q    Now, that issue of indemnity that came up, did the issue

15 of the 2013 LLC indemnity come up?

16 A    I'm sorry, Counsel, can you repeat that please?

17 Q    Sure.

18      So when you talked about the issue of indemnity coming up

19 in the negotiations with 3M, did that include the 2013 LLC

20 agreement -- indemnity?

21 A    I do not recall the specificity of the dates.

22 Q    I see.

23      Isn't it true, sir, that the existence of the 2013 LLC

24 agreement is not referenced in the declaration you filed in

25 support of the preliminary injunction motion on day one of

Stein - Cross/Winston                              52

1  these cases?

2  A    No, it is not.

3  Q    And is it also not true, sir, that the existence of this

4  indemnity is not referencing Mr. Castellano's first day

5  declaration in support of this motion?

6           MR. McKANE:  Yeah, I'm going to ask him to rephrase.

7  Objection to the form of the question.  It's a double negative

8  with the "also not true that," it is hard to --

9           MR. WINSTON:  You know, that wasn't a gold star

10 question.  Let me try again.

11                          (Laughter)

12 BY MR. WINSTON:

13 Q    Mr. Castellano's first day declaration, you've reviewed

14 that before, right?

15 A    Yes.

16 Q    And I think you may have even incorporated that first day

17 declaration or cited to it in your first day declaration in

18 this adversary, correct?

19 A    As I recall, I believe that is correct.

20 Q    But that declaration, Mr. Castellano doesn't make any

21 reference to the 2013 LLC agreement, does it?

22 A    Not to my knowledge.

23 Q    And it's also not referenced once in the very lengthy

24 informational brief that the Aearo debtors filed on day one,

25 correct?

Stein - Cross/Winston                                     53

1   A    Again, not to my knowledge.

2   Q    And in the McDonald Hopkins' presentation that you relied

3   upon on July 23rd to vote in favor of the funding agreement,

4   that makes no mention of the 2013 LLC agreement, correct?

5   A    No, it does not.  Yes, that is correct.

6   Q    And in every single one of the board meetings you attended

7   where there are board minutes, none of those mention the 2013

8   LLC agreements expressly, correct?

9   A    To my recollection, no, they were not mentioned

10  specifically in the board meetings, so yes, that is correct.

11           MR. WINSTON:  Let's go back to Exhibit 37, please.  I

12  think this one is admitted into evidence.

13           THE COURT:  It was.

14           MR. WINSTON:  Thank you, Your Honor.

15  BY MR. WINSTON:

16  Q    Exhibit 37, Mr. Stein, is the LLC agreement I believe you

17  were showed yesterday.  Do you recognize this?

18  A    Yes.

19           MR. WINSTON:  And if we can go to Section 20(b).  I

20  apologize to my helpful folks who I don't have a page number.

21           UNIDENTIFIED SPEAKER:  Seven, rolling over to eight.

22           MR. WINSTON:  Thank you, Mark.

23  BY MR. WINSTON:

24  Q    So we're calling out Subsection (b) of Section 20.

25       Mr. Stein, you're going to recognize this language, right?

Stein - Cross/Winston                              54

1  A    Yes.

2  Q    In your experience as a CRO and independent director, this

3  is pretty standard language in LLC operating agreements,

4  correct?

5  A    Yes.

6  Q    So in this definition, in order for there to be indemnity,

7  the covered person has to act in good faith on behalf of the

8  company, right?

9  A    Yes.

10 Q    And it has to be in a manner reasonably believed to be

11 within the scope of the authority conferred on such covered

12 person by this agreement, correct?

13 A    Excuse me.

14      Yes.

15 Q    Do you know, Mr. Stein, about a Qui Tam litigation

16 involving 3M?

17 A    I'm sorry, Counsel, can you repeat that please?

18 Q    Sure.

19      Do you know about a Qui Tam lawsuit against 3M?  Do you

20 know about that?

21 A    I heard the entire question, Counsel, with the exception

22 of the name of the entity with respect to the litigation.  That

23 was very difficult for me to hear.

24 Q    I apologize.  So let me repeat it.

25      Are you aware of a Qui Tam lawsuit against 3M?

1  A    No, I do not believe so.

2  Q    All right.

3      In your diligence of Aearo's books and records before the

4  bankruptcy, did you ever find any evidence or communications

5  where 3M sought indemnity on account of a settlement with the

6  United States Government?

7  A    No, not to my recollection.

8  Q    Okay.  This Section 20(b), this excludes from indemnity

9  any loss, damage, or claim incurred by such covered persons by

10 reason of such covered person's bad faith or willful misconduct

11 with respect to such acts or omissions.

12      Do you see that language?

13 A    Yes.

14 Q    That language is not in the funding agreement's definition

15 of loss, is it?

16 A    I'm sorry, Counsel, can you repeat that statement, please?

17 Q    Sure.

18      The language that I just read to you, that language

19 doesn't find itself in the funding agreement's definition of

20 losses, correct?

21 A    No, it does not.  That is correct.

22 Q    Is there a reason why if the 2013 LLC agreement was in any

23 way relevant to you before the petition date, why the language

24 in these LLC agreements was not copied into the funding

25 agreement?

1  A    I believe that when Mr. Meltzer and I were deliberating on

2  the matter and engaging with legal counsel, what we examined

3  was the existence of this indemnification provision and whether

4  or not there was a possibility that the outstanding Combat Arms

5  claims could be covered and then incorporating that into

6  whether or not they were willing to provide, as I believe I

7  testified to you yesterday, this much broader indemnification

8  (indiscernible), which is something that 3M wanted in exchange

9  for providing the uncapped funding but ultimately relied on the

10 final indemnification language of the funding agreement, which

11 ostensibly supersedes now the language in the LLC agreement.

12 Q    And based upon your answer that you had these discussions

13 with Mr. Meltzer and your counsel, it nonetheless never showed

14 up in any email, in any board minutes, or in the McDonald

15 Hopkins' presentation, or in any first day papers, did it?

16 A    No, it did not to my recollection.

17 Q    All right.

18      One more topic I'd like to cover with respect to the

19 funding agreement and then, hopefully, we will be finished.

20          MR. WINSTON:  Can we go back to Exhibit 2, please?

21          And go to Page 6.

22 BY MR. WINSTON:

23 Q    Do you need some water, Mr. Stein, by the way.  I haven't

24 asked --

25 A    (Indiscernible), actually.

Stein - Cross/Winston                                    57

1  Q    I apologize.

2  A    Thank you, Counsel.

3  Q    Do you have the big glass today?  The big mug?

4           THE COURT:  It's a stein.

5           THE WITNESS:  No, not today.  Only tea today,

6  Mr. Winston.  No coffee.

7           MR. WINSTON:  Okay.

8           THE COURT:  I think Mr. Stein's missing my dad jokes

9  in here.

10                          (Laughter)

11 BY MR. WINSTON:

12 Q    So starting on Page 6 is the definition of permitted

13 funding use, correct?

14 A    Yes.

15 Q    And this was a pretty heavily negotiated provision, right?

16 A    Yes.

17 Q    And there is a Subsection (a) and then there's a

18 Subsection (b), right?

19 A    Yes.

20 Q    Subsection (b) is the one that ensures that any of Aearo's

21 liabilities, one way or another, will be paid in full, correct?

22 A    Yes.

23 Q    Now, I'd like to focus on romanette (i) since I don't

24 think it was brought up in direct yesterday.  Romanette (i),

25 that's one of the things you bargained for in negotiating the

1  funding agreement, correct?

2  A    Yes, Counsel.  But I would like to read the language if

3  you're going to ask me questions about it.

4  Q    More than happy to do so.

5                    (Witness reads language)

6         THE WITNESS:  Counsel, thank you.  Please proceed.

7  BY MR. WINSTON:

8  Q    And one of the aspects of romanette (i) is if there's a

9  final binding settlement agreement executed by any company

10 party with respect to any subject liability, this is a

11 permitted funding use with 3M's dollars to pay, correct?

12 A    Under the terms of the funding agreement, yes, that is

13 correct.

14 Q    And company party includes the Aearo debtors, right?

15 A    I believe so, although I do not recall the exact

16 specificity of the definition.

17 Q    Okay.  And subject liability, that clearly includes the

18 Combat Arms Earplug claims, correct?

19 A    Yes.

20 Q    But this power only exists if there's no bankruptcy case

21 pending, correct?

22 A    I assume, Counsel, you're referring to subject liability?

23 Q    No, I'm actually referring --

24 A    I don't think I understand the question.

25 Q    -- to the first clause.  The first clause of romanette (i)

1  says, "At any time when there is no bankruptcy case pending,"

2  and then the rest follows.  Do you see that?

3  A    Yes.

4  Q    So it's your understanding of the agreement that you

5  negotiated and signed that romanette (i) applies if there's no

6  bankruptcy case pending, right?

7  A    Yes.

8  Q    You would agree with me that this clause, this

9  romanette (i), gave the Aearo debtors quite a bit of power to

10  try to settle the Combat Arms Earplug claims outside of

11  bankruptcy, right?

12  A    I believe it provides significant flexibility in relation

13  to considering alternate paths to resolve the claims and the

14  case.

15  Q    And this power, had you decided to use it, might have

16  achieved that global resolution you talked about on direct

17  yesterday, right?

18  A    It's a hypothetical, so it's difficult for me to

19  speculate.  But presumably, the answer is yes, then, and may

20  very well be yes, now.

21  Q    Now, we're in bankruptcy now so this clause doesn't apply

22  anymore, right?

23  A    The specificity of the clause does not apply.  But the

24  possibility of negotiating alternate resolutions within the

25  bankruptcy does apply.

Stein - Cross/Winston                                          60

1  Q    And when you signed the funding agreement, or before you

2  signed the funding agreement, you never considered contacting

3  the claimant's representatives -- let me withdraw that and try

4  that again.

5       After signing the funding agreement, you never considered

6  contacting the claimants' representatives to inform them that

7  you now had the power to negotiate and potentially enter into a

8  final binding settlement and 3M would be on the hook for it,

9  did you?

10 A    I'm sorry, can you repeat the question please?

11 Q    After signing the funding agreement, you never considered

12 contacting the claimants' representatives to inform them that

13 you now have the power to enter into a final binding settlement

14 agreement and 3M would be on the hook for it, did you?

15 A    I do not believe that we considered that course of action

16 at that time.

17 Q    And you signed this on July 25th, right?

18 A    Yes.

19 Q    And sometime on July 25th, the Aearo debtors' board

20 authorized the bankruptcy filing, right?

21 A    Yes.

22 Q    And the Aearo debtor's board never considered exercising

23 this power in connection with authorizing the bankruptcy

24 filing, did it?

25 A    No, not to my recollection.

Stein - Cross/Winston                                            61

1  Q    And, in fact, between the time of the signing of the

2  funding agreement and the board resolution, minutes, hours, not

3  a lot of time to even consider whether to exercise this power,

4  correct?

5  A    I do not recall the exact number of hours, but it was a

6  relatively brief period.

7  Q    And the next morning, July 25th, the Aearo debtors filed

8  for bankruptcy, right?

9  A    Yes.

10 Q    And once there's a bankruptcy filing, at least if I read

11 this clause correctly, this power under romanette (i) goes

12 away, right?

13 A    The specificity of that power specifically is no longer

14 relevant.

15 Q    Instead, we fall under romanette (ii), which means in

16 order to get the funding under the permitted funding use, it

17 has to be funded through a trust under a confirmed plan, right?

18 A    Yes.

19 Q    From the time that you were appointed to the debtors'

20 board -- let me start it over because I think you were

21 coughing.

22      From the time that you were appointed to the debtors'

23 board on June 13th through July 25th, there wasn't anything

24 pressing that required the Aearo debtors to file for bankruptcy

25 on July 26th, right?

Stein - Cross/Winston                          62

1  A    There were no exigent circumstances other than
2  contemplating, as a fiduciary, what course of action was going
3  to maximize the value of the enterprise on a risk-adjusted
4  basis.
5  Q    And let me just make sure I get an answer to the question
6  that I asked.   There was nothing pressing between your
7  appointment on June 13th and the bankruptcy filing date on
8  July 26th.
9        MR. McKANE:   Objection.   Asked and answered.   He said
10 there were no exigent circumstances.
11       THE COURT:   He did say that.
12       MR. WINSTON:   Okay.
13 BY MR. WINSTON:
14 Q    Was there a specific reason the companies had to file on
15 July 26th?
16 A    No, there was no specific reason other than the
17 determination that this course of action represented the value
18 maximizing path forward for the company.
19 Q    Was there anything that happened between July 12th and
20 July 26th that you can recall that prompted the company to file
21 for Chapter 11?
22 A    I do not recall any specific exigent circumstances outside
23 of the scope of what I testified to previously in regard to the
24 discharge of my duties.
25 Q    Now, the Aearo debtors don't have any funded debt, right?

Stein - Cross/Winston                                    63

1  A     I'm sorry, Counsel, can you repeat that please?

2  Q     Sure.

3        The Aearo debtors do not have any funded debt?

4  A     No, they do not.

5  Q     And they were not in default under any contracts as far as

6  you are aware, correct?

7  A     To my knowledge, no.

8  Q     3M had not threatened to terminate the shared services

9  agreement between June 13th and the petition date, correct?

10 A     To my knowledge, no.  Yes, that is correct.

11 Q     And in that same time frame, 3M had not threatened to cut

12 off funding of defense costs in the MDL.

13 A     To my knowledge, no, they did not.  Yes, that is correct.

14 Q     Now, you do know that the debtors have projected the costs

15 of administrations of these Chapter 11 cases is likely to be

16 tens of millions of dollars, correct?

17 A     Yes.

18 Q     In fact, in the funding agreement, there's a line item in

19 the commitment for $240 million for administrative costs,

20 correct?

21 A     Yes.

22 Q     And you testified yesterday that on July 25th, the board

23 considered two options, bankruptcy or what you testified as the

24 status quo, correct?

25 A     Yes.

1 Q    And of these two options, it chose the bankruptcy option,
2 right?
3 A    Yes.
4 Q    So the option, as I think we've confirmed, that was not
5 considered was using that romanette (i) power under the funding
6 agreement, correct?
7 A    At that time, no, that particular power was not
8 contemplated.
9 Q    Now, under the status quo as you understand it, Aearo does
10 not actually pay for any of the litigation costs in the MDL,
11 correct?
12 A    To my knowledge, Aearo, to date, has not funded any of
13 those costs directly.
14 Q    Okay.  Just a few more questions, then I'll be done.
15     You have been informed, Mr. Stein, that one of the Aearo
16 debtors' assets is a receivable due from 3M, correct?
17 A    Yes.
18 Q    That receivable is hundreds of millions of dollars, right?
19 A    Yes.
20 Q    So given the funding agreement obligations and given the
21 receivable, 3M is a net debtor to the Aearo debtors, right?
22 A    I'm sorry, can you repeat the question, please?
23 Q    Sure.
24     Given the way the funding agreement works and given the
25 existence of the receivable, 3M is a net debtor to the Aearo

1  debtors, correct?

2  A    Yes.

3  Q    And even though 3M is a net debtor to the Aearo debtors,

4  you have favored extending the automatic stay to 3M over the

5  objections of actual creditors to the Aearo debtors, correct?

6  A    I'm not suggesting anything other than the fact that I'm

7  here in support of the relief that we're seeking today.

8  Q    Now, under the funding agreement operations that we went

9  through yesterday, in order to access the funding, the Aearo

10 debtors have to first use their own assets, right?

11 A    Yes.

12 Q    That includes the receivable, correct?

13 A    I believe the receivable is one of the assets that would

14 be available for that purpose.

15 Q    So before the Aearo debtors would need funding from 3M

16 under the funding agreement, it could demand 3M to pay the

17 receivable to the Aearo debtors, correct?

18 A    I believe that Aearo would have the right to request

19 repayment but I do not know specifically if there are any other

20 terms or conditions surrounding the transactions that gave rise

21 to the receivable that might need to be incorporated into any

22 such deliberations before rendering that request.

23 Q    And on the first day of these cases, the Aearo debtors

24 filed this adversary proceeding, which has taken a few extra

25 days, to seek to enjoin all the Combat Arms Earplug cases,

66

1  correct, the first day?

2  A    Yes.

3  Q    But not on the first day did the the Aearo debtors demand

4  3M turn over the receivable that is on 3M's books and records

5  have the Aearo debtors?

6  A    No, they have not.  That is correct.

7  Q    And you, as one of the two disinterested and independent

8  directors, have not deliberated with the board on whether to

9  even make that demand, have you?

10  A    As of this time, no, we have not.

11  Q    The Bankruptcy Code has a lot of tools in it that favor

12  debtors, doesn't it?

13  A    I believe the Bankruptcy Code is very broad and has a

14  large number of tools that can be utilized for numerous

15  purposes.

16  Q    And one of those tools is demanding turnover of estate

17  property from this, and bring that action in front of this

18  Court, correct?

19  A    I believe so but would really need to defer to legal

20  counsel whether or not that would be a viable option under the

21  Code.

22          MR. WINSTON:  No further questions, Your Honor.

23          THE COURT:  All right.

24          Mr. McKane, do you have redirect?

25          MR. McKANE:  I do have redirect.

```
 1              THE COURT:  Well, let me ask.  How long is redirect?
 2              MR. McKANE:  Well, what I was going to suggest is
 3    since we've gone about an hour and a half, if I could have a
 4    few minutes and allow Mr. Stein to maybe take a break to get
 5    some water --
 6              THE COURT:  I wouldn't mind a little bit of time,
 7    either, because my computer crashed five minutes into this,
 8    because it's a Monday for this courtroom.  So it's not a big
 9    deal but it would be nice if at least IT could work on it.
10              Why don't we break and meet again at 9:45.  That
11    gives Mr. Stein enough time to drink out of his stein --
12                          (Laughter)
13              THE WITNESS:  Thank you, Your Honor.
14              THE COURT:  And get a break and let's reconvene.
15                          (Recess)
16              THE COURT:  I've been told by my IT bureau that every
17    thing's better now.
18              Let's find out.
19              All right.  Are we ready, everyone?
20              UNIDENTIFIED SPEAKER:  Yes, Your Honor.
21              THE COURT:  All right.
22              Plaintiff folks, are you ready?
23              UNIDENTIFIED SPEAKER:  Yes, Your Honor.
24              THE COURT:  All right.
25              Don't go up (indiscernible).  Mr. McKane.
```

68

1          MR. KELLER:  Your Honor?

2          THE COURT:  Yeah.  Can I call the case first?  Thank

3     you.

4          All right.  We're back on the record in Adversary

5     Number 22-50059.  We have completed the cross-examination by

6     Mr. Winston of Mr. Stein who is continuing to be a witness.

7          My understanding is Mr. Keller raised his hand on

8     Zoom, which I couldn't tell because my computer died.  But I'm

9     back now.  So let's go on the record.

10         Mr. Keller?

11         MR. KELLER:  Thank you, Your Honor.

12         For the record, Ashley Keller from Keller Postman.

13         Before you went to redirect, I just wanted to ask

14    permission for a very short probably five-minute cross-

15    examination of this witness.

16         THE COURT:  Now the difficult thing is that you're

17    via Zoom.  Are you in the courthouse or are you just attending

18    remotely completely?

19         MR. KELLER:  I'm remote, unfortunately, Your Honor.

20    I couldn't stay for the third day of festivities.  But my

21    understanding was that you were allowing participation by Zoom.

22    I'm sorry if that understanding was incorrect.

23         THE COURT:  Well, I believe I said -- and correct me

24    if I'm wrong, anyone, because this was at a status conference

25    -- that to the extent anyone -- any witnesses or anyone asking

1  questions should attend live and in person absent COVID just

2  because of technical issues which, of course, I've demonstrated

3  myself today that I have.

4        That's my recollection of what I said.  But I will

5  ask the parties in the courtroom if they can confirm that

6  because I had slept since then and read one or two pages of the

7  documents and I could be mistaken of what I said.

8        So I'll ask a representative of the debtors and a

9  representative of the claimant able to see if that recollection

10  is correct or if I'm mistaken?

11        MR. McKANE:  Your Honor, for the record Mark McKane,

12  Kirkland & Ellis, proposed counsel for the debtors.  I did

13  represent the debtors in that status conference and that is my

14  recollection, as well.  I don't have the transcript in front of

15  me either, which can be checked, but that is my --

16        THE COURT:  Well, I know everyone has transcripts, so

17  that's why I thought I'd ask my question, so.

18        MR. PFISTER:  Your Honor, Rob Pfister from the Klee

19  Tuchin firm on behalf of the claimants.  That is also my

20  recollection that it was very clear that if anyone wanted to

21  question the witness, it would have to be live and in the

22  courtroom.

23        THE COURT:  Okay.  So -- and thank you, Mr. Pfister.

24        Let me ask you this, Mr. Keller.  To what -- if you

25  were to ask your brief questions of Mr. Stein, what is the

1    subject area of which you would inquire?

2           MR. KELLER:  The appeals in the Eleventh Circuit.

3           THE COURT:  Well, and let me ask this.  Do you think

4    that he would have relevant knowledge to that inquiry?

5           MR. KELLER:  I think he would for the limited purpose

6    that I'm trying to elicit testimony.

7           THE COURT:  All right.  Let's do something I haven't

8    done before.  What question do you anticipate asking him?  I'll

9    just come out right on and ask.  Let's just --

10          MR. KELLER:  I'm sorry, Your Honor.  You want to me

11   just tell you the questions I proposed to ask?

12          THE COURT:  Yeah.  It's like a preview.  If you were

13   to do this, what would I be hearing in mere moments?

14          MR. KELLER:  Sure.

15          THE COURT:  And I'll tell you whether I think that

16   makes sense so you can go forward as an exception to what my

17   rule was or if, in fact, that I don't think it's relevant and

18   by the way it would violate my rule of having people in the

19   courtroom absent COVID.

20          So go ahead.  What would you ask understanding this

21   is a question not to Mr. Stein.  This is you telling the Court

22   what you intend to ask.

23          MR. KELLER:  Understood, Your Honor.

24          I intend to ask whether he's aware that there are

25   appeals pending in the Eleventh Circuit, whether he's aware of

1  who has been retained for 3M and the debtors in the Eleventh

2  Circuit, whether he's aware that the appeals are almost fully

3  briefed and that only a reply brief is left to be filed, and if

4  he's aware of the total 300 million that he testified on direct

5  that 3M had already spent on the CAEv2 litigation, how much

6  would be left to be spent to complete full briefing in the

7  Eleventh Circuit so that the Eleventh Circuit, if Your Honor

8  decided to modify any injunction if you entered one, would be

9  able to issue dispositive decisions reviewing Judge Rogers'

10  final orders.

11          THE COURT:  Okay.

12          MR. HUSNICK:  May I be heard, Your Honor?

13          THE COURT:  You may.  And I've been really negligent

14  of saying this because we're in such tight quarters.  Please

15  state your name for the record again as we speak so that there

16  is a reference in the record.

17          MR. HUSNICK:  Chad Husnick, Kirkland & Ellis,

18  appearing on behalf of the Aearo debtors.

19          Your Honor, at this moment in time, the Eleventh

20  Circuit has issued a docket entry staying those appeals.  And

21  so what in effect Mr. Keller is trying to do through a back-

22  door objection to the lift -- or to the preliminary injunction

23  motion is trying to get a carve out almost a lift-stay relief.

24          There's a proper method for doing that which is a

25  motion to lift the automatic stay, and we can have that

1 conversation at that time.  I don't think there's any relevance

2 to this line of question.

3              THE COURT:  Okay.

4              MR. KELLER:  Could I respond, Your Honor?

5              THE COURT:  Well -- is that -- that's a really

6 tentative hand raise, Mr. Winston.  Would you like to speak

7 first?

8              MR. WINSTON:  Your Honor, I'm going to do something

9 just because I think it's right as an officer of the Court.

10             I did ask the question whether Mr. Stein had read the

11 appellate brief, and he answered he hadn't, to the extent that

12 would inform Your Honor.

13             THE COURT:  No, you did.  And I think I know what the

14 answers are going to be on this, but in your defense, Mr.

15 Keller, you did raise this in your objection and -- among other

16 forms of relief that the Court could tailor in theory any

17 preliminary injunction to be.

18             I made a couple of exceptions already.  And with the

19 admonishment that this was supposed to be a one-day trial and

20 it's gotten longer, but I did state that if you should be live

21 and I know you have other people in your firm that could have

22 been here and asked these questions and the fact that we did

23 have a separation of witnesses and I think your witness was

24 there all the first day.

25             But, nonetheless, you can ask these brief questions

1  with regard to the Eleventh Circuit appeal because I think it's

2  going to be pretty quick, based upon what has already been

3  asked and answered by the witness.  But out of an abundance of

4  due process caution, I will allow you to do it briefly with the

5  understanding that if I think we've gone beyond, absent any

6  objection of a party, I will cut you off.

7              Is that acceptable to you, Mr. Keller?

8              MR. KELLER:  It most certainly is, Your Honor.

9              THE COURT:  Okay.

10             MR. KELLER:  And I appreciate both your indulgence

11  and apologize for misunderstanding the scope of your orders.

12             THE COURT:  All right.  And, Mr. Stein, have you

13  heard my colloquy with Mr. Keller?

14             THE WITNESS:  Yes, I have, Your Honor.

15             THE COURT:  Okay.  The main reason for that question

16  is can you actually hear him talk?

17             THE WITNESS:  Yes, I can, Your Honor.

18             THE COURT:  Because I'm happy to help a little bit,

19  but I've had people want me to relay questions before and that

20  is not really my job because I'm not very good at it.

21             All right.  We are back on the record.  A reminder,

22  Mr. Stein, you continue to be under oath.  This is day two of

23  your testimony.

24             Mr. Keller, you may ask your brief list of questions

25  regarding the Eleventh Circuit appeal.

 1              MR. KELLER:  Thank you, Your Honor.

 2                          CROSS-EXAMINATION

 3 BY MR. KELLER:

 4 Q    Mr. Stein, you recall during your direct examination that

 5 you said you knew 3M had spent over $300 million on legal fees

 6 and costs associated with the CAEv2 litigation.  Right?

 7 A    Yes.

 8 Q    Are you aware that the debtors as well as 3M have filed

 9 appeals of final judgments in the United States Court of

10 Appeals for the Eleventh Circuit?

11 A    I'm generally aware --

12              MR. HUSNICK:  Objection to form.  Mr. Keller, I

13 believe you meant orders, not judgments.

14              MR. KELLER:  No.  I meant judgments.  The appeals are

15 of judgments, Your Honor.

16              THE COURT:  I'll allow the question.

17              THE WITNESS:  I'm generally aware of the fact that

18 there are numerous cases outstanding, several of which are on

19 appeal.

20 BY MR. KELLER:

21 Q    And are you aware the debtors and 3M have retained Paul

22 Clement as counsel of record in the Eleventh Circuit appeals?

23 A    No.  I am not.

24 Q    Do you have any basis and knowledge to know who Paul

25 Clement is?

1  A    No.  I do not.

2  Q    So you've never heard of him?

3  A    I'm sorry.  Can you repeat that, please?

4  Q    So you've never heard of Paul Clement?

5  A    No.  I am not familiar with Paul Clement.

6  Q    If I told you that he was the former solicitor general of

7  the United States, would that --

8            THE COURT:  Hang on.  Hang on.  Mr. Keller?

9            MR. KELLER:  Yes, Your Honor.

10           THE COURT:  Why?  What are we doing?  He said he

11  doesn't know who he is.  Whether that' shocking to the

12  conscience or not isn't really relevant.  I don't know who he

13  is.  But I thought we were focusing on the amount paid, where

14  the judgments were, the status of the appeal.  That's what you

15  told me you were going to ask, so that's what I'm holding you

16  to.

17           So as exciting as this topic may be to you right now,

18  we're not going any further.  You may proceed.

19           MR. KELLER:  Okay.  That's fine.  I'll move on.

20  BY MR. KELLER:

21  Q    Are you aware that debtors and 3M have already filed their

22  opening briefs in the Court of Appeals for the Eleventh

23  Circuit?

24  A    No.  I'm not familiar with that specific appeal.

25  Q    Okay.  You said that you have experience with multi-

1  billion-dollar litigation.  Just based on your own knowledge,

2  do you have a sense of what it would cost to file a reply brief

3  in a high stakes case on appeal?

4  A    I know it's costly but could not give you an order of

5  magnitude.

6  Q    Well, in comparison to the $300 million that 3M's already

7  spent in legal fees associated with the CAEv2 litigation, do

8  you have a basis to say that it would be a relatively de

9  minimis amount compared to that figure?

10 A    I would inquire with legal counsel to get an estimate and

11 with that estimate would be able to respond to the question.

12 But outside of that, I'm not able to note affirmatively that it

13 would be de minimis or not.

14 Q    Okay.

15         MR. KELLER:  Thank you, Your Honor.  I have nothing

16 further, and I appreciate your accommodation.

17         THE COURT:  All right.  Thank you.

18         All right.  Out of an abundance of caution, I will

19 ask there were other objecting parties.  Does any objecting

20 party for which I'll generally call the tort claimants wish to

21 cross-examine Mr. Stein?

22                    (No audible response)

23         THE COURT:  All right.  I don't see anyone in the

24 courtroom, hopefully.  I don't see a hand raised, do I?

25         Okay.  And I don't see anyone running across the

Stein - Redirect/McKane                    77

1  hall.  So what I'll do then is allow then redirect to begin.

2          MR. McKANE:  Thank you, Your Honor.

3          And for the record, it's Mark McKane of Kirkland &

4  Ellis, proposed counsel to the debtors.

5                    REDIRECT EXAMINATION

6  BY MR. McKANE:

7  Q    Mr. Stein, can you hear me?

8  A    Yes, I can.

9  Q    Great.

10     I'm going to ask you about some lines of questions that

11 Mr. Winston raised with you today as well as yesterday.

12     Do you recall Mr. Winston asking you a series of questions

13 regarding the (indiscernible) disinterested director board

14 meeting on July 23rd?

15 A    Yes.

16 Q    And in response to one of those questions, you said that

17 you did not think that the time of that one meeting was

18 accurate of what transpired.  Do you recall that response?

19 A    Yes.

20          MR. McKANE:  If we could put up the demonstrative of

21 the timeline.

22 BY MR. McKANE:

23 Q    Mr. Stein, what is more accurate regarding what transpired

24 regarding the deliberations between you and Mr. Meltzer about

25 the funding agreement?

Stein - Redirect/McKane                    78

1  A    The deliberations began almost immediately after our

2  appointment to the boards of the Aearo entities as it related

3  to our conducting due diligence, engaging with legal counsel.

4      My response to the inquiry was in regard to the fact that

5  the final deliberation, the final board meeting which lasted

6  less than one hour, was the culmination of weeks of work and

7  hours of extensive deliberation between Mr. Meltzer and me with

8  our legal counsel, with the broader board of the Aearo

9  entities, and was noting that as is often the case the final

10 deliberation to take an action is often quite brief because of

11 the extent and significance of the deliberations that have

12 occurred leading up to that final meeting and that ultimate

13 action.

14 Q    And, sir, with regard to the decision to file for

15 bankruptcy that the full Aearo board considered, what is

16 accurate about what actually transpired with regard to the

17 deliberation on whether the Aearo entities should file for

18 bankruptcy?

19 A    The options that I testified to previously that we were

20 considering, which included the status quo and filing for

21 bankruptcy, were considered on what I would describe as a

22 parallel path.

23     The fact of the matter is the latter option, the

24 bankruptcy option, was not a viable option until there was a

25 means with which to prosecute the case.  When the funding

1  agreement negotiations concluded and there was an agreement to

2  proceed with the funding agreement between the parties, that

3  crystalized the option.

4      And subsequently thereafter, deliberations began to

5  determine given those facts and circumstances whether or not

6  the Aearo entities should file for bankruptcy.

7  Q    Let me move through another line of questions Mr. Winston

8  asked you about today.

9      You were asked a series of questions about if 3M were to

10  be found solely liable and did Aearo surrender a legal

11  argument.  Do you remember those lines of questions?

12  A    In general, yes, I do.

13  Q    Do you recall a couple of times during the course of your

14  cross-examination you used the phrase "in a vacuum."  Do you

15  recall that?

16  A    Yes.

17  Q    When you answered Mr. Winton's questions and you used the

18  phrase "in a vacuum," what did you mean?

19  A    (Coughs) Excuse me.

20      In response to those inquiries, I was noting that we would

21  need to consider all other facts and circumstances.  But if you

22  were to consider that inquiry in a vacuum without considering

23  any other facts and circumstances, then that would be my

24  response.

25  Q    And would those facts and circumstances with regards to

1  whether 3M is fully liable include any obligations that Aearo

2  had to indemnify 3M?

3  A    Yes.

4  Q    And what other facts and circumstances would you consider

5  in evaluating what would be necessary to reach a global

6  compromise?

7  A    I believe there are numerous commercial, legal, and

8  otherwise.

9       First would be the impact on the Aearo entities within the

10 context of the indemnification provided under the funding

11 agreement.  The opportunity to ensure that any path forward

12 would maximize the value of the Aearo entities on a risk-

13 adjusted basis, which would mean the efficient and prudent

14 utilization of the assets of the Aearo debtors.

15      In addition, it would be extremely important to ensure

16 that as claims are compromised within the context of developing

17 a path forward, that those claims are compromised in a way

18 that's fair and equitable so that there is no disparate

19 treatment between claimants which is to say that if two

20 claimants have an identical legitimate claim, under this

21 context, they should be treated in an identical fashion.

22 Q    And, sir, do you have a concern that continuing litigation

23 against 3M as opposed to addressing those claims in a

24 bankruptcy context could lead to disparate treatment?

25 A    Yes.

Stein - Redirect/McKane                              81

1  Q    Sir, in answering that last set of questions, I believe

2  you touched on your duties when you were discussing what

3  considerations you would undertake.

4      Can you describe to the Court what you considered your

5  duties to be as an assistant director of the Aearo boards?

6  A    I believe that I have a fiduciary duty to maximize the

7  value of the Aearo entities on a risk-adjusted basis and to

8  ensure that I do so on behalf of all of the constituents, not

9  just a single constituent and, therefore, believe as I

10 testified to previously, ensuring the efficient and prudent use

11 of the assets of the estate and the fair and equitable

12 treatment of the claimants is of paramount importance in the

13 discharge of my duties.

14 Q    And when you say all the constituents, does that include

15 all of the tort claimants?

16 A    Yes.

17 Q    Does it include 3M?

18 A    Yes.

19 Q    And when you refer to prudent use of estate assets, does

20 that also -- in that context --

21 A    Yes.

22 Q    -- does the prudent use -- I apologize.  Let me ask it

23 again because it was a bad question and --

24      THE COURT:  It was a very dramatic pause.  I liked

25 it.  Go ahead.

Stein - Redirect/McKane                                    82

1          MR. McKANE:  I was thinking.

2   BY MR. McKANE:

3   Q    Mr. Stein, does the prudent use of estate assets also

4   include the prudent use in compromising claims?

5   A    Yes.

6   Q    And do you believe that you can prudently use estate

7   resources by compromising claims here in this bankruptcy?

8   A    Yes.

9   Q    In your -- Mr. Winston's cross-examination of you this

10  morning, he asked about the jury verdict of Mr. Luke Estes.  Do

11  you recall that?

12  A    Yes.

13          MR. McKANE:  And if we could put Exhibit CO back up

14  on the screen.  The first page.

15          And if we could focus in on the paragraph and the

16  last three lines.

17  BY MR. McKANE:

18  Q    Mr. Stein, can you see the first page of the verdict form

19  for Mr. Estes?

20  A    Yes.

21  Q    Do you see where it says, "Based on the Court's

22  instructions on the law and evidence?"

23  A    Yes.

24  Q    Mr. Winston asked you about the verdict form, but he

25  didn't show you the instructions.  Did he?

                              Stein - Redirect/McKane                          83

1  A    No.

2  Q    I like Mr. Winston's line about Southwest Airlines.

3           THE COURT:  I'd say something, but I was told that I

4  make too many jokes.

5                          (Laughter)

6  BY MR. McKANE:

7  Q    Mr. Stein, what I've provided the Court and counsel is

8  what the parties filed as Docket 122.  It was the stipulated

9  facts regarding the MDL Minnesota litigation that was submitted

10 yesterday as agreed to by the claimants and the debtors.

11          MR. McKANE:  I'd like to direct -- if we could go to

12 Page 23, Paragraph 51.

13 BY MR. McKANE:

14 Q    Mr. Stein, do you see Paragraph 51?

15 A    Yes.

16 Q    And I'll read this joint stipulated fact into the record

17 and ask you a question about it.

18          "On April 29th, 2021, trial was held in the *EHK*

19          trial.  The following statements were made to the

20          jury by the MDL court during the jury instructions:

21          'Mr. Estes, Mr. Keefer, and Mr. Hacker have sued

22          several defendants that's designed and sold the

23          CAEv2, namely 3M Company; 3M Occupational Safety,

24          LLC; Aearo Holding, LLC; Aearo Intermediate, LLC;

25          Aearo, LLC; and Aearo Technology, LLC.'

Stein - Redirect/McKane                                84

1              "I will collectively refer to defendants as 3M."

2        Do you see that, sir?

3   A    Yes.

4   Q    So if you go back to the jury verdict form, so when you go

5   back to that statement with regard to 3M affirmative defenses,

6   do you have an understanding as to whether 3M includes all of

7   the defendants including all of these Aearo debtors?

8   A    I do now based on the document that we just reviewed.

9   Q    Sir, do you have a general understanding as to whether the

10  Aearo debtors have been held joint and severally liable in

11  those verdicts that have been entered in the MDL litigation?

12             MR. WINSTON:  Objection.  Foundation.

13             THE COURT:  It's a fair objection.

14  BY MR. McKANE:

15  Q    Do you have any understanding one way or another about

16  whether the Aearo debtors have been found liable or not liable

17  with 3M?

18  A    To my knowledge, they have been found liable.

19  Q    Mr. Stein, Mr. Winston asked you questions about your

20  prior engagements including with Kirkland & Ellis.  Do you

21  recall that today?

22  A    I'm sorry, Counsel.  Can you repeat that, please?

23  Q    No, I was just transitioning to another subject.  And it

24  was specifically regarding your prior work in the restructuring

25  space.

Stein - Redirect/McKane                          85

1      Do you recall him asking you questions about prior work

2  you may have done with Kirkland & Ellis or where Kirkland &

3  Ellis was a counsel in the matter?

4  A    Yes.

5  Q    Today he asked you about the TRU Taj engagement which was

6  part of the Toys "R" Us bankruptcy.  Do you recall that?

7  A    Yes.

8  Q    Did Quinn Emanuel represent one of the independent

9  directors in the Toys "R" Us engagement?

10 A    To my recollection, yes, although they did not represent

11 me.

12 Q    Right.  They didn't represent you.  They represented

13 another independent director.  Correct?

14 A    To my recollection, that is correct.

15 Q    And Mr. Winston asked you about the Intelsat matter.  Do

16 you recall that?

17 A    Yes.

18 Q    Did Quinn Emanuel represent one of the independent

19 directors in the Intelsat matter?

20 A    Again, they did not represent me, but yes.

21 Q    And, sir, Mr. Winston asked you about Nordic Aviation.  Do

22 you recall that?  NAC?

23 A    Yes.

24 Q    Did Quinn Emanuel represent one of the independent

25 directors in the Nordic Aviation matter?

Stein - Redirect/McKane                    86

1  A    Again, they did not represent me, but to my recollection,

2  yes.

3  Q    And, sir, do firms other than Kirkland & Ellis call you

4  about the Pentel engagements?

5  A    Yes.

6        I have been active on over 35 mandates during the tenure

7  of Stein Advisors.  And I have been represented in some

8  capacity by Kirkland & Ellis on approximately ten of those

9  matters.  And Kirkland & Ellis has been adverse to me on three

10 of those matters.

11       I have retained Quinn Emanuel, as I testified to

12 yesterday, on very large multi-billion-dollar litigation and

13 have obviously been adverse to them, including on this matter.

14 And there are numerous other professional services firms,

15 legal, financial, and otherwise, that I engage with.  It's not

16 in any way inconsistent, just the fact that it's a relatively

17 bespoke vertical for there to be continuing relationships.

18       However -- (coughs) -- excuse me, I would like to note for

19 the Court that my independence has never been questioned, and

20 my character, integrity, and judgment are of paramount

21 importance to me in the discharge of my duties.

22 Q    Mr. Stein, just a few more questions.

23       Yesterday, do you recall Mr. Winston asking you a series

24 of questions about the funding agreement and whether you

25 understood it would provide funding for the resolution of

Stein - Redirect/McKane                              87

1  claims in forums other than the bankruptcy court?

2  A    Yes.

3  Q    Do you recall that, sir?

4  A    Yes.

5         THE COURT:  And by the way, Mr. McKane, when you

6  speak, can you be a little closer to the microphone --

7         MR. McKANE:  Happy to do that.

8         THE COURT:  -- to get a record of it?

9         You're doing a very good presentation for the

10  courtroom, but this is for the record.

11         So proceed.  I'm sorry.

12         MR. McKANE:  No.  The record's of paramount

13  importance.

14  BY MR. McKANE:

15  Q    Are the debtors seeking a global resolution of claims?

16  A    Yes.

17  Q    To your knowledge, can any forum other than the bankruptcy

18  court provide a global resolution of the Combat Arms claims?

19  A    In my business judgment, no.

20  Q    Now there's been lots of discussion about the MDL claims.

21  Are there claims in forums other than the MDL court?

22  A    Yes.

23  Q    What is your understanding of how many claims are pending

24  in courts other than the MDL court?  For example, in Minnesota?

25  A    As I understand it, there are approximately 2,000 claims

1  outstanding in the Minnesota cases and then the prospect of

2  future claims.

3  Q    And, sir, when you use the phrase "future claims," do you

4  just mean claims not -- that have not yet been filed in any

5  court?

6  A    Yes.

7  Q    And do you have a view as to whether any court other than

8  the bankruptcy court can provide the global resolution of

9  claims in all of those forums or those yet to be filed?

10  A    My business judgment, no.  Only the bankruptcy court

11  offers that forum.

12  Q    And, sir, today, toward the end of Mr. Winston's

13  examination, he asked you about certain powers that you have.

14  Do you recall that?

15  A    Yes.

16  Q    Do you believe you have the power today and going forward

17  to work with your other directors to reach a global settlement

18  of all Combat Arms claims here in the bankruptcy court?

19  A    Yes.

20  Q    And what is your view as to whether a preliminary

21  injunction or an extension of the automatic stay causing

22  litigation outside of the bankruptcy court regarding Combat

23  Arms would aid you in reaching a global settlement of all those

24  claims in this court?

25  A    I believe that the relief requested, if granted, will

89

1  ensure that all of the parties are focused on this singular

2  forum, the forum of the bankruptcy court, which would afford

3  for the opportunity to prospectively engage in substantive

4  discussions about a global resolution that would include all of

5  the cases on behalf of all of the claimants, 3M and the Aearo

6  debtors.

7      Without that relief, I would suspect that parties will

8  continue to pursue actions in numerous other venues and there

9  would be very little likelihood of creating an opportunity for

10 direct engagement with all parties to determine a mutually

11 acceptable path forward.

12         MR. McKANE:  May I have a minute?

13         THE COURT:  You may.

14         MR. McKANE:  Your Honor, we have no further for Mr.

15 Stein at this time.

16         THE COURT:  Thank you.

17         Mr. Winston, would you like to do -- well, again, I

18 run out of re's -- any additional cross based upon the

19 redirect?

20         MR. WINSTON:  Your Honor, no.  No recross.  And I do

21 wish Mr. Stein a quick recovery.

22         THE COURT:  All right.  Thank you.

23         All right.

24         THE WITNESS:  Thank you.

25         THE COURT:  So I think, Mr. Stein, you can be

1  released as a witness.  I do hope you recover.  And until you

2  recover, I look forward to seeing you via remote testimony.

3                    (Laughter)

4            THE WITNESS:  Thank you, Your Honor.

5            THE COURT:  Thank you.  You may disconnect.

6            THE WITNESS:  Thank you, Your Honor.

7            THE COURT:  You're welcome.

8            All right.  Mr. McKane, et al., my understanding is

9  this was your last fact witness.  Is that correct?

10            MR. McKANE:  That is correct, Your Honor.

11            THE COURT:  Do you wish to rest on behalf of the

12  debtors of their evidentiary presentation in support of their

13  motion for declaratory -- oh my goodness, declaratory relief

14  and a preliminary injunction?

15            MR. McKANE:  We are prepared to rest our case in

16  chief.  We understand that we reserve the right to rebuttal

17  depending on what is presented by the claimants in addition to

18  what's already been presented.

19            THE COURT:  All right.  That's acceptable.

20            All right.  Thank you.

21            All right.  I don't even have to ask who to ask.

22            Does it make sense -- it's just, yeah, spin the

23  podium now?  As much as I love your side profile.

24            And state your name for the record.

25            MR. PFISTER:  Yes, Your Honor.  Rob Pfister from Klee

91

1   Tuchin firm on behalf of the claimants who signed a joint

2   brief.

3          I have what I think is very good news, which is all

4   of my caveats about, you know, maybe we need somebody for

5   foundation or maybe of all that, all of that can go away.  I

6   have even better news, which is the giant filings that hit the

7   Court's docket in terms of the request for judicial notice, we

8   have -- we offered to withdraw our pending requests for

9   judicial notice.

10         THE COURT:  Was this the one filed at 6:47 this

11  morning?

12         MR. PFISTER:  Nope.  That's the supplemental request.

13  But I've got good news on that, too.

14         THE COURT:  Okay.

15         MR. PFISTER:  I come bearing much good news.

16         So my understanding is is that we will withdraw our

17  original something like thousand page request for judicial

18  notice.

19         THE COURT:  All right.

20         MR. PFISTER:  The debtors will be withdrawing their

21  original some massive number of pages request for judicial

22  notice.  The Court already has the stipulated facts.  Those are

23  stipulated.

24         That leaves literally the only one thing is the

25  request for judicial notice that was filed at 6:30 or 6:45 this

1   morning.  That request for judicial notice has three

2   paragraphs.  Paragraph 2 and 3 we've resolved with debtors'

3   counsel.

4          So of the three paragraphs, the first addresses the

5   PCAM lawsuit.  That's the one that's not resolved.

6          THE COURT:  Okay.

7          MR. PFISTER:  The second addresses the centralization

8   in the JPML.  And the third addresses the Sunday night order

9   from the MDL court.

10         The Sunday night order from the MDL court has already

11  -- the Court's already ruled on that in the context of Mr.

12  Stein.  So that's no longer an issue, and we'll withdraw our

13  request that that be judicially noticed.

14         With respect to the centralization, the parties have

15  agreed that the first sentence of that can be judicially

16  noticed.  So what we'll do is we'll file a corrected version on

17  th docket once the Court rules.

18         THE COURT:  Let me -- okay.  So -- but let me ask

19  this.  When we ask for a corrected version, does it make sense

20  then to -- basically isn't it really because you've agreed a

21  supplement to the joint stipulated facts at this point?

22         UNIDENTIFIED SPEAKER:  It is, Your Honor.

23         MR. PFISTER:  I'm fine with calling it that.

24         THE COURT:  And that would be fine because if you

25  both agree but I deprive people of their opportunity to speak.

1           That's fine because -- and then to the extent there's

2    one left, I'll rule on it.  But to me that just makes it easier

3    for everyone, mainly me when I go back but I can look at the

4    stipulated fact and not have to parse through the -- and I

5    apologize, it was 6:42, not 6:47 filing.

6           All right.  So there's one issue remaining.  Is that

7    accurate?

8           MR. PFISTER:  That's correct.

9           So just to be clear, on number two, the first

10   sentence of that will come in, the rest of it about, you know

11   --

12          THE COURT:  Again, as long as you agree and put a

13   supplemental and joint stipulation of fact.  I don't think the

14   U.S. Trustee's had a chance to look at it.  But if we can do

15   that, great.  So I'm --

16          MR. PFISTER:  Excellent.

17          THE COURT:  -- I'm more focused on what is not --

18          MR. PFISTER:  Yep.

19          THE COURT:  -- resolved.  Thanks you.

20          MR. PFISTER:  Exactly.

21          So we're down to just the first paragraph which is

22   about the qui tam action.  What we are asking the Court to take

23   judicial notice of is up here in this first paragraph which is

24   that on May 17th of 2016, the United States Department of

25   Justice Criminal Investigative Division received a qui tam

94

1  notice of a lawsuit with that docket number against 3M Company.

2        Then we have attached the filing.  The Court may take

3  judicial notice that on July 23rd, 2018, 3M entered into a

4  settlement agreement with the U.S. Department of Justice.  As

5  part of their agreement, 3M -- as part of their agreement, "3M

6  agreed to pay back $9,100,000 of which $4,560,000 is

7  restitution."  That's all we're asking the Court to take

8  judicial notice of.

9        THE COURT:  Okay.  And, of course, it would just be

10  not for the truth of the matter asserted but simply that it

11  exists?

12        MR. PFISTER:  Well, just to take judicial notice

13  that, right, these things, the qui tam action was filed and

14  this settlement agreement and this payment happened.

15        THE COURT:  I understand that happened.

16        MR. PFISTER:  Not for the truth but --

17        THE COURT:  But that's just what the settlement

18  agreement says.

19        MR. PFISTER:  That's --

20        THE COURT:  Or that there was a settlement agreement

21  reached as a result of the qui tam action.

22        MR. PFISTER:  Yes.  That's all we need.

23        THE COURT:  All right.

24        Come on up.

25        MR. HOROWITZ:  Good morning, Your Honor.  For the

95

1  record, David Horowitz of Kirkland & Ellis.  We would object to

2  the Court taking judicial notice of a settlement agreement

3  insofar as that would be barred by Federal Rule of Evidence

4  408.

5          Separate and apart from that, Your Honor, the way in

6  which the judicial notice request is phrased is misleading.  It

7  states that 3M agreed to pay back $9.1 million.  It excludes

8  the fact that that payment was made on behalf of 3M and, among

9  others, its direct and indirect subsidiaries.  The fact about

10 the allegations in the complaint, of course, not adjudicated

11 facts susceptible to judicial notice, leave out the allegations

12 of the complaint that state, among other things, that the

13 Combat Arms earplugs were originally created by a company

14 called Aearo Technologies.  That's Paragraph 8.

15          It leaves out suggestions about Paragraph 10 that

16 state that the design defects were known to Aearo in 2000,

17 Paragraph 11 that talks about Aearo submitting an MPID, and

18 Paragraph 16 that talk about Aearo commencing NRR testing on

19 the earplugs.

20          So the way in which it's phrased is misleading.  And

21 separate and apart from that, it's quintessential 408.  And for

22 that reason, it is not judicially noticeable either in our

23 view.

24          THE COURT:  All right.

25          Let me ask you this.  Is there an objection to the

96

1   fact that a qui tam action exists?

2           MR. HOROWITZ:  It's a docket filing, Your Honor.  I

3   mean the Court could -- I mean I think the relevance of that is

4   sort of --

5           THE COURT:  And, again, I'm the trier of fact.  I

6   mean --

7           MR. HOROWITZ:  Yeah.  The qui tam action exists on

8   the docket.  I mean if the Court wants to review the

9   allegations in that complaint to see what are actually alleged,

10  we don't object to the Court taking judicial notice of that

11  fact.

12          THE COURT:  So is it -- this was the purpose of my

13  question, and I think I was inartful.

14          Because what you wanted -- what you're saying is,

15  well, there's not enough information.  It's misleading.

16  There's more to it.  So is the issue really with the qui tam

17  action or is it just the fact that exists or it's the fact that

18  you believe that just simply the paragraph there isn't enough

19  and you want the whole thing in there just to show it exists so

20  that you can at some point potentially say that, Your Honor,

21  that doesn't apply because -- what are we trying to do?

22          MR. HOROWITZ:  Courts could take judicial -- I mean

23  they're asking.  Courts could take judicial --

24          THE COURT:  I understand.

25          MR. HOROWITZ:  -- notice of adjudicated facts.

1          THE COURT:  Right.

2          MR. HOROWITZ:  Courts could take judicial notice of a

3  court order.

4          THE COURT:  Or that something exists.  Well, you're

5  going to have to say yes because in bankruptcy, we take --

6          MR. HOROWITZ:  Yeah.  And you can take judicial

7  notice of --

8          THE COURT:  I'm sorry.  I've won appeals on my

9  judicial notice of the court docket.

10          MR. HOROWITZ:  Fair enough.

11          THE COURT:  I can't say that's not possible.

12          MR. HOROWITZ:  Fair enough.  So that something

13  exists, yes.  That the allegations are not adjudicated facts.

14          THE COURT:  Well again --

15          MR. HOROWITZ:  Yeah, sure.

16          THE COURT:  I'm not saying it is.  But if we want --

17  if he wants to put in, it is what it is.

18          MR. HOROWITZ:  It is what it is.  And we would just

19  --

20          THE COURT:  Is there an objection to that?

21          MR. HOROWITZ:  Your Honor, the Court could take

22  notice that it exists.

23          THE COURT:  Okay.

24          MR. HOROWITZ:  But we would object to, you know, the

25  settlement agreement being offered to prove --

1               THE COURT:  Okay.  For the settlement agreement?

2               MR. HOROWITZ:  Yes, correct.

3               THE COURT:  Was the settlement agreement published

4   anywhere?  And, again, here's -- you don't maybe know this

5   about me.

6               MR. HOROWITZ:  Okay.

7               THE COURT:  I don't read the exhibits attached to

8   things.

9               MR. HOROWITZ:  Got it.

10              THE COURT:  Because in my mind, once I've read the

11  exhibit, I can't confirm that I have excluded that if it's not

12  admitted.  But as I looked at this and when I looked at it, I

13  knew it was there, I printed it and that's all I did.  So I

14  haven't looked at the exhibits.  I just looked at what was

15  stated in the motion.

16              So I don't know if the settlement agreement was

17  published or anything.  I don't know.  I know from testimony

18  that some people are aware of it and that it was resolved.  I

19  have that into evidence I think through testimony.  And I may

20  even without having the benefit of a transcript, someone maybe

21  even said what was paid or testified as to what was paid.  I

22  can't recall, but I think it was --

23              MR. HOROWITZ:  There was testimony about it.

24              THE COURT:  Okay.  So that's already in the record.

25              So when we talked about the settlement agreement, was

99

1  it filed, was it just a resolution?  What appears on the

2  docket?  Does it say if there's a settlement agreement?

3          And I know it's not your motion.

4          MR. HOROWITZ:  Your Honor, I would suspect there

5  would be something on the docket, yes.

6          THE COURT:  Okay.

7          MR. HOROWITZ:  It was public.

8          MR. PFISTER:  Even better, Your Honor -- and for the

9  record, Mr. Pfister -- the document we attached actually bears

10  the district court docket number on it.

11          THE COURT:  Okay.

12          MR. PFISTER:  It's a stipulated dismissal.  The

13  settlement appeared on the docket.

14          THE COURT:  Okay.  So it's something that's not a

15  public docket.

16          MR. HOROWITZ:  That's correct, Your Honor.

17          THE COURT:  Okay.

18          So, again, understanding it's not for the truth of

19  the matter asserted, what is the objection?

20          MR. HOROWITZ:  It's 408, Your Honor.  They're

21  offering -- I'm unclear as to the purpose for which they're

22  offering --

23          THE COURT:  Well, I don't know what they're quite

24  admitting it for, but --

25          MR. HOROWITZ:  Right.

100

1          THE COURT:  -- I can take judicial notice that it
2   exists.  Right?

3          MR. HOROWITZ:  You could take judicial notice that it
4   exists.

5          THE COURT:  Right.

6          MR. HOROWITZ:  I don't think it's fair to take
7   judicial notice of it and then convert it to evidence of
8   liability or anything like that.

9          THE COURT:  Well, that would be hard for me to take
10  judicial notice of a document to create liability.  Wouldn't
11  it?

12          MR. HOROWITZ:  I think that's right.

13          THE COURT:  Okay.  I think Mr. Pfister's nodding his
14  head, which makes me wonder then why are we going to argue
15  about it.  But, again, if it's just to say that it exists, I've
16  already had testimony regarding that there was something that
17  amounts were paid, to have judicial notice of the fact here's
18  the docket, here's the document, and it was settled.

19          If that's all it is, is it really 408?  Understanding
20  that I don't know what he's going to want to do with it.  I bet
21  you he's going to argue it.  And at that point, it's either
22  supported by what's in the docket or it's not.

23          MR. HOROWITZ:  Yeah.  I mean this is a concern, Your
24  Honor, because the RJN notes that the Seventh Circuit, and we
25  disagree with this, has indicated in dicta that a court --

1            THE COURT:  You like abbreviations, don't you?  The

2    RJN being the request for judicial notice?

3            MR. HOROWITZ:  Yes, the request for judicial notice.

4    Sorry.

5            THE COURT:  All right.  I'm a bankruptcy

6    (indiscernible).  You don't have -- you know, if you want to

7    talk about bankruptcy abbreviations, BAPCPA, things like that

8    --

9            MR. HOROWITZ:  Yeah.

10            THE COURT:  -- I'm good.

11            MR. HOROWITZ:  I won't know those, as well.  But --

12            THE COURT:  All right.

13            MR. HOROWITZ:  -- I will call it a request for

14    judicial notice.

15            THE COURT:  Okay.

16            MR. HOROWITZ:  There's a suggestion that matters

17    should be asserted to be taken for their truth and we'd

18    certainly object to that.

19            THE COURT:  Okay.

20            MR. HOROWITZ:  Your Honor could take notice of facts

21    of filings on public dockets.

22            THE COURT:  Okay.

23            And, Mr. Pfister, I guess let's just cut to the

24    chase.  To what end do you want me to take judicial notice of

25    this?  And when I say you, I mean the claimants.  I don't mean

102

1   it to be specifically you.

2          MR. PFISTER:  Yes, Your Honor.  I understand that.

3          So the sole fact is the one that's articulated in our

4   brief which --

5          THE COURT:  Well, and I want to hear it.

6          MR. PFISTER:  Right.

7          THE COURT:  Because your brief isn't exactly

8   perfectly fair.

9          MR. PFISTER:  Sorry to hear that.

10         THE COURT:  So I mean because you're advocating.  So

11  what do you intend to use it for?

12         MR. PFISTER:  Understood.

13         THE COURT:  What do you want me to do with this if

14  it's in the record?  Bluntly clear

15         MR. PFISTER:  Bluntly correct.  There is a qui tam

16  action in the name of the United States of America versus one

17  defendant.  It's called 3M Company.  It's on the caption.  That

18  I think we've gotten from Mr. Horowitz already.

19         Second is there was a settlement of that qui tam

20  action for $9.1 million not for the purpose of liability.  I'm

21  not going to argue that that shows that they were liable,

22  therefore, it doesn't implicate Rule 408.  The sole purpose of

23  the settlement for 9.1 million is is that 3M Company agreed to

24  settle the matter for $9.1 million.  That's it.

25         THE COURT:  And -- oh, you have a colleague standing

103

1  up.

2         UNIDENTIFIED SPEAKER:  Your Honor, we will be arguing

3  also that because the 9.1 million was not charged back, it is

4  conduct consistent with the company 3M having taken all of the

5  tort liability.  So I didn't want to be limited in the argument

6  because of what (indiscernible).

7         THE COURT:  Okay.  All right.

8         So all right.  So that's what you intend to use it

9  for?

10        MR. PFISTER:  That is correct, Your Honor.

11        THE COURT:  Mr. Horowitz?

12        MR. HOROWITZ:  It's skirting the 408 line, Your

13  Honor, but I suppose we could wait to see how they try to use

14  it in closing.

15        THE COURT:  Okay.  I think that's fair.

16        All right.  So I guess to the -- I know this was last

17  filed, so if this then deemed to be an objection to the request

18  for judicial notice that was filed?

19        MR. HOROWITZ:  I think that's correct, Your Honor.

20  And yes.

21        THE COURT:  Okay.  So if that's the dispute, I think

22  I would overrule the objection as modified with the

23  understanding that I can take judicial notice that something

24  was filed and that there was a settlement on it because it

25  appears on a public docket.

1          And we'll address I'm sure with great blaring if

2  anything else arises, but if that's simply asking me to take

3  judicial notice, I think they fall within the realm of judicial

4  notice, is it easily found, it's on the docket, there it is,

5  it's public.  I think it meets the criteria for just taking

6  judicial notice that it exists.

7          To the extent we want to go further than that and

8  that you're going to argue it's for the truth of the matter

9  asserted, that will be a legal argument that I think as far as

10  does it exceed the scope of judicial notice.  And I think

11  that's a valid argument.  But as far as putting it in through

12  judicial notice, I think that it is proper here given the fact

13  it's a public docket and the settlement does appear on the

14  docket.

15          MR. HOROWITZ:  Understood, Your Honor.  Thank you.

16          THE COURT:  All right.  Thank you.

17          MR. PFISTER:  And with that, Your Honor, the

18  claimants who signed the joint brief rest.

19          THE COURT:  A little louder.

20          MR. PFISTER:  With that, Your Honor, this is Robert

21  Pfister from the Klee Tuchin firm on behalf of the claimants

22  who signed the joint brief.  We rest.

23          THE COURT:  All right.

24          Does any -- with bated breath, does any other tort

25  claimant body which filed an objection to the motion for

1  declaratory relief and preliminary injunction wish to submit

2  additional evidence that's not already happened in support of

3  an opposition to the motion referenced?

4          And if you're going to speak, you're going to have to

5  come forward so I can hear -- no?

6          MR. BARRETT:  No.  Your Honor, we do not --

7          THE COURT:  It's too late now.  Now you got to come

8  forward.  But don't hit the monitor because that's expensive.

9          MR. BARRETT:  Kevin Barrett for Bailey & Glasser.  We

10 do not intend to call any witnesses.

11         THE COURT:  Thank you.

12         Believe it or not, that was necessary.

13         And I don't see anyone else in the courtroom

14 indicating they wish to.  And I don't hear the clitter and

15 clatter -- I mean they'd be here by now.  It's not that far.

16         All right.  So before I officially rest the

17 presentation of evidence, I think we have, and I'm a little bit

18 confused.  Perhaps it wasn't mentioned.  We had referenced and

19 I think published Exhibit CO that was used but no party has

20 moved that into evidence.  I just want to confirm that no party

21 does want to.

22         MR. PFISTER:  My understanding, Your Honor, is that

23 we do offer that into evidence.

24         MR. McKANE:  And, Your Honor, we would object to that

25 as inconsistent with the stipulation of facts that was reached

106

1  that was -- that's Docket 122 where there were -- where all of
2  the verdict forms, all of the jury instructions were covered
3  and negotiated over a 12-hour period on Sunday.

4          And my understanding is the verdict form was part of
5  the original request for judicial notice and in lieu of moving
6  those into evidence, we agreed to the stipulation of facts.

7          THE COURT:  Okay.

8          MR. PFISTER:  We can withdraw our request to admit
9  Exhibit CO, Your Honor.

10         THE COURT:  All right.  I just wanted to be clear
11 because I get nervous when I have a blank on there that wasn't
12 addressed.  So I appreciate that.  Thank you.

13         MR. PFISTER:  Yes.   Thank you.

14         THE COURT:  It takes a village to try a case.  If I
15 had a village to decide it, it would even be better, but a
16 village of two.

17         All right.  So let me ask then.  Is what remains the
18 closing arguments?

19         MR. McKANE:  Your Honor, just -- Mark McKane for the
20 debtors.  We believe that is the case.  We didn't hear from the
21 Keller firm stated they had any witnesses that they wanted to
22 put on.  We also note the United States Trustee's Office has
23 filed an objection, but they haven't sought any --

24         THE COURT:  I have disregarded the U.S. Trustee's
25 objection.  I apologize.

1          Does the U.S. Trustee wish to present any evidence in

2    support of its objection?

3          MS. DuVALL:  Your Honor, Laura DuVall on behalf of

4    the U.S. Trustee.  We do not intend to present any witnesses or

5    other evidence.

6          THE COURT:  Okay.  I made an assumption, and it

7    almost happened to me the adage but fortunately it did not.

8    Thank you.

9          And Mr. Keller did present evidence in support with

10   regard to the witness.  And we have the small problem of him

11   not being here live and in person, so -- but I was hoping that

12   was sufficient.  So -- and he also didn't raise his hand or

13   appear when I asked anyone else, so I'm taking that as we have

14   it.

15         MR. McKANE:  Very good.  With that, Your Honor, we

16   are prepared to proceed to closing argument.

17         THE COURT:  All right.  And, again, putting Mr.

18   Pfister in the awkward position of representing himself and

19   possibly others, but I know there's others in the courtroom.

20   Are the tort claimants prepared to move to closing?

21         MR. PFISTER:  Your Honor, Mr. Pfister for the record,

22   it's not an awkward position.  We've conferred with everyone,

23   and we are prepared to move to closing argument.

24         THE COURT:  All right.

25         MR. PFISTER:  We even have an order of operation in

1  terms of covering folks who are not signatories to our brief.

2  But we are prepared to move to closing.

3           THE COURT:  Excellent.

4           All right.  Well, I haven't had free time in the last

5  two days.  I don't quite know what to do.

6           I do think I'd like to give everyone an opportunity

7  to prepare because I do view this as an important part of it,

8  mainly because I will ask questions that -- of the counsel and

9  I want you to be prepared and also to be as prepared as

10 possible for closing.

11          Why don't we reconvene at 1:00, and we'll start the

12 closing arguments.  Debtors, it is your motion.  You get the

13 honor/burden of going first.  And then I'll let the tort

14 claimants respond, and then to the extent they have any further

15 questions, that's fine, we can deal with that.  And then we'll

16 proceed from there.

17          One thing I would like you all to consider before we

18 break, I know someone started getting up and ready to go but,

19 no, wait, there's more.  You had broached the idea of proposed

20 findings of fact and conclusions of law.  I don't know if we're

21 prepared yet.  And when I was a young lawyer, I often remember

22 that the people in charge of doing those things aren't the ones

23 at the table.

24          But I would like you to consider the time frame.  You

25 don't know yet.  Have you told your people when you'd be ready?

109

1               UNIDENTIFIED SPEAKER:  No, Your Honor.  I was just --

2               THE COURT:  Oh, you were getting ready to answer.

3       All right.

4               I'd like you all to think and confer with these

5       people what is the time frame in which you think it would be

6       prepared.  I think that would be helpful to know, too, when you

7       think you could suppose such a thing as it goes forward.  So

8       I think that would be helpful and something for you all to

9       discuss during this leisurely break between now and closing

10      arguments.

11              MR. McKANE:  We will confer with our team and check

12      with the claims counsel to see if we can agree upon a date.

13              THE COURT:  All right.

14              Mr. Pfister?

15              MR. PFISTER:  One question, Your Honor, and this is

16      just me.  I haven't conferred with anyone.  But in my

17      experience with proposed findings and conclusions, oftentimes,

18      those are filed before an argument if they assist the Court in

19      closing argument.

20              Obviously, I know we're not going to file them

21      between now and 1:00 p.m.

22              THE COURT:  Right.

23              MR. PFISTER:  There's no question.  But I thought it

24      would make sense to at least inquire that is it Your Honor's

25      preference if you have the time where if the parties could

1  submit proposed findings and conclusions, say, you know,

2  tomorrow, Friday, something like that if you had the time?  And

3  I'm not saying anyone's offered --

4           THE COURT:  You go on.  I'm just leaning back

5  preparing myself mentally.

6           MR. PFISTER:  What we want to do is be as helpful to

7  the Court as possible.  Again, this is just me speaking.  It's

8  nobody else.  But since Your Honor has raised the question of

9  findings and conclusions, what I don't know would be helpful

10 would be to argue about the issues and then give you the

11 findings and conclusions --

12          THE COURT:  All right.

13          MR. PFISTER:  -- as opposed to putting them in front

14 of you and then arguing the issues.

15          THE COURT:  Right.

16          MR. PFISTER:  So that's the only reason I raise it.

17          THE COURT:  Okay.  That's fair.  That's fair.

18          MR. PFISTER:  Okay.

19          THE COURT:  Generally speaking, I don't ask for them

20 before.

21          MR. PFISTER:  Oh, okay.

22          THE COURT:  And because one of the benefits I take

23 out of it is that now you've made your arguments, okay,

24 evidence is closed.  You've made your closings.  And now you

25 have to decide based upon what you've done what are the facts

1   that are in the record and what conclusions of law can I draw.

2   Now, granted, I'm going to ask questions and inquire of that.

3           But really, to me, at that point is when you lawyers

4   have to put -- you know, that's when the proof makes the

5   pudding.  You may think that you've proven something, and I may

6   even ask you about it, but when you sit down and look at the

7   facts as they've been presented and put into evidence, it may

8   not be there.  And I have found that is really helpful because

9   a lot of people will tell me in closing, well, Your Honor, we

10  have proven X, Y, and Z.  And then when it comes to the

11  proposed findings of facts and conclusions of law, sometimes

12  these are not in there because the facts didn't get in as they

13  thought they did.

14          And that's no fault of anyone else.  You're in the

15  heat of the moment.  You're trying -- I know you've had a live

16  transcription of the proceedings.  I know we didn't really have

17  room in here, so I don't know where she ended up.  But -- and

18  so -- and you've had colleagues and things.  But at the end of

19  the day, the record is what it is.

20          And if it's in there, yeah, that's a proposed

21  findings of fact and you can then make a conclusion of law

22  comment.  If it's not there, then you know you've done

23  something and maybe it gives you a chance to overcome it but

24  maybe you realize that we've got a problem.

25          But that's how I handle it.  And that also helps me

112

1  because at that point why am I asking you questions.  You've
2  already given me everything you're going to give me.  And at
3  that point, there's no reason to do it.  And it also doesn't
4  allow you to prepare for an argument that you may not be ready
5  for that you could include in a proposed finding of fact and
6  conclusions of law.

7          There may be a lot of questions that I bring up you
8  think, well, that's not really relevant but maybe we need to
9  address it now because he just talked about it.  So it's also
10  an opportunity for you to -- that's why if you ever do
11  dispositive motions, I close discovery after the summary
12  judgment motion.  The same reason.  If I say something's a
13  disputed fact that you didn't realize or weren't prepared for,
14  it lets you at least have some discovery time after that to do
15  it so when you come to trial, at least you had an opportunity
16  to try to get that ready.

17          So I try to do these things from the perspective I've
18  been in your shoes, not as fancy as shoes as you all, but I've
19  been there.  And that's how I think it helps you, too, because
20  you've got to be intellectually honest with yourself what have
21  I proven and what have I not just as I have to be
22  intellectually honest as what has been proven, not what I think
23  I wanted to be proven or what I thought I heard.  At the end of
24  the day, it's what's in there.  And that's what I have to go
25  on, and that's what you have to go on.

113

1          MR. PFISTER:  Understood, Your Honor.  And --

2          THE COURT:  That's a really long answer to your

3    question, I think.

4          MR. PFISTER:  Well, no, I greatly appreciate it.  And

5    what I wonder is if it might make sense to rather than break

6    until 1, if it might make sense to take maybe a ten-minute

7    break, see if there's any discussion amongst the parties.  Mr.

8    Husnick rose at the beginning and reported to Your Honor an

9    update about adjournment and that sort of thing.  I didn't -- I

10   purposely did not rise in that comment.

11         THE COURT:  I've given -- just in my brief time with

12   all of you all that ten minutes probably isn't going to do

13   much.  So I'm going to give you that full time.  Now if you --

14         MR. PFISTER:  Okay.

15         THE COURT:  -- in this bankruptcy, I know you're a --

16   the bankruptcy lawyers will know, a 1:00 start if something is

17   going on doesn't necessarily mean a 1:00 start.  Some of the

18   most exciting things in a bankruptcy case happened three

19   minutes after the case should have started.  I don't know if

20   you've heard of people settling the case in the courthouse

21   steps.  That happens a lot.

22         So sometimes I hold out hope that something exciting

23   will happen and I love getting notices if something's happened

24   in a JPL kind of thing.  That's weird.  I'm going to just

25   pretend that wasn't there.  But, no, take time, take 1.  If you

114

1  need more time at 1:00, that's fine.  If you're discussing that

2  you want to report something, I'll tell you that's fine.

3          But otherwise, I don't know if ten minutes after

4  three days and three years of MDL litigation will really do

5  anything.  And, plus, I also know that whatever is agreed to

6  would have to be approved by the district judge pursuant to the

7  procedures in the MDL.  So even if everyone is singing

8  "Kumbaya," it may not happen.

9          So, but keep the lines of communication open because

10  that's the only way that anything will move forward, either the

11  MDL or this case.

12          MR. PFISTER:  And if I might, Your Honor, I don't

13  want there to be any confusion since you referenced settlement

14  on the courthouse steps.  The only thing I'm discussing --

15          THE COURT:  No, no, no, no, no.  I --

16          MR. PFISTER:  -- is just a question of --

17          THE COURT:  I'm just sitting as a judge.

18          MR. PFISTER:  Right.

19          THE COURT:  I'm more than prepared that a 1:00

20  hearing may start at 1:30 --

21          MR. PFISTER:  Understood.

22          THE COURT:  -- the parties are talking about

23  something that's relevant.

24          MR. PFISTER:  The only thing --

25          THE COURT:  If you're just talking or if we're

115

1  rehashing arguments, that doesn't really help and I'll come out

2  and make you all sit down.  But if it's something construction,

3  of course, yes.  At the end of the day, the Court is a service

4  to the litigants.  If they can resolve it, whatever that issue

5  is, that's better than me making a decision because you can

6  manage your own risks better that way no matter what the

7  decision is.

8          MR. PFISTER:  There are many people watching.  I just

9  didn't want anyone to think I was saying --

10         THE COURT:  I know.  Your phone will go off and like

11 we're not resolving everything right now.  I understand.

12         MR. PFISTER:  I was just referencing an adjournment,

13 a brief adjournment.  That's all I was referencing and even

14 then I was just speaking as myself.

15         THE COURT:  That's fine.

16         MR. PFISTER:  Thank you, Your Honor.  I appreciate

17 it.

18         MR. McKANE:  Thank you for your time, Your Honor.

19 Nothing further from the debtors.

20         THE COURT:  Okay.  Thank you.

21         MR. McKANE:  We'll see you at 1:00.

22         THE COURT:  All right.  Let's reconvene at 1:00.

23 Obviously, if you need more time, my courtroom deputy is

24 available, you can tell her.  Other than that, I look forward

25 to hearing the closing arguments by the parties.  Thank you.

 1            MR. PFISTER:  Thank you.

 2                      (Lunch Recess)

 3            THE COURT:  All right.  Let's go back on the record

 4  in Adversary No. 22-50059.  We are here now, after many, many

 5  days, for closing arguments.  It is the debtors' motion for

 6  declaratory relief and preliminary injunction.  So they may

 7  proceed with their closing at their leisure.

 8            MR. HUSNICK:  Good afternoon, Your Honor.  Chad

 9  Husnick with Kirkland and Ellis, appearing on behalf of the

10  Aearo debtors.  Your Honor, I do have one short piece of news,

11  which Mr. Horowitz is here to report it and tends to be more

12  excitable than me.

13                      (Laughter)

14            MR. HUSNICK:  The good news, Your Honor, is that the

15  parties have collectively agreed, and I'll explain who I think

16  that is, to a further detente for seven days.  I'm going to

17  call it a detente, but for seven days.

18            THE COURT:  Very sophisticated, I'll make it.

19            MR. HUSNICK:  It'll be my last sophisticated comment

20  this afternoon.  And I think that will help -- hopefully, will

21  help Your Honor with the timing and the ruling, and you know,

22  will help us work -- continue to work with the parties.  I

23  believe the folks that are signing up for that, that would be

24  the Aearo debtors, the Aearo stock plaintiffs, the Seeger

25  plaintiffs, Paul, who's handling the Minnesota stuff, Keller

117

1  Postman and Quinn Emanuel.

2          The other firms that are represented by Mr. Pfister,

3  I believe are on the side with this, and Mr. Glasser, who I

4  believe has stood up from time to time and done some cross and

5  argument, I believe is subject to it.  We're working through

6  the detail.  I won't get into the detail of it.

7          THE COURT:  Okay.

8          MR. HUSNICK:  It'll be something short, similar to

9  the stipulation that we did last week.

10         THE COURT:  Okay.

11         MR. HUSNICK:  With that, Your Honor, unless you have

12 any questions about that or anyone else has anything more, I

13 think I'd proceed to argument.

14         THE COURT:  All right.  You're going to use a

15 PowerPoint just when I said I didn't need my Zoom, aren't you?

16         MR. HUSNICK:  Yes.

17         THE COURT:  That's all right.

18         MR. HUSNICK:  We may have a hard copy in Court.

19         THE COURT:  That's all right.  That's good.  I'll

20 just make this poor gentleman here very nervous as I stare at

21 him.

22         MR. HUSNICK:  Okay.

23                      (Laughter)

24         THE COURT:  Throughout the proceeding.

25         MR. HUSNICK:  May I approach, Your Honor?

118

1          THE COURT:  You may.  If you have one, do you have
2     two?  You know, I'm just afraid that I was joining as an active
3     participant and I was hearing voices this time, and I just --
4     you know -- I'm pretty tech savvy, but for whatever reason I
5     got things that were happening.  All right.
6          MR. HUSNICK:  Don't be too worried about the
7     thickness, Your Honor.  I'm certain that I'm going to move
8     quicker through it, or it's in colloquy --
9          THE COURT:  I need individually eight or nine, so --
10         MR. HUSNICK:  So here we go, Your Honor.
11         THE COURT:  All right.
12         MR. HUSNICK:  Again, Chad Husnick, for the record, on
13     behalf of the debtors.  Your Honor, when we filed our opening
14     brief and at the motion on the TRO we talked about the fact
15     that the debtors believe there are two potential paths under
16     the existing case law to get to the resolution.
17         Ultimately, what you're going to hear me say when I
18     step back is that there's four independent bases for granting
19     the relief that's requested in the preliminary injunction.  The
20     first of those is going to be 363(a)(3).  The second is
21     362(a)(1) and then 105(a), and there's going to be various sub-
22     prongs within that, that we believe we satisfy.  And I will lay
23     out all of the evidence.
24         The way I've set up my presentation, Your Honor, is
25     to walk through what I believe is how the Seventh Circuit law

119

1  maps across certain of the decisions that have addressed

2  similar sets of facts, and then I'll turn to the facts'

3  application of that legal framework to our factual situation

4  and the record before Your Honor.

5          THE COURT:  All right.

6          MR. HUSNICK:  So as I said, we believe there are two

7  bases.  I think the best decision summarizing all of the

8  circuit law that deals with 362, 105(a), the general equitable

9  powers of the Bankruptcy Court really is the LTL decision.  The

10  judge there took a deep dive -- he may not be the final

11  pronouncement on each of these issues of law, but he did a deep

12  dive on how the various courts have addressed the interplay

13  between those sections.

14          On 362 he made the observation, largely in reliance

15  upon the Robins case on the Fourth Circuit, that there are --

16  you know -- general rule is that the automatic stay does not

17  apply to third party non-debtors.

18          THE COURT:  I think you're in a unanimous agreement

19  on that one.

20          MR. HUSNICK:  Right.  And what I think the -- what

21  the Robins court did then said there's an exception to that,

22  and exception number one being the identity of interests are

23  inextricably intertwined, such that a judgment against the

24  third party is an effective judgment against the debtor.

25          The second prong, of course, is irreparable harm to

1  the debtor of the estate.  That one I think is a little bit
2  more amorphous, and you know, what does that mean.  The reason
3  why there's this distinction, though, is jurisdictional in
4  nature.  If it's application of the automatic stay, the
5  jurisdiction question becomes quite simple, because that's core
6  to the application of Your Honor's jurisdiction under 1334(a);
7  you have the exclusive and original jurisdiction under those
8  rules.  When you bridge the --

9           THE COURT:  Shared with the District Court.

10          MR. HUSNICK:  Pardon me?

11          THE COURT:  Shared with the District Court.

12          MR. HUSNICK:  Of course; of course, as a --

13          THE COURT:  I don't want any Article 3 in the
14  building getting nervous.

15          MR. HUSNICK:  Correct, as an adjunct to the District
16  Court.  Sorry.  When you get into 105(a), of course, then you
17  need to do that further analysis under section 1130 -- 1334(b),
18  where you only have -- it's -- you have jurisdiction, original,
19  but not exclusive, over related to.

20          And I'm going to get into how I believe we get into
21  related to, but I think the fundamental difference and that the
22  LTL court observed is that there's two different paths to get
23  here, and one makes it easier as a jurisdictional perspective.
24  Admittedly a lot of the courts in other circuits have blended
25  this.

1          Courts in this circuit had blended this, and they've
2    kind of gone from the rote application of 362, the non-debtors,
3    straight into the (indiscernible) we're extending the stay.
4    And I thought, you know, as a purely intellectual academic
5    matter, I thought Judge Kaplan's decision did a good job of
6    explaining why he felt it was different and why it's meaningful
7    to make that distinction.

8          And I submit if this were to land in front of
9    Easterbrook, I think Judge Easterbrook would probably take that
10   really rigid line, and I'll explain why.  But suffice to say,
11   the summary there was --

12          THE COURT:  Let me ask you this, didn't the LTL judge
13   ultimately end up saying I had core jurisdiction -- or, excuse
14   me -- that he had core jurisdiction over the issue of whether
15   or not to extend the automatic stay?

16          MR. HUSNICK:  Yeah, there's a nuance there.

17          THE COURT:  Is there?

18          MR. HUSNICK:  Insofar as he said -- yeah.  Actually,
19   in Judge Easterbrook in his -- his decision that he wrote on
20   National Tax, where he considered --

21          THE COURT:  Bush?

22          MR. HUSNICK:  Pardon me?

23          THE COURT:  On the Bush decision or National Tax?

24          MR. HUSNICK:  No, National Tax, where he concluded at
25   the end, notwithstanding that he did this entire 362 as a

1  362(a)(3) case, at the end he made the observation that he had

2  related to jurisdiction, as opposed to core jurisdiction.  So

3  there's a little bit of blurriness there, I will admit.

4          But I would submit, if you're applying 362 by its

5  terms, that would seem to fit within the core jurisdiction

6  under section 157 and 1334(a).  And I believe that to be the

7  right answer.  What Judge Easterbrook was observing was

8  jurisdiction as to the actual action.

9          I think that's a different question than jurisdiction

10  that you're exercising and applying to stay in your case.  It

11  may extend to that actual action, but when you're issuing an

12  injunction you're going further than just extending the stay to

13  protect the debtor and its property.

14          You're actually reaching out to protect the

15  interests, and that's where I think you need to go into section

16  1334(b) land and talk about whether there's a potential effect.

17  Of course, under 362 we believe there are two bases.  And look,

18  the application of the automatic stay extensions to debtors is

19  pretty well established for many years.

20          We may debate whether each of these individual cases

21  apply, but this is generally how the Court have addressed the

22  interplay in the cases that we mentioned here, whether it's

23  Manville, Robins, Babcock, Quigley more recently, and of

24  course, the four -- we lump them together -- the Texas Two-Step

25  cases.

1          Your Honor, as to 105(a), we actually believe,

2    whether you apply 362(a)(1) and (2) and (3) -- (a)(1), (a)(2)

3    and (a)(3), or you apply 105(a), we get to the in fact same

4    answer.  And I actually believe that, and I think Your Honor

5    observed right at the TRO hearing when you made the comment of,

6    well, if they're inextricably intertwined doesn't that get you

7    there under 105(a).

8          You weren't commenting on our facts, just the legal

9    framework, and I agree with you 100 percent.  And that's why in

10   the opening I largely focused on the application of the law as

11   to 105(a).  That said, we do believe you can get there.  I

12   mean, it's worth noting, the courts that have addressed these

13   issues under 105(a) under their similar fact pattern, and I'm

14   going to get into each of them, have all reached the same

15   conclusion on these exact facts.

16         Let me talk about some of the more frequent ones.

17   There's an error on your printed copy, Judge, on this chart.

18         THE COURT:  Yes.

19         MR. HUSNICK:  On the third column over, which is

20   fifth on the electric -- or electronic version -- the LTL one

21   was actually uncapped, funding obligation.  The confusion on

22   that in the press and in the media was around whether the

23   ultimate, publicly-traded holding company, so there were two --

24   they were two obligor.

25         There was the Newco and then there was the filing

1  company, LTL.  New JJCI had an uncapped obligation.  The

2  estimated value of that entity, New JJCI, was $65 billion.  The

3  publicly traded whole co also issued a guarantee of the funding

4  agreement obligation.

5          It had its own independent value.  That's a different

6  fact pattern, slightly, than what we have here where our

7  publicly traded whole co is actually the funding agreement

8  partner.  Does that make sense, then?

9          THE COURT:  I won't quibble with you on closing on

10 that, but go ahead.

11          MR. HUSNICK:  Okay.  So the point of this slide, Your

12 Honor, is to show the various facts that came up in each of

13 these cases, the funding agreement, the exhaustion requirement,

14 contact, funding obligation under the funding agreement, a

15 solvent parent, shared insurance.  You're going to see an X

16 here, and I think it's really important, but it was still

17 granted; X meaning it wasn't an operational debtor.

18          Aldrich, same set of facts, no insurance, granted.

19 DBMP, same, no shared insurance, no operational debtor,

20 granted.  Bestwall, same thing, actually affirmed on appeal in

21 front of the District Court, and now, here we are at Aearo.  So

22 the four judges, that's three Bankruptcy Court judges and one

23 District Court judge in two separate circuits that have

24 addressed almost the exact same set of facts, have reached the

25 same conclusions and they extended the stay.

1             And I'll explain why I think they're the same set of
2  facts, but I think our facts are better.  As I said at the
3  first day hearing, we're not a <u>Texas Two-Step</u>.  This is not
4  some sham transaction.  We've heard a lot about, it's a sham.
5  Aearo is 3M.
6             That's the same position that these plaintiffs'
7  lawyers have been taking the MDL and the Minnesota case from
8  the beginning of the litigation three years ago.  That's the
9  very facts that we're highlighting for Your Honor that makes
10 these inextricably intertwined claims under the case law that
11 you've addressed.
12            This isn't some corporate structure that we made up
13 overnight.  When I came to this situation the Aearo debtors
14 existed just as they exist today.  The existed separate and
15 apart from 3M, yes.  Are they managed as part of a corporate
16 conglomerate, the way a lot of subsidiaries are named?  Yes.
17            Are they defending the litigation in the MDL and in
18 the Minnesota State Court action as to all liability?  Yes.
19 They're saying, we're not -- none of us are liable.  There
20 wasn't any finger-pointing going on amongst the defendants at
21 this stage of the MDL transaction.
22            What we have here, Your Honor, is an organic
23 structure that we came to as it existed, and 230,000 times the
24 plaintiffs have said the same thing.  Aearo is jointly and
25 severally liable for the tort claims related to the earplugs.

1  That's what they said.

2      They can say, oh, they're just defendants in name

3  only.  Doesn't matter, Your Honor.  They were listed as

4  defendants, and what we uncovered in the facts and what the

5  evidence shows is that in fact, a lot of the actions were taken

6  by Aearo.  We don't have to get into the merits of those

7  actions and what happened.

8      Suffice to say, when you look at the complaints that

9  were filed, you look at the arguments that were made in the

10  MDL, you look at the arguments that were made in court, you

11  have to conclude that they're the same claims.  It's the same

12  claims, the same acts and the same liabilities.  That's why

13  they're inextricably intertwined.

14      When the courts that have addressed this entered

15  their opinions, they've addressed a lot of the arguments that

16  have been made, and I want to go into each of them at the right

17  time, but they heard and rejected each of the arguments about

18  contrived nature.

19      We're better than that here.  We don't have a

20  contrived nature of this setup.  This is an organic, operating

21  business.  We have employees.  It's not five, 10,000 employees,

22  but it's a healthy, operating business that is saddled with the

23  tort liabilities and has been for some time.

24      Each of these decisions, Your Honor, we believe

25  supports the conclusions for all of the reasons that I'll get

1    into as I walk through the facts.  The bottom, as I said,

2    Judge, four separate judges, Judge Kaplan, Judge Whitley, Judge

3    Beyer, Judge Conrad, they all reached the same conclusions.

4          This Court is not on an island when it's being asked

5    to do a preliminary injunction under this fact pattern.  Again,

6    I haven't come to the Seventh Circuit yet and I will.  Let's go

7    there now.  The Seventh Circuit I believe provides the two very

8    same patterns.

9          By citing Robins, the Seventh Circuit in the

10   Firmstrum (phonetic) case acknowledged that the automatic stay

11   can extend to non-debtor affiliates in two circumstances.  The

12   plan's brief said they assiduously avoided adopting Robins.

13   Yet twice in the case law the Seventh Circuit has looked to

14   Robins for guidance.

15         Yes, on both times that it said Robins doesn't apply,

16   but the sentence -- it doesn't -- it didn't say, we're not

17   adopting Robins.  They looked to Robins, cited Robins, as the

18   standard and then said that standard doesn't fit our specific

19   fact pattern.

20         With cute lawyering, the word "only" was inserted

21   into the brief to say that only as against non-debtors.  That's

22   isn't what the case said.  The case said that if 362 generally

23   is the non-debtors and then it goes on to explain the two

24   circumstances in which courts have held that it goes beyond

25   debtors to non-debtors, as our case.

1        First is the identity of interests.  I just talked a
2   bunch about that in connection with what we'll ultimately get
3   to in the 105(a) stuff.  But that one I believe is crystal
4   clear under section -- I'm not going to say that very often.  I
5   know you don't agree it's crystal clear.
6        To me it's clear, Your Honor.  I believe the case law
7   supports the conclusion that you can get there under 362(a)(1).
8   But what's even clearer to me, Your Honor, is 362(a)(3).
9   362(a)(3) says property of the estate.  These insurance
10  policies, these Legacy insurance policies and shared insurance
11  policies where we are insured are 100 percent property of this
12  estate, and Your Honor has the ability to enjoin actions that
13  are seeking to diminish or deplete that insurance.
14        Your Honor, that is not only what the Firmstrum case
15  says, but once again, the Seventh Circuit revisited this
16  concept, and what I think is really important about Firmstrum,
17  nowhere in the decision is 105(a) mentioned.
18        THE COURT:  And also, they didn't grant it.
19        MR. HUSNICK:  That's correct.  They didn't grant it
20  because the fact pattern there was radically different.  In
21  that case, your --
22        THE COURT:  Has the Seventh Circuit ever granted one?
23        MR. HUSNICK:  On the -- yes.  I'll come back to you
24  on that, Your Honor, but I believe there is a case where they
25  granted that.

1                  THE COURT:  Okay.  Okay.

2                  MR. HUSNICK:  But the -- each time they found that

3    the case was --

4                  THE COURT:  Let me ask you this.  Let me ask this,

5    and you want to be as crystal clear and you're like, well,

6    you're not so sure.  But if I look at it, if the stay really

7    does just jump to third parties without application of 105,

8    then doesn't that make bankruptcy like the most powerful tool

9    in the federal judiciary?

10                 MR. HUSNICK:  It is.  When you file for Chapter 11 --

11                 THE COURT:  Right, as to the debtor.

12                 MR. HUSNICK:  -- as to the debtor and reorganization

13   of the debtor, you have extraordinarily broad powers.

14                 THE COURT:  Right.

15                 MR. HUSNICK:  To reorganize debtor.

16                 THE COURT:  But if you look at all these cases, and

17   maybe you'll convince me I'm wrong, but especially in the

18   Seventh Circuit they thought, well, the embedded grounds, A.H.

19   Robins, they talked about that.  Don't they almost always end

20   up under 105?

21                 MR. HUSNICK:  A lot of courts go there, but I

22   wouldn't say they almost always do.  I mean, the five or six

23   cases that we talked about, again, outside the Seventh Circuit.

24   They haven't faced this issue yet.

25                 THE COURT:  Right.

130

1          MR. HUSNICK:  But they've reached the conclusion that

2  -- I know there's some cases; I'm going to come up with it when

3  I sit down, but the -- when you read Firmstrum in a case that

4  never once mentions 105, the judge would have immediately went

5  there.  That's just the nature of how you'd write the opinion.

6          You would say, you can't do this, but you could do it

7  under 105(a) and then you expand -- you explore that.

8          THE COURT:  They might have.

9          MR. HUSNICK:  But they didn't.

10          THE COURT:  And wouldn't it be great if some Seventh

11  Circuit case told me what I was supposed to do.  Wouldn't that

12  be amazing.

13          MR. HUSNICK:  Exactly.

14          THE COURT:  But they don't, do they.

15          MR. HUSNICK:  But in the absence of that, Your Honor

16  is allowed to look to other circuits to see what the other

17  circuits are doing.

18          THE COURT:  Well, I can, and they don't exactly,

19  really jump out there, do they.

20          MR. HUSNICK:  I disagree.  Robins is squarely on --

21          THE COURT:  Robins does, and everyone cites to

22  Robins, but all the cases that do generally, well, we better do

23  it all under the other --

24          MR. HUSNICK:  I think you should do it --

25          THE COURT:  -- cases.

1          MR. HUSNICK:  -- under alternative approaches.  I
2  would grant it --

3          THE COURT:  Yep.

4          MR. HUSNICK:  -- if I were -- if I were sitting in
5  Your Honor's stead, I would ask that the relief be granted
6  under both prongs.

7          THE COURT:  Okay.

8          MR. HUSNICK:  Right.  And the reason is because I
9  believe Your Honor is solidly within your jurisdiction to make
10  the finding on both prongs, and I think that's very routine for
11  courts who are addressing an issue, especially when it's a
12  cloudy issue --

13          THE COURT:  Well, of course.  I mean, because -- and
14  if you were here you would know, being reversed isn't as bad as
15  being remanded.

16          MR. HUSNICK:  Agreed.

17          THE COURT:  Whatever you do, don't get remanded.
18  Okay.

19          MR. HUSNICK:  Well, Your Honor, the --

20          THE COURT:  Do what you do, but if they disagree it'd
21  be great, but don't do it again.  So yes, they do cover it.
22  But you talk about this intellectually, okay.  So if you take
23  it as a fact that this is the stake and it applies to debtors,
24  except in a couple instances, according to the -- they all say
25  that, and the difficulty is how do you get to those instances,

132

1  right.

2          And I think -- and your poor partner who's never

3  appeared in Bankruptcy Court in front of me, again, on the

4  first day argued that of course it does.  It's just automatic.

5  We don't even have to be here, because 362(3) applied.  And I'm

6  like, well -- and I love how any quote I make automatically

7  gets quoted back to me in other briefs, but doesn't it take

8  that extra step if -- because it only talks about debtors.

9          Everyone agrees that normally it talks to debtors,

10  except you can extend it in a couple circumstances.  In order

11  to get to those circumstances don't I have to use 105 --

12          MR. HUSNICK:  Certainly --

13          THE COURT:  -- because I'm now taking it outside the

14  debtor?

15          MR. HUSNICK:  -- certainly not on section 362(a)(3).

16          THE COURT:  Well, that's what you keep telling me.

17          MR. HUSNICK:  There --

18          THE COURT:  But --

19          MR. HUSNICK:  -- there's no language in the

20  Bankruptcy Code that says, and certainly in 363(a)(3), that

21  says that it's only against debtors.  It talks about property

22  of the debtors' estate, and the property of the debtors' estate

23  here is the insurance policies.

24          And if that's being depleted, that's one of the

25  debtors' assets that is subject to the automatic stay.

1          THE COURT:  What was that issue in <u>Firmstrum</u>?

2          MR. HUSNICK:  Pardon me?

3          THE COURT:  What was that issue in --

4          MR. HUSNICK:  Well, the issue in <u>Firmstrum</u> was, there

5  was a single insurance policy.

6          THE COURT:  It was insurance, right?

7          MR. HUSNICK:  Correct.  And I believe the term had --

8  of that policy had expired such that there was only one claim

9  that could recover it in said insurance policy.  And the

10 plaintiffs in that action acknowledged that its claim was never

11 going to exceed the value of the insurance proceeds, such that

12 it had zero effect on the estate.

13         THE COURT:  Right.  And the Court let it go through,

14 right?

15         MR. HUSNICK:  And the Court lifted the stay.  That

16 was a lift stay case, and lifted the stay.  It took -- by the

17 way, it -- that is one reason you can look at if it did extend.

18 But <u>National Tax</u>, Your Honor, I believe filed a violation of

19 362(a)(3) as against a non-debtor.  That would be one of the

20 cases.  The case cite is 20 F.3d at 705.  Your Honor, we can --

21 I can spend more time on this if you'd like, or I --

22         THE COURT:  It's up to you.  I mean, I'll admit, I'm

23 skeptical, only because under your reading it really expands

24 the automatic stay, and where does it stop.  If you were a

25 company that filed for bankruptcy and you had a contract that

1  needed an exclusive widget, and WidgetCo made that widget, and

2  you had a contract that WidgetCo had to give you 1,000 widgets

3  a month, or even 1,000 widgets a day.

4        Otherwise, you couldn't function as a company.  You

5  need that widget to go in your grand creation.  Okay.  What if

6  someone starts suing WidgetCo?  What if they sue them and it's

7  a big -- for something unrelated to Widget, does the automatic

8  stay extend there, because you have a contract right to get

9  your 1,000 widgets.

10        MR. HUSNICK:  If you're not a direct beneficiary of

11  the -- you are under the insurance policy.  It's an asset of

12  the estate.  The contract is, but moving beyond that to say,

13  then, I can enjoin some third party from suing you, my contract

14  counter-party is a bridge too far from insurance.  It's

15  different.  The insurance is --

16        THE COURT:  All right.  So that's too far.

17        MR. HUSNICK:  The insurance policy is property of the

18  bankruptcy estate.  There are different ways to write insurance

19  policies.

20        THE COURT:  Well, there are, yes.

21        MR. HUSNICK:  For example, like Side A only coverage

22  under a D&L insurance policy would clearly not be property of

23  the estate, and that's why policies are drafted in that way.

24  Here, we have liability coverage.  It's an asset of the estate,

25  and if you're joint insurers under a liability policy, it's an

135

1    assets of the estate.

2            THE COURT:  All right.  (indiscernible)

3            MR. HUSNICK:  Your Honor, let me jump to 105(a).  As

4    you said, we can -- there's a separate line of cases that

5    doesn't discuss the automatic stay.  It talks more just purely

6    about the equitable rights under the Bankruptcy Code.  The

7    fifth -- the Seventh Circuit's, you know, key cases, Fisher,

8    Caesars, they lay out the tests.

9            I think, you know, there's no dispute I think about

10   what the high level, you know, what the test says.  I think

11   some of the underlying cases shed some light, but they clearly

12   don't, you know, provide every single answer.  I think you have

13   to apply the facts to the law.

14           And you can look outside of this circuit where

15   there's issues that you think haven't yet been addressed.  Your

16   Honor, I think it's important when you talk about 105(a) to

17   touch upon what I believe the plaintiffs got wrong under

18   Seventh Circuit law.

19           And they got it wrong because they didn't cite the

20   Seventh Circuit's most recent decision on the topic.  That's

21   important.  Your Honor, there's been a lot of development here.

22   Xonics came out in 1987.  Celotex made this observation about

23   the circuit splits in '95.

24           Fedpak, Fisher, Teknek each tried to put their own

25   gloss on it, and then Easterbrook, Judge Easterbrook, as he's

136

1  wont to do, came down and tried to tie them all together.  And

2  he rejected attempts to try and narrowly read that path, to try

3  and narrowly read Teknek.  And he broadened it in some ways to

4  say, look, one thing I'm not going to do is say that it's the

5  next post (indiscernible).

6        No circuit in the country has done that, we're not

7  doing it, we agree.  The second thing he did, he tried to deal

8  with this language barrier that any conceivable effect under

9  the (indiscernible) Higgins test versus what had come out of

10 Fedpak, Fisher, Teknek and he ultimately came down that

11 potential effect, any potential effect, but it's any potential

12 effect on the amount of property redistributed and the

13 allocation of property.

14        And I think the allocation is critical, as is the

15 amount, but they're both independent bases.  Allocation of

16 property goes to equitable allocation of property, and if

17 people are out litigating claims and racking up judgments on

18 the very same claims that are going to be and need to be

19 addressed in this case, that is going to result in inequitable

20 treatment of creditors, because some creditors are going to get

21 access to those systems, some are not.

22        And that is going to create the run on the bank, so

23 to speak that was -- bankruptcy was meant to deal with.

24        THE COURT:  But don't you have a funding agreement

25 that says 3M will pay for everything?

1        MR. HUSNICK:  Now, let's go to slide 83, if you don't

2   mind.  So Your Honor asked about whether this is a zero sum

3   game.  We don't believe it is, Your Honor, but let me start by

4   saying, the courts that have actually -- the courts have

5   addressed this exact issue.  Bestwall addressed it.

6        LTL addressed it.  What are our facts here?  This is

7   a summary slide and I'll give you the litmus testimonial on it.

8   No future funding source is risk free, Your Honor.  This is

9   slide 83 or 85 --

10        THE COURT:  Oh.  Maybe it's 85, because 83 just had a

11   quote.

12        MR. HUSNICK:  Yeah, 85.

13        THE COURT:  By a really good judge.

14                        (Laughter)

15        MR. HUSNICK:  I don't even know which one it is,

16   but --

17        THE COURT:  That hurt.

18        MR. HUSNICK:  I'm sorry.  I -- I --

19        THE COURT:  -- think it's me.

20                        (Laughter)

21        THE COURT:  -- Geez.

22        MR. HUSNICK:  My apologies, Your Honor.  Thank you.

23        THE COURT:  All right.

24        MR. HUSNICK:  There it is.  Thank you.

25        THE COURT:  Well, okay.

138

1            MR. HUSNICK:  I'll turn around the slide.  Sorry.

2   Your Honor, I think the key analysis here on this circularity

3   question is whether any of the individual funding sources,

4   including the funding agreement, is risk free, because the

5   test, the ex ante potential effect test articulated in Bush,

6   would have you say that is there any potential effect.

7            And here, if you are draining various assets that you

8   have because you're being forced to litigate the very same

9   claim, the claims that are being litigated, and you are in

10  effect a defendant, that is a sinking fund.  You may be able to

11  make whole, but there's no guarantees in life, and we're going

12  to talk about that in a second.  But first, you have to go

13  through your --

14           THE COURT:  Well, but it -- and I know you're going

15  to get there.

16           MR. HUSNICK:  Yes.

17           THE COURT:  But if you say there's no guarantees in

18  life doesn't mean, then, that every case satisfies that?

19           MR. HUSNICK:  Your Honor, I --

20           THE COURT:  There's always going to be potential

21  impact on funding.

22           MR. HUSNICK:  If you have a funding source coming in

23  your Chapter 11 estate that's agreed to fund it and there's a

24  cause action like this that's identical to the cause of action

25  against you, yes.  That is Caesars.  That -- that --

139

1           THE COURT:  Well, is that Caesars?

2           MR. HUSNICK:  You could say Caesars -- Caesars had a

3  source of assets.

4           THE COURT:  Yes.

5           MR. HUSNICK:  They were calling on the guarantees.

6           THE COURT:  Yes.

7           MR. HUSNICK:  And they had a settlement negotiated to

8  resolve the claims in the bankruptcy.  So they were the known

9  amount and they sought to enjoin while they were litigating --

10  or while they were prosecuting the bankruptcy plan to get that

11  settlement approved.

12           And by the way, that's the one bankruptcy judge

13  recently that declined to issue the preliminary injunction and

14  was swiftly reversed, because the Seventh Circuit said, you

15  absolutely have that power to protect --

16           THE COURT:  What's -- yes, but what -- Seventh

17  Circuit you have the power, but we're not going to tell you.

18           MR. HUSNICK:  Correct.

19           THE COURT:  And you can apply it and then remand it.

20           MR. HUSNICK:  And on remand.

21           THE COURT:  So right.

22           MR. HUSNICK:  Yeah.

23           THE COURT:  But, and correct me if I'm wrong, but

24  didn't in Caesars -- wasn't there a question of whether or not

25  the parent could ultimate peg what was being asserted?

1          MR. HUSNICK:  If the parent were hit on the guarantee

2   it was not going to be -- it would not honor its settlement

3   obligation.

4          THE COURT:  Correct.  Okay.

5          MR. HUSNICK:  And that was, you know, the fundamental

6   precipice of the issue, the --

7          THE COURT:  Right, because then was because that

8   third party, which they hoped to extend the stay to, couldn't

9   satisfy the judgment.

10          MR. HUSNICK:  Correct.

11          THE COURT:  Okay.  And so my question here is, is

12   this similar or dissimilar when you have a funding agreement

13   that says it is uncapped and will pay whatever amount is

14   necessary?  Is it the same?

15          MR. HUSNICK:  It's very similar.

16          THE COURT:  Okay.

17          MR. HUSNICK:  It -- your -- they're -- what they're

18   trying to create that just doesn't exist under the law is that

19   so-called solvent payor exception from 105(a).  And what --

20          THE COURT:  Well, that's not really what they're

21   saying, is it?

22          MR. HUSNICK:  Yes, that's 100 percent --

23          THE COURT:  They're not just saying that it's

24   solvent, because in Caesars they were solvent.

25          MR. HUSNICK:  No.  No.  The parent, they were --

141

1   they're suggesting that the parent has to be insolvent, and

2   therefore -- or potentially insolvent.

3          THE COURT:  Oh.  Maybe they're suggesting that, but

4   I'm just asking you the question, though, isn't that what

5   Caesars says?

6          MR. HUSNICK:  I don't believe at all that's what

7   Caesars said.  That happens to be the fact pattern in Caesars,

8   but Caesars didn't say that that was the fundamental premise

9   under which they issued the injunction or they -- what the

10  Seventh Circuit did is they just reversed it and said we just

11  were wrong in concluding that you didn't have the power to do

12  this.

13         You have the power to protect your estate from

14  impairment in defeating your restructuring process.  And that's

15  why I think the allocation element of Bush is so important,

16  because Your Honor's -- our job, my job with Your Honor's

17  support is to reorganize these debtors and resolve these claims

18  in this bankruptcy.

19         That may involve litigation in other forum.  That's

20  Your Honor's decision whether to allow certain of these issues

21  to go forward.  I would submit, Your Honor, that allowing

22  litigation to continue on the exact claims against the debtors

23  is going to completely undercut the debtors' attempt to try and

24  use the bankruptcy tools to resolve these claims.

25         THE COURT:  No.  I understand that.  I'm going to

142

1    circle that, though, because I think this is a big issue, and I

2    just want to understand there.  So in -- again, in Caesars it

3    was a math problem, or at least I'm going to posit this as a

4    question to you.

5              If one reads Caesars as saying, when there's a math

6    problem, i.e., the corporate parent can't satisfy everybody,

7    then 105 -- it's -- well, it's not even -- can apply.  It's a

8    textbook situation for 105 to apply, if that's the case,

9    because you're protecting the fact that if this doesn't happen

10   the parent might not be able to pay us, and then you're going

11   to be liable and that would just pay as a -- we think, but you

12   know, we're not going to make a decision, go back to Judge

13   Goldgar.  If --

14             MR. HUSNICK:  If he -- sorry, Your Honor.

15             THE COURT:  -- if that's the reading, is that similar

16   or dissimilar to this case?

17             MR. HUSNICK:  If that narrow reading's the reading,

18   it's dissimilar to our case.  I don't believe that's the right

19   reading in Caesars.  I don't believe Caesars was dependent

20   simply upon the fact that there may not be enough assets.  By

21   the way, even if you read it that way, though, Your Honor, it's

22   any potential effect, ex ante.

23             We cannot sit here today in light of the testimony

24   that was heard and say there's no potential effect.

25             THE COURT:  Okay.  What would that testimony be?

143

 1            MR. HUSNICK:  First and foremost, Your Honor, that's

 2  not working good.  That is a --

 3            THE COURT:  It never works when you need it.

 4            MR. HUSNICK:  First and foremost, I want to --

 5  there's a hierarchy in which things are going down.  I think

 6  it's really important, because the debtor has various forms of

 7  assets.

 8            THE COURT:  It does.

 9            MR. HUSNICK:  Various categories of assets summarized

10  here on the last slide in the exhaustion hierarchy.  As you

11  heard in the testimony, in the funding agreement itself, but in

12  the testimony from Mr. Stein, that he doesn't believe any of

13  these funding sources are riskless.

14            Cash is a depleting resource, but it's probably the

15  best resource.  But under the funding agreement it's the first

16  resource that has to be spent.  Second, the insurance policies,

17  has to be exhausted before he can call on the funding

18  agreement.  Third is -- we'll get to that one later.  Third --

19            THE COURT:  In camera.

20            MR. HUSNICK:  Third.  Sorry, jumped the gun.  You see

21  where I'm going here, Your Honor.  But third is the -- excuse

22  me -- the -- I want to go back one more -- is the funding

23  agreement.  So once you draw the cash, you draw the cash from

24  operations and the insurance.

25            Then you hit the funding agreement.  So your two

144

1  primary sources of recovery for creditors of your box or your

2  cash, your cash generated from operations, then you're going to

3  the funding agreement.  I submit to you, Your Honor, that that

4  is a potential affect of drawing on my assets, my existing

5  assets.

6          I may have another pool of assets to draw on to try

7  and keep replenishing that, and we believe it's a very sound

8  source of assets.  We believe that.  That's why Mr. Stein was

9  willing to enter into and negotiate the funding agreement.

10  That's why he went and asked for the funding in the fashion

11  that he got it.

12          But Your Honor, it's not riskless.  And this is --

13  this slide, Your Honor, you've heard the testimony go into the

14  record from an expert, Mr. Heaton.  He testified that he

15  believes in his opinion that the liability is in excess of $100

16  million.  That's at a minimum.

17          There was no cross from the plaintiff on that side.

18  That's the assertion.  That's the evidence in the record of

19  their view.  That's the asserted amount of the claim.  I

20  don't --

21          THE COURT:  Well, that is evidence -- that's the only

22  evidence I have as far as, you know, opinion on the minimum --

23  possible minimum exposure.

24          MR. HUSNICK:  Correct; correct.

25          THE COURT:  Regarding the tort claims.

1          MR. HUSNICK:  And the plaintiffs are saying -- the

2   other set of plaintiffs, Mr. Aylstock's clients are saying,

3   well, it's not that high.  It's always been there, by the way,

4   Your Honor.  There's been statements from that firm that it's

5   much higher than this, but suffice to say, if you have $100

6   billion number you cannot say that there's no potential affect.

7   We have assert claims --

8          THE COURT:  Do you object to that testimony, though?

9          MR. HUSNICK:  We crossed the witness to pressure test

10  the methodology.

11         THE COURT:  Okay.

12         MR. HUSNICK:  But we have an assertion from one of

13  the plaintiffs, not just in a pleading, but in a signed

14  declaration and we put the witness on and he testified.

15         THE COURT:  Well, we have testimony and the

16  declaration wasn't admitted into evidence.

17         MR. HUSNICK:  Fair enough, Your Honor.

18         THE COURT:  Well, okay.

19         MR. HUSNICK:  Your Honor, I'd stipulate when the test

20  is any potential affect ex ante and the asserted amount of the

21  claims exceeds the value of the pin, we can't ignore that.

22         THE COURT:  Okay.

23         MR. HUSNICK:  Perhaps that was a strategic mistake on

24  their part, but that's what they said.  That's what they did.

25  That's the record in front of Your Honor.  Let's go back to

146

1 where we were, please.

2          THE COURT:  So I'm just going to ask as an aside.

3 Who's the other gentlemen?  Will I ever know?

4          MR. HUSNICK:  Mr. Heaton, Mr. Aylstock.

5          THE COURT:  I didn't know that.  Thank you.  I didn't

6 know who this gentleman was.  So I'm like -- I don't know who

7 they're -- I don't -- all right.

8          MR. HUSNICK:  I should have previously -- I met him

9 just before the hearing.  I'm sorry.

10              (Several people talking at once)

11          THE COURT:  It's very non-flattering.  You didn't

12 even know I was on your slides.

13          MR. HUSNICK:  I knew -- sorry.  I'm never going to

14 live that one down, Your Honor.

15          THE COURT:  All right.  Go ahead.

16          MR. HUSNICK:  Okay.  So Your Honor, ultimately, I

17 think it's where we're coming down on the law here is we

18 have -- and I will admit to you -- to overlapping standards,

19 and you know, 105(a) provides Your Honor with much broader

20 power.

21          It's much more malleable and flexible, but we believe

22 the evidence that we put forth in satisfaction of our burden

23 materially overlaps amongst the two standards.  And so I will

24 spend quite a bit of time on that front.  The standard, of

25 course, no real debate here, the fair -- defeat or impair the

147

1  Bankruptcy Court's jurisdiction, the likelihood of success on

2  the restructuring and public in-fill.

3          THE COURT:  I'm going to ask, where'd you get a

4  three-prong test from?

5          MR. HUSNICK:  Your Honor, that came straight out of

6  Caesars.

7          THE COURT:  I know.  It's a trick question,

8  because -- and as I said, it's not exactly clear.

9          MR. HUSNICK:  Yes.

10         THE COURT:  Sometimes, it's just 105, just that.

11 Other times, it's the preliminary injunctions, which are quite

12 the serious test.  And so what do you propose I do?

13         MR. HUSNICK:  Your Honor, I would suggest and I would

14 apply the Caesars test the way it was articulated, the three

15 steps that they articulated.

16         THE COURT:   Okay.

17         MR. HUSNICK:  Which really is in the first instance,

18 I would say if we're going down the -- bridging from 362 to

19 105(a), it's finding a basis for extending the automatic stay.

20 So a basis for arguing the stay should apply, and then moving

21 from there to the third party.

22         That's really what this is all about.  So one is

23 really finding that basis for the stay.  And what the Court

24 articulated is defeat or impair the jurisdiction at the high

25 level.

148

1              THE COURT:  Right.

2              MR. HUSNICK:  But I think then you can get into, oh,

3  my word, we lost everything.  We need to wait?  Oh, we are

4  still on.  Okay.  Sorry.  My computer just went --

5              THE COURT:  Oh.  I see (indiscernible).

6              MR. HUSNICK:  Sorry about that.

7              THE COURT:  It's up to you.

8              MR. HUSNICK:  I think we're good.

9              THE COURT:  Okay.

10             MR. HUSNICK:  So your -- so I -- how I think you get

11  there, and this is where there's so much overlap, is in this

12  first factor.  I will admit to Your Honor that some of the

13  other lower courts, for example, in Gander, the Northern

14  District of Illinois, Judge Cox, as well as Judge Goldgar in

15  the Caesars remand, applied the fourth factor, the balance of

16  the harms.

17             THE COURT:  They do.

18             MR. HUSNICK:  It's interesting, because the Seventh

19  Circuit didn't mention that as a consideration, either in the

20  Fisher case or in Caesars.  However, it's really, in my opinion

21  as I read the cases and I read how they apply to the factor,

22  they really get to the same spot by analyzing the public harm

23  and the likelihood of success on the merits.

24             Your Honor, within defeat or impair the Bankruptcy

25  Court jurisdiction, I do believe there's -- and this is where I

1   get back to my independent bases.  So 362(a)(1), (a)(3) and now

2   we're at 105.  And within 105 we believe there's four

3   independent bases to reach the conclusion that the preliminary

4   injunction should issues, inextricably intertwined claims,

5   common insurance, indemnity and distraction from resolution of

6   the cases.  Let me talk about the evidence on each of these

7   that we put into the record.

8          THE COURT:  Let me ask you before you begin.  Do you

9   have to satisfy all of them?

10         MR. HUSNICK:  No, Your Honor.

11         THE COURT:  In your opinion?

12         MR. HUSNICK:  Each independent one would be a basis

13  for extending the automatic stay.  Your Honor, on inextricably

14  intertwined the LTL case did a good description of this,

15  largely in reliance upon the other cases that have addressed

16  this, Robins, et cetera.

17         But generally, what the courts have said is, when a

18  judgment against a third party is in effect a judgment against

19  the debtor the claims are inextricably intertwined.  Others

20  have said shared identifies of interest.  I submit, Your Honor,

21  here they're the exact same claims.

22         The conduct that's asserted in the underlying

23  litigation, both in Minnesota and the Florida MDL, is the same

24  web of conduct that's at issue.  This is a statement from the

25  plaintiffs' motion for consolidation of the three first

1  bellwether cases.

2          Again, one of those was for purely post-acquisition

3  issues.  The others were for two -- one bridged and one I think

4  was fully proved.  Your Honor, we laid out in a demonstrative

5  that I now believe we've put the evidence in to support on the

6  next slide, the building blocks for these claims.

7          In order to state the claims that they've made in

8  their pleadings they have to assert design, manufacture,

9  testing, sale and then instructions and failure to warn for the

10 other claims.  They cannot make a statement against the Aearo

11 debtor -- or against 3M without articulating that the design,

12 manufacture, testing and sale were done incorrectly.  They have

13 to state those.

14         But we know through the testimony that the design,

15 manufacture, testing and sale all happened before -- well, not

16 all of the sales, but some -- most of the -- or most of the

17 sales, as we know.  But the first three prongs all happened

18 before 3M was even on the scene.

19         And they can say, yeah, but, and they gloss it all

20 over and the reality is, when they plead these complaints

21 they're identical.  They add a few facts that they need to get

22 the one extra claim, but they're identical, fundamental

23 premise.  There is nothing more inextricably intertwined than

24 the same claim.

25         You heard in the testimony that Aearo designed -- and

1  this is just building up the building blocks -- Aearo designed

2  the Combat Arms Earplugs in consultation with the United States

3  Government, as well as ISL.  That's the French expert.  Your

4  Honor, the two-ended plug came into existence early in 1998,

5  the design in mid-1999, nothing after the acquisition in 2008.

6         The Flange report.  You hear a lot about the Flange

7  report and the complaints.  Every single complaint mentions the

8  Flange report.  The Flange report is the one -- a report that

9  it made some observations about the Combat Arms Earplugs.  That

10 report, Judge, was issued in 2000, July 10, 2000.

11        Aearo had nothing to do with 3M on July 10, 2000.

12 It's eight years, in fact, Your Honor.  But the Flange report

13 forms the fundamental basis in all of the case -- all 16 cases

14 that I've been trying, opening and closing, the Flange report,

15 the Flange report.  Again, an Aearo Flange report; it can't

16 make their case without it.

17        Let's move on from design in the report to the

18 testing.  You're going to hear -- you heard from Mr. Myers that

19 the technical group for Aearo is the one who created the

20 testing, and the testing was done in late 2000 -- or late 1999

21 into 2000, again, before the acquisition of the stock by 3M.

22        Sales.  Sales was another component of the building

23 blocks.  You heard from the testimony that 80.6 percent of the

24 sales occurred before 3M was on the scene.  They can't make an

25 assertion about those claims without involving Aearo.  They're

152

1  inextricably intertwined.

2          You heard a little colloquy on the record about the

3  numbers in this chart, Your Honor.  Just to clear that up, I --

4  the testimony if you parse through it, there was a chart

5  produced in discovery, Your Honor, that had a slightly

6  different number.

7          If you went with the higher number of 46 million, I

8  believe that the percentage goes down to seven -- or 75

9  percent.

10         THE COURT:  Seventy-five --

11         MR. HUSNICK:  The delta, Your Honor, is there were

12  some gloves that were sold in addition to earplugs to those

13  customers.  So when they created the chart for the

14  demonstratives in deposition they were able to slice through

15  and they noticed that that original chart included some non-

16  earplug sales.

17         Your Honor, carrying through, when they tried the

18  cases they tried them the exact same way.  They told the

19  bellwether jury that they should consider 3M and Aearo as all

20  the same company for purposes of the lawsuit.  And these are

21  just some excerpts from the opening statements, which are

22  included into the evidence or introduced into evidence.

23         For 3M, EER, Aearo, all the same entities.  They're

24  all the same for this lawsuit.  You hear one, you hear them

25  all.  They're all the same company.  The jury instructions did

153

1    the exact same thing, Your Honor, collectively referred to the

2    defendants as 3M, but we know that that covered 3M Company, 3M

3    Occupational Safety, LLC, Aearo Holdings, Aearo Intermediate,

4    LLC, Aearo, LLC, and Aearo Technologies, LLC, the defendants

5    and the debtors here in this litigation.

6         And it carries through to the verdict forms.  They

7    all describe them collectively as 3M.  Here it is.  It's one of

8    the stipulated facts that we submitted to Your Honor and -- so

9    it doesn't stop there, though.  We were articulating that these

10   were inextricably intertwined.

11        And then we got the Friday night special from Mr.

12   Keller, adversary complaint, withdraw the reference, JPML.  The

13   complaint against Aearo did exactly what we said it was doing.

14   It made the exact same claims that 3M has asserted in the MDL.

15   They cannot argue that these are different claims.

16        They simply cannot.  It has no credibility.  They

17   sued the same defendants in the MDL, the state and the

18   Bankruptcy Court for each of these claims.  And what we're

19   doing here, Your Honor, is just comparing the complaint -- the

20   adversary complaint to what was filed in the MDL.

21        This is all in the record, but you see it's the same

22   defendants.  It's the same claims.  It relates to the same

23   testing, the same development.  All of the facts are the core

24   facts that are inextricably intertwined with this case.

25        Mr. Keller in his own words or in his own pleading on

154

1  behalf of his client had the following to say.  "The

2  plaintiffs' personal injury claims in this adversary proceeding

3  mirror those pending before the MDL case."  I'm not a

4  litigator, so I don't know what an admission against interest

5  is, but that there is an admission that these are inextricably

6  intertwined claims.

7        Matheo's product use, Mr. Matheo is the plaintiff who

8  filed the proof of claim, again, his product use was entirely

9  post-3M acquisition, but all of his complaint, including the

10  Aearo complaint that they just filed on Friday in Your Honor's

11  Court, relate to the Aearo actions that were taken.

12        And the plaintiff continued to conflate Aearo and 3M.

13  Counsel in argument and the colloquy with you, you know, he was

14  using loosey-goosey terms, and ultimately said 3M was Aearo,

15  Aearo was 3M.  And Your Honor stopped him and made him clarify

16  that he was surely not talking about one and the same.

17        What does that get us, Your Honor?  We've kept our 11

18  cases.  I'm not ashamed.  The debtors are not shell companies

19  that were contrived by 3M.  The debtors do have real liability

20  for the Combat Arms claims.  We've been held jointly and

21  severally liable for over $300 million of judgments.

22        We're still facing 230,000 claims, plus 2,000 claims

23  in State Court.  Plaintiffs are just simply wrong.  Mr. Paul's

24  firm and their -- on behalf of their client, they asserted,

25  Your Honor, that the Aearo doesn't exist.  There's no business

1   there to reorganize.  This is flat wrong.

2          You heard from Mr. Castellano, this is an operating

3   business.  It may not be as big as they want, and the reality

4   is, if 3M didn't buy the stock in this company, Aearo probably

5   would have been in bankruptcy many years ago, and they probably

6   would be left with virtually no recovery.

7          So here we are, Aearo -- or 3M has stepped up through

8   the funding agreement.  These debtors are trying to reorganize

9   their business.  We're trying to facilitate the claim -- or

10  payment of the claims.  Your Honor, these arguments about sham

11  have been repeatedly rejected by courts with far worse fact

12  matters than ours.

13         It was rejected in the <u>LTL</u> case, most notably and

14  most recently.  It was rejected in the <u>Bestwall</u> case, as well.

15  The idea is that the Bankruptcy Code is set up to reorganize

16  debtor entities.  They may not like the fact that they -- in

17  hindsight that they sued these debtor entities.

18         I would submit, Your Honor, they had to and they know

19  it.  They couldn't just drop these debtors as defendants.  They

20  wouldn't have had a viable claim.  But they didn't and they

21  can't re-trade all of that three and a half years worth of

22  claims, all of those existing claimants.

23         Your Honor, let me turn to the next category.  I

24  promise, these ones will go faster.  Maybe not.  Maybe I'm

25  going to have more questions.

 1          THE COURT:  Who knows.

 2          MR. HUSNICK:  The ones that -- Your Honor, on the

 3  shared insurance program you heard from Mr. Sullivan, 3M's vice

 4  president insurance.  As I said in the opening, he was going to

 5  testify as to the towers of insurance, both the Legacy program

 6  of 500 and the $1 billion -- 1.5 billion of the 3M tower

 7  policy.

 8          THE COURT:  Something I wanted to ask and it's not in

 9  the record, but I'm just -- out of curiosity.  Are we aware of

10  any non-tort claimants in the MDL, because that's what we have

11  talked about.  Are there other claims out there?

12          MR. HUSNICK:  Outside of the MDL?

13          THE COURT:  Am I going against insurance?

14          MR. HUSNICK:  Yes, Your Honor.  We have asbestos

15  claims that were -- or not asbestos claims -- mask respirator

16  claims that may assert asbestos, silicon and other damages.  We

17  heard about those in the first day presentation.

18          THE COURT:  I heard about them, yes, and they're in

19  the funding agreement.  Just because I had to hear, tell me a

20  little bit more about them, because frankly, they've been

21  mentioned and never come up again.

22          MR. HUSNICK:  Well, Your Honor, I --

23          THE COURT:  Aside, if you're able to, give me a 30-

24  second description of what are these claims.

25          MR. HUSNICK:  Happy to, Your Honor.  We have

157

1  approximately, I think it was 1800 pending --

2          THE COURT:  And when you say "we," are we talking all

3  the debtors or some of the debtors or --

4          MR. HUSNICK:  I think it's most of the debtors, the

5  Aearo debtors, the Aearo Technologies, in particular, has -- is

6  a defendant or a co-defendant in approximately I think 1800

7  cases, if I remember correctly.  And though the accrued amount

8  of the damages is -- or as an accounting matter is

9  approximately $46 million.

10         Now, with masks and respirators you can -- there's --

11 and there can be latent claims and the like.  So that estimate

12 was based upon a report performed by the debtors' external

13 advisor, Eric at Aearo, who does this type of estimation for

14 accrual.

15         THE COURT:  But are the -- is that solely a -- are

16 those claims solely against the debtor?

17         MR. HUSNICK:  Some of them are solely against the

18 debtors.  Some are against 3M and the debtors.  We did not seek

19 relief in this preliminary injunction.

20         THE COURT:  Well, I just -- I just -- this is my

21 curiosity --

22         MR. HUSNICK:  Right.

23         THE COURT:  -- because they -- it's like a throwaway

24 line, and the rest of that question.

25         MR. HUSNICK:  Correct.

1              THE COURT:  And --

2              MR. HUSNICK:  The reality is, Your Honor, the -- I

3    mean, that's an accrued liability and it's a relatively -- what

4    I'm looking for -- right number, meaning they -- it's had time

5    to develop that number.

6              THE COURT:  Mature number?

7              MR. HUSNICK:  Mature.  Thank you.  That's the word I

8    was looking for.

9              THE COURT:  Okay.

10             MR. HUSNICK:  And you know, so there's a relative

11   amount of comfort with that docket.

12             THE COURT:  That's okay --

13             MR. HUSNICK:  I would say that all of those

14   claimants, they're here.  They may not be sitting in the

15   courtroom today.  They've all filed notices of appearances.

16   They're paying attention.  I have not had communications with

17   the U.S. Trustee on this, but I am certain that they're

18   communicating with the office of the United States Trustee,

19   because I've seen them all up here.

20             THE COURT:  Okay.  All right.  Thank you for that.

21             MR. HUSNICK:  You're welcome.

22             THE COURT:  I'm sorry.  Go ahead.

23             MR. HUSNICK:  Your Honor, again, in the testimony

24   you've heard on the shared insurance programs, again, if

25   litigation against 3M Company, the testimony from Mr. Sullivan,

1  were to continue in the MDL, 3M, of course, would pursue their

2  rights under the coverage and payment under the 3M tower

3  policies.

4          That would reduce available recoveries for their

5  joint insured plaintiff, me, the debtors.  I also heard that if

6  litigation continues they will pursue that.  This is a repeat

7  action on the slide.  I must have set it twice.  So moving onto

8  the next slide, the Legacy insurer has actually already made

9  some payments.

10          This is the -- out of the 500 million, you heard

11  about the $4 million that was paid to 3M.  And you heard that,

12  again, as I just said, 3M will continue to draw on that as it

13  can, and that will draw it down one of the ripe assets that's

14  available to Mr. Stein and Mr. Meltzer as the stewards for the

15  debtors.

16          Your Honor, you heard about the self-insured

17  retention of $25 million once there's a verdict.  If there is a

18  verdict that goes final and we're required to pay out on that

19  verdict, that will hit that self-insured retention and the

20  policies will start to draw down.

21          That's why we need the automatic stay -- or the stay

22  extended.  The cost of the Combat Arms litigation thus far for

23  16 cases, $347 million, $100 million of projected spending.  We

24  heard about this from Mr. Castellano, and $3.8 million average

25  spend per week if we were to continue to litigate as these

160

1    waves of discovery go out.

2         Your Honor, we think the third independent basis

3    under section 105(a) is the indemnity.  The indemnity is

4    embedded in the funding agreement.  It's contain -- but it's

5    also contained in each of the five LLC agreements.  There was

6    some quibbling over just how far does the indemnity under the

7    LLC agreement go.

8         We would submit it's pretty far.  I've litigated this

9    issue in the MSR Bankruptcy Court case where a creditor told me

10   that the top co breached its fiduciary duty because it was

11   managing the bottom co in the wrong way, and therefore, the top

12   co, because it was -- it took an action and was indemnified by

13   the bottom co, I can tell you right now, parties will make

14   those claims.

15        And so it was a recognition and the reason for that

16   testimony, Your Honor, is to make clear, it wasn't existing

17   indemnity.  It was there.  It may not be as clear as the

18   funding agreement indemnity, and that's why 3M asked for the

19   bulletproof indemnity that they insisted upon the funding

20   agreement.

21        They're saying, if we're going to agree to fund all

22   of these liabilities, including, Your Honor, the 46 plus

23   million dollars that I mentioned, and any other liabilities

24   that come out of Aearo only mass liabilities, 3M agreed to pick

25   that up, as well.  They're funding these Chapter 11 cases and

1  funding this situation.

2          THE COURT:  Does indemnity even matter when you're
3  joint severally liable?

4          MR. HUSNICK:  Yes, Your Honor.  The indemnity matters
5  because, you know, I'm basically agreeing to take over your
6  liabilities.  So if you pay out on your obligation, then I'm
7  going to pay you using my assets first.

8          THE COURT:  Which then you can turn around and ask
9  for.

10          MR. HUSNICK:  Ask for -- again, assuming -- you know
11  -- subject to Mr. Heaton's testimony, yeah.  Again, the -- keep
12  coming back to it's the potential affect.  Your Honor doesn't
13  know where we're going to be in a year or in two years.
14  Hopefully, we're not here in two years.  I would love to get
15  this case reorganized and better and be here on a different
16  matter.

17          THE COURT:  Well -- it's sustained.

18                      (Laughter)

19          MR. HUSNICK:  But Your Honor, I think that addresses
20  the point.  Resolution of all claims.  So let's talk about the
21  distraction.  The language, again, is the fair and impure -- or
22  defeat and impair Your Honor's jurisdiction.  And what we mean
23  by distraction, and what I believe the courts -- they've taken
24  such a broad reading of what that can mean, and we given --
25  we've given you several examples of different situations.

1          The LTL court focused a lot on use of resources and

2   how that can take away.  I'm more focused on the process and

3   the situation.  Your Honor, we have 232,000 claims, because we

4   have the 2,000 claims up there.  Plus, we have the asbestos

5   liabilities and they're all squarely in front of Your Honor.

6          And we believe that resolution of those claims is

7   necessary in order for us to confirm a Chapter 11 plan.  That

8   doesn't mean Your Honor's going to negate the merits of these

9   claims.  That's not what we're here about.  We're not talking

10  about -- you know -- first and foremost, Your Honor doesn't

11  have core jurisdiction over litigating the personal injury

12  claims.  Your Honor does --

13          THE COURT:  Not any.

14          MR. HUSNICK:  Your Honor does have the ability to

15  estimate --

16          THE COURT:  I can estimate, yes.

17          MR. HUSNICK:  -- and that is, you know, one tool

18  that's available.  But bankruptcy, first and foremost, as you

19  heard from the witnesses, Mr. Castellano testifying first and

20  foremost, this is about working together and trying to get to a

21  global resolution to bring closure to these cases.

22          THE COURT:  Let me ask you this, and this was I think

23  brought up in the fact that -- at least my -- I recall the

24  testimony was no actual Aearo employee has been involved in the

25  MDL.  Let me ask you this.  I understand that a global

163

1  resolution is how it's being presented, that the bankruptcy is

2  to have a global resolution of all the debtors' liabilities,

3  including what is the largest one, which are the tort

4  claimants, plus others.  Okay.  I get that.

5          So and -- but how would the distraction part of it be

6  met with 3M has covered all of the litigation expenses to date,

7  and appears to be continuing, understanding things can change

8  in the future, but if I'm looking just at now, they've covered

9  everything.

10         It's represented by White and Case and Kirkland and

11 Ellis and the MDL, but you have your own professionals for the

12 debtor for restructuring, right.  You have your disinterested

13 board of directors.  You have your own board of directors.  You

14 have your own employees.

15         What is the distraction, then, by continuing the --

16 if I were to know, what is the distraction when it appears that

17 it's relatively isolated, other than the fact that it may

18 inhibit the global resolution.  But what is the distraction?

19         MR. HUSNICK:  The distraction, Your Honor, is what

20 has happened over the last 14 days.  Our goal here is --

21         THE COURT:  Well, the things have happened, but

22 you've survived, right?

23         MR. HUSNICK:  But we've made -- in order to advance

24 the --

25         THE COURT:  Let me -- let me rephrase that.

1          MR. HUSNICK:  Yes.

2          THE COURT:  Nothing that has happened thus far has

3   affected this Court's jurisdiction over the case in front of --

4   cases in front of it.

5          MR. HUSNICK:  It's because, Your Honor, we're not

6   addressing any of the estimation issues.  We're not engaged in

7   a negotiation yet about the underlying resolution of the

8   claims.  If they're out litigating these claims in another

9   forum, these exact claims, how are we supposed to be resolving

10  the claims here?

11         We can't be resolving the claims here.  There would

12  be no focus on resolving claims.  The claim you'll be

13  litigating in the mass tort system --

14         THE COURT:  Do you believe that -- do you believe

15  that no one would answer the phone if you called them?  For

16  example, I think it's safe to assume you won't get anything in

17  today on this.  It would seem that nothing is stayed, although

18  you're working on a detente, which is laudable and makes sense.

19         But if you were to call someone today, and Mr.

20  Pfister was in front of me, if you were to call him today and

21  say, Mr. Pfister, I'd like to talk to you about resolving the

22  claims with your client, do you think he wouldn't respond

23  because there's litigation going on?

24         MR. HUSNICK:  Believe he'd be a lot less likely to

25  engage on that front, yes.  We attempt to try and ask -- I

165

1    don't want to get into settlement conferences --

2            THE COURT:  And that's fine, but I'm just -- okay.

3    So you're saying you think that he might.

4            MR. HUSNICK:  Well, 100 percent he would.

5            THE COURT:  Okay.

6            MR. HUSNICK:  If there is a ability to continue to

7    litigate and push these issues in waves of discovery, the goal

8    in their mind is to ratchet up the cost to such extent to bring

9    people to their knees.  That's the goal.  That's what they want

10   to do.  We want to take a time as the debtors and try and

11   negotiate resolution of these issues.

12           If we can't negotiate resolutions, there is a

13   streamline process for addressing these issues in these cases.

14   That's what the Bankruptcy Code set up.  They may not like it,

15   but that's what the Bankruptcy Code set up.

16           Your Honor, I think that's the distraction from the

17   cases.  You also asked about, you know, what's the distraction

18   from the resolution.  I truly believe, like you did hear about

19   the legal services.  Yeah, there's lots of people, there's lots

20   of staff.  Anybody can backfill on that.  When you lose the

21   focus of the very people who need to be in the room and

22   negotiate the resolution and they're all out litigating in

23   another forum, the exact same claims, I submit they're not

24   going to get resolved in this Court.

25           Let me get though, likelihood of success on the

166

1  restructuring, Your Honor, very briefly.

2         You heard the testimony which is on the record to

3  support our case.  You heard from Mr. Stein that the funding

4  indemnification agreement provided the means to facilitate

5  resolution in this case.  It does provide the resources.

6         Part of what is ironic here to me, Your Honor, is by

7  going out and getting a funding agreement that ensures that we

8  will have sufficient assets to fund and resolve the cases in

9  the lawsuits, the plaintiffs are arguing that massively

10  undercuts your ability to, your likelihood of success factor.

11  So if we didn't go get the funding agreement and have the

12  resources, I wouldn't have been able to put on as strong of a

13  case.

14         But now we're saying the debtors, 3M, should be

15  punished and not be available to use the 105(a) power because

16  they agreed to fund the case.  That's the part that bothers me

17  the most about the fact that when they argue, well it's

18  circular.  And I would say, well no, they agreed to fund the

19  case.

20         And if you look at, if you look at the cases that

21  deal with plan support agreements and funding agreements, these

22  are the older cases where the older third party non-consensual

23  release cases that parties put in money or agree to put in

24  money, this is (indiscernible) by the way, agree to put in

25  money as part of a settlement to fund the reorganization, and

167

1  they get the benefit of an extension of the automatic stay.  So

2  too here.

3       And when you look at those old cases, that's where

4  you see a lot of non-solvent, not even old cases, I'll give you

5  a couple more recent ones, you see some solvent payor issues

6  still getting the benefit because they agreed to fund the

7  restructuring.

8       One of those examples is Purdue.  There was no

9  assertion that the factors didn't have sufficient money to pay

10  the obligation.  The record there was I believe $11 billion of

11  assets and liabilities.  Their settlement was 5.6.  They got

12  the benefit of the PI.

13       Your Honor, We submit that the funding agreement is

14  there, it ensures the likelihood of success of this

15  restructuring on the public interest.

16       THE COURT:  I'm going to jump in for a second.  All

17  right, likelihood of success.  What is success?

18       MR. HUSNICK:  The cases have almost uniformly held in

19  this context, this confirmation of plan of reorganization that

20  allows this business to emerge from bankruptcy as a rearranged

21  enterprise, no longer under the burden of liability.  But the

22  duties of the box, as you heard from Mr. Stein, are to maximize

23  the value of the box and manage the liability.

24       There was a colloquy or an attempt to ask Mr. Stein

25  why didn't you prepetition just basically do a deal with us and

168

1   give us unfettered opportunity to sue your shareholder.  That

2   would have been inconsistent with Mr. Stein's fiduciary duty.

3   He has a fiduciary duty to manage liabilities and only pay the

4   liabilities that are valid allowed claims.  And that's what

5   this process is for.

6        THE COURT:  What, and I guess what I really meant to

7   say, and I understand it is ability to reorganize.  But assume

8   for a moment that you win and I grant a preliminary injunction

9   or a 105, however you want to call it, what is the game plan?

10  What are you going to do?  In the likelihood of reorganization,

11  what is the reorganization going to look like, or what would a

12  reorganization look like in this case?

13       MR. HUSNICK:  Well, I would expect very quickly after

14  that ruling, excuse me, very quickly after that ruling, Your

15  Honor, I would believe that we'd be in a room talking.  In the

16  absence of that, they'll be in the courtroom litigating.  In

17  the end they all will be in courtroom litigating in Minnesota,

18  and they'll have no reason to talk.

19       I truly believe there will not be engagement outside

20  of this courtroom or those courtrooms in the absence of a PI

21  which is going to distract from, we're going to be

22  simultaneously litigating every single issue.  We file a motion

23  in this case and we try -- let's say for example and we put

24  this in our reply paper, we'd be happy to engage in a

25  mediation.  We'd be happy if Your Honor would order a

1  mediation.

2          And if we engage in a mediation, that may resolve the

3  issue.  But if they don't have, if there's no preliminary

4  injunction, they have no incentive to do that.  And that's why

5  I believe, Your Honor, encourage, successful is resolving the

6  claims, not just in a way like they suggest, like the

7  plaintiffs' lawyers suggest that we should just kind of flip

8  the keys to the plaintiffs' lawyers and let them go sue 3M

9  indefinitely, or sue the debtor, you know, just allow the

10 claims against the debtors.  That's not honoring the fiduciary

11 duties, that's not managing the liabilities.  Our goal here is

12 to get resolution.

13         Move on, Your Honor?

14         THE COURT:  Okay.

15         MR. HUSNICK:  On the public interest factor, Your

16 Honor, this one again, a low bar under the standards.  We

17 believe that the courts have been unanimous that the public

18 interest is in reorganizing the business, and here we are with

19 an actual functioning business.

20         The other Texas two-step cases didn't even have a

21 functioning business.  We have one.  We have employees.  We

22 have an operating business with customers, vendors.  And we're

23 here to try and bring resolution to these situations and to

24 bring resolution to these claims.  And, you know, I think the

25 Court said it best, you know, resolving claims in a uniform and

170

1  equitable manner is in the public interest.  It also, I lost
2  the slide, but we can move on to the next slide.
3          It's also in the public interest because of the
4  judicial burden.  It leads taking the breathing spell and try
5  to work out a global resolution through these chapter 11 cases
6  to stop the overwhelming burden that will be imposed on the
7  federal judiciary with 30 percent of the existing judiciary
8  will be remanded to courts around the country beginning soon.
9  And this is Judge Rodgers own language.  And she said the
10  number of cases is staggering and that burden is extraordinary.
11
12          THE COURT:  I don't think that the Bankruptcy Code
13  has indicated that we are the watchdog of the federal
14  judiciary, are we, and an Article 1 Court is here to save the
15  day.
16          MR. HUSNICK:  It's a public interest issue.  And this
17  was an issue in all of the asbestos cases where the asbestos
18  claims --
19          THE COURT:  A lot of times it was the debtor that was
20  in bankruptcy in the --
21          MR. HUSNICK:  Well, the debtor is.
22          THE COURT:  Corporate debtor on whom more
23  responsibility was in bankruptcy.
24          MR. HUSNICK:  That's exactly what you have here, Your
25  Honor.  Aearo is a defendant in all of these litigations,

1   jointly and severally.  Not in name only.  We committed the

2   acts.  Our witnesses said that.  The testimony shows that.

3   This is not LTL, there's no noise around this related to that

4   type of issue.

5           THE COURT:  I'm not so sure you'll get that from the

6   other side.

7           MR. HUSNICK:  Oh, I'm certain.

8           THE COURT:  There is some noise.  But you are an

9   existing company.

10          MR. HUSNICK:  Exactly.  And we're here to do exactly

11   what we're entitled to do under Article 3, Article 1, sorry.

12          Your Honor, and that's why the Bankruptcy Code gives,

13   sets the whole premise of it is bringing things into a central

14   forum so we can have a discussion to try and resolve those

15   issues.  It's not some endless litigation.  One of the

16   plaintiffs' lawyer said they're seeking a permanent injunction,

17   not a preliminary injunction.

18          You have, we have a requirement to reaching agreement

19   on a chapter 11 plan.  There's imbedded protections in the

20   Bankruptcy Code for requirements to reach consensually

21   especially when it comes to mass tort cases.  And so --

22          THE COURT:  Especially with regard to asbestos cases.

23          MR. HUSNICK:  Correct.  That's correct, but all the

24   courts that have addressed that other mass tort issues have

25   applied that higher threshold.  And so there is a, even if you

1  went with the two-thirds threshold that ordinarily applies, it

2  still requires some level of consensus.

3          We believe and what most witness testimony was that

4  chapter 11 provides the only fair and equitable resolution

5  because it will stop the litigation, the lottery ticket

6  litigation.  We have the ability to fund these cases, and this

7  provides a forum, Mr. Castellano testified, provides the forum

8  for reaching a global solution, which is not where we're at

9  right now.

10         Your Honor, it's important to look at where the

11  verdicts have landed so far.  On this next slide you see the

12  verdicts range from 0 to 77 million.  Unfortunately, that

13  hasn't given a great deal of direction in terms of where things

14  are going to land.  You've got 8 dismissals, 6 defense

15  verdicts, and 13 ranging from low single digit millions all the

16  way up to $77 million.  That's not equitable resolution.  That

17  means that these plaintiffs have very similar fact pattern, and

18  this range of judgments that you see here simply counter to the

19  notion of just recovery for everyone on an equitable basis.

20         Your Honor, I'm just looking through to make sure

21  that I got most of this stuff.  Let's go to the next slide.

22         I wanted to spend a moment, there was a commentary

23  about removing our right to a jury trial.  That's not true.

24  Most of these case do have the opt out rights.  Yes, it

25  temporarily stays what's going on, but these are claims against

173

1  the debtors, they're in the chapter 11 cases.  Certainly the

2  district courts are capable of, if necessary, having a jury

3  trial if we need to do that.  Unlike in <u>LTL</u> though where they

4  were struggling, the Judge in <u>LTL</u> was struggling with, you

5  know, the next phase of the case and the beginning of the

6  estimation process, which is critically important to try to

7  bring parties together in resolution.

8          And they were talking about potentially remanding.

9  Ultimately the Judge rejected that.  We don't have to do that

10 here.  We've done the 19 Bellwether cases.  That's been tried.

11 And now we can use a different process, the restructuring

12 process in the Bankruptcy Code tool to try and bring resolution

13 in a different way.

14         Your Honor, I want to just flag 78.  There were some

15 assertions that 3M somehow assumed the liability.  That's not

16 the case.  You heard in the testimony form Mr. Castellano, his

17 team has done a thorough analysis of the documentation related

18 to the 2010 transactions.  There was no document where 3M

19 assumed the liabilities in a written agreement.  There's

20 nothing in the documents to reflect that.

21         Your Honor, let me just quick go to Slide 81.  Before

22 I get there, I'm sorry, I'll go back to -- I just want to

23 address.  There's two requests that were made in one of the

24 objections.  One is attempting to try border injunctive relief

25 against another non-party.  We'll address, there's a request by

174

1 Mr. Keller in the proper forum and try to bring 3M in to do
2 injunctive relief.  We can address that at this time.

3         We do not believe that all of the courts that have
4 addressed this issue have so held that's in an appropriate
5 exercise of jurisdiction today in this adversary proceeding to
6 try and enjoin a publicly traded company from doing its
7 ordinary course corporate governance.  Of course, there are
8 other remedies that would be available in the event that an
9 improper dividend was done.  But certainly we don't believe
10 it's going to be an issue.  But it's not the appropriate time
11 to just kind of loft that in from the side through the form of
12 an objection.

13         Your Honor, the other element that Mr. Keller raised
14 was as to the Eleventh Circuit.  We attempted to do some sort
15 of cross with Mr. Stein on this point.  Our view, Your Honor,
16 is right now the Court has entered in response to the
17 suggestion that bankruptcy filed on their docket, the stay
18 order.  Mr. Keller is free to ask Your Honor for relief from
19 the automatic stay if he'd like and we can appropriately brief
20 that at that time.

21         I don't want to say for sure that we wouldn't even
22 agree with it, we'd have to have a discussion.  But that
23 request hasn't been made, and it's certainly not appropriate
24 relief to rule on.

25         So let me wrap.  This Court, Your Honor, everybody

1  would agree of the exclusive jurisdiction to control this case.

2  I think everybody would agree that you have the jurisdiction to

3  control Your Honor's resolution of these cases, and that's the

4  power that's given to you under 105(a).

5          There are multiple legal paths that you can take to

6  get to this resolution.  We believe whether you move under

7  362(a)(1), 362(a)(3) or the more likely path 105(a), or all

8  three paths, the evidence that we put on in the record over the

9  last two and half days is ample to support issuing that relief.

10          All of the courts that have addressed this issue have

11  come to the same conclusion.  108 years of collective wisdom on

12  the bench, more than 70 pages of well reasoned opinion breaking

13  down at intricate levels what the law is.  The only way they

14  can attack those cases is to say ignore them, don't follow

15  those cases, Aearo (indiscernible).  Admit to Your Honor

16  there's simply no basis in the law for doing that.  The cases

17  are clear.  Without this requested relief we will have

18  continued chaos with no focus.

19          You saw that timeline chart, that was 14 days.  I

20  can't imagine what's going to happen in the next month, the

21  next six months.  That's why every court that has faced these

22  issues has granted the preliminary injunction.

23          Your Honor, unless you have any further questions, I

24  would reserve a few minutes -- well, one second if I may.

25          THE COURT:  That's fine.

1          MR. HUSNICK:  I was just going to do that.  I reserve
2     a few minutes for rebuttal, 20 minutes if I may.  I don't think
3     I'll need that.

4          THE COURT:  Let me ask this question.  If I were to
5     rule in your favor, and if <u>LTL</u> is upheld, I think they actually
6     argued today or recently, is that the end of MDL?

7          MR. HUSNICK:  No, Your Honor.

8          THE COURT:  Why not?

9          MR. HUSNICK:  MDL is broke for certain situations.  I
10    mean they go all out of control, like the asbestos situation,
11    then they need access to the bankruptcy world.  I think the MDL
12    system may be broken, we've read those, we've heard from
13    parties I think we believe this MDL is broken.

14         THE COURT:  All right.

15         MR. HUSNICK:  And if I may add one point to that,
16    Your Honor.

17                         (Laughter)

18         THE COURT:  You have to now.

19         MR. HUSNICK:  Well, if I don't, then heads will roll.

20         But the other point is is normally in the MDL system,
21    the Bellwether trial systems functions to give guidance on how
22    you should use those jury verdicts to guide the negotiations
23    and ultimate resolution.  Here with the wide ranging results,
24    it just hasn't be helpful to resolve.  So that's why, just to
25    put a finer point on why we believe an MDL in this situation

1  did not function correctly.  I don't believe it's an indictment

2  entirely on the MDL system.

3         THE COURT:  Do you believe that the Bellwethers would

4  have given proper guidance if you would have lost everyone?

5         MR. HUSNICK:  Certainly would have given different

6  guidance than what we got.

7                    (Laughter)

8         THE COURT:  All right.

9         MR. HUSNICK:  Thank you, Your Honor.

10        THE COURT:  I don't know how much time we'll have

11 left, but I will at least give you a brief rebuttal.

12        MS. LAURIA:  Your Honor, may I be heard very briefly?

13        UNIDENTIFIED SPEAKER:  Your Honor, I just object.  I

14 mean 3M is either in or it's not.

15        MS. LAURIA:  I'm not going to, in fact, all I want to

16 do is reserve rights on one point, Your Honor.

17        THE COURT:  Well, may I ask this?  Do you have to

18 reserve rights?

19        MS. LAURIA:  Your Honor, what I'm concerned about is

20 to your point earlier -- Jessica Lauria, White & Case on behalf

21 of 3M Companies.  We agree with what Your Honor said earlier

22 today.  We're not a party, we intervened as a party.  I was

23 very surprised to hear counsel earlier today try to use

24 something as an admission to get --

25        THE COURT:  Well let me ask this.  And I think I know

178

 1  where you're going.  And because I said I couldn't, and because

 2  I haven't heard their closing, wouldn't it be appropriate if

 3  something came up that at that point maybe you could say --

 4          MS. LAURIA:  In fact, I'll --

 5          THE COURT:  -- just to clarify the record rather than

 6  saying it now?

 7          MS. LAURIA:  That's fine, Your Honor.  I just wanted

 8  --

 9          THE COURT:  Because wouldn't that strengthen your

10  argument that you're just an observer here?

11          MS. LAURIA:  Thank you, Your Honor.  I'm absolutely

12  fine with that.  I just didn't want to get, have someone argue

13  that we waived it if I didn't --

14          THE COURT:  Well, you've got the debtors here of

15  course that can raise questions to a rebuttal.  But let's see

16  where we go.

17          MS. LAURIA:  Very good, Your Honor.  Thank you.

18          THE COURT:  Do you want five minutes before you

19  begin?

20          MR. PFISTER:  Why don't we do that, Your Honor, if

21  that's okay.

22          THE COURT:  Because it looks like you've enjoyed

23  wearing your mask and I thought it would give you --

24          Let's have five minutes, and that five minutes -- or

25  do you want to take ten?

1          Mr. PFISTER:  Maybe 10.

2          THE COURT:  Let's do 10.  Let's reconvene at 2.

3                    (Recess)

4               (Audio issues - begins as follows)

5          THE COURT:  -- declaratory relief as well as

6   preliminary injunction.  We've had the closing of the debtors.

7   We now turn to the closing of what I would now call

8   collectively the tort claimants.  And my understanding is that

9   there is an order of appearance, is that correct?

10         MR. PFISTER:  That is correct, Your Honor.  In light

11  of the --

12         THE COURT:  All right.  I'll let you take off and you

13  can tell me and then you can begin at your leisure.

14         MR. PFISTER:  Thank you.  So to some extent somewhat

15  like the opening statements on our side, I'm going to serve as

16  a bit of an emcee but also deliver a substantive portion of the

17  argument.

18         THE COURT:  All right.

19         MR. PFISTER:  Just for the record, Rob Pfister from

20  the Klee Tuchin firm.  I represent the Aylstock firm and Mr.

21  Aylstock is the gentleman whose picture you saw.

22         THE COURT:  Now I know who he is.

23         MR. PFISTER:  A handsome gentleman I might add, and

24  whose picture you saw on the debtors' PowerPoint.  But we

25  collectively, and I do mean collectively, the ten firms that

180

1    appeared as signatories on our joint brief really did make

2    amazing contributions.  We also have some folks who didn't

3    appear on our joint brief.  So, and I'm going to discuss how

4    those folks will be slotted in.

5            In terms of the folks who appeared on our joint

6    brief, we divided the argument into three parts.  I will be

7    covering the facts, what has been presented to the Court over

8    the last three days.

9            I was reading the, re-reading the Ceasar's case last

10   night and something jumped out at me from Judge Posner's

11   opinion.  He was talking about Section 105 and he said, you

12   know, that the threshold legal question as to the authority,

13   but whether it's appropriate is a factual issue, whether the

14   relief being sought is appropriate under 105 is a factual

15   issue.

16           And that's often or usually the case on a 105.  And

17   I'm not saying that there aren't critically important legal

18   issues because there are.  But for the reasons I hope to

19   clarify or explain to Your Honor, the facts here are really

20   dispositive.  So that's my part.

21           Then Ms. Cyganowski, who delivered the opening

22   statement for us, she will walk Your Honor through the Seventh

23   Circuit law.

24           I will admit to Your Honor that notwithstanding I'm a

25   native Indianan, when I started reading this , I don't practice

181

1  a lot in the Seventh Circuit.

2          THE COURT:  Are you a Hoosier?

3          MR. PFISTER:  I am a Hoosier, yes I am.

4          THE COURT:  Indiana?  Okay.  Go ahead.  You lost your

5  street cred.

6          MR. PFISTER:  No, there was a question as to whether

7  the Hoosier hop that we mentioned in our brief would be

8  offensive --

9          THE COURT:  Yeah.

10          MR. PFISTER:  -- and I said I don't think it would

11  be.  So I hope Your Honor wasn't offensive.

12          THE COURT:  I'm not a native of here so I'm not a

13  Hoosier.

14          MR. PFISTER:  Ah, okay.  But I am indeed a native.

15  But I don't practice too much in the Seventh Circuit.  And I

16  will say that when I first started looking at the Seventh

17  Circuit law there are some peculiarities.  And so I can't think

18  of anybody better than Ms. Cyganowski to walk the Court through

19  those questions.

20          What I will say is I thought it was interesting that

21  Mr. Stein's testimony was, he made sure to negotiate out the

22  condition in the funding agreement that 3M wanted that

23  conditioned the relief on 3M getting injunctive relief or the

24  debtors getting injunctive relief for 3M from this Court

25  because he did not want the uncertainty I believe was the term,

182

1  he did not want to subject the debtors to the uncertainty or

2  the unclarity on the law.

3      So I don't think the law is as clear as the debtors claim

4  that it is.  But I believe for purposes of my argument on the

5  facts, that we're in accord with the debtors on at least this

6  point which is that the fundamental threshold question, and

7  they first have to get to the threshold question, they have to

8  get past that if they want any relief.  But the threshold

9  question is whether allowing the litigation to proceed against

10  non-debtor 3M will affect the amount of property in the

11  bankruptcy estate or the allocation of property among

12  creditors.  So I think that at least everybody is square on.

13      Now, I don't think they ever get past that.  If they

14  don't, we don't have to worry about the rest.  If they do get

15  past it, they've got several other hurdles.  Ms. Cyganowski

16  will go through that.

17      And then finally Mr. Maclay will briefly address what

18  I'll call the practicality.  If you had to flock them under a

19  specific legal rubric, you'd probably flock them under

20  likelihood of success in the reorganization.  And I think one

21  of Your Honor's questions to Mr. Husnick about what does a

22  successful reorganization mean here is something that Mr.

23  Maclay will be able to address very well.  That's the

24  signatories to our brief.

25      Then my understanding is that Mr. Keller has actually

1  arrived in court, he was previously on Zoom.  I don't know if,

2  I don't know why but I heard he's in court or will be

3  imminently in court, so our proposal would be to have Mr.

4  Keller make whatever arguments he's going to make.

5          Let me just state again for the record, and I

6  understand why Mr. Husnick tries to par us with his "expert

7  witness."  That's not evidence we sponsored.  It's not

8  evidence, it's evidence that the debtors objected to.  I think

9  there's a real issue with that evidence.  But I just, I think

10 this motion of toying us with that evidence is a bit

11 misguiding.

12         And then finally the Bailey Glasser folks will make a

13 brief argument.  That will be the sole presentation from the

14 claimants' side.

15         THE COURT:  Okay.

16         MR. PFISTER:  With that, let me start on what I think

17 is the most critical and indeed dispositive point here, which

18 is, and it picks up on a comment Your Honor made at the end of

19 the first day, which is, you know, the core question or words

20 to this effect before you is, what does the funding agreement

21 mean if this is zero sum game regardless.

22         I'm not sure I'd use the term zero sum game in the

23 sense that that implies you know one winner and one loser.  But

24 I think this notion of circularity is critical.  And the facts

25 from the testimony the Court heard this week, the testimony of

1   Mr. Castellano, the testimony of Mr. Sullivan on insurance, the
2   testimony of Mr. Dai, and then finally the testimony of Mr.
3   Stein, plus the actual funding agreement itself, what those,
4   what the funding agreement establishes and what the evidence
5   about the parties' understanding of the operation of the
6   funding agreement establishes, is that every dollar that 3M
7   spends from this day forward, that is we are post-petition,
8   okay, every dollar that 3M spends in litigation is a dollar
9   that 3M is spending and it's not the debtors that are spending
10  it.

11          Under whatever theory they have of why the Aearo
12  debtors, why the Aearo entities may be liable, whether that's
13  because of the funding agreement and the liabilities that the
14  debtors, you know, voluntarily took on one day before the
15  bankruptcy, whether it's this, you know, pretty much newly
16  manufactured, I think the evidence was clear on this point, or
17  at least highly suggested that these 2013 LLC agreements that
18  Mr. Castellano described the indemnification obligations as
19  being buried in the LLC agreement, weren't mentioned in his
20  first day declaration, weren't mentioned in any board
21  presentation.  They kind of appeared --

22          THE COURT:  But is that, when you say suggested, but
23  aren't the facts in front of me that they were entered into, or
24  excuse me, that those agreements were dated 2015?

25          MR. PFISTER:  That is certainly the case.  And by

1   that time, the earplug business had been entirely up-streamed

2   to 3M itself.  That's why Aearo, when we're here on the first

3   day or I was here virtually on the first day hearing, they had

4   a big picture of a truck.  It's well we make insulation for the

5   motor and for the turbine for the engine and the like.  They

6   don't do anything with hearing protection, because all of that

7   moved up to 3M in 2010.

8            So whether the theory is is that, you know, the Aearo

9   defendants or the Aearo debtors rather are liable under the

10  funding agreement, whether there's, you know, any credence,

11  which I don't think there is to this motion of a pre-funding

12  agreement indemnification obligation, I don't think there's

13  any, enough evidence to support the notion that there is any

14  such pre-indemnification, funding obligation.  But I don't

15  think it matters.

16           And then finally the notion that we heard from Mr.

17  Husnick today that well, you know, they are defendants in the

18  MDL.  There's 230,000 claims against them, so of course they

19  have liability.

20           But under every iteration of that argument it doesn't

21  change the fact that 3M itself has liability, and has never

22  denied, even now they quibble over the percentage.  They say

23  well 80 percent of it is pre-2008, and you know they have this

24  from Mr. Myers, I think that's all a distraction because as

25  Your Honor noted in one of your questions, the liability

1    asserted in the earplug litigation is asserted as joint and
2    several liability.  That means, and the verdicts and the
3    judgments and the like are all against the defendants jointly
4    and severally.

5          Now, the fundamental rule when a plaintiff has a
6    judgment against the defendants jointly and severally, you can
7    pick the most solvent, the most available, the most accessible
8    defendant, and say hey, pay me my judgment please, right.  At
9    best under this funding garment, what happens is that
10   litigation against the Aearo defendants is stayed under 362(a),
11   no one disputes that.

12         If the plaintiffs proceed against 3M which they are
13   doing and will do unless this Court issues an injunction, what
14   will happen?  Let's say they spend $50 million in defense
15   costs, they're not going to get that money from Aearo.  Aearo
16   is not writing any checks.  Aearo is protected under the
17   automated stay.  Aearo is not going to be spending that money.
18   That money is going to be spent by 3M.  It's going to cut the
19   checks to its defense counsel in the litigation.  It is going
20   to cut the check for any appeal bond that has to be posted.  It
21   is going to cut the check to the plaintiff, any judgment that
22   is affirmed.  Okay?  It is going to be bear all those costs.

23         What happens given that the Aearo defendants are
24   protected by the automated stay?  3M just gets the claim
25   against them.  Maybe it's an administrative claim, maybe it's a

1  general unsecured claim, maybe it's a subordinated claim, maybe
2  it can be disallowed.  But it's a claim.  It's not cash.  There
3  is no money that would come out of the Aearo entity.

4          So if, you know, in the next year I forget what the
5  projection was, is it a $100 million in defense costs, those
6  are defense costs that 3M itself will bear.  It will write
7  checks.

8          THE COURT:  Can it ask Aearo to write them though?

9          MR. PFISTER:  Absolutely not with the automatic stay
10 in place.

11         THE COURT: Funding agreement?

12         MR. PFISTER:  The funding agreement --

13         THE COURT:  From what you're saying the funding
14 agreement doesn't really do anything because 3M is stayed from
15 doing anything under it, so aren't you really telling me that
16 it's just a piece of paper that doesn't matter?

17         MR. PFISTER:  I am telling you right now, it was a
18 different world in the moment pre-bankruptcy between the --

19         THE COURT:  That's in every case.

20         MR. PFISTER:  No, no, no, of course, of course.  In
21 the moment of pre-bankruptcy there was a different world.  And
22 in fact the evidence shows that in those moments there was an
23 opportunity for the fiduciary as the debtors to say, you know
24 what, under this, you know, under this clause (i), when no
25 bankruptcy case is pending, if we want to go and we have

188

1  settlement with the plaintiffs, it will be fully funded, right?

2  They didn't do that.  And you can draw a conclusion as to

3  whether they --

4          THE COURT:  Can they do that now too?

5          MR. PFISTER:  Right now they could, to the extent

6  they wanted to enter the fray which would be their choice --

7          THE COURT:  But they're in the fray.

8          MR. PFISTER:  No, they're not.  They're protected

9  from the automatic stay.

10         THE COURT:  But they're in the fray in the fact

11 aren't they named in 230,000 suits of joined severally liable

12 defendants?

13         MR. PFISTER:  Every single one of those lawsuits is

14 stayed under 362(a).

15         THE COURT:  As to them.

16         MR. PFISTER:  Yes.

17         THE COURT:  Okay.  So you don't think that that has

18 any impact on the debtors should the litigation go forward?

19         MR. PFISTER:  The litigation, this is not a lift stay

20 motion.  If we were here on lift stay motion --

21         THE COURT:  And I understand that -- okay.  So if

22 there's no preliminary injunction issued, you're right they

23 can't go after the debtors other than asserting claims.

24         MR. PFISTER:  Right.

25         THE COURT:  All right.  And you've indicated that

189

1  they intend to pursue the non-debtor defendants in the tort

2  claims.

3        MR. PFISTER:  Which is just one, 3M Company.

4        THE COURT:  Okay.  And you don't believe that the

5  action, any actions, judgments, verdicts, final orders against

6  3M won't affect the debtors at all?

7        MR. PFISTER:  How could it possibly?  The automatic

8  stay protects them.  They are, they literally are not -- so

9  there's two, there's two types of litigation, right, that could

10  go forward.  There are the interjudgment in the Eleventh

11  Circuit.  Those judgments are bonded, okay, there are bonds

12  that have been posted by 3M.

13        So if those appeals go forward, and you know, it's

14  interesting that 3M has, or that the debtors haven't brought a

15  motion for relief from stay, maybe we'll see one, who knows.

16  Those appeals are fully bonded, right.  So that means that the

17  money that's available to verify this judgment is already

18  reserved, it's not even properly (indiscernible).  That's one

19  kind of proceeding.  Okay.

20        But the second kind of proceeding is pre-petition

21  litigation where the Aearo debtors are co-defendants.  And the

22  fundamental rule, and it has been for decades is that if you

23  happen to be a co-defendant in a multi-defendant litigation,

24  and one of your co-defendants files for bankruptcy and is the

25  beneficiary of an automatic stay, that doesn't mean necessarily

190

1   ipso facto that the litigation gets stayed against you.

2           THE COURT:  All right.  That's why we're here.

3           MR. PFISTER:  That's why we're here.  Now, whether

4   someone moves for relief from stay to allow the claims to

5   proceed against the Aearo debtors, that's not a today issue,

6   right.  But today by operation of federal law, there is an

7   injunction that bars anyone from commencing, continuing an

8   action against Aearo then.

9           THE COURT:  Let's just assume for time that I'm

10  somewhat familiar with what the automatic stay says.

11          MR. PFISTER:  I apologize, Your Honor.

12          THE COURT:  Okay.

13          MR. PFISTER:  My point is that status quo ante is the

14  litigation against 3M that the debtors are asking the court to

15  stay, if not stayed right now.  Now, that's the whole semantic

16  issue of does the automatic automatically ---

17          THE COURT:  No, I agree.

18          MR. PFISTER:  So I think it's pretty clear that it's

19  not today.  If nobody does anything as to the Aearo debtors, 3M

20  is a defendant in that case.  It's not going to simply, if it

21  wants to default, it can default.  Maybe it'll say I'm going to

22  default, I'm going to withdraw my defense, right?  That would

23  be crazy, but you know, maybe they'll do that.

24          Short of that, they're going to keep paying Kirkland

25  & Ellis or some other law firm to defend the litigation to keep

1  incurring the defense costs.  Right?  Who is going to pay that?

2  They can't send the bill to Aearo, they can't send it to Mr.

3  Castellano, and say hey, see that provision in the funding

4  agreement where it says you will indemnify us.  Here's how much

5  we spent last month on our defense costs.  They can't do it.

6  They're protected by the automatic stay.

7         All that happens is that 3M gets a bigger and bigger

8  and bigger and bigger claim against Aearo.  That claim can't be

9  paid.  So how can there possibly be in effect?

10         THE COURT:  Didn't you just tell me that there's a

11  mounting, mounting claim against the debtors?  And did you just

12  tell me they can't pay it?

13         MR. PFISTER:  No, what I'm saying is --

14         THE COURT:  I must have misheard.  Go ahead.

15         MR. PFISTER:  I am saying that at best, what 3M has

16  is a contractual indemnity right under the funding agreement.

17  It's a contractual indemnity, so --

18         THE COURT:  Well, it's joint and severally too,

19  right?

20         MR. PFISTER:  Yes.  But the litigation can't continue

21  against the Aearo defendants.

22         THE COURT:  I understand.  But work with me here.

23  Assume for the moment, if you obtain $3 billion of judgments

24  against 3M and 3M pays it, can not 3M just under joint and

25  several liability go after, and by go after, assert a claim in

192

1  that amount against the debtors?

2          MR. PFISTER:  They can absolutely file a proof of

3  claim.

4          THE COURT:  Okay.

5          MR. PFISTER:  Yep.

6          THE COURT:  And you don't think that that proof of

7  claim has any affect on the distribution to the estate?

8          MR. PFISTER:  Absolutely not for another reason,

9  which is that under the funding agreement, right, proofs of

10  claim --

11          THE COURT:  I know, I'm just talking about joint and

12  several.  Because you guys aren't, you guys don't like the

13  funding agreement, I understand that.

14          MR. PFISTER:  Well there are pieces of the funding

15  agreement I like a lot.

16          THE COURT:  Okay.  But just under joint and several

17  liability, doesn't whatever happens to 3M increase Aearo's

18  liability?

19          MR. PFISTER:  Yeah.

20          THE COURT:  Okay.

21          MR. PFISTER:  Yeah.  So they are alleged to be joint

22  tortfeasors, right?

23          THE COURT:  Yeah, they --

24          MR. PFISTER:  They certainly are, right?  So 3M is

25  going to defend itself in the, you know, the earplug litigation

193

1  (audio issue) right?  When does the claim when you file a proof

2  of claim against a chapter 11 debtor for which no relief from

3  stay has been sought, when does that claim get paid?  It gets

4  paid under a confirmed plan.

5          THE COURT:  If you're able to confirm a plan.

6          MR. PFISTER:  Okay, that's true, if you're able to

7  confirm a plan.  If you're not able to confirm a plan, there

8  might be a different rubric.  But the issue here, all that

9  happens when defense costs get incurred, when judgments gets

10 paid, it just increases 3M.  No one, John Castellano is not

11 writing a check to the defense counsel, whoever that may be,

12 Kirkland & Ellis, somebody else, is not writing a check.  He is

13 not writing a check to judgment debtors, right.  If the Sloan

14 verdict gets affirmed, well first of all there's a bonded

15 judgment, so to the extent they're bonded, I can't represent

16 that every judgment is bonded.  But to the extent that any of

17 those judgments are bonded, they'll be paid from the bond, of

18 course.  To the extent that there are unbonded judgments or

19 there are judgments that the --

20         THE COURT:  Where do you think 3M would go after

21 they, assuming that happens and assuming the bond is exhausted,

22 where do you think 3M will go to recoup the payment to the

23 bond?

24         MR. PFISTER:  I mean they could ask, they could ask,

25 they could increase their proof of claim against the debtor.

1              THE COURT:  They could.

2              MR. PFISTER:  Right?

3              THE COURT:  Can they also seek payment from the

4    insurance?

5              MR. PFISTER:  I'm sure they could.  Well, I say I'm

6    sure they could, but, you know --

7              THE COURT:  I've already forgotten the distribution

8    argument, so if someone else would address that.

9              MR. PFISTER:  No, no, no, it's a fact.  It's a fact.

10             THE COURT:  Okay.  They will go against the

11   insurance?

12             MR. PFISTER:  Yep.

13             THE COURT:  Does that harm the estate?

14             MR. PFISTER:  Absolutely not.

15             THE COURT:  And why not?

16             MR. PFISTER:  So that turns to the insurance.  I will

17   tell Your Honor that when I was first looking at the debtors'

18   motion, I actually thought the insurance issue was potentially

19   the most, you know, substantive grounds they had and I was, you

20   know, thought, wow, we have to do some research on this.  The

21   way the testimony has come out at trial, it's not.

22             First of all, there's two types, there's two buckets

23   of insurance.  There are Aearo only policies, right.  It's,

24   those policies are owned and paid for by Aearo because they're

25   pre-acquisition policies.  It's $550 million in coverage.

1   There's no dispute that 3M is not an additional insured on

2   those policies, and they existed before 3M bought Aearo, right?

3   That's $550 million.  The litigation against Aearo's estate,

4   nobody can tap that $550 million.

5         And in fact, Your Honor, what I thought was very

6   interesting was, the only insurance recoveries to date have

7   been four payments under the Aearo policies.  And you know

8   what, they're checks and they're made out to 3M and no one can

9   explain why, right?  And they're sitting in a vault in

10  Minneapolis or Minnesota.  You want to talk about exercising

11  control over properties of the estate, that's $4 million that

12  is payable to Aearo, and it's sitting in a vault.  They're

13  exercising control over that property.  So that's the Aearo

14  policy, right?  That's the Aearo policy.

15        THE COURT:  Right.

16        MR. PFISTER:  Okay.  Now let's talk about the $1.05

17  billion dollars, the 3M policy.  That's the 3M tower.  That is

18  undisputed that 3M bought that coverage and that Aearo is

19  among, I think, numerous others additional insured, Aearo is an

20  additional insured.

21        First of all, again, these claims were tendered three

22  years ago.  In that three years, hundreds of millions of

23  dollars in judgments have been, not judgments, pardon me,

24  verdicts, have been rendered.  Right?  This policy, not one

25  dollar has been drawn on those policies.  If, if, let's just

196

1  assume the worst, right, if $1.05 billion in judgment is

2  ultimately ordered to be paid, okay, then what that will mean

3  is that 3M assuming it draws down from the insurance first,

4  okay, will get back the $1.05 billion.

5       How does that affect Aearo?  It doesn't.  Because the

6  way the funding agreement works, any money that, if Aearo has

7  liabilities, right, 3M has to satisfy it.  It can tell Aearo,

8  well I want you to look to insurance first.  Insurance, is

9  exhausted.  Right?  So let's say they've drawn down $1.05

10 billion in policies.  Then let's say there's another billion

11 dollars in liability that Aearo has somehow come liable for.

12 Again, not in the tort system because the litigation against

13 Aearo is stayed.  But let's say there's a confirmed claim of

14 reorganization that provides for an additional $1.05 billion,

15 again, just hypothetical numbers.  Right?

16       At that point, Aearo looks to 3M which has an

17 uncapped funding, it looks to 3M and it says, I've looked to

18 insurance, your insurance is all gone buddy, right, where's the

19 1.05 billion coming from?  It will come from your general

20 corporate assets.  In this context, the insurance is simply

21 another asset that's available to 3M.  It's no different than

22 if 3M has, you know, a plant in, you know, Duluth, right, it's

23 got a big plant.  And let's say it's theoretically possible

24 that depending if there's a $1.05 billion liability under the

25 funding agreement and the insurance has been exhausted, they

197

1 may have to sell that plant, right?  They may have to liquidate
2 it.

3          Does that mean that Your Honor has, you know, the,
4 that there is a reason to enjoin any actions against any asset
5 of 3M anywhere in the world merely because at some point that
6 asset may be used and may be called upon?  It can't mean that.

7          So the reason that the shared insurance argument
8 simply doesn't work is, well, there's no conclusion it doesn't
9 work, but the clearest reason it doesn't work is that the
10 insurance is not a cap.  The insurance is just a pay first,
11 right.  So let's say the liability wasn't 1.05 billion, it was
12 2.10 billion, right?  In that case, let's say the policy was
13 not impaired, okay.  There's a plan of reorganization in the
14 Aearo bankruptcy case, it says 2.10 billion, right.  Maybe 1.05
15 billion comes from the insurance and another 1.05 billion comes
16 from, you know, the sale of the plant in Duluth.  It doesn't
17 matter what the numbers are.  The insurance is just another
18 asset.  It's nothing more.

19          And for the reason that I initially thought that the
20 insurance, this is potentially a good argument looking at this,
21 is because of the, like the Robins case law.  And I think Your
22 Honor is, some of the questions have gotten to this issue of
23 you know who's liability is it, the tortfeasor.  You have to
24 always look at the context in which the case was defined.

25          And so Robins is the kind of granddaddy.  And in that

198

1   case, right, the company that is the debtor, A.H. Robins, made
2   a product and it had insurance coverage.  There was a genuine
3   limited fund because the assets of the company were not enough
4   by themselves to satisfy all the liability.  But there was
5   insurance coverage.  And so the decision in the <u>Robins</u> is
6   individual plaintiffs were barred by the automatic stay from
7   going against Robins because Robins is the debtor.  So they
8   said, aha, I've got ideas.  These other people have rights
9   under the Robins policy.  I believe in that case it was
10  directors and officers, must not have been Side A coverage,
11  that might have been an invention in response to <u>Robins</u>, could
12  have been others, right.  And they said, you know what, I can't
13  sue Robins.  I'm going to go sue, you know, Jim Smith director
14  and officer and I'm going to say, you know, Jim Smith, you're
15  liable, you're not protected by the automatic stay.  And the
16  court said, but you know what, all that is is a way to get
17  around the automatic stay because Robins might not have enough
18  assets.  Right?
19          And so if you allow the action against the non-debtor
20  to draw down the insurance, it could have an effect on the
21  distribution to the other claimants.  But that's not the case
22  here.  That possibly can't be the case here.
23          THE COURT:  Can't it?
24          MR. PFISTER:  No.  Not, it can't possibly be the case
25  because the insurance is merely  one source of funds.  It is

199

1  available out of all the other funds that 3M had to satisfy its

2  obligations under the funding agreement.  And that is the same

3  case today as it was pre-bankruptcy.  There's always some, you

4  know, outside risk that plaintiff, that debtors say, well

5  gracious, what if, you know, 3M can't pay.

6         The insurance policy, yes, it may well be a valuable

7  asset, I mean one can question how valuable it is when they

8  spent $347 million in defense costs and the insurers have paid

9  absolutely nothing.  I mean I know they're not eroding policies

10  but, it is an important assets, I think we can all agree to

11  that.  It is a $1.05 billion asset.  They've already committed.

12  The number doesn't mean anything.  Mr. Stein testified today

13  the number is meaningless.  But they've already committed to,

14  you know, quoting up a billion dollars.  Maybe they think

15  they're going to get that from their insurers.  I have no idea,

16  right.

17         But it's not like there's a hundred, you know,

18  billion dollars in insurance coverage, and the assets of 3M are

19  worth a billion dollars, right.  That could conceivably or

20  theoretically be a different issue.  But when you have a --

21         THE COURT:  And I have to ask this because if we're

22  just dealing with facts and what's in evidence, isn't the only

23  evidence I have as far as 3M's potential ability to pay

24  liability, wasn't that introduced by the (indiscernible)

25  claimants?

1          MR. PFISTER:  What you have in terms of evidence of

2    3M's ability to pay, first of all I don't know if that's

3    proper, that that issue was properly teed up.  The fact that

4    somebody who I don't represent --

5          THE COURT:  I know that you didn't represent it, you

6    didn't introduce it.  But if I'm just looking at the evidence

7    in front of me and you're the fact person --

8          MR. PFISTER:  I am.

9          THE COURT:  Isn't that the only fact I have in its

10   ability to pay?  I mean I have people saying that 3M is well

11   off, I have people saying that 3M can pay, including the

12   debtors, but I also have, not a declaration, but I have

13   testimony but based upon something or the other, the minimum

14   value that he came up with was 100 billion and that 3M had an

15   inability to pay that.

16         MR. PFISTER:  That, Your Honor --

17         THE COURT:  Let me rephrase that.  That 3M would have

18   an inability to pay judgment on that scale.

19         MR. PFISTER:  His testimony had so many problems with

20   this.  And the debtors --

21         THE COURT:  The debtors objected.

22         MR. PFISTER:  The debtors objected.

23         THE COURT:  And I overruled it.  Right or wrong,

24   there we are.

25         MR. PFISTER:  Well I don't know that you did, because

1   what you said, you said, listen, I listened very carefully.

2            THE COURT:  I'm going to --

3            MR. PFISTER:  You said Daubert is important, right.

4   You said I'm going to hear the testimony because Daubert is

5   noted for jury trials.  You can't have some charlatan get up on

6   the stands and confuse the jury, right?

7            THE COURT:  The judges are never confused.

8            MR. PFISTER:  So Daubert keeps the charlatan off the

9   stand.  But you know what, you had a charlatan on the stand.

10  That testimony --

11           THE COURT:  You didn't object.

12           MR. PFISTER:  I didn't object.  He was not my

13  witness.  And the debtors objected, and I don't think there's

14  any world in which when the debtors who are the defendant in

15  the proceeding, they make an objection, they fully supported

16  that objection.  What Your Honor said was, I know Daubert is

17  important, I will take matters into consideration when I'm

18  judging weight and credibility.

19           To me, maybe it's Midwestern nice, but to me that's a

20  very nice way of saying I got this guy who did this weird

21  binomial thing and, you know, seems kind of earnest and he is

22  who he is and whatever, I will give it the weight it's due.

23  That is what I heard.

24           And, Your Honor, the notion that you could credit

25  that testimony is, that testimony is preposterous.  If that

202

1  testimony had any, any possibility of being true, right, 3M

2  stock would have tanked.  It didn't, right?  The market which,

3  you know, the market is less than valuation these days, the

4  market reacted to that testimony as (indiscernible) buyers.

5          And, Your Honor, you know, frankly it's a crank

6  (phonetic).  And so you are the finder of fact, right, and I

7  don't think you can say on this record respectfully, I don't

8  think you can say --

9          THE COURT:  And this will be may last point on it.

10  If you think he's a crank, isn't that the objection?

11          MR. PFISTER:  That I should have objected that he's a

12  crank?

13          THE COURT:  Okay.  How do I know if he's a crank.

14  Nobody objected to the fact he wasn't qualified, nobody

15  objected to the fact that this guy had many, many degrees.  I

16  mean they objected on the <u>Daubert</u>, I overruled.  I mean I --

17          MR. PFISTER:  It was a soft overruling.  Okay.

18          THE COURT:  Okay.

19          MR. PFISTER:  Yeah.

20          THE COURT: (indiscernible).

21          MR. PFISTER:  Okay.

22          THE COURT:  Isn't that the only thing that's in front

23  of me?

24          MR. PFISTER:  They're handing me these little notes

25  which is, Mr. Stein on his direct testimony, right, he is a

1 confident, qualified person.  We may have disagreement with him

2 over many things.  I think he happened to have struck a pretty

3 darn good deal here on this funding agreement.  But he said, he

4 has no concern over 3M's solvency.

5      Remember we looked at the slide deck on the project,

6 you know, whatever it was called, project spin, right?  And Mr.

7 Stein, you know, his counsel on direct said, you know, do you

8 have any concerns about this.  No.  You know, I don't recall

9 the exact testimony, but it is not true that the crank is the

10 only evidence you have on the record.

11      You have Mr. Stein is an accomplished individual who

12 said I'm not concerned about 3M's ultimate solvency.  The Court

13 could, and I hate to bring up the word judicial notice, but you

14 could bring up, you know, we could offer as judicial notice the

15 3M share prices.

16      UNIDENTIFIED SPEAKER:  Objection, Your Honor.

17      THE COURT:  You don't get to object in closing.

18      But again, what the testimony was was what the

19 verdicts might be, the minimum amount of the verdicts and the

20 ability to pay.  Right?  Whether it's right or not, I don't

21 think the fact of if Mr. Stein is saying that I believe they're

22 solvent, I don't think anybody here today will say they're

23 insolvent today because everything is continued.

24      MR. PFISTER:  I mean that's the gist of the crank's

25 testimony.  I mean it is frankly.  He says that --

1          THE COURT:  All right.  So what other, is that the
2    evidence you believe that would tell me that 3M can cover all
3    the obligations of the debtors?

4          MR. PFISTER:  Let me frame in the reverse which is
5    these, I have no burden.  The plaintiff --

6          THE COURT:  I understand.  But tell me, you said
7    there was other evidence, I was waiting --

8          MR. PFISTER:  The plaintiffs have the burden.  And
9    let me just say first, Your Honor, in their burden if the
10   plaintiffs had said my goodness sake, 3M might be insolvent,
11   they would have put on expert testimony, Your Honor would have
12   heard it and that would have been the case.

13         THE COURT:  Not insolvency, but the ability to
14   satisfy the obligations that may arise from the tort claims.

15         MR. PFISTER:  Understood.  But that would be
16   insolvency in an equitable sense, right?  It's not balance
17   sheet insolvency or it's not, it would be unreasonably
18   plausible.  Right?  It would be insolvency --

19         THE COURT:  Do you believe the statement that he has
20   no doubt about their solvency to satisfy that in court?

21         MR. PFISTER:  I believe that statement is affirmative
22   evidence of solvency.  I believe the only other evidence of
23   solvency, Your Honor, is the crank.  And you are the finder of
24   fact and I think it would be, I don't want to say clear error,
25   I don't want to use words like that.  I think it would be --

205

1          THE COURT:  Well, you kind of did.

2          MR. PFISTER:  Well, I think it would be unsupportable

3    to credit him and say I'm going to issue an injunction, right,

4    in favor, on the debtors' request, I'm going to grant

5    injunctive relief because 3M might not be able to pay us,

6    right.  I don't think you can draw that conclusion from this

7    evidentiary record.  And I would urge you not to.  Okay?

8          But what I don't want to, but what I am, what I am

9    happy that we're talking about is the core issue which is the

10   funding agreement is a complete circle.  Okay?  The, oh, I'm

11   sorry, Ms. Gurvitz reminds me that the 2021 10K and 10Q are in

12   evidence without objection by the debtor.  I think those

13   documents demonstrate evidence of I do believe solvency, it's

14   not balance sheet solvency, right.  The going concern obviously

15   is the ability to pay your debts as and when they come due in

16   the ordinary course, and it's unreasonably small capital

17   solvency, right.  So I think Your Honor has evidence there.

18         But what I don't want to do is go down the crank

19   rabbit hole because I don't think that would not be a good

20   thing for us.  What I think is important is all of the talk

21   that debtors' theory of their relief.  And remember, they have

22   the burden of proof.  Their whole theory is not judged, 3M is

23   insolvent, it is the hierarchy of payments.  Right?  It is,

24   well it's actually not even that.  And let me, this leads to my

25   second factual point.  And I know Ms. Cyganowski wants to talk

1    about the law, but I think this is critically important.

2              So their theory, right, they have presented evidence

3    on this hierarchy of payment loan.  Right?  Oh my goodness

4    sake, the indemnification obligation that the debtors will owe

5    us for our defense costs, they may have refused those

6    obligations the day before bankruptcy, but their obligation.

7    Right?  That didn't come up on their slide deck.  It didn't,

8    and it couldn't.  Why couldn't it?  It's because of Mr. Stein.

9    Mr. Stein said, I am, Rich Stein negotiated that there's no

10   repayment obligation, right, it's all non-recourse, and it's an

11   obligation that it's unconditioned on whether 3M gets

12   injunctive relief.  That's why what they lead with is a slide

13   and the testimony about distraction.  I mean you, as an

14   advocate, you don't lead with enjoining one-third --

15              (Audio issues - continues as follows)

16              MR. PFISTER:  -- that's 3M under the shared services

17   agreement.  These people might be distracted, okay.  We did not

18   say that they couldn't perform the shared services, right.  And

19   Mr. Winston's cross of Mr. Stein, Mr. Stein said well of course

20   we can't terminate the shared services agreement because the

21   automatic stay prevents them from terminating it.

22              It's about literally a degradation of potential

23   services.  But they have Alex Partners with 12 to 14 full time

24   people.  They billed the debtors $5 million pre-petition.  I

25   have no idea what they paid Alex Partners 14 or $5 million

207

1  prep-petition.  I have no idea what these people were doing.  I

2  tried to get Mr. Castellano to tell me at deposition.  He

3  couldn't.  Because remember the company has no operational

4  problems.

5          And Mr. Castellano and his Alex Partners say don't be

6  in this litigation.  So anyway he's got a staff of 12 to 14

7  people.  You couldn't possibly make a showing of distraction.

8  Frankly it's almost laughable.

9          These are fine lawyers in terms of being technically

10 skilled and they know how to present evidence.  You do not walk

11 in to a Federal Bankruptcy Court and say I want one third of

12 the active Federal docket today halted in its tracks because a

13 small company and I'm casting any aspersions on Aearo here.  It

14 sounds to me like it's a company with 330 employees,

15 facilities, you know, that doesn't have anything to do with

16 earplugs for sure, right.  But it is an entity that is doing

17 its thing and by all accounts is profitable.

18         The evidence before you and the evidence upon which

19 Mr. Husnick said enter this injunction to halt one third of the

20 Federal docket is Mr. Castellano and his team of 12 to 14

21 people.  May not be able to use Joanne from accounting.  But

22 there was no foundation that Joanne from accounting was busy

23 working on the MDL.  There's no foundation that Joanne from

24 accounting can't, you know, be substituted in.

25         They're not asking you under 105 to enjoin Joanne

208

1  from accounting --

2               (Audio issues - court recess)

3          THE CLERK:  All rise.

4          THE COURT:  Please be seated.  Are we good?  All

5  right, let's go back on the record on Adversary 22-50059.  Mr.

6  Pfister was interrupted due to technical difficulties.  He is

7  doing the beginning of the close for the tort claimants.  Go

8  ahead sir.

9          MR. PFISTER:  Your Honor, I am near the end of the

10 beginning.  Let me just open with a quick apology.  I regret

11 my, the term crank.  What I had originally started out doing

12 was referring to a hypothetical witness.  I was talking about

13 what <u>Dalbert</u> was, you know, what <u>Dalbert</u> was intended to

14 prevent.  And somehow in the course of arguing I believe, I'm

15 sure I did, I actually referred to Mr. Heaton as a crank.  I

16 don't believe that.  I was wrong, I apologize.

17         THE COURT:  As long as you're not calling me a crank.

18         MR. PFISTER:  I am not.  I am not.  It was

19 inappropriate and I do apologize.

20         THE COURT:  All right.

21         MR. PFISTER:  Let me just close on that point just by

22 saying you have the 10-Q in front of you as evidence.  And that

23 10-Q which was issued on the same day as the funding agreement

24 was signed, the auditors say there's no going concern issue.

25 And that document is in as substantive evidence.

1          You also have testimony in the record for several
2   important propositions in regards to 3M solvency.  But most
3   importantly what I would say on this evidentiary point is I
4   don't believe it was properly teed up by the adversary
5   complaint and the motion.  There was some issue as to 3M
6   solvency.

7          And so if that was going to be an issue that was
8   going to be tried I think the evidence may have come in more
9   differently.

10          But in response to Your Honor's question about what
11  evidence is in the record, we have the Stein testimony which I
12  think is very clear from a respected financial professional.
13  Has no concerns about 3M's ultimate solvency and financial
14  capacity.

15          We have the 10-Q report with the auditor's report
16  that is in as substantive evidence.  And we have the corporate
17  representative testimony of 3M that you've asked in the funding
18  agreement, am I correct that 3M has agreed to fully fund every
19  claim either channeled into a confirmed plan of reorganization
20  to the extent that the debtor's are insufficient to pay them.
21  And his answer was, that is my understanding.

22          We also have his testimony that if all, the question,
23  if all the assets including insurance and cash run out and
24  money is needed to pay creditors in full at the claim
25  confirmation stage, GM has, 3M has committed to fund the

1  shortfall.  He said that's correct.  And he also testified that

2  includes monies that may we be owed by the debtor to 3M.

3       And then there's also the testimony, I believe it's

4  reflected in the document itself, that there is no repayment

5  obligation of any note.

6       So that is evidence before Your Honor on 3M's

7  solvency.  And I don't believe that the testimony of Dr. Heaton

8  is either the sole evidence in the record or is necessarily

9  proper or probative evidence in the record.

10       Let me flip through very quickly, just a few more

11  points.  On the distraction point, we have a comparison period

12  with Mr. Castellano having come to the debtors, coming as a

13  consultant to the debtors approximately two and a half months

14  prior to the petition date.  And I believe, I'm certain

15  actually he confirmed on the stand that despite the fact that

16  the 3M and actually both 3M and the debtors were defendants in

17  the ongoing litigation at that time.  He did not have a problem

18  using the shared services.

19       So we don't need to speculate as to will there be a

20  problem in the future because we have two and a half months of

21  history where he saw, not single 3M employee, pardon me, not a

22  single Aearo employee on the 330 operational employees was

23  distracted.  Not a single one of the 400 plus employees of the

24  non-debtor subsidiary were distracted.

25       And so I think for all of those reasons that the

1  testimony or that the argument rather with respect to

2  distraction on this record simply can't carry the day.

3          And then let me close very briefly with just a few

4  comments on this concept of time because I do think time has

5  popped up in this case in several ways.  Including Your Honor's

6  comments at the first day hearing I believe it was to Mr.

7  Bernick the question, why do you need this relief now.  These

8  debtors came in on a TRO, not on the first day of the case.

9          And it's important that Mr. Stein testified this

10 morning that there is no particular reason why the case had to

11 be filed on July 26th.  You know, there's nothing in particular

12 that made it an urgent thing.

13         We know from the evidence that was admitted in terms

14 of the board minutes, this strategic litigation management

15 exercise, you know, planning for months and the like.

16         The Code contains provisions that have different time

17 tables.  Automatic stay applies instantaneously.  That's one

18 time table.  Other end of the time table is, if you want to

19 enjoin claims under 5.4(g) and enjoin claims under that

20 section, there's a robust process that is required to do that.

21 Lots of due process.  Lots of other issues.  And the relief

22 that you get at the end is effectively the relief that they're

23 seeking today.

24         And that dovetails to my final comment which is Mr.

25 Husnick disagreed with the notion that they're seeking a

212

1  permanent injunction.  I think the point was a bit more subtle

2  than that.  It wasn't that they're seeking a permanent

3  injunction today, it is that this is not a temporary stay to

4  litigation.

5          The notion here is that the litigation will stop and

6  it will never restart.

7          THE COURT:  Why do you say that?

8          MR. PFISTER:  Because the, there is not some, so in

9  Caesar's for example there was a temporary stay that was

10  requested to allow an examiner report to be done and to insure

11  that the parent's assets wouldn't be dissipated.

12          And when you read the case in that context I think

13  it's important to read from that context.  Here they have, the

14  debtors have set this up and the tort system has failed them.

15  The MDL process is, according to them, you know, an utter

16  disaster.  Can't possibly provide any justice.

17          That's not on trial before you today.  But that is

18  the predicate, that is where they want to go.  And that's their

19  version of a vision rather of a successful reorganization, is

20  that these claims will never be tried, right.

21          The whole point is not we need to pause what Judge

22  Rodgers is doing in Florida so that we can do something

23  ourselves and then we'll all restart.  That's not the plan.

24          The plan is to halt and then again, now they have to

25  be successful later.  So I'm not saying that they halt today or

213

1  tomorrow or something ipso facto becomes a permanent halt.

2          What I am saying is when you're asked to start down a

3  road, right and you are being asked to start down a road and

4  then road they want you to start down is that these claims will

5  never be tried.

6          Now, I don't think they can ever get to their

7  ultimate goal of that road.  We are not here today on that.

8  But the status quo ante is these claims against 3M are being

9  litigated in the tort system.  Nothing imminent, nothing, you

10 know, huge has happened.  There's no effect on the debtor which

11 is protected by the automatic stay from these claims continuing

12 in their ordinary course, right.

13         There's no distraction.  There's no (indiscernible)

14 out of insurance.  There's no, you know, 3M is about to declare

15 bankruptcy.  None of that is true.

16         So when they come in on the day of the filing and

17 they say Your Honor halt these claims and then issue a

18 temporary restraining order on this.  And the Court didn't.

19         But now they say issue a preliminary injunction.  It

20 is to the end that they will be able to never try the claims,

21 right.  The plan is not please just pause it for three months

22 so we can get an examiner report.  The plan is Judge, we are

23 someday soon, right, because we want to start negotiating right

24 now, we want to make sure these claims are never back in front

25 of that MDL Judge, right.

1           They want you to take the first step on it.  They
2  wanted you to take it on day one of the case.  They want you to
3  take it now.  And what that does is it exactly alters the
4  status quo, exactly alters the status quo.  It enjoins one
5  third of the Federal docket.  The release is not necessary.
6  It's certainly not necessary now.

7           And let's just say, I don't think they've provided
8  entitlement to any relief.  But let's just say this case
9  continues, because we're not here on a motion to we're not
10 seeking to dismiss the (indiscernible).

11          Let's just say that in six months or a year some, you
12 know, some harm that they think is speculative or that they
13 speculate about today, let's say that comes to fruition, right.
14 Let's say Mr. Heaton, you know, is correct and there's some
15 huge financial problem at 3M and there's real doubts as to
16 whether 3M will at the end, you know, end of the day actually
17 going to honor funding agreements.

18          I'm not telling you that we won't oppose a renewed
19 request, right.  What I am saying is there is no need to change
20 the status quo today because they haven't, and they have not
21 shown entitlement to it.

22          So it's, when you're asked to start down a road, you
23 need to at least see what's the end game.  I'm not telling you
24 that their ultimate end game, you should find today that it's
25 improper.  I don't think their ultimate end game is proper.  I

215

1  think if that's the case we'll have subsequent proceedings on

2  that.

3        But my point then to the extent there's anything that

4  they're worried about, you can address it in the future.

5        Anyway, those were comments on time.  I've taken up

6  far more time that I ought to have.  I apologize.  Thank you

7  Your Honor.

8        THE COURT:  Thank you.  A little tighter quarters in

9  here, need to readjust.  I apologize.

10       MS. CYGANOWSKI:  I was about to say good evening, but

11 it's not quite.

12       THE COURT:  Not yet.

13       MS. CYGANOWSKI:  Good afternoon Your Honor, Melanie

14 Cyganowski, Otterbourg, P.C. representing the firm of Seeger

15 Weiss.  Christopher Seeger is here.  His picture was not put up

16 on the board.

17       THE COURT:  There's still time.

18       MS. CYGANOWSKI:  And I stand here today as Mr.

19 Pfister had pointed out on behalf of the many law firms and

20 claimants who have signed on to the consolidated brief, I

21 believe is the best way to refer to it.

22       Before beginning let me just also touch on something

23 you had asked earlier about the LTO appeal.  It's not scheduled

24 before the Third Circuit until September 19th.  There's oral

25 argument that will take place on that day.  So a decision

1 presumably won't be forthcoming for a while.

2          Your Honor I know we're pressed for time.  Let me try
3 to jump right in and start immediately with the governing law.
4 I frankly think there's little dispute between the parties that
5 we are guided by the teachings in <u>Fisher</u> and <u>Stevens</u>
6 (phonetic).

7          I appreciate the Court's comments throughout the
8 hearing that these teachings are perhaps not as clear as we
9 would all like.

10          However one thing that is particularly clear is that
11 the burden falls squarely on the debtors.  It's their burden,
12 it's their burden alone to prove by a preponderance of evidence
13 and this is of course well established.

14          Among other cases is that of <u>Sierra Club versus Gates</u>
15 at 499 F. Supp, 1102, excuse me 1101 and <u>Taylor versus Biglari</u>
16 at 971 F. Supp 2nd 847 where the Courts indicated, both in
17 Indiana, that the standard is "although there's discretion to
18 issue a preliminary injunction which lies with the Courts, the
19 injunctive relief is to be considered an extraordinary remedy.
20 And further that the moving party bears the burden of proving
21 and must establish by a preponderance of the evidence that he
22 is entitled to that relief."

23          So under <u>Fisher</u> and <u>Caesars</u> the debtors must
24 demonstrate that the third party litigation which they are
25 seeking to enjoin will defeat or impair the Bankruptcy Court's

217

1  jurisdiction over the case if the third party litigation is not

2  enjoined.

3       Here the question presented is will the continuation

4  of the MDL litigation now pending before Judge Casey Rodgers in

5  the United States District Court in the Northern District of

6  Florida defeat or impair this Court's administration of the

7  bankruptcy cases filed by Aearo Tech companies which comprise

8  five of the six nominal defendants in the MDL.  The sixth of

9  course is the 3M which is not a debtor here, is the corporate

10  parent of the debtors and one for which the 105 injunction is

11  being sought.

12       And in answering this question the debtor must

13  address, excuse me, the Court must address whether it has

14  jurisdiction over the litigation which the debtors are seeking

15  to enjoin.  We often refer to this as related to jurisdiction.

16       As a threshold matter, the Seventh Circuit has

17  adopted a narrow interpretation of what qualifies as sufficient

18  for a finding related to jurisdiction, saying the following and

19  I quote, "The jurisdiction of the Bankruptcy Court to stay

20  actions in other Courts extends beyond claims by and against

21  the debtor to include suits to which the debtor need not be a

22  party but which may, which may affect" we heard that, "the

23  amount of property in the bankruptcy estate or the allocation

24  of property among creditors."  And this is coming from Fisher

25  and Xonics and Memorial Estate, all Seventh Circuit cases.

1          As we've repeatedly noted through the hearing, we

2   believe that as a result of the funding and indemnification

3   agreement, neither the amount of property in the estate nor the

4   allocation of it between the creditors is affected.

5          Consequently the related to jurisdiction test fails

6   we believe by its terms.  But in any event, the Seventh Circuit

7   explained that it has adopted this more narrow interpretation

8   and I quote, "Out of respect for Article 3 as well to prevent

9   the expansion of Federal jurisdiction over disputes that are

10  best resolved by State Court."  This is coming out of the

11  FedPak Systems case.

12         And in like manner the Seventh Circuit stated in

13  Kubly at 818 F. 2nd 643 that the limited jurisdiction of the

14  Bankruptcy Court "may not be enlarged by the judiciary because

15  the Judge believes it wise to resolve the dispute".

16         Now the FedPak Systems Court was obviously referring

17  to the more usual interface of Federal and State jurisprudence.

18  But I submit Your Honor that the same respect applies to the

19  circumstances here, namely the interface of Article 1 and

20  Article 3 Courts and their respective jurisdictional reaches.

21         When we're facing this issue I believe that we must

22  confront but cannot ignore the legal implication and this goes

23  to a question the Judge, excuse me, that you asked earlier,

24  whether these, whether we call them Texas Two Step or some

25  other forum are doing.  You know, do the Article 1 Bankruptcy

219

1   Courts have the constitutional and legislative jurisdictional

2   bandwidth to encompass and envelop the jurisdiction of the MDL

3   litigation which is already has been designated as the central

4   forum in which it has been frankly vested by the, by the panel

5   and by Congress in these Article 3 Courts.

6          We submit that in <u>FedPak</u> as in <u>FedPak</u> and <u>Kubly</u>

7   that this Court should respect the jurisdictional bounds at

8   play here and apply a cautious and conservative approach in

9   making its decision so as to prevent the expansion of Federal

10  jurisdiction over disputes that can be and frankly have been

11  best resolved by another Court, here the MDL Court.

12         And we believe this is especially applicable when the

13  cases entitle litigants to a trial by jury, obviously a right

14  afforded under the Seventh Amendment.

15         We further submit and ask that this Court should do

16  this, the plea of the debtor is that it is the bankruptcy

17  system and our Article 1 Courts alone which is the best suited

18  forum to handle and resolve the hundreds of thousands of mass

19  tort cases pending throughout the country which in our case is

20  now pending before the MDL in the Northern District of Florida.

21         Beginning with the first day of hearing, repeated

22  throughout their papers, the debtor's mantra has been that

23  these Chapter 11 proceedings were initiated and I quote from

24  their motion papers at page 2, "In the wake of the failure of

25  the Combat Arms MDL to advance the equitable and efficient

220

1  resolution of tort claims related to the Combat Arms earplugs.
2  To achieve that goal it is necessary to pause the underlying
3  litigation".

4         Like the Bankruptcy Court, the MDL Court has many
5  tools to administer its dockets.  And I do not believe that we
6  should presume that Judge Rodgers will simply unleash thousands
7  of cases in some haphazard manner on remand as the debtors have
8  repeatedly threatened.

9         The MDL Courts and the MDL panel are designed and
10  charged with the purpose of effectively and efficiently
11  handling the mass tort litigation in a centralized forum.

12         The MDL Courts can also resolve mass tort disputes on
13  a global basis.  We should not presume that our Bankruptcy
14  Courts which are adept at doing this, are the only courts that
15  can.

16         But perhaps most important, this is not either or.
17  This is not a paradigm where we must choose.  There is no
18  reason why this Bankruptcy Court cannot continue to administer
19  the bankruptcy case before it without an injunction issuing in
20  favor of 3M, thereby allowing the MDL litigation to continue.

21         Global settlements may be negotiated in one or both
22  forums.  The debtors' disinterested directors may continue to
23  work towards their goal of global resolution that would include
24  all the cases on behalf of the claimants, 3M, including the
25  Aearo defendants.

1    And upon these settlements being reached, whether in

2 the MDL or in the Court because of the continued pendency of

3 these bankruptcy cases, resolutions can be consolidated.  They

4 can be reflected in a plan of reorganization with all of the

5 attendant bankruptcy protection.

6    We respectfully urge that this policy of having to

7 decide that we need to only have our forum and not the MDL

8 forum is not one before the Court.  That that's one that

9 belongs to Congress and we'll leave to them for another day to

10 resolve that.

11    But we cannot forget that there was a day, namely on

12 February 19th, 2019 when 3M Company, 3M Company itself

13 voluntarily sought and agreed to have the Combat Arms

14 litigation consolidated in the Federal forum of the MDL Court.

15 And in their pleading before the judicial panel for the multi

16 district litigation which is one of the documents in the

17 record, the first sentence of its pleading reads and I quote,

18 "3M Company supported consolidation of the more than 200 Combat

19 Arm earplug actions that have been filed against it to date and

20 the thousands of additional similar cases that plaintiff's

21 counsel has stated they intend to file in the future."

22    3M's request is granted and the Judicial Panel for

23 Multi District Litigation entered the appropriate orders for

24 consolidation.

25    Now three and a half years later after there were

1  plaintiff's verdicts in 13 of the 19 Bell Weather cases that

2  went to trial before nine different Judges, not just before

3  Judge Rodgers, only now does 3M decide to reverse the course.

4      There are times Your Honor when we should call a

5  spade a spade.  And we should point out that a lot of what is

6  going on is nothing less than a disgruntled litigant, namely

7  3M, which is simply seeking another judicial forum, one which

8  in Judge Rodgers' words, is far from her Court.

9      As Judge Rodgers observed the defendants before her,

10  particularly 3M, are "displeased with the rulings of the MDL

11  Court in the Bell Weather jury verdicts and so they are

12  attempting to evade the 3M primary narrative because it no

13  longer fits the company's strategic objective."

14      THE COURT:  Well let me ask you.  You stated that

15  they're tools and that both MDLs can be used and Bankruptcy

16  Courts can be used.  And I have said, the MDL is what it is.  I

17  don't know if it's been well run or not well run.  It seems the

18  fact that it's still going this probably means it's well run

19  given the size of it.

20      But is there anything inherently unjust of a party

21  deciding that maybe it's time to attempt the bankruptcy as far

22  as just using a different tool?  There's nothing --

23      MS. CYGANOWSKI:  There's nothing wrong.

24      THE COURT:  Right.

25      MS. CYGANOWSKI:  But 3M did not file this bankruptcy.

1           THE COURT:  And they haven't, that's correct.

2           MS. CYGANOWSKI:  They haven't.  They had every right

3  to do that and they didn't.  And that's part of what we

4  complain, that what they're trying to do is set up something

5  that is frankly an illusion that makes you think that the Aearo

6  Tech debtors and business is a legitimate bankruptcy.

7           THE COURT:  Is it?

8           MS. CYGANOWSKI:  It is to them.  And --

9           THE COURT:  But right now, right now, there's no, I

10  know you've alluded to a motion to dismiss.  But there's no

11  motion to dismiss in front of me.

12           MS. CYGANOWSKI:  Correct, there is none before you.

13           THE COURT:  I've got one additional document showing

14  that Aearo that exists.

15           MS. CYGANOWSKI:  Correct and there's no reason why --

16           THE COURT:  The debtors exist.

17           MS. CYGANOWSKI:  Right.  The debtors exist and they

18  are properly here for the moment before you.

19           THE COURT:  Right.

20           MS. CYGANOWSKI:  And there may never come a day,

21  there may never come a motion to dismiss.

22           THE COURT:  So when you say illusory though, the

23  debtors exist.

24           MS. CYGANOWSKI:  The illusory part of this is not

25  that the debtors don't exist, is that's the purpose of the

1 bankruptcy is not to reorganize Aearo, but to reorganize yes

2 all the other debts attendant to the litigation in 3M.

3         But the real purpose here is to get the injunction

4 for 3M.  3M wants the all encompassing and as we know there's

5 nothing more powerful and more embrassive than the injunction

6 that comes from this Court.  If 3M wanted that, then they

7 shouldn't be here.

8         Counsel referred to Purdue.  Purdue Pharma filed

9 Purdue.  Purdue Pharma did not file its subsidiaries.  The

10 injunction happened for the factors on that first stay because

11 the factors enter into a provisional settlement with the

12 debtor.  And the monies that were done was in connection with

13 that.  It's a whole different paradigm.

14         And if 3M wants to come to this Court and say I'm

15 here and I want everything that comes with it including the

16 injunction and I want to resolve all these litigations here,

17 they're most welcome.

18         But to say that these debtors which is a nominal

19 defendants up until this point, up until the point in time when

20 somebody at 3M gee whiz, I think we need to do something.

21 Until that happens, Aearo Tech was fine.  They had a solvent

22 balance sheet.  They didn't have accrued liabilities.

23         At no point up until now did 3M charge back, seek to

24 cross claim, I mean there were no actions historically that

25 suggest that these are all, (indiscernible) defendants, all of

1 whom are real, real defendants is what I mean.  Not that

2 they're not real companies.

3         THE COURT:  Okay.

4         MS. CYGANOWSKI:  Right, but they could have sought

5 allocation in the --

6         THE COURT:  They could have, but they didn't.

7         MS. CYGANOWSKI:  But they didn't.

8         THE COURT:  That is correct.  But they were engaged

9 in 230,000 --

10        MS. CYGANOWSKI:  They were.

11        THE COURT:  But why?

12        MS. CYGANOWSKI:  In each of them --

13        THE COURT:  Why?

14        MS. CYGANOWSKI:  They have shared common claims.

15 There's no doubt about that.  We're not denying that.  There

16 are claims that are shared.  3M has independent liability,

17 right.  There's a question and I'm not, I'm not --

18        THE COURT:  I know it's been alluded to and I

19 think --

20        MS. CYGANOWSKI:  And whether or not it's joint or

21 several --

22        THE COURT:  -- said there was some, they said there

23 was some independent claims against 3M.

24        MS. CYGANOWSKI:  Your Honor, absolutely are

25 independent claims.  So at this point there's no reason why the

226

1  litigation can't continue.

2          But let's remember, up until this point in time it
3  was 3M that told the MDL Court it's us, that's it.  Sole
4  responsible party.  And it's not just that they said that in
5  one instance, in the instance of the Wayman and the Vaugh
6  (phonetic) verdicts, they took place in a Court where there
7  were punitive damages claimed that accrued to each of the six
8  defendants.

9          And 3M affirmatively went to the MDL Court and said
10 Judge, it's just us.  It's not fair, it's not fair that you
11 should put on us multiple of three times for its six defendants
12 when it's us, 3M and 3M alone.

13         So to say now, the illusion Your Honor is that
14 they're now coming to you and saying oh, there's all these
15 common claims and these are legitimate claims.  And maybe they
16 are.

17         But the point of it is that up until the moment in
18 time when 3M felt that gee whiz I've got to find a way to deal
19 with this litigation but I do not want the burden of
20 bankruptcy.  I do not want the transparency of bankruptcy.

21         They should be filing monthly operating reports.
22 They should be having their operations impacted by all the
23 other rubrics that we demand in bankruptcy so that we know
24 what's going on, right.

25         But they don't want any of that.  They don't want

227

1  their balance sheet affected by a bankruptcy against 3M.  So

2  instead they say well look, we can say that all these things

3  are common.  We can say that we're so inextricably intertwined.

4  I mean they say the words.

5         But up until that point which was only three months

6  ago, none of this matter because they represented themselves

7  historically by their conduct, by their words, by their motions

8  that 3M was the sole responsible party.

9         And now, now we have this funding agreement because

10  we have Aearo Tech, 300 employees, operating a business of 100

11  million.  And the independent director says boy, I think I

12  should take on all the liabilities of the MDL.  That seems like

13  a good idea, even though up until that point in time there was

14  nothing on their books.  There were no accrued liabilities.

15  There was no suggestion that 3M was ever going to charge them.

16  There's not one, the evidence that came in the last three days

17  showed that there's not one financial entry on the books of 3M

18  or Aearo that says that Aearo is responsible or anything; for

19  their share, for anybody's share.

20         So for Mr. Stein to tell us well there may come a day

21  when 3M will come calling and say that by virtue of this 2013

22  indemnification that Aearo Tech may be liable, for what?  For

23  its share, for more shares, maybe.  But there was nothing,

24  nothing, there was no action up until that point in time, you

25  know.  The insurance, nobody said it was Aearo's.  3M, they

228

1    paid for it.  They put it in their vault.

2             The bonds, paid for by 3M.  Representation to the

3    Court there's never an Aearo employee ever.  There wasn't an

4    Aearo -- where was the CEO.  There wasn't anybody here.

5             We saw the testimony of Mr. Stein, the disinterested

6    director.  Where was Hopkins?  We can say that there are all

7    these things that it appears that they're legitimate, but I do

8    believe that, I can't think of the exact words to say that it's

9    an illusion.

10            I think this is also confirmed by Mr. Dai.  He was

11   3M's associate general counsel, corporate secretary.  When he

12   was describing project Crane he described it as 3M, not

13   Aearo's, not 3M's, strategic alternatives to managed

14   litigation.

15            So I don't fault them and there's nothing wrong with

16   them considering gee whiz, maybe we need to do something

17   differently.  But they should have come themselves.  3M should

18   be here.  And if they were here then everything else frankly

19   would flow.

20            We've talked about the circularity of the funding

21   agreement.  And the reason why it's circular is that we've had

22   testimony from Mr. Dai, Mr. Stein, Mr. Castellano that the

23   funding is uncapped.  The funding is there to provide for the,

24   any payments, the administrative of this case and any claims

25   that might arise in connection with creditors of this estate.

1          They needed that because Aearo Tech itself in the

2     absence of that would probably be, we'd be talking about

3     something akin to a Chapter 7 liquidation, right.  There's no

4     way that they would have the funds in and of themselves.

5          So in order to enable this entity that otherwise had

6     nothing to purport to be a debtor that would not only be, again

7     I'm using solvent but not in the sense it's a solvency test,

8     but it has to be sufficient robust to pay the claims.  There

9     had to be this funding agreement.  So it's the way it's

10     infusing funds by way of 3M.  And it is circular.  But the

11     claims of indemnity that may be asserted against the debtor as

12     Mr. Pfister pointed out will not reduce any operating capital

13     of the debtors and at best will convert 3M into a creditor.

14          If they file a claim at all.  I mean it was very

15     unclear from the first day.  And I'm not holding this against

16     them.  But certainly they were asked repeatedly, they being the

17     debtors, you know what type of claim will 3M be filing in this

18     case.

19          But it really doesn't matter because at the end of

20     the day it will be something that we would deal with.  But by

21     the terms, by the very terms of the funding agreement, 3M is

22     obliged to pay.  So they're paying themselves and that's why

23     it's circular.

24          The other part of it is that to the extent that the

25     litigation against 3M continues should there be judgments,

230

1  should those judgments be paid, that's a dollar for dollar
2  reduction against claims against the debtor's estate.
3          So again the Court is substituting real dollars for
4  bankruptcy dollars and bankruptcy claims.  It's not something
5  that affects the debtors', it certainly doesn't affect the
6  debtors' creditors.  And I don't believe that it in any way
7  affects the allocation among the creditors were 3M judgments to
8  be entered and dealt with outside of this bankruptcy.
9          I referred to this a little bit before but I'd like
10 to come back to it, it's like why was the funding agreement
11 needed in the first place.  It does go back to this notion that
12 if in the absence of this, these debtors would be unable to be
13 here in the way that they are.
14         So we think that it's emblematic of what Judge
15 Rodgers was referring to when she called it a scheme of naked
16 duplicity.  They point to, I mean they say all the right words,
17 inexplicably intertwined claims, common insurance, indemnity
18 obligations that supposedly again create this circle of
19 identity of interest.  And they point to a distraction.
20         I wanted to share with the Court that one of the
21 reasons I keep referring to Judge Rodgers is not because I'm
22 asking this Court to review her rulings or review the docket.
23 The reason why I'm suggesting that the Court look at her words
24 is that it is so rare in our judicial system for another Court
25 not sitting as your Appellate Court, to reach out and talk to

231

1  you and to talk to us.

2          She has lived with 3M and the Aearo defendants for
3  the last three and a half years.  She knows what they did
4  before her.  And her words to us has been be cautious, be
5  weary.  Look at what they're doing because at this stage of the
6  game, they're doing an about-face of the claims and all the
7  arguments that they've been making up until this point.

8          Certainly in her words it's because they're
9  disgruntled litigants.  Maybe that's true.  But the bottom line
10 of her words is that it's a caution to us.

11         We're skeptical.  You've heard your scepticism in our
12 voices.  We believe that when you look at each of the elements
13 that they ask you to look at, common insurance, indemnity, the
14 supposed distraction, that none of them really ring true.  And
15 when you shed the spotlight on them, they fall apart.

16         They talk about the separateness.  But we know that
17 in 2010 3M up streamed the business and operations of Aearo.
18 They talk about distractions but we know that there's this
19 support agreement so that 3M provides everything for them,
20 legal, accounting, financial which is probably why there never
21 was an Aearo witness or Aearo employee as a witness in any of
22 these proceedings.

23         They now say that Aearo is an important and real
24 defendant when up until this point in time they certainly
25 haven't been.

232

1              THE COURT:  Well I have to ask you again though,

2   aren't they a named defendant in every action?

3              MS. CYGANOWSKI:  They are, they are.  And --

4              THE COURT:  Why?

5              MS. CYGANOWSKI:  Because there are, because it was

6   their product.  Because they didn't --

7              THE COURT:  So they are a real defendant?

8              MS. CYGANOWSKI:  They are -- I don't want to --

9              THE COURT:  --  just a nominal defendant, it doesn't

10  matter.

11             MS. CYGANOWSKI:  Yes, they are.

12             THE COURT:  But it matters when it's on a caption --

13             MS. CYGANOWSKI:  It does matter.

14             THE COURT:  -- complaint.

15             MS. CYGANOWSKI:  It certainly does matter.  But when

16  you have another party and --

17             THE COURT:  And I understand that.

18             MS. CYGANOWSKI:  Right.

19             THE COURT:  But I guess I just --

20             MS. CYGANOWSKI:  We're not the ones who said that,

21  right, it was 3M.  3M voluntarily put on the cloak themselves

22  and said it's us.  We are the sole responsible party.  We will

23  run the litigation.  We will present the evidence.  We will, we

24  will be Aearo because they merged Aearo into themselves.

25             THE COURT:  Well then you dismiss them.

233

1          MS. CYGANOWSKI:  Actually motions are coming to do
2   that.
3          THE COURT:  But only filed after the bankruptcy.
4          MS. CYGANOWSKI:  I'm not confident of that Your
5   Honor.
6          THE COURT:  Okay.
7          MS. CYGANOWSKI:  I'm really not confident of that.
8          THE COURT:  And that's fine.
9          MS. CYGANOWSKI:  I know that there are motions
10  pending.  They may have been pending prior to the filing.  That
11  I, that I do not know.
12          I'm sure there are other questions and if you'd like
13  to ask them I'm happy to --
14          THE COURT:  I guess my first question would be, and
15  we kind of, are the, is it your view that you're saying that I
16  don't necessarily have related to the jurisdiction to look at
17  the issue?
18          MS. CYGANOWSKI:  Yeah, I believe you do.
19          THE COURT:  You believe I do?
20          MS. CYGANOWSKI:  Yes, absolutely.
21          THE COURT:  All right.
22          MS. CYGANOWSKI:  You -- you --
23          THE COURT:  That's a question I have, because --
24          MS. CYGANOWSKI:  Right.
25          THE COURT:  -- you say that, and they say they that

234

1  will be --

2          MS. CYGANOWSKI:  Yes.  No, you absolutely have that.

3          THE COURT:  And so your position -- the position of

4  those you represent is that their request failed on the prong

5  of 105 and the test under there?

6          MS. CYGANOWSKI:  Correct.

7          THE COURT:  Okay.  Thank you.  That was my first

8  clarification question.

9          MS. CYGANOWSKI:  Yes.

10          THE COURT:  My second clarification, and I'm trying

11  to -- and I know you're the legal expert, and you probably were

12  a bankruptcy judge longer than me, so you probably are the

13  biggest expert in the room, other than myself --

14          MS. CYGANOWSKI:  You're the most recent.

15          THE COURT:  That doesn't mean much.  I just have less

16  gray hair at the moment.

17          MS. CYGANOWSKI:  There's a reason for that.  I go to

18  beauty parlors.

19          THE COURT:  When we look at this, and -- I can't

20  comment on that --

21                          (Laughter)

22          THE COURT:  Now, I lost my train of thought.  I'm

23  sorry.  Well done.  All right.  No, I didn't lose my train of

24  thought.  Oh, I'm sorry, it's back.

25          When you cited the Seventh Circuit case law about

1  different types of jurisdiction, and -- and I don't think that

2  you mentioned Bush which unfortunately was an appeal from this

3  Court, not me, but was opining on that, and do you feel that,

4  in that decision, Judge Easterbrook modified how I should look

5  at those things or does it not matter, because that was

6  discussing related-to jurisdiction, which you say I have.

7              MS. CYGANOWSKI:  First the latter --

8              THE COURT:  All right.

9              MS. CYGANOWSKI:  -- first the latter, and I think at

10 bottom because less of a jurisdictional issue as to whether or

11 not you have the power, as much as our argument is that you

12 should decline to exercise it.

13             THE COURT:  Okay.

14             MS. CYGANOWSKI:  It truly is.  We do not believe that

15 the circumstances -- and I'm trying to think of another way to

16 say it -- that up until the moment when the lightbulb went off

17 in somebody's head at 3M, 3M was chugging along in this MDL

18 litigation by itself, surely, by itself, without even a thought

19 that the other defendant should be there, right?  I mean, they

20 could have, at any time, up until that point, as others have

21 done, LTL and -- and run off the other -- the other cases that

22 have been pointed to.

23             I mean, there are many differences between these

24 cases.  They're not the same, but they could have, at any time,

25 said, for nothing else than bookkeeping, jury, please allocate

236

1 responsibility between the defendants, because it's not
2 unusual, and we saw this in LTL, in Johnson & Johnson, who is a
3 material party there.  And Johnson & Johnson and JJCI, which
4 was the entity that had existed before the two-step had book
5 entries.  They were allocating defense costs, judgment costs,
6 all kinds of costs, in between intercompany.

7          We have none of that here -- none of that.

8          THE COURT:  Well, we do have a debtor that existed.

9          MS. CYGANOWSKI:  There we go.

10         THE COURT:  All right.

11         MS. CYGANOWSKI:  So there's no reason -- our point
12 now is that there is no reason why 3M can't and should not be
13 forced -- be forced to be in the forum that it chose, namely
14 the MDL court, to keep chugging along, because the litigation
15 against the defendant, the Aearo defendants, is stayed.  It's
16 not going forward.  There is no reason why the litigation
17 against 3M cannot continue on its independent liability.
18 Whatever happened before can continue, because that's the way
19 that they constructed it.

20         I'm prepared to conclude, Your Honor.  I do want to
21 point out -- I think I have, but I think the ramifications of
22 your decision go well beyond this case.  I think there are
23 policy implications that others have been urging, because if,
24 in fact, this paradigm is -- succeeds again, and we've clearly
25 been fighting it in other forums.  This isn't the first time

1  that we've shown up to tell the Bankruptcy Court, you're not

2  the only -- and, again, this is hard.  I love the Bankruptcy

3  Court.  It's my home.

4          THE COURT:  I'm somewhat partial to it, yes.

5          MS. CYGANOWSKI:  That we're not the only judicial

6  forum that knows how to do a global settlement.  We're not the

7  only judicial forum that knows how to efficiently move cases

8  along.  There are other courts that do that, and, particularly

9  here -- and I don't think we can forget, there is a Seventh

10 Amendment jury right here.  The estimation -- you can't -- the

11 estimation for them -- I'm sorry -- for these folks on this

12 side to say that, estimation is equivalent, it's not.

13 Estimation is the global right.  It's -- and why do we -- let's

14 step back.  Why do we do estimation?

15         THE COURT:  Well, but I -- I just have a quick

16 question on that.  Didn't you just say that the MDL court,

17 also, was well equipped to promote settlement?

18         MS. CYGANOWSKI:  Yes, and there were.

19         THE COURT:  But -- but --

20         MS. CYGANOWSKI:  There were settlement discussions

21 that were going in --

22         THE COURT:  Oh, no, I know that, but many issues have

23 been made in the papers -- and I just want to clear this up,

24 not that anyone cares, but when they're, like, this would

25 deprive them of their Seventh Amendment jury trial right.

1          MS. CYGANOWSKI:  Correct.

2          THE COURT:  And I just want to be clear, I can't

3    deprive them of that --

4          MS. CYGANOWSKI:  Right.

5          THE COURT:  -- because it's their right.  And I can't

6    hear PI cases.

7          MS. CYGANOWSKI:  Correct.

8          THE COURT:  And the only way that I can do anything

9    is via consent.

10          MS. CYGANOWSKI:  Correct.

11          THE COURT:  But when we say that, and everyone throws

12    up their hands, I just want to make clear that you're also

13    saying that one of the outcomes in an MDL is settlement --

14          MS. CYGANOWSKI:  Correct.

15          THE COURT:  -- in which their claims would not be

16    tried in front of a jury?

17          MS. CYGANOWSKI:  Correct.

18          THE COURT:  Okay.  I just --

19          MS. CYGANOWSKI:  But, there's more -- there's more.

20          THE COURT:  No, I understand.

21          MS. CYGANOWSKI:  Your Honor --

22          THE COURT:  I just wanted to get that on the record

23    that --

24          MS. CYGANOWSKI:  Yes, but there --

25          THE COURT:  -- that we have twin goals in that

1  respect to resolve this.

2          MS. CYGANOWSKI:  We absolutely do, but I don't think
3  we should forget that there were settlement discussions prior
4  to the case.

5          THE COURT:  Right.

6          MS. CYGANOWSKI:  Right.  And we heard from Mr. Stein
7  that even though he's been on since May, and even though he was
8  aware of mediation efforts happening, he didn't show up.  And
9  we know -- we heard from his testimony today, that the funding
10 agreement allowed him to do that.  He could have participated
11 in settlement discussions.  He had the financial funds if he
12 wanted to to do this -- I forget the words, but I'm going to
13 get a t-shirt, efficient, effective, global settlement for
14 everyone.

15         He could have done that.  He didn't even think about
16 it -- didn't even think about.  There has been nothing in the
17 record that suggests that the TEL claimants -- I'm sorry, wrong
18 case.

19                         (Laughter)

20         MS. CYGANOWSKI:  My apologies.  My apologies, that
21 the veterans here with the combat earplugs, there was never any
22 suggestion that they never showed up when asked to settle.
23 They did.  They will.  They'll continue.  But in this forum,
24 MDL forum, that will never come to an end.

25         But I do think you need to appreciate, Your Honor,

240

1  that your decision will have significant repercussions in the

2  tort world.  This notion that if, indeed, a solvent Fortune 500

3  company can get all the benefits of bankruptcy, including the

4  most important, the stay, without filing by doing this

5  paradigm, it's certainly not going to be the last.

6       My last comments, Your Honor, are simply this.  On

7  the first day, I stood up and told you who I represented.  I

8  think it's important to remember, these 230,000 cases are

9  people, and they're not just people.  They are veterans.  They

10 are service members who served their country, and we believe

11 that 3M, this Fortune 500 company, should honor them this.  We

12 believe they deserve their day in court, and their opportunity

13 to do more than present their claims in an estimation

14 proceeding, which is nothing more than a global paradigm that

15 is a tool for this Court to use when its determining

16 feasibility of a proposed plan, which would only be necessary

17 if there were a cap on funding.  So, here, where there is no

18 cap, I respectfully submit that these are tools that are not

19 necessary and are part of the illusion to make us think that

20 this is a bankruptcy, that it's more a bluff, than I think it

21 is -- looking for a different word.  Thank you.

22       THE COURT:  All right.  Thank you.

23       My kids are always trying to text me.  If you don't

24 mind, I'll turn off my iPad.  I apologize.  Go ahead.

25       MR. MACLAY:  Good afternoon, Your Honor.  My name is

1    Kevin Maclay, and I'm from the law firm of Caplin and Drysdale.

2    I represent the law firms of Cory Watson, P.C., a member of the

3    Joint Settlement Committee of the MDL; Heninger, Garrison,

4    Davis, LLC, a member of the Steering Committee of the MDL and

5    the Gori Law Firm, P.C., a member of the Executive Committee of

6    the MDL.  But, of course, I am here for the broader group who

7    signed on for the joint consolidated brief.

8              THE COURT:  All right.

9              MR. MACLAY:  Your Honor, I have a --

10             THE COURT:  I have to interrupt you briefly, because

11   I just realized something.  We're getting close to 5:00, and I

12   don't want you to stop, but if anyone decides now is the

13   appropriate time to leave, as it's after 5:00, please go down

14   to the B-2 exit, which is on the northeast side.  If you go

15   down this hall and go down to the elevator all the way to the

16   basement, that's the way you can get out.  You can get out at

17   this way too.  I'm just saying, because I think people might

18   start slipping out as we're talking.

19             (Judge speaking with law clerk.)

20             THE COURT:  I just don't want someone to walk out and

21   then get in trouble if they go out the wrong exit.  Not that

22   you won't be riveting, but just in case.

23             All right, go ahead, proceed.

24             MR. MACLAY:  Thank you, Your Honor, I appreciate the

25   vote of confidence.  Your Honor, a lot of my presentation is

1  going to be directed to answering some of the questions you've

2  asked, because they nicely tie in to the issues I was already

3  planning to address.

4        The first thing I would like to address is something

5  that you just talked about which is, isn't it true that Aearo

6  is a party to the complaint filed in the MDL.  Well, Your

7  Honor, I think it's important to remember it was a party, long

8  ago when people were still developing their case theories and

9  filing against the people that may have been responsible.  But

10 we now know that although -- that our parties are not a

11 necessary party.  How do we know that?  Because Judge Rogers

12 said so.

13       Judge Rogers' orders which are in front of Your Honor

14 and have been presented to Your Honor make very clear that it's

15 3M that's the responsible party.  And so I think, Your Honor,

16 that with respect to that issue, their being named on the

17 complaint, it really isn't an issue anymore.  And I am very

18 confident, Your Honor, that the plaintiff would be more than

19 happy to drop Aearo from their complaint, now that Judge

20 Rogers, herself, as well as 3M, itself, through its actions,

21 have made clear who the actually responsible party is.

22       So that's just in response to a comment that you had

23 made a minute ago.

24       THE COURT:  All right.  And that just -- that just

25 occurred?

243

1              MR. MACLAY:  That just occurred, meaning, Your Honor?

2              THE COURT:  I mean, when did you learn that they --

3              MR. MACLAY:  Judge Rogers has ordered it.

4              THE COURT:  -- weren't adversaries?

5              MR. MACLAY:  Well, Your Honor, I'm a bankruptcy

6  lawyer, so I don't want to pretend, in terms of what I learned

7  when, but in terms of when the plaintiffs learned it, I think

8  Judge Rogers, herself, in recent days, has made it very clear.

9  Was that before or after the bankruptcy?  I can't answer that

10 question with any degree of certainty, Your Honor.

11             But I can say, just thinking about it as a matter of

12 common sense, through the course of discovery, through the

13 course of opponent admissions, you know, you learn things.  And

14 I think there is no reason, at this point, given Judge Rogers'

15 comments and rulings, to say that it's anything other than that

16 3M is the clear party, again, based on the judge who oversees

17 that case, and now they're sitting in Federal Court.  So I

18 don't know if we need to look behind her ruling on that point.

19             THE COURT:  Can I?

20             MR. MACLAY:  I don't think so.  I don't think --

21             THE COURT:  I can't look behind the ruling whether I

22 like it or I don't like it.

23             MR. MACLAY:  Right.

24             THE COURT:  But I also don't know, I mean, she didn't

25 -- and I don't have a position on this yet, but she kindly

244

1  invited this Court to make a finding about collateral estoppel.

2  I don't know -- first, it's fine; I'm used to being invited to

3  things.  But secondly, I don't know if I can make such a

4  finding, so but -- go ahead.

5          MR. MACLAY:  All right.  I would just sort of note in

6  this connection, Your Honor, that, of course, it's the debtor

7  who has the burden.  To the extent there are murky

8  uncertainties, those kind of count against their account,

9  because they have a burden that they need to meet to get this

10 injunction, which is an extraordinary remedy.

11         THE COURT:  Right.  But -- okay, go ahead.

12         MR. MACLAY:  Your Honor, talking, for a moment -- and

13 then I'll move into some related areas about the likelihood of

14 success prong.  The debtors effectively argue at it's a low

15 bar.  All we have to show is some chance for argument, but of

16 course, they have the burden here.  They don't get a

17 presumption.  And in our brief -- and I won't go into this too

18 much in detail, but in our brief, we noted the the SGL Carbon

19 case --

20         THE COURT:  Right.

21         MR. MACLAY:  -- where a court determined that a

22 bankruptcy filing was to seek a tactical litigation advantage

23 and dismissed it.  Now, this isn't a motion to dismiss.  I

24 would just note, Your Honor, that we agree with Your Honor that

25 you're not the watch dog of the federal judiciary, and a lot of

1   what you've heard from the debtor's side case is effectively an

2   attack on what we've just heard today, you know, "out of

3   control" MDL Federal-sitting District Court judge.

4        It's not what this Court is here to do.  It's not an

5   appropriate argument for them to make, and it kind of embodies,

6   you know, a risk that, in fact, they don't have the likelihood

7   of success because what they're doing is inherently

8   illegitimate, as you also heard from Ms. Cyganowski.

9        Now, there's also a practical issue here, Your Honor,

10  which I would urge you to think about fulsomely, which is, the

11  debtor did a constructive approach here.  They admit -- they

12  admit at the first-day hearing this was "settlement

13  negotiation".  Their filing of the case, they described that

14  way.

15       You heard today, from debtor's counsel, that they

16  need a significant majority of claimants to support what

17  they're trying to do, and this isn't the way to go about it.

18  There was no reach-out before the bankruptcy to any members of

19  the plaintiffs.  They have, obviously, no plan and no creditor

20  support for such a non-existent plan.

21       You've heard from Ms. Cyganowski, under the U.S.A.

22  Gymnastics case, that in that case, of course, the tort

23  plaintiff supported the issuance of the PI, supported the

24  issuance of a PI over the objection of the affected tort

25  creditors.  And, of course, you heard from the debtors today

246

1   about Purdue.  But, again, as Ms. Cyganowski pointed out,

2   Purdue was a case where there was a pre-petition negotiation

3   with creditors which resulted in a term sheet settlement.  And

4   pursuant to that term sheet settlement, a large creditor group

5   supported the issue, and said that injunction --

6           THE COURT:  Would it -- would it be true to say that

7   every mass tort bankruptcy had creditor support prior to

8   filing?

9           MR. MACLAY:  Absolutely not.  I think it's a mixed

10  bag, but the ones that did are more likely to be more efficient

11  and more successful.  And I'm about to go into some detailed

12  examples of that.

13          THE COURT:  All right.

14          MR. MACLAY:  So, and you heard, of course, from Mr.

15  Stein on redirect that he, "would suspect" that there would be

16  "real likelihood" of engagement with all parties, absent the

17  issuance of the PI.  But that's in the case that Your Honor

18  said this decision isn't a basis for an injunction; it doesn't

19  meet the debtor's burden.

20          But more broadly, look at the cases the debtor chose

21  to focus on for this supposed negotiation approach.  LTL,

22  Eldridge, DBMP and Bestwall.  All those cases have some things

23  in common, Your Honor.  First of all, they're all the subject

24  -- they all were the subject of Congressional hearings in front

25  of the Federal Court Sub-committee of the Senate Judiciary

1   Committee (audio issue) types of Texas Two-Step case, and then

2   they're relying almost entirely today on the Texas Two-Step

3   rationale.  And the title of that hearing was "Abusing Chapter

4   11, Corporate Efforts to Sidestep Accountability Through

5   Bankruptcy".

6           No confirmed plans, no consent for negotiations.  The

7   Bestwall case was filed November 2nd of 2017, almost five years

8   ago.  No progress has been made.  They got a preliminary

9   injunction.  They had a mediation.  It led nowhere.  That's the

10  path the debtors are urging you to take, but there's an

11  alternative.  Look, for example, at the Owens-Illinois

12  bankruptcy, Your Honor, from Delaware 20-128.  In that case, we

13  had a debtor with substantial mass tort bankruptcy that

14  actually talked to the Committee and did not file a motion for

15  a preliminary injunction to protect their funding parent, and

16  they also had a funding parent.  They also had a funding

17  agreement.

18          In the Owens-Illinois case, with that level playing

19  field, there were consensual settlement negotiations and a

20  mediation, and it resulted in approximately two years in a

21  confirmed plan in which the payment percentage for the affected

22  tort claimants is 100 percent.  That's shown, for example, in

23  docket 1220 of that case or 1406.

24          And so, Your Honor, the point being, they say we need

25  this preliminary injunction to negotiate.  We need it to come

248

1   up with a confirmed plan.  Well, the <u>Owens-Illinois</u> debtors

2   didn't need it, and they were much more successful then, for

3   example, the <u>Bestwall</u> debtors who took the approach they want

4   you to endorse.

5          But there are other examples.  Let's look at the

6   <u>Kaiser Gypsum</u> bankruptcy.  In <u>Kaiser Gypsum</u>, there was

7   originally pre-petition negotiations between creditors and

8   debtors -- and the debtor -- debtors, in that case.  There was,

9   in that case, initially, an agreed-upon 105 injunction because

10  of these negotiations.  And then what happened, it became clear

11  during the course of those negotiations and associated

12  discovery that there was an insurer out there, Truck Insurance

13  Company who --

14         THE COURT:  I'll tell you what -- because I think

15  you've researched this, so I don't want to --

16         MR. MACLAY:  Well, I'm in all these cases, I'm

17  counsel there.

18         THE COURT:  Oh, well, then that's -- no, so the

19  question is really this, though, why do we have successive

20  reorganization?  It doesn't say that you have to have X-number

21  of percent people signed on?

22         MR. MACLAY:  That's correct, Judge, it doesn't.

23         THE COURT:  It just means that there are tiers that

24  you might be able to reorganize, and it is, admittedly, what

25  has been called a low bar in my Court.  So when you -- and this

249

1  is what you're addressing, so I guess when you say that the

2  likelihood, and they're like, well, no, get a plan, and they

3  can't do it otherwise, what bar did he have to hit?

4           MR. MACLAY:  Well, Your Honor, I think there are two

5  issues baked into your question.  The first bar they have to

6  hit is they have to show is it a legitimate enough bankruptcy

7  that you don't look at it and think it shouldn't be endorsed,

8  right?  A bankruptcy that is trying to protect a non-filing

9  parent company with substantial liabilities and assets and what

10 is in bankruptcy is much more in the nature of a shell,

11 arguably without the liability, but certainly a much smaller

12 share of them based on historical norm.  Is that a bankruptcy

13 that this Court should think is copacetic in the sense that you

14 would expect a consensually negotiated plan to emerge?  Because

15 they've already told you, it has to be consensual.  They need

16 consensus.

17           THE COURT:  Well, they have to.

18           MR. MACLAY:  Have to.

19           THE COURT:  Right.

20           MR. MACLAY:  They told you that, but yet -- but did

21 they pick up the phone and call a single plaintiff before they

22 filed?  Have they even done that to date?  Not to my knowledge,

23 Your Honor, and not in the record in front of you.

24           But what I do know, Your Honor, is that in cases in

25 which I've been involved, and I've been in about 25 mass tort

1  bankruptcies, the cases that work, the cases that actually

2  successfully organized, and do so in an efficient manner are

3  the ones that start out without an aggressive preliminary

4  injunction and start out without an information rate, which

5  essentially attacks the victims.  It attacks veterans who

6  served our country, who have jury verdicts, who have rulings

7  from another sitting Federal Court judge.  It just tries to

8  attack all of those people and, essentially, run away from

9  their already adjudicated liability.

10          That isn't, on its face, Your Honor, is a legitimate

11  bankruptcy process.  And what I'm suggesting to you is that

12  when you look at the prong of likelihood of successful

13  reorganization or if you look at it more broadly in terms of

14  the jurisdictional issue and whether or not, you know, it would

15  impact creditor recovery, either way, Your Honor, if you don't

16  see a path for what they're doing that seems legitimately

17  productive, it doesn't -- it's going for results in its

18  consensus they say they need, then you shouldn't endorse it.

19          And what I'm trying to tell you --

20          THE COURT:  How do I know, at this stage of the

21  bankruptcy?

22          MR. MACLAY:  Well, you can evaluate whether they've

23  met their burden.

24          THE COURT:  Well, there is that.  When you say that

25  they can't -- I mean, this is the only thing I can really look

251

1    at that some mass tort bankruptcies, many, end up with a plan,

2    as far as becoming consensual.  Because, one of the

3    difficulties I have in this is, is honestly, what is

4    consensual, and does it -- how are they ever going to get that

5    when everyone is fighting?  And that's something I have to

6    struggle with as I write the opinion.

7         But I also look at the headlines -- <u>Boy Scouts</u>

8    creating a plan.  And they fought tooth and nail over

9    everything, how to do claims, how to classify.  So that, maybe

10   -- it appears there's a likelihood of success.  <u>U.S.A.</u>

11   <u>Gymnastics</u>, they didn't really get along, even though they

12   didn't necessarily oppose the motion.  But the creditor body

13   and the insurers, they were all opposed in many aspects, but

14   ultimately, they came to a conclusion where they got enough on

15   board so that they could get a settlement.

16        I mean, if that happened, despite the adversarial

17   nature of the parties at the beginning, it's not always

18   successful.  Granted, not every case that's a case that you say

19   they're still trying, but I mean, if I look at just the

20   likelihood of success of a mass tort bankruptcy, do the relief

21   that they can.

22        MR. MACLAY:  Your Honor, it's hard for anyone to ever

23   say in any context that there is no chance.

24        THE COURT:  No, I know, but there at least is a body

25   of cases until the mass torts can be resolved even at these

252

1 high threshold, which are usually higher than the asbestos, if

2 they're not asbestos, I mean, to try to say, but, you know,

3 would even be better.  What more do I look at, as a Judge,

4 because I can't say they're never going to do it, no one's ever

5 going to agree, because how would I know?  I haven't been in

6 the case long enough to do it.

7          Don't I just look at, can they fund it, and is there

8 a cap to resolution?

9          MR. MACLAY:  No, Your Honor.  As the note essentially

10 says, which is what I was about to say anyway, the issue that

11 you need to decide as a court of equity is not just limited to

12 likelihood of success prong.  I start off talking about that,

13 but --

14          THE COURT:  No, no, right.  I didn't mean to --

15          MR. MACLAY:  Right.  The big picture, you need to

16 consider a world with the injunctions or without the

17 injunctions and which is better, from your perspective, as the

18 arbiter of the equities here.

19          THE COURT:  Well, that's really broad.  Do I even

20 have that much?

21          MR. MACLAY:  Well --

22          THE COURT:  Isn't it just limited to --

23          MR. MACLAY:  -- there are opinions, if you don't have

24 jurisdiction, then, no, then you can't do it.

25          THE COURT:  Well, that's really broad.  Do I even

253

1  have that much?

2          MR. MACLAY:  Well --

3          THE COURT:  Isn't it just limited --

4          MR. MACLAY:  -- there are things -- if you didn't

5  have jurisdiction, then, no, then you can't do it.

6          THE COURT:  -- to have to have jurisdiction to at

7  least look at it.

8          MR. MACLAY:  Well, to look at it, sure.  But I'm

9  talking about, there are standards that you need to meet to get

10 an injunction.

11         THE COURT:  Without question, yes.

12         MR. MACLAY:  And if they don't meet them, well, then

13 you can't --

14         THE COURT:  Right, even if I think it's the best

15 thing in the world --

16         MR. MACLAY:  Right.

17         THE COURT:  -- I can't.

18         MR. MACLAY:  But if they do meet them, Your Honor, in

19 some respects, you still have some flexibility, right?  You are

20 a Bankruptcy Court judge --

21         THE COURT:  Well, ultimately, yes, I can, yes.

22         MR. MACLAY:  Right, and what I'm trying to get to

23 here, Your Honor, is that if you conclude that, based on the

24 evidence presented to you and the argument presented to you

25 that it would be better for this case to not have a preliminary

254

1  injunction be entered, you certainly do not have to enter it.

2  No one can tell you different.

3          THE COURT:  I don't disagree with you.

4          MR. MACLAY:  And the argument I'm making right now,

5  Your Honor, having transitioned so much from the likelihood of

6  success prong is that this case would be better off if you

7  don't grant the injunction.  In this case, sure, the victims

8  would be better off, and they should be the focus here, Your

9  Honor, because, of course, under the Seventh Circuit test, it's

10  whether recoveries to them will be affected?

11          THE COURT:  Right.

12          MR. MACLAY:  And every single one of them is telling

13  you, don't grant this injunction.  So the people actually

14  affected under the Seventh Circuit test say, don't do it, and,

15  of course, the only case cited to you from within the Seventh

16  Circuit doing it is a case where they consented.  So there is

17  no precedence even cited to underneath the Seventh Circuit

18  standard where it was against the opposition of the creditors,

19  and I've already noted, Your Honor, a couple of other cases

20  that they've cited which had creditor support for the reasons

21  I've given because they were approached a very different way

22  than they've been approached here.

23          When they say -- let me jump ahead, Your Honor.  I

24  have other examples, here, that I'd like to talk about, but let

25  me get through a fundamental point here.  You heard from

1  counsel for the debtors that if the PI isn't granted, quote --
2  well, I don't know if I can say quote.  These are my scribbled
3  notes.  But I believe he said something very much like this.
4  "100 percent, it will preclude negotiations."

5         Well, that's not true.  I've just given you an
6  example of a case where there wasn't a PI, and that didn't
7  preclude negotiations.  I have more examples that I can give,
8  so it's just -- there's no support for that.  It's an
9  unsupportable assertion, frankly.  And the intent in these
10  cases, she said, is that they're intended to bring people to
11  their knees.  It's a very odd sort of personification of a
12  multi-billion dollar conglomerate corporation.

13         But putting that aside, it's blaming the victim.
14  It's actually backwards.  The problem here is not the injured
15  veterans.  The problem here is the multi-billion dollar
16  corporation that wants to seize the negotiations.  It wants to
17  stick these injured veterans into a box that they cannot escape
18  from into this extension of the 105 injunction and then
19  negotiate with them when they have no ability to do anything
20  about it.  They have no ability to pursue discovery.  They have
21  no ability to pursue their cases against 3M.  They're stuck in
22  this.

23         Now, sure, the debtor, because they're controlled by
24  3M, would love to stick these victims into that box, but that
25  doesn't mean it's appropriate.  Your Honor, nothing drives

256

1 settlements like jury verdicts.  That is a tried and true

2 maximum.  I've seen this effort many times in my practice.  And

3 what they want to do is to get threat off the table.  If you

4 deny the preliminary injunction, Your Honor, it's not just that

5 there might be negotiations.  Of course, there will be

6 negotiations, because then they will have an actual incentive

7 to negotiate.

8          Why would 3M take negotiations seriously when they're

9 getting an indefinite payment holiday, while the injured

10 victims sit there unable to pursue their claim.  They're

11 constitutional rights to a jury trial don't mean anything if

12 they can't actually utilize those rights.  Whereas, in a world

13 in which you don't grant the PI, in that world, it would be a

14 level playing field.

15          Anyhow, Your Honor, the long story short is, as is

16 Kaiser Gypsum, as in Owens-Illinois, we have actual

17 demonstration that we don't need a preliminary injunction for

18 negotiations to occur.  And we actually know, from what

19 happened in Kaiser and in Owens-Illinois that, actually, there

20 is some evidentiary support for the concept that negotiations

21 and cases are confirmed more quickly, efficiently and

22 cooperatively without a preliminary injunction.  And that's one

23 of the many reasons, Your Honor, that the claimants stand up

24 united in front of you to ask that you deny this injunction.

25          Thank you.

1           THE COURT:  All right.  Thank you.

2           MR. PFISTER:  Thank you.  As the emcee, Your Honor,

3    Rob Pfister from the KTBS firm.  I believe Mr. Keller was going

4    to -- Mr. Keller is here.

5           THE COURT:  All right.  Let me ask this before we

6    begin, does anyone need a break?

7                        (No audible response.)

8           THE COURT:  All right.

9           I usually like to go on break.

10                          (Laughter)

11          MR. KELLER:  Yeah, that's a good call, Your Honor,

12   we're not asking for a break at this time.

13          THE COURT:  You may proceed.

14          MR. KELLER:  Thank you, Your Honor.  Ashley Keller

15   from Keller, Postman.  A lot of focus, obviously, on any

16   questions you have and on clarifying some, I think,

17   mischaracterizations of our objections.

18          So let me start by saying, go team, to quote Your

19   Honor from the discovery hearing which I've now read the

20   transcript for, and realized I had to be here in-person, so

21   apologies again for this morning, but I fully support the

22   position of other claimants that the debtors have utterly

23   failed to meet their burden of proof and that an injunction

24   shouldn't issue.  That's our primary position.

25          But our alternative position recognizes that Your

258

1  Honor might not agree with us.  And I think it's important to
2  clarify that we are asking Your Honor therefore to exercise
3  your equitable powers to modify the requested injunction.  And
4  I take the Fifth Amendment due process clause very seriously.
5  I recognize that 3M has not been named as a party in this
6  adversary proceeding, which we'll get to again in a moment, but
7  for my purposes, for purposes of my objection, I therefore
8  can't ask you -- and did not ask you -- to say 3M must do or
9  not do something.  That's not the requested modification to the
10 injunction that I have proposed.

11         I have, instead, asked you to draw on your very broad
12 equitable powers under 105, acting, effectively, as a court of
13 chancery to narrow the requested relief that the debtors are
14 asking for in one respect.  That's the Eleventh Circuit aspect
15 of our objection, and then to impose conditions on 3M that they
16 can accept or not.  So it's not a due process violation, just
17 like it's not a due process violation to give 3M the full
18 benefit of the injunction that the debtors have asked for, even
19 though 3M is not a party to this proceeding.

20         You have ample authority under case law, both within
21 the bankruptcy context and outside of the bankruptcy context
22 makes this clear.  If you wanted supplemental authority through
23 proposed findings, I'd be happy to provide it to you.  I can
24 cite you chapter and verse that you have the right to impose
25 those sorts of conditions on 3M that it can accept or not in

259

1 the name of equity.  So at a broad level, that's the authority

2 that we're asking Your Honor to exercise through our

3 objections.

4       Let me talk specifically about the Eleventh Circuit

5 which is probably the more modest request for relief that we

6 are asking for.  You've seen the informational brief.  You

7 heard about the cross of Dr. Heaton, which we will also, I

8 suspect, get back to.  A major aim from the debtors, which I

9 know is not in front of you right now, and you have

10 appropriately said you're not deciding it here, is the

11 Bellwether trials are not representative.  They were riddled

12 with all sorts of flaws.

13       Judge Rogers admitted evidence that she shouldn't

14 have admitted.  The Government contractor defense would have

15 saved us from liability, but she inappropriately granted

16 summary judgment for the plaintiffs.  And therefore, the

17 veterans aren't entitled to very much money.  That's,

18 obviously, going to be, apart of this bankruptcy injunction or

19 not.

20       Respectfully, I'd sort of characterize our first

21 requested modification for the injunction as a put up or shut

22 up idea.  You say Judge Rogers committed all of these mistakes,

23 well, then don't grant the injunction with respect to the

24 already almost fully brief Eleventh Circuit Court of Appeals'

25 argument.  3M is a party there.  It's the only one that posted

260

1  a bond.  And the only real response to this, I think, is two-

2  fold.

3          The first response is, well, this isn't the lift stay

4  hearing.  I agree.  I'm not asking to lift the stay with

5  respect to the debtors.  I'm perfectly content to proceed in

6  the Eleventh Circuit only against 3M.  That's the only party

7  that has put up property outside of the estate.

8          THE COURT:  Aren't you better off, from a negotiation

9  perspective -- understanding your hypothetical if I grant the

10  preliminary injunction.  So I'm going to assume, for the

11  purposes of this discussion, I have.

12          MR. KELLER:  An assumption I don't like, but, yeah,

13  okay.

14          THE COURT:  So I want to see what happens.  Isn't

15  then, your negotiation position, better in the context of the

16  stayed litigation.  Now, everyone is stayed, and we're all

17  sitting around a bankruptcy table talking.  Aren't you better

18  off if that decision is unclear?

19          MR. KELLER:  I disagree, Your Honor.

20          THE COURT:  What if you lose that appeal, if for some

21  reason you were to lose?  What if you start creating a

22  (indiscernible)?

23          MR. KELLER:  I understand, Your Honor, but I have the

24  courage of my convictions, and I'm perfectly --

25          THE COURT:  Well, I know you do, but -- but maybe the

1  creditors don't.

2          MR. KELLER:  Well, the parties to those appeals --

3          THE COURT:  The creditor bodies.  The entire 230,000

4  plus unknown claimants.

5          MR. KELLER:  I understand, Your Honor.

6          THE COURT:  Right.

7          MR. KELLER:  What Your Honor --

8          THE COURT:  Wouldn't it be better to have that as

9  negotiation leverage, to sit at a table when Aearo or 3M goes,

10 you know, we keep telling you that they're wrong, and you --

11 but the fact is, there was a verdict on the record -- they

12 appealed -- but there is a verdict that says my position or the

13 creditors' position on these issues is correct.

14          Doesn't that give you a lot more negotiating power

15 than to run the risk of appeal and have an Eleventh Circuit

16 Court say, you're correct, Movant?  This was an incorrect

17 decision, therefore, vacate or whatever the Eleventh Circuit

18 might do or as I've already said remand for further

19 proceedings.

20          Aren't you better off having the judgment in hand,

21 the verdict's in hand and arguing later that these are still

22 valid verdicts, and, you know what, I'll file a claim on this,

23 because it's a pretty good number, and there's no appeal.  I

24 know you're going to contest that but I have this.  She was

25 right on whatever -- I think you mentioned government

1  contractors and some other things.  She was -- she was right.

2      So whatever you're saying -- and we need more money.

3  Doesn't that help you?

4      MR. KELLER:  I understand Your Honor's question.  And

5  you're essentially saying, doesn't uncertainty create better

6  settlement talks but that uncertainty cuts in both directions.

7  And I think that they are going to argue before Your Honor, not

8  just at the settlement table, you have to assign a probability

9  to whether the Eleventh Circuit is going to reverse, and you

10 should assign a high probability during your estimation

11 process, because we're right, and they're wrong.

12     THE COURT:  If it gets to estimation.

13     MR. KELLER:  If it does, and I since, like, think

14 we're engaged in hypotheticals, we have to assume that it will.

15 And I think eliminating uncertainty is actually better long-

16 haul in a complex bankruptcy like this, where we're potentially

17 going to be here for awhile.  We can all be hopeful that there

18 will be discussions around the settlement table post haste.

19 That has not been the experience thus far, and, again, you're

20 not not here to look favorably or unfavorably on what happened

21 in the MDL, but Judge Rogers has issued an order to show cause

22 about the mediation not being potentially in good faith.

23     So we have reason on our side of the table to be

24 doubtful that we're going to get to a point where those

25 discussions are fruitful and giving them the benefit of not

1    having to face the music, where they've made all of these
2    accusations about the MDL and the Bellwether process and the
3    legally erroneous and evidentiary decisions that it will not
4    cost them anything to go forward with those appeals.  So the
5    monetary aspect that we're going to talk about in a moment, I
6    think, is completely off the table from a harm perspective.

7              And so is, I think, respectfully, the distraction
8    point.  I think that Your Honor knows what the evidence has
9    been in this proceeding without distractions and how the
10   accounting department and the in-house legal department just
11   couldn't possibly focus on an effective plan of reorganization
12   without very much specifics that there's ongoing CAev2
13   litigation.  You can, of course, tell from my voice I'm
14   incredulous about that.  Color me very skeptical that the
15   accounting team and the legal team at 3M can't help and walk
16   and chew gum at the same time.  But there is no real argument
17   with respect to distraction, no argument on the record, not a
18   shred of evidence on distractions with respect to just the
19   Eleventh Circuit Court of Appeals going forward.

20             And I'll tell you on the distractions point, since
21   it's a balancing of equities perspective, it's also very
22   distracting to have ringing in your ears 24/7, 365 and still
23   have to live your life.  And it's extremely distracting not to
24   be able to hear your wife or your children say, I love you, and
25   that's what we allege 3M has done to these veterans who wore

264

1 the uniform of the United States, many of whom are on the cusp

2 of getting their day in court.

3          So there's a lot of distractions on the other side of

4 the ledger, too, and obviously, as a court of equity, you have

5 to balance the equities.  Allowing that to go forward, I don't

6 think is enough of a distraction for the accounting team and

7 the legal team that the debtors are relying on from their

8 parent, 3M, to warrant not modifying the stay in that regard.

9          So I understand your point about uncertainty, and how

10 that sometimes can be something that facilitates negotiations.

11 But given all of the water under the bridge and the sales

12 negotiations thus far, I think it's more appropriate to put

13 them to their paces.  I know this didn't come in, because of my

14 sort of truncated cross.  They have one of the very best

15 appellate lawyers in the country, the former Solicitor General

16 of the United States, former partner of Kirkland, who recently

17 left, but he's still the lead counsel of record.  They're going

18 to be just fine.  They're very ably represented, and if they're

19 right, they're right, and they'll demonstrate that.

20          But they're not right is our position, and I think

21 that's going to benefit Your Honor down the road when you have

22 that conclusion from the only Court of Appeals that can

23 actually review Judge Rogers' decision and say, yes or no,

24 they're position is correct or our position is correct to

25 conduct in a broken MDL and did all of these improper things or

265

1  no --

2        THE COURT:  I think this was already said, I can

3  never review that.

4        MR. KELLER:  Understood.  Understood, but you can

5  certainly look at an Eleventh Circuit decision, if it issues,

6  on those points.

7        THE COURT:  I can look at what decision is there, as

8  well.

9        MR. KELLER:  Correct.  So I'll leave that there

10  unless you have further questions --

11        THE COURT:  I don't, no.

12        MR. KELLER:  -- about the first modification?

13        Let's get to our proposed second modification to

14  the proposed stay.  And, again, to be very clear, we are not

15  suggesting that you enjoin 3M because the debtors didn't

16  bring --

17        THE COURT:  I'm going to ask you a quick question on

18  that.

19        MR. KELLER:  Sure.

20        THE COURT:  Besides the fact that I love how some

21  people in the same proceeding tell me how powerful 105(a) is,

22  and then turn around and tell me how limited it is, but --

23        MR. KELLER:  It's both.

24        THE COURT:  -- it is what it is.  But here's my

25  question to you.  Who is the Movant for the injunction?

266

1          MR. KELLER:  The Movant for the injunction are the

2     debtors.

3          THE COURT:  Correct.  So when you say 3M can say yes

4     or no to whatever the multiple things that you said, dividend

5     stock purchase and things like that --

6          MR. KELLER:  Yes?

7          THE COURT:  All right.  If they say no, who does that

8     harm?

9          MR. KELLER:  Well, I'll explain to you why I don't

10    think they're going to say no, if you credit the testimony, but

11    I'll answer your question --

12         THE COURT:  But who do they harm?

13         MR. KELLER:  If they say no, I don't think it harms

14    anybody, on one view of the evidence.

15         THE COURT:  But remember, under my hypothetical, I

16    have granted the preliminary injunction.

17         MR. KELLER:  I understand.

18         THE COURT:  I find that there is a reason that

19    benefits the estate if litigation is stayed as to 3M in the MDL

20    tort claim.  If that's the case, and I make that finding --

21    bless you -- if I make that finding, and then you want me,

22    then, to condition things on it to make 3M walk or not walk,

23    and I'm going to take it based solely that I would have

24    authority to do that.  Who would be harmed if they walked?

25         MR. KELLER:  If they walked, it would admittedly harm

267

1  the creditors because they'd be spending the 3.8 million

2  dollars a week on CAev2 litigation that --

3          THE COURT:  It would harm creditors and debtors,

4  right?

5          MR. KELLER:  It would harm creditors and debtors,

6  depending on the view of the evidence that you accept.

7          THE COURT:  Right.  So that I already said I think is

8  valid under the various prongs.  I think we're relatively

9  agreed on under 105.

10          MR. KELLER:  If you only thought that it was, for

11  example, distraction --

12          THE COURT:  No, but that's not the problem.  I mean,

13  all the -- all the distractions, all those prongs are aimed at

14  the debtor.

15          MR. KELLER:  Correct.

16          THE COURT:  And then your proposed relief, like,

17  okay, you granted it, but I really think you should condition

18  it.  And, I mean, it's a novel argument.  I understand why

19  you're making it.  But my concern is, the Movant is the debtor.

20  The Movants are the debtors.

21          MR. KELLER:  Correct.

22          THE COURT:  They're saying, we need this for an

23  effective reorganization, and at the point you're at, I already

24  agree with them.  And I don't remember the presenters -- the

25  t-shirts you wanted, but all those things that were on Mr.

1  Stein's t-shirt, the effective, economic or global

2  reorganization.  I don't know.  Global-thermal nuclear war.

3                     (Laughter)

4            THE COURT:  And I agree with all of those things.

5  And, now, we're at -- okay.  I believe that this is going to

6  benefit the estate, but, 3M, you have to do these things.

7            MR. KELLER:  Yes.

8            THE COURT:  3M, a publically traded company, I want

9  you to do these things.

10           MR. KELLER:  Yes.

11           THE COURT:  And they may not be able to.  They may

12 not.

13           MR. KELLER:  But they can.

14           THE COURT:   I know just enough about publically

15 traded companies to know that I don't know anything about

16 publically traded companies.  And I've received a bankruptcy

17 diploma.  But, okay, so we put these conditions on, and they

18 say they can't or they won't, because you said put up or shut

19 up, right?  Well, that was for the brief.  I'm sorry.  But put

20 these on 3M.

21           If they walk away, what happens then?

22           MR. KELLER:  Well, two things, Your Honor.  I want --

23 you have a hypothetical -- but I want to be able to argue why

24 they will accept the conditions.  But I'll get to that, and I

25 can directly answer your question.  If you find that Dr.

269

1  Heaton's testimony is the only thing you've got that was
2  credible enough --
3           THE COURT:  I've already decided.
4           MR. KELLER:  Yes, we'll get to that.
5           THE COURT:  We don't know how yet, because there's no
6  opinion, but it's a bullet-proof really well written opinion.
7           MR. KELLER:  Right.  He's the greatest expert.  You
8  -- you --
9           THE COURT:  I don't know what he's saying.  I'm just
10 saying I've ruled in the favor of the debtor.
11          MR. KELLER:  Correct.  In that circumstance, if you
12 were buying that argument that they -- here's the condition I
13 want to impose, because it will protect the debtors --
14          THE COURT:  Right.
15          MR. KELLER:  -- and protect the estate, and they
16 don't accept the conditions, I would hope that you would expect
17 that the debtors would immediately come back, actually name 3M
18 properly as a party, and I think we should ask some serious
19 questions as to why that hasn't happened if they're crediting
20 the testimony of Dr. Heaton --
21          THE COURT:  Well --
22          MR. KELLER:  -- all of a sudden, and --
23          THE COURT:  -- we're here, and that wasn't an
24 objection that 3M wasn't a party.
25          MR. KELLER:  Well, for sure.

270

1        THE COURT:  And here we are.

2        MR. KELLER:  I am not suggesting that, you know, we
3  should retroactively try and go back in time, but you can
4  certainly take account of the fact that if they say no, they
5  can very quickly be added as a party, and we can go through the
6  process of making sure --

7        THE COURT:  Well, I guess this is my difficulty with
8  what you want.  I'm not sure 105 would ever allow me to do
9  anything with a publically traded company as far as how they
10 deal with their dividends and things like that.  I don't know.

11       MR. KELLER:  You're not working on that.

12       THE COURT:  Well, my biggest concern is this, is that
13 -- and I don't -- I haven't had the opportunity to read all of
14 your authority with regard to how I can condition a preliminary
15 injunction.  But if it's issued, and it's a preliminary
16 injunction under 105, I am trying to protect the debtors and
17 the estate.

18       MR. KELLER:  That is correct.

19       THE COURT:  Which is why you say, well, you can do
20 it.  But if I find that it's proper, at that point, don't I
21 stop, because anything that could threaten that could just undo
22 everything I've just said.  I basically doom the debtor's
23 reorganization by saying this relief that you need -- and,
24 again, this is just a hypothetical, but I've ruled in their
25 favor, saying that, yeah, you're right, but sorry.

1            MR. KELLER:  I think if you're in the hypothetical

2   world where you're concerned about the dissipation of 3.8

3   million dollars a week, you have to be hyper-concerned about

4   the dissipation of 10 million dollars a day, which 3M is about

5   to pay out in dividends next week.  You have to be hyper

6   concerned about tens of millions of dollars of buy-backs every

7   month, when we're complaining about 3.8 million dollars a week.

8            You have to be extremely concerned that they announce

9   on the day of this bankruptcy that they're going to spin off 40

10  percent of their assets.  And so imposing a condition, even

11  though you're not sure about what a public company could do,

12  again, you know, there was a cute demonstrative put out about

13  Dr. Heaton, a picture of Mr. Aylstock, and, you know, they

14  can't -- they can't both be right.

15           I think that would have been a better demonstrative

16  if both pictures were Mr. Husnick that can't both be right,

17  because I think they're, respectfully, talking out of both

18  sides of their mouth.  They can't say we have these concerns,

19  and even though we don't credit it that much, the only evidence

20  you've got is 3M might not be able to pay all of its

21  obligations, while at the same time saying, let's not take a

22  shot at this condition that will prevent the dissipation of

23  orders of magnitude or assets.  Two orders of magnitude, at

24  least, more assets over the coming months, when the thing that

25  they're worried about is 3.8 million dollars a week.  That just

272

1  doesn't compute.

2          And so, if you credit the rest of Dr. Heaton's

3  testimony, because, again, they now love Dr. Heaton.  They

4  didn't love on him on cross, but the only thing you've got,

5  which is, of course, not true, and I'm not speaking against

6  this expert.  He's not a crank; he's a very smart man.  And I

7  appreciate Mr. Pfister's statement on the record which was very

8  gracious of him, and in the heat of argument, things were said.

9          But if you're going to credit his testimony, you've

10 got to credit all of his testimony that they didn't impeach,

11 which they didn't.  They're only impeachment of Dr. Heaton was,

12 you didn't look at the Bellwethers to see if they're

13 representative.  We've got about 45 minutes of that sort of

14 impeachment, and he doesn't want the 7th Amendment.  And if he

15 could go back in time and be James Madison, he wouldn't have

16 written this into the Constitution.  Great.  Those are

17 irrelevant -- but with respect to the actual testimony that he

18 gave that he is an expert on, that I assume after you heard the

19 voir dire, you accepted him as an expert on, he said, not

20 paying the dividend, not buying back stock and not spinning off

21 assets doesn't hurt the company, because the corporate person

22 is keeping cash in its bank account.  It's keeping assets on

23 its balance sheet.

24         And so, if you're going to credit Dr. Heaton, because

25 they now want you to, because they think he's the greatest

273

1   thing since sliced bread, then you've got to credit all of it.

2   And therefore, the condition that we're asking you to impose,

3   which is obviously a reasonable condition, is 3M faces risks

4   associated with its ability to pay these judgments, and they're

5   going to accept that condition, based on Dr. Heaton's

6   testimony.

7          If you don't want to credit his testimony, because

8   you say, he's a smart enough guy, but it's a limited record; he

9   didn't have enough; I can't extrapolate from the Bellwether;

10  I'm choosing not to give him weight, and I'm looking at the 10K

11  and the stock price of 3M, you can credit that.  But they can't

12  mix and match and decide that they only like the things that

13  they want to hyperfocus on and not accept the rest of the

14  testimony that 3M would take this condition.  Because they're

15  not a party, they can't tell you one way or another now.  We

16  can deal with them being a party at the appropriate time, if

17  that's warranted.  But the testimony was, they would take the

18  condition, because they still get to save the 3.8 million

19  dollars a week, which is obviously money they would like to

20  save, and it harms them not at all to pay dividends, buy back

21  stock or dissipate 40 percent of the value of this company

22  through this healthcare spin-off.

23          So I think it would be a reasonable condition for

24  Your Honor, based on that testimony that they are now focused

25  on, for you to say, if I'm crediting that, the conditions are

1 reasonable.  As a court of equity, I can do it.  I encourage
2 you to look at the case law that we cited.

3          And I'd just like to conclude with this, you know,
4 I've come up a lot in the openings and now in the closings.
5 It's not necessarily a role I relish, it may surprise you to
6 learn.  I'm not looking for the limelight.  But in my mind, an
7 elephant in this room is, why wouldn't the debtor -- and I know
8 we're not there.  They didn't name 3M.  That's water under the
9 bridge.  But why not?  Why not?  How could it not be good for
10 the debtors to have asked for the condition that we're seeking
11 that you can only do as a condition, because we didn't name 3M.
12 We couldn't name 3M as a party, and the debtors chose not to
13 name 3M as a party.

14          I'm sorry to say this.  This is obvious.  Because
15 Kirkland and Ellis can't file that.  They cannot ask you, even
16 if it's awesome for the debtor, even if they think it's the
17 greatest thing in the world for the debtor, they cannot ask
18 you, they cannot, in good faith, consistent with their ethical
19 obligations, ask you to impose that condition, because they
20 represent 3M in the litigation.  They still represent 3M in
21 front of Judge Rogers, and they still represent 3M on appeal.
22 It would be a concurrent, non-waivable conflict of interest for
23 them to bring that up.

24          And as a court of equity, you're allowed to account
25 for that.  You're allowed to say, yeah, this is bizarre that

 1  there is any possibility -- that's the test that my colleague

 2  brought up, the potential effect that I could talk about Judge

 3  Easterbrook and Judge Posner, if it's just anti, a slight

 4  possibility that this could be problematic, you can exercise

 5  your equitable discretion.  And then they, themselves, said,

 6  nothing is for sure.

 7        Yeah, 3M's got good credit, but nothing's guaranteed.

 8  They're making that argument.  Why would they allow 3M to

 9  dissipate tens of billions of dollars of assets?  So they can't

10  bring the proper motion that we had to bring, as an objector,

11  without all of the (indiscernible) that we could have gotten if

12  3M was named as a party.  It's deeply problematic that we're in

13  this situation.

14        Again, I don't relish having to be the one to have

15  brought this objection, but I think it's important to the

16  Court's consideration, as you're balancing the equities, that

17  the actual best thing for the estate, if you're going to grant

18  relief, which, again, I don't want to be in that assumed world,

19  is not to allow this company to become half the size that it

20  currently is.  That doesn't make any sense for the debtors.  If

21  they're only worried about possibilities, they should want the

22  relief that I'm asking for.

23        Thank you, Your Honor.

24        THE COURT:  Thank you.

25        Now, I don't -- I asked my staff, and I got a laugh

1    -- I'm nervous that I'm going to get in trouble, so I don't

2    know, but out of an abundance for my future health, I'm going

3    to take a brief break now until 5:30.  And, again, if you want

4    to leave, you have to go out B2, otherwise it'll set off

5    alarms.  We'll have CFOs and Marshals angry at you, angry at

6    me.  You're all welcome to stay, because I'm not kicked out of

7    my courtroom, now.  So we do have one hard number to remember,

8    which is at 8:00 the air goes off.  So, hopefully, we don't go

9    until 8:00, but I can't go without air conditioning, because

10   I'm not strong intestinal fortitude.  So hopefully, we'll get

11   done there.  And I do want to mention, because I see Ms. Duvall

12   here again, I once again have omitted the fact that the United

13   States Trustee has filed an objection to the motion, and I want

14   to give her an opportunity to speak after the tort claimants,

15   and I apologize.

16           MS. DUVALL:  Thank you.

17           THE COURT:  All right.  So let's take a break until

18   5:30.

19           ALL COUNSEL:  Thank you, Your Honor.

20                    (Recess)

21           COURTROOM DEPUTY:  All rise.

22           THE COURT:  All right.  Let's get back on the record

23   in 22-50059.  We are about to hear a continuation of the

24   closing arguments of the tort claimants.  I'm sorry I

25   interrupted you, but you may proceed.

277

1            MR. BARRETT:  Thank you, Your Honor.  I'm thinking,
2 maybe, at this hour, we should start with calisthenics, but
3 I'll pass.  I am Kevin Barrett.  I'm with the law firm of
4 Bailey and Glasser in Charleston, West Virginia.  I'm here on
5 behalf of thousands of veterans and soldiers who have claims in
6 the MDL, specifically, veterans and soldiers represented by
7 Bailey and Glasser and the law firm of Pulaski, Kherkher.  We
8 filed an objection on behalf of those veterans and soldiers.
9 We join in the arguments made by the claimant group that the
10 debtors have not satisfied their burden.  I'm not going to
11 repeat them.
12            And, in fact, Judge, I'm here to offer you an
13 alternative basis for denying the injunction, without having to
14 get into all of the standards relating to the issuance of one.
15            THE COURT:  All right.
16            MR. BARRETT:  This Court's a court of equity.  The
17 debtors are here asking you for equitable relief in the form of
18 an injunction.  The Supreme Court and the Seventh Circuit, in
19 the Allied Industrial Worker's case have both said that a court
20 of equity can and should exercise its equitable powers to deny
21 the entry of an injunction whenever it finds that the plaintiff
22 has unclean hands or is abusing judicial process.
23            There is a case, Your Honor, that I submit is on
24 point fully with this case.  That's the Shapiro vs. Wilgus
25 case.  It is from 1932, a decision offered by Judge Cardozo.

278

1  There, Your Honor, an individual debtor was in financial

2  distress, but he had a plan to pay his creditors over time.

3  Two of them, though, refused to go along with his plan, so he

4  came up with a plan of his own.

5          He hatched a plan to form a corporation.  Unlike

6  himself, an individual debtor, the corporation could be the

7  subject of a receivership.  He could not under Pennsylvania

8  law.  So he transferred -- after he formed that corporation, he

9  transferred his business assets and liabilities to that

10 corporation, and then caused a receivership case to be

11 initiated against that corporation three days later.

12         At that point, Your Honor, he, essentially -- and

13 he's working with friendly creditors -- caused the parties to

14 request that the receivership court enjoin the two creditors

15 from prosecuting their claim.  He was completely up front about

16 it.  If he could just a little breathing spell, he said, he

17 could repay his creditors in full.

18         The lower court or courts granted the injunction, but

19 the Supreme Court, which, Your Honor, was acting on its own,

20 and on it's own record -- there was no record below --

21 unanimously reversed the entry of that injunction.  The Court

22 said -- Justice Cardozo said, even if the debtor had a genuine,

23 even well-founded belief that his actions were fair and lawful,

24 he had no entitlement to an injunction barring the creditors'

25 suit.

279

1          He had rigged the case solely for the purpose of

2    getting that injunction that he could not otherwise have gotten

3    before he formed the corporation and filed the receivership.

4    "Whether or not," the Court said, "the debtor acted in good

5    faith, that was improper."

6          The Court essentially refused to open the doors of

7    equity and even consider an injunction that hindered and

8    delayed the debtor's creditors because the debtor had acted

9    inequitably in jimmying up this receivership case and creating

10   the basis for an injunction to which he was not otherwise

11   entitled.

12         Your Honor, everyone in this courtroom knows what's

13   going on here.  3M is trying to flee the MDL after it got bad

14   verdicts in the Bellwethers and after Judge Rogers did what MDL

15   judges do, and they're supposed to do, and set up waves of

16   trials.  So much comes from the debtor's initial filings with

17   this Court.  They're not running from that even today.  They

18   still think this MDL is broken, and they need an alternative.

19         And to get out of that MDL court, the supposedly

20   broken MDL court, 3M, who was undoubtedly and solely litigating

21   that MDL, completely shifted its litigation position,

22   negotiated an indemnification and funding agreement with its

23   wholly-owned subsidiary, filed that subsidiary in bankruptcy

24   and, now, on the basis of that funding agreement, seeks the

25   entry of an injunction to bar the three-year-old functioning

1  MDL from continuing.

2       Neither the debtors nor, frankly, 3M are trying to

3  hide that.  They are mostly just chipping around the edges.

4  They're trying to convince you that Aearo retained the -- I'm

5  sorry.  They're trying to convince you that the indemnification

6  portion of that funding agreement is nothing new.  They started

7  out saying, in the first-day papers, that Aearo retained the

8  tort liabilities when it transferred the division that housed

9  the earplug business in 2010.

10      That didn't work, because the accounting for that

11  transaction completely belied that theory.  More importantly,

12  every action that 3M and Aearo took after that transaction for

13  12 years until the filing of this case is totally consistent

14  with the idea that 3M took a transfer of that liability in

15  2010.

16      3M never made a single demand for indemnification

17  from the debtors.  3M never issued a reservation of rights.  3M

18  never allocated any of the $350,000 of the cost of litigation

19  to the debtors.  3M never allocated any of the cost of the nine

20  million dollar Qui Tam settlement to the debtors.  3M had never

21  allocated any of the cost of the supersedeas funds issued in

22  the appeals for any of these judgments.  3M even made its own

23  claim under an Aearo insurance policy that had obviously been

24  transferred to 3M in 2010 along with Aearo's other assets, and

25  then it took the checks that it got from that insurance company

1   and put them in a vault.

2          In short, Your Honor, 3M has never treated Aearo as

3   liable for these earplug claims on an intercompany basis, for

4   accounting purposes, for litigation purposes, for no purpose,

5   Your Honor.  To the contrary, they have treated those claims as

6   -- 3M has treated those claims as its own liability for 12 full

7   years, including three years in litigation.

8          3M even got a multi-million dollar judgment -- sorry

9   -- multi-million dollar reduction in a judgment based upon a

10  theory that is completely consistent with their having taken a

11  transfer of the liability.  There was, 3M said, in connection

12  with that, only one party liable, not six or seven, only one,

13  and therefore, damages were capped based upon only one liable

14  party, 3M.  So 3M took a reduction in a judgment based on a

15  theory that is completely consistent with the notion that Aearo

16  transferred all of that liability to 3M back in 2010.

17         Now, Your Honor, they have run from that original

18  theory almost completely.  You've heard almost nothing about

19  that original theory from the debtors today, nothing about the

20  2010 transaction.  When that first theory didn't work, Your

21  Honor, 3M and the debtors shifted to this new theory that

22  they're pushing and that you are hearing today, and that is,

23  that Aearo has already agreed to indemnify 3M under its

24  operating agreement.

25         But that doesn't work either, Your Honor.  Those

282

1  agreements indemnify 3M, at most, for ordinary corporate

2  government kinds of things, the kinds of things you would find

3  in an operating agreement.  It certainly does not extend to the

4  operation of a business by 3M that Aearo transferred to 3M

5  three years before the indemnifications were even made.

6        Mr. Stein, essentially, acknowledged this, Your

7  Honor, by testifying that Aearo -- and this is his emphasis --

8  may have indemnified 3M.  In the end, Your Honor, there is only

9  one fact that you really need to consider, and nobody is

10 denying or disputing this.  3M and Aearo obviously believed, in

11 July of this year, that they needed the indemnification that's

12 in the funding agreement, so much so, Your Honor, that they

13 entered into a very suspect eve-of-bankruptcy transaction on an

14 agreement to assume billions of dollars of liability.

15       So, Your Honor, let's take them up on that.  Let's

16 lean in and call this what it is, say what this really is.  The

17 debtors really only indemnified 3M on the day before the

18 bankruptcy filing.  That, Your Honor, is almost indisputable,

19 and, in fact, that's because their own actions support that.

20       What's more, Your Honor, it is clear that they did

21 that for one purpose and one purpose, alone, and I'm talking

22 about the indemnification.  They did that to provide a basis

23 for this Court to enter the injunction that they're here

24 requesting today.

25       Without that, Your Honor, there's no identity of

283

1  interest because of the transfer of the liabilities to 3M in

2  2010.  There's no identity of interest.  They cannot get the

3  injunction without this indemnification that they entered into

4  on the eve of this case.  And what are they doing with that

5  injunction, Your Honor?  Just like the debtor did in the

6  Shapiro vs. Wilgus case, they are trying to hinder and delay,

7  prevent creditors, 233,000 of them, plus, from prosecuting

8  those claims.

9          There is no other logical explanation for that

10 indemnification, Your Honor, no independent, legitimate, honest

11 debtor would ever enter into an indemnification to include

12 billions of dollars of liability, in the words of Judge Rogers,

13 to take on dire financial circumstances.  And I say that with

14 or without the funding agreement.  No one would do that.

15         The debtors don't get anything out of it.  They are a

16 pass-through entity at this point.  There is no fee.  There is

17 no interest.  There is no nothing that's going to be the

18 debtor's in exchange for that indemnification.

19         Your Honor, we don't have to close our eyes.  We do

20 not have to pretend that this is an ongoing transaction.  But

21 we also don't have to hold our noses and go along with that

22 transaction.  This Court is a court of equity.  It has the

23 equitable power, statutorily authorized equitable power to --

24 and this is by and large a quote -- to enter orders to prevent

25 abuse to this process.

284

1          And, Your Honor, I submit that all you have to do is
2   look at the facts in <u>Shapiro vs. Wilgus</u>.  That is exactly what
3   is going on here.  This Court does not have to participate in
4   this gaming of the system that these folks engaged in.  The
5   Court does not have to recognize this funding agreement that no
6   debtor would enter into and that 3M manufactured and imposed on
7   its subsidiaries for the sole purpose of obtaining relief that
8   it was not otherwise entitled to.

9          The Court can say no to a well-heeled defendant that
10  pivots in its long-held legal position to escape a legal system
11  that it helped to form and now doesn't want.  Let's call it
12  what it is, Your Honor, unclean hands; inequitable behavior; an
13  abuse of process, just like the Supreme Court did in <u>Shapiro</u>
14  <u>vs. Wilgus</u> and deny the injunction.

15         Your Honor, there is no doubt that these cases can
16  and will, probably, go on without the issuance of an
17  injunction.  The debtors can continue their bankruptcy cases.
18  They might even get out, fully, of any obligation on account of
19  these tort claims, if the Court just gives the MDL court the
20  space to decide whether 3M is solely responsible for these
21  liabilities, as it certainly seems to believe.

22         And, Your Honor, the funding agreement won't even go
23  away.  There is no out in the funding agreement if you do not
24  issue an injunction.  3M is just as bound today as it would be
25  tomorrow if you deny this injunction.  There is no reason, Your

285

1  Honor, for a stay in this case, an injunction in this case.
2  There is law on point that gives you the authority to just say
3  no.
4          Unless you have any questions, Your Honor, I will
5  end.
6          THE COURT:  I do not.  Thank you.
7          MR. BARRETT:  Thank you.
8          MR. PFISTER:  As the emcee for the claimants here,
9  Your Honor, that concludes our -- the claimants' presentation.
10          THE COURT:  Thank you.
11          Ms. Duvall?
12          MS. DUVALL:  Thank you, Your Honor.
13          Though I may have the most limited comments of the
14  day, Laura Duvall, on behalf of the United States Trustee.  I'm
15  not here to argue whether you not you should issue the
16  injunction.  I'm simply here to tell you we have three limited
17  objections.  I'm not going to rehash those objections, because
18  I know that Your Honor can read, and we did have the relatively
19  short objection that we filed.
20          Really, what I wanted to say is that, to the extent
21  that Your Honor does want to grant that preliminary injunction,
22  please take those concerns that we have into account, simply
23  because one of the bigger issues that we did raise, and I'll
24  just mention it briefly, is that we haven't had the chance to
25  appoint a Creditors Committee.

1        So, while the veterans have been well represented in

2   this hearing, we would actually like to make sure that we

3   appoint an official Committee of Creditors or committees, at

4   this point. We're just not sure. But we're working through

5   that, so we would like to make sure that you're taking that

6   into account when you're making the decision you make.

7        THE COURT:  All right.

8        MS. DUVALL:  Thank you.

9        MR. HUSNICK:  I only have about 30 minutes -- I'm

10  joking. Good afternoon -- or good evening, Your Honor, Chad

11  Husnick with Kirkland and Ellis. I have about ten pages of

12  notes. I'm going to be really brief. What I am summing up and

13  everything I just heard is, there is no challenge to the fact

14  that these are intertwined claims. There's simply been no

15  counter-argument to that point.

16       All of the claims were brought, both against 3M and

17  against the Aearo debtors. They're the same exact claims.

18  They're seeking to continue to litigate those. Your Honor, I

19  thought, made the very astute observation about how the claim

20  will keep building against Aearo as a result of the indemnity

21  agreement. I believe the words from counsel were, it will get

22  bigger and bigger and bigger. That was in his closing

23  argument.

24       There is no challenge to the common insurance.

25  That's the second -- an independent prong that Your Honor has

287

1  to reach the conclusion that the stay can extend under Section
2  105(a).  We also believe, of course, that that can -- the stay
3  applies under Section 362(a)(3).

4      I want to respond, very briefly, to some of the
5  accusations about sham transactions.  The application of the
6  Shapiro vs. Wilgus case is an absolute non sequitur.  These
7  entities exist.  They have existed.  The evidence in this
8  record shows that the -- these entities created the earplugs.
9  They designed the earplugs in consultation with ISL and the
10 U.S. Government.  They manufactured them.  They sold them.
11 They were sued 230,000 times for that.  The plaintiffs cannot
12 run away from that fact.

13     The concession from counsel that I heard is that you
14 have related-to jurisdiction, Your Honor.  That means that
15 there is an effect on the estate.  We agree.  There is an
16 effect on the estate.  It's certainly enough to be a potential
17 effect warranting an extension of the automatic stay.

18     We are looking forward to engaging with the parties
19 in this case, and we intend to do that.  We believe that the
20 preliminary injunction will help the debtors further that cause
21 in working with the plaintiffs, working with an official
22 committee when it's formed.  We believe it's necessary.  We
23 believe the last two weeks demonstrates why it's necessary to
24 focus the attention on folks here and towards a resolution.

25     Unless Your Honor has any questions, I believe I will

1  rest my case.

2            THE COURT:  I do not.

3            MR. HUSNICK:  Thank you.

4            THE COURT:  Well, I thank you all for your time and

5  attention.  You've done a good job presenting the issues,

6  putting on evidence, dealing with this as we go from court to

7  court.  I still have my box, have coat, will travel.

8            I think, in sum (indiscernible) makes a good point.

9  I can look at it.  Everyone agrees I have related-to

10 jurisdiction.  The question is, should I issue an injunction

11 under 105, understanding that there is also the independent

12 argument under (a)(1) and (a)(3).  And that's what it comes

13 down to.

14            Throughout the course of this, I haven't made up my

15 mind, I lean one way; I lean another way.  I think a lot of it

16 is because of the scope of the case and the issues involved.

17 It also is because of the enormity of the case.  I mean, some

18 cases -- the 105, I view, is something that you need to look at

19 carefully.

20            As an attorney, I used to joke, well, when in doubt,

21 105.  You know, it's the plea of desperate lawyers, but there's

22 also a great deal of power residual in that section.  And I

23 need to think about it.  I don't know where I'm going right now

24 because there's a lot of things I have to consider.

25            And I have to look at the evidence.  It's one thing

289

1 to sit here and listen to it.  I also need to look at it to

2 make sure.  I need to make sure what I think I heard is what's

3 actually said and to look at those things.

4       I think the invitation was made, would you like

5 proposed findings of fact and conclusions of law.  I think that

6 would be helpful here.  I will tell you that proposed findings

7 of fact are findings of fact; they're not argument.  What is

8 it?  I mean, a finding of fact would be that the trial was held

9 in three days.  That's a finding of fact.  Whether it was a

10 productive trial or not productive trial, that's not.  Cite to

11 the record.

12       My brief foray into fellows work, it was fun trying

13 to find in the record where things were said, because I swear

14 it was there.  Sometimes it wasn't, and then I couldn't say it.

15 So consider that.  But -- and don't take any of my questions as

16 a sign of where I'm going.  I know a lot of you haven't

17 practiced -- 99 percent of you haven't practiced in front of

18 me.  I like to ask questions because I like to hear what the

19 answers are.  Sometimes the answers matter; sometimes I just

20 want to hear you say what I think you'll say to confirm it, but

21 it's the only way I'm able to interact before I write an

22 opinion, because obviously, after I do that, I don't really get

23 to talk to you about the case unless I'm remanded, at which

24 point, I'll be angry.

25       So I would -- don't read anything into it.  If you

290

1    think you may have won leaving here, maybe you did, maybe you
2    didn't, but it's probably not because of what I said.  If you
3    think you're not doing well, it may not be what I said.  It's
4    what I write that matters at the end of the day.

5           The one thing I will say, I had a fairly significant
6    case where I didn't mention it, and I'm going to mention it
7    here.  The Seventh Circuit does have, under its rules,
8    something of a direct appeal of a bankruptcy decision.  I think
9    whatever ruling I make, there might be a reason for sides to do
10   that.  And why I say that is this, whether I'm right or whether
11   I'm wrong, you may -- on what I rule, I might be right, I might
12   be wrong.  I don't know.

13          But to me, it's an important enough question that you
14   not have -- that you maybe don't want to go to District Court,
15   wait for awhile and get that and then go to the Seventh
16   Circuit.  I don't know.  But it is a tool there, and I think,
17   given the magnitude of this case, may be something you want to
18   explore.  I don't know.  I can't tell you to do it.  I can't
19   put in an opinion, raise an appeal to the Seventh Circuit,
20   because I don't have the authority to do that, but it is
21   something to consider.  It is a rule that we have here that, on
22   cases of import, might make sense.

23          Does anyone have any questions of the Court before I
24   release you to the streets?

25          UNIDENTIFIED SPEAKER:  Your Honor, on the proposed

1   findings of fact, conclusions of law?

2            THE COURT:  Yes?

3            MR. PFISTER:  File on Monday?

4            THE COURT:  Is that enough time for you?

5            MR. PFISTER:  First, Your Honor, may I address the

6   final (indiscernible) at this point?

7            THE COURT:  Sure, because I realize, last time

8   (indiscernible), so go ahead.

9            MR. PFISTER:  So, for the record, Rob Pfister, for

10  the claimants who signed the brief.  We were thinking about it

11  over lunch, and, first of all, we're happy to provide findings

12  -- proposed findings and conclusions.  And I think in a case

13  where, you know, if we had put on a bunch of evidence, and they

14  had put on a bunch of evidence, and their findings were, you

15  know, believe our people, and our findings were, believe their

16  people, right, it would be one thing.

17           Here, the way the evidence came in, and the way the

18  burden works, right, the debtors put on, essentially, all of

19  the evidence.  We crossed all their witnesses, and the one

20  witness that we called, we called adversely, and it was, you

21  know, their person.

22           I think, rather than -- and just like, you know,

23  they're the movants, and they put in the opening brief, and

24  then we put in the opposition, I think it would be more

25  helpful, if we could see what the debtors propose in terms of

1  findings and conclusions, and then --

2          THE COURT:  I generally haven't done that, no matter

3  where the burden of proof lies.  I don't think that's

4  appropriate.

5          MR. PFISTER:  Okay.

6          THE COURT:  Because it gives you -- everyone wants

7  that last bite of an apple, and then they'll turn around and

8  say, but we've got to do rebuttal, and we should get -- no.

9  And it wouldn't be simultaneous -- they're not filed.  I

10  believe most of you have my staff attorney's email.  If not, we

11  have dusty business cards, which we will distribute.  They go

12  to her.  Put it in Word format, because for decades we used

13  WordPerfect.  I think we probably could use it, but let's not.

14  We're o the cusp, you know, 2023, let's use Word, a great 1990s

15  invention.

16                          (Laughter)

17          THE COURT:  You laugh about this.  When I started

18  this job, we still were on Lotus products.  So I get it.  And

19  to the extent -- and, obviously, you don't have to have

20  proposed findings of fact, because you don't have the burden of

21  fact.  If you don't feel the need to do that, you don't have

22  to.  You could just say, they missed it, and here's our

23  conclusions of law.  That's up to you, obviously, but, and you

24  don't have to do this, if you don't want to.

25          MR. PFISTER:  I absolutely do want to, you know.

293

1          THE COURT:  You guys offered, so, okay.  And it can't
2    hurt.  So timeline, when -- I don't want to make poor people
3    work over the weekend, but it seems like -- when do you propose
4    that such things could be done?
5          MS. CYGANOWSKI:  Tuesday morning at 10:00.
6          THE COURT:  That is so random, I like it.
7          MR. PFISTER:  Your Honor, based on the -- Mr.
8    Husnick's five-dollar word détente, and the fact that the
9    district court has said that you should only sign off on a
10   seven day extension of time until 3M and others are back in
11   front of her court, we would ask for Monday, so we could at
12   least have an opportunity to continue to advance the process.
13         We're not trying to put any hawk on you.
14                         (Laughter)
15         THE COURT:  But you have seven days.  Can Monday be
16   done?
17         MR. PFISTER:  We can do Monday, Your Honor.  We could
18   not do, maybe 10:00 a.m.  Maybe could we do 5:00 p.m.?
19         THE COURT:  I was going to say 10:00 a.m. because she
20   said 10:00, and I just thought that was wonderfully random.
21         MR. PFISTER:  If Your Honor wants 10:00 a.m., we'll
22   do 10:00 a.m.
23         THE COURT:  Monday at 10:00 is random enough.
24         MR. PFISTER:  Your Honor, we'll meet them halfway at
25   1:00, if you want it in the afternoon?

1          THE COURT:  Pardon?

2          MR. PFISTER:  Your Honor, I was just proposing -- she

3    said there's some question about what time on Monday.  We'd

4    meet them halfway and do 1:00, get the original proof on Monday

5    morning before handing it in.

6          THE COURT:  That's fine.  (indiscernible)  Make sure

7    it's 1:00 Eastern Standard Time.  That's fine.

8          MR. PFISTER:  And to be clear, these are -- it's a

9    Word format document.  It's proposed findings of fact and

10   conclusions of law.  I heard Your Honor, you don't want any

11   additional briefing.  Proposed findings of fact, proposed

12   conclusions of law, and to the extent we are not asking the

13   Court to find any facts, you know, we might cast ours as

14   conclusions of law that the burden hasn't been met or something

15   along those lines.

16         THE COURT:  Whatever you want to do.

17         MR. PFISTER:  Okay.

18         MS. CYGANOWSKI:  I'm Melanie Cyganowski, for the

19   record.  What did we end up with on Monday with time, because

20   with all due respect, we have a lot of people we have to

21   coordinate with.

22         THE COURT:  I understand.

23         MS. CYGANOWSKI:  We're going to be --

24         THE COURT:  Also understand, I have to give you an --

25   I want to give you an opinion.

1          MS. CYGANOWSKI:  Correct.  So if we got it to you by

2   4:00 or 3:00?

3          THE COURT:  When do you need?

4          MS. CYGANOWSKI:  The afternoon on Monday would be

5   just better.  I mean -- 3:00?

6          THE COURT:  Ultimately, all I can do is get done what

7   I can get done.  I mean, you can get it to me by tomorrow, and

8   that doesn't mean I'm going to have an opinion done, because we

9   have to collaborate -- I mean, you all have quite the legion of

10  folks to do stuff.  We have two people.

11         MS. CYGANOWSKI:  Correct.

12         THE COURT:  So we're going to do the best we can, and

13  it is what it is, what we get done, but I mean, if you want to

14  do Monday at 5:00, that's fine.  We have plenty of other things

15  to work on that we can do.

16         MS. CYGANOWSKI:  We appreciate, Your Honor.  We'll

17  try for sooner.

18         THE COURT:  I understand.  I understand.

19         MR. PFISTER:  And so they'll be final, just to

20  clarify --

21         THE COURT:  Look, if you send it three minutes before

22  them, I can't get into that.  I don't care.  As a matter of

23  fact, we're all smart enough not to look at anything before the

24  designated time, so let's just -- let's do what we can.  5:00

25  prevailing Eastern Standard Time.

296

1            MS. CYGANOWSKI:  Thank you.

2            MR. PFISTER:  Your Honor, one more thing before I

3    leave.  This is unrelated to the preliminary injunction, but I

4    believe under the Local Rules, we have the hearing schedule

5    tomorrow on the lift stay motion.

6            THE COURT:  You do.

7            MR. PFISTER:  As part of our --

8            THE COURT:  The continuing saga.

9            MR. PFISTER:  As part of our detente, we had agreed

10   with Mr. Keller to adjourn that motion, but in accord with

11   Rule, I think it's 5071-1, that requires me to move to adjourn

12   that, and --

13                          (Pause)

14           MR. PFISTER:  This one doesn't have a pending motion.

15   We're happy to put one on file, if that will help you.

16           THE COURT:  I'm assuming you guys want to leave.

17           MR. PFISTER:  That's correct.

18           THE COURT:  Normally, I don't do this.  If both of

19   you go on the record and make an oral request -- I'm going to

20   get in trouble for this -- make an oral request to continue the

21   hearing, I will do that.

22           MS. CYGANOWSKI:  Continued or --

23           THE COURT:  Continued to the next omnibus --

24   adjourning to the next omnibus.

25           COURT CLERK:  Should we just do another motion, a

1  motion to enforce?

2       THE COURT:  Yeah, but I want to get the

3  representations from Mr. (indiscernible).

4       MS. CYGANOWSKI:  Is Mr. Keller still here?

5       THE COURT:  Come on on the record.  And the reason I

6  ask these things, the reason is, because I don't like them, A,

7  and it makes it all -- maybe Judge Cyganowski knows this -- it

8  doesn't matter what the code says and what the local rule says,

9  I'm also bound by what our system does.  And there has to be a

10  disposition.  There has to be some event that allows me to

11  continue it.  I can do it sua sponte.  But there has to be

12  something that allows me to do it.

13       That's why oral motions are bad, because there's no

14  record.  Now, we have the advantage here.  Most of the people

15  are here, but there may have been someone who's not here that

16  thinks it's happening and shows up tomorrow and, oh, where is

17  everybody.

18       So if you can file something early -- and when I say

19  early, you guys know early better than I do -- that would

20  assist me in then creating a record as to continuing it to the

21  next omnibus hearing.

22       UNIDENTIFIED SPEAKER:  I can certainly file a motion

23  tonight.  It's not --

24       THE COURT:  That's fine.

25       UNIDENTIFIED SPEAKER:  It's very easy, and it will be

298

1  straightforward.

2           THE COURT:  He said he seconds the motion, so it

3  appears you can indicate consent.  But I just -- I need a piece

4  of paper to do an oral ruling, especially on something of this

5  size.  If I start ruling from the bench, nobody is ever going

6  to know what's going on, I think, so --

7           UNIDENTIFIED SPEAKER:  Would it help if we filed a

8  notice of vacating the hearing tonight or anything like that?

9           THE COURT:  No.  No, because I need a motion.

10          UNIDENTIFIED SPEAKER:  All right.

11          THE COURT:  Remember, you can't vacate a motion or

12 vacate a hearing on your own.  That's my thought.  It was my

13 hearing.

14          So a brief motion seeking continuance and getting a

15 joint -- it can be ruled on, and we'll take the matter off.

16          MR. PFISTER:  Okay.  Thank you, Your Honor, and I

17 believe that that will leave us with no other items on the

18 agenda --

19          THE COURT:  Okay.

20          MR. PFISTER:  -- after that one.

21          THE COURT:  All right.  So not only would you be,

22 then, free from the courtroom, you are free to leave the lovely

23 city of Indianapolis, Indiana.

24          MR. PFISTER:  We plan to have a nice dinner tonight

25 to relax.

299

1          MS. CYGANOWSKI::  You're buying?

2                    (Laughter)

3          THE COURT:  What better way to start negotiations

4  than a nice dinner?

5          MR. PFISTER:  McDonald's is a good place for it,

6  so --

7          THE COURT:  All right.  Anything else, then?

8          ALL COUNSEL:  Thank you, Your Honor.

9          THE COURT:  All right.  Before you go, remember,

10  please exit out of B2.  There is a guard there until 7:00 who

11  can let you out.  Anything after that, you will need an escort.

12  Please don't make my staff stay any later than they have, and I

13  trust that you can get out of here by 7:00, understanding that

14  if we don't have anything tomorrow, all of your stuff will need

15  to be removed from the courtroom, and thank you.  Thank you,

16  all.  We are officially adjourned.  Thank you.

17          ALL COUNSEL:  Thank you, Your Honor.

18                    * * * * *

19

20

21

22

23

24

25

300

# **C E R T I F I C A T I O N**

We, KAREN K. WATSON, DIPTI PATEL, ELIZABETH REID-GRIGSBY, THERESA PULLAN, TRACY GRIBBEN, JUNE KAUFMAN and JACQUELINE MULLICA, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Karen K. Watson                  /s/ Dipti Patel
KAREN K. WATSON                      DIPTI PATEL


/s/ Theresa Pullan                   /s/ Elizabeth Reid-Grigsby
THERESA PULLAN                       ELIZABETH REID-GRIGSBY


/s/ Tracy Gribben                    /s/ June Kaufman
TRACY GRIBBEN                        JUNE KAUFMAN


/s/ Jacqueline Mullica
JACQUELINE MULLICA
J&J COURT TRANSCRIBERS, INC.         DATE:  August 19, 2022