EXHIBIT 4

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| IN RE: | . | Case No.  22-02890-JJG |
| | . | (Jointly Administered) |
| AEARO TECHNOLOGIES LLC, | . | |
| ET AL., | . | 116 U.S.  Courthouse |
| | . | 46 E.  Ohio Street, Room 116 |
| Debtors. | . | Indianapolis, IN  46204 |
| . . . . . . . . . . . . | . | |
| AEARO TECHNOLOGIES LLC, | . | |
| ET AL., | . | |
| | . | |
| Plaintiffs, | . | |
| V. | . | Adversary No. 22-50059-JJG |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| APPENDIX A, | . | |
| | . | |
| Defendants. | . | |
| | . | Monday, August 15, 2022 |
| . . . . . . . . . . . . | . | 9:00 a.m. |

TRANSCRIPT OF HEARING ON DEBTORS' MOTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
BEFORE THE HONORABLE JEFFREY J. GRAHAM
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtors: | Kirkland & Ellis LLP |
| | BY:  CHAD HUSNICK, ESQ. |
| | 300 North LaSalle Street |
| | Chicago, IL  60654 |
| | |
| | Kirkland & Ellis |
| | BY:  MARK McKANE, ESQ. |
| | 555 California Street, 27th Floor |
| | San Francisco, CA  94104 |
| | |
| Audio Operator: | Heather Heiser-Davis |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**

**(609) 586-2311    Fax No.  (609) 587-3599**

APPEARANCES CONTINUED:

| | |
|---|---|
| For 3M Company: | Faegre Drinker Biddle & Reath LLP<br>BY:  JAY JAFFE, ESQ.<br>600 East 96th Street, Suite 600<br>Indianapolis, IN  46240 |
| | White & Case LLP<br>BY:  MICHAEL ANDOLINA, ESQ.<br>111 S. Wacker Drive, Suite 5100<br>Chicago, IL  60606 |
| | White & Case LLP<br>BY:  JESSICA LAURIA, ESQ.<br>     GREGORY STARNER, ESQ.<br>1221 Avenue of the Americas<br>New York, NY  10020-1095 |
| For Aylstock, Witkin,<br>Kreis & Overholtz, PLLC: | Klee, Tuchin, Bogdanoff & Stern, LLP<br>BY:  ROBERT J. PFISTER, ESQ.<br>1801 Century Park East, 26th Floor<br>Los Angeles, CA  90067 |
| For Seeger Weiss LLP: | Otterbourg P.C.<br>BY:  MELANIE CYGANOWSKI, ESQ.<br>     ADAM SILVERSTEIN, ESQ.<br>230 Park Avenue<br>New York, NY  10169-0075 |
| | Seeger Weiss LLP<br>BY:  DAVID BUCHANAN, ESQ.<br>55 Challenger Road<br>Ridgefield Park, NJ  07660 |
| For the U.S. Trustee: | U.S. Department of Justice<br>BY:  HARRISON E. STRAUSS, ESQ.<br>46 E. Ohio St., Road 520<br>Indianapolis, IN  46204 |
| For Clark Love & Hutson: | Fishman Haygood LLP<br>BY:  TRISTAN MANTHEY, ESQ.<br>     BRENT BARRIERE, ESQ.<br>201 St. Charles Avenue, Suite 4600<br>New Orleans, LA  70170-4600 |
| For Bellwether<br>Claimants: | Quinn Emanuel Urquhart & Sullivan, LLP<br>BY:  ERIC WINSTON, ESQ.<br>865 S. Figueroa Street, 10th Floor<br>Los Angeles, CA  90017 |

```
APPEARANCES CONTINUED:

For Bailey Glasser          Bailey Glasser LLP
Plaintiffs:                 BY:  KEVIN W. BARRETT, ESQ.
                            209 Capitol Street
                            Charleston, WV  25301

                    - - - - -
```

Castellano - Direct/McKane                    67

```
 1              THE COURT:  Let's play it by ear.
 2              MR. McKANE:  Very good, Your Honor.
 3              THE COURT:  Because I don't know yet.
 4              MR. McKANE:  Fair enough.
 5              THE COURT:  So I have a little box, but I'm not sure
 6  I'll be able to contain the files or exhibits you've given me,
 7  so -- propose to give me, so we'll see.
 8              MR. McKANE:  All right.
 9              Your Honor, may we publish Exhibit 43?
10              THE COURT:  You may.
11  BY MR. McKANE:
12  Q    Now, Mr. Castellano, the shared services agreement, do you
13  see it's dated April 1st, 2008?
14  A    Correct.
15  Q    All right.  Is this the shared services agreement that
16  remains in place today?
17  A    It is, yes.
18  Q    And is this the agreement that to your knowledge that's
19  been in place for the entire time at Aearo?
20  A    Yes.  It is the agreement that's been in place.
21  Q    All right.  So, Mr. Castellano, starting at a high level,
22  30,000 feet, can you describe the shared services arrangement
23  between Aero and 3M?
24  A    Certainly.
25        So 3M -- whenever 3M acquires a company, they integrate
```

1 that company from a back -- what I'll call a back-office

2 technical assistance perspective to get efficiency of scale but

3 more importantly to also ensure consistency of policies and

4 procedures across their portfolio of companies.

5      So this shared services agreement touches on effectively

6 all critical back-office functions as well as a number of

7 health and safety, technical assistance, and engineering

8 assistance functions to allow Aearo the ability to grow its

9 business yet still ensure compliance with standardized policies

10 and procedures in place by 3M.

11 Q   And, sir, just to make sure we're on the same page with

12 regards to the language like back-office function, can you

13 describe some of the departments, if you will, that would

14 comprise the back office?

15 A   Certainly.

16      So it's fairly extensive.  It would include finance,

17 accounting, treasury, insurance, human resources, procurement,

18 IT.  Effectively, the infrastructure necessary to support Aearo

19 is provided by 3M.  And as an example, simple functions such as

20 paying employee or paying vendors, those systems are provided

21 by 3M.  And, again, that goes to the efficiency of managing

22 those back-office functions.

23 Q   All right.  Sir, just there are a bunch of lawyers in the

24 room, legal back office, as well?

25 A   I'm sorry.  Yes.  Legal is another critical function

1  provided by 3M.

2  Q    All right.  Sir, when you testified earlier today that

3  Aearo had approximately 330 employees, does that include any of

4  these back-office personnel?

5  A    No, it doesn't.

6        The back-office personnel that I'm referring to are

7  provided by 3M pursuant to this agreement.

8  Q    All right.  Let me direct your attention to Paragraph 2.2

9  which is on PDF Page 6.

10       Sir, do you see that, sir, Mr. Castellano, that services

11 that are provided are listed on Appendix A -- or Appendix 1,

12 excuse me?

13 A    Yes, I see that.

14 Q    All right.

15            MR. McKANE:  And if we could go to Appendix 1, which

16 is numbered Page 15.

17 BY MR. McKANE:

18 Q    Sir, did your team evaluate whether the 3M is actually

19 providing the services that are described in Appendix 1?

20 A    Yes.

21       As part of our diligence, as I testified previously or

22 earlier, it was important to understand how Aearo actually

23 conducts its business.  And since the shared services is such a

24 critical component of the infrastructure for Aearo, we did

25 spent -- my team and I did spend a significant amount of time

Castellano - Direct/McKane                    74

1  A    So there was a set of transactions in 2009 and another set

2  of transactions in 2010.

3  Q    All right.  Let's start with 2009.  What happened in 2009,

4  any transfer between Aearo and 3M?

5  A    Yeah.

6       So 3M, as I understand it, has a policy where they

7  aggregate the intellectual property of an acquisition into

8  their own specific intellectual property legal entities.  So in

9  2009, the Aearo companies transferred the intellectual property

10 trade names-trademarks know-how to ultimately these two 3M

11 legal entities.

12      The IP -- we confirmed the IP was actually transferred

13 itself.  And this was reflected in Aearo's books and records up

14 the chain through the legal entities as an actual dividend

15 contribution to reflect the transfer of the intellectual

16 property to ultimately 3M.

17 Q    And, sir, did your diligence uncover any other activity in

18 2009 in terms of a transfer or dividend between Aearo and 3M?

19 A    Not in 2009, no.

20 Q    What about in 2010?

21 A    So in 2010, the -- 3M wanted to ensure and more properly

22 align its reporting units.  And Aearo then recorded a

23 transaction to transfer what was approximately 80 percent of

24 the Aearo business -- that business was the Head, Eye, Ear,

25 Hearing, and Face Safety business -- to transfer that to 3M's

1  Occupational Health and Environmental Safety Division for

2  management reporting purposes.

3  Q    For management reporting purposes, what does that mean?

4  A    So from a management reporting perspective, it's not

5  uncommon for an organization regardless of their size to look

6  at its business differently than just on a consolidated basis.

7  So the Occupational Health and Environmental Safety Division

8  wanted to just aggregate this particular division of Aearo into

9  its overall results so it could evaluate it from an operating

10  and performance perspective.

11      At the end of the day, management reports on a

12  consolidated basis will total the total consolidated financial

13  statements that get published, but this is more from an ability

14  to run the business on a day-to-day basis.  That's something

15  smaller than just the consolidated results.

16  Q    And, sir, how was this 2010 transfer recorded?

17  A    So there were journal entries recorded on Aearo's books

18  and records that effectively moved this division over to 3M and

19  then 3M correspondingly recorded the same transactions on its

20  books and records to reflect that this -- this business unit of

21  Aearo is now a business unit within this one 3M division for

22  management reporting purposes.

23  Q    And did you and your team share what you learned with the

24  Aearo boards?

25  A    We did.

Castellano - Direct/McKane                          76

1  Q    And did you present your findings at an Aearo board

2  meeting?

3  A    Yes, on a summary basis.

4  Q    Mr. Castellano, I'm going to hand you what has been

5  previously marked as Exhibit 144.

6       Mr. Castellano, do you recognize Exhibit 144?

7  A    I do.

8  Q    What is it?

9  A    These are meetings of a board meeting from July 19th,

10 2022.

11 Q    And, sir, do you see the list of attendees on Page 1?

12 A    I do.

13 Q    Do you see your name?

14 A    Yes.

15       MR. McKANE:  Your Honor, the debtors move into

16 evidence Exhibit 144.

17       THE COURT:  Any objection to what has been designated

18 Exhibit 144?

19       MR. PFISTER:  No objection, Your Honor.

20       THE COURT:  All right.  Seeing no objection, the

21 Court will admit Exhibit 144.

22       (Debtors' Exhibit 144 admitted into evidence)

23       THE COURT:

24 BY MR. McKANE:

25 Q    Mr. Castellano, do you see upper right-hand corner Exhibit

Castellano - Direct/McKane                        77

1  144 and then Page 1 of 74?

2  A    I do.

3  Q    All right.  Using that pagination, can we go to Page 58 of

4  74?

5  A    Yes, I see that.

6  Q    All right.  And, sir, do you recognize Page 58 of 74?

7  A    Yes.

8       It's a cover page of a presentation my team prepared in my

9  direction for this meeting.

10 Q    All right.  Let me direct your attention further to Page

11 65 of 74, and let me know when you're there.

12 A    I'm there, yes.

13 Q    All right.  And, sir, Page 65 of 74 is a one-page -- is

14 one page of that presentation entitled "2010 Aearo Safety

15 Product Business Transferred to 3M."  Do you see that, sir?

16 A    I do.

17 Q    Can you explain to the Court what you were trying to

18 communicate to the Aearo board with regards to this slide?

19 A    Yes.

20      So as I previously stated, effective January 1st, 2010, 3M

21 wanted to transfer the Head, Eye, Ear, Hearing, and Face Safety

22 Division of Aearo to its Occupational Health and Safety

23 Division.

24      So if you look on the left-hand side of the page and maybe

25 I'll just focus you on the net assets transferred line, which

1  is approximately $648 million, so what that represents is the

2  net book value of this particular division's assets and

3  liabilities that were then correspondingly recorded on 3M's

4  balance sheet effectuating the transfer for management

5  reporting purposes of this particular division.

6  Q    All right.  And, sir, you said these are net assets

7  transferred, correct?

8  A    That's correct.

9  Q    Were any Aearo liabilities transferred to 3M as part of

10 the 2010 transaction?

11 A    There were.

12 Q    Okay.  And are those summarized on this slide, as well?

13 A    Yes.

14      There's a section for liabilities.

15 Q    All right.  And, sir, can you walk the Court through the

16 liabilities that were specifically transferred from the Aearo

17 debtors to 3M in 2010?

18 A    Certainly.

19      So these liabilities represent ordinary course working

20 capital liabilities of this particular division of Aearo.  The

21 vast majority of these, if you look, the line that's called AP

22 represents -- that stands for accounts payable, and that would

23 be for vendor invoices, third-party vendor invoices that this

24 particular division was obligated on.

25      The ICE/P represents intercompany AP.  Aearo does purchase

Castellano - Direct/McKane                         79

1  raw materials from 3M for its production processes, and this
2  would be -- this would be the obligation that was outstanding
3  as of January 1st, 2010 from a working capital perspective.
4      And then the accrued expenses and other liabilities
5  effectively just represent accruals, so expenses that have been
6  incurred yet haven't matured for things like payroll, benefits,
7  and other -- other expenses accordingly.
8  Q   And, sir, was your team able to validate what was
9  specifically transferred from the Aearo entities to 3M in 2010?
10 A   Yeah.
11     My team reviewed the -- the journal entries and the
12 supporting documentation that culminated in this particular
13 summary.
14 Q   And, sir, did the supporting documentation include a
15 purchase and sale agreement?
16 A   No.
17     The supporting documentation was just the journal entries
18 and the -- the work papers that supported these numbers.  There
19 were no agreements that were entered into between Aearo and 3M
20 for this transfer.
21 Q   Were there any tort liabilities transferred in 2010?
22            MR. PFISTER:  Objection. Foundation, Your Honor.
23            THE COURT:  Response?
24            MR. McKANE:  I think, Your Honor, the witness has
25 already established the foundation by his specific review of

 1  the specific journal entries that were -- that evidence the

 2  transfer.

 3          THE COURT:  All right.  Go ahead.

 4          THE WITNESS:  So, no, there were no tort liabilities

 5  transferred as there were no tort liabilities in existence at

 6  this time.

 7  BY MR. McKANE:

 8  Q    And, sir, as part of your diligence in the 2008, 2009, and

 9  2010 transactions, did you or your team identify any

10  documentation in which 3M assumed Aearo's tort liabilities?

11  A    We found no documentation where there was an assumption of

12  tort liabilities.

13  Q    And as part of that same diligence for that same

14  transactions, did you or your team identify any documentation

15  that suggested that Aearo tort liabilities were transferred to

16  3M?

17  A    No.

18      We found no evidence of any documentation supporting that.

19  Q    And from 2010 to the present, are you aware of any

20  transfer of tort liabilities from Aearo to 3M?

21  A    No, we are not.

22  Q    Let's change topics.

23      In your capacity as chief restructuring officer, have you

24  become familiar with the debtors' organizational documents?

25  A    Yes, I have.

278

# C E R T I F I C A T I O N

We, KAREN K. WATSON, DIPTI PATEL, THERESA PULLAN, ELIZABETH REID-GRIGSBY, ALYCE STINE and WENDY ANTOSIEWICZ, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Karen K. Watson                    /s/ Dipti Patel

KAREN K. WATSON                        DIPTI PATEL


/s/ Theresa Pullan                     /s/ Elizabeth Reid-Grigsby

THERESA PULLAN                         ELIZABETH REID-GRIGSBY


/s/ Alyce Stine                        /s/ Wendy Antosiewicz

ALYCE STINE                            WENDY ANTOSIEWICZ

J&J COURT TRANSCRIBERS, INC.           DATE:  August 17, 2022