# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to: *All Wave 1 Cases* | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## ORDER[1]

This Order resolves Plaintiffs' omnibus motion to exclude expert testimony and opinions, in whole or in part, under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993) for the Wave 1 cases, *see* ECF No. 3319.[3]

## A.     James Crawford, M.D.

Dr. James Crawford is a board-certified otolaryngologist and neurotologist. He previously served as a physician in the United States Army for 24 years, and now runs the Idaho Ear Clinic and also serves as an assistant professor of surgery at the Uniformed Services University.  Dr. Crawford offers a host of general opinions in

---

[1] This Order assumes the parties' familiarity with the nature of this multidistrict litigation, the claims and defenses at issue, and the current evidentiary record, and thus sets out only what is necessary to explain the Court's rulings.  The Order also incorporates by reference the applicable legal standards set forth in prior similar orders.  *See, e.g.*, *Beal*, 7:20cv0006, ECF No. 142 at 1-5 (general *Daubert* standard); *id*. at 5-6 (differential etiology standard); *In re 3M*, 3:19md2885, ECF No. 1680 at 2-6 (general *Daubert* standard).

[3] The parties' respective motions to preserve *Daubert* and Rule 702 motions and arguments previously ruled on in the bellwether cases, *see* ECF Nos. 3320 & 3321, are granted.

the Wave 1 cases that Plaintiffs find objectionable, which the Court addresses in turn.

### 1.    Opinion that Tinnitus Rarely Occurs Without Noise-Induced Hearing Loss

Dr. Crawford opines that noise-induced tinnitus "rarely occurs in the absence of noise-induced hearing loss."  *See* Crawford Rep., ECF No. 3319-3 at 6, 23. Plaintiffs challenge this opinion as unsubstantiated.  The Court disagrees, in part. According to Dr. Crawford's expert report (and Defendant's briefing), this opinion is not based on any peer-reviewed scientific literature or scientific studies.  Rather, he drew on observations made while diagnosing and treating symptoms of tinnitus patients.  While this is an adequate basis for the opinion, it does limit the scope of Dr. Crawford's testimony at trial.  He may discuss the incidence of noise-induced tinnitus only in terms of his personal observations while treating patients, and he must not generalize those opinions beyond his own patient population.

### 2.    Opinion that 95% of People with Tinnitus Develop Coping Strategies

Dr. Crawford also offers an opinion, without citation to authority, that "95% of people with tinnitus develop coping strategies and have no significant problem with" the condition.  *See id*. at 6.  The Court previously limited Dr. Crawford's testimony on any relationship between tinnitus and mental health (including coping strategies) to his personal observations as a clinician because he cited no scientific

support for his proposed statements about the broader population of tinnitus patients. The same is true of Dr. Crawford's expert disclosures in the Wave 1 cases; however, this time (yet notably never during general expert discovery), Defendant has cited peer-reviewed literature that includes various statistics about the mental health and/or functional impacts of tinnitus (although none reference the 95% figure reflected in Dr. Crawford's report). Dr. Crawford may discuss the statistics in this literature in connection with his testimony, to the extent that he relied on them in forming his general opinions. He also may discuss his personal observations regarding his own patients' coping strategies and mental health effects. He may not, however, spout unsupported statistics about the general population of tinnitus sufferers.

### 3.      Ototoxicity Opinions

Dr. Crawford opines that salicylates, "certain illicit drugs," and "toxic solvents," among other substances not challenged here, can be ototoxic. Plaintiffs argue those opinions are unreliable, unhelpful, and misleading. The Court agrees, in part.

Salicylates are not a group of substances for which scientifically reliable evidence has been previously presented in this litigation establishing a causal relationship between exposure and sensorineural hearing loss and/or tinnitus. *See generally* ECF No. 1330 (discussing ototoxic medications and substances).

Defendant had ample opportunity to present such evidence and elected not to. But moreover, none of the materials submitted in connection with the instant briefing establishes more than an association,[4] which this Court has repeatedly found insufficient, without more, to reliably support an expert opinion on causation.[5] Consequently, Dr. Crawford's opinion regarding the ototoxicity of salicylates is excluded on reliability and 403 grounds.

Dr. Crawford's opinions about the ototoxicity of *unspecified* "illicit drugs" and "toxic solvents" are excluded as unreliable, unhelpful, and unduly prejudicial, as are any such opinions regarding medications, other drugs, or chemicals not previously found to be ototoxic by the Court. *See, e.g.*, *Beal*, 7:20cv006, ECF No. 130 at 9. However, to the extent a case-specific diagnostician reliably rules in a particular drug or chemical as a potential cause of a Wave 1 plaintiff's hearing loss or tinnitus (*e.g.*, naproxen), and scientifically reliable evidence has been found to establish a causal relationship between exposure to that drug or chemical and

---

[4] *See* Larry E. Humes et al., *Noise & Military Service* (National Academy of Sciences 2006) ("Humes 2006") ("Conclusive results have not emerged from investigation of the effects of noise exposure with…salicylates."), ECF No. 3376-3 at 6; Claudia Barros Coelho et al., *Classification of Tinnitus: Multiple Causes with the Same Name*, OTOLARYNGOLOGY CLINICS OF N. AM. 53:515-529 (2020) ("Of interest is the widespread use of salicylate as a pain medication. It might induce mild to moderate hearing loss when used in high doses.").

[5] *See, e.g.*, ECF No. 1910 at 9-10 (excluding Dr. Crawford's opinion regarding association between recreational marijuana use and tinnitus); *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1307 (N.D. Fla. 2018) (discussing the "well-established" Bradford Hill analysis that guides a scientific inquiry into whether an observed association represents a "true cause-effect relationship").

auditory dysfunction, Dr. Crawford's general expert testimony about the drug or chemical will be admissible to provide relevant context and/or insights in that plaintiff's case. *See, e.g.*, ECF No. 2218 at 21-22 (same regarding otolaryngologist/neurotologist's general hidden hearing loss opinions).

### 4.    Somatic Tinnitus Opinion

Plaintiffs challenge Dr. Crawford's opinion that "[s]omatic tinnitus is widespread among tinnitus sufferers" on grounds that it is false, misleading, and "belie[d]" by the scientific literature cited in his report. *See* Pl. Motion, ECF No. 3319 at 19. While the Court agrees that the term "widespread" conveys that somatic tinnitus is fairly pervasive among tinnitus patients, there is literature to support that characterization.[6]    Plaintiffs' disagreement with this characterization is more appropriately addressed during cross-examination or the presentation of contrary evidence.  With that said, the admissibility of Dr. Crawford's general opinions regarding somatic tinnitus will depend on the case-specific opinions on causation offered for a particular plaintiff.  To the extent a case-specific diagnostician reliably

---

[6] *See, e.g.*, Massimo Ralli et al., *Somatic Modulation of Tinnitus: A Review & Some Open Questions*, OTOLARYNGOLOGY OPEN J. 2(4): 111, 112 (2016) ("The modulation of tinnitus by somatic movements is widely diffused among … tinnitus sufferers and has bee reported to involve one to two-thirds of them with different patient series ranging between 65% and 83%."); Susan Shore et al., *Neural mechanisms underlying somatic tinnitus*, *in* PROGRESS IN BRAIN RESEARCH 107 (B. Langguth, et al. eds., Elsevier B.V. 2007) ("Approximately two-thirds of individuals with tinnitus can modulate the loudness or pitch of their tinnitus by voluntary or external manipulations" or movements); Robert A. Levine, *Somatic Tinnitus*, *in* TINNITUS: THEORY & MGMT. 108, 109 (BC Decker Inc., 2004) (reporting 80% of clinical and nonclinical test subjects could somatically modulate their tinnitus).

rules in somatic tinnitus as a potential cause of a plaintiff's auditory symptoms, Dr. Crawford's general testimony about somatic tinnitus will be admissible to provide relevant context and/or insights in that plaintiff's case. However, Dr. Crawford's somatic tinnitus opinions must be excluded as irrelevant, unhelpful, unfairly prejudicial, confusing, and misleading in cases where no case-specific expert has reliably ruled in somatosensory neural sources as a potential cause of the plaintiff's auditory dysfunction. *See* ECF No. 2934 at 7 (excluding evidence or argument as to somatic tinnitus where no case-specific expert reliably ruled in the condition as a potential cause of the plaintiff's auditory symptoms).

### 5. Opinions on Military Rates of Hearing Loss & Tinnitus

As in his previous reports, Dr. Crawford opines that "[n]oise-induced hearing loss is common in the military" and that servicemembers "have significant threshold shifts at higher rates than considered appropriate in industrial hearing conservation programs." *See* Crawford Rep., ECF No. 3319-3 at 33. Consistent with the Court's prior rulings on opinions of this nature, brief background testimony that noise-induced hearing loss and/or tinnitus are "common" conditions in the military population is permissible. *See* ECF No. 2845 at 21; *Beal*, 7:20cv006, ECF No. 130 at 12. However, evidence or argument about military rates of hearing loss and average hearing thresholds of military veterans, or measurements of a particular

plaintiff's hearing loss against the "average" military data, is irrelevant, unhelpful, misleading, and substantially more prejudicial than probative.  *See id*. at 12-13.

### 6.    Ruptured Eardrums Opinion

Plaintiffs also seek exclusion of Dr. Crawford's opinion that ruptured eardrums from blast exposures are common, even when earplugs are worn, on grounds that the opinion was not disclosed in his expert report and is supported only by his "personal experience."  *See* Pl. Motion, ECF No. 3319 at 20-21.  This is incorrect.  Dr. Crawford's report expressly states that a blast "may result in ruptured eardrums" and that he had personally observed servicemembers with "tympanic membrane perforation" following blast exposures.  *See* Crawford Rep., ECF No. 3319-3 at 24.  Scientific literature cited in Dr. Crawford's report supports his clinical observations.[7]  Plaintiffs may properly address any perceived weaknesses in this opinion—for example, with evidence that "the incidence of ruptured [tympanic membranes] is significantly reduced [for those wearing hearing protection]—under cross-examination or with a competing expert witness.  .  *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd*., 326 F.3d 1333, 1345 (11th Cir. 2003) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)).

---

[7] *See* Crawford List of Materials Considered, ECF No. 3319-3 at 45 (citing Stephen A. Fausti et al., *Auditory & Vestibular Dysfunction Associated with Blast-Related Traumatic Brain Injury*, 46:6 J. REHAB. RSCH. & DEV. 797-810 (2009) ("Fausti 2009")); Fausti 2009, ECF No. 3376-16 at 3 (describing how blast exposures can rupture tympanic membrane).

The same is true of Dr. Crawford's statement that "[h]earing loss is twice as prevalent in diabetics as it is in age-matched individuals without diabetes." *See* Crawford Rep., ECF No. 3319-3 at 27. As with many of the opinions set forth in Dr. Crawford's reports over the course of this litigation, this statement is not immediately followed by a citation to scientific literature demonstrating its veracity. *See id.* However, scientific support for the proposition is present on his List of Materials Considered.[8] Consequently, this opinion is admissible under Rule 702 and *Daubert.*

### 7. Remaining Challenged Opinions

Plaintiffs challenge the following three additional opinions from Dr. Crawford, or the perceived implications of the opinions, as lacking a reliable basis: (1) his opinion that noise-induced hearing loss does not affect low frequencies on pure tone audiometry, *see* Crawford Rep., ECF No. 3319-3 at 14; (2) his opinion regarding what constitutes generally accepted test-retest variability for military screening and diagnostic audiograms, *see id.* at 16; and (3) based on Dr. Crawford's explanations of Forms DD2215 and DD2216, *see id.* at 16-18, any implication that the forms reliably identify the type of hearing protector issued or used by a plaintiff.

---

[8] *See id.* at 46 (citing Jack Katz et al., HANDBOOK OF CLINICAL AUDIOLOGY (Wolters Kluwer Health 7th ed. 2015) ("Katz 2015")); Barbara E. Weinstein, *Hearing Loss in the Elderly: A New Look at an Old Problem*, *in* Katz 2015 at 631 (discussing comparative incidence of hearing loss in diabetics and nondiabetics), ECF No. 3376-9 at 6.

The first of those opinions (frequencies typically affected by hearing loss) has at least some support in the scientific literature,[9] and the others (test-retest variability, DD2215/DD2216) are adequately premised on Dr. Crawford's specialized knowledge and decades of experience as an otologist and neurotologist, and informed by his roles with the Army Hearing Conservation Program and the DoD Hearing Center for Excellence.[10]  Legitimate scientific debates about the merits of these opinions, *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999) (citing *Daubert*, 509 U.S. at 596), or factual disagreements about their implications, *see Viterbo v. Dow Chem. Co*., 826 F.2d 420, 422 (5th Cir. 1987), are for a jury to decide.

## B.    Jennifer LaBorde, Au.D.

Dr. Jennifer LaBorde is a clinical audiologist and Director of Audiology Services at the Medical Center Clinic in Pensacola, Florida.  Dr. LaBorde offers general opinions describing the nature, etiology, diagnosis, treatment/management,

---

[9] *See* Humes 2006, ECF No. 3376-3 at 41 ("[A] hallmark of noise-induced hearing loss is the appearance of a hearing loss for high frequency sounds, with the worse hearing thresholds typically occurring at frequencies of 3000-6000 Hz.  Frequently, hearing is normal or near normal at lower frequencies[.]").

[10]   It is noteworthy that Dr. Crawford has issued at least five general reports to date, and testified in numerous bellwether trials, without ever offering many of the opinions discussed in this Order.  While the Court has decided to allow the new general opinions in Waves 1 and 2 given the parties' stipulation on the issue, the Court has rejected that stipulation and prohibited new general experts and new general opinions by previously disclosed experts, for future Waves as contrary to the primary purposes of multidistrict litigation—the just, efficient, and economical resolution of common questions of fact and law.  *See* Order, ECF No. 3470.

effects and prevention of various auditory conditions.  Plaintiffs argue for exclusion of two of her general opinions.

First, Plaintiffs challenge Dr. LaBorde's "unsupported" opinions that "noise-induced tinnitus is not likely to occur in the absence of noise-induced hearing loss," *see* LaBorde Rep., ECF No. 3319-19 at 16, and that tinnitus is "not indicative or predictive of more severe, permanent injuries to the auditory system," *see id*. at 22. Dr. LaBorde did not offer any scientific authority for those opinions, and the scientific literature cited in Defendant's briefing does not go so far as to state that tinnitus and hearing loss must—or even usually—occur simultaneously.[11] Consequently, Dr. LaBorde's broad conclusion about the nature of any relationship between tinnitus and hearing loss can only be viewed as drawn from observations made over the course of her "23 years of clinical experience treating over 12,000 patients for hearing loss and tinnitus."  *See* Def. Brief, ECF No. 3375 at 16-17.  As with Dr. Crawford, this is an adequate basis for her opinions, but it limits the scope of her testimony at trial.  She may discuss her personal observations while treating patients with tinnitus and hearing loss, but she must not generalize those opinions

---

[11] *See* Piers Dawes et al., *Natural history of tinnitus in adults: a cross-sectional and longitudinal analysis*, BMJ OPEN (2020), ECF No. 3376-18 at 8 ("Poorer hearing . . . was associated with the presence of tinnitus [in this cross-sectional study]"); id. at 8-9 ("Noise exposure is the primary modifiable risk factor for tinnitus and the pathophysiological impact can be either cochlear hair cell dysfunction, leading to subjective hearing loss, and/or cochlear synaptopathy, the effects of which are more subtle."); Humes 2006, ECF No. 3376-3 at 137 ("[Tinnitus] is associated with many conditions, including noise exposure and noise-induced hearing loss" and "[i]t is not always possible to identify a precipitating cause of tinnitus.").

beyond her own patient population.  To the extent certain of Dr. LaBorde's previous testimony can be viewed as somewhat inconsistent with her current opinions, that is a matter affecting the weight and credibility of her opinions, not their admissibility.[12] *See Gonzalez v. Inman Trucking, Inc.*, No. 3:19cv006, 2017 WL 7905499, at *5 (W.D. Tex. June 20, 2017) ("The fact that [an expert] arguably contradicted himself during his deposition testimony does not bear upon the admissibility of his testimony, but upon his credibility, which is a jury determination."); *Exim Brickell LLC v. Bariven*, No. 1:09cv20915, 2011 WL 13131317, at *5 (S.D. Fla. Mar. 11, 2011) (same with respect to arguable "contradictions and concessions" in deposition transcript and written reports).

Second, Plaintiffs seek exclusion of Dr. LaBorde's opinions regarding the cause of blast-induced auditory dysfunction.  More specifically, in her report, Dr. LaBorde opines that blasts and explosions do not cause tinnitus, hearing loss, and/or difficulty understanding speech by injuring peripheral auditory system structures, like the cochlea.  Rather, in her opinion, blast-induced auditory dysfunction is "produce[d]" only by air pressure waves or direct blows to the head that injure the brain, disrupting neural connections and damaging blood vessels, which impedes the brain from detecting and processing incoming auditory signals.  Plaintiffs argue this

---

[12] *See, e.g.*, LaBorde Trial Testimony in *Kelley*, ECF No. 3319-20 at 4 ("Tinnitus and other symptoms can give you indication that something is happening in the auditory system before permanent hearing loss.").

opinion is not supported by the literature cited in Dr. LaBorde's report. The Court agrees, in part.

The problem with the blast exposure opinions set forth in Dr. LaBorde's report is that they misrepresent the scientific literature on the etiology of blast-induced auditory dysfunction. None of the research cited by Dr. LaBorde (or Defendant, in its briefing) states that in blast "scenario[s], it is not noise injuring the cochlea, but rather pressure or force injuring the brain, that produces the associated tinnitus, hearing, and/or difficulty understanding speech." *See* LaBorde Rep., ECF No. 3319-19 at 19-20. To the contrary, the literature reflects—and Dr. LaBorde conceded under questioning at her deposition—that blasts have the potential to cause auditory dysfunction via multiple mechanisms, *including* noise-induced damage to hair cells, synapses and the cochlea.[13] Dr. LaBorde may not suggest otherwise at trial. Additionally, Dr. LaBorde's general opinions regarding blast-induced auditory dysfunction are only admissible in cases where a case-specific diagnostician has

---

[13] *See, e.g.*, Antony R. Joseph et al., *Clinical audiometric patterns of hearing loss following blast-related injury in U.S. military personnel*, INT'L J. AUDIOLOGY (2020), ECF No. 3319-25 at 2 ("Blast impulse noise…has been described as mechanically and metabolically injurious to the auditory system" and "available studies have reported a variety of associated hearing loss patterns."); Frederick J. Gallun et al*., Implications of blast exposure for central auditory function: A review*, 49(7) J. REHAB. RSCH. & DEV. 1059-74 (2012), *cited in* LaBorde Rep., ECF No. 3319-19 at 27 ("Auditory system functions, from peripheral sensitivity to central processing capacities, are all at risk from a blast event."); Fausti 2009, ECF No. 3376-16 at 3-44 ("The blast wave and ensuing noise exposure cause structural damage to the inner and outer hair cells," and synapses, which can result in temporary or permanent hearing loss and/or tinnitus); *id*. at 2 ("Impairment due to blast can include peripheral hearing loss, central auditory processing deficits, vestibular impairment, and tinnitus.").

reliably ruled in blast exposure and/or head trauma as a potential cause of the plaintiff's symptoms.  Absent that, her general blast exposure opinions are excluded as speculative, irrelevant, unhelpful, unfairly prejudicial, confusing and misleading.

## C.    Karthik Rajasekaran, M.D., FACS

Dr. Karthik Rajasekaran is a board-certified otolaryngologist and Assistant Professor of Otorhinolaryngology Head and Neck Surgery at the University of Pennsylvania, Perelman School of Medicine.   Dr. Rajasekaran offers general opinions regarding sound and hearing, and the causes, diagnosis, and treatment of hearing loss and tinnitus.  Plaintiffs challenge various aspects of Dr. Rajasekaran's opinions on qualifications, reliability, helpfulness, and/or 403 grounds, and/or as directly conflicting with this Court's prior rulings.

### 1.    Opinions Outside Rajasekaran's Report

Plaintiffs first request that Dr. Rajasekaran be precluded from offering any opinions not disclosed in his general expert report, including opinions concerning the CAEv2, safer alternative designs, 3M's conduct, military fault, military hearing conservation programs, damages, or individual Wave plaintiffs.  The request is granted as to the aforementioned specific topics, as they are not referenced in Dr. Rajasekaran's report and he expressly conceded that he lacks the requisite knowledge or expertise to opine about most of them.  Beyond that, the Court does not find it appropriate to narrowly define the scope of Dr. Rajasekaran's testimony

regarding his properly disclosed opinions on hearing loss and tinnitus at this time. The trial judge will determine whether particular trial testimony falls within the scope of Dr. Rajasekaran's expert disclosures. *See* Fed. R. Civ. P. 37(c)(1).

### 2. Hearing Protectors & Diagnosing the Cause of Hearing Loss and Tinnitus

At his deposition, Dr. Rajasekaran testified that he is "certainly not an expert" in "hearing protection devices" and that diagnosing the cause of hearing loss or tinnitus is similarly "not really [his] area of expertise." *See* Rajasekaran Dep., ECF No. 3319-29 at 6, 15. Plaintiffs argue this testimony demonstrates Dr. Rajasekaran is unqualified to offer opinions concerning hearing protectors, including those related to fit and seal, or to generally discuss the various causes of hearing loss and tinnitus. The Court disagrees, in part. The fact that Dr. Rajasekaran does not routinely ascertain the cause of a patient's hearing loss and/or tinnitus in the course of diagnosing and treating those conditions does not diminish his capacity to qualifiedly offer general causation opinions about hearing loss and tinnitus based on his specialized training and experience in the field of otolaryngology. Dr. Rajasekaran's background also adequately equips him to opine on the importance of wearing hearing protection around noise exposures, including testimony about hearing protectors with which he is familiar and/or has recommended to patients, from a clinician's perspective. He may not, however, offer opinions about the efficacy of the CAEv2 because he admittedly knows nothing about it, *see id.* at 8,

and he may not evaluate or discuss potential safer alternative designs for the same reason, *see id*. at 18-19.  So limited, Dr. Rajasekaran's general causation and hearing protector opinions are within his expertise.

### 3.    Cochlear Synaptopathy, Hidden Hearing Loss, and Otoacoustic Emissions

Plaintiffs move to exclude Dr. Rajasekaran's opinions regarding cochlear synaptopathy, hidden hearing loss ("HHL"), and otoacoustic emissions ("OAEs") as unreliable, unhelpful, and misleading because he has never diagnosed a patient with HHL, he was unfamiliar with cochlear synaptopathy and HHL before this litigation, and, in their view, he offers only *ipse dixit* as the basis for rejecting OAEs as a measure of auditory injury.  These arguments fail.  While Dr. Rajasekaran may not be the foremost authority on cochlear synaptopathy or HHL, his specialized education and experience enable him to review, analyze, and offer expert opinions describing the existing scientific literature on those issues.  *See, e.g*., *Trilink Saw Chain, LLC v. Blount, Inc*., 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008) ("[A]n expert with the education or background to permit him to analyze a given set of circumstances ... can through reading, calculations, and reasoning from known scientific principles make himself very much an expert [regarding a] particular product even though he has not had actual experience with the product.").

As for OAEs, scientific literature cited in Dr. Rajasekaran's report supports his general testimony that OAE testing is commonly used with patients who are

difficult to test with conventional audiometry, such as infants or developmentally delayed populations. However, he offered no scientific authority or support for his additional opinions describing perceived limitations of OAE testing.[14] This shortcoming limits the scope of his testimony regarding OAEs at trial. Given Dr. Rajasekaran's clinical experience, he may discuss the utility of OAE testing only in terms of his personal observations while treating patients. He must not generalize those opinions beyond his own patient population.

### 4.    Tobacco, Alcohol, and Substances in Fuel

Dr. Rajasekaran offers opinions that tobacco, heavy alcohol consumption, and certain chemical solvents in gasoline and diesel fuel (*i.e.*, benzene, toluene, and xylene) can cause hearing impairment and/or tinnitus. *See* Rajasekaran Rep., ECF No. 3319-28 at 9. Plaintiffs argue those opinions should be excluded as unreliable, unhelpful, and violative of Rule 403. Regarding tobacco and alcohol, the Court agrees. As the Court has previously found, and incorporates by reference here, despite ample opportunity to do so, Defendant has presented no scientifically reliable evidence  in this litigation—including in connection with the instant briefing— establishing a causal relationship between tobacco use, alcohol consumption, and

---

[14] *See* Rajasekaran Rep., ECF No. 3319-28 at 20 ("OAE tests are not considered to be hearing tests that can help determine hearing loss like traditional audiograms; they also cannot definitively indicate whether auditory injury is present. Moreover, OAE testing is difficult to perform without interference from external noise and movement. There are many possible causes of reduced or absent OAEs and OAE testing alone cannot diagnose hearing loss.").

auditory dysfunction. *See, e.g.*, *In re 3M*, 3:19md2885, ECF No. 2218 at 34-35; *id.*, ECF No. 137.    Correlations and associations, without more, are not enough. *See*, *e.g.*, *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, n.16 (11th Cir. 1999) ("[S]howing *association* is far removed from proving *causation*."); *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1307 (N.D. Fla. 2018) (discussing the "well-established" Bradford Hill analysis that guides a scientific inquiry into whether an observed association represents a "true cause-effect relationship").  Consequently, Dr. Rajasekaran's tobacco and alcohol use opinions are excluded on reliability, helpfulness, and 403 grounds.

Regarding chemical solvents, Dr. Rajasekaran's opinions are admissible, in part, in appropriate cases.  More specifically, he may not offer opinions in any case about the ototoxicity of unspecified chemical solvents or gasoline/diesel fuel generally, as those sorts of overly broad generalizations are unreliable, unhelpful, and unduly prejudicial. *See, e.g.*, *Beal*, 7:20cv006, ECF No. 130 at 9.  However, to the extent a case-specific diagnostician reliably rules in benzene, toluene, or xylene as a potential cause of a plaintiff's hearing loss, Dr. Rajasekaran's general expert testimony about the ototoxicity of those specific chemical solvents will be admissible to provide relevant context and/or insights in that plaintiff's case.

### 5.    Medications

Dr. Rajasekaran also offers general opinions that certain medications (aminoglycosides, vancomycin, chemotherapy drugs like cisplatin, loop diuretics, NSAIDs, and salicylates) can cause hearing loss and/or tinnitus.   Because Dr. Rajasekaran cited no scientific authority in support of these opinions, Plaintiffs argue they must be excluded as lacking a reliable basis.  The Court agrees, in part.

Again, despite ample opportunity to do so, Defendant has submitted no scientifically reliable evidence previously in this litigation establishing a causal relationship between auditory dysfunction and salicylates or vancomycin, *see generally id.*, and none was presented in connection with Dr. Rajasekaran's general report.   Consequently, Dr. Rajasekaran's opinions regarding the ototoxicity of salicylates, vancomycin, and/or other unspecified medications, are excluded on reliability and 403 grounds.

Scientifically reliable evidence previously was presented establishing the potential cochleotoxicity of aminoglycosides, naproxen (NSAID), and alkylating platinum-based antineoplastics (such as cisplatin).  *See* ECF No. 1330 at 5.  The reversible cochleotoxicity of loop diuretics and NSAIDS other than naproxen has also been shown to be reliable and thus has been admissible in certain cases.  *See id.* at 6 (finding evidence regarding reversible cochleotoxic medications relevant in "limited instances" where a plaintiff's use of those medications coincided with his

hearing loss or tinnitus diagnosis, and the plaintiff continues to use the medications today). Accordingly, the admissibility of Dr. Rajasekaran's general opinions regarding those specific medications will depend on the case-specific causation opinions offered for a particular plaintiff. To the extent a case-specific diagnostician reliably rules in aminoglycosides, naproxen, or alkylating platinum-based antineoplastics as a potential cause of a plaintiff's auditory symptoms, Dr. Rajasekaran's general testimony about those medications will be admissible to provide relevant context and/or insights in that plaintiff's case. The same is true for reliable case-specific opinions ruling in loop diuretics or NSAIDs other than naproxen, assuming a showing is made that the plaintiff's use of the medication coincided with his or her hearing loss/tinnitus diagnosis and he or she continues to use the medication today. *See id*. However, where no case-specific expert has reliably ruled in one of these medications as a potential cause of the plaintiff's auditory dysfunction, Dr. Rajasekaran's opinions regarding the medications must be excluded as irrelevant, unhelpful, unfairly prejudicial, confusing, and misleading." *See* ECF No. 2934 at 7 (excluding evidence or argument as to somatic tinnitus where no case-specific expert reliably ruled in the condition as a potential cause of the plaintiff's auditory symptoms).

6.      No Known Causes of Tinnitus

Plaintiffs seek exclusion of any opinion by Dr. Rajasekaran that there are no known causes of tinnitus as lacking a reliable scientific methodology or basis, conflicting with other defense experts' opinions, unhelpful, confusing and misleading.  This request is denied.  While Dr. Rajasekaran observed in his report that "the exact cause [of tinnitus] is unknown," and that its "mechanism of action" is not well-understood, these are fairly well-established and uncontroversial scientific propositions. *See generally* HHL Order, ECF No. 1933.  Dr. Rajasekaran's report also acknowledges and discusses a number of potential causes of tinnitus, including noise.  *See* Rajasekaran Rep., ECF No. 3319-28 at 20-23.  Alleged weaknesses in his general opinions about the cause of tinnitus may be properly addressed through cross-examination and competing expert testimony. *See Quiet Tech.*, 326 F.3d at 1345.

D.      M. Charles Liberman, Ph.D.

Dr. Charles Liberman is a Professor of Otolaryngology and Vice Chair for Basic Research in the Department of Otolaryngology at the Massachusetts Eye and Ear Infirmary, as well as Director of the Eaton-Peabody Laboratories.  Dr. Liberman offers general opinions discussing the "normal structure and function of the peripheral auditory system," the "important structural changes underlying" certain types of auditory dysfunction, various measures of cochlear function, and the

phenomenon of hidden hearing loss ("HHL").  *See* Liberman Rep., ECF No. 3319-37 at 5.  Plaintiffs challenge certain of Dr. Liberman's opinions on qualifications and methodological grounds.

Plaintiffs first argue that Dr. Liberman is not qualified to testify about the capacity of current diagnostic measures to establish whether a living human has HHL or age-accelerated hearing loss because he is not a physician or audiologist, and does not personally diagnose patients as part of his work.  This is incorrect.  Dr. Liberman has over 40 years of experience studying, publishing, and teaching courses on the structure and function of the peripheral auditory system in both animal models and humans.  Moreover, it is undisputed that through this work, he and his colleagues develop the audiological diagnostic tools used by physicians and other clinicians around the world.  *See* Liberman Dep., ECF No. 3319-36 at 5-6.  Perhaps most significantly for purposes of his general opinions here, Dr. Liberman is the "co-discoverer" of the pathophysiological changes—primary neural degeneration and cochlear synaptopathy—viewed by many in the scientific community as causes of HHL.  *See* Liberman Rep., ECF No. 3319-37 at 3.  Plaintiffs previously championed Dr. Liberman's published and peer-reviewed work in this area in arguing for the admissibility of HHL opinions in this litigation, and the Court relied heavily on that work in finding HHL opinions generally reliable and admissible in appropriate cases.  *See* HHL Order, ECF No. 1933.  Notably, that same work provides in-depth analyses

of the limitations of various potential diagnostic measures for HHL.[15]  Given the breadth of Dr. Liberman's knowledge and experience studying the potential causes, functional impacts, diagnostic tools, and treatments for HHL, he is imminently qualified to offer general opinions on those issues.[16]

Somewhat relatedly, Plaintiffs also challenge Dr. Liberman's opinion that "no single test or combination of objective tests" can "definitively diagnose" HHL in the living on grounds that it imposes a higher standard for diagnosis—in essence, absolute certainty—than medical professionals routinely employ when treating patients. *See* Pl. Motion, ECF No. 3319 at 31-32.  This challenge fails.  Dr. Liberman's "opinion" is merely a statement of undisputed fact about the current state of the scientific landscape with respect to HHL diagnoses.  While the Court has determined from the scientific literature that "there are established diagnostic techniques" that may reliably support a HHL diagnosis in this litigation, all of those techniques have limitations, including the inability to definitively diagnose cochlear synaptopathy and/or primary neural degeneration.  *See* HHL Order, ECF No. 1933 at 11-13.  It is entirely proper for Dr. Liberman to offer rebuttal opinions discussing

---

[15] *See, e.g.*, M. Charles Liberman et al., *Toward a Differential Diagnosis of Hidden Hearing Loss in Humans*, PLoS ONE 11(9):e0162726 (2016), ECF No. 1902-23; *see also* Sharon G. Kujawa & M. Charles Liberman, *Translating animal models to human therapeutics in noise-induced and age-related hearing loss*, 377 HEARING RSCH. 44-52 (2019).

[16] No case-specific diagnoses will be permitted, of course, because Dr. Liberman is not a medical doctor or audiologist.

those limitations in cases involving a reliable case-specific diagnostic opinion of HHL by a Plaintiffs' expert. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the…appropriate means of" exposing any alleged shortcomings in Dr. Liberman's opinion. *See Daubert*, 509 U.S. at 596.

Last, Plaintiffs argue for exclusion of any testimony by Dr. Liberman about TBI and ototoxicity because he has no expertise in either area. This request is granted. Dr. Liberman concededly does not have the requisite training or experience to offer expert testimony about potential interrelations between TBIs and auditory dysfunction, and he did not disclose any opinions about ototoxicity in his expert report. *See* Liberman Dep., ECF No. 3319-36 at 28-29, 32-33.

## E.     John Bertelson, M.D.

Dr. John Bertelson is a board-certified neurologist and professor at Texas Tech University School of Medicine and the University of Texas-Austin Dell Medical School, with nearly 20 years of clinical experience diagnosing and treating neurologic disorders in adults. Dr. Bertelson offers general opinions regarding the classifications, epidemiology, diagnosis, symptoms, functional impacts, and treatment of TBI. Plaintiffs challenge various aspects of Dr. Bertelson's opinions on qualifications, reliability, and helpfulness grounds.

As to Dr. Bertelson's qualifications, Plaintiffs argue that he lacks the knowledge, training, and experience to offer opinions diagnosing the cause of hearing loss or tinnitus, even as they relate to TBI, or to opine about PTSD.  The Court agrees, in part.  Because Dr. Bertelson has no background or clinical experience with otology, audiology or PTSD, he is not qualified to offer opinions discussing the nature, prevalence, etiology of auditory dysfunction and/or PTSD as a general matter, or on any interrelation between the two, *see* Bertelson Rep., ECF No. 3319-38 at 9-10, and he may not diagnose the cause of a plaintiff's hearing loss, tinnitus, or PTSD.  However, his specialized education in neurology, and decades of experience diagnosing and managing TBI patients, amply qualifies him to describe the "[s]ymptoms commonly seen following" TBI, which may include hearing loss and/or tinnitus, *see id*. at 8, and to review and testify about the published literature on the intersection between TBI, auditory symptoms, and military blast events.  The fact that Dr. Bertelson never personally served in the military and has not routinely treated current or former servicemembers does not detract from his qualifications to opine on TBIs in the military blast context, so long as his opinions are limited to the pathophysiological mechanisms underlying TBI-induced auditory symptoms and he

does not attempt to speak with personal knowledge or authority on the military experience.[17]

As to the reliability and helpfulness challenges, the Court finds them largely resolved by the exclusion of Dr. Bertelson's non-TBI-related opinions on qualifications grounds. Dr. Bertelson permissibly drew on his extensive and specialized knowledge and experience in the field of neurology, together with the scientific literature, in reaching opinions about TBIs in the military context. *See Jones v. Novartis Pharms. Corp.*, 235 F. Supp. 3d 1244, 1256 (N.D. Ala. 2017) ("Experts are permitted to draw conclusions from a set of observations that are based on their extensive and specialized experience."). To the extent certain of Dr. Bertelson's TBI opinions may be viewed as somewhat inconsistent, or their bases and sources have arguable weaknesses, those are matters affecting the weight and credibility of his TBI opinions, not their admissibility. *See In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 372 (M.D. Fla. 2018) ("If [d]efendants believe that the basis for [the expert's] opinions is insufficient, they can explore that with [the expert] on cross examination and argument for the benefit of the trier of fact."); *Gonzalez*, 2017 WL 7905499, at *5 ("The fact that [an expert] arguably contradicted

---

[17] So, for example, he is unqualified to offer his proposed opinions discussing other "pathophysiological mechanisms, common in the blast-injured population, which likely account for tinnitus[,]" such as noise trauma, barotrauma, neck trauma and PTSD. *See* Bertelson Rep., ECF No. 3319-38 at 9-10.

himself during his deposition testimony does not bear upon the admissibility of his testimony, but upon his credibility, which is a jury determination."); *Exim Brickell*, 2011 WL 13131317, at *5 (same with respect to arguable "contradictions and concessions" in deposition transcript and written reports).

## F.    W. Winn Chatham, M.D.

Dr. Winn Chatham is a clinical immunologist/rheumatologist and Professor of Medicine at the University of Alabama.  He offers general opinions regarding hearing loss caused by autoimmune disorders.  Plaintiffs seek exclusion of Dr. Chatham's opinions as irrelevant and unhelpful in cases where no case-specific diagnostician has reliably ruled in an autoimmune condition as a potential cause of the plaintiff's hearing loss and/or tinnitus.  The Court agrees that the admissibility of Dr. Chatham's autoimmune disorder opinions will depend on their helpfulness and fit in the context of a particular case.  In cases where a diagnostician has reliably ruled in a particular autoimmune disorder as a potential cause of the plaintiff's auditory symptoms, Dr. Chatham's general opinions regarding that precise disorder may be admissible to provide relevant context and/or insights in the case.  However, in the absence of a reliable case-specific diagnostic opinion (ruling in and/or ruling out) as to a particular autoimmune disorder, Dr. Chatham's general opinions must be excluded as irrelevant, unhelpful, unfairly prejudicial, confusing, and misleading. *See* ECF No. 2898 at 7-8 (excluding "vague and sweeping references to the 'wide

variety' of systemic autoimmune conditions" not implicated in the plaintiff's case); ECF No. 2218 at 21-22 (same regarding otolaryngologist/neurotologist's general hidden hearing loss opinions).

## G.    Kenneth Billheimer, Au.D. & Jennifer Tufts, Ph.D.

Dr. Kenneth Billheimer is an audiologist and former military hearing conservation officer during the years 1978 to 1988. Dr. Jennifer Tufts is a licensed audiologist and a professor in the Department of Speech, Language and Hearing Sciences at the University of Connecticut. Both doctors offer general opinions evaluating the performance of the CAEv2 based on various tests performed by third-party laboratories, including the military, and Dr. Tufts also considered Aearo's internal testing. Plaintiffs argue that the doctors are unqualified to opine about ANSI testing, and that their opinions are unreliable and unhelpful because they are based on cherry-picked data, lack critical analysis, and/or ignore the real-world performance of the CAEv2.[18]

Regarding qualifications, the Court disagrees, subject to the limitations applicable to other audiologists who have offered expert opinions in this litigation. Dr. Billheimer has decades of clinical experience in the field of audiology and has

---

[18] Plaintiffs also seek exclusion of Dr. Tufts' opinions because she "agreed to support 3M years before reviewing any documents" regarding the CAEv2 and only ever considered materials curated and supplied by defense counsel. *See* Pl. Motion, ECF No. 3319 at 50. Criticisms of this nature may impact Dr. Tufts' credibility and/or the weight to be accorded her opinions, but they do not reflect a reliability or helpfulness basis for exclusion under Rule 702 and *Daubert*.

personally performed more than 500 REAT tests, albeit not to ANSI labeling standards. Dr. Tufts does not have a doctorate degree in audiology and has not practiced clinical audiology in many years; however, she has engaged in academic research involving hearing protection devices for 16 years, and in that work, she uses REAT tests and "related techniques to study issues related to fitting and evaluating hearing protectors and in the development of hearing protector fit-testing systems." *See* Tufts Rep., ECF No. 3319-48 at 3. Based on this specialized knowledge and experience, both doctors are at least "minimally qualified" to opine on the REAT testing for the CAEv2 from a clinician's perspective. *See Trilink*, 583 F. Supp. 2d at 1304. To be clear, neither has the requisite education or professional experience to offer opinions on the EPA's regulatory labeling requirements or the adequacy of the CAEv2's label or warnings under the Noise Control Act. *See, e.g.*, Tufts Dep., ECF No. 3319-49 at 25 (discussing her "understanding" that earplugs sold to the military are "except[ed]" from the NRR labeling requirements). But so long as the doctors "stay within the reasonable confines of" their experience-based expertise with REAT testing, they may offer opinions about the results of REAT testing on the CAEv2. *See, e.g.*, *In re 3M*, No. 3:19md2885, ECF No. 1680 at 103-11.

Plaintiffs' general reliability and helpfulness challenges—*i.e.*, cherry-picking data, inconsiderable analysis, and/or assigning little or no weight to certain information—require little explication. Dr. Billheimer reviewed a substantial body

of third-party REAT and impulse testing on the CAEv2.  Dr. Tufts reviewed the same materials, as well as Aearo's internal testing and third-party field studies of the CAEv2.  In their reports and deposition testimony, both doctors clearly explained how the testing supported their conclusions that the CAEv2 "perform[ed] as expected."  *See, e.g.*, Billheimer Rep., ECF No. 3319-41 at 16; Tufts Rep., ECF No. 3319-48 at 21 ("The [test] results…consistently show that both ends of the CAEv2 function properly and as expected to protect hearing.").  To the extent Plaintiffs believe either doctor should have considered additional materials or assigned greater weight to particular data points, those perceived methodological weaknesses may be addressed on cross examination or with a competing expert witness, but are not grounds for exclusion of the opinions.  *See Quiet Tech.*, 326 F.3d at 1345 (quoting *Bazemore*, 478 U.S. at 400).

## H.    Richard Neitzel, Ph.D.

Dr. Richard Neitzel is an industrial hygienist and exposure scientist, and currently serves as a full professor, Associate Director of the Office of Global Public Health, and Associate Director of the Center for Occupational Health and Safety Engineering at the University of Michigan.  As relevant to the instant motion, Dr. Neitzel offers the following general opinions that Plaintiffs challenge on various grounds: (1) evaluating the performance of CAEv2 based on tests performed by

third-party laboratories, including the Michael & Associates, Inc.; and (2) explaining that certain substances—burn pits, medications, chemicals—can be ototoxic.

As to the former, Plaintiffs seek exclusion of Dr. Neitzel's proposed opinions regarding REAT testing performed by the Michael lab given the Court's previous exclusion of references to the Michael report for any purpose because of Defendants' repeated attempts to misuse the report in bellwether trials. *See* ECF No. 2244. Consistent with the Court's prior ruling on the admissibility of evidence regarding the Michael testing, which is incorporated by reference here, this request is granted.

Regarding burn pits, Dr. Neitzel's opinions are inadmissible. The Court has previously found, and now incorporates by reference here, that no scientifically reliable evidence has been presented in this litigation establishing a causal relationship between burn pit exposure and noise-induced sensorineural hearing loss and tinnitus. 3M had ample opportunity to do this. Because no new scientific evidence has been offered in connection with the instant briefing that would support reconsideration of the prior ruling, Dr. Neitzel's burn pit opinions are excluded on reliability, helpfulness, and 403 grounds.

As to ototoxic medications, Dr. Neitzel is unqualified to offer general expert opinions. While Dr. Neitzel has extensive training and professional experience in the field of occupational noise exposure, drug ototoxicity has arisen only tangentially in that work and only in the context of raising employers' general awareness that

workers' use of certain categories of medications may pose a "potential complicating factor" in preventing hearing loss in the industrial setting. *See* Neitzel Dep., EF No. 3319-51 at 9. Dr. Neitzel does not (and cannot) differentially diagnose drug-induced hearing loss, and has never studied or published on the issue. As a result, in his expert report and at his deposition, he speaks in overly broad and general terms about the complex and nuanced factors that affect a drug's ototoxicity both as a general proposition and at the individual level. For these reasons, Dr. Neitzel's general opinions regarding ototoxic medications/drugs are excluded.

Finally, the admissibility of Dr. Neitzel's general opinions regarding ototoxic industrial chemicals will depend on the case-specific opinions offered by medical and audiology professionals for a particular plaintiff. To the extent a case-specific diagnostician reliably rules in an industrial chemical as a potential cause of a plaintiff's hearing loss or tinnitus, and scientifically reliable evidence has been found to establish a causal relationship between exposure to that chemical and auditory dysfunction, Dr. Neitzel's general expert testimony about the chemical will be admissible to provide relevant context and/or insights in that plaintiff's case. *See, e.g.*, ECF No. 2218 at 21-22 (same regarding otolaryngologist/neurotologist's general hidden hearing loss opinions). However, Dr. Neitzel's chemical ototoxicity opinions must be excluded as unhelpful and misleading in cases where no case-

specific expert has reliably ruled in industrial chemicals as a potential cause of the plaintiff's auditory dysfunction.

## I.    SASRAC Opinions

Drs. Gregory A. Flamme, Mark R. Stephenson, Steve Tasko, and William Murphy of Stephenson and Stephenson Research and Consulting ("SASRAC") co-authored a general report in connection with the Wave 1 cases.[19]  Plaintiffs challenge several aspects of SASRAC's opinions, which the Court addresses in turn.

### 1.    Opinion 3:  The DoD determines the specifications for the hearing protectors it includes in the DoD hearing conservation program

SASRAC offers opinions that the DoD "is responsible" for identifying the noise hazards and hearing protection requirements of service members, and for selecting products that meet service members' needs, and that hearing protection manufacturers lack visibility into that process beyond the "salient characteristics" stated in a DoD product solicitation.  *See* SASRAC Rep., ECF No. 3319-52 at 84-85.  Plaintiffs argue that (1) the SASRAC witnesses lack the qualifications to offer opinions regarding DoD hearing protector procurement during the relevant time period or the legal duties imposed on manufacturers by law or contract; (2) the

---

[19] Drs. Flamme and Stephenson are audiologists, Dr. Tasko is a scientist specializing in acoustics and communications disorders, and Dr. Murphy is a physicist with a background in hearing sciences.  Plaintiffs do not challenge these experts' qualifications.

opinions are not supported by a reliable factual or methodological basis; and (3) the opinions are confusing and unhelpful.  The Court agrees, in part.

To begin with, none of the SASRAC witnesses are experts in the field of federal government procurement.   Thus, none of them may testify about the government procurement process generally or the specific procurement process for the CAEv2.  3M had ample opportunity during general expert discovery to retain a qualified expert to counter Admiral Leslie's government procurement opinions but did not.  SASRAC is wholly unqualified to fill that void.  Moreover, consistent with the applicable law regarding the proper scope of expert testimony, *see, e.g.*, *In re 3M*, 3:19md2885, ECF No. 1680 at 114-120 (discussing admissibility of so-called "attorney mouthpiece" testimony), which is incorporated by reference here, none of the SASRAC witnesses may offer opinions about the military's alleged duties with respect to the CAEv2, the reasonableness or feasibility of any provision in the MPID for the CAEv2, who was responsible for a particular provision of the MPID, or whether Defendants or the CAEv2 "complied with" or "satisfied" the MPID.

The SASRAC witnesses are also precluded from testifying about 3M, the military, and/or Dr. Ohlin's state of mind (e.g., what they believed, intended, knew, should have known, wanted to know, or did not know about various propositions). All such testimony amounts to improper legal opinions, is beyond the scope of the SASRAC witnesses' expertise, and/or is unhelpful.  With that said, Dr. Stephenson

may discuss the military's standards and procedures for testing hearing protectors, and for instructing and training servicemembers on proper fit and use, while he served, based on his extensive involvement in those matters during his service. The other SASRAC witnesses may not. Moreover, neither Dr. Stephenson, nor any other expert, will be allowed to testify that any failure by the DoD with respect to the specifications, standards, procedures, and/or training on the CAEv2 caused or contributed to a plaintiff's alleged injuries.

**2.      Opinion 7:  There is no scientific basis upon which to determine a hearing protector's role in preventing tinnitus or other auditory outcomes beyond hearing sensitivity measured using the audiogram**

SASRAC's Opinion 7 is admissible in part and inadmissible in part. The plaintiffs' general experts offer opinions that the CAEv2 caused or contributed to certain individual plaintiff's tinnitus and other auditory injuries not measurable on an audiogram (i.e., hidden hearing loss). *See generally* Order, ECF No. 1933 (hidden hearing loss). In an appropriate case, *see id.* at 10-15, (standard for admissibility of hidden hearing loss opinions), SASRAC may rebut expert testimony of that nature with its opinion that there is no existing method for definitively determining a hearing protector's role, if any, in the development of tinnitus and/or other forms of hidden hearing loss. *See* SASRAC Rep., ECF No. 3319-52 at 120-22. However, SASRAC's list of "risk factors" that "can have strong relationships with tinnitus" and otherwise "hidden" auditory system dysfunction is inadmissible,

in part. *See id*. at 120-21. "Higher Service-Connected VA disability rating" as a "risk factor" is excluded because references to VA compensation and pension ratings and materials are generally inadmissible in this MDL, consistent with the Court's prior rulings on this issue, which are incorporated by reference. *See, e.g.*, *Montero*, 7:20cv067, ECF No. 78 at 2. Moreover, the Court has previously found that no scientifically reliable evidence has been presented in this litigation establishing a causal relationship between certain of SASRAC's listed factors and tinnitus/auditory dysfunction (although Defendant had ample opportunity to do so); therefore, those factors—burn pit exposure, fuels/JP-8, smoking, anxiety or depression—are excluded on reliability, helpfulness, and 403 grounds. Other factors—blast exposure, head injuries/TBI/concussion, neck injuries, medications—will only be relevant and admissible in cases where a case-specific expert has differentially diagnosed them as potential causes of a plaintiff's hearing loss or tinnitus; absent that, testimony regarding those factors is excluded on helpfulness and 403 grounds. The remaining factors—male gender, military service, military deployments, dizziness, and reduced sleep—have been (in prior cases) and may continue to be reliably discussed in terms of their potential impacts on the nature and/or perception of a plaintiff's tinnitus and auditory dysfunction, although SASRAC may not characterize the relationship(s) as causal.

### 3.      Burn pits/JP-8

As the Court has previously found, and incorporates by reference here, no scientifically reliable evidence has been presented in this litigation establishing a causal relationship between burn pit/JP-8 exposure and noise-induced sensorineural hearing loss and tinnitus (despite ample opportunity to do so).  Because Defendants have not offered any new scientific evidence that would support reconsideration of the prior ruling, SASRAC's burn pit/JP-8 opinions are excluded on reliability, helpfulness, and 403 grounds.

### 4.      Opinion 7:  Tobacco use

SASRAC identifies smoking as a "risk factor[] for tinnitus and auditory system dysfunction."  *See* SASRAC Rep., ECF No. 3319-52 at 120-21.  As the Court has previously found, and incorporates by reference here, no scientifically reliable evidence has been presented in this litigation—including in connection with the instant briefing—establishing a causal relationship between tobacco use and tinnitus or auditory system dysfunction.  *See, e.g.*, *In re 3M*, 3:19md2885, ECF No. 2218 at 34-35; *id.*, ECF No. 137.  Therefore, SASRAC's tobacco use opinions are excluded on reliability, helpfulness, and 403 grounds.

### 5.      Opinion 13:  Lack of effective quiet

As in the bellwether cases, SASRAC opines that servicemembers' lack of access to quiet recovery periods between temporary threshold shifts caused by prior

noise exposure exacerbates the hazards posed by subsequent exposures to noise.  *See* SASRAC Rep., ECF No. 3319-52 at 149-50.  The Court has repeatedly found that SASRAC's so-called "effective quiet" opinion lacks a reliable scientific basis and now incorporates those rulings by reference in the Wave 1 cases.  *See, e.g.*, *In re 3M*, 3:19md2885, ECF No. 2218 at 38-39.  Because Defendants have not offered any new scientific evidence that would support reconsideration of the prior ruling, SASRAC's effective quiet opinions are excluded on reliability, helpfulness, and 403 grounds.

### 6.    Murphy's opinions

Dr. William Murphy is a physicist and acoustics engineer who previously served in hearing loss prevention-related roles at the National Institute for Occupational Safety and Health (NIOSH), but now is a Senior Scientist with SASRAC.  Plaintiffs argue that Dr. Murphy "intentionally hid the existence of highly relevant CAEv2 REAT test data" during discovery in this litigation and did not consider that data in forming his general opinions in Wave 1.  *See* Pl. Motion, ECF No. 3319 at 63.  For these reasons, Plaintiffs ask the Court to strike Dr. Murphy as a testifying witness, or alternatively, to strike all of his opinions concerning the efficacy of the CAEv2.  *See id*.

On consideration, the Court finds it appropriate to defer ruling on whether to strike Dr. Murphy's testimony.  The results of Dr. Murphy's prior REAT testing of

the CAEv2 bear directly on one of the most fundamental issues of disputed fact in this litigation—the effectiveness of the CAEv2—as well as the credibility of Dr. Murphy's current opinions. It would be highly and unfairly prejudicial for Dr. Murphy to be permitted to testify at a trial about his current views on the CAEv2's efficacy (in particular, the attenuation effectiveness of the green end) while Plaintiffs had or have no ability to explore (because they never knew the data even existed) and/or challenge those views by reference to potentially contradictory test materials from his prior REAT tests of the CAEv2. Dr. Murphy cannot avoid the implications of his own prior work by simply declining to consider it in connection with his opinions here.[20]

With that said, it is unclear whether Plaintiffs ever attempted to obtain Dr. Murphy's REAT test data/results from the government via the *Touhy* process. Presumably not, because Wave 1 discovery concluded before Dr. Murphy first disclosed the fact of the CAEv2 REAT testing, and the existence of test results/data, at his deposition on June 28, 2022.[21] Based on the evidentiary materials submitted with the instant briefing, the undersigned believes that it should not be difficult for the government to locate the relevant documents on receipt of an appropriate *Touhy*

---

[20] *See* Murphy Dep. (June 28, 2022), ECF No. 3319-62 at 41-42 (explaining that his prior REAT testing of the CAEv2 was "not information that [he] referred to in preparing for and trying to understand this case").

[21] Fact discovery concluded on April 1, 2022. Expert discovery concluded on June 27, 2022.

request.   Consequently, the undersigned will reopen discovery for the limited purpose of allowing Plaintiffs to pursue a *Touhy* request for documents related to Dr. Murphy's REAT testing of the CAEv2.   If the government produces the documents, then Plaintiffs will be permitted to redepose Dr. Murphy regarding the REAT testing and the newly produced documents.   If the government does not produce the documents for any reason and/or limits Dr. Murphy's testimony about the REAT testing he performed, then Plaintiffs should file a motion to compel to the extent they continue to seek the documents.   Dr. Murphy will be precluded from offering expert opinions on the CAEv2 at trials if the Plaintiffs ultimately do not receive the documents.

Plaintiffs must submit an appropriate *Touhy* request immediately, and provide biweekly status updates to the Court beginning on **November 7, 2022**.   Once the government produces the requested documents, Dr. Murphy's second deposition must occur within 21 days thereafter.   If the government responds to the *Touhy* request by stating that it cannot or will not produce the requested documents for any reason, Plaintiffs must immediately advise the Court.

## J.   E. Scott Elledge, M.D.

Dr. Scott Elledge is an otolaryngologist in private practice, who previously served as an otolaryngologist in the United States Army from 1991 to 1994.   He offers general "opinions about military conservation programs, their strengths and

weaknesses, and how they actually operate." *See* Elledge Rep., ECF No. 3319-64 at

3. Plaintiffs challenge Dr. Elledge's opinions on qualifications, reliability, and

helpfulness grounds.

As an initial matter, Dr. Elledge's report and deposition testimony necessitate

a clear directive that any opinions offered by him at trial are subject to the Court's

prior rulings on the admissibility of expert testimony regarding the Army's hearing

conservation efforts, which are incorporated by reference here. *See, e.g.*, *In re 3M*,

3:19md2885, ECF No. 2218. This means he may testify about the history, purpose,

intent, and implementation of the Army Hearing Program, including the tension

between combat readiness and hearing conservation, to the extent his testimony is

reliably based on his personal observations, experience with, and knowledge of the

program, as opposed to speculation or information relayed to him by others. *See id*.

at 2-3. However, his opinions regarding Army- or installation-wide success or

failure of hearing conservation efforts, and in particular, his generalizations about

most servicemembers often not wearing their hearing protection devices, lack a

reliable factual basis, are pure speculation, and thus are improper. *See id*. at 3, 16-

17.

Dr. Elledge's qualifications and the factual basis offered for his opinions also

limit the testimony he may provide in this context. He served as an otolaryngologist

in the Army from 1991 to 1994, and has practiced otolaryngology in the private

sector since that time, which, on first blush, would suggest he may have the requisite knowledge and experience with the Army Hearing program and applicable implementing regulations to provide expert testimony on those issues. However, unlike other experts for both sides with opinions regarding Army hearing conservation matters—for example, Dr. James Crawford and Dr. Mark Packer—Dr. Elledge never held a role at CHPPM or in the Army Hearing Conservation Program, never participated in the development of regulations or policy guidance related to hearing conservation, never performed servicemembers' annual audiograms or earplug fit/instruction, never evaluated earplugs for procurement or safety purposes, and has never systematically evaluated the implementation or efficacy of the Army hearing conservation program (or any civilian or industrial program) or formally studied the incidence of earplug use by soldiers in the field. Indeed, Dr. Elledge concedes that he is "not a hearing conservationist," *see* Elledge Dep., ECF No. 3319-65 at 16, that he left the Army before the regulations pertinent to this litigation were implemented, *see id*., ECF No. 3376-67 at 7-8, and that his opinions about Army hearing conservation efforts are largely based on anecdotal conversations with colleagues at various installations and personal observations and dialogue with audiologists implementing the program at Fort Bragg, while his opinions about Army-wide earplug use are based on his personal interviews of individual soldiers while diagnosing and treating them at Fort Bragg. Nowhere did he explain how

those anecdotal conversations and observations reliably inform and adequately support his Army-wide opinions here.  Consequently, those opinions are excluded, as are his purely speculative statements about what the military would or would not do with respect to procuring hearing protectors, relying on manufacturer testing and instructions, or "fail[ing] to conserve soldiers' hearing" as a general matter.  *See* Elledge Rep., ECF No. 3319-64 at 6.

As a practicing otolaryngologist and former military physician, Dr. Elledge may discuss the importance of training on and fitting of earplugs, and discuss the military's hearing related regulations and policy guidance from a clinical perspective, based on his review of those materials.  *See, e.g.*, ECF No. 1651 at 17 (same regarding otolaryngologist/neurotologist).  He may also testify to what particular servicemembers told him about their use of hearing protection to the extent it relates to diagnosis or treatment, but he cannot generalize that testimony to servicemembers he did not personally treat.[22]  *See id.*  Further, he may not speculate about what the military otolaryngologist or audiologist community knew or understood about various hearing conservation propositions.  Because Dr. Elledge is primarily drawing on his clinical knowledge and experience as the basis for his

---

[22] *See, e.g.*, Elledge Rep., ECF No. 3319-64 at 4 ("In my experience, soldiers at [Fort Bragg in the two years that Dr. Elledge served as Chief of Otolaryngology there] very rarely wore hearing protection while deployed, and almost never wore hearing protection when in combat or situations where maintaining situational awareness was essential.").

opinions, all testimony must "stay within the reasonable confines of" that experience-based expertise.  *See, e.g.*, ECF No. 1680 at 103-11.

## K.    Dennis Driscoll

Dennis Driscoll is a board-certified noise control engineer with more than 42 years of experience specializing in noise measurements, noise exposure assessments, noise control engineering, and hearing loss prevention for private industry.  Driscoll offers general opinions regarding best practices for civilian hearing conservation programs and hearing loss prevention, and recites a multitude of estimated nonmilitary noise levels and exposure durations (both occupational and recreational) "that pose a significant risk for" noise-induced hearing loss.  *See* Driscoll Rep., ECF No. 3376-70 at 32.  Plaintiffs argue that Driscoll's opinions should be excluded as unhelpful because they are untethered to any individual plaintiff's actual noise exposure and amount to nothing more than "parroting" of information from various literature and databases.  Pl. Motion, ECF No. 3319 at 75.  The Court disagrees, in part.  Driscoll's current report is very comprehensive, presumably to account for as many potential civilian noise levels and exposure durations as might naturally be anticipated to arise in the Wave 1 cases.  Not all of this data will be relevant or helpful in any one case, and much of it will be irrelevant, unhelpful, confusing, misleading, and a waste of time in most cases.  However, in cases where a case-specific diagnostician has ruled in and/or out a particular source of occupational or

recreational noise as a potential cause of a plaintiff's auditory symptoms, Driscoll may properly offer explanatory opinions and insights regarding the noise levels and exposure durations that are potentially hazardous to human hearing for a civilian noise source of that nature.   In doing so, he may not stray into testimony about the legion of civilian noise sources not at issue in the particular case or exceed the scope of analysis disclosed in his report.   So limited, Driscoll's general opinions will address matters "beyond the understanding and experience of the average lay person," *see United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985), and "fit" the disputed facts in a case, *see McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004).

## L.    Stan Phillips, M.D.

Dr. Stan Phillips is a clinical otolaryngologist with nearly 25 years of experience diagnosing and treating hearing loss and tinnitus.   His general opinions are directed primarily at the nature, incidence, diagnosis, and treatment of somatic tinnitus.   Plaintiffs ask that the admissibility of Dr. Phillips' somatic tinnitus opinions be limited to cases in which a case-specific diagnostician has reliably ruled in somatic tinnitus as a potential cause of the plaintiff's auditory symptoms.   This request is granted.   In such cases, Dr. Phillips' general testimony about somatic tinnitus will be admissible to provide relevant context and/or insights on the condition.   However, his somatic tinnitus opinions must be excluded as irrelevant,

unhelpful, unfairly prejudicial, confusing, and misleading in cases where no case-specific expert has reliably ruled in somatosensory neural sources as a potential cause of the plaintiff's tinnitus.  *See* ECF No. 2934 at 7 (excluding evidence or argument as to somatic tinnitus where no case-specific expert reliably ruled in the condition as a potential cause of the plaintiff's auditory symptoms).

## M.    Preservation Motions

At earlier stages of this litigation, the Court entered a series of orders resolving the parties' respective *Daubert* motions in the bellwether cases.[23]  A number of the previous rulings are broadly applicable to issues and experts in the Wave cases.  For preservation purposes only, both sides have now moved to incorporate certain of their respective *Daubert* motions and responses regarding those general issues and experts in the Wave 1 cases.[24]  *See* ECF Nos. 3320, 3321.

On consideration, the preservation motions are granted, the parties' respective arguments on the issues and experts identified in the preservation motions are preserved for purposes of the Wave 1 cases, and the Court's previous rulings on those matters are adopted and incorporated in the Wave 1 cases.

---

[23] *See In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19md2885, ECF Nos. 1651, 1680, 1690, 1701, 1780, 1910, 1933, 2202, 2218, 2232, 2290, 2845, 2860, 2898, & 2934; Beal, 7:20cv006, ECF No. 142.

[24] Consistent with the parties' stipulation regarding the filing of separate omnibus *Daubert* preservation motions for Wave 1, which both sides did, *see* ECF No. 3320, the preservation requests included in Plaintiffs' substantive *Daubert* motion are **DENIED AS MOOT**.

**N.     Conclusion**

Based on the foregoing, the parties' preservation motions, ECF Nos. 3320 & 3321, are **GRANTED** and Plaintiffs' omnibus motion to exclude expert testimony and opinions under Rule 702 and *Daubert*, ECF No. 3319, is **GRANTED IN PART**, **DENIED IN PART**, and **DEFERRED IN PART**, consistent with this Order.

**SO ORDERED**, on this 24th day of October, 2022.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**