# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to All Cases | Case No. 3:19md2885<br><br>Judge M. Casey Rodgers<br>Magistrate Judge Hope T. Cannon |

## ORDER

The past few months have been fairly tumultuous, both in the MDL and elsewhere, with CAEv2-related controversies now pending in this Court, in the Eleventh Circuit Court of Appeals, Seventh Circuit Court of Appeals, United States Bankruptcy Court for the Southern District of Indiana, and Minnesota state court. Nonetheless, in that time, thousands of plaintiffs—9,290 in total—have filed new cases against only 3M Company in the MDL.[1] More than 3,100 plaintiffs have newly transitioned to the MDL docket and paid the requisite filing fee. And four waves of individual MDL cases (totaling 2,000 plaintiffs) have continued with plaintiff-specific discovery in preparation for remand to their respective transferor courts for trial.[2] Of course, the current litigation posture follows on the heels of 16 bellwether trials and 19 verdicts that occurred between March 2021 and May 2022,

---

[1] There were 229,484 cases pending in the MDL as of October 25, 2022.

[2] Five hundred cases were initially assigned to each wave. Currently, there are 374 active cases in Wave 1, 362 active cases in Wave 2, 362 active cases in Wave 3, and 500 active cases in Wave 4.

which was preceded by extensive corporate and government discovery on common issues. Needless to say, incalculable time and resources have been and continue to be devoted to these endeavors by the parties, the special masters, and the federal judiciary.

Shortly after 3M's MDL co-defendants filed for bankruptcy in July 2022, 3M adopted a jarringly novel litigation stance—namely, that it "is not liable for the conduct of" its co-defendants (in particular, the Aearo entities) because, among other reasons, it is not a successor-in-interest to the co-defendants' alleged tort liability and it did not directly assume that liability when it acquired the Aearo entities. *See, e.g.*, *George v. 3M Co.*, 7:20cv71963, ECF No. 46 at 9-10. In other words, for the first time in the three-and-a-half year history of the MDL, 3M paradoxically claims that Aearo alone (now strategically steered into bankruptcy) is the bogeyman and 3M itself has neither independent nor successor liability for any alleged CAEv2-related injuries. The Wave 1 plaintiffs have collectively moved for summary judgment on 3M's "full and independent liability for [all] CAEv2-related injuries" based on judicial estoppel, collateral estoppel, waiver, and implied assumption of liability. *See* ECF No. 3506-1. That matter is now fully briefed and ripe for adjudication by the Court. Although the briefing was filed in the context of the Wave 1 cases, it presents liability issues common to all cases in the MDL, the resolution of which will affect how all of those cases may proceed. The Court will rule on the

matter promptly. However, given the broad import and impact of that decision, the Court also intends to *sua sponte* certify its decision for interlocutory appeal. While this will inject further delay into the litigation, and continued uncertainty about the claims and/or defenses, appellate review of the Court's decision—if desired by either side—needs to occur before thousands of cases are remanded to transferor courts around the country for trial.

To conserve the parties' and judicial resources in the interim, and enable both sides to fully engage in ongoing settlement negotiations, the following changes will be implemented in the MDL:

**1.     Stay of Wave Process**. The current waves will be stayed as of the below dates, and no new waves will be initiated, until further order of the Court. Any Wave plaintiff who believes successor liability is not at issue in his or her case, such that the stay should be lifted and the case permitted to proceed at this time, may file an appropriate motion.

| No. | Date |
|---|---|
| Wave 1 | Immediate Stay |
| Wave 2 | October 31, 2022 (close of expert discovery) |
| Wave 3 | November 4, 2022 (close of fact discovery) |
| Wave 4 | November 7, 2022 (deadline for written discovery requests and production of online records) |

**2.     Stay of Transition Process.** The transition process is hereby stayed until further order of the Court.

**3.     Monthly Settlement Conferences.** Beginning in November 2022, the parties must convene for monthly settlement conferences at the United States District Court, One North Palafox Street, Pensacola, Florida. Special Master Randi S. Ellis will schedule and conduct the conferences. The following attorneys must personally attend each conference on behalf of the common plaintiffs: Bryan Aylstock, Chris Seeger, and Justin Witkin. On behalf of 3M, Kevin Rhodes, Executive Vice President and Chief Legal Affairs Officer, must attend the conferences as the corporate representative with full settlement authority, subject to Board approval. Courtney Enloe, Senior Vice President and Deputy General Counsel for 3M, may also attend. Additionally, 3M must be represented at the conferences by settlement counsel with demonstrated experience resolving mass torts (and in particular, product liability matters) in the multidistrict litigation context. During the conferences, the parties must meet and confer with each other and Special Master Ellis to discuss settlement, and negotiate in good faith. The confidentiality parameters adopted for prior mediations will apply to the monthly settlement conferences. *See* ECF No. 3424.

The Defense Occupational and Environmental Health Readiness System ("DOEHRS") records that were recently produced by the Department of Defense for

nearly the entire MDL plaintiff population will be an essential component of the settlement discussions. BrownGreer PLC, a neutral third-party, has now analyzed that data and shared its findings with the Court. In the Court's view, it is critically important for both sides to hear BrownGreer's unbiased insights regarding the nature and scope of that audiometric data as it relates to the hearing loss claims in this litigation,[3] and to use those insights to rationally inform their decision-making.[4]

A few additional comments are warranted. Much vitriol has been directed at the undersigned in various forums of late for a range of supposed failings in this MDL. The vilification, while frequently personal and provocative, generally amounts to nothing more than the overzealous and deceptive public posturing that has unfortunately seeped into the adversarial process in recent years, a response to

---

[3] BrownGreer was prepared to present its findings to the parties at the mediation session previously set for October 6, 2022. That mediation was cancelled, however, after the Court was notified that 3M had no intent to reach a global resolution in the MDL. That may or may not still be true—litigants routinely make concessions and/or change their settlement positions for a variety of reasons (and, sometimes, for no apparent reason at all). Either way, BrownGreer's objective findings are significant enough that both sides should have them.

[4] This is not to say that the DOEHRS data alone establishes the cause of any service member's hearing-related injuries. But the data does demonstrate the *fact* of certain injuries based on hearing thresholds measured by conventional pure tone audiometry, the gold standard for determining the type, degree, and configuration of hearing loss. There is no averaging of select frequencies, as with pure-tone averages, which are only "for epidemiological use" (not individual diagnoses) in any event. *See* World Health Organization, *World Report on Hearing* at 38 (2021). And there are no estimations, formulas or assumptions as used in the workers' compensation and disability ratings context. Rather, the DOEHRS data reflects the *actual* hearing loss of individual service members in this litigation.

which is beneath the dignity of the Court. One matter, however—repeated attacks on the integrity of the bellwether process—cannot stand uncorrected.

The bellwether process for this MDL is beyond legitimate reproach. From the beginning, both sides agreed that bellwether proceedings would be important and necessary to the parties' evaluation of the relative merits of the various claims and defenses, to understand how juries respond to the evidence, to gain insights to assist in valuing the larger pool of cases, and to advance the litigation as a whole. Through collaboration and consensus, the parties and the Court together designed a selection process that resulted in a truly representative pool of bellwether cases. This involved prevalence analyses performed on a random sample of the inventory by BrownGreer PLC (again, a neutral third-party) to ascertain the most representative characteristics of the plaintiffs in terms of branch of service, age, and injury.[5] From the pool of representative bellwether candidates, each side selected an equal number of cases (and alternates), alongside a number of random selections by both the parties and the Court, to proceed with plaintiff-specific discovery and trial. Nineteen bellwether

---

[5] At the time, there were 139,693 claimants registered in MDL Centrality in connection with the 3M litigation. One percent of that population—1,397 claimants—was *randomly selected* for consideration as potential bellwether candidates. Next, a series of prevalence analyses were conducted on the entire population of claimants with completed census forms, to identify the individual plaintiff characteristics that were most representative of the whole, in terms of branch of service, age, and injury. The analyses revealed that the most representative claimant was between the ages of 30 and 49, serves or served in the Army, and alleged a combination of tinnitus and hearing loss. Of the randomly selected 1%, 175 cases met the three criteria. Those 175 cases comprised the bellwether candidate pool from which all bellwether plaintiffs were selected.

cases were tried. The statistics have been recited numerous times before but they bear repeating here. 16 different trials. 19 representative plaintiffs. 19 separate verdicts. 10 different presiding judges from districts throughout the Eleventh Circuit. Jury venires drawn from three dissimilar divisions in the Northern District of Florida. One side or the other may be unhappy with certain results, or with the uncomfortable lessons learned from jury after jury, but several truths are inviolate no matter how loudly one yells or how forcefully one pounds the table—the bellwether selection process was developed fairly and by consensus, the bellwether plaintiffs were representative of the overall composition of this litigation,[6] the bellwether trial process enabled the cases to be heard by a diverse combination of judges and jury pools, and, as a result, the bellwether verdicts provide a fair representation of how juries view the evidence and value the claims. No other MDL litigants in this country have obtained more objectively representative and reliable data points about individual claims, and the broader whole, in this timeframe, than the parties in this litigation. Whether they use that information honestly and responsibly going forward is, of course, up to them. But the fundamental fairness of

---

[6] After the bellwether selections were made, and the MDL inventory had grown to 150,885 plaintiffs with 89,815 census forms on file, BrownGreer performed another prevalence analysis on the new data. That analysis confirmed the characteristics of the most representative plaintiff remained the same as before, and matched the criteria used in the bellwether selection process. On October 27, 2022, at the Court's request, BrownGreer again performed a prevalence analysis on the 220,240 census forms currently completed in MDL Centrality. **The trends as to the most representative characteristics—plaintiffs between the ages of 30 and 49, who serve or served in the Army, and allege a combination of tinnitus and hearing—remain the same today**.

the bellwether process by which the information was obtained is unassailable, as is the recently produced DOEHRS data.

**DONE AND ORDERED**, on this 27th day of October, 2022.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**