# EXHIBIT 3

Confidential - Pursuant to Protective Order

1              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF FLORIDA
2                  PENSACOLA DIVISION
3
     IN RE: 3M COMBAT ARMS  )  Case No.
4    EARPLUG PRODUCTS        )  3:19md2885
     LIABILITY LITIGATION    )
5    _____    )  Judge M. Casey
                             )  Rodgers
6    THIS DOCUMENT RELATES   )  Magistrate Judge
     TO ALL CASES            )  Gary R. Jones
7
8            THURSDAY, JANUARY 23, 2020
9    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
10                    - - -
11            Videotaped deposition of D. Garrad
12   Warren, III, held at the offices of KIRKLAND
13   & ELLIS LLP, 300 North LaSalle, Chicago,
14   Illinois, commencing at 9:02 a.m., on the
15   above date, before Carrie A. Campbell,
16   Registered Diplomate Reporter, Certified
17   Realtime Reporter, Illinois, California &
18   Texas Certified Shorthand Reporter, Missouri
19   & Kansas Certified Court Reporter.
20                    - - -
21
             GOLKOW LITIGATION SERVICES
22        877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
23
24
25

Confidential - Pursuant to Protective Order

```
 1            A P P E A R A N C E S :
 2
       AYLSTOCK, WITKIN, KREIS & OVERHOLTZ,
 3     PLLC
       BY:  BRYAN F. AYLSTOCK
 4         baylstock@awkolaw.com
           JENNIFER HOEKSTRA
 5         jhoekstra@awkolaw.com
       17 East Main Street
 6     Pensacola, Florida  32502
       (850) 202-1010
 7
       and
 8
       CLARK, LOVE & HUTSON, PLLC
 9     BY:  EMILY MARLOWE
           emarlowe@triallawfirm.com
10     440 Louisiana Street, Suite 1600
       Houston, Texas  77002
11     (713) 757-1400
12     and
13     LANIER LAW FIRM PLLC
       BY:  CRISTINA DELISE
14         cristina.delise@lanierlawfirm.com
       126 East 56th Street
15     New York, New York  10022
       (212) 421-2800
16
       and
17
       TRACEY & FOX
18     BY:  LAWRENCE TRACEY
           ltracey@traceylawfirm.com
19     440 Louisiana Street, Suite 1901,
       Houston, Texas  77002
20     (713) 495-2333
       Counsel for Plaintiffs
21
22
23
24
25
```

Confidential - Pursuant to Protective Order

```
 1      KIRKLAND & ELLIS LLP
        BY:  BARRY E. FIELDS
 2           barry.fields@kirkland.com
        300 North LaSalle
 3      Chicago, Illinois  60654
        (312) 862-2000
 4
        and
 5
        KIRKLAND & ELLIS LLP
 6      BY:  WHITNEY N. KNOWLTON
             whitney.knowlton@kirkland.com
 7      2049 Century Park East
        Los Angeles, California  90067
 8      (310) 552-4200
        Counsel for Defendants
 9

10
    ALSO PRESENT:
11      DANNY OLIVO, Tracey & Fox
12      JAMES BATTLE, Aylstock, Witkin,
        Kreis & Overholtz
13
        COREY SMITH, trial technician,
14      Golkow Litigation Services
15
16  V I D E O G R A P H E R :
        DAN LAWLOR,
17      Golkow Litigation Services
18                    - - -
19
20
21
22
23
24
25
```

Confidential - Pursuant to Protective Order

```
 1              Is that -- did I read that
 2   correctly?
 3        A.    Yes, sir.
 4        Q.    And that's correct, right?
 5        A.    Yes, sir.
 6              (Warren Exhibit 4 marked for
 7        identification.)
 8   QUESTIONS BY MR. AYLSTOCK:
 9        Q.    I'm going to mark this exhibit,
10   and it's a demonstrative exhibit we've
11   created based upon what we know.  I just want
12   to ask you if this is reflective of the three
13   private equity firms over, well, four years
14   that had created over $1 billion in value as
15   reflected on your CV.
16        A.    Those are the three private
17   equity firms, yes, sir.
18        Q.    And so VCP, what does that
19   stand for?
20        A.    Vestar Capital Partners.
21        Q.    Okay.  So when you came on to
22   Aearo, VCP was a private equity firm?
23        A.    Yes, sir.
24        Q.    A group of investors that owned
25   it that were interested in making it into a
```

Confidential - Pursuant to Protective Order

```
 1    more profitable company and selling it,

 2    right?

 3         A.     That is correct.

 4         Q.     And they had purchased it for

 5    205 million.

 6                Does that sound right to you?

 7         A.     I believe so, yes.

 8         Q.     And then it looks like while

 9    you were there, they sold it for $180 million

10    profit to Bear Stearns.

11                Does that comport with your

12    recollection?

13                MR. FIELDS:  Objection.  Form.

14         Sorry, objection.  Form.

15                THE WITNESS:  They sold it for

16         $385 million.  I'm not sure what their

17         profit was.

18    QUESTIONS BY MR. AYLSTOCK:

19         Q.     Okay.  Well, VCP had bought it

20    205 and sold it for 385, so that's pretty

21    good.

22                MR. FIELDS:  Objection.  Form.

23                THE WITNESS:  Yes, it is.

24    QUESTIONS BY MR. AYLSTOCK:

25         Q.     Yeah.
```

Confidential - Pursuant to Protective Order

1                 And so Bear Stearns, was that

2    private equity, or is that a hedge fund?

3         A.    No, that was -- again, these

4    are all private equity firms.

5         Q.    Again, a group of investors

6    looking to make the business profitable and

7    then sell it after a period of time --

8         A.    Yes, sir.

9         Q.    -- for hopefully a nice profit,

10   right?

11        A.    Yes, sir.

12        Q.    And it looks like they were

13   successful from 2004 to 2006, because Bear

14   Stearns private equity sold it to Permira?

15        A.    Yes, sir.

16        Q.    And that was for 765 million.

17                Does that comport with your

18   recollection?

19        A.    Yes, sir.

20        Q.    And so now we're talking about

21   doubling inside of two years.

22                That's pretty good, isn't it?

23        A.    Well, not doubling, but it

24   was --

25        Q.    Pretty close?

Confidential - Pursuant to Protective Order

```
 1        A.      -- a good -- a nice increase,
 2   yes.
 3        Q.      And what -- for the jury, what
 4   is Permira?  Is that --
 5        A.      Again, they're a private equity
 6   firm that are actually London based, but they
 7   had operations in the US as well.
 8        Q.      So am I pronouncing it right,
 9   Permira?
10        A.      Permira, yes, sir.
11        Q.      So Permira bought it from Bear
12   Sterns in 2006-ish when you were there?
13        A.      Uh-huh.
14        Q.      And they're a group of
15   investors in London?
16        A.      That's where they're
17   headquartered, yes, sir.
18        Q.      Okay.  And so again, as private
19   equity, their goal is to make it more
20   profitable and then sell it again for another
21   profit after a few years, right?
22        A.      Yes, sir.
23        Q.      It looks like they were able to
24   achieve their goal as well because it wasn't
25   a couple years later they sold it for
```

Confidential - Pursuant to Protective Order

```
 1    1.2 billion to 3M; is that right?

 2         A.      That is correct.

 3         Q.      And you were part of the team

 4    that helped engineer those sales to the

 5    different private equity firms, Bear Stearns,

 6    Permira and 3M, correct?

 7         A.      Correct.  Yes, sir.

 8         Q.      The second bullet point talks

 9    about that you successfully led business --

10         A.      You're referring to the --

11         Q.      Yeah, I'm sorry, I'm back to

12    the CV.

13         A.      -- résumé?  Okay.  Thank you.

14         Q.      Yeah, I'm sorry about that.

15         A.      Okay.

16         Q.      It talks about that you

17    successfully led business through multiple

18    line reviews with such key retails, Home

19    Depot, Lowe's, Ace Hardware and Walmart.

20               Do you see that?

21         A.      I do.

22         Q.      And you're aware, are you not,

23    that the Combat Arms version 2 also had a

24    consumer component to it?

25         A.      Yes.
```

Confidential - Pursuant to Protective Order

1    Q.    And it was actually sold in

2    consumer retailers as a sportsman plug?

3    A.    Yes, I believe it was.

4    Q.    And to welders as an Arc plug.

5          Do you recall that?

6    A.    Yes.

7    Q.    And so was part of your

8    responsibility to get the Combat Arms

9    version 2 plug in a consumer form into the

10   consumer market?

11   A.    Yeah, part of our

12   responsibility was to get as many of our

13   products into retail as we possibly could,

14   and that included the Combat Arms.

15   Q.    Okay.  Because that would help

16   realize more profit, which hopefully would

17   make the company more profitable and able to

18   be sold, correct?

19   A.    As would all of the products

20   that we sold.

21   Q.    Okay.  Above -- well, let's

22   see.  After 2008, it looks like you left

23   Aearo Technologies; is that right?

24   A.    Yes, sir.

25   Q.    And that was after it was sold

Confidential - Pursuant to Protective Order

```
1    to 3M, correct?

2         A.    Yes, sir.

3         Q.    Now, you stayed on as a

4    consultant for 3M for a little --

5         A.    I did not.

6         Q.    You did not?

7         A.    I did not.

8         Q.    Okay.

9         A.    No, I was not offered a

10   consulting opportunity.

11        Q.    Okay.  But you were part of the

12   team that made the pitch to 3M to buy

13   Aearo --

14        A.    Yes.

15        Q.    -- for 1.2 billion, right?

16        A.    Yes.  Yes.

17        Q.    Now, since then, until your

18   recent retirement, you were at Icon

19   Investment Partners.

20              Is that another hedge fund or a

21   private equity or whatever you call it?

22        A.    No, actually Icon Investment

23   Partners was a small company that myself and

24   our CEO and two other senior managers formed.

25   We were what we would call senior advisors
```

Confidential - Pursuant to Protective Order

1    our responsibility.

2         Q.    Well, when you were

3    communicating with those end users in

4    marketing materials or anywhere, it was

5    important that the information conveyed was

6    accurate, clear and unambiguous when it came

7    to how to use the product?

8         A.    I would agree with that.

9              (Warren Exhibit 8 marked for

10        identification.)

11   QUESTIONS BY MR. AYLSTOCK:

12        Q.    Okay.  Plaintiff's Exhibit 8

13   for the record.

14             You've seen this document

15   before, haven't you?

16        A.    I believe so, yes.

17        Q.    In fact, you were involved in

18   the creation of this document, correct?

19        A.    I was.  Portions of it, yes.

20        Q.    And the purpose of this

21   document was to meet with 3M and try to

22   convince 3M to purchase Aearo, correct?

23        A.    The purpose of the document was

24   to -- we made this presentation to a number

25   of potential acquirers, of which 3M was one.

Confidential - Pursuant to Protective Order

```
 1          Q.     Did Aearo get other bids to

 2   purchase it or just 3M's?

 3          A.     I believe we did, but I don't

 4   recall.

 5          Q.     3M's was the most, I take it,

 6   because you took that one?

 7          A.     3M's is the one that we

 8   accepted, yes, sir.

 9          Q.     Okay.  And since you weren't

10   hanging around, it didn't really matter to

11   you who bought it, other than whoever paid

12   the most, right?

13               MR. FIELDS:  Objection.  Form.

14               THE WITNESS:  That is not

15          necessarily true.  We had sold the

16          company three previous times, and I

17          stuck around all three of those times.

18          So it really depended upon who the

19          acquirer was.

20   QUESTIONS BY MR. AYLSTOCK:

21          Q.     Okay.  Well, in any event, you

22   knew that if it was acquired that you stood

23   to gain financially, fair?

24          A.     Yes.

25          Q.     Okay.  So if we look at this
```

Confidential - Pursuant to Protective Order

1    presentation, the introduction is by Mike

2    McLain, your boss, right?

3         A.    Yes, sir.

4         Q.    And the very first slide after

5    that is the management team, and you're there

6    on the left, Gary Warren, senior vice

7    president, North America, right?

8         A.    Yes.

9         Q.    And the operating board on the

10   next page has your name on it as the

11   president, North America safety, correct?

12        A.    That is correct.

13        Q.    And we talked about this

14   earlier, but it looks like Mike McLain,

15   yourself, Rahul Kapur, Jim Phillips and Jim

16   Floyd had all been at DowBrands previously?

17        A.    Yes, sir.

18        Q.    And you knew all of those folks

19   from DowBrands?

20        A.    Yes, sir.

21        Q.    Okay.  And so is the operating

22   board different from the board of directors?

23        A.    Yes.

24        Q.    Okay.  You're the ones who

25   actually on the ground running the company?

Confidential - Pursuant to Protective Order

1      A.      That is correct.

2      Q.      And when it came to North

3   American safety products, including the

4   Combat Arms version 2, you were the one

5   running that?

6      A.      North -- yes, sir.

7      Q.      Okay.  Now, there's an

8   executive summary on page 5, and there's a

9   bullet point for military and law

10  enforcement?

11     A.      Yes, sir.

12     Q.      And so one of the things you're

13  touting to 3M and others when you're asking

14  them to purchase Aearo is that you've been

15  able to get sales from the military and law

16  enforcement for various products, correct?

17          MR. FIELDS:  Objection.  Sorry.

18      Objection.  Form.

19          THE WITNESS:  If I could, the

20      purpose of this slide was really to

21      set out the agenda as to what we were

22      going to cover in the presentation.

23  QUESTIONS BY MR. AYLSTOCK:

24     Q.      Okay.  That's fair.

25     A.      Okay.

Confidential - Pursuant to Protective Order

1      Q.    And the next page, page 6,

2  talks about the fact that Aearo has a strong

3  strategic fit and value creating for 3M, that

4  was one of the messages you wanted to convey

5  to 3M?

6      A.    Yes, sir.

7      Q.    And if we drill down a little

8  bit on page 11, one of the things any suitor

9  to purchase a company looks for is sales and

10  revenue growth over time, fair?

11      A.    That is correct.

12      Q.    And, in fact, this chart

13  demonstrates that year after year after year

14  Aearo was able to increase sales and increase

15  revenue?

16            MR. FIELDS:  Objection.  Form.

17  QUESTIONS BY MR. AYLSTOCK:

18      Q.    Making it a more attractive

19  purchase for 3M, fair?

20            MR. FIELDS:  Sorry, same

21       objection.

22            THE WITNESS:  Yes.

23  QUESTIONS BY MR. AYLSTOCK:

24      Q.    And if you go a couple more

25  pages, drilling down again, there's a slide

Confidential - Pursuant to Protective Order

1    here about the safety --

2         A.    Page 13?

3         Q.    Yes, sir.

4         A.    Okay.

5         Q.    And again, this is the part

6    that you're in charge of, right?

7         A.    No.

8         Q.    The safety product line?

9         A.    No.  Well, no.  This slide is

10   talking about global sales of which my areas

11   of responsibility would be part of that.

12        Q.    Part of that.

13              Did you present this slide, or

14   was this Mr. McLain --

15        A.    You know, I don't recall.

16        Q.    You could have?

17        A.    I -- since it was global, I

18   doubt it.

19        Q.    Okay.

20        A.    I don't recall.

21        Q.    Well, in any event --

22        A.    In fact -- in fact, as I

23   look -- no, I don't believe I did.

24        Q.    Okay.  But you were there when

25   this presentation was being given?

Confidential - Pursuant to Protective Order

1     A.     Yes, sir.

2     Q.     And you don't quarrel with

3   anything that was presented to 3M about these

4   numbers, do you?

5     A.     I don't recall that I did at

6   the time, no.

7     Q.     Okay.  And you don't today

8   either, do you?

9     A.     I haven't looked at them, but,

10   no, I take it at face value.

11     Q.     Okay.  And if we're talking

12   about gross sales for the safety product

13   line, hearing protection is actually the

14   number one driver for sales, correct?

15     A.     It is certainly the largest,

16   yes.

17     Q.     Largest by far, and it's

18   increasing year over year, correct?

19     A.     4.4 percent versus the prior

20   year and -- yes, sir.

21     Q.     Okay.  So that was one of the

22   things that you felt important for 3M to know

23   when valuing the company and making the

24   decision to purchase Aearo, correct?

25             MR. FIELDS:  Objection.  Form.

Confidential - Pursuant to Protective Order

```
 1                THE WITNESS:  Yeah, they needed
 2         to understand, you know, all of our
 3         business and how it was doing.
 4    QUESTIONS BY MR. AYLSTOCK:
 5         Q.    Including --
 6         A.    So including hearing
 7    protection, but, yes, everything.
 8         Q.    Sure.  Absolutely.
 9                Because they're buying it all,
10    right?
11         A.    Right.
12         Q.    If you go to page 20, another
13    thing that 3M needed to understand, according
14    to this presentation about passive hearing,
15    was the fact that Aearo had a recognized
16    testing lab.
17                Do you see that on the passive
18    hearing?  Well, let me strike that.  Let's
19    just kind of walk through it a little bit on
20    page 20.
21                You see there on the left with
22    passive hearing?
23         A.    Yes, sir.
24         Q.    That would include the Combat
25    Arms version 2?
```

Confidential - Pursuant to Protective Order

```
 1        A.     Yes, sir.

 2        Q.     What it says up at the top is

 3   that Aearo has leading hearing and eyewear

 4   R&D capabilities?

 5        A.     Yes, sir.

 6        Q.     And that, you believed, would

 7   be important to 3M in deciding whether or not

 8   to purchase Aearo, right?

 9        A.     One of the factors, yes.

10        Q.     In fact, one of the factors

11   here is that it had attenuation, NRR testing

12   in a recognized testing lab, correct?

13        A.     That is correct.

14        Q.     And you also tout here that it

15   had extensive end user training programs.

16               Do you see that?

17        A.     I do.

18        Q.     In fact, you were involved in

19   the decision to do some training product --

20   programs with regard to Combat Arms

21   version 2, correct?

22        A.     Yes.

23        Q.     Okay.  If we go to page 28,

24   there's passive hearing protection

25   strategies.
```

Confidential - Pursuant to Protective Order

1            Why'd you sell it?

2       A.    We felt we could get a good

3   price for it.

4       Q.    And, in fact, you were a part

5   owner in Aearo?

6       A.    I was.

7            (Warren Exhibit 53 marked for

8       identification.)

9   QUESTIONS BY MR. AYLSTOCK:

10      Q.    These are some schedules to the

11  plan to merger -- the sale, basically, of

12  Aearo to 3M.

13      A.    Okay.

14      Q.    Are you familiar with this?

15      A.    I am.

16      Q.    It's Exhibit 53.

17            What's the date on it?

18      A.    November 14, 2007.

19      Q.    If we turn to the page that

20  ends in Bates number 15, 215 --

21      A.    Okay.

22      Q.    -- about four pages in, it

23  actually lists the number of common shares

24  and preferred shares you have, correct?

25      A.    That's correct.

Confidential - Pursuant to Protective Order

```
 1                    CERTIFICATE
 2
 3           I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
 4   Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
 5   of the examination, D. Garrad Warren, III,
     was duly sworn by me to testify to the truth,
 6   the whole truth and nothing but the truth.
 7           I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
 8   testimony as taken stenographically by and
     before me at the time, place and on the date
 9   hereinbefore set forth, to the best of my
     ability.
10
             I DO FURTHER CERTIFY that I am
11   neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
12   action, and that I am neither a relative nor
     employee of such attorney or counsel, and
13   that I am not financially interested in the
     action.
14
15
16

             _____
17           CARRIE A. CAMPBELL,
             NCRA Registered Diplomate Reporter
18           Certified Realtime Reporter
             California Certified Shorthand
19           Reporter #13921
             Missouri Certified Court Reporter #859
20           Illinois Certified Shorthand Reporter
             #084-004229
21           Texas Certified Shorthand Reporter #9328
             Kansas Certified Court Reporter #1715
22           Notary Public
23           Dated:  January 27, 2020
24
25
```