# EXHIBIT G

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS    CASE NO. 3:19-md-2885
EARPLUG PRODUCTS                    MCR-GRJ
LIABILITY LITIGATION
                         Judge M. Casey Rodgers
This Document Relates    Magistrate Judge Gary
to: Joshua Moss                     R. Jones

Case No: 7:20cv34822-
        MCR-GRJ

DEPOSITION OF
JOSHUA MOSS
January 28, 2022

S T I P U L A T I O N

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of JOSHUA MOSS may be taken before Kerry K. Thames,

Page 2

1  Commissioner, at Loganville, Georgia, on
2  January 28, 2022, commencing at 2:03 P.M.
3         IT IS FURTHER STIPULATED AND AGREED
4  that the signature to and reading of the
5  deposition by the witness is waived, said
6  deposition to have the same force and effect
7  as if full compliance had been had with all
8  laws and rules of court relating to the taking
9  of depositions.
10        IT IS FURTHER STIPULATED AND AGREED
11  that it shall not be necessary for any
12  objections to be made by counsel to any
13  questions except as to form or leading
14  questions, and that counsel for the parties
15  may make objections and assign grounds at the
16  time of the trial, or at the time said
17  deposition is offered in evidence, or prior
18  thereto.
19        IT IS FURTHER STIPULATED AND AGREED
20  that notice of filing of deposition by
21  commissioner is waived.
22
23

Page 3

1              INDEX
2
3  EXAMINATION BY:                    PAGE NO.
4  Mr. Taylor                            7
5
6             EXHIBITS
7
8       (There were no exhibits marked.)

Page 4

1              APPEARANCES
2
3  FOR THE PLAINTIFF(S):
4  Mr. Justin Parafinczuk
5  PARAFINCZUK, WOLF & SUSEN, P.A.
6  110 East Broward Boulevard
7  Suite 1630
8  Fort Lauderdale, Florida 33301
9
10 FOR THE DEFENDANT(S):
11 Mr. David Taylor
12 THOMPSON, COE, COUSINS & IRONS
13 700 N. Pearl Street
14 25th Floor
15 Dallas, Texas 75201

Page 5

1       I, Kerry K. Thames, acting as
2  Commissioner, certify that on this date as
3  provided by the Federal Rules of Civil
4  Procedure, and the foregoing stipulation of
5  counsel, there came before me JOSHUA MOSS,
6  witness in the above cause, for oral
7  examination, whereupon the following
8  proceedings were had:
9
10        THE COURT REPORTER:  Are you using
11 the usual Federal stipulations?
12        MR. TAYLOR:  Yes, objections only to
13 form.
14        VIDEOGRAPHER:  Good afternoon.
15 We're going on the record at 2:03 P.M. on
16 January 28th, 2022.  This is Media Unit 1 of
17 the video-recorded deposition of Joshua Moss
18 taken by counsel for the defendant in the
19 matter of Joshua Moss v. 3M Company filed in
20 the U. S. District Court, Northern District of
21 Florida, Pensacola Division, Civil Action
22 Number 7:20cv34822-MCR-GRJ.  This deposition
23 is being held on-line as a Zoom video-

| | |
|---|---|
| Page 6 | Page 8 |
| 1  conference with all parties appearing | 1    Q.  And what's your date of birth? |
| 2  remotely. My name is Thomas Devine from the | 2    A.  ████████ 1987. |
| 3  firm Veritext, and I am the videographer. The | 3    Q.  And where do you presently live? |
| 4  court reporter is Kerry Thames, also with | 4    A.  I live in Loganville, Georgia. |
| 5  Veritext. I am not authorized to administer | 5    Q.  All right. Do you work presently? |
| 6  an oath, and I am not related to any party in | 6    A.  Yes. |
| 7  this action, nor am I financially interested | 7    Q.  Where do you work? |
| 8  in the outcome. | 8    A.  I work at Emory Hospital. |
| 9         Counsel appearing remotely will now | 9    Q.  And what do you do at Emory |
| 10 please state their appearances and affilia- | 10 Hospital? |
| 11 tions for the record. If there are any | 11   A.  I'm an occupational therapist. |
| 12 objections to proceeding, please state them at | 12   Q.  Can you give me a feeling for what |
| 13 the time of your appearance, beginning with | 13 that entails, what your day-to-day work is |
| 14 the noticing attorney. After appearances have | 14 like? |
| 15 been noted, the court reporter will swear in | 15   A.  I help restore functional indepen- |
| 16 the witness, and we may proceed. | 16 dence after a person who's sustained an injury |
| 17        MR. TAYLOR: I'm David Taylor with | 17 or illness who's no longer able to perform |
| 18 the law firm of Thompson, Coe, and I represent | 18 self-care skills. So I help them regain their |
| 19 the defendant 3M. | 19 independence with self-care. |
| 20        MR. PARAFINCZUK: Justin Parafinczuk | 20   Q.  And how long have you been working |
| 21 with the law firm Parafinczuk, Wolf on behalf | 21 there? |
| 22 of the plaintiff. | 22   A.  Approximately four years. |
| 23        THE WITNESS: I'm Joshua Moss. I'm | 23   Q.  As I'm sure you know, we're here |

| | |
|---|---|
| Page 7 | Page 9 |
| 1  the plaintiff. | 1  taking your deposition based on a lawsuit that |
| 2 | 2  was filed regarding a hearing injury that |
| 3         JOSHUA MOSS, | 3  occurred when you were in the Army. I think |
| 4  being first duly sworn, was examined and | 4  you were in the Army, that's the right branch, |
| 5  testified as follows: | 5  isn't it? |
| 6 | 6    A.  Yes, I was in the Army. |
| 7  EXAMINATION BY MR. TAYLOR: | 7    Q.  Okay. From the records that I saw, |
| 8    Q.  Mr. Moss, I'm going to be asking you | 8  I think you were in the Army starting in 2011. |
| 9  some questions, and if you don't understand | 9  Am I in the right year? |
| 10 it, just tell me you don't understand the | 10   A.  Correct. |
| 11 question. Sometimes my questions are not very | 11   Q.  And then you were in there until |
| 12 good, being honest about it, and I'm happy to | 12 2015, correct? |
| 13 rephrase it. So if you answer, I kind of | 13   A.  Correct. |
| 14 assume we're on the same sheet of music. I | 14   Q.  Okay. Before you joined the Army, |
| 15 hope we are. And also if you need a break at | 15 can you give me an understanding of what kind |
| 16 any time, or I may need a break, just ask us | 16 of work you did and, you know, what your life |
| 17 and we're happy to take that break. This is | 17 was like, that kind of thing? |
| 18 not an endurance contest. So is that okay | 18   A.  Before I joined the armed services I |
| 19 with you? | 19 was in high -- I was a juvenile correction |
| 20   A.  Yes. | 20 officer. |
| 21   Q.  Can you give me your full name, | 21   Q.  I was going to tell you I was a |
| 22 please? | 22 juvenile probation officer in a prior life |
| 23   A.  Joshua Lucian Bradley Moss. | 23 myself. Did you do probation or detention, or |

Page 10

1 what part did you do?
2    A.  Detention.
3    Q.  And where was that, in Georgia or
4 somewhere else?
5    A.  That was in Georgia.
6    Q.  Okay.  And how long did you work as
7 a juvenile detention officer?
8    A.  Over a year.
9    Q.  And then prior to that what type of
10 work did you do, if any?
11    A.  I believe I worked at Target for a
12 brief period, and before that I was an
13 undergraduate student at Alabama State
14 University.
15    Q.  Okay.  Are you married, sir?
16    A.  Yes.
17    Q.  And do you have children?
18    A.  Yes.
19    Q.  Can you tell me your children's
20 ages, please?
21    A.  Twelve, ten, and four.
22    Q.  And what is your wife's name?
23    A.  Tonesha Moss.

Page 11

1    Q.  Have you ever given a deposition
2 before today?
3    A.  No.
4    Q.  I don't know if you're taking any
5 medication or not that might impact your
6 memory, but is there -- are you taking any
7 kind of medication that causes you concern
8 that you may either be foggy or have some
9 difficulty with your memory today?
10    A.  No.
11    Q.  You were asked or I believe you were
12 asked to bring any kind of documents or
13 documentation you had relating to your hearing
14 or to the 3M Combat Arms CAEv4 (sic) earplugs.
15 Do you have anything like that, any documenta-
16 tion or records that you maintained?
17    A.  All of my records have been provided
18 to my attorney.
19    Q.  Okay, thank you.  And do you have
20 any of the CAEv2 earplugs that you retained
21 after you left the Army?
22    A.  Could you repeat that?  I'm sorry.
23    Q.  Sure.  Do you have any of the

Page 12

1 earplugs that you retained after you left the
2 Army?
3    A.  No.
4    Q.  What type of hobbies have you had,
5 specifically anything to do with firearms or
6 hunting or guns or anything like that?  Have
7 you had any hobbies you participated in
8 relating to that?
9    A.  No.
10    Q.  I want to focus now on just before
11 you entered the Army.  I know you had a
12 physical and you were checked out.  Did you
13 have any hearing issues at all before you went
14 into the military?
15    A.  No.
16    Q.  When you joined, tell me about the
17 training that you received and the assignments
18 that you were given, and take your time so we
19 can kind of go through your Army career, if
20 you don't mind.
21    A.  Okay.  2011 I joined in Georgia, and
22 I was assigned to Fort Sill, Oklahoma.  I
23 spent approximately nine weeks in basic

Page 13

1 training.  Left Fort Sill, Oklahoma, went to
2 Fort Sam Houston for a sixteen-week health
3 care specialist training.  That's also known
4 as a combat medic if you're assigned to an
5 infantry unit.  I left after the sixteen weeks
6 medical training and was assigned to my first
7 duty station at Fort Lewis, Washington, and I
8 was assigned to an infantry unit.
9    Q.  And so did you stay at Fort Lewis
10 for a period of time?
11    A.  Yes, that was my primary duty
12 station throughout my term.
13    Q.  And then -- and so you would have
14 been there in 2011, or was it already --
15 excuse me, I got the dates mixed up -- no, I
16 didn't.  So how many months, then, would you
17 have stayed at Fort Lewis?
18    A.  I don't recall exactly how many
19 months.
20    Q.  When did you deploy to Afghanistan?
21    A.  I deployed between November of 2011
22 to -- eleven months from that date.  I don't
23 recall the exact dates.

Page 18

1  ing that you dealt with a lot of seriously
2  injured soldiers as that was your job, right?
3      A.  Yes, I was responsible for adminis-
4  tering a Glasgow Coma Scale to see how
5  severely impaired they were.  I was responsi-
6  ble for recording vitals in the field.  We
7  were in the mountains, so we used the
8  equipment we had on us to do that, and then I
9  was responsible for assisting with radioing
10 for med-evac and med-evac'ing patients to the
11 helicopter and sending them to a medical
12 facility with equipment that could treat them
13 and assess them properly.
14     Q.  And I'm assuming that the only time
15 you were exposed to IEDs or explosions like
16 this was when you were in Afghanistan, right?
17     A.  Yes, when I was in the States the
18 exposure came from gun ranges.
19     Q.  And as combat medic, were you -- did
20 you get the same kind of training as other
21 soldiers when you say that it occurred from
22 practice and training where there would be
23 loud noises on the gun range and things like

Page 19

1  that?
2      A.  Yes, we got trained in basic train-
3  ing no matter what your military occupational
4  specialty was, and then medic training in how
5  to maintain your equipment, how to properly
6  use your equipment, that continued on to
7  advanced individual training at Fort Sill,
8  Oklahoma, where I underwent the medical
9  training.  And I had a few months at my -- the
10 permanent -- or primary duty station before I
11 was shipped to Afghanistan.
12     Q.  I want to talk for a minute about --
13 not a minute, but for a little bit about what
14 we call the CAEv2.  What did you call the
15 different ear protections that y'all were
16 provided by the Army?  Did y'all have names
17 for them?
18     A.  Not specifically.  We just called
19 them ear protection.  Or eye protection, we
20 called them eye pro.  No fancy names.
21     Q.  Okay, as I understand it, and you
22 correct me if I'm wrong because you know and I
23 don't, there were several types of hearing

Page 20

1  protection that was provided to the soldiers.
2  Is that accurate or not?
3      A.  We were provided with one form of
4  hearing protection, and that protection we
5  were responsible for along with our other
6  equipment to maintain.  Especially when
7  deployed, being in the mountains, you're
8  supposed to pack light and maintain the
9  equipment you have, and I kept up with my
10 equipment as good as I could.
11     Q.  Okay.  And, as I understand it, they
12 provided some of those little soft foam plugs
13 that you could jam in your ear.  Do you
14 remember getting those?
15     A.  I remember seeing those.  Those were
16 seen mostly when I was at basic training
17 before we were issued equipment that we would
18 maintain long term.
19     Q.  When do you first recall receiving
20 the Combat Arms earplugs that were dual-ended,
21 had two ends?
22     A.  I received those when I was at
23 advanced individual training at Fort Sam

Page 21

1  Houston, and I also received them when I was
2  assigned to Fort Lewis.  And that was a part
3  of my uniform equipment.
4      Q.  Okay, so you first got them, then,
5  when you were in basic -- what I call basic
6  training, is that right, or Sam Houston, was
7  that -- or was that after you had been in the
8  Army for a while?
9      A.  Basic training is Fort Sill,
10 Oklahoma, and Fort Sam Houston was my medical
11 training.
12     Q.  Ah, okay, I'm sorry, I got that
13 backwards.  Okay, so you first received them
14 when you were at Fort Sam Houston, is that
15 right?
16     A.  Right.  I had used them on and off
17 when I was at Fort Sill, Oklahoma, in
18 combination with the soft ear protection that
19 you stated, but I used them -- the -- the
20 Combat Arms Version 2 earplugs when I was at
21 Fort Sam Houston and Fort Lewis.
22     Q.  Okay.  And when would you use them?
23     A.  All the time.  When we were in

Page 62

```
 1              C E R T I F I C A T E
 2
 3  STATE OF ALABAMA:
 4  JEFFERSON COUNTY:
 5
 6         I hereby certify that the above and
 7  foregoing deposition was taken down by me in
 8  stenotype, and the questions and answers
 9  thereto were transcribed by means of
10  computer-aided transcription, and that the
11  foregoing represents a true and correct
12  transcript of the testimony given by said
13  witness upon said hearing.
14         I further certify that I am neither
15  of counsel nor kin to the parties to the
16  action, nor am I in any way interested in the
17  result of said cause.
18
19  
20      KERRY K. THAMES - COMMISSIONER
21      Certificate Number: ACCR 364
22      Expires 9-30-22
23
```

Veritext Legal Solutions
877-373-3660                                    800.808.4958