## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19md2885 |
| This Document Relates to All Cases | Judge M. Casey Rodgers<br>Magistrate Judge Hope T. Cannon |

## ORDER[1]

Federal litigation—particularly high profile multidistrict litigation—is not for the faint of heart.  It can be a taxing, rough and tumble business.  Nevertheless, there are limits.  Contumacious conduct and bad faith tactics have no place in the adversarial process, and when this occurs, federal courts are armed with broad discretion to rectify and deter the abusive practices through appropriate sanctions. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 137 S. Ct. 1178, 1186 (2017).  Such is the case here.

The Wave 1 plaintiffs have collectively moved for an order precluding Defendant 3M Company from attempting to avoid any portion of its alleged liability for the CAEv2 claims in this litigation by shifting blame to the Aearo defendants (collectively "Aearo"), as a consequence for the company's explicit statements and

---

[1] This Order assumes the parties' familiarity with the nature of this multidistrict litigation, the claims and defenses at issue, and the current evidentiary record, and thus sets out only what is necessary to explain the Court's rulings.

conduct establishing itself as the sole responsible party for nearly four years in the MDL.[2]  Plaintiffs' motion is premised on theories of judicial estoppel, collateral estoppel, waiver, and implied assumption of liability, alleged violations of federal pleadings rules, and charges of bad faith conduct sanctionable under the federal courts' inherent powers.  *See* ECF Nos. 3506-1, 3560.  While each of these mechanisms represents a well-established approach to addressing some or all of a party's misconduct in a case, only one—the inherent authority of a federal court to moderate the conduct of those appearing before it—furnishes a legal and contextual framework that allows for consideration of the full range of litigation abuses alleged in this matter.  On that basis alone, Plaintiffs' motion is granted.

"Federal courts possess certain inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Goodyear Tire*, 137 S. Ct. at 1186 (internal citations omitted). "That authority includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id*.  The inherent power "can be invoked even if procedural rules exist which sanction the same conduct," *Chambers v. NASCO, Inc*., 501 U.S. 32, 49 (1991), because those rules "are not substitutes for the inherent

---

[2] This encompasses any argument by 3M that it is the "wrong party" or does not otherwise bear anything but full liability for all alleged CAEv2 injuries, including but not limited to successor liability arguments, apportionment of fault, and/or superseding cause defenses.  For clarity, this Order's use of the term "successor liability" refers to any attempt by 3M to shift blame for CAEv2 liability to Aearo.

power," *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995).  Whereas rules-based sanctions can reach only "certain individuals or conduct, the inherent power extends to a full range of litigation abuses" and serves to fill the gaps left by other sanctioning mechanisms.  *Mroz*, 65 F.3d at 1575 (quoting *Chambers*, 501 U.S. at 46).  Because of this expansive and potent scope, the inherent power "must be exercised with restraint and discretion," and only in service of its dual purpose of "vindicat[ing] judicial authority without resorting to a contempt of court sanction and to make the prevailing party whole."  *See Purchasing Power, LLC v. Bluestem Brands, Inc*., 851 F.3d 1218, 1223 (11th Cir. 2017) (citing *Chambers*, 501 U.S. at 44-46).

To impose sanctions under its inherent power, a court must first find that a party's conduct "constituted or was tantamount to bad faith."  *See Thomas v. Tenneco Packaging Co., Inc*., 293 F.3d 1306, 1320 (11th Cir. 2002); *see also Peer v. Lewis*, 606 F.3d 1306, 1316 (11th Cir. 2010) ("*Peer I*") ("The key to unlocking a court's inherent power is a finding of bad faith.").  Bad faith, in this context, is judged by a subjective standard, *see Purchasing Power*, 851 F.3d at 1223-25, meaning the "inquiry should focus primarily on the [party's] conduct and motive, rather than on the validity of the case," *Wachovia Bank v. Tien*, 406 Fed. App'x 378, 383 (11th Cir. 2010) (citing *Rothenberg v. Sec. Mgmt. Co., Inc*., 736 F.2d 1470, 1472 (11th Cir. 1984)).  The standard may be met with either: (1) direct evidence of subjective bad faith; or (2) evidence of conduct "so egregious that it could only be

committed in bad faith." *Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020) (quoting *Purchasing Power*, 851 F.3d at 1224-25); *Byrne v. Nezhat*, 261 F.3d 1075, 1125 (11th Cir. 2001), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) ("Without a 'smoking gun' statement from the [party], *i.e.*, 'I know my claim is frivolous and I am pursuing this claim to harass the defendants,' a district court makes a determination of bad faith by drawing inferences from the conduct before it."). A finding of bad faith is warranted where a party attempts to commit (or commits) a fraud on the court, knowingly raises a frivolous argument, argues a meritorious claim for the purpose of harassing an opponent, engages in purposely vexatious behavior, delays or disrupts the litigation, or hampers enforcement of a court order. *See Chambers*, 501 U.S. at 44-46; *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998).

When exercising its inherent power to sanction abusive litigation practices, a court must comply with due process both in determining bad faith and assessing sanctions. *See Chambers*, 501 U.S. at 50. The party to be sanctioned must receive (1) notice of the legal authority on which the sanctions would be based, the specific conduct that is alleged to be sanctionable, and the form of the potential sanctions; and (2) an opportunity to be respond to the invocation of sanctions and to justify its actions. *Mroz*, 65 F.3d at 1575-76. Once the requirements of due process are met

and a finding of bad faith has been made, a court has "broad discretion" to fashion an appropriate sanction.  *See Peer I*, 606 F.3d at 1316.

Here, 3M received fair notice from Plaintiffs' briefing, which sought sanctions under the court's inherent authority and outlined the conduct alleged to be sanctionable, *see* Pl. Briefs, ECF Nos. 3506-1 & 3560, and from a subsequent Order advising that the Court was considering inherent power sanctions, identifying the specific conduct that may warrant sanctions, and communicating the form of potential sanctions, *see* ECF No. 3571.  *See Mroz*, 65 F.3d at 1575 ("Notice can come from the party seeking sanctions, from the court, or from both.").  3M also had the opportunity to respond to, and be heard on, the issues of bad faith and sanctions. *See* Def. Response, ECF No. 3584.  Therefore, 3M's due process rights have been properly preserved in this case, and the Court turns to the issue of bad faith.

The necessary context for the facts and inferences that compel a finding of bad faith in this litigation dates back to early 2019.  At that time, 3M—arguing in the interests of justice, efficiency, and convenience—actively and successfully lobbied the Judicial Panel on Multidistrict Litigation for centralization of all CAEv2 claims in an MDL.[3]  After the matter was consolidated and transferred to the

---

[3] *See* 3M Response to Motion to Transfer Related Actions for Coordinated Pretrial Proceedings, *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, MDL No. 2885, ECF No. 98 at 5-6 (Feb. 19, 2019) (arguing centralization in an MDL is "appropriate" given the anticipated number and common factual predicates for CAEv2 claims, for the convenience of the parties and witnesses, and to "promote the just and efficient conduct" of the claims "by, among other things,

undersigned for coordinated pretrial proceedings, 3M vigorously litigated in the MDL for the next three-and-a-half years, negotiating for governing procedural and logistical rules; engaging in common corporate, military, and expert discovery, as well as case-specific discovery for 19 bellwether plaintiffs; completing case-specific discovery and dispositive motions practice for 374 Wave 1 cases;[4] and extensively briefing (and orally arguing, as appropriate) issues ranging from the applicability of the federal officer removal statute (as to certain claims) and the federal government contractor defense (as to all design defect and failure to warn claims) to more than 260 motions in limine, 109 *Daubert* challenges, 42 case-specific summary judgment motions, 47 choice of law disputes,[5] and 21 post-trial motions, not to mention countless discovery, procedural, and/or logistical disputes.  Scorched earth battle was waged against every theory of liability alleged in this litigation, yet there was nary a whisper that Aearo, and not 3M, was the only proper target, or even a target at all.

---

eliminating duplicative discovery, preventing inconsistent rulings on *Daubert* and other pretrial matters, and conserving the resources of the parties, their counsel, and the judiciary.").

[4] Initially, as with all the Waves, there were 500 cases in Wave 1.  *See* Case Management Order No. 31 (Wave Order #1), ECF No. 2304.  That number decreased as cases were moved from Wave 1 for various reasons and/or dismissed during Wave 1 discovery, resulting in 374 active cases in Wave 1 as of now.

[5] There were 8 choice of law disputes in the bellwether cases, and 39 such disputes in the Wave 1 cases.

Then came the bellwether trials, 16 in total over 14 months, resulting in 19 verdicts—13 plaintiffs' verdicts, 6 defense verdicts—totaling nearly $300,000,000 in jury verdicts. And that's when the bottom fell out. Suddenly, according to 3M, the MDL was a "failure," this Court's legal rulings were riddled with "substantial" errors (only those in which Plaintiffs prevailed, of course), and the bellwether trial process was "tainted" and "flawed" (again, only with respect to trials in which Plaintiffs prevailed).[6] It was time for a new forum—in the interests of justice, fairness, and efficiency (sound familiar?)—no more of this MDL nonsense.[7]

Together with its MDL co-defendants, 3M devised a scheme to oust the Congressionally-established system for resolving mass tort disputes in Article III courts and install its new favored forum (for the moment, anyway), an Article I court, at the helm. Not because any of the entities was facing a *bona fide* threat of financial distress, and not due to managerial or operational difficulties that were jeopardizing the entities' continued viability. No, this was good old-fashioned litigation forum shopping, solely—and admittedly—designed to evade dissatisfactory legal rulings and verdicts in the MDL, and to avoid potential future liability for a *non-debtor*, 3M,

---

[6] *See In re Aearo Techs. LLC*, Case No. 1:22bk2890, Informational Brief, ECF No. 12 at 5, 7, 47 (Bankr. S.D. Ind. July 26, 2022).

[7] *See id*. at 5.

in the tort system.[8]  And there's the catch.  3M itself was not willing to pay the price of admission to an Article I forum—here, reorganization and submission to the oversight of a bankruptcy court.   Not to be denied, the company hatched a workaround.  Aearo would file for Chapter 11 bankruptcy protection but seek an extension of the statutory automatic stay of litigation to 3M, who would never file a bankruptcy petition itself.  To pull this off, the entities executed a funding and indemnity agreement—on the eve of Aearo's bankruptcy filing—allocating 100% of 3M's liability for the CAEv2 claims in the MDL to Aearo in exchange for 3M's commitment to fund all of Aearo's liabilities and costs in bankruptcy.[9]  Newly (and voluntarily) saddled with *all* liability for the largest MDL in the federal judiciary's history, Aearo would be recast as the "real-party defendant" when it comes to CAEv2 claims and the parties' funding and indemnity agreement heralded as validly creating an identity of interest between the depletion of Aearo's assets in bankruptcy and continued litigation against 3M in the MDL, which, in the companies' telling, justified a stay or injunction of CAEv2 litigation against 3M.  If successful, 3M

---

[8] *See id*. at 5-8, 10-17, 24-56, 58 (detailing the dissatisfactory outcomes in the MDL and arguing that extending the automatic stay of CAEv2 litigation to 3M is "essential" to Aearo's reorganization).

[9] However, as the bankruptcy court recognized, the flaw in this orchestrated extraction is that the agreement is entirely circular given that under the agreement, Aearo is obligated to indemnify 3M for all CAEv2 liability, yet Aearo is also authorized to seek repayment from 3M for those same liabilities.  *See In re Aearo Techs., LLC*, 642 B.R. 891 (Bankr. S.D. Ind. Aug. 26, 2022).  Thus, the agreement has no practical economic impact on Aearo's ability to reorganize and fails to create the identity of interest that 3M desired.

would reap all the benefits of bankruptcy with none of the attendant burdens.  The bankruptcy court ultimately rejected that strategy and declined to extend the stay to 3M, allowing the CAEv2 claims against 3M in the MDL to continue unabated by the bankruptcy proceeding.  *See In re Aearo Techs., LLC*, 642 B.R. 891 (Bankr. S.D. Ind. Aug. 26, 2022).

The bankruptcy court's decision should have ended the sophistry, barring its reversal on appeal.[10]  It did not.  Instead, after losing its attempt to piggyback onto Aearo's bankruptcy protection, the company returned to the MDL and sought to rewrite the history of the CAEv2, its relationship with Aearo, and the litigation by asserting *for the first time* that it has neither independent nor successor liability for any alleged CAEv2-related injuries.[11]  The idea here, of course, is to reconstruct 3M's litigation narrative to align with the newly conceived bankruptcy fiction that Aearo is, and always has been, a separate entity with sole and complete responsibility for all CAEv2 liability.  Attempting to do so in this context, for this purpose, and at

---

[10] *See In re Aearo Techs., LLC*, No. 22-2606, ECF No. 14 (7th Cir. 2022) (granting Aearo's petition for authorization of direct appeal of bankruptcy court's order denying injunction).

[11] *See, e.g.*, *George*, No. 7:20cv71963, Amended Answer, ECF No. 78 at 6-10 (Nov. 7, 2022).  3M did not assert its new strategic position in the MDL until *after* the bankruptcy court denied the preliminary injunction request, presumably because an injunction of CAEv2 claims against 3M would have obviated the need for further maneuvering in the MDL for the foreseeable future.  Nevertheless, from the day Aearo's bankruptcy petition was filed, there were signs that 3M was attempting to uncouple itself from Aearo—for example, new counsel immediately appeared in the MDL for 3M alone; the days of shared counsel for all defendants were over—but only to a point, for purposes of the new bankruptcy narrative, which was factually irreconcilable with the MDL narrative to date.

this late juncture is a brazen abuse of the litigation process after 3M's nearly four years of affirmatively asserting, advocating, and wielding—to the detriment of Plaintiffs—the precise opposite position in the MDL.[12]

3M's first affirmative representation regarding its relationship with Aearo came at the parties' Rule 26 conference in early June 2019.  At that time, Plaintiffs explicitly asked 3M whether there would be any dispute as to which company—3M or Aearo—had responsibility for CAEv2-related liabilities.  Eric Rucker, 3M's corporate representative and current Associate General Counsel, unequivocally responded that "no argument would be raised" on the issue due to the nature of the Aearo acquisition.  *See* Hoekstra Declaration, ECF No. 3361-1 at 2.  3M has never denied that Mr. Rucker made this statement,[13] and in fact, the company's entire course of conduct going forward (until losing its bid for a bankruptcy stay, at least) was consistent with it.

---

[12] To be clear, the Court is *not* finding—and could not find—that 3M and Aearo's statements and conduct in connection with the bankruptcy proceeding amount to bad faith litigation abuses.  Thus, while the companies' statements and conduct before the bankruptcy court provide highly probative context and insight into 3M's strategic motives in the MDL, they are *not* the factual bases for the imposition of sanctions here.

[13] For example, 3M did not offer—but certainly could have and undoubtedly would have, if it was in a position to do so—an affidavit or sworn declaration from Rucker denying that this exchange occurred.  The company's only comment on the matter was a statement in the instant briefing that another one of its attorneys who also was present at the Rule 26 conference said he "has no recollection of" the exchange, *see* Def. Response, ECF No. 3584 at 6, although even that attorney previously conceded—not in a sworn declaration but in a courtroom discussion—that he was "certainly . . . not trying to argue that [Plaintiffs' sworn account of the exchange] is wrong or right" because he "ha[s] no idea about that situation," *see* Oral Argument Tr. (Aug. 11, 2022) ECF No. 3584-2 at 4.

In its Master Answer filed in October 2019, and its Amended Answer filed in February 2020, for example, 3M could have affirmatively put successor liability at issue—and *would have* if there was a genuine, good faith basis to do so—either by explicitly pleading it (just as it did in the post-bankruptcy Answers filed in Wave 1 cases)[14] or simply denying the allegation in the Master Complaint that "3M is liable for [Aearo's] conduct," *see* ECF No. 704-1 at 7. It did not.[15] Instead, the company asserted a general objection to the allegation as calling for a legal conclusion, but "[t]o the extent a response [was] required," it "admit[ted] that the Aearo Defendants are indirect, wholly-owned subsidiaries of 3M." *See* Amended Answer, ECF No. 959 at 7. Nothing about this response even hints that 3M intended to contest its full and independent liability relative to Aearo.[16]

---

[14] *Compare* Answer to Master Long Form Complaint, ECF No. 800-1 & Amended Answer to Master Long Form Complaint, ECF No. 959, *with George*, 7:20cv71963, Answer, ECF No. 46 at 6-10 (Sept. 29, 2022) & Amended Answer, ECF No. 78 at 6-10 (Nov. 7, 2022).

[15] Notably, however, it did assert an array of defenses aimed at shifting liability to other parties—namely, the United States military and individual plaintiffs themselves—just *never to Aearo*.

[16] *See* 5 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE CIVIL § 1261 (April 2022) ("[T]he theory of [Federal Rule of Civil Procedure] 8(b) is that a defendant's pleading should apprise the opponent of those allegations in the complaint that stand admitted and will not be in issue at trial and those that are contested and will require proof to be established to enable the plaintiff to prevail."); *see also Western Union Tel. Co. v. Aldridge*, 219 F. 836, 838 (5th Cir. 1914) ("The office of pleading is to inform the court and the parties of the facts in issue; the court that it may declare the law, and the parties that they may know what to meet by their proof.") (quoting *Hill v. Mendenhall*, 88 U.S. 453, 455 (1874)); *Edelman v. Belco Title & Escrow, LLC*, 754 F.3d 389, 395 (7th Cir. 2014) ("The purpose of a responsive pleading is to put everyone on notice of what the defendant admits and what it intends to contest."); *Peak v. ReliaStar Life Ins. Co.*, 1:16cv3491, 2018 WL 6380772, at *2 (N.D. Ga. Sept. 28, 2018) (same).

3M reinforced this liability paradigm again and again over the next three years as the parties and the Court developed and executed the discovery, pretrial briefing, and bellwether trial plans for the litigation. Amidst twenty-two case management conferences, innumerable court filings, and countless biweekly discovery and leadership calls, hearings, and oral arguments, 3M deliberately established itself as *the defendant* with exclusive responsibility for, and control over, alleged CAEv2 liability. Examples abound. 3M alone verified interrogatory responses sent to all defendants. 3M alone produced hundreds of thousands of documents. Current and former 3M employees testified on behalf of 3M alone—not Aearo—at 30(b)(6) depositions, fact depositions, and bellwether trials regarding events that occurred both before and after the Aearo acquisition. Aearo and its employees (to the extent any existed at the time) verified nothing, produced nothing, and sent no one.[17] And while 3M correctly maintains that successor liability generally involves questions of law to be resolved by a court (although, it should be noted, that legal determination will undoubtedly depend on questions of fact that must be resolved by a jury), not one of the company's 388 summary judgment motions in either the bellwethers or

---

[17] *See, e.g.*, Brian Myers Choice of Law Testimony (Jan. 8, 2021), ECF No. 3361-13 at 12 (testifying that when 3M acquired Aearo in 2008, "the headquarters of Aearo … was liquidated; it ceased to exist"); Brian Myers 30(b)(6) Dep. (Oct. 18, 2019), ECF No. 3361-6 at 15-16 (testifying that he "didn't know there was an Aearo anymore" in response to the question of whether he understood Plaintiffs have brought claims against both 3M and Aearo); Hoekstra Declaration, ECF No. 3361-1 at 2 (declaring that at the Rule 26 conference in June 2019, Mr. Rucker "represented that all former Aearo employees in hearing protection were now 3M Company employees, and that Aearo does not really have any employees").

the Wave 1 cases raised the issue.[18]  All of these actions affirmed Mr. Rucker's discovery conference representation that 3M alone was responsible for CAEv2-related liabilities.

Significantly, all 16 bellwether trials went forward with no suggestion from 3M that it had anything but exclusive liability for alleged CAEv2-related injuries. 3M sent a corporate representative to every trial (ironically now, Mr. Rucker).  Aearo sent no one.  Defendants were referred to collectively as "3M" for purposes of liability and damages by both sides and the Court, with no objection from 3M.  In cases involving apportionment of fault, the parties agreed to jury instructions and verdict forms allowing fault to be apportioned to a single defendant, 3M, and 3M never once argued that the relative fault of any other defendant should be considered in connection with the plaintiffs' injuries, even in cases involving CAEv2 use that occurred solely *before* 3M acquired Aearo.  *See, e.g.*, *Adkins*, 7:20cv012, ECF Nos. 113 at 33-35 (instructions); 118 at 3 (verdict form).  Indeed, of the 516.5 total trial hours allocated to Defendants across the bellwether trials, not one moment was spent on evidence or argument that 3M did not actually (even partly) belong in this litigation.

---

[18] 3M filed 18 summary judgment motions in the bellwether cases (a motion was filed in all but one case) and 370 summary judgment motions were filed in the Wave 1 cases.  These latter submissions only predated Aearo's bankruptcy filing by four days.  Yet it was not until *after* the bankruptcy court denied Aearo's request for a preliminary injunction of CAEv2 claims against 3M that 3M reversed its position on successorship in the MDL.

Perhaps the most damning assertions by 3M on this issue to date—one of which was made *after* the bankruptcy scheme first was concocted in early spring of 2022 but *before* Aearo's Chapter 11 filing in July 2022 and *before* the bankruptcy court declined to extend the bankruptcy stay to 3M[19]—occurred in the post-trial briefing on statutory cap issues in the *Wayman* and *Vaughn* bellwether cases. The state law applicable in those cases imposed noneconomic damages caps on a per defendant basis, and Plaintiffs argued to the Court that this meant the statutory cap should be multiplied six times for the six named corporate defendants in this litigation. Defendants opposed the cap multiplier on the basis of their "single vicarious liability" for CAEv2 injuries, and rejected as "illusory" any "suggestion that they are six separate parties for purposes of *this litigation*" since 3M "owns and controls 100% of the other five named defendants." *See Wayman*, 7:20cv149, ECF No. 194 at 3 (Feb. 23, 2022); *id.* at 4 ("[R]egardless of their corporate form, Defendants share the same potential liability in this case."); *Vaughn*, 7:20cv134, ECF No. 179 at 8-9 (May 16, 2022) (same). The Court was persuaded by Defendants' position that their respective liabilities were "one and the same," *see, e.g.*, *Wayman*, 7:20cv149, ECF No. 194 at 3, and shielded them from the statutory

---

[19] *See In re Aearo Techs. LLC*, 642 B.R. 891, 898 (Bankr. S.D. Ind. Aug. 26, 2022) ("Beginning in March 2022, 3M began exploring strategic alternatives to the MDL. Among those alternatives was a chapter 11 bankruptcy for the Aearo Entities."); *see also* CAE Committee's Objection to Employment of Kirkland & Ellis LLP as Attorneys for the Aearo Debtors, No. 1:22bk2890, ECF No. 730 at 5 (Nov. 2, 2022) (citing May 9-10, 2022 Board regarding same).

cap multiplier on that basis.  *See id*., ECF No. 198 at 5-6 (May 24, 2022); *Vaughn*, 7:20cv134, ECF No. 181 at 4-5 (June 6, 2022).  This was no small thing—it was the difference between a nearly $1 million damages cap based on a single defendant, 3M, and a $6 million cap based on six defendants, which significantly reduced the two plaintiffs' damages awards.  3M's clear strategic decision to frame its own potential liability in "*this litigation*" as indistinguishable from that of the other five defendants belies the company's attempt to disclaim any such liability now.

The above factual findings are not an encyclopedic account of 3M's every act of deception and prevarication with respect to successor liability in this litigation. However, the findings clearly demonstrate a deliberate and continuous course of conduct and statements—in pleadings, discovery, bellwether trials, post-trial motions, and the case-specific discovery and dispositive motions for the first wave of cases being prepared for remand—successfully orchestrated by 3M to establish itself as the party responsible for alleged CAEv2 claims.  3M's assertions were either knowingly false at the time or, instead, and much more likely the case, regrettable truths that became incompatible with their bankruptcy strategy.  Either way, 3M's attempt to renege on those positions now, and its duplicitous motives and mode of doing so, are beyond the pale of acceptable litigation conduct and reflect a flagrant contempt for this Court and the MDL process.  Significant to this ruling, 3M's machinations have frustrated, manipulated, and delayed the fair, efficient, and

effective resolution of hundreds of thousands of CAEv2 claims. The MDL is at a standstill. No Wave trials, no remands, no nothing can go forward until 3M's ruse is run up the flagpole. And there can be no dispute but that this was by design. 3M freely admits it. *See, e.g.*, *In re Aearo Techs. LLC*, Case No. 1:22bk2890, Informational Brief, ECF No. 12 at 5-8 (Bankr. S.D. Ind. July 26, 2022). These abuses are the epitome of bad faith and demand severe sanction.

Federal courts have an arsenal of sanctions within their discretion to impose in response to bad faith conduct that abuses the judicial process. *See Mingo v. Sugar Cane Growers Co-op of Fla.*, 864 F.2d 101, 102 (11th Cir. 1989). Sanctions can range from a simple reprimand to the striking of claims or defenses, adverse inferences, lawyer discipline, monetary penalties, outright dismissal of a lawsuit, and/or default judgment. *See Mingo*, 864 F.2d at 102; *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc*., 561 F.3d 1298, 1306-07 (11th Cir. 2009) (affirming district court's exercise of inherent authority to strike answer and enter default judgment against defendant for bad faith litigation misconduct). Dismissal of a claim, the striking of a defense, and/or default judgment are among the heaviest penalties, appropriate only in the most compelling circumstances, where another party has been prejudiced by the bad faith conduct and lesser sanctions would not adequately punish and deter the abuses. *Bernal v. All Am. Inv. Realty, Inc*., 479 F. Supp. 2d 1291, 1338 (S.D. Fla. 2007). Significantly, a sanction that "is a direct response to

the harm that the bad faith conduct…causes" is "clearly" within a district court's discretion.  *See Barnes*, 158 F.3d at 1215; *Peer v. Lewis*, 571 F. App'x 840, 845 (11th Cir. 2014).

Here, 3M's bad faith conduct has been, and continues to be, highly and unfairly prejudicial to Plaintiffs.  From day one in the MDL, successor liability was an issue common to all cases, albeit one based on state law, much like choice of law. Plaintiffs undisputedly raised it from the very start of the litigation—both verbally and in the pleadings—but were met with repeated assurances that 3M alone was the responsible party.  Had 3M changed its position on successor liability early on, or even before the Wave process began, the Court would have organized this litigation very differently.  Just as with choice of law, there would have been common discovery on successor liability, followed by summary judgment and/or bellwether trials to resolve disputes of fact.[20]  Waves would have been grouped and coordinated by state to ensure timely and efficient resolution of any dispute in advance of remand.  As it stands now, however, 3M's dilatory and self-serving tactics have cost Plaintiffs the opportunity to pursue discovery, summary judgment, and/or jury

---

[20] Omnibus briefing and court orders on common issues involving the interpretation and application of state laws is a fairly routine practice in MDLs, including this one.  *See, e.g.*, Defendants' Choice of Law Brief for Group A Plaintiffs, ECF No. 1539; Plaintiffs' Choice of Law Brief for Group A Plaintiffs, ECF No. 1540; Choice of Law Order for Estes, Keefer, & Hacker (applying Georgia and Kentucky law), ECF No. 1599; Choice of Law Order for Baker (applying Washington law), ECF No. 1613; Choice of Law Order for McCombs (applying Alaska law), ECF No. 1615; *see also* Plaintiffs' Choice of Law Brief for Group C Plaintiffs, ECF No. 1871; Defendants' Choice of Law Brief for Group C Plaintiffs, ECF No. 1872.

determinations on successor liability in the general discovery and bellwether contexts. Indeed, the bellwether process is rendered effectively meaningless with respect to one of its primary purposes—namely, "to answer troubling causation or liability issues common to the universe of" plaintiffs—because the verdicts say nothing about the relative fault of each named defendant. *See In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997).[21] If 3M has its way here, Plaintiffs instead will be forced to litigate these issues on a piecemeal basis following remand to transferor courts, substantially increasing their costs and unfairly subjecting them to the risk of inconsistent rulings on the same issues within the same states and potentially even the same federal districts.[22] The burden on the transferor courts to resolve the disputes would be extraordinary.[23] In a litigation numbering nearly 250,000 cases, catastrophe is virtually certain. It also was entirely avoidable, given the Court's mandate to resolve common questions arising from the allegations in this

---

[21] *See* Judge Eldon E. Fallon, *Bellwether Trials*, 89 UMKC L. REV. 951, 952 (2021) ("[T]he primary purpose of conducting bellwether trials is . . . to provide meaningful information, experience, and data to allow the parties to make an intelligent and informed decision as to the future course of the litigation. The type of information and data spawned by the bellwether process includes such things as . . . testing the various theories of liability or defenses in a trial setting, and . . . the result or verdict rendered by the jury.").

[22] As just one example, Plaintiffs would have to redepose the very same witnesses on remand—including Brian Myers, Garrad Warren, and Elliott Berger (who has actively fought against further participation in the litigation), to name a few—that were already deposed extensively in the MDL.

[23] It also would frustrate the long-settled plan for the first few Waves that this Court would resolve all pretrial motions in those cases so that, on remand, a transferor court need only set each case for trial. 3M was well aware of this plan for the Wave cases.

consolidated proceeding, which it has attempted to do in earnest.  *See* Transfer Order, ECF No. 1; 28 U.S.C. § 1407.  Finally, Plaintiffs have expended substantial time and resources responding to 3M's abuses, which, for months now, have derailed their efforts to litigate or otherwise resolve their claims on the merits.  Again, by design and solely to further 3M's eleventh hour strategic objectives.

This simply is not a situation where a litigant made an offhand comment about potential liability once, twice, or even thrice.  Rather, 3M purposely engaged in a nearly *four-year campaign* to establish itself as the sole responsible party for CAEv2 claims, then abruptly reversed course when that narrative no longer suited its strategic objectives, to the detriment of both the Plaintiffs and the administration of justice in this MDL.  *See Fuery v. City of Chicago*, 900 F.3d 450, 454 (7th Cir. 2018) ("As is often the case in life, … the whole of abusive action is greater than the sum of the parts of which it is made.  Were we to view judicial abuses piecemeal, each one might not be worthy of sanctions, or even comment.  But these incremental abuses chip away at the fair administration of justice and frustrate a trial judge's faith that she can rely upon the lawyers before her—officers of the court—to set forth a fair and accurate presentation of the facts and law."); *id*. at 464 ("Many of the violations may seem trivial (others, however, not at all).  But … it is the district court who can evaluate the whole ball of wax and determine whether the small incremental blows to the integrity of a [case] add up to something that requires sanctioning.

Death by a thousand cuts is no less severe than death by a single powerful blow."). Only one sanction is commensurate with the seriousness of that assault on the integrity of the MDL and this Court.  The company must be held to its explicit statements and conduct on the issue of successor liability.[24]  Any other result would reward 3M's bad faith manipulation with a favorable litigation outcome, embolden it with further opportunities to subvert the judicial process on remand, and upend the nearly four years of methodical effort (not to mention the incalculable amount of money spent) that culminated in bellwether trials that would now stand for little. Reprimands and monetary penalties would fail to address the nature, purpose, and ramifications of 3M's abuses.  No lesser sanction will make Plaintiffs whole, adequately punish 3M, and deter future parties—and MDL litigants, in particular— from engaging in similarly egregious gamesmanship.

It is worth noting that this litigation is without precedent, in terms of both magnitude and complexity.  Years of painstaking collective work have been devoted to fairly, effectively, and efficiently moving it to resolution, in whatever form that takes.  Every organizational tool, every logistical rule, and every discovery and trial schedule that 3M now denounces was crafted by collaboration and consent.  So too

---

[24] *See, e.g.*, *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1306 (11th Cir. 2006) (holding that "[g]iven [the party's] clear history of bad faith stonewalling [regarding interest payable to the bankruptcy Debtor], the bankruptcy court was well within its discretion to conclude that the party had forfeited its opportunity to dispute both its liability to the Debtor for interest and the amount of interest it had earned").

were the processes for developing the record, defining the legal landscape, testing the theories of liability and defenses at bellwether trials, and everything in between. When that labor yielded results that 3M found unpalatable, the company had legitimate options. Pursue appeals. Continue litigating. Collaborate on a framework to assess, resolve and provide fair compensation for CAEv2 claims in the MDL. *File a petition for bankruptcy alongside its codefendants*. Masquerading as the hapless wrong party defendant and purposefully ambushing the other side with a wholly contrived strategic position, after nearly four years of representing that 3M has exclusive responsibility for all CAEv2 liability in the MDL, exceeds the bounds of good faith litigation conduct. These bad faith abuses "transcend[] the interests of the parties in" this litigation and "so violate the judicial process" that only the harshest penalty is appropriate. *See Zocaras v. Castro*, 465 F.3d 479, 484 (11th Cir. 2006).

Accordingly, it is **ORDERED** that:

1.  The Remand Wave 1 Plaintiffs' Motion for Summary Judgment on 3M Company's Full and Independent Liability for CAEv2-Related Injuries, ECF No. 3506-1, is **GRANTED**, consistent with this Order.

2.  Defendant 3M Company is hereby precluded from attempting to avoid any portion of its alleged liability for the CAEv2 claims in this litigation by shifting blame to the Aearo defendants, as a sanction for the company's explicit statements and conduct establishing itself as the sole responsible party for nearly four years in the MDL and its bad faith reversal of that position solely to serve its strategic objectives in bankruptcy.

3.      This Order will apply to all cases currently filed in the MDL, whether on the MDL or administrative dockets, and all cases filed in or transferred to the MDL in the future.

4.      Given that this Order impacts all current and future cases in the MDL, as well as future trials, the Court finds that this Order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from [it] may materially advance the ultimate termination of the litigation." *See* 28 U.S.C. § 1292(b).   The proceedings will be **STAYED** pending resolution of any interlocutory appeal.   The Court, however, will continue to enter rulings on pending motions.  Given the impact the stay will have on the nearly 250,000 cases pending in the MDL, the Court respectfully requests the Eleventh Circuit to hear any appeal from this Order as soon as practicable.

**SO ORDERED**, on this 22nd day of December, 2022.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**