**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**


IN RE: 3M COMBAT ARMS EARPLUG   )   Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,  )
                                )   Pensacola, Florida
                                )   February 23, 2023
                                )   8:02 a.m.
                                )
                                )
_____)


**DATA DAY**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE

(Pages 1-61)

Presented by:    BrownGreer PLC
                 by:  **ORRAN L. BROWN SR.**
                       *obrown@browngreer.com*

                     **DENNIS CARTER JR.**
                       *dcarter@browngreer.com*
                     250 Rocketts Way
                     Richmond, Virginia  23231

# P R O C E E D I N G S

08:02:25  **THE COURT:**  Good morning and welcome to Data Day.

08:02:27  As you all know, this morning BrownGreer will share

08:02:30  its analysis of the DOEHRS data with the Court and all

08:02:35  interested attorneys and parties to the MDL.  Before they do

08:02:39  that, though, I'm going to make some preliminary remarks, offer

08:02:43  some observations, and then they'll get started.

08:02:46  Let me introduce, before I go any further, the two

08:02:49  BrownGreer individuals here with us this morning.  Mr. Orran

08:02:53  Brown, founding partner --

08:02:54  Good morning.

08:02:55  **MR. BROWN:**  Good morning, Your Honor.

08:02:56  **THE COURT:**  -- of BrownGreer PLC; and then Dennis

08:03:02  Carter, who is a data analyst at BrownGreer and has done a lot

08:03:05  of the legwork with this data.

08:03:07  Thank you both for being here.

08:03:08  We have folks here in the courtroom.  Obviously there

08:03:10  are people on Zoom joining us and I believe also conference

08:03:15  calls, so welcome to everyone.

08:03:16  For those of you who don't know what DOEHRS stands for

08:03:23  -- and I'm going to be real basic here but there may be some

08:03:27  people who don't -- DOEHRS stands for Defense Occupational and

08:03:32  Environmental Health Readiness System, and it is a software

08:03:34  system used by the Department of Defense to collect, store, and

08:03:38  track certain health information for servicemembers worldwide.

08:03:42   1          As it relates to this MDL, DOEHRS is the source of

08:03:50   2   audiometric data for virtually all the plaintiffs in the MDL

08:03:52   3   who have served in the military.

08:03:54   4          As both sides know, it took considerable time and

08:03:57   5   effort to obtain the data from the Department of Defense.

08:04:01   6   That's an understatement.  That was due largely to the size of

08:04:07   7   our plaintiff population.

08:04:09   8          I do appreciate very much, though, the DoD and DOJ's

08:04:14   9   willingness to get that data produced to us.  It's been very

08:04:18   10   helpful and I think as you'll see as we proceed this morning.

08:04:22   11          We now have a response from the DoD in terms of

08:04:26   12   audiometric data for more than 178,000 plaintiffs.  A request

08:04:33   13   was recently submitted for more than 30,000 additional

08:04:38   14   plaintiffs' DOEHRS data, and hopefully we'll hear from the DoD

08:04:42   15   and DOJ in regards to that *Touhy* request soon.

08:04:46   16          Now, as you know, if you read my order of February

08:04:50   17   17th, this proceeding is purely informational, no party was

08:04:54   18   required to attend, no aspect of this proceeding is

08:04:58   19   adversarial, and no findings or rulings will result from this

08:05:04   20   proceeding.

08:05:04   21          The sole intended purpose of Data Day is to educate

08:05:09   22   primarily the non-leadership stakeholders in connection with

08:05:14   23   the litigation who have not been as familiar with the

08:05:19   24   audiometric data as perhaps the leadership has been over the

08:05:24   25   past several months.

| | | |
|---|---|---|
| 08:05:26 | 1 | As you know, again, if you read my order, leadership |
| 08:05:31 | 2 | counsel has had this data for many months, and some of you may |
| 08:05:35 | 3 | also have had it.  But I don't know that everyone has had |
| 08:05:37 | 4 | access to it and has had the ability to analyze it as |
| 08:05:41 | 5 | leadership has analyzed it and as now BrownGreer has analyzed |
| 08:05:47 | 6 | it. |
| 08:05:47 | 7 | A couple of things I'll ask you all to keep in mind as |
| 08:05:50 | 8 | you take in the presentation.  First, on the one hand, the data |
| 08:05:55 | 9 | is the data, right?  And, in some respects, it can and does |
| 08:06:00 | 10 | speak for itself. |
| 08:06:02 | 11 | On the other hand, when you're dealing with an |
| 08:06:04 | 12 | enormous volume of complex information such as what's contained |
| 08:06:08 | 13 | in the DOEHRS database, it's difficult to derive insights or |
| 08:06:15 | 14 | draw meaningful conclusions from the raw data without the |
| 08:06:18 | 15 | assistance of data analytics. |
| 08:06:20 | 16 | And like I said, the parties have had their data |
| 08:06:26 | 17 | analysts reviewing this data for quite some time, and then also |
| 08:06:31 | 18 | that's where BrownGreer comes in.  And, at my request and in |
| 08:06:34 | 19 | using solely the parameters that I provided to them -- and I'll |
| 08:06:38 | 20 | speak more about that in just a moment -- BrownGreer's data |
| 08:06:42 | 21 | analysis revealed a number of what I consider to be valuable |
| 08:06:45 | 22 | insights about the inventory and about each side's own analysis |
| 08:06:49 | 23 | of the inventory which would otherwise I think be lost in the |
| 08:06:54 | 24 | sheer mass of information, because it is massive. |
| 08:06:57 | 25 | Now, as you all know, data can be sliced and diced in |

08:07:02   1   many different ways and, depending on the methodological

08:07:06   2   approach that's applied to the data which inherently involves

08:07:10   3   some statistical assumptions and subjective analytical choices

08:07:15   4   that can affect the outcome of the analysis, the results often

08:07:20   5   vary.  And they can at times vary widely.  And in my

08:07:25   6   observation, that's precisely what has happened here, and you

08:07:29   7   will see that.

08:07:29   8        The parties and their experts have taken very

08:07:33   9   different approaches from a methodological standpoint to

08:07:38   10   analyzing the DOEHRS data and, as a result, they've reached

08:07:41   11   very different conclusions about what the data says regarding

08:07:46   12   the hearing-related injuries in this plaintiff population.

08:07:50   13        There's nothing surprising about that.  There's

08:07:53   14   nothing surprising about the parties' respective positions.

08:07:56   15   There's nothing wrong with their positions either.  But there's

08:08:00   16   no way to marry or combine those positions because they are

08:08:07   17   completely different in the foundational approach that they

08:08:11   18   used in approaching the data.

08:08:14   19        And in fact, since I last have heard from or spoken to

08:08:20   20   leadership about their approaches, they may have changed their

08:08:23   21   approaches.  I don't know.  That's fine, too.

08:08:25   22        But as the judicial officer charged with shepherding

08:08:30   23   this MDL for the benefit of all interested parties, I recognize

08:08:35   24   the need for an impartial, nonadversarial analysis of the data.

08:08:41   25   And I did that for two reasons.  I've told leadership what

08:08:44    1    these reasons were.  In other words, I've told them why I felt

08:08:49    2    there was a need for BrownGreer to do this, and I've told them

08:08:52    3    what I asked them to do.

08:08:54    4        I felt that a neutral middle-of-the-road approach was

08:09:00    5    necessary given how far apart the parties' conclusions were

08:09:04    6    based, again, on those very different approaches that they've

08:09:07    7    used.  And I also felt that a different approach, one that was

08:09:10    8    based on the evidence from literally hundreds of *Daubert*

08:09:14    9    challenges and the 16 bellwether trials that were conducted

08:09:18   10    here concerning both the science of hearing-related injury and

08:09:21   11    the facts that the juries in those cases found significant,

08:09:25   12    that that might yield important and relevant insights that

08:09:29   13    neither side's approach adequately captured.

08:09:31   14        For example -- and again, I'm going to offer some

08:09:36   15    observations -- neither side's approach accounted for specific

08:09:40   16    causation in terms of the timing of the plaintiff's earplug use

08:09:44   17    relative to changes reflected in their audiometric data.  I

08:09:50   18    felt this was important for obvious reasons related to a

08:09:55   19    plaintiff's ability to prove injury in a tort case, which is

08:09:58   20    what this litigation is.

08:10:04   21        Moreover, as I understand it -- and I say this based

08:10:08   22    on my communications with 3M as well as a review of the

08:10:11   23    informational brief that was filed in the Aearo bankruptcy --

08:10:15   24    3M's approach relied on impairment rating scales that, in very

08:10:19   25    simple terms -- I'm going to let Dennis and Orran get a lot

08:10:23  1   more nuanced about this -- but in simple terms, average a

08:10:29  2   person's hearing thresholds at very specific frequencies.  And

08:10:29  3   again, I say "simple terms" because there's more to the

08:10:33  4   impairment rating scales than just a pure-tone average, but

08:10:37  5   that is the starting point in an impairment rating scale.

08:10:40  6        Also an observation I made, the impairment rating

08:10:43  7   approach includes certain frequencies -- these are lower

08:10:47  8   frequencies -- that, according to trial experts on both sides,

08:10:50  9   both defense and plaintiff experts, agree are rarely affected

08:10:56  10  by noise.  And so, in my view, that artificially lowers the

08:11:04  11  pure-tone average for a plaintiff claiming to suffer from

08:11:09  12  noise-induced hearing injury.

08:11:10  13        And again, significantly in my mind, at least one of

08:11:14  14  the impairment rating scales, the AMA scale, specifically

08:11:17  15  excludes the frequencies that we heard from expert after expert

08:11:21  16  after expert on both sides of the aisle that are most commonly

08:11:26  17  affected by noise, which also is obviously a problem in a case

08:11:29  18  in which the issue is noise-induced hearing loss as opposed to

08:11:35  19  some other form of hearing loss.

08:11:38  20        To my knowledge, there's not been one expert in the

08:11:42  21  MDL on either side who has ever offered an opinion on the

08:11:46  22  existence or the absence of hearing loss for a particular

08:11:49  23  plaintiff based on a pure-tone average or anything like a

08:11:52  24  pure-tone average.

08:11:55  25        To the contrary, in all of the 16 bellwether trials,

08:11:58    1   as well as in the Wave 1 cases that I've reviewed, all of the

08:11:58    2   experts, plaintiffs and defense alike, testified that hearing

08:12:09    3   loss is diagnosed based on single frequency shifts, not an

08:12:12    4   average.

08:12:12    5          But again, there are no right or wrong approaches

08:12:15    6   here.  These are just observations that I have made that I

08:12:19    7   consider relevant, and that is why I've asked BrownGreer to do

08:12:23    8   the approach that they have done because I feel like it's most

08:12:28    9   closely tied to the evidentiary record in this tort litigation.

08:12:32   10          Now, I asked BrownGreer to analyze the data from four

08:12:38   11   perspectives.  There were three and then I worked with them and

08:12:41   12   asked them to move it into four or to change it to four.

08:12:47   13          There are the two party approaches, as I understand

08:12:51   14   them.  One is a single frequency.  One is pure-tone average,

08:12:56   15   which I'll call a pure-tone average plus because there's a

08:13:00   16   little more to it than just the averaging, but it's based on

08:13:03   17   the first and last audiogram reflected in the data.

08:13:07   18          Then a third approach that I asked them to do, which

08:13:11   19   is also single frequency, and it accounts for the timing of

08:13:15   20   earplug use relative to significant threshold shifts in the

08:13:19   21   audiometric data.  This is what I was talking about earlier

08:13:23   22   when I said I didn't feel that the parties' approaches

08:13:26   23   accounted for specific causation, and so I tried to do that --

08:13:30   24   or BrownGreer has done that based on what I've asked them to

08:13:32   25   do.

08:13:32    1            And then finally, a fourth approach, which is a

08:13:38    2    variation of the pure-tone average plus approach that accounts

08:13:41    3    for the timing of the earplug use relative to the significant

08:13:45    4    threshold shifts in the audiometric data.

08:13:49    5            You'll also hear from BrownGreer regarding its

08:13:54    6    analysis of the DOEHRS data for evidence of tinnitus, and

08:13:59    7    you'll hear the details of each approach in just a moment.

08:14:01    8            Let me emphasize a couple of final points.  BrownGreer

08:14:04    9    did not select any of the assumptions or parameters used in

08:14:09   10    these analyses.  As I explained to leadership in December of

08:14:12   11    last year, BrownGreer merely implemented the approaches as I

08:14:17   12    asked them to do.

08:14:19   13            The parties' approaches may have evolved over time.  I

08:14:23   14    said that a minute ago.  That's fine.  Maybe even encouraging.

08:14:28   15    But again, as I understood it in December, there was a

08:14:31   16    significant gulf between the two conclusions.

08:14:36   17            The goal here today is transparency, transparency.

08:14:41   18    And again, I'm not here to say these are the only approaches.

08:14:49   19    They're certainly not the only ways to approach this data.

08:14:55   20    These are all reasonable approaches to the data.  The

08:15:01   21    approaches I've asked BrownGreer to use, I don't suggest that

08:15:05   22    they're the be-all and the end-all.

08:15:10   23            Again, none of this is binding on anyone in any

08:15:14   24    context.  You can love it, you can hate it, you can throw it in

08:15:17   25    the trash can, you can discard it, you can rely on it.  It's

08:15:23    1    totally up to you.  My hope is just that it will be one factor

08:15:26    2    that the parties can consider -- that all parties can consider

08:15:30    3    that may inform settlement talks down the road.  Maybe not.

08:15:34    4    Either way is fine.  It's totally up to you as the parties.

08:15:38    5         This is not, again, adversarial.  That's why there are

08:15:43    6    no counsel seated at counsel table.  There will be no argument

08:15:48    7    here today by anyone.  There will certainly be no

08:15:50    8    cross-examination of BrownGreer.  There will be no post-Data

08:15:55    9    Day filings accepted in this Court.

08:15:58   10         So please do not -- you are instructed you may not

08:16:03   11    file anything in this Court regarding today's presentation.

08:16:07   12    That's just clogging the docket because there's nothing coming

08:16:11   13    out of this presentation, again, that is binding on anyone or

08:16:15   14    final.  So do not do that.

08:16:19   15         Also, there should be no questioning or querying of

08:16:24   16    BrownGreer by anyone after today's presentation.  That would

08:16:30   17    not be fair to the other parties.  If one side is contacting

08:16:36   18    BrownGreer asking them about what they did, why they did it,

08:16:40   19    and the other side is not present, that's not fair.

08:16:43   20         So, with all of that said, if the parties want to get

08:16:47   21    together and jointly request a formal hearing on the data, we

08:16:53   22    can certainly do that.  I don't know to what end because that,

08:17:00   23    too, would not be binding or final.  But if each side wants to

08:17:07   24    -- we want to come to court, present your expert, the other

08:17:11   25    side present its expert, you challenge, you know, and we have a

08:17:14  1   Data Day cage fight brawl, fine.  I'll be here for it.  And

08:17:20  2   I'll even make findings, if you want me to.  They won't go

08:17:25  3   anywhere, but we can do that.  If you feel that you need to be

08:17:29  4   able to question BrownGreer, present your own experts, make

08:17:34  5   argument, again, I'll be here for it.  It just won't be today.

08:17:39  6          We can also do something sort of less formal than

08:17:43  7   that.  We can have a workshop, you can question and inquire of

08:17:51  8   BrownGreer in that setting, maybe try to come up with better

08:17:54  9   ways to approach the data.

08:17:57  10          I've asked BrownGreer to put together -- it's not

08:18:00  11   going to be presented today but -- a plaintiff profile of 500

08:18:05  12   plaintiffs at random.  They can also do that for any law firm.

08:18:11  13          So they can take these approaches or any other

08:18:14  14   approach but any one of these four approaches and apply it to a

08:18:18  15   law firm's inventory, they can apply it to every single

08:18:22  16   plaintiff in the litigation for whom we have DOEHRS data on.

08:18:25  17   That's a lot of plaintiffs.  That can be done as well.

08:18:29  18          So you all let me know if in the future you want to

08:18:34  19   get together for either of those purposes.

08:18:36  20          All right.  Those are my remarks, my observations.

08:18:39  21   I'm now going to turn the proceeding over to BrownGreer.

08:18:43  22          And again, very happy to have you here, Orran.  Thank

08:18:47  23   you.

08:18:47  24          MR. BROWN:  Thank you, Your Honor.  Good morning.  May

08:18:49  25   it please the Court?

| | | |
|---|---|---|
| 08:18:50 | 1 | I am Orran Brown.  And with me is, as the Court |
| 08:18:53 | 2 | mentioned, Dennis Carter, who is a data analytics architect, |
| 08:18:57 | 3 | and he and his team have been leading the digging around in the |
| 08:19:00 | 4 | information we have to produce the results we have and going to |
| 08:19:03 | 5 | share with everyone today. |
| 08:19:04 | 6 | And as the Court mentioned, we have all the census |
| 08:19:08 | 7 | form answers, the data -- live data from the census form |
| 08:19:11 | 8 | answers on the platform.  We have all the DOEHRS data that was |
| 08:19:15 | 9 | obtained by request by plaintiffs leadership and given to us. |
| 08:19:19 | 10 | And the question that we were given -- or the task we were |
| 08:19:20 | 11 | given was:  What can we learn from that?  How can we mine or |
| 08:19:24 | 12 | dig into that data and find out what it can tell us? |
| 08:19:28 | 13 | And as the Court mentioned, there are various |
| 08:19:30 | 14 | approaches and methods to attack the data.  We're going to |
| 08:19:34 | 15 | share four of them today, four different approaches.  There are |
| 08:19:38 | 16 | other ways to look at it.  We're not medical experts and, as |
| 08:19:41 | 17 | the Court mentioned, we're completely impartial about this. |
| 08:19:46 | 18 | We're not here today to say that any one of these approaches is |
| 08:19:49 | 19 | preferable or better than the others.  There are other pathways |
| 08:19:52 | 20 | to look at the data. |
| 08:19:53 | 21 | The bottom line is, if someone gives us the parameters |
| 08:19:57 | 22 | they'd like to explore in this information, we can tell you the |
| 08:20:03 | 23 | results or we can tell you it's not there.  We can slice and |
| 08:20:06 | 24 | dice this information in many different ways.  Today we're |
| 08:20:08 | 25 | going to look at four ways. |

08:20:10  1          And we are sharing the screen with people on Zoom.

08:20:16  2     They should be able to see the same slides we're seeing here.

08:20:20  3     But this is what we're going to walk through today, four

08:20:22  4     approaches about hearing loss, comparing the outcomes in the

08:20:25  5     information from those approaches, and then looking to what we

08:20:28  6     can learn about the tinnitus claims from the DOEHRS data or the

08:20:34  7     census form information or medical records we have.

08:20:38  8          And so first I want to set the stage about the

08:20:41  9     populations that we're talking about.  The Court mentioned some

08:20:44  10    numbers, but we do want to make sure we understand, of all the

08:20:47  11    plaintiffs who have been in this MDL, the ones we have

08:20:49  12    information on are the ones on which we could perform this kind

08:20:53  13    of analysis.

08:20:53  14         Originally there were the numbers that we're looking

08:20:55  15    at in terms of total plaintiffs, less the dismissed and

08:21:00  16    withdrawn and closed, and we get to the 234,000-plus number of

08:21:05  17    active plaintiffs who are in the MDL still.  So that's --

08:21:07  18         **THE COURT:**  Let me interrupt you just a minute, Orran.

08:21:09  19    I apologize.

08:21:10  20         This box that's at the top of the monitors, is that

08:21:13  21    our box?

08:21:13  22         **MR. SANDERS:**  Yes, ma'am.

08:21:15  23         **THE COURT:**  Does it have to be there?

08:21:17  24         **MR. SANDERS:**  Yes, ma'am.

08:21:18  25         **THE COURT:**  You can't move it?

| | | |
|---|---|---|
| 08:21:20 | 1 | **MR. SANDERS:**  It's been that way since we got it. |
| 08:21:22 | 2 | Unfortunately, we can't, because of the Zoom call. |
| 08:21:26 | 3 | **THE COURT:**  All right.  Well, I don't know what this |
| 08:21:28 | 4 | is going to do to some of the other slides, Orran.  But if you |
| 08:21:31 | 5 | can -- just because you can't see it, is it 382,474? |
| 08:21:40 | 6 | **MR. BROWN:**  Yes, we can work around that.  The total |
| 08:21:41 | 7 | box is all the plaintiffs originally in this MDL, the 382,474, |
| 08:21:46 | 8 | which is the number that's partially hidden by the camera icon. |
| 08:21:46 | 9 | **THE COURT:**  Sorry about that. |
| 08:21:50 | 10 | **MR. BROWN:**  And, yeah, we worked on that, but in the |
| 08:21:51 | 11 | system there's no way to move the box.  But, yeah, I'll try to |
| 08:21:55 | 12 | make sure we can all see behind the screen there. |
| 08:21:59 | 13 | **THE COURT:**  Can you go back? |
| 08:22:03 | 14 | **MR. BROWN:**  You bet. |
| 08:22:04 | 15 | **THE COURT:**  The second line, that is the number of |
| 08:22:07 | 16 | cases that have been dismissed, withdrawn, or closed? |
| 08:22:11 | 17 | **MR. BROWN:**  Yes. |
| 08:22:14 | 18 | **THE COURT:**  147,876.  And then the active number of |
| 08:22:18 | 19 | plaintiffs in the MDL, as of I'm sure a recent date, 234,598? |
| 08:22:28 | 20 | **MR. BROWN:**  Yes, correct, Your Honor.  And of course, |
| 08:22:28 | 21 | our analysis then is looking at the active plaintiffs.  We have |
| 08:22:30 | 22 | not tried to figure out, of those who have been dismissed, |
| 08:22:30 | 23 | withdrawn, or closed, what the data might show about them |
| 08:22:33 | 24 | because -- |
| 08:22:34 | 25 | **THE COURT:**  I asked you not to. |

| | | |
|---|---|---|
| 08:22:36 | 1 | **MR. BROWN:**  -- we're past that. |
| 08:22:38 | 2 | And then we talked about census form information |
| 08:22:42 | 3 | because we have all that data.  This shows us, in terms of |
| 08:22:46 | 4 | those active plaintiffs, we have a census form submitted by |
| 08:22:49 | 5 | over 228,000 of them.  There's about 6,100 who don't have a |
| 08:22:55 | 6 | census form.  Most of those are more recent -- I think it's |
| 08:22:57 | 7 | nearly all of those are more recent filings that haven't met |
| 08:23:00 | 8 | their deadlines yet. |
| 08:23:01 | 9 | But we have -- among the active plaintiffs, we have |
| 08:23:03 | 10 | census forms on over 228,000 of them submitted on the system, |
| 08:23:07 | 11 | and we have that information live because it's submitted on the |
| 08:23:11 | 12 | live platform.  Today we're going to be talking about |
| 08:23:16 | 13 | information from the census form answers that we're using for |
| 08:23:19 | 14 | purposes of these approaches. |
| 08:23:20 | 15 | And so very quickly these are -- what we're looking at |
| 08:23:23 | 16 | here is the census form question 2 which asked about serving in |
| 08:23:26 | 17 | the military and which dates a person was in the military, and |
| 08:23:31 | 18 | then asks for duty stations.  And this is the question 2b where |
| 08:23:37 | 19 | we get to information about did you use the Combat earplugs, |
| 08:23:41 | 20 | the Combat Arms Earplugs, and if so, when, when did you start |
| 08:23:45 | 21 | using them and then when did you stop using them. |
| 08:23:47 | 22 | So this is -- we're going to talk about those |
| 08:23:49 | 23 | parameters, about picking the audiograms within the data to use |
| 08:23:55 | 24 | for this analysis, and one of the approaches is trying to match |
| 08:23:58 | 25 | up the audiogram testing with when they started or stopped |

08:24:01    1   using these Combat earplugs.

08:24:06    2           This is the question in the census form that gave us

08:24:09    3   that information.  I think throughout the census form process

08:24:13    4   there was some concern that this had not been answered because

08:24:17    5   it was -- seemed to be kind of tied to duty station and

08:24:20    6   occupational specialty.

08:24:22    7           And so, in the addendum, there was another effort to

08:24:26    8   harvest this information about when you used the earplug, did

08:24:30    9   you use the earplugs.  And so these questions 2 and 3 in the

08:24:34   10   addendum were drawing upon those answers to be able to try to

08:24:38   11   pinpoint when a person started and stopped using the Combat

08:24:46   12   earplugs.

08:24:47   13           There were questions in here about injuries.  We're

08:24:48   14   going to talk a little bit in a few minutes about what the

08:24:52   15   assertions are in the census form about hearing loss, hearing

08:24:55   16   loss alone, hearing loss with tinnitus, or tinnitus alone.

08:24:58   17   These are the questions in the census form that we're pulling

08:25:02   18   those answers from.

08:25:03   19           There were also questions about when you thought the

08:25:05   20   injury started.  We're not really using that today.  That's

08:25:09   21   another parameter or another input you could try to match

08:25:14   22   audiograms with injury, but today we're not doing that.  These

08:25:17   23   answers are really not complete and it's self-reported.  So

08:25:22   24   we're not using the injury date today, but it's another angle

08:25:26   25   that could be used to attack the information.

08:25:28    1          So this Figure 1, the title is the active plaintiffs
08:25:35    2     by the injury they asserted in their census form.  So we looked
08:25:39    3     at the question where these answers come from.  And of the
08:25:46    4     234,598, which is the big number in the center, active
08:25:50    5     plaintiffs, we have this distribution about what injuries they
08:25:52    6     have stated they had incurred.
08:25:55    7          And we use the word "assertion," "injury assertion."
08:25:59    8     That's not to disparage that we don't believe it.  It's just
08:26:02    9     that it's stated or reported as to what injuries that are being
08:26:07   10     claimed.
08:26:07   11          The bulk of this 131,000 number in the bottom left, 56
08:26:12   12     percent of this population of active plaintiffs have asserted
08:26:16   13     hearing loss and tinnitus.  There's a group that asserted only
08:26:19   14     hearing loss that's another 5-and-a-half percent.  And the
08:26:23   15     tinnitus-only claim is 71,408, so it's about 30 percent of the
08:26:29   16     active plaintiff population.
08:26:30   17          Down here in the bottom right we have some numbers of
08:26:35   18     active plaintiffs that we cannot do the injury pinpointing on
08:26:39   19     either because they haven't given us a census form yet so
08:26:42   20     they're new cases or there were options in the census form
08:26:46   21     answers to check "other" or the "not specified" means they
08:26:53   22     didn't answer it or they gave us some answer that doesn't
08:26:56   23     really work, so they didn't say tinnitus or hearing loss, but
08:27:00   24     they chose some response that doesn't allow us to channel them
08:27:05   25     to one of the categories of hearing loss or tinnitus.

08:27:07  1    But we do have injury assertion information on a lot

08:27:10  2  of the active plaintiff population from the census form, and so

08:27:15  3  we keep kind of narrowing down the population we can focus on

08:27:18  4  today to try to see what the data tells us about these

08:27:20  5  assertions that are made in the census form.

08:27:22  6    The Court mentioned the DOEHRS data system.  We did

08:27:26  7  get the information that the plaintiff leadership had requested

08:27:30  8  of the DoD.  This is the dates of production that -- in 2021,

08:27:37  9  2022.  There's a request made in January that we don't have a

08:27:43  10  response to yet.  But we got all this data from the DoD that

08:27:48  11  was requested and inputted into our system.

08:27:53  12    How many people.  Well, we know we have 234,598 active

08:28:00  13  plaintiffs, and that's the top box.  In response, we got DOEHRS

08:28:05  14  data back on 178,040 of that population.  So we have this

08:28:12  15  wealth of information on 178,040 active plaintiffs.

08:28:18  16    There's 12,042 that were turned in to the DoD, but we

08:28:23  17  didn't get a response.  We think, in some instances, that's

08:28:26  18  because the Social Security number was wrong, there was

08:28:28  19  something that didn't match up in their system, or the data

08:28:31  20  just wasn't there because --

08:28:32  21    **THE COURT:**  Yeah.  I'll interrupt for a minute.  We do

08:28:34  22  know from the DoD that, when DOEHRS system went live, there

08:28:41  23  were command-level units that simply did not upload their

08:28:46  24  audiometric data into DOEHRS.  So there are some plaintiffs for

08:28:51  25  whom there is no DOEHRS data for that reason.  It's not the

plaintiffs' fault.  It just isn't there.

MR. BROWN:  As best we could tell, Your Honor, it rolled out in January of 2006 maybe, and the commands were supposed to backfill.  I mean, we have data in here on audiograms done in 1984, so a lot of them did, but apparently there are gaps in what was loaded or placed in the database once it was available.

And then I mentioned this recent request, there's another 30,636 that are in the January request.  We don't have a response to that yet.  But once we do, we'll put that in the same system and be able to run the same analysis and all that.

There's 13,880 that have not been submitted along the course of time that this has been working along.  I think some of that is there's a nonparticipating law firm, some of that are people who used these -- or said they used them only in civilian situations.  Some of that are plaintiffs where we don't have a valid Social Security number or we have something that's obviously wrong -- 1, 2, 3, 4, 5, 6, 7 -- so they couldn't be submitted.

THE COURT:  And we're trying to drill down more on that.

MR. BROWN:  The goal is to get as much information as we can on all these folks.  And we haven't given up on them, I think, but we don't have it for today because it didn't come back to us.

08:30:14   1       So then we get to this net number of active plaintiffs

08:30:19   2   with information in DOEHRS, 178,040, and so let's go back to

08:30:19   3   what injuries that group is asserting.

08:30:28   4       So 112,257 asserted hearing loss in their census

08:30:33   5   forms, 56,159 asserted tinnitus only, and then 9,600 are in

08:30:41   6   that category where we don't really know what injuries they're

08:30:44   7   asserting.

08:30:45   8       But we keep kind of narrowing our focus down to the

08:30:49   9   people that we can really talk about with DOEHRS data, active

08:30:54   10  cases and asserted hearing loss either alone or with tinnitus,

08:30:58   11  or asserted tinnitus only, and see what the data can tell us

08:31:01   12  about those assertions.  And so we're working with this

08:31:04   13  population as we move ahead in this discussion.

08:31:08   14      When we got the DOEHRS data, we had to get a data

08:31:12   15  dictionary -- I don't expect anybody to read this, this is

08:31:15   16  pages and pages -- so that we could understand what the fields

08:31:19   17  in the data meant.  Because there's so much information in here

08:31:22   18  taken from the audiogram tests that we have to be able over the

08:31:26   19  course of time -- there's some plaintiffs in here that have one

08:31:29   20  audiogram, there's some that have many.  We think the --

08:31:34   21      There was one person that had, Dennis, how many?  86,

08:31:40   22  87?

08:31:40   23      **MR. CARTER:**  87.

08:31:44   24      **MR. BROWN:**  The data says that person had 87 tests

08:31:47   25  over the course of his service.  So there's a lot of

08:31:50   1   information, and we had to figure out how to use it.  There

08:31:54   2   were in the information 89 fields -- think of columns; there

08:31:57   3   were almost 3.9 million records -- think of rows in a

08:32:02   4   spreadsheet.  And then the data points, the cells that that

08:32:06   5   meant, there's almost 344 million data points in the DOEHRS

08:32:11   6   data.  And so we learned from this dictionary how to make sense

08:32:15   7   of it and use it for analysis of what it tells us about the

08:32:19   8   hearing testing.

08:32:21   9        One thing that we were curious about and the Court was

08:32:24   10   curious about was does all this information mention use of the

08:32:30   11   Combat earplugs, because there are spaces in the forms that the

08:32:35   12   military uses to indicate the type of hearing protection that a

08:32:40   13   serviceperson is wearing at the time.  And what we concluded

08:32:45   14   was that the data in the DOEHRS data is not really a reliable

08:32:49   15   place to look to show product use.

08:32:52   16        There are like 10 percent of them, as it shows in the

08:32:55   17   top right, where it's mentioned in the data.  There's 89

08:33:00   18   percent where it's not mentioned, it's just not in there.  We

08:33:04   19   don't think that means that they didn't use the Combat earplug;

08:33:09   20   it's just not -- we can't verify the use in the information

08:33:14   21   that's in there.  It's just not there.  So it didn't help us a

08:33:16   22   lot on product use.

08:33:17   23        So we ended up -- let's think about what we can learn

08:33:22   24   about the testing results, about hearing and hearing changes or

08:33:26   25   hearing levels or hearing sensitivity levels.  The Court

|       |    |                                                                                    |
|-------|----|------------------------------------------------------------------------------------|
| 08:33:29 | 1 | mentioned four approaches.  This table lists the four |
| 08:33:33 | 2 | approaches. |
| 08:33:35 | 3 | So, when we're talking about hearing performance or |
| 08:33:41 | 4 | hearing sensitivity levels, you have to decide, well, which |
| 08:33:45 | 5 | tests are you going to use, either one or a starting point and |
| 08:33:51 | 6 | an end point.  If you're trying to figure out how a person's |
| 08:33:55 | 7 | hearing performance or sensitivity changed over time, you have |
| 08:33:59 | 8 | to decide, well, where do we start and where do we stop, and |
| 08:34:03 | 9 | what are we going to do with the information.  You know, are we |
| 08:34:06 | 10 | going to look for changes in the response from one to the next |
| 08:34:10 | 11 | or some average as the Court mentioned. |
| 08:34:12 | 12 | And so today's four approaches, the first two are |
| 08:34:16 | 13 | measuring shifts in performance at various frequencies and |
| 08:34:20 | 14 | decibel levels from one test to the other.  It's trying to look |
| 08:34:24 | 15 | at how you perform on one test in terms of the sound levels you |
| 08:34:29 | 16 | can hear and then a later test and the sound levels you're able |
| 08:34:34 | 17 | to hear then and how it's changed. |
| 08:34:36 | 18 | And so we're using as the starting point in that one |
| 08:34:40 | 19 | the first audiogram that's in the data, the very first one, and |
| 08:34:44 | 20 | the last one is the last one in the data.  It's just bracketed |
| 08:34:48 | 21 | on bookends of whatever information is in there from first to |
| 08:34:52 | 22 | last. |
| 08:34:53 | 23 | This, I think, is the approach the Court mentioned is |
| 08:34:55 | 24 | kind of the plaintiffs' counsel approach. |
| 08:34:57 | 25 | **THE COURT:**  As I understood it. |

08:34:58    1       **MR. BROWN:**   As we understand it.  And so measuring

08:35:02    2    shifts between the first one in the data and the last one in

08:35:02    3    the data.

08:35:06    4       The second one is also looking at shifts but, as the

08:35:10    5    Court described, we're trying to peg that a little more closely

08:35:14    6    to earplug use.  And so we're using the information in the

08:35:17    7    census form about when you used the earplugs and trying to find

08:35:20    8    the audiogram that is nearest the start date of earplug use and

08:35:24    9    the end date of earplug use.

08:35:25   10       And this says reference audiogram.  That first

08:35:29   11    audiogram that we're using is the reference audiogram, which is

08:35:33   12    the way the system describes the baseline.  There are -- as

08:35:38   13    we'll see in a moment in the forms, they keep track of a prior

08:35:42   14    audiogram and a current audiogram and measuring the current one

08:35:47   15    against the former one, which is the baseline reference.

08:35:50   16       **THE COURT:**   When you say "they" you mean the DoD?

08:35:53   17       **MR. BROWN:**   The DoD, the way they keep the information

08:35:55   18    and what they use it for.  And so, in this approach, too, we're

08:35:58   19    measuring the shifts between the audiogram -- it's a reference

08:36:01   20    audiogram at the start of earplug use and the one that's

08:36:04   21    nearest the end of the earplug plug use.  They always --

08:36:07   22    obviously doesn't match exactly, but most of them are within a

08:36:10   23    year or so of those start and end points.  And measuring the

08:36:13   24    shifts between the two, we'll see what that tells us.

08:36:16   25       The third approach and the fourth approach are the

08:36:19  1   averaging.  It's the AMA impairment rating which starts with

08:36:23  2   this pure-tone average approach and then applies other steps to

08:36:26  3   it, and we'll see what the formula is.  But we're doing that

08:36:29  4   averaging approach and its impairment percentage rating on the

08:36:33  5   same audiograms we're doing in the first two approaches.

08:36:35  6        In other words, we're looking at let's do the

08:36:39  7   averaging on the first and the last and do it on the one that's

08:36:42  8   nearest earplug use start and earplug use end and see how it

08:36:47  9   comes out, do they come out alike or whatever the different

08:36:50  10  approaches, what does it tell us about levels of hearing

08:36:53  11  impairment or levels of hearing changes from one point to the

08:36:57  12  other.

08:36:57  13       THE COURT:  And again, what I understood to be -- can

08:37:02  14  we go back, Dennis, to the prior slide -- to the nearest of the

08:37:08  15  plaintiffs' approach is No. 1, and what I understood nearest to

08:37:12  16  the defense's approach at one point in time was Approach No. 3.

08:37:17  17  And so, hopefully it was clear from my comments and now from

08:37:21  18  Orran's, but 2 and 4 were something I added, right?

08:37:26  19       MR. BROWN:  Right, Your Honor, understood.

08:37:28  20       And let's see what we learned.  Again, we also here

08:37:34  21  have to decide our populations for this first approach.  And

08:37:41  22  the Court and the lawyers who have been living and breathing

08:37:44  23  this, they're much more familiar with this than we can be.  But

08:37:48  24  just as a reminder, in the DOEHRS data there are hearing

08:37:53  25  responses on these tests that are recorded at six frequencies

08:37:57  1  from 500 to 6000 hertz, with that being the pitch, measuring

08:38:05  2  the pitch that you can hear.

08:38:06  3       And this R line here is, say, your first audiogram

08:38:10  4  that we're looking at, the reference audiogram, the baseline.

08:38:14  5  And as the test is administered, then your response or the

08:38:20  6  pure-tone that you can hear at least I think 50 percent of the

08:38:23  7  time that it is recorded, at what sound level is necessary for

08:38:25  8  you to hear it.  The higher the decibel loudness the more

08:38:32  9  impaired your hearing is.

08:38:34  10       So the higher the score, it means it's a louder sound

08:38:36  11  it takes for you to be able to hear it, which means your

08:38:39  12  hearing is not as good as if your score is lower at a lower

08:38:43  13  decibel.

08:38:44  14       And so these two lines here are showing two test

08:38:48  15  results at different times, the top one being the reference and

08:38:51  16  what the sensitivity response levels were at that audiogram,

08:38:55  17  and then the later test, the A line is the end point, whatever

08:39:00  18  the one we're using as the end point.  And then measuring

08:39:04  19  shifts is, all right, at each frequency how did it move.  Like

08:39:09  20  we've illustrated here a 40 decibel shift at the 3000 hertz

08:39:16  21  level between the earlier test and the later.

08:39:18  22       So, when we talk about shifts, that's what we're

08:39:21  23  talking about, it's at each frequency did it move up or down.

08:39:26  24  And we're looking here for positive shifts, meaning higher

08:39:30  25  numbers, which means declining hearing responses or capability.

08:39:34    1    There are negative -- sometimes your hearing improves from one

08:39:38    2    test to the other.  Today, when we talk about shifts, we're

08:39:42    3    looking for positive, you know, plus a certain number of

08:39:44    4    decibels.

08:39:45    5         So that's what the data contains, and we learned where

08:39:48    6    to find that and how to find the reference audiogram in the

08:39:52    7    DOEHRS data.

08:39:53    8         We still have to define our population because doing

08:39:56    9    this approach requires two tests.  We have to have one at the

08:40:00   10    beginning and one at the end.  In the DOEHRS data there's this

08:40:05   11    7,632 or almost 7 percent of them who have only one audiogram

08:40:13   12    in the data.  So we can tell what's on that audiogram, but we

08:40:17   13    can't tell anything beyond it because there's not a later one

08:40:20   14    to compare it to.

08:40:20   15         And so, when we're doing this bracketing of first and

08:40:23   16    last audiogram, we can do it on 104,625 active plaintiffs in

08:40:32   17    the DOEHRS data who have more than one audiogram.  Sometimes

08:40:36   18    they're close together, sometimes they're far apart, but at

08:40:40   19    least we have two to work with.  We have to drill down to the

08:40:44   20    populations we can do the analysis on, and this is now 104,625

08:40:49   21    active plaintiffs.

08:40:50   22         What did we learn from it?

08:40:52   23         All right, so this is one take on it.  In measuring

08:40:56   24    shifts from that first audiogram to the last, we bucketed these

08:41:02   25    in shifts of kind of increments of 5 until you get to the

08:41:06  1   higher decibel levels or higher shift numbers.  And what we did

08:41:12  2   here was look at the maximum shift in any frequency between the

08:41:20  3   earlier test and the later one.  It could be that there were

08:41:26  4   shifts in more than one frequency.  It could be there was a

08:41:29  5   shift of 5 in one, a 10 in one, and 40 in another.

08:41:34  6        There's so many layers behind this that, again, there

08:41:38  7   are different ways to slice and dice the information in terms

08:41:40  8   of looking at which hertz is more important, which frequency is

08:41:44  9   more important, which degree of shift is more important, which

08:41:48  10  degree indicates severity levels of impact or loss of hearing.

08:41:54  11       How do you dig into the many layers behind this?  For

08:41:59  12  today's purposes, this is the biggest shift we saw in the data

08:42:03  13  from one test to another at any frequency or maybe more than

08:42:10  14  one frequency, but a plaintiff is channeled into one of these

08:42:12  15  bars here by virtue of the largest shift we saw.

08:42:16  16            **THE COURT:**  So this is in either ear?

08:42:18  17            **MR. BROWN:**  In either ear, exactly.

08:42:21  18            **THE COURT:**  Right.  I'm going to stop you for just a

08:42:23  19  moment.

08:42:23  20       I need to ask for everyone who is present today by

08:42:26  21  Zoom or telephone connection to please mute your Zoom or your

08:42:35  22  phone.  Apparently there's a problem, somebody's line is not

08:42:39  23  muted, and the rest of the folks are getting a lot of

08:42:42  24  background noise.  So please confirm that you are muted if you

08:42:47  25  are remote.  Thank you.

08:42:49    1          **MR. BROWN:**  Thank you, Your Honor.

08:42:49    2          And so, yes, this is either ear.  Could be both ears,

08:42:53    3    could be left, could be right.  But again, that's another sort

08:42:56    4    of degree of analysis that could be done as a shift on left,

08:43:03    5    shift on right, shift on both.

08:43:05    6          When we're looking at one test and the later test and

08:43:08    7    measuring changes from one to the other, there are so many ways

08:43:12    8    to look at the changes, the shifts, which frequencies, which

08:43:16    9    frequencies matter more than others maybe.  We're not here

08:43:19   10    today to opine on that.  But this does depict --

08:43:22   11          **THE COURT:**  But you could?

08:43:24   12          **MR. BROWN:**  We could.

08:43:25   13          **THE COURT:**  I spoke about workshop on a different day,

08:43:29   14    you certainly could drill down into those categories.

08:43:31   15          **MR. BROWN:**  We could take any one person, any group of

08:43:34   16    people, any collection of people, as long as we have the data,

08:43:36   17    we can tell you which -- and you pick the audiograms -- what

08:43:41   18    were the shifts between this one and that one and which

08:43:44   19    frequencies.

08:43:44   20          And this distribution pattern we see here in this

08:43:47   21    graph is showing that there were folks who show -- that didn't

08:43:53   22    have a shift.  There were some that had -- the biggest shift

08:43:56   23    they had was a 5 decibel shift changing from 20 to 25 or

08:44:01   24    something or 10 to 15.

08:44:03   25          Then you move on up and see the folks that had a shift

08:44:08   1    of 10 decibels, 15, 20, 25 to 45, which is the biggest change.

08:44:14   2    Obviously, you get much bigger changes as we go to the right

08:44:19   3    across the screen.  And then some who had changes of 50 decibel

08:44:22   4    levels or more, the worst or biggest, the maximum shift.

08:44:26   5         And so this is one way to slice this information.  In

08:44:29   6    other words, this tells us that, yes, there are folks who had

08:44:31   7    shifts between one and the other, there's some that had smaller

08:44:35   8    ones as their worst one, there's some that had some pretty

08:44:39   9    major ones.

08:44:40   10        To dig behind that even further, you'd look at like,

08:44:43   11   well, which hertzes, how many of them, because some of these

08:44:46   12   may have had shifts of 50 or more in more than one hertz.  And

08:44:48   13   so, when you start trying to stratify severity of impact or

08:44:54   14   injury, you can stratify it in a lot of different levels.  This

08:45:02   15   is one of them.  And so that's our first approach using the

08:45:06   16   first and last audiogram.

08:45:08   17        Now we're going to do the same shift analysis between

08:45:11   18   when you started using earplugs and when you stopped using

08:45:14   19   earplugs, trying to match the testing to the period of time you

08:45:19   20   were using the Combat earplugs.

08:45:23   21        And again, we have to figure out, well, how many

08:45:25   22   people can we do that on, because we can't do it on everybody.

08:45:29   23   There's this 112,257 number of people who allege hearing loss,

08:45:35   24   we have DOEHRS data on, they're active cases.  But we need the

08:45:39   25   earplug use dates for these folks to pick an audiogram around

08:45:43  1    that time.  We have to take that from the census form, what

08:45:47  2    they told us in the census form in those answers to those

08:45:50  3    questions we looked at earlier.

08:45:51  4         And so, for this group, we have use dates for about 55

08:45:57  5    percent of them, 62,111 people.  We don't have use dates for

08:46:03  6    almost 45 percent of them because it's not answered in the

08:46:06  7    census form, it was left open or "to be determined" or

08:46:12  8    something or "will supply later."

08:46:14  9         We can only use the data we have, and we have it on 55

08:46:18  10   percent of this population so that we can now find the dates

08:46:21  11   they say they started using the Combat earplugs and when they

08:46:25  12   stopped and find the audiograms that were around those times.

08:46:28  13   That's what we're trying to do in the data -- or we did do in

08:46:32  14   the data.

08:46:32  15        There are other ways to add to this population.  If

08:46:34  16   you just assumed, if you're in one branch of the service and

08:46:38  17   you have the start date of service and you have the end date of

08:46:41  18   service, that you used the Combat earplugs the whole time,

08:46:46  19   provided that it was from, like, the second half of '99 until

08:46:50  20   2015 when they were actually in use, you could get this up to

08:46:54  21   about 85 percent, if you made that assumption.  We didn't do it

08:46:58  22   today.  We stayed in the more conservative way of, all right,

08:47:01  23   they told us the use dates and we're going to go with that.

08:47:03  24        We had to put some date restrictions in here because

08:47:09  25   there were some folks who said they used the earplugs in

08:47:15   1   earlier years than they were available.  We had to put a late

08:47:19   2   '99 and a 2015 date restriction in here so we didn't pull

08:47:24   3   audiograms that were before the earplugs were being used even

08:47:27   4   or long after they were being used.

08:47:29   5        So we did set that sort of limit or control on the

08:47:33   6   information we were pulling from for the 62,111 we could do

08:47:39   7   this on.  So we're using this -- this is now in the smaller

08:47:42   8   population because we had more people we could do first and

08:47:46   9   last.  Here we have to have the earplug use dates.

08:47:50   10        Where does all this information come from?  Well, the

08:47:55   11   DD-2216, which is the form that the Department of Defense uses

08:48:00   12   to record these tests, we're just looking at this form and

08:48:04   13   seeing all these data points in terms of measuring the

08:48:08   14   responses at the frequencies.  And they even have an indication

08:48:12   15   of whether they think it's a yes/no significant threshold

08:48:17   16   shift.

08:48:18   17        This is the section where there was an opportunity at

08:48:20   18   least to put in what type of hearing protection was used.  We

08:48:25   19   don't have that in, as we saw, the bulk of them.  All of this

08:48:29   20   information, this is the part of the 344 million fields or data

08:48:36   21   points we got, and it refers to a reference audiogram.  When

08:48:39   22   they're taking a test, they'll try to refer back to what your

08:48:44   23   baseline was, and so that's where we get information about

08:48:47   24   reference audiograms.

08:48:48   25        This 2215 document form is one that's used for the

08:48:55   1   reference audiogram, the one that they think this is your

08:48:57   2   baseline, this is going to be your baseline.  Again, it's still

08:48:59   3   capturing the information about your response levels or

08:49:01   4   sensitivity levels at each of these frequencies and what your

08:49:07   5   decibel response -- how loud it has to be for you to hear it.

08:49:10   6           **THE COURT:**  And these forms DD-2215 and 2216 were

08:49:18   7   exhibits in every trial.

08:49:18   8           **MR. BROWN:**  Yes, okay.

08:49:19   9           **THE COURT:**  So the parties, at least those who were

08:49:24   10   involved in any of the trials, are familiar with these forms.

08:49:25   11           **MR. BROWN:**  So what did we -- in this approach, then,

08:49:27   12   what did we see in the data about, again, either ear, maximum

08:49:31   13   shift we saw among the population of the 62,000 that we could

08:49:37   14   do this on from the audiogram that's around the time you

08:49:40   15   started using the earplugs and around the time you stopped,

08:49:45   16   what were the changes in those tests.

08:49:48   17           And so we're looking here at the same kind of

08:49:53   18   distribution pattern or at least depiction of it in terms of

08:49:58   19   shifts of 0 or 5 or 10 or more.  And so, again, the biggest

08:50:04   20   shift we saw in the data, either ear, could be one hertz, could

08:50:10   21   be more than one hertz.

08:50:11   22           Again, we're all -- the same layers behind this about

08:50:13   23   which hertzes matter, how big the shift matters, but again,

08:50:14   24   this is what we see.  We have these folks in these buckets

08:50:18   25   depending upon how big your shift was --

08:50:21   1      **THE COURT:**  And your results changed, I mean, from the

08:50:23   2   first approach -- for instance, if I remember, I think there

08:50:27   3   were more with shifts of 50 dB or greater in the second

08:50:32   4   approach than there were in the first, but then you see from

08:50:35   5   the second and the first more people in the +25 to 45 dB move

08:50:46   6   to -- excuse me, let me go back -- looks like they actually

08:50:47   7   move over in the bar graph on greater than 10 dB is higher.

08:50:51   8      So, again, when you set the parameters or you change

08:50:56   9   them, obviously your results are going to change.

08:51:00   10     **MR. BROWN:**  Yes, you get different outputs.  And we're

08:51:03   11  going to see -- at the tale end of this we're going to circle

08:51:04   12  back and compare all four of these approaches and we'll see

08:51:06   13  exactly what you're talking about, Your Honor, in terms of,

08:51:09   14  well, what's the difference between one or the other in terms

08:51:11   15  of the distribution pattern of shifts that you see between one

08:51:14   16  test and the other.

08:51:15   17     Let's go to Approach 3.  And now we're moving into the

08:51:20   18  averaging.  Because we talked about, well, which hertzes matter

08:51:26   19  and do we measure shifts on one frequency or a bunch of them.

08:51:32   20  And so, in the ones that we've seen so far, we're looking at

08:51:35   21  the maximum shift in any frequency -- could be one, could be

08:51:40   22  more.

08:51:40   23     These approaches that used an averaging or a pure-tone

08:51:44   24  average and then other steps in it are blending the hertz

08:51:48   25  response scores together to try to come up with some overall

08:51:53  1   impression.  As opposed to looking at any particular hertz over

08:51:59  2   time, you're looking at an overall score or rating based on all

08:52:05  3   of the hertzes or some of the hertzes, depending on which ones

08:52:09  4   you average, and then comparing that baseline score to a later

08:52:13  5   score to see what the change was.

08:52:15  6          This AMA impairment guide, which comes from I think

08:52:19  7   the third edition of the AMA guide to measuring impairment --

08:52:21  8   not just hearing but all kinds of physical impairments for

08:52:26  9   purposes of, like, assessing disability compensation, it has

08:52:29  10  several steps in it that -- and this comes from the most

08:52:33  11  recent, I think, third edition in 2023.

08:52:36  12         The first step you do is the averaging piece.  And you

08:52:38  13  take the 500, 1000, 2000 hertz and 3000 decibel scores, add

08:52:46  14  them together, and divide by 4 to get an average score on those

08:52:52  15  four hertz levels.  It doesn't do the 4000 or 6000 hertz, it's

08:52:59  16  not part of the scoring.  It leaves off the higher hertz levels

08:53:05  17  in their steps.  This is their formula.

08:53:07  18         That gives you a decibel hearing loss number that's an

08:53:10  19  average of the four.  If you had 25 on every one of them, your

08:53:15  20  average would be 25 decibels.  And then you take that hearing

08:53:18  21  loss and you subtract 25 decibels.  They call it a fence.  It's

08:53:22  22  kind of -- the assumption, I think, is that, if your hearing is

08:53:27  23  around the 25 decibel level, it's normal, is the assumption

08:53:30  24  here.  I'm not saying medically that's correct, but that's the

08:53:33  25  assumption.

08:53:34  1          And so you take the score you got and the average and

08:53:38  2  you kind of give back or you set a fence, they call it, of 25

08:53:42  3  decibels and see what's left over.  If you have a higher score

08:53:46  4  than 25, then you've got some loss that you multiple by

08:53:51  5  1-and-a-half percent to get to a rating.

08:53:55  6          **THE COURT:**  Right.  And just for those who may not be

08:53:58  7  as familiar with the trial records as others, depending on the

08:54:05  8  organization standard that is being applied, they could be

08:54:11  9  anywhere -- that floor could be anywhere from 15 dB or greater,

08:54:16  10  20 dB or greater, and of course 25 dB or greater.  And with the

08:54:20  11  AMA with this impairment rating guide it's 25.

08:54:23  12          **MR. BROWN:**  Yes.  And as we understand it, the

08:54:26  13  pure-tone average, which is part of another averaging approach

08:54:30  14  which gives you a decibel number, doesn't do this added step of

08:54:34  15  a percentage rating impairment.  It says, if your score average

08:54:38  16  is 25 or less, then you have normal hearing.

08:54:41  17          **THE COURT:**  The average, right?

08:54:43  18          **MR. BROWN:**  The average.  So these things set that 25

08:54:46  19  kind of as a threshold to say you have to have a number higher

08:54:49  20  than that to have hearing loss under this disability standard.

08:54:53  21          And they also translate those scores -- what we just

08:54:58  22  saw was on one ear, to get your percentage rating on one ear,

08:55:03  23  and then you do it on both ears to get to what they call the

08:55:09  24  binaural hearing loss formula.  They multiple your better ear

08:55:14  25  percentage by 5, add your worst ear percentage, divide that by

08:55:18  1   6, and you get a percentage rating for both your ears combined.

08:55:22  2        And then they take that rating and you end up -- if

08:55:25  3   you have a percentage greater than zero, it means you have some

08:55:30  4   hearing loss under this formula.  And it can be 5 percent, it

08:55:33  5   can be 20 percent -- if it's 100 percent, then that's complete

08:55:39  6   hearing loss, you're basically deaf.

08:55:44  7        And the report form that this is done on, the AMA

08:55:46  8   report form, that sets out this whole formula.  It walks you

08:55:53  9   through, you enter the scores, you divide by 4, you take away

08:55:59  10  the 25 fence, you multiply it by 1-and-a-half, you end up with

08:56:04  11  these percentages.  And that's what we are doing then in the

08:56:12  12  AMA approaches.

08:56:13  13        THE COURT:  And again, very different from a single

08:56:16  14  frequency analysis.

08:56:17  15        MR. BROWN:  Yes, totally different.  It doesn't use

08:56:19  16  all the frequencies, and it gives equal weight to each

08:56:23  17  frequency, and it's an average.  So you're not looking at

08:56:26  18  shifts in any particular frequency.  You're looking at changes

08:56:29  19  in your percentage score from one to the next.

08:56:35  20        And so it is blending all -- we talked about how which

08:56:38  21  frequency matters.  Well, this blends at least four of the

08:56:41  22  frequencies together and divides them and gives you a

08:56:45  23  percentage impairment rating.

08:56:46  24        And they also go through the next step in terms of --

08:56:49  25  we talked about comparing baseline to current test.  The AMA

08:56:54  1   has this apportionment formula, it calls it, which is the word

08:57:00  2   that's blocked by the icon on the screen, that says, all right,

08:57:02  3   well, you take your total impairment rating, which is whatever

08:57:06  4   your score is today, your test today, you look at the test

08:57:10  5   before that we're considering reference or baseline, and

08:57:15  6   subtract the two.

08:57:16  7       And it's trying to -- the way the literature talks

08:57:19  8   about, it's trying to account for different causations, it's

08:57:22  9   trying to account for, you know, where you started.  If you had

08:57:24  10  some level of a hearing impairment when you started, then this

08:57:28  11  takes that out of play and is measuring the change from

08:57:31  12  wherever you started from to the end.

08:57:33  13      But they call it apportionment to basically match the

08:57:37  14  baseline, subtract it from your current, and you end up with a

08:57:42  15  percentage score.  Like if you were 20 percent on the first one

08:57:45  16  loss and 40 percent on the second one, your net score is 20

08:57:49  17  percent because it's trying to measure the change between one

08:57:52  18  to the next in terms of this averaging formula.

08:57:55  19      So who can we do this on and what did we find out?

08:58:04  20      Again, we have to use plaintiffs in the data that have

08:58:07  21  more than one audiogram because it takes two to do this

08:58:10  22  apportionment thing in it.  We applied that formula to the

08:58:14  23  first and last audiogram in the data in this Approach 3, and

08:58:19  24  this is where it came out.

08:58:20  25      The numbers you see here, like hearing loss in left

| | |
|---|---|
| 08:58:24 | 1 |
| 08:58:33 | 2 |
| 08:58:37 | 3 |
| 08:58:37 | 4 |
| 08:58:44 | 5 |
| 08:58:49 | 6 |
| 08:58:51 | 7 |
| 08:58:56 | 8 |
| 08:59:00 | 9 |
| 08:59:02 | 10 |
| 08:59:06 | 11 |
| 08:59:09 | 12 |
| 08:59:12 | 13 |
| 08:59:13 | 14 |
| 08:59:17 | 15 |
| 08:59:20 | 16 |
| 08:59:28 | 17 |
| 08:59:32 | 18 |
| 08:59:38 | 19 |
| 08:59:43 | 20 |
| 08:59:47 | 21 |
| 08:59:49 | 22 |
| 08:59:57 | 23 |
| 09:00:01 | 24 |
| 09:00:04 | 25 |

ear only, 6,317, that means they had a rating percentage more than zero in the left ear; rating percentage more than zero in the right ear only; 6,366 then had more than zero percentage in both ears.

Combined together there are, under this formula, 16,017 active plaintiffs with more than one audiogram in the data who have more than zero percent score under the AMA impairment rating formula in either or both ears.

**THE COURT:**  Out of 104,000?

**MR. BROWN:**  Out of 104,000.  We'll see in a minute kind of what that looks like in terms of how these compare -- these different approaches tell us about the population and the buckets they're in.

So those are our numbers.  If you look at, well, what percentage -- we have more than zero, and this is the distribution pattern of that.  There's 5,933 of them who have left ear 1 to 10 percent loss.  This is left ear.  And you move up to see lower numbers that have greater loss.  I mean, these up in the 70 to 100 percent, that's a lot of hearing loss or impairment.  But that's the distribution pattern left ear for the people who we can do this on.

This is the right ear.  Kind of similar but, again, the lower percentages tapering off to the higher percentages. This is both ears after that net result, you back out the first one from the second one and you still have a greater than zero

| | | |
|---|---|---|
| 09:00:08 | 1 | percentage in both ears. |
| 09:00:09 | 2 | These are the numbers.  And so the populations under |
| 09:00:12 | 3 | this averaging formula and the disability rating are smaller. |
| 09:00:16 | 4 | In terms of people who have some measurable shift, you end up |
| 09:00:22 | 5 | with groups here of greater than zero percent hearing loss that |
| 09:00:28 | 6 | are smaller populations.  And we'll see at the end kind of how |
| 09:00:32 | 7 | that stacks up. |
| 09:00:33 | 8 | So that's the first and last audiogram.  Again, we're |
| 09:00:36 | 9 | mirroring the first two approaches on shifts.  And so in this |
| 09:00:41 | 10 | Approach 4 we've got -- let's use the ones around Combat |
| 09:00:48 | 11 | earplug use dates, start and end.  The same audiograms we used |
| 09:00:51 | 12 | in the other two approaches, let's see what this average tells |
| 09:00:54 | 13 | us about the scores on those.  This is what we learned on that. |
| 09:00:58 | 14 | Again, after you do the formula, run the formula |
| 09:01:02 | 15 | through -- all the data through the formula, back out and do |
| 09:01:05 | 16 | the apportionment step, take out the first one, we've got these |
| 09:01:09 | 17 | numbers of hearing loss -- of the 62,000 where we can do this |
| 09:01:13 | 18 | on with dates of use, 3,108 have more than zero percent in the |
| 09:01:20 | 19 | left ear; 1,731 right ear; both ears 2,542 more than zero; |
| 09:01:29 | 20 | 7,381 in either or both. |
| 09:01:31 | 21 | So the population, again, if you're measuring or |
| 09:01:33 | 22 | bracketing when you use the earplugs, this is what the |
| 09:01:36 | 23 | apportionment formula and the percentage average will tell you |
| 09:01:39 | 24 | about people that have in the DOEHRS data a hearing loss of |
| 09:01:44 | 25 | greater than zero percent. |

09:01:46  1          **THE COURT:**  Out of the 62,000?

09:01:48  2          **MR. BROWN:**  Out of the 62,000.

09:01:49  3          **THE COURT:**  And is the distribution the same?  Oh,

09:01:52  4    you're going to the next slide.

09:01:53  5          **MR. BROWN:**  We'll see it.  Yeah, this is how that

09:01:56  6    breaks down.  It looks a lot alike, again, bunched in the lower

09:02:00  7    percentages left ear, right ear, both ears bunched in the lower

09:02:06  8    percentages, tapering off as we get up -- and these are numbers

09:02:09  9    of plaintiffs in each of these categories -- and as you move up

09:02:12  10   with larger hearing loss numbers or percentages scores, rating

09:02:17  11   scores.

09:02:18  12         And so let's see, all right, we've got four

09:02:22  13   approaches.  Where do they come out?  How do they compare to

09:02:28  14   each other?

09:02:28  15         And this Figure 13 that we're looking at, which is in

09:02:32  16   the part that's blocked out, it's comparing the Hearing Loss

09:02:33  17   Approach 1 and Hearing Loss Approach 2.  So here are the two

09:02:36  18   approaches that deal with shifts.  Just using different

09:02:39  19   starting and ending audiograms, how do they look?

09:02:42  20         And so the Approach 1, which is the red color, those

09:02:47  21   are the percentage of the population we could do it on who had

09:02:52  22   shifts -- maximum shifts, either ear, in those categories.  And

09:02:57  23   so they're pretty close in a bunch of places in terms of --

09:03:03  24   Approach 1 in the red, first to last audiogram; Approach 2 in

09:03:08  25   the blue, earplug-use-start/earplug-use-end audiograms, maximum

09:03:15  1   threshold shift of 0, 5, 10, 15, and up.

09:03:19  2          You can see in the -- some of them have higher -- like

09:03:23  3   in the shift of 10 decibels there are a higher percentage of

09:03:28  4   that population in the earplug use date Approach 2 than in the

09:03:34  5   first and last.

09:03:38  6          As you get up in the higher numbers of 25 to 45, there

09:03:41  7   are more people that had that degree of maximum shift, any

09:03:45  8   frequency, either ear, from first and last audiogram.

09:03:48  9          So some of these are kind of within a margin of error,

09:03:52  10  because there're like 13 and 12 percent, they're very close

09:03:57  11  some of them.  They show some differences in outcome depending

09:04:01  12  which audiogram you're using.

09:04:01  13         **THE COURT:**  This is all single frequency audiometric

09:04:05  14  data, single frequency, 500 to 6000 hertz measured.  And from

09:04:14  15  what we know, again, back to the evidentiary record in the

09:04:18  16  litigation, depending on what society's or organization's

09:04:22  17  standard for hearing loss in measuring hearing loss you're

09:04:26  18  considering, you may be at 15 dB or greater for loss or it

09:04:35  19  could be 20 or it could be 25?

09:04:37  20         I mean, this is a big dispute between the parties.

09:04:41  21         **MR. BROWN:**  Understood.

09:04:42  22         **THE COURT:**  And it was a big dispute and debate

09:04:44  23  amongst the experts in the trials.

09:04:46  24         So where does normal hearing end and mild, moderate,

09:04:51  25  and severe begin -- or mild begin and then on to moderate and

| | |
|---|---|
| 09:04:54 | 1 |

severe.  And again, depending on what organization you're --

standard you're looking at, it could be 15, it could be 20, or

it could be 25.  And so just people need to understand that.

If you're looking at this and saying, okay, well, out

of this population who is considered injured, I would say any

of the individuals in less than the 15 dB -- but these are

shifts, for one thing, so it's a little more complicated.  But

if you have less than 15 dB shift in any ear at any frequency,

you don't have hearing loss under any standard that we heard

about in any trial.

Again, just my observation.

**MR. BROWN:**  Exactly right, Your Honor.  And we're not

here to say where you draw the line on that.  But if somebody

told us where they wanted the line, we could tell you who is on

one side and who is on the other.

**THE COURT:**  Well, and I bring this up only because,

under the AMA approach, it does tell you who is injured --

**MR. BROWN:**  Yes, exactly.

**THE COURT:**  -- under that approach, who's injured and

who's not.

**MR. BROWN:**  If you're more than zero, you're

considered to have some level of loss.  Here it's really a

question of which degree of shift matters.

**THE COURT:**  What standard you use.

**MR. BROWN:**  Okay.  So let's keep going.

| | | |
|---|---|---|
| 09:06:17 | 1 | And this is a pause for -- as a little bit of a |
| 09:06:24 | 2 | detour.  We talked about which hertzes are included in the |
| 09:06:28 | 3 | various methodologies and, you know, we're looking at all the |
| 09:06:33 | 4 | hertzes in the first two approaches. |
| 09:06:37 | 5 | The AMA averages the 500 up to 3000, not all of them. |
| 09:06:43 | 6 | And we were asked to try to isolate the scoring in the 500 |
| 09:06:48 | 7 | hertz and the 1000 hertz only, the lower pitches, to see how |
| 09:06:55 | 8 | that affects the results. |
| 09:06:57 | 9 | **THE COURT:**  And I asked you to do that. |
| 09:06:59 | 10 | **MR. BROWN:**  This is the distribution pattern of |
| 09:07:01 | 11 | maximum shifts either ear, and this is using Approach 2, which |
| 09:07:09 | 12 | is the audiogram start of use of the earplugs, audiogram at the |
| 09:07:15 | 13 | end of use. |
| 09:07:16 | 14 | If you're looking only at 500 hertz and 1000 hertz, |
| 09:07:20 | 15 | this is the distribution pattern.  There are more people to the |
| 09:07:23 | 16 | left of the screen which have smaller maximum shifts of 5 to 10 |
| 09:07:27 | 17 | decibels than if you -- this was all the hertzes.  See the |
| 09:07:32 | 18 | difference.  If you're looking at 500 or 1000 there are smaller |
| 09:07:38 | 19 | maximum shifts at 500 to 1000 hertz than overall, which is |
| 09:07:42 | 20 | looking at all the hertzes you end up with more people with |
| 09:07:46 | 21 | larger shifts. |
| 09:07:46 | 22 | I think the takeaway from this is, yeah, these lower |
| 09:07:52 | 23 | pitches show smaller shifts.  They also mean that it kind of |
| 09:07:58 | 24 | brings down the AMA averages because these hertzes are in here, |
| 09:08:02 | 25 | your scores are -- lower decibels on them, it's going to bring |

09:08:05  1     down your overall impairment rating on the average.

09:08:08  2         So one way to look at it, one take on it is, all

09:08:12  3     right, isolate this hertz or that hertz or these two hertzes

09:08:14  4     and see how it affects the data.  If you're bucketing people,

09:08:17  5     then let's figure out which of these matter.  The point of this

09:08:21  6     is these lower hertzes do kind of affect the overall outcome

09:08:26  7     compared to looking at all of them.

09:08:30  8         All right, this is -- the Court mentioned earlier, all

09:08:32  9     right, well, let's see what we learned from all four of these

09:08:34  10    approaches and how they kind of stack up against each other,

09:08:38  11    the first two being the shift approaches.

09:08:42  12        And again, we've got these color codings in here to

09:08:47  13    show 5 or 10 or whatever.  And again, where you draw the line,

09:08:53  14    like if you said, all right, a shift of 15 matters, then that's

09:08:57  15    this from 16 percent up.  If you said 20 is what matters, then

09:09:01  16    it's the 13 percent up.

09:09:04  17        But you can see the first two lines or bars going

09:09:09  18    across Approach 1 or Approach 2, measuring shifts, maximum

09:09:14  19    shift, either ear, then using the different starting and

09:09:17  20    stopping points of the audiograms, there's some differences.

09:09:20  21    Again, we saw this earlier in the bar graphs, but you end up

09:09:24  22    with numbers that are kind of alike each other.  But again,

09:09:29  23    it's a question of where you draw the line about which degree

09:09:33  24    of shift matters as to whether you look at persons who are

09:09:37  25    above a certain level here are considered to have an injury and

09:09:41  1    persons who are below it don't.

09:09:43  2         On the AMA approaches, it obviously is a different

09:09:46  3    story because their formula with the 25 fence and using four of

09:09:54  4    the hertzes, and you end up with 85 or 88 percent of the people

09:09:57  5    who have zero or less.  There's no hearing percentage loss

09:10:04  6    rating on 85 or 88 percent of the people between those two

09:10:09  7    audiograms under those two approaches.  There's 15 percent or

09:10:13  8    12 percent of them who have more than zero.

09:10:17  9         And this is basically telling us which approach you

09:10:21  10   use is going to affect where you come out, what angle you take

09:10:26  11   on the data, the significance of a frequency or group of

09:10:32  12   frequencies or averaging of frequencies.  What we learn, you

09:10:34  13   know, we can apply different approaches, but whatever approach

09:10:39  14   you take ends up with different outcomes in terms of your

09:10:42  15   conclusions you make about, well, who is in an injured bucket

09:10:47  16   and who is not.

09:10:48  17        **THE COURT:**  And we also know -- I think -- I don't

09:10:49  18   remember the slide number, but for that 15 and 12 percent,

09:10:55  19   those are going to be less severe hearing loss as compared to

09:10:57  20   the others.

09:10:59  21             **MR. BROWN:**  They are because they are --

09:11:00  22             **THE COURT:**  I mean, it's injured.

09:11:02  23             **MR. BROWN:**  -- down in here.

09:11:02  24             **THE COURT:**  Yes.

09:11:03  25             **MR. BROWN:**  Yes.  The percentage scores are going to

09:11:05   1   tend to be at a lower end under that formula like we saw in

09:11:10   2   those slides.

09:11:11   3          So that's a comparison of the approaches on hearing

09:11:15   4   loss.

09:11:16   5          And now we did take a journey through tinnitus as to

09:11:20   6   what we could learn from the census form data or the records

09:11:25   7   that have been submitted in the MDL process or the DOEHRS data

09:11:30   8   about tinnitus.  And so let's see what's in there about it,

09:11:35   9   because, you know, tinnitus -- there's no test for tinnitus

09:11:39   10  apparently, but what can we learn from here about some markers

09:11:43   11  for it.

09:11:44   12         Among the -- it's 158,999 active plaintiffs who have

09:11:51   13  asserted in their census form the injury of tinnitus either

09:11:56   14  alone or along with hearing loss.  It's a total of almost

09:12:02   15  159,000 plaintiffs.  So what can we tell about tinnitus from

09:12:06   16  any of the information we have?

09:12:08   17         We first look to see, all right, the plaintiffs have

09:12:13   18  been submitting medical records in the MDL on MDL Centrality.

09:12:19   19  We have lots of records.  We have lots of things that are

09:12:22   20  medical records and reports of treatment and testing.  We have

09:12:25   21  a lot of documents that aren't medical.

09:12:27   22         So we went through all the records that are in the MDL

09:12:33   23  Centrality platform and segregated them by what's a medical

09:12:36   24  record and what's not.  And then the Court gave us some search

09:12:41   25  terms to see, all right, did anybody mention tinnitus in the

09:12:44  1    records.

09:12:44  2         THE COURT:  And let me just, so everybody knows, this

09:12:48  3    came from my review of expert reports and trial records in

09:12:53  4    terms of the search terms given to you all for your queries.

09:12:58  5         MR. BROWN:  Understood.  And, of course, we could do

09:12:59  6    this records query only on people we have medical records on.

09:13:03  7              This slide is telling us, all right, if you asserted

09:13:06  8    hearing loss and tinnitus, we have 55,344 plaintiffs who have

09:13:11  9    uploaded or given us some medical records; and tinnitus only,

09:13:16  10   28,000.  So there's a big population here we don't have the

09:13:21  11   medical records on.  So, again, we're getting down to a smaller

09:13:22  12   group of people we can do this on, say, 87,505 who have medical

09:13:27  13   records that we can look at.

09:13:28  14              And what did it tell us?

09:13:31  15              Basically we took all the records, did an OCR sort of

09:13:35  16   scouring of them to see if these words on the left here were

09:13:39  17   mentioned anywhere in the records.  I think the idea is, all

09:13:42  18   right, well, was there any sort of contemporaneous

09:13:46  19   corroboration or report of tinnitus at the time back in the day

09:13:51  20   where people were making a subjective report on tinnitus,

09:13:56  21   ringing in the ears or buzzing or whatever.

09:14:00  22              This is what we found in the documents, the people who

09:14:02  23   have some mention of buzzing, ringing, tinnitus in a medical

09:14:11  24   record through a word search.  And this one you can -- a

09:14:15  25   plaintiff can be in more than one of these rows because

| | |
|---|---|
| 09:14:18 | 1 |

somebody mentioned tinnitus and ringing and buzzing.

**THE COURT:**  Right.

**MR. BROWN:**  This is not a head count.  This is, all right, well, how many records have a mention of any of these conditions in it that are tinnitus or tinnitus adjacent or kind of proxies for tinnitus.

**THE COURT:**  And, am I correct, you could do this for individual plaintiffs?

**MR. BROWN:**  We could, any one plaintiff, any group of plaintiffs.  We ended up with these kind of net numbers of people who we find in the record some mention of tinnitus or ringing or buzzing for 31,457 who --

**THE COURT:**  Records?

**MR. BROWN:**  -- assert hearing loss and tinnitus.

**THE COURT:**  Are these for -- but you're saying some of these plaintiffs may appear in -- or was that the prior slide, not this?

**MR. BROWN:**  That's this slide.  You can appear on more than one number here.

**THE COURT:**  Oh, here.

**MR. BROWN:**  But here we tried to net it -- we did net it out --

**THE COURT:**  Oh, okay.  I misunderstood.

**MR. BROWN:**  -- to say, all right, let's get a head count of 31,457 plaintiffs, active plaintiffs who allege

09:15:19  1   hearing loss and tinnitus, who mention tinnitus or ringing or

09:15:22  2   buzzing somewhere along the way in a record.

09:15:25  3           So there's 15,500 who assert in their census form

09:15:32  4   tinnitus injury only who mentioned tinnitus somewhere along the

09:15:34  5   way in a medical record.  There's no mention for 37,097 of

09:15:41  6   them, and again, the totals of the people we have records on.

09:15:43  7           But this was just an effort to see, all right, if

09:15:46  8   there are medical records, let's run through them and see if

09:15:48  9   there's some contemporaneous kind of report of tinnitus,

09:15:53  10  ringing, or buzzing.  Does that indicate that, okay, it must

09:15:56  11  have been going on because they reported it for medical care?

09:15:59  12  That's what this is -- the approach is, all right, well, what

09:16:01  13  do you tell from the medical records that we have in the MDL

09:16:05  14  Centrality platform.

09:16:06  15          What do we know from the DOEHRS data about tinnitus?

09:16:11  16          Well, again, we have 178,040 people who have DOEHRS

09:16:16  17  data and, of them, 112,000 hearing loss plus 56,159 asserted

09:16:26  18  tinnitus only.  And again, we have this group where we don't

09:16:28  19  know their injury.

09:16:29  20          The 112,257 we just went through.  That's the hearing

09:16:34  21  loss people, we did the shift.  So for the next few slides

09:16:37  22  we're focusing on this 56,159 who asserted tinnitus alone to

09:16:42  23  see what we can tell in the DOEHRS data about tinnitus, and

09:16:46  24  we'll finish up with the whole crowd, the whole audience.

09:16:50  25          But these right here, we took two approaches to the

| | | |
|---|---|---|
| 09:16:54 | 1 | DOEHRS data on tinnitus, and we're looking for shifts of 10 |
| 09:16:59 | 2 | decibels or more in any frequency in either ear. |
| 09:17:03 | 3 | And the Court asked us to do this, this 10 decibel or |
| 09:17:07 | 4 | more kind of shift.  Whether it's temporary or permanent, we're |
| 09:17:11 | 5 | not here today to say whether temporary or permanent.  But is |
| 09:17:15 | 6 | that some sort of marker or proxy for tinnitus?  If you have a |
| 09:17:20 | 7 | shift and your hearing is declining by 10 decibels or more |
| 09:17:23 | 8 | between one test or another, is that an indication perhaps of |
| 09:17:28 | 9 | tinnitus? |
| 09:17:29 | 10 | I think there was some testimony -- |
| 09:17:29 | 11 | **THE COURT:**  Correct. |
| 09:17:31 | 12 | **MR. BROWN:**  -- in trials that obviously we were not |
| 09:17:34 | 13 | present for that maybe uses this as a marker for tinnitus. |
| 09:17:39 | 14 | And again, we're not saying that's right or wrong. |
| 09:17:42 | 15 | We're just saying, if you did that, if you assume that a shift |
| 09:17:44 | 16 | of 10 decibels or more between one test to another is some sort |
| 09:17:49 | 17 | of indication that, yes, there may have been tinnitus in this |
| 09:17:53 | 18 | serviceperson, what does the DOEHRS data tell us about that. |
| 09:17:58 | 19 | And so, if we're looking at, again, our first |
| 09:18:03 | 20 | approach, first and last audiogram, looking for tinnitus, we |
| 09:18:07 | 21 | can do this on, again, 52,544 people who have more than one |
| 09:18:16 | 22 | audiogram.  Now, this is the crowd of people that allege |
| 09:18:19 | 23 | tinnitus only.  These are different people from all of our |
| 09:18:22 | 24 | hearing approach that we looked at in our first four |
| 09:18:24 | 25 | approaches, but now we're focusing on people who have asserted |

09:18:27   1   -- plaintiffs who have asserted tinnitus only, and we get

09:18:30   2   52,000 -- 94 percent of them almost that we have more than one

09:18:34   3   audiogram on that we can look for shifts on.  A different

09:18:38   4   population from what we already looked at.

09:18:40   5   But what we found was 42,000-plus have a shift of 10

09:18:47   6   decibels or more in any frequency on either ear between the

09:18:54   7   first audiogram in the data and the last audiogram in the data.

09:18:57   8   So, if that's a proxy for tinnitus, there's 42,816 who

09:19:02   9   have that between first and last.  Again, it's one frequency.

09:19:07   10  It could be 10, could be 40, could be bigger, but at least 10.

09:19:11   11  That's the distribution pattern for the first approach which is

09:19:14   12  first and last.

09:19:16   13  And then we did the same two brackets of audiograms

09:19:22   14  when you started using the earplugs and when you ended.  Again,

09:19:25   15  we have to have answers in the census form about when you used

09:19:28   16  the earplugs to be able to do this on this tinnitus-only

09:19:32   17  population.  We have that on about 54-plus percent of this

09:19:37   18  population so that we can do -- figure out an audiogram around

09:19:41   19  when they started using the earplugs and when they finished and

09:19:45   20  see if there are shifts in there.

09:19:47   21  And in that audience we have 23,755 who have a shift

09:19:55   22  of 10 decibels or more in any frequency, either ear, from the

09:20:02   23  audiogram that's nearer the time they started using the Combat

09:20:06   24  earplugs and the time that they finished.

09:20:07   25  And so, if that's a marker for tinnitus, then there's

09:20:13   1    22,755 who have it.

09:20:16   2         THE COURT:  According to some experts it is.  And it

09:20:19   3    may be the subject of some debate, but there is a record of

09:20:22   4    that.

09:20:22   5         MR. BROWN:  This is where we end up in terms of the

09:20:29   6    two approaches on tinnitus in terms of what percentage of the

09:20:33   7    population have a shift of at least 10 decibels or more than 10

09:20:38   8    decibels -- 10 decibels or more that may be a marker for

09:20:42   9    tinnitus.

09:20:42   10        So it's 81 and 78 percent, 81 percent first and last,

09:20:50   11   audiogram 78 percent, earplug use start and end date

09:20:52   12   audiograms.

09:20:55   13        And then we expanded this tinnitus thing just to see

09:20:59   14   -- make sure that we covered the whole waterfront.  What we

09:21:01   15   looked at just now was just the group that alleged tinnitus

09:21:05   16   only.  We went back in and pulled everybody who alleged

09:21:09   17   tinnitus, whether it's alone or with hearing loss.  That's a

09:21:12   18   bigger population.

09:21:12   19        THE COURT:  That's the biggest injury population.

09:21:15   20        MR. BROWN:  It's the what?

09:21:17   21        THE COURT:  It's the greatest injury population.

09:21:20   22        MR. BROWN:  Yes, it is, of tinnitus and hearing loss

09:21:22   23   alleged.

09:21:23   24        We did the same approaches as we just looked at in the

09:21:26   25   two tinnitus approaches.  On the first one, you know, where we

09:21:30  1   have first audiogram in the data, last audiogram, we do that on

09:21:37  2   93.4 percent of the population.  So, on 148,577 people we have

09:21:45  3   two audiograms to see what the shifts were if you alleged

09:21:49  4   tinnitus either alone or with hearing loss.

09:21:52  5        This expanded version gives us these numbers of people

09:21:56  6   between the first and last audiogram who had a shift of at

09:22:00  7   least 10 decibels, 128,000.  That's the whole population.  It

09:22:05  8   includes the tinnitus-only people we just looked at and the

09:22:08  9   people who alleged hearing loss and tinnitus.

09:22:10  10        And then on the second approach in this expanded

09:22:14  11   tinnitus, which is earplug use dates, audiograms, we can do

09:22:19  12   that on 55 percent of this population who gave us use dates,

09:22:24  13   and we end up with this distribution of people, 72,106, that

09:22:36  14   have a shift at least 10 decibels in any frequency between

09:22:39  15   those two audiograms, with the comparison being this in terms

09:22:43  16   of -- the whole tinnitus population under those two approaches,

09:22:46  17   you get percentages of the population that are fairly close

09:22:50  18   that have 10 decibels or more shifts between one test and the

09:22:55  19   other.

09:22:55  20        And again, that's trying to plow through the DOEHRS

09:23:00  21   data to see if there's anything in here that you can use to

09:23:04  22   assess or analyze the tinnitus assertions based upon the

09:23:08  23   testing results in the audiogram responses.

09:23:12  24        **THE COURT:**  But, again, this tells you nothing about

09:23:15  25   the severity of the tinnitus at all.

| | | |
|---|---|---|
| 09:23:18 | 1 | **MR. BROWN:**  It does not.  It's 10 or up.  You could go |
| 09:23:23 | 2 | further in how much it is.  We were looking at this comparison |
| 09:23:31 | 3 | -- the percentages we get out of here compared to the smaller |
| 09:23:37 | 4 | group.  They don't vary a lot in terms of whether it's the |
| 09:23:46 | 5 | tinnitus only allegations -- that's the number that you see |
| 09:23:48 | 6 | that popped into the side or above -- or the entire population. |
| 09:23:51 | 7 | They're close. |
| 09:23:54 | 8 | This is the entire population.  But if you look at the |
| 09:23:58 | 9 | group we started with, the 55,000 tinnitus-only people, you get |
| 09:24:03 | 10 | 19 percent below 10, 22 percent above.  It's a little different |
| 09:24:10 | 11 | but that's -- we just wanted to compare the two populations |
| 09:24:14 | 12 | that come out in kind of the same place pretty close to each |
| 09:24:18 | 13 | other. |
| 09:24:18 | 14 | **THE COURT:**  Yeah.  And again, this is making the |
| 09:24:22 | 15 | assumption that a shift of 10 dB or greater reflected on the |
| 09:24:25 | 16 | audiogram for a particular plaintiff may indicate some injury |
| 09:24:31 | 17 | to the auditory pathway that could support a tinnitus claim |
| 09:24:36 | 18 | based on some of the expert testimony. |
| 09:24:38 | 19 | **MR. BROWN:**  That's how we understand that assumption, |
| 09:24:40 | 20 | and so that's what we tried to figure out, you know, what did |
| 09:24:43 | 21 | it tell us about them. |
| 09:24:44 | 22 | So, Your Honor, that's what we did and wanted to |
| 09:24:47 | 23 | present today in terms of sharing our approaches, four |
| 09:24:50 | 24 | approaches on the hearing loss measurements and then these |
| 09:24:53 | 25 | various ways to look at tinnitus, whether it's in the records, |

| | | |
|---|---|---|
| 09:24:56 | 1 | what people are asserting, is there a way to find anything |
| 09:24:59 | 2 | that's an indicator of it in the DOEHRS data.  That's what we |
| 09:25:03 | 3 | were able to do. |
| 09:25:04 | 4 | It took a lot of plowing through the information and |
| 09:25:08 | 5 | trying to aggregate it and present it in some understandable |
| 09:25:11 | 6 | way, but we hope it's helpful. |
| 09:25:12 | 7 | And again, we're ready to do this on any pathway or |
| 09:25:15 | 8 | approach that the Court or any of the parties would like or |
| 09:25:18 | 9 | populations to see, all right, well, let's tweak it here, tweak |
| 09:25:23 | 10 | it there, measure it differently, use different audiograms. |
| 09:25:26 | 11 | All of that now is doable.  In terms of what the parameters or |
| 09:25:30 | 12 | inputs are, we can tell you the outputs. |
| 09:25:33 | 13 | **THE COURT:**  Yeah, you have it all set up. |
| 09:25:35 | 14 | **MR. BROWN:**  It's all set up, Dennis is all set up. |
| 09:25:36 | 15 | **THE COURT:**  An enormous amount of work. |
| 09:25:39 | 16 | **MR. BROWN:**  All of the programming that goes behind |
| 09:25:42 | 17 | drawing upon the right cells to do this analysis, it took a lot |
| 09:25:46 | 18 | of building.  It's set up now.  But when you tweak it, we just |
| 09:25:52 | 19 | change the programming a little bit, we can spit out different |
| 09:25:52 | 20 | results.  It's not immediate, depending upon -- but, you know, |
| 09:25:55 | 21 | Dennis can do almost anything, so yeah, we can do it almost any |
| 09:25:59 | 22 | way you'd like or any of the parties would like. |
| 09:26:01 | 23 | **THE COURT:**  Could I ask for you to pull back up the |
| 09:26:04 | 24 | slide -- I don't remember the number -- that compares the four |
| 09:26:07 | 25 | approaches with the bar? |

09:26:18    1             **MR. BROWN:**  Yes.

09:26:18    2             **THE COURT:**  Oh, I think it was maybe not a bar.  A lot

09:26:18    3   of colors.

09:26:18    4             **MR. BROWN:**  Yeah, there are a lot of colors and we'll

09:26:18    5   get there.

09:26:19    6             That one?

09:26:20    7             **THE COURT:**  No.  Back, further back.  There you go.

09:26:23    8             So this is --

09:26:23    9             **MR. BROWN:**  That one, right?

09:26:30   10             **THE COURT:**  No.  It's not a bar.  It's the other one,

09:26:30   11   this one.  *(page 45)*

09:26:34   12             So this is the main reason I asked BrownGreer to --

09:26:41   13   why do we keep going off of the --

09:26:41   14             **MR. CARTER:**  There's a delay on yours.

09:26:41   15             **THE COURT:**  There's a what?

09:26:41   16             **MR. CARTER:**  Go back to the colored one, Orran.

09:26:41   17             **THE COURT:**  Yeah, I want to go back to the colored

09:26:41   18   one.  Okay, that one.

09:26:52   19             One of the main reasons I asked BrownGreer to do what

09:26:56   20   I asked them to do, and that is because, looking at this early

09:27:00   21   on, I could tell the plaintiffs' approach to the data and the

09:27:05   22   defendants' approach to the data could not result in greater

09:27:11   23   difference.  I mean, it's huge.  And so I don't know a way to

09:27:17   24   marry that, and I told the parties that, I don't know, into

09:27:20   25   your settlement negotiations, I mean, how you bring those

09:27:25   1   together because they are so very different in terms of the

09:27:30   2   approach to the data.  And I don't know the answer to it.

09:27:34   3         I've made observations about both sides' approach.  I

09:27:43   4   think causation is important.  But again, I'm in the tort

09:27:47   5   system, and I'm looking at what a plaintiff has to do to prove

09:27:52   6   claims in a tort system.  You all may come up with, I don't

09:27:57   7   know, a different formula, some way of looking at this to

09:28:01   8   resolve this litigation.  I hope you do.  But it's not going to

09:28:06   9   be with any blending of these two approaches.

09:28:10   10        And as far as I can tell, based on the last time I had

09:28:14   11   discussions with the parties -- and it's been a couple of

09:28:17   12   months -- 3M was very steeped in its approach and the

09:28:21   13   plaintiffs were obviously very, very wedded to their approach.

09:28:26   14        And so I'll leave it to the meditators to try to get

09:28:38   15   the two sides together, but I wanted everyone to see how

09:28:41   16   different it is in terms of the results in terms of injury to

09:28:44   17   plaintiffs on the hearing loss claims depending on the approach

09:28:49   18   you use.  And I don't know if there's wiggle room or not.

09:28:55   19        And even with the AMA approach, it's injury or no

09:29:01   20   injury.  So you look at Approach No. 3, 85 percent of that

09:29:07   21   population is not injured.  So, if you apply this rating scale

09:29:14   22   to the population in some setting, 85 percent bye-bye, no

09:29:24   23   injury at all, you're not going to get into a bucket.

09:29:27   24        On the first two single frequency approaches you do

09:29:30   25   have to look at shifts, degree of shifts, is it 10 dB or

09:29:33  1   greater, you have to look at the science and what the experts

09:29:35  2   say about that, and then where does that shift end up, is it at

09:29:40  3   least 15 db.  If you're going with 20 dB, does it end up at 20

09:29:44  4   dB or does it end up with 25 dB if you're going with 25 dB.

09:29:44  5   And that definitely will make a difference in terms of how many

09:29:49  6   people are, quote/unquote, "injured."  And then, of course, you

09:29:55  7   look at the decibel level to determine whether it's a moderate

09:29:59  8   injury or severe injury.  But that's -- I guess that's for

09:30:04  9   another day.

09:30:04  10      I know the parties, you all are -- I guess you're

09:30:08  11  continuing to talk and work on this.  But from my review of

09:30:14  12  this, if you are all still here where I left off with you, you

09:30:18  13  have a long ways to go in terms of coming together and agreeing

09:30:24  14  on how to assess injury in this population.

09:30:29  15      And tinnitus is even more difficult or it's more, I

09:30:37  16  guess, elusive.  You don't have the data that you do for the

09:30:42  17  hearing loss claims.  It's difficult for the plaintiffs because

09:30:45  18  of that, but tinnitus is difficult for the defense because

09:30:48  19  those claims are not going to be thrown out just because

09:30:52  20  there's no tinnitus mentioned in a medical record.  That's just

09:30:57  21  not going to happen.  There is no objective test for tinnitus.

09:31:00  22  You all know that, your experts know it.  It's been testified

09:31:03  23  to over and over and over again in every trial.  There was

09:31:06  24  never any general causation challenge to tinnitus and noise

09:31:11  25  exposure, nor do I think there could have been, but there

09:31:14   1   wasn't.  So you're stuck.

09:31:16   2         I mean, those people -- I don't know how valuable

09:31:19   3   their claims are, but they're most likely going to get to a

09:31:25   4   jury if they say they have tinnitus.  We can't say, in terms of

09:31:30   5   as a matter of law, no, you don't.  So that's a problem.

09:31:34   6   That's a lot of people.

09:31:39   7         Observations.  Like I said, you can like them, hate

09:31:44   8   them, discard them, or maybe use them down the road in some way

09:31:50   9   to help get the litigation resolved, which is what everyone has

09:31:55   10   said they want to do.  But I still think you're very far apart

09:31:58   11   in that regard.  If this is where you still are, you're very,

09:32:04   12   very far apart.

09:32:05   13         But I appreciate you doing this, Orran and Dennis.

09:32:08   14         **MR. BROWN:**  Thank you, Your Honor.

09:32:09   15         **THE COURT:**  Thank you.  I know that a great deal of

09:32:10   16   work has gone into this, and I think it's very helpful for

09:32:13   17   everyone to see it.  Otherwise you're just lost in a morass of

09:32:23   18   data that you can't make any meaningful conclusions about.

09:32:27   19         And again, one conclusion that is very clear from all

09:32:30   20   of this is that the parties are very far apart if they're still

09:32:33   21   using these same approaches.

09:32:35   22         **MR. BROWN:**  Thank you, Your Honor, for the opportunity

09:32:36   23   to do this.  And we stand ready to assist the Court and the

09:32:40   24   parties.  If there's a middle ground between any of these

09:32:43   25   approaches, then we can run it and we'll figure out who's in

09:32:47  1   which bucket.

09:32:48  2          THE COURT:  Well, at some point -- I mean, the

09:32:50  3   litigation either resolves or, I guess, it doesn't.  Maybe it

09:32:54  4   resolves on appeal.  If it doesn't, there's so many different

09:33:01  5   variations of what could happen here because there's so many

09:33:05  6   different challenges in the appellate courts right now.

09:33:09  7          But if the litigation does proceed, somebody is going

09:33:13  8   to make this determination.  If it's in bankruptcy, if you stay

09:33:16  9   in bankruptcy, somebody is going to look at these approaches --

09:33:19  10  somebody is going to have to apply an approach -- an estimator,

09:33:23  11  a bankruptcy judge, somebody is going to have to apply an

09:33:28  12  approach.

09:33:28  13         If you come back to the MDL, you're either going to

09:33:32  14  decide on an approach and resolve the litigation in the context

09:33:35  15  of the MDL or juries are going to make the decision for you.

09:33:39  16  They won't be doing it on any of these approaches.  They'll be

09:33:43  17  doing it the good old-fashioned tort way.  But there's only a

09:33:51  18  certain number of outcomes here.

09:33:55  19         We're waiting to hear from appellate courts to decide

09:33:58  20  which direction the litigation is going to proceed.  But from

09:34:00  21  there, you're either going to settle it or you're going to try

09:34:05  22  cases, or again, some neutral third party is going to have to

09:34:13  23  apply an approach to all of this data to come up with a way to

09:34:17  24  compensate the people who are injured.  But again, that's the

09:34:20  25  big question is how many are injured.

| | | |
|---|---|---|
| 09:34:23 | 1 | All right.  Thank you all.  I appreciate you coming. |
| 09:34:27 | 2 | And if you decide you want a Data Day cage fight or brawl, let |
| 09:34:33 | 3 | me know.  We can certainly do that.  Or if you want something |
| 09:34:35 | 4 | short of that, that can be arranged as well, and BrownGreer |
| 09:34:38 | 5 | will be there, you can ask questions, challenge their |
| 09:34:42 | 6 | methodology, if you like, at that point, again, dig deeper into |
| 09:34:50 | 7 | what they did and how they did it, but I think Orran was very |
| 09:34:58 | 8 | transparent in terms of what was done. |
| 09:35:00 | 9 | And you did exactly what I asked you to do, and I know |
| 09:35:03 | 10 | you did it based on the raw data. |
| 09:35:05 | 11 | Thank you all. |
| | 12 | **MR. BROWN:**  Thank you, Your Honor. |
| | 13 | *(Proceedings concluded at 9:35 a.m.)* |
| | 14 | --------------------- |
| | 15 | *I certify that the foregoing is a correct transcript from the* |
| | 16 | *record of proceedings in the above-entitled matter.  Any* |
| | | *redaction of personal data identifiers pursuant to the Judicial* |
| | 17 | *Conference Policy on Privacy are noted within the transcript.* |
| | 18 | |
| | 19 | *s/Donna L. Boland*                              *2-28-2023* |
| | | *Donna L. Boland, RPR, FCRR*              *Date* |
| | 20 | *Official Court Reporter* |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |