1          **UNITED STATES DISTRICT COURT**
          **NORTHERN DISTRICT OF FLORIDA**
2                **PENSACOLA DIVISION**

3

IN RE:  3M COMBAT ARMS EARPLUG ) Case No: 3:19md2885
4  PRODUCTS LIABILITY LITIGATION  )
                                  )  Pensacola, Florida
5                                 )  September 8, 2023
                                  )
6                                 )  9:05 a.m.
   _____)

7

8          **TWENTY-THIRD CASE MANAGEMENT CONFERENCE**

9                **TRANSCRIPT OF PROCEEDINGS**
        **BEFORE THE HONORABLE M. CASEY RODGERS**
10             **UNITED STATES DISTRICT JUDGE**
                  **(Pages 1 through 87)**

11

12  <u>APPEARANCES</u>:

13  (via Zoom)              The Honorable **JUDGE LAURIE MILLER**,
                           Fourth Judicial District of Minnesota
14  (via Zoom)              The Honorable **GARY R. JONES**
15                         United States Magistrate Judge (ret.)

16
   For the Plaintiffs:     Aylstock Witkin Kreis & Overholtz, PLLC
17                         by:  **BRYAN F. ALYSTOCK**
                           17 East Main Street
18                         Pensacola, Florida 32502
                           *balystock@awkolaw.com*
19
                           Clark Love & Hutson, PLLC
20                         by:  **SHELLEY HUTSON**
                           400 Louisiana Street, Suite 1600
21                         Houston, Texas 77002
                           *shutson@triallawfirm.com*
22
                           Seeger Weiss, LLP
23                         by:  **CHRISTOPHER A. SEEGER**
                           55 Challenger Road, Sixth Floor
24                         Ridgefield Park, New Jersey 07660
                           *cseeger@seigerweiss.com*
25

```
 1   APPEARANCES CONT'D:

 2   For the Defendant:       Moore Hill & Westmoreland, PA
                              by:  CHARLES F. BEALL, JR.
 3                            350 West Cedar Street
                              100 Maritime Place
 4                            Pensacola, Florida 32502
                              cbeall@mhw-law.com
 5

 6                            Jenner & Block, LLP
                              by:  THOMAS J. PERRELLI and
 7                                 JOANNA WRIGHT
                              1099 New York Avenue NW
 8                            Suite 900
                              Washington, DC 20001-4412
 9                            tperrelli@jenner.com
                              jwright@jenner.com
10

11                            White & Case, LLP
                              by:  MICHAEL C. ANDOLINA
12                            111 South Wacker Drive
                              Suite 5100
13                            Chicago, Illinois 60606-5055
                              mandolina@whitecase.com
14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

1

2          *(Call to Order of the Court.)*

3               THE COURT:  All right.  Good morning.  Welcome to what

4     is Case Management Conference Number 23 in the 3M Combat Arms

5     Earplug litigation, MDL 2885.

6               I'm going to make some remarks, but before I do, I

7     want to state on the record my reasons for recording these

8     proceedings today.  Most of you know, at least the lawyers in

9     the room do, that recording of judicial proceedings is

10    prohibited by Judicial Conference policy, but there are

11    exceptions to that policy and this proceeding fits one of those

12    exceptions.

13               The CMC today will be recorded for purposes of

14    furthering judicial administration.  The Settlement Program that

15    we'll be addressing here this morning, we'll be discussing,

16    impacts more than 250,000 plaintiffs nationwide in the MDL, as

17    well as thousands more plaintiffs in Minnesota state court.  And

18    unfortunately there is no medium that would enable live

19    attendance by all of those plaintiffs and/or their counsel, not

20    even -- you know, obviously not in the courthouse, not even

21    through the Zoom connection or our court's telephone

22    conferencing system.  But the educational information that will

23    be presented today needs to be disseminated in a way that as

24    many individuals as possible can be informed about the

25    settlement, can make an informed decision about whether to

1  participate in the Settlement Program, and for that reason, I

2  have authorized the recording of this CMC today.  The recording

3  will be made available on the Court's public website for the

4  MDL, as will the presentation materials that you'll be seeing

5  today.  Most likely, though, not until Monday.  It will take us

6  some time to get that done.

7          All right.  Well, we're here this morning for a couple

8  of reasons.  The first of which is to more formally announce and

9  celebrate the parties' global resolution of the MDL litigation

10  as well as the related Minnesota state court litigation.  The

11  settlement, as you know, was reached approximately a week ago.

12  We're also here to discuss implementation of the settlement

13  going forward.

14          Before proceeding any further, though, I'd like to

15  introduce Judge Laurie Miller from the Fourth District --

16  Judicial District Court of Minnesota in Hennepin County,

17  Minnesota.  Judge Miller and her court have been engaged and

18  committed partners with this court for quite a while, both

19  during the litigation phase as well as during the settlement

20  process, and it is safe to say that the settlement would not

21  have been possible without her, and I thank her personally.

22  This is the first time we've met, I guess in person here, and I

23  personally thank you, Judge Miller, for your support and your

24  many collaborative efforts with our court.  In just a few

25  moments I know you'll be making some remarks as well, but let me

```
 1    return to my remarks and start with the settlement itself.

 2          Last week I told the MDL leadership counsel on both

 3    sides, more specifically those who had been most heavily

 4    involvement in the settlement negotiations, that with this

 5    settlement they have accomplished something extraordinary.  I

 6    told them that in my 21 years on the federal bench, I have never

 7    seen litigation as intense and as hard fought as I had seen in

 8    this MDL but that I had also never seen such remarkable

 9    collaboration, such remarkable determination to resolve

10    litigation as they've shown over the past several months.  And I

11    told them that they had done a great service to their clients

12    and to the federal judiciary.  Every word of that was and

13    continues to be true.

14          Let me speak for a moment to that last part about the

15    tremendous service that this global resolution represents.  This

16    MDL, as most in this courtroom know, is the largest in the

17    federal judiciary's history.  And for the past two years the MDL

18    has comprised a shocking one third of the federal judiciary's

19    entire civil docket.  You can take shots at those statistics all

20    day long, but this was the reality for and the responsibility of

21    those of us involved in the MDL, plaintiffs and defendants and

22    the Court, to find ways to deal with the magnitude of the

23    litigation.  And we did.

24          A tremendous amount of effort went into trying to

25    separate the wheat from the chaff.  There was sweeping
```

1    corporate, military, expert, and case-specific discovery over

2    the course of the MDL.  As you know, there were 16 bellwether

3    trials with 19 different plaintiffs.  There were wins and there

4    were losses on both sides.  There were 1500 cases in overlapping

5    wave-, case-specific discovery.  And over the years, the Court

6    dismissed nearly 100,000 cases in the MDL; and in the end, what

7    I think we've learned is that some cases have a lot of merit,

8    some cases have zero merit, and some cases fall in between.  And

9    that's -- I think that's the lesson.

10           But the message here this morning, aside from thanking

11   people for their efforts in getting to the litigation -- and

12   getting the litigation to this result, and I will be thanking

13   some people here in just a moment, but what I want to say on the

14   record this morning, once and for all, is that this settlement

15   is fair.  It is fair to the 250,000-plus plaintiffs in the MDL.

16   I believe it is fair to the Minnesota plaintiffs -- but I will

17   leave that to Judge Miller to discuss further -- but I also

18   believe it is fair to 3M.  And I say this from the perspective

19   of someone who is rather uniquely positioned.  I'm positioned as

20   a neural.  And I don't think there's anyone who knows and

21   understands this litigation, both its intricacies and broader

22   whole of it, as well as its risks, more thoroughly as I do as a

23   neutral.

24           I've been in the trenches of the litigation with the

25   parties since day one, April 3rd, 2019.  I've dealt with

1    discovery.  I've worked with the government.  I've reviewed and

2    ruled on thousands of motions, thousands of objections.  I've

3    presided over six trials with nine plaintiffs and listened to

4    the record of ten other trials.  I followed closely the appeals

5    of the bellwethers and the Aearo defendant's bankruptcy.  No one

6    is in a better position or more credible position to evaluate

7    this settlement than I am.  And again I say to all of you that

8    the settlement is fair and the settlement is smart.

9          Notably, among those who are closest to litigation and

10   most impacted by it, there's been tremendous support for the

11   settlement that the parties have reached.  But not surprisingly,

12   there have also been critics already of the settlement, largely

13   academic pundits and market analysts, as best I can tell; but

14   these folks know very little about the actual litigation that's

15   taken place here.  I doubt seriously that they sat through one

16   bellwether trial, much less multiple trials.  They know and

17   recite jury verdicts, but that's it.  They certainly have never

18   spoken to a jury, as I did with the parties multiple times.

19   They know nothing about the relative strengths and weaknesses of

20   individual claims.  They know nothing about the nuanced

21   evidentiary record that was developed by the parties over nearly

22   five years of legal proceedings across one state court and four

23   federal court dockets:  The MDL docket, of course; the Eleventh

24   Circuit Court of Appeals; the United States Bankruptcy Court for

25   the Southern District of Indiana; and also the Seventh Circuit

1    Court of Appeals.

2            And importantly, those who criticize the settlement,

3    they have no knowledge of the extraordinary risk and

4    extraordinary costs associated with continued litigation of any

5    Combat Arms Earplug claim, much less the costs and the risk of

6    litigating hundreds of thousands of claims; and to criticize it

7    based simply on jury verdicts, theoretical ideals, or market

8    vagaries is just simply not to understand this uniquely complex

9    litigation at all.

10           Those who reject the settlement will learn hard

11   lessons that Judge Miller and I already know, but that's for

12   another day.  For those who embrace the settlement and recognize

13   it for the success that it is, I say to you congratulations.  In

14   just a moment, there will be presentations, as I said, about how

15   to participate in the Settlement Program and also for what's in

16   store in the coming months as far as the Settlement Program.

17           But before we get into that -- and I promise I'm

18   almost done.  Lengthy remarks but it's been a lengthy, lengthy

19   litigation.  I say that lightly -- I do want to acknowledge the

20   extraordinary work of others who have been in the trenches also

21   over the life of this litigation and whose contributions, while

22   largely unsung, have been important to achieving the successful

23   resolution that we celebrate here today.

24           First, I want to start with our court's incredible

25   staff:  Our clerk's office under the leadership of our Clerk of

1    Court, Jessica Lyublanovits; court reporters; IT staff; court

2    security officers; even our judges.  And I thank especially

3    Chief Judge Mark Walker who could not have been more gracious

4    and generous with his support of the MDL.  And also I thank the

5    other judges of my court but also around the Eleventh Circuit

6    who assisted in trying bellwether cases here.

7            And, of course, I'm going to take a moment to thank my

8    law clerks, many of whom have come and gone over the life of

9    this litigation, but each one of whom left an indelible mark on

10   the litigation.  The parties had armies of lawyers tackling the

11   demands of the litigation.  My law clerks were an army of four,

12   and later three, but you'd never have known it from the volume

13   and quality of work that they produced on the tightest of

14   timelines, particularly during the bellwether phase.  Most of

15   them I think are on the Zoom right now.  I can't see you, but I

16   thank you for all of the support you gave to this litigation.

17           I want to mention one of them by name.  She has been

18   with me on this litigation from the start, and that's Tevenia

19   Jacobs.  And she will be upset with me for mentioning her by

20   name.  But most of you who have been involved in this litigation

21   know Tevenia, and you know that she has given it her all, heart

22   and soul, and I'm grateful to her for that and so much else.  I

23   mean, she worked on this litigation day and night, weekends, and

24   holidays for the nearly five years we've been at it.

25           And regarding the clerk's office again, I have to say

1   that they have set a very high bar throughout the federal

2   judiciary for how to manage a massive MDL docket.  We are a

3   small court and a small clerk's office, but they have handled it

4   like pros.  They're now considered -- these individuals in our

5   clerk's office are considered powerhouses in the MDL world.  We

6   are often contacted by other courts about how to do this with

7   multiple dockets and managing thousands and thousands of cases.

8   I couldn't be more proud of them or more thankful to them for

9   all of their work in responding to my urgent eleventh-hour

10  requests for data and reports and other statistical information.

11          Next, nothing this extraordinary happens in a vacuum.

12  And, in fact, the settlement itself is in no small part a

13  testament to the tireless efforts of numerous special masters,

14  including retired United States District Court Judge Dave

15  Herndon, Magistrate Judge Gary Jones from this court, and

16  Magistrate Judge Hope Cannon, also from this court.

17          Judge Cannon, most of you know, succeeded Judge Jones

18  as the magistrate judge assigned to this litigation when Judge

19  Jones retired.  Judge Cannon quickly -- she is a very quick

20  study.  If you know her, you know that -- did not take her long

21  at all to become an integral member of the mediation team, and I

22  don't believe there would have been a settlement had it not been

23  for her.

24          Judge Jones is also here with us today.  I see him on

25  Zoom.  Many of you remember Judge Jones and his work in the

 1   litigation from the start in April of 2019 until his retirement

 2   in September of 2022, and he was -- he was involved in many

 3   aspects of the litigation, but particularly discovery and also

 4   privilege issues.

 5          We've missed you, Gary.  Glad you're back with us here

 6   today.  I know you have a few remarks you'll make in a moment,

 7   but I want to personally thank you for everything you did to

 8   contribute to the litigation.

 9          And then one special master that I'd like to mention

10   and I think deserves special mention is BrownGreer, and they are

11   here today.  Orran Brown is here, Jake Woody is here, Roma

12   Petkauskas I believe is on Zoom; but they have been integral,

13   indispensable.  Their litigation support apparatus, MDL

14   Centrality, has assisted this litigation in ways that I can't

15   even express.  The data analytics they've provided, the industry

16   knowledge that they have, their professionalism -- all of it is

17   top rate, and we appreciate very much.

18          There's Jake.

19          Thank you very much for everything you've done in

20   responding to all of my, again, eleventh-hour requests for

21   massive amounts of data.  I seen Orran smiling because he knows

22   that's true.  Also, they are here today, as you'll hear in just

23   a moment, because they have been appointed as the settlement

24   data administrator going forward for the Settlement Program.

25          There was a village of other special masters over the

1    course of the litigation.  I don't have time to announce all of

2    them and mention them by name, but they all played a unique

3    role, and I thank them for that as well.

4         Another mention I want to make, and it's no small

5    shout-out, and that is to the Department of Defense, to the

6    United States Army, the Department of Justice, and the Veterans

7    Administration.  They've been involved in this litigation from

8    almost day one.  Some of the attorneys in this room traveled

9    with me -- two or three times, I think -- to Washington to meet

10   with them, and they made this litigation a priority.  As massive

11   as it is, they did, and it was indispensable support of the

12   discovery and data needs of the litigation, and I very much

13   appreciate all of their cooperation.

14        There is also a thanks to be made -- and I'm going to

15   let, I think, the plaintiffs do this in their presentation about

16   the settlement, but there's also a thanks to be offered to the

17   Veterans Administration in particular for a letter that they've

18   provided in connection with the settlement dealing with liens as

19   well as benefits.  And I'm just -- I'll leave it at that and ask

20   the parties to mention that, please, in just a little bit.

21        And then, of course, last, but certainly not least, is

22   the parties.  All of you, from the bellwether gladiators -- and

23   there were gladiators; that is an understatement -- to those who

24   have been diplomats more recently in the negotiations.  And

25   frankly, the negotiations -- I say diplomats, but the

1   negotiations were hard fought as well when they needed to be.

2   But from what -- from that extreme of litigators to the

3   negotiators and everyone in between, everyone was instrumental

4   in arriving at this historic resolution.  Every document

5   reviewed, every deposition taken, every motion filed, every oral

6   argument made, every trial conducted -- you all develop the data

7   points that were necessary to resolve the litigation.  You

8   brought insight into the litigation, and then that was taken

9   forward into the negotiations which resulted, again, what I

10  think is a very fair and successful conclusion.

11          No one will be surprised to hear me say that I pushed

12  counsel very hard.  I'm sure there will be snickers about that.

13  But most everyone rose to the occasion like the professionals

14  that you are, and in my view the leadership teams on both sides

15  really do exemplify the very best of the legal profession.  And

16  because we have so many individual plaintiffs, I want to speak

17  to them in -- just for a second in saying that they have all

18  been extremely well represented by the leadership counsel in

19  this litigation on the plaintiff side.  3M, ably represented as

20  well.  But I want those 250,000-plus plaintiffs to know that

21  they were represented very well.

22          Now, there's one more unsung party whose

23  contributions to the resolution of this may not be fully

24  appreciated by everyone, and that individual is Michael Roman.

25  Michael Roman is 3M's chef executive officer and its chairman of

```
 1    the board.  You may recall that he was personally asked to
 2    attend mediation here in Pensacola earlier this year, and he
 3    came.  And while he was here -- and I was present for much of
 4    it, and I can attest to the fact that while he was here, he was
 5    very, very much engaged in this process; and it was clear to me
 6    in meeting and talking with him that he was committed to forging
 7    a mutually agreeable resolution.
 8            His engagement didn't stop at that mediation.  I don't
 9    think it's an overstatement to say that we would not be here
10    today celebrating this settlement had it not been for Mr. Roman
11    and his determination to find a solution to the litigation
12    amidst the overwhelming reality of that litigation and as
13    massive as it was.
14            And those are my thanks.  Again, I'm sure I've left
15    people out, but I just want everyone to know that I think
16    everyone had a part in this, and I'm extremely proud of everyone
17    for getting us here.  So I'm going to turn it over to Judge
18    Miller for a few remarks and then Judge Jones, and then a couple
19    of individual lawyers I think have some remarks to make.
20            So, Judge Miller.
21            JUDGE MILLER:  Thank you, Judge Rodgers.  And let me
22    say it's an honor to be appearing in your courtroom, virtually
23    if not in person.  It would have been great if I could have
24    worked out a way to get there, but it just wasn't meant to be
25    this week.
```

1        But I join in everything that Judge Rodgers has just

2   said, and I have a few Minnesota-specific remarks that I did

3   want to make this morning.

4        This litigation has had as long an odyssey in

5   Minnesota state court as it has in federal court.  In fact, it

6   may have begun here earlier, because I think cases began being

7   filed here in February of 2019.  Right off the bat they were all

8   being removed to federal court.  And so shout-outs will be given

9   to the courts involved down south, but these were all removed to

10  the federal district court here in Minnesota.  And then the

11  removal issue had to go up to the Eighth Circuit before it could

12  be sorted out, which cases were going to be heard where, and it

13  was an Eight Circuit ruling that resulted in kind of a

14  military-civilian plaintiff split, if you will.  The civilian

15  cases all ended up staying here in state court.  The military

16  cases ended up all going to the MDL.  And so our active

17  litigation began after that remand, the remand started coming

18  back, in the wake of the Eighth Circuit ruling.

19        So we didn't actually end up trying any cases here,

20  but we did everything but.  We had massive motion practice, many

21  bellwether cases, many bellwether trials that were worked up and

22  at the point of going to trial but ended up not starting to pick

23  a jury for a variety of reasons, case specific and some

24  settlement related.  But we had many lawyers and many court

25  staff, many people very busily working up these cases, and we

were prepared to start our first bellwether trial, believe it or not, this coming Monday.  September 11 was going to be our go-date for the first civilian bellwether trial.  Global settlement has now made that trial date moot.  I'm not going to have the pleasure of seeing the trial lawyers here put on a show, which I have no doubt would have been equally as entertaining as the shows that you had down in Florida.

But I would like to express my appreciation to all concerned for all the work that has been done to produce the global settlement that has resolved not only the MDL case but the Minnesota cases.  We may not have as many cases here in percentage terms of the overall total, but it has been an overwhelming undertaking for my court as well.  Our cases are not in the hundreds of thousands; they're in the mere thousands.  But nevertheless, my assistant chief judge came by a few weeks ago to tell me that, you know, you are, according to our weighted caseload, doing the work of at least four judges on our bench.  So I appreciated that.

It isn't just me, though.  Like Judge Rodgers, I am supported by a host of folks here who I want to express appreciation to:  My court staff, our civil administrative staff who have been managing our large number of cases that are filed here, my law clerks who have come and gone.  But this hasn't been mine from the get-go.  Unlike Judge Rodgers, I was not the first judge assigned to these cases.  I was the presiding judge

```
 1    of our civil division when these cases came in, and I assigned
 2    them to my colleague, Judge Tom Fraser -- (Zoom audio
 3    distortion) -- in many a year, and he willingly took it on.  And
 4    I thought for sure that Judge Fraser would get it across the
 5    finish line before he retired, but he was required to retire in
 6    2021, because in Minnesota we do have mandatory retirement for
 7    judges.  When he turned 70, he had to leave, and he then
 8    bequeathed these cases to me.  So they've been mine ever since.
 9            So I really want to give a shout-out to Judge Fraser
10    because he worked the initial case here, the Graves' case, up
11    for trial.  He was prepared to try it.  That case resolved for
12    its own reasons short of trial, but he issued any number of
13    rulings that created the solid foundation for me then to come in
14    and take over without having to do a lot of that groundwork.  So
15    thank you, thank you, Judge Fraser, for all your work.
16            Thank you, Judge Rodgers, for your work as well,
17    because many of the issues that I ended up deciding had
18    previously been presented to your court, and it was very helpful
19    to have the guidance of how you thought about these issues
20    before I began to look at them and weigh in on them.  I had
21    state law considerations that didn't always lead in the same
22    directions as federal law, but it was very helpful to have your
23    thoughts and your rulings as I began considering those issues.
24            I, too, want to express my appreciation to the
25    settlement special masters and, in particular, to the special
```

1   master for the Minnesota litigation.  Retired judge --

2   Magistrate Judge Jeffrey Keyes has been absolutely invaluable in

3   assisting me and assisting, I believe, the other special masters

4   in guiding this global settlement resolution.

5           And I also want to express appreciation to the lawyers

6   for the Minnesota group of cases.  I've had very able leadership

7   on both the plaintiff and the defense side in Minnesota.  On the

8   plaintiff side in particular, I would like to mention Dan

9   Gustafson and Rick Paul who've been there for everything,

10  through thick and thin.  And Mr. Gustafson, in particular, has

11  been involved in the settlement negotiations at the end and I

12  think was very helpful in making this happen for the Minnesota

13  cases as well as the MDL.

14          My understanding is that this global settlement would

15  not have been possible without my folks being on board.  And I

16  appreciate the leadership on the plaintiff side as well as 3M

17  side, and Ben Hulse for 3M here in Minnesota has been really

18  helpful as well to make sure that our batch of cases were

19  represented, were included, were able to get on board with the

20  settlement as it got across the finish line.  So thanks to all

21  of you.

22          I've got to say, presiding over this litigation has

23  been fascinating, but, like everyone else here, I think I'm

24  relieved that it has resolved such that we're not going to have

25  to continue with trying massive numbers of cases going forward.

```
 1    I know there's a lot of work left to be done on the
 2    implementation front.  We're going to hear more about what that
 3    entails in a minute.  But I look forward to working with
 4    everyone in keeping this process moving forward, keeping this
 5    implementation on track, taking care of all of these plaintiffs
 6    here in Minnesota, as well as those in the MDL, so that everyone
 7    receives a fair resolution.
 8            And, like Judge Rodgers -- I haven't had as deep an
 9    immersion in this since I didn't get to try a case and I haven't
10    seen the hundreds of thousands of MDL cases, but from the
11    perspective of the Minnesota piece of this -- I, too, believe
12    that this is a fair and just resolution and will serve the
13    litigants here in state court just as it does those in federal
14    court.
15            So thank you again, Judge Rodgers, for giving me a
16    piece of your podium today, and I turn the proceedings back to
17    you.
18            THE COURT:  Absolutely.  Thank you so much, Judge
19    Miller.  I appreciate your remarks.  I know everyone here does.
20            All right.  Judge Jones, remarks?
21            JUDGE JONES:  Yeah, thank you.  Thank you, Judge
22    Rodgers.
23            I just wanted to voice your applause for the parties
24    in reaching the settlement.  And I think you used the words
25    "fair" and "smart."  It's definitely fair and smart, but the
```

1   settlement is really good for both sides.  This is a good thing

2   for 3M, and this is a good thing for service members.  Everyone

3   did not get what they wanted, but that's what settlements are

4   about:  something that's mutually agreeable.

5          And I mediate a lot of cases, even as a retired judge,

6   and it's always the word I use, "mutually agreeable," and I

7   think you really had that here.  And I believe that and I know,

8   Judge Rodgers, you believe that.  I'm sure Judge Cannon does as

9   well.  And probably the three of us are in the best objective

10  position to assess all of the pros and cons of the merits, of

11  the arguments of the parties, and I think all three of us truly

12  believe this is a good settlement.

13         I'd like to make one other comment.  This goes back to

14  early in the case, and my early involvement in the case was

15  largely involved with a number of the e-discovery issues.  And I

16  do want to thank both sides and applaud both sides for their

17  professional participation in the e-discovery process.  And as

18  many of you might know, I lecture frequently on e-discovery

19  issues, and I use the -- this case as the blueprint for how

20  e-discovery ought to operate in a large case like this.  So the

21  parties should be applauded for that.  And I think early on in

22  the case, that helped the case to move on as best as it could in

23  a large litigation like this.

24         Then the last thing I wanted to say, you know, we have

25  a global settlement.  We're going to hear in a moment about the

```
 1    details, but there is an expression, and the expression is "the
 2    devil is in the details."  So I encourage the parties to
 3    continue to cooperate and work in the utmost good faith in
 4    ironing out any details that might arise.  And I can assure you
 5    that Judge Rodgers, Judge Cannon and, to the extent I'm
 6    involved, I will also do everything in my power to push this
 7    settlement to its final conclusion.
 8            So congratulations again to everyone.  I'll be
 9    interested in hearing the details in a moment when we hear the
10    presentations from the parties.
11            Thanks again, Judge Rodgers.
12            THE COURT:  Thanks, Judge Jones.  And I will be
13    calling on you to help with that push when the time comes, but
14    thank you very much for those remarks and your contributions to
15    the litigation as a whole.
16            Let me turn to the parties and introduce those on each
17    side that are here from leadership.  On the plaintiff side we
18    have Mr. Aylstock, Mr. Seeger, and Ms. Hutson.  On -- and I know
19    there are numerous other plaintiffs' lawyers here, but I'm
20    talking about at counsel table.  And then on the defense side,
21    Mr. Beall, Mr. Perrelli, Ms. Wright, and Mr. Andolina present
22    for 3M.
23            So I'm going to call on -- I believe Mr. Seeger is
24    going to make a few remarks on behalf of the plaintiffs and then
25    Mr. Perrelli on behalf of the defendants.
```

1          All right.  So, Mr. Seeger.

2          MR. SEEGER:  Thank you, Your Honor.  Good morning.

3          Good morning, Judge Miller.  I haven't seen you in a

4    long time.  It's nice to see you again by Zoom.

5          Judges Herndon and Cannon, who are here, and Judge

6    Keyes who I believe is on Zoom as well.

7          I'd like to just start by saying -- some of my

8    comments are going to repeat some of the things you said, Judge,

9    but I think it bears repeating in some respects.  But it really

10   has been a honor to represent these clients, particularly the

11   men and women of our armed forces.  Some of whom are here in the

12   courtroom here today.  So it's been a tough road, but it's been

13   worth it.

14         So -- and I also want to thank you, Judge, for giving

15   me the opportunity to sort of address this landmark settlement

16   that we've achieved.

17         So, Your Honor, the plaintiffs' committee you

18   appointed in May of 2019 stuck together and showed incredible

19   solidarity through a staggering amount of work done on behalf of

20   our clients through the COVID pandemic, through 16 bellwether

21   trials that Your Honor oversaw, through wave discovery in more

22   than 1500 cases, through an attempt to move the case into

23   bankruptcy court, and finally, after more than -- feels like

24   longer, but -- about two solid years of negotiating, we've

25   achieved this result.  The negotiations were often contentious

```
 1   and always hard fought, but the result makes it all worth it.

 2         I don't say this -- make this next comment to be

 3   contentious in any way, but I do think we have to contextualize

 4   the result.  It's important for the men and women watching and

 5   for people who might be reading this transcript.  But when 3M

 6   decided to file Aearo for bankruptcy, they had estimated the

 7   liability here at $1 billion.  The result that we've achieved

 8   and negotiated is $6 billion.  And I'm very proud to offer this

 9   settlement to my clients, and I'm proud to stand with Bryan and

10   Shelley and Clayton and all of us who negotiated this and offer

11   it and recommend it to everyone's clients.  It is a fair

12   settlement.

13         Before I hand this off to Bryan, I think I'd be remiss

14   if I didn't make the following comments, and I'm going to be --

15   as I said, I'm going to be brief.

16         Your Honor, we owe you a debt of gratitude.  I had in

17   my prepared comments that you had oversaw hundreds of motions,

18   and now that you mention it, I think it's thousands of motions.

19   And in every single one --

20         THE COURT:  Well, we can ask Tevenia.  I think it's

21   closer to thousands, but...

22         MR. SEEGER:  I'm sorry to talk over you, Your Honor.

23         In every single one of those, you gave us decisions

24   promptly.  This litigation moved.  You oversaw 16 bellwether

25   trials when most of the courts in the country were shut down.
```

1    And I don't say that as a criticism to any district.  But you

2    opened your court, your brought us in, you figured out how to

3    get through that; and we -- we and our can clients owe you a

4    tremendous amount of gratitude for that and the way that you've

5    managed and helped us get through this case.  So thank you, Your

6    Honor.

7            I also have to thank Judge Herndon and Magistrate

8    Judge Cannon for constantly giving us -- helping us with

9    solutions to our problems, forcing us to meet, locking us in the

10   room and making sure we continued to meet until we got to this

11   result.

12           So thank you for that to both of you.

13           Finally, you need a dance partner to get to this

14   result, and I have to compliment the lawyers that were hired by

15   3M -- Tom Perrelli, Mike Andolina, and Joanna Wright -- for

16   doing this with us.  They are tough adversaries.  It wasn't

17   easy, but they were reasonable, and we were able to do this.

18   Both parties were able to pull this off for our clients.

19           So thank you, Your Honor for that.  I'm giving it off

20   to Bryan.

21           Oh, it is Bryan or --

22           THE COURT:  Okay.  I think first we're going to hear

23   from Mr. Perrelli.  Thank you, Mr. Seeger.

24           MR. PERRELLI:  Good morning, Your Honor.

25           THE COURT:  Good morning.

1           MR. PERRELLI:  And on behalf of 3M and Aearo, I want

2    to thank the Court for the role that you have played in bringing

3    us to this settlement and also the decision to hold this Case

4    Management Conference to provide a platform for the parties and

5    the administrators to provide important substantive and

6    logistical information for people looking to participate in the

7    settlement.

8           I'm only going to speak for a couple of minutes

9    because I think we really should be focused on disseminating

10   complete and accurate information to all the claimants on how

11   they can participate.

12          Again, I want to thank the MDL Court, Judge Miller.

13          Pleased to meet you, Judge Miller.  I've mediated a

14   case for you but have never met you.

15          And also thank the mediators -- Judge Herndon, Judge

16   Cannon, Judge Keyes -- for bringing us to this resolution.  And

17   I also want to thank the negotiating plaintiffs' counsel --

18   Bryan Aylstock, Clayton Clark, Chris Seeger, Dan Gustafson --

19   and their teams for working with 3M and Aearo, both to bring

20   this settlement to fruition but also in the coming months as we

21   go forward to work together to successfully reach the

22   participation levels set forth in the Settlement Agreements.  I

23   think, as Judge Jones said, this is going to be a long-term

24   commitment for both sides to work together.

25          I really don't want to talk about the past or events

1   in the litigation.  Having said that, this settlement is a

2   moment for 3M to turn the page and devote its time and focus to

3   business and continued innovation rather than litigation.  The

4   parties can cease litigating and fighting over a product that

5   Aearo stopped selling more than seven years ago.

6         But as I said, it is often the case that parties sign

7   settlements and go their separate ways.  That's not what we have

8   here.  We're going to be working together for years to educate

9   and enroll every plaintiff who chooses to join.

10        As the Court knows, 3M's focus has been on reaching a

11  settlement structured with the goal of fully resolving all

12  disputes related to Combat Arms Earplugs, not simply entering a

13  few settlements with a few lawyers while litigation continues

14  into the future with all the ramifications on the federal

15  judiciary.  That's what this settlement seeks to achieve:

16  resolution with all Combat Arms claimants.

17        As you'll hear, the settlement is structured to

18  promote broad participation, first through the identification

19  order process and the Court's orders, by which we hope as many

20  Combat Arms claimants as possible will be identified and given

21  the opportunity to participate in the settlement.  The success

22  really does depend on claimants showing up and registering,

23  first to reach the 98 percent participation level, and then with

24  additional funds being unlocked at higher and higher percentages

25  as claimants come forward and join.

1          And that's what 3M wants.  We want all claimants to

2     come forward and be part of the settlement, recognizing that the

3     company will pay more, up to $6.01 billion, provided all

4     claimants register for the settlement.

5          We very much believe in the settlement.  We think it's

6     fair, as the Courts have said.  We want it to be successful; and

7     that success is going to depend on everyone doing their part,

8     from the ID order, getting information to claimants, getting

9     registrations in.  We want every claimant to know their options

10    and to hopefully see that the settlement is the best path when

11    compared to the delays and burdens and uncertainty of further

12    litigation.

13         We appreciate that both the MDL Court and Minnesota

14    Court have recognized in their Case Management Orders that it's

15    in the parties' interest to focus now on this settlement and

16    that litigation will continue to be stayed as we work on it.

17    That's our focus, and we will work with the Courts, the

18    plaintiffs -- all of the plaintiffs' lawyers, the Qualified

19    Settlement Fund, and all the administrators to obtain the

20    maximum participation possible.

21         So thank you again, Your Honor, for all of your

22    efforts here.  I know -- I have seen how much effort you have

23    put into this.  We appreciate you helping us to get to this

24    place, which I think is fair to all, and we will -- we are

25    committed to continuing to work with you on it.

1          Thank you.

2          THE COURT:  Thank you, Mr. Perelli, and thank you to

3    your team.

4          All right.  Next I think we're on to implementations.

5    I'm going to turn this over to Mr. Aylstock.

6          And, again, the point of all of this is -- going

7    forward this morning is to make sure that all plaintiffs in the

8    litigation have the opportunity to make an informed decision

9    about participation.

10          MR. AYLSTOCK:  Thank you, Your Honor.  May it please

11    the Court.

12          Nice to meet you, Judge Miller.  Thank you for all of

13    your efforts as well.  I say that on behalf of the entire

14    Negotiating Plaintiffs' Committee, on behalf of the leadership

15    for the MDL that would not have been able to prosecute this case

16    without the teams of people that were able to represent the

17    veterans, service members, and civilians that are brought

18    forward, their claims.  It's been an enormous honor and a

19    responsibility to help these clients, and we're going to

20    continue to help them in a collaborative way with my colleagues

21    from the other side to implement this settlement.

22          We do have a number of settlement administrators that

23    Your Honor has appointed.  I wanted to introduce them to the

24    people on the Zoom and those in the courtroom.

25          I'll start with Jake Woody and Orran Brown.  Your

1    Honor called them out specifically for all of their work leading

2    up to this point.  And I want to echo those comments and also

3    thank Your Honor for encouraging this resolution.  Simply would

4    not have happened without Your Honor, your staff, Judge Miller

5    and her staff, all of the hard work that went into it, including

6    Judge Herndon and Judge Cannon pushing us over the edge.

7            But one of the inflection points I think that created

8    this settlement was, in fact, all of the data that BrownGreer

9    was able to house, the Data Day that Your Honor put forward and

10   we've implemented -- and you'll see this in Mr. Garretson's

11   presentation in a little bit -- a lot of the principles that

12   were brought forth through the Data Day that Your Honor held

13   with the BrownGreer team.  So I thank you for all of that effort

14   in getting us to that point.

15           I'd like to also introduce the Archer team, Scott

16   Freeman and Blake Deady.  They'll be giving a presentation on

17   additional implementation aspects of the settlement, in

18   particular the registration process.  That will follow the

19   identification process that we'll talk about in just a minute.

20           And then Mr. Garretson, who's on the end, is the

21   Settlement Allocation Administrator.  He's worked with

22   biostatisticians and medical experts to come up with a fair way

23   to divide the settlement proceeds that are part of the

24   settlement so that each and every client gets their own case

25   evaluated based upon the objective factors that are contained

1     largely within the DOEHRS data and the data from the DOD and

2     DOJ -- that we also thank for all of their efforts in providing

3     that data.  They didn't have to do it.  And Your Honor worked

4     hard, Judge Herndon worked hard, and we very much appreciate

5     that data because that is the data that forms the basis of most

6     of these claims.

7            Finally, Mr. Chris Klotz is the Extraordinary Injury

8     Administrator that you've appointed.  There are outlier claims

9     in this litigation that don't fit neatly within the data points

10    of an audiogram, and Mr. Klotz will work with the parties to

11    make sure that those people also get a fair settlement

12    throughout this process.

13           And finally Mr. Sansom, in the back, is the

14    court-appointed CPA.  He's also -- has a significant role in

15    this settlement, Your Honor, with regard to co-administrator of

16    Qualified Settlement Fund.  The Settlement Fund will hold the

17    money until it's divided pursuant to the procedures and then

18    distributed.  But part of the settlement is a stock transfer,

19    and it was a creative solution brought forth by Mr. Perrelli and

20    his team.  The stock will be need to be liquidated and turned

21    into cash because we don't expect to give stock to the claimants

22    but, rather, cash.  So that will be an enormous role, and he'll

23    be an enormous help.

24           So thank you, Mr. Sansom, for that.

25           I'll now go to, just briefly, a presentation.  Some of

1    it will be a little bit repetitive of what you'll hear in a

2    little bit, but I think it's bear -- it's worth repeating

3    certain aspects of the settlement because in order to

4    efficiently manage and implement this settlement of more than

5    250,000 people, it's going to require a lot of work not just by

6    the administrators and the Court and the masters but each and

7    every individual plaintiff's counsel will be expected to help in

8    the implementation of the settlement for their individual

9    claimants.

10           As Mr. Perrelli mentioned, this settlement is a global

11   settlement.  It is intended to resolve all claims and if, in

12   fact, we are able to do that -- and I believe that we will -- it

13   will total over $6 billion.

14           Is this working, Brian?

15           Here we go.

16           It does have a very high participation threshold, and

17   in large part that's because, as Mr. Seeger mentioned, we intend

18   to recommend this settlement to 100 percent of our people that

19   we represent, and I'm proud to be able to do so because it is,

20   in fact, a fair settlement.

21           The settlement is -- the payments are spread over a

22   period of time.  That's a function of the hard-fought

23   negotiations.  But ultimately, all of the claimants are designed

24   to be paid throughout this settlement, and there will be an

25   expedited payment program that will start, we believe, early

1  next year.  It's intended to include all Combat Arms Version 2

2  cases.  All represented cases, all *pro se* claimants will be

3  permitted to participate in the settlement, as well as the

4  bellwether verdicts; the Wave cases that you mentioned; the

5  Minnesota cases being overseen by Judge Miller and her able

6  special master, Judge Keyes; cases on the Administrative Docket

7  that the Court created early in the litigation to facilitate the

8  transfer of information from the DOD and DOJ; as well as those

9  cases that are not yet filed but represented by counsel.

10         However, in order to participate in the settlement,

11  there is an identification process, and that is to allow the

12  Court and parties and the administrators to know what is the

13  scope of the litigation, how many claimants are indeed eligible

14  to participate.  And the identification or reference date is

15  coming up.  It's on Tuesday.  And --

16         THE COURT:  Four days a way.

17         MR. AYLSTOCK:  It's four days away.  BrownGreer's

18  going to speak to that.

19         And the Court entered CMO 60 to address the

20  identification of claimants that the parties negotiated in the

21  MSA.  I encourage people to not wait until Tuesday to file their

22  list of claimants and their declaration of list -- of claimants

23  because there's no reason to wait.

24         In the -- there's also some registration deadlines for

25  the Wave cases that are part of a separate MSA and different

1    deadlines that the Archer folks will identify.

2           Primary counsel, according to CMO 60, must, in fact,

3    identify all of the claimants that they represent.  BrownGreer

4    has been good enough to provide primary counsel for all of the

5    cases that are currently in their system in the MDL a

6    prefilled-out list that identifies them.  But it's incumbent on

7    primary counsel to participate -- who want to participate in

8    this list, and even those who don't, to comply with CMO 60 and

9    provide their information pursuant to that order no later than

10   Tuesday.

11           If you have claimants that are not yet filed but you

12   represent them, they also must be on that identification order.

13   The purpose of this is to include everybody.  This is indeed a

14   global settlement, and those claimants that do not comply with

15   this order are subject, pursuant to CMO 60, to a dismissal with

16   prejudice.

17           And I know from having practiced before Your Honor in

18   this case for four and a half years, and other cases, you treat

19   these orders as orders and not suggestions.

20           So I encourage everybody to read and comply with those

21   orders.

22           The information that is necessary pursuant to the

23   identification order is important to the entire administration

24   of the settlement.  And that is because Archer, who is the

25   Settlement Administrator, will need this information to

```
 1    administer the settlement and create the registration forms that
 2    will be provided to each and every settlement member so that
 3    they can make an informed decision about the risks and benefits
 4    of the settlement and/or moving forward as a litigating
 5    plaintiff.  That includes the Social Security number, it
 6    includes the date of birth, and, for deceased plaintiffs --
 7    claimants, rather, you also must provide the information about
 8    the surviving representative so that they, too, can participate
 9    in the settlement should they so desire.
10          There will be a four-month registration period, and
11    that will be handled through the Archer system, and each and
12    every claimant will be evaluated based upon their own
13    audiometric data and their records with regard to tinnitus, and
14    they receive what we know will be a fair settlement offer based
15    upon that information, along with an opportunity to cure or
16    provide additional information should they so desire.
17          Claimants who choose not to participate in the
18    settlement, as Your Honor knows, will be subject to CMO 57.
19    That has additional requirements to proceed outside of the
20    settlement.  But every claimant must register, and that
21    registration process includes the option to become a litigating
22    plaintiff.
23          So our steps, very briefly:  We need to identify all
24    of our claimants by Tuesday, no later than.  And then each and
25    every client will be supplied a registration form by Archer, and
```

1    they will have the decision on how to proceed.  They will have

2    options, Your Honor.  Based upon the payment schedule, we've

3    created two options to participate in the Settlement Program.

4    We'll include an expedited pay option.  That will be a

5    simplified process in a first-in/first-out basis, and that

6    Mr. Garretson will explain further, how those claimants will be

7    stratified based upon their -- that objective data.

8            They'll also have the opportunity to participate in a

9    full evaluation program that will take a deep dive, pursuant to

10   the Court's Data Day and the BrownGreer work, into the specifics

11   of their specific audiometric data, as well as their tinnitus

12   claims, and have the opportunity for an extraordinary injury

13   fund as well; and that will be a points-based system that,

14   again, has been created in conjunction with biostatisticians and

15   medical experts to ensure sure everybody is treated fairly and

16   evaluated individually in this program.

17           For those that don't choose to participate in the

18   program -- and we do not recommend -- we will not be

19   recommending that for any of our clients -- but they will be

20   subject to CMO 57.  Those requirements are, I think it's safe to

21   say, onerous but I think necessary to make sure that the

22   claimants that go forward outside the settlement choose the

23   correct option and, in fact, have their claims properly vetted

24   before they proceed.

25           So with that, I'm going to turn it over to my

1    colleagues at BrownGreer, Jake Woody, who's going to further

2    discuss the implementation as it relates to the identification

3    order requirements.

4            Thank you, Your Honor.

5            THE COURT:  All right.  And let me, as you're

6    transitioning -- thank you, Mr. Aylstock.

7            And, Mr. Woody, if you'll give me one minute.  Let me

8    just stress something or reiterate something that Mr. Aylstock

9    just said about the identification order and the deadlines for

10   the declaration forms.  That deadline is not aspirational.  It

11   is four days away.  And Mr. Woody's probably going to speak to

12   this, but I'm going to go ahead and let you all know something

13   he'll I'm sure address.

14           But I've instructed Mr. Woody and Mr. Brown to unplug

15   their computers at midnight on September 12th, and that's

16   central time.  What that means is they will not accept a

17   declaration form from any of you after that time.  They

18   simply -- they won't be able to accept it.  And I have given

19   them that instruction.  That wasn't their decision; it was mine.

20   Again, this is not aspirational.  We have to have an accurate

21   inventory of the eligible claimants in order to administer this

22   program going forward.  It's absolute necessity.  Whether you

23   end up participating in the settlement or not, we have to have

24   that information.

25           Go ahead.

1          MR. WOODY:  Thank you, Your Honor.

2          My name's Jake Woody.  I'm with BrownGreer.  I'm here

3    to give you a report on our job as Data Administrator in this

4    litigation so far.

5          Bear with me one moment, Your Honor.

6          THE COURT:  That's all right.

7          MR. WOODY:  Thank you, Brian.

8          I'm just building the anticipation for my next slide.

9          THE COURT:  Mr. Marbut, is it just sticking or --

10         All right.  Okay.

11         MR. WOODY:  There we go.

12         THE COURT:  Very good.  Thank you.

13         MR. WOODY:  Thank you, Brian.

14         So, Your Honor, our job is as follows.  Under the

15   order appointing us as Data Administrator and in particular

16   CMO 60, which sets out our duties, which are, as Bryan

17   mentioned, to implement the ID order process.

18         What that means, Your Honor, is that we have provided

19   lists to counsel of the data that we have in MDL Centrality on

20   their claimants that we have in our system.  We've prefilled it

21   with the information that we have on hand.  Those lists are for

22   counsel to review, update, and I'll talk about that in a minute.

23   And also there's a PDF declaration they need to submit in

24   addition to that Excel list.  We will take that data, review it,

25   deduplicate it if necessary, provide it to Archer and the

1    parties, and it will the basis of this settlement going forward.

2    Everybody on it will be an eligible claimant.

3             There are other duties that we have, which I won't

4    talk much about today.  Bryan mentioned CMO 57.  There are other

5    things we'll be doing, but today I'm going to talk mostly about

6    the ID order process.

7             This timeline, Your Honor, sets forth the dates that

8    govern.  These are all from your orders.  The first five deal

9    with the ID order process.

10            On August 29th the Administrative Docket reopened.  On

11   September 1st we implemented CMO 60 module, which I'll talk

12   about in a minute, that allows counsel to review what we have,

13   update it, and give it back to us.  Bryan mentioned

14   September 12th is the deadline.  That is a hard deadline, as you

15   noted.  After that, we'll issue -- we'll review the data,

16   provide it to the parties and Archer on or before September 27,

17   and then the final step in this process is on October 12th,

18   which is the deadline for anybody to challenge what we have in

19   our report.

20            There are other things in this timeline, but I'll

21   leave that -- the rest of it to my friends at Archer to discuss.

22   I'm going to talk about mostly about the first five items on

23   here.

24            THE COURT:  I asked -- Mr. Woody, are you going to be

25   addressing the prepopulating that you've all --

1          MR. WOODY:  Yes, Your Honor.

2          THE COURT:  -- you've been doing?  Okay.

3          MR. WOODY:  Yes, Your Honor, I will.

4          This is our CMO 60 module, which we placed on MDL

5  Centrality, as I mentioned, on September 1st.  There are a

6  couple of important things that I want to talk about.  I'm going

7  to spend some time on this slide and talk about the mechanics of

8  giving this information back to us and a couple of important

9  notes.

10          You'll note -- you'll see in the module, which is

11  available on our MDL Centrality home page for all counsel, that

12  there are a few important links here.  One of them is the PDF

13  that people need to download and sign.  The other one is the

14  eligible claimant list, which is what I've mentioned is the

15  Excel.  We've prepopulated with the data that we have on hand.

16  Counsel should review that information carefully.  We've

17  collected it over the last four years.  It is what we have, but

18  it is incumbent on counsel, I believe, to review it and make

19  sure that it is correct.

20          In addition to that, they should add anybody who is

21  not already on the list.  We have prefilled everything that we

22  have, which is generally name, date of birth, social, and the

23  docket number, and also the MDL Centrality ID that we have

24  assigned to each claimant in our system.  If you have a new

25  person who does not have an ID, you should leave that column

1    blank.  And when you submit this list to us, we'll assign them

2    an ID.  And the reason we're doing that is so that they're in

3    our system and that counsel can then complete the other steps

4    that they may have to do in our system to move forward in the

5    settlement process, mostly involving census forms and other

6    documents that they need to give us.

7              So if there are people that you need to add to the

8    list, you should do it.  You should feel free to do it.  It will

9    not be prepopulated, obviously.  You'll have to fill out the

10   whole thing, but we will assign them an ID and store that data.

11   So that is -- that should help this move seamlessly through the

12   process with no hiccups, is our objective there.

13             THE COURT:  And, Mr. Woody, approximately how many

14   claimants do you have in your system, in MDL Centrality, for

15   this litigation, now that you're doing this work is

16   prepopulating work for?

17             MR. WOODY:  Judge, we prepopulated about 170,000

18   claimant information.  We do have more in our system, but they

19   have been deactivated or they're not -- they don't appear to be

20   eligible to participate, so we did not prefill them.  However,

21   if people need to put them back on the list, they can do it.

22   We're not going to stop you.  But we prefilled the information

23   for the active plaintiffs that we have in our system, and it was

24   about 170,000.

25             THE COURT:  But that's active -- when you say active,

```
 1    you don't mean just active docket, you mean -- it's active in
 2    Administrative Docket as well?
 3              MR. WOODY:  Yes, Your Honor.  When I talk about active
 4    in MDL Centrality, it's largely linked to those things, but
 5    there are also -- it is sort of independent, and there can be
 6    people in our system -- we allow people to put anything they
 7    need to put in there, and that's who we prefilled there.
 8              THE COURT:  And you've prefilled for approximately
 9    170,000?
10              MR. WOODY:  Yes, Your Honor.  And I believe it was
11    about --
12              THE COURT:  Which is extraordinary.
13              MR. WOODY:  Yeah.  Thank you, Your Honor.  Well, we
14    appreciate it.  There is a reason to do this, and that's because
15    we can do that sort of thing.  But we can only do it because
16    we've been working on this for four years, and we have all that
17    information.  We obviously didn't make it up.  It was given to
18    us by counsel.  So they have worked very hard to give us that
19    information as well, and I believe it's a benefit to everybody
20    that it's there now.  And it's making this a little bit easier
21    because these timelines are a bit tight.
22              So you download the list, you fill it out, you update
23    it, correct anything that needs to be corrected, and then you
24    upload it back to us.  And when you do that, we'll send you an
25    email confirming that we received it.  And then we'll process
```

```
 1    it, meaning we'll assign new IDs, examine the data, make sure it
 2    was the correct spreadsheet.  It is important that people don't
 3    make up their own spreadsheet, Your Honor.  They should use the
 4    one that we've provided.  We cannot accept homemade Excels.
 5    They need to use the list that we have.  And that's because we
 6    need to be able to track this data, and we can't do it if we're
 7    getting a hodgepodge of different formats.
 8            So we've prefilled it, and there's a reason for that.
 9    It allows us to store the data effectively and move it forward.
10            THE COURT:  I want counsel to hear that.  The
11    spreadsheet that you're going to resubmit to BrownGreer must be
12    the BrownGreer spreadsheet.
13            MR. WOODY:  Yes, Your Honor.
14            THE COURT:  Not something that you or your law firm
15    has made up.
16            MR. WOODY:  And you mentioned the deadline.  And
17    there's a couple reasons why I think it's very important that
18    counsel should probably go ahead and do this, if they haven't
19    already.  We have received a significant number of submissions
20    already, but we know there is much more to come.  And the
21    reasons to do it now, not wait, are -- I think there's three of
22    them, Your Honor.
23            One of them is obviously when you're using the
24    internet, things can happen.  We don't want people to wait till
25    the last minute and have problems with the connection and things
```

```
 1    like that, which does happen.  I don't think it will, but it's

 2    better not to wait for that reason alone.  But also because

 3    we'll be able to tell you.  If you give us your information now,

 4    we can tell you if it was -- if it worked.  We can tell you if

 5    you gave us the wrong spreadsheet.  We can tell you what the

 6    data looks like that we received.

 7              And this is here.  There's a link down at the bottom.

 8              After you upload it, you can review the submission and

 9    make sure that it looks like.  You can update it if you need to

10    before the deadline, add more people to it if you need to.  But

11    I think it's important that people go ahead and do this now,

12    review the data that we've gotten, we'll show it to you, and

13    we'll send you an email confirming whether it worked or not.  It

14    will tell you if you have a hundred people on your Excel, we've

15    processed a hundred of them.  If we processed -- we were are

16    able to process 50, we'll tell you that.

17              And the only reason we wouldn't process anything, Your

18    Honor, is because there's no name.  That's the only thing we're

19    looking for in terms of accepting it.  And also it's got to be

20    our spreadsheet.  So we'll tell if you there is something wrong

21    with it.  Obviously, if you do it at midnight on Tuesday, we're

22    going to not be able to tell you in time for you to fix it.  So

23    I think it's important for people to do that now.

24              And then the third reason is the one you just

25    mentioned, Your Honor.  This page will go away at midnight
```

central time on September 12th, and you will not be able to give

us this information.  We obviously have no independent authority

to grant extensions.  We won't entertain them.  And I think it's

important that counsel go ahead and do this now and get this

done.

THE COURT:  I agree.  Thank you.

MR. WOODY:  And then, again, the upload button is at

the bottom, Your Honor, just to talk a little bit about the

mechanics.  And there's two things that you need to give us, a

PDF, the declaration PDF, and the Excel list.  That's what needs

to be done here.

There is a provision in one of the orders that

mentions a hard copy.  We do not need paper.  Do not send us

paper, please.  You can upload a PDF of your Excel through this

process as well to satisfy that requirement.

THE COURT:  Okay.

MR. WOODY:  Just to touch on a few others things, Your

Honor.  One is the -- our integration with Archer.  We've

transferred a significant amount of information to them.  We've

provided our census data on approximately 250,000 people and

also transferred 5.5 terabytes of data to them.  I believe that

transfer is complete.  We've been working closely with them all

week to get that done.

5.5 terabytes of data, it's about 2.2 million

documents, which is quite a bit.  I struggle with the way to

1  sort of visualize 5.5 terabytes, and the best I could do -- I

2  know Orran didn't quite like my idea, but -- if you have an

3  iPhone and you have 16 iPhones that will hold 1 terabyte of

4  data.  So what we've done is essentially filled up a hundred

5  iPhones completely with documents and provided that to Archer

6  and will continue to process new documents and transfer those as

7  we receive them as well.  And I think that process has run

8  smoothly, and we'll work hard to make that work.  We know that

9  Archer needs this information to do their job, and we'll work

10  expeditiously to get it to them.

11       And I want to touch briefly on what we'll do after

12  September 12th.  We're going to review the data we've received,

13  deduplicate it.  We have already deduplicated most of --

14  everything in our system that we've prepopulated, which I think

15  was another good reason to do it, so that we don't get -- we

16  don't get problems that we've already solved back.  We've

17  deduplicated all that stuff.

18       I imagine there will be some duplicates, Your Honor,

19  but I'm hopeful that this process is not too difficult,

20  especially because we should have full socials and dates of

21  birth.  I think the deduping process will not be too hard.  Of

22  course, I say that.  We'll see how it goes.  But I -- we've done

23  it before and we can do it again.  We'll finish that on or

24  before September 26th and provide it to the parties and Archer

25  on the 27th.

1        And after that, I believe the next deadline is the

2   12th for anybody to challenge what we provided and look at their

3   list and see if they need to do anything different with it.

4        THE COURT:  That challenge provision is for a

5   challenge to the overall list.  It is not a challenge to, hey, I

6   didn't get my form in in time, so --

7        MR. WOODY:  Yes.

8        THE COURT:  -- I'm challenging that I'm not on the

9   list because I didn't get my form in in time.

10       MR. WOODY:  Thank you, Your Honor.  Thank you for that

11   clarification.  That's right.

12       That is the mechanics of the ID order process.  We've

13   tried to make it as easy as possible.  We have actually done

14   this before in other settlement programs.  We've done this exact

15   process, which I believe greatly assisted us in being able to do

16   this so quickly.  We know what works and what doesn't work and

17   learned a lot of lessons from those processes that we've applied

18   here.  And I think so far it's working great, Your Honor.  We

19   have not had any issues.  We will be monitoring everything over

20   the weekend and up until the deadline to make sure that

21   everything's working.

22       And we have a help desk, we have a hotline, and email

23   inboxes that people can email.  I'll show that information here

24   at the end, but we do have a lot of people back in our offices

25   making sure that this works, getting back to people as soon as

 1    they can.  We have received a lot of questions.  If we don't

 2    know the answers, we are working with the PEC to get the right

 3    answers and make sure they know what they're doing and we know

 4    what they're doing and what everybody is telling each other is

 5    the same.  I think that process has worked very well as well, so

 6    we'll continue to do that.

 7            We'll work very hard to make sure that everybody

 8    doesn't have any trouble doing this, and if they do, we'll help

 9    them fix it.  But, again, after the 12th, we can't do anything.

10    We're going to turn it off.  So it is important that people do

11    that.  And if they need help, go ahead and ask us.  If you're

12    worried about something, go ahead and email us.  We're happy to

13    help you with anything that you have questions about.

14            In addition to the ID order process, there are a few

15    other things that I wanted to mention we'll continue to work on.

16    We'll continue to process short-form complaints, which is a

17    process that has worked well over the last four years.  That --

18    there's a way to give us that information in bulk, on a

19    spreadsheet or fill it out, the actual short-form complaint PDF.

20    Then give that to us, that process will continue.

21            The census forms will continue.  We have those up.

22    They need to be filled out for people who haven't done them.

23    That process is the same that it's been over the last four

24    years, and I think we are well aware -- everybody should be well

25    aware of how that works.

1          And in addition to that, we have new documents we

2    expect to receive.  And like I said, we'll transfer those to

3    Archer as we receive them.  We'll monitor new case filings, and

4    we will also be handling the plaintiff fact sheet process, which

5    I didn't touch on much today.  Bryan mentioned it.  It is a

6    significant plaintiff fact sheet.  That template is up on our

7    portal now.  People can review it.  If they're thinking about

8    how to proceed, they can take a look at that fact sheet and see

9    if they want to fill it out.  It's available on our home page

10   for anybody who would like to take a look it.

11         THE COURT:  Mr. Woody, am I right, as far as new case

12   filings, that with BrownGreer's assistance and the clerk's

13   office, their efforts, we are making sure that we don't have new

14   filed cases that do not appear on a declaration?

15         MR. WOODY:  Yes, Your Honor.  We are -- we've

16   appreciated the assistance of the clerk's office over the last

17   four years.  We've worked very well with them.  We have not --

18   we would not really able to do this without a lot of help from

19   the courthouse, and the clerk's office in particular, to process

20   this data and make sure that we know it's on the docket and they

21   know what we have, and we'll continue to do that.

22         And lastly, Your Honor, just our contact information

23   here.  The email inbox where people can email us if they need

24   help is is 3mearplugs@BrownGreer.com.  Our number is

25   888-361-0741.  And the website for MDL Centrality is

1    mdlcentrality.com.

2              And I appreciate your kind words earlier, Your Honor.

3    They were very nice.  I will -- I do want to say that none of

4    this would be -- would have been possible without the help of

5    quite a few people back in our offices.  So I'm happy to be here

6    representing BrownGreer.  I'm proud to do it.  And I appreciate

7    your kind words.  And unless you have any questions, Your Honor,

8    that's the end of my presentation.

9              THE COURT:  I don't have any more questions.  Thank

10   you, Mr. Woody, for the extraordinary support.  We've come a

11   long ways from the prevalence analysis days, bellwethers,

12   haven't we?

13             MR. WOODY:  Yes, we have.  Thank you, Your Honor.

14             THE COURT:  All right.  Thank you very much.

15             All right.  Mr. Aylstock.

16             MR. AYLSTOCK:  I'll introduce Scott Freeman from

17   Archer, and his partner, Blake Deady, will presenting on the

18   registration process and moving forward, as well as the lien

19   resolution process.

20             THE COURT:  Okay.

21             MR. FREEMAN:  Thank you, Bryan.

22             Your Honor, good morning.  Scott Freeman, chairman of

23   Archer.  I want to introduce Blake Deady.  He's our president

24   and general counsel.  The goal was for me to do the entire

25   presentation.  This is a settlement that has absolutes and

1    deadlines that cannot move.  It's static.  With this much

2    importance, I talk off the cuff.  We felt like our most

3    detail-oriented individual should cover some of the key dates

4    and timing and process-related items for the parties.

5           Again, we're honored to accept this appointment.

6    We're excited about the process, and we understand the task at

7    hand.  We know this is a six-plus-year project.  From my

8    standpoint -- you touched on this earlier -- we've already got

9    some early wins.  Archer was appointed --

10          I guess we'll load the presentation.  Sorry.

11          So this is our rough agenda for today.  Again, I'm

12   going to cover our role.  I'm going to talk mainly about liens.

13   I'm going to talk a little bit about Qualified Settlement Fund

14   administration because it's a little bit different process than

15   some might expect it to be.  And then I'm going to turn to over

16   to Blake to really hammer into the details on the process, the

17   logistics, the coordination.

18          I would also like to thank BrownGreer.  We've been

19   working with them the last couple, you know, weeks getting data,

20   which is really important for us to ingest it, to process it.

21   Like BrownGreer, we've got hundreds of people working on this

22   settlement.  It is -- you know, something of this magnitude

23   requires the work of many, and it's appreciated, for their

24   responsiveness and things that they've done for us to help start

25   analyzing the data that we have and how to get it set up in our

1    system.

2          We were appointed -- and, Judge Rodgers, you talked on

3    this earlier, about the VA liens, and I do want to touch on that

4    in a second.  But, you know, first these are the parties that

5    we're working with.  These are the court-appointed individuals.

6    You know, I would call it the dream team.  And these are the

7    roles that you've got for each party.  Bryan has touched on some

8    of these folks.

9          Obviously Archer will be doing lien resolution, will

10   be the QSF administrator, will be administering the settlement.

11   Randy was -- pointed out in the back.  Randy has a very vital

12   and critical role.  Not only does he have to help us with the

13   investments and the corpus of the trust, but with the way

14   money's going to be moving back and forth, the sale of stock,

15   it's very important to have an expert like that on our team.

16   And obviously he's got duties related to common benefit, but

17   when we do digital disbursements and we pay claimants, we have

18   to have a lot of people doing a lot of work.  So having Randy as

19   the co-trustee is really important, and I appreciate them being

20   appointed.

21         We've touched on BrownGreer a number of times.  They

22   will be handling the settlement data.  BrownGreer is one of the

23   most experienced firms doing this.  We're very confident that

24   the data that we're going to be getting, assuming all of the law

25   firms are compliant, is going to be in good order, and we'll be

```
 1   able to process through that relatively quickly so we can get on

 2   with the important part of the settlement as it relates to the

 3   registration and releases.

 4          The settlement special master, John Perry, from

 5   Louisiana, I've known John for 15 years.  He's an incredible

 6   guy.  He will be dealing with any disputes related to the MSA,

 7   challenges to that identification order, any challenges to the

 8   calculations of participation levels, just making sure that the

 9   MSA is followed and the parties are consistently following the

10   MSA.

11          Matt Garretson's going to be speaking after us.  Most

12   people know Matt in this industry.  I've been doing this for

13   around 20 years.  I've known Matt since I started.  We couldn't

14   have a more experienced special master to figure out how to

15   handle the allocations and the methodology.  He is, you know,

16   lawyer, scientist -- he's a lot of things -- data engineer, and

17   we're -- we couldn't be more happy to have Matt on the team to

18   help us so we can obviously get the ord numbers out and make it

19   very clear and something that everybody can understand.

20          Mr. Klotz has been appointed as the extraordinary

21   injury settlement master.  He's obviously a key part of that.

22   There's people that have a lot of extenuating circumstances to

23   their case.  When we talk about supplementing data and providing

24   us more data, that firms will do, some of those things -- PTSD

25   claims, things like that -- are things you can't necessarily,
```

1    you know, get the full breadth of without having an additional

2    master in that role.

3            When we get to -- you know, when we talk about

4    liens -- little delay.

5            So this is, you know, an early win, and Judge Rodgers

6    referenced this.  You know, Archer was appointed as the Lien

7    Resolution Administrator in February of 2020.  So we've been

8    kind of behind the scenes.  There's not a lot of work to do on

9    the lien side till you have a settlement, but the good news is

10   is we worked with a very understanding VA office.  Neil

11   Stallings in the Revenue Law Group had worked with us because we

12   had received hundreds and hundreds of emails throughout this

13   process of:  I don't know that I want to participate in the

14   settlement because I'm going to lose my benefits, or it's going

15   to impact something I have.

16           And a lot of settlements that we've dealt with in the

17   past, people worry about losing Medicaid and special needs

18   trusts, but this is something unique to this particular

19   demographic.  And the good news is is we do have a waiver of all

20   the VA liens, which is really important.  So that means no

21   claimant's disability rating is going to be adversely affected.

22           Neil put a letter that we had him revise, and the

23   Court has put that up on the website.  It's August 22nd, 2023.

24   It just reconfirms what we had discussed with them in 2021 in

25   the Memorandum of Understanding.  But, again, I've got this

 1    bullet point at the bottom, you know:  Enrolled member of

 2    Department of Veteran Affairs will not lose health or disability

 3    benefits or have their disability rating adversely adjusted.

 4    Okay.

 5             So that's really important.  A lot of people think,

 6    great, no liens.  Well, not so fast, right?  So we are the Lien

 7    Resolution Administrator.  We have a duty, statutory duty, to

 8    resolve government liens in this situation.  Medicare, Medicaid,

 9    and Tricare.  And I'm going to touch on Tricare a little bit

10    because there's not a central processing source for Tricare, and

11    it's going to require counsel to have -- make sure their

12    claimants are providing Archer with information -- what branch,

13    where they might have treated -- because we have to go to that

14    specific, you know, branch and that specific, you know, base to

15    try to get data on Tricare so we can accurately resolve those

16    liens.

17             So while we do have great news on the VA side, we

18    still have things that we've got to do, that the government

19    requires, and we will do our job doing that.

20             There we go.

21             So we do have to submit every claimant to Medicare,

22    okay, for verification of entitlement.  We're going to do this

23    on a global basis.  The good news is is we feel that when

24    Medicare churns through the data that we've been going back and

25    forth with them, there's not going to be a ton of related care,

1    is our opinion.  There will be a -- we hope this -- sometime

2    later this fall, this winter, we'll finalize that global for

3    Medicare and we'll be able to put that part of the lien process

4    behind us.

5            So, you know, again, maybe it's -- we put

6    December 15th, 2023.  If it happens sooner, that's great.  But

7    they've been mining the data and going through the data already,

8    and that's where we're at as it relates to Medicare.

9            Medicaid, as many of you know on past settlements, is

10   when you were injured what states were you living in.  There's

11   not -- it's not like Medicare where it's the federal side.  It's

12   state specific.  So we've got to know -- and I need claimants'

13   counsel on this call to understand -- that we need to know where

14   people might have lived when they were treating with this when

15   you -- when the injuries had started and where they might have

16   treated in states, because we do have a duty to resolve any

17   Medicaid liens that are related as it pertains to the

18   settlement.

19           Tricare, I talked about this earlier.  When we send

20   out registration forms, we will have an additional document for

21   Tricare, and it's really important.  Again, we need to know if

22   there's an agency that might have a medical lien that's related

23   to some place that they treated at during their military service

24   and those regions, and there is not some central area we can go.

25   So we're going to have to go branch by branch, you know, venue

1   by venue and figure out what we have there on Tricare for what

2   the claimants are telling us on their forms.  And if they didn't

3   treat, they don't need to worry about it; but if they treated,

4   it's really important that we get that information so we can

5   check with Tricare to see for related claims.

6          I do want to take a step back and just remind

7   everybody this is recorded, as the judge mentioned.  Our

8   materials will be available.  I'm not somebody that reads every

9   line on the power point, but this is a really important

10  settlement as it relates to the process and the deadlines.  So

11  Blake will be doing a lot of that when he follows up with me to

12  talk about those deadlines.  You know, the BrownGreer -- the

13  BrownGreer MDL Centrality, you know, being shut off on that

14  date.  Again, we can't reiterate enough, please get your data in

15  as soon as you can.

16         This settlement, we will be paying every claimant

17  directly.  So we're the QSF Administrator, the Qualified

18  Settlement Fund Administrator.  It's also called a 468B trust.

19  We need to pay the clients directly.  The only way we can do

20  that is if we get fee and expense information from law firms.

21  So we will be working in a cadence where we're sending, here's

22  your cleared list of claimants, please provide your fees and

23  expenses.  I'll be working with Randy to make sure we update the

24  Court.

25         If we've got -- I don't want to say bad actors.  I

```
 1   want to assume everybody's doing it, but we need to put some
 2   deadlines in place.  When we've got a cleared client, we would
 3   like to get them paid.  We cannot wait on law firms to dig
 4   through files.  So I encourage anybody on the call now.
 5          We will host some town halls.  We will show people our
 6   technology and ways that we can transfer data back and forth,
 7   but it's really important for us to get your fee and expense
 8   information.  And hopefully we can lock some fees and people
 9   know what they have and they can have their client list ready so
10   when they see them on a cleared list, we have that information.
11          And our cadence would be that we pay the clients one
12   week, we pay the lawyers the following week.  And we just expect
13   to do that for as long as we need to.  Six years, right?  I've
14   got an 11-year-old.  I guess he'll be graduating high school
15   when this finishes.  Maybe my wife doesn't share the enthusiasm
16   that I do.
17          But, you know, there are other duties that we're
18   getting a lot of questions about.  Bankruptcy's come up a lot.
19   That's dealt with in the MSA.  Same with probate.  Blake's going
20   to touch on these things.
21          But, again, this settlement only works with
22   cooperating parties, and the claimants' counsel that represents
23   these folks, we are -- you know, I'm running this project.  I'm
24   the chairman of Archer.  I'll be involved.  I'll be in front of
25   this Court probably many times talking about the settlement and
```

 1   where we're at.  Reporting is going to be really important, and

 2   we're going to give you every report so you can figure out what

 3   bucket and where your clients stand and have the opportunity to

 4   be extremely involved in the process from registration and

 5   releases and getting them paid.

 6            And Huntington Bank is the QSF custodial bank.

 7   They've got a great payment platform for digital payments.  So

 8   if your clients want PayPal or Venmo or ACH, we have all the

 9   capabilities to do that.  So you don't have to worry about the

10   U.S. Postal Service and, you know, check fraud and things like

11   that.  So electronic payments will be available for those that

12   want it, and we'll have some fraud prevention and things like

13   that in place.

14            But I am going to turn it over to Blake because this

15   next part is extremely important, again.  I think my team

16   thought wisely to allow Blake to finish this presentation.

17            Thank you.

18            THE COURT:  Mr. Freeman, thank you.  I look forward to

19   working with you --

20            MR. FREEMAN:  Thank you.

21            THE COURT:  -- and seeing this successful settlement

22   implemented.

23            MR. DEADY:  Good morning.  Your Honor.

24            THE COURT:  Good morning.

25            MR. DEADY:  One thing that I wanted to add on to

1    Mr. Freeman's comments were, to counsel -- particularly counsel

2    listening by video -- is do not become overwhelmed right now

3    with the amount of information that we're placing upon you.  The

4    presentation will be available on the settlement website.  I'll

5    provide that.  It's also -- will be at the end of the

6    presentation today.

7         Don't worry about your fee and expense ledgers yet.

8    Let's focus on the identification order.  It's due Tuesday.  And

9    then registration will be coming up in short order after that,

10   and here's the timeline.  Mr. Aylstock presented some of these

11   dates.  But again -- and so did -- so did Mr. Woody.  Again,

12   I'll -- it bears repeating, the identification order deadline

13   expires Tuesday, September 12th.

14        Right now it is Archer's at least target date to issue

15   registration forms in early October, approximately October 9th.

16   I'll talk a little bit more about that in just a second; but, of

17   course, that largely depends upon the amount of data that is

18   transmitted to BrownGreer in the identification process and then

19   BrownGreer's ability to scrub that data, get it into a form that

20   they're already transmitting to Archer, and then Archer using

21   that data to prepopulate registration forms.  Very critically,

22   and like BrownGreer's doing in the identification order, it is

23   Archer's intent to prepopulate registration forms as much as

24   possible with, of course, claimant demographic data and injury

25   data based upon the census forms and the DOEHRS data.

1          So we're looking at a target date to begin delivering

2   registration forms which will been done electronically to

3   claimants.  That's one of the reasons why email addresses are

4   absolutely critical on the identification order and declaration.

5   We need to send your claimants a unique token that identifies

6   them where they can go on and complete their registration forms.

7   That is critical.  There's always going to be outliers,

8   claimants that may not participate in email or refuse to or be

9   in a situation where they cannot access their registration form

10  electronically.  There will be alternative methods for us to

11  reach out to those claimants.

12          December 29th, which is 14 days prior to the

13  expiration of initial registration for MSA I.  We will send a

14  notification out to law firms and claimants that have failed to

15  register.  Seven days prior to the expiration of registration,

16  we'll do that again.  The initial registration deadline expires

17  on January 12th, 2024.  That is four months from the reference

18  date.

19          There's some information on the following slide, which

20  I'll go to in just a second here, related to claimants that may

21  opt out, that change their mind.  That allows for an 60-day

22  additional timeline for them to change their minds and decide

23  they wish to participate in the settlement.  Again, this is a

24  little bit more of a narrative description of the dates related

25  to the initial registration date and some disengagement lists

1    that are owed to the Court and to the administrator by the end

2    of January for claimants that fail to participate by

3    registering.

4            The wave cases have a separate settlement agreement

5    and a separate timeline.  I think everyone may be familiar with

6    that by this point.  The reference date -- well, first of all,

7    the identification with BrownGreer remains the exact same.  It's

8    no different.  It's the same for any claimant related to MSA I

9    or MSA III.  The same reporting from BrownGreer to Archer and to

10   the Court.  Archer is endeavoring to launch the registration

11   process for wave cases a little bit earlier than the non-wave

12   cases in early October, again prepopulating registration forms

13   with as much data, including injury information if possible.

14           I believe the cases in Waves 1 through 3 have pretty

15   extensive medical record discovery completed.  So those cases

16   should be easier to get the registration forms in proper order.

17   The registration deadline for wave cases is three months.  So

18   non-wave cases is four.  The registration deadline for wave

19   cases is three months and expires on December 12th, 2023, the

20   end of this year.  Again, we'll be notifying claimants that

21   we're seeking their registration forms and working with

22   plaintiffs' counsel to ensure that those arrive timely prior to

23   the deadline.

24           A couple points.  Mr. Freeman mentioned just a second

25   ago -- my colleague, Scott -- that there will be an additional

1   form going out with registration forms.  We're calling it a lien

2   questionnaire.  It will be a document that will look like the

3   registration form, but it will provide additional information to

4   Archer which will assist us in governmental lien resolution.

5           Scott mentioned Tricare.  It's very important that we

6   get military branch information and any location where a

7   claimant may have treated for their hearing injury, hearing

8   loss, or tinnitus.  It will help us with Tricare.  There is no

9   central place for us to go resolve liens with Tricare.  It's

10  critical for -- that we get that data in addition to any state

11  of residence where a claimant may have lived, either during the

12  time they used the product or treated for the injuries so that

13  we can most efficiently get through Medicaid lien resolution.

14          Again, I mentioned this a minute ago, these

15  registration forms will be delivered electronically.  So

16  conceptually, again -- stressing again -- email addresses are

17  critical in the ID order.  Please try to get valid email

18  addresses for all of your claimants.  Conceptually, we'll --

19  Archer will receive the information from BrownGreer, we will

20  then process census data and DOEHRS records and employ

21  Mr. Garretson's settlement allocation methodology.

22          And to establish the preliminary eligibility, we will

23  prepopulate registration forms.  They will be published to law

24  firms and claimants alike.  The law firms will get a report of

25  the registration forms going to their claimants.  Their

1    claimants can log into the claimant portal that Archer is

2    building and creating right now to access their registration

3    form and review their release.  Signatures will be -- will be

4    required for these documents.  The good news is we are -- the

5    parties have agreed to accept electronic signatures through

6    DocuSign.  So all of this will be done electronically.

7            Critically important -- we've got a lot of questions

8    about this -- plaintiff law firms and claimants will have an

9    opportunity to review their prepopulated registration forms, and

10   if they believe that there is information that they need to

11   supplement regarding their injury, their category of hearing

12   loss, whether it's mild or moderate, or if they have tinnitus

13   but our records don't show it, they will an opportunity to

14   supplement their registration form and documents with Archer.

15   And at that point in time, we can amend the registration form

16   and resend it to the claimant if the supporting documents

17   support their contention.

18           Once the registration form gets into a position where

19   claimants and their lawyers both agree that it's correct and

20   accurate, they will go out to claimants for final execution, and

21   then those can be, like I mentioned a second ago, returned to

22   Archer with a DocuSign electronic signature.

23           This slide has a little bit more of a schematic that I

24   won't go all the way through because it's effectively what I

25   just said.  But the critical thing to take away from this piece

1    is if you look at the green boxes, that's where a law firm can

2    interact with the workflow process.  The claimant has that same

3    opportunity.  The arrows actually on here, we demonstrate how

4    the claim can proceed through the workflow process where there's

5    opportunities to actually put up a stop sign, review the

6    registration form, and offer any supporting supplemental

7    records.

8           Again, every law firm is going to have an opportunity

9    to update or supplement the claimant information to Archer.

10   Every law firm will have the opportunity to review the

11   prepopulated registration forms and confer with their clients

12   prior to distribution to the claimants.  We will notify firms

13   before any general correspondence is distributed to claimants.

14   I would encourage you as CAE counsel right now to introduce

15   Archer to your clients.  We have a very important role as we're

16   charged and appointed by the Court to make sure that we

17   administer the settlement as efficiently and as completely as

18   possible.

19          Scott mentioned this earlier.  We're going to continue

20   to host town halls.  We hosted one last Tuesday with BrownGreer

21   and leadership counsel to try to answer as many questions as we

22   could in an hour, both through a Q-and-A session that was in

23   written form and live as we were taking those questions

24   submitted to us in written form.  So as we get through -- past

25   the identification process and the registration, we'll continue

1    to schedule town halls to provide counsel and their claimants

2    with as much information as we possibly can and to answer any

3    questions as the process develops.

4           For debtor claimants, there is a requirement to

5    resolve your bankruptcies.  This is -- presentation is pulled

6    directly -- language directly from both MSA I and III.  Each

7    eligible claimant shall agree and, by executing that release,

8    that will indicate in the registration form whether there is a

9    bankruptcy action that's currently pending or whether he or she

10   is seeking bankruptcy protection.  The language is almost

11   identical in each release, except release -- or MSA III

12   references wave cases.

13          Importantly, on the registration form, there are

14   questions related to this that are very straightforward.  I've

15   included them here for you.  I won't read this, but essentially

16   if you have a claimant that answers yes to these questions, the

17   claimant's required to provide the bankruptcy court the

18   jurisdiction and case number.  Archer will assist the claimant

19   in coordinating that bankruptcy -- or coordinating the

20   settlement through that bankruptcy.  We will, through the

21   registration process, identify claimants which indicate the same

22   and begin reaching out to trustees to assist in the coordination

23   of the settlement award through the bankruptcy estate, if it is

24   an asset of the bankruptcy estate, working directly with the

25   trustee.

1          For deceased claimants -- there it is.

2          Importantly, again, this information is available in

3    the MSA, but I'll hit a couple high points here.  If you have a

4    claimant that is deceased and that is going to receive greater

5    than $75,000, their release, importantly, will not be effective

6    until executed by a representative of the deceased eligible

7    claimant in accordance with applicable state law.  Importantly,

8    Archer will work with those representatives of the deceased

9    claimant and local counsel, if necessary, to ensure that the

10   proper personal representatives are appointed by a court so that

11   they have the authority to execute the release per the

12   requirements of the parties and, importantly, 3M.

13          If you have a claimant that's going resolve their case

14   for less than $75,000, there's a different alternative there

15   which includes satisfying the small estate administration rules

16   under applicable state law or having all the beneficiaries

17   identified enter into a family settlement affidavit which Archer

18   will be putting together in short order and conferring with the

19   parties to get approval for a global application of the same.

20          It bears repeating here, I guess, or at least

21   mentioning, that Archer shall not have or distribute any

22   settlement funds on behalf of a deceased eligible claimant until

23   Archer, as the claims administrator, confirms the release has

24   been executed in conformance to the party's MSA.

25          Mr. Freeman talked about this a few minutes ago

1    related to Archer's QFS administration responsibilities.  I
2    won't go over too much of this again, but I do want to reiterate
3    that Archer is responsible, working with Mr. Sansome, to
4    effectively distribute settlement proceeds to any stakeholder
5    related to a claimant that may be receiving a settlement award.
6    That includes the claimants, most importantly, to their medical
7    lienholders, to counsel for fees and costs, or anyone else that
8    may receive a portion of the settlement award.
9         Again, at some point, probably getting through the end
10   of registration process, Archer will begin putting together the
11   fee and expense ledger information for law firms, and it's
12   important that law firms comply with the deadlines that we're
13   going to set in place so that as claimants begin getting into a
14   position to be paid, we can effectively do that without waiting
15   for fee and expense ledgers from firms.
16        Mr. Freeman mentioned electronic payments, and that
17   will be an option in addition to robust fraud prevention.
18        Reporting is always a critical question by everyone
19   involved, and it is Archer's intent to provide most importantly
20   the Court with reporting related to the registration process in
21   addition to CAE counsel, the defendants, 3M.  There will be
22   dashboards.  I won't flip through the rest of these slides.  I
23   think one's enough that everyone can access this presentation I
24   think both through the Court's website, certainly the settlement
25   website that Archer's created.

1          But importantly, we intend to report on -- across

2     every function that Archer's going to perform, whether that's

3     registration, lien resolution, bankruptcy coordination, or

4     probate coordination, in addition to QSF distributions, both

5     from a holistic QSF level to a law firm level, even through a

6     claimant level.  And transparency is obviously the most

7     important factor in this.  This reporting for everyone will at

8     least provide real-time status as to the settlement and how it's

9     progressing, both in terms of submission deficiencies and one

10    day when we get this thing completed.

11         So I will tell you right now that Archer's very

12    flexible on this reporting.  We'll start creating, but I know

13    that we're going to have requests, and we will try to satisfy

14    all those requests as we get them.  We'll get that contact

15    information up here.

16         There is a settlement website.  It will be up in a

17    second here, but we stood this up last week.  It's

18    3m-earplugsettlement.com.  Again, there it is.

19    3m-earplugsettlement.com.  There's the Archer website.  And,

20    importantly, we have an Archer email address right now for

21    anyone to contact us at 3mcaecounsel@archersystems.com.

22         On short order, once we get past the identification

23    process into registration, we'll also have a toll-free number

24    that is dedicated to this settlement.  And like our partners and

25    colleagues at BrownGreer, we encourage you to call us when we

1    get through that process.  We're going to have folks helping

2    both through live telephone calls, emails, chat functions if we

3    need it.  And, you know, look, we're as incentivized as anyone

4    to make sure this project goes as efficiently and smoothly as

5    possible.

6              Thank you, Your Honor.

7              THE COURT:  Thank you, Mr. Deady.

8              Let me follow up with a couple of comments.  A lot of

9    information, comprehensive, dense, full, but intentionally so.

10   Judge Miller and I wanted to make sure that all of the law

11   firms, lawyers involved in the litigation, here and in

12   Minnesota, as well as the claimants themselves, have the

13   information that they need in order to make an informed decision

14   about participating in the settlement.  And this is the best way

15   I could think of doing that, and Judge Miller agreed.

16             The other thing is the deadlines are tight, but as

17   we've just heard from Mr. Woody and Mr. Deady, this process is

18   extremely user friendly.  Deadlines are tight, but it's very

19   user friendly.  I mean, I heard -- you know, I heard

20   prepopulated declarations, prepopulated registration forms,

21   electronic signatures, direct electronic cash pay to clients.

22   Again, extremely user friendly if you engage and get involved in

23   the process.

24             And so I appreciate Archer and I appreciate BrownGreer

25   for making this so user friendly to the people involved in the

```
 1    litigation who elect to participate, which we hope will be
 2    everyone.
 3            I do want to make one other comment.  If you're a law
 4    firm or a *pro se* and you have no -- a law firm with clients or
 5    *pro se*, you have no cell phone -- in this day and age, that's
 6    rare, but I think it's -- it certainly is possible.  No cell
 7    phone, no email address, I think I saw on the slides, Mr. Deady,
 8    you had, that those people need to be identified sooner rather
 9    than later, because they have to be dealt with, and we need
10    to -- I don't need to, they need to figure out the best way to
11    communicate with those folks.  So if that's any of your clients,
12    I would suggest you identify them as soon as you can.
13            Also, I'd like to ask BrownGreer and Archer to hold
14    another town hall within the next two weeks.  I think now all of
15    this information is out there, people will have time to digest
16    it.  It will be on websites -- Court's website, Archer's
17    website, BrownGreer's website -- time to digest it and come up
18    with more questions, and today we're simply not going to have
19    time to entertain questions.  And so if you all would plan for
20    that, I would certainly appreciate it.  I'm sure Judge Miller
21    would as well.
22            Mr. Garretson, how long is your presentation?  And I'm
23    not trying to cut it short.  I just need to decide if we should
24    take a recess before we start.
25            MR. GARRETSON:  15 minutes.
```

1            THE COURT:  15?  Everybody okay?  Can we keep going?

2        *(Parties all nodding heads.)*

3            THE COURT:  All right.  Mr. Garretson, you're up.

4            MR. GARRETSON:  Thank you, Your Honor.

5            I hope it's truly 15 minutes after I said that with

6        such confidence.

7            Good morning, Your Honor.  My name is Matt Garretson,

8        and I'm are pleased and very thankful to be appointed as the

9        special master to oversee the settlement allocation process.

10       And while this is my first appearance in front of you, Your

11       Honor, I do want to assure you, the Court and all who are

12       listening today, that I have been working feverishly with many

13       people in this room since my appointment to get my head around

14       the data and to work with the experts to get up to speed quickly

15       so we could put together this framework I'm about to present to

16       you here today.  And I also am reminded by several of my

17       colleagues that I have been doing this for 25-plus years of

18       designing and overseeing settlement programs.

19           In the course of doing that, you know, I've kind of

20       come to believe there's this gold rule for every settlement

21       allocation program.  That gold standard is that we have to make

22       sure that similarly situated plaintiffs receive similar and fair

23       compensation consistent with their unique harm, and it needs to

24       be done as quickly as possible.  And so with this in mind, we've

25       designed this -- these two settlement allocation methodologies

1    that I'll outline here today.  But, first and foremost, let me

2    just say I'm committed and believe that that standard can be

3    achieved in this settlement.

4         The payment program overview.  As I mentioned, there

5    are two payment program options for claimants in this

6    settlement.  The first being the expedited pay program, and the

7    second being a deferred pay/full evaluation program.  That's a

8    mouthful, so throughout this I'll just call them the expedited

9    program and the full evaluation program.

10        And there will also be an extraordinary injury fund

11   available which I will touch on here as we conclude today.

12        The expedited pay program.  Eligibility for the

13   expedited pay program is fairly straightforward.  A claimant

14   must elect at the time of registration that they would like to

15   participate in the expedited pay program.  They must establish

16   that they have tinnitus or recorded tinnitus or hearing loss as

17   defined in this program outline.  And, of course, they must

18   execute a release and dismissal.

19        While these categories remain subject to slight

20   refinement, we do foresee the following five expedited pay

21   program categories.  And the first being -- and when I say

22   yet-to-be defined, we do believe as we get through the data, we

23   may need a miscellaneous category for cases that reach a

24   threshold of compensation or compensability but do not reach the

25   level of these other five categories -- or other four

1    categories.

2            So the first being this miscellaneous.  I used an

3    example up there that I think is blocked by the screen of, like,

4    non-U.S. military contractors, or something to that effect.

5            The second being tinnitus only, and these would also

6    be claims that produce no evidence through audiological data of

7    hearing loss but do have a history of tinnitus.

8            Level 3 has two categories, subcategory A and B.  A

9    being recorded tinnitus, and those would be records of diagnosis

10   of tinnitus or records establishing that the claimant sought

11   treatment for symptoms of tinnitus within two years of last

12   earplug use.  And then 3 -- the subcategory B would be slight

13   hearing loss.  And the reason these are in the same category is

14   they are anticipated to have the same compensable amount.  But

15   slight hearing loss would be defined as a 15-decibel

16   hearing-loss shift in at least one of the testing frequency in

17   at least one of the ears.  Mild hearing loss, 20-decibel to

18   35-decibel hearing loss at one of the testing frequencies.

19           And the last category for the expedited pay being

20   moderate or greater hearing loss, which would be defined as 40

21   or greater decibel hearing loss at one of the testing

22   frequencies.

23           So to accomplish this, at least to establish hearing

24   loss in those categories, a claimant will need two audiograms

25   and one that precedes the last use of earplugs.  And we refer to

1   these in both the expedited pay program and the full evaluation

2   program as the reference audiogram, or baseline, and the injury

3   audiogram.  And I referred in the previous slide of the testing

4   frequencies, and in both programs we're evaluating testing

5   frequencies at 2,000; 3,000; 4,000; and 6,000 hertz.

6           The payment amounts and timing of the expedited pay.

7   With respect to Payments Levels 2 through 5, we will have

8   minimum guaranteed payment amounts.  I'll cover that in a few

9   more moments.  The timing, of course, is a function of the

10  claimants who participate in the expedited program as opposed to

11  the full evaluation program.  A FIFO rank -- or the first in,

12  first out -- will be ranked, and that's the order in which

13  Archer will process those claims.  And because this is a

14  multitiered funding mechanism in this settlement, it also may

15  have to do with the timing of funds being available.

16          And so for illustrative purposes, I put up these three

17  scenarios where, like, the early payment which would be

18  triggered by your FIFO rank, your first in, first out rank,

19  those who are higher in that schedule, we believe could receive

20  their expedited pay prior to December 31st, 2023.

21          The majority payment scenario refers to what we

22  estimate the majority of people participating in the expedited

23  pay program.  This is the date by which we believe they could

24  receive their full payment, and you see we have that as prior to

25  December 31st, 2024.  And the later payment scenario just

1    accommodates for the fact that if there are -- if there is a

2    high participation threshold or high participation in the

3    expedited pay program, the latest those late registrants into

4    the expedited pay program may receive their payment is prior to

5    September 30th, 2025.

6          Other expedited pay considerations.  We are working

7    through the math on a potential for a secondary payment to the

8    expedited pay claimants.  And basically what we envision here is

9    that would be triggered by some ratio being achieved where the

10   average payment to the full evaluation program claimants begins

11   to exceed a ratio of the payment of expedited pay claimants.  We

12   are working with experts to determine what that trigger may be,

13   but we believe there could be a scenario where we go back with

14   additional funds to the expedited pay claimants once we have the

15   final registration and participation figures and once all the

16   scoring is done for the full evaluation program claimants.

17         But, again, what we will publish here shortly is the

18   guaranteed minimum payments should a claimant elect to

19   participate in the expedited pay program.

20         I've referenced the extraordinary injury fund, which

21   I'll speak about as we conclude today.  Expedited pay settlement

22   program participants are not eligible for the EIF, the

23   extraordinary injury fund, with one exception.  The Level 3

24   claimants with evidence of recording tinnitus will have the

25   option to participate or to file an additional claim, if you

1    will, within the extraordinary injury fund.

2          So that is an outline of the expedited pay program.

3    I'll turn now to the full evaluation program.

4          Let me first talk for a moment about how the funds are

5    divided between these two programs.  And, again, being complex

6    at this point because we have these funding dates so the total

7    settlement fund amounts may increase as certain thresholds are

8    met.  So we have that as the starting point.  And then to

9    determine the funds available for the full evaluation program,

10   we are deducting the -- from the total settlement funds

11   available all the funds required to pay the guaranteed minimum

12   payments to the expedited pay claimants, the funds that are set

13   aside for the extraordinary injury fund, and a registration

14   payment which we would pay to every full evaluation claimant

15   upon their registration.

16          So I know that's a lot of math.  All this will be

17   available -- you'll see, kind of, my punch line at the end -- as

18   we're going to create some great exemplars and materials to help

19   claimants and their counsel make a full and informed decision.

20   But this is the basic math of how we get a pot of money now

21   available for the full evaluation program.

22          The eligibility criteria for the full evaluation

23   settlement program is very similar.  Claimants will elect the

24   deferred pay/full evaluation program at the time of the

25   registration.  They must establish that they had mild or greater

1    hearing loss, as established by a shift between the reference

2    and the injury audiogram during the time of their earplug usage.

3    And like the claimants participating in the expedited pay

4    program, they'll have to execute a release and dismissal.

5           The way in which a claimant establishes the hearing

6    loss, which is the baseline for the measurements or the

7    beginning of the scoring process in the full evaluation program,

8    as I mentioned, they have to supply the reference audiogram and

9    an injury audiogram.  As we stand here today, we're defining the

10   reference audiogram and injury audiogram as follows:  The

11   reference being dated within one year, post or prior of the date

12   of the first use of the earplugs, as stated in the registration

13   form.  With the injury audiogram dated within one year of the

14   last use.

15          And because -- when we designed these models, I tend

16   to get spooked by hard cliffs.  Like if you're just outside by

17   one day that somehow you're not eligible at all, and so what we

18   are designing is a value adjustment that after the final points,

19   which I'm about to go into, are calibrated for -- and calculated

20   for each claimant, that if someone is outside of that one-year

21   time frame, they could have -- they could still participate, but

22   they would have their overall points reduced, depending on the

23   variance they are outside of the those time frames for up to a

24   total of four years on either end.

25          And as I mentioned the testing frequencies are the

same in the full evaluation program and the expedited pay

program.

I would also say that the full evaluation methodology

utilizes what I believe to be the state of the art with respect

to allocating settlement proceeds, and that is it utilizes an

objective point-scoring system.  And why I call it the state of

the art is, you know, it is the methodology which is utilized

in, I believe, most contemporary, large mass tort settlements.

And I also believe it's the state of the art because I think

it's the most effective way to inform claimants before they sign

up for a settlement program, the way in which they'll be treated

on account of their unique injuries compared to all other

claimants and all other similarly situated claimants.

So it is a point-based system, and we will assign

points based on the severity of injury and the strength of the

association between that injury and the claimant's use of the

earplugs.  When I talk about severity of injury, we're really

talking about in these cases severity of impairment, and we will

award points based on a claimant's injury audiogram impairment

score.  Impairment scores ranging from mild to severe at each of

the testing frequencies.

So you can envision left ear; right ear; 2,000;

3,000; 4,000; 6,000 hertz being the testing frequencies.  We now

have, kind of, eight columns, right?  And they -- the claimant

can be eligible based off their shift in each of those columns

```
 1    for points.  The more severe the shift is, the greater the
 2    points.  And so the points will slide across in each of those
 3    silos, if you will -- each of those silos being testing
 4    frequencies -- across the impairment score from mild to severe.
 5            And when I speak about strength of association, what
 6    we're getting at here is that the -- we're talking about the
 7    percent of that deficit.  That percent of the shift that is
 8    related to the claimant's earplug usage.  It's what, you know,
 9    what we would assume is that each claimant came into their usage
10    with some different level of audiological readout to begin with.
11    So the more a claimant's impairment is related to the time
12    period during which the claimant wore the earplugs, the greater
13    the point award will be.
14            Other point-modifying factors.  We are utilizing a
15    bilateral impairment multiplier, and that is to recognize the
16    real-world implications of having bilateral hearing impairment.
17    Not to minimize unilateral hearing impairment, but when we look
18    at the point score as I reference across each of those
19    ear-scoring testing frequencies, if there is bilateral
20    impairment, at least a moderate level in both ears, we will add
21    additional points on top of the otherwise total sum of the
22    testing frequencies in the left and right ear.
23            For instance, a moderately severe in left ear and
24    profound in the right ear bilaterally impaired claimant would
25    receive an adjustment that is greater than a moderate left
```

1  ear/moderate right ear bilaterally impaired claimant.

2          Two points that will factor into this is an age

3  adjustment.  Just to recognize that there is a decline in

4  hearing as we age, and so there is a slight adjustment built

5  into the points calculator based off the age of diagnosis, the

6  age being the injury audiogram, and then an adjustment in the

7  full evaluation methodology as well for individuals with

8  recorded tinnitus.

9          So I mentioned that we're awarding points, and the

10  question I get from claimants most of all is, you know, I want

11  to be awarded dollars not points.  So the question is how do we

12  determine a claimant's dollar award amount by utilizing a point

13  system.  Well, what we have to do to be able to factor or

14  determine a claimant's dollar award amount is to be able to

15  multiply their final award points times the point dollar value.

16  So that gets to my statement that we need to know the point

17  dollar value.

18          The point dollar value is determined by dividing the

19  deferred full payment funds -- that pot of money I showed a few

20  slides back, how we calculate that -- that becomes our numerator

21  by the denominator, which is the entire total of all points

22  awarded to all claimants in the full evaluation program.

23          So there's an element of this, as you can see, that

24  can't be determined -- the final point dollar value can't be

25  determined until all cases have been scored, but we are working

1   with experts to do predictive modeling on how we believe the

2   claimants will score at the mean and the median and the maximum,

3   if you will, across that entire point system so that we can come

4   up with a high end and a low end of the probable value -- dollar

5   value of a point.

6           So as we roll this compensation methodology out to

7   claimants, they and their counsel will be able to make an

8   informed decision of which model, which program they would

9   elect, because they'll have access to the point system, they'll

10  have access to the high and low predictive amounts of the

11  dollar -- the dollar value of a point, and they'll be able to

12  make a determination, do they believe they would fare better in

13  the full evaluation program or in the expedited pay program.

14          This will be -- oh, my gosh.  I promised 15.  I'm at

15  20.  Let me wrap it up.

16          Calculation dates.  Because this is a multitiered

17  funding settlement, meaning it's -- the funding is occurring

18  over a series of certain dates, even though we can't pay a

19  claimant their entire amount until the end of these funds being

20  deposited, we can at each of -- having calculated the points for

21  each claimant, every time a payment comes in to the fund that is

22  eligible to be distributed to the full evaluation claimants, we

23  can make a payment because we know their points amount already.

24  So at every funding date, we can calculate a payment to the

25  claimants who participate in the full evaluation program.

1          Other full evaluation program considerations.  I did

2    reference that under this methodology that at the time of

3    selecting and registering and becoming an eligible full

4    evaluation payment claimant, there will be an immediate payment

5    upon registration and then will continue through with the point

6    evaluation.

7          And finally, Your Honor, as I referenced, the

8    Extraordinary Injury Fund.  Been working with Special Master

9    Chris Klotz, who's in the courtroom here today, collaborating on

10   the design, guidelines for that program for compens -- for

11   compensating injuries that are not fully considered in this

12   framework I've just outlined here today.

13         So with that, I conclude and -- oh, sorry.

14         THE COURT:  I was just going to -- I was just going to

15   compliment you and say this is a remarkable amount of

16   information you put together in a very short period of time.  I

17   appreciate.  I know everybody else does --

18         MR. GARRETSON:  Thank you so much.

19         THE COURT:  -- as well.  Thank you.  I hope you'll

20   participate in the town hall as well.

21         MR. GARRETSON:  I'd love to, Your Honor.  Thank you.

22         THE COURT:  All right.  Thank you so much.

23         Let me mention one other matter related to the

24   program.  It's rather unique, I think, in the MDL world with the

25   global settlement for the settlement proceeds to be paid

1    directly to the claimant as opposed to the law firm and to an

2    escrow account or trust fund account and held and then we wait

3    for the lawyers to distribute all the money.  As you heard, this

4    will be different.  But I do want to say to all of the law firms

5    and lawyers involved in this here today listening and later who

6    watch the recorded proceeding, that with Mr. Sansom and his

7    firm's help, I assure you that there will be a very strict,

8    close accounting of the distribution of these funds.

9            And if any of you have been keeping track of your

10   time, as plaintiff lawyers throughout the life of this

11   litigation, you know that Mr. Sansome takes very good notes,

12   keeps very close track of numbers.  And so I have full -- I'm

13   fully confident in his ability to be the eyes and ears of the

14   Court, and he will have very strict and regular reporting

15   requirements to me as well in that regard.

16           All right.  We are wrapping up, but before we do, I

17   have to take just another couple of minutes to mention a few

18   people who I know would rather not be mentioned and identified

19   and highlighted, but I'm going to do it anyway, and then we will

20   conclude.

21           But first is Judge Herndon.  So from the beginning of

22   this litigation -- really, I mean, almost the very beginning --

23   he has been involved in this litigation.

24           I know this is -- you're not going to be happy about

25   this.

1          So he's been involved in this litigation.  I mean, he

2     has been there with the Court, with the parties every step of

3     the way.  Early on, discovery and moved into bellwethers, and

4     then his role just got expanded and expanded because he did such

5     a good job in every role, and I just kept expanding it.  And

6     then of course, and lastly, in the mediation process.

7          I've made a lot of decisions throughout the life of

8     this MDL, but bringing Dave Herndon in to help me manage the

9     litigation was, by far, the best decision I made throughout the

10    litigation.  The only thing I would do differently if I had the

11    opportunity to change anything is his title would have been

12    Special Master of All.

13         That would have just been one order, and I wouldn't

14    have had to modify and expand your role.  But from the bottom of

15    my heart, thank you for everything.

16         And then finally, nothing as extraordinary as this

17    settlement -- it's been referred to as landmark, it's historic,

18    it is unprecedented obviously in its size and magnitude, but

19    nothing like this occurs in litigation without skilled

20    professional leadership on both sides.  And I want to right now

21    take a moment to reference individuals that were involved the

22    last few intense months.

23         Chris Seeger was right.  The parties have been

24    negotiating and trying to find a resolution for the better part

25    of two years, but the last four to six months have been intense.

1    There were, I know, a number of individuals involved in those

2    meetings and negotiations, some of whom I'm probably not even

3    aware of.  I do know from the plaintiff side we have

4    Mr. Aylstock, Mr. Seeger, Mr. Clark, Mr. Moreland, Mr. Seeley.

5    Very, again, intensely different roles in that process, but all

6    important roles.

7              And then on the defense side we had Mr. Perrelli,

8    Ms. Wright, and Mr. Andolina, who -- and maybe others, but those

9    I'm aware of from the last few months.

10             And I want to take a final minute to award the MDL MVP

11   award to Bryan, Chris, Tom, and Mike.  As I said, nothing like

12   this and this extraordinary happens without extraordinary

13   leadership, and you all here at the end really brought this to

14   the finish line.  Something like this, again, doesn't happen

15   without that leadership.  And I mentioned you four because I saw

16   it -- I heard it, I saw it, I heard about it from Judge Herndon,

17   Judge Cannon.  They shared my feelings in this regard.

18             But, again, you all had to have a professional respect

19   for one another and a level of trust as well as a joint resolve

20   on both sides to reach an agreement or this would never have

21   happened.  If any one of you four had faltered or blinked -- and

22   I'm sure you blinked a few times, but you all understand -- this

23   just wouldn't have been achieved.  And so I would like to say to

24   each of you that you got it done, you should be very proud of

25   what you've gotten done, it is fair and it is smart, and I

```
 1    congratulate you on that job very well done.
 2              Okay.  Judge Miller, thank you for being here.  I wish
 3    you could have been here in person as well, but maybe next time
 4    I'll come to Minnesota if we need to have another hearing.  I've
 5    never been to Minnesota, and so I would like to do it sooner
 6    rather than later because it's going to get really cold there
 7    soon.  But I appreciate you being here today for this historic
 8    Case Management Conference and offering the remarks you did.
 9              Do you have anything you'd like to say in closing?
10              JUDGE MILLER:  I really can't build upon what you just
11    said.  I agree with everything you said, other than giving a
12    shout-out to my leadership too.
13              THE COURT:  Yes.
14              JUDGE MILLER:  Judge Keyes is as essential to me as
15    Judge Herndon has been to you.  And then also my folks -- Dan
16    Gustafson, Rick Paul, Ben Hulse -- I know you have all been
17    working your fingers to the bone in the last few weeks and
18    months as well.  So thank you.
19              I agree this settlement is monumental, but it is fair,
20    and I hope every claimant who is aware of this, watching this
21    today or in the future, takes everything that was said here
22    today to heart and signs up.
23              THE COURT:  Okay.  Very good.  And I echo that.
24              And I think our next hearing will likely be the
25    fairness hearing on the stock transfer, unless something else
```

comes up in the meantime.  And if so, you'll let me know.  But

otherwise, I don't think we have a date for that scheduled yet,

and we will get that scheduled when it's convenient for the

parties.  I don't want to put it off too long, but we'll get

that scheduled.

          And otherwise this proceeding is adjourned.  I wish

you all well.

     *(Proceedings adjourned at 11:14 a.m.)*

                         * * * * * * * *

     I hereby certify that the foregoing is a true and correct
transcript of the stenographically reported proceedings held in
the above-entitled matter, pursuant to the provisions of Section
753, Title 28, United States Code.

                                                9/11/23
_____     _____
Julie A. Wycoff, RMR, CRR           Date
Official U.S. Court Reporter