**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS EARPLUG     )     Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,    )
                                  )     Pensacola, Florida
                                  )     December 11, 2023
                                  )     9:06 a.m.
                                  )
                                  )
_____    )


**FAIRNESS HEARING**


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE

(Pages 1-97)

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*1 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

**A P P E A R A N C E S**

**JUDGE DAVID R. HERNDON** (ret.)

**JUDGE LAURIE J. MILLER, MINNESOTA JUDICIAL BRANCH**


**FOR THE PLAINTIFFS:**     Aylstock, Witkin, Kreis & Overholtz, PLLC
                           By: **BRYAN F. AYLSTOCK**
                               *baylstock@awkolaw.com*

                               **JENNIFER HOEKSTRA**
                               *jhoekstra@awkolaw.com*
                           17 E Main Street, Suite 200
                           Pensacola, Florida  32502

                           Seeger Weiss LLP
                           By: **CHRISTOPHER A. SEEGER**
                               *cseeger@seegerweiss.com*
                           55 Challenger Rd, 6th Floor
                           Ridgefield Park, NJ  07660



FOR THE DEFENDANTS:     White & Case LLP
                        By: **MICHAEL C. ANDOLINA**
                            *mandolina@whitecase.com*
                        111 S Wacker Drive, Suite 5100
                        Chicago, Illinois  60606-5055

                        Jenner & Block
                        By: **JOANNA WRIGHT**
                            *jwright@jenner.com*

                            **AMIT B. PATEL**
                            *apatel@jenner.com*
                        1155 Avenue of the Americas
                        New York, NY 10036-2711


                        Moore, Hill & Westmoreland, PA
                        By: **CHARLES F. BEALL, JR.**
                            *cbeall@mhw-law.com*
                        350 W Cedar Street, Suite 100
                        Pensacola, Florida  32502

                    P R O C E E D I N G S

09:45:37  1

09:47:44  2        *(Court called to order at 9:06 a.m.)*

09:05:59  3        **THE COURT:**   Good morning, everyone.

09:06:02  4        This morning the Court, joined by judge Laurie Miller

09:06:08  5   from Minnesota state court, who is on the Zoom --

09:06:11  6        Good morning, Judge Miller.

09:06:15  7        -- we will be conducting a fairness hearing in

09:06:20  8   connection with the parties' proposed transfer of 3M common

09:06:24  9   stock as part of the global settlement of all of the claims in

09:06:26  10  the MDL as well as all of the claims pending in Minnesota state

09:06:30  11  court.

09:06:30  12        Before we get started, let me say that the hearing has

09:06:36  13  generated quite a bit of interest, and for that reason, we

09:06:41  14  requested additional Zoom links as well as additional

09:06:46  15  conference call lines from the Administrative Office of the

09:06:53  16  Courts.  The max that we were given access to was 1,000 for the

09:06:57  17  Zoom link.  We hit that capacity early last week in terms of

09:07:04  18  requests for Zoom links.  We've also maxed out on the AT&T

09:07:15  19  conference line connection capabilities at 125, and that was

09:07:18  20  last week as well.

09:07:18  21        I'm told that over the weekend my courtroom deputy,

09:07:23  22  Ms. Rogers, received over 100 emails requesting additional Zoom

09:07:28  23  links and/or call-in information, and obviously it was simply

09:07:33  24  too late.  The notice, as I'll mention in a few minutes, of

09:07:38  25  this hearing was entered on October 18th.  And again, we only

09:07:42  1   have so much capacity that we're given in terms of technology.

09:07:47  2        I also want to state that it's my understanding that

09:07:53  3   the Zoom links as well as the conference call line are largely

09:07:58  4   occupied based on the requests that we received by claimants.

09:08:04  5   So most of those folks utilizing either the Zoom or the

09:08:09  6   conference calling are claimants.  Of course, there's a few

09:08:13  7   legal representatives and a handful of press, but the

09:08:18  8   overwhelming majority are claimants.

09:08:21  9        And also, I think it's worth noting that this hearing

09:08:24  10  is open to the public, and I see several members of the public

09:08:29  11  have taken advantage of that this morning.  The courtroom,

09:08:34  12  while not at capacity, certainly is full.

09:08:37  13       So, the motion for the fairness hearing or fairness

09:08:44  14  determination by the Court has been made jointly by the parties

09:08:50  15  and, because of that, this morning the presentation will be a

09:08:54  16  joint presentation.

09:08:55  17       And I have here in the courtroom at counsel table both

09:09:00  18  plaintiffs leadership -- the NPC is here represented by

09:09:05  19  Mr. Aylstock, Mr. Seeger, and Ms. Hoekstra, and 3M is present

09:09:11  20  represented by Mr. Beall, Mr. Andolina, Ms. Wright, and

09:09:21  21  Mr. Patel, and they will be, again, presenting a joint program

09:09:23  22  this morning for the Court's consideration.

09:09:25  23       My understanding of the outline of that program is,

09:09:29  24  first there will be a settlement program update from the

09:09:33  25  parties, and it will be by Mr. Aylstock, I believe, for the

09:09:37   1   plaintiffs, and then Mr. Andolina for 3M.  But again, it's a

09:09:42   2   joint presentation.

09:09:43   3         Following the settlement program update, there will be

09:09:46   4   a fairness hearing introduction by Mr. Seeger.  That will be

09:09:51   5   followed by an evidentiary phase of the hearing, and that will

09:09:55   6   be presented by lawyers on both sides in terms of those

09:10:02   7   witnesses.

09:10:02   8         And then following the evidentiary presentation, there

09:10:06   9   will be a fairness hearing argument by Ms. Wright.  I think I

09:10:11   10  have all of that hopefully correct.

09:10:12   11        So before we get started with the joint presentation,

09:10:15   12  I'd like to make a few preliminary remarks about why we're here

09:10:20   13  this morning.

09:10:21   14        As part of the overall global settlement of the claims

09:10:28   15  both in the MDL as well as in Minnesota -- and I'm referring,

09:10:32   16  of course, to the CAEv2, the earplug claims -- but the parties

09:10:39   17  have agreed that 3M will issue $1 billion in shares of common

09:10:45   18  stock to the NPC, which is the negotiating plaintiffs' counsel,

09:10:50   19  in settlement of, again, the CAEv2 claims both here in the MDL

09:10:55   20  as well as in Minnesota state court.

09:10:56   21        This is all laid out more specifically in MSA 1.  And

09:11:03   22  in MSA 1 it is contemplated that the stock will be issued in

09:11:11   23  four separate tranches of $350 million, $250 million, another

09:11:16   24  $250 million, and then $150 million over time, as I said,

09:11:20   25  separate tranches over time, depending on certain settlement

09:11:23   1    participation requirements being met.  And all of this, again,

09:11:27   2    is spelled out in MSA 1 for those who want to read it more

09:11:32   3    specifically.

09:11:32   4         The MSA also contemplates that this stock transfer --

09:11:38   5    or these transfers -- or the overall transfer, let me just

09:11:41   6    refer to it as that -- will be exempt from the registration and

09:11:47   7    prospectus delivery requirements of the 1933 Securities Act.

09:11:52   8         And the Court has been specifically advised that 3M,

09:11:56   9    as the issuer of the common stock, will rely on the exemption

09:12:07   10   in section 3(a)(10).

09:12:09   11        The parties also contemplate that these shares of

09:12:14   12   stock will be issued by 3M as unrestricted, meaning that they

09:12:19   13   will be freely transferable on issuance and not subject to SEC

09:12:25   14   Rule 144.  I expect, based on the declarations that I've

09:12:30   15   received in advance of the hearing, that I will be hearing more

09:12:34   16   about that through witness testimony.

09:12:35   17        Before this proposed exchange of stock can occur, the

09:12:41   18   MDL court, because the MDL court is the Court with jurisdiction

09:12:46   19   over the qualified settlement fund which will hold the proceeds

09:12:53   20   of the stock, that the MDL court must find that the stock

09:12:56   21   transaction is fair to all those who will receive the

09:12:59   22   securities or the proceeds of those securities.

09:13:02   23        So, in that regard, the Court must find that the

09:13:06   24   shares of common stock to be issued will be issued solely in

09:13:10   25   exchange for bona fide outstanding claims or property

| 09:13:14 | 1 | interests; the Court must also hold a fairness hearing that is |
|---|---|---|

interests; the Court must also hold a fairness hearing that is

open to everyone to whom the securities are intended to be

issued; third, adequate notice must be given to all of those

persons; and fourth, there cannot be any improper impediments

to the appearance of those persons at the hearing.

So in an effort to comply with these requirements, the

parties requested that the Court set this fairness hearing and

also requested that the Court issue formal notice of the

hearing to all claimants who may receive proceeds of the stock

and give them the opportunity to appear and to be heard on the

matter of the stock transfer and the fairness of that.

This was done on October 18th, 2023, within the 45-day

requirement for notice in advance of the hearing.  And we will

hear more about the notice that was provided in this case when

we hear witness testimony in just a few moments.

So, in response to the Court's order regarding

scheduling the hearing and also providing notice to those who

wish to be heard, the Court received the following:

There were four claimants who filed notices of intent

to appear on the docket, which is what the order required.

Three of those were withdrawn, and the fourth the Court was

told that counsel intended to withdraw the notice, but that has

not been done as of this morning, and that claimant is Andrew

Gordon.

But as to the notices that were withdrawn, the Court

09:15:05  1   was advised either by counsel or by the claimants themselves --

09:15:09  2   some of these claimants the Court actually contacted directly.

09:15:14  3   Others were contacted by either plaintiffs' leadership and/or

09:15:21  4   the claimant's individual counsel.

09:15:26  5          But what the Court was told is that the notice was

09:15:31  6   either filed in error, meaning the claimant lacked an

09:15:37  7   understanding of what the hearing was to be about or the nature

09:15:40  8   of the hearing, or the claimant either just simply changed his

09:15:48  9   or her mind about intending to appear.

09:15:52  10         There were three additional claimants who simply

09:15:55  11  emailed the clerk's office saying that they wished to appear.

09:15:59  12  There was not a notice of hearing filed on the docket.  That's

09:16:04  13  okay.  We contacted those individuals as well to inquire as to

09:16:09  14  whether they intended to appear, that was either the Court

09:16:14  15  contacted them, leadership contacted them, or their counsel

09:16:18  16  contacted them.  And similarly, for those three we were advised

09:16:24  17  that they had misunderstood the nature of the hearing and/or

09:16:27  18  they simply had changed their mind, they did not wish to

09:16:31  19  appear.  That was the response the Court was given.

09:16:35  20         One person, not a claimant, simply sent a newspaper

09:16:41  21  clipping of the fairness hearing via email to the clerk's

09:16:45  22  office, but we could find no filed case for that person.

09:16:52  23         There were three claimants who submitted their notices

09:16:56  24  of intent to appear directly to Archer as opposed to the Court.

09:17:03  25  Those claimants were contacted at the Court's request by either

09:17:08   1   Archer or leadership, and in response, Archer and/or leadership

09:17:15   2   were advised that the person no longer wished to appear.

09:17:18   3   So I will be inquiring at the tail end of this hearing

09:17:25   4   if, in fact, there is someone here, a claimant who wishes to be

09:17:31   5   heard.  Hopefully that person -- if there is someone here,

09:17:35   6   hopefully that person complied with the Court's order and

09:17:38   7   submitted a notice of intent to be heard, as required.  There

09:17:44   8   may be someone we missed.  So something may have been submitted

09:17:48   9   and we missed it, so I'll be checking at the end of the hearing

09:17:51   10   about that.

09:17:52   11   All right.  I believe that completes my preliminary

09:18:01   12   comments.

09:18:02   13   Judge Miller, is there anything you would care to add?

09:18:06   14   **JUDGE MILLER:**  Just briefly.  My court likewise issued

09:18:11   15   an order establishing this hearing today, inviting claimants

09:18:15   16   from the Minnesota litigation to submit a notice to appear, if

09:18:20   17   they wished to appear and be heard.  And we did not receive any

09:18:23   18   positive responses, so I don't anticipate any of the Minnesota

09:18:26   19   claimants appearing today.

09:18:28   20   **THE COURT:**  All right.  Well, thank you for that.  And

09:18:31   21   again, thank you for being here.

09:18:32   22   Let me check one thing.

09:18:35   23   (Conference between the clerk and the Court.)

09:18:52   24   **THE COURT:**  Let's go ahead and get started with the

09:18:57   25   agenda.  We'll start with a settlement program update by

09:19:00  1    Mr. Aylstock and then Mr. Andolina.

09:19:01  2          **MR. AYLSTOCK:**   Good morning, Your Honor.   Good

09:19:03  3    morning, Judge Miller.   Good morning, Judge Herndon.

09:19:08  4          I rise to give a brief settlement update.   And it

09:19:12  5    seems like a long time ago to some of us, but it really wasn't.

09:19:15  6          On August 29th, just a few short months ago, the

09:19:18  7    parties engaged and consummated and signed an historic

09:19:25  8    settlement to resolve all of the claims in this MDL and in

09:19:28  9    Minnesota.   And I'm happy to report that so far the settlement

09:19:33  10   has received overwhelming support both from and most

09:19:37  11   importantly from the claimants, who will receive the benefit of

09:19:40  12   the settlement, but also from various media outlets, including

09:19:46  13   veterans organizations.   I am grateful for their support.   As

09:19:52  14   the Court is aware, this was a hard-fought litigation and

09:19:55  15   certainly a hard-fought settlement.

09:19:57  16          *Stars and Stripes* issued an opinion piece by Ed

09:20:02  17   Timperlake, and its quote is here:

09:20:04  18          "As a Marine F-4 pilot in Southeast Asia during the

09:20:09  19   Vietnam War, I quickly learned that, when you've won, it's

09:20:12  20   smart to declare victory and move on.   That's what veterans

09:20:15  21   should do in the 3M case and accept this historic settlement."

09:20:20  22          Similarly, The Hill issued an op-ed by Colonel Preston

09:20:26  23   McLaughlin, Retired:   "Veterans are wise to accept 3M's earplug

09:20:32  24   lawsuit settlement."

09:20:33  25          Other military organizations of note, including the

09:20:35    1    Military Times, the Veterans of Foreign Wars, the Military

09:20:40    2    Order of the Purple Heart, Military.com, other organizations

09:20:42    3    have also come out strongly in support of the settlement, and

09:20:46    4    we're grateful for that.

09:20:47    5         Most importantly, the claimants themselves -- and I

09:20:51    6    want to provide an update to the Court and the parties with

09:20:54    7    regard to the response that we've seen from the claimants in

09:20:58    8    support of the settlement.

09:21:00    9         But before I get to that, there's a reason I think why

09:21:04    10    there's support, and that's because of the hard work of so many

09:21:08    11    people that have worked these past few months in support of the

09:21:12    12    settlement and in advancement thereof.

09:21:16    13         BrownGreer, as the Court is aware, handled the

09:21:19    14    identification order.  They're now co-QSF administrator, and

09:21:24    15    they'll be working with the parties moving forward with regard

09:21:28    16    to certain aspects of the settlement administration.  They have

09:21:31    17    done just great work in collating the mountains of data and

09:21:36    18    sorting out the dual rep and other issues.  Archer has pushed

09:21:41    19    out well over a hundred thousand claimant registration forms

09:21:48    20    and conducted themselves with regard to the work of the

09:21:51    21    settlement in very great fashion in advancing the cause.

09:21:57    22         The DoD and DOJ, as the Court is aware, had received,

09:22:02    23    pursuant to the Court's orders, supplemental requests for

09:22:07    24    audiometric data, which we call the DOEHRS data for military

09:22:11    25    veterans, and they received that earlier this year.  And they

09:22:15   1   -- I wanted to thank them because in mid-November they were

09:22:18   2   able to provide the balance of the data that was housed in this

09:22:24   3   DOEHRS database to the parties, and that allowed tens of

09:22:28   4   thousands of additional claimants to receive more fulsome

09:22:32   5   information in evaluation of their case, and I wanted to

09:22:37   6   specifically thank them in particular.

09:22:39   7        Also, as the Court is aware, when the settlement was

09:22:43   8   consummated, there were tens of thousands of claimants that

09:22:46   9   were on tolling agreements that needed to be filed.  And the

09:22:49   10   clerk's office -- this clerk's office in particular had to deal

09:22:53   11   with tens of thousands of filings on very short notice, assign

09:22:58   12   claim numbers and so forth.

09:23:00   13        Judge Herndon, of course, has been instrumental

09:23:03   14   throughout this post-settlement process, in addition to

09:23:10   15   Mr. Sansom, who is in the courtroom, Matt Garretson, who is the

09:23:14   16   settlement allocation masters.

09:23:17   17        I think we've had nearly a dozen town halls for

09:23:20   18   counsel so that everybody can understand the mechanics of the

09:23:24   19   settlement, the methodology of the settlement, how this is all

09:23:27   20   working, how it's as objective as possible, how the

09:23:32   21   extraordinary injury fund will work.  So they've all done a

09:23:36   22   yeoman's effort in making sure that claimants and their counsel

09:23:41   23   can understand the settlement and participate in it, if they so

09:23:45   24   wish.

09:23:45   25        Also, I want to thank Your Honor and Judge Miller for

09:23:50   1   managing the docket so skillfully and making sure that the

09:23:54   2   claimants who are part of this are identified and within the

09:24:00   3   Court's jurisdiction so that the settlement can be administered

09:24:04   4   properly.

09:24:04   5       And finally, my colleagues at Jenner Block and White &

09:24:10   6   Case and also Butler Snow who is managing the review of the

09:24:14   7   releases, everybody is working extremely hard to facilitate

09:24:18   8   this settlement, and because of that I believe we've been able

09:24:22   9   to achieve a lot in just a few months.

09:24:25   10      All of the verdict cases, the bellwether verdict cases

09:24:30   11  have now been -- they've signed on to the settlement and all of

09:24:33   12  the claimants I'm happy to report have already been paid.

09:24:36   13      The wave cases, they're part of the settlement both in

09:24:42   14  Minnesota, those Minnesota bellwether cases as well as the Wave

09:24:46   15  cases that Your Honor activated, 1603 of them specifically.  So

09:24:53   16  far we're at -- 94 percent have returned their releases.

09:24:58   17  There's only 6 percent left to go.  And of those 94 percent who

09:25:01   18  have returned their forms, all have elected to participate in

09:25:05   19  the settlement.

09:25:07   20      As the Court is aware, the deadline for registration

09:25:11   21  for the wave claimants is fast approaching, December 20th, nine

09:25:17   22  days from today.  Your Honor issued an order specifically

09:25:20   23  reminding the remaining -- there's now less than 100 claimants

09:25:24   24  -- that they need to get their forms in.  There's active

09:25:28   25  outreach going on to those remaining claimants so that they can

09:25:32  1   participate in the settlement, but we do anticipate 100 percent

09:25:35  2   participation through the wave claimants, and we certainly hope

09:25:39  3   that to be the case.

09:25:40  4          With regard to the remainder of the claimants both in

09:25:45  5   Minnesota and in the MDL, things are also going well.  There

09:25:52  6   are more than 30,000 -- well in excess of 30,000 releases that

09:25:58  7   have been delivered to 3M's counsel at Butler Snow.  They're

09:26:02  8   being evaluated.  But that was one of the preliminary

09:26:05  9   thresholds that was negotiated.  We're happy to report that

09:26:08  10  we've been able to provide those releases and they're being

09:26:12  11  reviewed.  Mr. Andolina will speak to that a little bit

09:26:15  12  further.

09:26:16  13         Of the claimants who have registered through that

09:26:19  14  process outside of the waves and the verdicts, the vast

09:26:25  15  majority -- in fact, well in excess of 99 percent are electing

09:26:29  16  to participate in the settlement.  A lot of those that have not

09:26:34  17  have questions and may have -- when they talk to their lawyer,

09:26:39  18  from our experience, they do understand that this is a

09:26:43  19  settlement that is in their best interest.  That deadline is

09:26:47  20  fast approaching as well.  It's at the end of the January.  And

09:26:51  21  the Court, I'm sure, will be issuing some orders in advance of

09:26:54  22  that.

09:26:55  23         I did want to remind counsel that have not yet had a

09:27:01  24  chance to review all of the draft registration forms that

09:27:05  25  Archer provided them some time ago that December 20th is the

09:27:09  1    deadline for counsel to have gone through those forms and have

09:27:16  2    them pushed to their clients.  After that point in time, Archer

09:27:21  3    will be pushing them to the clients directly to provide the

09:27:24  4    clients sufficient time to determine whether or not this

09:27:27  5    settlement is fair for them.

09:27:29  6         But based upon the response rate at this point, we

09:27:34  7    feel exceedingly confident that we will hit our 98 percent

09:27:39  8    initial participation threshold and that ultimately, pursuant

09:27:42  9    to our recommendation, 100 percent of the folks will ultimately

09:27:48  10   want to participate in the settlement either through the

09:27:52  11   expedited payment program, what we call the EPP, the deferred

09:27:58  12   payment program.

09:27:58  13        And as the Court is aware, there's been a lot of work

09:28:01  14   on the extraordinary injury fund program.  You've been involved

09:28:04  15   in that directly, and we thank you for that.

09:28:09  16        And we have Special Master Garretson -- Special

09:28:12  17   Allocation Master Garretson, who has worked with various

09:28:19  18   experts to come up with a very robust program to ensure that

09:28:22  19   everybody's case is evaluated individually.  This is not a

09:28:27  20   one-size-fits-all settlement because we represent individuals

09:28:31  21   and we're proud to do so, particularly with this population

09:28:36  22   consisting a large part of veterans and active duty, as well as

09:28:40  23   our military contractors and our civilian claimants.

09:28:45  24        And with that, I'm happy to report that things are on

09:28:50  25   track.  We believe that we will hit our deadlines that are

09:28:53  1    imposed pursuant to the MSA and the Court's orders, and we

09:28:58  2    thank you for your diligent management of the docket as well as

09:29:01  3    Judge Miller for doing the same.  Thank you.

09:29:04  4              **THE COURT:**  All right.  Thank you, Mr. Aylstock.

09:29:09  5              Mr. Andolina.

09:29:13  6              **MR. ANDOLINA:**  Good morning, Your Honor.  Mike

09:29:20  7    Andolina of White & Case.

09:29:21  8              On behalf of 3M, we echo the NPC's enthusiasm about

09:29:29  9    the progress of this historic settlement.

09:29:31  10   As Mr. Aylstock indicated, we have resolved and the

09:29:34  11   courts have dismissed the verdict cases.  And the progress on

09:29:38  12   the wave cases, the 94 percent that Mr. Aylstock just reported,

09:29:43  13   has been nothing short of tremendous.

09:29:44  14   In the past two weeks, 3M has received in excess of

09:29:49  15   30,000 releases from claimants seeking to participate in the

09:29:53  16   expedited payment program under the settlement, which is the

09:29:57  17   expected number and timing contemplated under the agreements.

09:30:03  18   Our team is currently, as Mr. Aylstock indicated,

09:30:06  19   reviewing those releases, and I'm pleased to report that we are

09:30:09  20   on track to make the initial release payment by the end of this

09:30:13  21   month.

09:30:13  22   This early participation in the expedited payment

09:30:18  23   program indicates that the settlement is being well received by

09:30:21  24   claimants and is proceeding as intended by the parties and by

09:30:25  25   the courts.

09:30:26   1        The widespread participation that we are seeing of

09:30:32   2   cross-claimants further supports the conclusion that

09:30:36   3   implementation of the settlement is also proceeding as planned.

09:30:39   4        I also want to express our appreciation for the myriad

09:30:43   5   of folks that Mr. Aylstock references.  We particularly want to

09:30:47   6   thank the settlement administration teams at BrownGreer and

09:30:51   7   Archer.  We know that they have been working around the clock.

09:30:55   8        We also want to thank Judge Herndon for his ongoing

09:30:59   9   efforts.  And of course, we deeply appreciate both courts'

09:31:04   10  assistance in supporting the implementation of the settlements.

09:31:08   11  We know that you and Judge Miller have spent an incredible

09:31:12   12  amount of time focused on managing your dockets and also making

09:31:15   13  sure that claimants are heard.

09:31:17   14       We recognize the amount of time that has been put in

09:31:22   15  by all of the individuals that I've mentioned.

09:31:25   16       I also want to thank our friends at the NPC, so we

09:31:31   17  very much appreciate everyone's efforts.

09:31:33   18       I think Mr. Seeger is now going to talk a little bit

09:31:37   19  about the opening.

09:31:38   20       **THE COURT:**  All right.  Thank you, Mr. Andolina.  And

09:31:39   21  from the Court's standpoint -- and Judge Miller can speak as

09:31:44   22  well -- this Court is extremely pleased with the progress thus

09:31:49   23  far in the settlement program, and no doubt it is due to

09:31:54   24  extraordinary effort of the lawyers as well as the settlement

09:32:01   25  administration team, as has already been mentioned.

| 09:32:05 | 1 | And I also want to particularly thank two individuals |
|---|---|---|

And I also want to particularly thank two individuals
or sort of entities that are not part of the settlement
administration team and echo what Mr. Aylstock said earlier,
and that is the DoD and the DOJ, as well as our court's clerk
office, who has just done an amazing, amazing, extraordinary
job with the docket.

Judge Miller, anything you'd care to add?

**JUDGE MILLER:**  Well, I'd like to express my thanks to
everyone who has already been thanked, but also add thanks to
the Minnesota leadership who has instrumental in making sure
that the settlement -- we have a small set of cases here but we
also have some considerations that I think everyone has been
able to attend to very effectively, and I appreciate all the
hard work that has gone into making sure it stays on track in
both jurisdictions.

**THE COURT:**  Thank you.

Judge Herndon, I didn't mean to ignore you.  Is there
anything you'd like to add this morning?

**JUDGE HERNDON:**  As we begin the next phase of this
hearing, let me confirm that all of these negotiations,
including the negotiations regarding stock transfer, were not
only arm's length but vigorously and aggressively negotiated by
both parties and represent the complete agreement of the
parties.

**THE COURT:**  I thank you for those personal

And I also want to particularly thank two individuals
or sort of entities that are not part of the settlement
administration team and echo what Mr. Aylstock said earlier,
and that is the DoD and the DOJ, as well as our court's clerk
office, who has just done an amazing, amazing, extraordinary
job with the docket.

Judge Miller, anything you'd care to add?

**JUDGE MILLER:**  Well, I'd like to express my thanks to
everyone who has already been thanked, but also add thanks to
the Minnesota leadership who has instrumental in making sure
that the settlement -- we have a small set of cases here but we
also have some considerations that I think everyone has been
able to attend to very effectively, and I appreciate all the
hard work that has gone into making sure it stays on track in
both jurisdictions.

**THE COURT:**  Thank you.

Judge Herndon, I didn't mean to ignore you.  Is there
anything you'd like to add this morning?

**JUDGE HERNDON:**  As we begin the next phase of this
hearing, let me confirm that all of these negotiations,
including the negotiations regarding stock transfer, were not
only arm's length but vigorously and aggressively negotiated by
both parties and represent the complete agreement of the
parties.

**THE COURT:**  I thank you for those personal

09:33:34    1    observations.  I know you were intimately involved in those

09:33:43    2    negotiations, so thank you.

09:33:44    3             Mr. Seeger, let's hear from you regarding the

09:33:49    4    presentation this morning.

09:33:51    5         **MR. SEEGER:**  Yes.  Good morning, Your Honor.  And my

09:33:53    6    presentation got even shorter than it was because you did a

09:33:56    7    really good job of laying out why we're here today.

09:33:59    8             Let me just start, Your Honor, by saying, on behalf of

09:34:03    9    the veterans and the clients we represent, we once again want

09:34:06   10    to thank this Court for your continued guidance from day one of

09:34:10   11    the litigation and with respect to every aspect of this

09:34:12   12    settlement.  We thank you that, your time.  Also for scheduling

09:34:15   13    this hearing today to determine the fairness, should you

09:34:18   14    conclude that, of the stock that the QSF is to receive.

09:34:22   15             I'll jump ahead to what the presentation is going to

09:34:25   16    hold today.  As you mentioned, the parties filed a joint motion

09:34:31   17    for approval of stock issuance exempt from the registration

09:34:32   18    requirement under the Securities Act that you referenced.

09:34:36   19             We have filed also in support of that motion an

09:34:39   20    affidavit from the former SEC commissioner Professor Robert

09:34:44   21    Jackson, who is in the court today and you'll hear from, Your

09:34:49   22    Honor, Professor Jackson.

09:34:50   23             We also have an affidavit from Dr. Shannon Wheatman,

09:34:55   24    who will discuss the notice aspects of the program, and from

09:34:59   25    Blake Deady who is also in the courtroom.  He moved.  There he

09:35:02    1    is.

09:35:02    2            I think what we're going to do today is we're going to

09:35:05    3    start first with Mr. Deady, who is the president and GC of

09:35:09    4    Archer Systems, and he's just going to discuss the distribution

09:35:11    5    of the actual notice to the claimants.

09:35:13    6            And then we're going to go to Dr. Wheatman, who is a

09:35:16    7    noticing expert, and we'll discuss the effectiveness of the

09:35:20    8    notice program for this hearing in alerting Combat Arms

09:35:24    9    claimants of the hearing.

09:35:25   10            And finally, Professor Jackson, who is a security

09:35:30   11    scholar, former commissioner the SEC, and will briefly discuss

09:35:35   12    section 3(a)(10) exemption and how the SEC's guidance would

09:35:41   13    apply in the event the Court determines that the exchange of

09:35:44   14    stock is fair.

09:35:44   15            Following that testimony, Ms. Wright will present to

09:35:47   16    the Court argument and she'll pull this all together as to why

09:35:51   17    the proposed issuance should be exempt under 3(a)(10) which

09:35:56   18    will allow for the shares, once delivered, to be immediately

09:35:58   19    resold.

09:36:01   20            And, obviously, throughout this hearing, Judge, this

09:36:03   21    will be subject to any questions you have to the witnesses or

09:36:06   22    us.  Thank you, Your Honor.

09:36:07   23            **THE COURT:**  Thank you, Mr. Seeger.

09:36:08   24            All right.  Then I believe we will get started with

09:36:16   25    the hearing testimony.

09:36:18   1              Ms. Wright, are you going to start that with

09:36:21   2    Mr. Deady?

09:36:55   3         **BLAKE DEADY, WITNESS PRESENTED BY 3M COUNSEL, DULY SWORN**

09:37:04   4              **THE COURT:**  State your full name and spell your last

09:37:08   5    name, please.

09:37:08   6              **THE WITNESS:**  My name is Blake A. Deady, D-e-a-d-y.

09:37:14   7                    **EXAMINATION OF BLAKE DEADY**

09:37:16   8    **BY MS. WRIGHT:**

09:37:17   9    **Q.**   Good morning, Mr. Deady.

09:37:18   10   **A.**   Good morning.

09:37:18   11   **Q.**   What's your current job?

09:37:19   12   **A.**   I'm the president and general counsel of Archer Systems.

09:37:23   13   **Q.**   And how long have you been in that role?

09:37:24   14   **A.**   I've been employed with Archer for almost seven years and

09:37:28   15   in that role for the same amount of time.

09:37:31   16   **Q.**   Have you held any other roles during that time?

09:37:33   17   **A.**   I have.  On a couple of occasions, I've also been the chief

09:37:36   18   operating officer, but I'm not currently serving that position.

09:37:40   19   **Q.**   But you were president and GC for your entire tenure at

09:37:45   20   Archer?

09:37:45   21   **A.**   That's correct.

09:37:46   22   **Q.**   What does Archer do?

09:37:47   23   **A.**   Archer is a national settlement and claims administration

09:37:50   24   firm with certain areas of focus including QSF administration,

09:37:56   25   class action settlement program coordination, healthcare lien

| | |
|---|---|
| 09:38:02 | 1 |
| 09:38:07 | 2 |
| 09:38:09 | 3 |
| 09:38:13 | 4 |
| 09:38:15 | 5 |
| 09:38:21 | 6 |
| 09:38:25 | 7 |
| 09:38:28 | 8 |
| 09:38:32 | 9 |
| 09:38:32 | 10 |
| 09:38:36 | 11 |
| 09:38:38 | 12 |
| 09:38:45 | 13 |
| 09:38:46 | 14 |
| 09:38:50 | 15 |
| 09:38:50 | 16 |
| 09:38:54 | 17 |
| 09:38:59 | 18 |
| 09:39:04 | 19 |
| 09:39:07 | 20 |
| 09:39:13 | 21 |
| 09:39:19 | 22 |
| 09:39:20 | 23 |
| 09:39:20 | 24 |
| 09:39:23 | 25 |

resolution, including Medicare set-asides, bankruptcy and probate coordination for claimants in mass tort and class action settlements, and some trust services, medical record review, nurse review, things like that.

**Q.**   Briefly, what role has Archer played in this litigation?

**A.**   Archer is the court-appointed settlement administrator and has previously served as a co-QSF administrator.

**Q.**   And again briefly, what's your understanding of why we're here today?

**A.**   We're here to discuss the transfer of common stock to satisfy certain settlement consideration and settlement of these claims under section 3(a)(10) of the Security Act.  This is the fairness hearing.

**Q.**   Did Archer play a role in the preparation for the fairness hearing?

**A.**   We did.  We were -- as the settlement administrator, we were required to send direct notice to claimants of the Court's notice and give claimants the opportunity both to be informed about it and, if they chose to appear, to provide them with the necessary forms to notice the Court with an intent to appear.

**Q.**   And in your role as president and GC of Archer, did you oversee the direct notice program?

**A.**   I did.

**Q.**   Have you participated in any other notice programs at Archer?

| | | |
|---|---|---|
| 09:39:24 | 1 | **A.**   I have. |
| 09:39:24 | 2 | **Q.**   Approximately how many? |
| 09:39:25 | 3 | **A.**   Probably ten to a dozen over the course of my time there. |
| 09:39:29 | 4 | **Q.**   Did you submit a declaration in connection with this |
| 09:39:33 | 5 | hearing? |
| 09:39:33 | 6 | **A.**   I did. |
| 09:39:34 | 7 | **MS. WRIGHT:**  Your Honor, may I approach the witness? |
| 09:39:37 | 8 | **THE COURT:**  Yes, you may. |
| 09:39:40 | 9 | **MS. WRIGHT:**  Before I continue, Your Honor, we have |
| 09:39:57 | 10 | copies of the entire submission made today, if the Court and/or |
| 09:39:59 | 11 | the Court's staff would appreciate a copy. |
| 09:40:02 | 12 | **THE COURT:**  Of the declaration? |
| 09:40:05 | 13 | **MS. WRIGHT:**  Including the declaration, yes. |
| 09:40:07 | 14 | **THE COURT:**  I have that.  I think I'm fine.  Thank |
| 09:40:10 | 15 | you, though. |
| 09:40:11 | 16 | **MS. WRIGHT:**  Of course. |
| 09:40:11 | 17 | **BY MS. WRIGHT:** |
| 09:40:12 | 18 | **Q.**   Mr. Deady, I just handed you a document.  Are you familiar |
| 09:40:14 | 19 | with that document? |
| 09:40:15 | 20 | **A.**   Yes, I am. |
| 09:40:15 | 21 | **Q.**   What is it? |
| 09:40:16 | 22 | **A.**   This is my declaration of which I completed and filed with |
| 09:40:19 | 23 | the Court. |
| 09:40:19 | 24 | **Q.**   And at a high level, what does that declaration describe? |
| 09:40:23 | 25 | **A.**   It describes the two different notice campaigns that Archer |

09:40:29   1    conducted, campaigns to provide direct notice to claimants in

09:40:34   2    this settlement.

09:40:34   3    **Q.**    In connection with that notice campaign, did the Court

09:40:37   4    issue any instructions to Archer?

09:40:39   5    **A.**    Yes.  The Court instructed Archer to provide direct notice

09:40:44   6    to eligible claimants in this MDL.

09:40:46   7    **Q.**    How did the Court instruct Archer to do that?

09:40:50   8    **A.**    Well, there is an order and in the direct order there's

09:40:53   9    language that required Archer, as the settlement administrator,

09:40:57   10   to provide direct notice to, again, eligible claimants in the

09:41:01   11   MDL.

09:41:02   12   **Q.**    Are you referring to Exhibit B of your declaration?

09:41:05   13   **A.**    I am.

09:41:05   14   **Q.**    Can you read the last sentence in the Court's order of the

09:41:12   15   -- I'm sorry, let me ask a better question.

09:41:17   16       Do you see the first paragraph of that order?

09:41:18   17   **A.**    I do.

09:41:19   18   **Q.**    Could you read the last sentence?

09:41:20   19   **A.**    Sure.  "The settlement administrator is directed to provide

09:41:24   20   the notice attached as Exhibit A which the Court hereby

09:41:27   21   approves to all eligible claimants in the MDL and their

09:41:31   22   counsel."

09:41:31   23   **Q.**    What's the date of that order?

09:41:32   24   **A.**    October 18th, 2023.

09:41:35   25   **Q.**    Did you adhere to the Court's instruction?

| | | |
|---|---|---|
| 09:41:38 | 1 | **A.**   We did. |
| 09:41:38 | 2 | **Q.**   What did the notice contain? |
| 09:41:42 | 3 | **A.**   So, the notice that Archer provided -- and I know we'll get |
| 09:41:47 | 4 | into this -- either by electronic mail or by paper mail through |
| 09:41:51 | 5 | the United States Postal Service, actually had the entire |
| 09:41:55 | 6 | components of the Court's order.  So it had the two-page court |
| 09:41:59 | 7 | order issued by this Court on October 18th, 2023.  It also |
| 09:42:07 | 8 | contained Exhibit A, which is the single one-page notice of the |
| 09:42:13 | 9 | fairness hearing, in addition to Exhibit B of the Court's |
| 09:42:18 | 10 | order, which is the notice of intent to appear if you were to |
| 09:42:21 | 11 | appear by counsel, or Exhibit C, which is the notice of intent |
| 09:42:25 | 12 | to appear to be filed with the Court if you were going to |
| 09:42:27 | 13 | appear on your own behalf or *pro se*. |
| 09:42:34 | 14 | **Q.**   You mentioned earlier that Archer sent notice by both email |
| 09:42:38 | 15 | and U.S. Mail? |
| 09:42:39 | 16 | **A.**   That's correct. |
| 09:42:40 | 17 | **Q.**   So, if we start just with the email notice, am I |
| 09:42:45 | 18 | understanding correctly that the substance of the notice is |
| 09:42:47 | 19 | contained in Exhibit B of your declaration? |
| 09:42:49 | 20 | **A.**   That is correct. |
| 09:42:51 | 21 | **Q.**   Was there any other information included in the email |
| 09:42:55 | 22 | notice? |
| 09:42:55 | 23 | **A.**   The email notice contained a single sort of introductory |
| 09:43:03 | 24 | remark related to, pursuant to the Court order, the Court is |
| 09:43:08 | 25 | going to hold a hearing, please -- the date and time of the |

09:43:13   1   hearing was provided in the introductory language, and then

09:43:17   2   there was an opportunity for the claimant to click to a

09:43:21   3   hyperlink where they could read those documents that we just

09:43:25   4   discussed, which is the order, the actual single-page notice,

09:43:28   5   and the exhibits to the Court's order, which are the notices of

09:43:31   6   intent to appear.

09:43:32   7   **Q.**   Now, if we switch to the notices that were mailed via paper

09:43:37   8   mail, what was contained in those notices?

09:43:39   9   **A.**   It would have just been the Court's order, the single-page

09:43:46   10  notice, and the two different versions of the notices of intent

09:43:49   11  to appear.  There was no introductory comment.

09:43:52   12  **Q.**   So, do Exhibit A and B to your declaration contain the

09:43:57   13  entirety of what was sent to eligible claimants in this MDL?

09:44:02   14  **A.**   They do.

09:44:03   15  **Q.**   Did you send any other information regarding this hearing

09:44:05   16  to eligible claimants in the MDL?

09:44:05   17  **A.**   Archer did not.

09:44:07   18  **Q.**   How did you determine who to send notice to?

09:44:16   19  **A.**   Archer, as the settlement administrator, has been working

09:44:19   20  with the settlement data administrator, BrownGreer, since the

09:44:24   21  end of August when the settlement was announced.

09:44:28   22      BrownGreer and Archer exchanged data almost weekly

09:44:33   23  probably, and BrownGreer maintains a global list of eligible

09:44:38   24  claimants in this MDL, which includes information such as case

09:44:41   25  number, counsel information, email addresses, telephone

09:44:48   1   numbers, obviously the eligible claimant names, and other

09:44:51   2   contact information for each of those individuals.

09:44:53   3   **Q.**   Does it also include mailing address?

09:44:55   4   **A.**   It does.

09:44:56   5   **Q.**   Is that the data you used when disseminating the notice for

09:45:01   6   this hearing?

09:45:02   7   **A.**   It is.

09:45:02   8   **Q.**   How many notice campaigns in total did Archer execute?

09:45:07   9   **A.**   Two.

09:45:09   10   **Q.**   When did the first campaign start?

09:45:12   11   **A.**   The first campaign started on October 20th.

09:45:14   12   **Q.**   Was that by email, paper mail, or both?

09:45:17   13   **A.**   Email.

09:45:17   14   **Q.**   When did the first campaign conclude?

09:45:20   15   **A.**   October 21st.

09:45:22   16   **Q.**   How many emails did you send in the first campaign?

09:45:29   17   **A.**   Archer attempted to send -- I'll give you the exact numbers

09:45:34   18   -- just under 240,000 emails, so 239,818 emails were sent to

09:45:40   19   eligible claimants beginning on October 20th and concluding on

09:45:43   20   October 21st.

09:45:43   21   **Q.**   How did Archer actually send those emails?

09:45:46   22   **A.**   We use a commercially available web-based platform named

09:45:53   23   Constant Contact.  One of the concerns around sending emails of

09:45:58   24   this volume is that certain -- you don't want to be identified

09:46:02   25   as a spammer, and so we used Constant Contact, which allows --

| 09:46:07 | 1 | it's a commercially available tool, like I said, which allows |

it's a commercially available tool, like I said, which allows

Archer to deliver volumes of emails after some testing to

confirm we have a trusted customer/client relationship with the

target audience.

**Q.**   Does Archer use Constant Contact regularly?

**A.**   We do.  We use it in the normal course of our business, and

I believe we've been using it since 2018.

**Q.**   Does Constant Contact provide any kind of reports back to

you respect to -- well, let me stop there.  Does Constant

Contact provide you with any reports when you use them to send

emails?

**A.**   Yes, they do.  They provide us both summary-level and

granular-level reports.

**Q.**   Are those reports automated?

**A.**   They are from the sense that they produce them -- I'm

certain that we could -- you know, if we have certain data

requests, we could ask for them, but they are automated, yes.

**Q.**   Did you review those reports in preparing for your

testimony today?

**A.**   I reviewed the summary reports, yes.

**Q.**   And I think you already testified just under 240,000 emails

were sent through Constant Contact?

**A.**   That's correct, on the October 20th-21st campaign, that's

correct.

**Q.**   How many were successfully delivered?

| 09:47:19 | 1 | **A.**   234,683. |

**A.**   234,683.

**Q.**   What do you understand me to mean when I say "successfully delivered"?

**A.**   Well, we are notified -- Archer is notified by Constant Contact if there's an email that bounces back.  And "bounce back" simply means that the email to that addressee could not be delivered.  The email address may be bad, there may be some other defect in it.  But otherwise, we get a confirmation of successful delivery, and in this case for that campaign it was almost 235,000 individuals.

**Q.**   And how many bounced back?

**A.**   5,135.

**Q.**   You testified that you executed two notice campaigns in advance of this fairness hearing, correct?

**A.**   Yes.

**Q.**   Was that second campaign by email, U.S. Mail, or both?

**A.**   It was by both.

**Q.**   And when did that second campaign occur?

**A.**   November 16th, 2023.

**Q.**   Starting just with the email, how many emails did you send in the second campaign?

**A.**   We attempted to email 26,146 eligible claimants.

**Q.**   How many of those 26,146 bounced back?

**A.**   595.

**Q.**   Did you also send these by Constant Contact?

09:48:45   1    **A.**   We did.

09:48:46   2    **Q.**   Why weren't these emails included in the first campaign?

09:48:56   3    **A.**   There were a number of claimants with data issues that we

09:48:59   4    were trying to determine their eligibility or if they were

09:49:02   5    indeed eligible claimants in the MDL.  That was one of the

09:49:05   6    reasons.

09:49:05   7         Under CMO 60, claimants were required to update their

09:49:10   8    contact information including email addresses with the

09:49:12   9    settlement data administrator, BrownGreer.  And from the time

09:49:14   10   that we started our initial campaign until November 16th, those

09:49:19   11   data issues gradually over time were resolved, and claimants

09:49:23   12   also submitted updated email information.

09:49:26   13        As you are aware and the Court is aware, email is required

09:49:29   14   for the registration process because those forms are delivered

09:49:33   15   to claimants electronically.  So, as that information,

09:49:38   16   including contact information with email addresses and

09:49:40   17   determinations around eligibility, began to clear up for some

09:49:44   18   of those claimants, we conducted the second campaign.

09:49:46   19   **Q.**   Why did you also include U.S. Mail notices in the second

09:49:52   20   campaign?

09:49:52   21   **A.**   It was a decision that I personally made.  I wanted to make

09:49:55   22   sure that, for those bounce-backs in particular from the first

09:50:00   23   campaign that we conducted on October 20th and 21st, not having

09:50:06   24   -- I wanted to -- as we started the second campaign, I wanted

09:50:09   25   to make sure that, without going claimant by claimant to

09:50:12  1   determine if they had submitted updated email addresses to

09:50:16  2   BrownGreer, those 5,135 that I mentioned, that we would simply

09:50:21  3   also send them, in an abundance of caution, a paper mail notice

09:50:24  4   to their address reported to BrownGreer.

09:50:27  5         Additionally, there was approximately still 1,259, 1,260

09:50:37  6   claimants that were identified as eligible claimants in the MDL

09:50:39  7   that had not provided an email address, so we had to conduct a

09:50:43  8   mail campaign anyway.

09:50:44  9   Q.   You testified earlier BrownGreer provided you with the

09:50:47  10  physical addresses of the eligible claimants in the MDL?

09:50:52  11  A.   That's correct, they provide -- part of their information

09:50:55  12  related to eligible claimants includes a mailing address.

09:50:58  13  Q.   Did you use that data to send these U.S. Mail notices?

09:51:02  14  A.   We did.  We used that data, and, as we loaded it, we, of

09:51:08  15  course, run that information through what's called the National

09:51:12  16  Change of Address database to determine if any of those

09:51:16  17  eligible claimants' mailing addresses had recently updated

09:51:20  18  through the NCOA, the National Change of Address database.

09:51:25  19  Q.   And what did you do if they had been updated?

09:51:28  20  A.   We sent them to the updated address.

09:51:30  21  Q.   How many notices were sent by U.S. Mail?

09:51:32  22  A.   6,394.

09:51:36  23  Q.   At the time you submitted your declaration, how many had

09:51:41  24  been returned as undeliverable?

09:51:43  25  A.   Only 72.

| | | |
|---|---|---|
| 09:51:44 | 1 | **Q.**   Has that number changed since you submitted your |
| 09:51:50 | 2 | declaration? |
| 09:51:50 | 3 | **A.**   It has.   That number is now 521. |
| 09:51:55 | 4 | **Q.**   As a result of the two campaigns, did any eligible claimant |
| 09:52:02 | 5 | receive notice of the hearing twice? |
| 09:52:06 | 6 | **A.**   Yes, that is a possibility.   And from our determinations, |
| 09:52:08 | 7 | yes, there are claimants that have received the notice twice. |
| 09:52:13 | 8 | **Q.**   Why? |
| 09:52:13 | 9 | **A.**   Well, like I said, many of those claimants that had |
| 09:52:19 | 10 | bounce-backs updated their email addresses.   And after we went |
| 09:52:22 | 11 | back and took a look at the data, they were successfully |
| 09:52:26 | 12 | delivered in the second email campaign, but, as I mentioned |
| 09:52:29 | 13 | earlier, we went ahead and sent them a paper notice as well. |
| 09:52:31 | 14 | So they may have received the notice twice if they opened the |
| 09:52:35 | 15 | mail. |
| 09:52:35 | 16 | **Q.**   Approximately how many eligible claimants may have received |
| 09:52:41 | 17 | notice twice? |
| 09:52:42 | 18 | **A.**   I think it was 5,241, if my memory is correct. |
| 09:52:50 | 19 | **Q.**   So, in total, how many emails were successfully delivered |
| 09:52:57 | 20 | as part of the notice program? |
| 09:52:59 | 21 | **A.**   Let me do the math in my head real quick.   It was -- we've |
| 09:53:12 | 22 | got about approximately 260,000 or more claimants received |
| 09:53:19 | 23 | notice by email. |
| 09:53:20 | 24 | **Q.**   And that does not include the mail notice that was |
| 09:53:24 | 25 | successfully delivered, correct? |

09:53:26   1   **A.**   Correct.

09:53:26   2   **Q.**   Are you aware of approximately how many claimants are in

09:53:31   3   this MDL?

09:53:31   4   **A.**   I think it's somewhere between 270- to 271,000 claimants, I

09:53:39   5   believe, so somewhere in between 270- and 271-.

09:53:43   6   **Q.**   So approximately what percentage of claimants in this MDL

09:53:46   7   received email notice of this hearing?

09:53:48   8   **A.**   Right.  So Archer knows that we've delivered notice to more

09:53:53   9   than 260,000 claimants.  So, if we use the denominator of

09:53:58   10  270,000, we would have provided direct notice to more than 96

09:54:02   11  percent of claimants -- more than 96 percent of eligible

09:54:10   12  claimants in this MDL.

09:54:10   13  **Q.**   And if we were to fold in the ultimate number of mail

09:54:13   14  notices successfully delivered, that percentage would increase

09:54:17   15  above 96; is that correct?

09:54:18   16  **A.**   It would.  I think we'll probably, at the end of the day,

09:54:22   17  be somewhere, when we run the final reports after the return

09:54:25   18  mail stops, that we will probably have provided direct notice

09:54:30   19  to somewhere north of 260,000 claimants.  It could be 261-,

09:54:40   20  262,000 claimants.

09:54:40   21  **Q.**   Does Archer maintain data with respect to the numbers you

09:54:43   22  just testified about?

09:54:43   23  **A.**   We do.

09:54:44   24  **Q.**   What kind of data?

09:54:45   25  **A.**   It would include a full report of both the typical claimant

09:54:49  1    identification information, which we've briefly discussed, case

09:54:52  2    number, address, unique plaintiff ID, those things, and in

09:54:57  3    addition to how the direct notice was attempted, by email or

09:55:02  4    mail, and the success or failure of that attempt, meaning it

09:55:08  5    was delivered or it was returned.

09:55:13  6    **Q.**   Are you able to prepare a report that identifies only the

09:55:15  7    eligible claimants that who did not receive direct notice in

09:55:19  8    the MDL?

09:55:20  9    **A.**   Yes, we can do that as well.

09:55:21  10   **Q.**   If asked, would you maintain that report?

09:55:23  11   **A.**   We have that report, we're building that report, and, yes,

09:55:27  12   we will maintain that report.

09:55:28  13              **MS. WRIGHT:**   Your Honor, may I confer with co-counsel?

09:55:32  14              **THE COURT:**   Yes.

09:55:35  15              **MS. WRIGHT:**   I have no further questions.

09:55:38  16              Thank you, Mr. Deady.

09:55:42  17              **THE COURT:**   Mr. Deady, I have a couple of just quick

09:55:45  18   questions.

09:55:46  19              When you issued the notices, whether by email or U.S.

09:55:53  20   Mail, did you account -- before you issued those notices, did

09:55:59  21   you account for the dismissals that had occurred?  Because, as

09:56:02  22   we know, there were closer to 300,000 initially eligible

09:56:06  23   claimants, and then that number has been reduced over time due

09:56:10  24   to dismissals, voluntarily dismissals, court-ordered

09:56:17  25   dismissals, and that brings us down to the number you just

09:56:19  1   referenced, which is 271- approximately -thousand.

09:56:23  2           Did you account for that when you issued notices or is

09:56:25  3   it possible that claimants whose cases have since been

09:56:30  4   dismissed actually received notices?

09:56:32  5           **MR. DEADY:**  Your Honor, I think, directly we tried to

09:56:36  6   account them -- where the case was identified as dismissed at

09:56:39  7   the time we conducted the notice campaigns, we certainly did

09:56:42  8   not send notice to those claimants.

09:56:45  9           Now, one of the points of discussion with Ms. Wright

09:56:48  10  was these claimants that we identified that we had not sent

09:56:51  11  notice to in October 20th that were in a holding pattern, if

09:56:56  12  you will -- that's my term, that's not a term of art -- some of

09:56:59  13  those claimants I think were the eligibility issues that were

09:57:02  14  being determined.

09:57:03  15          So I cannot sit here today and testify that a claimant

09:57:07  16  that was dismissed did not receive the notice, but we certainly

09:57:07  17  identified those that were known at the time of the October

09:57:10  18  20th campaign and did not send notice to cases that had been

09:57:13  19  previously dismissed by the Court.

09:57:15  20          **THE COURT:**  All right.  You indicated that the 5,135

09:57:26  21  that had not been delivered via email or returned as

09:57:31  22  undeliverable were then issued notice by mail.  But I didn't

09:57:37  23  hear you reference the 595.  I'm looking at paragraph 12 of

09:57:43  24  your declaration.  That was the second campaign.

09:57:49  25          Were those not attempted by mail?

09:57:52   1        **MR. DEADY:**   They were not reattempted by mail after

09:57:54   2   the November 16th campaign.  I made the decision on the 5,135

09:58:06   3   to make sure that we could saturate as much opportunity as we

09:58:09   4   could.  And because I knew those bounce-backs occurred at that

09:58:13   5   time, I wanted to go ahead and send the mail campaign out with

09:58:16   6   the second email campaign.

09:58:16   7        **THE COURT:**   So whoever these 595 claimants are, we

09:58:19   8   know they did not receive notice?

09:58:22   9        **MR. DEADY:**   Except unless they were -- there is that

09:58:25   10   possibility that the email address that was provided to us on

09:58:28   11   October 20th -- they could still be part of the bounce-backs

09:58:33   12   from the 5,135.  As claimant email addresses were updated, it's

09:58:38   13   quite possible that that 5,135 claimants gave us another bad

09:58:44   14   email address, if that makes sense.

09:58:46   15        But to Ms. Wright's question earlier, Archer will

09:58:51   16   identify very discrete specific list of individual eligible

09:58:55   17   claimants whom we know could never have received direct notice

09:59:01   18   from Archer in our two campaigns, if that makes sense.

09:59:05   19        **THE COURT:**   Yes.  That list is going to be very

09:59:11   20   important, and the converse of that is also important to

09:59:13   21   identify those who did receive notice.

09:59:16   22        **MR. DEADY:**   Absolutely, absolutely.  And like I said,

09:59:19   23   I've already been looking at the reporting on that, and we can

09:59:22   24   identify -- because of the way that the information was

09:59:24   25   delivered to Constant Contact, for example, and the way we

| | | |
|---|---|---|
| 09:59:30 | 1 | initiated and conducted the mail campaign, everything was done |
| 09:59:35 | 2 | with multiple aspects of unique claimant ID numbers, whether |
| 09:59:38 | 3 | that was case number, unique ID from Archer, or unique ID from |
| 09:59:41 | 4 | BrownGreer who will have that information discretely on an |
| 09:59:46 | 5 | individual claimant level. |
| 09:59:47 | 6 | **THE COURT:** Very good. |
| 09:59:49 | 7 | Ms. Wright any follow-up to my questions? |
| 09:59:50 | 8 | **MS. WRIGHT:** Just one, if Your Honor will allow. |
| 09:59:51 | 9 | **BY MS. WRIGHT:** |
| 09:59:51 | 10 | **Q.** The Court asked you if it was possible that the universe of |
| 09:59:54 | 11 | individuals who were receiving notice was more likely 290,000 |
| 09:59:58 | 12 | given the time in which cases were dismissed. |
| 10:00:01 | 13 | Do you recall that question? |
| 10:00:02 | 14 | **A.** I do. |
| 10:00:02 | 15 | **Q.** Do you know what percentage would receive direct notice if |
| 10:00:10 | 16 | 290,000 was used as the denominator instead of 270-? |
| 10:00:16 | 17 | **A.** May I pull my cell phone out of my pocket just to punch up |
| 10:00:20 | 18 | a calculator? |
| 10:00:21 | 19 | **THE COURT:** Yes. |
| 10:00:23 | 20 | **MR. DEADY:** I'm pretty good at math but -- so if |
| 10:00:24 | 21 | Archer has delivered -- |
| 10:00:24 | 22 | **THE COURT:** That's fine. I just did some quick math |
| 10:00:27 | 23 | on mine. |
| 10:00:28 | 24 | **MR. DEADY:** I appreciate the accommodation. |
| 10:00:30 | 25 | So, if Archer delivered 260- and the denominator was |

| | |
|---|---|
| 10:00:33 | 1 |

actually 290-, you would be bumping right at 90 percent.  It'd

be 89.66 percent, so right at 90 percent.

          **MS. WRIGHT:**  Thank you.

          No further questions, Your Honor.

          **THE COURT:**  Thank you, sir.  You may step down.

          *(Witness excused.)*

          While we're changing witnesses, I would like to just

make an announcement to those who are on either the AT&T

conference lines or the Zoom, frankly, but please mute your

phone, certainly if you're on the AT&T line, and mute your

audio if you're on the Zoom.  We're receiving multiple emails

from people about that being a problem on the conference call.

          Go ahead, Mr. Andolina.

          **MR. ANDOLINA:**  Your Honor, we would like to call

Dr. Shannon Wheatman.

    **SHANNON WHEATMAN, WITNESS PRESENTED BY 3M COUNSEL, DULY SWORN**

          **MADAM CLERK ROGERS:**  Thank you.  Please be seated.

          Please state your full name and spell your last name

for the record.

          **THE WITNESS:**  It's Shannon R. Wheatman, last name

W-h-e-a-t-m-a-n.

          **THE COURT:**  All right, Mr. Andolina, go ahead.

                    **EXAMINATION OF SHANNON WHEATMAN**

BY MR. ANDOLINA:

Q.   Good morning, Dr. Wheatman.  Where do you work?

Timestamps:
10:00:39 2
10:00:44 3
10:00:44 4
10:00:46 5
10:00:48 6
10:00:54 7
10:00:59 8
10:01:07 9
10:01:13 10
10:01:13 11
10:01:21 12
10:01:26 13
10:01:27 14
10:01:30 15
10:01:38 16
10:01:55 17
10:02:00 18
10:02:01 19
10:02:03 20
10:02:08 21
10:02:10 22
10:02:11 23
10:02:12 24
10:02:13 25

| | | |
|---|---|---|
| 10:02:16 | 1 | **A.**   I work at Signal Interactive Media. |
| 10:02:20 | 2 | **Q.**   What is your role at Signal Interactive Media? |
| 10:02:21 | 3 | **A.**   I'm the executive director. |
| 10:02:23 | 4 | **Q.**   What does Signal Interactive Media do? |
| 10:02:26 | 5 | **A.**   So we assist courts, attorneys, and the government in class |
| 10:02:31 | 6 | action litigations or mass claims processes.  We implement |
| 10:02:36 | 7 | notice programs, design notice programs, and also analyze |
| 10:02:39 | 8 | notice programs. |
| 10:02:39 | 9 | **Q.**   What is a notice program? |
| 10:02:41 | 10 | **A.**   So the notice program are the ways that we reach out to |
| 10:02:45 | 11 | claimants to inform them about a case. |
| 10:02:48 | 12 | **Q.**   We'll come back to Signal and your work there, but can you |
| 10:02:53 | 13 | describe your educational background, please. |
| 10:02:55 | 14 | **A.**   So, besides my undergraduate degree, which is in |
| 10:02:59 | 15 | psychology, I have two masters degrees and a Ph.D.  I have a |
| 10:03:03 | 16 | master's degree in legal studies from the University of |
| 10:03:07 | 17 | Nebraska-Lincoln, and a master's degree and a Ph.D. in social |
| 10:03:12 | 18 | psychology from the University of Georgia.  My masters thesis |
| 10:03:15 | 19 | was on comprehension of jury instructions, and my doctoral |
| 10:03:17 | 20 | dissertation was on layperson's comprehension of class action |
| 10:03:22 | 21 | notice. |
| 10:03:22 | 22 | **Q.**   Can you describe your employment history? |
| 10:03:24 | 23 | **A.**   I've been employed in the legal notice field for over 19 |
| 10:03:28 | 24 | years.  And prior to that, I worked for four years with the |
| 10:03:32 | 25 | Federal Judicial Center.  While I was there -- and the Federal |

10:03:36   1   Judicial Center is the research and educational agency for the

10:03:38   2   federal courts.  And while I was there, I worked with the Civil

10:03:45   3   Rules Advisory Committee to draft the plain language model

10:03:47   4   notices that are used in class actions.  That's what formed the

10:03:50   5   basis of my dissertation.

10:03:52   6   Q.   Let me ask you a few questions related to your experience

10:03:55   7   on legal notice.  How many cases, Dr. Wheatman, have you

10:04:02   8   personally been involved in?

10:04:03   9   A.   I've been involved in over 700 cases where I either

10:04:06   10  designed, implemented, and/or analyzed the notice program.

10:04:10   11  Q.   And what types of cases did these include?

10:04:11   12  A.   Predominantly class actions, and I work across the gamut in

10:04:17   13  class actions but mostly in consumer and antitrust cases, and

10:04:21   14  also in mass tort bankruptcies.

10:04:22   15  Q.   Have any of the class actions that you've worked on been

10:04:26   16  part of an MDL?

10:04:28   17  A.   Yes.

10:04:28   18  Q.   Do you have a sense of how many?

10:04:29   19  A.   I would say a few dozen.

10:04:32   20  Q.   Have you ever had a court reject a notice program that you

10:04:37   21  designed?

10:04:38   22  A.   No.

10:04:39   23  Q.   Have you authored articles or publications regarding

10:04:44   24  effective communication and notice?

10:04:46   25  A.   Yes, I've authored or co-authored over 20 articles on

| | | |
|---|---|---|
| 10:04:51 | 1 | effective communication strategies. |
| 10:04:53 | 2 | **Q.**   Have you testified in court proceedings in the area of |
| 10:04:55 | 3 | notice programs? |
| 10:04:56 | 4 | **A.**   Yes, I've testified 13 times. |
| 10:04:58 | 5 | **Q.**   Have you ever been qualified as an expert by any court? |
| 10:05:02 | 6 | **A.**   Yes. |
| 10:05:02 | 7 | **Q.**   Has there ever been a circumstance where a party sought to |
| 10:05:07 | 8 | qualify you as an expert and that request was denied? |
| 10:05:10 | 9 | **A.**   No. |
| 10:05:10 | 10 | **Q.**   Let's talk for a moment about your work in connection with |
| 10:05:13 | 11 | this proceeding, Dr. Wheatman. |
| 10:05:15 | 12 | When were you retained? |
| 10:05:15 | 13 | **A.**   I was retained jointly by the NPC and 3M on September 11th, |
| 10:05:20 | 14 | 2023. |
| 10:05:21 | 15 | **Q.**   And in connection with your retention regarding the notice |
| 10:05:25 | 16 | of fairness hearing, did you prepare a declaration that was |
| 10:05:29 | 17 | filed with the Court? |
| 10:05:30 | 18 | **A.**   I did. |
| 10:05:31 | 19 | **MR. ANDOLINA:**   Your Honor, may I approach and provide |
| 10:05:35 | 20 | Dr. Wheatman a copy of her declaration? |
| 10:05:38 | 21 | **THE COURT:**   You may. |
| 10:05:51 | 22 | **BY MR. ANDOLINA:** |
| 10:05:52 | 23 | **Q.**   Dr. Wheatman, is the declaration that you provided and that |
| 10:05:56 | 24 | was filed with the Court in the binder that I just provided to |
| 10:06:00 | 25 | you? |

**A.**   Yes.

**Q.**   In preparing for your testimony today, Dr. Wheatman, is there something that you need to revise?

**A.**   Yes.  When I was preparing my testimony, I learned that the notice of the fairness hearing was not placed at the settlement website hosted by Archer.  At the time I executed my declaration I thought it was.

So there is an inaccuracy in paragraph 9 of my declaration, and I do apologize to the Court for this misstatement.

**Q.**   Did the issue that you just identified impact any other testimony or declaration?

**A.**   No, it doesn't affect my opinion on the overall adequacy of the notice program.

**Q.**   Dr. Wheatman, I wanted to start my questioning on your role in this case by asking you a few questions about the direct notice program that Mr. Deady just testified about.

Do you recall that testimony?

**A.**   Yes.

**Q.**   And you were sitting in the front row and heard Mr. Deady?

**A.**   That's right.

    **MR. ANDOLINA:**   Your Honor, may I approach again?

    **THE COURT:**   Yes, you may.

**BY MR. ANDOLINA:**

**Q.**   Dr. Wheatman, I've handed you a copy of Mr. Deady's declaration.  Have you seen that document before?

10:07:22   1   **A.**   Yes.

10:07:22   2   **Q.**   And Exhibit B to that declaration is a document entitled 3M

10:07:28   3   Combat Arms Earplug Settlement Information About Proposed Stock

10:07:31   4   Issuance and Fairness Hearing.

10:07:34   5        Do you see that document?

10:07:35   6   **A.**   I do.

10:07:36   7   **Q.**   Were you involved in preparing that document?

10:07:38   8   **A.**   Yeah, I worked with the parties to draft this notice.

10:07:42   9   **Q.**   And that notice was then approved by the Court?

10:07:46   10  **A.**   Correct.

10:07:46   11  **Q.**   In drafting or assisting the parties in drafting that

10:07:51   12  notice, Dr. Wheatman, what was your goal in designing the

10:07:55   13  notice?

10:07:55   14  **A.**   The overall goal was to ensure that we provided the

10:07:59   15  necessary information to eligible claimants to understand what

10:08:02   16  this was about, and also I wanted to make sure that the

10:08:05   17  language was very simple so people would understand that.

10:08:09   18  **Q.**   Did you achieve that goal?

10:08:10   19  **A.**   I believe we did.

10:08:11   20  **Q.**   What aspects of the notice made it clear and concise in

10:08:17   21  presentation?

10:08:17   22  **A.**   So, in every notice that I do, I always have kind of a bold

10:08:22   23  headline at the top of the notice.  And here we used the 3M

10:08:26   24  Combat Arms Earplug Settlement, which would immediately let the

10:08:30   25  people know that this would be something that would be

10:08:32   1    important for them to read.  It's also laid out -- and, you

10:08:34   2    know, we have two questions and answers, which is something

10:08:37   3    that my research has shown aids readability.

10:08:40   4        And it's also in plain language.  I conducted a readability

10:08:44   5    analysis using the Flesch-Kincaid test which measures grade

10:08:48   6    level, and it measured out at a ninth grade reading level,

10:08:52   7    which is very good.

10:08:53   8    Q.   When you say it was very good that it measured out at the

10:08:57   9    ninth grade reading level, what do you mean by that?

10:09:00   10   A.   It means that anybody who had a ninth grade education or

10:09:04   11   greater would be able to likely understand this notice on the

10:09:08   12   first read.

10:09:08   13   Q.   Do you have an understanding of the overall education level

10:09:11   14   of the military population?

10:09:13   15   A.   Yeah.  I looked at some data that showed that they're more

10:09:17   16   heavily educated and more likely to have a college degree than

10:09:20   17   the average adult.

10:09:21   18   Q.   As Mr. Deady testified, the notice that you assisted in

10:09:25   19   drafting was delivered by email and U.S. Mail to eligible

10:09:30   20   claimants?

10:09:30   21   A.   Yes.

10:09:30   22   Q.   And you recall that testimony?

10:09:32   23   A.   I do.

10:09:32   24   Q.   And you recall that Mr. Deady testified that the direct

10:09:36   25   notice was delivered to approximately 96 percent of eligible

10:09:44   1   claimants?

10:09:45   2   **A.**   Right.

10:09:45   3   **Q.**   In your experience, is delivering notice to 96 percent of

10:09:50   4   claimants typical?

10:09:51   5   **A.**   No.  It's very high.

10:09:52   6   **Q.**   Is delivering -- is 90 percent a typical delivery

10:09:58   7   percentage?

10:09:59   8   **A.**   I still think it's high.  The Federal Judicial Center has a

10:10:03   9   notice checklist for judges that they use in class actions, and

10:10:07   10   it reports that having a high-reaching program is between 70

10:10:11   11   and 95 percent.  So once you're getting over 90 percent, that's

10:10:15   12   a really good result.

10:10:17   13   **Q.**   And is there something about the notice program in this

10:10:20   14   case that's particularly unique in your experience?

10:10:23   15   **A.**   Yes.  I've never had a situation like this where basically

10:10:26   16   100 percent of people who were impacted by the notice were

10:10:30   17   actually informed, since I understand that the only people

10:10:33   18   impacted by the stock issuances are those who received direct

10:10:37   19   notice.

10:10:38   20   **Q.**   Dr. Wheatman, what is a supplemental notice program?

10:10:42   21   **A.**   So a supplemental notice program is using media to bolster

10:10:47   22   a direct notice campaign.

10:10:49   23   **Q.**   When are supplemental notice programs typically used?

10:10:53   24   **A.**   I mean, they're generally used when you have a slightly

10:10:59   25   less than comprehensive mailing list.  So here you had a very

10:11:04   1   comprehensive mailing list, so it was unusual to have a media

10:11:08   2   program on top of it, but the parties wanted to go above and

10:11:11   3   beyond and provide additional notice.

10:11:13   4   **Q.**   How did you design the media program to reach -- to

10:11:19   5   supplementally reach claimants?

10:11:21   6   **A.**   So there are two steps in developing a media program.  The

10:11:25   7   first step is to find out all that we can about the

10:11:29   8   demographics of claimants.  And so we know that the majority or

10:11:33   9   most all of the claimants are veterans.  I got information from

10:11:37   10   Archer that 82 percent of eligible claimants were between the

10:11:40   11   ages of 25 and 54.  And also that it was possible that there

10:11:44   12   were some other professions like construction workers and

10:11:48   13   farmers that may have used the Combat Arms Earplug -- the 3M

10:11:51   14   Combat Arms Earplug Version 2 as well.

10:11:53   15        Now, after we know the information about the demographics,

10:11:57   16   then we look to see what can we find out about their media

10:12:02   17   usage habits.  So we have access to media survey data from

10:12:09   18   MRI-Simmons.  So they survey tens of thousands of people every

10:12:10   19   year to find out what media they're consuming, and fortunately,

10:12:13   20   veterans were measured in that data.  And so I found that

10:12:17   21   they're very heavy consumers of online.  98 percent of veterans

10:12:23   22   who are aged 25 to 54 have been online in the last 30 days,

10:12:27   23   they spend an average of 32 hours a week online, where the

10:12:31   24   average U.S. adult is spending between 22 and 24 hours.  So

10:12:36   25   veterans are very heavy consumers of online.

10:12:40    1          And I also looked at their social media habits, found the

10:12:43    2    top three social media platforms that they used.  63 percent of

10:12:46    3    them use Facebook, 38 percent use Instagram, and 24 percent use

10:12:52    4    Reddit.

10:12:53    5    **Q.**   Once you have the claimant profile, what did you do next?

10:12:58    6    **A.**   Once we have the profile, we design the media program.

10:13:01    7    **Q.**   And here there were two components of the program; is that

10:13:04    8    right?

10:13:04    9    **A.**   Yes, print and online.

10:13:06    10   **Q.**   Let's talk about the print component.  What did you do with

10:13:11    11   respect to the print component, Dr. Wheatman?

10:13:14    12   **A.**   So the notice appeared as a quarter-page ad in the *Wall*

10:13:19    13   *Street Journal* on November 16th, 2023.  The *Wall Street Journal*

10:13:23    14   has a circulation of 609,654.  And we didn't just place the

10:13:30    15   notice in the legal classified section of the paper; we placed

10:13:33    16   it in the main news section.  So it had very good positioning,

10:13:38    17   and it was on the same page as an article about the Ukraine

10:13:41    18   War.

10:13:42    19   **Q.**   And that notice is attached as Exhibit 2 to your

10:13:45    20   declaration; is that correct?

10:13:46    21   **A.**   That's correct.

10:13:47    22   **Q.**   So let's talk about the digital component.  What did you do

10:13:54    23   in designing the digital media component of the supplemental

10:13:58    24   notice program?

10:13:58    25   **A.**   So, we definitely wanted to be on those top social media

1    platforms, so advertisements appeared on Facebook, Instagram,

2    and Reddit.  We also had ads appear on *Stars and Stripes*.

3         The rest of the advertisements that we did online were

4    targeted specifically to the groups that we were interested,

5    which are veterans aged 25 to 54.  We also were able to reach

6    people who had ear issues, people who had previously -- had

7    search history that they looked for information around hearing

8    aids.  We were able to reach people who had previously visited

9    websites that veterans would be on, like VA.gov, USAA.com, and

10   NavyFederal.org.  And we were also able to reach veterans who

11   were members of specific veterans organizations, and that was

12   on Facebook and Reddit.

13   **Q.**   How many ads were delivered through the digital media

14   program?

15   **A.**   So we delivered over 13.1 million ads online.  Now that's a

16   gross number, so some people would have had the opportunity to

17   see that ad more than once.  I should note that this is an

18   updated number from my declaration.  My declaration was

19   executed on November 25th, 2023, and the online media campaign

20   ran until November 30th.  So, during those five days, we were

21   able to deliver an additional 1.2 million gross impressions.

22   **Q.**   And the ads that we're referring to, at least printed

23   copies of those ads, are identified in Exhibits 3 and 4 of your

24   declaration; is that right?

25   **A.**   That's correct.

10:15:44 1  **Q.**   And in addition to the information on those ads, what would

10:15:48 2  happen if you clicked on the ad?

10:15:50 3  **A.**   If someone clicked on the ad, they would go to the

10:15:54 4  settlement website hosted by Archer.

10:15:56 5  **Q.**   When did the digital media campaign take place as compared

10:16:02 6  to the direct notice that Mr. Deady testified about?

10:16:05 7  **A.**   So, as Mr. Deady testified, the initial email campaign

10:16:11 8  started on October 20th and 21st.  My calculations showed that

10:16:17 9  90 percent of eligible claimants were sent notice at that point

10:16:21 10  in time, and that's the number that looks at removing the

10:16:24 11  undeliverable ones.  And the media -- the online media campaign

10:16:30 12  started on November 6th and ran through November 30th.

10:16:33 13      The second batch of emails and mailings that Archer sent

10:16:39 14  out went out two weeks before our online media campaign ended

10:16:44 15  on November 30th.  So 100 percent of eligible claimants would

10:16:48 16  have received their direct notice during that media campaign.

10:16:53 17  **Q.**   What were the print and online ads intended to do?

10:16:58 18  **A.**   They were intended to bolster the direct notice campaign,

10:17:02 19  to provide people an additional opportunity to learn about the

10:17:06 20  fairness hearing.

10:17:06 21  **Q.**   Dr. Wheatman, based on your knowledge, training, and

10:17:13 22  experience, do you have an opinion as to whether the notice

10:17:16 23  provided to claimants was adequate and reasonable notice?

10:17:19 24  **A.**   Yes, in my opinion, it was reasonable, and it was more than

10:17:22 25  adequate because, you know, you reached between 89 to 96

10:17:27  1    percent of eligible claimants, but you've reached 100 percent

10:17:29  2    of eligible claimants that are impacted by the stock issuances.

10:17:34  3    You also had notices, in my opinion, that are in plain

10:17:37  4    language, and you went above and beyond in having a

10:17:40  5    supplemental media program when you did have such an effective

10:17:44  6    direct notice campaign.

10:17:46  7         **MR. ANDOLINA:**  I have no further questions, Your

10:17:46  8    Honor.

10:17:48  9         Do you have any questions for Dr. Wheatman?

10:17:51  10         **THE COURT:**  Dr. Wheatman, can you confirm that the

10:17:53  11    Court did have input into and actually approved the notices

10:17:56  12    that you used?

10:17:58  13         **DR. WHEATMAN:**  Yes, you did.

10:17:59  14         **THE COURT:**  That's my only question.

10:18:01  15         **MR. ANDOLINA:**  Thank you, Your Honor.

10:18:02  16         **THE COURT:**  Thank you, ma'am.  You may step down.

10:18:04  17         *(Witness excused.)*

10:18:05  18         **THE COURT:**  And I might want to get a copy of that

10:18:07  19    dissertation on comprehension of jury instructions.

10:18:11  20         **MR. ANDOLINA:**  We will provide that, Your Honor.

10:18:16  21         **THE COURT:**  Your next witness?  Mr. Seeger?

10:18:21  22         **MR. SEEGER:**  Your Honor, the parties are going to call

10:18:24  23    up Dr. Robert Jackson -- I'm sorry, Professor Robert Jackson.

10:18:30  24    I confused him with Dr. Wheatman.

10:18:36  25      **ROBERT JACKSON, WITNESS PRESENTED BY CLAIMANTS, DULY SWORN**

| 10:18:47 | 1 | **MADAM CLERK ROGERS:**  Thank you.  Please be seated. |

**MADAM CLERK ROGERS:**  Thank you.  Please be seated.

Please state your full name and spell your last name for the record.

**THE WITNESS:**  Robert Jackson, J-a-c-k-s-o-n.

**THE COURT:**  All right, Mr. Seeger, go ahead.

**MR. SEEGER:**  Your Honor, just to save a little bit of time, as you know, Professor Jackson prepared an affidavit that was submitted to Your Honor.  He has that in front of him.  If it's okay with you, rather than me hand it up, I just instructed him to bring it with him.

**THE COURT:**  Yes, that's fine.

**MR. SEEGER:**  Thank you, Your Honor.

**EXAMINATION OF ROBERT JACKSON**

BY MR. SEEGER:

Q.   Professor Jackson, what's your current job?

A.   I'm a professor at law at the NYU School of Law where I co-direct the Institute For Corporate Governance & Finance.

Q.   And prior to joining NYU School of Law, what were you doing?

A.   I was a commissioner on the U.S. Securities and Exchange Commission.

Q.   And what year did you join the Securities and Exchange Commission as a commissioner?

A.   I was confirmed in 2017 by the U.S. Senate and stepped down in February 2020.

10:19:49  1   **Q.**   And then before that, before you became a commissioner of

10:19:53  2   the SEC, what were you doing?

10:19:55  3   **A.**   I was a professor of law at the Columbia Law School.

10:19:59  4   **Q.**   Did you also serve, I believe, in the Department of

10:20:03  5   Treasury for some time?

10:20:04  6   **A.**   That's correct.  Before joining the Columbia Law School

10:20:09  7   faculty, I was an advisor in the Treasury Department during the

10:20:14  8   2008-2009 financial crisis.  Before that, I practiced law at

10:20:19  9   the New York law firm Wachtell, Lipton, Rosen & Katz.  And

10:20:20  10  before that, I was an investment banker at the firm Bear

10:20:24  11  Stearns.

10:20:24  12  **Q.**   Professor Jackson, just take a minute --

10:20:35  13          (Zoom interference.)

10:20:36  14          **THE COURT:**  Will you all please mute your phones.  I

10:20:39  15  really don't want to ask again.

10:20:43  16          Sorry about that, sir.  Go ahead.

10:20:46  17          **MR. SEEGER:**  Thank you, Your Honor.

10:20:48  18  BY MR. SEEGER:

10:20:48  19  **Q.**   Professor Jackson, could you tell us a little bit about the

10:20:51  20  role you played in the 2007-2008 financial crisis, just a

10:20:56  21  minute or two so the judge understands your background?

10:20:58  22  **A.**   Sure.  During that time, the Congress and government had to

10:21:01  23  decide what the conditions would be for financial institutions

10:21:05  24  who received financial support from the U.S. Government during

10:21:08  25  the financial crisis.  I was involved with helping to design

10:21:11   1   the corporate governance protections for taxpayers with respect

10:21:16   2   to the conditions that were necessary for the firms to follow

10:21:21   3   after they accepted federal financial support.

10:21:23   4   **Q.**   And would it be fair to say that those efforts were to

10:21:26   5   ensure the stability of the U.S. economy while we went through

10:21:28   6   the financial crisis?

10:21:30   7   **A.**   Yes, sir.  The protections we put in place were designed to

10:21:33   8   ensure that taxpayers were promptly repaid the money that they

10:21:37   9   provided those financial institutions and to ensure the

10:21:40   10   stability of the United States financial system.

10:21:41   11   **Q.**   Thank you.  As an academic, can you tell us a little bit

10:21:48   12   about areas that you have focused on, areas of research of

10:21:51   13   interest to you?

10:21:52   14   **A.**   Sure.  So my scholarship tends to be empirical scholarship

10:21:57   15   that focuses on evidence from financial markets about the

10:22:00   16   various dynamics that we see.  So, for example, things like

10:22:04   17   insider trading, investor protection.

10:22:08   18       My most recent set of studies focused on brokers who

10:22:11   19   mislead or otherwise harm their clients, and we study the law

10:22:15   20   that governs investors who would like to be compensated for

10:22:18   21   losses created by brokers who don't serve their interests.

10:22:21   22   **Q.**   Okay.  And then, Professor Jackson, while you were

10:22:24   23   commissioner of the SEC, can you give us some idea of what your

10:22:28   24   responsibilities were as a commissioner, things you focused on,

10:22:32   25   projects you dealt with?

10:22:32  1   **A.**    Sure.  The five SEC commissioners oversee the divisions of

10:22:38  2   the SEC from their Division of Enforcement which brings

10:22:41  3   lawsuits on behalf of the U.S. Government for securities fraud

10:22:44  4   and other violations of the security laws.  I also oversaw the

10:22:48  5   development of disclosure rules, the disclosure rules, for

10:22:52  6   example, that public companies have to follow when they provide

10:22:55  7   information to investors.  I oversaw the division that governs

10:22:58  8   the rules on stock trading, for example, on the New York Stock

10:23:02  9   Exchange, and other related departments at the SEC that oversee

10:23:05  10  the securities laws.

10:23:07  11  **Q.**    At some point you were contacted by initially plaintiffs'

10:23:12  12  leadership; is that correct?

10:23:13  13  **A.**    That's correct.

10:23:13  14  **Q.**    And do you recall approximately when?

10:23:15  15  **A.**    I believe it was early August 2023.

10:23:19  16  **Q.**    And generally speaking, what was the nature of what we

10:23:22  17  asked you to do?

10:23:24  18  **A.**    You asked me to consult with you about the possibility that

10:23:27  19  certain of the settlement arrangements in this matter might be

10:23:32  20  paid pursuant to securities that would not be registered and

10:23:36  21  would instead be issued pursuant to the exemption under Section

10:23:39  22  3(a)(10) of the 1933 Securities Act.

10:23:42  23  **Q.**    And just a housekeeping issue, if, for some reason, you

10:23:46  24  want to refer to your affidavit, would you just point the Court

10:23:48  25  and us to the page you're looking at, if you need to do that

10:23:51  1    going forward?

10:23:52  2    **A.**   Sure will.

10:23:53  3    **Q.**   Thank you.

10:23:55  4         And Professor Jackson, you understand the parties and 3M

10:23:57  5    have filed a motion asking the Court to approve 3M stock

10:24:01  6    issuance as part of the settlement agreement as exempt from

10:24:04  7    registration of the Section 3(a)(10) of the Security Act?  You

10:24:08  8    understand that, correct?

10:24:09  9    **A.**   Yes, sir, I do.

10:24:09  10   **Q.**   Did you provide us with -- and you did -- an affidavit

10:24:13  11   setting forth your opinions, which you have in front of you,

10:24:15  12   correct?

10:24:15  13   **A.**   That's right.

10:24:16  14   **Q.**   All right.  Before we go to your conclusions, could you

10:24:19  15   talk to us about what research, if any, or investigation you

10:24:23  16   did prior to submitting your affidavit?

10:24:25  17   **A.**   Sure.  And I described this at paragraph 5 of my

10:24:30  18   declaration on page 2.  I consider a range of sources about the

10:24:34  19   history of the Section 3(a)(10) exemption as it was originally

10:24:39  20   adopted, the SEC guidance that has been provided about the

10:24:43  21   meaning of that section since 1935.  And then, of course, I've

10:24:46  22   reviewed the documents in this case, including certain

10:24:49  23   securities filings of 3M, the settlement agreement that has

10:24:55  24   been described this morning, and the Court's orders in these

10:24:58  25   proceedings, including its case management orders.

10:25:03  1    **MR. SEEGER:**  And, Your Honor, just going forward, we

10:25:05  2    are offering the testimony of Professor Jackson as an expert on

10:25:08  3    securities regulations, so we'd like to offer him to the Court

10:25:11  4    in that context.

10:25:12  5            **THE COURT:**  He is so designated, and Ms. Wheatman as

10:25:17  6    well on notice.

10:25:18  7            **MR. SEEGER:**  Thank you, Your Honor.

10:25:20  8    **BY MR. SEEGER:**

10:25:20  9    **Q.**  Specifically, what did we ask you to analyze, if you could

10:25:23  10   tell us a little bit generally?

10:25:25  11   **A.**  Well, you asked, in light of my experience, for me to offer

10:25:28  12   some considerations that might be relevant to proceedings under

10:25:31  13   Section 3(a)(10), just like this one.  And I offered four

10:25:36  14   conclusions based on my review of the documents I've just

10:25:39  15   mentioned.

10:25:40  16   **Q.**  Would you go ahead at a high level and tell us what the

10:25:42  17   four conclusions were that you reached?

10:25:44  18   **A.**  Sure.  First, the history of this particular statute

10:25:47  19   Section 3(a)(10) and SEC and previous decisions describing how

10:25:53  20   these hearings should proceed and be designed can guide courts

10:25:58  21   facing these kinds of questions and the kind of motion before

10:26:00  22   the Court today.

10:26:03  23       These proceedings are understood or were understood by

10:26:05  24   Congress to serve as a substitute for the investor protections

10:26:09  25   that would ordinarily be provided by the SEC's disclosure

10:26:13  1    process, which will not be required for these securities.

10:26:18  2         Second, before exempt securities are issued in addition to

10:26:22  3    certain procedural prerequisites, Section 3(a)(10) requires a

10:26:27  4    reviewing court to conclude that the terms of the subject

10:26:31  5    exchange are fair and to approve the exchange.

10:26:34  6         Third, my declaration notes that the negotiation and

10:26:36  7    mediation process that produced the terms at issue here, the

10:26:40  8    extensive disclosures that are already applied to 3M stock and

10:26:44  9    the mechanisms that are going to govern the issuance and sale

10:26:47  10   of the securities to the QSF in this case are relevant to

10:26:52  11   determining whether the exchange is fair, and thus whether

10:26:56  12   unregistered securities may be issued and sold to the QSF and

10:27:00  13   sold as described in the MSA.

10:27:03  14        And then, finally, if the Court does choose to conclude

10:27:06  15   that the exchange contemplated by the MSA is fair and approves

10:27:09  16   issuances of 3M common stock in the exchange, then I think it's

10:27:12  17   clear that such shares of 3M common stock are exempt from

10:27:15  18   registration and may be resold without regard to the SEC's rule

10:27:20  19   144, so long as the QSF is not an affiliate of 3M.

10:27:25  20   Q.   And, Professor Jackson, what is your understanding of the

10:27:28  21   purpose of the 3(a)(10) exemption?

10:27:31  22   A.   So the 3(a)(10) exemption is designed to provide an

10:27:37  23   opportunity for claims -- and I should be clear -- the statute

10:27:40  24   says "bona fide claims or property interests" to be exchanged

10:27:45  25   for securities that will not be subject to the registration

10:27:49   1   requirements of the '33 Act.

10:27:53   2   **Q.**   To your knowledge, has the SEC published its views as far

10:27:57   3   as what's required to satisfy the 3(a)(10) exemption?

10:27:57   4   **A.**   Yes, they have.  Dating all the way back to 1935, the SEC

10:28:01   5   has published a series of documents on that subject.  The most

10:28:06   6   recent update is known as Staff Legal Bulletin 3A.

10:28:10   7   **Q.**   And have you reviewed these guidelines and publications?

10:28:14   8   **A.**   Yes, sir, I have.

10:28:14   9   **Q.**   Does that guidance provide circumstances when the SEC staff

10:28:19   10   will answer questions about the 3(a)(10) exemption?

10:28:23   11   **A.**   It does.  Like many SEC staff guidance documents, the staff

10:28:27   12   lay out when they're willing to consult with issuers and

10:28:32   13   counsel regarding questions raised by the document.

10:28:33   14   **Q.**   And did you yourself participate in consultation with SEC

10:28:36   15   staff?

10:28:37   16   **A.**   Yes, I did.

10:28:38   17   **Q.**   So, generally speaking, what does the exemption 3(a)(10)

10:28:44   18   require?

10:28:44   19   **A.**   What it requires is a substantive consideration of the

10:28:51   20   value of the settlement compared to the possible results of

10:28:54   21   litigation.  And there are a series of factors -- I described

10:28:59   22   them in my declaration -- that might guide a court engaging in

10:29:02   23   that substantive consideration.

10:29:03   24   **Q.**   If we could, let's go through the factors.  What factors

10:29:06   25   are assessed to evaluate the fairness of a Section 3(a)(10)

10:29:10　1　exemption?

10:29:11　2　**A.**　Sure.  So, in paragraph 28 of my declaration, I note that

10:29:19　3　courts have found relevant a series of factors, I characterize

10:29:23　4　them as three.  First, whether the record shows that the

10:29:26　5　proposed exchange was negotiated at arm's length; second,

10:29:33　6　whether those receiving securities have had the opportunity for

10:29:34　7　direct participation in the process of obtaining full

10:29:37　8　disclosure; and as noted earlier in the report that, third, the

10:29:40　9　available and reliable market value of the stock because it

10:29:44　10　takes into account asset value and other factors that might go

10:29:47　11　into the value of the consideration.

10:29:48　12　**Q.**　Okay.  And with regard to the first factor you mentioned,

10:29:51　13　whether it's an arm's length bargain, what does the record show

10:29:55　14　to you regarding that fact?

10:29:56　15　**A.**　Well, in this case, because of its extensive procedural

10:30:01　16　history, in particular before this Court, this is a case where

10:30:05　17　the history of arm's length bargain is deeper and greater than

10:30:09　18　any other 3(a)(10) case of which I am aware.  There is

10:30:13　19　extensive information about the value of the claims provided by

10:30:17　20　both sides.

10:30:17　21　　As the Court has observed in its orders, including

10:30:24　22　bellwether jury trials, those provide unparalleled insight into

10:30:28　23　the merits of the claims and provide a very unique context for

10:30:28　24　this case in which an exchange is being proposed under Section

10:30:35　25　3(a)(10).

| | | |
|---|---|---|
| 10:30:35 | 1 | **Q.**   And, in your mind, does that go to the amount of |
| 10:30:37 | 2 | information that's available to the parties and to the Court |
| 10:30:39 | 3 | with respect to the fairness of this exemption? |
| 10:30:41 | 4 | **A.**   Absolutely.  I think that's an extremely unusual and |
| 10:30:45 | 5 | important factor in this case.  And from the SEC's perspective, |
| 10:30:49 | 6 | as I say, although there had been many 3(a)(10) requests over |
| 10:30:52 | 7 | the years, I'm not aware of any where there was such |
| 10:30:56 | 8 | transparency and background, insight, as the Court I think |
| 10:31:00 | 9 | correctly put it, about the value of the claims. |
| 10:31:03 | 10 | **Q.**   And now move to the next factor, opportunity for obtaining |
| 10:31:07 | 11 | full disclosure.  What does the record demonstrate to you? |
| 10:31:10 | 12 | **A.**   Well, here, the courts in the SEC have explained that what |
| 10:31:14 | 13 | we want to be sure of is that there's enough transparency about |
| 10:31:18 | 14 | the securities that will be received so that those receiving it |
| 10:31:21 | 15 | can understand what they're getting. |
| 10:31:22 | 16 | And in this case, 3M is a widely-held publicly-traded |
| 10:31:26 | 17 | company, subject not only to the ongoing disclosure |
| 10:31:29 | 18 | requirements of the '34 Act and the SEC's oversight of it, but |
| 10:31:33 | 19 | also the New York Stock Exchange's rules which also provide for |
| 10:31:39 | 20 | some requirements with respect to transparency. |
| 10:31:43 | 21 | **Q.**   With regard to available and reliable market value, what |
| 10:31:49 | 22 | does the record show you? |
| 10:31:49 | 23 | **A.**   Well, here, again, 3M is a widely-held, traded company, and |
| 10:31:53 | 24 | that would give me comfort that the proposed recipients of the |
| 10:31:57 | 25 | stock here are going to get securities for which there is a |

10:32:00    1    ready and reliable market value.

10:32:02    2        There are many other 3(a)(10) cases involving securities

10:32:06    3    not like that.  But this is a case where there is a clear and

10:32:11    4    deep value -- market for the value of the stock.

10:32:16    5        Moreover, in this particular case, counsel and the Court

10:32:18    6    have come up with a series of mechanisms governing the issuance

10:32:23    7    and sale of the stock that give me even more comfort about the

10:32:26    8    reliable market value in this case.

10:32:28    9    Q.   And let me move on to that.  What about the structure of

10:32:32   10    the exchange, how does that weigh?  There's a concept in the

10:32:36   11    MSA with regard to valuing the stock called VWAP.  Can you

10:32:40   12    start by explaining what VWAP is and how does that play into

10:32:44   13    your analysis?

10:32:44   14    A.   Sure.  So I think there are three aspects of the design of

10:32:48   15    this settlement that are especially compelling with respect to

10:32:50   16    the available and reliable market value of 3M stock.  And the

10:32:55   17    first, as you say, sir, is the use of volume-weighted average

10:33:00   18    price, or VWAP, to determine the number of shares that will be

10:33:03   19    issued.

10:33:03   20        The MSA calls for the number of shares to be determined by

10:33:06   21    the value of the tranche -- the payment that is being made --

10:33:10   22    divided by the VWAP for the 10 days prior to and including the

10:33:15   23    date of issuance of the shares.

10:33:16   24        This approach, which is used in a number of contexts, gives

10:33:21   25    us comfort that the number of shares won't be determined on the

10:33:28   1   basis of an unrepresentative trade in price or day.  Instead,

10:33:32   2   the use of this average provides us some comfort that the

10:33:33   3   snapshot of value we're taking at that time is representative

10:33:37   4   of what the market understands the value of the shares to be.

10:33:40   5   **Q.**   And is it your understanding that the use of this average

10:33:42   6   will be used for even tranche of stock that gets delivered

10:33:46   7   under the MSA?

10:33:47   8   **A.**   Yes, sir.  And, as I mentioned in my declaration, this

10:33:49   9   approach is used widely in corporate transactions and even by

10:33:54   10  regulators to determine the value of publicly-traded

10:33:57   11  securities.

10:33:57   12  **Q.**   All right.  And then based on all of these considerations

10:34:00   13  we're discussing, what was your conclusion with respect to the

10:34:04   14  appropriateness of the 3(a)(10) exemption for the stocks to be

10:34:08   15  delivered by 3M?

10:34:08   16  **A.**   I should say just two more quick things --

10:34:11   17          **THE COURT:**  That's what I was going to ask, can I hear

10:34:13   18  the other two --

10:34:13   19          **MR. SEEGER:**  Oh, sorry, I didn't mean to cut you off.

10:34:14   20          **THE COURT:**  -- considerations that factor into your

10:34:17   21  opinion on the structure or design?

10:34:19   22          **PROFESSOR JACKSON:**  Yes, Your Honor, of course.

10:34:20   23          The second thing that gives me comfort in this case is

10:34:22   24  that the payments of -- or the issuance of shares, I should

10:34:25   25  say, will be done over time.  So this mitigates the risk that

10:34:29    1    the dilution caused by any significant single issuance will

10:34:36    2    depress the stock's price while the QSF is engaging in sales of

10:34:38    3    the securities.

10:34:40    4         And again, the SEC's guidance has said we should

10:34:45    5    really be focused on -- and my focus here has been on -- the

10:34:47    6    securities holders who are participating in the exchange.  And

10:34:50    7    here that's the QSF and the claimants in these matters.

10:34:54    8         And the fact that this is going to be done over time

10:34:56    9    in these separate tranches gives me real comfort that they will

10:35:01   10    be protected with respect to the risk that there will be

10:35:01   11    dilution of the stock all at once.

10:35:04   12         The last factor is the approach that the Court and the

10:35:07   13    parties have taken to overseeing the QSF and its investment

10:35:12   14    manager.  The documents in the case are very clear that the

10:35:15   15    investment manager must be independent, must, subject to court

10:35:19   16    oversight, must act only in the interest of the funds

10:35:23   17    beneficiaries, and is subject to a fiduciary standard of care

10:35:27   18    with respect to investment and reinvestment in the principal

10:35:31   19    income of the trust assets.  In addition, the investment

10:35:35   20    manager must report monthly to the Court on all

10:35:40   21    investment-related decisions.

10:35:40   22         These two give me comfort that the securities that

10:35:43   23    will be issued will benefit from a ready and available market

10:35:49   24    value when they are liquidated so that they can be used to pay

10:35:52   25    the claims at issue in this case.

10:35:55  1  **BY MR. SEEGER:**

10:35:56  2  **Q.**   Thank you.  Just to be really clear, would there be any

10:35:59  3  restriction on the QSF's ability to liquidate the stock based

10:36:03  4  on what you've seen?

10:36:04  5  **A.**   No.  And I think that's an important aspect of Section

10:36:07  6  3(a)(10).  Many cases in which securities are issued exempt

10:36:10  7  from registration -- so, for example, in what the SEC calls

10:36:14  8  regulation D offerings -- many cases there's a holding period.

10:36:20  9  And I might feel differently about these matters if there were

10:36:23  10  a holding period over which the QSF might have to take risks

10:36:25  11  with respect to the value of 3M stock.

10:36:26  12       But under Section 3(a)(10), the sales, if the Court chooses

10:36:31  13  to approve the exchange as fair and approve the issuance of the

10:36:35  14  shares, they are freely and immediately saleable in a way that

10:36:39  15  will allow the QSF to maximize their value for the claim

10:36:43  16  beneficiaries.

10:36:44  17  **Q.**   Would you explain -- well, let me ask you, are there --

10:36:49  18  just to be clear, there are no restrictions on the QSF as far

10:36:53  19  as reselling, correct?

10:36:54  20  **A.**   No, sir, so long as the QSF is not an affiliate of 3M for

10:36:59  21  these purposes.  I described the definition under SEC rules of

10:37:03  22  an affiliate requires some kind of control as between the

10:37:06  23  issuer and the entity that is claimed to be an affiliate.

10:37:09  24       I understand the Court to have been very clear in its

10:37:11  25  orders that the QSF itself and its investment manager are to be

10:37:15  1    independent, and that gives me confidence that they will not be

10:37:18  2    deemed to be affiliates, and therefore will be able freely to

10:37:21  3    sell the securities once -- if they are approved, if the

10:37:25  4    issuance is approved.

10:37:27  5            **THE COURT:**  Mr. Seeger, can I ask a question here real

10:37:29  6    quick?  I don't want to forget it, and it may be a little off

10:37:32  7    topic if we keep going.

10:37:34  8            Sir, what is the distinction -- I'm going to show my

10:37:40  9    ignorance here of SEC law or securities.  What is the

10:37:43  10   distinction between section D, the one-year holding period that

10:37:47  11   you just spoke about, and then Rule 144 six-month period?  I

10:37:52  12   don't know if that's called a holding period or not, but it

10:37:55  13   seems to sound like a holding period.

10:37:58  14           **PROFESSOR JACKSON:**  Sure is.  That's a very good

10:37:59  15   question, Your Honor.

10:38:00  16           **THE COURT:**  They're separate?

10:38:02  17           **PROFESSOR JACKSON:**  Yes, Your Honor.  Just to back up

10:38:04  18   a moment, in general the securities laws provide that

10:38:07  19   securities that are to be offered or sold in interstate

10:38:10  20   commerce must either be registered with the SEC or subject to

10:38:12  21   an exemption from registration.

10:38:15  22           There are a number of exemptions.  And the SEC's

10:38:18  23   regulation D, Rule 144 issued in connection with certain

10:38:23  24   resales just tells us the circumstances under which those kinds

10:38:27  25   of securities can be resold.

10:38:28   1          In my declaration, I point to two different holding

10:38:32   2   periods -- one a six-month holding period and one a year-long

10:38:37   3   holding period.  The six-month generally applies to ongoing

10:38:39   4   reporting issuers who are disclosing the way that 3M is here,

10:38:43   5   that are subject to the 10K annual report rules, et cetera.

10:38:47   6          **THE COURT:**  I understand now.

10:38:47   7          **PROFESSOR JACKSON:**  The one-year requirement applies

10:38:49   8   to those who don't provide that information.  And the theory

10:38:52   9   there is that, because there's more information out there, a

10:38:54   10  shorter holding period is appropriate.

10:38:58   11         **THE COURT:**  Makes sense.  Thank you very much.

10:39:00   12  **BY MR. SEEGER:**

10:39:01   13  **Q.**   I only had one or two last questions.

10:39:03   14         Professor Jackson, I just want to be clear.  With respect

10:39:06   15  to the delivery of the stock under MSA 1, have you reached

10:39:14   16  conclusions as to whether they are exempt under Section

10:39:18   17  3(a)(10) and the stock can be immediately resale able?

10:39:21   18  **A.**   If the Court approves the exchange as substantively fair

10:39:26   19  and approves the issuance of the securities, then, yes, I

10:39:30   20  understand that the SEC's view and my view would be that, under

10:39:32   21  the securities laws, they could be immediately resold without

10:39:36   22  regard to any of the requirements under Rule 144.

10:39:39   23  **Q.**   And do you hold these opinions to a reasonable degree of

10:39:42   24  certainty, including the opinions expressed in your affidavit?

10:39:44   25  **A.**   Yes, I do.

10:39:45   1          **MR. SEEGER:**   Judge, I don't have any further

10:39:46   2   questions.

10:39:47   3          **THE COURT:**   Thank you.

10:39:48   4          I have a question, Mr. Jackson.

10:39:51   5          The issue of notice is obviously a pertinent and

10:39:58   6   important issue in the fairness determination.   But the way I

10:40:03   7   read the legal materials that have been given to me is that the

10:40:07   8   notice must be given to those to whom securities will be issued

10:40:14   9   or to those who will be receiving the securities.

10:40:16   10          In this case, that's the QSF.   It's not directly the

10:40:23   11   claimants.   And we just heard a question from Mr. Seeger in

10:40:27   12   regards to the resale or the selling of the security.   That's

10:40:35   13   the QSF that will do that, if I make this determination of

10:40:40   14   fairness, it's not the claimant who will be -- they will not be

10:40:45   15   issued securities so they will not be selling those securities.

10:40:49   16          I think it's a good thing and a best practice that the

10:40:57   17   parties have done what they've done to ensure that tens of

10:41:02   18   thousands, hundreds of thousands of claimants have received

10:41:05   19   notice about this hearing and have been given an opportunity to

10:41:08   20   appear and be heard.   Ultimately they will be receiving -- the

10:41:13   21   ones who received notice will be receiving proceeds of the sale

10:41:18   22   of security.

10:41:18   23          But where is it in the law that tells me that the

10:41:20   24   notice to the claimants themselves is legally required?

10:41:26   25          **PROFESSOR JACKSON:**   Well, Judge, it's an important

10:41:28  1   question because what you're, I think, pushing on, quite

10:41:33  2   rightly, is who are the recipients of the securities that are

10:41:37  3   going to be issued in this case.

10:41:39  4        And one could take the view, and I think the Court is

10:41:41  5   quite right to say, that here it would be the QSF.  And I'm

10:41:46  6   given some comfort by that fact because you can imagine a

10:41:51  7   different case, Judge, where the securities would be issued to

10:41:53  8   individual claimants who might have to take the risk of the

10:41:57  9   securities on their own.  And, Judge, I would take a different

10:42:00  10  view of that.  Whereas here you have a QSF with an independent

10:42:06  11  investment manager required to report to you who knows more

10:42:09  12  about the case than, with all respect to counsel, I think

10:42:13  13  anybody, and will be able to oversee that process.  So that

10:42:16  14  gives me a great deal of comfort.

10:42:18  15       But your question is where in the statute does it say

10:42:21  16  that the recipient must have an opportunity to, for example, to

10:42:25  17  appear at a hearing.

10:42:26  18       **THE COURT:**  Yeah, the recipient of the funds.  I mean,

10:42:29  19  even the bulletin does not refer to that.

10:42:32  20       **PROFESSOR JACKSON:**  I agree, I agree, Judge.  What I

10:42:35  21  would say is, here the parties have gone to such length to

10:42:38  22  provide notice to all the claimants for all kinds of good

10:42:41  23  reasons.

10:42:41  24       **THE COURT:**  And this is not criticism.  I'm just

10:42:45  25  asking as far as the law is concerned, what your opinion is,

10:42:48  1    being the expert that you are.

10:42:50  2             **PROFESSOR JACKSON:**  Well, thanks, thank you, Judge.

10:42:52  3    My own view is that the good news here is that the Court need

10:42:55  4    not determine whether it's the QSF or the individuals who are

10:42:59  5    the recipients because so much notice has been provided.  But I

10:43:03  6    am given a lot of comfort by the fact that it is the QSF

10:43:06  7    because for all the reasons that Your Honor has mentioned.

10:43:08  8             **THE COURT:**  All right, thank you.

10:43:09  9             Mr. Seeger, any follow-up to my inquiry?

10:43:12  10            **MR. SEEGER:**  No.

10:43:13  11            **THE COURT:**  Any from 3M?

10:43:15  12            **MR. ANDOLINA:**  No.

10:43:16  13            **THE COURT:**  All right, sir, thank you very much, and

10:43:19  14   you may step down.

10:43:24  15            **PROFESSOR JACKSON:**  Thank you, Your Honor.

10:43:25  16            *(Witness excused.)*

10:43:25  17            **THE COURT:**  All right.  We'll hear argument from

10:43:38  18   Ms. Wright.

10:43:54  19            Go ahead, ma'am, when you're ready.

10:43:56  20            **MS. WRIGHT:**  Thank you, Your Honor.

10:43:59  21            Again, Joanna Wright from Jenner & Block.  I represent

10:44:01  22   3M, but I'm here today on behalf of both the parties.

10:44:03  23            Given the extensive testimony from two experts,

10:44:07  24   Mr. Deady, and the Court's intelligent questioning, I'm going

10:44:09  25   to try to keep this argument as short as possible.

10:44:12    1        As you know, as the Court is well aware, we are

10:44:15    2   jointly moving the Court today for a fairness determination

10:44:18    3   such that 3M may issue stock pursuant to reliance on the

10:44:22    4   exception under Section 3(a)(10).

10:44:25    5        Typically issuers must register stock, as Professor

10:44:32    6   Jackson just testified, unless they may rely on a valid

10:44:36    7   exemption, and here that exemption is Section 3(a)(10).

10:44:38    8        **THE COURT:**  Ms. Wright, could I stop you with an

10:44:40    9   apology?

10:44:40   10        **MS. WRIGHT:**  Yes.

10:44:40   11        **THE COURT:**  I wanted to place something into the

10:44:42   12   record before you started argument, and I neglected to do so.

10:44:42   13        **MS. WRIGHT:**  Certainly, Your Honor.

10:44:46   14        **THE COURT:**  I think it would be appropriate, for

10:44:48   15   purposes of the record, to also just reference the declarations

10:44:52   16   of Derek Brown from Orion Settlement Solutions, who is the

10:44:59   17   court-appointed investment manager, and the Court has received

10:45:02   18   his declaration and reviewed that as part of this hearing.  I

10:45:05   19   will consider it a part of this record.

10:45:07   20        Also, the declaration of Richard Sandulli, who is with

10:45:13   21   Metaurus.  And Metaurus -- he's the co-chief executive officer

10:45:19   22   and partner of Metaurus Advisors LLC, a firm that has been

10:45:23   23   retained by Orion or Derek Brown to advise Orion, the

10:45:30   24   court-appointed investment manager, on the hedging and timely

10:45:33   25   liquidation of any 3M common stock issued to the QSF if the

10:45:39   1   Court makes that fairness determination.

10:45:41   2             **MS. WRIGHT:**  Thank you for that, Your Honor.

10:45:45   3             **THE COURT:**  I apologize for the interruption.

10:45:47   4             **MS. WRIGHT:**  Not at all.  I've crossed it off my list,

10:45:50   5   so I appreciate it.

10:45:50   6             Just very briefly, Section 3(a)(10), the statute

10:45:54   7   itself, it exempts securities from being registered if they are

10:45:58   8   issued in exchange for one or more bona fide claims, as

10:46:05   9   Professor Jackson just testified, if the terms and conditions

10:46:07   10  of such issuance and exchange are approved by a court after

10:46:09   11  hearing upon the fairness of such terms and conditions, at

10:46:13   12  which all persons to whom is it proposed to issue securities

10:46:14   13  shall have a right to appeal.

10:46:16   14            So I want to just anchor, less for the Court but more

10:46:21   15  perhaps for the Zoom attendees, why it is again that we are

10:46:24   16  here.

10:46:24   17            Under the MSA, 3M has committed to distributing into

10:46:30   18  the QSF up to $3.5 billion if and when the plaintiffs hit 98

10:46:37   19  percent, meaning 98 percent of those claimants have elected to

10:46:40   20  participate in the settlement.

10:46:41   21            We heard from Mr. Aylstock this morning about the

10:46:45   22  momentum that is continuing on to carry them to 98 percent.

10:46:48   23            Upon satisfaction of 98 percent, 3M may elect to

10:46:52   24  satisfy that three-and-a-half billion with one billion in

10:46:56   25  common stock.  Professor Jackson just testified to the manner

10:47:01  1    in which that stock would be issued to the QSF through four

10:47:02  2    tranches four specific separate dates.  And the Court this

10:47:07  3    morning identified that the four tranches are $350 million,

10:47:11  4    $250 million, $250 million, and $150 million.

10:47:15  5           Professor Jackson has testified to the VWAP or the

10:47:18  6    volume-weighted average price of the stock that will be used

10:47:22  7    for each tranche over the ten-day period prior to the date of

10:47:27  8    that tranche's issuance.  He testified that the VWAP reflects,

10:47:31  9    quote, "a snapshot of the value of the market value of those

10:47:34  10   each individual tranches, and it diminishes the risk of

10:47:39  11   dilution."

10:47:39  12          The case law also cited both to the Court in our joint

10:47:43  13   memo as well as in Professor Jackson's declaration adopts and

10:47:47  14   incorporates this mechanism for determining individual amounts

10:47:50  15   of shares on issuance.

10:47:52  16          **THE COURT:**  Do you expect that -- well, let me back

10:47:57  17   up.  Mr. Andolina referenced in his opening statements

10:48:02  18   following Mr. Aylstock about the settlement program and the

10:48:07  19   thus far success of the program that 3M was expecting to

10:48:13  20   hopefully, after reviewing all the releases, to make that

10:48:18  21   payment provided for in the QSF.  I think it was December 1st,

10:48:23  22   but that's been pushed off because of the requirement of the

10:48:27  23   number of releases.

10:48:30  24          By the end of the year, though, I think is what I

10:48:33  25   heard you say, Mr. Andolina.

10:48:34  1          Is that anticipated to be a stock transfer?

10:48:38  2          **MS. WRIGHT:**  No, Your Honor.  The first tranche of

10:48:40  3   stock is that $350 million value stock tranche that would be

10:48:46  4   issued upon plaintiffs hitting 98 percent.

10:48:48  5          **THE COURT:**  Only until the 98 percent --

10:48:52  6          **MS. WRIGHT:**  That's correct.

10:48:52  7          **THE COURT:**  So this is a separate fund of money that

10:48:58  8   will be issued in December, hopefully, it's not a stock

10:49:05  9   transaction.

10:49:07  10         **MS. WRIGHT:**  That's correct.  I think the Court is

10:49:10  11  speaking about Section 11.1 upon satisfaction of 30,000

10:49:11  12  releases, and that will be only cash payment.

10:49:13  13         **THE COURT:**  Thank you for that clarification.

10:49:17  14         **MS. WRIGHT:**  Of course.

10:49:18  15         One additional clarification that I just want to make

10:49:20  16  very clear, to the extent the Court hasn't already, and I think

10:49:22  17  her questioning to Professor Jackson did so:  No individual

10:49:26  18  claimant will be receiving stock.

10:49:28  19         Individual claimants who will be releasing their

10:49:31  20  litigation claims in this MDL will receive solely cash in

10:49:35  21  exchange for that release, cash compensation only.  So I want

10:49:38  22  to make sure that everyone is on the same page with respect to

10:49:41  23  that.

10:49:41  24         Now, the Court identified the two declarations for

10:49:45  25  Mr. Sandulli and Mr. Brown, and I want to get to those.  But

10:49:50   1    before I do -- and I want to discuss them in connection with

10:49:53   2    explaining why and how individual claimants will only receive

10:49:56   3    cash.  But before I do, I want to, if possible, just follow-up

10:50:00   4    directly on the Court's inquiry with Professor Jackson.

10:50:04   5          While it is true that the QSF is the only entity that

10:50:10   6    will, in fact, hold the stock, it is holding it in trust for

10:50:12   7    the individual claimants.  And as Professor Jackson testified,

10:50:17   8    we conferred multiple times with the SEC about this

10:50:20   9    transaction, and they asked some of the same questions the

10:50:22   10   Court asked.

10:50:22   11         And because the QSF is acting in trust, pursuant to

10:50:27   12   Mr. Sandulli and Mr. Brown, as well as the court-appointed QSF

10:50:32   13   co-administrators, while the individual plaintiffs will receive

10:50:35   14   cash proceeds of the stock, I think it was in an abundance of

10:50:39   15   respect for the statute that the notice was, in fact, delivered

10:50:42   16   to those individual claimants who will be receiving the

10:50:45   17   proceeds of the stock.

10:50:47   18         **THE COURT:**  I understand that.  My question and

10:50:49   19   inquiry with Mr. Jackson was in regards to the statute or even

10:50:54   20   the bulletin as to whether that distinction was noted, and

10:51:02   21   according to his testimony and my review, it is not.  But I

10:51:07   22   understand.  And again, this was not criticism.  I'm just

10:51:10   23   trying to determine exactly what the law requires.

10:51:14   24         **MS. WRIGHT:**  And thank you, Your Honor, for that.

10:51:16   25         And turning to the mechanics very quickly, Orion has

10:51:22   1   been appointed by this Court as the investment manager for the

10:51:25   2   QSF, and it submitted its declaration that it views its goal

10:51:29   3   and its responsibility as investing the principal and income of

10:51:32   4   the assets held in the QSF to, quote, "preserve maximum value."

10:51:36   5       In order to ensure that it can preserve maximum value

10:51:40   6   with respect to the stock, it, as the Court is aware, retained

10:51:44   7   Metaurus Advisors LLC, who are investment banking advisors, and

10:51:48   8   Mr. Sandulli also submitted a declaration that he views his

10:51:53   9   role as the principal of Metaurus to advise and assist in the

10:51:58   10  liquidation of the stock to, again, preserve maximum value.

10:52:09   11      So, again, Orion testified that it is its intent to

10:52:15   12  liquidate any and all of 3M common stock issued to the QSF

10:52:17   13  under the MSA to ensure that the QSF's beneficiaries -- here,

10:52:23   14  the individual veterans, the claimants -- will receive the

10:52:25   15  consideration to which they may be entitled in the form of cash

10:52:27   16  only.

10:52:27   17      So the Court is well familiar with the guidance.  The

10:52:33   18  statute here is a little bit skinny, so I would like to use the

10:52:36   19  guidance in the argument to demonstrate why we have established

10:52:39   20  all of the elements and the factors under the statute.

10:52:43   21      Again, the cases we cited including *Oceana* make clear

10:52:48   22  that courts are well within their discretion and prudence to

10:52:51   23  rely on the guidance even though it is not binding.

10:52:54   24      So I'm going to turn now to the guidance that

10:52:58   25  Professor Jackson testified about and march through as quickly

10:52:58  1    as possible the elements.

10:53:02  2            So the first element is that a court must approve the

10:53:04  3    fairness of the terms and conditions.

10:53:05  4            The SEC does not need to be named as a party, nor does

10:53:09  5    it need to participate.  We know that from both the guidance

10:53:12  6    and, again, the case law, the *Oceana* case says that the

10:53:17  7    3(a)(10) exemption falls entirely within the purview of the

10:53:19  8    long-established court system, here in this case the MDL court.

10:53:23  9            Again, in conferring with the SEC, the SEC provided

10:53:27  10   feedback that it was its expectation that the MDL court would

10:53:31  11   hold this hearing in conjunction with Judge Miller but that the

10:53:34  12   MDL court -- that's Your Honor obviously -- would issue the

10:53:39  13   fairness determination and that that determination would reach

10:53:42  14   the claimants in this MDL.

10:53:43  15           So we have clearly established and satisfaction the

10:53:47  16   first factor.

10:53:47  17           The second is that the Court must be advised of the

10:53:51  18   fairness hearing before the hearing itself and of 3M's intent

10:53:54  19   to rely on 3(a)(10).  I think the Court acknowledged that

10:53:58  20   finding in its opening comments, so I won't march through those

10:54:03  21   opening factors, but they're in our memo.

10:54:06  22           Third, the securities must be exchanged for claims and

10:54:10  23   cannot be offered for cash.  The element here is looking at

10:54:13  24   what the individual claimant is offering in exchange for the

10:54:15  25   securities.  Here, it is litigation claims, it is the Combat

10:54:20  1    Arms claims that they are releasing.  They are bona fide

10:54:24  2    outstanding claims, and they are being exchanged for the

10:54:26  3    securities which will be liquidated and then provided cash to

10:54:29  4    them.  So that element is satisfied.

10:54:31  5        Fourth -- and this was the heart of Professor

10:54:36  6    Jackson's testimony -- the Court must find that the terms and

10:54:40  7    conditions of the exchange are fair.  The guidance kind of owns

10:54:43  8    and the case law owns that the statute never enumerates what

10:54:46  9    the Court should consider when evaluating fairness, and the

10:54:49  10   case law is clear that it is within the Court's discretion to

10:54:54  11   cobble together the fairness indicators as it sees fit.

10:54:58  12       Having said that, the guidance, especially in the

10:55:00  13   later guidance has come behind and said in a footnote that,

10:55:02  14   from the SEC's staff perspective, the fairness evaluation is

10:55:04  15   that the exchange is both substantively fair and procedurally

10:55:08  16   fair.

10:55:09  17       The guidance further says that, for the Court to

10:55:11  18   properly evaluate if the exchange is substantively fair, the

10:55:16  19   Court must be in a position to know and understand the value of

10:55:19  20   the claims being released as well as the value of the stock

10:55:23  21   being issued for that exchange.

10:55:24  22       I don't want to belabor the point.  The Court itself

10:55:29  23   said at the implementation hearing, no one is in a better

10:55:33  24   position than this Court to know the value of the Combat Arms

10:55:35  25   claims.  This Court has seen case-specific discovery in

10:55:39  1   handling of motion practice for nearly 400 of these Combat Arms

10:55:44  2   cases, culminating in rulings on more than 260 motions in

10:55:48  3   limine, 109 *Daubert* challenges, 47 choice of law disputes, 42

10:55:54  4   case-specific summary judgment motions, 21 post-trial motions,

10:55:58  5   and countless additional discovery.

10:56:00  6            **THE COURT:**  It seemed like there was so much more.

10:56:03  7            **MS. WRIGHT:**  I'm sure there was, Your Honor.

10:56:06  8            Moreover, this Court has appointed a settlement

10:56:08  9   allocation master and an extraordinary injury special master

10:56:13  10  that Mr. Aylstock spoke about this morning.  They have created

10:56:17  11  extensive documentation and processes for evaluating each

10:56:20  12  individual eligible claimant's claim and the value of that

10:56:23  13  claim.

10:56:23  14           As Professor Jackson opined both in his declaration

10:56:28  15  and again today, he has never seen a case where the Court and

10:56:31  16  the counsel negotiating a settlement were in such a deep and

10:56:34  17  rich position to know the value of the claims, as discovery

10:56:39  18  here has been extensive.

10:56:40  19           Second, the Court must be in a position to evaluate

10:56:43  20  the actual value of the 3M common stock that will be issued in

10:56:48  21  exchange for those claims.  Here, again, Professor Jackson

10:56:51  22  testified 3M is a public company and, as such, is subject to

10:56:57  23  rigorous securities laws which require it to make certain

10:57:00  24  public disclosures on a regular and annual basis.  It is also

10:57:04  25  subject to the New York Stock Exchange rules which require that

10:57:07  1    it make certain disclosures if any material event occurs.

10:57:09  2          All of those filings and disclosures are publicly

10:57:12  3    available to anyone who may inquire about them, and they occur

10:57:17  4    on a regular basis.

10:57:20  5          So, finally, as Professor Jackson testified, 3M's

10:57:24  6    status is a widely-held publicly-traded company provides

10:57:28  7    comfort that the proposed recipients of 3M common stock will

10:57:33  8    receive securities for which there is a readily available and

10:57:36  9    reliable market value, and that readily available and reliable

10:57:40  10   market value is publicly available to anyone who chooses to

10:57:42  11   inquire.

10:57:43  12         I want to now turn to procedural fairness, but thanks

10:57:47  13   to Judge Herndon, I could possibly simply yield the floor to

10:57:51  14   Judge Herndon who this morning found that the negotiations were

10:57:54  15   conducted at an arm's length, having observed them in their

10:57:59  16   entirety.

10:58:00  17         Courts in the Eleventh Circuit here do come behind the

10:58:02  18   statute and identify five factors that they use to determine

10:58:06  19   whether the negotiations that reached the ultimate decision to

10:58:08  20   exchange the stock for the money occurred at an arm's length

10:58:12  21   and was procedurally fair.

10:58:13  22         I will run through those five factors very quickly and

10:58:17  23   explain why we have ticked them all off.  But at a high level,

10:58:21  24   those five factors are the recommendations of counsel, the

10:58:24  25   scope of discovery, apparent alternatives to the settlement,

10:58:28  1   the nature and volume of responses from those receiving the

10:58:31  2   notice of the hearing, and the opportunity for direct

10:58:34  3   participation by those who would receive the securities.

10:58:37  4          Again, Professor Jackson testified to the procedural

10:58:40  5   fairness of this exchange stating, I believe, separately on

10:58:42  6   this point, that he's never seen a case that proceeded in such

10:58:48  7   a deep and rigorous manner in which there was full transparency

10:58:52  8   to the parties.

10:58:53  9          Finally, before I march through the factors, the case

10:58:57  10  law is clear that the factors are not disjunctive nor must all

10:59:01  11  five be satisfied.  They are factors for the Court to consider

10:59:03  12  and to weigh in making its evaluation of whether procedural

10:59:07  13  fairness has been met.  Many of the cases go on to find

10:59:11  14  procedural fairness even if one, two, or three of the factors

10:59:15  15  weigh against it.  So it's a comprehensive evaluation that the

10:59:19  16  Court should make in its judgment.

10:59:21  17          The first factor, counsel recommendation.  Here, as

10:59:25  18  the Court well knows, the NPC and 3M vigorously negotiated this

10:59:27  19  and recommended the settlement.  In addition, every individual

10:59:31  20  claimant who elects to participate in the settlement will have

10:59:34  21  done so after the recommendation of their individual counsel.

10:59:37  22          On the scope of discovery, which is the second factor,

10:59:40  23  again, there is so much more than I even ticked off, but

10:59:44  24  discovery has been more extensive here than in perhaps any

10:59:48  25  other case in which there has been a 3(a)(10) hearing.

10:59:51  1        To put it succinctly, as this Court explained in

10:59:55  2   CMO 57, this is a mature tort.

10:59:57  3        With respect to settlement alternatives, again, this

11:00:02  4   has been extensively litigated, discovery has proceeded at a

11:00:08  5   scope truly incredible.  And even if that were not the case,

11:00:12  6   the case law under 3(a)(10) makes clear that it is assumed that

11:00:15  7   settlement is preferred to litigation to spare the burden of

11:00:19  8   the court system and to ensure a resolution in which both

11:00:22  9   parties come out satisfied.  That could not be any more the

11:00:26  10  case than it is here, especially where the cost of litigation

11:00:30  11  could exceed the value of an individual claimant here.

11:00:33  12       With respect to the nature and volume of responses,

11:00:36  13  the Court heard Mr. Deady testify about the direct notice

11:00:38  14  program that the parties implemented and executed and

11:00:42  15  Dr. Wheatman's testimony about that program.  Over 260,000

11:00:46  16  notices of the fairness hearing were successfully delivered to

11:00:50  17  eligible claimants.

11:00:51  18       The Court this morning ticked off the responses that

11:00:54  19  were received by either the Court by filing a notice of intent

11:00:58  20  or that were received by Archer.  I think in total they were

11:01:01  21  less than 10.  After consultation with their counsel, however,

11:01:07  22  many of them, as the Court explained, decided that their

11:01:11  23  questions had been answered or their confusion dispelled and

11:01:15  24  ultimately decided not to appear at the hearing.

11:01:17  25       I do want to say, though, and the case law is clear on

Argument by Joanna Wright                                    82

| 11:01:20 | 1 | this, even if all ten had decided to appear and be heard, this |

11:01:20    1    this, even if all ten had decided to appear and be heard, this

11:01:25    2    factor, 10 over 260,000, would still weigh overwhelmingly in

11:01:31    3    the parties' favor in benefit of a fairness finding.

11:01:32    4         The opportunity for direct participation dovetails

11:01:37    5    closely off the nature and volume of responses.  Here, because

11:01:41    6    the population who will be receiving proceeds of the stock is

11:01:43    7    limited to claimants who received direct notice, they all had

11:01:46    8    an opportunity for direct participation, which Dr. Wheatman

11:01:50    9    testified is unheard of.  In a noticing program, it's usually

11:01:54   10    70 to 90 percent.

11:01:57   11         In addition, as the Court explained this morning, the

11:01:59   12    Court provided not only the opportunity to claimants and the

11:02:01   13    general public to appear here and be heard today, but also

11:02:06   14    appear by Zoom and by phone.  There can be no question that

11:02:09   15    there has been an opportunity for direct participation, and

11:02:11   16    we've seen on the docket that people have engaged in it in

11:02:14   17    varying levels.

11:02:15   18         Fifth, the Court must hold a hearing to approve the

11:02:20   19    transaction.  I think we can check that off.

11:02:22   20         Sixth, the fairness hearing must be open to everyone

11:02:26   21    to whom the securities would be issued.  Again, this dovetails

11:02:28   22    off the procedural fairness factors.

11:02:30   23         And I should have said -- I apologize, Your Honor --

11:02:31   24    I'm moving beyond now the procedural fairness factors into the

11:02:33   25    rest of the guidance factors.

11:02:35    1        Seventh, under the guidance, adequate notice must be

11:02:42    2    given to all persons.  Here, again, you see the case law and

11:02:45    3    noticing experts cobbling together what they believe that to

11:02:48    4    mean, as both the guidance and the case law is slim on its own

11:02:53    5    guidance with respect to what adequate notice is.

11:02:57    6        Dr. Wheatman testified that, in her 19 years in this

11:03:00    7    industry, 70 to 95 percent outreach of claimants, both direct

11:03:04    8    and supplemental, not necessarily 70 to 95 percent direct only,

11:03:10    9    is far adequate.  She also testified to the adequacy of the

11:03:15    10   content of the notice that this Court, of course, approved

11:03:19    11   every piece of it, including the actual notice as well as the

11:03:22    12   media notices.

11:03:25    13       So here, over -- between 89 and 96 percent of eligible

11:03:30    14   claimants in this MDL, depending on how you calculate it,

11:03:34    15   received direct notice.  So we are at the high end, even if you

11:03:37    16   take 89, of a typical noticing process.

11:03:40    17       And again, it's the gold-plated standard because here

11:03:44    18   that is direct notice, that is not direct notice and

11:03:46    19   supplemental notice.  Were we to fold in claimants who received

11:03:50    20   notice through the supplemental media program, that percentage

11:03:53    21   would only increase.

11:03:55    22       Eighth, there can be no improper impediments to the

11:04:01    23   appearance of anyone who may be receiving proceeds from the

11:04:04    24   stock at this hearing.  Again, we have satisfied that.  The

11:04:07    25   guidance is very clear that a notice of intent to appear, which

11:04:12    1    allows the Court to hold an orderly hearing, is accepted and

11:04:15    2    approved, and no other -- there were no impediments that could

11:04:19    3    be understood or identified in appearance of this hearing.

11:04:22    4    Indeed, as I said earlier, the Court made the hearing open to

11:04:26    5    the public, open by Zoom and open by phone.

11:04:29    6         So that is the guidance in the SEC -- those are the

11:04:35    7    elements in the SEC guidance that we believe the parties have

11:04:37    8    satisfied in spades.

11:04:39    9         I want to step back and just a little bit reflect upon

11:04:43   10    the further feedback that the parties received from the SEC in

11:04:46   11    their consultation with the SEC that Professor Jackson

11:04:49   12    testified about.

11:04:50   13         The SEC sought assurance that no more than one-third

11:04:54   14    of the proceeds of the stock would be used for attorneys' fees,

11:04:58   15    consistent with a footnote in their guidance that limits the

11:05:01   16    use of proceeds from the stock or stock itself to one-third of

11:05:07   17    the total amount.

11:05:09   18         Second, the staff requested that the only individuals

11:05:14   19    who received proceeds from the stock be individuals who receive

11:05:18   20    direct notice, again, increasing the standard beyond perhaps

11:05:23   21    the typical notice program.

11:05:25   22         Here, as Mr. Deady testified, Archer has and will

11:05:29   23    maintain both a list of the claimants in the MDL who received

11:05:33   24    direct notice as well as a list of the claimants in the MDL who

11:05:36   25    did not receive direct notice.

| | | |
|---|---|---|
| 11:05:38 | 1 | So the QSF code administrators could use either list |
| 11:05:44 | 2 | to ensure both that only eligible claimants who received direct |
| 11:05:48 | 3 | notice would be issued proceeds from the stock and also that |
| 11:05:48 | 4 | their attorneys would receive no more than one-third of the |
| 11:05:53 | 5 | proceeds. |
| 11:05:53 | 6 | As we stated in our memo, this Court has jurisdiction, |
| 11:05:56 | 7 | of course, over the QSF, and we would respectfully request that |
| 11:05:59 | 8 | any fairness determination include those two constraints such |
| 11:06:03 | 9 | that the distribution of funds from the stock issuance would |
| 11:06:07 | 10 | comply with the SEC feedback. |
| 11:06:10 | 11 | Finally, we would respectfully submit that we have |
| 11:06:15 | 12 | satisfied all of the factors under the guidance, the case law, |
| 11:06:19 | 13 | and the statute 3(a)(10), and therefore, respectfully request a |
| 11:06:23 | 14 | finding that the exchange is fair, that 3M may issue the stock |
| 11:06:28 | 15 | in reliance on Section 3(a)(10) and that, as Professor Jackson |
| 11:06:32 | 16 | testified, it can be immediately sold without a holding period. |
| 11:06:37 | 17 | **THE COURT:**  All right.  Thank you, Ms. Wright. |
| 11:06:39 | 18 | Let me inquire of Judge Miller has any questions for |
| 11:06:42 | 19 | you. |
| 11:06:42 | 20 | And, Judge Miller, if you had any questions of the |
| 11:06:45 | 21 | witnesses, they're still here, all three are still in the |
| 11:06:48 | 22 | courtroom.  So, if you have a question that was not addressed, |
| 11:06:52 | 23 | I'm happy to call one or more of them back to the stand. |
| 11:06:57 | 24 | **JUDGE MILLER:**  The only question that occurred to |
| 11:06:59 | 25 | me -- we have lots of evidence that notice was given to all of |

11:07:04   1   the MDL claimants.  Was notice provided to all of the Minnesota
11:07:08   2   claimants as well?
11:07:11   3           MS. WRIGHT:  It was not, Your Honor, and that was
11:07:13   4   intentional by design based on the feedback of the SEC.  We did
11:07:17   5   not want to confuse an individual claimant with respect to
11:07:21   6   whether they would be receiving proceeds of the stock.  And
11:07:25   7   here, where we had already determined that we would be seeking,
11:07:28   8   with this Court's approval, a fairness finding that the
11:07:31   9   proceeds of the stock were limited to claimants in the MDL who
11:07:34  10   had received direct notice.  We designed the notice program to
11:07:40  11   reach only that population to avoid any potential confusion
11:07:44  12   with the Minnesota claimants.
11:07:46  13           And I would say we have some precedent for this -- we
11:07:51  14   have an embarrassment of riches with two courts appearing at
11:07:57  15   this hearing, and there's some precedent for that in the *Trade*
11:07:57  16   *Partners* case which we cite, which interestingly is the other
11:08:01  17   MDL case in which a fairness hearing was held.
11:08:05  18           JUDGE MILLER:  Thank you.  I thought that was the
11:08:07  19   case, but I thought we should confirm it so, if there are any
11:08:10  20   Minnesota claimants who are listening in among the Zoom or
11:08:14  21   audio participants, that they were aware of that aspect of this
11:08:17  22   particular portion of the settlement.
11:08:21  23           MS. WRIGHT:  Thank you for that clarification.
11:08:23  24           THE COURT:  Their settlement proceeds would be cash
11:08:25  25   only?

11:08:26  1      **MS. WRIGHT:**  That's correct, Your Honor.

11:08:29  2      **JUDGE MILLER:**  Just to follow-up on that, my

11:08:31  3  understanding is that there have been assurances provided that

11:08:34  4  there will be adequate cash settlement proceeds to respond to

11:08:37  5  all of the Minnesota claimants' claims without need for

11:08:40  6  additional funding to come from the stock portion?

11:08:46  7      **MS. WRIGHT:**  That's correct, Your Honor.  If 3M elects

11:08:48  8  to provide the $1 billion -- and, of course, it has four

11:08:53  9  tranches -- of consideration in the form of stock, there would

11:08:57  10  still be, if the parties reached 100 percent participation

11:09:02  11  level, $5 billion not in the form of stock.  And of course, the

11:09:07  12  numbers are such that that should well exceed the compensation

11:09:11  13  needed for the Minnesota claimants.

11:09:20  14      **THE COURT:**  Judge Miller, anything else?

11:09:22  15      **JUDGE MILLER:**  No.  That was my primary question, and

11:09:25  16  I appreciate the response.  Thank you.

11:09:30  17      **MS. WRIGHT:**  Thank you, Your Honor.

11:09:31  18      **THE COURT:**  Ms. Wright, I don't have any questions.  I

11:09:34  19  thank you very much for your oral presentation, very helpful,

11:09:38  20  organized, and I'm sure I'll be looking at it again when I

11:09:41  21  start drafting my order.

11:09:44  22      **MS. WRIGHT:**  Thank you, Your Honor.

11:09:45  23      **THE COURT:**  Thank you.

11:09:45  24      Let me pause for a moment and ask if there are any

11:09:52  25  claimants in the courtroom who submitted -- it was supposed to

| 11:09:59 | 1 | have been filed -- a notice of intent to appear and be heard at |
| 11:10:03 | 2 | this hearing? |
| 11:10:04 | 3 | Of course, the order required any claimant seeking to |
| 11:10:07 | 4 | be heard to be here in person.  And so I'll ask now if there is |
| 11:10:13 | 5 | anyone who would like to be heard? |
| 11:10:14 | 6 | Are you raising your hand, sir? |
| 11:10:19 | 7 | All right, sir, you'll -- sir, I know you have some |
| 11:10:28 | 8 | difficulty.  I really need you to come up here, though, to the |
| 11:10:32 | 9 | lectern where there's a microphone so you can be heard.  I |
| 11:10:38 | 10 | apologize.  This is just a large courtroom, and the acoustics |
| 11:10:41 | 11 | are not the best.  And so that everyone can hear you, including |
| 11:10:45 | 12 | those who are by Zoom and telephone, I have to ask you to come |
| 11:10:50 | 13 | forward.  Thank you. |
| 11:10:51 | 14 | **MR. NANCARROW:**  I'm Duane Nancarrow, retired Air Force |
| 11:10:58 | 15 | staff sergeant. |
| 11:10:58 | 16 | **THE COURT:**  Can you spell your last name, please? |
| 11:10:59 | 17 | **MR. NANCARROW:**  Nancarrow, N-a-n-c-a-r-r-o-w.  Sorry |
| 11:11:02 | 18 | for the speech impediment, but I have no hearing and no |
| 11:11:02 | 19 | balance. |
| 11:11:10 | 20 | **THE COURT:**  I understand, it's fine. |
| 11:11:10 | 21 | **MR. NANCARROW:**  In 2005 I was hurt in Afghanistan in |
| 11:11:15 | 22 | Bahram by an explosive ordinance that left me with impairment. |
| 11:11:21 | 23 | I have 100 percent hearing loss in my left ear, 80 percent |
| 11:11:26 | 24 | hearing loss in my right ear.  With it, I have no cochlea, no |
| 11:11:31 | 25 | eardrum in my left ear.  I have a cracked cochlea in my right. |

| | | |
|---|---|---|
| 11:11:35 | 1 | And my question is about the security exchange when |
| 11:11:40 | 2 | issuing the stocks.  I know 3M is now standing up to the plate |
| 11:11:43 | 3 | and taking responsibility.  But prior to this -- I filed this |
| 11:11:48 | 4 | case from the get-go -- is they threatened with bankruptcy |
| 11:11:54 | 5 | several times.  And I know you stopped it and Judge Miller |
| 11:11:57 | 6 | stopped it several times and kept them from filing for |
| 11:11:57 | 7 | bankruptcy. |
| 11:12:01 | 8 | What's going to stop them from filing bankruptcy a |
| 11:12:04 | 9 | year down the road and that stock is not worth anything? |
| 11:12:08 | 10 | **THE COURT:**  And that's your question?  Let me ask |
| 11:12:12 | 11 | also, before we respond to that question:  Did you file |
| 11:12:14 | 12 | something indicating you -- |
| 11:12:16 | 13 | **MR. NANCARROW:**  Yes.  My forms went to Archer, and it |
| 11:12:22 | 14 | was hard to get through because I had to go through my |
| 11:12:24 | 15 | financial accountant, Edward Jones, and we emailed it to them |
| 11:12:28 | 16 | several times and it came back rejected with the email, and |
| 11:12:31 | 17 | then I sent it to my phone and they sent it back.  And I have a |
| 11:12:35 | 18 | copy of it on my phone but it's locked up in the locker |
| 11:12:39 | 19 | downstairs. |
| 11:12:39 | 20 | **THE COURT:**  Okay.  And it's your understanding that |
| 11:12:42 | 21 | you have a pending case? |
| 11:12:45 | 22 | **MR. NANCARROW:**  Yes, I do have a pending case.  They |
| 11:12:47 | 23 | have me on file.  But when I talked to Archer, they refused to |
| 11:12:53 | 24 | talk to me.  They had some person with an Indian accent told me |
| 11:12:59 | 25 | they can't talk with me unless my lawyer is present. |

| | | |
|---|---|---|
| 11:12:59 | 1 | **THE COURT:**  Are you represented or do you represent |
| 11:13:00 | 2 | yourself? |
| 11:13:03 | 3 | **MR. NANCARROW:**  Yes, I'm represent by the Alexander |
| 11:13:08 | 4 | Shunnarah group, Tyler Vale, Caroline Cook, and Les Raybourn. |
| 11:13:12 | 5 | **THE COURT:**  And, sir, to your knowledge, is your case |
| 11:13:13 | 6 | filed in the MDL or in Minnesota state court? |
| 11:13:17 | 7 | **MR. NANCARROW:**  It's the MDL here in Florida in |
| 11:13:19 | 8 | through Alabama. |
| 11:13:22 | 9 | **THE COURT:**  All right.  Let me ask if -- I don't want |
| 11:13:26 | 10 | to speak for the parties, so if either or both parties or both |
| 11:13:31 | 11 | sides wish to address that question about a potential |
| 11:13:36 | 12 | subsequent bankruptcy by 3M. |
| 11:13:40 | 13 | **MR. AYLSTOCK:**  Yes, Your Honor. |
| 11:13:41 | 14 | And I want to thank you first for your service and |
| 11:13:43 | 15 | your attendance here today, sir. |
| 11:13:46 | 16 | That obviously was an issue with regard to the |
| 11:13:49 | 17 | negotiations.  We have received assurances that there is no |
| 11:13:54 | 18 | present intention by 3M to declare bankruptcy. |
| 11:13:59 | 19 | **MR. NANCARROW:**  By good faith. |
| 11:14:01 | 20 | **MR. AYLSTOCK:**  And we do take them at their word and |
| 11:14:04 | 21 | their good faith. |
| 11:14:04 | 22 | In addition, I would say that this portion of the |
| 11:14:06 | 23 | stock, which is the focus of this hearing, is a minority |
| 11:14:11 | 24 | portion.  It's still a billion dollars, but there's $5 billion |
| 11:14:16 | 25 | cash in addition to that. |

| | |
|---|---|
| 11:14:17 | 1 |

And what the reality is, if there's some circumstance that bankruptcy is in the cards, that would apply to the cash and the stock and everything else.  So it's not a situation where I know -- I won't speak for 3M -- I don't believe that they have that intent nor is that in their interest to go down that road.

I have personally seen the commitment of 3M's counsel toward the integrity and sanctity of the settlement.  We have received assurances of that first payment for the $30,000, and we're working very hard for the next payments to come forward and hold them to their commitment to the claimants, including you.

**MR. NANCARROW:**  What I've seen so far, most veterans have not --

**THE COURT:**  I'm going to stop you for just a minute and ask if 3M would like to also have a chance to respond to your initial question.

Ms. Wright?

**MS. WRIGHT:**  Thank you, Your Honor.

First, thank you again, sir, for your service.

I think what Mr. Aylstock was referring to is set forth in Section 16.1 of the MSA, and I do think those concerns that have been ably identified by you, sir, would be -- would impact both, as Mr. Aylstock said, a stock issuance, a cash disbursement, and/or a litigation claim as well.

| | |
|---|---|
| 11:15:50 | 1 |
| 11:15:55 | 2 |
| 11:15:58 | 3 |
| 11:16:03 | 4 |
| 11:16:07 | 5 |
| 11:16:13 | 6 |
| 11:16:16 | 7 |
| 11:16:19 | 8 |
| 11:16:22 | 9 |
| 11:16:23 | 10 |
| 11:16:27 | 11 |
| 11:16:31 | 12 |
| 11:16:34 | 13 |
| 11:16:37 | 14 |
| 11:16:41 | 15 |
| 11:16:45 | 16 |
| 11:16:48 | 17 |
| 11:16:52 | 18 |
| 11:16:57 | 19 |
| 11:16:59 | 20 |
| 11:17:03 | 21 |
| 11:17:05 | 22 |
| 11:17:09 | 23 |
| 11:17:14 | 24 |
| 11:17:17 | 25 |

Thank you, Your Honor.

**THE COURT:**  Sir, from my standpoint, from the MDL court's standpoint, I don't -- in spite of the history, I don't perceive of any indication, certainly not at this point, that 3M is in any way contemplating bankruptcy.  And in fact, 3M never filed bankruptcy.

**MR. NANCARROW:**  The media platforms with the news agencies is reporting a lot of it, and that's months, you know, years prior to this.  And I've followed this case from the get-go because I've been on board since day one.  But the reality is I've met a lot of other veterans who thought this was a farce, that this was not going to happen.

**THE COURT:**  Who thought what was a farce?

**MR. NANCARROW:**  This whole 3M stuff for the earplugs settlement, and they didn't bother even jumping on board.  I go to the VA a lot locally here in Pensacola, and I see a lot of them that just thinks it's -- they didn't believe it and, with that, they never made the -- I told them get on board, get to the deadlines, turn in your DD-214s, get all the information, and they just dragged their feet until the deadlines came.

And you're trying to reach that 100 percent, it's probably never going to make it because a lot of people -- I've met quite a few of them that didn't even bother to even submit, and they have 30 to 40 percent hearing loss.

**THE COURT:**  Let me clarify.  And I understand the

| | |
|---|---|
| 11:17:20 | 1 |
| 11:17:25 | 2 |
| 11:17:32 | 3 |
| 11:17:39 | 4 |
| 11:17:43 | 5 |
| 11:17:48 | 6 |
| 11:17:52 | 7 |
| 11:17:57 | 8 |
| 11:18:01 | 9 |
| 11:18:05 | 10 |
| 11:18:06 | 11 |
| 11:18:12 | 12 |
| 11:18:22 | 13 |
| 11:18:25 | 14 |
| 11:18:28 | 15 |
| 11:18:32 | 16 |
| 11:18:32 | 17 |
| 11:18:35 | 18 |
| 11:18:36 | 19 |
| 11:18:39 | 20 |
| 11:18:43 | 21 |
| 11:18:54 | 22 |
| 11:18:55 | 23 |
| 11:18:55 | 24 |
| 11:19:02 | 25 |

reason for your question and your concern given your question.
But it is not 100 percent of the veterans who are injured or 98
percent of the veterans who may have an injury.  It is only
cases that are filed.  It's not people at the VA who wish they
had filed a claim.  This is based on pending cases in either
this court or the Minnesota state court.  And, as you heard
earlier, that number right now, in terms of eligibility to
participate -- and of course, no one is required to participate
in the settlement, but eligibility to participate is around
271,000.

So it's not the universe of veterans or people who are
even outside of this litigation who we're worried about right
now.  It's just getting to that 98 percent here.

And as you probably know, there are statutes of
limitations to bring claims.

**MR. NANCARROW:**  Yes, ma'am.

**THE COURT:**  And many of these injuries occurred quite
some time ago.

**MR. NANCARROW:**  The question is for me is, you know,
first it was just they threw out the secondary -- because I
have dealt with the balance issues, I've had traumatic brain
injury because of this, I have no balance in either one of my
ears.  You take it for granted every day that you have balance.
I have to wake up and I have to orientate myself to a horizon
line.  I'm off the meclozine and the phenergan that gave me

| | | |
|---|---|---|
| 11:19:08 | 1 | nausea just like it would do for sickness for a boat or air |
| 11:19:08 | 2 | sickness or anything like that.  But this is, you know, a |
| 11:19:11 | 3 | common thing for me every day now, and with it came seizures. |
| 11:19:17 | 4 | And I just want to hear some more about the special |
| 11:19:21 | 5 | compensation for personnel like me because, first, is this |
| 11:19:24 | 6 | going to be just straight up tinnitus and hearing loss. |
| 11:19:27 | 7 | **THE COURT:**  What you're referring to is the |
| 11:19:30 | 8 | extraordinary injury fund. |
| 11:19:32 | 9 | **MR. NANCARROW:**  Yes, ma'am. |
| 11:19:32 | 10 | **THE COURT:**  And that program is in the process of |
| 11:19:34 | 11 | being rolled out.  Actually, this weekend I reviewed a final, |
| 11:19:39 | 12 | and I expect you'll be hearing more about that from your |
| 11:19:43 | 13 | counsel in the very near future. |
| 11:19:45 | 14 | Have you -- I'm just curious, it really -- as I said, |
| 11:19:49 | 15 | no one has to participate.  But have you elected to participate |
| 11:19:54 | 16 | or have you made an election yet? |
| 11:19:57 | 17 | **MR. NANCARROW:**  I have made an election to |
| 11:20:01 | 18 | participate, and it was from a couple of my audiologists and |
| 11:20:07 | 19 | some other veterans got me on board, let me know. |
| 11:20:07 | 20 | **THE COURT:**  But you have made an election at this |
| 11:20:10 | 21 | point, you believe you've elected to participate? |
| 11:20:12 | 22 | **MR. NANCARROW:**  Yes. |
| 11:20:13 | 23 | **THE COURT:**  And you're now waiting to hear about the |
| 11:20:16 | 24 | extraordinary injury fund? |
| 11:20:17 | 25 | **MR. NANCARROW:**  Correct, ma'am. |

| | | |
|---|---|---|
| 11:20:18 | 1 | **THE COURT:**  All right, good.  Well, good luck to you, |
| 11:20:19 | 2 | sir.  I appreciate you coming forward and speaking to us this |
| 11:20:22 | 3 | morning. |
| 11:20:23 | 4 | **MR. NANCARROW:**  Thank you for your time, and thank you |
| 11:20:25 | 5 | to the lawyers, and thank you to 3M to stepping up to the |
| 11:20:26 | 6 | plate. |
| 11:20:26 | 7 | **THE COURT:**  And thank you for your service, sir. |
| 11:20:32 | 8 | Is there anyone else, any other claimants here that |
| 11:20:36 | 9 | filed an intent to appear and wish to be heard? |
| 11:20:58 | 10 | **MR. RUFUS JORDAN:**  -- *(unintelligible)* -- |
| 11:20:58 | 11 | **MS. WRIGHT:**  Your Honor, would you like me to inquire? |
| 11:21:01 | 12 | **THE COURT:**  If you would, Ms. Wright.  I can't make |
| 11:21:05 | 13 | out what he's saying. |
| 11:21:13 | 14 | **MS. WRIGHT:**  Your Honor, this gentleman just told me |
| 11:21:16 | 15 | he was returning these forms but does not wish to be heard. |
| 11:21:20 | 16 | The forms I'm holding are just the notices of intent to appear. |
| 11:21:24 | 17 | **THE COURT:**  And, sir, is your name on those forms? |
| 11:21:27 | 18 | **MR. RUFUS JORDAN:**  Yes, ma'am. |
| 11:21:28 | 19 | **THE COURT:**  And you don't wish to be heard today; is |
| 11:21:30 | 20 | that correct? |
| 11:21:31 | 21 | **MR. RUFUS JORDAN:**  (Indicating negatively.) |
| 11:21:32 | 22 | **THE COURT:**  You're shaking your head no.  I will take |
| 11:21:35 | 23 | that as a no. |
| 11:21:35 | 24 | **MS. WRIGHT:**  I don't see his name but perhaps |
| 11:21:39 | 25 | Mr. Bradford could -- |

| | | |
|---|---|---|
| 11:21:40 | 1 | **THE COURT:**  I can't accept those without a name.  I |
| 11:21:43 | 2 | would need to have a name. |
| 11:21:46 | 3 | **MS. WRIGHT:**  Your Honor, would you like me to -- |
| 11:21:49 | 4 | **THE COURT:**  If you would, please, if he would just |
| 11:21:51 | 5 | include his name there so that I have a record of the forms |
| 11:21:54 | 6 | that we've received. |
| 11:23:07 | 7 | Just for the record, is his name there now on the |
| 11:23:11 | 8 | form? |
| 11:23:11 | 9 | **MS. WRIGHT:**  Mr. Rufus Jordan. |
| 11:23:30 | 10 | **MR. BOBBY BRADFORD:**  Your Honor, if I could help |
| 11:23:31 | 11 | clarify, he just thought he was required to attend because he |
| 11:23:34 | 12 | received the notice. |
| 11:23:35 | 13 | **THE COURT:**  We heard that from others. |
| 11:23:37 | 14 | **MR. BRADFORD:**  He just wanted to do what he thought he |
| 11:23:40 | 15 | was supposed to do, that's all. |
| 11:23:41 | 16 | **THE COURT:**  I hope he did not travel a long distance. |
| 11:23:44 | 17 | **MR. BRADFORD:**  I did not ask him, I'm sorry. |
| 11:23:46 | 18 | **THE COURT:**  We heard that that was one of the reasons |
| 11:23:49 | 19 | given for notices being withdrawn is that folks didn't |
| 11:23:53 | 20 | understand, unfortunately. |
| 11:23:57 | 21 | Okay.  Anything else? |
| 11:23:59 | 22 | *[No response.]* |
| 11:23:59 | 23 | I am going to file that notice in Mr. -- it was Rufus |
| 11:24:08 | 24 | Jordan? |
| 11:24:09 | 25 | **MS. WRIGHT:**  Correct, Your Honor. |

| | | |
|---|---|---|
| 11:24:09 | 1 | **THE COURT:**  In Mr. Jordan's individual case, and then |
| 11:24:12 | 2 | my order will reflect that he appeared but was under a |
| 11:24:15 | 3 | misimpression as to why -- that he needed to be here, believed |
| 11:24:20 | 4 | he needed to be here, mistakenly, and I'll make sure that's a |
| 11:24:24 | 5 | part of my order. |
| 11:24:26 | 6 | **MS. WRIGHT:**  Thank you, Your Honor. |
| 11:24:27 | 7 | **THE COURT:**  Thank you. |
| 11:24:27 | 8 | Is there anything else from anyone? |
| 11:24:31 | 9 | *[No response.]* |
| 11:24:32 | 10 | If not, I want to thank Ms. Wheatman, Mr. Deady, and |
| 11:24:36 | 11 | Mr. Jackson for appearing here live and providing your |
| 11:24:40 | 12 | testimony.  That, coupled with your declarations, will be very |
| 11:24:46 | 13 | helpful to me in making this decision. |
| 11:24:49 | 14 | And I do expect to have a decision out fairly quickly |
| 11:24:52 | 15 | and will endeavor to do so hopefully before Christmas.  If not, |
| 11:24:57 | 16 | by the end of the year, next couple of weeks. |
| 11:25:00 | 17 | Thank you all for being here.  Have a nice rest of the |
| 11:25:03 | 18 | day. |
| 11:25:04 | 19 | Judge Miller, Judge Herndon, thank you for being here. |
| | 20 | *(Proceedings concluded at 11:25 a.m.)* |
| | 21 | -------------------- |
| | 22 | *I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  Any* |
| | 23 | *redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy are noted within the transcript.* |
| | 24 | |
| | 25 | *s/Donna L. Boland                          12-11-2023*<br>*Donna L. Boland, RPR, FCRR            Date*<br>*Official Court Reporter* |

**INDEX**

                                                                    PAGE


Opening by the Court                                                  3

Settlement Program Update:
  By Mr. Aylstock                                                    10
  By Mr. Andolina                                                    16

Fairness Hearing Introduction by Mr. Seeger                         19


TESTIMONY:

**BLAKE DEADY,** presented by Ms. Wright                            21

**SHANNON WHEATMAN,** presented by Mr. Andolina                     38

**ROBERT JACKSON,** presented by Mr. Seeger                         51


Fairness Hearing Argument Presented by Ms. Wright                   69


CERTIFICATE OF REPORTER                                             97