UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| IN RE:3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-MD-02885 |
| This Document Relates to: All Cases | Judge M. Casey Rodgers<br>Magistrate Judge Hope T. Cannon |

# ORDER

On August 29, 2023, Negotiating Plaintiffs' Counsel ("NPC") and Defendants, including 3M Company ("3M") (collectively with NPC, the "Parties"), agreed to a global settlement of all Combat Arms Earplug version 2 ("CAEv2") claims in this MDL and in Minnesota state court. As part of the global settlement, the Parties entered into three Master Settlement Agreements ("MSAs"). *See* ECF No. 3809-1 (MSA I); ECF No. 3809-4 (MSA II); ECF No. 3809-6 (MSA III).[1] Pursuant to the MSAs, 3M may issue up to $1 billion of 3M common stock in partial satisfaction of certain payment obligations that are triggered when the NPC achieves a 98% Participation Level in the settlement program. Assuming the 98% Participation Level is reached and 3M does not, in its sole discretion, elect to pay some or all of the foregoing $1 billion in cash in lieu of issuing stock, 3M will issue shares of common stock to the Qualified Settlement Fund ("QSF"), established

---

[1] Unless otherwise noted, terms used herein are defined as in the Agreements.

pursuant to this Court's order, ECF No. 3856, in four separate tranches (the "Stock Issuances") equal to $1 billion.

On November 27, 2023, the Parties filed a Joint Motion For Approval of Stock Issuances Exempt From Registration Requirement Under Securities Act Section 3(a)(10), ECF No. 3945, seeking a determination from this Court that the terms and conditions of the MSAs providing for the Stock Issuances in exchange for the release of CAEv2 claims are fair within the meaning of Section 3(a)(10) ("Section 3(a)(10)") of the Securities Act of 1933, and thus the Stock Issuances are exempt from the registration requirements of the statute. *See* 15 U.S.C. § 77c(a)(10). Based on the Parties' joint submissions, the record of the Fairness Hearing held on December 11, 2023, and other relevant information reasonably available, the Court concludes, as set forth more fully below, that the terms and conditions of the Agreements pertaining to the Stock Issuances are fair within the meaning of Section 3(a)(10) and thus the Stock Issuances are exempt from registration pursuant to Section 3(a)(10).

**I.  ANALYSIS**

In general, federal securities law prohibits any company from issuing stock and any recipient of stock from immediately selling the stock in interstate commerce, unless the shares are first registered with the United States Securities and Exchange Commission ("SEC"). *See* Securities Act of 1933, ch. 38, 48 Stat. 74 (codified as

amended at 15 U.S.C. §§ 77a–77aa); *see also* Jackson Decl. ¶ 9; *see also* Barbara A. Ash, *Reorganizations and Other Exchanges under Section 3(a)(10) of the Securities Act of 1933*, 75 NW. U. L. REV. 1, 4 (1980-1981). The registration process mandates extensive upfront disclosures about a company's operations, properties, and management; the securities being offered for sale; market and tax information; legal proceedings; and financial statements certified by independent accountants. *See* Corp. Compl. Series: Securities §§ 1:7-1:9 (2022 ed.). These registration disclosure requirements are intended to protect investors so that they may make informed investment decisions. *See SEC v. Blinder Robinson & Co.*, 511 F. Supp. 799, 802 (D. Colo. 1981).

The Securities Act of 1933 also contains an exemption from the registration requirements, however, for certain securities transactions, including, as applicable here, stock issuances under Section 3(a)(10). *See* 15 U.S.C. § 77c(a)(10). Congress's justification for the exemption was "that supervision over, and approval of, the exchange transaction by a competent court . . . following a consideration of the fairness of the transaction, is an adequate substitute for disclosure" that would otherwise accompany registration.[2] *See* Barbara A. Ash, *Reorganizations and Other*

---

[2] Here, the terms and conditions surrounding the Stock Issuances are material to the Parties' settlement. More specifically, Defendants' ability to issue securities pursuant to the exemption under Section 3(a)(10), the QSF's ability to receive the securities, and the free transferability of the securities without regard to Rule 144 of the 1933 Securities Act, are material terms of MSA I.

3

*Exchanges under Section 3(a)(10) of the Securities Act of 1933*, 75 NW. U. L. REV. 1, 5 (1980-1981) (citing U.S. Sec. & Exch. Comm'n, Securities Act Rel. No. 33-312, 1 Fed. Sec. L. Rep. (CCH) ¶ 2181, at 2590 (1935)).  Under Section 3(a)(10), a security may be exempt from registration if it:

> is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court. . . .

*See* 15 U.S.C. § 77c(a)(10). One of the advantages of Section 3(a)(10)'s registration exemption is that it "avoids the time and expense of registering shares and allows for the issuance of shares that are not restricted as they would have been if issued

---

*See* MSA I § 7.2, ECF No. 3809-1. Rule 144(a)(3) concerns the selling of restricted securities. Restricted securities are securities acquired in unregistered, private sales from the issuing company or from an affiliate of the issuer. Rule 144(d), otherwise known as Regulation D, requires, among other things, a prospective reseller of restricted securities, subject to ongoing SEC reporting requirements (such as 3M), to hold shares for at least six months before reselling. 17 C.F.R.§ 230.144(d)(1)(i). According to the Parties' expert witness, Robert Jackson, a former SEC Commissioner and current Pierrepont Family Professor of Law and Co-Director of the Institute for Corporate Governance and Finance at the New York University School of Law, securities issued pursuant to 3(a)(10) are not considered "restricted securities" and thus are immediately tradeable notwithstanding the holding period in Regulation D. *See* Fairness Hr'g Tr. 64-66, ECF No. 3965; *See YA II PN, Ltd. v. Taronis Techs., Inc.*, 435 F. Supp. 3d 622, 626 n.5 (S.D.N.Y. 2020) ("Because the Court approves the exchange as fair, the shares can be resold immediately as "unrestricted and freely tradeable exempted securities pursuant to Section 3(a)(10).") (citing *In re Tripath Tech., Inc., Sec. Litig.*, 2006 WL 1009228, at *2 (N.D. Cal. April 18, 2006); *see also* SEC Staff Legal Bulletin No. 3A (CF), at 4 (June 18, 2008), available at https://www.sec.gov/corpfin/staff-legal-bulletin-3a ("SLB 3A").

4

. . . in a private placement." *Oceana Capitol Grp. Ltd. v. Red Giant Ent., Inc.*, 150 F. Supp. 3d 1219, 1223 (D. Nev. 2015).

Notably, "Congress did not require that the SEC be named as a party" in Section 3(a)(10) proceedings because Congress intended "the § 3(a)(10) exemption to fall entirely within the purview of the long-established court system, rather than the [SEC]." *Id.* Nonetheless, to aid counsel and courts in navigating Section 3(a)(10), SEC Staff has issued a Staff Legal Bulletin from the SEC's Division of Corporation Finance concerning the Section 3(a)(10) exemption. *See* SLB 3A, *supra* note 3. "Although [SLB 3A] is not binding on the [C]ourt," *In re Trade Partners, Inc. Investor Litig.*, No. 1:07-md-1846, 2008 WL 4911797, at *2 (W.D. Mich. 2008), the undersigned finds it helpful and persuasive in determining fairness for purposes of Section 3(a)(10).

Together, Section 3(a)(10) and SLB 3A set forth conditions that must be met in order for securities to qualify for the Section 3(a)(10) exemption from registration. In relevant part, those conditions are:

- A court must approve the fairness of the terms and conditions of the exchange.

- The securities must be issued in exchange for securities, claims, or property interests; they cannot be offered for cash.

5

- The reviewing court must hold a hearing before approving the fairness of the terms and conditions of the transaction.

- The reviewing court must:

    o   be advised before the hearing that the issuer will rely on the Section 3(a)(10) exemption based on the court's approval of the transaction; and

    o   find, before approving the transaction, that the terms and conditions of the exchange are fair to those to whom securities will be issued.

- The fairness hearing must be open to everyone to whom securities will be issued in the proposed exchange.

- Adequate notice must be given to all of those persons.

- There cannot be any improper impediments to the appearance by those persons at the hearing.

- No more than one-third of the securities issued in the settlement may be used to fund attorneys' fees.

See 15 U.S.C. § 77c(a)(10); SLB 3A, 1-2, n. 10.

On careful consideration of the above conditions, the Court makes the following findings in connection with its fairness determination:

A. *Approving Entity*

This Court has jurisdiction over the QSF, MSA I § 13.1.2, ECF No. 3809-1, and over all identified Eligible Claimants who may receive proceeds traceable to the Stock Issuances and thus it may, as contemplated by Section 3(a)(10): (1) consider the fairness of the terms and conditions of the Stock Issuances, and (2) approve such terms and conditions. *See* Louis Loss & Joel Seligman, SECURITIES REGULATION § 3-C-3 (2004) (analyzing the relevant language of Section 3(a)(10)).

B. *Exchange*

The securities proposed to be issued under the Agreements will be issued in exchange for the release of pending legal claims, *i.e.*, the securities will be received by the QSF and will be used exclusively to settle MDL CAEv2 Claims. *See* MSA I § 11.4, ECF No. 3809-1.

C. *Fairness Hearing*

The Court held a public hearing on December 11, 2023. Judge Laurie Miller, who presides over CAEv2 claims filed in Minnesota state court, joined the hearing. The hearing was open to attendance by all individuals to whom securities might be issued (or to whom proceeds of the sale of the securities may be paid) pursuant to the Agreements, including in person, by telephone, or by Zoom video conference. *See* ECF No. 3911. All MDL Eligible Claimants wishing to be heard had the opportunity to address the Court in person by timely filing a Notice of Intent to

7

Appear, *id.*, which, as detailed below, was distributed directly to all identified Eligible Claimants in the MDL, including those who may receive proceeds traceable to the Stock Issuances. Also, as detailed below, the Notice was made available to the general public on the internet. The hearing was also open to the general public. *Id.*

**D.** *Notice*

The Parties provided more than adequate notice of the Fairness Hearing through a jointly developed comprehensive notice program, which included direct, actual notice to all Eligible Claimants identified under Case Management Order No. 60, ECF No. 3814, and supplemental notice through targeted publications, including in the *Wall Street Journal* and the military news website *Stars and Stripes*, and internet advertisements.[3] Regarding direct notice specifically, the Court-appointed Settlement Administrator, ARCHER Systems, LLC, *see* ECF No. 3816, distributed notice directly to all identified Eligible Claimants in the MDL either electronically by email, or in hard copy by U.S. Mail, using the contact information provided by Eligible Claimants.[4]  *See* CMO 60, ECF No. 3814 at 5–7. The Settlement

---

[3] It could be argued that notice was only required as to the QSF because only the QSF will receive the stock in the proposed exchange. Eligible Claimants will receive the proceeds of the sale of the stock; they will not receive the stock itself. *See* Fairness Hr'g Tr. 67-69, ECF No. 3965. While the Court recognizes this argument may have legal merit, it need not decide the issue because, to their credit, the Parties went far beyond providing notice to the QSF. *See id.* (Jackson stating, "My own view is that the good news here is that the Court need not determine whether it's the QSF or the individuals who are the recipients because so much notice has been provided.").

[4] Notice of the Fairness Hearing was also posted on the Court's public website. *See* FLND, 3M Products Liability Litigation, MDL No. 2885, https://www.flnd.uscourts.gov/3m-products-

Administrator maintains information in its database identifying the Eligible Claimants to whom direct notice was delivered and estimates that over the course of its targeted notice campaign, it delivered notice to 260,646 Eligible Claimants, or approximately 89%-96% of Eligible Claimants in the MDL. *See* Deady Aff'd ¶ 14; Fairness Hr'g Tr. 32-33, 38, ECF No. 3965.[5]

### E. *No Procedural Impediments*

The Court did not impose any procedural impediments to the appearance of any person at the hearing to whom securities will be issued in the proposed Stock Issuances (or who might receive proceeds traceable to the Stock Issuances), or to the appearance of any Eligible Claimant in the MDL wishing to be heard.

### F. *Fairness*

"Fundamentally, the court must find that the proposed issuance and exchange of securities is fair after considering the totality of the evidence." *Oceana Capitol*, 150 F. Supp. 3d at 1224 (citing *Trade Partners*, 2008 WL 4911797, at *3). The

---

liability-litigation-mdl-no-2885. One of the Parties' experts, Shannon R. Wheatman, incorrectly represented in her declaration that Notice was placed on the Settlement Administrator's website too. Wheatman Decl. ¶ 2. Wheatman noted this inaccuracy during her testimony at the Fairness Hearing, and apologized for the misstatement. *See* Fairness Hr'g Tr. 42, ECF No. 3965. The Parties' joint motion also contained the same misrepresentation, which they brought to the Court's attention prior to the hearing. *See* Joint Mot. 13, ECF No. 3945. On this record, the misstatements do not impact the adequacy of the notice given to Claimants.

[5] While Archer delivered notice to over 260,000 Claimants, it admitted that it might have delivered notice to Claimants who were placed on dismissal orders after the start of their notice campaign on October 20th. *See* Fairness Hr'g Tr. 35, 37-38 ECF No. 3965. This accounts for the difference in percentage for Eligible Claimants who received direct notice. *See id.*

reviewing court "must have sufficient information before it to determine the value of both the securities, claims or interests to be surrendered and the securities to be issued in the proposed transaction." SLB 3A at ₱ 4(B)(2).

The undersigned is intimately familiar with the value of the CAEv2 claims through overseeing case-specific discovery and handling motion practice for nearly 400 CAEv2 cases, which culminated in rulings on more than 260 motions *in limine*, 109 *Daubert* challenges, 47 choice-of-law disputes, 42 case-specific summary judgment motions, and 21 post-trial motions, as well as countless additional discovery, procedural, and/or logistical disputes. *See* ECF No. 3811 ¶ 6. The undersigned also personally presided over six CAEv2 bellwether trials involving nine plaintiffs. *Id.*

Additionally, 3M's financial condition is a matter of public record. Because 3M is a publicly traded company listed on the New York Stock Exchange ("NYSE"), the Securities Exchange Act of 1934 requires that 3M regularly and timely file extensive information regarding its business and financial condition with the SEC. This information includes quarterly and annual reporting of financial statements, detailed narrative disclosures regarding 3Ms's financial condition and results of operations for the quarter and year, and material risks relating to 3M's business. 3M is also required to file a report within four business days of the occurrence of various triggering events, including its entry into material contracts, release of periodic

10

earnings results, significant acquisitions and dispositions, material impairments, changes to governing documents, and changes in the composition of 3M's board of directors or certain changes to 3M's executive officers. *See*, *e.g.*, SEC Forms 10-K, 10-Q, & 8-K; Corp. Compl. Series: Securities §§ 1:7-1:9 (2022 ed.).

3M is also subject to the New York Stock Exchange rules requiring it to promptly release to the public any news or information that might be reasonably expected to materially affect the market value of its stock, which may include events such as securities offerings and pricings related thereto, major product launches, regulatory rulings, new patent approvals, and dividend or major repurchase announcements. *See, e.g.*, NYSE Listed Co. Manual at §§ 201-202.[6] Thus, comprehensive and up-to-date material information about 3M is readily available at all times to any member of the public who wishes to review it. The NPC and the undersigned have had access to and have reviewed such information as each deemed relevant to their consideration of the Agreements and anticipated Stock Issuances.

To be sure, any resale of 3M common stock is inherently speculative and carries risk. However, as the Parties' expert witness, Robert Jackson testified, three

---

[6] The NYSE Listed Co. Manual is available at https://nyse.wolterskluwer.cloud/listed-company-manual.

11

considerations substantially weigh in favor of a fairness finding in connection with this exchange.[7] *See* Fairness Hr'g Tr. 62-63, ECF No. 3965.

First, for each separate tranche of stock issued the number of shares will be based on the volume weighted average price (VWAP) of 3M common stock over the 10-trading day period ending on, and including, the last trading day prior to the date of issuance. VWAP is used by regulators and sophisticated parties—such as investment bankers or senior business executives—to determine the fair value of shares for publicly traded firms. *See* Jackson Decl. n. 57 ("investment bankers estimating the value of stock consideration to be paid to selling shareholders in mergers and acquisition use VWAP to inform investors of the approximate value of the shares they will receive… Senior executives whose stock and options will be cashed out in a merger often accept a value for their shares determined by VWAP"); *see also Trade Partners,* 2008 WL 4911797, at * 4 (finding that stock was "susceptible to precise valuation" because it used a VWAP of the proposed stock twenty days before its issuance). In Jackson's view, since 3M common stock is highly liquid and widely held, "the use of this average (VWAP) provides us some comfort that the snapshot of value we're taking at that time is representative of what

---

[7] As noted previously, Mr. Jackson is a former SEC Commissioner and current Pierrepont Family Professor of Law and Co-Director of the Institute for Corporate Governance and Finance at the New York University School of Law.  The Court found him highly qualified and credible.

the market understands the value of the shares to be." Fairness Hr'g Tr. 62, ECF No. 3965.  The Court agrees.

Second, the MSA calls for any issuances of 3M common stock to occur in tranches over time. According to Jackson, this structure will protect Claimants because it "mitigates the risk that the dilution caused by any significant single issuance will depress the stock's price while the QSF is engaging in sales of the securities." Fairness Hr'g Tr. 62-63, ECF No. 3965.  Again, the Court agrees.

Third, Jackson found it significant that the Parties and the Court "have taken further steps to ensure an orderly liquidation of any 3M Common Stock issued pursuant to the MSA" by appointing an Investment Manager, Orion Settlement Solutions, for all investment-related decisions regarding the QSF. *See* Jackson Decl. ¶ 35.  Orion is subject to a fiduciary standard of care with respect to the investment and reinvestment of the principal and income of Trust Assets and is charged with liquidating any stock delivered to the QSF. *See* ECF Nos. 3867 and 3888.  To accomplish this, Orion retained Metaurus Advisors LLC, an asset management company, to provide advice on liquidating the 3M common stock issued to the QSF. The Co-Chief Executive Officer of Metaurus, Richard Sandulli, submitted a declaration in advance of the hearing stating that it is his "expectation that, under normal market conditions, Orion should be able to hedge most market price risk of any shares to be delivered to the QSF."  Sandulli Decl. ¶ 8, ECF No. 3958.  For an

13

additional level of risk-reduction, Orion has been ordered to provide regular reports to the undersigned. All of these additional steps are significant to the Court's fairness determination.

Beyond these considerations, courts in the Eleventh Circuit consider five factors when determining whether an issuance of securities under Section 3(a)(10) is "fair": "(1) the recommendations of counsel; (2) the scope of discovery; (3) apparent alternatives to the settlement; (4) the nature and volume of responses from those receiving notice of the hearing; and (5) opportunity for direct participation by those who would receive issued securities." *Sec. & Exch. Comm'n v. Founding Partners Cap. Mgmt.*, No. 09-CV-229, 2014 WL 2993780, at *12 (M.D. Fla. July 3, 2014) (citing *Blinder Robinson*, 511 F. Supp. at 801 (D. Colo. 1981)).

On consideration of these factors, the Court makes the followings findings:

First, the proposed Stock Issuances, and the settlement more generally, have been recommended by both the NPC and Defendants, and the Stock Issuance provision in the Agreements was extensively negotiated as part of a mediation spanning multiple months under the supervision of mediators appointed by the Court. Sept. 8, 2023 Hr'g Tr. 84–86, ECF No. 3862. The Agreements resolve litigation that has been pending before this Court for nearly five years, during which time the Court has developed deep familiarity with the CAEv2 claims and Defendants' defenses to those claims. The Court's understanding of the litigation

14

and the Agreements is detailed extensively in the record, including in CMO 57, ECF No. 3811, and Sept. 8, 2023 Hr'g Tr., ECF No. 3862. The "recommendations of counsel" thus weigh in favor of a finding of fairness. *See Founding Partners*, 2014 WL 2993780, at *12.

Regarding the second and third factors—scope of discovery and apparent alternatives to settlement—the Agreements contemplate resolution of over 270,000 CAEv2 cases pending in the MDL as well as several thousand cases in Minnesota state court. As noted, during the nearly five years the MDL has been pending, the Court has developed deep familiarity with all aspects of the CAEv2 claims and defenses, including "the relative strengths and weaknesses of individual claims" based on "the nuanced evidentiary record that was developed by the parties over nearly five years[,]" "extraordinary costs associated with continued litigation of any Combat Arms Earplug claim[,]" and "the risk of litigating hundreds of thousands of claims[.]" Sept. 8, 2023 Hr'g Tr. 7–8, ECF No. 3862. The unprecedented breadth of discovery, along with the indisputable superiority of the global settlement over continued litigation of hundreds of thousands of individual CAEv2 claims throughout the federal judiciary and in Minnesota state court, further weigh in favor of a finding of fairness. *See Founding Partners*, 2014 WL 2993780, at *12.

Fourth, every MDL Eligible Claimant who may receive the proceeds of the Stock Issuances was sent direct notice of the Fairness Hearing by either electronic

15

or paper mail, and that notice included detailed and straightforward instructions for any MDL Eligible Claimant wishing to address the Court at the Fairness Hearing. Courts have found direct notice to be adequate in the past. *See Trade Partners*, 2008 WL 4911797, at *2, *4 (notice provided "to all plaintiffs in these consolidated cases" "both by regular mail and, where possible, by email" 19 days before hearing found "adequate"). As previously noted, the Court finds that the comprehensive notice program was more than adequate to ensure that the Fairness Hearing was open to all interested Claimants.

Fifth, of the over 260,000 Eligible Claimants in this MDL who received direct notice, only four filed Notices of Intent to Appear on the MDL docket. As it turned out, however, the four notices were filed in error and were promptly withdrawn.[8] *See* ECF Nos. 3966, 3961, 3960, 3937.

At the end of the Fairness Hearing, the Court asked whether any Claimant(s) in the courtroom wished to be heard. *See* Fairness Hr'g Tr. 88, ECF No. 3965. One Claimant came forward and raised concerns about the possibility of the value of 3M stock depreciating if the company filed for bankruptcy and requested further

---

[8] Four Claimants improperly filed Notices of Intent directly with the Settlement Administrator as well. These notices were also filed in error, and informally withdrawn prior to the hearing. *See* Fairness Hr'g Tr. 8, ECF No. 3965. After the Fairness Hearing, one Claimant, Brandon Stanfield, sent a letter to the Court and attached a completed Notice of Intent to Appear. Stanfield attended the Fairness Hearing via Zoom and believed that he needed to complete the form to ensure that his attendance was proper. In other words, he did not wish to appear in person and be heard.

information on the Extraordinary Injury Fund methodology. *See id.* at 88-95. Another Claimant in the courtroom personally delivered a Notice of Intent to Appear during the proceeding, but subsequently withdrew it. This Claimant was under the mistaken impression that he was required to attend the proceedings and needed to complete and deliver the Notice of Intent to Appear. *See id.* at 95-96. Considering the number of Eligible Claimants involved in the MDL, "That lack of response is, in itself, some indication of the perception of fairness among those who are to be offerees." *Blinder Robinson*, 511 F. Supp at 802 (where approximately 11,000 notices of the Fairness Hearing were mailed out to claimants, but only 15 responses were received by the Court). The Court finds that Eligible Claimants were provided an opportunity to obtain full disclosure of information related to the proposed stock transfer by virtue of the direct and supplemental notice campaigns, and their ability to attend and/or appear at the Fairness Hearing.

### G. *Additional Observations*

There are two additional observations that warrant note. First, using the Eligible Claimant data and notice data maintained by the Settlement Administrator, the QSF Co-Administrators will ensure that the distribution of proceeds traceable to the Stock Issuances will be restricted as follows: (1) only identified Eligible Claimants in the MDL to whom direct notice was delivered will receive proceeds

17

traceable to the Stock Issuances,[9] and (2) no more than one third of the proceeds traceable to the Stock Issuances will be used to pay attorney's fees for the identified Eligible Claimants to whom notice was provided. The Court intends to oversee this process to ensure compliance.

Second, the Court acknowledges that it was advised prior to the hearing that the shares of 3M common stock to be issued will be issued pursuant to, and 3M intends to rely on, the exemption from registration provided by Section 3(a)(10) of the Securities Act of 1933, assuming the Court approves the terms and conditions of the Stock Issuances as fair.

## II.   CONCLUSION

Based on the foregoing, the Court concludes that (1) the shares of 3M common stock to be issued in the four separate Stock Issuances will be issued solely in exchange for *bona fide* outstanding legal claims; (2) all persons and entities to whom

---

[9] On November 21, 2023, 3M filed an amended 8-K, disclosing that,

"the administrators of the QSF will be instructed to segregate the cash proceeds from any sale of the Shares so that such cash proceeds are paid only to claimants subject to the jurisdiction of the MDL Court who receive advance notice of the fairness hearing and, subject to certain limitations, for payment of those claimants' related attorneys' fees. Payments to any other eligible claimants would be made solely from the cash portion of the Settlement consideration that is not derived from any sale of Shares."

3M Company, Form 8-K/A (filed Nov. 21, 2023) (https://investors.3m.com/financials/sec-filings##document-4905-0000066740-23-000105-1).

the shares of 3M common stock may be issued in the Stock Issuances have had the right to appear at the fairness hearing; (3) the fairness hearing was open to all persons and entities to whom the shares of 3M common will be issued; (4) adequate notice has been given to all persons and entities to whom the shares of 3M common stock will be issued, and there have been no improper impediments to the appearance of such persons and entities at the fairness hearing; (5) the terms and conditions of the Agreements, including the Stock Issuances in exchange for the settlement and release of CAEv2 claims against 3M, are fair both procedurally and substantively to all persons and entities on behalf of whom the shares of 3M common stock will be issued under the Agreements and this Order, and the Court hereby approves the terms and conditions of the Stock Issuances; (6) the Stock Issuances are exempt from registration pursuant to Section 3(a)(10); and (7) the shares of 3M common stock to be issued in the Stock Issuances will not be "restricted securities" within the meaning of Securities Act Rule 144(a)(3) and will be immediately (upon issuance) freely transferable and freely tradeable without regard to Rule 144.[10]

---

[10] Reselling the shares of 3M common stock issued pursuant to this Court's approval of the Section 3(a)(10) exchange is not subject to the holding period rule of Rule 144(d), as long as the sellers of stock are not affiliates of the issuer and have not been affiliates within 90 days of the transaction. *See Oceana Capitol*, 150 F.Supp.3d at 1225; *In re Trade Partners*, 2008 WL 4911797, at *2; SLB 3A at 5 ("Section 3(a)(10) may generally be resold without regard to Rule 144 if the sellers are not affiliates of the issuer of the Section 3(a)(10) securities and have not been affiliates within 90 days of the date of the Section 3(a)(10)-exempt transaction, as such securities would not constitute "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act"). Affiliate is defined under Rule 144(a)(1) as a "person that directly, or indirectly through one or

Accordingly, 3M may issue the shares of 3M common stock as contemplated by the Stock Issuances in the Agreements without registration or compliance with the prospectus delivery and disclosure requirements of United States securities laws (or, as appropriate, any analogous state securities laws).

Finally, at any time after the issuance of any tranche of shares of 3M common stock pursuant to the Stock Issuances, the QSF Co-Administrators may, in accordance with the terms of the Agreements, sell or cause to be sold all or any portion of such shares, in reliance on the Section 3(a)(10) exemption from registration requirements of the Securities Act of 1933 and any analogous provisions of applicable state securities laws, which exemption shall also remain applicable to and not otherwise limit or invalidate the initial issuance and delivery of such shares by 3M to the QSF.

**SO ORDERED** on this 31st day of December, 2023.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

more intermediaries, controls, or is controlled by, or is under common control with, such issuer." 17 C.F.R. § 230.144(a)(1). Neither the QSF Administrators nor the NPC are affiliates of 3M.