**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**IN RE: 3M COMBAT ARMS**
**EARPLUGS PRODUCTS**
**LIABILITY LITIGATION**

Case No. 3:19-md-2885

The Hon. Judge M. Casey Rodgers
Magistrate Judge Hope T. Cannon

This Document Relates to:

*Jonathan Swaim v. 3M*,  8:20-cv-34303-MCR-HTC; *Timothy Bush v. 3M*, 8:20-cv-34531-MCR-HTC; *Ross Forrest v. 3M*, 8:20-cv-3478-MCR-HTC; *Ivy Campbell v 3M*, 8:20-cv-34949-MCR-HTC; *Michael Hejmanowski v. 3M*, 8:20-cv-35070-MCR-HTC; *Justin Mcshan v. 3M,* 7:20-cv-30099-MCR-HTC; *Tyler Frey v. 3M*, 8:20-cv-35326-MCR-HTC; *Gary Bergeron v. 3M*, 8:20-cv-35336-MCR-HTC; *Mark Norman v. 3M*, 8:20-cv-35704-MCR-HTC; *Willie Humes v. 3M*, 8:20-cv-35794-MCR-HTC; *Terry Armstrong v. 3M*, 8:20-cv-35815-MCR-HTC; *Dwan Jacobs v. 3M*, 8:20-cv-35463-MCR-HTC; *Blaine Mott v. 3M*, 7:21-cv-05210-MCR-HTC; *Steadman Friday v. 3M*, 7:21-cv-05264-MCR-HTC; *Derrell Derouen v. 3M*, 7:23-cv-03557-MCR-HTC; *Robert Williams v. 3M*, 3:22-cv-24152-MCR-HTC

---

## MEMORANDUM IN RESPONSE TO ORDER TO SHOW CAUSE

**MAY IT PLEASE THE COURT:**

On May 1, 2024, this Honorable Court issued an Order directing undersigned counsel to show cause as to whether 15 Releases of undersigned counsel's clients comply with the terms of MSA I and CMO 58.  In response to the Order, undersigned counsel respectfully submits, as follows:

## PERTINENT FACTUAL AND PROCEDURAL BACKGROUND

As this Honorable Court is thoroughly familiar with the facts and circumstances of this litigation, undersigned counsel has limited its recitation to matters directly pertinent to the issues raised in the show cause Order.

After the formation of MDL 2885, undersigned counsel came to represent over 1300 Combat Arms v2 Earplugs claimants in MDL 2885.  By the time of this Honorable Court's Identification Order on August 29, 2023, this number was down to the 908 clients who were all included on the firm's timely identification submission on September 12, 2023.  While undersigned counsel sent written status reports to all of our clients on a more or less monthly basis beginning in January of 2019 and continuing up until the present, some clients did not have documented hearing loss or report tinnitus to undersigned counsel, others elected not to pursue the claims, while others simply failed to maintain contact and could not be located by undersigned counsel, despite substantial efforts to do so.[1]

---

[1] In well over one hundred written communications to clients since the inception of the litigation, the vast majority of all client communications ended with an explicit instruction to advise undersigned counsel immediately if there were any changes to the client's mailing address, phone number or email address, because, we advised, it was essential that we be able to reach all clients at all times.

Following the Identification Order deadline on September 12, 2023, undersigned counsel immediately began contacting all 908 clients included on the identification submission to advise what they would need to do to complete their registrations so they could participate in the settlement. As many of these clients had not kept their information current, undersigned counsel and their staff wrote, called, emailed, and texted all 908 clients to ensure that everyone who wanted to participate in the settlement had the opportunity to do so.[2] While undersigned counsel is mindful that we continued to register clients up until the eleventh hour of the registration deadline, this was done to ensure that every client who wanted to participate in the settlement could do so.

By the morning of the registration deadline, 862 of the 908 clients included on the identification submission had successfully completed their registrations.[3] This left 46 remaining clients to be registered if they wished to participate in the

[2] Upon information and belief, this resulted in well in excess of 15,000 separate attempts to contact every single one of the 908 clients represented by the firm to ensure that every client who wanted to settle their claims was able to do so. During this period, the Mass Tort Department at the Morris Bart firm had six full-time attorneys and twelve paralegals. Our team was literally working around the clock up until the end of the January 25, 2024 deadline to ensure that every client's file was thoroughly reviewed so that we could properly advise each and every client regarding whether to elect the Expedited Pay Program (EPP) or Deferred Pay Program (DPP) option. This required an in depth review of every client's file, including every available audiogram, and additional audiograms obtained during this process, to make certain that each and every one of our clients made the proper election based upon the circumstances of their individual case.

[3] Significantly, a lot of the communications with our clients following the identification deadline involved advising clients regarding the differences in making an EPP versus a DPP election, but also walking many clients through the details of how to complete the registration process online due to various difficulties they encountered with Archer's online system. We found that most of our early registered clients were reasonably computer savvy and had less difficulty completing the online process. But as the deadline grew closer, unregistered clients required significantly greater assistance. This necessitated having a team member on the phone with unregistered clients to walk them through each step of the process to ensure that registrations were completed timely and properly.

3

settlement.  That day, our entire team was attempting to contact all of the remaining 46 clients to ensure that all of these clients had an opportunity to preserve their claims by completing their registrations if they wished to do so.   As a result, 15 of the remaining 46 clients were able to complete their registrations online while on the phone with a Morris Bart team member who walked them through the registration process over the phone.  Two clients came to Morris Bart's offices in New Orleans to complete their registrations with a team member sitting beside them, because efforts to walk these clients through the registration process over the telephone were not successful.[4]

Having thoroughly advised our clients on multiple occasions and through multiple means about what they needed to do to complete their registrations, we could have literally thrown in the towel on the small number of remaining unregistered clients, but we did not do so.  During the over four years that we have represented clients in MDL 2885, we have come to learn a great deal about the extreme challenges many of our clients face and how even relatively modest tasks like downloading a Blue Button Report  can, for some clients,  cause enormous

---

[4] While these efforts were ongoing, other team members continued to reach out by text, email and telephone to the remaining 29 clients whose registrations were not completed.  During this process, other team members were searching for possible alternative contact information in public records databases and/or through various social media platforms to make sure that we contacted everyone humanly possible to ensure that they did not lose their claims unless they chose to do so.  Up until that time, we had advised each and every client on the identification submission by multiple written means (letter, email, and text) of the January 25, 2024 deadline and that they would lose their claims if they failed to complete their registrations on time.

anxiety, trigger PTSD, and even elicit unprovoked aggression, which our team members have handled with patience and grace. Over the course of the litigation, our team became fully invested in protecting the rights of each and every client whom we represent.   No one  on the Morris Bart team stood to directly benefit anything from completing registrations for the handful of remaining unregistered clients beyond the mere satisfaction of knowing that the team had done everything it possibly could to protect the interests of each and every firm client.  In short, we are very proud to represent our clients in this litigation.  These are clients for whom we have gone the extra distance at every step of the process.  This brings us to the remaining 29 unregistered clients and the 15 releases that are the subject of the present show cause order.

While the vast majority of our clients (880 to be precise) were able to complete their registrations by the January 25, 2024 deadline with varying degrees of assistance from team members with the Morris Bart firm, 15 of the unregistered clients, whom we were finally able to reach on the last day to register, were for one reason or another, simply unable to complete their registrations online.[5]  All 15 of these clients made the decision to register their claims and made their EPP/DPP elections after being fully counseled regarding which election was most appropriate.

---

[5] The individual facts and circumstances surrounding each of these 15 clients and why they could not complete their registrations on their own are set forth in detail in affidavits, which we have submitted under seal so as not to disclose confidential, privileged and/or personal information.  See, attached Exhibit List.

No Morris Bart employee made these decisions for them, because these decisions were not ours to make.   All 15 of these clients unequivocally wanted to participate in the settlement,  They were simply unable to complete their registrations online for the specific reasons set forth in the affidavits we have submitted.   As these 15 clients were unable  to complete their registrations online, but wanted to settle their claims, these clients gave their express and explicit approval for the Morris Bart firm to complete their registrations and sign their releases for them, which, as discussed in detail below, is fully permissible under Louisiana law.[6]

Based upon the foregoing, 895 of the 908 Morris Bart clients included on the firm's identification submission were able to successfully complete their registrations after being individually counseled on their EPP/DPP elections.   This left 13 Morris Bart clients who did not complete their registrations, because these clients could not be located.   As we were never able to reach these 13 clients prior to the conclusion of the registration deadline, we could not: 1) confirm their desire to participate in the settlement, 2) counsel the claimants on the EPP versus DPP election, 3) walk them through the registration process over the telephone or in our offices, or 4) complete the registrations for them if they wanted to register but were unable to do so on their own.   As set forth below, at all pertinent times, undersigned

---

[6] All 15 telephone calls in which clients provided their authorizations were recorded to ensure that there was never any doubt that that this approval had been given.

counsel acted in good faith, in the best interests of the firm's clients and in accordance with Louisiana law.

I.  **Under Louisiana Law, an Amanuensis May Sign the Name of Other Persons on Legal Documents if Authorized to Do So.**

In *White v. Batson*, an action was brought by the seller of immoveable (real) property seeking specific performance. 317 So.2d 205 (La. App. 1 Cir. 1975). The trial court ordered specific performance, and the defendant/putative purchaser appealed.  At issue in the case was whether an earlier 1945 conveyance of the property was invalid, because the deed was not physically signed by one of the co-owners (Mrs. Knox) but signed on her behalf by another co-owner (Mr. Amiss) who signed at Mrs. Knox's explicit direction. The deed in question explained that Mrs. Knox was blind and confined to her home and that she directed her co-owner (Mr. Amiss) to affix her signature to the instrument. The Louisiana Court of Appeal for the First Circuit found that the Louisiana law of mandate (called power of attorney in common law jurisdictions) did not apply, because a principal and agent relationship had not been established.  Specifically, the Court found that Mr. Amiss was not a mandatory (power of attorney) for Mrs. Knox, so there was no violation of the rule of law prohibiting a verbal mandate to sell immoveable (real) property.[7]

---

[7] In Louisiana, all instruments governing the sale of immoveable (real) property must be in writing. *See*, La. C.C. Art. 1839 (acts transferring immoveable property must be in writing).  Accordingly, a mandate (known as a power of attorney in common law jurisdictions) relinquishing the authority to transact land would also have to be in writing.  *See, Franklin v. Regions Bank*, 2021 WL 867261 (W.D. La. 3/8/21).  In this regard, a

Rather, the Court held that Mr. Amiss was simply an instrumentality for her signature.[8]

In *Batson*, the Court of Appeal found that Mrs. Knox had signed the instrument through an amanuensis, Mr. Amiss. The 1945 deed therefore created no cloud on the title that would serve to prohibit specific performance of the sale. In rendering its decision, the Court acknowledged that if Mrs. Knox's request to Mr. Amiss to sign the deed for her was a mandate to transfer the title to immoveable property, then the act of sale would have been defective because, in Louisiana, a mandate for immoveable property must be in writing. *See*, id. at 207. In rendering the decision, the Court of Appeal recited:

> Generally, a signature may be made for a person by the hand of another acting in the presence of such person, and at his direction, **or** request, or with his acquiescence, unless a statute provides otherwise. **A signature so made becomes the signature of the person for whom it is made, and it has the same validity as though written by him.** *** Where a signature is made in this manner the person writing the name is regarded as a mere instrumentality, by which the person whose signature is written exercises **his own discretion**

---

mandate is distinguishable from an amanuensis. A mandate (power of attorney) authorizes the agent to undertake all decision making and acts consistent with the mandate. *See, e.g., Franklin, su*pra. An amanuensis, in contrast, merely signs someone else's name at the other person's direction, because the other person is unable to do so for any number of reasons. *See, Batson, supra.* No discretion or power to make decisions is involved with an amanuensis. *See, Batson, supra at 208* (amanuensis does not exercise its own discretion) (citing 80 C.J.S. Signatures s 6, p. 1291). The amanuensis is merely a scrivener affixing a person's name or mark where he or she is unable to do so. *See* id*; see also, Waggoner v. Gran Parish Police Jury, infra (*amanuensis may sign the person's name or affix a mark, such as an "X").

[8] Mr. Amiss could sign Mrs. Knox's name to the instrument at her direction, but did not otherwise undertake any discretionary actions such that would have required a written mandate. *See*, id. at 206 (Mr. Amiss was not an agent or mandatory but simply provided a helping hand who loaned his eyes and arm to Mrs. Knox so that she could, through him, sign the act of sale).

**and acts for himself, and not through an agent**. Id. at 208 (citing 80 C.J.S. Signatures s 6, p. 1291) (emphasis added).

Significantly, the Court in *Batson*, held that Mrs. Knox's instruction to Mr. Amiss to sign her name was not a verbal mandate.  This distinction is critically important, because, as discussed in further detail below, under Louisiana law, a mandate (power of attorney) for immoveable (real) property must be in writing. *See*, La. C.C. Art. 1839; *see also, e.g., Batson, supra*. Accordingly, if a written mandate were required, the sale would have been invalid since the formality of a writing had not been met and none of the parties to the original sale were still living for purposes of ratifying and therefore curing a defective mandate.[9]  The *Batson* decision underscores the difference between a mandate, in which one person confers discretionary decision making authority and the power to contract to another person, versus an amanuensis, where one person merely asks another person to sign on his or her behalf.  The *Batson* Court held that the signing of the name of Mrs. Knox by Mr. Amiss was the lawful signature of Mrs. Knox.  The Court went on to explain that Mr. Amiss was not the agent of Mrs. Knox in the context of the Louisiana codal requirement that a mandate to convey immoveable property must be in writing.  Mr. Amiss was "nothing more than an amanuensis to Mrs. Knox, the instrument through which she wrote her name on the deed in much the same sense that one would use a

---

[9] *See, Sanders v. Rudd, infra*, at 1274-1275 (a principal may ratify the acts of the agent to overcome a deficient mandate).

typewriter, a pen, or pencil to write a document or letter." *See, id*. at 208.  **The Court went on to note that, "our extensive research does not reveal a single case wherein the courts have declared such action of an amanuensis invalid."** See, id. at 209 (emphasis added). Accordingly, an amanuensis is not disfavored under Louisiana law.[10]

In *Meyer v. King*, the Louisiana Supreme Court similarly considered the validity of a counter-letter on which the son had signed his father's name with his father's consent. 29 La. Ann. 567 (La. 1877).  The Court held that the counter-letter was not a mandate but the act signed for, in the presence of, and under the instructions of the parent who could not sign for himself.  The **"authority was delegated for only one object, was not to be exercised out of the interested parties presence, lasted the pace of time required to write the name, and expired when the last letter of the principal's name fell on the agent's pen. In such a case, the act itself is the act of the principal, not of the agent."** *See*, id. at 570.  As in *Batson, supra*, the son was merely the amanuensis of his father.

In *Elmore v. Butler*, the trial court ruled that the deed from M.M. Elmore to Georgia Elmore and Novie Elmore was null and void, because, at the time of the

---

[10] To the contrary, amanuensis  is a perfectly ethical and legal way to perfect a legal document when the person whose signature is required cannot, for whatever reason, provide this. *See, Batson, supra, Meyer v. King, infra; Elmore v. Butler, infra; Waggoner v. Grant Parish Police Jury, infra; Coats v. Guaranty Bank & Trust Co., infra*. (all of which upheld the availability of amanuensis in Louisiana and which confirmed that a signature affixed through an amanuensis is legally valid, binding and fully enforceable).

transfer, M.M. Elmore's hand was too shaky to write. 169 So.2d 717 (La. App. 2 Cir. 1964). The notary therefore instructed Mr. Elmore to hold the pen and to allow the notary to write for him, which is what he did. The Louisiana Court of Appeal for the Second Circuit reversed the trial court's decision finding that the signature of M.M. Elmore affixed by the notary became the signature of M.M. Elmore, effectively perfecting the conveyance in dispute.

In *Waggoner v. Grant Parish Police Jury*, the Louisiana Supreme Court considered the validity of a petition requesting the police jury to order an election regarding a local liquor option ordinance. 203 La. 1071 (La. 1943). The Court held that numerous signatures required for the petition's validity were not actually signed by the voters whose names appeared thereon but that the voters had verbally authorized the use of their signatures, which could be made either in or out of the presence of the voters in question, because "they had in advance specifically authorized others to sign their names for them." Id. at 1081-1082. The voters had "specifically conferred upon designated persons the power and authority to sign their names for them." Id. at 1082. The Court noted, "in many instances in this case the names of the petitioners were affixed to the petition by some person other than the petitioner, and in some instances not even in the presence of the petitioners. Id. at 1084. The Court held, ***We think the names should be counted in all cases where the names of the voters were affixed to the petition by another in their presence***

***and at their direction, and in all cases where the names were affixed thereto by another with express authorization given beforehand, even though not signed in the voters' presence."*** Id. at 1085 (emphasis added).[11]

In *Coats v. Guaranty Bank & Trust Co.*, the plaintiff owned as her separate property shares of stock in the defendant's bank, which the plaintiff did not sign but had signed by her husband in her presence and at her special request and instruction. 174 La. 504 (1932).  The Louisiana Supreme Court held that the husband had "sufficient power, authority, and authorization" to endorse the stock for his wife, thereby making the stock transfer valid.[12] Similarly, in *Elmore v. Butler*, the Louisiana Court of Appeal for the Second Circuit reversed the finding of the trial court, finding that the signature of the grantor, affixed to the deed by a notary authorized to do so, became the signature of the grantor, thereby authorizing the conveyance. 169 So.2d 717 (La. App. 2 Cir. 1964).[13]

---

[11] This is consistent with the law of other states interpreting *amanuensis*.  For example, in *Kadota Fig Assan of Producers v. Case-Swayne Co.*, 167 P.2d 523, 527 (Cal. App. 3rd 1946),the court stated, "tis true that cases, some of which involved the sufficiency of signatures by mark, do state that the instruments were signed, at the request of the party thereto in the presence of the maker's thereof.  **But we are cited to no case, and know of no authority which requires that the signature of the party shall be actually made in his presence.  We are of the opinion the signature is valid and binding when the authorization to sign the instrument is conveyed directly to the amanuensis by telephone, as it was in this case.**  Id. at 527 (emphasis added).

[12] The Court held that because her name was signed in her presence without any protest by her, but with her complete sanction and approval, the signature had the same effect under the law as if she had signed it herself.  Id. at 508.

[13] Courts outside Louisiana have similarly upheld that an amanuensis may sign legal documents for other persons when authorized to do so.[13]  In *BLC Lexington SNF, LLC v. Skipworth*, the United States District Court for the Eastern District of Kentucky held that the son of a nursing home resident may sign his father's name to an admission agreement that contained an arbitration clause, thereby making the arbitration provision enforceable. 2018 WL 6816067 (E.D. Ky. 12/27/18).   In *The Sprott Wyman v. the Sprott*, a vessel

In this case, undersigned counsel were not acting under mandate for the 15 clients who could not complete their online registrations, because undersigned counsel did not make the decision to accept the settlement for them, did not make their election between EPP or DPP, and otherwise exercised no discretion or decision-making that might require a formal act of mandate (power of attorney) under Louisiana law.  To the contrary, undersigned counsel were merely acting as a scrivener, or amanuensis, by affixing these clients' signatures to their releases pursuant to their express and explicit authorization to do so.  Undersigned counsel made no attempt to copy these clients' signatures or otherwise attempt to forge their signatures as the show cause order suggests may have occurred.  To the contrary, undersigned counsel merely signed the releases pursuant to the express and explicit authorization of these 15 clients, because they were unable, for various reasons, to do so themselves.  Under Louisiana law, amanuensis signatures require no particular form as even an "X" will suffice for this purpose.  *See, Waggoner, supra*. Moreover, as the signatures are legally binding on these claimants, no fraud was committed

---

charterer signed a bill of lading in the master's name, with his knowledge and under circumstances implying his assent.  70 F. 327 (1895).  The United States District Court for the Southern District of New York found that the bill of lading was signed by the charterer as the master's amanuenses.  Id. at 330.  In *United States v. Mendoza*, the United States Court of Appeals for the Ninth Circuit affirmed that a subagent directed by the agent to sign the agent's name on a surety bond was "no more than an amanuensis" such that the surety could be held liable on the bond.  764 F.2d 699, 702 (9th Cir. 1985).

against the defendants.  The signatures have the same effect as if signed by the clients themselves.[14]

In signing the 15 releases at issue, undersigned counsel were not seeking to take any shortcuts or otherwise deceive the parties or this Honorable Court in any way, shape or form.  If this were the case, undersigned counsel could have signed all 895 of the releases for the claimants who completed their registrations if these clients had authorized undersigned counsel to do so.  But this is not what happened.  The vast majority (880 of 905) of undersigned counsel's clients were able to complete their registrations and sign their releases on their own.  But in the case of the 15 clients in question who were unable to do so, undersigned counsel acted as their amanuensis and merely affixed their names to the releases so their claims would be preserved in accordance with their authorization to do so and pursuant to Louisiana law, which is unequivocal regarding the validity and enforceability of signatures made by an amanuensis.[15]

If undersigned counsel were somehow attempting to cheat the system, undersigned counsel could have just as easily completed the registrations and signed the releases for the 13 remaining unregistered clients whom we were unable to reach

---

[14] *See, Batson, supra, Meyer v. King, infra; Elmore v. Butler, infra; Waggoner v. Grant Parish Police Jury, infra; Coats v. Guaranty Bank & Trust Co., infra.*

[15] *See, id.*

before the conclusion of the registration deadline. But this did not happen either. Since undersigned counsel could not reach these clients, we could not walk them through the registration process, and, in the event that these efforts proved unsuccessful, obtain the requisite authorizations to complete the registrations and sign the releases for them as amanuensis if these clients authorized us to do so. The claims of these 13 clients were therefore lost, because these clients could not be reached. Undersigned counsel had done everything we could legally do for them.

Based upon the foregoing, the signatures on the 15 releases in question are legally valid and binding under Louisiana law, making the signatures thereon fully enforceable.[16] Since the signatures have the same legal effect as if signed by the clients themselves, undersigned counsel respectfully submits that the signatures are fully in compliance with MSA I and CMO 58.

Despite the legal validity of the 15 amanuensis signatures under Louisiana law, undersigned counsel recognizes the importance of and preference for obtaining original signatures whenever possible. The fact that 880 of undersigned counsels' clients signed their own releases underscores that this was unequivocally the preferred procedure of the Morris Bart firm. Amanuensis was only used as the last available resort to preserve the claims of 15 clients who were unable to provide their

---

[16] *See, id.*

own signatures for the reasons set forth in the attached affidavits.  Undersigned counsel respectfully submits that we would have been derelict in our legal and ethical obligations to these 15 clients if we had not provided them with the option to sign by amanuensis since this option was legally available to them under Louisiana law. If we had refused to sign by amanuensis when this option was available, we believe this would have been legal malpractice.

Last, the fact that 13 of the remaining unregistered clients lost their claims, because we could not reach them to walk them through the registration process or, alternatively, obtain their authorization to sign by amanuensis, shows that undersigned counsel was not seeking in any way to preserve claims that could not legally be preserved.  There was no fraud.  Undersigned counsel acted properly at all times as officers of the Court in accordance with all of our legal and ethical obligations under the law.

II. **Under Louisiana Law, Attorneys Can Act as a Mandate for Their Clients in Settling Claims and Executing Legal Documents Necessary To Perfect a Settlement.**

Under Louisiana law, a verbal mandate (power of attorney) authorizing another person to negotiate and execute contracts or other legal documents is absolutely permissible.[17]  Louisiana law does not require mandates to be in writing

---

[17] In *Dennis Miller Pest Control, Inc. v. Wells*, the Louisiana Court or Appeals for the Fourth Circuit upheld a verbal mandate by a restaurant owner to an employee to enter into a pest control contract.  320  So.2d 590 (La. App. 4 Cir. 1976); *see also, Greenburg v. Forest*, which held that a mandate may be written or oral and is

or take any particular form unless the law prescribes a certain form for the underlying act.  *See*, La. C. C. Art. 2993.[18]  While a client can verbally authorize an attorney to sign various types of legal documents on the client's behalf without a written mandate, Article 3072 provides that a compromise or settlement must be made in writing or recited in open court.  *See.* La. C.C. Art. 3072.  For this reason, a mandate authorizing an attorney to compromise and settle a client's claims must also be in writing. *See, Henry v. Maxum Indemnity Co., infra*.

In *Henry v. Maxum Indemnity Co.*, the enforceability of a multi-plaintiff settlement was challenged, including whether the use by plaintiffs' counsel of mandates to negotiate and settle the claims and sign the releases, complied with the parties' agreement requiring all 148 plaintiffs to settle their claims. 2023 WL 3976118 (E.D. La. June 13, 2023).  In holding the settlement enforceable, the Court found that the agreement neither authorized nor prohibited the use of mandates.[19] The Court stated, "**just as the corporate parties to this settlement will sign the**

---

accepted expressly or tacitly.  520 So.2d 728 (La. 1988).  A verbal mandate can be established by testimonial proof consistent with the Louisiana law of conventional obligations (contracts).  In *Greenburg*, the court found no evidence in conflict with the finding of a mandate based upon an express oral authorization. *See, id*. at 732-733.

[18] In Louisiana, *inter Vivas* donations (excepting corporeal immoveables) must be accomplished in writing by authentic act.  Likewise, the renunciation of a succession must also be in writing, but also suretyships, remissions of debt, and compromises.  Accordingly, mandates to undertake these transactions must be in writing as well with the exception that an deficient verbal mandate may be cured through ratification by the principal.  *See, Sanders v. Rudd, infra.*

[19] Likewise, in this case, undersigned counsel has found no prohibition in MSA I or CMO 58 against the use of an amanuensis when this was the only option available to a claimant to preserve his or her claims, particularly when, at least in the State of Louisiana, this option is legally available to them and renders the mark or signature made by the amanuensis the signature of the person who authorized it.

**settlement through an agent, so too, it is possible for the plaintiffs to do so.**" Id. at * 9 (emphasis added).  The Court further stated, "Despite defendants' challenges to the mandate, the Court finds it sufficiently authorizes counsel *to both settle the plaintiffs' claims* and to execute the necessary releases." Id.  In other words, the mandate authorized the attorneys to make all the decisions necessary to settle the claims, including the amount and other terms of the settlement, and authorized the attorneys to sign whatever documents were necessary to memorialize and perfect the settlement decisions made by the attorneys.[20]   Specifically, as the Court in *Henry* held:

> Each plaintiff who has signed this form has given express authority to attorneys Block and Mathew Hymel to both settle the claims raised in their respective lawsuit and to sign the necessary releases. The form complies with all legal requirements and, to the extent all plaintiffs signed the form mandate as plaintiffs' counsel represents, plaintiffs' counsel is authorized to execute the releases on each plaintiff's behalf.  This means that plaintiffs will be in compliance with the requirement to provide 148 signed releases <u>even if some or all of those releases are executed by plaintiffs' counsel as mandatory for the plaintiff(s)</u>. Id. at * 9 (emphasis added).

While a client can provide a written mandate to his/her attorney to negotiate and settle claims, and execute whatever documents are necessary to perfect the settlement, a written mandate was not required in this case, because undersigned counsel did not make any decisions or otherwise perform any discretionary functions

---

[20] This is consistent with Louisiana law, which provides that the decision to accept settlement belongs to the client and the client alone. *See, Culpepper & Carroll, PLLC v. Cole*, 929 So.2d 1224, 1225 (La. 2006).

of a mandatory such that would require a written mandate under Louisiana law. *See, Batson, supra*.  To the contrary, the 15 clients at issue made all of their own decisions but simply could not complete the registration process online.  These clients only authorized undersigned counsel to complete the registrations and to sign their names to the releases, and this is exactly what undersigned counsel did.  This was a permissible act by an amanuensis under Louisiana law. *See, Batson, supra, Meyer v. King, infra; Elmore v. Butler, infra; Waggoner v. Grant Parish Police Jury, infra; Coats v. Guaranty Bank & Trust Co., infra.*[21]

III.   **Even if a Written Mandate Were Required in This Case, Which Is Denied, Any Defect in the Verbal Mandate That Was Given Has Been Cured By Ratification Under Louisiana Law.**

In *Sanders v. Rudd*, the sellers brought an action for specific performance against the purchasers of a mineral lease, which the purchasers were attempting to avoid, because the purchase agreement in question was executed by the vendor's attorney pursuant to a verbal mandate from the sellers to accomplish the sale. 427 So.2d 1271 (La. App. 2 Cir. 1983).  While the Louisiana Court of Appeals for the Second Circuit noted that the mandate was required to be in writing because it

---

[21] Further, while the Court in *Henry* found the release valid and the settlement enforceable,  the Court noted that "to the extent any plaintiff says Block lacked authority to bind them *[sic]*, that creates a cause of action between the plaintiff and Block, NOT the defendants." Id. at *10 (emphasis in original); *see also, Pierre v. T&K Express, Inc.*, 2018 WL 1413233 (E.D. La. 1/9/18) * 5 (although attorney exceed his authority in settling claims, the settlement was found binding, but subject to a separate right of action by the plaintiff against the attorney).

involved the sale of an interest in immoveable (real) property, the Court held that this defect in the mandate was cured by the seller's ratification of the agent's acts. Id. at 1274.[22]

In this case, even if the verbal authorization provided by the 15 clients in question was required to be in writing, which is vehemently denied due to the law of amanuensis, the verbal authorizations or mandates were ratified by the telephone recordation of the express authorizations provided by these clients to sign their releases. Even if these recordings were found insufficient for whatever reason, the affidavits signed by clients confirming that they provided a mandate as well as the actual releases, which they have now signed by their own hands, ratifies the actions undertaken by undersigned counsel in signing the releases as amanuensis.[23]

Again, as undersigned counsel exercised no discretionary authority on behalf of the 15 clients in question, a written mandate was not required under Louisiana law. But even if a mandate were required, which is vehemently denied, the deficiency was cured by the clients' ratification of the mandate that was given.

---

[22] The Court held that the lack of an express written mandate did not render the transaction involving immoveable property an absolute nullity or subject it to nullity at the will of third persons. Rather, citing the Louisiana Supreme Court, the Second Circuit held that "our substantive law does recognize that a principal may ratify the unauthorized acts of his agents." *See id.* (citing *Rebman v. Reed*, 286 So.2d 341 (La. 1973)(remaining citations omitted); *see also, Bolding v. Eason Oil Co.*, 178 So.2d 246 (1965)(lack of a written mandate may be cured by ratification).

[23] In this regard, in *Franklin v. Regions Bank*, the United States District Court for the Western District of Louisiana held that when a written mandate is required, the deficiency of a verbal mandate can be cured with the express ratification by the principal or by corroborating circumstances, which support that a verbal mandate occurred. 2021 WL 867261 (W.D. La. 3/8/21) at *3-4.

Undersigned counsel has thoroughly reviewed MSA I and CMO 58 and has found no prohibition against signatures that are completely enforceable and legal under the laws of the state where the signatures were made, in this instance, Louisiana. **Under Louisiana law, the signature made my an amanuensis on behalf of another person is legally regarded as having been made by the hand of the person who authorized it.[24]**

The signatures are legal and binding, and no fraud of any kind was committed, because undersigned counsel were legally authorized to act as an amanuensis based upon the verbal authorizations that were given. If the defendants sought to challenge the validity of the releases based upon the signatures, they would find no relief under Louisiana law, which governs their validity. Full faith and credit requires recognizing the validity of signatures that are legally binding and enforceable under Louisiana law.[25]

IV.   **Under CMO 86, Defense Counsel Was Required to Provide Undersigned Counsel with an Opportunity to Cure The Deficiency Before Bringing the Matter to this Honorable Court's Attention.**

CMO 86 provides that, "if Defendants reject a Release because of signature name, or other deficiency issue, Primary Counsel are directed to cure the

---

[24] *See, Batson, supra, Meyer v. King, infra; Elmore v. Butler, infra; Waggoner v. Grant Parish Police Jury, infra; Coats v. Guaranty Bank & Trust Co., infra.*

[25] U.S.C.A Const. Art. 4, § 1.

deficiencies." *See*, CMO 86 at 14, ¶ 9.  In this instance, defense counsel never provided undersigned counsel with an opportunity to address any deficiencies with respect to the 15 releases in question before the issuance of the present show cause Order, which is the subject of the within response.  Had undersigned counsel been given the opportunity to address the putative deficiencies, undersigned counsel could have provided a detailed explanation regarding the legal validity of the signatures that would have included the unequivocal line of Louisiana decisions confirming that  that the signatures were, in fact, one hundred percent valid.  Given undersigned counsel's good faith actions under Louisiana law and the entirely legal basis for having signed the releases in the capacity of amanuensis, undersigned counsel, should, at a minimum, have been given an opportunity to cure any perceived deficiencies with the releases before this matter was brought to the Court's attention, raising the suggestion that the releases were somehow fraudulent when, in point of fact, nothing could be farther from the truth.  In any event, as releases signed by the clients' own hand have now been provided to the defense, any putative deficiencies in the releases have been cured by ratification. *See, Sanders v. Rudd, supra*. Undersigned counsel respectfully suggests that defense counsel were required to follow the deficiency process mandated by CMO 86 before raising the possibility of fraud with this Honorable Court.  Given the seriousness of the assertions in question, following the deficiency process would have allowed undersigned counsel to state

its position, its good faith reliance on Louisiana law, and undertake any curative acts requested by the defense. If, after following the protocols required under CMO 86, defense counsel still believed the releases were deficient, the matter could have been brought to this Honorable Court's attention at that time.

V.    **Conclusion**

Under Louisiana law, a person may authorize an amanuensis to affix his or her signature to a legal document, which signature is then treated as having been made by the hand of the person who authorized it. Undersigned counsel undertook no discretionary acts that would require a written mandate (power of attorney) under Louisiana law. An amanuensis is merely a scrivener who signs for another person who authorizes this when he or she is unable to do so. Undersigned counsel were at all times acting in good faith and in accordance with the longstanding law of Louisiana, which governs the attorney-client relationship with the 15 clients whose releases have been called into question.

Undersigned counsel sincerely hopes that this Honorable Court will accept undersigned counsel's explanation, which is well grounded in Louisiana law, which renders the signatures in question valid, binding and enforceable. Undersigned counsel fully respects the preference for clients' signing their own releases, which is evidenced by the fact that 880 of undersigned counsel's registered clients did just that. But the only way that undersigned counsel could preserve the claims of the 15

clients in question was to act as an amanuensis, the validity of which, as set forth in great detail above, has long been recognized in Louisiana. None of undersigned counsel's acts were undertaken hastily but with full consideration of Louisiana law and the Orders of this Honorable Court. Undersigned counsel were not seeking to gain anything for themselves by acting as amanuensis but were only acting in the best interests of the clients, who, while admittedly tardy in their efforts to complete their registrations, nonetheless attempted to do so within this Honorable Court's deadline. Based upon their individual circumstances, amanuensis provided the only available means to preserve their claims. The amanuensis signatures are accorded full and binding effect under Louisiana law and are treated as if signed by the hand that authorized them.

Undersigned counsel respectfully submits that it acted in good faith at all times and that the signatures comport with MSA I and CMO 58 based upon their unassailable validity under Louisiana law. If, however, for any reason, this Honorable Court is dissatisfied in any way with undersigned counsels' explanation as to our actions, or the validity of the amanuensis signatures under Louisiana law, undersigned counsel will gladly present before this Honorable Court to respond to any questions that may shed additional light on the matters presented. Given the gravity of the issues raised in the show case Order, undersigned counsel humbly requests the opportunity to present to the Court in person if, for any reason, the

foregoing does not adequately address the issues to this Honorable Court's satisfaction.

Respectfully submitted,

By: */s/ Betsy J. Barnes*
Betsy J. Barnes (La. Bar No. 19473)
MORRIS BART, L.L.C.
601 Poydras St., 24th Floor
New Orleans, LA 70130
Telephone: (504) 525-8000
Fax: (504) 599-3380
bbarnes@morrisbart.com

By: */s/ John C. Enochs*
John Enochs (La. Bar No. 22774)
MORRIS BART, L.L.C.
601 Poydras St., 24th Floor
New Orleans, LA 70130
Telephone: (504) 525-8000
Fax: (504) 599-3380
jenochs@morrisbart.com

By: */s/ J. Robert Warren, II*
J. Robert Warren, II (La. Bar No. 23357)
MORRIS BART, L.L.C.
601 Poydras St., 24th Floor
New Orleans, LA 70130
Telephone: (504) 525-8000
Fax: (504) 599-3380
rwarren@morrisbart.com

By: */s/ Paul Villalobos*
Paul Villalobos (La. Bar No. 22881)
MORRIS BART, L.L.C.
601 Poydras St., 24th Floor
New Orleans, LA 70130
Telephone: (504) 525-8000
Fax: (504) 599-3380
pvillalobos@morrisbart.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2024, I electronically filed the foregoing document with the Clerk of the U.S. District Court, Northern District of California, using the CM/ECF system, which will send notification of such filing to all parties.

*/s/ John C. Enochs*
John C. Enochs, counsel for plaintiffs

## CERTIFICATE UNDER N.D. FLA. LOC. R. 7.1(F)

I certify that the within memorandum contains 7224 words, not counting the case style, signature block, and any certificate of service, based on the word-processing software used to prepare it.