# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885-MCR-GRJ |
| This Document Relates to All Cases | Judge M. Casey Rodgers<br>Magistrate Judge Hope T. Cannon |

## MEMORANDUM IN SUPPORT OF
## 3M COMBAT ARMS EARPLUG PLAINTIFFS' LEADERSHIP'S
## MOTION FOR COFIRMATION OF THE NINE PERCENT HOLDBACK
## ASSESSEMENT AND FOR AN ORDER SETTING FORTH THE
## PROTOCOLS AND PROCEDURES FOR THE ALLOCATION OF
## COMMON BENEFIT ATTORNEYS' FEES

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

FACTS ............................................................................................................... 5

    I.     Overview ........................................................................................ 5

    II.    Detailed History............................................................................ 6

          A.     Pre-Leadership Appointment ............................................ 6

          B.     Early Discovery ................................................................ 8

          C.     Summary Judgment on the Government Contractor Defense ............................................................................ 15

          D.     Expert Development ........................................................ 18

          E.     Bellwether Motions ........................................................ 25

          F.     Bellwether Trials ............................................................ 27

          G.    Remand Wave Workup .................................................... 30

          H.    Aearo Bankruptcy and Appeals...................................... 32

          I.     ISL Depositions and Post-Trial Motions ...................... 36

    III.   The 3M Combat Arms MDL Settlements .......................... 37

    IV.   The 3M Combat Arms Common Benefit Fund ................... 40

APPLICABLE LAW ........................................................................................ 41

ARGUMENT ................................................................................................... 45

    I.     Each Johnson Factor Supports the 9% Holdback Assessment and

Proposed Fee Award. .......................................................................... 45

    *1.*    *The time and labor required* ............................................... 47

    *2.*    *The novelty and difficulty of the questions involved* ..... 48

    *3.*    *The skill requisite to perform the legal service properly* .................................................................................................. *50*

    *4.*    *The preclusion of other employment by the attorneys due to acceptance of the case* ...................................................... *51*

    *5.*    *Customary fee* ....................................................................... *53*

    *6.*    *Whether the fee is fixed or contingent* .............................. *53*

    *7.*    *The time limitations imposed by the client or circumstances* ....................................................................... *54*

    *8.*    *The amount involved and the results obtained* .............. *55*

    *9.*    *The experience, reputation, and ability of attorneys* ..... *56*

    *10.*    *The "undesirability" of the case* ........................................ *57*

    *11.*    *The nature and length of professional relationship with the client* ................................................................................. *58*

    *12.*    *Fee awards in similar cases* ............................................... *58*

II.    A Lodestar Cross-Check Confirms the Proposed Fee Is Reasonable. .................................................................................................. 61

CONCLUSION ....................................................................................... 64

# INTRODUCTION

*In re 3M Combat Arms Earplugs* is an MDL with no historical equal. The story of the successful resolution of the largest MDL in history began with Plaintiffs' Leadership taking on unprecedented risk against a Fortune 500 company. From the start, Defendants were convinced they would get the litigation thrown out with their global preemption defense; once Plaintiffs defeated that defense, Defendants used all litigation tactics necessary to avoid paying the veterans, active-duty soldiers, and the civilians they injured. For over four years Defendants waged a "scorched earth battle," Dkt. 3610 at 6, forcing Plaintiffs' Leadership to litigate and re-litigate issue after issue. From the infancy of the MDL through general fact discovery, expert discovery, 16 bellwether trials, and the Aearo bankruptcy, Plaintiffs' Leadership engaged in "intense" and "hard-fought" litigation. PX-1, 9/8/23 Tr. at 5:2-13.

Over the past five years, dedicated teams of lawyers and staff devoted more than 364,189.5 hours of common benefit work in pursuit of justice for hundreds of thousands of Plaintiffs injured by Defendants' defective earplug—the CAEv2. The efforts of Plaintiffs' Leadership and the Court, along with the $6.01 billion global settlement providing redress for over 250,000 injured American servicemembers and civilians, squarely align with the size and significance of this landmark litigation.

This Court is well aware of the Master Settlement Agreement ("MSA") and

of the timing of 3M's payment obligations therein. Indeed, to ensure transparency, this Court has posted the MSA on its website and provided each claimant through counsel has been provided with his or her FIFO rank and the anticipated payment schedule for Expedited Payment Program ("EPP"), Deferred Payment Program ("DPP"), and Extraordinary Injury Fund ("EIF") awards. As of the date of this motion, approximately half of the EPP claimants have been paid or will be paid in the immediate future, barring any payment impediments such as bankruptcy or probate. It is estimated that by the spring of 2025, approximately 93% of all claimants will have been paid their base awards, again barring any payment impediments. Given this substantial progress, and factoring in the time it will take for the Court and Special Master to consider the appropriate allocations of attorneys' fees, Plaintiffs' Leadership believes the time is now ripe to begin the common benefit allocation process.

On September 19, 2023, this Court issued Common Benefit Order No. 4 after Plaintiffs' Leadership and 3M reached a global settlement of this litigation. The Court extended the 9% holdback assessment to include all claimants' recoveries, irrespective of whether counsel executed a Participation Agreement, finding: "The successful global resolution of this litigation has inured to the benefit of all claimants in the litigation. The plaintiff leadership team committed substantial time and

resources to mount, sustain, and bring to a conclusion this complex MDL, for the common benefit of all CAE claimants, with no assurance of success or a return on their investments. The holdback ensures those attorneys are reasonably compensated for their common benefit work." Dkt. 3875. But at that time, it was not yet "ripe" for the Court to decide "whether payment of any common benefit fees or expenses [was] appropriate." *See* Dkt. 488 at 1. The Court contemplated that "[a]t the appropriate time," Plaintiffs' Leadership would move the Court to "enter an order regarding the protocols and procedures for Special Master Dave Herndon to make recommendations to the Court on common benefit fee allocations." *See* Dkt. 1659 at 11.

Plaintiffs' Leadership now respectfully submits that the time is ripe. Accordingly, Plaintiffs' Leadership requests confirmation of the 9% holdback assessment of the Gross Monetary Recovery from the $6.01 billion Combat Arms Settlement, minus the expenses (assessments and held costs) previously awarded by this Court. *See* Dkt. 3988; Dkt. 3984. The resulting fee percentage is well within the range of common benefit fees awarded in other large cases and is appropriate under Eleventh Circuit law.

Plaintiffs' counsel who performed common benefit work ("Plaintiffs' Counsel" or "Common Benefit Counsel") quite literally "made the case" through

briefing dispositive motions out of the gate, developing discovery plans and expert witnesses, trying 16 bellwether trials over more than 14 months, defending Plaintiffs' bellwether verdicts on appeal, defeating Defendants' attempt at a forced resolution in bankruptcy, and ultimately resolving the litigation through complex, lengthy settlement negotiations.

Defendants' immunity arguments loomed over the litigation from the start; however, Plaintiffs' Counsel skillfully rebuffed Defendants' relentless pursuit of the government contractor defense, marshalling the critical evidence in discovery that ultimately allowed the Plaintiffs to prevail on their affirmative motion for summary judgment. This paved the way for Plaintiffs' Counsel to litigate Plaintiffs' claims on the merits, beginning with deftly handling the massive organizational work that this case demanded. Plaintiffs' Counsel reviewed and coded over 11 million pages of documents produced through corporate, military, expert, and case-specific discovery, which became the ammunition for 260 general-liability and case-specific depositions. Never relenting, Plaintiffs' Counsel fought—day in, day out—and won battles that all made the difference. Their efforts culminated in 16 bellwether trials with 19 different Plaintiffs, resulting in 13 Plaintiffs' verdicts and, ultimately, a global resolution.

In sum, the requested fee is fair and reasonable given the complexities of this

case, the massive amount of time devoted, the risks undertaken, the results achieved, and the benefits those results have conferred on Plaintiffs and the federal judiciary—the fair and just resolution achieved for over a quarter of a million injured soldiers and civilians. To facilitate the process going forward, Plaintiffs' Leadership also requests the Court establish protocols and procedures for the allocation of common benefit attorneys' fees with Special Master Herndon. *See* Dkt. 1659 at 11.

## FACTS

### I.    Overview[1]

From 1999 to 2015, Defendants 3M Company; 3M Occupational Safety LLC; Aearo Technologies LLC; Aearo Holdings, LLC; Aearo Intermediate, LLC; and Aearo, LLC (collectively, "3M" or "Defendants") manufactured, marketed, and sold the Combat Arms version 2 (CAEv2) earplugs to consumers and the United States military. But just about every other fact was hotly contested throughout the litigation, including who invented the CAEv2, whether the military designed various aspects of the earplug, and whether the military and servicemembers who used the CAEv2 should bear fault for the hearing loss that resulted. Ultimately, Plaintiffs' Leadership was able to prove to the Court on summary judgment that the United States military

---

[1] A list of significant pleadings, Pretrial Orders ("PTOs"), Case Management Order ("CMOs") and other Court Orders is attached as Exhibit PX-2.

was not the inventor nor the designer of the CAEv2. Plaintiffs' Leadership went on to prove to multiple unanimous juries that internal testing showed the CAEv2 did not provide the advertised level of hearing protection, that the earplug was defective, and that Defendants never warned of the CAEv2's dangers. Instead, Defendants concealed such information from the military and all users for the CAEv2's entire lifetime on the market. As a result, both servicemembers and consumers suffered life-altering hearing injuries, including hearing loss and tinnitus. Only after Defendants' internal tests came to light in another case did 3M finally pull the plug and discontinue its defective CAEv2. Recognizing Defendants' wrongdoing, multiple unanimous juries awarded substantial compensatory and punitive damages.

## II.    Detailed History

### A.    Pre-Leadership Appointment

The genesis of the civil litigation against 3M related to its CAEv2 earplugs began in the summer of 2018, when 3M reached a $9.1 million settlement with the United States Government to resolve a *qui tam* lawsuit under the False Claims Act. *See* PX-3, Military Times Article, July 26, 2018. The q*ui tam* lawsuit followed an earlier patent suit involving 3M and its competitor, Moldex, in which Defendants' secret internal report detailing the CAEv2's defects and dangers—the "Flange Report"—was produced under seal. Shortly thereafter, civil lawsuits began to be

filed on behalf of U.S. military veterans and civilians who had suffered hearing loss and tinnitus following their use of the CAEv2. 3M immediately claimed immunity from those suits under the government contractor defense, which essentially extends the government's sovereign immunity to government contractors that design products to meet the government's specifications, so long as the government is fully apprised of the possible resulting dangers.

Given the cloud of the government contractor defense looming overhead, many mass tort "experts" advised plaintiffs' attorneys against accepting these cases on behalf of our veterans. Those experts publicly disseminated their grim prophecy to the industry, predicting that "it is likely the Plaintiffs will not prevail in this case, nor will 3M settle this case." *See* PX-4, Mass Tort Nexus Executive Summary, 2019.

Despite the risks involved, certain Plaintiffs' lawyers were determined to press ahead with litigation on behalf of our veterans, active-duty soldiers, and a few government contractors and civilians. The cases were eventually consolidated by the United States Judicial Panel on Multidistrict Litigation as Case No. 3:19-MD-2885, *In re 3M Combat Arms Earplug Products Liability Litigation*, in the Northern District of Florida before Judge M. Casey Rodgers, "an able jurist with experience in presiding over a large products liability MDL." Dkt. 1 at 2.

Following consolidation on April 3, 2019, Judge Rodgers appointed Interim

Lead and Liaison Counsel for Plaintiffs on April 5, 2019. Dkt. 3 at 4. Shortly thereafter, counsel for Plaintiffs from firms all over the country assembled in Pensacola for a series of meetings prior to the Initial Case Management Conference on April 17, 2019.

On May 20 and May 21, 2019, the Court heard oral presentations for the Plaintiff Leadership Structure, pursuant to the process outlined in Pretrial Order No. 4. Dkt. 76. On May 22, 2019, the Court entered Pretrial Order No. 7 with Plaintiff Leadership Appointments, including Lead Counsel, Co-Liaison Counsel, Executive Committee, Steering Committee, and Subcommittee appointments. Dkt. 376.

### B. Early Discovery

The Court-appointed Plaintiffs' Leadership immediately went to work planning litigation strategy, developing discovery plans, and preparing to confront legal issues. 3M remained blunt about its intention to vigorously defend the litigation, employing the vast resources of a Fortune 500 company and hiring very experienced litigators. In response, Plaintiffs' Leadership used their collective expertise and spent every dollar and every hour necessary to successfully represent the servicemembers and civilians injured by Defendants.

The Court is aware of the daily and often hour-to-hour hard-fought grind of this litigation. Early on, Plaintiffs' Leadership negotiated tolling agreements and

census requirements to handle the large volumes of anticipated claimants. Additionally, given the military's significant role in this case, the parties and the Court made an early effort to coordinate government discovery pursuant to *Touhy* regulations. On May 20, 2019, the MDL Court hosted a *Touhy* Presentation by AUSA Leah Butler, AUSA Kathryn Drey, and Major Collin Evans. At that presentation, Major Evans foreshadowed that the government's cooperation and "approval doesn't mean you're going to get [the discovery] very quickly." PX-5, May 20, 2019 Tr. at 23:24-24:1.

In June, the parties met and held a productive, multiple-day Rule 26(f) conference, during which the parties negotiated the production of materials from the prior Moldex litigation, the utilization of Technology Assisted Review ("TAR") for production of electronically stored information ("ESI"), as well as depositions of 3M's current and former employees. In particular, the parties hammered out the framework for rapid and targeted general liability discovery to address the threshold issue of summary judgment relating to the government contractor defenses. After a lengthy series of intense meet and confers, the parties stipulated to and the Court entered a series of orders relating to the preservation, confidentiality, privilege, and production of ESI (Pretrial Orders Nos. 8, 9 and 10). Dkt. 440, Dkt. 442 and Dkt.

443. The discovery stay was lifted on June 20, 2019, and a Phase 1 Discovery schedule was implemented to expedite early discovery. Dkt. 452 (CMO 2).

The Court set an aggressive schedule for general discovery to be completed, *see* Dkt. 651, and Plaintiffs' Leadership committed all the necessary resources to meet the deadlines and develop a strong trial package for MDL claimants. Plaintiffs' Leadership formed a general discovery strategy designed to fend off 3M's initial motion practice and simultaneously develop the evidence that laid the groundwork for trial success and global resolution. On June 19, 2019, Plaintiffs served initial discovery requests on 3M.

With bare-bones discovery in hand, MDL Plaintiffs filed the Master Long Form Complaint and Jury Trial Demand ("Master Complaint") on September 20, 2019. *See* Dkt. 704. The 90-page Master Complaint brought 16 causes of action, including design-defect, failure-to-warn, fraud and misrepresentation, consumer-protection, and punitive-damages claims. *Id.*; *see also* Dkt. 705 (Master Short-Form Complaint).

With the Complaint defining the contours of Plaintiffs' claims, Plaintiffs' Leadership proceeded to engage in motion practice compelling Defendants to produce responsive documents to support Plaintiffs' claims. *See, e.g.*, Dkt. 1059. Plaintiffs' Leadership also received, organized, and reviewed millions of pages of

documents. Plaintiffs' Leadership accomplished this task in a tight timeframe, with documents coded and ready to be used in general liability depositions that began in fall 2019—less than six months after consolidation.

Throughout the fact and expert discovery period, the parties continued to negotiate difficult discovery disputes. Plaintiffs' Counsel persisted through multiple rounds of meet and confers, compressed briefing on disputed matters, and multiple discovery hearings before Magistrate Judge Jones. Ultimately, Plaintiffs were able to pursue their desired discovery into Defendants' design, development, testing, representations and omissions, marketing, and sales about and of the CAEv2. Through document discovery, Plaintiffs' Counsel were able to develop key trial themes surrounding the CAEv2's shortcomings—including in its design, testing, and warnings—and Defendants' concealment of the same from Government.

Just four months after Plaintiffs' initial discovery requests were served, liability depositions began. Throughout the fall of 2019 and spring and summer of 2020, Plaintiffs' Leadership took nearly 40 depositions of 27 former and current Aearo/3M employees and 30(b)(6) witnesses.[2] For several key witnesses, depositions required multiple days of testimony due to the amount of time and information covered and the complexity of piecing together the story of 3M's

_____

[2] A list of all depositions taken during general discovery—including liability, *Touhy*, bellwether, and expert depositions—is attached hereto as Exhibit PX-6.

corporate liability.

Plaintiffs' Leadership and their teams coordinated their efforts to prepare for these depositions. The locations and timing of the depositions were heavily negotiated and strategically scheduled. Leadership stacked depositions of custodians that would provide 30(b)(6) testimony on behalf of 3M/Aearo. Concurrently, members of Plaintiffs' Leadership also prepared for the depositions of current and former 3M/Aearo employees in their personal capacity, as those depositions were taken within the following weeks. Recognizing that the depositions of Defendants' current and former employees would likely serve as "trial" testimony for future bellwether trials, the assigned attorneys and their teams collaborated closely to ensure that every relevant aspect of the testimony and all essential documents were thoroughly covered—especially with overlapping liability witnesses being deposed on a daily basis or occasionally simultaneously in adjoining conference rooms.

Plaintiffs' Leadership further engaged in extensive coordination and strategizing between the deposition and briefing teams. In addition to corporate witnesses with relevant knowledge, Plaintiffs' Leadership deposed Department of Defense ("DoD") witnesses as well as DoD third-party contractors. Responding to the government contractor defense also required an extensive review of design elements of the CAEv2, including information gathered from patents, design

documents, military procurement documents, and prior 3M depositions related to the development of the earplug including those of Elliott Berger, Richard Knauer, and Robert Falco. Additionally, Leadership performed discovery and research related to the French-German Research Institute of Saint-Louis ("ISL") and their alleged involvement in the development and design of the CAEv2.

Plaintiffs' Leadership's tireless work and expertise in planning its litigation strategy, developing theories, and organizing the documents produced by 3M paid off in the general liability depositions. These depositions were essential in defeating 3M's attempt at having this litigation dismissed as a matter of law, and further set the stage for success at the bellwether trials—many of the general liability depositions eventually became essential trial clips.

Bellwether jury after bellwether jury watched and heard the testimony elicited by Plaintiffs' Leadership of Elliott Berger, Ron Kieper, Brian Myers, Jeffrey Hamer, Robert Falco, Robert Klun, Timothy McNamara, Douglas Moses, Martin Salon, and Gary Warren, among others. The stellar work by Plaintiffs' Leadership in preparing for and taking these general liability depositions in large part built the foundation for the story of how 3M so dangerously and greedily designed, marketed, and sold the CAEv2 earplugs, with gross disregard for the safety of the servicemembers and consumers who used them.

The parties' efforts to obtain document discovery from the U.S. Military and Department of Veteran Affairs, which are governed by specific *Touhy* regulations, presented unique challenges to general and case-specific discovery and proved complex to coordinate. On October 25, 2019, the MDL Court held its Sixth Case Management Conference. The Court appointed the Honorable Judge David Herndon (Ret.) as a "special master [to] help[] us all wade through the military DoD document production issues that we have and also help[] us facilitate the ultimate resolution of the affirmative defenses of 3M." PX-7, Oct. 25, 2019 Tr. at 3:15-18. In order to obtain this *Touhy* discovery, Plaintiffs' Leadership moved for and received no less than 42 Privacy Act Orders. *See* Dkts. 499, 669, 712, 750, 787, 817, 829, 855, 862, 887, 952, 957, 995, 1030, 1039, 1083, 1112, 1144, 1174, 1216, 1269, 1313, 1366, 1419, 1471, 1514, 1549, 1581, 1617, 1658, 1682, 1745, 1760, 1784, 1800, 1821, 1835, 1843, 1847, 1861, 1928, 2172, & 2302. In addition to numerous hearings and meetings on the issue, the parties and the Court traveled to Washington, D.C., and attended meetings at the Pentagon to discuss the processes and challenges in obtaining the required records, including DOEHRS audiometric data for hundreds of thousands of soldiers. Obtaining this case-specific *Touhy* discovery was instrumental for the bellwether trials and eventual wave and settlement process.

### C. Summary Judgment on the Government Contractor Defense

Before the bellwether trials could begin, the Court had to rule on the government contractor defense, which Defendants held out as a global preemption defense that was potentially MDL-dispositive. On April 1, 2020, both parties filed cross-motions for summary judgment on Defendants' government contractor defense. In their motion, Defendants argued that they satisfied each of the three prongs of the government contractor defense such that they were purportedly immune from every single one of Plaintiffs' claims. *See* Dkt. 1071. Indeed, Defendants' counsel publicly proclaimed their firm belief in the strength of this defense, professing that "[t]his case falls squarely within the heartland of [the government contractor] defense, and that defense alone should bring this massive and misdirected litigation to an end." PX-8, Reuters Article at 3, Feb. 25, 2022.

Plaintiffs' Leadership accepted the challenge of refuting Defendants' position head on. Plaintiffs, too, were confident in the strength of their argument and the record they had developed through discovery, filing an affirmative motion for summary judgment on Defendants' defense. *See* Dkt. 1072. Weaving together document discovery and deposition testimony, Plaintiffs contended the government contractor defense failed as a matter of law. Not only did Plaintiffs attack the merits

of the three primary prongs of the defense, they advanced novel arguments about the absence of a design contract and the stock-product exception.

Just two weeks after the opening motions were filed, Plaintiffs' Leadership filed their response to Defendants motion on April 14, 2020. *See* Dkt. 1089. Plaintiffs' Leadership refuted each of Defendants' arguments and challenged 3M's narrative that the government dictated the CAEv2's design and knew all there was to know about its defects and dangers. A mere seven days later, Plaintiffs' Leadership filed their reply brief, further distinguishing Defendants' arguments and authority. *See* Dkt. 1102. In total, Plaintiffs submitted nearly 100 pages of briefing and 122 voluminous exhibits.

On June 15, 2020, Judge Rodgers held a hearing on the government contractor defense. Plaintiffs' Counsel's argument alone lasted over 2 hours, with the hearing lasting over half a day. *See* Dkt. 1186.

On July 24, 2020, the Court denied 3M's government contractor defense. *See* Dkt. 1280. Further, the Court granted Plaintiffs' motion for summary judgment on the issue. *Id.* The Court held that the government contractor defense was inapplicable to any of Plaintiffs' claims, paving the way for Plaintiffs to litigate on the merits.

On August 3, 2020, Defendants filed a motion requesting the Court to certify its order for an interlocutory appeal. *See* Dkt. 1298. Plaintiffs' Leadership opposed

Defendant's motion on August 17, 2020. *See* Dkt. 1326. Defendants' motion was ultimately denied. Dkt. 1329.

But the government contractor defense was not the only complex legal issue that Plaintiffs faced. Given that the majority of Plaintiffs were injured on federal military bases, these cases also implicated the federal enclave doctrine. Prior to the start of the Group A bellwether trials, Plaintiffs' Leadership oversaw and executed briefing and oral argument in support of the choice-of-law analysis. *See, e.g.*, Dkt, 1540. Defendants argued that Indiana law should apply to all bellwether plaintiffs, which included Indiana's unfavorable 10-year statute of repose that would have placed tens of thousands of Plaintiffs' cases at risk of dismissal, if not more. Plaintiffs, by contrast, argued for a case-specific choice-of-law determination, advocating for the application of four different state laws (Washington, Georgia, Kentucky, and Alaska) under the federal enclave doctrine.

Guided by the Court's innovation, the choice-of-law hearing was structured as a "mini-trial," where both sides presented opening and closing presentations, along with sworn testimony from the Plaintiffs, 3M witnesses, and experts. Leadership collected and presented both fact and expert testimony and evidence relative to each Plaintiff to argue that the law of the state of injury controlled. The organization, presentation, and fierce advocacy of Plaintiffs' Leadership led to a

17

choice-of-law victory. Indiana would not be the default, and each Plaintiff would be permitted to advocate for his or her individual choice of law.

### D. Expert Development

To keep up with the accelerated litigation schedule and Science Day requirements, Plaintiffs' Leadership quickly got up to speed on a wide range of acoustic, audiologic, and other scientific concepts. From the start of the case, Plaintiffs' Leadership retained and worked with leading experts in hearing conservation, the development of hearing protection devices, and military rules and regulations. In connection with the first Science Day, Leadership worked with newly retained experts to preview for the Court the scientific issues anticipated in the litigation—including issues concerning sound and acoustics, hearing protection, hearing loss and associated impacts, and military specific hearing conservation programs. Further, a detailed and highly effective animation, commissioned under the supervision of the Plaintiffs' Leadership's experts, was prepared as a demonstrative to assist with Leadership's presentation of a central theory of the case.

Following the first Science Day, Plaintiffs' Leadership continued to seek out the most prominent experts in the field to support their claims, including experts in hearing protection devices, hearing science (audiologists and ENTs), hearing testing, and hearing injury treatment, as well as the military culture and doctrine surrounding

hearing conservation. Plaintiffs' Leadership met with experts across the country and carefully vetted them to determine which were best suited to this litigation. Plaintiffs' Leadership ended up submitting expert reports on behalf of 20 general expert witnesses.

As the Census and Bellwether discovery progressed, a need for a second Science Day emerged to allow the parties to make presentations to the Court surrounding medicines and substances that are considered ototoxic. On July 9, 2020, Experts for both parties testified. Dkt. 1229. Following the efforts of the second Science Day, the Court's order on ototoxic medications and illicit substances associated with hearing loss and tinnitus was filed on August 17, 2020. The Court's ruling what constituted an ototoxic substance – and more importantly what did not - further extended into the bellwether trials and provided a basis to streamline and illuminate multiple proximate cause arguments.

Another significant expert issue, in this case, involved the issue of hidden hearing loss ("HHL")—in other words, real hearing loss that is perceived but not quantitatively reflected on conventionally tested audiometric thresholds (250 to 8,000 Hz). The parties briefed and argued this on *Daubert* in advance of the Group B bellwether trials. *See, e.g.*, *Adkins* Dkt. 88. The Court sided with Plaintiffs, disagreeing with Defendant" contention that "the existence of HHL in humans has

not been scientifically established and there is no valid, reliable methodology for diagnosing it in living humans." *Id.* at 89. The Court ruled that Plaintiffs' experts could offer reliable HHL diagnoses so long as they were supported by a "measurable indicator of auditory dysfunction," such as testing of the auditory brain response (ABR), word recognition scores ("WRS"), or signal-in-noise ("SIN"). *Id.* at 10-12. This ruling, together with Plaintiffs' Leadership's efforts at the *Adkins* and *Wayman* trials to persuade juries about the compensability of HHL and tinnitus-only claims, were significant to the parties' settlement negotiations and the settlement compensation scheme.

Plaintiffs' Leadership's hard work and diligence identifying and supporting the efforts of retained expert witnesses proved fruitful during the bellwether trials, the outcomes of which contributed to the successful resolution of the litigation. Among the experts who agreed to testify on behalf of Plaintiffs were:

- Richard McKinley, an acoustical engineer and former head research scientist for the 711th Human Performance Wing, Human Effectiveness Directorate for the Air Force Research Laboratory ("AFRL"). With over 40 years of experience, Mr. McKinley became a leading scientist within the Department of Defense Hearing Conservation Program. Mr. McKinley was likewise an internationally recognized expert in steady-state and

impulse noise acoustics, hearing protector design and testing, and military standards. Mr. McKinley had first-hand experience with the CAEv2 earplugs while working at AFRL and felt compelled to testify in this litigation.

- Dr. Mark Packer, a Neurotologist and Otolaryngologist, Retired USAF Colonel, and Former Director of the Congressionally mandated Hearing Center for Excellence. In this role, Dr. Packer was responsible for the implementation of a multi-branch, cross-agency research and evaluation program designed to identify the prevalence rates, causes, and mitigation of hearing loss and tinnitus for the entire DoD. Dr. Packer served as both a general and case specific expert. Dr. Packer was familiar with the CAEv2 from his time as a Neurotologist in the Air Force and as the Director of the Hearing Center for Excellence. Like Mr. McKinley, he felt compelled to testify in this litigation.

- Christopher Spankovich, PhD, an Audiologist and Professor at the University of Mississippi. He is one of the nation's leading experts in hearing loss, tinnitus, and ototoxicity. Dr. Spankovich was central to Leadership's presentation during the second Science Day and the successful opposition of Defendants' alternative-causation arguments

regarding drug-induced hearing loss and tinnitus challenges. Dr. Spankovich was likewise a key expert in educating the Court on synaptopathy and central auditory processing disorders.

- Dr. David Eddins, PhD, an Audiologist and Professor at the University of South Florida, as well as the Director of a world-class laboratory qualified to perform hearing protection efficacy studies. Dr. Eddins secured approval from USF Internal Review Board for a comprehensive study to determine relative levels of noise reduction of the CAEv2 using human and artificial test fixtures; Dr. Eddins reported related data that substantiated the loosening defect of the CAEv2. Dr. Eddins team included Dr. Roger Juneau (ear morphology expert), Dr. Charles Formby (tinnitus expert) and Dr. Steve Armstrong (electrical engineer and acoustics expert).

- Dr. Antony Joseph, PhD, a Retired Navy Commander now practicing as an Audiologist and Professor at Illinois State University. Dr. Joseph was the Clinic Director for one of the Navy's largest outpatient centers, the Director of Public Health for overseas operations, and deployed as Medical Director during Operation Iraqi Freedom. Today, he is a lead expert in acoustic trauma secondary to blast overpressure from explosive munitions and devices.

- Dr. Moises Arriaga, a Neurotologist and Otolaryngologist at Louisiana State University; Former USAF Lieutenant Colonel and Director of Neurotology Wilford Hall Air Force Base in San Antonio, Texas.

- Dr. Lawrence Lustig, a Neurotologist and Otolaryngologist, and Chair of the Department of Otolaryngology at Columbia University.

- Dr. Marc Bennett, a Neurotologist and Otolaryngologist at Vanderbilt University.

- Allie Coetzee Leslie, a Retired Navy Rear Admiral with expertise in ethics in military procurement. As a former military leader in contracts and acquisitions for the Department of Defense, Admiral Leslie provided unique testimony regarding Defendants' improper conduct surrounding the sale of the CAEv2 to the DoD.

- Brigadier General Timothy Edens, former Commanding General and Director of Army Safety. General Edens is an expert in military standards, safety, readiness, and proper practices and procedures related to qualification and practice on military ranges. General Edens provided testimony addressing matters relating to servicemembers' exposure to hazardous noise in the military and the safety procedures in place to prevent hearing damage.

Plaintiffs' Leadership worked painstakingly to ensure that these experts had the documents, testimony, and information available for their consideration in developing, supporting, and ultimately defending their expert opinions. Plaintiffs' Leadership defended 30 general expert depositions and defended against 90 *Daubert* challenges across Bellwether Groups A, B, C, and D. The quality of Plaintiffs' general experts and their preparation for trial played an important role in the bellwether trial successes. *See* PX-9, Expert *Daubert* Chart.

Plaintiffs' Leadership also identified, retained, and supported the efforts of case-specific causation experts to evaluate and render causation opinions for each of the bellwether cases. Again, Plaintiffs' Leadership ensured the case-specific expert reports were well-supported and would withstand Defendants' inevitable challenges. Plaintiffs' Leadership defended 50 case-specific depositions and successfully defended over 30 case-specific *Daubert* motions during the bellwether process.

Defendants likewise had their own respective teams of experts, and Plaintiffs' Leadership was responsible for preparing for and taking their depositions. Defendants disclosed 13 general experts, and Plaintiffs' Leadership deposed all of them. Plaintiffs' Leadership also filed *Daubert* challenges against every one of Defendants' general experts. Many of those challenges were successful, in whole or in part, and Defendants' experts were appropriately limited by the Court.

Defendants disclosed 22 case-specific experts for Bellwether Groups A-D. Plaintiffs' Leadership deposed all of them and filed 22 *Daubert* challenges. Just as with the general experts, many of those challenges were successful, and the juries only heard the appropriate expert testimony at the bellwether trials.

### E. Bellwether Motions

In preparation for the bellwether trials, there were multiple discovery disputes related to the production and redaction of Plaintiffs' sensitive medical records. Defendants sought production of case-specific medical records from the Veteran's Administration ("VA"), the DoD, and the Veterans Benefits Administration. Multiple hearings were held where Plaintiffs' Leadership advocated on behalf of the servicemembers, particularly defending against the improper use of their mental health records. Defendants moved to compel unredacted records, but Plaintiffs' Leadership worked to fiercely protect the information with appropriate redactions. The Court ultimately held that the Bellwether Plaintiffs' "garden variety" emotional distress claims were insufficient to place Plaintiffs' mental health in controversy. This dispute persisted in case-specific permutations, requiring multiple hearings before this Court as well as extensive review and redaction of medical records for use at trial.

The parties also engaged in significant motion practice on summary judgment,

filing 21 motions in the bellwether cases. Even with the government contractor defense adjudicated, there were several defenses that Plaintiffs affirmatively attacked on summary judgment, including the sophisticated intermediary doctrine, learned intermediary doctrine, and bulk supplier defense; superseding cause; apportionment and contributory fault; statutes of limitation and statutes of repose; and the open-and-obvious defense, among others. Plaintiffs further defended their claims against Defendants' repeated attacks, arguing for discovery rule or tolling of statutes of limitations and militating evidence and applicable law to support Plaintiffs' product liability, negligence per se, fraud and misrepresentation, and punitive damages claims. Although the issues may have repeated from case to case, the applicable state law and case-specific facts varied, requiring intensive research and writing efforts so that Plaintiffs could try their claims on the merits.

Plaintiffs also engaged in extensive briefing and oral argument surrounding the myriad of bellwether motions in limine. In Group A, Plaintiffs' Leadership brought dozens of omnibus motions, which set the stage for all the trials to come. This included matters relating to the government contractor defense, VA Compensation and Pension documents and determinations, and collateral-source issues, among others. Case-specific motions in limine were also brought on behalf of each individual Plaintiff. And Plaintiffs of course defended against Defendants'

motions in limine, as well as their motions for reconsideration. In total, the Court adjudicated 260 motions in limine across the 19 bellwether cases. Plaintiffs' Leadership briefed and argued each of those motions.

It took a staggering amount of work and money for Plaintiffs' Leadership to get each and every one of the 16 bellwether cases to trial. Leading into the trials, there were extensive meet and confers, briefing, and argument on the general liability deposition designations and exhibits. More often than not, even after the Court had previously ruled, 3M would re-argue certain general designations during subsequent trials. Plaintiffs' Leadership also handled meet and confers, briefing, and argument concerning the case-specific deposition designations and exhibits. Plaintiffs' Leadership further responded to various pre-trial order requirements and drafted and submitted proposed verdict forms and jury instructions.

### F.     Bellwether Trials

Prior to the bellwether trials, 3M was steadfast in its refusal to pay anything to resolve the claims brought against it by servicemembers harmed by the CAEv2. Leadership knew that winning trials would be critical foundation for negotiating any future settlements. In preparation for the bellwether trials, members of Plaintiffs' Leadership organized and conducted three separate focus groups over many weeks. Team members prepared various trial strategies, presentations, and witness

examinations to present to mock juries. Post-mock trial analysis was performed, implementing and refining bellwether trial strategies based on the deliberations and feedback from the jurors. This team also worked to develop what became known as the "3M Storyboard," which was used demonstratively during the bellwether trials to present both general liability documents and scientific evidence related to hearing loss. Detailed and highly effective animations, commissioned under the supervision of the Plaintiffs' Leadership's experts, were further perfected to ensure that juries could understand the complex science needed to find in favor of the bellwether Plaintiffs.

Between March 29, 2021, and May 20, 2022—under 14 months—16 bellwether trials on behalf of 19 bellwether Plaintiffs took place throughout the Northern District of Florida (Pensacola, Tallahassee, and Gainesville courthouses): *EHK* (involving Plaintiffs Estes, Hacker, and Keefer), *McCombs*, *Baker*, *Adkins*, *Blum*, *Palanki*, *Camarillo*, *Finley*, *Montero*, *Stelling*, *Sloan-Wayman* (involving Plaintiffs Sloan and Wayman), *Vilsmeyer*, *Wilkerson*, *Kelley*, *Vaughn*, and *Beal*. The bellwether trials implicated 10 different states' laws and involved 10 different presiding judges. Ten of the bellwether trials resulted in verdicts for 13 Plaintiffs, and the remaining six trials resulted in defense verdicts.

3M defended each bellwether case vigorously. Leading up to and during trial,

and typically under the able supervision of Judge Herndon, the parties engaged in serial (daily) meet and confers on matters such as demonstratives or in limine issues. Through the course of the bellwether trials, there would be serial briefing by 3M to address alleged prejudicial atrocities that happened at trial that day for which it sought remedies, including multiple motions for mistrials. Following the close of each Plaintiff's case, 3M would make its inevitable directed verdict motion, often requiring on-the-spot rebuttal by Plaintiffs' Leadership.

When Plaintiffs' Leadership obtained favorable verdicts, there would be a litany of post-trial motions, and if those were denied, the inevitable appeal. In their post-trial briefings, Defendants moved for new trials, requested remittitur, challenged statutory caps on damages, and renewed their motions for judgment as a matter of law. All post-trial briefings required timely and diligent responses and motion practice by Plaintiffs' Leadership to protect and preserve the trial successes. To say the bellwether trials were hard-fought would be an understatement.

Despite having lost 10 of the 16 bellwether trials—with 13 out of the 19 Plaintiffs prevailing (resulting in more than $220 million in verdicts)—3M never offered one dollar on any of the bellwether cases until the litigation ultimately settled post-bankruptcy. 3M fought each verdict, bringing appeals in *Estes*, *Hacker*, *Keefer*, *Baker*, *Adkins*, *Vilsmeyer*, *Wilkerson*, and *Camarillorazo*. All but one of these cases

were fully briefed, and the *EHK* and *Baker* cases were argued before the Eleventh Circuit Court of Appeals. 3M's unrelenting strategy to delay and evade payment continued, but Plaintiffs' Leadership never flinched.

As of May 2022, servicemembers had been awarded over $220 million, yet Defendants had still not offered a penny to resolve any of the bellwether verdicts. Thus, Leadership continued to dedicate the time and financial resources to this case to ensure justice for servicemembers and civilians injured by the CAEv2.

## G.  Remand Wave Workup

On November 22, 2021, following the completion of several bellwether trials, the Court issued Case Management Order No. 31 (Wave Order #1) stating that it would be requiring "several hundred cases" "to [be] work[ed] up" "simultaneously in waves" of "approximately 500 cases per wave." Dkt. 2304 at 1. Three other wave orders followed soon thereafter. Dkt. 2787, Dkt. 3126, Dkt. 3478. These orders required full workup of groups of 500 cases and contemplated eventual remand to the transferor courts. *See also* Dkt. 3188.

The majority of Plaintiffs' Leadership's efforts during the wave process were focused on organizing and sharing institutional knowledge. That coordination and effort was central toward keeping counsel focused on their common goal: a full and fair resolution of the litigation on behalf of all Plaintiffs. So that each and every

Plaintiff could benefit from the years of common benefit work, and to impart the learnings of the bellwether cases to individual Plaintiffs' lawyers, Plaintiffs' Leadership organized a series of meetings and training sessions in Pensacola. At these meetings, individual Plaintiffs' attorneys were provided with the materials necessary to effectively represent their clients during the wave workup and beyond. Work product including expert reports, deposition designations and videos, trial exhibits, sample motions, and more was made available to these attendees; nothing was withheld. These meetings proved to be invaluable to individual Plaintiffs' counsel, with attendees reporting they "have never before been invited by lead counsel to come watch part of a trial or participate in meetings discussing the current state of the litigation" and that they "appreciate not only the hard work [Leadership] continue[s] to put in on behalf of all of our clients but also [Leadership's] inclusion of lawyers outside your firm and inner circle." *See* Aylstock Affidavit ¶ 13.

In short, just as they had done prior to the wave process, Plaintiffs' Leadership was there to assist the individual case lawyers throughout the wave process and to provide advice along the way to any lawyer who asked for assistance. In total, leadership sent over 400 coordinated emails to counsel as part of their efforts to efficiently and effectively keep the MDL informed and unified. The streamlined communication from Leadership was essential in keeping Plaintiffs' counsel

informed of case updates, meetings, and litigation strategy. These communication efforts were repeatedly praised by counsel for plaintiffs who appreciated the "excellent communication with this MDL" and were impressed by the way that Leadership "has organized and developed the biggest mass tort in history." *See* Aylstock Affidavit ¶ 14.

### H. Aearo Bankruptcy and Appeals

On June 10, 2022, the MDL court issued an order directing the parties to attend a mediation in July. Dkt. 3188. The Plaintiffs' Leadership was hopeful that the time had come to reach a reasonable resolution of the hundreds of thousands of pending cases, and they prepared for the upcoming mediation in earnest. The mediation was held in New York City over multiple days beginning on July 13, 2022. Unfortunately, that mediation was not successful, although the parties did commit to continuing the negotiations in the coming weeks and months.

Less than two weeks after that mediation, 3M ordered its subsidiary, Aearo Technologies, to file for Chapter 11 bankruptcy. That very day, 3M's counsel in this MDL filed a Notice of Bankruptcy and Adversary Proceedings on behalf of Aearo Technologies LLC, et al. in the Southern District of Indiana. *See* Dkt. 3328. 3M immediately petitioned the Bankruptcy Court for an immediate stay of all MDL litigation, seeking shelter under bankruptcy law meant to protect the debtor in

bankruptcy. (The Aearo entities automatically received the benefit of such a stay under the bankruptcy code.)

With a funding agreement and bankruptcy filing, 3M (through its wholly owned subsidiary, Aearo) attempted to not only avoid accountability for the verdicts entered against it, but also to prevent future trials altogether and skirt responsibility for the injuries that hundreds of thousands of veterans suffered while using defective CAEv2 earplugs. At its "first day" hearing in the Bankruptcy Court, Defendants contended that its expert analysis showed that its liability pursuant to the bankruptcy code was less than $1 billion, and that such sum would purportedly compensate hundreds of thousands of claimants, filed and unfiled. On September 14, 3M's in-house counsel Kevin Rhodes praised its expert's methodology in the $1 billion claims estimation, reiterating 3M's belief that paltry amount given the number of claimants (likely more than 300,000 in the bankruptcy context) would provide full and fair compensation to all victims of Defendants' wrongdoing. PX-10, 3M Company (MMM) Annual Laguna Conference (Transcript), Sep. 14, 2022.

In other words, assuming that a very conservative number of approximately 250,000 claimants would come forward in the bankruptcy context, the average gross payout to each claimant under 3M/Aearo's bankruptcy plan would be under $4,000. Ultimately, and after nearly a year of additional costly and needless litigation,

Plaintiffs' Leadership was successful in blocking those efforts, but not without expending considerable time and resources in both the MDL and the Bankruptcy Court. Just a few examples of such efforts are set forth below.

On August 4, 2022, Plaintiff Guy Cupit filed in the MDL court a Motion for Ruling on 3M Company's Waiver and/or Judicial Estoppel of Any Defense Regarding Its Full Liability. Plaintiffs' Leadership submitted a declaration in support of the motion and asked this Court for a ruling that 3M had waived or was judicially estopped from defending, arguing, or otherwise attempting to avoid any portion of its liability based on the argument that 3M is the "wrong party" and does not bear full independent liability for all CAEv2-related injuries.

Plaintiffs' Leadership efforts and strategic motion were a success. While the Court did not find the issues ripe to rule on the estoppel, the order was a critical step in preventing such arguments. The well-crafted plan worked, shunting any efforts to claim that 3M should not bear the full weight of the liability for the CAEv2. Plaintiffs' Leadership were able to aid the Court to see that Defendants were "displeased with the rulings of this Court and the bellwether jury verdicts … [and] attempting to evade the 3M primacy narrative but only—and *admittedly*—because it no longer fits the companies' strategic objectives." Dkt. 3386 at 6. Plaintiffs' Leadership's efforts, including strategic filings to dismiss Aearo and proceed against

3M in certain Wave Cases, helped prevent the argument that 3M should not be 100% liable. The Court said it best: "3M Company's statements and course of conduct since the start of the MDL are premised on two truths—that 3M Company is directly and independently responsible for the CAEv2 liability in this litigation and that its subsidiaries are parties in name only." *Id.*

Meanwhile, in the Bankruptcy Court, a Preliminary Injunction Hearing was held on August 15-17, 2022, in support of Defendants' efforts to prohibit any and all litigation against 3M from proceeding in this MDL. Plaintiffs' Leadership, along with CAE claimants' bankruptcy counsel, vehemently opposed the motion and actively participated in the preparation of the pleadings and in the hearing itself. On August 26, 2022, the Bankruptcy Court issued an Order Denying the Motion for Preliminary Injunction.

The Aearo Debtors appealed the Order Denying the Motion for Preliminary Injunction, and the Seventh Circuit Court of Appeals held oral argument on April 4, 2023. Again, Plaintiffs' Leadership was instrumental in drafting of the appellate pleadings, creating the appellate record, and preparing for the oral argument.

Thereafter, Plaintiffs' Leadership, acting in concert with the CAE Claimants' Committee, moved to dismiss the Aearo bankruptcy as a sham. The Bankruptcy Court held a multi-day hearing on April 19-21 and April 24-25, 2023, in

Indianapolis. Nearly one year after Aearo filed for bankruptcy, on June 9, 2023, Judge Jeffrey Graham dismissed the Aearo bankruptcy. The Court stated that it "simply cannot conclude that either entity is presently in distress, even under a generous reading of that term's meaning." *In re Aearo Techs. LLC, et al.*, Case No. 22-02890-JJG-11, Dkt. 1744 at 41 (S.D. Ind. Bankr. June 9, 2023). 3M again appealed this ruling to the Seventh Circuit Court of Appeals.

## I.     ISL Depositions and Post-Trial Motions

Finally, the tide had turned in favor of a reasonable resolution for Plaintiffs. However, 3M had one more trick up its sleeve. Unwilling to admit the government contractor defeat, 3M attempted to sow doubt as to who was the true creator of the design for the CAEv2 earplug that multiple juries had found 3M defectively designed. This effort involved deposing French scientists Dr. Dancer and Dr. Hamery from the Institute of Saint-Louis ("ISL"), a research laboratory associated with the French and German ministries of defense. They hold several patents for hearing protection devices and their components, including a patented, non-linear filter used in the CAEv2. Elliott Berger, the designer of the CAEv2, consulted with the French scientists about their non-linear filter and incorporated it into the CAEv2 design. The Plaintiffs' Leadership hired French counsel and traveled overseas to participate in the depositions, which were conducted pursuant to the Hague

Convention, and secured testimony that the French scientists had not dictated the CAEv2's design—instead, 3M/Aearo had. Contrary to 3M's narrative, the ISL scientists had neither seen the final CAEv2 design specifications nor the testing results detailed in the infamous "Flange Report." In fact, the French scientists had cautioned against using short, hard-stemmed earplugs like the CAEv2. Leadership was highly effective and successful in eliciting factual testimony from the scientists, which prevented sixteen bellwether trials being unraveled.

## III.    The 3M Combat Arms MDL Settlements

On August 29, 2023, 3M agreed to pay up to $6,010,000,000 to resolve all claims that its CAEv2 caused the user ("CAEv2 Claimants") to suffer hearing-related injuries. The total settlement amount is the sum of three separate settlements for three distinct groups of CAEv2 Claimants: (1) CAEv2 Claimants who went to trial during the MDL bellwether process and obtained a verdict, (2) CAEv2 Claimants whose cases were selected for discovery and pre-trial workup in the "wave" process implemented by the Court, and (3) all other CAEv2 Claimants. The global settlement resolved more than 250,000 lawsuits in the MDL and Minnesota state court filed by United States military servicemembers, veterans, and civilian users, alleging CAEv2-related injuries.

Though the years of on-again, off-again negotiations are confidential, the long

and tortured history of these settlement negotiations is well known to the Court. Multiple multi-day settlement negotiations were held in Pensacola, Florida; New York City, New York; Philadelphia, Pennsylvania; and Washington, D.C. The Court appointed multiple settlement special masters to assist the parties in the negotiations, and Plaintiffs' Leadership prepared earnestly for each of those negotiating sessions. Mountains of data were examined, sorted, and carefully analyzed in an attempt to determine the fair value of the litigation as a whole. But it was not until after the dismissal of the bankruptcy proceedings that the negotiations began to bear fruit.

Ably guided by the Honorable Judge Herndon and Magistrate Judge Hope Cannon, members of the Plaintiffs' negotiating committee worked literally around the clock with their counterparts on the other side in hopes that a global settlement could be reached. Many tense moments occurred during those negotiations, but ultimately the parties agreed on a resolution. Even subsequent to reaching the agreement in principle, the Plaintiffs' negotiating committee continued to negotiate non-stop to bring about a final Master Settlement Agreement.

During the September 8, 2023 Case Management Conference where details of the settlement were presented, the Court commended Plaintiffs' Leadership and their unprecedented collaboration and determination in achieving the monumental settlement. *See* 9/8/23 Tr. at 5:2-5:13. The settlement also received resounding

support from third parties including sources such as Military.com, which lauded the settlement as "[s]triking a balance between securing substantial value for vets and preventing 3M from facing a real bankruptcy brought on by too large a settlement, which would leave veterans with nothing." PX-11, Military.com Article, Oct.19, 2023. Multiple other veterans' organizations also hailed the historic settlement as fair to the Plaintiffs. PX-12, Veterans of Foreign Wars Article, Sept. 18, 2023. Ultimately, that fairness was borne out by the Plaintiffs themselves, with over 99.8% of the Plaintiffs agreeing to participate in the 3M CAEv2 settlement program.

Notably, 3M repeatedly told the public and its shareholders that any liability from this litigation was not probable. *See* PX-13, United States Securities and Exchange Commission Form 10-K for 3M Company For the Year Ended December 31, 2018 (2019); PX-14, United States Securities and Exchange Commission Form 10-K for 3M Company For the Year Ended December 31, 2019 (2020); PX-15 United States Securities and Exchange Commission Form 10-K for 3M Company For the Year Ended December 31, 2020 (2021). Even after filing of Aearo's bankruptcy in 2022, 3M assured its shareholders there would be no liability in excess of the $1 billion funding agreement—despite 3M having over $220 million in judgments and over 200,000 claims still pending against it at the time of the bankruptcy filing. Ultimately, it was only because of the tireless and skilled efforts

of Plaintiffs' Leadership that the ultimate resolution of the MDL resulted in more than six times this amount.

## IV.    The 3M Combat Arms Common Benefit Fund

The Court entered several Common Benefit Orders ("CBO") starting with CBO No. 1, Dkt. 488, on July 12, 2019, and culminating with CBO No. 5, Dkt. 3968, on December 14, 2023. Other orders of the Court also touch on common benefit issues, including Case Management Order ("CMO") No. 67, Dkt. 3864, on September 11, 2023. In CBO No. 2, on January 9, 2020, the Court appointed Randall Sansom, CPA, as the Common Benefit Fund Special Master, a position in which he continues to serve. *See* Dkt. 900 at 1. *See also* Declaration of Randall Sansom. CBO Nos. 1 and 2 outline the process for the massive undertaking of collecting, reviewing, and auditing submissions from Plaintiffs' counsel of time spent and costs incurred. The MDL 2885 3M Combat Arms Common Benefit Fund was established by Common Benefit Order No. 3, as amended by Common Benefit Order No. 4. *See* Dkt. 1659; Dkt 3875. These orders require 3M to withhold 9% of the Gross Monetary Recovery paid to a plaintiff whose case was subject to the jurisdiction of MDL 2885 or any state court.[3]

---

[3] This 9% holdback covers both common benefit attorneys' fees and expenses. Because the Court recently authorized reimbursement of all assessments and held costs, *see* Dkt. 3988; Dkt. 3984, Plaintiffs' Leadership is not requesting the full 9% as a fee, but only what remains and after the cost reimbursement.

# APPLICABLE LAW

For well over a century, the Supreme Court has recognized the "common fund" exception to the general rule that a litigant bears his or her own attorneys' fees. *Trustees v. Greenough*, 105 U.S. 527 (1882). "[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). The common fund doctrine is rooted in equity, preventing the unjust enrichment of a person who did not contribute to the litigation's cost "by assessing attorney's fees against the entire fund." *Id.* Essentially, the common fund doctrine allows attorneys who contribute the most to an MDL to be fairly compensated for their work. *Id.*; *see also Turner v. Murphy Oil USA, Inc.*, 422 F.Supp.2d 676, 680 (E.D. La. 2006) ("Thus, to avoid the problem of free-riding, the U.S. Supreme Court over 125 years ago approved the common benefit doctrine, which provides that when the efforts of a litigant or attorney create, preserve, protect, increase, or discover a common fund, all who benefit from that fund must contribute proportionately to the costs of the litigation." (citing *Boeing Co.*, 444 U.S. at 479).

"[T]he [MDL] court's authority to award common benefit fees and expenses to counsel who provided work beneficial to all Plaintiffs from the recoveries of all Plaintiffs is well-established." *In re Ethicon Physiomesh Flexible Composite Hernia*

41

*Mesh Prod. Liab. Litig.*, 2022 WL 17687425, at *5 (N.D. Ga. Nov. 14, 2022); *see also, e.g.*, *In re Genetically Modified Rice Litig.*, 835 F.3d 822, 828 (8th Cir. 2016) ("No party challenges the propriety of the Common Benefit Order or the 'well established' authority of a district court to compensate leadership lawyers . . . ."). Such an award is supported by the common fund doctrine, equity, quantum meruit, and the Court's broad managerial authority. *See In re Vioxx Prods. Liab. Litig.*, 760 F.Supp.2d 640, 647-48 (E.D. La. 2010). Indeed, the Court's authority to compensate attorneys for common benefit work at the conclusion of a case is the natural byproduct of the Court's authority to appoint leadership counsel to do common benefit work. *See In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 549 F.2d 1006, 1016 (5th Cir. 1977) ("[I]f lead counsel are to be an effective tool the court must have means at its disposal to order appropriate compensation for them."); *In re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113, 129-30 (2nd Cir. 2010) ("[T]he desirability—indeed, the compelling need—to have pretrial proceedings managed or at least coordinated by lead counsel or a steering or executive committee demands the existence of a source of compensation for their efforts on behalf of all."); Manual for Complex Litigation, § 14.215 (4th ed. 2004) (noting that "Lead and liaison counsel may have been appointed by the court to perform functions necessary for the management of the case but not appropriately charged to their clients.").

The district court has broad discretion to determine the amount of a fee award given its "superior understanding of the litigation," but it must also "provide a concise but clear explanation of its reasons for the fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). The Eleventh Circuit uses the percentage method to "compensate attorneys who recovered an identifiable sum by awarding them a reasonable fraction of that sum." *In re Ethicon Physiomesh*, 2022 WL 17687425, at *6 (citing *In re Equifax, Inc. Customer Data Security Breach Litig.*, 999 F.3d 1247, 1278 (11th Cir. 2021)); *see Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 775 (11th Cir. 1991). "Under the percentage method, the court awards attorney's fees as a reasonable percentage of the common fund to compensate attorneys who recovered an identifiable sum by awarding them a reasonable fraction of that sum." *In re Ethicon Physiomesh*, 2022 WL 17687425, at *6 (citing *In re Vioxx*, 760 F.Supp.2d at 650).

The value of a settlement fund includes all monetary amounts actually paid (or irrevocably deposited into a fund for payment) to or for the benefit of Plaintiffs in the litigation. *In re Ethicon Physiomesh*, 2022 WL 17687425, at *6 (citing *Vioxx*, 760 F.Supp.2d at 652). Where, as here, the settlement may involve payments over a period beyond the point in time when the common benefit fee is determined, the settlement fund also includes a "reasonable estimate" of the amount of future

payments that are expected to be made to the Plaintiffs. *See, e.g.*, *In re Ethicon Physiomesh*, 2022 WL 17687425, at *6; *see In re Oil Spill by the Oil Rig "Deepwater Horizon*,*"* 2016 WL 6215974, at *15 (E.D. La. Oct. 25, 2016); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 334 (3d Cir. 1998); *Weiss v. Mercedes-Benz*, 899 F.Supp. 1297, 1304 (D.N.J. 1995).

The *Johnson* factors guide the Court's inquiry into the reasonableness of a percentage-based fee. *E.g.*, *Amorin v. Taishan Gypsum Co.*, 861 F. App'x 730, 735 (11th Cir. 2021) (citing *Johnson v. Ga. Highway Exp., Inc.*, 488 F.2d 714 (5th Cir. 1974)). Those factors are: (1) time and labor required; (2) novelty and difficulty of the questions; (3) skill requisite to perform the legal service properly; (4) preclusion of other employment by the attorney due to acceptance of the case; (5) customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) amount involved and the results obtained; (9) experience, reputation, and ability of the attorneys; (10) undesirability of the case; (11) nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* at 735 n.7 (citing *Johnson*, 488 F.2d at 717-19).

Eleventh Circuit courts may use a lodestar analysis[4] in conjunction with the

---

[4] Lodestar analysis requires the court to first determine the number of hours reasonably spent by the Plaintiffs' counsel on the matter and multiply those hours by an hourly rate the court deems reasonable for similarly complex non-contingent

*Johnson* factors to "cross check" the reasonableness of a common benefit fee award. *See Ethicon*, 2022 WL 17687425, at *6; *In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1100 (11th Cir. 2023) (holding that the district court did not abuse its discretion in using both the *Johnson* factors and the lodestar analysis).

## ARGUMENT

### I.  Each Johnson Factor Supports the 9% Holdback Assessment and Proposed Fee Award.

The work Plaintiffs' Counsel performed to obtain this $6.01 billion global settlement is, by definition, exceptional. Because of their unrelenting efforts, more than 250,000 servicemembers and civilians will benefit from this historic settlement. Through four years of hard-fought litigation on behalf of those servicemembers and civilians, Plaintiffs' Counsel performed for the following common benefit work:

- preparing for and participating in 24 monthly status conferences.

- drafting and lodging 130 written discovery requests;

- analyzing and cataloging more than 11 million pages of documents;

- taking or defending 260 depositions;

- finding, retaining, and working with more than 40 expert witnesses from numerous fields of discipline, culminating in dozens of experts reports;

---

work. That lodestar figure may then be adjusted upward or downward for certain factors known as multipliers, such as contingency and the quality of the work performed, to arrive at a final fee. *Camden*, 946 F.2d at 772.

- learning complex medical and scientific issues;

- researching and defending against motions on a variety of legal issues, including but not limited to Defendants' global preemption defense, choice of law, *Daubert*, summary judgment, and numerous discovery disputes;

- preparing for and presenting oral argument on the foregoing legal issues;

- preparing bellwether cases for trial, including pretrial conferences, hundreds of motions in limine, countless disputes over deposition cuts and exhibits, and adjudicating discovery disputes before the Special Master;

- preparing for and trying 16 bellwether trials spanning approximately 36 weeks between March 2021 and May 2022 to verdict;

- defending those verdicts on appeal, with six fully-briefed merits appeals and an interlocutory appeal with MDL-wide implications to boot;

- providing support to all Wave Plaintiffs, including by preparing and disseminating liability and medical information to Wave Counsel, participating in weekly meet and confers and heated negotiations, and engaging in motion practice; and

- negotiating a $6.01 billion global settlement that resolved the verdict cases, wave cases, and the more than 250,000 claims from all other claimants.

In light of the foregoing, Common Benefit Counsel's extraordinary efforts and

results justify a 9% assessment and the resulting fee award.

### 1. The time and labor required

All told, Common Benefit Counsel (including partners/members, senior associates, associates, law clerks, and paralegals) spent more than 364,189.5 hours preparing and litigating this case for the good of all Plaintiffs. This is a staggering number of hours—the equivalent of 175 people working full-time for a year—and this enormous collective effort of time and labor supports a 9% holdback assessment and the resulting fee award.

Much like in cases where similar fee awards have been granted, Common Benefit Counsel in this MDL "had to negotiate trial plans and coordinate various schedules [including with the Department of Defense and Department of Justice], engage in extensive discovery involving millions of pages of documents from Defendants and third parties, develop Plaintiff [fact sheet and census forms], . . . and expend thousands of hours on pleadings and complex motions practice, the work-up of [19 bellwether cases to verdict], and leadership devoted itself to negotiating the terms of a private Settlement Agreement, which itself was time- and labor-intensive and complex." *See In re Ethicon Physiomesh*, 2022 WL 17687425, at *9. Plaintiffs' Leadership's work continues to this day through managing and administering the global settlement process to fully and finally resolve all 250,000-some cases.

The hours expended by Common Benefit Counsel in this case far surpass the hours spent in other comparable cases where requests for similar (and even larger) fee awards have been approved. *See, e.g.*, *Chinese-Manufactured Drywall*, 424 F.Supp.3d at 503 (11.4% common benefit fee for 109,236.22 hours of work); *In re Ethicon Physiomesh*, 2022 WL 17687425, at \*9 (10% for 50,993.25 hours); *Actos*, 274 F.Supp.3d at 517, 550 (8.6% for more than 200,000 hours).

Accordingly, the first *Johnson* factor favors the 9% holdback assessment and the resulting fee award.

### 2.    The novelty and difficulty of the questions involved

The Court has repeatedly been reminded of the complex nature of this case. This MDL hinged on numerous complex and novel legal issues, some of which could have brought this entire litigation and all 250,000 member cases to a screeching halt. From the start, Defendants insisted that the government contractor defense, among others, barred Plaintiffs' claims in toto. Those predictions proved incorrect due to Plaintiffs' Leadership's unmatched creativity, legal acumen, and zealous work ethic to defeat Defendants' global preemption defense after more than a year of extensive preparation, scorched-earth briefing, and a day-long oral argument on cross-motions for summary judgment in the middle of the COVID pandemic. Not to mention, Plaintiffs' Leadership went on to protect all 250,000 cases against formidable

argument on a plethora of other issues, including *Daubert*, choice of law, damages caps, preemption under the Noise Control Act, and appeals to name a few.

In addition to complex legal issues in global motion practice, the individual cases presented their own challenges, of course. Bellwether cases required Plaintiffs' Leadership to master complex medical and scientific issues relating to noise exposure, personal protective equipment, and hearing science, as well as EPA labeling regulations and DoD rules and regulations. Not only was Plaintiffs' Leadership required to navigate difficult legal questions typically presented in product liability cases, but significant issues relating arose in all of these cases. The usual statute-of-limitations issue became exceedingly more complex with the addition of the federal-enclave doctrine and discovery of latent hearing injuries; the typical alternative-causation inquiry was complicated by the sophisticated-intermediary doctrine, superseding-cause defense, and apportionment to an immune third party.

Unexpected, to be sure, the COVID crisis only exacerbated the hurdles that Plaintiffs' Leadership had to overcome. Leading this litigation required fortitude and persistence, as well as financial sacrifice. Given the substantial costs per trial, the impediments to pursuing these cases were enormous. The global settlement agreement was similarly hard-fought, requiring creativity and adaptability to novel

and complex issues, such as a portion of the settlement paid in newly issued common stock.

"[T]he fact that Plaintiffs' counsel obtained [these results] in the face of formidable legal opposition further evidences the quality of their work." *Stagi v. Nat'l R.R. Passenger Corp.*, 880 F. Supp. 2d 564, 570 (E.D. Pa. 2012). At every turn, Defendants never gave up, filing dispositive motions on nearly every claim and *Daubert* challenges against nearly every one of Plaintiffs' experts in the bellwether cases. At trial, Defendants attempted to curtail the Plaintiffs' case through *in limine* motions and motions for directed verdict, only to then attempt to unwind or remit jury verdicts through post-trial motions, appeals to the Eleventh Circuit, and Rule 60 motions based on discovery conducted of a foreign government entity called ISL.

If that weren't enough, Defendants next attempted to avoid liability through a contrived funding agreement and forced bankruptcy—an unexpected tactic that was overcome when Plaintiffs' counsel prevailed in dismissing the bankruptcy proceeding. Each challenge mounted by the well-supported corporate Defendants threatened to end or significantly curtail Plaintiffs' claims in this MDL, ultimately presenting a serious risk of nonpayment for all Plaintiffs and their counsel.

Thus, the second *Johnson* factor also favors the proposed fee award.

### 3. The skill requisite to perform the legal service properly

After presiding over nearly five years of intensive litigation, a half-dozen bellwether trials, and extensive settlement negotiations, the Court regularly witnessed the exceptional quality of Plaintiffs' Counsel's work, which conferred an exceptional benefit on their clients in the face of daunting obstacles and highly sophisticated defense counsel. It is both a formidable and complicated challenge to prevail in any product-liability MDL, let alone one with more than 250,000 claimants. The orderly and effective management of this massive MDL presented innumerable hurdles that most law firms and lawyers would never overcome.

This MDL required dedicated research and study to comprehend and address a myriad of difficult and novel legal, scientific, and medical issues. It required an array of attorneys with broad experience and skills—each masters of their craft. Their participation in this MDL added significant value to the representation of their clients. The record before the Court establishes that the litigation involved a wide gamut of complex and novel challenges, which Plaintiffs' Counsel met at every turn based on their collective, extensive experience in complex litigation.

Accordingly, the third *Johnson* factor favors the proposed fee award.

### 4. The preclusion of other employment by the attorneys due to acceptance of the case

This MDL, which commenced in 2019, is now in its sixth year; the full satisfaction of Defendants' payments to claimants will continue through 2029. Many

members of the firms leading the common benefit efforts had to forego other important cases and potential fees during this time-consuming litigation. Meeting the immense time and expense demands of the massive MDL necessarily limited the ability of Common Benefit Counsel to work on numerous other matters, all without any guarantee that such a substantial investment of the many years' worth of time and effort would ever be reimbursed.

This case is comparable in duration many other "super-mega-fund cases."[5] *See Actos*, 274 F.Supp.3d at 489 (spanning more than six years and awarding a common benefit fee of 8.6%); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F.Supp.2d 732, 770, 798, 827 (S.D. Tex. 2008) (spanning over six years and awarding a 9.52% fee, despite it being "quite low and therefore very reasonable" compared to the "average megafund award" of 11.61%); *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 424 F.Supp.3d 456, 468, 504 (E.D. La. 2020) (spanning over 11 years and holding that an 11.4% common benefit fee "is consistent with the common benefit fee awarded in cases producing similar recoveries"); *Nat'l Football League*, 2018 WL 1635648, at *1, *11 (E.D. Pa. Apr. 5, 2018) (spanning more than six years and awarding an 11% common benefit fee).

---

[5] "Super-mega fund cases" refers to "cases with valuations of larger than one billion dollars." *In re Diet Drugs*, 582 F.3d 524, 536 n.26 (3d Cir. 2009) (quoting *In re Diet Drugs*, 553 F.Supp.2d 442, 487 (E.D. Pa. 2008).

Under the fourth *Johnson* factor, the "onerous" opportunity cost and time limitations imposed in this MDL further support the proposed fee award. *In re Ethicon Physiomesh*, 2022 WL 17687425, at *9; *In re Xarelto*, 2020 WL 1433923 at *6.

### 5.     Customary fee

As noted in *Ethicon*, the "customary fee for similar work" analysis is largely redundant of the benchmark percentage factor, which is discussed below. An approximately 9% fee is well within the benchmark percentages for similar cases. *See, e.g.*, *In re Ethicon Physiomesh*, 2022 WL 17687425, at *12; *In re Xarelto*, 2020 WL 1433923 at *7.

### 6.     Whether the fee is fixed or contingent

The fifth *Johnson* factor considers whether the fee is fixed or contingent; it focuses on the beginning of the case with an evaluation of the serious risks of non-recovery faced by Plaintiffs' Counsel when they committed themselves to this MDL on a contingency basis. *See In re Ethicon Physiomesh*, 2022 WL 17687425, at *12. All Plaintiffs' Counsel litigated this case on a contingency basis, assuming a substantial risk that the MDL would yield no recovery and leave them uncompensated. The risk of receiving little to no recovery is a key factor in considering a fee award. *See, e.g.*, *In re Xarelto*, 202 WL 1433923 at *6.

Where, as here, counsel face such risks—including early attacks by 3M of a potentially dispositive nature for the entire MDL and a bankruptcy "detour"—but recover significant compensation for their clients, the sixth *Johnson* factor favors the proposed fee award. *See id.*; *In re Ethicon Physiomesh*, 2022 WL 17687425, at *12; *In re Diet Drugs*, 553 F.Supp.2d at 479.

### 7.    The time limitations imposed by the client or circumstances

This MDL required both litigants and counsel to abide by a strict and efficient schedule, almost unheard of in similar complex cases. While the average mass tort MDL over the past decade has lasted 8-9 years, this case proceeded at a far faster clip. The Court employed hands-on management and monthly status conferences to ensure that discovery was conducted promptly and the litigation proceeded efficiently. Less than one year after the MDL was formed, in the midst of discovery, counsel and litigants had to deal with the world-wide pandemic caused by COVID-19. In the face of those logistical difficulties imposed by COVID restrictions, counsel and the Court persevered and completed enormous amounts of discovery, intensive briefing and oral argument on cross-motions for summary judgment, significant expert work-up and *Daubert* motions, and no less than sixteen bellwether trials. Under this Court's aegis, time was never squandered, and the first bellwether trial began less than two years after the MDL took off—with just a single one-week

extension of a deadline when a hurricane made landfall in Pensacola.

The fact that these efforts were performed at such a clip during one of our country's most challenging times speaks volumes to the dedication of Plaintiffs' Counsel to representing their clients (not to mention the dedication of this Court and its staff in efficiently managing this litigation). The seventh *Johnson* factor thus favors the requested fee award. *See In re Ethicon Physiomesh*, 2022 WL 17687425, at *9.

### 8. The amount involved and the results obtained

Although the eighth factor, "the amount involved and the results obtained" has been called "the most critical factor in determining the reasonableness of a fee award." *In re Xarelto*, 2020 WL 1433923, at *7 (quoting *Hensley*, 461 U.S. at 436). "Success is determined not only by the gross amount of the recovery but also by the number of individuals who benefit from the class settlement, the degree to which it provides them with full compensation for their injuries, and the extent to which the settlement benefits the public at large." *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, 2016 WL 6215974, at *18 (E.D. La. Oct. 25, 2016). There can be no question that based on the outcome in this landmark litigation, the requested fee award is both fair and appropriate.

As described above, Plaintiffs' Leadership secured three Master Settlement

Agreements that globally resolved more than 250,000 claims for $6.01 billion with virtually no opt outs. As the Court observed based on its experience "deep in the trenches of the litigation with the parties since day one," 9/8/23 Tr. at 6:24-25, this $6 billion global settlement where several bellwether trials resulted in defense verdicts is an extraordinary success for all Plaintiffs. There is no question that the common benefit work of Plaintiffs' Leadership produced this tremendous result.

Accordingly, the eighth *Johnson* factor favors the requested fee award.

### 9. The experience, reputation, and ability of attorneys

At the inception of this MDL, the Court initiated an intensive merit-selection process to appoint experienced, reputable, and able counsel to serve as Plaintiffs' Leadership. Since those appointments—at status conferences, in briefs and pleadings, and at oral arguments, *Daubert*, evidentiary hearings, and trial—the Court has seen firsthand the unique talent of the lawyers appointed to represent Plaintiffs.

As their work in this case exemplified, the attorneys who performed common benefit work in this MDL are skilled in product liability and personal injury litigation. Many of them, particularly those in Plaintiffs' Leadership, specialize in handling complex product liability cases, involving the coordination of thousands of cases across the country for pretrial purposes. The scale of such litigation requires extraordinary organizational skills and zeal to push matters forward on behalf of all

cases at the same time. This must be done as efficiently as possible, requiring an immense commitment of time and money, as well as long hours and extensive travel.

Plaintiffs' Leadership Counsel was well versed in managing large MDLs like this one. They were not only willing but more than able to handle every substantive and procedural issue—from legal and regulatory challenges to bankruptcy court (and back), culminating in the global resolution of the largest MDL in American history.

Therefore, the *ninth Johnson* factor likewise supports the requested fee award. *See, e.g.*, *In re Ethicon Physiomesh*, 2022 WL 17687425, at *11.

### 10. The "undesirability" of the case

The tenth *Johnson* factor looks at the risks shouldered by counsel. *See, e.g.*, *Ethicon*, 2022 17687425, at *10; *In re Xarelto*, 2020 WL 1433923, at *8. Plaintiffs' Counsel faced formidable challenges in taking on such a massive case with so many claimants and corporate Defendants supported by multiple well-funded defense counsel. Indeed, at the outset of the litigation, mass tort "experts" opined that the entire case would fail under the weight of the government contractor defense. It did not, but only because of the dedication of the Plaintiffs' Leadership in marshalling the facts to defeat it. Defendants' attorneys, from multiple nationwide law firms upheld as among the very best in the country, fought skillfully and tenaciously at every turn. Plaintiffs' Counsel incurred significant expenses while exposed to

significant legal risks involving global preemption defenses and other potentially dispositive issues, in addition to uncertain jury trial outcomes and several high-stakes appeals.

As this Court recently acknowledged, Plaintiffs' Leadership "fronted millions of dollars in costs and expenses, and assumed a very real and significant risk ono recovery, in furtherance of their work for the common benefit." Dkt. 3984 at 1. Just like the preceding *Johnson* factors, the tenth *Johnson* factor also supports the requested fee award. *See, e.g.*, *In re Xarelto*, 2020 WL 1433923, at *8.

### 11.    The nature and length of professional relationship with the client

This eleventh *Johnson* factor was designed to account for those instances when "a lawyer in private practice may vary his fee for similar work in the light of the professional relationship of the client with his office." *Johnson*, 488 F.2d at 719. There are few, if any, pre-existing relationships between the individual Plaintiffs in this MDL and Plaintiffs' Counsel. Though some attorney-client relationships continue beyond the settlement phase to include litigation-related matters such as lien resolution or bankruptcy negotiation, this factor is neutral and not entitled to significant weight in the analysis. *See, e.g.*, *Ethicon*, 2022 17687425, at *12.

### 12.    Fee awards in similar cases

"In MDL cases, the determination of a reasonable hourly fee is largely

influenced by the relationship which the total fee bears to the total amount recovered." *In re Xarelto*, 2020 WL 1433923, at *8. The approximately 9% fee award requested here is substantially similar to awards that have been made in other cases.[6]

Not only is the requested fee award in line with recent awards generally, but it is also aligned with awards that have been approved in comparable super-mega

---

[6] *See, e.g.*, *In re Roundup Prods. Liab. Litig.*, MDL 2741, Dkt. 17366 (N.D. Cal. Oct. 6, 2023) (8% assessment); *In re Ethicon Physiomesh Flexible Composite Hernia Mesh Prod. Liab. Litig.*, 2022 WL 17687425, at *14 (N.D. Ga. Nov. 14, 2022) (9% assessment for fees); *In re Nat'l Prescription Opiate Litig.*, MDL 2804, Dkt. 3828 (N.D. Ohio Aug. 12, 2021) (7.5% assessment for fees); *In re Testosterone Replacement Therapy Prods. Liab. Litig. ("TRT")*, MDL 2545, Dkt. 3163 (N.D. Ill. Nov. 24, 2020) (19.5% assessment); *In re Xarelto*, MDL 2592, 2020 WL 1433923, at *73-74 (E.D. La. Mar. 24, 2020) (12% assessment for fees); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 424 F.Supp.3d 456, 468, 504 (E.D. La. 2020) (11.4% assessment for fees); *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, MDL 2734, 2019 WL 7859557, at *8 (N.D. Fla. Dec. 6, 2019), *R&R adopted*, 2019 WL 7019219 (N.D. Fla. Dec. 21, 2019) (9% assessment); *In re Nat'l Football League Players' Concussion Inj. Litig. ("NFL")*, MDL 2323, 2018 WL 1635648, at *1, *11 (E.D. Pa. Apr. 5, 2018), *aff'd in part, remanded in part*, 814 F.App'x 678 (3d Cir. 2020) (11% assessment for fees); *In re Actos (Pioglitazone) Prod. Liab. Litig.*, 274 F.Supp.3d 485, 489 (W.D. La. 2017) (8.6% assessment); *In re Nuvaring*, 2014 WL 7271959, at *3 (E.D. Mo. 2014) (11% assessment for fees); *cf. In re Juul Labs, Inc.*, MDL 2913, Dkt. 4238 (N.D. Cal. May 15, 2024) (30% for fees, plus interest); *In re Aqueous Film-Forming Foams Prods. Liab. Litig. ("AFFF")*, MDL 2873, Dkt. 1813 (D.S.C. Aug. 4, 2021) (9% assessment); *In re Syngenta AG MIR162 Corn Litig.*, MDL 2591, 2018 WL 6436074, at *11-16 (D. Kan. Dec. 7, 2018) (33% for fees); *see also In re Xarelto*, 2020 WL 1433923, at *5 (citing Theodore Eisenberg & Geoffery Miller, Attorneys' Fees and Expenses in Class Action Settlements: An Empirical Study, 1 J. Empirical Legal Studies 27, 74 (2004), which concluded that fees of upwards of 20% are reasonable).

fund cases. Courts in similar situations involving multi-million-dollar settlements have repeatedly recognized that a common benefit fee around 9% is appropriate. *See, e.g.*, *AFFF*, MDL 2873, Dkt. 2641 (D.S.C. Oct. 11, 2022) (9% assessment on an approximately $15 million settlement); *TRT*, MDL 2545, Dkt. 3163 (N.D. Ill. Nov. 24, 2020) (19.5% for fees and costs on a confidential settlement); *Xarelto*, 2020 WL 1433923 at *73-74 (12% fees on a $775 million settlement); *NFL*, 2018 WL 1635648 (E.D. Pa. 2018) (11% fees on $982 million settlement). In fact, it might even be "on the low end of the range." *Ethicon*, 2022 WL 17687425, at *7 (collecting cases); *compare, e.g.*, *In re Takata Airbag Prod. Liab. Litig.*, 2022 WL 1669038, at *7 (S.D. Fla. Apr. 4, 2022) (awarding 30% in attorneys' fees and expenses from a $42 million common fund, which amounted to "roughly 22% of the total settlement value"); *see also In re Xarelto*, 2020 WL 1433923, at *5 (citing Eisenberg & Miller, who studied class-action settlements with "recoveries greater than $190 million" and found the "mean fee percentage in such cases is 12 percent").

In short, an approximately 9% fee award remains in line with the norm.[7] The final *Johnson* factor thus supports Plaintiffs' Counsel's request.

---

[7] Indeed, given the nature of this settlement being paid out over many years, the present value of the 9% assessment figure is not available at this time; factoring in the time value of money, and recognizing that an attorney fee paid out over the next five years is worth less than that same amount were it paid out today, provides further evidence that Plaintiffs' fee request is reasonable.

## II.   A Lodestar Cross-Check Confirms the Proposed Fee Is Reasonable.

The Eleventh Circuit typically uses the percentage of the fund method for common fund cases. *Camden*, 946 F.2d at 774. Although it is "not require[d]," *Abilify*, 2019 WL 7859557, at *8 n.57 (N.D. Fla. Dec. 6, 2019), courts occasionally also use an abbreviated lodestar cross-check to further gauge the reasonableness of the percentage-based fee award. *See Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1298 (11th Cir. 1999); *Equifax*, 999 F.3d at 1278; *Ethicon*, 2022 WL 17687425, at *13 (opting to employ a final lodestar cross-check and noting that such a cross-check does not require the lodestar method's typical "exhaustive scrutiny"). To conduct the lodestar cross-check, the Court assesses the number of hours multiplied by a reasonable blended billing rate and then calculates the multiplier by comparing this figure to the total attorneys' fees. *See In re Vioxx*, 760 F.Supp.2d at 658, 660; *In re Xarelto*, 2020 WL 1433923, at *9.

Plaintiffs' Leadership collectively submitted 364,189.5 hours of time to the Fee Committee. As in *Ethicon*, regardless of what reasonable hourly rate is selected for the cross-check, the number of hours expended in this MDL would yield a multiplier that would fall well within the range of reasonableness for similar cases. *See In re Ethicon Physiomesh*, 2022 WL 17687425, at *13. Though different hourly rates would yield a different lodestar multiplier, the multiplier would still fall

squarely within the range that courts have deemed reasonable. *See id.*

Based on the total 364,189.50 hours and the maximum $510,312,447.27 fee,[8]

a $400 blended rate would yield a lodestar multiplier of 3.5; a $450 rate would yield

a lodestar multiplier of 3.1; a $500 rate would yield a lodestar multiplier of 2.8; and

a $550 rate would yield a multiplier of 2.55.[9] Such multipliers are well within the

range of reasonableness and support the fee request here. *See Kay Co. v. Equitable*

*Production Co.*, 749 F.Supp.2d 455, 470 (S.D.W. Va. 2010) ("Courts have generally

held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable

attorneys' fee."); *In re Diet Drugs*, 582 F.3d 523, 545 (1st Cir. 2009) (concluding

that a multiplier of 3.4 "or somewhere in that neighborhood" is "below or near the

average multiplier in the 'super-mega-fund' cases"); *In re Nat'l Football League*

---

[8] This $510,312,447.27 figure is the result of calculating 9% of the total settlement ($6.01 billion), which results in a total holdback of $540,000,000, minus the previously disbursed capital contributions ($20,031,250), Dkt. 3984, and held costs ($9,656,302.73), Dkt. 3988.

[9] Blended hourly rates in this range—and well above—have been routinely recognized by courts as reasonable and appropriate for work in complex high-risk litigation. *See, e.g.*, *In re Xarelto*, 2020 WL 1433923, at *9 (average billing rate of $433.98 is "appropriate hourly rate"); *In re Vioxx*, 760 F. Supp. 2d at 660 (similar); *In re Guidant Corp.*, 2008 WL 682174, at *15 (similar); *Enron*, 586 F.Supp.2d at 741 (similar); *Actos*, 274 F.Supp.3d at 526 (similar); *Deepwater Horizon*, 2016 WL 6215974, at *19 (similar); Survey: Class Action Defense Rates Keep Pace with Plaintiffs' Rates in 2020, NALFA News Blog (Mar. 4, 2020), http://www.thenalfa.org/blog/survey-class-action-defense-rates-keep-pace-with-Plaintiffs-rates-in-2020/ (finding that billing rates for 95% of all class actions fall within the $200 to $1,200 hourly rate for attorneys at partner and associate levels).

*Players' Concussion Injury Litig.*, 2018 WL 1635648, *9 (E.D. Pa. 2018) (noting a lodestar multiplier of 2.96 was "well within the norm for this Circuit, which has noted that multipliers ranging from one to four are frequently awarded").

Of course, the foregoing lodestar multipliers are further reduced when considered in the context of current billing rates charged by hourly-compensated law firms. Indeed, billing rates have sharply risen over the time this MDL was litigated.[10] In this case, the highest applied comparison billing rate—$550—is eminently reasonable in comparison, and likewise well below that charged by Defendants' counsel when litigating against Plaintiffs' Leadership in the bankruptcy proceedings. *See, e.g.*, *In re Aearo Techs. LLC, et al.*, Case No. 22-02890-JJG-11, Dkt. 877-1 (S.D. Ind. Bankr. Dec. 2, 2022) (Kirkland & Ellis attorney billing rates ranging from

---

[10] From 2020 to 2021, average partner billing rates increased from $705 to $738 per hour (+4.7%); from 2021 to 2022, average partner billing rates increased from $737 to $749 per hour (+1.5%). Andrew Maloney, *Billing Rates Have Increased, But Not Enough to Beat Inflation*, The American Lawyer, Nov. 1, 2022 (Lexis). Similarly, from 2022 to 2023, industry rates grew by 8.3%. Dan Packel, *The Law Firm Disrupted: Rising Billing Rates, Rising Partner Compensation*, The American Lawyer (June 27, 2024), https://www.law.com/2024/06/27/the-law-firm-disrupted-rising-billing-rates-rising-partner-compensation/. The trend continued into 2024, with Am Law firms ranked 1 through 50 increasing their billing rates 9.8% as of the first quarter. Andrew Maloney, *Billing Rate Hikes 'Not Slowing Down,' With Pricing Surges Expected in 2024*, The American Lawyer (June 26, 2024), https://www.law.com/americanlawyer/2024/06/26/billing-rate-hikes-not-slowing-down-as-latest-data-show-expected-surges-in-2024/#:~:text=NEWS-Billing%20Rate%20Hikes%20'Not%20Slowing%20Down%2C'%20With%20Pricing%20Surges,according%20to%20new%20survey%20results.

$660/hour to $1,845/hour); Dkt. 1276-1 (S.D. Ind. Bankr. Mar. 13, 2023) (Clement & Murphy attorney billing rates of upwards of $2,350/hour). The award sought here results in a lodestar cross-check that is directly in line with awards in other super mega fund cases and demonstrates the reasonableness of the Court's holdback years ago.

\* \* \*

Lacking any guarantee of success or repayment for their efforts, the attorneys who performed common benefit work in this MDL did so at substantial risk and expense. After nearly five years of intense, hard-fought, and challenging litigation, including global preemption briefing and 16 bellwether trials, Plaintiffs' Counsel secured an unprecedented result: a $6.01 billion dollar settlement and common fund to resolve the claims of more than 250,000 Plaintiffs. For their extraordinary efforts, Plaintiffs' Leadership respectfully requests, on behalf of all Plaintiffs' Counsel, that the Court confirm the 9% holdback assessment. Plaintiffs' Leadership also requests an order establishing a process for the allocation of the resulting attorneys' fees with Special Master Herndon.

## CONCLUSION

The Court should grant Plaintiffs' Leadership's motion to confirm the 9% common benefit holdback and establish a procedure for allocation of attorneys' fees.

Dated: August 28, 2024

Respectfully Submitted,

/s/ Christopher A. Seeger
Christopher A. Seeger,
Co-Lead Counsel
(Admitted Pro Hac Vice)
New Jersey State Bar No. 042631990
Seeger Weiss LLP
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Tel.: (212) 584-0700
cseeger@seegerweiss.com

s/ Shelley V. Hutson
Shelley Hutson, Co-Lead Counsel
(Admitted Pro Hac Vice)
Texas State Bar No. 00788878
Clark, Love & Hutson, GP
440 Louisiana Street, Suite 1600
Tel.: (713) 757-1400
shutson@triallawfirm.com

/s/ Bryan F. Aylstock
Bryan F. Aylstock,
Lead Counsel
Florida State Bar No. 078263
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 East Main Street
Suite 200
Pensacola, FL 32502
Tel.: (850) 202-1010
baylstock@awkolaw.com

***Plaintiffs' Leadership***

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

I hereby certify that the foregoing memorandum contains 14,267 words and complies with the Court's local rule.

*/s/ Bryan F. Aylstock*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2024, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

*/s/ Bryan F. Aylstock*