IN RE: 3M COMBAT ARMS                    Case No. 3:19md2885
EARPLUG PRODUCTS
LIABILITY LITIGATION

This Document Relates to                  Judge M. Casey Rodgers
Certain Cases filed by
Heninger Garrison Davis
On Behalf of Ugandan Clients              Magistrate Judge Hope T. Cannon

## SPECIAL MASTER REPORT AND RECOMMENDATION

### I.      INTRODUCTION

This report is respectfully submitted to the Court pursuant to the order appointing the undersigned, David R. Herndon, as a Special Master to investigate the issue of whether certain documents filed in this litigation's Settlement Program constitute ethical violations or other misconduct by claimants or counsel, or both, to ensure the integrity of the Program. ECF 4159.

What is clear to this Special Master is that Heninger Garrison Davis's handling of its Ugandan claims failed at several levels. Just as with any legal representation of persons who have been injured and seek compensation through the courts, a lawyer has obligations to the clients, the Court, the legal profession, and the settlement agreement with the defendant. The Special Master finds the firm failed in each category. W. Lewis Garrison was at the top of the professional responsibility mechanism for this firm. As senior partner, with a great deal of MDL experience to inform and guide him, he should have set the roadmap and overseen the firm's management for litigation and the settlement program. Garrison was more involved in the litigation aspect of this litigation with bellwethers trials but had almost no day-to-day handling of the settlement phase of the litigation. However, if one were to quantify the responsibility for the failures in the representation of these Ugandan

claimants, partners Taylor Bartlet and William Bross by far carry the heaviest load of responsibility for the failures of this law firm in the representation of its Ugandan clients and its duty to the Court. The undersigned does not find that any member of the Heninger Garrison Davis firm intentionally committed fraud on the Court through this settlement program. It is clear, however, that Bartlett and Bross were not simply negligent in the handling of these claims, but instead were consciously and recklessly indifferent to the variety of circumstances of the Ugandan settlement program allowing fraud to occur and equally indifferent to their duties as officers of the Court in this MDL.

## II. BACKGROUND

During the investigation of this matter, the Special Master reviewed the records in the custody of BrownGreer, the settlement administrator, and in the course thereof reviewed hundreds of claims files, audiograms and other supporting documents. In addition, I held discussions with personnel at BrownGreer who were thoroughly involved in the administration of the Heninger Garrison Davis (HGD) claims, including Orran Brown, Jake Woody, Matt Hazzard, JP Guidon and David Smith. Many of the discussions with BrownGreer personnel were related to my requests for additional information following up on the reports BrownGreer prepared. Discussions were also held with Bryan Aylstock and Chris Seeger, plaintiffs' Lead Counsel over the Settlement Program.  Zoom interviews were conducted with W. Lewis Garrison, Alex Rosales, Taylor Garrison and Chanlyn Free of HGD, as well as Arafah Musoke of Uganda and the person HGD considers to be the referring counsel of the vast bulk of the Ugandan cases. Interviews of Taylor Bartlett, Jeanie Sheadd, and William Bross were conducted in person and taken with a court reporter and transcripts were secured and are part of the Appendix to this R&R along with other documents cited or referred to herein. The transcripts have a legend at the beginning that the transcripts are confidential pursuant to a protective order. That was an error. They were never intended to be confidential. The Special Master also read and reviewed the BrownGreer Audit Report of the Ugandan claims, a responsive document thereto authored by HGD, and the BrownGreer Analysis of Heninger Garrison Davis 8/15/25 Audit Report Response. While minimal, each of these documents have some personal identifying information associated with the

audiograms and the Court likely will seal those exhibits pending review. Moreover, the Special Master read and reviewed a report from Coastal Pacific Investigations, an organization hired by Lead Bryan Aylstock, outlining its investigation of the issues involved with Ugandan claims, and particularly Arafah Musoke. The Special Master reviewed the Master Settlement Agreement and consulted with PhD Audiologist Christopher Spankovich who serves as an expert consultant to the Settlement Program. I conducted many internet searches relative to registration of medical providers, medical clinics, and attorney registration. I reviewed the U.S. Department of State website for information about Uganda. I researched the record in the MDL for certain issues. I read and reviewed the Local Rules for the Northern District of Florida, the Rules of Professional Conduct of The Florida Bar, and the Alabama Rules of Professional Conduct.

As anyone who had any involvement in the 3M CAE MDL knows, this MDL has enjoyed a thoroughly robust management by the Court with efficiency, effectiveness, and speed. Though not long in duration, deadlines were treated as firm and enforced. An extensive bellwether process was pursued, completed, and, from a timeline perspective, was the beneficiary of trial dates early not later. Both sides of the litigation vigorously represented plaintiffs and defendant. Settlement negotiations began early but did not result in a settlement for an extended period. Compromising took a back seat to advocacy. However, once Master Settlement Agreements were signed, an extremely robust settlement administration was set up and managed with the kind of supervision the entire litigation process enjoyed. Given more than a quarter of a million persons applied and entered that program, the settlement administration is complicated. To make the process as thorough, clear, and manageable for all counsel with clients in the program, the Court established a Settlement Administrator, an allocation Special Master, and all the data processing necessary for such an in-depth process. Part of that data processing included a means for counsel and plaintiffs, individually, to upload and access files containing the supporting documentation for each plaintiff in the program. Seemingly countless, "town hall meetings" were held, primarily on Zoom, so that anyone that needed to learn the claims processing could do so. Countless digital notices, settlement and allocation methodology, frequently asked questions and answers, were available so everyone could thoroughly learn the settlement process to represent the clients, now claimants, and the amount of money to which they were entitled in this litigation.

No objective observer or participant in the settlement process could legitimately assert that the information flow from the settlement program to the claimants and counsel was flawed in any significant way.

The discussions which led to this investigation of the Ugandan claims filed by HGD began with numerous emails from Ugandan claimants, represented by Heninger Grarrison Davis (HGD), and governmental agencies, complaining about lack of payment and discrimination against non-U.S. citizens. While purportedly sent by different persons, the emails contained the exact same language. Once the number of claims that qualified for DPP points became sizeable and knowing the Settlement Program's automated review system took the claims at face value, BrownGreer undertook a hands-on review. With that review, certain irregularities came to light with the claims. The BrownGreer Audit Report: Heninger Garrison Davis was prepared by BrownGreer and provided to the Court and dated May 4, 2025. Of the 10,434 plaintiffs HGD represents in the MSA I settlement program, 997 such settlement claimants are Ugandan nationals. Of the 997 Ugandan plaintiffs represented by HGD, 978 elected DPP, 19 elected EPP. The plaintiffs from Uganda worked for contractors that provided security guards for certain embassies and military bases in Middle East war zones, primarily Iraq and Afghanistan, where the United States faced hostilities. The Ugandan plaintiffs claim they were issued 3M Combat Arms Earplugs, suffered injury, and were entitled to a portion of the settlement. The EPP claimants were entitled to $100 in the settlement program and those awards were paid. They were not required to submit the type of supporting documents that DPP registrants are required to submit. It is, therefore, unknown if the issues which have been raised in the DPP cases would have come to the fore in the EPP cases. Therefore, the only claims under investigation involve DPP claims.

## III.   FACTS

By virtue of the automated claim and review process, prior to a hands-on review, HGD had 884 Ugandan clients who appeared to qualify for DPP registration payments which began on 1/17/25 when BrownGreer attempted to pay two Ugandan claimants via ACH.  Both payments were unsuccessful.  BrownGreer then issued four claimant payments directly to HGD on 1/30/25.  On 3/13/25, BrownGreer began issuing international wires to Ugandan claimants. The total amount of such $1,000 payments, $884,000, rendered a net amount of $804,440 after the Common

Benefit Fund 9% holdback was taken out. Since HGD is an in-ledgering firm, it was known that the 40% attorneys fee was $364.00. They assessed this amount on most, but not all Ugandan claimant's DPP Registration Payments. Breaking down the amount paid for DPP registration fees to the HGD Ugandan clients, $480,126 would be the net for the claimants, $321,776 to HGD for fees, and $79,560 to the Common Benefit Fund. The value for HGD's fees includes the international bank fees, which are to be paid from attorney fees. Because of the irregularities that were discovered in the ongoing hands-on review of the claims, registration fee payments were suspended on April 17, 2025, however, wire transfers to Ugandan claimants that were initiated before that date continued to bounce back to the Settlement Administrator until May 25, 2025. Already paid claimant shares at that point amounted to $438,354 to 807 claimants. That left 77 unpaid for a total of $41,772. Paid to HGD at that point in time were fees in the amount of $21,112. Transferred to the Common Benefit Fund, still held in the account, was $75,150.

Fifty-six Ugandan DPP claimants were awarded points ranging from 0.07635 to 40.72012. Notices were sent to 10 of the claimants beginning on March 10, 2025. However, a similar hold was placed on these awards on April 17, 2025 and none have been paid.

BrownGreer determined that 92.5% of HGD's 884 Ugandan claimants in the DPP program had audiograms uploaded during the December 2024 Grace Period, not before the July 26, 2024 DPP Supplementation Deadline.

HGD's first contact with Ugandan clients occurred in or around August 2019 when Aaron Gartlan, an Alabama lawyer, referred four or five clients to HGD. Those clients were registered in the time frame between August and the end of 2019.

Arafah Musoke, who identified himself as a practicing lawyer in Kampala, Uganda who also served as CEO of non-governmental non-profit known as Hollyne Care, contacted William Bross, a partner at Heninger Garrison & Davis, either late 2021 or early 2022. He told Bross that he had a group of clients he had represented for years and was in possession of all their records. These additional Ugandans were registered in or around July 2022. Throughout the documents reviewed during this investigation, the Special Master noted that this gentleman is referred to as Musoke Arafat, Arafat Musoke and by other names. Ultimately, HGD provided a photocopy of the gentleman's passport, obtained during this investigation, which shows his

given name to be Arafah Kaitale and his surname to be Musoke. It is customary in written language in Uganda to refer to a person with his last name printed first. For purposes of this R&R, the undersigned will refer to him by his given name first (as spelled on the passport and told to me by Mr. Musoke). Of note, like most of the countries around the world Uganda lists the day first, then the month and last the year. The official language of Uganda is English.

The BrownGreer Audit establishes that the processing of Ugandan claimants for BrownGreer starts with the fact that none of the Ugandan nationals, working for a contractor of the United States for security roles in a few war-torn locations in certain countries, had any DOEHRS audiograms. To support their claims, they could only provide audiograms from medical providers they procured themselves. During this litigation and settlement program, the prevalent assumption was that these Ugandan contractors would only have one audiogram, a post injury audiogram. However, it became clear from my conversations with Mr. Musoke that such an assumption was inaccurate. According to Musoke, the companies that contracted with the Department of Defense to provide security personnel at bases and embassies in war zones had the Ugandan citizens that were potentially eligible for hire for these positions undergo a very thorough pre-deployment medical evaluation. The same was true upon return from deployment. Therefore, it is more than likely that in the records of those medical evaluations would have been in the records of the hiring contractors and the medical providers rendering such services. Consequently, what became to be known as reference and injury audiograms should have been attainable for the Ugandan plaintiffs.

On November 8, 2024, BrownGreer issued notices denying a $1,000.00 DPP Registration Payment to 912 HGD Ugandan claimants due to the lack of an audiogram. BrownGreer issued Alert No. 24-0037 explaining the requirements to receive a DPP registration payment as follows: "Pursuant to the Allocation Methodology, a claimant must supply either a Reference Audiogram or an Injury Audiogram to qualify for the DPP Registration Payment. If a claimant does not have any audiograms, either from DOEHRS data or through the DPP supplementation process, the claimant is not eligible to receive the $1,000 Registration Payment. Denied claimants will not receive any future DPP Notices and the DPP claim will be closed. Because the July 26, 2024 DPP Supplementation deadline has passed, no new documents or information, including audiograms, may be submitted now."

Sixty-six of the HGD Ugandan claimants submitted audiogram reports by the July 26, 2024 DPP deadline, with forty-two submitting one audiogram and twenty-four providing two, according to the BrownGreer Audit Report. Consequently, on November 18, 2024, BrownGreer sent notices granting DPP registration payments to those sixty-six claimants. Claiming that they did not know the requirement to submit an audiogram showing hearing loss, despite notices and town hall meetings discussing the requirement, HGD began pushing back with BrownGreer for the denial of the 912 claimants request for a registration payment. In fact, prior to being advised again that an audiogram was required even for a registration payment Taylor Bartlett asked BrownGreer if anyone else had found the same "loophole" he had. Bartlett advised his partners that he had figured out a way to get a thousand dollars for the DPP clients not awarded points so they could get a fee and have their expenses paid. The firm's persistence in its position together with just a few complaints from other primary counsel, caused Orran Brown of BrownGreer to review the matter with allocation Special Master Garretson and the Court. Special Master Garretson explained that hearing loss was still a prerequisite to being paid the registration payment. His exact turn of phrase was that the registration payment was not simply a "signing bonus." The claimants who failed to timely upload one or more audiograms failed to prove hearing loss. Judge Rodgers found the Special Master's decision to be correct, particularly since the program was a settlement program meant to compensate actual hearing loss.

The Court approved additional time to submit audiograms, consistent with the criteria, open not only to the HGD firm but all firms, thereby allowing a ten-day "Grace Period," from December 3, 2024 through midnight December 12, 2024, for DPP claimants to submit audiograms, provided they were in their possession by the previous deadline of July 26, 2024. The audiograms could either be in possession of the client or counsel, but they could not go out and obtain a new nor a previously not possessed audiogram to satisfy the eligibility criteria. On December 10th, BrownGreer heard from one of the HGD clients who stated HGD advised that any audiograms submitted during the Grace Period had to be in HGD's possession as of July 26th. Orran Brown emailed HGD to make sure they understood the audiograms could either be in the firm's possession as of that date or in the client's possession.

Table 3 of the BrownGreer Audit, page 5, sets out the five HGD employees who uploaded audiograms during the Grace Period. They include, with a

parenthetical number of audiograms uploaded, Taylor Garrison (342), Chanlyn Free (274), Alex Rosales (249), Taylor Bartlett (178), Jeanie Sleadd (121), and Sam Chance (98). A telling statistic in Table 3 reveals that a total of 101 audiograms were uploaded during the first day of the Grace Period (December 3rd), 60 during the second, 103 during the third, 42 during the fourth, none during the fifth, 20 during the sixth, and 177 during the seventh day of the ten-day grace period. During the eighth day, the same day Orran Brown clarified for HGD that the in-possession requirement of the criteria permitted those audiograms in possession of the claimant as well as counsel, 278 audiograms were uploaded, with another 468 on the ninth day and another 13 on the last day of the Grace Period. Taylor Bartlett advised the undersigned that he voluntarily cut off, to the greatest extent possible, audiograms being sent and uploaded after the ninth day because he needed time to get a report from BrownGreer as to which clients had their registration payment denied and which did not have any audiograms uploaded. Arafah Musoke told me the Ugandans, including him, were told at some point to stop sending audiograms to HGD even though they had many more to send. In his words, "there just wasn't enough time." These numbers reveal that prior to the abovementioned clarification given to HGD, 503 audiograms were uploaded. Following that email, 759 audiograms were uploaded.

## IV.    HENINGER GARRISON DAVIS STAFF INTERVIEWS

Speaking with the HGD staff persons who did the uploading of audiograms during the Grace Period provided good insight into the hectic nature of their work during those ten days. Taylor Garrison, who uploaded the greatest number of audiograms advised me that her role at the firm was one of client communication. She was tasked to pitch in and help the others with uploading the audiograms during the Grace Period since most of the review team that had been doing the uploading had moved on. Ms. Garrison, who started with HGD in June of 2023 and worked as the Front Desk coordinator, was never on one of the review teams that examined audiograms of HGD clients. While substituting in for this team, Ms. Garrison's work was a steady production, unlike Ms. Free and Ms. Rosales whose uploading numbers markedly rose on 9th day of the Grace Period. Taylor Garrison's work during the Grace Period was simply to compare the clients name to the name on the audiogram report to make sure they matched and then to look for the audiogram grid as indicia

that the record she was looking at was an audiogram and to upload it and to repeat that process as quickly as she could.

Chanlyn Free, started at HGD in September 2023, was assigned to Taylor Bartlett and began working on 3M CAE immediately. Initially, she worked client contact communication with phone and email. Ms. Free was trained in Filevine, HGD's software product designed to facilitate client case management, to make accurate notes, Outlook, the phone system and texting functions on Connect. She was then trained to look up documents to make sure they had been filed but she did not file claims. Training at HGD for the 3M MDL was typically in group settings with Taylor Bartlett usually leading, with Jeanie Sleadd leading on occasion. For U.S. clients Ms. Free participated in discussions of what to look for in audiograms. For U.S. clients she was taught to look for certain shifts on audiograms to determine which category the client belonged in. She was also taught to look for start usage date and end usage date and then to calculate the duration of the usage. Additionally, Ms. Free was taught to make sure a name on an audiogram matched the particular client on whose case she was working. Both Ms. Free and Ms. Garrison remarked that a stamped certification-like mark at the bottom of Ugandan audiograms were not similarly present on U.S. audiograms.

As did the other staff, Ms. Free confirmed that the Ugandan clients were treated the same as any other client. For the supplementation July 2024 deadline to upload records, their Filevine system was where the records were located typically having been received from Hollyne Care and sent to a dedicated 3M earplug email address. Occasionally, a client would send a record directly to the dedicated email address. Chanlyn Free and Taylor Garrison, who began the Grace Period pulling records from the firm's Filevine, stated that with just two or three days to go, they were provided with a OneDrive and told to pull records from there. Like Ms. Garrison, Ms. Free, at the time the Grace Period began, was pulled from other firm work to upload audiograms and was told to just match the client's name with the name on the audiogram, look for an audiogram chart, and to upload as quickly as possible. The firm's OneDrive contained hundreds of audiograms. They believed, but without direct knowledge, that the records came from Hollyne Care.

Alex Rosales, who started at the firm as an intern in 2022 while a college student, did quite a lot of work on the 3M CAE litigation but had primarily moved

over to other cases by the time the Grace Period work was required. She was directed to assist in that effort and advised that at first during the Grace Period they were only working with records in their Filevine system, there was less pressure, and they had time to look at the audiograms. When, at the tail end of a verbal status report Ms. Rosales was giving Taylor Bartlett early in the Grace Period she said, with a humorous tone, "we sure see a lot of Dr. Bob." (Ms. Garrison and Ms. Free remember seeing that name a lot as well.) Mr. Bartlett's response was "I didn't hear that, I don't know what you're saying." He did not inquire further. Ms. Rosales said the staff did spot some issues with dates and noticed that the Ugandan audiograms were different in appearance from the U.S. audiograms. The only direction she recalls with the Ugandan audiograms, though, was to make sure the name was right and the document was an audiogram. She does not recall any directive to be on the lookout for anything troublesome in the records. Ms. Rosales does recall that during the first part of the Grace Period when looking more closely at the audiograms, they occasionally would find one that was out of time regarding when the audiogram was taken. When it became rushed, they only had time to match names, note the presence of an audiogram graph but couldn't look at the audiogram for anything else. She feels that the rush began Monday of the last week (December 9th) or certainly by Tuesday.

We discussed the appearance of the Ugandan audiograms, trying to learn if the staff noticed anything about the audiograms that was out of the ordinary. The Ugandan ones were strange, she said, because they were foreign but at first the U.S. audiograms seemed strange because they were not the type of medical records, they were used to seeing. She pointed out they were used to "working with words, not graphs." Ms. Rosales also relayed that during the first part of the Grace Period the audiograms were all coming from their Filevine system. Then around Monday or Tuesday they received a OneDrive, not sure where it came from, and were told to retrieve audiograms for uploading from there with pressure to upload as fast as they could.

As noted above, 503 Ugandan audiograms were uploaded before the universe of available reports was expanded in the eyes of Taylor Bartlett. Of those 503 reports, 218 audiograms were uploaded by Taylor Garrison who advised that she was only instructed to compare the name on the report with the claim and confirm an audiogram grid was present. Ms. Garrison was never on a review team and wasn't

trained in any aspect of what to look for in an audiogram. It is clear from discussions with the three staff persons above, there was never a direction or training to look for entries on audiograms nor the audiograms generally for out-of-the ordinary statements or writings simply dissimilar to what was seen in a typical U.S. audiogram. There wasn't any direction, from Bartlett or Bross to look for possible indications of fraud nor any training on how to spot suspicious narratives or graphs.

## V. HENINGER GARRISON DAVIS PARTNER INTERVIEWS

The undersigned interviewed the four partners of HGD that were involved in the 3M CAE MDL. Lew Garrison, founding partner at Heninger Garrison Davis, was involved in bellwether activities in the 3M CAE MDL. Taylor Bartlett, Jeanie Sleadd, and William Bross were the day-to-day managers of the litigation in gathering information relevant to the firm's clients going forward in the event of trials or settlement. When a settlement was reached, it was Bartlett, Sleadd, and Bross that managed the client acceptance and claims practice to represent their clients' objectives of being compensated for injuries. Garrison knew the submission of claims for clients involved a great deal of technical know-how and skill, which he did not possess. While he maintained a high-level policy and supervision position over Taylor, Jeanie and Bill, he was not involved in supervising staff in doing their jobs in support of those other three partners. Aside from an awareness that the firm represented a number of Ugandan clients who worked as contractors to support the U.S. in Iraq and Afghanistan during those wars and that the firm was working with a lawyer in Uganda that had experience in helping Ugandans with claims for injuries unrelated to the earplugs, Garrison did not become aware of any specifics relative to Ugandan claims until the BrownGreer Audit Report came out.

William Bross is the HGD partner who heads up the intake department. The Ugandan nationals' representation started with a handful – approximately 5 – referred from Alabama lawyer Aaron Gartlan. Not long after that, Mr. Bross received an email from Hollyne Care with another person, Arafah Musoke, asking about the earplug litigation. They emailed initially and then had a Zoom meeting. He indicated there were several individuals he was working with through Hollyne Care that had familiarity with the earplug case. Musoke had other experience helping Ugandan nationals with Defense Base Act (DBA) cases. He also had been active with Ugandans pre and post deployment to war zones for American contractors.

Essentially, they worked out an arrangement where Musoke would facilitate Ugandan nationals seeking representation for hearing loss in the 3M earplug MDL. HGD required a signed retainer agreement, an intake form providing demographics, exposure information, medical records, ID, passport, copy of employment contract or some documentation of employment in a war zone for the US. One thing I noted in many of the retainer agreements were the words Hollyne Care printed below the signature line for the client. Those words were supplied by Mr. Musoke and were meant by him to segregate the persons working directly with or through him. The retainer agreements with the Hollyne Care name numbered 679. HGD did not have a conversation with Musoke about a referral fee arrangement. However, HGD considered him, based on Musoke's representation, a licensed lawyer in Ugandan and referring counsel. HGD was aware that Hollyne Care was an NGO that contracted with the government to assist returning Ugandans from war zones. A lot of communication with Ugandan clients went through Hollyne Care or Musoke since many of them did not have access to email personally. It is clear from discussions I had with Arafah Musoke and HGD partners that Bross was Musoke's primary contact throughout. Mr. Bross provided copies of Mr. Musoke's passport and national identification card. He also provided a photocopy of a stamp which was represented to him by Musoke as confirmation of his status as a licensed lawyer. Bross agreed that without more it really did not confirm Musoke's status as a licensed lawyer. Those three items of identification mentioned were obtained by Mr. Bross during my investigation of the matters at hand and at my request. They did not vet Musoke but did research Hollyne Care. It seemed credible to HGD. No one at HGD vetted any of the medical providers until after the BrownGreer Audit when they contacted the Ministry of Health and learned that The Good Doctors clinic's license was a forgery. HGD, likewise, did not check into the repetitive sign-off by one doctor on audiograms.

Among the identifiers submitted by the Ugandan claimants meant to demonstrate proof of use of the 3M CAE earplugs were letters of appreciation, certificate of service, location photos, and other identifiers that the Ugandan individual contractor was employed by a company providing security in the theater of war. None of those documents provided anything more than circumstantial evidence of employment. Bross agreed with me that the certificates of employment for a contractor to work at different bases did not address what, if any, exposure the

Ugandans had to explosions or gunfire. Nor did they identify the 3M CAE earplugs as the hearing protective device worn by the Ugandans. The direct employer of each of the Ugandan contractors turned MDL plaintiff could have supplied them with the 3M CAE earplug to match those being used by active military in the area or could have been earplugs obtained specifically by the employer.

Intake staff was trained on the firm's case management system and uploading documents as they came into that system. Bross personally likes hard copies and so he had the staff maintain a parallel set of files for those. When asked about checking, during intake, about characteristics of documents that caused one to question the legitimacy of a claim or client, he advised that most of what they would receive were IDs or passports and he saw no reason to question their legitimacy. The consistent issues had to do with the order of names (first versus last) and dates. Approximately 5 – 10% of the Ugandan clients did not have had an ID or passport but were still processed.

Partner Jeanie Sleadd had a very full and active role in the bellwether and wave process. Once the settlement was reached, she did have a role in training staff in what to look for regarding service-connected usage of the earplug for all HGD clients. She attended most town hall meetings regarding the settlement program. Her name does appear in the BrownGreer table reflecting who from HGD uploaded audiograms during the Grace Period. Ms. Sleadd was not typically involved in the uploading of documents into the Settlement Program administered by BrownGreer. However, during the Grace Period crunch she did perform that role to some extent. Even then her role was limited because she was traveling during that week. According to Table 5 in the BrownGreer Audit Report, Ms. Sleadd uploaded 21 audiograms in the first 3 days of the Grace Period and 65 in the last 4 days. Her instructions for these uploads were the same as that given to staff – match names and make sure the document was an audiogram. Overall, her work with the Ugandan cases was quite limited.

The 3M CAE MDL was, by HGD partner Taylor Bartlett's description, "his project." Bartlett as of this writing is no longer associated with HGD and occupies a position in the Bowline Law firm. That he is no longer employed by HGD is irrelevant since the conduct being investigated occurred during that employment and during his representation of HGD clients in litigation presided over by the Honorable

M. Casey Rodgers and subject to her orders and the cannons of professional conduct governing that representation. The undersigned is aware of disagreements between HGD and Bartlett and Bowline regarding which counsel represent the HGD clients after the separation of Bartlett from HGD. The Court has ordered those involved to file affidavits, in camera, which are due before this R&R will be filed. The undersigned does not possess knowledge that the dispute will be relevant to this inquiry and reporting.

Lew Garrison was certainly the senior lawyer at HGD but not involved in the day-to-day management of this litigation. He was lead from a high level, e.g., in his words, "this is where we are going, these are the cases we are taking, this is the criteria, this is how many cases I want to file, I don't want to file these cases." Garrison, according to Bartlett, had overarching policy control, meeting regularly with the 3M team, asking for updates, making decisions about travel and depositions, and spending money.

Bartlett, like Bill Bross, said the first Ugandan clients came through a referral from Aaron Gartlan. When Ugandan referrals from him dropped off they had no Ugandan referrals until Arafah Musoke reached out. Thereafter, most of the Ugandan clients were Musoke referrals with perhaps 12-20 coming directly to HGD through word-of-mouth from other clients. The intake process actually was changed for the Ugandans but only to the extent HGD required them to submit an intake form, census form, ID and proof of use earlier than U.S. clients to get around some communication issues.

Since so many cases came through Arafah Musoke, I asked Bartlett about their vetting process of him. In addition to phone calls, zoom calls and emails, they vetted Arafah with internet research primarily. They found various references from international aid organizations in which they listed Hollyne Care as a "legitimate" NGO in which they were providing resources to. They asked for his registration documents for Hollyne Care which he provided in "2022 or so." HGD partners did not represent to me that they vetted Hollyne Care in that time frame by contacting the Ministry of Health as they did during this investigation. Therefore, the firm cannot demonstrate that the 2022 certificate was genuine or simply another forgery as they later learned about the current certificate. HGD was copied in error (they believe) on an email between Arafah and a US law firm that had obtained a verdict

or settlement in a Defense Base Act case and the U.S. firm was requesting information about how to wire the client his money. The "erroneous inclusion" on an email was at the time they were evaluating Arafah. They felt this gave credence to his claim that he had legitimate clients who were injured. Bartlett was not aware, at the time of my interview, of any news accounts of Arafah being accused of defrauding many Ugandans. They did not vet any of the medical providers until the BrownGreer Audit Report came out. Mr. Bartlett said he was not of the impression that Uganda was known for fraud committed by its citizens. Based on missionary experiences of some people in his family, he believed Uganda has a "special relationship" with the United States. The United States Department of State website makes quite clear that our government finds Uganda to be a country where Americans traveling or doing business must understand that fraud is prevalent and caution must be exercised when traveling or doing business there.

Arafah was not paid anything by HGD and has no expectation of getting paid as far as Bartlett knows.

When asked the specific question, Bartlett said HGD did not try to get the pre-employment medical examination records from any of the contractors hiring the Ugandans. In fact, he did not understand that the contractors did pre-employment medical examinations until I asked that question. Interestingly, he did recall that Hollyne Care performed pre-employment medical examinations and believes some of the audiograms they have on Ugandan clients were reference audiograms prior to the Ugandans leaving for work in the war zones. When asked if the reference audiograms we discussed from Hollyne Care would have been uploaded to BrownGreer, he said not necessarily. Bartlett explained by discussing the registration process for settlement where you could choose expedited pay or deferred pay. Deferred pay clients themselves could upload documents and some did, both Ugandans and Americans. But HGD would not necessarily know unless they looked at every file of their clients at BrownGreer. He describes what he called a "lull" between January and July, the DPP supplementation period. For every DPP client they had, Ugandan and U.S., HGD went through their system to find every medical record they had for their DPP clients. Starting in January of 2024, they developed a process where they had a spreadsheet and their team of people looked at 1400 or 1500 DPP clients, Ugandan and U.S., files to find reference and injury audiograms. They used the BrownGreer DPP calculator inputting the audiograms and the

calculator would "spit" out points. These calculations they used in-house, not uploading to BrownGreer, so when they got points back from BrownGreer they could compare with their in-house numbers. If based on their analysis a client that chose DPP and was not entitled to points from all the medical records the firm had, they did not intend to upload an audiogram and for some of their clients there was only one. "At that point in time our understanding was if a client chose DPP and even if they didn't upload a single audiogram, they would be entitled to a $1,000 registration payment," according to Bartlett. For many of the Ugandans during the January to July 2024 DPP supplementation period, they did not upload audiograms.

When I asked about staff training, Bartlett stated that intake staff primarily reported to Bill Bross. Bartlett and Bross "would meet with them and explain what to do with the various physical documents we had, where they go in the case management system, how to report into the – how to type into the case management system different information, whether it be from the intake form, communication with the referring source, census form information, checkboxes that we would want so that we could determine whether this was a contractor or a veteran, years of service, where to place DD214s.

"We had to meet with them when the Ugandan stuff – when Ugandan clients – when we started getting more Ugandan clients. The volume picked up. I started noticing discrepancies in the way that they wrote the names and dates of birth in our system." Bartlett transcript, pages 61-62.

I discussed with Mr. Bartlett the process employed by HGD for attaining and examining medical records. Once settlement was announced and things had to get done quickly, they had to get medical records for all the HGD earplug clients. They moved extra people over from intake and one-off cases. They hired temporary people, did shift work, hired nurses to come in after working a day shift at Children's Hospital who would review records, upload and submit until midnight. They did substantive review of medical records, DOEHRS data etc. Once the records were retrieved, they had to train staff as to what to look for in medical records and had almost daily meetings in a conference room they took over for that purpose. Taylor, Jeanie, Bill, Mary Ashton (Taylor's paralegal) conducted question and answer sessions almost daily. Mr. Bartlett would do spot checks to make sure staff inputting stuff correctly. He determined at one point that two staff persons were not inputting

information correctly and they were terminated, after which Bartlett asserts, he checked everything they did prior to termination.

HGD did not obtain medical records directly from providers for the Ugandan clients. Most of the records for clients represented by Hollyne Care came from Arafah. Some records came from the clients.

When asked about the BrownGreer Audit Report that suggested there were Ugandan audiograms that were fake and whether there was a different vetting process for audiograms set up for the Ugandans, Bartlett said they were not vetted any differently than U.S. private provider audiograms. When asked if the Ugandan-generated audiograms looked differently or like the U.S. generated audiograms, Bartlett said they looked the same. For example, same kind of x and o markings for which ear, and shooters notches present on a lot of audiograms. Values were in ranges like that of U.S. service members.

Asked about the examples BrownGreer included in the audit report with language "Caused by the use of the 3M earplug" in audiograms purportedly performed in 2008, Mr. Bartlett said, on page 84 of the transcript, "I think that is a fraudulent audiogram. We didn't catch it. We didn't see it before and, you know as I think back about our processes, the reason we didn't catch it is that **we weren't reviewing narratives** (emphasis added). You know, the documents that we had for clients that were relevant to submission were audiograms and the values of those audiograms.

"And the exhibits that were on the audit report, audiograms were on different pages from the narratives. **So, our staff, me, Jeanie, no one was looking at narratives from – at this point in time. It wasn't -- it wasn't relevant to our inquiry** (emphasis added)." Bartlett has several suspicions as to how their review of records took them specifically to the audiogram and not the narrative language, but it is clear from my discussion with him that their focus and perceived relevance was simply the audiogram and the thresholds recorded therein without consideration of the concept of fraud. As for the one audiogram Bartlett conceded was fraudulent, this Special Master is not aware of any documentation that demonstrates Bartlett or HGD took any action to withdraw the audiogram from consideration.

With the comment Alex Rosales made to me that she drew attention, in a light hearted way, to a "Dr Bob" whose name kept showing up on audiograms purportedly performed in Uganda, I asked if there was any discussion in the firm, either among the partners or staff about who was signing off on the Ugandan audiograms, providing an example of one audiologist or doctor who signed off on a whole bunch of different audiograms, Bartlett stated that he probably looked at 20,000 or 30,000 audiograms generally and, likewise, had hundreds of conversations with staff people about audiograms, but he doesn't remember ever personally being alerted to a concern about any signatures or names of providers. He again stated they were looking at audiograms and dates when they were performed.

When I asked if there was anything about the Ugandan records that ever raised a red flag or caused them to question why something was in a record or prompt a need to look in more depth, Bartlett said not prior to the BrownGreer Audit Report. He felt what they were doing confirmed in his mind that the audiograms were legitimate. They were running reports weekly to look at progress toward meeting their deadline. They determined point values, if a client was going DPP. They had average point values for Army members, Navy members, and contractors. They found that about 5% of their US service members were eligible for points under DPP. Of the Ugandans, 3% or 4% were eligible. The average points for US citizens were 15, 16. 17. Ugandans were 7 or 8. "But nothing jumped out" to Bartlett. Given the specifics of Mr. Bartlett's assertion here to suggest that nothing was askew with the Ugandan claims. BrownGreer's response to Bartlett's assertion:

"We are not sure why HGD makes this claim or where it comes from. Of the 515 U.S. citizens in the DPP the firm represents, 498 received Points. That is 96.7% who qualify for Points, not 95% who did *not* qualify. HGD represents another 2,106 EPP claimants with Level 4 (1,741) and Level 5 (365) determinations in the EPP, which means these claimants also would have qualified for some DPP Points had they elected the DPP instead. So, 23.6% of the firm's 8,922 EPP U.S. citizens could have gotten DPP Points. To say that their 95% failing Ugandan claimants raised no red flags because their U.S, clients were failing at the same rate is quite bizarre." Section C, page 4, BrownGreer's reply to HGD's response.

I asked Mr. Barlett to describe what the process was for HGD during the Grace Period. Bartlett told me the instructions to their team was we're not looking for

points because we have already done that analysis, we are trying to provide BrownGreer the audiogram that shows some sort of hearing loss so that "these clients will get their registration payment, period." The further instruction to their team was it must be in the firm's possession before July the 26th. Bartlett said to me, "That's what you see on p 5 of the audit report, December 3 through December 9 and I think my math was about 503 audiograms were uploaded during that period." They notified all their clients by email that the firm had an obligation to get to BrownGreer any audiogram in the HGD system by July 26th. Orran Brown, however, received a forwarded email from one of the HGD clients and Orran sent Bartlett an email around the 9th or 10th of December stating "you know if it is in your client's possession as of July 26, 2024, or your possession, you may upload that record." That changed HGD's understanding "fundamentally" as to what they should upload.

The OneDrive mentioned by Ms. Rosales, Ms. Free, and Ms. Garrison was set up by HGD to hold any Ugandan medical records received after July 26, 2024. Some clients sent in records on their own and Mr. Musoke sent in records. Mr. Musoke, in fact, told me in a follow-up interview that in December 2024 Mr. Bross said HGD wanted all audiograms going back five years and they only had two weeks to send them. Musoke describes the clients, all of whom had been sent emails according to Mr. Bartlett, hurriedly tried to get the records. Musoke told me, **some of the records no longer existed but medical providers "knew" the clients and remembered testing them and so recreated the audiograms. Some audiograms were created new but back dated.** They were still gathering records when Bross told him time was up and not to send any additional records. Mr. Bartlett stated that any audiograms or other medical records received by HGD after July 26th were placed in the OneDrive and that it was "quarantined" so that only Mr. Bartlett, Ms. Sleadd, and Mr. Bross had access to it. When they set up the OneDrive, HGD was operating under the impression that audiograms had to be in the possession of HGD within the July 26th deadline and they did not want a staff person to inadvertently upload an audiogram received after that date.

After the email from Orran Brown regarding the in-possession-of issue, Taylor Bartlett changed the firm's position that only the three partners described heretofore had access to the quarantined OneDrive folder on Uganda. He looked in that folder and believed there were 700 or so documents. Bartlett said, "So we devised a plan to go get these records that are sitting in a special folder that had been

quarantined from the rest of the staff so that there wasn't an accidental upload of something. We wanted to make sure we followed – we appreciated that there was this grace period. The Court didn't have to do it. Garretson didn't have to do it. We realized it was a concession and that we appreciate, so we wanted to make sure we followed the letter." Bartlett Transcript pages 97-98. Mr. Bartlett further explained that the documents in the folder were either received from Musoke or clients and had been literally dragged into the folder. Names were not in any type of order, and one had to open a file, look for the name, search for that name in the HGD system or BrownGreer system. They then had to match that name with an audiogram and upload without consideration of whether it was a duplicate of another they already possessed. There was not time to do any kind of analysis. Bartlett went on to say, "And so the process was, figure out the name, put it in our system where it should be, where everyone can access it, take it out of quarantine, upload it to BrownGreer, indicate on our spreadsheet – I had another one of these live spreadsheets that said who uploaded each document and who reviewed it. And then check – write 'yes' in this column that you have uploaded this document. And that's what we did on the 10th and 11th." Bartlett transcript, pages 101-102.

The first indication HGD had that fraud was suspected in the Ugandan claims was when they received the BrownGreer Audit Report, on May 6, 2025. Without specificity in the report as to whose audiogram or record was an example of potential fraud, HGD did not attempt to dig into the audiograms in each of the claims. They only went into the files for the claimants that received points under DPP. They did not see anything in those reviews that "stood out." HGD did not, according to Bartlett, do an in-depth search for suspicious or potentially fraudulent audiograms or other records. They did look at the ones that were attached as an exhibit to the BrownGreer Audit Report, searching the case management system, the quarantine folder, who uploaded what, whether there was second review, communications with the client before and after the Grace Period. The only audiogram for a Ugandan client that they refused to upload was for a client who, during the Grace Period, said he went to his audiologist, who told that client that there was an error in his previously written audiogram and that client wanted to have HGD upload the corrected audiogram, but Mr. Bartlett refused.

## VI.    ARAFAH MUSOKE INTERVIEW

Obviously, a key person in this inquiry and the story of Ugandan claims filed by HGD is Arafah Kaitale Musoke. Throughout the various documents and references to this person, his name is spelled a variety of ways. The undersigned chooses the first, middle and last names used and spelled in this report because it is the name that appears on Mr. Musoke's passport and national identification card. Copies of those were supplied to me by William Bross at my request. Were this report written for a Ugandan tribunal, it would be customary to refer to the person as Musoke Arafah Kaitalae. Ugandan naming convention created issues for HGD and their staff for a short period of time.

Mr. Musoke describes himself as a general practitioner in law, licensed to practice in 2019 after graduating from law school at the Pentacostal University in Kampala, Uganda. Although the undersigned was able confirm such a university exists in Kampala and has an active law school, I could not confirm that Musoke is a licensed lawyer. An attempt to confirm his licensure failed when my email to the Ministry of Justice in Uganda went unanswered. A follow-up effort likewise failed. The undersigned finds that Musoke was not performing the role of a lawyer in this litigation. In my discussions with Aarafah Musoke he presents himself as acting on behalf of Hollyne Care for the benefit of returning Ugandan contractors. He holds himself out to be the CEO of Hollyne Care in Kampala. He represents that Hollyne Care is a non-governmental organization that is funded by the Ugandan government to facilitate and assist Ugandan citizens preparing for and returning from deployment in either Iraq or Afghanistan performing civilian work, primarily security, for the U.S. military at bases and embassies. As such, the undersigned asserts it is not relevant if he is a licensed lawyer since his integrity and honesty must be determined independently of his status as a licensed lawyer. He was acting in his role as the CEO of Hollyne Care. Relevant to this investigation is his work with returning Ugandans many of whom asserted, in some way, they were injured, suffering hearing loss and/or tinnitus. It was alleged by the Ugandan plaintiffs that they were issued the 3M CAEv2. If true, they certainly could be eligible for compensation as nothing in this litigation or settlement program has limited eligibility to U.S. citizens. Prior to 2019 it seems that Musoke's work at Hollyne Care was for returning contractors injured in some way in their work for the U.S. government in Iraq and Afghanistan who had Defense Base Act (DBA) claims. That act provides an extension to the federal workers' compensation program. In that program, Musoke dealt with many

different injuries. It is irrelevant to this investigation whether the hearing injuries could or should have been pursued through the CBA as well. However, in 2018 at a conference for DBA practitioners Musoke had a conversation with a lawyer who mentioned the 3M litigation and said he would do some checking when he returned to the States for the lawyers doing that work. It is through that networking that Musoke found William Bross and HGD. Arafah contacted HGD in 2019. It is known from Taylor Bartlett and William Bross that they thought the first contact with Musoke was for himself and that he was a potential client, so they sent him an intake package. Once it was established that Mr. Musoke, under the auspices of Hollyne Care, was in the business of referring clients to lawyers that could help them, he began referring clients to HGD through William Bross. In my meeting with Musoke, he revealed that he had as many as 25,000 potential clients he could have referred but that Mr. Bross required certain medical records be sent to the firm and most of the potential Ugandan clients did not have email or even know how to use it or a way to get the records so considerably fewer Ugandans became clients. When I asked Taylor Bartlett and William Bross about the larger number of potential clients, neither could recall ever hearing such a number.

According to Musoke, early on when HGD had the Ugandan clients fill out a questionnaire seeking information about earplug use and place of use but were not asked to send records. Some clients obtained their records and used those to fill out the forms, after which some such forms would have been stored in the client's file with Hollyne Care. Based on Musoke's description some of the audiograms would have been reference audiograms, performed preemployment, and some injury audiograms, performed after return from deployment. He recalls HGD telling the Ugandan clients they did not need to send the audiograms, although some clients did anyway. Musoke complains about HGD's handling of the claims because, according to him, many Ugandan clients missed out on their claim because of not having an audiogram with the claim. Later came a demand for records to be collected in a week's time when the reality in Uganda was that some clients were far away from cities and communication was limited with some having no internet. A client attempting to provide documentation might have to drive for days to deliver it. Musoke asserts that the week they were given was impossible to meet and in fact, in his opinion, the request for information could take six months to accomplish.

Early December of 2024 was when Musoke first learned that HGD wanted medical records and specifically audiograms going back five years. He was told by Mr. Bross that they only had "two weeks." He had some of the records himself in Hollyne Care for those clients without email addresses and that he was managing but many clients had to go back to the medical providers to try to obtain those records. Musoke and the clients began sending audiograms as fast as they could, they worked day and night without sleeping trying to send as many records as they could until Bross said stop, no more records could be sent. Musoke helped some of the clients who did not have an email service send audiograms, some of the clients who had emailing capability would do it themselves. As aforementioned, for many clients, the records no longer existed but since the medical providers "knew" the client, "remembered" the client, "remembered" testing the client, they recreated the audiogram. Some changed information on a record that did exist, according to Musoke.

Mr. Musoke complains that many Ugandans received notice that they had no points and so did not qualify for compensation. Since Bross said it was due to not having audiograms the Ugandans feel they never really received an explanation for the denial.

While interviewing Mr. Musoke a second time to follow-up on several issues, the undersigned asked if fraud was an issue in Uganda generally. He stated it was a problem throughout the country. He relayed that Uganda is a very poor nation, and many people lack the resources needed to live adequately. In the early days when Arafah Musoke began working with HGD he warned William Bross that he should not accept medical records directly from clients. He told Bross not to trust anything he is sent. He gave the same advice to the corporations that were hiring Ugandans to work in war zones. In those circumstances, whether pre-employment medical exams, work injury treatment records or post-employment medical evaluations, he advised the corporations to have someone pick up records directly from the medical providers. The reason for the advice to William Bross and the contractors was that it was typical for Ugandans to alter such records to suit their needs. He also asserts that if Mr. Bross suspected that a record was "fudged" in some way, Bross should send the record to Musoke, because he has a list of every ENT in Uganda, and he could check the accuracy of the record.

When asked about articles suggesting allegations of fraud against him and whether he has ever been charged or convicted of fraud, he denied both. He went on to explain, though not credibly, that Americans travel to Uganda to represent injured persons, but don't do all the things one is required to represent those clients. In dealing with governmental agencies they say and do things to make their Uganda contact look bad so that the government agency will not trust that contact. The hope of the Americans is that once that trust is lost the Americans will try to get them to substitute for the original contact someone "who will make mistakes," according to Musoke.

The Coastal Pacific Investigations report, commissioned by Lead Counsel, which focuses primarily on Musoke, provides a litany of allegations against Musoke. The only medical provider which demonstrated legitimacy was Kampala Family Clinic. It does not, of course, address the issue of an audiogram or other record starting out legitimate but after being provided to the individual alterations being made by that individual to enhance the helpfulness of the document. as alluded to by Musoke. It is stated that the information developed by the investigators came from open-source material on the internet. Obviously, the same information would have come to light much sooner had HGD conducted such a search. In addition, BrownGreer found a case from the U.S. Department of Labor, Benefits Review Board, styled Kasule v. Triple Canopy and Continental Casualty Company. BRB No. 20-0181, decision issued August 20, 2020. The Benefits Board ultimately did not alter the award of compensatory damages to Kasule, who was pro se. However, relevant to this report, the Board remanded the case for further investigation by the District Director regarding a communication that stated an organization that represented Kasule for a discrete part of the case was paid through Hollyne Care and Kasule was complaining about the money paid to Hollyne Care. I was also able to locate this case simply by using Hollyne Care as search terms. The point is not whether Hollyne Care did something illegitimate in that case, we don't know the reality of that from the published order, but that it should raise some suspicion about Hollyne Care as part of a due diligence of Musoke.

## VII.  BROWNGREER AUDIT

The BrownGreer Audit Report is dated May 4, 2025. Bill Bross inquired of the undersigned for approval to respond to the audit report and with quick agreement

from me, HGD prepared a response which is dated August 15, 2025. Thereafter, I asked BrownGreer to prepare a response to the HGD document and that response was dated August 15, 2025. As the Court is fully familiar with and in possession of each of these documents, this R&R will not rehash and duplicate those efforts and instead will highlight certain findings and attempt to pull together certain facts to facilitate this report's efforts to provide a complete picture.

The Audit Report makes it clear that due to a substantial number of indicators uncovered while processing the claims of HGD's Ugandan clientele BrownGreer believes that "nearly all the DPP submissions from Ugandan claimants are fabricated and not credible." The indicators of fraud in those submissions include terminology that is impossible, reports that have been altered, suspicious provider sources, a substantial number of identical reports, handwriting irregularities, and, in one case, a claim for a client who was already paid through a claim made by another law firm.

The Audit Report is an excellent account of the process, procedures, and timelines written with honesty and integrity in my opinion. The conclusions relayed in the report are the result of excellent rationale and reason. The facts gathered during this investigation, in my opinion, confirm and bolster the BrownGreer conclusions. One of the BrownGreer conclusions dealt with a finding by them that there were many examples of duplicate audiograms which they ultimately concluded were more than coincidence and represented fraud. The undersigned consulted with Dr. Spankovich and asked him to evaluate those audiograms. His conclusion was that all such audiograms were fraudulent.

The HGD Response to the BrownGreer Audit Report focuses heavily on an avoidance of any appearance that HGD intentionally committed fraud. HGD, as they pointed out in the response, handled the Ugandan claims just as they did the U.S. claims, except they required certain documentation earlier due to logistic difficulties, not mentioning a more pressing need to vet what was received for integrity. They are right in this equal treatment. The problem is they didn't have a process or procedure to vet any claim for fraud. HGD relies on a theory that the statistical data between U.S. claims and Ugandan claims were nearly the same. They are wrong and the BrownGreer Analysis demonstrated it.

HGD would have liked this Special Master to conclude that because some of their Ugandan clients uploaded audiograms themselves which would have prevented

them from knowing what the contents of those audiograms were. During this investigation, I accessed hundreds of HGD clients' files to look at audiograms and other documentation. As Mr. Bartlett commented to me at page 47 of his transcript that to know what someone uploaded, they would have to go through every file in BrownGreer. If they didn't care to take the time to find out what their U.S. clients uploaded, the Ugandan numbers were much less. To that point, accessing the Ugandans files, as I did, simply requires searching the client's CID and then accessing the file. The documents in each file are listed in common language.

The HGD Response is very light on process and procedure in HGD for the gathering of information to make claims for the Ugandans. It is clear that the real issue in Taylor Bartett's handling of the Ugandan claims was that he really believed he was being clever by discovering his registration payment "loophole" which conveniently required no work in the manner of supplying proof of hearing loss in a defective earplug case.

BrownGreer's Analysis of the HGD Response was a devastating pushback to that response. BrownGreer performed a point by point take down of the HGD assertions. Just as the conclusion heretofore provided regarding the original BrownGreer Audit Report, the BrownGreer analysis is confirmed and bolstered by the investigation and fact gathering by the undersigned.

As heretofore mentioned, BrownGreer also responded to several inquiries from the undersigned. Some of the inquiries involved expanding on some of the findings in the Audit Report. Examples of those inquiries include additional claimants with reporting that was in the wrong timeframe (impossible language), as well as altered reports, and 607 claimants with 793 records with significant handwriting irregularities.

## VIII. UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA LOCAL RULES

A multi-district litigation (MDL) within the jurisdiction of the Judicial Panel on Multi-District Litigation, as this Court knows and the description makes clear, is a consolidation of cases from other federal district courts, often great in number, that bring to this Court attorneys licensed to practice in an equally great number of states. N.D. Fla. Loc. R. 11.1(C) provides for such lawyers to represent their clients in this

MDL upon paying a fee and providing proof that the attorney is a member in good standing of the bar in the jurisdiction where the attorney resides or regularly practices law. In that same rule, at (G)(1), there is the mandate that an attorney must comply with the Rules Regulating The Florida Bar, unless federal law provides otherwise.

## IX.    THE RULES REGULATING THE FLORIDA BAR

Rule 4-1.1 requires that a lawyer provide competent representation to a client and that requires legal knowledge, skill, thoroughness, and preparation reasonably necessary for such representation.

Rule 4-1.16 requires a lawyer to withdraw from representation (1) if the representation will result in violation of the Rules of Professional Conduct or law; (4) the client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent, unless the client agrees to disclose and rectify the crime or fraud; or (5) the client has used the lawyer's services to perpetuate a crime or fraud, unless the client agrees to disclose and rectify the crime or fraud.

Rule 4-3.3 covers the subject of candor to the Court. In subparagraph (a) it prohibits a lawyer from (1) making a false statement of law or fact to the Court or failing to correct a previous false statement of law or fact by the lawyer; (2) failing to disclose a material fact to a Court when disclosure is required to avoid assisting a fraudulent act by a client; (4) offering evidence the lawyer knows to be false or if the lawyer comes to know that previously offered evidence was false, the lawyer shall take reasonable remedial measures including, if necessary, disclosing it to the Court.

Rule 4-5.1(a) requires managerial lawyers generally to make reasonable efforts to ensure the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct, and (b) specifically places that requirement on a lawyer with supervisory authority over another lawyer. Subparagraph (c)(2) deems a violation of the conduct rules if the supervisory lawyer becomes aware of misconduct by a subordinate lawyer and ratifies it or fails to take remedial action.

Rule 4-5.3(a) requires nonlawyer assistants, such as paralegal, legal assistant, or other similarly titled employees work under the direction or supervision of a

lawyer or law firm. Subparagraph (c) makes clear that such nonlawyer staff may work without the presence or active involvement of the lawyer, but the lawyer must review and be responsible for the work product of the paralegals or legal assistants.

## X.    ALABAMA RULES OF PROFESSIONAL CONDUCT

The Alabama Rules of Professional Conduct, as is customary with the advent of the ABA Model Rules, is quite similar to that of The Florida Bar.

Rule 1.1 requires that a lawyer provide competent representation to a client and that requires legal knowledge, skill, thoroughness, and preparation reasonably necessary for such representation.

Rule 1.16 requires a lawyer to withdraw from representation (1) if the representation will result in violation of the Rules of Professional Conduct or law; (4) the client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent, unless the client agrees to disclose and rectify the crime or fraud; or (5) the client has used the lawyer's services to perpetuate a crime or fraud, unless the client agrees to disclose and rectify the crime or fraud.

Rule 3.3 covers the subject of candor to the Court. In subparagraph (a) it prohibits a lawyer from (1) making a false statement of law or fact to the Court or failing to correct a previous false statement of law or fact by the lawyer; (2) failing to disclose a material fact to a Court when disclosure is required to avoid assisting a fraudulent act by a client; (3) offering evidence the lawyer knows to be false or if the lawyer comes to know that previously offered evidence was false, the lawyer shall take reasonable remedial measures.

Rule 5.1(a) requires a partner in a law firm to make reasonable efforts to ensure the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct, while (b) requires a lawyer having direct supervision over another lawyer to make reasonable efforts to ensure the other subordinate lawyer conforms to the Rules of Professional Conduct. Subparagraph (c) deems a violation of the conduct rules if the supervisory lawyer becomes aware of misconduct by a subordinate lawyer and ratifies it or fails to take remedial action.

Rule 5.3, covering nonlawyer assistants, makes clear in subparagraph (c) a lawyer is responsible for the conduct of the nonlawyer that would be a violation of the Rules of Professional Conduct if engaged in by the responsible lawyer, if that lawyer orders or ratifies the conduct involved or, as a partner in the firm in which the nonlawyer is employed, or has direct supervisory authority over such nonlawyer and knows of the conduct at time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

## XI.    ABA MODEL RULES

The ABA Model Rule 1.2(d) restricts a lawyer's conduct when a lawyer knows a client's action is criminal or fraudulent. The ABA issued a Formal Opinion on April 29, 2020 regarding this provision in Model Rule 1.2(d), wherein the Standing Committee on Ethics and Professional Responsibility stated, in part: "Model Rule 1.2(d) prohibits a lawyer from advising or assisting a client in conduct the lawyer 'knows' is criminal or fraudulent. That knowledge may be inferred from the circumstances, including a lawyer's willful blindness to or conscious avoidance of facts. Accordingly, where facts known to the lawyer establish a high probability that a client seeks to use the lawyer's services for criminal or fraudulent activity, the lawyer has a duty to inquire further to avoid advising or assisting such activity. Even if information learned during a preliminary interview or during a representation is insufficient to establish "knowledge" under Rule 1.2(d), other rules may require the lawyer to inquire further in order to help the client avoid crime or fraud, to avoid professional misconduct, and to advance the client's legitimate interests. These include the duties of competence, diligence, communication, and honesty under Rules 1.1, 1.3, 1.4, 1.13, 1.16, and 8.4."

## XII.   FINDINGS

As an overview, it is clear from all the evidence uncovered in this investigation, including the findings of BrownGreer and Coastal Pacific Investigations, that fraud was committed in Uganda in the submission of fraudulent medical records clearly to show hearing loss by the Ugandan contractor clients of HGD. Whether Arafah Musoke was acting only in the best interests of the beneficiaries of a Ugandan government policy to assist returning citizen contractors from war zone deployments by funding an NGO headed by Mr. Musoke or was defrauding those very beneficiaries for his personal gain will not be a finding of this

report. Without an extensive discovery process, likely in Uganda, it is impossible to know who and how many perpetrated this fraud. Perhaps, even that would not reveal the actual fraudsters. Consequently, whether the clients of HGD individually or as a group were guilty of fraud will not be a finding of this report. The role of this Special Master is to investigate if there was fraud and what role if any HGD played in perpetrating such fraud or were willfully or recklessly indifferent to that fraud and to make recommendations to the Court regarding what, if any, remedy should be ordered by her.

As the 3M CAE settlement program got underway, HGD had ample time to learn and understand the settlement agreements, the settlement methodology, participate in town hall meeting where the settlement methodology was explained, and collect medical records, particularly audiograms. The failure to do so thoroughly caused them, in part, to fail to understand the need for the submission of proof of hearing loss. Consequently, that set up HGD for the Grace Period crush when they did not have the time to make sure their process was completed for all audiograms sent or that the Ugandans wanted to send. There were so many, Bartlett cut off the process before complete. Even worse, due in large part to that crush of uploading audiograms, HGD did not examine the audiograms for errors or indicia of fraud, did not determine in whose possession those audiograms were held, failed to determine the process undertaken by Musoke, and simply uploaded audiograms as fast as they could. It is non-sensical, though telling, that Taylor Bartlett and William Bross delighted at having been the only firm to "discover" a loophole whereby a claimant without an audiogram could elect EPP and receive $100.00 while the result of not submitting an audiogram in DPP garnered a $1,000.00 registration payment. Without the failure to understand the program, HGD would have had ample time to gather audiograms and other medical records, as well as setting up an anti-fraud vetting process. Table 1 in the BrownGreer Analysis of the Heninger Garrison Davis 8/15/25 Audit Report Response is not just telling on this point but shocking. That table demonstrates that 45 Ugandan claimants uploaded documents during the supplementation period and none, thereafter, including during the Grace Period. Taylor Bartlett uploaded 50 documents during the DPP Supplementation and Jeanie Sleadd 1 during that time. There were 1,263 downloads during the Grace Period. Furthermore, when I asked Mr. Bartlett about gathering medical records of the Ugandans, trying to learn how much was done prior to the Grace Period when things

were not so hectic, he suggested they couldn't have because until the settlement had been announced because prior to that the Judge had prevented them from obtaining medical records. First, that prohibition had to do with the VA since as a governmental agency the Touhy process had to be invoked but that did not include the Ugandan's whose records were not with the VA. No order ever prohibited collecting private medical provider records as far as I can remember nor was one revealed through a search. Second, they had nothing standing in their way, once they undertook the representation of the Ugandan clientele, to seek records directly from the medical providers who examined the hearing of the Ugandans either about to deploy or recently returned from deployment. There was nothing to prevent HGD from collecting records from the employers of the Ugandan plaintiffs. The HGD process did not entail sending whatever authorization needed to have such records released to those claimants' counsel just like the lawyer for a U.S. client sending an authorization to a private medical provider and obtaining an audiogram if he or she had been to such a provider. If HGD had made direct requests to the Ugandan medical providers, as suggested by Musoke, they would have been able to assess early the actual existence of, the validity of, and integrity of the providers and the audiograms purportedly to have originated with those providers.

William Bross and Taylor Bartlett failed to establish a procedure and training to insure against fraudulent documents submitted by their clients or Hollyne Care and Arafah Musoke through staff reviewers or themselves. They simply did not, at any time, perform a fraud analysis of the documents they intended to rely on in their claimants' request for compensation. It is true that they ultimately did not have the time to vet the audiograms uploaded but that was because they did not plan for that time. Such a failure is on HGD, particularly Taylor Bartlett and William Bross, and is not excusable conduct for the Court to allow to pass without being held accountable. They failed to perform a due diligence on Mr. Musoke and failed to perform a due diligence as the firm was beginning to pursue claims for Ugandans referred by him through Hollyne Care. They believed Mr. Musoke to be credible and a "smooth operator" but failed to heed his warning about not trusting Ugandans with medical records consistent with the nation-wide practice of fraud. A simple examination of the U.S. State Department's warning about fraud in Uganda might have altered Mr. Bartlett's view that Uganda had a "special relationship" with the United States and it does not have a reputation for widespread fraud. Similarly, they

failed to vet the legitimacy of the doctors, audiologists, and clinics that were the source of audiograms.

The finding of this Special Matter is that all, except four, of the Ugandan claims submitted by Heninger Garrison David were fraudulent. Only those four claims, out of 997, have some indicia of reliability in that the clinics can be verified and while the audiograms do not have data points that clearly believable, they do not have obvious indications of manipulation. Unable to draw a conclusion of the impact, however one of the four was an Aaron Gartlan referral, one worked with Hollyne Care, and the other two having no apparent connection with either. With those few exceptions, and there is not absolute certainty about those four, a reasonable person would conclude that the group of Ugandan claims, as a whole, were not legitimate. The four excepted cases carry the claim identification numbers of 287342, 374024, 385529, and 385550.

Further, it is the finding of this Special Master that the facts uncovered herein are sufficient to assert that there are violations of the canons of ethics of the Northern District of Florida, the Rules Regulating the Florida Bar, and the Alabama Rules of Professional Conduct. This Special Master furthers asserts that the conduct that leads to this conclusion is sufficient to serve as an additional basis for this Court to impose sanctions on HGD generally and Lewis Garrison, Taylor Bartlett, and William Bross for their individual acts of misconduct.

Attached to this Report and Recommendation is an Appendix containing many of the documents referred to herein.

## XIII. RECOMMENDATIONS TO THE COURT

1. It is the recommendation of this Special Master that the Court find that Heninger Garrison Davis and specifically partners Taylor Bartlett and William Bross specifically and Senior Partner W. Lewis Garrison generally, all lawyers owing a fiduciary obligation to the clients of said firm to competently and thoroughly represent them in the matter of this litigation, failed to do so. The failure in the first instance came from not acquiring a thorough understanding of the settlement agreement and the methodology of the settlement program. It is further recommended that the Court find that partners Garrison, Bartlett and Bross failed to adequately supervise and ensure that the

nonlawyer staff persons of the Heninger Garrison Davis firm were prepared to comply with rules of professional conduct

2. It is the recommendation of this Special Master that the Court find, for the purpose of supporting evidence for the sanctions to be imposed by this Court, that Heninger Garrison Davis and specifically Senior Partner W. Lewis Garrison and partners Taylor Bartlett and William Bross violated the various rules within the Rules of Professional Conduct in Florida and Alabama, cited in this Report. This Special Master particularly notes that at no time has Heninger Garrison Davis, or any of the partners whose conduct has been scrutinized by this Report, taken any remedial action regarding the fraudulent audiograms submitted to the Settlement Program. Instead, the firm, through its response to the BrownGreer Audit Report, has simply asserted the firm and its partners did nothing wrong. It is further recommended that the Court find that partners Bross and Bartlett failed in every respect to determine, in advance of confirming representation of Ugandan citizens, the risks inherent in doing business in Uganda and in failing to establish a process to assess the validity of information supplied to the firm. This includes failing to perform due diligence inquiries of the medical clinics relied upon by the Ugandan clients to assure those clinics were legitimate. This also includes failing to take charge of requesting medical records, including audiograms, directly from the entities that allegedly performed hearing tests and the written records attendant thereto. It is further recommended that the Court find that partners Bross and Bartlett failed to perform due diligence inquiries of Arafah Musoke and failing to have a clear and written understanding of the role he would play in the litigation. For example, was Mr. Musoke to be lawyer referring clients to Heninger Garrison Davis, assuming the law firm was able to determine his exact legal status as a lawyer? Whether he was to be a referring lawyer or performing duties as the CEO of Hollyne Care, Bross and Bartlett failed to establish the precise duties Musoke was to undertake, if any. Because some Ugandan clients of Heninger Garrison Davis were not working directly with Musoke and there was a blurring of lines regarding Musoke's relationship with each client, Bartlett and Bross failed to establish sufficient communications with those clients to properly represent all Ugandan clients. Communicating with clients principally by email or text, or through Musoke

in his undefined role, was simply inadequate. Telephone contact or, even better, in-person town hall meetings in Uganda likely was the least that was required to competently and thoroughly represent this group of clients.

3. In the first paragraph of Section III. Facts, on page 4, this report sets out the huge sums of money involved in the Ugandan cases. That fraudulent supporting documents were submitted to acquire that money for clients and their lawyers demands significant accountability aside from simply recouping the money. The Court is certainly justified in ordering sanctions against the Heninger Garrison Davis firm and W. Lewis Garrison, Taylor Bartlett and William Bross. It is the recommendation of this Special Master that W. Lewis Garrison be sanctioned for his role in this unprofessional conduct in an amount not less than ten thousand dollars ($10,000.00), that Taylor Bartlett and William Bross be sanctioned for their roles in an amount not less than twenty thousand dollars ($20,000.00) each. Each such sanction should, in the opinion of the Special Master, be applied to the individual and not the law firm. As for the firm, Heninger Garrison Davis, it should be sanctioned not less than fifty thousand dollars ($50,000.00).

4. It is the recommendation of this Special Master that the DPP registrations and applications of the Heninger Garrison Davis Ugandan clients be deemed void and invalid, except for claims 287342, 374024, 385529, and 385550. Further, all moneys already paid by BrownGreer for each of the voided Ugandan claims must be returned to the settlement program by Heninger Garrison Davis for the replenishment of the fund and the common benefit hold back funds should be withdrawn from the Common Benefit Fund and returned to the settlement program account. Every category of these funds is discussed in this R&R in the first paragraph of Section III. Facts, on page 4. However, to confirm accuracy of the amounts, the undersigned recommends that the Court direct BrownGreer to determine exactly what funds must be returned, consistent with the ultimate findings of the Court and provide the Court an itemization or accounting. Naturally, as part of this recommendation, all Ugandan calculated payments that were held up by BrownGreer pending a resolution of this matter should remain with the settlement program. As for the 4 exempted claims, each was awarded a $1,000.00 gross payment, less $90.00 for the Common Benefit Fund, less $364.00 for attorney fees, netting

each $546.00. Even though their claims would not be voided, if the Court adopts the recommendation of this R&R, the impact of 993 fraudulent claims is huge, and the Heninger Garrison Davis firm should be required to disgorge and return to the Settlement Program its attorney fees in each of the 4 exempt cases. Since, for those 4 claims, the settlement was consummated, the funds withheld for the Common benefit fund should remain with the common benefit fund, and the $546.00 net to each of the claimants should be retained by the 4 claimants. It should be noted that all funds that are required to be paid back to the settlement program for the Heninger Garrison Davis voided Ugandan claims must be paid by that firm directly within 15 days of the entry of the Court's final order in this matter. The settlement program will not be required to wait for any recoupment by the firm from the Heninger Garrison Davis clients.

5. This Special Master asserts that it is without controversy that no one who devoted time and treasure should be uncompensated nor bear expense out-of-pocket during the entire investigation of the Ugandan claims, designed from the beginning to provide the Court with the issues and facts embedded within this group of claims in the settlement program for which she is the ultimate manager. The investigations and inquiries made were requested or sanctioned by the Court and clearly within the inherent authority of the Court to manage this litigation and its settlement program. The settlement fund, the common benefit fund, including other counsel and claimants, should not be made to pay the time and expense of this investigation. As a further sanction against the Heninger Garrison Davis law firm, for its role in the extraordinary circumstance of submitting false medical records, should be required to pay the compensation and expenses approved by the Court, to be paid at the direction of the Court to those persons the Court authorized to investigate in some way the matter of the Ugandan claims. As part of the direction by the Court, this Special Master recommends the Court order Heninger Garrison Davis pay such time and expenses in a timeline decided by the Court, to the persons or entities decided by the Court and in the amounts decided by the Court. The Court should order said compensation and reimbursement be paid directly to the payees individually or to the settlement program to be passed through to those payees as the Court deems appropriate.

6. This Special Master is aware that Lead Counsel Aylstock and Seeger, Randy Sansom, and Brown Greer itself also worked on this investigation of the Ugandan claims. There, of course, may be others of whom this Special Master is not aware and should be compensated. It is the recommendation of this R&R that all such persons or entities, and any others whom the Court directed to perform work on this investigation, advise the Court, through Mr. Sansom, of all time and expenses in the pursuit of the facts from the time BrownGreer first began to inquire into this matter until it is resolved. It is recommended that each named entity or person be compensated consistent with their usual rate of pay. If Lead Counsel do not have a standard hourly rate established in this litigation, it is recommended that given their years of practice, that the rate be set by the Court at $1500.00 per hour.

7. The last recommendation of this Special Master is that this Report and Recommendation, together with the attachments to it and any orders the Court deems pertinent, be sent to the Florida and Alabama Bars' disciplinary committees for consideration of any action it would consider appropriate.

Counsel is hereby notified that objections to these proposed findings and recommendations must be filed within twenty-one (21) days of the date of the Report and Recommendation. Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. The Court will conduct a *de novo* review of this Report and Recommendation and any objections filed thereto.

Dated this 5th day of December, 2025.

Respectfully submitted

s/ *DavidRHerndon*

Special Master

# APPENDIX

CONTENTS

1. BrownGreer Audit Report
2. Heninger Garrison Davis Response to the BrownGreer Audit Report
3. Exhibits to HGD Response
4. BrownGreer Analysis of Heninger Garrison Davis Response
5. Coastal Pacific Investigation Report of Arafah Musoke
6. Exhibits to Coastal Pacific Report
7. Transcript of Taylor Bartlett Interview
8. Transcript of William Bross Interview
9. Transcript of Jeanie Sleadd Interview
10. Ugandan Health Ministry Letter re: The Good Doctors Clinic License