UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS                    Case No. 3:19md2885
EARPLUG PRODUCTS
LIABILITY LITIGATION

This Document Relates to:                 Judge M. Casey Rodgers
All Cases                                 Magistrate Judge Hope T. Cannon

SPECIAL MASTER REPORT AND RECOMMENDATION
COMMON BENEFIT FEES

## I.    Background

This MDL began on April 3, 2019 with the consolidation and transfer of all the then-pending cases involving the 3M Combat Arms Earplugs version 2 to Judge M. Casey Rodgers in the Northern District of Florida.  Extensive litigation ensued from that point with plaintiffs vigorously prosecuting their individual actions, as a collective under the auspices of this MDL, and defendant just as vigorously defending the allegations pursued against it. Over the next four years and four months, with cases transferred by the JPML on an ongoing basis, as well as cases being filed directly in the Northern District of Florida on the MDL's active docket and administrative docket, MDL 2885 quickly attained the distinction of being the largest MDL in the history of the federal judiciary and responsible for in excess of forty percent of the federal judiciary's entire civil caseload.   On August 29, 2023,

the Court announced on the website of the United States District Court for the Northern District of Florida that the parties had reached an agreement to settle all the cases pending in the MDL, as well as those cases filed on consolidated dockets in the State of Minnesota courts. The total settlement was Six Billion, Ten Million Dollars ($6,010,000,000.00).

The undersigned has been thoroughly involved in most aspects of this MDL and engaged in countless activities to facilitate the efficient and effective management of the MDL supporting Judge Rodgers' masterful efforts to provide a fair and just handling of a record-setting volume of individualized cases consolidated into a huge litigation. The undersigned was appointed by the President and confirmed by the United States Senate as a United States District Judge in 1998. Within the first year on the federal bench, the undersigned was appointed to preside over a multi-district litigation.  Since that first appointment to preside over an MDL case, with more to follow, the undersigned attended thirteen Transferee Judges' Conferences sponsored by the Judicial Panel of Multi-District Litigation (JPML), five of which he either served as a speaker or moderator or both.  Such conferences are the educational effort of the JPML to provide judges who have been assigned such litigation with the knowledge and wherewithal to effectively and efficiently preside over the litigation assigned to them.  Both before and after retirement from the federal bench, this retired U.S. District Judge has also spoken extensively at legal

education conferences, seminars, and workshops, participating with other lawyers and judges in discussions of the processes, procedures, and practices for managing complex and mass tort litigation, including the concept of and process for awarding common benefit fees. The undersigned has the experience and knowledge to report to the Court and to recommend awards to participating law firms. Special Master Sansom has served as the accountant and custodian of the time records throughout this litigation and attending most of the hearings in Court that dealt with significant issues, including bellwether trials. His knowledge of the time recorded and submitted by counsel and the work performed and by whom is only surpassed by the presiding judge. This retired judge, as well as Special Master Sansom have engaged in the vetting, managing, and analyzing of common benefit time submissions, following the best practices for such endeavors, for the purpose of making this report and recommendation to Judge Rodgers for her ultimate decision regarding common benefit fees.

## II.   Process

From the outset of this litigation the concept of potential common benefit was considered and a framework set up to analyze and qualify submissions of plaintiffs' lawyers working to advance the litigation for those plaintiffs. In an Order of Appointment, ECF 392, May 28, 2019, the Court appointed Ellen Reisman as Common Benefit Special Master and Randall Sansom as CPA. On January 9, 2020,

Judge Rodgers in Common Benefit Order No. 2, ECF 900, amended Common Benefit Order No 1 by removing Reisman from the Special Master role, in order to work on other aspects of the litigation, and replacing her with Randall Sansom, who retained his role as the appointed CPA for the Common Benefit Fund. Sansom was directed to work with Common Benefit Committee to resolve any disputes as to time entries submitted by counsel to ensure the validity and Common Benefit Order compliance of all submissions of common benefit time and to maintain accounts for assessments paid in by plaintiffs' counsel for the expenses associated with litigating, including the payment of certain of those litigation expenses. Legitimate time was approved and recorded while submitted time which failed to comply with the Common Benefit Orders of the Court was rejected. Sansom was also directed to meet monthly with Judge Rodgers to present time submissions which he rejected but which counsel persisted, or the Common Benefit Committee disagreed with Mr. Sansom. This process allowed Judge Rodgers to decide such controversies on a quick basis and to provide a process for Special Master Sansom and MDL counsel to fully understand the correct application of the Court's Common Benefit Orders.[1] Common Benefit Order No. 2 specified that Special Master Sansom would not file a Report and Recommendation as to attorney fees and costs. Responsibility for

---

[1] The Common Benefit Orders (CBO) entered in this MDL were CBO No. 1, ECF 488;  CBO No. 2, ECF 900; CBO No. 3, ECF 1659; CBO No. 4, ECF 3875; CBO No. 5, ECF 3968; and, CBO No. 6, ECF 4129.

issuing a Reports and Recommendations to the Court for held costs were assigned to the undersigned in CBO 3, ECF 3968, and for the award of common benefit fees in CBO 6, ECF 4129.

Even though not yet the subject of a common benefit order, the Court advised the undersigned in January of 2020 that her intent was to task me with the reports and recommendations for held costs and common benefit fees. Consequently, from that point he reviewed the monthly reports of Sansom and his business partner Sarah Hogan to provide a thorough understanding of the data and a sense of the time being spent for the common benefit of the litigation. Countless discussions, from the point of that beginning process through the present, were held between the undersigned and either or both Special Master Sansom and Ms. Hogan regarding the substance of seeming endless numbers of time submissions.

Importantly, the work performed by Sansom and Herndon throughout the litigation kept each abreast of the enormous activity in the MDL, enabling each to have the context and real time use of the hours ultimately submitted for common benefit consideration. It further provided each with a thorough knowledge of the work being performed. Special Master Sansom had access to all time submissions, and he attended a significant number of Court hearings and sessions. Special Master Herndon was given broad assignments, which expanded from time to time, that caused him to attend a myriad of meetings, in-person and virtually, such as court

hearings, mediation sessions, and discussions with Judge Rodgers pertinent to his assignments. The undersigned led countless meetings between the parties and the Department of Justice and Department of Defense pursuant to the Touhy process. Herndon was, of course, able during any such meetings to know which counsel actively participated. The undersigned was able to observe which counsel performed a lead role and which assumed a supporting role and whether there were persons who seemed to be mere observers. That process allowed Herndon to assess the value of each counsel to this litigation. The undersigned attended the first bellwether trial in person and observed most of the other bellwether trials via a closed (non-public) court zoom feed. Throughout the bellwether process the undersigned continued in his role of holding meet and confer meetings with both sides to resolve disputes outside of court to streamline the trial process.

The Court entered CBO 6, ECF 4129, in December of 2024. In detail, the Order recited the requirements to be determined eligible for common benefit fees, including the requirement to submit an application with information needed for consideration of an award of common benefit fees. A deadline was directed for January 27, 2025. Any firm, that did not submit an application was not eligible to be considered for such fees. Once CBO 6 was entered, setting up the process for the common benefit recommendations to the Court in the future, Sansom, Hogan and Herndon met several times to discuss and decide upon the course to take to

thoroughly analyze each application for the possibility an award of common benefit funds. Those discussions involved such matters as the various categories of work should be considered as common benefit. We conducted preliminary interviews of 10 persons, each in an early and prominent leadership role to put together a roadmap of where to look for information, and whom else to interview, all of which Sansom and Herndon could draw upon in constructing a recommendation for Judge Rodgers on common benefit matters.

Once the applications were received, Sansom and Herndon undertook individualized thorough reviews of each application. Each applicant firm that requested an opportunity to defend its application was granted that opportunity. Most were able to do so in person, and a much lesser number chose to or were allowed to present by a virtual meeting.

The analysis of the benefit provided by each applicant firm to the common good of the litigation, or lack thereof, included the consideration of many mission critical activities involved in this vast piece of mass tort litigation. The broader categories included law and briefing, expert witnesses, depositions, bellwether trials, commitment to the litigation, settlement, and settlement administration. Part and parcel to those broad categories were more narrow discrete sub-categories of work such as leadership generally, financial commitment, dedication to the MDL even as firms suffered from the lack of attention to the firm's other business or efforts to

attain more business, trial strategy and theme development of the overall objective of the litigation from the plaintiff's perspective, the science of general causation of hearing loss and tinnitus, critical research of defenses such as government contractor which was a potential litigation dispositive matter. Moreover, the narrow categories included briefing of a myriad of motions and complaints, discovery, depositions, expert witness identification and preparation, a large number of bellwether trials in various venues, appellate matters, settlement negotiation, a huge educational effort to help plaintiffs understand the settlement agreements to make a decision as to whether to support or reject such agreements, and an ongoing effort to manage a massive settlement program. All with a defendant that more than vigorously defended the litigation, even to the extent to take a run at the Bankruptcy Court in search of a novel strategy to end the tort system litigation. This MDL was very complex relative to the legal issues and logistics and, in fact, was the largest MDL in the history of American jurisprudence with the number of encompassed plaintiffs' cases exceeding 300,000. Every aspect of the work performed to the benefit of the litigation was examined, analyzed and considered.

Much, if not all, of the work within this litigation specified above was important in considering the "Johnson factors," *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 7114 (5th Cir. 1974), which were fully considered, analyzed and applied as appropriate. Intense and thorough conversations and analysis,

including how to analyze, the work reported in the time submissions and through personal observation were pursued. Particularly pertinent and given careful and thorough consideration were the Johnson factors of time and labor, novelty and difficulty of the litigation (in particular the presence of the potential litigation ending defense of government contractor immunity), skill of counsel, preclusion of other legal work by firms due to the aggressive time lines of this litigation and the extraordinary attention to excessive numbers of issues presented, customary fees including contingent fees, and the results obtained. With an eye to the Johnson Factors, each broad category of tasks undertaken during the litigation was quantified as to the whole and as to the other categories. The benefit to the common good of the litigation or to the detriment of the litigation was carefully analyzed as to each applicant.

The number of hours submitted by all common benefit applicants varied largely. A number of attorneys spent a great many hours of work to prosecute this litigation. A small number spent very few hours, by comparison. Judge Rodgers, at page 3 of Common Benefit Order No. 1, ECF 488, directed that "the Court will be assessing the value of the work performed and how it contributed to the common benefit, rather than performing a strict calculation of hours multiplied by some hourly rate." It was clear from information gathered in preparation for this analysis that even though hours could be compliant with the Court's order on their face that

did not equate to value to the litigation. For example, submitting time for attending a deposition or a meeting, many of which occurred on a virtual platform due to COVID or simply for convenience, did not ensure the submission was for a necessary participant. Likewise, attendance at court hearings did not ensure a factor of necessity either. Other examples were uncovered but these are representative. Given the characteristics of this litigation, Sansom and Herndon, in keeping with the presiding judge's directive, concluded that common benefit awards should be based on merit as it contributed to the common benefit of the entire litigation. The reliance on a lodestar calculation or a lodestar check against the concept of precise and actual benefit common to the litigation was exhaustively discussed by Herndon and Sansom, each of whom concluded would not provide an accurate analysis of common benefit. Consequently, a lodestar calculation and lodestar check were rejected as a path to make recommendations to Judge Rodgers. Clearly, the hours submitted were relied upon by the special masters to provide good insight into the amount of work performed and the reasons for the time spent provided good insight into value to the litigation in a merits-based analysis.

Considering the global settlement that was successfully negotiated in this litigation and the 100% participation by plaintiffs who qualified for the settlement program, the analysis of common benefit focuses on the work that ultimately contributed to that success. An overview of the broad categories of litigation work

demonstrates that the bellwether process was an outsized factor in this litigation's success. Nineteen randomly selected plaintiffs participated as bellwether plaintiffs over the course of sixteen trials. The first trial in the process was a consolidation of three different plaintiffs and was tried by MDL Presiding Judge Rodgers in the Pensacola Division of the Northern District of Florida. In all, Judge Rodgers presided over six trials in Pensacola. Ten other judges presiding over trials in Pensacola, Tallahassee, and Gainesville. There were thirteen plaintiffs' verdicts and six defense verdicts. Millions of dollars were awarded by juries in each of the successful plaintiff trials. As one usually observes in bellwether trials, the parties learned a significant number of factors or data, regardless of whether plaintiff won or lost, that went a long way to informing both sides of the litigation in the analysis of the liability issues and damage models. They learned how the witnesses stood up to direct and cross examination and the responses from the juries to each. They learned what exhibits landed favorably or unfavorably with the jurors. They were able, by the end, to know how the in-trial motion practice would likely be going forward. They were able to learn how the attorneys' opening statements and closing arguments were or were not effective, as well as how plaintiffs' and defendant's theories were or were not effective. Trials with several judges in different venues offered a glimpse into how the cases might do going forward when remanded to original jurisdictions. It is apparent that the number of trials, judges and venues

added more than a typical reservoir of data when compared with the far fewer numbers of bellwether trials that have become common place in the MDL legal world.

Law and briefing in this MDL also played an outsized role in the success of the litigation before, during, and after the bellwether process. The defense placed a great deal of reliance and credence on its primary defense, that of government contractor immunity, as it asserted that it was only a contractor doing what the Department of Defense wanted it to do. An extraordinary amount of time and talent was utilized to obtain a judicial denial of this litigation-dispositive issue. Complaint drafting and motion practice are typically the bread and butter of any MDL law and briefing team. A great deal of work was also undertaken by that team in this MDL to offer advice to discovery and deposition teams as to the nature of vital or much needed facts or concessions to seek to develop. Law and briefing assisted trial counsel in crafting witness interrogation necessary to meet the legal requirements of the cause of action. Appellate matters were a part of this litigation, naturally, but played a less vital role in light of the eventual settlement.

It goes without saying, the teams of lawyers and support staff that developed the bench of experts who would consult and lend their expertise to plaintiffs' counsel, facilitating a complete book of knowledge that became the theories to be relied upon in the prosecution of the plaintiffs' cases in bellwethers and beyond, were extremely

valuable to the success of the litigation. The dozens of lawyers that prepared for and took depositions to develop facts or trial testimony were also critical to the litigation in similar fashion to those that worked with experts, sometimes identical counsel in both roles. Similarly important were those that devoted extensive effort to attain the successful settlement of the litigation. The mediation/negotiation process ultimately required years of effort from a relatively small number of plaintiffs' counsel throughout, but which saw a variety of court appointed mediators and several defense counsel shuttled in and out of the process. The settlement was ultimately embodied in three separate master agreements that were complicated. Moreover, marshaling what and who were necessary to establish an infrastructure to administer a settlement program that needed to establish thorough and varied practices and allocation protocols to dispense compensation to more than two hundred and seventy thousand plaintiffs claiming entitlement to that compensation was an incredibly important endeavor and a vital process in the long-term success of the settlement.

Commitment to the litigation was a factor the Special Masters reviewed. Some firms made very significant financial commitments to the MDL. Some firms, large and small, committed so many lawyer and staff hours to the MDL that it consumed much of the time and resources of the firms resulting in the reality of turning away other, often lucrative, business. Some firms had few injury cases in the litigation but devoted huge and important time to the success of the MDL despite the need to wait

for the common benefit process to play out over years of periodic payments of the settlement proceeds by the defendant before seeing appropriate compensation. Though not specifically common benefit to the MDL, some firms committed time and resources to defeat the ill-conceived defense tactic of putting up one-sixth of the money the tort system ultimately generated in settlement value to divert and funnel all cases through a bankruptcy administration targeting a subsidiary company which the defendant was on record conceding that the subsidiary was not exposed financially by the litigation. Fees ordered by the Bankruptcy Court for work there were noted.

The undersigned and Randy Sansom were provided with the contingent fees paid to counsel, in firms that had clients in the litigation. A small number of firms did not have clients in the litigation but certainly did provide value and beneficial service to the successful resolution of the litigation. In making a recommendation to the Court, the Special Masters reviewed and considered, as appropriate, those contingent fees including such fees on bellwether cases with successful results.

Not unusual in multi-district litigation, as well as other litigation where common benefit is to be analyzed and fees paid such as class action litigation, the concept of common detriment has evolved in the jurisprudence of federal courts. Detrimental acts to the litigation certainly occurred in this MDL. Fairly frequently court hearings, depositions, meetings meant to assist the parties in finding

efficiencies and avoiding conflict, were attended by attorneys for firms that were not necessary for those events, but who were merely observers and not actual participants but who nonetheless submitted common benefit time for their presence. On the other hand, counsel assigned or volunteered to perform certain tasks on occasion failed to perform the tasks. There were lawyers who underperformed in the mediation process which required a combined effort and objectives for success. Some counsel failed in the establishment of a successful plan and persons to administer the complex settlement program. All these detrimental acts were factored into the recommended awards under the common benefit umbrella.

The undersigned also submitted a Report and Recommendation to the Court regarding the motion of plaintiffs' counsel to confirm the nine percent holdback for the common benefit fund. ECF 4108. It was my recommendation there that the Court continue the nine percent holdback and after a comprehensive analysis of the compensation needed for the Court to reasonably allocate common benefit fees and following this R&R the Court exercise her discretion whether to utilize the entire nine percent or reduce the percentage to create the pool of funds to be used for common benefit fees. The Court adopted the recommendations in that R&R. Naturally, at this point in time, the Court has not had sufficient information to decide whether to use the entire nine percent to create that pool of funds or to utilize a lesser percentage and create a smaller pool of funds. The recommendation to the Court in

this report will be based on the percent of the whole, without dollar amount. That percentage is to be applied to the entire amount of money in the common benefit pool of funds in order to be informed of the eventual allocation of common benefit fees.

## III.   Recommendation

The recommendations of the Special Masters for the allocation to eligible firms are stated in the Exhibit accompanying this R&R.

Counsel are reminded CBO No. 6, ECF 4129, provided that any objections to this Report and Recommendation must be filed within fourteen (14) days of entry on the MDL's main docket.

Dated this 11th day of June, 2026.

Respectfully submitted.

s/ *DavidRHerndon*
Hon. David R. Herndon (ret)
Special Master

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within **fourteen days** of the date of the Report and Recommendation. Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. An objecting party must serve a copy of its objections upon all

other parties. A party who fails to object to the Special Master's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.