**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to: All Cases | Judge M. Casey Rodgers Magistrate Judge Hope T. Cannon |

**OBJECTION OF CLARK, LOVE & HUTSON, PLLC**
**TO SPECIAL MASTER REPORT AND RECOMMENDATION**
**ON COMMON BENEFIT FEES**

**INTRODUCTION**

On April 3, 2019, the Judicial Panel on Multidistrict Litigation consolidated and transferred all federal cases involving claims of hearing loss and tinnitus related to Defendants' Combat Arms Earplug Version 2 ("CAEv2") to this Honorable Court for coordinated and consolidated proceedings. Dkt. 1. On April 19, 2019, the Court established a leadership structure that included a variety of committees and subcommittees. Dkt. 76. Shortly thereafter, on May 22, 2019, the Court appointed Lead and Co-Lead Counsel for Plaintiffs. Dkt. 376 at 1. The Court appointed Shelley V. Hutson of Clark, Love & Hutson, PLLC ("CLH") to serve in a crucial role as Co-Lead Counsel for Plaintiffs. *Id.* The Court also appointed Mrs. Hutson to serve as Chair of the Common Benefit Committee and appointed Clayton A. Clark of CLH to serve on the Joint Settlement Committee. *Id.* at 5-6.

1

Over the next four years, "MDL 2885 quickly attained the distinction of being the largest MDL in the history of the federal judiciary and responsible for in excess of forty percent of the federal judiciary's entire civil caseload." Dkt. 4216 at 1. Throughout this four-year time period, Mrs. Hutson and Mr. Clark applied and were reappointed to their respective leadership positions each year. *See* Dkt. 1131 at 1-3 (May 17, 2020); Dkt. 1795 at 1-3 (May 26, 2021); Dkt. 3080 (May 6, 2022); Dkt. 3734 at 1-3 (May 15, 2023). In each instance, "the Court reappointed Mrs. Hutson and Mr. Clark "to continue fairly, effectively, and efficiently representing the interests of all plaintiffs in this litigation." Dkt. 1131 at 1-3 (May 17, 2020); Dkt. 1795 at 1-3 (May 26, 2021); Dkt. 3080 (May 6, 2022); Dkt. 3734 at 1-3 (May 15, 2023).

In 2022, Michael Moreland of CLH was appointed to the Plaintiffs' Steering Committee ("PSC") "based on the current demands of the litigation and in recognition of [his] meaningful contributions while serving in non-leadership roles." Dkt. 3080 at 1-2, n.1. Mr. Moreland was subsequently reappointed to the PSC by the Court in 2023. Dkt. 3734 at 1-3.

Further, though not formally appointed by the Court, consistent with Common Benefit Order No. 1 and with the knowledge and express consent of Lead and Co-Lead Counsel and Michael Sacchet, court-appointed Chair of the Law & Briefing Subcommittee ("LBS"), Jason M. Milne of CLH served as a *de facto* member of the

2

LBS from 2020 through 2023 and contributed greatly to the overall law and briefing efforts of the Plaintiffs' Leadership Group, including taking a leadership role in the coordination and preparation of *Daubert* briefing for all of the bellwether trials, attending and providing law and briefing support at 7 bellwether trials for 10 bellwether plaintiffs,[1] and serving as the sole appellate representative at both *Vilsmeyer* and *Palanki*.

Subsequently, on August 29, 2023, due to the "collective effort" of CLH and all common benefit counsel (*see* Dkt. 4129 at 2), the parties reached a global settlement of all CAEv2 claims. Dkt. 3820. The total settlement totaled a staggering Six Billion, Ten Million Dollars ($6,010,000,000.00). Dkt. 4216 at 1-2. As this Court has recognized, "[i]n the time between consolidation and settlement, a great deal of work for the common benefit of all Plaintiffs ensued." *E.g.*, Dkt. 4192 at 2. Indeed, "[i]t is precisely because of the exemplary contributions of the entire leadership team that the litigation achieved a global resolution[.]" Dkt. 3863 at 1.

---

[1] Mr. Milne spent 118 days in Pensacola at the express request of Lead and Co-Lead Counsel and Mr. Sacchet for bellwether pre-trial and trial proceedings. Every member of these bellwether trial teams is familiar with Mr. Milne's important work pertaining to these proceedings, including trial motion practice, negotiations with opposing counsel, preparation of directed verdict charts, responses, and outlines, the preparation of jury instructions, and revision of witness outlines to ensure compliance with applicable law. Mr. Milne would not have been asked by leadership counsel to be present and to assist in more than 100 days of bellwether trials if his assistance was not both necessary and beneficial to the overall success of the bellwether trial processes.

As will be discussed in greater detail below, in fulfilling their court-appointed roles as leadership counsel in the massive 3M Combat Arms Litigation, Mrs. Hutson, Mr. Clark, Mr. Moreland, and the entire CLH firm devoted tremendous time and vast resources "for the purpose of furthering the common interests of the consolidated cases." Dkt. 4129 at 1. CLH's "qualitative contribution to this litigation" (*see* Dkt. 4129 at 14) was substantial and included numerous "mission critical activities," including "law and briefing, expert witnesses, depositions, bellwether trials, commitment to the litigation, settlement, and settlement administration." *See* Dkt. 4216 at 7.

Yet, in Special Master David R. Herndon's recent Report and Recommendation Concerning Common Benefit Fees ("R&R"), the Special Master recommended an award to CLH of only **5.00%** or **1/20th** of the total common benefit fee—a percentage effectively which places CLH **seventh (7th)** among firms contributing to the common benefit of the 3M Combat Arms Litigation. Dkt. 4216-1. While CLH respects Special Master Herndon greatly and appreciates his hard work, CLH believes that the Special Master's recommendation undervalues CLH's qualitative and quantitative contributions to the litigation, as demonstrated by the applicable *Johnson* factors and the other factors identified by the Court, including without limitation the success of CLH's efforts, the vast number of hours worked by CLH, as well as CLH's sizeable capital contributions which were "necessary to fund

4

the litigation as a whole." *See* Dkt. 488 at 7.

This Objection is submitted with full appreciation for the judicial stewardship that made this litigation possible. Judge Rodgers did far more than merely preside over a complex MDL; the Court actively demanded accountability from all participants, pushed the litigation forward, and devoted extraordinary attention to protecting the claims of servicemembers. In a litigation where no defendant has been more recalcitrant in accepting responsibility or more resistant to a global solution, the Court's willingness to engage and insist on forward movement created the conditions that ultimately allowed Tom Perrelli to persuade 3M that settlement was necessary and achievable. Accordingly, CLH files this objection to the Special Master's R&R and respectfully requests that the Court, in conducting its *de novo* review of the R&R and "the appropriate allocation of the common benefit fund" (Dkt. 4129 at 2-3), increase the award to CLH to an amount commensurate with CLH's considerable contribution to the common benefit and to ensure a fair and equitable distribution of common benefit fees to CLH.

## BACKGROUND

Having presided over the historic 3M Combat Arms Litigation since its inception, this Court is intimately familiar with the more than four-year history of this case.

Shortly after MDL 2885 was formed, this Court appointed Bryan Aylstock as

Lead Counsel for Plaintiffs and Shelley Hutson and Christopher Seeger as Co-Lead Counsel. This leadership team was "appointed by the court to perform [all] functions necessary for the management of the case."  Dkt. 488 at 2. Given the outsized role Lead and Co-Lead Counsel (and those acting under their direction)[2] would play successfully prosecuting the 3M Combat Arms Litigation, the Court appropriately recognized that "the recovery of common benefit time [by these individuals and their law firms] will be allowed and is essential." Dkt. 488 at 9.

Thereafter, the Court established "guidelines regarding the submission and compensability of common benefit time."[3] Dkt. 488 at 4, 10-11. Counsel would only be eligible to receive common benefit attorney's fees if the time expended and activity in question were for the common benefit, appropriately authorized, and timely and properly submitted. *Id.* at 11. Each lawyer or staff member working on common benefit activities was required to submit a separate report of his/her time and expense records every month "into a centralized system selected by the Common

---

[2] As stated by the Court: "Only previously authorized common benefit work is eligible for consideration for compensation. Authorized common benefit work is an assignment made or authorized by Lead or Co-Lead Counsel, subject to the provisions of this Order." Dkt. 488 at 11. "In the event Plaintiffs' Counsel are unsure if the action they are about to undertake is considered a common benefit action, counsel must ask Lead, Co-Lead Counsel, or Common Benefit Fund Committee in advance as to whether such time may or may not be compensable." *Id.* at 23.

[3] Compliance with these guidelines was required for common benefit time to be eligible for compensation but did not create a presumption that such time would be compensated or reimbursed. Dkt. 488 at 11.

Benefit Fund Committee, in consultation with the Common Benefit Special Master and CPA." *Id.* at 11, 13. "[C]ounsel were notified that their time and cost entries were subject to close review by Special Master [Randall] Sansom[4] and his business partner, Sarah Hogan, CPA, and entries would be accepted or rejected by the same individuals[.]"[5] Dkt. 4219 at 4. "Legitimate time was approved and recorded while submitted time which failed to comply with the Common Benefit Orders of the Court was rejected." Dkt. 4216 at 4.

**The purpose of Special Master Sansom's "substantive review" was "to have time and expenses reviewed and accepted or rejected as eligible for common benefit compensation as the litigation progresse[d] and not [to] wait for a substantive review until nearly the end of the litigation." Dkt. 488 at 13-14. Indeed, "[t]he express intent of Common Benefit Order No. 1 was to pursue**

---

[4] In Common Benefit Order No. 2, Randall Sansom, CPA, was appointed to serve as Common Benefit Fund Special Master, including "to review and approve common benefit Attorney Time…for potential reimbursement." Dkt. 900 at 1-3. Pursuant to that appointment, Special Master Sansom and Ms. Hogan performed "critically important" tasks pursuant to the Court's common benefit orders and "closely assisted the [Court] in the common benefit time and cost submission process through monthly auditing of the submissions, making decisions on whether to accept or reject those submissions, and regularly reporting to the [Court] on the submission process." Dkt. 4129 at 17.

[5] As stated by the Court: "The Common Benefit Special Master and CPA will work with the Common Benefit Fund Committee to ensure the accuracy of time and expense submissions, as well as their compliance with the Court's Orders." Dkt. 488 at 13-14.

7

and complete the submission, consideration, and acceptance/rejection process as the litigation was ongoing in order to ensure accuracy, transparency, and honesty in the submission process" (Dkt. 4129 at 5) and "to avoid as much as possible any disputes over the classification of time and expenses as common benefit and the value of same." Dkt. 488 at 13-14.

Based upon this understanding and framework, Shelley Hutson, Clayton Clark, Michael Moreland, and the entire CLH law firm devoted tremendous time and vast resources to the prosecution of this litigation "for the purpose of furthering the common interests of the consolidated cases." Dkt. 4129 at 1.

**Over the course of more than four years, CLH accrued, timely submitted, and had audited and approved by Special Master Sansom and Ms. Hogan more than <u>forty-nine thousand one hundred (49,100)</u> hours of common benefit time from twenty (20) attorneys—including four (4) senior-level attorneys with more than one hundred (100) years of combined legal experience—as well as twelve (12) paralegals. This figure, which is to be anticipated given CLH's substantial role in the litigation, including as Co-Lead counsel for Plaintiffs, easily ranks among the top 2-or-3 common benefit firms in terms of the total amount of time devoted to the common benefit. CLH was also one of the top three (3) contributors of Plaintiffs' Leadership to the Litigation Fund over the course of 4 years.**

It is not possible to recount here all of the common benefit tasks and contributions made by CLH attorneys and legal professionals throughout the 3M Litigation. Therefore, CLH incorporates herein by reference its detailed time submissions, which were submitted to and approved by Special Master Sansom and already in the possession of (or accessible to) the Special Masters and the Court in accordance with Common Benefit Order No. 6.[6]

Nevertheless, CLH's "qualitative contribution to this litigation" (*see* Dkt. 4129 at 14) was substantial and included numerous "mission critical activities," including "law and briefing, expert witnesses, depositions, bellwether trials, commitment to the litigation, settlement, and settlement administration." *See* Dkt. 4216 at 7.

- CLH was one of the firms that carried the litigation from inception through settlement. CLH did not merely contribute hours; CLH contributed judgment, infrastructure, personnel, risk, capital, and leadership at the inflection points that moved the litigation forward.

- CLH devoted 32 full-time employees to the litigation, including 4 partners, 16 associates, and 12 paralegals, and expended approximately $31 million to support the litigation, including the third-highest amount of held costs among common benefit contributors,[7] $1,112,500.00 in capital contributions, and the cost of maintaining a full-time team for more than four years.

---

[6] Under Common Benefit Order No. 6, fee applicants were prohibited from resubmitting their time entries which were already in possession of the Special Masters and the Court. Dkt. 4129 at 5, 15.

[7] Dkt 3988.

- CLH performed 49,167.9 accepted common benefit hours, including 11,461.1 senior-partner hours, 2,970.5 partner hours, 24,207.8 senior-associate hours, 6,341.8 associate hours, and 4,186.7 paralegal hours.

- Shelley Hutson served as Co-Lead Counsel and Chair of the Common Benefit Committee. Mrs. Hutson contributed 8,154.9 accepted hours, nearly all of which reflected work performed for the common benefit of all Claimants and not work on CLH's personal docket. From the outset, Mrs. Hutson helped train and deploy a group of young lawyers who could assist other firms in handling the 3M litigation. She then worked closely with Special Master Sansom and his team to organize the tort so that it could be run in a disciplined, businesslike, and accountable manner. That work included creating accountability mechanisms to ensure firms submitted common benefit time and expenses properly, and building work-authorization systems so that firms performed work assigned by leadership rather than duplicating work or creating unnecessary common benefit expense. Mrs. Hutson also led important science and expert work, including preparing and presenting Dr. Eric Bielefeld at Science Day before the Court and counsel to frame the scientific proof that would become central to Plaintiffs' case. In *Baker*, she also handled critical choice-of-law issues, presenting several plaintiffs at the evidentiary hearing and arguing how their testimony affected the law applicable to their claims. For approximately four years, Mrs. Hutson worked on this case every day. CLH's administrative and structural work benefited every claimant and every participating firm because it created a functioning common benefit system in a massive and unusually complex MDL. This was essential to making the litigation manageable, efficient, accountable, and trial-ready.

- Clayton Clark served as a member of the Settlement Committee. Mr. Clark contributed 2,433.9 accepted hours. Mr. Clark's common benefit role began well before the Settlement Committee work in April 2019, before the MDL was formed, when he was among the first lawyers willing to finance and develop the 3M litigation. That commitment came before any ruling on the Government Contractor Defense, before any bellwether verdicts, and before there was any clear light at the end of the tunnel. After taking that early risk,

Mr. Clark remained involved in settlement efforts throughout the litigation, attending at least twenty-five mediations at the request of the Special Masters. Clayton Clark negotiated to tether any potential resolution of verdict and wave cases to a global resolution that included all claimants. Mr. Clark negotiated the concept that claimants should have the ability to choose between a quick-pay option and a fuller evaluation. Mr. Clark also worked on an insurance solution and negotiated directly with Tom Perrelli on global settlement-specific matters other than the final settlement number and the end-game orders. Mr. Clark set the table for settlement by focusing on process and structure when valuation disputes were preventing progress. CLH helped design an Article III settlement process that provided 3M the closure it required while preserving a global resolution for claimants. CLH's settlement work was not peripheral or merely supportive; it helped make the final settlement possible.

- Jason Milne performed critical legal research and writing functions from 2020 through 2023, throughout which time he served as a *de facto* member of the LBS. Mr. Milne contributed 4,914.3 accepted common benefit hours. Mr. Milne researched and drafted briefing on key bellwether issues, including jurisdiction, choice of law, consolidation, affirmative defenses, punitive damages, comparative fault, statutes of limitation and repose, and SCRA tolling. At the request of Leadership, Mr. Milne took a leadership role in the coordination and preparation of *Daubert* briefing for the bellwether trials. Mr. Milne spent 118 days in Pensacola at the request of leadership (Understandably, Mr. Sacchet and Ms. Odom could not attend all of the bellwether trials) for bellwether pre-trial and trial proceedings. Mr. Milne provided law and briefing support for the *Estes/Hacker/Keefer*, *McCombs*, *Baker*, *Adkins*, *Palanki*, *Sloan/Wayman*, and *Vilsmeyer* bellwether trials. Mr. Milne's work required case-specific, fact-specific, and state-law-specific analyses. Mr. Milne implemented appellate and briefing programs during the bellwether process and later for the wave process.

- Michael Moreland served as a member of the informal ad hoc Wave and Remand Subcommittee. Mr. Moreland contributed 2,970.5 accepted hours. He was added to leadership after already performing leadership-level work

11

daily, often seven days a week. He worked as a primary contributor to the ad hoc Wave and Remand Subcommittee. Mr. Moreland helped work up wave cases, provided wave counsel with templates and tools, and helped demonstrate to 3M that plaintiffs would pursue remanded wave cases through trial absent a fair global settlement. That work showed 3M the scope, scale, and sustainability of the plaintiffs' litigation position. The MDL could not and would not have settled without the Court's willingness to push wave cases and the plaintiffs' ability to keep up with aggressive deadlines. CLH's wave work should be weighted heavily because it helped create the pressure necessary to resolve the litigation globally. CLH's work in the wave process benefited all claimants because it demonstrated that firms with sufficient resources and commitment would step into cases and try them if necessary.

- Amanda Hunt helped across all stages of the litigation, including discovery, bellwether preparation, and courtroom presentation. Ms. Hunt contributed 5,623.5 accepted hours. She played a lead role in preparing deposition outlines, reviewing transcripts, and drafting detailed summaries for expert and fact-witness depositions. Her work helped maintain continuity and consistent strategy across hundreds of depositions.

- Emily Marlowe's deposition work was embedded in every stage of the litigation, including strategy development, witness preparation, transcript analysis, expert preparation, and courtroom presentation. Ms. Marlowe contributed 7,508.9 accepted hours. She drafted detailed deposition outlines, and provided real-time deposition support by monitoring testimony, flagging inconsistencies, pulling document references, and helping counsel adapt questioning during critical examinations. Ms. Marlowe's deposition analysis helped leadership anticipate trial performance, mitigate risks, and prioritize high-value claims.

- Marcela Arevalo's deposition work supported trial preparation, pleadings, dispositive motions, and bankruptcy proceedings. Ms. Arevalo contributed 2,486.7 accepted hours. She used deposition testimony in *Daubert* motions, summary-judgment briefs, and post-trial filings on issues including causation, notice, and product defect. Marcela Arevalo served as a member of five

12

bellwether trial teams. Ms. Arevalo's trial-team work was requested by leadership counsel.

- Jennifer Steinkuehler handled deposition logistics for all 3M and Touhy depositions, all bellwether fact-witness depositions, and all bellwether expert depositions. Ms. Steinkuehler contributed 2,735.1 accepted hours as a paralegal. She kept the official deposition calendar for plaintiffs' leadership counsel, and coordinated with court reporters, videographers, and deposition-taking counsel.

- CLH's contribution is more accurately understood as a through-line in the litigation: CLH helped launch the tort, built the systems needed to manage it, supported discovery and trial work, helped create remand pressure, preserved settlement leverage during bankruptcy, and helped construct the final settlement process.

CLH undertook these monumental efforts at the expense of the firm's other business opportunities, including the Monsanto Roundup litigation. Through the leadership, financial commitment, and dedication of CLH (and other leadership counsel), Plaintiffs' claims were developed, advanced, and successfully prosecuted against a formidable, well-funded opponent, represented by seasoned legal counsel, resulting in a Six Billion, Ten Million Dollar ($6,010,000,000.00) global settlement to the clear and direct common benefit of all Plaintiffs.

Yet, in his R&R, the Special Master recommends a common benefit fee award to CLH of 5.00% of overall common benefit fee pool. Dkt. 4216; 4216-1. This recommendation greatly underestimates CLH's contributions to the overall success of the 3M Combat Arms litigation placing CLH as only the seventh most significant common benefit contributor. Dkt. 4216-1. For the reasons set forth herein, CLH

respectfully objects to the Special Master's recommendation and asks this Court, in the interests of fairness and equity, to increase CLH's percentage of the common benefit fee pool to an amount commensurate with CLH's considerable contribution to the common benefit.

## ARGUMENT

The common benefit doctrine is well-established in American jurisprudence. "The Supreme Court, the Eleventh Circuit, and courts in this District have all noted that '[a] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as whole.'" *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1358 (S.D. Fla. 2011). The common benefit doctrine recognizes that those who receive the benefit of a lawsuit without contributing to its costs are "unjustly enriched" at the expense of the successful litigant. *Id.*; *see also Erkins v. Bryan,* 785 F.2d 1538, 1548 (11th Cir. 1986).

In its Common Benefit Orders, this Court has articulated "the standards that will be employed in assessing [common benefit] applications." Dkt. 488 at 1. As stated by the Court: "Common benefit work product includes all work performed for the benefit of all plaintiffs, including pre-trial matters, discovery, trial preparation, potential settlement process, and all other work that advances this litigation to conclusion." Dkt. 488 at 3; Dkt. 1659 at 2. However, "evaluating contribution to the

14

common benefit is a qualitative analysis because 'not all types of work are created equal.'" Dkt. 488 at 3 (quoting *In re Vioxx*, 802 F. Supp. 2d 770, 772 (E.D. La. 2011)). Therefore, this Court has stated that it will be assessing the value of work performed and how it contributed to the common benefit, rather than performing a strict calculation of hours multiplied by some hourly rates. Dkt. 488 at 3; Dkt. 4129 at 7. "Specifically, the Court will be guided by the factors set forth in *Johnson v. Georgia Hwy. Exp., Inc.*, 488 F.2d 714 (5th Cir. 1974), as directed by the Eleventh Circuit in *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991)." Dkt. 488 at 3; Dkt. 4129 at 7.

A.    **Application of the *Johnson* Factors Demonstrates that CLH Should Receive a Common Benefit Fee Award in Excess of 5.00% of the Common Benefit Fee Pool.**

The twelve *Johnson* factors are as follows: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases. *See, e.g., Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d at 772 n.3. Here, as explained

15

below, the application of the *Johnson* factors militates in favor of an increased common benefit award to CLH.

### 1.      The Time and Labor Required.

Under Eleventh Circuit jurisprudence, "the first criterion of the *Johnson* test, **and indeed the one most heavily weighted**, is the time and labor required." *Camden I,* 946 F.2d at 772 (emphasis added). Throughout the course of the 3M Combat Arms Litigation CLH attorneys and legal professionals logged, submitted for approval, and had approved <u>49,167.9 hours</u> of common benefit work. This common benefit work was completed over the course of more than four (4) years by twenty (20) attorneys and twelve (12) paralegals.[8]

The work performed by CLH unequivocally demonstrates its total commitment to the litigation. Like a handful of other common benefit firms, "CLH committed so many lawyer and staff hours to the MDL that it consumed much of the time and resources of the firm[] resulting in the reality of turning away other, often lucrative, business." Dkt. 4216. This massive undertaking by CLH was necessary to

---

[8] CLH recognizes that under Common Benefit Order No. 6, previously accepted time is to be considered in the common benefit fee analysis but that acceptance of previously submitted time is not outcome determinative, that a lodestar calculation is not the beginning and end of the fee analysis (or even required in the Eleventh Circuit), and that "the Court will be assessing the value of the work performed and how it contributed to the common benefit, rather than performing a strict calculation of hours multiplied by some hourly rate." Dkt. 4129 at 5, 12, 13 n.6.

successfully fulfill the vital leadership roles assigned to CLH attorneys by the Court and critical to the overall success of the 3M Combat Arms Litigation.

CLH's "qualitative contribution to this litigation" is immense and cannot be overstated. *See* Dkt. 4129 at 14. The qualitative contributions of CLH to this MDL are set forth in detail above and in the Narrative of CLH in Support of Common Benefit Application, the Affidavit of Clark, Love & Hutson, PLLC in Support of Common Benefit Application, and in CLH's approved common benefit time entries, all of which are incorporated herein by reference as if restated herein word-for-word.

As just a few examples, CLH attorneys, including Shelley Hutson, Clayton Clark, and Michael Moreland, were appointed to and fulfilled significant leadership roles throughout the litigation, including as Co-Lead Counsel for all plaintiffs. The Court recognized the important and meaningful efforts of Mrs. Hutson, Mr. Clark, and Mr. Moreland when it reappointed these individuals to these positions in each of four years the litigation was ongoing. Holding and successfully fulfilling a leadership position is a key factor in assessing a firm's the common benefit contributions. *See, e.g.*, Dkt. 4129 at 14, 23.

- Shelley Hutson served as Co-Lead Counsel and Chair of the Common Benefit Committee, where she helped build the common benefit infrastructure that allowed the MDL to function.

- Mrs. Hutson carried that leadership into the merits of the litigation, serving as discovery strategy liaison for *Baker, Sloan,* and *Camarillorazo*, presenting key experts and arguments to the Court,

and playing critical trial roles in *Baker, Palanki* (a Defense pick), and *Sloan/Wayman*.

- Clayton Clark made the early, high-risk decision to commit CLH to the 3M litigation before the MDL was formed, when the viability of the tort was still uncertain.

- Mr. Clark later served on the Settlement Committee and worked to develop the Article III settlement structure that gave 3M the closure its Board required and made the final settlement possible.

- Michael Moreland served as a key member of the ad hoc Wave and Remand Subcommittee, where he helped work up cases and coordinated motion work so that Plaintiffs could keep pace with the Court's aggressive wave deadlines.

- Mr. Moreland's leadership helped demonstrate to 3M that Plaintiffs were prepared to carry the wave/remand process through trial absent a fair global settlement, creating the pressure that helped drive the final resolution.

The R&R gives insufficient weight to one of CLH's common benefit contributions: the common benefit structure itself. As Chair of the Common Benefit Committee, Shelley Hutson worked hand-in-hand with Special Master Sansom to build the procedures by which common benefit work would be authorized, tracked, and reviewed. That work created procedures to track firm hours and expenses, requiring accountability for timely and accurate submissions, and implemented work-authorization systems to ensure that firms performed work assigned by leadership rather than unnecessary or duplicative projects.

That infrastructure was not merely administrative. It was the operating system for the MDL's common benefit work. In a litigation of this size, a functioning

18

common benefit structure was essential to prevent duplication, control costs, authorize work, and ensure that the work performed advanced the interests of all Claimants. The efficiency created by that structure should not be overlooked or treated as less valuable simply because its success reduced chaos, duplication, and waste. To the contrary, the fact that the common benefit system functioned so well is itself evidence of the value of the work performed by Special Master Sansom and Mrs. Hutson. The R&R properly recognizes many categories of common benefit work, but it does not sufficiently credit the firm that helped build and administer the very framework through which common benefit time and expenses were authorized, submitted, and reviewed. CLH's role in creating and maintaining the common benefit structure warrants materially greater weight in the final allocation.

CLH attorneys served as discovery strategy liaisons and/or discovery liaisons in nine bellwether cases.  CLH attorneys performed material roles at the bellwether trials as set forth herein, including in *EHK*, *McCombs*, *Baker*, *Adkins*, *Sloan/Wayman*, *Palanki*, *Kelley*, and *Vilsmeyer*. Through the contributions of CLH and other trial counsel, eight of these eleven plaintiffs secured victory at trial. There can be no doubt that "the bellwether process was an outsized factor in this litigation's success." Dkt. 4216. Many CLH attorneys played significant roles in the bellwether trial process:

- Mrs. Hutson participated in trial strategy, fact and expert witness preparation, and examination of key witnesses as trial.

19

- Mr. Milne attended and provided law and briefing support at 7 bellwether trials for 10 bellwether plaintiffs, primarily handling Daubert, trial briefing, jury instructions, preservation, and courtroom legal issues. Importantly, these were not CLH cases.

- Mr. Milne sat in court and served as the briefing lawyer in bellwether and individual trial proceedings in which CLH had no case-specific ownership interest, client-specific recovery interest, or separate fee interest apart from the common benefit. He performed that work because leadership requested CLH's assistance on legal issues affecting the litigation as a whole.

- Ms. Arevalo spent 97 days at pretrial and trial and assisted with 5 bellwether trials for 6 bellwether plaintiffs. Ms. Arevalo assisted with witness preparation, demonstratives, exhibit preparation, and other key tasks.

- Mr. Milne and Ms. Arevalo would not have been asked by leadership counsel, time-and-again, to be present and to assist in more than 200 days of bellwether trials if their assistance was not necessary and beneficial to the overall success of the bellwether trial processes.

Moreover, it is undisputed that "[l]aw and briefing in this MDL also played an outsized role in the success of the litigation before, during, and after the bellwether process." Dkt. 4216 at 12.

- CLH attorney Jason Milne, supported by CLH attorneys, and others, played an instrumental role in the law and briefing efforts.

- Mr. Milne also drafted memoranda, pleadings, discovery briefs, summary judgment oppositions, appellate briefing, post-trial filings, and scores of other assignments from Leadership.

- Mr. Milne attended and provided law and briefing support at 7 bellwether trials for 10 bellwether plaintiffs, and also served as the sole appellate representative at both *Vilsmeyer* and *Palanki.* This

20

resulted in Mr. Milne spending 118 days in trial on behalf of the Common Benefit of the tort.

The foregoing is not even the tip of the iceberg. The vast number of hours worked by CLH attorneys and other legal professionals and the qualitative contributions of CLH to this litigation easily merit an award in excess of 5.00% of the total common benefit fees. The Special Master's recommendation undervalues the vast number of hours worked by CLH attorneys and other legal professionals and the qualitative contributions of the firm.

### 2. The Novelty and Difficulty of the Questions Involved and the Skill Requisite to Perform the Legal Service Properly.

As the Court well knows, this was not a simple products liability case, far from it. The commitment and skill necessary to see this challenging litigation through to a successful conclusion was extraordinary.

From the outset, the challenge was daunting. This complex MDL involved legal claims from individuals across all 50 states based upon varying state laws. The litigation was brought against a formidable foe with substantial financial and legal resources, including a cadre of highly regarded legal counsel. The litigation involved complex scientific issues related to hearing loss and tinnitus and complex legal issues relevant to plaintiffs' claims and Monsanto's defenses. Given that most plaintiffs were military servicemembers who used the CAEv2 during their military service, the litigation presented myriad complex legal issues arising under federal

21

and state law, including discovery, choice of law, permissible legal claims, government contractor defense, Servicemembers Civil Relief Act ("SCRA") tolling, personal jurisdiction, and more. The novelty and difficulty of the questions involved called for exceptional legal skills.

As set forth herein, CLH and its attorneys did not balk at the assignment before them, but met the challenge head-on and demonstrated the legal skills necessary to prosecute this litigation to a successful conclusion. Consequently, these factors weigh heavily in favor of a substantial common benefit fee award to CLH.

### 3. The Preclusion of Other Employment by the Attorney Due to Acceptance of the Case, The Time Limitations Imposed by the Client or the Circumstances, and the Undesirability of the Case.

At the outset of the 3M litigation, CLH chose to engage in the tort wholeheartedly rather than pursue other cases within its expertise.[9] This case, which spanned more than four years and 49,100 hours, constituted a significant undertaking to CLH.

CLH was fully committed to the case and litigated all aspects of it zealously both in this Court and, to a lesser extent, on appeal. This action demanded constant attention and effort on the part of CLH as a result of the size and complexity of the

---

[9] This decision was not without substantial risk. As recognized by this Court: "The plaintiff leadership team committed substantial time and resources to mount, sustain, and bring to a conclusion this complex MDL, for the common benefit of all CAE claimants, with no assurance of success or a return on their investments." Dkt. 3875 at 1.

22

litigation, defendants' vigorous defense of their positions, and the rigorous pace of the proceedings. Often, legal briefs and other submissions on lengthy and complex subjects were due in a matter of hours or days, for instance when CLH attorney (Mr. Milne) responded to 3M's January 7, 2022 motion to continue trial proceedings in the *Sloan/Wayman* case on the eve of trial due to three of 3M's on-site trial members testing positive for COVID-19.

The vast resources and time CLH devoted to the 3M Combat Arms litigation meant that CLH was unable to pursue other business opportunities. For instance, CLH would have devoted substantially more time to the Monsanto Roundup litigation, if it had not devoted that time to this case. Under applicable law, "[p]riority work that delays the lawyer's other legal work is entitled to some premium." *Johnson*, 488 F.2d at 718. This is particularly true when, as here, otherwise available business is foreclosed and the attorney is not free to use his/her time for other purposes. *Id.*

For these reasons, and because CLH took on a disproportionate share of the common benefit work in this case compared to other common benefit firms, CLH respectfully requests an increase to the Special Master's recommended common benefit fee award.

### 4.    The Customary Fee and Awards in Similar Cases.

Under applicable law, "the customary fee for similar work in the community

23

should be considered," as well as "awards in other similar cases." *Johnson*, 488 F.2d at 718-19. These factors are largely neutral given that all of the common benefit attorneys were working on the same complex litigation, except that Lead and Co-Lead Counsel are often awarded a premium with respect to fee allocations in mass tort cases like this one given their significant leadership roles and additional responsibilities, organization and direction of the litigation, reputation, and heavy-lifting in the prosecution of the litigation. *See, e.g., In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 790 (S.D. Tex. 2008). Given the outstanding work of CLH's Shelley Hutson, Clayton Clark, and Mike Moreland in key leadership roles throughout the litigation, these factors work in favor of an increase in the recommended allocation of common benefit fees to CLH.

5.    **Whether the Fee is Fixed or Contingent.**

It is undisputed that the recovery of any common benefit fee award in the 3M Combat Arms Litigation was contingent upon the successful resolution of the litigation. The Eleventh Circuit has consistently held that "[l]awyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result." *E.g., Yates v. Mobile Cnty. Pers. Bd.*, 719 F.2d 1530, 1533 (11th Cir. 1983) (quoting *Jones v. Diamond,* 636 F.2d 1364 (5th Cir.1981) (*en banc*)). Accordingly, "[t]he standard of compensation must enable counsel to accept apparently just causes

24

without awaiting sure winners." *Freeman v. Motor Convoy, Inc.*, 700 F.2d 1339, 1356 (11th Cir. 1983) (quoting Jones, 636 F.2d at 1382).

Here, CLH was one of the firms that carried the litigation from its inception. CLH did not merely contribute hours; CLH contributed judgment, infrastructure, personnel, risk, capital, and leadership at the inflection points that moved the litigation forward. In February 2019, Clayton Clark attended a 3M meeting in Miami to discuss the litigation and made the decision that CLH would commit to the tort at a high level. CLH's early commitment came at a time when the litigation presented substantial risk, including the Government Contractor Defense, preemption issues, uncertain damages, and difficult specific-causation questions. CLH's early commitment helped give validity and momentum to the tort at a critical stage when other firms were still evaluating whether the litigation was viable.

CLH's early and total commitment to this "just cause" brought on behalf of injured U.S. military servicemembers—without awaiting a "sure winner" before devoting substantial resources to the cause—separates CLH from other common benefit contributors and warrants a substantial common benefit fee award well in excess of 5.00% of the total common benefit fee pool.

**6.    The Amount Involved and the Results Obtained.**

The 3M Combat Arms Litigation constitutes the largest MDL in U.S. history by a wide margin. It involves the claims of more 200,000 individuals, mostly U.S.

25

military servicemembers. Understanding both the scope and significance of this litigation, Lead and Co-Lead Counsel, including CLH, set out with the objective to obtain the best results possible for these injured members. Ultimately, four years of intense and painstaking effort and heated litigation produced a global settlement eclipsing $6 billion dollars, a clear victory inuring to the benefit of all plaintiffs. This incredible result could not have been achieved absent the collective effort of all common benefit counsel, among which CLH played a predominant role.

In addition to direct involvement in settlement negotiations throughout the four-year history of the litigation, CLH played a prominent role in the successful negotiation of the Master Settlement Agreements. CLH's pivotal role in procuring the global settlement for all plaintiffs warrants a substantial common benefit fee award in favor of CLH.

**7.      The Experience, Reputation, and Ability of the Attorneys.**

This Court is familiar with the experience, reputation, and ability of the CLH attorneys involved in this litigation. Shelley Hutson, Clayton Clark, and Michael Moreland previously submitted detailed credentials to the Court as part of their leadership applications. In addition, credentials for CLH's other key attorney contributors are incorporated herein by reference.

Only a handful of common benefit firms devoted the sheer number of attorneys to this litigation as CLH. Even fewer brought to bear the insight,

26

knowledge, and expertise of four (4) seasoned, senior-level attorneys with more than (100) years of combined legal experience like CLH. Respectfully, the experience, reputation, and ability of CLH's attorneys merits an increase in the recommended common benefit fee award to CLH.

**8.    The Nature and the Length of the Professional Relationship With the Client.**

Here, neither CLH nor any common benefit counsel is believed to have had a prior attorney-client relationship with any the bellwether plaintiffs whose claims were front and center in these proceedings. Therefore this factor is neutral.

Although this factor is neutral in the traditional attorney-client sense, the record confirms that CLH undertook trial responsibilities for bellwether plaintiffs who were not originated CLH clients. For example, on January 5, 2022, the Court's law clerk, Justin Ferraro, emailed Muhammad Aziz regarding the upcoming *Sloan* trial, noting that the Court understood Ronald Sloan was his firm's client and that Bryan Aylstock, Dave Buchanan, Michael Sacchet, Shelley Hutson, and their teams had appeared on Mr. Sloan's behalf at the pretrial conference. Mr. Ferraro asked Mr. Aziz to confirm whether he and Mr. Sloan had agreed that the above-named leadership trial team would represent Mr. Sloan at trial. Mr. Aziz responded the same day that he would not attend trial and that "Mr. Sloan's case was referred to Mrs. Hutson for handling including trial as his lead counsel." A copy of this email correspondence is available for the Court's review if needed.

27

**9.    The Time Required to Reach a Settlement and the Economics Involved in Prosecuting the Action.**

Finally, in *Camden I*, the Eleventh Circuit added a handful of additional factors, including "the time required to reach a settlement" and "the economics involved in prosecuting" the action, both of which are relevant here. *See Camden I*, 946 F.2d at 775; *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1278 n.22 (11th Cir. 2021). Here, it took just over four years from the consolidation of all federal proceedings before this Court to global resolution. The Court as well as Lead and Co-Lead Counsel deserve tremendous credit for breakneck speed at which this monumental, complex litigation was litigated to successful conclusion.

CLH posits that without the leadership of the Court and its appointed Lead and Co-Lead Counsel and their firms, as well as the substantial funding of the litigation by these firms and others, it would not have been possible to have achieved the favorable result obtained in such a short period of time or with as much success as was obtained here. Indeed, the economics were such that without total commitment by Lead and Co-Lead Counsel and their firms to fund the litigation—including specifically by CLH—tackling such a formidable, well-resourced foe would have been virtually impossible.

For these reasons, CLH deserves a considerable common benefit fee award. These factors also weigh in favor of a common benefit fee award exceeding 5.00% of the common benefit fee pool.

**B.**      **The Application of Various Others Factors Identified by the Court in Its Common Benefit Orders Militates in Favor of an Increased Fee Award to CLH.**

In its Common Benefit Orders, the Court identified a series of additional factors it would consider in assessing common benefit fee awards. While CLH has addressed these factors in its prior Narrative and above, CLH wishes to highlight a few of these additional factors which merit a common benefit fee award in excess of 5.00% of the common benefit fee pool.

From the outset, this litigation concerned servicemembers whose claims required disciplined and persistent prosecution. CLH has always respected the Court's commitment to ensuring that Claimants received a fair process and that the litigation was managed in a manner worthy of the people it served. Judge Rodgers's willingness to go well beyond the ordinary level of personal involvement is a large part of why CLH has confidence in respectfully bringing this objection to the Court.

CLH is not asking the Court to reward parochial firm interest over the common benefit. CLH asks the Court to ensure that the fee allocation reflects the very common benefit principles this Court protected throughout the MDL. When measured against customary treatment of leadership and result-producing work in comparable common benefit proceedings, comparable fee-allocation principles support an upward adjustment because CLH's work carried the kind of responsibility, risk, efficiency, leadership, and litigation-wide value that courts

29

traditionally recognize when allocating common benefit fees in complex litigation.

CLH also committed to the success of the litigation through sustained financial support including making the third-highest contribution in held costs and $1,112,500.00 in capital contributions "necessary to fund the litigation as a whole" (Dkt. 488 at 7), neither of which were reimbursed until the Court's order authorizing such reimbursement in January 2024. Dkt. 4129 at 8. Indeed, due to its many attorneys serving in leadership roles, CLH had contributed more capital contributions than any other firm.

CLH was involved in every critical aspect of the litigation, including the development of the legal claims and theories, case management, discovery, depositions, document review, expert development, Science Day, law and briefing, numerous bellwether pretrial conferences and trials, and settlement negotiations. Dkt. 4129 at 7-11.

The concern is not simply that CLH believes its own contributions should have been valued more highly. The concern is that, when measured against the record as a whole, the recommended allocation appears to place CLH behind firms with materially fewer accepted common benefit hours, materially smaller capital commitments, and less sustained involvement in the leadership structure. CLH does not seek to diminish the work of any other firm, and it recognizes that many firms made meaningful contributions to the common benefit; however, common benefit

30

allocations must be tied to relative contribution, risk, investment, responsibility, and litigation-wide value. A recommendation that ranks CLH seventh among common benefit contributors does not fairly reflect the comparative record. CLH respectfully submits that the Court should consider whether the recommended allocation appropriately values that work relative to firms whose investment, hours, risk, and litigation-wide responsibilities were substantially less.

## CONCLUSION

CLH respectfully brings this objection because it trusts the same careful oversight that guided this MDL from inception through settlement. Judge Rodgers's handling of 3M has not gone unnoticed by those who carried this litigation for the benefit of servicemembers. CLH asks only that the final common benefit allocation reflect those same principles of fairness and accountability, and that CLH's award be increased to account for its early risk, sustained commitment, leadership, common benefit infrastructure, wave work, trial support, and settlement contributions. Pursuant to the Court's "equitable and inherent managerial power over this consolidated and multidistrict litigation" (CBO No. 1 at 2) and in the interests of justice and fairness, CLH respectfully requests that the Court increase its recommended common benefit fee award from 5.00% to an amount in excess of 10.00% of the common benefit fee pool.

31

32

Dated: June 25, 2026

Respectfully submitted,

*/s/ Shelley V. Hutson*
Clayton A. Clark
Texas Bar No. 04275750
Shelley V. Hutson
Texas Bar No. 00788878
W. Michael Moreland
Texas Bar No. 24051080
Jason M. Milne
Texas Bar No. 24109314
**CLARK, LOVE & HUTSON, PLLC**
400 Louisiana St., Ste. 1700
Houston, Texas 77002
Telephone:  (713) 757-1400
cclark@triallawfirm.com
shutson@triallawfirm.com
mmoreland@triallawfirm.com
jmilne@triallawfirm.com

## **CERTIFICATE OF WORD COUNT**

Pursuant to Local Rule 7.1(F) of the United States District Court for the Northern District of Florida, I hereby certify that the foregoing Memorandum contains 7,794 words, as determined by the word-count function of Microsoft Word. The word count includes headings, footnotes, and quotations, and excludes the case caption, signature block, Certificate of Word Count and Certificate of Service, as permitted by Local Rule 7.1(F).

*/s/ Shelley V. Hutson*
Shelley V. Hutson

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2026, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

*/s/ Shelley V. Hutson*
Shelley V. Hutson